1                    UNITED STATES DISTRICT COURT

2                    DISTRICT OF MASSACHUSETTS

3     _____

4     UNITED STATES OF AMERICA,

5                         Plaintiff,        Criminal Action
                                            No. 17-cr-10305-ADB
6     v.
                                            June 7, 2019
7     JOSEPH BAPTISTE and
      ROGER RICHARD BONCY,                  Pages 1 to 145

8                         Defendants.

9     _____

10

11

12

13

14               TRANSCRIPT OF EVIDENTIARY HEARING
           BEFORE THE HONORABLE ALLISON D. BURROUGHS
15               UNITED STATES DISTRICT COURT
                JOHN J. MOAKLEY U.S. COURTHOUSE
16                    ONE COURTHOUSE WAY
                 BOSTON, MASSACHUSETTS  02210

17

18

19

20

21

22                    JOAN M. DALY, RMR, CRR
23                    Official Court Reporter
                  John J. Moakley U.S. Courthouse
24                 One Courthouse Way, Room 5507
                    Boston, Massachusetts  02210
25                    joanmdaly62@gmail.com

1    APPEARANCES:

2

3    FOR THE GOVERNMENT:

           KRISS BASIL
4          ELINA RUBIN-SMITH
           Assistant U.S. Attorneys
5          U.S. Attorney's Office
           John J. Moakley Courthouse
6          Suite 920
           One Courthouse Way
7          Boston, Massachusetts 02210
           617.748.3144
8          kriss.basil@usdoj.gov
           elina.rubin-smith@usdoj.gov

9

10   FOR THE DEFENDANT JOSEPH BAPTISTE:

11         DONALD LAROCHE, ESQUIRE
           Law Office of Donald LaRoche, PLLC
12         3360 Post Office Road #1801
           Woodbridge, Virginia 22195
13         774.204.1016
           dlaroche@dlesq.net

14

15   FOR THE DEFENDANT ROGER RICHARD BONCY:

16         JARED E. DWYER, ESQUIRE
           Greenberg Traurig, P.A.
17         333 S.E. 2nd Avenue
           Miami, Florida 33131
18         305.579.0564
           dwyerje@gtlaw.com

19

20

21

22

23

24

25

INDEX OF WITNESSES

WITNESS                                                      PAGE

SPECIAL AGENT PETER ANDERSON

    Direct Examination By Mr. Dwyer.....................   7
    Redirect Examination By Mr. Dwyer...................  49
    Recross Examination By Ms. Rubin-Smith..............  51

JAMAL CRAIG KING

    Direct Examination By Mr. Dwyer.....................  54
    Cross Examination By Mr. Basil......................  66
    Redirect Examination By Mr. Dwyer...................  71
    Recross Examination By Mr. Basil....................  72

SPECIAL AGENT GARETT TROMBLY

    Direct Examination By Mr. Dwyer.....................  74
    Cross Examination By Mr. Basil......................  88
    Redirect Examination By Mr. Dwyer................... 117

E X H I B I T S

DEFENSE EXHIBIT                                    PAGE

          1.........................................  23

          2.........................................  74

          3.........................................  74

          4.........................................  74

          5.........................................  74

1          P R O C E E D I N G S

2              (The following proceedings were held in open

3    court before the Honorable Allison D. Burroughs, United

4    States District Judge, United States District Court, District

5    of Massachusetts, at the John J. Moakley United States

6    Courthouse, One Courthouse Way, Boston, Massachusetts, on

7    June 7, 2019.

8              The defendant, Roger Richard Boncy, is present with

9    counsel.  The Assistant U.S. Attorneys are present.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2                    (The following proceedings were held in open

3    court before the Honorable Allison D. Burroughs, United

4    States District Judge, United States District Court, District

5    of Massachusetts, at the John J. Moakley United States

6    Courthouse, One Courthouse Way, Boston, Massachusetts, on

7    June 7, 2019.

8                    The defendant, Roger Richard Boncy, is present with

9    counsel.  The Assistant U.S. Attorneys are present.)

10                   THE COURT:  I'm calling the case.  U.S. versus

11   Baptiste is called.

12                   MR. DWYER:  Your Honor, Mr. Dwyer on behalf of

13   Mr. Boncy who is present here in court.

14                   THE COURT:  And where is co-counsel and his client?

15                   MR. DWYER:  Your Honor, I had a telephone

16   conversation with him last night.  He indicated he was

17   traveling to Boston today and would be present at the

18   hearing.  Other than that, I have nothing to report to the

19   Court.

20                   THE COURT:  We can't start until he gets here.  Now

21   we have time to get you water.

22                   MR. BASIL:  Thank you, Your Honor.  I appreciate

23   the Court's accommodation.  For the record, Kriss Basil and

24   Elina Rubin-Smith for the Department of Justice on behalf of

25   the United States.  With us at counsel table is case agent

1   Garett Trombly who we also expect as the case agent to be

2   with us at counsel table during trial.

3           THE COURT:  Yes, that's fine.

4           MS. RUBIN-SMITH:  Good afternoon, Your Honor.

5           MR. BASIL:  For the record, Your Honor, although we

6   have reached out to Mr. LaRoche, we have heard exactly

7   nothing from him.

8           THE COURT:  Your motion.  He joined in it?

9           MR. BASIL:  Your Honor, he joined on the record at

10  the last hearing and you allowed it.

11          MR. DWYER:  Okay.

12          THE COURT:  Mr. LaRoche is here.  Call your

13  witness, please.

14          MR. DWYER:  Mr. Boncy calls Special Agent Peter

15  "Anderson".

16          THE CLERK:  Will you please raise your right hand.

17          (SPECIAL AGENT PETER ANDERSON duly sworn by the

18  Deputy Clerk.)

19                      DIRECT EXAMINATION

20  BY MR. DWYER:

21  **Q.**  Good afternoon, Mr. Anderson.

22  **A.**  Good afternoon.

23  **Q.**  That's a fake name, right?

24  **A.**  Yes, it is.

25  **Q.**  Your real first name is Peter, right?

1    **A.**  That's correct.

2    **Q.**  That's not a fake name?

3    **A.**  It is.

4    **Q.**  Are you okay with me calling you Special Agent Peter?

5    **A.**  That's fine.  Thank you.

6    **Q.**  We have limited time today.  So I'm going to move

7    quickly, and I apologize for that in advance.  Okay?

8    **A.**  Yes, sir.

9    **Q.**  You're an FBI agent?

10   **A.**  Yes, I am.

11   **Q.**  How long have you been one?

12   **A.**  A little over 11 years.

13   **Q.**  Where are you currently stationed?

14   **A.**  On the west coast.

15   **Q.**  And you are an undercover; is that correct?

16   **A.**  As one of my job duties, yes.

17   **Q.**  One of your job duties.  How long have you been an

18   undercover?

19   **A.**  Since 2012.

20   **Q.**  Do you do that on a fulltime basis, undercover work?

21   **A.**  No, I don't.

22   **Q.**  So you work cases as well?

23   **A.**  That's correct.

24   **Q.**  You're both a case agent and undercover for the FBI?

25   **A.**  That's true.

1   **Q.**   Did you get training as an undercover with the FBI?

2   **A.**   I went through a selection course.

3   **Q.**   Okay.  And other than the selection course, did you get

4   any training from the FBI on how to be an undercover, how to

5   run an undercover, that sort of thing?

6   **A.**   Some, yes.

7   **Q.**   Okay.  And tell us generally how long that training was.

8   **A.**   I would say, without being too specific, for a period of

9   weeks there have been trainings.

10  **Q.**   Periodic trainings?

11  **A.**   Yes.

12  **Q.**   Let me jump back to 2015.

13  **A.**   Yes, sir.

14  **Q.**   At some point in time were you assigned to an

15  investigation that was based here in Boston?

16  **A.**   Yes, sir.

17  **Q.**   And were you assigned in your undercover capacity?

18  **A.**   Yes, I was.

19  **Q.**   Did you use the name Peter Anderson in that case?

20  **A.**   Yes, I did.

21  **Q.**   Approximately when were you assigned to the investigation

22  in Boston?

23  **A.**   In the fall of 2015 approximately.

24  **Q.**   Up until the fall of 2015, have you acted in any

25  undercover capacity in connection with that investigation?

1    **A.**   No.

2    **Q.**   The target of that investigation at that time was Joseph

3    Baptiste; is that correct?

4    **A.**   That's my understanding.

5    **Q.**   Okay.  When you got assigned, who was the case agent?

6    **A.**   Special Agent Vince Chambers.

7    **Q.**   Did you have an initial briefing with Mr. Chambers?

8    **A.**   Yes, I did.

9    **Q.**   Who was present at that initial briefing?

10   **A.**   I can't recall every person who was present for the

11   briefing.  But Special Agent Chambers was there.  I was

12   there.  Other FBI employees were there.

13   **Q.**   Okay.  Now, switching gears a little bit here.  As an

14   undercover, your job essentially is to aid the FBI in

15   gathering evidence, correct?

16   **A.**   That is correct.

17   **Q.**   And as an undercover you pose as a fictitious person,

18   correct?

19   **A.**   That's correct.

20   **Q.**   All right.  And when it comes to undercover activities,

21   one of the main pieces of evidence that you collect is

22   recordings, correct?

23   **A.**   That is one of the pieces of evidence I collect, yes.

24   **Q.**   Sometimes it's audio recordings, correct?

25   **A.**   That's correct.

1    **Q.**   Sometimes it's video recordings, correct?

2    **A.**   Correct.

3    **Q.**   And sometimes you use both video and audio recordings,

4    correct?

5    **A.**   Correct.

6    **Q.**   And sometimes when you conduct meetings you have multiple

7    recording devices involved, correct?

8    **A.**   Correct.

9    **Q.**   And part of the reason is that recording devices fail,

10   correct?

11   **A.**   That is true.

12   **Q.**   And the other part of the reason is that sometimes a

13   recording device won't pick up certain parts of the

14   conversation, correct?

15   **A.**   That's true.

16   **Q.**   And, for example, in the investigation of Mr. Baptiste

17   you had a meeting here in Boston on November 12, 2015,

18   correct?

19   **A.**   Correct.

20   **Q.**   And you were involved in that meeting, correct?

21   **A.**   Yes.

22   **Q.**   And Mr. Boncy was involved in that meeting, correct?

23   **A.**   Yes.

24   **Q.**   And Mr. Sales was there?

25   **A.**   Yes.

1    **Q.**  And there were multiple recording devices used at that

2    meeting, correct?

3    **A.**  Yes.

4    **Q.**  The other part is you work a lot of undercover cases

5    while this is going on, correct?

6    **A.**  I can at times work multiple cases at the same time.

7    **Q.**  And in 2015, three, four years ago, how many cases were

8    you working at the time?

9    **A.**  That was the only undercover case I was working.

10   **Q.**  That was the only undercover case you were working at the

11   time?

12   **A.**  That's correct.

13   **Q.**  Okay.  And one of the reasons you do recordings is to

14   preserve evidence, correct?

15   **A.**  Yes, sir.

16   **Q.**  Because you don't write generally reports about your

17   interactions with the targets of an investigation, correct?

18   **A.**  It depends on the circumstances.  But if there are

19   recordings, generally I do not.

20   **Q.**  Right.  Because from your perspective and from the FBI's

21   perspective, the best evidence is the recording, correct?

22   **A.**  Yes.

23   **Q.**  You rely on the recording itself, correct?

24   **A.**  I do.

25   **Q.**  Isn't it common practice at the FBI that you don't write

1   reports because you have the recording, correct?

2   **A.**  I would say that is some people's practice, yes.

3   **Q.**  Is that yours?

4   **A.**  Most often, yes.

5   **Q.**  Okay.  And it was your practice in this case, correct?

6   **A.**  It was.

7   **Q.**  You only wrote one 302 about a meeting, correct?

8   **A.**  I believe that's accurate.

9   **Q.**  So the recording device and the recording itself is

10  intended to preserve evidence of the interactions with the

11  targets of the investigation, correct?

12  **A.**  Yes, sir.

13  **Q.**  And before you have those recordings you actually plan

14  the interaction with the target of the investigation,

15  correct?

16  **A.**  At a general level, yes.

17  **Q.**  And you do that planning with a case agent, correct?

18  **A.**  That's correct.

19  **Q.**  And the general level is certain things that you're

20  looking to say, you want to hear what they'll say in relation

21  to what you say, correct?

22  **A.**  That's fair.

23  **Q.**  You will talk through, for lack of a better word, goals

24  and objectives of the recording.  Is that true?

25  **A.**  That's true.

1    **Q.**  You will do that with the case agent, correct?

2    **A.**  Yes.

3    **Q.**  After the recording you will walk through whether or not

4    you achieve those goals or failed to achieve those goals?

5    **A.**  Yes.  We will debrief after the meeting.

6    **Q.**  That debriefing, is it done orally?

7    **A.**  Yes.

8    **Q.**  Is it ever done in writing?

9    **A.**  Not often.

10    **Q.**  Okay.  Who's directing the undercover?

11    **A.**  When you say directing the undercover, can you be more

12    specific.

13    **Q.**  Can you go out and make a recording on your own?

14    **A.**  I would not do that, no.

15    **Q.**  Who would tell you to make a recording?

16    **A.**  The case agent.

17    **Q.**  Who would tell you what to say in the recording?

18    **A.**  Nobody would tell me specifically what to say in a

19    recording.

20    **Q.**  Okay.  But they would give you goals of what to say?

21    **A.**  Yeah.  I would say overall guidance.

22    **Q.**  And who is that?

23    **A.**  Specifically?

24    **Q.**  Yes.

25    **A.**  At times it was Special Agent Chambers.

1  **Q.** And was it ever Mr. Trombly?

2  **A.** Yes.  At times it was Special Agent Trombly.

3  **Q.** They were the case agents in the Baptiste matter,

4  correct?

5  **A.** That's correct.

6  **Q.** Now, the Baptiste investigation, we talked about it a

7  little bit earlier.  You were assigned in and around the fall

8  of 2015; is that correct?

9  **A.** That is correct.

10  **Q.** In connection with that investigation, you're posing as

11  an individual from SEW Funds, correct?

12  **A.** Yes.

13  **Q.** You worked with another undercover in that investigation,

14  correct?

15  **A.** Yes, I did.

16  **Q.** And that undercover went by the name Nello, correct?

17  **A.** That's correct.

18  **Q.** SEW Funds was posing as a potential investment fund,

19  correct?

20  **A.** That's true.

21  **Q.** Entirely fabricated though?

22  **A.** Correct.

23  **Q.** SEW Funds was posing as a fund that wanted to invest in

24  Haiti, correct?

25  **A.** Yes.

1   **Q.**  Specifically they wanted to invest in a "cement project",

2   right?

3   **A.**  Yes.

4   **Q.**  That cement project was brought to Nello, the other

5   undercover in the matter, by Mr. Baptiste, correct?

6   **A.**  I don't know specifically the origin of how that project

7   was brought to the attention of the FBI.

8   **Q.**  You were not briefed on how that project came in?

9   **A.**  Not all the details, no.

10  **Q.**  In connection with that investigation, there was a

11  meeting in Boston in or around November 12, 2015, correct?

12  **A.**  Yes.

13  **Q.**  During the course of that meeting there were discussions

14  about the cement project, correct?

15  **A.**  Yes.

16  **Q.**  And after that meeting, some time in later November, you

17  received an email from Mr. Boncy, correct?

18  **A.**  So I never individually received an email myself.  The

19  emails were maintained by the case agent.

20  **Q.**  Okay.  So the emails that would be addressed to you would

21  be not received by you?

22  **A.**  Correct.

23  **Q.**  Who would receive them?

24  **A.**  The case agent.

25  **Q.**  Would you review them?

1    **A.**  No.  I would be made aware of them.

2    **Q.**  You would be made aware of them.  How would you be made

3    aware of them?

4    **A.**  Verbally.

5    **Q.**  Would they ever be forwarded to you?

6    **A.**  I don't ever remember having them forwarded to me.

7    **Q.**  Okay.  Do you recognize this email?

8    **A.**  Can you give me a moment?

9    **Q.**  Yep.

10   **A.**  This is familiar to me, yes.

11   **Q.**  You recollect it?

12   **A.**  Yes.

13   **Q.**  Okay.  This is an email that was sent to you by Mr. Boncy

14   on November 20, 2015; is that correct?

15   **A.**  That's what it says, yes.

16   **Q.**  Okay.

17           MR. DWYER:  Your Honor, at this time I'd offer

18   Defendant's 1 for today's hearing only.

19           THE COURT:  Any objection from the government on

20   the email?

21           MR. BASIL:  Yes, Your Honor.  First, this is a

22   direct examination, not a cross, but we have cross

23   examination going on.  We are also well beyond the scope of

24   what the Court ordered today.

25           THE COURT:  That's what I was going to circle back

1  to.  It's a witness that is affiliated with the government.

2  He can lead the witness, first of all.  Second of all, my

3  understanding of the point -- I'll give you what time I can.

4  We can resume at 4:00, and you can have some time Monday

5  afternoon, too.  But my understanding that the point of this

6  was to flesh out the circumstances under which the tapes were

7  destroyed in order to figure out whether or not you're

8  entitled to a jury instruction on that.

9          And that, in part, turns on whether the destruction

10  was inadvertent, intentional, et cetera.  I will let you do

11  what you want, but I want to make sure we're all on the same

12  page about the purpose of today.

13          MR. DWYER:  Understood.  I think the purpose of

14  today is to establish the nature of the destroyed evidence,

15  whether it's apparently exculpatory or something else.  And

16  that's where this is going, Your Honor.  If it's apparently

17  exculpatory, the standard is much different than bad faith.

18          THE COURT:  Okay.

19          MR. BASIL:  Your Honor, just so we're clear, the

20  Court is going to -- it sounds like what we're going to

21  actually have is like a preview of the entirety of the case

22  as to Mr. Boncy and whether this piece of evidence was

23  exculpatory.  That's where he's going with this as he's

24  walking through.  That's beyond the scope of what the Court

25  talked about.

1          THE COURT:  In terms of what conclusions we're

2    going to draw and what we're going to do about the absence of

3    this evidence, I don't think he's wrong that the nature of

4    the evidence is relevant to how we're going to handle it,

5    right?  I think he's entitled to that.  I just want to make

6    sure we're all on the same page about what we're doing.

7          MR. DWYER:  Understood, Your Honor.

8          MR. BASIL:  For the Court's information, there is a

9    witness who Mr. Dwyer asked to be available today who is here

10   but had anticipated the hearing being at 12, there would be

11   time this afternoon.  His flight is at 6 p.m.  That witness

12   will not then be available until during trial next week.

13         So to the extent that the defendant needs to talk

14   to Special Agent, supervisory Special Agent Jamal King, who

15   is the person who ran this system or knows about the system,

16   he's available to testify.  But he will not be available to

17   testify when we resume at 4 p.m.

18         THE COURT:  He has a flight?

19         MR. BASIL:  Yes, Your Honor.  He has a flight to go

20   home.

21         THE COURT:  At 6?

22         MR. BASIL:  Yes, Your Honor.

23         THE COURT:  He could probably be here for some

24   period of time, somewhere between 4 and 5, right?

25         MR. BASIL:  Conceivably, Your Honor.

1          THE COURT:  How long do you want with that witness?

2          MR. DWYER:  Your Honor, I don't think I'm going to

3    need that witness for very long at all.

4          THE COURT:  Do you want to take him out of order

5    now or at 4?

6          MR. DWYER:  I'd prefer to get where we can with

7    this witness and take him out of order then.

8          THE COURT:  Okay.

9          MR. DWYER:  Do we go to the ELMO briefly, Your

10   Honor?

11         THE COURT:  Yes.  There's no ELMO in front of the

12   witness, there's no screen.

13   BY MR. DWYER:

14   **Q.**  Okay.  We'll do it the old-fashioned way.  You see this

15   document, count in 12 pages.  I apologize.  There's no Bates

16   stamp on it.  It's section five, financing.

17   **A.**  Five point --

18   **Q.**  It's 5.1?

19   **A.**  Okay.  Very good.

20   **Q.**  And at section 5.1 it says, "As further detailed in

21   Schedule B, factory shall include at least two phases

22   involving investment estimated at 84 million."

23         It's referencing there, however, Schedule B,

24   correct?

25   **A.**  It is.

1  **Q.**  Okay.  And Schedule B, which is, if you go to the very

2  last two pages of this exhibit, that's Schedule B.

3  **A.**  Yes.

4  **Q.**  If you go to the last page of the exhibit, it says -- at

5  the bottom it says, "Charitable contribution.  The party

6  agrees that JVC shall be required to invest 5 percent of its

7  annual net income for purposes of funding the 'social

8  program' established by the parties."

9         Do you see that?

10  **A.**  I do.

11  **Q.**  Okay.  So this was a document that was received by the

12  FBI, correct?

13  **A.**  Yes.

14         THE COURT:  Mr. Dwyer, you can still use the ELMO

15  for everything else.

16         MR. DWYER:  I just can't see it on my screen.

17         THE COURT:  The ELMO is re-initializing.  You can

18  use it.  We have the audio back up.  Today is cursed.

19  BY MR. DWYER:

20  **Q.**  So we just looked at the charitable contribution section.

21  It's 5 percent of its annual net income, correct?

22  **A.**  That's what that says.

23  **Q.**  Subsequent to the receipt of this, after you got -- after

24  the FBI gets this email and the attachment, you had a meeting

25  with Mr. Baptiste in New York City, correct?

1    **A.**   There was a meeting with Mr. Baptiste in New York City,

2    yes.

3    **Q.**   On December 16, 2015, correct?

4    **A.**   That's correct.

5    **Q.**   And it was just you and he, correct?

6    **A.**   That's correct.

7    **Q.**   All right.  No Mr. Boncy?

8    **A.**   No.  He was not present.

9    **Q.**   Okay.  And at this meeting with Mr. Baptiste you

10   discussed the "5 percent for social programs", correct?

11   **A.**   We did.

12   **Q.**   I am going to show you a transcript.

13            MS. SMITH:  Your Honor, we object to the use of

14   this transcript.  We have not received it in advance of the

15   hearing.

16            THE COURT:  What's the transcript from, please,

17   Mr. Dwyer?

18            MR. DWYER:  It's from an undercover recording that

19   the government provided.  I can play the recording, Your

20   Honor, if I can plug into the Court's audio system.  I have a

21   clip set up.

22            THE COURT:  There's no jury in the box.  It's just

23   me.

24            MS. SMITH:  I understand, Your Honor.  But we have

25   not had a chance to review the transcript.  The witness has

1    not had a --

2              THE COURT:  Play the tape, Mr. Dwyer.

3              MR. DWYER:  Understood, Your Honor.  If I can plug

4    it into the Court's audio.  It's one clip.

5    BY MR. DWYER:

6    **Q.**  It's you and Mr. Baptiste in a hotel room, correct?

7    **A.**  Yes.

8    **Q.**  During the course of this hotel room, you have a

9    conversation about the social programs, correct?

10    **A.**  Yes.

11    **Q.**  Do you recall what he told you?

12    **A.**  Not specifically.

13              THE COURT:  What are the dates of the tapes that

14    were destroyed?

15              MR. DWYER:  December 19, Your Honor.  This is

16    December 16.

17              THE COURT:  I know that.  Thank you.

18              (Defendant Exhibit No. 1 admitted.)

19              [Audio tape played and not transcribed.]

20    BY MR. DWYER:

21    **Q.**  Mr. Baptiste is describing 5 percent as something to be

22    put on the table, correct?

23    **A.**  That's what he says.

24    **Q.**  It's consistent with an earlier discussion you had with

25    him that it might potentially relate to some pay-offs, right?

1    **A.**   Correct.

2    **Q.**   So in this meeting you and Mr. Baptiste are talking about

3    the social programs saying social programs equals pay-offs,

4    correct?

5    **A.**   Correct.

6    **Q.**   That's the conversation you had with Mr. Baptiste?

7    **A.**   At that point.

8    **Q.**   And then during the course of this conversation you had a

9    discussion about -- do you recall having a discussion about

10   whether Mr. Boncy knew about this?

11   **A.**   I can't recall the specifics.

12   **Q.**   Okay.  So after this discussion you had a telephone --

13   two telephone calls with Mr. Boncy, correct?

14   **A.**   That's correct.

15   **Q.**   All right.  The two telephone calls with Mr. Boncy

16   occurred on approximately -- on December 19, 2015, correct?

17   **A.**   Yes, sir.

18   **Q.**   And Mr. Boncy was reaching out to you to speak with you,

19   correct?

20   **A.**   He did.

21   **Q.**   And ultimately you reached out to him, correct?

22   **A.**   Correct.

23   **Q.**   And you actually had two calls, correct?

24   **A.**   That's true.

25   **Q.**   Both on December 19?

1    **A.**  Yes.

2    **Q.**  And you placed those calls, correct?

3    **A.**  I did.

4    **Q.**  And you placed them from a phone that you were using as

5    an undercover, correct?

6    **A.**  That's correct.

7    **Q.**  It was a phone that was provided to you by the FBI,

8    correct?

9    **A.**  Correct.

10   **Q.**  And during those phone calls -- actually before we get

11   into those calls, this is the first time that you had spoken

12   to Mr. Boncy since your November 12 meeting, correct?

13   **A.**  That's true.

14   **Q.**  You'd spoken to Mr. Baptiste numerous times, correct?

15   **A.**  Yes.

16   **Q.**  You met in a hotel room in New York City with

17   Mr. Baptiste, correct?

18   **A.**  Yes.

19   **Q.**  And you had not talked to Mr. Boncy before the

20   November 12, 2015, meeting?

21   **A.**  Correct.

22   **Q.**  And your fellow undercover Nello had not spoken to

23   Mr. Boncy since November 12, 2015, correct?

24   **A.**  I can't speak for him.  I don't know.

25   **Q.**  You don't know whether the undercover in the case spoke

1    with the target of the investigation?

2    **A.**   No, I don't.

3    **Q.**   Okay.  Who would we ask about that?

4          MS. SMITH:  Your Honor, objection.  This is an

5    undercover agent who is a witness.  He's not a case agent.

6    He doesn't have the basis for this information.

7          THE COURT:  Overruled.

8    **A.**   Ask your question again, please.

9    BY MR. DWYER:

10   **Q.**   Who would we ask to know who knew what about what was

11   going on in the investigation?

12   **A.**   You could ask the undercover you're referencing.

13   **Q.**   Okay.  What about the case agent?  Who's directing the

14   investigation?

15   **A.**   The case agent.

16   **Q.**   Okay.  So as far as you know, this was only the second

17   contact that you had had with Mr. Boncy, correct?

18   **A.**   Yes.

19   **Q.**   And did you tell the case agent that you were going to

20   have these telephone calls?

21   **A.**   Yes.

22   **Q.**   Which case agent?

23   **A.**   Special Agent Trombly.

24   **Q.**   How did you tell him?

25   **A.**   Via telephone.

1    **Q.**   How long was the conversation?

2    **A.**   I can't remember.  It was three and a half years ago.

3    **Q.**   Okay.  What was discussed on that conversation?

4    **A.**   Just that I was to have a conversation with Mr. Boncy.

5    We were going to go over the contract, and I can't remember

6    the specifics.  Again it was three and a half years ago.

7    **Q.**   But you were going to go over the contract, correct?

8    **A.**   Yes.

9    **Q.**   And part of what you were going to go over was the social

10   programs, correct?

11   **A.**   I believe in the context we did discuss the social

12   programs, yes.

13   **Q.**   Okay.  And you had that discussion with Mr. Trombly?

14   **A.**   What discussion?

15   **Q.**   About what you were going to discuss?

16   **A.**   I think in a general sense we did, but I can't remember

17   the specifics.

18   **Q.**   Okay.  Do you keep notes of your goals or objectives of

19   your undercover recordings?

20   **A.**   No.

21   **Q.**   After this planning session, for lack of a better word,

22   with Mr. Trombly, did you reach out to Mr. Boncy?

23   **A.**   Yes.

24   **Q.**   Okay.  And that's when you had the two telephone calls?

25   **A.**   Correct.

1  **Q.**  And they totaled approximately, would you agree, about 40

2  minutes of conversation?

3  **A.**  I think that's about right.

4  **Q.**  It's actually you called one time.  Did he hang up or did

5  you hang up?

6  **A.**  I can't remember.

7  **Q.**  Okay.  Did he hang up angry?

8  **A.**  I don't recall that.

9  **Q.**  Did you hang up angry?

10  **A.**  I don't recall that.

11  **Q.**  Was he yelling at you?

12  **A.**  I don't recall that.

13  **Q.**  Okay.  You don't recall it, or it could have happened?

14  What is it?

15  **A.**  I don't recall being angry.  I don't recall him being

16  angry.

17  **Q.**  Okay.  Fair enough.  But you don't have the recording, so

18  you don't really know, correct?

19  **A.**  Correct.

20  **Q.**  Do you recall talking with him about pay-offs?

21  **A.**  I can't recall if we specifically talked either using

22  that term or an overview of that.

23  **Q.**  So you don't know whether you used the term pay-off?

24  **A.**  No, I don't.

25  **Q.**  Did you use the term "bribe"?

1    **A.**  I don't remember.

2    **Q.**  Is it possible that you did?

3    **A.**  It's possible.

4    **Q.**  Is it possible that you didn't?

5    **A.**  Yes.

6    **Q.**  Because we don't have the recording, correct?

7    **A.**  That's correct.

8    **Q.**  Right.  So you did talk about social programs, correct?

9    **A.**  I believe we did.

10   **Q.**  And when you talked with Mr. Boncy, he said something

11   very different than what Baptiste said, correct?

12   **A.**  In the context of some telephone calls, yes.

13   **Q.**  What does "in the context of some telephone calls" mean,

14   Special Agent?

15   **A.**  There was a subsequent telephone call with Mr. Baptiste

16   where we referenced the phone calls I had with Mr. Boncy.

17   **Q.**  And when you referenced the phone calls that you had with

18   Mr. Boncy in the subsequent call with Mr. Baptiste, you are

19   accurately relating what Mr. Boncy said to you on the

20   telephone, correct?

21   **A.**  I would say that's true.

22   **Q.**  Okay.  You weren't lying.  That was not a lie?

23   **A.**  No, I don't believe it was.

24   **Q.**  Okay.  And when you talked with Mr. Baptiste one day

25   after December 19, you told him that Mr. Boncy said something

1    very different about the social programs, correct?

2                    MS. SMITH:  Objection, Your Honor.

3                    THE COURT:  Basis?

4                    MS. SMITH:  The attorney is referencing a

5    transcript, and the transcript does not say what he is saying

6    it says.

7                    THE COURT:  Overruled.

8    BY MR. DWYER:

9    **Q.**  Would it help you to listen to the recording?

10   **A.**  It would.

11                   MR. DWYER:  Your Honor, I'd request to play a clip

12   from that phone call.

13                   THE COURT:  That's fine.  Go ahead.

14                   [Audio tape played and not transcribed.]

15   BY MR. DWYER:

16   **Q.**  You didn't know who to believe?

17   **A.**  That's what I said.

18   **Q.**  Because Baptiste says for pay-offs and Richard said it

19   was for something else, right?

20   **A.**  That is possible.

21   **Q.**  Why do you think it's possible?

22   **A.**  Because the technique used to elicit details from people

23   is to feign confusion about a topic.

24   **Q.**  Special Agent, you just testified that what you relayed

25   about your phone call with Mr. Boncy was accurate as to what

1    happened on the call with Mr. Boncy.

2    **A.**   I can't remember exactly what we spoke about on the call,

3    sir.

4    **Q.**   I understand that.  So you're saying that you could have

5    been making this up or maybe you weren't making it up?

6    **A.**   No, sir.  That's not accurate.  The way it's

7    characterized in my call with Mr. Baptiste is to allow him to

8    explain more about what the 5 percent is for.

9    **Q.**   But isn't it true that Mr. Boncy told you something

10   different than what Baptiste told you in New York?

11   **A.**   I believe he did, yes.

12   **Q.**   And it indicated this was not for pay-offs, correct?

13   **A.**   It could have, yes.

14   **Q.**   Let's listen to the rest of the recording.

15            MR. DWYER:  Your Honor, I'd ask to put the

16   transcript in front of the witness although the government

17   has not seen it yet.  I think the witness was a participant

18   to it, and I think it would make it easier to go back and

19   forth.

20            THE COURT:  I'm sure it would make it easier for

21   him, but they're objecting to it, and he hasn't had a chance

22   to review it either.

23            MR. DWYER:  Understood.

24            [Audio tape played and not transcribed.]

25   BY MR. DWYER:

1    **Q.** You said there, "Because when you and I talked, my

2    understanding was that's money to pay off politicians."

3            Did you hear that?

4    **A.** Yes.

5    **Q.** That's your voice?

6    **A.** Yes.

7    **Q.** And Richard said something different than that, correct?

8    **A.** I believe he did.

9    **Q.** On the telephone?

10    **A.** Yes.

11    **Q.** On the 19th?

12    **A.** Yes.

13    **Q.** And the heart of this case is a conspiracy basically to

14    pay off politicians, correct?

15    **A.** Yes.

16    **Q.** And Richard said something different than that, correct?

17    **A.** I believe he did.

18    **Q.** And when I say Richard, I mean Mr. Boncy.

19    **A.** Yes, sir.

20    **Q.** And, in fact, the cement project that you were planning

21    on doing with Mr. Baptiste and Mr. Boncy, you didn't go

22    forward with it, correct?

23    **A.** That's correct.

24    **Q.** It was issues about the financing, the budget, political

25    unrest in Haiti, correct?

1    **A.**  Yes.

2    **Q.**  That was what you have claimed, right?

3    **A.**  Yes.

4    **Q.**  Okay.  So in this same phone call you had discussions

5    about doing other projects with Mr. Baptiste, correct?

6    **A.**  I believe so.

7    **Q.**  But you wanted to make sure that Richard wasn't involved,

8    correct?

9    **A.**  I don't know what you're referencing.

10    **Q.**  Okay.

11         MR. DWYER:  Your Honor, if I could play another

12    clip?

13         THE COURT:  Yes.

14         MR. DWYER:  If I could just set it up.

15    BY MR. DWYER:

16    **Q.**  You were talking to Mr. Baptiste about potentially

17    bringing into Miami the finance minister from Haiti, correct?

18    **A.**  Correct.

19    **Q.**  His name is Lalo, is that right?

20    **A.**  I believe so.

21    **Q.**  That's what you understood?

22    **A.**  At the time, yes.

23    **Q.**  You wanted him to come in and pitch you on some deals,

24    and maybe you would make another undercover corrupt scheme in

25    that deal, correct?

1    **A.**  It's a possibility, yes.

2    **Q.**  That was the goal?

3    **A.**  Mm-hmm.

4    **Q.**  Okay.

5             [Audio tape played and not transcribed.]

6    BY MR. DWYER:

7    **Q.**  You were asking if Richard has anything to do with those

8    projects?

9    **A.**  Yes.

10   **Q.**  Who cares?  Why did you?

11            MS. SMITH:  Objection, Your Honor.

12   BY MR. DWYER:

13   **Q.**  Why did you ask that question?

14            THE COURT:  Hold on a second.  What's the basis?

15            MS. SMITH:  Argumentative.  Commentary.

16            THE COURT:  Overruled.

17   **A.**  Can you ask your question again, please?

18   BY MR. DWYER:

19   **Q.**  You asked if Richard had anything to do with these

20   projects, correct?

21   **A.**  Yes.

22   **Q.**  And that's, in part, because Richard did not seem to be

23   on board with what Baptiste was talking about, correct?

24   **A.**  I just wanted to understand if Boncy was involved with

25   these other projects.

1   **Q.**  Okay.

2               [Audio tape played and not transcribed.]

3   BY MR. DWYER:

4   **Q.**  Isn't it true, Agent, you're trying to make sure that

5   Richard has no part of those projects?

6   **A.**  No.

7   **Q.**  You raised it again in the same call.  Do you recall

8   that?

9   **A.**  No, I don't.

10              MR. DWYER:  May I play another clip?

11              THE COURT:  Sure.

12              [Audio tape played and not transcribed.]

13  BY MR. DWYER:

14  **Q.**  So that's the second time you said, "If it doesn't have

15  to do with Richard, that's fine with me.  We'll move

16  forward."

17  **A.**  That's correct.  If these new projects being discussed

18  did not involve Boncy, then we'll move forward without Boncy.

19  **Q.**  And, of course, the day before you had spoken with

20  Mr. Boncy for 40 minutes.  And during that call Mr. Boncy had

21  made clear that the social programs had indicated something

22  different than what Baptiste said, correct?

23  **A.**  Different, correct.

24  **Q.**  Baptiste says pay-offs.  Richard says something

25  different, correct?

1   **A.**  Correct.

2   **Q.**  To a point that you called Baptiste to follow up on it,

3   correct?

4   **A.**  Correct.

5   **Q.**  Okay.  And the case agent knew that, correct?

6   **A.**  We debriefed after my telephone calls with Boncy.

7   **Q.**  You told him that Boncy says social programs don't have

8   anything to do with pay-offs.  What did you tell him?

9   **A.**  I can't remember specifically, sir, what we talked about

10  three and a half years ago after my telephone calls with

11  Boncy.

12  **Q.**  Why didn't you write it down?

13  **A.**  Because we don't do that.

14  **Q.**  Why not?

15  **A.**  Because the calls have been recorded.

16  **Q.**  Were they?

17  **A.**  They were recorded.

18  **Q.**  You listened to it?

19  **A.**  I did not.

20  **Q.**  Who listened to it?

21  **A.**  I don't know.

22  **Q.**  Did the case agent?

23  **A.**  I don't know.

24  **Q.**  Where are they today?

25  **A.**  I couldn't tell you.

1    **Q.**  What did you do to secure the evidence?

2    **A.**  I used the FBI's auxiliary system to record the testimony

3    phone calls.  I had no reason to believe it had

4    malfunctioned.

5    **Q.**  Did it malfunction?

6    **A.**  I don't believe it did.

7    **Q.**  You don't know?

8    **A.**  Correct.

9    **Q.**  Nobody knows?

10   **A.**  I don't know.

11   **Q.**  Okay.  But what we do know is there was a call with a

12   target of an investigation, correct?

13   **A.**  Yes, sir.

14   **Q.**  Then there was a second call with the target of the

15   investigation, correct?

16   **A.**  That's correct.

17   **Q.**  And on those calls he said something different than what

18   was the heart of the charged conspiracy, correct?

19   **A.**  He said something different, yes, sir.

20   **Q.**  Okay.  And those calls were not saved by the FBI,

21   correct?

22   **A.**  I don't know what happened to those calls, sir.

23   **Q.**  And you couldn't get up on the stand and give us 40

24   minutes of back and forth to say what happened on that phone

25   call, correct?

1    **A.**  No, sir.  It was three and a half years ago.

2    **Q.**  I understand that.  I have a hard time three and a half

3    weeks ago.  It's fair.  That's why you record, correct?

4    **A.**  That's correct.

5    **Q.**  But you're supposed to do something with the evidence,

6    correct?

7    **A.**  Can you be more specific?

8    **Q.**  You're supposed to preserve it?

9    **A.**  It was recorded.

10   **Q.**  You're supposed to preserve it, correct?

11   **A.**  Evidence should be preserved, yes.

12   **Q.**  That's FBI policy, correct?

13   **A.**  Yes.

14   **Q.**  Preserve the evidence?

15   **A.**  Yes, it is.

16   **Q.**  So in this case whose job was it to preserve that

17   evidence?

18   **A.**  I can't say specifically, sir.  I made the phone calls,

19   and that was the end of my involvement with that evidence.

20   **Q.**  But how do you make sure that the evidence gets saved?

21   **A.**  That was not my role.

22   **Q.**  I understand that.  But your job, as you said, is to make

23   recordings.  It's the best evidence that the FBI can get.

24   How do you make sure that that is preserved?

25   **A.**  I trust in the system that I used.

1    Q.  And what is that system?

2    A.  I refer to it as an auxiliary recording system that the

3    FBI has.

4    Q.  Did it work?

5    A.  I have no reason to think that it didn't.

6    Q.  How do you double-check that it works?

7    A.  I don't.

8    Q.  Have you ever double-checked that it works?

9    A.  No.

10   Q.  Do you now double-check that it works?

11   A.  No.

12   Q.  You still don't care?

13   A.  I wouldn't characterize it that way.

14          MS. SMITH:  Objection, Your Honor.  Argumentative.

15          THE COURT:  Overruled.

16          MR. DWYER:  Your Honor, if I can just have a

17   moment.  You said you needed to quit at 12:45, correct?

18          THE COURT:  If you can finish with him, and I can

19   possibly go a few minutes over and get the cross done, I'm

20   going to do that.

21          MR. DWYER:  Okay.

22   BY MR. DWYER:

23   Q.  Let me just double-check.  There is no email that relates

24   to contents of the two lost calls?

25   A.  Not that I'm aware of.

1    **Q.**  No FBI 302?

2    **A.**  Not that I'm aware of.

3    **Q.**  Any other type of written report?

4    **A.**  Not that I'm aware of.

5    **Q.**  And you told essentially -- you told the case agent in

6    this case that on that call Boncy had said something

7    different than Baptiste about what was going on with the

8    social programs, correct?

9    **A.**  The case agent and I debriefed over the telephone after

10   the call.  I don't recall exactly what we spoke about, but it

11   was a general discussion about what took place on the calls

12   with the knowledge that the calls had been recorded.

13   **Q.**  And what took place on the calls, just so it's clear,

14   generally, you can't remember the specifics, is that Richard

15   Boncy said that the social programs were for something other

16   than pay-offs, correct?

17   **A.**  They were for something different.

18   **Q.**  Different than pay-offs, right?

19   **A.**  I believe so.

20   **Q.**  And the facts that social programs were for pay-offs are

21   what you believed to make the scheme illegal, correct?

22   **A.**  That was part of the scheme, yes.

23        MR. DWYER:  No further questions, Your Honor.

24                   CROSS EXAMINATION

25   BY MS. RUBIN-SMITH:

1    **Q.**   Good afternoon, Agent.

2    **A.**   Good afternoon.

3    **Q.**   Did you record the calls that you made in this case?

4    **A.**   Yes, I did.

5    **Q.**   How did you record them?

6    **A.**   I used the FBI's auxiliary monitoring program.

7    **Q.**   Were you also aware that there was a Title III wiretap in

8    this case?

9    **A.**   Yes, I was.

10   **Q.**   When you were recording the calls in this case, how long

11   did you think those calls would be preserved?

12   **A.**   Indefinitely.

13   **Q.**   Where did you think they would be preserved?

14   **A.**   On a computer system somewhere.

15   **Q.**   Have you previously used this auxiliary system to record

16   calls in other cases?

17   **A.**   Yes.

18   **Q.**   Were you an undercover in those other cases?

19   **A.**   Yes.

20   **Q.**   How many times have you used this system to record calls

21   in other cases?

22   **A.**   Dozens.

23   **Q.**   In those other cases, was it your job to actually

24   download or preserve the calls that were recorded?

25   **A.**   No.

1  **Q.**  So was it your job just to make the recording?

2  **A.**  Yes.

3  **Q.**  Directing your attention to these two December 19 calls

4  with defendant Boncy, did you have any reason to believe that

5  your recording was unsuccessful?

6  **A.**  No.

7  **Q.**  Did you tell anyone, any of the case agents, to destroy

8  the recording?

9  **A.**  No.

10  **Q.**  Did anyone at the FBI tell you that the recording was

11  destroyed?

12  **A.**  No.

13  **Q.**  Did anyone in the case tell you that Mr. Boncy was no

14  longer a target of the investigation?

15  **A.**  No.

16  **Q.**  There was discussion of the 5 percent and the social

17  programs.  Directing your attention to a meeting that you had

18  on November 12, 2015, was Mr. Boncy at that meeting?

19  **A.**  He was.

20  **Q.**  Was Mr. Baptiste at that meeting?

21  **A.**  Yes.

22  **Q.**  Was there a discussion of social programs at that

23  meeting?

24  **A.**  Yes.

25  **Q.**  What was the context of that discussion?

**A.**   The context of the discussion was that the social
programs were needed to ensure the success of the cement
factory being built in Haiti.

**Q.**   And were the social programs described to you by
Mr. Baptiste and Mr. Boncy?

**A.**   Yes.

**Q.**   How were they described?

**A.**   Described as money that would be used for the benefit of
local politicians.

**Q.**   Did you understand that social programs included bribes?

**A.**   Yes.

**Q.**   Was a 5 percent number discussed in the context of social
programs?

**A.**   Yes, it was.

**Q.**   Were bribes discussed using other terms at that meeting
as well?

**A.**   Yes.

**Q.**   What kinds of terms were used to discuss bribes at that
meeting?

**A.**   I believe that day the term "pay to play" was used.

**Q.**   Was the term "unforeseen expenses" also used to describe
bribes?

**A.**   Unforeseen expenses was used.

            MR. DWYER:  Your Honor, I am going to object here.
If we can get some foundation as to who is saying what.  I

1    think it's important.  There's multiple people in this

2    meeting.

3              THE COURT:  I think her point is that he's there

4    when it's being discussed.  So he's hearing it if he's not

5    saying it.  If you, on those things pay to play and

6    unforeseen expenses, if you can try and elicit who said it.

7    BY MS. RUBIN-SMITH:

8    Q.  Was Mr. Boncy present at the meeting when those terms

9    were discussed?

10   A.  Yes.

11   Q.  Did Mr. Boncy ever say that social programs would not be

12   used to pay bribes?

13   A.  No.

14   Q.  Did Mr. Boncy ever say that unforeseen expenses are for

15   something else other than bribes?

16   A.  No.

17   Q.  Did Mr. Boncy tell you what he did, what his job was?

18   A.  Yes.

19   Q.  What did he tell you about his job?

20   A.  He was the CEO of the company.

21   Q.  Which company?

22   A.  Haiti Invest.

23   Q.  Did Mr. Boncy also tell you that he used to work in

24   compliance?

25   A.  Yes.  He described to me his extensive career with

1    compliance with Honeywell and another company I believe

2    called Medtronic.

3    **Q.**   And Mr. Sales, was his job described to you?

4    **A.**   Yes.

5    **Q.**   Was he at the meeting the entire time?

6    **A.**   He was.

7    **Q.**   What was his job?

8    **A.**   His job was as a member in Haiti Invest.

9    **Q.**   Was he also described as a lawyer?

10   **A.**   I believe he was, yes.

11   **Q.**   Did Mr. Baptiste refer to Mr. Boncy and Mr. Sales as

12   lawyers?

13   **A.**   He did.

14   **Q.**   What did he say about their job as lawyers?

15   **A.**   With regards to Haiti Invest?

16   **Q.**   Anything that you remember about what he said as their

17   job as lawyers at that meeting?

18   **A.**   He said that their job as lawyers was to -- there was

19   specific language used to describe everybody's roles in the

20   meeting, and I don't want to misspeak by saying it

21   incorrectly.

22   **Q.**   Do you remember Mr. Sales mentioning corrupt practice?

23   **A.**   Yes.

24   **Q.**   In what context was that mentioned?

25   **A.**   Mentioned that we cannot have corrupt practice, I believe

1    is what he said.

2    **Q.**  Was that in the same conversation that social programs

3    were discussed in terms of bribes?

4    **A.**  Yes.

5    **Q.**  Were you aware of the content of the calls that were

6    intercepted on the Title III wiretap on Mr. Baptiste's phone?

7    **A.**  No.

8    **Q.**  Did you know who Mr. Baptiste was talking to?

9    **A.**  No.

10   **Q.**  Were you aware of any Title III wiretap calls between

11   Mr. Baptiste and Mr. Boncy or the concept of the of those

12   calls?

13   **A.**  No, I wasn't.

14   **Q.**  Were you aware of the context of emails that were

15   exchanged between Mr. Boncy and Mr. Baptiste?

16   **A.**  No, I wasn't.

17   **Q.**  You were asked whether Mr. Boncy was angry during his

18   phone call with you on December 19?

19   **A.**  I was.

20   **Q.**  I'm sorry?

21   **A.**  I was asked that, yes.

22   **Q.**  And do you recall Mr. Boncy being angry?

23   **A.**  No, I don't.

24   **Q.**  Does that mean you don't remember it, or you remember

25   that he was not angry?

1    **A.**   I don't remember him being angry during that phone call.

2    **Q.**   If Mr. Boncy were angry during that phone call, do you

3    think you would have remembered it?

4              MR. DWYER:  Objection.  Calls for speculation.

5              THE COURT:  Overruled.

6    **A.**   I believe I would remember that, yes.

7    BY MS. RUBIN-SMITH:

8    **Q.**   Why is that?

9    **A.**   Because it's an emotional response, and I would likely

10   have a stronger memory of a conflict or confrontation with

11   someone than I would if the conversation were benign.

12   **Q.**   Now, in terms of what led to that December 19 call, do

13   you remember anything about the cost of the project?

14   **A.**   Yes.

15   **Q.**   What do you remember about that?

16   **A.**   I remember that I had been told by the case agent that

17   the cost of the project had been communicated as going up by

18   I think $24 million.

19   **Q.**   Was that one of the reasons for your call?

20   **A.**   Yes.

21   **Q.**   Now, the meeting with Baptiste in Miami on December 29,

22   2015, do you know the purpose of that meeting?

23   **A.**   It was to go over again additional contract information.

24   **Q.**   Do you know if there were any other purposes that the FBI

25   had for that meeting?

**A.**  I believe it was possible that a confrontation would take place between the FBI and Mr. Baptiste.

**Q.**  Did a confrontation take place?

**A.**  Yes, it did.

**Q.**  When you asked in the recording that defense counsel played if Richard is involved in other projects with Lalo, why did you ask that?

**A.**  I just wanted to understand the scope of involvement for these additional involvements which were being discussed.

**Q.**  Is that part of your job as an undercover?

**A.**  Yes, it is.

**Q.**  Did you ever tell --

    MS. SMITH:  May I have a moment, Your Honor?

    THE COURT:  Yes.

BY MS. RUBIN-SMITH:

**Q.**  One more question, Agent.  Do you recall Mr. Baptiste ever telling you that Boncy would be careful in discussing bribery with you?

**A.**  Yes.

**Q.**  What did Mr. Baptiste say about that?

**A.**  He says he has to be careful.  He wanted to insulate himself.  He didn't want to talk like that.  Things of that effect, words of that effect.

    MS. SMITH:  Thank you.  Nothing further.

    MR. DWYER:  Brief redirect?

1          THE COURT:  Yes.

2                    REDIRECT EXAMINATION

3    BY MR. DWYER:

4    **Q.**  Agent, the meeting in Boston that was discussed on cross

5    examination with Ms. Rubin-Smith, you testified that

6    Mr. Boncy was present when the term "pay to play" was used?

7    **A.**  No.  That term was used during the Boston meeting on

8    November 12.

9    **Q.**  Okay.  Was Mr. Boncy present when that term was used?

10   **A.**  I don't believe he was present when that specific term

11   was used.

12   **Q.**  Okay.  And then you also talked about the social programs

13   being used -- or the 5 percent being used to pay bribes.  Was

14   Mr. Boncy present for that conversation?

15   **A.**  I don't believe he was present for that conversation.

16   **Q.**  Because you had a side conversation with Mr. Baptiste,

17   correct?

18   **A.**  That is correct.

19   **Q.**  You took him into another room, correct?

20   **A.**  Correct.

21   **Q.**  He and you spoke very, for lack of a better word, dirty

22   talk with Mr. Baptiste?

23   **A.**  We were using very clear language.

24   **Q.**  You used pay to play with Mr. Baptiste, and you talked

25   about the 5 percent being the amount for bribes with

1    Mr. Baptiste?

2    **A.**   Correct.

3    **Q.**   But those conversations didn't occur in the presence of

4    Mr. Boncy, correct?

5    **A.**   Those specific conversations did not occur in his

6    presence.

7    **Q.**   I just wanted to clear that.  You testified that you

8    would believe these recordings would have been retained

9    indefinitely?

10   **A.**   Yes, sir.

11   **Q.**   What's the basis for that?

12   **A.**   Because it's evidence, and it's recorded.

13   **Q.**   Okay.  But just because you record it, it's retained

14   indefinitely?

15   **A.**   That is what I assumed.

16   **Q.**   And what was that assumption based on?

17   **A.**   Just being an FBI agent and the fact we're recording

18   evidence.

19   **Q.**   Have you ever heard the term ELSUR?

20   **A.**   I believe it's pronounced ELSUR, but yes.

21   **Q.**   ELSUR.  It's an acronym, right?

22   **A.**   It is.

23   **Q.**   What does it stand for?

24   **A.**   I believe it stands for electronic surveillance.

25   **Q.**   That is the FBI's way to retain electronic surveillance,

1    correct?

2    **A.**   That's the term we use, yes.

3    **Q.**   How did you confirm -- and frankly policy requires you to

4    check in electronic evidence to ELSUR, correct?

5    **A.**   When electronic evidence is collected, policy is that it

6    is turned in, yes.

7    **Q.**   How did you ensure that the two phone calls with

8    Mr. Boncy was checked into ELSUR?

9    **A.**   I didn't.

10   **Q.**   You didn't.  Who confirmed that it was checked into

11   ELSUR?

12   **A.**   I don't know.

13   **Q.**   Was it checked into ELSUR?

14   **A.**   I don't know.

15   **Q.**   Sitting here today you still don't know?

16   **A.**   No, I don't.

17   **Q.**   But it's FBI policy to check in all electronic evidence

18   into ELSUR?

19   **A.**   Yes.

20           MR. DWYER:  If I could just have a moment, Your

21   Honor.  Nothing further, Your Honor.

22           THE COURT:  Recross?

23                      RECROSS EXAMINATION

24   BY MS. RUBIN-SMITH:

25   **Q.**   Agent, you were asked about why you thought evidence was

1    preserved indefinitely in terms of recording.

2    **A.**  Yes.

3    **Q.**  Do you know how long wiretap evidence is preserved?

4    **A.**  No, I don't.

5    **Q.**  You were asked about some statements that were made at

6    the November 12 meeting in the conference room?

7    **A.**  Yes.

8    **Q.**  Okay.  Do you recall a statement where Mr. Boncy said he

9    hasn't paid a cent yet?

10   **A.**  Yes.

11   **Q.**  And do you recall Mr. Baptiste saying that it takes

12   longer because he doesn't want to spend the money?

13   **A.**  Yes.

14   **Q.**  And do you recall Mr. Boncy saying "if I had the funds"?

15   **A.**  I do.

16   **Q.**  Do you recall Mr. Boncy saying he gets information from

17   the Bureau of Mines?

18   **A.**  Yes.

19   **Q.**  And do you recall what he said about the need to pay

20   them?

21   **A.**  I don't recall specifically what he said.

22   **Q.**  Do you recall him saying that he doesn't need to pay

23   them?

24   **A.**  Yes.

25   **Q.**  And do you recall confirming that they don't need to get

1    paid?

2    **A.**  Yes.

3    **Q.**  And do you recall his response being "for those guys,

4    no."

5    **A.**  I do remember that.

6    **Q.**  Now, do you remember Mr. Baptiste and Mr. Sales

7    discussing the 5 percent of unforeseen expenses being built

8    into the proposal?

9    **A.**  Yes.

10   **Q.**  Was that in the context of bribery expenses?

11   **A.**  Yes.

12   **Q.**  Was Mr. Boncy present during that discussion?

13   **A.**  Yes, he was.

14   **Q.**  Did Mr. Boncy say anything to contradict those

15   statements?

16   **A.**  No, he did not.

17   **Q.**  Did you attempt to be clear in that meeting, in the group

18   meeting with Mr. Boncy and Mr. Baptiste and Mr. Sales, that

19   when you were talking about unforeseen expenses and social

20   programs, that you had the same understanding you were

21   discussing bribes?

22   **A.**  Yes.

23   **Q.**  And did you use the words "pay to play" to confirm that

24   you all had the same understanding?

25   **A.**  I believe I did.

1    MR. DWYER:  Objection.  Never mind, Your Honor.

2    Let it stand.

3    MS. SMITH:  Nothing further.

4    THE COURT:  All right.  I'll see you all back at 4.

5    MR. DWYER:  Thank you, Your Honor.

6    (Court recessed at 12:57 p.m.)

7    THE CLERK:  Can you please raise your right hand.

8    (JAMAL CRAIG KING duly sworn by the Deputy Clerk.)

9    THE CLERK:  Can you please state your name and

10   spell your last name for the record.

11   THE WITNESS:  My full name is Jamal Craig King.

12   Last name is spelled K-I-N-G.

13   MR. DWYER:  Your Honor, may I inquire?

14   THE COURT:  Yes.

15   MR. DWYER:  For the record Jed Dwyer on behalf of

16   Mr. Boncy.  Present with me here at counsel table is

17   Mr. Boncy.

18                   DIRECT EXAMINATION

19   BY MR. DWYER:

20   **Q.**  Special Agent King, did you prepare an affidavit in

21   connection with a response to a motion?

22   **A.**  I did.

23   **Q.**  And putting aside the handwriting on this affidavit and

24   highlighting, which, please don't pay any attention to, does

25   that appear to be the affidavit?

1    **A.**   Yes.

2           MR. DWYER:  Your Honor, identify this as 6 and move

3    for admission.

4           THE COURT:  Hold on.  Any objection?

5           MR. BASIL:  No, Your Honor.  But it's already

6    attached to our motion.

7           THE COURT:  It's already admitted.

8           MR. DWYER:  Very well.

9    BY MR. DWYER:

10   **Q.**   Is there anything in the affidavit that you would like to

11   change or correct?

12   **A.**   No.

13   **Q.**   Is there anything in the affidavit that you would like to

14   expand on?

15   **A.**   No.

16   **Q.**   I know you have a flight today so I want to move through

17   this somewhat quickly, and I apologize for being quick.

18   **A.**   Yes, sir.

19   **Q.**   In your affidavit you discuss an FBI consensual recording

20   system that you were familiar with in 2015; is that correct?

21   **A.**   That's correct.

22   **Q.**   And that recording system, that consensual recording

23   system, where was it located?

24   **A.**   The system itself was located in Quantico, Virginia.

25   **Q.**   When you say the system itself, what is that made up of?

1  **A.**  The system is a collection of servers.

2  **Q.**  The consensual, it's referred to as a consensual

3  recording system.  What is consensual about it?

4  **A.**  It's consensual with respect that the individuals

5  recording phone calls are cooperators, and they're the ones

6  who have given their consent to record their phone calls.

7  **Q.**  Okay.  And do undercover agents use it as well?

8  **A.**  Yes.

9  **Q.**  And they would give their consent as well?

10 **A.**  Correct.

11 **Q.**  And when they're using this phone system, are they

12 assigned a specific phone number?

13 **A.**  They can use a phone number, yes.

14 **Q.**  Okay.  They're not given a specific one?  Does the system

15 assign it one?

16       MR. BASIL:  Your Honor, we're getting very close to

17 law enforcement sensitive information on how the system

18 actually operates.

19       THE COURT:  Well, the witness can let us know when

20 he's reached his limit on it.

21       MR. BASIL:  Okay.  Just to alert the Court.

22 **A.**  I do believe that is getting a little bit into the law

23 enforcement sensitive aspect of the system.

24 BY MR. DWYER:

25 **Q.**  Okay.  I've heard of consensual Title III.  Have you ever

1    heard of that?

2    **A.**  Yes, I have.

3    **Q.**  Is it similar to a consensual Title III?

4    **A.**  Yes, it is.

5    **Q.**  Is it almost the same?

6    **A.**  It is similar in that it records the phone calls of

7    consenting parties.

8    **Q.**  So every single phone call going out and every single

9    phone call coming in is recorded?

10   **A.**  When placed through the system, yes.

11   **Q.**  Tell us in connection with that, with an undercover who

12   is operating in a case in Boston, what's the interplay

13   between Quantico and Boston in collection of the data?

14   **A.**  Phone calls are recorded at Quantico.  And then the

15   recorded phone calls are transferred to Boston for download.

16   **Q.**  Okay.  When you say "transferred to Boston for download",

17   what does that mean?

18   **A.**  It means that the recorded phone calls are transferred

19   via a network connection to a Boston terminal to be

20   downloaded.

21   **Q.**  Okay.  Is there an email or something that accompanies

22   them?  How does somebody know that, uh-oh, we've got

23   something to download?

24   **A.**  The system, if configured, there could be or would be an

25   email component.  However, it's incumbent upon the cooperator

1    to also inform the case agent that the recording has

2    happened.

3    **Q.**   Okay.  So you've got an aspect of somebody who makes the

4    phone call is supposed to call the case agent and say, yeah,

5    I made the phone call.  Is that what you're saying?

6    **A.**   Correct.

7    **Q.**   All right.  Same thing with the undercover, they're

8    supposed to call and say, hey, I made the phone call?

9    **A.**   Yes.

10   **Q.**   But there's also part of the system that sends a

11   notification to the field office, right?

12   **A.**   If that was configured.

13   **Q.**   Okay.  Who chooses how to configure it?

14   **A.**   That be would the technical personnel setting up the

15   account.

16   **Q.**   Okay.  So you know that in this case there was an account

17   that was set up, correct?

18   **A.**   Correct.

19   **Q.**   Did you look to see whether it provided notification to

20   the Boston field office?

21   **A.**   I did not.

22   **Q.**   Okay.  Would you be able to find that information out for

23   us?

24   **A.**   Possibly, yes.

25   **Q.**   So normally in that type of a situation where

1    notification is set up, a case agent gets the email saying

2    that something's come in, right?

3    **A.**    I believe the way the system is configured, it would

4    actually go to what's known as an ELSUR operations

5    technician.

6    **Q.**    An ELSUR operations technician?

7    **A.**    Yes.

8    **Q.**    Is that an FBI employee?

9    **A.**    Yes, it is.

10   **Q.**    Are they located in the field office?

11   **A.**    Yes, they are.

12   **Q.**    So in this case we have two phone calls that no longer

13   exist, correct?

14   **A.**    Correct.

15   **Q.**    And it's possible, you don't know, that notification of

16   those phone calls and that there were recordings to download

17   was sent to an ELSUR operations technician in Boston?

18   **A.**    It could be possible.

19   **Q.**    Okay.  How would we find that out?

20   **A.**    We would have to go back and determine who were the EOT's

21   at that time to determine if an email was sent to them.

22   **Q.**    Okay.  And could it also be sent to the case agent?

23   **A.**    It's my recollection that the email notification

24   capability only went to EOT's.

25   **Q.**    Okay.  In this case did anyone ask you to look for that

1    notification capability?

2    **A.**   No.

3    **Q.**   Was it ever discussed?

4    **A.**   Not that I'm aware of.

5    **Q.**   That notification and/or the phone call, whatever, the

6    link is sent to Boston.  Is the file of the phone call itself

7    sent to Boston?

8    **A.**   The files are transferred from Quantico to the Boston

9    computer.

10   **Q.**   Okay.  And then you said something about downloading.

11   Where are you downloading from?

12   **A.**   You're downloading from the Boston computer.

13   **Q.**   Okay.  So the phone call is made and a file is created;

14   is that right?

15   **A.**   Correct.

16   **Q.**   What type of a file is it?

17   **A.**   It's a wave file.

18   **Q.**   Okay.  And then that wave file is stored in Quantico?

19   **A.**   It's stored for at least 30 days, yes.

20   **Q.**   Okay.  And then at some point it's also sent up to

21   Boston?

22   **A.**   Correct.

23   **Q.**   When in that 30 days?

24   **A.**   So there is an automatic process which transfers the

25   phone call from Quantico to the Boston work station the day

after the phone call takes place.

**Q.**  So the day after a phone call -- let's use a real life example.  December 19, 2015, two phone calls were placed to a phone that was working on the system, of the consensual system.

Do you recall that?

**A.**  Correct.

**Q.**  So a day after that, December 20, notification would have come up to Boston that there's a file here?

**A.**  If it was configured.  If the notification option was configured.

**Q.**  Okay.  And would it automatically get transferred from Quantico to Boston?

**A.**  Yes.

**Q.**  Okay.  So when would that happen?

**A.**  Automatic transfers typically happen some time in the morning after the phone call was recorded.

**Q.**  Okay.

**A.**  Additionally, if the call was needed sooner than that, the call could be manually pulled down to the Boston computer.

**Q.**  So if an undercover had a conversation with the case agent and they said, hey, this is a phone call you need to listen to, they could go onto the system and pull it down?

**A.**  The individual who had access to that account could log

1    into the system and do an update to pull the call sooner.

2    Q.   Okay.  So it's possible that a notification would go to

3    Boston.  And regardless of where the notification went, the

4    file would be transferred the next morning?

5    A.   Correct.

6    Q.   Is it a copy of the file, or is it the same file?

7    A.   It's a copy of the file.

8    Q.   And regardless, the case agent could reach into the

9    system, and if appropriately authorized, download it?

10   A.   Yes.

11   Q.   Who was the appropriately authorized person on December

12   2015 for the system for the telephone that is at issue in

13   this case?

14   A.   To my understanding it was Special Agent Chambers.

15   Q.   Vincent Chambers?

16   A.   That is my understanding.

17   Q.   How did you come to that understanding?

18   A.   There is a case agent assigned to the account with the

19   account name of Chambers.

20   Q.   Did you look inside the internal FBI database to get that

21   information?

22   A.   Yes.

23   Q.   And Chambers was assigned during this time period?

24   A.   Yes.

25   Q.   Okay.  Did anyone else have authority?

1  **A.**  Well, the EOT's, as I mentioned before, have global

2  access to all of the calls as part of their duties.

3  **Q.**  The EOT's are the electronic operations?

4  **A.**  Operations technician.

5  **Q.**  Technician.  So it would be the Boston EOT would have had

6  access, too?

7  **A.**  Yes.

8  **Q.**  Okay.  And as far as you know it was Chambers who was

9  assigned?

10  **A.**  Yes.

11  **Q.**  At some point in time did that change?

12  **A.**  It did.

13  **Q.**  When was that?

14  **A.**  Approximately June of 2016 I believe.

15  **Q.**  Who became the authorized user?

16  **A.**  It would be special agent Garett Trombly.

17  **Q.**  Who do you go to to be authorized?  Who makes that

18  decision?  Who says, yeah, it's Vincent or it's Garett?  Who

19  does that?

20  **A.**  It's the case agent who makes that determination as to

21  who should be associated with the account.

22  **Q.**  Okay.  So the case agent would just reach out to who?

23  **A.**  The case agent would have to reach out to their local

24  technical personnel to designate a new case agent to be

25  assigned to the account.

1    **Q.**   So switching now to the files that are down at Quantico.

2    You said they would be saved for at least 30 days?

3    **A.**   Yes.

4    **Q.**   How long would they be saved?  That's an at least.  Do

5    you know how long they could be saved?

6    **A.**   They could potentially be saved for years until at such

7    time we needed to recover hard drive space from the server.

8    **Q.**   Okay.  And so if you needed the space, they'd get knocked

9    out?  Is that basically it?

10   **A.**   We would remove calls from the system, the oldest calls

11   first in order to recover hard disk space.

12   **Q.**   Do you keep track of when things are deleted off the

13   system?

14   **A.**   No, we don't.

15   **Q.**   Today does anything get deleted off the system?

16   **A.**   As it exists today, no.

17   **Q.**   When did that change?

18   **A.**   In October of 2018.

19   **Q.**   Why did it change?

20   **A.**   Due to advances in technology, we instituted a

21   reengineering effort of the system, and that's one of the

22   changes that we implemented.

23   **Q.**   Have you been involved in other cases like this where

24   files were lost?

25   **A.**   No.

1  **Q.**  This is the first time?

2  **A.**  This is the first time that I've had to testify about a

3  matter like this, yes.

4  **Q.**  And how long have you been working with the FBI?

5  **A.**  14 years.

6  **Q.**  And how long down in Quantico?

7  **A.**  Approximately four years.

8  **Q.**  And how long on this system?

9  **A.**  I have been the accountable supervisor for the system

10  since August of 2016.

11  **Q.**  August of 2016?

12  **A.**  Yeah.

13  **Q.**  So since August of 2016 to today, you're the supervisor

14  of this system?

15  **A.**  Yes.

16  **Q.**  This has never happened before with the FBI as far as you

17  know?

18  **A.**  As far as I know.

19  **Q.**  Would it rise to the level of you as the supervisor of

20  the system to know whether or not it happened?

21  **A.**  If it was brought to my attention, yes.

22  **Q.**  How do the case agents and the other folks get trained on

23  the usage of the system?

24  **A.**  They're trained by their technical personnel in the

25  field.

1    **Q.**  So that's something done in the field, not by Quantico

2    personnel?

3    **A.**  Correct.

4    **Q.**  Do you keep track of that training?

5    **A.**  No, we don't.

6    **Q.**  Does the local office keep track of it?

7    **A.**  I'm not aware if they do.

8    **Q.**  Just to be clear, when you looked at the system, the

9    system showed that it successfully recorded two audio files

10   on December 19, 2015; is that right?

11   **A.**  Yes.

12   **Q.**  The first was approximately 11 minutes.  The second was

13   approximately 29 minutes.  Is that right?

14   **A.**  That's correct.

15           MR. DWYER:  Nothing further, Your Honor.

16                     CROSS EXAMINATION

17   BY MR. BASIL:

18   **Q.**  Mr. King, with respect to the consensual recording

19   system, what information does it say about who logs on to it

20   to download files?

21   **A.**  Could you rephrase the question?

22   **Q.**  Sure.  What information is saved in the system about who

23   actually logs on to download a file?

24   **A.**  That information is not saved in the system.

25   **Q.**  Okay.  How about just log-ons to the system at all at a

1  local FBI field office?  Any information saved on that?

2  **A.**  No.

3  **Q.**  How about deletions of files from the system?  Any

4  information saved on that?

5  **A.**  No.

6  **Q.**  Are there any user files saved as part of the consensual

7  system?

8  **A.**  No.

9  **Q.**  Based on the records available to you, can you determine

10  whether anyone downloaded the calls from the December 19,

11  2015, calls that Mr. Dwyer was just asking you about from the

12  terminal in Boston?

13  **A.**  I'm unable to determine that.

14  **Q.**  If those calls had not been downloaded, what would your

15  expectation be about how long they would persist on the

16  Boston terminal?

17  **A.**  My expectation is that the calls would persist

18  indefinitely until downloaded.

19  **Q.**  Earlier Mr. Dwyer asked you about something called

20  consensual T-III?

21  **A.**  Yes.

22  **Q.**  Consensual T-III, does that involve a system called Voice

23  Box?

24  **A.**  Yes.

25  **Q.**  How long do audio recordings exist on the T-III system

1    for consensual calls?

2    **A.**   Indefinitely.

3    **Q.**   Special agent, are you aware of any facts about what

4    actually happened to the terminal for the consensual

5    recording system from 2015 from the Boston field office?

6    **A.**   I am aware that it was replaced in June of 2017.

7    **Q.**   Why was it replaced, sir?

8    **A.**   It was malfunctioning.

9    **Q.**   What kind of a malfunction would cause the entire

10   terminal to be replaced?

11   **A.**   If the hard drive was inoperable or there was some type

12   of mother board failure, it would warrant the replacement of

13   the computer.

14   **Q.**   If the hard drive on a terminal failed, would that

15   involve loss of files saved on that hard drive?

16   **A.**   Yes.

17   **Q.**   Are you aware of any hard drive ever failing on any FBI

18   field office terminal?

19   **A.**   Yes.

20   **Q.**   Okay.  So are you aware as a result of that files being

21   not recoverable from an FBI field office terminal?

22   **A.**   Yes.

23   **Q.**   So before when Mr. Dwyer had you say or elicited an

24   answer from you that no call had ever been lost before, is it

25   fair to say that hard drives containing calls, in fact, have

1  failed previously?

2  **A.**  Yes.

3  **Q.**  And you are aware of that?

4  **A.**  Yes, I am.

5  **Q.**  Do you have any way of knowing whether the terminal in

6  the FBI field office was actually functioning correctly on

7  December 19, 2015?

8  **A.**  No.  The only thing that I have is the entry from the

9  database stating that the call had been recorded and

10  transferred to the terminal.

11  **Q.**  Now, with respect to the back ups on the system in 2015

12  at Quantico, how, if at all, did Quantico tell field agents

13  about that particular policy?

14  **A.**  We explain the policy to our technical personnel in the

15  field, and it's their responsibility to educate their

16  customer base.

17  **Q.**  But as far as Quantico goes, there was no information

18  provided to investigating agents about how long these back

19  ups might or might not exist?

20  **A.**  No.

21  **Q.**  Now, you mentioned the engineer who -- you mentioned that

22  the files are deleted at some point to save space or were at

23  least back then?

24  **A.**  Yes.

25  **Q.**  Who did that?

1    **A.**  That would be the program engineer.

2    **Q.**  Does the program engineer do that with any reference to a

3    specific case?

4    **A.**  No.

5    **Q.**  With respect to these particular calls that Mr. Dwyer was

6    asking about, is there anything in the system that can tell

7    you how long after the 30-day mark those calls were actually

8    deleted from the system at Quantico?

9    **A.**  No.

10   **Q.**  Are you able to tell us anything about when those files

11   were actually lost from the Quantico server?

12   **A.**  I'm unable to do so.

13   **Q.**  Did anyone in this case ask you to delete files relating

14   to the case?

15   **A.**  No.

16   **Q.**  Special Agent, do you recall that before you signed your

17   affidavit in this case, you and I spoke on the telephone?

18   **A.**  Yes.

19   **Q.**  And in the course of that conversation you told me

20   information; is that correct?

21   **A.**  Yes.

22   **Q.**  Do you recall that I asked you whether an email

23   notification system had been set up for this account that

24   we're talking about?

25   **A.**  I do not recall.

1    **Q.**  Okay.  Could that have happened?

2    **A.**  Yes.

3              MR. BASIL:  No further questions.

4              MR. DWYER:  Very briefly, Your Honor.

5                        REDIRECT EXAMINATION

6    BY MR. DWYER:

7    **Q.**  With regards to the Boston malfunction, do you know what

8    happened?

9    **A.**  I do not know what happened.

10   **Q.**  So it could be a mother board.  It could be a hard drive.

11   You don't know?

12   **A.**  I do not know.

13   **Q.**  I thought I heard, but I want to clarify, if somebody

14   deletes something off of the Boston system, there would be no

15   record of it?

16   **A.**  The only way to delete a call off of the system would be

17   to download and burn it.

18   **Q.**  What does that mean?

19   **A.**  It means to transfer the call to a compact disk.  That

20   process will remove the call from the computer.

21   **Q.**  And that's the standard process that's supposed to

22   happen, right?

23   **A.**  Correct.

24   **Q.**  So the standard process is that you're supposed to

25   download it onto a disk, and then you're supposed to submit

1  it as evidence, right?

2  **A.**  If it has been downloaded, yes.

3  **Q.**  Okay.  So when you were talking before about these

4  malfunctions that have happened in other places and all that

5  other stuff, you've never had a situation where it wasn't

6  downloaded and not submitted into evidence and where they

7  were hunting around to see what happened to the evidence,

8  right?

9  **A.**  Correct.

10  **Q.**  Okay.

11          MR. DWYER:  Nothing further, Your Honor.

12                    RECROSS EXAMINATION

13  BY MR. BASIL:

14  **Q.**  You were asked the question about the standard practice

15  for downloading calls?

16  **A.**  Yes.

17  **Q.**  What is the standard practice throughout all FBI offices

18  everywhere about when in the course of an investigation calls

19  should be downloaded off of the consensual monitoring system?

20  **A.**  There is no specific policy about when calls are supposed

21  to be downloaded.  It's just that when they are downloaded,

22  they are to be submitted into evidence.

23  **Q.**  Okay.

24          MR. BASIL:  No further questions.

25          THE COURT:  You're free to go.

1           THE WITNESS:  Thank you.

2           MR. DWYER:  Your Honor, a little bit of

3    housekeeping before we call the next witness.

4           THE COURT:  Yes.

5           MR. DWYER:  I used some exhibits previously with

6    Mr. Anderson.  It's Exhibit 1, 2, 2T, 3, 4, and 5.  I'd like

7    to make sure that those do get admitted.

8           THE COURT:  Give me the numbers again.

9           MR. DWYER:  1, 2, 2T, 3, 4, and 5.  I identified

10   all of those.  2T I believe Your Honor sustained the

11   objection to.  So I don't believe those are actually in

12   evidence.

13          THE COURT:  That was the transcript?

14          MR. DWYER:  That's correct, Your Honor.

15          THE COURT:  1 I have in my hand.  2, 3, 4 and 5 are

16   the tapes?

17          MR. DWYER:  9 clips.

18          THE COURT:  Do you have any objection to these?

19          MR. BASIL:  We have objection to the transcript.

20   He gave me a copy of it on a little thumb drive like he has

21   there a few minutes ago.  I haven't had a chance to look at

22   it.

23          THE COURT:  It's not admitted.  I didn't admit the

24   transcript.

25          MR. BASIL:  As to the others, no, Your Honor.

1          THE COURT:  Exhibit 1 has already been admitted, I

2     think.  He's just now admitted clips of the tapes that he

3     played.  He's identified 2-T for the record but concedes that

4     it was not admitted, and it's not admitted.

5          MR. DWYER:  Very well.  Your Honor, I have copies

6     each of those exhibits for the Court on a thumb drive.

7          THE COURT:  Give it to Karen.

8          (Defendant Exhibit Nos. 2 to 5 admitted.)

9          MR. DWYER:  Your Honor, at this time we'd like to

10    call Special Agent Garett Trombly.

11         THE CLERK:  Can you please raise your right hand.

12         (SPECIAL AGENT GARETT TROMBLY duly sworn by the

13    Deputy Clerk.)

14         THE CLERK:  Could you please state your name and

15    spell your last name for the record.

16         THE WITNESS:  My name is Garett Trombly.  The last

17    name is T-R-O-M-B-L-Y.

18                        DIRECT EXAMINATION

19    BY MR. DWYER:

20    **Q.**  Good afternoon, Special Agent.

21    **A.**  Good afternoon, counselor.

22    **Q.**  When did you start with the FBI?

23    **A.**  2011.

24    **Q.**  And did you have any previous law enforcement experience?

25    **A.**  I did not.

1  **Q.**  Was the Boston field office your first assignment?

2  **A.**  No, it was not.

3  **Q.**  What was your first assignment?

4  **A.**  I was assigned to the office in Norfolk, Virginia.

5  **Q.**  How long were you in Norfolk?

6  **A.**  Until August 2015.

7  **Q.**  Okay.  And is that when you came up to Boston?

8  **A.**  It is.

9  **Q.**  Did you work any undercovers in Norfolk?

10  **A.**  Not as an undercover.

11  **Q.**  Did you work them as a case agent?

12  **A.**  Not as the primary case agent, but I assisted.

13  **Q.**  Did you work them as a co-case agent?

14  **A.**  I assisted on investigations involving undercovers.

15  **Q.**  Okay.  In Norfolk did they use the same consensual

16  monitoring system that we just heard about from Mr. King?

17  **A.**  Yes.  It was available.

18  **Q.**  Did you download the recordings down there?

19  **A.**  On some investigations I did.

20  **Q.**  You did.  So you're aware of how the system worked?

21  **A.**  I was.

22  **Q.**  When you arrived in the Boston field office, did you

23  receive training with regards to the collection of electronic

24  evidence?

25  **A.**  When I arrived in Boston, no.

1  **Q.** Did you receive any training from the Boston individual

2  assigned to do the collection of ELSUR, the ETO, or whatever

3  it was Mr. King referred to?

4  **A.** EOT. No, I did not.

5  **Q.** EOT. Okay. So no, no training?

6  **A.** No.

7  **Q.** But you already knew how to use the consensual system,

8  correct?

9  **A.** I had used it previously.

10  **Q.** You had downloaded previously, correct?

11  **A.** I had.

12  **Q.** When you came to Boston, were you assigned to the Joseph

13  Baptiste investigation?

14  **A.** I was. I was assigned to an investigation that involved

15  Joseph Baptiste.

16  **Q.** Okay. That was approximately August 2015?

17  **A.** Roughly.

18  **Q.** Who was the case agent at that time?

19  **A.** Lead investigator was Special Agent Vincent Chambers.

20  **Q.** Okay. And you were the co-case agent?

21  **A.** Yes.

22  **Q.** Were you briefed on the investigation?

23  **A.** Yes.

24  **Q.** And by whom?

25  **A.** Mainly Vince.

1    **Q.**   That's Special Agent Chambers?

2    **A.**   Sorry.  Yes.

3    **Q.**   And how much time did you spend together talking about

4    the case and how the evidence had been collected and so forth

5    and so on?

6    **A.**   I couldn't quantify it.

7    **Q.**   When did you learn that it was a group one investigation?

8    **A.**   Right away more or less.

9    **Q.**   Was it your first group one?

10   **A.**   That I don't recall.

11   **Q.**   There's a difference between a group one and other

12   undercover investigations, correct?

13   **A.**   Technically there are differences.

14   **Q.**   What are those technical differences?

15   **A.**   I'd rather not disclose the differences, but the

16   functional differences from the case investigator point of

17   view are not particularly critical.

18   **Q.**   You have to get a much higher level of approval, correct?

19   **A.**   The approval levels are distinct.

20   **Q.**   With a group one it's elevated to a higher level of

21   approval, correct?

22   **A.**   Higher is fair.

23   **Q.**   And there is quarterly reports, annual reports that have

24   to be generated, correct?

25   **A.**   There's periodic reporting.

1    **Q.**  Were you part of that periodic reporting?

2    **A.**  I was aware of the periodic reporting.

3    **Q.**  Did you review it?

4    **A.**  Yes.

5    **Q.**  And in that periodic reporting they would talk about the

6    types of undercover that they were doing and the recording

7    and so forth, correct?

8    **A.**  Generally, yes.

9    **Q.**  When did you first meet the undercovers assigned to this

10    case?

11    **A.**  I don't recall specifically, but it would have been -- I

12    don't recall specifically actually.

13    **Q.**  Okay.  And also in connection with this case was there a

14    Title III wiretap?

15    **A.**  There was.

16    **Q.**  Was that wiretap of Mr. Baptiste's telephone?

17    **A.**  Yes.

18    **Q.**  Was that monitored here in the Boston field office?

19    **A.**  It was.

20    **Q.**  Was every call captured on that wiretap?

21    **A.**  I'm not sure I understand the question.

22    **Q.**  Every call that was made from Mr. Baptiste's telephone,

23    was it captured?

24    **A.**  I can't speak to that.  I know that the Voice Box system

25    preserves the evidence that we're passed from the telephone

1    provider.

2    **Q.**  So you haven't looked to see if there were any calls that

3    were missed?

4    **A.**  I am currently aware of calls that appear in the call log

5    of Baptiste's phone that do not appear in the Title III

6    intercept log.

7    **Q.**  So telephone calls were made or received on

8    Mr. Baptiste's telephone but do not appear in the wiretap; is

9    that correct?

10   **A.**  All I can say is there's a discrepancy between the logs.

11   **Q.**  Okay.  So the logs on the phone don't match the Title III

12   wiretap logs?

13   **A.**  True.

14   **Q.**  Which one would you rely on?

15   **A.**  Rely in what way?

16   **Q.**  Which one would you say is the one that you measure the

17   others against?

18   **A.**  I don't measure either against the other.

19   **Q.**  Okay.  They're just missing some calls, and you haven't

20   attempted to identify why they might be missing?

21   **A.**  I'm generally aware of potential explanations for

22   sessions that might not have been perfectly captured by the

23   technology available to the FBI.

24   **Q.**  Okay.  Let's switch now to the undercovers and the

25   consensual wiretap or consensual system that was being used.

1    Okay?

2            The approval for the use of that, do you know how

3    that approval was arrived at, who gave that approval?

4    **A.**  No.

5    **Q.**  You understand that in this case there's two telephone

6    calls that were made to Mr. Boncy that are missing, correct?

7    **A.**  I do understand.

8    **Q.**  When did you first learn that the evidence of those calls

9    had not been collected?

10   **A.**  October 2018.

11   **Q.**  October 2018?

12   **A.**  October 2018.

13   **Q.**  Before or after Mr. Boncy was indicted?

14   **A.**  Before.

15   **Q.**  So you knew before he was indicted that these calls had

16   been lost?

17   **A.**  I was aware before he was indicted that the calls were no

18   longer available at Quantico.

19   **Q.**  Where are they available?

20   **A.**  My present understanding is that they are not available

21   anywhere.

22   **Q.**  They're gone.

23   **A.**  That's not a question.

24   **Q.**  Are they gone?

25   **A.**  They are currently unavailable to the best of my

1    knowledge.

2    **Q.** What does that mean?  Could I go and get them somewhere?

3    **A.** The government is unable to produce --

4    **Q.** You don't want to say lost.  You don't want to say

5    destroyed.  But unavailable indicates that they might some

6    day be available.  Will they some day be available?

7    **A.** Not that I know of.  The government isn't able to produce

8    them for the purposes of this trial.

9    **Q.** Are they somewhere?

10   **A.** Not that I know of.

11   **Q.** So are they lost?

12   **A.** I am unable to produce them for the purpose of this

13   trial.

14   **Q.** Okay.  If we were to push the trial three months, could

15   you produce them?

16   **A.** Not that I know of.

17   **Q.** So when these calls were made, did you have a briefing

18   with the undercover before they were made?

19   **A.** I don't recall specifically.

20   **Q.** You don't recall specifically.  Was it your practice to?

21   **A.** My general practice was to discuss with undercovers in

22   advance of calls to be made with subjects.

23   **Q.** Did you make notes of those conversations?

24   **A.** No.

25   **Q.** Okay.  Why not?

**A.**   It's not my practice.  The electronic record, the
recording of the conversation is the best evidence and speaks
for itself.

**Q.**   Okay.  But we don't have that, right?

**A.**   Not as to those calls.

**Q.**   Okay.  Did you have a conversation afterwards with the
undercover about what had happened on that telephone call?

**A.**   I have no specific recollection of such conversation.

**Q.**   Was it your customary practice to do so?

**A.**   It was.

**Q.**   So do you have any reason to believe that you did not?

**A.**   No, I do not.

**Q.**   Would he normally relay to you the contents of that
telephone call?

**A.**   He would relay to me a summary of the conversation, yes.

**Q.**   And based on that summary, would you make certain
investigative decisions as to what to do next?

**A.**   Each subject contact would be taken in the context of the
entire investigation and would factor into next steps.

**Q.**   And did you make some decisions on what to do with
regards to next steps?

**A.**   In the context of those calls?

**Q.**   Yes.

**A.**   Not that I recall specifically.

**Q.**   Did the undercover make a phone call the next day to

1    Mr. Baptiste?

2    **A.**  Yes, he did.

3    **Q.**  And as customary with your practice, did you speak to the

4    undercover before that telephone call was made?

5    **A.**  Again I don't have a specific recollection of that, but

6    it was my practice.

7    **Q.**  And did you speak to him afterwards?

8    **A.**  Again I don't have a specific recollection, but it was my

9    practice.

10   **Q.**  And with regards to that telephone call, which we've

11   heard portions of in this case, the December 20, 2015,

12   telephone call between Mr. Baptiste and the undercover, there

13   was a discussion about the telephone calls that were had with

14   Mr. Boncy, correct?

15   **A.**  Peter represented something that -- made a representation

16   about what Boncy had said on the previous call.

17   **Q.**  Had you and the undercover planned the representation?

18   **A.**  Not that I recall.

19   **Q.**  Okay.  So would it have generally been part of your plan

20   with regards to the upcoming call with Mr. Baptiste?

21   **A.**  I can't make a general statement about a specific like

22   that.

23   **Q.**  What do you remember the undercover telling you about the

24   telephone calls he had with Mr. Boncy?

25   **A.**  Nothing whatsoever.

1    **Q.**  Nothing at all?

2    **A.**  No.

3    **Q.**  No recollection whatsoever?

4    **A.**  None.

5    **Q.**  And you certainly didn't put that in the report, correct?

6    **A.**  No.

7    **Q.**  Meaning the conversation that you had.  Because the best

8    evidence is the recording, right?

9    **A.**  Correct.

10   **Q.**  When that December 19, 2015, telephone call was made,

11   were you on leave, in the office?  Where were you?  Do you

12   know?

13   **A.**  I don't recall.

14   **Q.**  With regards to the case, December 19, 2015, who was the

15   case agent?

16   **A.**  On that day I was.

17   **Q.**  Who's responsible to secure all of the evidence in the

18   investigation to make sure it's properly secured?

19   **A.**  The responsibility was mine.

20   **Q.**  That's yours.  Did you do it with those two December 19,

21   2015, calls?

22   **A.**  My understanding at the time was that the calls were

23   preserved on the auxiliary system.

24   **Q.**  Your understanding was that they were preserved on the

25   auxiliary system?

1    **A.**  The consensual recording system.

2    **Q.**  Where?  Quantico or Boston?

3    **A.**  Quantico.

4    **Q.**  And what was that based on?

5    **A.**  My investigative experience to date.

6    **Q.**  But you downloaded them in Norfolk, correct?

7    **A.**  At times, yeah.

8    **Q.**  All right.  Why did you think they would be backed up at

9    Quantico?

10   **A.**  That was my understanding of all telephone intercept

11   technology that the FBI had.

12   **Q.**  Who gave you that understanding?

13   **A.**  I don't recall the individual.  That was the

14   understanding I had with respect to Voice Box.

15   **Q.**  Why would you download them?

16   **A.**  Because you can't deliver for purposes of discovery,

17   among other reasons, a computer server that's in Quantico.

18   **Q.**  Okay.  But that's the only reason you do it, discovery?

19   Aren't you required to download it and put it into ELSUR?

20   **A.**  Eventually.  But ELSUR is a safekeeping methodology.

21   That's my understanding of the reason for ELSUR, the ELSUR

22   closet.

23   **Q.**  Do you think the evidence of those telephone calls was

24   properly maintained, meaning the December 19, 2015, calls?

25   **A.**  I think all investigative activity in this case conformed

1    to proper standards.

2    **Q.**   That's not my question.  My question is the evidence of

3    the telephone calls, was it properly maintained by the FBI?

4    **A.**   I think it was maintained to the good faith understanding

5    of all individuals involved.

6    **Q.**   So it's acceptable?

7    **A.**   That's not my decision to make.

8    **Q.**   Was the evidence in this case properly maintained?  It's

9    a simple question.  You think it was?  Yes or no.  Who are

10   you --

11   **A.**   They're -- the way I take the word "proper" is as a

12   measure of intention, and therefore I answer yes.  There was

13   no bad faith.  There was no intentional misdeed or anything

14   of that nature with respect to the preservation of all

15   evidence in this case.

16   **Q.**   But you don't have it, right?

17   **A.**   I do not.

18   **Q.**   Right.  It's lost?

19   **A.**   That's your word.

20   **Q.**   It's not here?

21   **A.**   That's true.

22   **Q.**   And in your mind that's proper?

23   **A.**   That's not what I said.

24   **Q.**   You said it's proper?  Yes or no.

25              MR. BASIL:  Your Honor, asked and answered at this

1  point.

2          THE COURT:  He can have that.  Let's move it along,

3  okay?  It's late.

4  BY MR. DWYER:

5  **Q.**  Is it proper?  Yes or no.

6  **A.**  The evidence handling in this case was proper.

7  **Q.**  Okay.  Did you listen to that December 19, 2015, call?

8  **A.**  Never.

9  **Q.**  Did anyone?

10  **A.**  Not that I know of.

11  **Q.**  Did you listen to any calls in this case?

12  **A.**  Many.

13  **Q.**  Did you listen to any calls on the consensual monitoring

14  in this case?

15  **A.**  No.

16  **Q.**  Why not?

17  **A.**  For the active investigative period of this case, I did

18  not have access to the Peter account in that system.

19  **Q.**  So because you didn't have access, you never listened?

20  **A.**  The majority of calls, my understanding at the time was

21  that the majority of the calls on that system were also

22  collected via Voice Box on the T-III.

23  **Q.**  The majority of the calls on that line were corrupted?

24  Is that what you said?

25  **A.**  That's not what I said.

1    **Q.**  Can you repeat that?  I missed it.

2            THE COURT:  He said collected.

3            MR. DWYER:  Oh.  The majority were collected.

4    **A.**  My understanding is that the system was being used as a

5    back up to the T-III.  And I listened to the calls there.

6            MR. DWYER:  Your Honor, if I could have one moment.

7    BY MR. DWYER:

8    **Q.**  I just want to clarify.  Did you think that these

9    consensuals were getting backed up in Quantico or in Boston?

10   **A.**  My understanding of the system at the time was that

11   collection took place on some system in Quantico, and there

12   they remained until and unless they were burned to disk in

13   Boston.

14   **Q.**  Okay.  But they weren't backed up on the Title III from

15   Mr. Baptiste's telephone.  The consensual and Title III are

16   entirely different?

17   **A.**  I don't consider the consensual and Title III the same

18   thing.

19   **Q.**  But the consensual is a separate system from the Title

20   III?

21   **A.**  That's correct.

22   **Q.**  Okay.

23           MR. DWYER:  Nothing further, Your Honor.

24                       CROSS EXAMINATION

25   BY MR. BASIL:

1    **Q.**  Special Agent, a few moments ago Special Agent King was

2    on the stand.  Do you remember that?

3    **A.**  Yes.

4    **Q.**  He testified about something called EOT, right?

5    **A.**  Yes.

6    **Q.**  When in your experience has an EOT ever communicated the

7    receipt of data to the a case agent?

8    **A.**  Never to my knowledge.

9    **Q.**  In this case do you recall what kinds of emails were sent

10   by the consensual recording system to case personnel?

11   **A.**  I became aware of emails that were sent to Special Agent

12   Chambers reminding him of the existence of the account

13   generally, not with respect to any particular item or

14   recording in the account.

15   **Q.**  You mentioned that you found out about these two calls in

16   October of 2018; is that right?

17   **A.**  That's correct.

18   **Q.**  How did you find out?

19   **A.**  During a telephone conversation with you.

20   **Q.**  Okay.  And after I called you about that, what did you

21   do?

22   **A.**  After I called, at my first opportunity I went into the

23   office and checked the system to see if there were any such

24   calls.

25   **Q.**  Why did you go to the system to see if they were there?

1    **A.**  Because that's where I expected to find them.

2    **Q.**  Why would you expect that calls recorded in 2015 would be

3    on a computer system in 2018?

4    **A.**  Because that was my investigative experience to that

5    point and my understanding of the system.

6    **Q.**  So you're saying that you actually thought that something

7    recorded on a computer three years earlier would continue to

8    exist on a computer?

9    **A.**  Yes.

10   **Q.**  When did you find out that calls on the Quantico system

11   could potentially be wiped after 30 days?

12   **A.**  Some time in either October or November of 2018.

13   **Q.**  What's the retention period on the Title III system?

14   **A.**  My understanding is that it's indefinite.

15   **Q.**  If you needed to get a call off a Title III system that

16   had been made back in 2015, could you get it today?

17   **A.**  Yes.

18   **Q.**  After Special Agent Chambers left the case, what did you

19   need to do to get authority to make a download?

20   **A.**  I would have had to go to the tech squad, the personnel

21   that administered the system and request an authority change.

22   **Q.**  Why didn't you do that?

23   **A.**  I didn't feel the need to at the time.  We were

24   collecting the bulk of the evidence on the T-III system.

25   **Q.**  With respect to the files from the 2015 Boston terminal

1    from the auxiliary system, what steps have you taken to try

2    to get those files?

3    **A.**   When I first logged in, I attempted to download them.

4    And when that failed, I went to the local personnel who

5    administer the local version of the system and asked for

6    help.  My understanding is that they communicated down to

7    Quantico to have them check if the files were available on

8    their servers.  When we got that negative answer, over an

9    ensuing time, I'm not sure precisely when, I learned that, in

10   fact, as supervising Special Agent King testified, a local

11   copy was delivered to the local machine, which we then tried

12   to examine for the calls.  That was negative.

13          But then we found out that the machine in place in

14   2018 was not the same one that was in 2015.  So we set about

15   trying to find that machine, which we did.  It was shipped

16   back to us from Quantico where it was -- a computer

17   specialist in Boston examined it for all audio files and gave

18   me a disk of those.  I reviewed every one of them, and there

19   was no fragment or complete record of anything pertaining to

20   this or any other investigation.

21   **Q.**   Special Agent, did you destroy those calls?

22   **A.**   I did not.

23   **Q.**   Did you direct anyone to destroy those calls?

24   **A.**   No.

25   **Q.**   Did you seek to leave them on a system with the

1    expectation that a computer hard drive would fail some time

2    in 2017?

3    **A.**   Absolutely not.

4    **Q.**   Let me ask you some questions about the content of the

5    call and the context for the calls that we're talking about.

6    Okay?

7              MR. BASIL:  If I could have one second, Your Honor.

8    Thank you.  I'll see if I can get my speakers to play onto

9    your system.

10   BY MR. BASIL:

11   **Q.**   Special Agent, do you recall earlier today, Mr. Dwyer

12   asked the question -- you were here for the testimony earlier

13   today of Undercover Peter; is that correct?

14   **A.**   I was.

15   **Q.**   Mr. Dwyer asked a question of whether Mr. Boncy was

16   actually in the room when something called pay-to-play was

17   discussed.

18   **A.**   Yes.

19   **Q.**   Are you aware of whether Mr. Boncy was in the room when

20   pay-to-play was discussed?

21   **A.**   I am aware.

22             MR. BASIL:  Your Honor, I'd like to play what's

23   been marked as trial Exhibit 1909.  It's previously been

24   delivered to the defendants.  I am going to play the audio.

25   This is a video clip.

1              (Video played.)

2    BY MR. BASIL:

3    **Q.**  Okay.  Let's just for the record do as best as we can

4    with what we played in.  It will be submitted to the Court at

5    trial, so we'll have that.

6              Special Agent, have you reviewed that section of

7    the video?

8    **A.**  I have.

9    **Q.**  Who was actually in the room at the time the video

10   played?

11   **A.**  The defendants Baptiste and Boncy, Jean Frederic Sales

12   and the undercovers Peter and Nello.

13   **Q.**  Relative to Undercover Peter, where was Mr. Baptiste?

14   **A.**  Across the table.

15   **Q.**  About how far?

16   **A.**  Three, four feet.

17   **Q.**  And where was Mr. Boncy relative to Mr. Baptiste?

18   **A.**  Sitting right next to him.

19              MR. BASIL:  May I approach the witness for a

20   moment?

21              THE COURT:  Yes.

22   BY MR. BASIL:

23   **Q.**  Special Agent, was he as close as I am to you right now?

24   **A.**  Roughly, yes.

25   **Q.**  Okay.  And where was Mr. Sales?

**A.**  Sitting next to Mr. Boncy.

**Q.**  Let the record reflect that I stood about two feet from Special Agent Trombly.  In the clip that we listened to, Anderson says in response to a question from Sales -- Sales asks if you have a checklist of things that you're worried about.  Anderson says with Boncy sitting there, Well, I mean we're starting to go down it, but really it's just -- it's the general expenses.  You know what I mean by that? Pay-to-play expenses when we're developing in Haiti.  This is an area we're unfamiliar with.

Do you recall that?

**A.**  I do.

**Q.**  Having reviewed the video, what was Mr. Boncy's response to pay-to-play being spoken that way?

**A.**  Didn't react in any way.

**Q.**  And Peter goes on later in that clip, he says, because again like I -- like we said the person on the ground doesn't care about letters from prime ministers.  And Baptiste responds no, right?

**A.**  Correct.

**Q.**  And Anderson continues a little further on and says at the end, That doesn't pay the rent, right?

**A.**  Correct.

**Q.**  He says at the end, It won't buy girlfriends nice dresses and things, right?

1    **A.**  Correct.

2    **Q.**  Based on your training and experience as an FBI agent,

3    what is the purpose of making such a statement in an

4    undercover meeting?

5    **A.**  It's to establish uniformity of understanding of the

6    subject of discussion.

7    **Q.**  Mr. Baptiste then states, "A smart business always sets

8    aside to make sure that we take care of this kind of

9    problem."

10            Do you recall that?

11   **A.**  I do.

12   **Q.**  And Anderson said, So it was 5 percent.  And Baptiste

13   responded, 5 percent, right?

14   **A.**  Yes.

15   **Q.**  And someone said yes, right?

16   **A.**  Correct.

17   **Q.**  And Mr. Sales says unforeseen; is that right?

18   **A.**  Yes.

19   **Q.**  And Baptiste clarifies unforeseen expenses, right?

20   **A.**  Yes.

21   **Q.**  And then an undercover agent says, it's already built in

22   the proposal?

23   **A.**  Yes.

24   **Q.**  And Mr. Baptiste answers yes; is that correct?

25   **A.**  Correct.

1    Q.   What was Mr. Boncy's response to that exchange on the
2    video?
3    A.   He nodded his head.
4    Q.   Nodded his head in what manner?
5    A.   Affirming his consent or agreement.
6    Q.   Was he shaking his head to indicate no?
7    A.   No.  He was nodding it up and down like yes.
8    Q.   Earlier today Mr. Dwyer played a segment of an audio tape
9    of a call between Mr. Baptiste and Undercover Peter on the
10   20th; is that right?
11   A.   Yes.
12   Q.   Let me play a segment of that for you.  For the record
13   this is trial Exhibit 73 that has been previously provided to
14   counsel.  This is session 3383 from the wire.  I'm going to
15   start it playing at minute 15 and 25 seconds.
16            (Audio played.)
17   BY MR. BASIL:
18   Q.   Special Agent, have you reviewed that call previously?
19   A.   I have.
20   Q.   Based on your training and experience in the FCPA, what
21   is the reference to U.S. laws in that exchange?
22   A.   It's a reference to the FCPA.
23   Q.   And what was Mr. Baptiste's explanation for Mr. Boncy's
24   way of talking about this issue?
25   A.   That he was trying to insulate himself and be careful.

1    **Q.**  I'd like to ask you again about the context for the calls

2    we've been talking about on the 19th, if that's okay with

3    you.

4    **A.**  Sure.

5    **Q.**  I provided to defense counsel a copy of the exhibits

6    previously filed for the Court.  I also have a courtesy copy

7    for the Court, and I will approach.

8            MR. BASIL:  Ms. Folan, for you.  Your Honor, may I

9    please give a copy to the witness as well?

10           THE COURT:  Sure.

11           MR. BASIL:  To help the court reporter, I'll speak

12   as close to the microphone as I possibly can.  Usually I

13   speak fairly loud, so when people in court tell me they can't

14   hear me, I'm surprised.

15   BY MR. BASIL:

16   **Q.**  So Special Agent, let me start out by asking you the

17   question.  Let me direct you to the day of December 16, 2015.

18   Okay?  Yes?

19   **A.**  Yes.

20   **Q.**  Where were you on December 16, 2015?

21   **A.**  I was in New York City.

22   **Q.**  Why were you in New York City that day?

23   **A.**  We had planned to interview Baptiste that day.

24   **Q.**  When you say interview Baptiste that day, were you

25   referring to an undercover meet with Baptiste?

1    **A.**   No.   Something separate from that.

2    **Q.**   Okay.   What would that have been?

3    **A.**   That would have been Special Agent Allison Pauly and I

4    overtly approaching Baptiste as FBI agents and interviewing

5    him.

6    **Q.**   I'm sorry.   Did you answer completely?   I cut you off.

7            At what point in an investigation do you make an

8    approach like this on a person who is under investigation?

9    **A.**   When we've made the determination that we have sufficient

10   evidence to charge the individual if the interview doesn't go

11   well.

12   **Q.**   Did that approach on Mr. Baptiste actually happen that

13   day?

14   **A.**   It did not.

15   **Q.**   Why not?

16   **A.**   Baptiste brought his wife to New York City and that

17   confounded the timetable for the approach and our ability to

18   have a confidential interview with him.

19   **Q.**   Broadly speaking, what evidence were you aware of conduct

20   to be sufficient to charge an individual -- what evidence

21   like that were you aware of with respect to Mr. Baptiste and

22   Mr. Boncy as of December 16, 2015?

23   **A.**   Well, we had multiple conversations between Baptiste and

24   Boncy regarding bribery of Haitian government officials to

25   include the wire intercepts during which Baptiste called

1    Boncy and asked permission and agreement to offer a job on

2    the port project to Axan Abellard in exchange for his support

3    and getting the letter from the Prime Minister's office.

4            They had also discussed on separate calls bringing

5    the Prime Minister onto the port project once he left office

6    in exchange for his support while Prime Minister.  And they

7    had discussed on the telephone the use of NOAH as a

8    concealment device and conduit to funnel money down to Haiti

9    for payment to Haitian government officials.

10   **Q.**  And how much of the project was discussed as a source of

11   bribes?

12   **A.**  A rough quantification was 5 percent.

13   **Q.**  If I could have you look in the packet of documents in

14   front of you at what was previously submitted to the Court as

15   Exhibit 133 or document 133-1 on the docket.  And I'll have

16   you look at page 29 of 117, if you could.

17   **A.**  I'm there.

18   **Q.**  Special Agent, what is this document?

19   **A.**  It's a transcript of a call that we intercepted on the

20   wire.

21   **Q.**  What is the date of the call?

22   **A.**  November 25, 2015.

23   **Q.**  Okay.  Let me refer you to line 6, if I could.  Do you

24   see Baptiste says there, I already spoke to Axan for the

25   letter.

1              Do you see that?

2    **A.**  I do.

3    **Q.**  Boncy responds yes.  Do you see that?

4    **A.**  I do.

5    **Q.**  Baptiste says, Can I tell him if he gives us, if he also

6    gives us something for the Mole, I will give him something.

7              Do you see that?

8    **A.**  I do.

9    **Q.**  What is the Mole there?

10   **A.**  Mole is short for Mole St. Nicolas which was the

11   geographical site of the port project.

12   **Q.**  Boncy responds, Yes, yes, naturally, finally.  Do you see

13   that?

14   **A.**  I do.

15   **Q.**  And then Baptiste says, No, I am telling you, I am

16   telling you.  And Boncy responds, Do not, do not write it, do

17   not write it.

18              Do you see that?

19   **A.**  I do.

20   **Q.**  Special Agent, what is this exchange?

21              MR. DWYER:  Objection, Your Honor.

22              THE COURT:  Sustained.

23   BY MR. BASIL:

24   **Q.**  Special Agent, what is the relationship between the

25   interaction here and 5 percent social funding in the contract

1    for the port project?

2                MR. DWYER:  Objection, Your Honor.

3                THE COURT:  I don't understand the question.  You

4    need to lay a better foundation.

5    BY MR. BASIL:

6    **Q.**  Do you recall earlier today Mr. Dwyer characterized 5

7    percent for social funding as being the central feature of

8    the government's case?

9    **A.**  I recall that, yes.

10   **Q.**  Okay.  And when I asked you a few moments ago about what

11   criminal conduct you were aware of by December 16, you

12   mentioned an exchange about Axan Abellard; is that correct?

13   **A.**  I did.

14   **Q.**  Is that this exchange?

15   **A.**  It is.

16   **Q.**  What's the relationship between this exchange and the 5

17   percent for social funding, as Mr. Dwyer referred to earlier,

18   as being the central part of the case?

19               MR. DWYER:  Same objection.

20               THE COURT:  Foundation about the relationship

21   between --

22   BY MR. BASIL:

23   **Q.**  Sure.  Special Agent, is this part of the 5 percent for

24   social funding?

25   **A.**  No, it's not.

1    **Q.**  Let's go on to page 32 of 117, please.

2    **A.**  I'm there.

3              MR. BASIL:  Your Honor, to speed things along, may

4    I lead on at least identification of documents?

5              MR. DWYER:  No objection, Your Honor.

6              THE COURT:  Mr. Dwyer is not objecting.

7              MR. BASIL:  Thank you.

8    BY MR. BASIL:

9    **Q.**  Special Agent, is this also a wire intercept?

10   **A.**  Yes.

11   **Q.**  Is this a wire intercept dated the same day as the prior

12   call we just reviewed?

13   **A.**  Yes.

14   **Q.**  Is this a call between persons believed to be Axan

15   Abellard and Joseph Baptiste?

16   **A.**  Yes.

17   **Q.**  Let me refer you to line 12, please.  Do you see there it

18   says, "Also I have spoken to Richard.  He has told me that

19   you are an engineer.  If you could approve for the Mole as

20   well, we would make you a part of it.  Abellard responds,

21   Yes, thank you, okay.

22              Do you see that?

23   **A.**  Yes.

24   **Q.**  Could I have you go to the next page, 33?

25   **A.**  Yes.

1    **Q.**  At line 36 Baptiste says, "I already spoke to him.  I

2    told him that you were an engineer.  It would be good if you

3    could join us so you could push the project forward.  He told

4    me that's not a problem.  Abellard responds, No problem.

5    Baptiste responds, Axan, we have serious money for that

6    project.  Abellard responds, Okay then, once you tell me so,

7    no problem, chief.  And Baptiste then responds, We do have

8    money for that project.  I say the same thing to my client.

9    He is going to be my consultant.  He says, Right after he is

10   out of the Prime Minister's office, he will join.

11           Do you see that?

12   **A.**  I do.

13   **Q.**  What was of the significance of this event in your

14   investigation?

15   **A.**  This was Baptiste offering a Haitian government official

16   a thing of value in exchange for that government official's

17   use of his office.

18   **Q.**  Is this the 5 percent for social funding under the

19   contract?

20   **A.**  No.

21   **Q.**  Could I have you go forward to page 40 of 117.  Okay.  Is

22   this also a wire intercept?

23   **A.**  Yes.

24   **Q.**  Is this a session, call that took place two days later on

25   11/27/2015?

1    **A.**  It is.

2    **Q.**  Let me refer you to line 19.  Baptiste says, Now all of a

3    sudden the lawyers and everybody is on the table.  They can

4    see the size of the thing that we're doing and that's what

5    I'm talking about.  And there's a response from Boncy that's

6    unintelligible and Baptiste continues, So now I have to go

7    across the table and get everybody something.  It's just a

8    matter of getting the last piece to them by Monday.  And

9    Boncy responds, Keep, keep Peter warm.

10            Special Agent, where, if anywhere, in this call

11   does Mr. Boncy indicate that Mr. -- does Mr. Boncy indicate

12   that Mr. Baptiste should not --

13            MR. DWYER:  Objection, Your Honor.

14   BY MR. BASIL:

15   **Q.**  -- go across the table and get everybody something?

16            THE COURT:  Basis?

17            MR. DWYER:  The call speaks for itself.

18            THE COURT:  You can ask him his understanding.

19   BY MR. BASIL:

20   **Q.**  Sure.  What's your understanding of what just happened

21   there in that portion of the call that I read it?

22   **A.**  Baptiste is describing to Boncy the need to continue to

23   make payments to Haitian government officials to move the

24   project along.

25   **Q.**  What is your understanding of Mr. Boncy's response?

1    **A.**   He never objects.

2    **Q.**   What does "keep Peter warm" mean to your understanding?

3    **A.**   It meant that Baptiste should keep Peter happy

4    essentially and apprised of developments.

5    **Q.**   Is this the 5 percent for social funding?

6    **A.**   No.

7    **Q.**   Could you go forward to page 49 of 117.

8    **A.**   I'm there.

9    **Q.**   Have you, in fact, reviewed -- so this is another

10   session, another call, and this is dated December 23, 2015;

11   is that correct?

12   **A.**   Yes.

13   **Q.**   In session 2022, right?

14   **A.**   Correct.

15   **Q.**   Have you actually reviewed the audio for this file?

16   **A.**   Yes.

17   **Q.**   Okay.  Were you able to identify the voices on it?

18   **A.**   Yes.

19   **Q.**   Okay.  Do you see down there at lines 8 and 9 it says, RB

20   for 8 and JB for 9.  Do you see that?

21   **A.**   Yes.

22   **Q.**   Based on your review should that, in fact, be reversed

23   that it's JB above and then RB?

24   **A.**   Yes.

25   **Q.**   Special Agent, let me refer you to line 7 where Mr. Boncy

1    states, It's very important to understand because, laughing,

2    each person wants theirs understand.  And Baptiste responds,

3    Pardon me, I know, that's what I know for sure, (laughing),

4    what happens, absolutely each step that takes, each person

5    wants, wants, a piece of.  Yes.  Absolutely, absolutely.  I

6    told him once we have the letter we will take care of

7    everybody.  And Boncy responds, Yes, yes, I'll see you.

8           Do you see that?

9    **A.**  Yes.

10   **Q.**  Is this the 5 percent for social funding?

11   **A.**  No.

12   **Q.**  Could we please go on to page 55 of 117.  Are you there?

13   **A.**  I am.

14   **Q.**  Is this another call intercepted on the wire?

15   **A.**  Yes.

16   **Q.**  This was dated 12/12/2015, is that correct?

17   **A.**  Correct.

18   **Q.**  And session 2682?

19   **A.**  Yes.

20   **Q.**  This is a call involving Mr. Boncy and Mr. Baptiste?

21   **A.**  Correct.

22   **Q.**  You're able to recognize their voices on the call?

23   **A.**  Yes.

24   **Q.**  At line 209 Mr. Baptiste says, We are going -- make sure

25   that everything that we need from the government we have it.

1    Any license, anything we need, we will hire them as

2    consultants to get this license.  And Boncy responds, Uh-huh,

3    uh-huh.  Baptiste says, You understand?  And Boncy responds,

4    Okay.  But do not write it.  Technically this thing about the

5    Prime Minister, (laughing), do not write it.

6              Do you see that?

7    **A.**  I do.

8    **Q.**  What is your understanding of what happens there?

9              MR. DWYER:  Objection, Your Honor.  The agent's

10    understanding I think is irrelevant.

11              THE COURT:  I'm happy to have you keep doing this,

12    but I'm not really sure what you're driving at.

13    BY MR. BASIL:

14    **Q.**  Is the arrangement here the 5 percent for social funding?

15    **A.**  No.

16    **Q.**  What significance did this event have to you in your

17    investigation?

18    **A.**  This was yet another discussion where Boncy and Baptiste

19    were agreeing on the offer of employment to Haitian

20    government officials in exchange for their support of the

21    port project.

22    **Q.**  Based on your training and experience as an FCPA

23    investigator, what's the significance of that?

24              MR. DWYER:  Objection, Your Honor.

25              THE COURT:  Overruled.

1    **A.**  It's a violation of the FCPA.

2    BY MR. BASIL:

3    **Q.**  Let me have you look at page --

4           THE COURT:  I'm going to strike that testimony

5    because that was a legal conclusion.  I thought he was going

6    to say something else.  It doesn't matter.  It's just me.

7    I'm not going to take that answer.

8    BY MR. BASIL:

9    **Q.**  Let me have you look at page 57 of 117, please.

10   **A.**  I'm there.

11          THE COURT:  So the point that you're trying to make

12   is that the missing callings have to do with the 5 percent,

13   but that even absent those calls there's evidence of criminal

14   activity that was completely separate from it?

15          MR. BASIL:  Your Honor, the point here is that by

16   the time of the calls on December 19, all the facts that

17   prove the government's charges as to every element already

18   existed.  The suggestion that the 5 percent for social

19   funding was the case as of December 19 is simply untrue, and

20   we'll get to that in just a moment.  What actually existed by

21   this time was a complete and perfected conspiracy.

22          THE COURT:  I know we're going to hear all this

23   next week, and it's going to go to a jury next week, and it's

24   fine.  For my purposes here I don't need to hear every single

25   call where they're talking about something other than the 5

1    percent.  I get the gist of it.

2          MR. BASIL:  Your Honor, if the Court is prepared at

3    this time to say that the evidence on the 19th was merely

4    potentially useful rather than apparently exculpatory, as the

5    defendant is saying, then I won't go on.

6          THE COURT:  They are two different concepts, right?

7    You can go on with this line of questioning for a long time.

8    I'll let you do it if you want.  Just because there's other

9    evidence, it doesn't mean that that evidence wasn't

10   exculpatory.

11         MR. BASIL:  Your Honor, the crime was complete

12   and --

13         THE COURT:  That may be.  That may be.

14         MR. BASIL:  And the calls that happened on the 19th

15   were pursuant to an agreement between the parties on the

16   18th, which I'm about to get to, that make every statement

17   made on those calls inculpatory statements as overt acts in

18   furtherance of the conspiracy.

19         THE COURT:  Okay.  But I don't need to find that

20   today.  That's what you're going to be --

21         MR. BASIL:  Your Honor, from the government's point

22   of view, these calls cannot be apparently exculpatory under

23   the meaning of that term, which means apparently materially

24   exculpatory, because they can be construed easily by the

25   government as being totally consistent as being inculpatory.

1    THE COURT:  Okay.  Keep going if you want to.  I'm

2    not trying to shut you off.  I'm just saying I got it.  But

3    go ahead.

4    MR. BASIL:  I'll move along, Your Honor.

5    BY MR. BASIL:

6    Q.  Special Agent, let me have you look at page 57 of 117.

7    A.  I'm there.

8    Q.  Is this an email sent by Mr. Boncy to Mr. Baptiste on

9    December 18?

10   A.  Yes.

11   Q.  Is the effect of this email that Mr. Boncy is forwarding

12   something called a draft note to Special Agent Peter?

13   A.  Yes.

14   Q.  Could I have you look at the next page, please.  This is

15   page 58 of 117.

16   A.  I'm there.

17   Q.  Let me refer you to bullet point number three in the

18   draft note from Mr. Boncy.  Do you see that?

19   THE COURT:  You've got to slow down.  We literally

20   have not left this courtroom since 9:30 this morning.  Just

21   slow down for her.  She's doing yeoman's work today.

22   MR. BASIL:  Yes.

23   BY MR. BASIL:

24   Q.  And it states there, Please note that as pointed out

25   earlier that the Satarem's, S-A-T-A-R-E-M, original estimate

1    did not include additional cost such as the ones related to

2    the role you anticipates, with an S, for Joe Baptiste in

3    advocating the process interest with the local authorities.

4    We propose that an additional amount of 5 percent be added to

5    the final estimation of costs.

6               Do you see that?

7    **A.**  I do.

8    **Q.**  When, if ever, had you heard 5 percent referenced in

9    relation to local authorities in your investigation?

10   **A.**  Among other times on November 12, 2015.

11   **Q.**  Let me refer you now to page 61 of 117.

12   **A.**  I'm there.

13   **Q.**  Okay.  In the middle email there Mr. Boncy writes, "A

14   possible alternative is to try to include it when we review

15   the updated costs in May.  This may be too late for you.  The

16   problem we are facing is that we used the bare minimum costs

17   which Satarem used.  If we don't mention at all, he will

18   challenge it then.  Perhaps you could suggest another way to

19   refer to it."

20               Do you see that?

21   **A.**  Yes.

22   **Q.**  Mr. Baptiste responds, "I will not be able to wait for

23   May.  I need to have the 5 percent on the date of signing of

24   contract.  The people who have helped make this contract

25   possible will not wait."

1            Do you see that?

2    **A.**   I do.

3    **Q.**   Okay.  Let's go on to page 71 of 117.  Are you there?

4    **A.**   I'm there.

5    **Q.**   Is this another call intercept on 12/18/2015?

6    **A.**   It is.

7    **Q.**   Okay.  This is between Mr. Baptiste and Mr. Boncy?

8    **A.**   Yes.

9    **Q.**   Referring you to line 9.  Mr. Boncy says, "What I am

10   saying is, I, I, the note raised it from 34 to 39."  Let me

11   stop there.

12            Is that million dollars?

13   **A.**   Yes.

14   **Q.**   Is that okay?  Baptiste responds, That's what I'm saying,

15   I don't want to bother him then for that to start.  Boncy

16   responds, I know, I know.  But the part of the problem is

17   we're a bit stuck because we have -- and Baptiste then

18   responds, skipping a couple of lines, there is always

19   unforeseen expenses that you incur when you start the project

20   in construction mostly.  And you tell him, Okay, we need

21   extra 4 to 5 million to unblock something.  Boom.  Can you

22   provide that?  And Boncy responds uh-huh.

23            Do you see that?

24   **A.**   Yes.

25   **Q.**   Let me have you go forward to page 73 of 117.

1    **A.**   Okay.

2    **Q.**   At the top Baptiste says, Yeah, keep it at 4.  Again is

3    that million?

4    **A.**   Yes.

5    **Q.**   He says signing after the project has begun we will tell

6    him, my man, we need to increase it by such amount because

7    those are unforeseen that, that arise over there.  You need

8    to provide an additional 5 percent.

9         Do you see that?

10   **A.**   Yes.

11   **Q.**   Down at line 37, do you see Mr. Boncy responds, And I'll

12   exclude, and I'll exclude the 5 percent, as I said to you

13   earlier.

14        Do you see that?

15   **A.**   Yes.

16   **Q.**   After this date what was your understanding of the

17   agreement between Mr. Baptiste and Mr. Boncy regarding the

18   5 percent?

19             MR. DWYER:  Objection.

20             THE COURT:  Basis?

21             MR. DWYER:  Speculation.

22             THE COURT:  His understanding of it.

23             MR. DWYER:  Then relevance, Your Honor.  His

24   understanding.

25             THE COURT:  He can testify about his understanding

1    of it, whatever its marginal relevance might be.

2              MR. DWYER:  Understood.

3    **A.**  My understanding was that Baptiste and Boncy had reached

4    a new agreement such that they would request an additional 5

5    percent from Peter in SEW Funds after the execution of the

6    contract as a way to mitigate the increasing costs of the

7    project from 84 million to 110 million.

8    BY MR. BASIL:

9    **Q.**  Let me have you go forward to page 102 of 117, please.

10   **A.**  Okay.

11   **Q.**  This is a call between Mr. Boncy and Mr. Baptiste on

12   12/20/15; is that correct?

13   **A.**  Yes.

14   **Q.**  53 seconds there Boncy says, Well, you know, Peter called

15   me last night and he went -- Do you see that?

16   **A.**  Yes.

17   **Q.**  He continues a line down, No, no.  He was, you know, he

18   was very positive when he called.

19              Do you see that?

20   **A.**  Yes.

21   **Q.**  Let me have you go forward to page 106 of 117.

22   **A.**  Okay.

23   **Q.**  And right there at line 623 Boncy says, "And that's the,

24   that's the concern.  At least I think from the tone of our

25   conversation we spoke for about 30 minutes talking about his

1    family and this and that.

2              Do you see that?

3    **A.**   Yes.

4    **Q.**   Who is "he" in that sentence to your understanding?

5    **A.**   Peter.

6    **Q.**   Could you go forward to page 110 of 117.

7    **A.**   Of 117?  Okay.

8    **Q.**   At 1311, the line there that says, Axan is coming up to

9    talk to me about --

10   **A.**   Yes.

11   **Q.**   Down at 1339, do you see that he says, Because you know

12   that he's already our friend.  He's proved that he is already

13   our friend.  So we're going to treat it as such.

14             Do you see that?

15   **A.**   Yes.

16   **Q.**   To your understanding what is that a reference to?

17   **A.**   The fact that they had involved him -- included him in

18   the port project, which was to say they had paid him the

19   bribe.

20   **Q.**   Okay.  Let me have you look at one last page, page 112 of

21   117, please.

22   **A.**   Okay.

23   **Q.**   At 60 minutes, 54 seconds, do you see that Baptiste says,

24   I talked to Peter, Peter and everybody, that asked me, well,

25   will we support both.  And he agreed with me if we have -- it

1    says inaudible, simultaneous speakers -- election, I will

2    support both.

3            And skip down to 1706.  He then says, At first, no,

4    no.  At first he will say no.  Why don't we wait until one

5    become president then we will support.  I said no, by that

6    time we going to cost you millions.

7            Do you see that?

8    **A.**  Yes.

9    **Q.**  And Boncy responds, Yeah, you're absolutely right.  Do

10   you see that?

11   **A.**  Yes.

12   **Q.**  When, if ever, have you heard these two men discuss this

13   topic before?

14   **A.**  It came up on November 12 at the Boston Harbor Hotel

15   meeting.

16   **Q.**  Generally what was their conversation on November 12 of

17   2015?

18   **A.**  That payments to candidates to Haitian government office

19   would be cheaper before someone won an election because then

20   the price would go up.

21   **Q.**  Special Agent, what did you do on December 29 of 2015?

22   **A.**  I interviewed Baptiste.

23   **Q.**  Was that the approach that you had previously planned for

24   December 16?

25   **A.**  Yes.

1    **Q.** Why didn't you approach Mr. Boncy that night?

2    **A.** The investigative team had selected Baptiste for

3    interview and potential recruitment because he was

4    U.S.-based, and he was also more apparently connected to

5    Haitian government officials and so seemed to be a better

6    recruitment candidate for advancing the investigation.

7    **Q.** Was Mr. Boncy no longer a target of the investigation at

8    that time?

9    **A.** He was definitely a target of the investigation at that

10   time.

11                   MR. BASIL:  If I could have a moment, Your Honor.

12                   THE COURT:  Sure.

13                   MR. BASIL:  Nothing further, Your Honor.

14                            REDIRECT EXAMINATION

15   BY MR. DWYER:

16   **Q.** Special Agent, you testified about wanting to approach

17   Mr. Baptiste on December 16, 2015, correct?

18   **A.** Correct.

19   **Q.** And at that point in time, December 16, 2015, the FBI had

20   given him $50,000, correct?

21   **A.** Correct.

22   **Q.** And he had reported back to the FBI that he had made

23   certain payments in Haiti to public officials, correct?

24   **A.** Yeah.

25   **Q.** And you had reviewed those calls, correct?

1   **A.**   I had.

2   **Q.**   And you believe that he had made those payments to

3   Haitian public officials, correct?

4   **A.**   It was an open question at the time.

5   **Q.**   But you understood, you believed he had made the

6   payments, correct?

7   **A.**   I just said it was --

8   **Q.**   You personally, open question with you?

9   **A.**   We understood that --

10   **Q.**   Not we.  You, Special Agent.

11   **A.**   Sure.  I understood that he had made representations on

12   the phone, and that he had made representations including

13   that he withdrew funds down in Haiti to make payments

14   directly from there.

15   **Q.**   You personally believed that he had made payments to

16   Haitian public officials, correct?

17   **A.**   I believed certainly that he had made noncash payments to

18   Haitian government officials.

19   **Q.**   That's not my question, Special Agent.  The FBI -- Let's

20   start from the beginning again.  The FBI gave him $25,000,

21   correct?

22   **A.**   Twice.

23   **Q.**   Did they give him $25,000, Special Agent?

24           MR. BASIL:  Objection, Your Honor.

25   **A.**   We gave him $50,000.  We just said this.

1        THE COURT:  I just don't think he heard you.

2    BY MR. DWYER:

3    Q.   Did the FBI give Mr. Baptiste $25,000 in November 2015?

4    A.   Yes.

5    Q.   Okay.  And you gave him $25,000 premised on the fact that

6    he told you he was going to pay the Prime Minister, correct?

7    A.   That was part of the justification for the payment, sure.

8    Q.   What was the rest of the justification for giving him

9    $25,000?  Christmas?

10   A.   It wasn't Christmas.

11   Q.   Okay.  What was the rest of the justification?  You said

12   it was part of the justification.

13   A.   Meaning that he had represented that he intended to make

14   payments to Haitian government officials in Haiti.  However,

15   when you take an investigative step directly with subjects,

16   you never know exactly what they're going to do.  So part of

17   the investigative process is to observe what happens.

18   Q.   Okay.  Did you observe what happened?

19   A.   With respect to those $25,000, we received some

20   information from Citibank, yes.

21   Q.   What was the information you received from Citibank and

22   when?

23   A.   I'm not sure specifically when, but within a week or two

24   weeks of that transfer, we had been told that the first

25   $25,000 to NOAH had been transferred to other U.S. bank

1    accounts controlled by Baptiste.

2    **Q.**  So you knew when -- Let's see.  You said the first couple

3    of weeks you knew that the money had been transferred to

4    other bank accounts of Joseph Baptiste?

5    **A.**  I don't recall the specific date when we -- when I talked

6    to Citibank.

7    **Q.**  Okay.  Was it before you gave him the next $25,000?

8    **A.**  I believe that it was.  Although I don't recall for sure.

9    **Q.**  So you knew that he had not used -- that he had used the

10   money to move to his own personal bank account and gave him

11   another $25,000?

12   **A.**  Yes.

13   **Q.**  And the second time he asked for $25,000, he told you

14   that he was going to use it to pay off Haitian public

15   officials, correct?

16   **A.**  True.

17   **Q.**  The same explanation he gave the first time, correct?

18   **A.**  Generally, yes.

19   **Q.**  But you knew he lied the first time, correct?

20   **A.**  No, that's not correct.

21   **Q.**  He moved that money to his own personal bank account,

22   correct?

23   **A.**  True.

24   **Q.**  And did he pay Haitian public officials from his own

25   personal bank account?

1  **A.**  No.  And I didn't say that.

2  **Q.**  What happened to the money in his own personal bank

3  account?

4  **A.**  My understanding is that he used it for domestic expenses

5  here.

6  **Q.**  When did you learn that?

7  **A.**  We're talking about the same thing.  That's what I just

8  testified to.

9  **Q.**  Before you made the second payment?

10  **A.**  Yes.  Because he had made representations during the

11  course of the same conversations, same time period that he

12  had access to funds directly in Haiti and didn't need to draw

13  money from the United States to make the payments he was

14  describing.

15  **Q.**  Okay.  So you gave him $25,000.  You knew that he had

16  moved it to personal bank accounts and used it for domestic

17  personal expenses, correct?

18  **A.**  That was the information we received from Citibank, yeah.

19  **Q.**  That's okay.  And then you gave him another $25,000?

20  **A.**  Yeah.

21  **Q.**  Okay.  And again he told you I'm going to pay Haitian

22  public officials with that money, correct?

23  **A.**  Yes.

24  **Q.**  Did you tell the prosecutors on the case what was

25  happening with this money?

1    **A.**  I don't recall specific conversations.

2    **Q.**  Did you have a discussion with your supervisor about what

3    was going on with this money?

4    **A.**  I'm sure I did, yeah.

5    **Q.**  Okay.  And what was the discussion?  What was the reason

6    to give this man who had said he used the $25,000 to pay

7    Haitian public officials another $25,000?

8    **A.**  The same justification that it had been the first time.

9    **Q.**  What was that?

10   **A.**  That he had represented that he intended to pay Haitian

11   government officials, and that he had access to money

12   directly in Haiti, not necessarily from the NOAH account in

13   the United States.

14   **Q.**  Why did you send it to Haiti?

15   **A.**  Because the NOAH account in the U.S. was the concealment

16   device or method that had been offered by Baptiste.

17   **Q.**  Weren't you concerned that he was scamming you?

18   **A.**  No.

19   **Q.**  Not at all?

20   **A.**  I wouldn't use the word "concern".

21   **Q.**  Did you have an investigative Spidey Sense that he might

22   be scamming you?

23   **A.**  We committed the funds on the basis I just articulated

24   and observed what happened from there.  That's how you

25   investigate.

1    **Q.**  Okay.  He never used those funds to pay Haitian public

2    officials, correct?

3    **A.**  My investigative experience is that money is fungible.

4    People treat their total fiscal position as a global sum

5    based on the aggregate of money they have in different pots

6    in different places.

7    **Q.**  Didn't he tell you that he transferred that money to

8    Haiti on one phone call, sir?

9    **A.**  That I don't recall.

10   **Q.**  Okay.  So when you arrested him, you were unsure whether

11   he had paid any Haitian public officials with that $50,000?

12   **A.**  I didn't arrest.

13   **Q.**  I'm sorry.  You're right.  You didn't.  December 16,

14   2015.  You were unsure as to whether or not he had used that

15   $50,000 to pay Haitian public officials?

16   **A.**  I guess that's fair.

17   **Q.**  That's fair.  Right?  And was that shared generally

18   across the investigative team, people didn't know whether to

19   trust Baptiste?

20   **A.**  That I don't recall.

21   **Q.**  Okay.  But you didn't necessarily trust Baptiste,

22   correct?

23   **A.**  I never said that.

24   **Q.**  You were unsure if he paid Haitian public officials.

25   **A.**  No.  That's not what I said.  You asked the question had

1  he used that $50,000 to pay Haitian public officials.  I said

2  that I did not know.

3  **Q.**  He had told you that he used that $50,000 to pay Haitian

4  government officials.  He told the undercover, correct?

5  **A.**  Yes.

6  **Q.**  But he didn't, correct?

7  **A.**  Again it depends on your definition of "that $50,000".

8  **Q.**  Okay.  Do you think Baptiste, when he's talking on the

9  wire and with the undercovers, is a man of sterling truth?

10             MR. BASIL:  Objection, Your Honor.

11             THE COURT:  Basis?

12             MR. BASIL:  Could counsel define "sterling truth"?

13             THE COURT:  Overruled.  You can't elicit testimony

14  about what he understood certain things to be and then resist

15  testimony where they're trying to get his impression of other

16  things.

17             MR. BASIL:  Your Honor, we're currently getting

18  testimony about Spidey Senses and sterling truth.  I don't

19  believe I used such language.

20             THE COURT:  It's not that far off from his

21  understanding of what's going on in conversations that he

22  wasn't present for.  You're asking his impressions based on

23  his experience as an agent prior and in the course of this

24  investigation.  I'm not sure any of it's all that relevant.

25  But I let you have it, now I'm going to let him have it.

1    **A.**  Could you repeat the question, please.

2    BY MR. DWYER:

3    **Q.**  Mr. Baptiste, during the course of the wire intercept, he

4    would tell various people different stories, correct?

5    **A.**  He didn't always say the exact same thing to everybody.

6    **Q.**  He would say what was needed with the audience, correct?

7    **A.**  I don't know that I agree with that characterization.

8    **Q.**  Did you have concerns that Mr. Baptiste was scamming the

9    FBI?

10   **A.**  Again that word concern, I was not concerned.

11   **Q.**  It didn't bother you?

12   **A.**  No.

13   **Q.**  You testified earlier payments to candidates were

14   discussed at various times.  Were they political

15   contributions or payments, sir?  Is that your

16   characterization, payments?

17   **A.**  My understanding based on my work in this investigation

18   was that there were no legitimate political contributions

19   discussed by anybody involved ever.

20   **Q.**  Okay.  That's your understanding?

21   **A.**  Yes.

22   **Q.**  Now, I want to go back to the context and the concepts

23   and all those different things and what's going on on

24   December 18, 19.  Do you remember all those questions?  And

25   we went through Exhibit 1A, very long, right in front of you

1    there?

2    **A.**  Yes.

3    **Q.**  Okay.  Does there come a time in an investigation where

4    you say, you know what, we've got enough evidence, I don't

5    need to save it anymore?

6    **A.**  No.

7    **Q.**  No.  Your job is to preserve evidence, correct?

8    **A.**  Collect and preserve, sure.

9    **Q.**  As long as the investigation goes on, correct?

10   **A.**  And thereafter.

11   **Q.**  And thereafter.  And in this case the investigation was

12   going on, correct?

13   **A.**  What time are we talking about?

14   **Q.**  December 19 --

15   **A.**  Yes.  The investigation at that time was ongoing.

16   **Q.**  And you certainly didn't make any estimation at any time

17   during this case to say we've got enough, we don't need to

18   save this evidence, correct?

19   **A.**  No.

20   **Q.**  And if you had evidence that was exculpatory, you would

21   feel obligated to preserve it?

22   **A.**  I feel obligated to preserve evidence regardless of its

23   perceived exculpatory quality.

24   **Q.**  But you didn't take the steps to preserve those

25   December 19, 2015, telephone calls in this case, did you?

1   **A.** I disagree.  My understanding at the time was that they

2   were preserved indefinitely on the original device of

3   collection at a headquarters facility.  My understanding of

4   the -- yeah.  That's the answer.

5   **Q.** It was at the headquarters facility, right?

6   **A.** Yeah.

7   **Q.** Okay.  Good.  The emails to Chambers about the consensual

8   wire, you testified about that on cross examination.

9   **A.** Mm-hmm.

10  **Q.** How did you become aware of those?

11  **A.** He forwarded one to me.

12  **Q.** When?

13  **A.** I believe in January 2016.

14  **Q.** January of 2016?

15  **A.** I think that's right.

16  **Q.** What was the date of that?

17  **A.** I don't recall.

18  **Q.** I'm sorry.  January 2016 you received the email from

19  Vincent Chambers?

20  **A.** Yeah.  I think that's right.

21  **Q.** Do you still have it?

22  **A.** Yeah, sure.

23  **Q.** You do?

24  **A.** I believe I do.

25  **Q.** That was January 2016, at most 45 days from the lost

1    telephone calls, correct?

2    **A.**  I'll adopt your math.  Sure.

3    **Q.**  You were on notice that there were calls that needed to

4    be downloaded, correct?

5    **A.**  That's not the content of the email.

6    **Q.**  What was the content of the email then?

7    **A.**  It's an automated message that reminds the authorized

8    user or the authorized controller of the account that the

9    account exists.  And if it's no longer in use, then contact

10   the relevant personnel to deactivate.

11   **Q.**  And when you received that email, what did you do?

12   **A.**  I don't recall specifically.

13   **Q.**  Did you respond?

14   **A.**  I don't recall.

15   **Q.**  Did you take action to see what was still up there on the

16   server?

17   **A.**  No.  I didn't understand that as a necessary step, and

18   the investigation was ongoing.

19   **Q.**  In Norfolk you had done this.  You had downloaded on this

20   same system in Norfolk?

21   **A.**  Yes.  The collection event was similar to a wire is when

22   the period of collections is over, you collect everything on

23   one disk and then pass it to ELSUR for local preservation.

24   **Q.**  In June of 2016 you became the user of this system, is

25   that right, the authorized user?

1  **A.** In June 2016, yes, that's my understanding.

2  **Q.** How did you become the authorized user?

3  **A.** I don't recall the specific steps that I took.

4  **Q.** What did you do when you became the authorized user?

5  **A.** I believe that I logged in to check whether a call made

6  to me by Peter as a test of the system had been captured.

7  **Q.** Okay.

8  **A.** Like a system check.

9  **Q.** But you have to download it to do that, right?

10 **A.** No.

11 **Q.** No?

12 **A.** No.

13 **Q.** What do you do?

14 **A.** I believe at the time the way the system was configured,

15 you could just log in and look at the most recent line, the

16 record, which would have been identifiable as my telephone

17 number on -- within -- I forget which day I did it.  But

18 whatever day I logged in.

19 **Q.** So you just saw if the call was there.  You didn't

20 actually listen to the call?

21 **A.** Peter and I didn't have a conversation on the system, or

22 at least not one of any length or anything worth reviewing.

23 **Q.** But you said you logged in to see if a call that Peter

24 had made to you was on the system, right?

25 **A.** Yeah.  Correct.

1    **Q.**  And did you listen to the call?

2    **A.**  I don't recall.

3    **Q.**  So we're clear, Special Agent, you were the case agent

4    from December 2015 to the time that this case was indicted,

5    correct?

6    **A.**  At some point in December.  Not the entirety of December

7    2015.  But the rest is true.

8    **Q.**  Okay.  And you never once listened to these calls?

9    **A.**  No.

10                MR. DWYER:  Nothing further, Your Honor.

11                MR. BASIL:  Nothing, Your Honor.

12                THE COURT:  You're good.

13                THE WITNESS:  Thank you, Your Honor.

14                MR. DWYER:  Nothing further from us, Your Honor, on

15    the motion.

16                THE COURT:  Does the government want to call its

17    own witnesses?

18                MR. BASIL:  I missed it.

19                THE COURT:  Do you want to call any of your own

20    witnesses?

21                MR. BASIL:  No, Your Honor.

22                THE COURT:  So I don't think this needs to be

23    resolved.  I'm not going to dismiss the case on this, which

24    should not come as a surprise to you.  So I'm thinking that

25    we don't need to resolve this by opening statements, correct?

1    We're talking about what kind of instruction?

2            MR. DWYER:  Understood.  If it's an instruction

3    issue, no, Your Honor.  There's various remedies in between,

4    however, including suppression of other types of evidence and

5    so forth, which I think the First Circuit case law makes

6    clear that you don't have to dismiss, but you can penalize

7    here because frankly this is a mess.  Right?

8            THE COURT:  I agree that what happened was not

9    exemplary.  It also does not seem to have been intentional on

10   the part of anybody.

11           MR. DWYER:  I think there's probably some

12   credibility there.  I'm not going to say -- I will reserve my

13   arguments on bad faith.  Let's put it that way.  But I do

14   think that this call was exculpatory, and it's completely

15   different from what Baptiste, the alleged co-conspirator, is

16   getting at.

17           And to say somehow that there should be no remedy

18   here but for an instruction, which I'm sure the government is

19   going to argue we have to prove bad faith on, is just

20   inconsistent.

21           THE COURT:  I'm going to give you some kind of

22   instruction on it.  I'm open to hearing what other sorts of

23   remedies you think are appropriate.  I don't know whether

24   this call was exculpatory or it wasn't.  But I think that

25   your ability to now argue that it was is pretty valuable in

1    the context of things.

2            MR. DWYER:  I agree.

3            THE COURT:  You may be better off without the call

4    than you would be with it.  We don't know.  Right?

5            MR. DWYER:  We don't know.

6            THE COURT:  We don't know.

7            MR. DWYER:  We don't know, Your Honor.  And that's

8    a problem.

9            THE COURT:  But you are free to argue that.  And I

10   will give you some kind of instruction missing evidence or

11   spoliation.  I don't know how strong an instruction because

12   I'm not willing to find that they did it intentionally.  So

13   we'll see what the range of possible instructions are.

14           MR. DWYER:  Understood.

15           THE COURT:  No question that it's sloppy.

16           MR. DWYER:  It's sloppy.  So is the 25.  And 25

17   sloppy when they don't even know what he's using it for.  The

18   whole thing is sloppy.

19           THE COURT:  I would just like someone to give me

20   $25,000 and not be concerned about it.  I'm good with that.

21   But you have that, too.  In terms of suppression, I don't see

22   anything that sort of -- I'm having trouble with the fruit of

23   carelessness.

24           MR. DWYER:  I think the wiretap, Your Honor.

25           THE COURT:  No.  I'm not suppressing the wiretap on

1    this.  But you also have your arguments about the wiretaps
2    and the consensual logs not matching up.  I don't know what I
3    would do on a carelessness thing.  But even assuming that it
4    was something more than careless, I don't see that there's a
5    particular fruit of the fact that this tape was missing or
6    the suppression would be closely aligned to the -- for lack
7    of a better word I'm going to call it misconduct, although I
8    don't know that it was misconduct.  But I don't see anything
9    that they got that was closely aligned to the thing that they
10   lost.

11            MR. DWYER:  I understand.  The problem is we're
12   stuck with a bunch of calls where they're talking with --
13   this is a classic game of telephone.  The government decided
14   not to talk to my client and instead have a third party speak
15   for him.  And then they talked to him three times, and two of
16   those three are gone.  And on those two of the three he says
17   something entirely different than what they're banging
18   Mr. Baptiste about.

19            THE COURT:  That's like a gold mine for you.

20            MR. DWYER:  I know, Judge, but no man should have
21   to sit through that gold mine.  He has a due process right
22   that these agents save the evidence, particularly when it's
23   apparently exculpatory.

24            THE COURT:  I don't know that it was exculpatory.
25   And I don't know that it's a due process right.  I'd have to

1    think about that.  It should not have happened.  Right?  I'll
2    give you that easily.  And I'm willing to entertain remedies,
3    but I'm not going to dismiss the case on this.
4            It wasn't intentional misconduct.  And suppressing
5    the wiretap seems like really killing the dog over the --
6    killing the horse over the nail in its foot, right?
7            So if you want to come up with some other ideas on
8    that, I'm open to it.  But it's hard for me to think what
9    those might be under these circumstances.  Look, I'm not
10   condoning what happened here.  I don't think that there's
11   anyone from the government that's sitting in this room that's
12   going to condone it either.
13           MR. DWYER:  Well, there was one on the stand, Your
14   Honor, who won't admit that --
15           THE COURT:  He's trying to be careful.  He's
16   probably going to be on the stand again next week, right?
17           MR. DWYER:  Yeah.  I understand, Your Honor.  We'll
18   think up some ideas.  Of course run them by the government.
19   There are a couple of other housekeeping things.
20           THE COURT:  I have a list, too.  Do you want to do
21   your list or my list?
22           MR. DWYER:  Your list, Your Honor.
23           THE COURT:  The civil case that I have been
24   enjoying all week long is not over.  Judge Young is going to
25   impanel the jury on Monday.  The civil case should be to the

1    jury by 11.  We have the charge and the two closings.  That's
2    all that's left.  Hopefully he'll pick a jury, and then we'll
3    give them a little bit of a break, and then we'll be ready
4    for openings in this case.
5          I am not -- I think just in terms of the orderly
6    progression of evidence, and given that I've given you two
7    weeks for a case that I don't think really sounds like it's
8    going to push the envelope on that, I don't think we'll
9    bother trying to put on testimony on Monday.  Just pick a
10   jury and do openings.  Does that make sense to everybody?
11         MR. BASIL:  Yes, Your Honor.
12         MR. DWYER:  Yes, Your Honor.
13         THE COURT:  I have copies for you of the voir dire
14   if I can figure out which pile I put it in.  The voir dire, I
15   have a clean copy; I have a red lined copy.  The copies of
16   what I would normally say to the jury when they came up, I'll
17   give it to you.  I'm sure Judge Young has his own spiel.
18   I'll hand him mine.  Maybe he'll use it and maybe he won't.
19   And I will give you a copy of the preliminary instructions,
20   which will be the first thing that I do after there's a jury
21   selected and just before openings.  So I have copies of all
22   of that for you.
23         And that's it except have we come to a resolution
24   on the undercover identity and how we're going to deal with
25   that at trial?

1          MS. RUBIN-SMITH:  Your Honor, our proposal is that
2     the undercover testify as Peter Anderson, and we make it
3     clear that that is not his real name.
4          THE COURT:  I'm not doing that.  I think I've said
5     that every single time we've been in court that that's not
6     what's going to happen.  It's not fair to them.  Come up with
7     some other way.  If you want to call him Agent Peter and
8     Undercover Peter, but it's going to be crystal clear.  We've
9     been over this.  You can't make it look to this jury like he
10    was using the same name in court and the same name in the
11    investigation.  There is an aspect of deceit to it that they
12    want to exploit.
13         It is perfectly permissible to see -- I'm not
14    impugning the government's conduct at all.  This was the path
15    you chose with an undercover, and now that's what you're
16    going to live with in front of the jury.
17         MS. RUBIN-SMITH:  We propose to call him Agent
18    Peter as we did today.
19         THE COURT:  Agent Peter is fine with me.
20         MR. DWYER:  I don't have a problem with that, Your
21    Honor.
22         THE COURT:  Okay.  Agent Peter.  I know we've had
23    this discussion about Agent Peter four times.  I hope we just
24    put it to bed.  Okay?
25         Let's start with you and then we'll move over to

1    the government.  If Mr. LaRoche's issues are different than

2    yours, we can --

3            MR. DWYER:  Your Honor, today I objected a couple

4    times.  I will have a standing objection if anyone who is not

5    participating in a telephone call attempts to interpret it.

6            THE COURT:  My view on that is, and I will hear the

7    government on it, is that if there are particular code words

8    that the case agent has come to be familiar with during the

9    course of the investigation, like calling a kilogram of

10   cocaine an elephant, or whatever we're calling it these days,

11   I will allow that.  Something that requires some special

12   expertise.

13           If there's somebody in the room participating, he

14   can give his understanding to explain why he says what he

15   says next.

16           MR. DWYER:  I don't have any objection to that, but

17   what we heard today is an agent who's all over the place.

18           THE COURT:  I agree.  But it's just me.  It's just

19   me.

20           MR. DWYER:  I understand.  I wanted to make that

21   clear that I didn't object today, but I will have a standing

22   objection at trial.  The other is, Your Honor, I know we're

23   going to start on Tuesday.  There is a significant amount of

24   recordings that we have to prepare for purposes of cross.  I

25   would request names of the first witnesses that will be on

1    that first day to be provided to us tomorrow.

2              THE COURT:  I thought we'd agreed that you'd give

3    him the list of witnesses a few days in advance.

4              MR. BASIL:  Sure.  Ornello Arlati is the first

5    witness.

6              MR. LAROCHE:  Who?

7              MR. DWYER:  Ornello Arlati.

8              THE COURT:  Of course when it's your turn to put on

9    a case, to the extent they're giving you exhibits and witness

10   names in advance, you'll extend them the same courtesy.

11             MR. DWYER:  Understood.  Which brings me to the

12   third point.  We may have additions to witness list.  We will

13   get them to chambers over the weekend.  Is that permissible?

14             THE COURT:  Yes.  But don't forget I am now not

15   doing the voir dire myself.  I will get in super early on

16   Monday because I have to get this other thing finished off.

17   I'll make the additions and hand it to Judge Young.

18             MR. DWYER:  Okay.  And then the final thing for me,

19   Your Honor, is I know today we had some back and forth on

20   transcripts which are really just marked for identification,

21   the English language transcripts.  And we do intend to offer

22   some of our own, and we would likely want to use them on

23   cross in the government's case.

24             In this case the government is not producing

25   transcripts of the entire meeting.  For example, there's a

1    three-hour meeting, and they're just giving clips.  So we

2    need to somehow work out how to use our transcript beforehand

3    so that we don't run into a kerfuffle in front of the jury.

4         So I would propose we can provide our transcripts

5    to the government tonight.  And if we've got an issue, we

6    resolve it over the weekend.  But otherwise that we be

7    permitted to use them on cross.

8         THE COURT:  They're going to be permitted to use

9    their transcripts on cross.  Either I can give the jury an

10   instruction -- because ultimately you're going to have to put

11   on some sort of verification of your transcript.  It's hard

12   to do when they're putting on their case.  Either you resolve

13   it or I give the jurors an instruction, an instruction to the

14   extent that everybody's prepared their own drafts, and I

15   anticipate everyone will put on someone to explain how they

16   got their drafts, and the jury will credit that however they

17   will.

18        MR. BASIL:  Your Honor, are we discussing foreign

19   language transcripts or English?

20        MR. DWYER:  English.

21        MR. BASIL:  Your Honor, I believe the case law on

22   English language transcripts is the audio is the evidence.

23   He can certainly refer to a chalk with the witness and say

24   doesn't it say this.  The witness may say that's not what I

25   heard.

1    THE COURT:  I thought you were talking about the

2    translation transcripts.

3    MR. DWYER:  It's not the translations.  I

4    apologize.  We're working the translations out.  We may have

5    some additionals.  I'm talking about like today the chalks,

6    the English language ones, which we tried to use today and

7    there was an objection.

8    THE COURT:  I'm sorry.  I thought these were the

9    translated transcripts.  You can put a transcript in front of

10   them, and you can play the tape.

11   MR. DWYER:  We can provide it and publish it to the

12   jury at the same time?

13   THE COURT:  Yeah.  They'll hear what they'll hear.

14   They're going to see your transcripts, and they'll see your

15   transcripts.  As long as they're hearing it.

16   MR. DWYER:  Understood.

17   THE COURT:  I thought we were talking about the

18   foreign language transcripts.

19   MR. BASIL:  No, Your Honor.  Now, with respect to

20   the foreign language transcripts, to the extent there are

21   small pieces of English in them, our solution to that, as we

22   previously discussed with the Court, the government will

23   offer the entirety of the tape.  So that will actually be in

24   evidence.  And then we will use the foreign language

25   transcript to present that to the jury without playing long

1    sections of --

2            THE COURT:  I thought you were going to indicate in

3    some way in the transcript what words were in English.

4            MR. BASIL:  Yes, Your Honor.

5            THE COURT:  That's fine.

6            MR. BASIL:  The non-italicized part is the foreign

7    language, and the italicized is the English.

8            THE COURT:  This is another issue I thought we'd

9    pretty much beaten to death over the last few weeks.

10           MR. BASIL:  Yes.  To the extent it came up today,

11   there's a different treatment of the English language in each

12   case.  I think both parties are going to be using in the

13   foreign language transcripts relying on the fact that if

14   there's a dispute about what is said in the English language

15   portion, the jury is going to have to listen to the tape to

16   figure it out.

17           THE COURT:  They can listen to the tape, but they

18   can do it with each of your suggestions of what the tape

19   says.

20           MR. BASIL:  Thank you.

21           MR. DWYER:  We don't have an objection to that

22   process, Your Honor.  I think we said that the last time.

23           THE COURT:  I'm pretty sure that horse is dead.

24   Anything else from the government?

25           MS. RUBIN-SMITH:  Yes, Your Honor.  With reference

1    to the witness who is authenticating the phone extraction, we

2    propose that the witness authenticate the disk of the entire

3    extraction, but that we only use a couple of excerpts that

4    are actually relevant to the case to use as exhibits to the

5    jury so they don't receive a whole disk of irrelevant

6    information.

7            THE COURT:  Perfectly fine.

8            MS. RUBIN-SMITH:  Okay.  Then second with the

9    Creole transcripts, we received proposed edits from

10   Mr. Boncy's counsel but not from Baptiste's counsel.  So we

11   just wanted to confirm that there will be no proposed edits

12   coming this weekend because we are working to finalize the

13   transcripts.

14           THE COURT:  He's next.  I've gone to him, him.

15   First of all, Mr. LaRoche, before we get to that, what's your

16   position on what she just raised?  Do you have any

17   corrections to the transcripts.

18           MR. LAROCHE:  No, Your Honor.

19           THE COURT:  Do you have anything else you want to

20   raise, Mr. LaRoche?

21           MR. LAROCHE:  No, Your Honor.

22           THE COURT:  Is your client going to be here?

23           MR. LAROCHE:  He will.  He's coming in on Sunday,

24   Your Honor.

25           THE COURT:  Okay.

1          MS. RUBIN-SMITH:  Your Honor, just one more thing.

2   We did send two lists of proposed stipulations; one list of

3   authenticity stipulations and the other factual.  We've only

4   heard back that Boncy and Baptiste will stipulate that

5   they're U.S. citizens and nothing else.  I just wanted to

6   confirm that there are no further stipulations.

7          MR. DWYER:  I think that's correct, Your Honor.

8          MR. LAROCHE:  I agree.

9          THE COURT:  Maybe they'll soften up on that as we

10  go along.

11         MR. DWYER:  Could be.

12         THE COURT:  I have these for you guys.  How many

13  copies do you guys want?

14         MR. BASIL:  Two.

15         THE COURT:  Do you guys want more than two,

16  Mr. Dwyer, Mr. LaRoche?

17         MR. DWYER:  No, Your Honor.

18         THE COURT:  Come on up.

19         MR. LAROCHE:  Your Honor, there's one.  We just

20  have the one name.  We're going do add that.

21         THE COURT:  You can either give it to Erika or you

22  can email it to us.

23         MR. LAROCHE:  Okay.

24         THE COURT:  Is that it?

25         MR. DWYER:  That's it.  Thank you, Your Honor.

1          THE COURT:  Listen, it is my intention to sit 10 to

2     4.  There's at least one day when I can't do it, which is

3     Thursday the 13th.  I'm not going to be able to start until

4     about 11.  Other than that, I think I am good for 10 to 4.

5     Okay?

6          MR. DWYER:  Thank you, Your Honor.

7          THE COURT:  Case is recessed.

8          (Court recessed at 6:02 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

- - - - - - - - - - -

CERTIFICATION


    I certify that the foregoing is a correct
transcript of the record of proceedings in the above-entitled
matter to the best of my skill and ability.




/s/ Joan M. Daly                    July 10, 2019


_____            _____

Joan M. Daly, RMR, CRR              Date
Official Court Reporter