1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3   UNITED STATES OF AMERICA,           )
                                        )
4                                       )
    vs.                                 )  No. 15-CR-10150-GAO
5                                       )
    MITCHELL DANIELLS,                  )
6                    Defendant.         )

7

8

9

10          BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                   UNITED STATES DISTRICT JUDGE
11                    JURY TRIAL - DAY SEVEN

12

13

14         John Joseph Moakley United States Courthouse
                        Courtroom No. 22
15                     One Courthouse Way
                    Boston, Massachusetts 02210
16

17                        May 29, 2019
                          10:03 a.m.
18

19

20

21
                  Kathleen Mullen Silva, RPR, CRR
22                     Official Court Reporter
           John Joseph Moakley United States Courthouse
23                 One Courthouse Way, Room 7209
                    Boston, Massachusetts 02210
24                 E-mail: kathysilva@verizon.net

25         Mechanical Steno - Computer-Aided Transcript

1   APPEARANCES:

2

3          United States Attorney's Office

4          AUSA Glenn A. MacKinlay

5          AUSA Timothy E. Moran

6          John Joseph Moakley U.S. Courthouse

7          Boston, Massachusetts 02210

8          617.748.3397

9          for the United States of America

10

11         Demissie & Church

12         Derege B. Demissie, Esq.

13         929 Massachusetts Avenue, Suite 01

14         Cambridge, Massachusetts 02139

15         617.354.3944

16         for the Defendant

17

18   Also Present:  Lindsay Rosenbaum, Esq.

19

20

21                           INDEX

22                                                    PAGE

23     Jury Charge - Part One                         3
       Closing Argument By Mr. MacKinlay             16
24     Closing Argument By Mr. Demissie              35
       Rebuttal By Mr. MacKinlay                     48
25     Jury Charge - Part Two                        49

<pre>
 1                    P R O C E E D I N G S
 2          THE CLERK:  All rise for the court and the jury.
 3   (Court and jury enter.)
 4          THE COURT:  All set.  Good morning, Jurors.
 5          JURORS:  Good morning.
 6          THE COURT:  I appreciate your patience.  We had a few
 7   logistics to deal with.
 8          JURY CHARGE - PART ONE
 9          I have two major responsibilities in a trial such as
10   this.  The first is to preside over the case to make whatever
11   procedural or evidentiary rulings are necessary in the course
12   of the trial.  You have seen that I've been doing that.  The
13   other major responsibility is at this stage of the proceedings
14   to give you what we call instructions in the principles of law
15   that pertain to the matters you've heard about and about which
16   you will have to make some decisions.  I'm going to give you
17   these instructions about the law that applies to these matters.
18          You can think of this as sort of a short course in all
19   the law you need to know in order to decide the issues in this
20   case.  You should not resort to any other ideas you might have
21   from other sources about what the law is or might be with
22   respect to these issues, but take it that what I tell you is a
23   complete and accurate summary of the principles of law that are
24   to be applied in this case.
25          It is my duty to set forth these principles fully and
</pre>

1    accurately, without regard to any personal or private views I

2    might have about the wisdom or prudence of these principles, or

3    whether there might be different or additional ones that could

4    be applied, but rather, to tell you what the law is with

5    respect to these matters.

6         And you have a similar duty to accept and faithfully

7    apply the principles sensibly and without any personal --

8    without regard to any personal or private views you might have

9    about the wisdom or prudence of the principles or whether there

10   might be different or additional ones that could be applied.

11   Instead, accept that these are the principles of law that apply

12   to these matters.  Consider the instructions sensibly, as a

13   whole, and apply them faithfully.

14        I am going to talk about two general areas, and I'm

15   going to divide my time in doing it.  First, I'm going to talk

16   about the principles that relate to the particular offenses or

17   crimes that are charged by the indictment in this case; that

18   is, I will tell you what the government is required to prove in

19   order to convict the defendant of the charges that are made

20   against him.

21        After I've done that, the lawyers will have their

22   opportunity to present their closing statements to you.  I

23   think it will be helpful to you in listening to the closing

24   statements to have understood from me what the principles are

25   that relate to the charge.  After the closing statements, I'll

1    have some more to say to you about the manner in which you'll

2    think about the evidence, discuss it, and come to some

3    judgments about it.

4            Before I define the elements of the charges made, let

5    me make a preliminary comment in general about the law of

6    federal crimes:

7            As I'm sure you all understand, our Nation is a

8    federal republic, and both the states and the national

9    government have in their respective spheres the authority to

10   enact laws, including laws prohibiting and punishing certain

11   conduct as criminal.  Federal criminal law consists of laws

12   enacted by Congress that define certain acts as criminal.  A

13   typical formula of a federal criminal statute is for Congress

14   to provide that whoever does A, B and C commits an offense.  We

15   refer to that described activity -- that is, the A, B, and C --

16   as the elements of a particular crime.

17           Where all the defined and necessary elements of the

18   crime have occurred in fact, the crime has been committed.

19   Where all the defined and necessary elements have not occurred

20   in fact, the crime has not been committed.  If some necessary

21   elements are proved but some are not, the crime has not

22   occurred.  The task of a jury in a criminal prosecution is to

23   determine whether the government has proved as a factual matter

24   all the defined and necessary elements beyond a reasonable

25   doubt.  Your focus should be on that question.

 1          Let me turn to the specific offenses that are charged
 2     in the indictment.
 3          The indictment in this case presents four counts.
 4     Each count alleges a distinct federal criminal offense.
 5          Count One of the indictment charges that on or about
 6     March 28, 2015, the defendant, while he was under indictment
 7     for a crime punishable by imprisonment for a term exceeding one
 8     year, received a firearm that had been shipped or transported
 9     in interstate or foreign commerce, this in violation of Section
10     922(n) of Title 18 of the United States Code.
11          For you to find the defendant guilty of this charge,
12     the government must prove three elements or factual
13     propositions beyond a reasonable doubt:
14          First, the defendant was in fact under indictment for
15     a crime punishable by imprisonment for a term of more than one
16     year on or about the date alleged.
17          Second, that the defendant, acting both knowingly and
18     willfully, received the firearm identified in Count One during
19     the time that he was under indictment.
20          Third, that the firearm had at some time traveled in
21     interstate or foreign commerce.  Let me define some of those
22     terms.
23          Being under indictment for these purposes means being
24     formally charged with a criminal offense punishable by
25     imprisonment for a term exceeding one year.  I instruct you

1    that the criminal complaints issued out of the Waltham District

2    Court qualify as indictments under the statutory definition,

3    and that the crimes charged in those criminal complaints are

4    punishable under Massachusetts law by imprisonment for a term

5    exceeding one year.

6         The term "firearm" means any weapon which will expel,

7    or is designed to expel, a projectile by action of an

8    explosive, including the frame or receiver of any such weapon.

9    It is not necessary for you to determine whether the firearm

10   was in working condition at the time it was received.

11        To "receive" a firearm means knowingly to take

12   possession of it.

13        To "possess" means to have something within a person's

14   control.  This does not necessarily mean that the defendant

15   must hold it physically, that is, have actual physical

16   possession of it.  As long as the firearm is within the

17   defendant's control, he possesses it.  A person who has direct

18   physical control of something on or around his person is said

19   to be in actual possession of it.  A person who is not in

20   actual possession but who has both (a) the power or ability and

21   (b) the intention to exercise control over something is in

22   constructive possession of it.  For example, I can be said to

23   be in possession of the books on the shelves in my office even

24   though they are there and I am here, because I have both the

25   ability and the intention to exercise control over them.  If

1    you find that the defendant either had actual possession or

2    that he had the power and intention to exercise control over

3    the firearm, even though it may not be in his physical

4    possession, you may find the government has proven possession.

5         A person acts "knowingly" if he acts voluntarily with

6    knowledge of the relevant facts and not because of mistake or

7    accident.  The government must prove the defendant knew that he

8    was under state indictment at the time he received a firearm,

9    if he did, but it is not necessary to prove that the defendant

10   knew the crime was punishable by a term in prison of more than

11   one year.  It is enough for the government to prove that the

12   defendant knew that the charge had been made against him at the

13   time that he allegedly received the firearm.

14        A person acts "willfully" if he acts with the intent

15   or bad purpose to disobey or disregard the law.  The defendant

16   need not be aware of the specific law or federal statute that

17   his conduct might be violating, but he must act with the intent

18   to do something that the law forbids.

19        The question whether the defendant acted knowingly or

20   willfully, those questions are questions of fact for you to

21   determine, just as you determine any other fact at issue.

22   These questions require you to make a determination about the

23   state of a person's mind and the purpose with which he has

24   acted at the time of the acts in question.  Direct proof of

25   what someone knew or intended is often not available, and it is

1  not necessarily required.

2       The ultimate fact of knowledge or intent, though

3  subjective, may be established inferentially by circumstantial

4  evidence, based on a person's outward manifestations, his

5  words, his conduct, his acts, and all the surrounding

6  circumstances disclosed by the evidence, and the rational or

7  logical inferences that may be drawn from therefrom.

8       The term "interstate or foreign commerce" requires the

9  government to prove that the firearm had at some point been

10 shipped or transported between one state and another state, or

11 between the United States and another country.  It is not

12 necessary for the government to prove that the defendant had

13 any involvement in the shipping or transportation of the

14 firearm, or that the defendant knew that the firearm had

15 previously been shipped or transported in interstate commerce.

16       Count Two of the indictment charges that on various

17 dates between March 2013 and June 18, 2015, the defendant

18 engaged in the business of dealing in firearms without a

19 license, in violation of Section 922(a)(1)(A) of Title 18 of

20 the United States Code.  The relevant portion of that statute

21 reads, "It shall be unlawful for any person, except a licensed

22 dealer, to engage in the business of dealing in firearms."

23       For you to find the defendant guilty of this charge,

24 the government must prove three facts beyond a reasonable

25 doubt:

First, that on or about the dates set forth in the indictment, the defendant engaged in the business of dealing in firearms;

Second, that the defendant engaged in such business without a license issued under federal law; and

Third, that the defendant acted willfully.

The term "firearm" has already been defined for you. A "firearm" is any weapon which will expel, or is designed to expel, a projectile by the action of an explosive.  This includes the frame or receiver of such weapon.

The term "engaged in the business" means a person who devotes time, attention, and labor to dealing in firearms as a course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms.  The term "with the principal objective of livelihood and profit" means that the intent underlying the sale or disposition of firearms is predominantly a financial one, that is, conducted for the purpose of profit or financial gain.

A person who deals in firearms only as a hobby or to maintain a personal gun collection, and not as an essentially economic activity or means of making money is not engaged "in the business" of dealing in firearms.

One may be engaged "in the business" of dealing in firearms even though the business does not require all, or even

1    a substantial portion, of his working time.  Nor is it

2    necessary for the government to show that a profit was actually

3    made.

4          To act "willfully" has been defined for you.  It means

5    to act with the intent or bad purpose to do something that the

6    law forbids.  As with any other fact at issue in the case, the

7    intent and purpose of an action may be established through

8    evidence that is either circumstantial or direct.

9          Count Three of the indictment charges the defendant

10   with obstruction of justice in violation of Section 1503 of

11   Title 18 of the United States Code.  The relevant portion of

12   that statute reads, "Whoever corruptly endeavors to influence,

13   obstruct, or impede, the due administration of justice" shall

14   be guilty of an offense.

15         This law is designed to prevent the distortion or

16   miscarriage of justice resulting from improper interference

17   with the processes of justice.  It is aimed at any means by

18   which the orderly and due administration of justice may be

19   improperly interfered with and thus impeded, thwarted or

20   corrupted.  The due administration of justice refers to the

21   fair, impartial, uncorrupted and unimpeded investigation,

22   prosecution, disposition or trial of any matter conducted or to

23   be conducted in the courts of the United States.

24         In order to prove the defendant guilty of obstruction

25   of justice the government must prove the following three

1   elements of the offense beyond a reasonable doubt:

2          First, that there was a judicial proceeding pending

3   before a federal court at the time alleged in the indictment;.

4          Second, that the defendant knew of the existence of

5   the proceeding in question; and

6          Third, that the defendant corruptly endeavored to

7   obstruct, influence, or impede the administration of justice in

8   the proceeding.

9          The term "judicial proceeding" includes every step in

10   a matter or proceeding in the federal courts to assure the just

11   consideration and determination of the rights of the parties to

12   that matter.  You are instructed that a federal criminal

13   prosecution is a judicial proceeding in the relevant sense.  So

14   is a grand jury investigation.

15          The question whether a person had knowledge of

16   something is a question of fact for you to determine, like any

17   other fact question, based on the direct and circumstantial

18   evidence presented to you during the course of the trial.

19          To "corruptly endeavor" to interfere or impede means

20   acting with the improper motive or purpose of obstructing

21   justice.  A corrupt intent need not be the only motive for the

22   defendant's actions, but it must have actually been one of the

23   motives.  An "endeavor" to obstruct need not have succeeded.

24   Any effort, whether successful or not, that is made corruptly

25   for the purpose of obstructing or impeding the proceeding is

1    punishable under the statute.

2          Count Four of the indictment charges the defendant

3    with witness tampering in violation of Section 1512(b)(1) of

4    Title 18 of the United States Code.  That statute provides in

5    relevant part:

6          Whoever knowingly, corruptly persuades another person,

7    or attempts to do so, with the intent to influence, delay or

8    prevent the testimony of any person in an official proceeding,

9    commits the offense of witness tampering.

10          The statute is designed to protect persons who are

11   victims of federal crimes, persons who may be called to testify

12   or give evidence in a federal proceeding, either civil or

13   criminal, and persons who have information about federal

14   crimes.  The integrity of the federal system of justice depends

15   upon the cooperation of victims and potential witnesses.  If

16   persons with relevant information do not come forward, produce

17   evidence and appear when summoned, the criminal justice system

18   may be significantly impaired.  The statute was devised to make

19   it unlawful for anyone to tamper with such a witness in the

20   manner described in the statute.

21          The defendant is charged with knowingly corruptly

22   persuading, or attempting to corruptly persuade, potential

23   witnesses in the prosecution against him, with the attempt to

24   influence, delay or prevent their testimony in the present

25   prosecution.

1        In order to prove the defendant guilty of tampering

2   with a witness by corrupt persuasion, the government must prove

3   each of the following elements beyond a reasonable doubt:

4        First, that on or about the date or dates alleged, the

5   defendant corruptly persuaded or attempted to corruptly

6   persuade at least one of the identified witnesses;

7        Second, that the defendant did so knowingly;.

8        Third, that the defendant believed that there was a

9   current or future official proceeding in which the testimony

10  might occur; and

11       Fourth, the defendant did so with the intent to

12  influence, delay or prevent the testimony of the witnesses in

13  the expected official proceeding.

14       To "corruptly persuade" means to act knowingly with a

15  wrongful purpose to convince or induce another person to engage

16  in certain conduct.

17       To act with the intent to influence the testimony of a

18  witness means to act for the purposes of getting the witness to

19  change or color or shade his or her testimony in some way.  It

20  is not necessary for the government to prove that a witness's

21  testimony was in fact changed in any way.

22       An official proceeding means a proceeding before a

23  court, judge, or federal agency.  A federal criminal trial is

24  an official proceeding for purposes of the statute.  The law

25  does not require the proceeding be pending at the time of the

1    actions, as long as the proceeding was foreseeable such that

2    the defendant knew that his actions were likely to affect the

3    proceedings.

4         So those are the elements of the respective offenses.

5         A couple of final words about the language of the

6    indictment.  You'll have a copy of the indictment for your

7    reference purposes.  The indictment uses the phrase "in or

8    about" when it alleges times and dates.  The government is not

9    required to prove that events occurred on the exact dates

10   alleged.  It is sufficient if it proves the events occurred on

11   dates within the range specified in the indictment.

12        The indictment sometimes uses the conjunctive word

13   "and."  It is sufficient if the government proves the offense

14   in the disjunctive, as if the word "or" had also been used.  In

15   other words, an allegation of "and" includes "and/or."  It's

16   just a quirk of federal pleading.

17        So that's the conclusion of the first part of my

18   instructions.  We'll now turn to the closing statements by

19   counsel.  And when they're finished, I'll have some more to say

20   to you about your deliberations.

21        The order of presentation of the closing arguments is

22   that the government presents its statement first, followed by

23   the defendant, and the government has an opportunity for a

24   brief rebuttal if it chooses.

25        I understand Mr. MacKinlay will speak for the

1    government.

2            MR. MacKINLAY:  Thank you, Your Honor.

3            <u>CLOSING ARGUMENT BY MR. MacKINLAY</u>

4            MR. MacKINLAY:  That man's a gun trafficker.

5    (Indicating.)  Witness after witness came into the courtroom,

6    walked around up to the stand and told you so.  And he was busy

7    too.  In the space of just over two months, eight guns were

8    trafficked by this defendant.  When the ATF came calling and

9    the walls started closing in on him, what did he do?  He tried

10   to cover it up.  And he did that in two ways.  First, he told

11   witnesses to lie, and that's -- he told them not to testify,

12   not to come to this court, this very courtroom, before you and

13   to testify, but his plan, his scheme didn't work.  You heard

14   from the witnesses, and they told you -- they pointed to him,

15   and they told you that he is an illegal gun dealer.

16           Now --

17           May we have the computers and the monitors, please,

18   Your Honor.

19           THE COURT:  Yes.  The front row is set up, but the

20   jurors in the back row, get your monitors ready.

21           MR. MacKINLAY:  Thank you.

22           THE COURT:  Are you ready to use it, Mr. MacKinlay?

23           MR. MacKINLAY:  I am.

24           Thank you, Your Honor.

25           Now, the court has just provided a summary of the law

1   that is applicable, and obviously listen to the judge.  He's

2   going -- has provided you a detailed account of the law.  I

3   have a couple points I want to talk about before getting into

4   summarizing the evidence that supports the relevant charges as

5   we go through.  With respect to engaged in the business of

6   dealing in firearms, a couple points to make, which are a

7   person has to devote a period of time and attention to

8   acquiring and selling guns principally to make money, although

9   we don't have to prove profit, and lastly it doesn't

10  necessarily have to be the defendant's primary job of

11  employment.

12        Let's talk about this gun trafficking scheme of the

13  defendant.  How long was it going on?  Well, PJ Copithorne took

14  the stand and told you since 2009.  2009, acquiring, selling

15  guns making money doing it.  That was his testimony.  Timothy

16  Bailey told you he saw the defendant with two guns on a prior

17  occasion, prior to the time that he purchased the gun in March

18  of 2015, he saw the defendant with two guns on a prior occasion

19  showing that he had been doing it for a period of time.  And

20  when he went to make the deal and purchase the gun from the

21  defendant, what did the defendant tell him?  Going down south,

22  down south to get some guns.  I'll be back.

23        Who were his suppliers of guns to this gun trafficking

24  scheme?  Well, first himself.  You saw the 4473.  His name is

25  on them.  He bought guns in Pennsylvania.  You can see that

he's the purchaser in the store.  Those guns were in
Massachusetts and recovered in various locations in and around,
for example, Framingham, where he resided.  He's one of the
suppliers.  Who else?  Will Roberts is a supplier.  Why did he
turn to Will Roberts?  Well, you know the answer to that
because according to -- Kenny Brobby told you that the
defendant said, "My license has been suspected or canceled or
terminated," something along those lines.  Right?  You remember
him.  The testimony controls.  But more than that, you also
heard that in 2014, the defendant had the case in the Waltham
District Court, and the NICS background check to purchase the
gun over the counter would have blocked him from buying a gun.
He needed to get another supplier, turn to a straw purchaser.
That's what the ATF called it, remember, a straw purchaser.  In
this case William Roberts.

You also heard that he approached Ashley Turner and
asked her to buy some guns for him.  She received pay from the
defendant.  When she declined, he said, "Well, how about your
friends?"  Those are the suppliers and potential suppliers of
guns in the scheme.

Who are the customers?  The customers are people that
he was selling -- acquiring and then selling them to.  He got a
sale, and we're going to talk about it in more detail, Timothy
Bailey.  PJ Copithorne was going to be a customer.  Remember,
he was going to get one of the four guns that he helped bring

1    back.  Essentially it didn't happen because the defendant asked

2    for permission to sell it to someone else and did.  But there

3    are others on the way back from one of the trips, and we'll go

4    through the text messages in a moment.  Grambo.  Remember the

5    text messages where Kenneth Brobby was in the car, and the

6    defendant is texting people trying to get in touch with

7    customers, using a code, a code that was easily cracked by

8    Kenneth Brobby and the ATF using numbers and using -- numbers

9    that were consistent with the caliber of the guns and also the

10   cost of the guns.  So there were customers, also Alcides

11   Valentin, which was a customer that Kenneth Brobby provided to

12   the defendant, his friend in Worcester was looking for a gun,

13   too.

14            What else was involved in the gun trafficking scheme

15   of the defendant?  He took the serial numbers off.  Why?  Well,

16   you know that.  So you can't can trace back to the original

17   purchaser.  He obliterated the serial numbers with a Dremel

18   tool.  In addition to that, he did it for a reason.  Why did

19   the defendant do all this?  For profit.  The profit is clear

20   when you look at the gun.  The 9-millimeter Smith & Wesson that

21   Timothy Bailey purchased was bought over the counter in

22   Pennsylvania on March 27 by William Roberts.  The defendant

23   brought it back, sold it on March 30, just three days later.

24   First bought for $299.95 plus tax, sold the first time for $800

25   to Timothy Bailey.  Within one hour he sold it for $1,500 to

1    what turns out to be an informant for the ATF.  Profit?  Of

2    course.  Each gun had that much profit into it.  That's why he

3    was trafficking guns.  That's why he was engaged in the

4    business, to make money.  What did PJ Copithorne tell you about

5    the defendant?  He said he needed money.  That's why he was

6    doing it.

7         I know we presented evidence of three trips from

8    Massachusetts to Pennsylvania and back.  I'm just going to talk

9    about one trip.  The one trip that I think best illustrates the

10   scope of his scheme.  That's the March 27 trip -- 26, 27, 28,

11   down and back.  You remember Kenneth Brobby met the defendant

12   at Framingham State College, loaned him $300, went on a drive

13   down to Pennsylvania, met with Will Roberts at his house, slept

14   overnight.  His child was there.  You recall that.

15        And then Will Roberts, the defendant and Kenneth

16   Brobby went to not one but two stores -- remember that? -- and

17   acquired two guns on that day, one in each store.  You remember

18   that at this time William Roberts told you that the defendant

19   was very particular about what guns he wanted.  On one

20   occasion, a prior occasion, he provided a brochure.  Remember,

21   he marked the brochure and showed what guns he wanted?  On this

22   occasion you don't need the brochure.  You have your own eyes

23   from the video inside the Sportsman's Outlet.  Remember, Joshua

24   Kahle came and testified about the layout of the store, about

25   what's in the gun cases in the front of the store.  And you see

1    the man in the white hat, well, that's the defendant on the
2    left side, and he's looking at a firearm in that section of the
3    case, and lo and behold, a couple of hours later, where does
4    William Roberts go?  Right where he's told to go.  Right where
5    he's told to go to buy the gun the defendant picked out.  It's
6    the same spot.  And you'll recall William Roberts picks up and
7    looks at the gun in the video and quickly hands it over and
8    purchases it.
9         The 4473, which I know you heard a lot about and it
10   was flashed in front of you dozens of times, the firearms
11   transfer record document shows the purchase of the gun to
12   William Roberts.
13        Now, at the house, or apartment I should say, where
14   William Roberts lived there was an argument before the
15   defendant and Kenneth Brobby returned to Massachusetts.  That
16   argument in which Kenneth Brobby said words to the effect of --
17   again, your memory controls -- "These are nice.  These guns are
18   nice.  People are going to like these."
19        MR. DEMISSIE:  Objection.
20        MR. MacKINLAY:  Again, your memory of the testimony
21   controls, but words to that effect.  And what is the response
22   from the defendant?  "Shut up.  Shh," words to that effect.  He
23   didn't want William Roberts to know he was selling guns.  They
24   get into the vehicle and they head back, and at that point
25   there is text messages, which these are taken from the

1   defendant's phone when he -- after he was later arrested, and

2   they show the date of March 29, the return trip, and the

3   terminology is -- I don't know if you'd call it code --

4   "thang," "piece."  Those are what Brobby told you they're

5   referring to here.  8.75 is $875.  8.5 is $850.  And the

6   negotiation between Grambo and the defendant for the sale of

7   the two guns that he'd just gotten in the store on videotape

8   with Will Roberts's assistance.  "I got someone who want the

9   40."  "I'll do 7 for that."  "I got 8 for the 40."  I mean,

10  these with gun dealers connecting with customers and

11  negotiating a price for the caliber.  That's what was happening

12  at that point.

13         You also know that when -- on the trip back, the

14  defendant is contacting Timothy Bailey, whom he had told he was

15  going down south to get a gun.  Remember that?  And these text

16  messages going back and forth, Bailey testified that he said,

17  "Hurry up or we're going to lose it."  And the text messages

18  also show that as well.  "It might be already moved."  "No,

19  hold that for me," says Bailey.  I'll get it in the AM," in the

20  morning.  Later Bailey says, "You're going to come through,

21  bro?"  And the defendant responds, "Yes in process, g."

22         That is, again, the gun dealer defendant negotiating

23  and planning this meeting and the sale of the gun that was

24  requested before he went down there with Timothy Bailey.

25         Now, what about the Timothy Bailey sale?  You did hear

1    that he -- the sale between the defendant and Bailey took place

2    in the basement.  There was no serial number on the gun.  There

3    was no paperwork.  There was a straw purchaser, William

4    Roberts, used to conceal Mr. Daniells's involvement.  Does that

5    sound like a hobby or a private collection sale?  Of course

6    not.  Of course it's not.  It's a gun dealer selling to a drug

7    dealer, who is also a felon in the basement of some apartment

8    building in Boston.

9         But the problem is on that particular gun, Smith &

10   Wesson 9-millimeter, the defendant made a mistake.  You know

11   what his mistake was?  The internal serial number.  Remember

12   you heard from the agents that they were able to locate -- and

13   that's the bottom left-hand corner there -- the serial number

14   by just removing the slide.  They didn't have to wait for the

15   processing by the crime labs.  Literally March 30, the date of

16   the sale in Boston, they have the serial number and were

17   calling the gun store and reaching out for William Roberts'

18   parents saying, hey, we've got to talk to this guy.

19        The 4473 shows the gun was purchased by William

20   Roberts, as he told you he bought it, and then the serial

21   number that's on the internal matches up to the second page as

22   well.

23        Now, during that time, from March 30 to April 16, Will

24   Roberts did not tell the truth, and he told you that.  And he

25   told you why.  He did not tell the truth to the agents.  And he

1    came in here and told you he didn't.  When he went in to meet

2    with the lawyer on the 16th, he told the full account of what

3    happened and, moreover, he agreed to make recorded phone calls

4    with the defendant, to talk to him about the gun trafficking

5    that had just gone on.

6         And those calls and recordings are telling.  At the

7    time of the sale and the time of the possession of the

8    9-millimeter Smith & Wesson by the defendant and subsequent

9    sale to Timothy Bailey, at that time period, the defendant had

10   charges pending in the Newton District Court.  Let me talk

11   about this for a minute before I turn back to the calls.  The

12   charges that were pending are charges that the court has

13   instructed you carry more than a year in jail and that the

14   charging method of the complaint on the two charges is an

15   appropriate charging instrument for purposes of the under

16   indictment.

17        So what do we need to establish that charge, that he

18   possessed the gun and that it was -- the firearm was working or

19   met the definition of a firearm, and it traveled in interstate

20   commerce, and that he knew that the case was pending, knew the

21   case was pending?  He's going into the courthouse.  The ATF

22   agent conducted surveillance.  They took a picture of him going

23   into the courthouse.

24        What about the records?  What do the records from the

25   courthouse show you?  Well, they show you that Mitchell

 1   Daniells had a pending case.  The date was in 2014 when it
 2   initially started.  The charging instrument is a criminal
 3   complaint, again in his name.  The charge is possession of a
 4   firearm, and the penalty is two and a half to five years, and
 5   you can continue to read.  But the docket sheet not only shows
 6   that he was there on April 9 as the ATF agents surveilled him
 7   and took pictures of him, they showed he was there on multiple
 8   occasions back in 2014.  In other words, the case was pending
 9   as of the time of March 28 to 30, when he had the gun and sold
10   it to Timothy Bailey.  He's clearly heading into court and
11   coming out of court at that point and heading for his car in
12   the parking lot of district court.

13         The gun traveled in interstate commerce.  You heard
14   Special Agent Mattheu Kelsch describe that, that the shipping
15   records from Smith & Wesson indicated that it was shipped to
16   Connecticut and ultimately it was purchased in Pennsylvania
17   before it was actually transported back across state lines.
18   There certainly are multiple ways the weapon crossed state
19   lines establishing that element as well.  You also heard from
20   Special Agent Kelsch that met the definition of being a
21   firearm.  They all did.

22         So what did he do to try to cover up the efforts by
23   the ATF?  Well, at first he tried to tell people to lie.  Use
24   your common sense, members of the jury, because that's an
25   important attribute of what you have and what you bring to the

1    table and bring to your deliberation.  Your common sense to

2    size up things and see whether things have a ring of truth.

3         When Mitchell Daniells tells Roberts, who's in

4    Pennsylvania, "Just tell them that the guns were stolen," does

5    that make any sense?  The guns were found 500 miles away in

6    Massachusetts three days later, and William Roberts has never

7    been to Massachusetts.  I mean, it makes no sense at all.

8    None.

9         Did the defendant improperly attempt to persuade the

10   witness, or for purposes of obstruction of justice, did he

11   improperly have the objective of influencing or obstructing

12   justice in this courthouse, in this matter?  He certainly knew

13   the case was ongoing.  He'd been charged and brought into

14   court.  And the evidence that you saw clearly establishes that

15   his intent was to do just that, improperly influence witnesses

16   in the case that you have heard here over the past week or so.

17        What is the first evidence of that?  Again, it's prior

18   to the time that -- it's prior, as initially when William

19   Roberts is involved in talking to the ATF, he texts back and

20   forth, "You may want to call a lawyer," the defendant says, "to

21   ask a few questions."  "You don't know who robbed you, and you

22   didn't know they were missing until they called you.  It wasn't

23   like you knew someone stole from you."  He's telling William

24   Roberts what to say.  It's a lie.  He's trying to influence

25   him, and that shows his continuing motive throughout the case

1   from back before the case began, while it was under

2   investigation right through and including the time it was here

3   in court.

4          In addition to the defendant's texts, he also in the

5   recorded calls repeatedly says "The guns were stolen.  Tell

6   them the guns were stolen" in the first call, the guns were

7   stolen.  "The shit was stolen.  It got stolen.  It got stolen."

8   He's telling the cover story, which makes no sense, and it's

9   not true, and it's improper to do that.

10         He also goes on to say, "Let me give you some expert

11  advice.  They just got stolen.  It's as simple as that."

12         He goes on to say --

13         Well, let me ask you something:  If the defendant is

14  telling somebody what the story is, is he really looking out

15  for his best interest, or is he looking out for his own best

16  interests?  Isn't he really improperly trying to influence him

17  by telling him what to say to protect himself for

18  accountability?

19         What about a year later, when he's in custody and he

20  makes phone calls using the jail system, and in this case

21  Kenneth Brobby mentions in this call on May 21 he's going to go

22  talk to the ATF guy?  What was the tone of voice and demeanor

23  of the defendant, remember, when he heard that call?  Do you

24  remember?  "Don't.  Don't.  Whoa, whoa, whoa, whoa.  Chill."

25  Afraid that he was going to cooperate and provide information.

1    Taking all stops out to make sure he doesn't do that.  "Don't
2    do that.  It's kind of good I called you.  I'm not trying to
3    give you any advice to obstruct justice.  All I'm saying -- for
4    the record, all I'm saying is I'm not trying to obstruct
5    justice."  That's exactly what he was trying to do.  He
6    repeated it because that's exactly what he was trying to do,
7    trying to get Kenneth Brobby to obstruct justice.

8         Certainly not there -- at the bottom Daniells says,
9    "They're not trying to help me out, and they're definitely not
10   trying to help you out."  He's looking out for his own
11   interest.  That's the improper motive.  He's not giving him
12   expert advice at all, when you think about it.  He's trying to
13   protect himself from accountability.

14        What's the second aspect of the efforts to
15   encourage -- discourage witnesses from coming to court?  The
16   Georgetown Law Journal.  Remember?  That's the packet that was
17   intercepted that on the bottom line, the last line it says,
18   referring to this paper, "It's called the Georgetown Law
19   Journal."  That's code.  Georgetown Law Journal was nothing
20   more than a script or a playbook about what to do and what to
21   say in this very courtroom.  We know it because we intercepted
22   it.  PJ Copithorne provided us a copy that was provided to him
23   by Biko Kponou that was provided to him by the defendant.  When
24   it was delivered, what was said?  "This is from Mitchell."
25   What does the Georgetown Law Journal actually say?  Well, it

1    says in code, it says what to do and what not to do.  It
2    provides examples of what to say, and to take the Fifth
3    Amendment, even to the point of being held in contempt rather
4    than testifying against him.
5           The paperwork, not following the code, let them both
6    know if they're approached in the future to plead the Fifth,
7    not a single word, not even "hi."  "Take the Fifth.  You have
8    the right to take the Fifth.  Take the Fifth.  Don't testify
9    against me."  That's what the Georgetown Law Journal was.
10   That's his game plan.  That's what he did.  That's what he
11   brought into this courtroom.  "Stick to the story, the
12   Georgetown Law Journal."  You're not following the code when
13   people were discussing, hey, it's the paperwork.  I'll go talk
14   to Biko Kponou.  I'm going to talk to witnesses about the
15   paperwork that you want me to give to them.  The defendant was
16   insistent, no, it's the Georgetown Law Journal.  "Stick to the
17   code," showing his improper state of mind, showing his motive
18   at the time.
19          What does he say about perjury?  He describes it
20   should take 90 days for perjury, referring to PJ or Paul
21   Copithorne, rather than testifying on the stand against him,
22   because, you see, taking the Fifth Amendment, what he's really
23   saying is don't testify against me.  If you come to court and
24   testify, I know you're going to tell them what I did.
25          Another section of the Georgetown Law Journal reflects

1    the Timothy Bailey aspect of it.  This was supposed to be

2    delivered to Timothy Bailey.  There's two things they want

3    Timothy Bailey to do.  First is to take contempt.  This time I

4    think it's a 30-day maximum, not even.  Again, defendant's

5    words.  This is what he wrote telling him to take the Fifth

6    Amendment, take the 30 days rather than coming in here and

7    testify.

8            The second part of it is equally troubling because he

9    asks him to file a false affidavit, lying under oath about what

10   happened to defendant's involvement in the sale to Bailey.  Two

11   aspects of Timothy Bailey.  Bailey didn't get the packet,

12   though.  Remember?  Biko Kponou says, "I didn't find him.  I

13   didn't give it to him."  But he did get the message, didn't he,

14   Timothy Bailey, right in the courthouse?  What did the

15   defendant say to him, when they first arrested him and he came

16   into court?  "You don't know me."  What was he saying by that?

17   "Don't testify that you know me as being the person who sold

18   you that gun.  You don't know me."  Unlawful purpose, improper

19   purpose trying to influence the witness Timothy Bailey?

20   Absolutely.

21           What about the questions, that section of the script

22   of the Georgetown Law Journal?  I brought two of them.  One of

23   them says, "Is it possible that some or all of the testimony is

24   possibly false, fictitious or inaccurate?  I'm not a hundred

25   percent certain of the above."  Come on, you know what he's

1    saying there.  Change your story, lie under oath.

2         In the second part he's talking about the brochures.

3    "Is it possible that you never actually saw any firearms or a

4    catalogue from Pennsylvania, you don't know for certain?"  I

5    mean, come on.  Members of the jury, add it up.  He clearly was

6    trying to improperly affect, impede, obstruct this case.

7         Now, I expect the defendant is going to get up here

8    through counsel and talk at great length about the government's

9    witnesses.  They have immunity.  They have a plea agreement and

10   so forth.  They shouldn't be trusted.  Well, Timothy Bailey did

11   time on his plea agreement, and he expects to do more if he

12   doesn't tell the truth.  The court does the sentencing on that.

13   What about the others?  What is the linchpin of their ability

14   to avoid charges in the case?  They have to tell the truth

15   before you.

16         But there's two important considerations of the

17   witnesses in this case.  The first is they're not on trial.

18   They're not on trial.  There's only one name on the verdict

19   slip that you're going to take into the back and vote on.  It's

20   Mitchell Daniells.

21         The second important consideration for you.  Who

22   picked them?  Think about it.  Who picked them?  He picked

23   them.  PJ Copithorne, his friend from grade school; Biko Kponou

24   and Kenny Brobby, middle school and high school; William

25   Roberts, his co-worker in the fracking industry; and Ashley

1    Turner, somebody he dated.  He picked all these people.  They

2    are the people that he dragged into this, and they came into

3    court.

4            I want to go to Ashley Turner though.  Let's think

5    about her for a minute, the young lady who came in, single

6    mother, three kids including one with special needs.  Doesn't

7    know anything about the gun trafficking.  Just knows he came in

8    and asked me to buy guns for him, and he was going to pay me

9    for them, and I said no, he'd done that many times before.

10   Where is her motive to lie?  I submit you could find she didn't

11   have a motive.  What did she say arrived in the mail after she

12   was disclosed as a witness against him?  What did she say

13   arrived in the mail?  A letter from him, and she said she

14   believed, based upon reading it, that he was asking her to lie.

15           Now, you should look for corroboration amongst the

16   witnesses.  Is there corroboration amongst the witnesses as

17   they're testifying about what occurred?  For example, on the

18   trip I described four people were involved.  You heard from

19   three of them, and they testified that the defendant is the one

20   who was involved in gun trafficking.  Are their stories a

21   perfect match?  Of course not.  If there was a perfect match in

22   their testimony, you would justifiably find fault with that.

23   There is imperfections in their testimony, but look at what

24   they said and line it up and see if it's consistent.  I submit

25   to you you will find it is.

1          But there are other forms of evidence that we talked

2     about and we introduced to you that also support the testimony

3     that we provided you.  For example, the physical evidence.

4     Again, let's look at the obvious.  Pennsylvania guns were found

5     here in Massachusetts right where the defendant was spending

6     time.  That's the obvious.  But there's more than that.

7          The 4473s match up to the guns that were purchased by

8     the defendant, by Will Roberts.  How about the search of the

9     defendant's house and bedroom?  What do we find there?  An amo

10    box, Taurus gun keys.  Oh, wait a minute now.  Taurus gun keys.

11    You heard that those open -- allow unlocking of a Taurus

12    weapon.  Six guns were purchased by William Roberts for the

13    defendant.  Is it a shock that he has a Taurus gun key in his

14    house after six guns were bought?  Of course not.  Evidence is

15    corroborating both PJ Copithorne and William Roberts that that

16    was what occurred.

17         What else?  The Dremel tool used to remove serial

18    numbers, PJ Copithorne says I saw him do it twice.  That's

19    consistent with the types of marks that were found on the

20    weapons that he tried to remove, but the serial number,

21    restoration staff at the crime lab was able to restore them.

22         In his bedroom, what about the telephone records?

23    Again, telephone records, they don't lie.  What do they show?

24    They show connectivity showing frequency of calls between

25    William Roberts, Kenneth Brobby and Paul Copithorne with the

1    defendant's phone.  They're friends with him.  They're

2    connected to him.  They're speaking.  What about connectivity

3    around times of the sales.  The three trips that we saw in the

4    past, information in charts regarding that as well that show

5    that they were speaking and organizing the trips down and back

6    with the guns.

7          What about the firearm tracking -- excuse me.  The

8    cell phone tracking of the defendant's phone leaving

9    Massachusetts, going to Pennsylvania, staying overnight on that

10   one night, March 26, 27 coming back, you saw the tracking of

11   them.  You heard the testimony.  What does it do?  It supports

12   the people that were in the car saying that's what happened.

13   Right?

14         The forensics you heard, the photographs make it very

15   clear for you to see with your own eyes the matching of the

16   serial numbers from the firearms to the 4473s, including this

17   particular one that comes back to William Roberts, one of the

18   guns that he says he purchased.

19         Now, finally, what lengths would the defendant go to

20   impede a witness in the orderly administration of justice?

21   Well, let's look at this call to Kenneth Brobby which I submit

22   makes clear that he's paying off Kenneth Brobby not to tell on

23   him and not to appear and testify, because the money that was

24   discussed here was going to pay for Brobby's lawyer and

25   essentially what the defendant is saying is, "Nah, I'd

1    rather you not tell on me than give me $500."  Brobby says,

2    "Huh?"  "Trust me," the defendant says, "I mean, I'd rather you

3    plead the Fifth than give me $500."

4         Direct evidence from his lips of his improper state of

5    mind attempting to influence witnesses and to obstruct justice.

6         In conclusion, after you have the opportunity to

7    consider all the evidence and the witnesses that you've heard,

8    I'm going to ask you to return with a verdict finding the

9    defendant guilty of all four counts that you have for your

10   consideration:  The charges of dealing firearms without a

11   license, possession of firearm while under indictment, witness

12   tampering and obstruction of justice.

13        MR. DEMISSIE:  May we have HDMI1?

14        Thank you.

15        THE COURT:  Do you want it up right away?

16        MR. DEMISSIE:  You can test it.

17        THE COURT:  I have it.  Do you want it fully

18   displayed?

19        MR. DEMISSIE:  Sure, yes.

20        CLOSING ARGUMENT BY MR. DEMISSIE

21        If we're talking about just the sale of a firearm, it

22   would be a different story.  But you are being asked to answer

23   specific questions.  The question you're being asked is not if

24   Mitchell Daniells sold a firearm.  When we started out, one

25   thing I asked you to do is to wait until you hear the judge's

1   instruction, until you get a chance to deliberate before you

2   make up your mind, to pay attention to the witnesses, to listen

3   to the testimony and make your decision not based on emotion

4   but based on the evidence that you heard in this case.

5         I've watched you, and you've done that, and I thank

6   you for your attention, for your time and for being here, and I

7   hope you don't find yourself charged with a crime.  Anyone can

8   find themselves in that position, and the promise we all get

9   from the system is that if we do, you will have a jury like

10   yourselves who will decide the case based on the evidence

11   presented.

12         So I'm going to walk through some of the stuff that

13   you have to decide.  The way the government presented the case

14   is in such a way that you would look at other things than look

15   at the stuff that you need to make a decision.  And I'll tell

16   you why that is.

17         Before you is the statute that charges, number one,

18   dealing in firearms without a license.  You are asked to answer

19   the question whether Mitchell Daniells willfully engaged in the

20   business of dealing in firearms.  Not whether he sold a gun,

21   not whether he sold a gun to a drug dealer, or whether or not a

22   person found with a gun had a machete in his car, as one of the

23   witnesses testified to.  That's not stuff that helps you make a

24   decision.  What helps you make a decision is whether or not his

25   conduct meets this requirement, whether he's devoted time,

1  attention, and labor in dealing in firearms as a regular course

2  of trade or business with a principle objective of livelihood

3  and profit.

4      What did you hear to help you decide whether he

5  engaged in dealing in firearms for livelihood and profit?  What

6  did you hear that helped you decide whether he engaged in

7  dealing in firearms as a regular course of trade or business?

8  What you heard, based on the evidence, you heard these five

9  firearms, three of them were bought in 2015.  Two of them that

10  were purchased by Mitchell Daniells in 2013 were found.  One of

11  them involved a cash transaction.  One.  You heard no other

12  cash transaction from any witness.  The total sum of evidence

13  regarding transactions involves a sale of a gun for $500 more

14  than it was bought.  That's it.  What I'm trying to do is

15  direct your attention to the evidence you heard so that you

16  don't get swayed by stuff that does not help you decide the

17  case.  The question that's being asked requires you to look for

18  evidence based on what you heard in this courtroom from

19  witnesses.  Not what you think might happen.  For all you know

20  there's two other guns in 2013 that could have been sold by

21  Copithorne, Brobby, could have been stolen.  I don't know what

22  happened to them.  I don't have any evidence of that.  Neither

23  do you.

24      They presented one cash transaction.  Copithorne said

25  he was present at an apartment where Mr. Daniells gave a gun to

1    a person named Figueroa.  He didn't see money being exchanged.

2    That's the evidence.

3         The government did not prove that the principle

4    objective was livelihood and profit.  That's what you have to

5    find.  Engaged in the business of dealing in firearms as a

6    regular course of trade or business.

7         As you look at the case, as you look at the elements,

8    you have to find the government -- whether the government

9    proved the elements beyond a reasonable doubt or not.  Look at

10   your notes, search your memory of the evidence, and see if you

11   have evidence that proves that.  That's what I'm asking you to

12   do.

13        You didn't hear a lot about Mitchell Daniells.  You

14   heard about certain things he's done from various witnesses,

15   and pretty much, except for one witness, the woman who came

16   from Pennsylvania, every other witness's testimony was

17   purchased by the government.  It was purchased in return for

18   leniency in terms of Timothy Bailey.  In the case of PJ

19   Copithorne, Kenny Brobby, William Roberts, it was purchased and

20   returned for non-prosecution.

21        PJ Copithorne said he stored -- he kept the guns in

22   his apartment.  He kept guns in his apartment.  They didn't

23   search his apartment.  Then he said Mr. Daniells took them.

24   There's no evidence that he took them, other than his word.  He

25   knew he was facing serious charges on the state side and

1   potentially on the federal side.  And he came in and testified.

2          The judge will instruct you on how to evaluate

3   testimony by people who received benefit from the government.

4   These are not people who just, despite what they said they

5   wanted to do the right thing or they just want to tell the

6   truth.  They've spoken to the government repeatedly over

7   several years.  It's been going on since 2015.  It's no secret

8   Mitchell Daniells was arrested June 18, 2015.  He's been in

9   jail since then.  He has a state pending charge that he has to

10  deal with when he's done with this.  He's been talking to

11  people.  What they've been saying to him is they've been

12  pressured, and it's in the phone conversations that are

13  recorded.  He said people are coming -- telling me -- I'm not

14  naming names, but they're telling me they're being pressured to

15  say things they don't want to say, things that are not true.

16         And you look at the statement -- before I get there,

17  let's go to number 10.  I'm going to talk about obstruction of

18  justice.  Mr. MacKinlay said to you -- he talked about in terms

19  of obstruction of justice about Timothy Bailey and William

20  Roberts.  The question you're being asked in this indictment is

21  whether from June 2016 continuing through June 2017 whether or

22  not Mitchell Daniells obstructed or impeded the due

23  administration of justice.  He has absolutely no contact with

24  Timothy Bailey after June 2016.  Timothy Bailey was arrested

25  back in June 2015.  What I'm asking you to do is to answer the

1   question you're being asked, search your memory, look at your

2   notes to help you remember, and see for evidence, look for

3   evidence.  Not stuff the government's telling you, but what you

4   heard.  There's no testimony anyone contacted Timothy Bailey.

5   In fact, Biko said he didn't contact him at all.

6            William Roberts, Mr. MacKinlay just showed you some

7   messages back and forth.  All that happened before June 2016.

8   It's not even part of this charge.

9            So you're being asked a specific question:  Did

10  Mitchell Daniells, between June 2016 through June 2017,

11  obstruct justice by directing witnesses to recant truthful

12  testimony, to testify falsely, to assert their rights against

13  self-incrimination after they had already waived those rights,

14  to assert rights against self-incrimination even where such

15  right is nonexistent because of grounds of immunity?  Not just

16  that he did that, but he did that with corrupt intent.  I'm

17  going to talk to you about corrupt intent, because that's the

18  element that I think is crucial for your evaluation of this

19  charge.

20           What you will see from the statement that you will --

21  the statement that you will -- actually, the question.  I'm

22  sorry, the questions.

23           What you will see is you'll have these questions that

24  were included in the package.  The government presented to you,

25  and I ask that it be admitted in evidence, because it's the

1    main reason why the package was being given to people.  You

2    will recall Biko was saying that he was helping the lawyer

3    interview witnesses.  He was bringing witnesses to the lawyer's

4    office.  And in the package -- this is a part of the questions

5    that Mr. Mitchell Daniells wrote out.  And this was given to

6    Paul Copithorne.  And this clearly shows the intent, the motive

7    for contacting and asking Paul Copithorne and Kenny Brobby to

8    provide information.  The reason why he is contacting them is

9    because he believed the government was overreaching, pressuring

10   people to say certain things.  When you look at these

11   questions, and you'll have it in the jury room, I ask you to

12   read it in full, and see if this indicates corrupt intent or an

13   intent to bring out additional evidence.

14          I, as a lawyer, can tell people you have a right to

15   the Fifth Amendment.  That is advice I give.  It's not because

16   I have more rights than anyone else.  My intent is to advise

17   the person.  You, anyone, can advise any other person about

18   their rights.  If they don't know their rights, you can say to

19   a friend, "You can assert your Fifth Amendment."  If your

20   intent is to impede by lying to the person, that's a different

21   story.  Corrupt intent is where you come from a mindset, you're

22   not trying to get the truth out.  You don't believe there's no

23   pressure exerted on the person to say something.  You're not

24   trying -- you don't believe the person is hiding things.  In

25   this case Mitchell Daniells believed these people that he's

1    contacting were pressured to say things that are not true.  Not

2    everything, but some.  Did not understand their rights, and

3    they were being placed in a position where they're compromising

4    their own position as well as his.

5          Telling someone to lie is a different story.  Paul

6    Copithorne testified he was never told to lie.  Kenny Brobby

7    testified he was never asked to lie.  Paul Copithorne said no

8    one threatened him.  Kenny Brobby said no one threatened him.

9    I guess when you talk about these dates, June 2016, 2017,

10   you're really talking about those two people.

11         And then both of them said no one offered them money.

12   The government talked about the tape where $500 for a lawyer

13   was discussed.  Listen to that tape.  Not the transcript.

14   Listen to the tape.  I ask if you listen to any tape, which you

15   can play in the jury deliberation, listen to the tape, not the

16   transcript.  When you listen to the tape, you will see -- you

17   will hear Mitchell Daniells says -- in fact, he's not offering

18   him money.  The witness, Kenny Brobby, was saying I couldn't

19   send you money.  Listen to that.  He said I couldn't send you

20   money.  I used it for the lawyer.  And as a joke he's laughing.

21   He says, "Well, you'd rather use it for a lawyer than give it

22   to me."  People say stuff like "Tell on me."  That doesn't

23   mean -- between two people who know each other like that, it

24   could mean anything.  Say, "This guy likes guns.  Tell on me."

25   He actually likes guns.  He has guns.

1          You have the context, not just the words.  How's it

2      said?  He knows it's being recorded.  He knows he's not

3      supposed to obstruct justice, which is why he said on the tape,

4      "I'm not trying to obstruct justice, but my motive is I want

5      you to know."  He knows the government monitors.  Everyone

6      knows that.

7          And what is he referring to about the Georgetown

8      Journal?  Because he's sending it to someone to collect

9      evidence that he wants to use in court.  He doesn't want the

10     government to know he's collecting evidence from these same

11     people the government had by that time -- they became so in

12     regular contact with the case agent, they learned their first

13     name.  You heard from Kenny Brobby they show up at my

14     grandmother's house, I think he said.  I don't know how they

15     know where I am.  At different times they come to me.  So

16     obviously he wants to have a confidential communication with

17     these witnesses where he's trying to collect an affidavit.

18         Now, the government doesn't own the truth.  Just

19     because what they believe, what they packaged is the truth, it

20     doesn't mean that's what Mitchell Daniells believes.

21         He actually provided the reports themselves.  Look at

22     these questions.  He says page 654, line 4:  "Is that true?

23     Did you feel coerced?"  And the rest of the questions you will

24     see has more reference to pages, line numbers.  "Is that true?

25     Is that accurate?"  He's trying to get information that shows

1    some of the statement -- if you believe the government

2    presented everything they collected over the five years in the

3    past one week, that's not how it works.  The government

4    collects a lot of evidence, and they select what to present.

5    When Mitchell Daniells sits in jail 24 hours looking at that,

6    he's addressing different things.  Heck, there's even something

7    about someone being an escort.  It's in the questions.  You can

8    look at it.  And he's says, "That's not true.  Why did you say

9    that?"

10            These questions are two pages.  You will have the full

11   two pages with you.  Please read it.  And the government

12   referred to that tape.  Please listen to that tape, and whether

13   it's a sarcastic remark, if that's the crux of the government's

14   case that he corruptly persuaded or used that to obstruct

15   justice by saying, "Don't give me $500 you wanted to give me,

16   use it for a lawyer," that's their case for obstruction of

17   justice?

18            Witness tampering.  What you are required to do is

19   find that Mitchell Daniells corruptly persuaded.  What is the

20   evidence that he corruptly persuaded?  The package was actually

21   sitting at Biko's house for three months before he gave it to

22   Paul Copithorne.  Paul Copithorne said he told me not to -- to

23   waive -- to assert my Fifth Amendment.  Mitchell Daniells never

24   actually asked him to do that.  He wrote a letter to Biko,

25   which Biko didn't take out of the package, but he gave the

```
 1    package as is.  So there's no persuasion by Mitchell Daniells
 2    whatsoever.  No persuasion applied on any witness.  Again, we
 3    are talking about between October 2016 through June 2017
 4    there's no communication that we're dealing with, with Bailey
 5    or with Roberts, really, Paul Copithorne and Kenny Brobby.
 6    Both of them said -- Kenny Brobby said -- and it's your memory
 7    that controls, but he said he wasn't told directly to do
 8    something, but he got the impression.  Corruptly persuade is
 9    what you need to find.  And every communication between Paul
10    Copithorne and Mitchell Daniells was recorded because he said
11    he never visited him in person.  Every communication between
12    Kenny Brobby and Mitchell Daniells was recorded because he
13    didn't visit him in person.  Where is the corrupt persuasion?
14    He did send them questions for them to answer.  That's not
15    corrupt persuasion.
16          The government picked the charges in this case.  As I
17    said, Mitchell Daniells faces a state court charge, possession.
18    You heard about a car stop.  He told the officer, "I have a
19    gun, and I have a license."  Apparently the Pennsylvania
20    license to carry, which he has --
21          MR. MacKINLAY:  Objection.
22          MR. DEMISSIE:  -- doesn't work in Massachusetts.  So
23    he was charged.
24          However, what the government chose to do in this case
25    was charge him with being -- transport -- receiving a firearm
```

1    while being under indictment and dealing in firearms.  From all

2    the federal charges, that's what they picked to do.  They then

3    packaged the case to present that to you.

4         You heard from -- I called Agent McPartlin, and he

5    testified.  I think his testimony is significant.  There is no

6    federal license required to sell a firearm.  There's no form

7    that you can engage in the regular business -- and I'm not

8    going to go over that.  You already -- I think you get the

9    point.  But in the end I also asked him about this charge, and

10   he said he didn't know the person who filed it.  And then he

11   said from the application, from the complaint, it's a police

12   officer.

13        Then when he was asked by the prosecutor, is that

14   person a police prosecutor, he said yes, that's William Carlo,

15   a police officer.  But he didn't know.  Why is that important?

16   It shows a willingness to make facts fit.  If that can happen

17   within 20 minutes, what can happen within a span of three, four

18   years when witnesses come repeatedly before them to say things?

19   How statements are left out, selected and packaged.

20        Even with that, the government has not proven its

21   case.  They have not proven Mitchell Daniells engaged in

22   dealing in firearms for livelihood and profit.  They have not

23   proven he tampered and corruptly persuaded a witness or engaged

24   in obstruction of justice.  I admit the transfer of --

25   receiving a firearm under indictment is a difficult one.  You

1    would have to find the knowing requirement.  I'm asking you to

2    not base your decision on emotion because there's a lot of good

3    lawyering on the part of the government that brought emotion to

4    this case.

5         Can we get the --

6         And why am I saying that?  Number 14, please.  I'm

7    just giving you an example.

8         This is a Beaver Terrace apartment.  The government

9    has many pictures of this house, 105A, but they picked the one

10   with a baby stroller.

11        Next is a picture of a gun found inside.  They took a

12   picture next to a toy box.  And the last one.  They have

13   another picture.  Same one.  Why does it -- the picture of a

14   gun is not significant to the case.  It's a gun they found.

15   It's not evidence that materially affects your decision.  What

16   I'm asking you to do is we all have emotional reaction to

17   firearms.  What I'm asking you to do is uphold the tradition in

18   this country where people, no matter what type of infamous,

19   reprehensible conduct they might have committed, receive a fair

20   trial.

21        It actually started in Massachusetts in March 1770,

22   when British soldiers fired on protestors in Boston known as

23   the Boston Massacre.  You all have heard of that.  None other

24   than John Adams represented the defendants, and the people of

25   Boston heard the evidence and gave them a fair trial and

1    acquitted them.  You can't do that if you're not able to judge

2    the evidence without passion.  I'm asking you to do that.  And

3    I know if you do, and apply just the facts that you heard, just

4    the evidence on a set of questions in the indictment, read the

5    indictment, what he's charged with, and come to a conclusion as

6    to each element of the crime.  When you do that, I'm confident

7    you'll arrive at the right verdict, and I ask you to find

8    Mitchell Daniells not guilty.  Thank you.

9              THE COURT:  Rebuttal?

10             Are you using any graphics for this?

11             MR. MacKINLAY:  No, Your Honor.

12             THE COURT:  Okay.

13             REBUTTAL BY MR. MacKINLAY

14             MR. MacKINLAY:  Defense counsel just pointed out

15   something regarding federal licenses not required to sell guns.

16   That's not the law.  Federal firearms license is required to

17   sell guns by someone who's engaged in a business like him.

18             This Pennsylvania license to carry, that's a red

19   herring.  It's a distraction.  It has nothing to do with this.

20   That was the testimony.  It allowed him to possess a gun in the

21   State of Pennsylvania, not to sell them up here.

22             You also heard that he was a resident at the time in

23   Pennsylvania, and the people up here, including Timothy Bailey,

24   were residents in Massachusetts.  You can't do that either.

25   You need a federal license.  He didn't have one.  He didn't

1   have one then.  He never has.  That was the testimony from the

2   ATF licensing witness.

3          With respect to intimidation, witness tampering, as

4   well as obstruction, take a look closely at the court

5   instructions because it's very clear that the obstruction

6   includes attempted but unsuccessful efforts to obstruct, and

7   that tampering includes attempts to tamper with witnesses, but

8   doesn't have to be successful.  In other words, the fact that

9   these witnesses came in here into court doesn't mean he didn't

10  commit the crime.

11         Finally, the defendant through counsel argues that the

12  principle objective was not established that Mr. Daniells was

13  in this endeavor, scheme to make money.  Why would Kenneth

14  Brobby front $300, give him in advance $300, and make the trip

15  down to Pennsylvania if he didn't think there was going to be

16  sales to make his money back?  Why did PJ Copithorne front in

17  advance a loan, $800 on the second trip, to the defendant if he

18  didn't expect there to be sales of those guns to pay him back?

19  The evidence is clear he was in this to make money, profit from

20  the sale of illegal gun sales, and that's just what he did.

21              JURY CHARGE - PART TWO

22         THE COURT:  Jurors, you have been very patient and

23  attentive.  I ask you to bear with me for just a few more

24  minutes while I complete my instructions.

25         I want to talk now about how you should go about

1    assessing the evidence in the case and fulfilling your

2    responsibility to resolve the issues that are presented.

3              There are two aspects to your deliberations.  First,

4    you now have to decide what the evidence has proved or not

5    proved.  It is your responsibility to determine what facts have

6    been established or not by the evidence.  After you have made

7    those determinations, you must consider what the facts mean in

8    light of the principles regarding the elements of the charged

9    offenses that I gave you in the earlier part of the

10   instructions.  That is, do the facts as you find them establish

11   that the charges against the defendant have been proved beyond

12   a reasonable doubt or not?

13             It's often said that jurors such as yourself are the

14   sole and exclusive judges of the facts of the case.  You

15   determine the weight, the value, the significance, the effect

16   of the evidence that you've seen and heard, and you decide on

17   the evidence what conclusions you should draw about the issues

18   that are presented.

19             Your oath as jurors requires you to determine the

20   facts of the case without fear or favor, based solely on a fair

21   consideration of the evidence.  That fundamental proposition

22   means two things.

23             First of all, of course, it means you are to be

24   completely fair-minded and impartial, swayed neither by

25   prejudice nor sympathy, by personal likes or dislikes toward

1    anybody involved in the case, or about the nature of the crime

2    charged.  Your responsibility is simply to judge the true

3    meaning of the evidence fairly and impartially.

4         The second important point regarding your fair

5    consideration of the evidence is that the judgment must be

6    based solely on the evidence that has been presented in the

7    course of the case.

8         You may not go beyond the evidence by speculating or

9    guessing what other things might be true that were not shown.

10   Your responsibility is to resolve the issues so far as you can

11   by your consideration of the evidence that has been presented.

12   Your conclusion should be those that the evidence directs you

13   to.  If there should be issues as to which the evidence is

14   insufficient or inconclusive so that you're not able to draw a

15   firm conclusion, then you have to leave any conclusion undrawn.

16   You may only draw those conclusions that the evidence supports.

17        I'm going to talk a bit more about the evidence in a

18   minute, but let me first remind you again what is not evidence.

19        I told you at the beginning of the case the lawyers'

20   summaries of the evidence in their openings, when they were

21   telling you what they expect what the evidence will be, and now

22   in their closings as they try to recall it for you, those are

23   not part of the evidence.  They are an attempt to marshal the

24   evidence for you to try to persuade you to understand it in a

25   way that is consistent with their view.  But to the extent your

1    appreciation of the evidence differs in any way from the way

2    the lawyers have either predicted it or now argued it, it's

3    your understanding and your assessment of it that control.

4    What the lawyers say cannot add to or subtract from the

5    evidence.  You have heard the evidence, and it is your judgment

6    on that evidence that matters.

7         The evidence does not include questions.  Only answers

8    are evidence.  You may not consider any answer or evidence that

9    I directed you to disregard -- that happened on a couple of

10   occasions -- or that I directed to be stricken from the record.

11        The indictment is not evidence.  You will have the

12   indictment before you in the course of your deliberations in

13   the juror room because it sets forth the charges that are made.

14   I caution you that the fact that a defendant has had an

15   indictment filed against him is not evidence that he has

16   committed the crime alleged, but simply a means of setting

17   forth what the government charges.  The indictment only

18   proposes; you as the jury decide, based on the evidence,

19   whether what is proposed has been proved.  And you are to

20   consider only the offenses that are charged in the indictment.

21        Now, let me address some of the things that are

22   evidence in the case.

23        You have a number of exhibits in the case.  You will

24   have access to all those exhibits that have been admitted in

25   evidence, and you may consider them and give them whatever

1    weight, value, or significance you think they are fairly

2    entitled to receive.  That judgment is entirely yours.

3            We are able to have the exhibits presentable to you in

4    digital form.  You have no doubt seen the screen on the wall in

5    the jury room.  You will get to use it.  It is part of what we

6    call the Jury Evidence Recording System.  The parties put their

7    exhibits in digital form into a drive, and it is fed into that

8    monitor.  So you'll have complete control over it.  When you

9    activate the touch screen when you go into the room to

10   deliberate, you will see a prompt for a tutorial.  There is a

11   brief four-minute or so tutorial that teaches you how to use

12   the system.  It is very simple and similar to using an iPad or

13   other tablet.  You can scroll through the exhibits.  Some

14   exhibits you can zoom in and out of.  There's an index.  So you

15   can call up an exhibit by entering the exhibit number on the

16   keypad and so forth.

17           Now, some of the exhibits in the case have been

18   physical exhibits or actual items.  Those are available to you

19   as well.  If you would like to view any of the physical

20   exhibits, you simply should write a note indicating which

21   exhibit or exhibits you would like to view and give the note to

22   the court security officer, and we will arrange for those

23   exhibits to be shown to you.

24           Also among the exhibits admitted into evidence were

25   recordings of telephone conversations.  The recordings

1    themselves are the evidence, not the transcripts that were

2    provided to you to assist your listening.  The transcripts will

3    not be provided to you during deliberations, but the recordings

4    are part of the evidence and will be on the system and you can

5    listen to them as you wish.

6         You may have noticed that during the trial exhibits

7    happened to be referred to as government exhibits or defense

8    exhibits as they were introduced.  The fact that an exhibit is

9    marked by a particular party or introduced by a particular

10   party is useful for recordkeeping purposes, but the designation

11   is entirely irrelevant for your purposes.

12        In addition to the exhibits, you have the testimony of

13   witnesses who appeared here in the courtroom to answer

14   questions that were put to them.  You ought to give the

15   testimony of each witness whatever weight, value, or

16   significance in your judgment it is fairly entitled to receive.

17   With respect to each witness, you should think about the

18   testimony and decide how much value or meaning it ought to have

19   to fair-minded people like yourselves who are looking for the

20   truth.

21        You may find, as you think about the evidence from a

22   particular witness, that you find credible, reliable, or

23   meaningful just about everything the witness has said, perhaps

24   just about nothing the witness has said, or perhaps something

25   between.  Maybe there are some things from a witness you find

credible and reliable and other things from the very same

witness that you are more skeptical of or doubtful about.

There is no automatic rule.  You don't have to accept any given

witness's testimony in total or reject it in total.  You should

think about the testimony itself and accept what is meaningful

and reliable and reject what is not.

The principal factors you may consider in evaluating a

witness's testimony may be summed up as perception, memory, and

narration.

Perception:  How good were the witness's observations

of events in the first place?  What were the circumstances

under which they were made, and how did those circumstances

affect, if they did, the witness's ability to make accurate

observations of the events the witness has described?

Memory:  How accurate and reliable is the witness's

recollection of events?  Some people may have a better ability

to recall events in the past accurately.  Sometimes, again, the

circumstances surrounding events may have an effect on the

ability of people to remember things.  For instance, sudden,

unexpected events may be both perceived and remembered with a

different degree of accuracy than expected events that unfold

in an orderly pace.

Narration:  How good, how accurate, is the witness in

narrating or telling what has happened?  Is the testimony

truthful?  Is it complete?  Is the witness leaving out things

which, if known, might make a difference to the listener in evaluating things?  Is the witness careful in describing things?  Is the witness uncertain or confident?  Is the witness's narration consistent, or does it vary?

You may take into account any partiality or bias that a witness might have toward one side or the other.  Does the witness have any reason, motive, or interest in the outcome of the case or anything else that would lead the witness to favor one side or the other in the testimony?  A tendency to favor one side or the other might be deliberate, an intentional effort to favor one side, or it might be unconscious, arising out of some affiliation or affinity with one side or the other.  Again, such tendencies could affect the reliability of the testimony, and you ought to consider whether there has been any such effect with respect to the testimony you've heard.

In this case, there has been testimony from several witnesses who made agreements with the government.  You heard testimony from one witness, Timothy Bailey, who was charged in connection with crimes that the government accuses Mr. Daniells of committing and pled guilty after entering into a plea agreement with the government.  You heard that under that agreement, the government agreed to make a favorable sentencing recommendation with respect to Mr. Bailey based on his cooperation with the government in this prosecution.

You also heard testimony from several witnesses,

1    including William Roberts, Kenneth Brobby, Paul Copithorne, and

2    Biko Kponou, who had knowledge of events giving rise to this

3    criminal prosecution and agreed to testify under a grant of

4    immunity.  Immunity generally means that the witness's

5    testimony may not be used against him in a subsequent criminal

6    proceeding.  A witness with an immunity agreement will be

7    prosecuted for perjury or false statement made while testifying

8    under a grant of immunity.  The agreements of the witnesses

9    that I have just mentioned between the witnesses and the

10   government are in evidence for you to consider and review.

11        Now, it is legitimate for the government to enter into

12   these kinds of agreements.  You may accept the testimony of a

13   person who testifies after entering into such a agreement, and

14   you may convict a defendant based even solely on such evidence,

15   so long as you are convinced of the defendant's guilt beyond a

16   reasonable doubt.

17        However, you should bear in mind that a witness who

18   has entered into an agreement for immunity from prosecution or

19   for a favorable sentencing recommendation from the government

20   may have a motive to tell the government what he thinks it

21   wants to hear.  A witness who realizes that he may be able to

22   curry favor with the government and thereby obtain a more

23   lenient sentence or avoid criminal charges may have a motive to

24   testify untruthfully.  So you should consider such testimony

25   with great care and caution.  After your careful and cautious

1   consideration of such evidence, you may decide it is not

2   reliable and reject it, or you may decide it is reliable and

3   accept it as truthful.  That judgment is yours alone.

4        Now, this is an important caution.  The fact that

5   Mr. Bailey entered a guilty plea, and the others testified

6   under immunity, may only be considered in assessing the

7   credibility of their testimony.  It is not a factor you may

8   consider in assessing the guilt or innocence of Mr. Daniells.

9   The witnesses who appeared at trial may be presumed to have

10  acted after an assessment of their own best interests for

11  reasons personal to them.  Their decisions to plead guilty to a

12  criminal charge or to seek immunity from charges has no bearing

13  on the question whether the defendant is guilty of the offenses

14  charged against him in this case.  As I've said, that question

15  is to be considered in light of all of the evidence you have

16  heard in the course of the case.

17       Now, consider the evidence as a whole.  You should

18  consider the evidence from each witness not only by itself, in

19  isolation, as if that person were the only -- that witness was

20  the only person who testified, but also in the context of all

21  the evidence you have heard.  For example, there might be a

22  piece of evidence about which you were originally skeptical.

23  Then you might hear other evidence that leads you to re-examine

24  your initial impression, and you begin to trust the questioned

25  evidence a bit more.  The opposite might happen, of course, as

1   well.  You might tend to accept something that sounds pretty

2   good at first.  Then as you consider other evidence, you might

3   begin to doubt what you first tended to accept.  So, again,

4   think of the evidence sensibly as a whole as you make sound

5   judgments about it.

6           You may make inferences from the evidence.  We say

7   that a fact in a case like this can be proved by either two

8   kinds of evidence: direct evidence of the fact or

9   circumstantial evidence of the fact.  Direct evidence is when

10  there is a piece of evidence which, if accepted, tends directly

11  to prove the fact.  Often, it's simply an assertion.  Suppose

12  somebody came into the courtroom now and said, "It's raining

13  out."  Well, you would have to consider and decide whether the

14  person had any basis for knowing what the weather was like

15  outside and whether they could be trusted to tell you

16  accurately what the weather was.  But if you are satisfied as

17  to those matters, then you could accept the assertion, and as a

18  result of accepting it, believe the fact that it was raining

19  out.  Similarly, an exhibit or a piece of physical evidence

20  might be direct evidence of a fact.

21          Suppose, however, instead of having somebody tell you

22  directly what the weather was like, a person came into the

23  courtroom now wearing a wet raincoat and holding up a wet

24  umbrella.  Even without any direct assertion being made about

25  what the weather was, you have some observation, some evidence,

from which you might draw the conclusion or inference that it was raining outside, because in your common experience wet raincoats and umbrellas are evidence of that fact.

An inference is simply a conclusion you draw from available information that you have found to be reliable.  I point that out because sometimes you hear people say, "That's just circumstantial evidence.  That doesn't prove anything." That saying goes too far because circumstantial evidence can prove things if properly used.  And if you think about it, everyone probably relies on circumstantial evidence routinely through the day.  You walk into the kitchen and you see the tea kettle steaming on the stove, you know enough not to put your finger on the burner because you have drawn the inference that the burner is hot.

You must be careful, however, in drawing inferences that the inferences you draw are those that are genuinely supported by the information that you're basing the inference on.  An inference, and consequently proof of a fact by circumstantial evidence, cannot be an excuse for guessing or speculating.  If there are ultimate possible inferences from the evidence, you can't just pick one you happen to like.  You have to be persuaded that any inference you make is superior to other possible inferences based on the evidence and the information you have.

And, of course, to the extent that you rely in a

1    criminal case on finding facts by circumstantial evidence, in

2    the end the elements of the offense in each case must have been

3    proven beyond a reasonable doubt.

4         Now, I told you at the very beginning of the case --

5    and I repeat it now, because this is very important -- the fact

6    that a person is charged with a crime is no evidence the person

7    has committed the crime.

8         The fact that an indictment has been returned against

9    a person tends not at all to prove that the person has done

10   what the indictment alleges.  It is a means of presenting the

11   charge so that the matter can be tried in a full trial such as

12   we have had.

13        So you should give no weight or consideration to the

14   fact that a charge is made.  Your judgment about whether the

15   defendant is guilty or not of the crimes charged must be based

16   on the evidence in the case and only the evidence in the case.

17        A defendant in a criminal case has the right

18   guaranteed by the Bill of Rights in our Constitution to choose

19   not to testify in the case.  There may be many reasons why a

20   defendant would choose to invoke and exercise that right.  You

21   may not under any circumstances draw any inference or

22   presumption against the defendant from the fact that he did not

23   testify.  You should not even discuss the matter.  You are to

24   decide the issues presented solely from your consideration of

25   the evidence that has been given in the case.

1            As I reminded you at the outset of the trial, the

2      defendant is presumed to be innocent of the crimes he is

3      charged with unless and until the government has proved by the

4      evidence that he is guilty and has proved that beyond a

5      reasonable doubt.  The burden of proof rests with the

6      government.  A defendant assumes no burden to prove that he is

7      innocent.

8            The question is never, "Which side has convinced me?"

9      but rather, "Has the government convinced me beyond a

10     reasonable doubt that the defendant is guilty?"  If the answer

11     to that question is yes, the government is entitled to your

12     verdict of conviction.  If the answer is no, then the defendant

13     is entitled to be, and must be, acquitted.

14           The burden placed upon the government to prove a

15     defendant's guilt beyond a reasonable doubt is a strict and

16     heavy burden, but it is not an impossible one.  It does not

17     require the government to prove a defendant's guilt beyond all

18     possible, hypothetical, or speculative doubt.  There are

19     probably very few, if any, things in human affairs that can be

20     proved to an absolute certainty, and the law does not require

21     that.

22           But the evidence must exclude in your minds any

23     reasonable doubt about the defendant's guilt of the crime he is

24     accused of.  A reasonable doubt may arise from the evidence

25     produced or from a lack of evidence.  If you conclude the

1    evidence may reasonably permit either of two conclusions with

2    respect to a particular charge -- one, that the defendant is

3    guilty as charged and the other, that he is not guilty -- then

4    you must in those circumstances find him not guilty.

5          Reasonable doubt exists when, after you've considered,

6    compared, and weighed all the evidence, using your reason and

7    your common sense, you cannot say that you have a settled

8    conviction that the charge is true.  Conversely, we say a fact

9    is proved beyond a reasonable doubt if, after consideration of

10   all of the evidence, you are left with a settled conviction

11   that the charge is true.

12         A reasonable doubt is not speculation or supposition

13   or suspicion.  It is not an excuse to avoid an unpleasant duty.

14   And it is not sympathy.

15         While the law does not require proof that overcomes

16   every conceivable or hypothetical doubt, it is not enough for

17   the government to show the defendant's guilt is probable or

18   likely even if it seems to be a strong probability.  The

19   government must establish each element of the offense charged

20   by proof that convinces you and leaves you with no reasonable

21   doubt and thus satisfies you that you can, consistent with your

22   oath as jurors, base your verdict on it.

23         Again, if you are so convinced, then it is your duty

24   to return a verdict of guilty.

25         If, on the other hand, you have a reasonable doubt

1    about whether the defendant is guilty of the crime charged, you

2    must give the defendant the benefit of the doubt and find him

3    not guilty.  I emphasize again that the defendant has no burden

4    to prove he is innocent.  He is entitled to the verdict of "not

5    guilty" if the government has failed to prove him guilty beyond

6    a reasonable doubt.

7            Your verdict must be a unanimous one whether it is

8    guilty or not guilty.  That is, you must deliberate until you

9    have reached a unanimous verdict with respect to the charges

10   presented.

11           Your function is to weigh the evidence in the case and

12   to determine whether the defendant is guilty or not guilty as

13   to each particular charge based solely on the evidence.  Under

14   your oath as jurors, you are not allowed -- you must not allow

15   any possible punishment which may be imposed upon the defendant

16   to influence your verdict or enter your deliberations.

17           Let me see counsel at the sidebar, please.

18   **(SIDEBAR CONFERENCE AS FOLLOWS:**

19           MR. DEMISSIE:  Your Honor, if I may be permitted to

20   make some objections on the substantive offenses because I

21   didn't get a chance to comment on the preliminary instruction.

22           I requested the definition of indictment under the

23   CFR, and I just note that objection.

24           THE COURT:  All right.

25           MR. DEMISSIE:  So I would object to the definition

1    given by the court that indictment qualifies -- the Waltham

2    District Court case qualifies as an indictment.

3          I also, Your Honor, would object that -- would ask the

4    court to instruct the jury that they must find that he knew the

5    complaint qualified as an indictment.

6          THE COURT:  Okay.

7          MR. DEMISSIE:  I object to the preliminary portion of

8    the obstruction of justice and witness tampering where the

9    court explained why -- the purpose of the statute.  I think

10   that it should be excluded from the instruction.

11         The first element for corrupt -- for the charge of

12   witness tampering, attempt to corruptly persuade -- corruptly

13   persuade or attempt to corruptly persuade, the statute charges

14   him by directing witnesses directly.  So he's not charged with

15   an attempt but by actual conduct.  So for that purpose, I think

16   that should be corrected.

17         And that's it.

18         THE COURT:  Okay.  I'm not going to make any changes.

19         MR. MacKINLAY:  Nothing from the government, Your

20   Honor.

21         MR. DEMISSIE:  Thank you.

22   **END OF SIDEBAR CONFERENCE.**)

23         THE COURT:  Jurors, just a few final comments.

24         One of the first things I suggest you do in your

25   deliberations is to select one of your members to act as

1   foreman of the jury.  I leave that to you folks.  That person

2   will have the responsibility to communicate with us when you

3   have a verdict.  If you have any questions about the

4   instructions or about the law that you're unable to resolve

5   after discussion among yourselves, you may send us a note and

6   ask us a question about the law.  We would rather have you ask

7   the question and get a correct answer than for you to guess or

8   be unsure about what principle of law applies.

9          We cannot, however, answer any questions about the

10  facts of the case or the meaning of the evidence and so on.

11  That is entirely and exclusively for you to determine.

12         By law, the deliberating jury will consist of 12

13  jurors.  There are 13 of you.  We always have a margin so that

14  if things happen during the course we don't lose jurors so that

15  we get below 12.  In this case we lost a juror right off the

16  bat.  We had two alternates.  The alternate juror, using the

17  method we use to determine that, is the juror in seat number 3,

18  the third one in.  You will be kept separately.  You will be

19  here available to serve.  Sometimes jurors -- we need this

20  because if someone falls by the wayside during deliberations,

21  then we have the alternate still available to participate, if

22  necessary.

23         The rest of you are the deliberating jury, and you

24  will conduct your deliberations and tell us when you've reached

25  a verdict.  You all have the notes taken.  Be respectful of

1  each other's note-taking abilities and memories.  Please

2  remember that not anything any of you wrote down is necessarily

3  exactly the way things were said.  So use it as a prompt to

4  your memory, but don't rely on it as a text.  And we ask you to

5  deliberate with a mind towards hearing each out and considering

6  the evidence seriously as a group and, if you can, coming to an

7  agreement.

8        Each juror is entitled to his or her own opinion, and

9  in the end each should render a verdict which represents that

10 juror's own conscientious view of the evidence.  That doesn't

11 mean that you don't listen to each other and deliberate

12 collectively.

13        So, jurors, we now ask you to withdraw, deliberate

14 upon the evidence, and return when you have reached a verdict.

15        THE CLERK:  All rise for the court and the jury.

16 (Jury exits.)

17        MR. DEMISSIE:  Your Honor, the indictment is going to

18 the jury --

19        THE COURT:  Yes.

20        MR. DEMISSIE:  -- and the one that was previously

21 filed just says "witnesses known to the grand jury number 1, 2,

22 3, 4, 5."

23        THE COURT:  Yes.

24        MR. DEMISSIE:  Do we name the names?

25        THE COURT:  No, because it's the indictment as it

1    exists.

2              MR. DEMISSIE:  They just don't know the names is what

3    I'm saying.  That's the problem.

4              THE COURT:  They have evidence.

5              MR. DEMISSIE:  Okay.  Thank you.

6    (Court exits.)

7    (Jury deliberating.)

8              THE CLERK:  All rise.

9    (Court enters.)

10             THE CLERK:  Continuation of the Daniells trial.  Be

11   seated.

12             THE COURT:  So the jurors have sent a note, which I'll

13   read for the record, although it will be marked as an exhibit.

14   I should say I'll read, to the best of my ability, because the

15   penmanship is a little bit questionable.

16             "We need clarification on whether we have to prove

17   only one gun or selling multiple."

18             Here's what I propose:  I propose to tell them that at

19   pages 9 and 10 of the written instructions, they have a

20   description of what needs to be proved under Count 2.  They

21   should take that as the guidance and discuss it among

22   themselves.  In other words, I'm not going to add or subtract,

23   but simply -- this is the reason -- this is a rare event for me

24   to give them the transcript, but I anticipated because of the

25   nature of some of the charges, that it would be best if they

 1  had a source that they could simply look at and debate.

 2      What conclusions they draw in line with those

 3  instructions is up to them.  I'm not going to -- I don't intend

 4  to vary it.  So I guess I tell what I propose, and I invite any

 5  objection.

 6      MR. DEMISSIE:  So they would be given just 9 and 10,

 7  or they already have the entire --

 8      THE COURT:  They have the entire instructions.

 9      MR. DEMISSIE:  Okay.

10      THE COURT:  I'm just going to refer -- this seems

11  quite plainly about Count 2.

12      MR. DEMISSIE:  Yes.

13      THE COURT:  So I'm just -- well, if you prefer, I can

14  say I have given you instructions, written instructions, which

15  describe what need to be proved under each of the four counts.

16  I don't intend to say any more than that.  You have the

17  instructions.  I wouldn't give them any differently now than I

18  gave them this morning.

19      MR. DEMISSIE:  Yeah, referring them to 9 to 10 makes

20  sense, because I think that's --

21      THE COURT:  Well, yes, although it could be viewed as

22  restrictive as well.  Maybe what I'll do -- I could say, "You

23  have the written instructions.  You should consider them

24  sensibly as a whole.  This appears to be about Count 2.  The

25  instructions regarding Count 2 are pages 9 and 10.  I direct

1   your attention to those instructions."

2           MR. DEMISSIE:  Sometimes it's helpful to say, "You've

3   heard all of the evidence, and your decision would be based on

4   the evidence you heard, and we're not going to comment on the

5   evidence."  I don't know if that may be helpful.

6           THE COURT:  I don't want to be that -- I don't want

7   to -- once I begin talking about other subjects, there's no way

8   of drawing a neat line where to stop.  One way to draw a neat

9   line is to refer only to Count 2, which is what it appears to

10  be.  On the other hand, I could simply refer them to the

11  written instructions as a whole.

12          MR. DEMISSIE:  That's fine, Your Honor.

13          THE COURT:  Which is fine?  Which way, Mr. Demissie?

14          MR. DEMISSIE:  I think it makes sense, the instruction

15  as a whole, and referring to pages 9 to 10.  That makes sense

16  to me.

17          MR. MacKINLAY:  I think that's fine, Your Honor.  The

18  instruction as a whole, and a reference to 9 and 10, just for

19  their ease, but I don't think going beyond that is necessary.

20          THE COURT:  Okay.  Let's get the jurors, including the

21  alternate.

22          THE CLERK:  All rise for the jury.

23  (Jury enters.)

24          THE COURT:  Jurors, we received a note from you asking

25  for clarification on a point.  You have a written copy of the

1   instructions which I gave you.  I would not give you any other

2   instructions.  I refer you to the written copy.  I infer from

3   the question you're thinking about Count 2.  The instructions

4   pertaining to Count 2 are found at pages 9 and 10.  I wouldn't

5   say anything any differently than I said it this morning, and

6   you have that.  Okay?

7            We'll ask you to continue your deliberations.

8            THE CLERK:  All rise for the court and the jury.  The

9   court will be in recess.

10  (Court and Jury exit.)

11  (Jury deliberating.)

12           THE CLERK:  All rise for the court and the jury.

13  (Court and jury enter.)

14           THE CLERK:  Be seated.

15           THE COURT:  Jurors, you've had a long day.  We're

16  going to call it quits for the day and resume tomorrow.

17           I instruct you to have no discussions about anything

18  that has gone on in the jury room with anybody, including

19  yourself.  Put the case on hold overnight.  Enjoy your evening.

20  Come back refreshed.  And we'll start again at 9:00 and resume

21  the deliberations in the morning.  All right?  Enjoy the

22  evening, and we'll see you tomorrow.

23           THE CLERK:  All rise for the court and the jury.

24  Court will be in recess.

25           THE COURT:  Let me add one thing I should add.  As

1   you're gathering, until you've come into the courtroom and

2   we've put it on the record that you've returned, don't begin

3   your deliberations anew until that formal event has occurred.

4   Okay.  Thanks.

5   (Court and jury exit.)

6   (The proceedings adjourned at 4:48 p.m.)

1                    C E R T I F I C A T E

2

3

4     UNITED STATES DISTRICT COURT )

5     DISTRICT OF MASSACHUSETTS    )

6

7

8            I certify that the foregoing is a correct transcript

9     from the record of proceedings taken May 29, 2019 in the

10    above-entitled matter to the best of my skill and ability.

11

12

13

14

15    /s/ Kathleen Mullen Silva                    5/20/20

16

17    Kathleen Mullen Silva, RPR, CRR              Date
      Official Court Reporter
18

19

20

21

22

23

24

25