UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DZHOKHAR A. TSARNAEV, also known as Jahar Tsarni,<br><br>Defendant. | Criminal Action No. 13-10200-GAO |

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

**LOBBY CONFERENCE**

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts 02210
Friday, January 2, 2015
11:05 a.m.

Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts 02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

APPEARANCES:

OFFICE OF THE UNITED STATES ATTORNEY
By: William D. Weinreb, Aloke Chakravarty and
Nadine Pellegrini, Assistant U.S. Attorneys
John Joseph Moakley Federal Courthouse
Suite 9200
Boston, Massachusetts 02210
On Behalf of the Government

FEDERAL PUBLIC DEFENDER OFFICE
By: William W. Fick and Timothy G. Watkins,
Federal Public Defenders
51 Sleeper Street
Fifth Floor
Boston, Massachusetts 02210
- and -
CLARKE & RICE, APC
By: Judy Clarke, Esq.
1010 Second Avenue
Suite 1800
San Diego, California 92101
- and -
LAW OFFICE OF DAVID I. BRUCK
By: David I. Bruck, Esq.
220 Sydney Lewis Hall
Lexington, Virginia 24450
On Behalf of the Defendant

P R O C E E D I N G S

THE COURT: Okay. I think the principal reason -- there are several things, briefly, to sort of finalize the questionnaire. And I know you've submitted something Wednesday, which I got this morning.

I guess my -- what are the topics? As to siblings, I think I'm going to leave the questions as they are.

MR. BRUCK: All three?

THE COURT: Yeah. I have in mind that this originated as a joint proposal, so, anyway...

The government now proposes a -- what we can call a government trust question, I guess?

MR. WEINREB: Well, just to be clear, your Honor, our understanding was that the Court had -- we had proposed a question about what we referred to as conspiracy theorists, and the Court had -- the defense had objected, we had discussed it, and we were directed to come up with an alternative proposal. So I just want to make clear this is the alternative --

THE COURT: This is your second-string proposal.

MR. WEINREB: -- proposal, not a new --

THE COURT: Okay. Fair enough.

I guess I continue to think that the overblown or exaggerated question is enough to trigger an inquiry on voir dire, so I think we'll leave it at that.

We've -- I don't know that we discussed this in

advance. This is with respect to the foreign witness issue. We still are awaiting the government's position on that, but we thought the way to handle it was -- after talking with the jury clerk and others, we thought the way to handle it mechanically from their point of view was to have a separate list. So that's the -- Question 85 and 86 separates the witness list into Attachment A and Attachment B, and B would only be the foreign witnesses in question. It would be easily attachable that way and segregatable for security reasons, and it will be easy for the jury staff to handle that. So that's the way -- if you look at 85 and 86, that's the way we'll handle --

MS. CLARKE: Your Honor, when we got your revised issue and saw A and B, and I had already sent to Paul A, which is what I've also sent to the government, which is the combined domestic --

THE COURT: Without the foreign names.

MS. CLARKE: -- and a second, B, which is just international.

THE COURT: Right. That's what we'll do.

MS. CLARKE: And it's in Excel, so you can work with it.

THE COURT: So Question 85 asks for the combined list, and they'll write and answer in this questionnaire as to the numbers of the -- it's a numbered list, I gather? It should be.

MS. CLARKE: Well, it's on Excel.

THE COURT: So you can do it.

MS. CLARKE: It's on Excel, so I can do it.

THE COURT: At least with reference to this question it has to be numbered because we ask them to write the number of the witness in the space.

MS. CLARKE: If I can work with Jane right afterwards I can modify it to whatever you need it to be.

THE COURT: So that's the joint list. And then they'll separately be asked to look at Attachment B and indicate on it if they know somebody rather than in this. So it doesn't get identified here, okay?

Now, the other issue I guess on the questionnaire was social media screen names?

MR. BRUCK: We feel like it does let the jurors know that when they're being asked "Have you written stuff in social media," that they have need to really think about it because someone may be checking. You know, and otherwise it's very easy to think, Well, not that I can remember, whatever. And we see that social media is just lighting up, we see tweets now about, "Boy, what I wouldn't give to be on this jury," you know? It's really something out there.

MR. WEINREB: Your Honor, we're opposed. We think that's a reach too far and that jurors will view that as being a level of intrusive beyond what other questions here ask. And

we're also quite concerned that the jurors will assume that's a government question rather than a defense question, which is what it is, and that it will -- it will put them in the mind that they'll assume that it's the government that has the ability to go check up on their private social media postings. And with all the talk in the news about the NSA and various other agencies, we think it's just unfair. We're going to get blamed for asking a question that we don't even care to know the answer to, particularly, compared to the defense.

THE COURT: Yeah, that may be true. Maybe they assume the government already --

MS. CLARKE: Knows.

THE COURT: -- knows all that, if they're of that frame of mind.

But I'm with you on the first point. I think it's just a bridge too far. You know, these are our fellow citizens. They have an important responsibility here and we have to know about it, but there are some things that I think we need to be respectful of. This just goes a little too far, I think.

So I think that is --

MR. BRUCK: I'm sorry.

THE COURT: Go ahead.

MR. BRUCK: There were two issues that you -- unless we infer the rulings from the draft --

THE COURT: You might.

MR. BRUCK: I mean, the agreed-upon questionnaire included the question about what you remember about this case. Now we have three questions that are sort of pretesting about siblings, and another one about teenagers and siblings, and no question that says what do you know about this case. And, you know, given the issues around venue, we really think that one needs to go back in.

MR. WEINREB: Do we have a number?

MS. CLARKE: It's not in this new one.

MR. BRUCK: It was.

THE COURT: Where was it?

MR. BRUCK: It was 79, "What did you know about the facts of this case before you came to court today, if anything?"

THE COURT: Yeah. Right. Yeah. No, we took that out. We took it out. It implied that there were facts of the case that they could objectively know and I didn't want to support that misimpression.

MR. BRUCK: If it were changed to "What did you read or hear about this case before you came here," it would solve that problem.

THE COURT: No, I think it -- again, I think it's too unguided. I think the questions we asked are okay, so...

MR. BRUCK: And then the last one was whether -- there

were two more: One was, "Have you decided that the person that bombed the marathon should get death" without -- you know.

THE COURT: The E to the A, B, C, D?

MR. BRUCK: The E.

THE COURT: Yeah. So I spent a good bit of time with the cases that we talked about last time, and I think that for the calibration that we're looking for, the questionnaire is too clumsy and it is -- but those kinds of issues, I think, can be addressed in the voir dire. We're going to have voir dire with, I expect, just about every one of them about their death penalty answers. And I think it's probably a more finely tuned tool than a question like that on the questionnaire.

So I expect we'll be touching on those issues, but -- to find out what their true dispositions, if any, are, but I think it's an oral matter rather than a written matter. And the same with the other --

MR. BRUCK: Pretrial publicity?

THE COURT: Sure. But, you know, your other specific -- police officer, child.

MR. BRUCK: Terrorism. Okay.

THE COURT: Yeah. We'll certainly talk with them about pretrial publicity. No question. Okay. So I think we're okay on that.

We got a trial brief from the government, I think, on Wednesday. Are we getting one?

MR. BRUCK: We don't anticipate filing one unless there are particular -- we feel like we have raised in particular motions the trial issues that we see coming at this point.

THE COURT: Okay.

MS. CLARKE: Judge, there is a reference in the government's trial brief to having in a prior pleading given 404(b) notice, and we can't find that prior pleading.

MR. WEINREB: It's possible it was in a discovery letter and not in a pleading. I remember drafting it, so I'm pretty certain we sent it to you. It was only about the defendant's drug use and sales of drugs, which we argue was inextricably intertwined with --

MS. CLARKE: Maybe you could point us to where it is.

MR. WEINREB: Yes, we'll endeavor to do that.

MR. BRUCK: I should clarify about the trial brief. We may respond to some particular -- fairly narrow points that were raised there. We didn't see the utility in our filing a sort of unguided trial brief that was not responsive to issues that were being raised, and that's why we haven't done it.

THE COURT: Well, all right. We'll take things as they come.

So are we all set on the exhibit list now? Is that in shape?

MR. FICK: We're still studying whether we're able

to -- the government provided a thumb drive with exhibits on it. We're still making sure we can -- if we have questions about that, I guess we'll raise it in the first instance with the government. We're still studying the issue, I guess is the bottom line. It's a lot of material.

THE COURT: Well, I'm not asking so much if you're happy with it as is it in order; that is, you can look at it and you know what Exhibit 117 is.

MR. FICK: Again, because of the volume, we're working through it right now. So I don't have a final answer for you.

MR. WEINREB: Your Honor, we did not at this point number the exhibits because we knew that --

THE COURT: You're going to be moving them around?

MR. WEINREB: Exactly. Plus --

THE COURT: Well, at some point they have to stop moving, don't they? In other words, the numbers are somewhat arbitrary anyway. I mean --

MR. WEINREB: That's true.

THE COURT: -- you know --

MS. CLARKE: You may do 200 before you do 2.

THE COURT: It happens all the time.

MR. WEINREB: No, of course we understand that once we actually begin on the first day of trial, we need a fixed order. And presumably, you know, we'll -- we will, you know, in a timely fashion provide an exhibit list with actual fixed

numbers. And I believe --

MS. PELLEGRINI: I think the Court had asked us for a list of who we thought the first witnesses in the first couple of weeks were going to be and the exhibits that we think will go with that, and I had that to bring with me. I'll get that to the Court and counsel.

THE COURT: Good. All right.

MS. PELLEGRINI: Those are not numbered. They -- but I could. I could number those.

THE COURT: I mean, I just think it makes it convenient, that's all. Particularly when so many of these exhibits have similar descriptions.

MS. PELLEGRINI: They do.

THE COURT: It's just a way of pinning it down so you know what it is.

MR. FICK: And if that could be correlated to a prior list so we don't wind up in a later state of confusion, I think that would be helpful.

MS. PELLEGRINI: It has a title and you could put it in a folder so you could find it again but it won't correlate to a number. I could put that number in.

MS. CLARKE: I guess the question is: Are you going to give us the same exhibit list with numbers in it or a new exhibit list?

MS. PELLEGRINI: No, it's not a new exhibit list; this

is just a witness and exhibit order.

THE COURT: This is the subsidiary list, you're talking about, for the first weeks of trial?

MS. PELLEGRINI: The first weeks.

THE COURT: That's different. But what happens for that will eventually have to happen for everything in terms of the exhibits.

MS. PELLEGRINI: Correct.

THE COURT: So just -- you know, my interest is when the jury gets it, they'll be able to know what they're looking at and how to find what they want and things like that so -- ultimately. So there has to be some -- and it just seems to me the sooner we fix that -- fix it in the sense of establish it -- then the convenience is for everybody. And if it gets a little illogical because it's out of order, I guess that's minor, it seems to me.

MR. WATKINS: Just one more thing: Mr. Weinreb said the other day that exhibits were about 90 percent fair -- I believe there are still some that have not been provided to us yet. So this is an ongoing process.

MR. WEINREB: As the Court is undoubtedly aware, there are several attorneys working on this simultaneously. We're all trying to combine things all the time, and so we need to do an audit to see whether any digital copies of exhibits were not provided and then provide those. In between responding to all

the motions, we're working on that pretty constantly, so we'll keep doing that.

MR. WATKINS: Your Honor, I just raise it because I sent a letter yesterday to them, and I know everybody has been working very hard, but some of the exhibits are specific to discovery requests we made before perhaps. I should say we're still going through the exhibits. We're still going through trying to place them in the context of the trial and in the context of our discovery request.

But I just raise this to the Court because some of this, at least, seems to be brand-new as to the exhibit; in other words, we never received it before, to my knowledge, and now it's coming out as an exhibit. They're probably in regard to discovery that should have been provided, perhaps wasn't, and perhaps that will be given over in the audit.

But we're coming to the point now where there are things coming in that are brand-new and that's a difficulty for us, particularly when we're required now to come up with our exhibits for the guilt phase, which necessarily rely on what they're doing.

I don't know if I have an answer other than to give the Court the heads-up that there might be some litigation over whether these should be introduced at trial given the kind of late disclosure that there is.

THE COURT: Well, you know, the volume of material

makes some rough edges inevitable, I think. We'll just have to deal with how significant those rough edges are.

MR. WATKINS: But there is the point where the rough edges become unfair to the defendant.

THE COURT: It's a possibility. We'll assess it. And that happens in simpler cases as well.

MR. WATKINS: But this is a mammoth case, there's no doubt about it, but it becomes all the more problematic because the timing of it now is we're all going to be involved with jury selection. That is going to be a more-than-full-time job to try to --

THE COURT: You're going to get -- that's why I required the disclosure, the preview of the first couple of weeks of trial, so you can focus on what the near horizon is. There will be other things inevitably that are on more-distant timelines, and we'll address those as -- you know, progress is incremental, and we'll eventually get there.

MS. CLARKE: We'll have a complaint box.

(Laughter.)

MR. WEINREB: Your Honor, I'm not prepared to argue about any particular item of evidence. I just don't want our silence to indicate --

MS. CLARKE: Indicate acquiescence?

MR. WEINREB: -- that we acknowledge we're producing anything late or not at all.

MR. WATKINS: And I would say it could be that I'm completely wrong about it, but because of the pace that we're at on all of this for all of us, mistakes are going to be made, and the mistakes generally are going to redound against the defendant. They have FBI agents who pored over this case for 18 -- longer than 18 months now and can easily correct the mistakes they made. We have no such safety net if something comes in at the last minute that we should have prepared for or we should have litigated.

THE COURT: Okay. I hope to be able to send you, this afternoon, a transcript or copy, I guess, of my intended preliminary instructions to the venire on Monday morning. And I've rewritten it to some degree. I don't think you'll find anything surprising or unusual, but you'll have it. And if there's any problem, we can deal with it Monday morning, but I don't think so.

Did you have a chance to review the video?

MS. CLARKE: Judge, that is something. I found a 19- -- I think we found a 1995 version.

THE COURT: No, it's 2009.

MS. CLARKE: I cannot open the one on the Massachusetts website.

THE COURT: Yeah, I couldn't either. I just didn't know if it was my technical skills.

(Laughter.)

MS. CLARKE: Well, at least we match.

THE COURT: Yeah, but it's supposed to be there. I don't know what the reason is it's not. I've looked at it a couple of times. And it's about 20 minutes long, and there's some good stuff and for this case not-so-good stuff in the sense that it describes, for example, some voir dire procedures that we don't follow as if they're the normal course; attorney-conducted, for example. There's also a short segment that I think is inappropriate for this case about the value of expert witnesses, which I thought was a little surprising.

Otherwise, the format is kind of interesting. It begins with an address by the chief justice, brief, about two minutes, and then there's a back-and-forth, head shots with Justice O'Connor and Justice Alito saying noble things about jury service. And then they have some people who are said to be actual jurors commenting on their experiences and so on, and it flips back and forth. And then there's sort of an interlocutor who does the voir dire stuff and so on and so forth. So it's just an employee of the federal judicial system as far as I can tell. So it goes back and forth.

I haven't had time, and it's probably getting too late to try to do it, to see if we could have an edited version that would cut out the stuff that I think is inappropriate and just do the inspiring stuff. I'll explore that if I have time today. I'm not sure we will. But I mean some of the inspiring

stuff is appropriate. And it's nice to -- and some of it comes from jurors themselves, which is nice, saying, "I'm very proud of what I did."

But if we can't do that, I think I'll ask that it not be used. I think my instructions are sort of a substitute for it anyway, which we'll have some encouragement to civic responsibility and so on and so forth.

MS. CLARKE: Is it possible Mr. McAlear might be able to give each side a DVD of it today?

THE COURT: You can ask him. I don't know if they're lying around. That's what I got; I got a disk. So whether he has a bunch of them or I have the disk, I don't know.

MS. CLARKE: But you'll let us know if you make the decision to edit it?

THE COURT: Yeah. So my conclusion is playing it straight through would not be the best thing to do. If it could be edited down, as I sort of have it schemed out in my head, then I think it might be. And if we did succeed technically in getting that done, then you'd get to see it before we showed it to them. And whether that could be, you know, sent to you on a file --

MS. CLARKE: Or we come over and look at it. You could just let us know.

THE COURT: Just because we're getting close to Monday morning, that's all. So anyway, that's in there. I don't know

whether we'll get to do it, that's all.

MR. CHAKRAVARTY: Your Honor, a third option, and I suppose it's prone to potential error, is just playing the first couple of minutes or whatever you think is -- just Chief Justice Roberts.

THE COURT: Yeah, you could. There is a -- I think it's about the first six or seven minutes is principally the justices. It does -- there is a little piece in the middle of that where this interlocutor comes on and says what the rest of the video is going to show. Anyway. Yeah, I guess you could put it on and shut it off. Anyway, we'll consider the different options. I'm just not sure we'll get it done.

So you have different views about the public being in the courtroom and what that means for First Amendment purposes. I take it there's no concern for Sixth Amendment purposes?

MS. CLARKE: No.

THE COURT: Which the cases divide. And I think the stickier cases, as I read them and recall them, relate to the Sixth Amendment issue rather than the First Amendment issue. And I don't know whether it's possible to predict what the First Circuit or the Supreme Court would think about, for First Amendment purposes, a public airing of the events transpiring in a room from which there is no -- in which there's no physical presence of non-participants but there is full audio and video information provided. I just don't know. So I guess

it's --

MR. WEINREB: Your Honor --

THE COURT: Let me just -- the threat to the integrity of the proceeding comes more from the Sixth Amendment than from the First Amendment, it seems to me.

MR. WEINREB: Well, I would say two things: First, even on Sixth Amendment grounds we have a concern. Although the defense can waive various rights, there's always the possibility that in retrospect the defendant may decide that it was a mistake not to have been in the courtroom, and that will become an issue on appeal or on collateral attack as to whether he was ill-advised when it came to his rights being waived.

And secondly, with respect to the First Amendment issue, although I agree that the case law in that area is not sufficiently well developed to say with any confidence how the Supreme Court might rule on that, looking at other cases like the Sixth Amendment cases like *Coy v. Iowa* and that whole line of cases which hold the defendant has a right to face-to-face confrontation of witnesses. The importance the Supreme Court has placed in general on trials being open proceedings, it seems like caution would dictate that a small number of people in the courtroom is the better course.

And the only argument against it, since that is the default in every case, is having, you know, a courtroom full of people could intimidate jurors or just make them feel reluctant

to speak up. But a smattering of people in the room seems quite unlikely to have that effect.

And, you know, it may well be, based on experience in other high-profile trials, that even fewer than ten people show up and want to attend the proceeding so that, you know, setting the limit at ten may well result in, in a way, a de facto situation where the courtroom was wide open to anybody who wanted to attend with the exception of reporters. I do agree that you'll have more than one of those if it's -- if they're allowed because they're all going to be here with nowhere else to go.

But it seems, you know, looking at all of the legal and practical considerations together, that allowing ten individuals into the courtroom is the better course.

THE COURT: Well, we have a little time because this won't happen until the Thursday when we have to start, so we can think this through, but I have not further explored this with Judge Casper, who presided in that way. I don't know whether you've talked to any of your colleagues who were involved in that case and know why they decided on the number they did; how they permitted people to be part of that; whether they, as I think your suggestion was, had sort of reserved seats for people by their profession. Those are all kind of problematic, it seems to me, other than just a random assembly. I could see some clever lawyer developing an argument

against -- regarding that as public if it's engineered too much.

So I don't know the answers to those. But I guess we can -- we should think about it because we're going to have to decide it at some point, but we still have about a week and a half to do that, so...

MR. CHAKRAVARTY: We did canvass our colleagues. And as far as their memory, correct me if I'm wrong, is the defense attorney in the *Bulger* case had actually suggested the five in an abundance of caution and everybody just went along with it and it was designed to be random.

THE COURT: Was that -- do you know, was that considered in light of the Sixth Amendment as opposed to the First?

MR. CHAKRAVARTY: That's unclear. I think it was in light of the --

THE COURT: I think the more recent circuit cases, and I've had one of them on a 2255, was Sixth Amendment rather than First Amendment cases. So this is a current development of the law that seems to be happening.

MR. WEINREB: Moreover, your Honor, I just want to mention again that the -- both parties have a right to jurors who can fairly consider both available punishments in this case, death penalty and life without parole, and we do not believe that the government's right can be vindicated without

having the defendant present at the table.

THE COURT: If you've got law on that, I'd like to see it. Again, it's a question we'll have to resolve by the 15th if it remains a defense consideration not to have him present. He will, of course, be present this week -- next week for the preliminary instructions.

MS. CLARKE: Twice a day?

THE COURT: Twice a day, right.

A couple of details about docketing. We're getting into a little bit of a mess in a couple of areas. So if there is a motion for leave to file something as to which leave is needed, it's usually attached, the motion to file the attached response or whatever. Once the motion is allowed, the party has to then take the initiative to refile. That doesn't always happen. I just call that --

The other was --

MR. WATKINS: Judge, may I just interrupt there? That includes sealed pleadings?

THE COURT: Well, with respect to sealed pleadings, we established at the beginning of the case a procedure that really goes beyond what our normal procedures on sealing are because we were sensitive to some concerns, particularly from the press, that too much sealing was going on, and we wanted to be sure that there was an adequate record for review if that ever became an appellate issue by a third party, for example,

that the motion to seal would state an adequate ground for sealing, that the order to seal would state the reason why the order was being given so that that could all be reviewed. There would be a track record and it would not just be granted and so on and so forth.

And so that leads me to the point I was going to make: I think I'm sort of getting the impression that some of the motions to seal are getting more summary and they're not adequately giving the reason why this particular paper needs to be sealed. Often it's a recurring reason, you know, it's related to CJA expenses or something like that. But it should appear in the motion so that we can then put it in the order so it can be tracked as a legitimate sealing under the circumstances.

MR. WEINREB: Actually, on that subject, there's been a problem -- or a question that has vexed us a little bit from the start, which is that the defense has filed a great number of things under seal that the government would ordinarily not have sealed had we filed them, and saw no need that they be sealed or that our responses be sealed.

THE COURT: For example?

MS. PELLEGRINI: Way back when -- the first example I can think of was the SAMs motion.

THE COURT: Was that filed under seal?

MS. CLARKE: No.

THE COURT: I didn't think it was.

MS. PELLEGRINI: A motion was filed under seal and was put in the cover, and we were filing our response under seal because the original had been asking that it actually not -- that it be unsealed.

MS. CLARKE: That was then unsealed.

MS. PELLEGRINI: It was then unsealed. I'm giving an example of one --

MR. WEINREB: But in general, we're often in the position where the defense has filed a motion for leave to file something under seal, the motion's been granted, so the motion's filed under seal. At that point we're filing -- we're in the position of filing a response, and we face Ms. Hobson's choice: We either file it publicly and risk doing something that the Court would not have wanted us to do, or we file leave to -- file a motion for leave to file it under seal when we really can't state a reason in good faith that we believe it needs to be under seal other than that the Court has allowed the original motion to be filed under seal.

So if that states an adequate reason, then we're --

THE COURT: It might, actually. In other words, at least pro tem, that since the Court had already indicated that the original filing should be under seal, a response to it, which might be suggestive of the content of the sealed material, therefore, should follow under seal. At some point,

and certainly after verdict but maybe some point before that, I don't know if anyone is going to have the time to do it, but we will have to conduct a review of what's sealed. I mean, at some point I envision a good bit of the record being unsealed before it goes off to other places.

MS. CLARKE: I think most of the sealed stuff up until the recent weeks has been funding. There may be --

THE COURT: I would guess that 60 or 70 percent of it is related to the funds.

MS. CLARKE: Right. But then recently there's just been a whole lot of litigation under seal.

MR. FICK: Well, part of that was to sort of preserve or to prevent jury exposure to things like the *Daubert* motions, et cetera.

THE COURT: Right.

MR. FICK: Understanding this is a long way off and that there may be good reason to unseal much of this, I think the parties might like an opportunity at least to be heard as a preliminary matter before things are unsealed.

THE COURT: Probably. I would think so. I think I would need your perspective.

Yeah?

MS. CLARKE: On that note, I was -- we were getting ready this morning to file another request for disclosure of jury records because we now have some statistics based on what

the Court gave us, whatever the 29th was. And because it cites that 538 individuals didn't respond, 819 were excused, it cites to that data -- not by name -- I didn't know whether to file that under seal or publicly.

THE COURT: I guess -- I think for the reason that we're still about to do jury selection, the less is out there in discussion, the better. So I would say for now. That's the kind of thing that probably doesn't have to be sealed for very long. And we talked about that with other jury-related matters. We just want to make sure it's --

MS. CLARKE: We want to make sure that it's as much notice as possible, so I'll file it under seal.

THE COURT: Okay.

The final mechanical or technical thing is: Sometimes a motion to seal will come with paper attachments, and it's not always clear how much is to be sealed or not sealed and so on and so forth. So again, if the -- the motions could be explicit about what is covered by the motion to seal, in other words, just as kind of a simple example, the motion to seal, motion to do something or other which is supported by three declarations or something like that. Enumerate those so it's clear to the docketing clerk what is covered by this motion and so on. I think we've had a couple of occasions where materials have come in kind of in a batch and it's been a little hard to navigate through that, that's all.

MS. CLARKE: We can't track a lot of the docket numbers for the sealed --

THE COURT: Well -- and I think some of it is related to what we've just been talking about, that there's maybe not a follow-up. For example, I think it's happened on a couple of occasions that something -- so, for example, motion to file a day late, okay? Motion gets allowed, the thing is attached, but it might not actually get docketed as a different item. That's happened once or twice, I've seen. So it's, you know, an accounting problem.

The last thing I have -- actually, someone referred to a SAMs motion. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

MR. WEINREB: Your Honor, I have two quick matters. Can we go off the record for the first one?

THE COURT: We could try, I guess. Yes.

(Discussion off the record.)

THE COURT: Okay. Back on the record.

MR. WEINREB: Then the second matter was simply this: The Court's decorum order specifies that the only people who may have electronic devices like BlackBerries in the courthouse are attorneys and members of the press, that there are certain people in our office who are neither attorneys nor members of the press, namely, the victim/witness assistants, who will be working in the overflow courtrooms, and especially the one that's for the victims. And like all members of the U.S. Attorney's Office, they're normally permitted to have their electronic devices in the courthouse and use them where they're needed.

And I don't think there's any reason really for an amendment to the decorum order if the Court just rules that

employees of the U.S. Attorney's Office are tantamount to attorneys for purposes of that order.

THE COURT: Are there similar people on the defense side?

MS. CLARKE: We have filled out forms that the clerk's office had, I think.

MR. WATKINS: Michelle did.

THE COURT: To be able to bring them into the courthouse?

THE CLERK: Electronics with the marshals.

THE COURT: This is slightly different because it's addressing the decorum order, but I think we can extend it to non-lawyer active participants on the teams. I don't think there's any problem with that. And I don't know whether we need to have a codicil or something that says that.

MR. WEINREB: I don't see any need for it.

THE COURT: Okay. Okay. I think that's what we have.

MS. CLARKE: Do you have anything else?

MR. WATKINS: No, I think we're done.

THE COURT: Good. Thank you.

COUNSEL IN UNISON: Thank you.

(The proceedings adjourned at 11:54 a.m.)

C E R T I F I C A T E

I, Marcia G. Patrisso, RMR, CRR, Official Reporter of the United States District Court, do hereby certify that the foregoing transcript constitutes, to the best of my skill and ability, a true and accurate transcription of my stenotype notes taken in the matter of Criminal Action No. 13-10200-GAO, United States of America v. Dzhokhar A. Tsarnaev.

/s/ Marcia G. Patrisso
MARCIA G. PATRISSO, RMR, CRR
Official Court Reporter

Date: 1/23/15