UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,    )
                             )
        Plaintiff,           )
                             )  Criminal Action
v.                           )  No. 13-10200-GAO
                             )
DZHOKHAR A. TSARNAEV, also   )
known as Jahar Tsarni,       )
                             )
        Defendant.           )
                             )

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

**JURY TRIAL - DAY SIX**

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Tuesday, January 20, 2015
8:37 a.m.

Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

APPEARANCES:

OFFICE OF THE UNITED STATES ATTORNEY
By:  William D. Weinreb, Aloke Chakravarty and
Nadine Pellegrini, Assistant U.S. Attorneys
John Joseph Moakley Federal Courthouse
Suite 9200
Boston, Massachusetts  02210
- and -
UNITED STATES DEPARTMENT OF JUSTICE
By:  Steven D. Mellin, Assistant U.S. Attorney
Capital Case Section
1331 F Street, N.W.
Washington, D.C.  20530
On Behalf of the Government

FEDERAL PUBLIC DEFENDER OFFICE
By:  Miriam Conrad, Federal Public Defender
51 Sleeper Street
Fifth Floor
Boston, Massachusetts  02210
- and -
CLARKE & RICE, APC
By:  Judy Clarke, Esq.
1010 Second Avenue
Suite 1800
San Diego, California  92101
- and -
LAW OFFICE OF DAVID I. BRUCK
By:  David I. Bruck, Esq.
220 Sydney Lewis Hall
Lexington, Virginia  24450
On Behalf of the Defendant

P R O C E E D I N G S

THE COURT: All right. This is to just follow up on a couple of the prospective jurors from last week that I wanted to reserve and reread the transcript. So let's start with 38, if anybody wants to add -- I mean, it's been pretty well argued.

MR. BRUCK: Well, we don't have a great deal to add except to emphasize what we uncovered over the weekend.

THE COURT: I've read your submission.

MR. BRUCK: Thank you. We just feel like -- picture a jury of 12 members that were like this juror. And no one would think that's an impartial jury. We think it's quite clear on the issue of bias that he is disqualified; and on top of that, he's a juror who said he would be worried about his hardship. He should be treated like the other self-employed jurors.

MR. WEINREB: I have nothing to add.

THE COURT: I think, on reflection, he should be excused. I think it's actually a combination of the two. His hardship might be endurable for a couple of weeks; but for the length of this trial, I think it's pretty significant. And while I -- I think I said on Friday, I appreciated his thoughtfulness, evident thoughtfulness, but I think that his emotions are too close to this case.

I think we reserved on 58 as well -- 54.

MR. WEINREB: That was the government's motion, your

6-4

Honor. I'd just like to add -- emphasize that this is a case, I think, where the Court's ability to observe the prospective juror's demeanor and his way of answering the questions particularly important. This is somebody who wrote in his questionnaire that he believed that the death penalty was state-sanctioned murder, and he's being asked whether he could bring himself to commit state-sanctioned murder.

And although -- and he clearly expressed a great deal of ambiguity, at the very least, about his ability to do that, to personally, as a realistic matter, give somebody the death penalty given his incredibly strong feelings against it. And although it's true that if it is theoretically possible for somebody to do that, this is not a juror who convincingly said that he could.

And I just want to emphasize that in *Uttecht v. Brown*, which is the Supreme Court's latest ruling on this very kind of question, it emphasized that when there's ambiguity in the prospective juror's statements, the trial court is entitled to resolve it in favor of the state without risking reversible error if the trial court believes that its assessment of the juror convinces it that it is just a theoretical possibility, not a practical point. In that case, the trial court excused a potential juror who stated six times that he could consider the death penalty or follow the law; but because those responses were interspersed with more equivocal responses, that was

enough to justify striking the juror.

And we just submit this is one of those cases where the Court cannot be convinced that he really, as a practical matter, could participate in something that he considers to be state-sanctioned murder.

MR. BRUCK:  Well, your Honor, I think it's very telling that, inadvertently, I'm sure, Mr. Weinreb misstated what the juror stated on his questionnaire.  He said that after listing things that he didn't like about the death penalty, he said that it only seems -- "The only thing it seems to serve," which is equivocal itself, "is state-sponsored vengeance," not murder.  There's a huge difference.  Vengeance retribution, that is a constitutionally permissible goal of capital punishment.  There are Supreme Court cases that talk about where the justification for a death sentence is inadequate.  It becomes unconstitutional because it is nothing but state-sanctioned infliction of human suffering for no rational purpose.  So in some ways, there is a fairly respectable position that's within the legal mainstream if this man had been a lawyer.

Mr. Weinreb went after this question of whether he would require the government to actually change his opinions of the death penalty or only show that it was justified in this case, and we got the answer.  He said, "Again, I feel I do have reservations on the death penalty, but I think, with

difficulty, I could overcome them if it was proven for a specific case." There are no words in English to make it any clearer that this is a death-scrupled juror who would put that -- his beliefs aside if the evidence in an individual case justified the death penalty. Mr. Weinreb cites *Uttecht v. Brown* but doesn't mention that in *Uttecht* the juror clearly didn't understand what was going on. He kept saying the only time he would impose the death penalty is if there was a danger of the defendant getting out on parole or being released and doing it again. He was told over and over again that Washington State has abolished parole and that couldn't happen. And he kept coming back to that as his justification.

So what was really happening, even though, yes, he said he could impose it but he could only impose it in conditions that were impossible to ever occur in any case. And that was what the judge, in his discretion, took into account. And the Supreme Court said, Well, under those circumstances, you've got to go with the judgment of the Court, who is there and observes the juror.

I'll grant you, as I said on Friday, that this man has a slightly unusual style of communication. That's just the way he talks. But that's not the basis for disqualifying anybody from service based on his opinions about capital punishment. And the ambiguity was resolved. We didn't even do any follow-up questions. We didn't think it was an issue after his

final answer to Mr. Weinreb.  And we just don't think there's any basis.

I understand -- the state has 20 challenges, and that's what those are for.  They clearly don't trust that he would go with them, and maybe he wouldn't.  But that's what peremptory challenges are all about.

THE COURT:  Yeah.  I think we'll leave it to that.  I think you'll have to use a peremptory on him.  I think it's -- on the record, it's way too close a call, and you never know what somebody looking only at the record will think about it.  I have my concerns about his candor, but I think it's best that I allow the strike -- I mean, disallow the strike and let you, if you choose, exercise a peremptory.

Okay.  So we'll recess this portion.  When the jurors are ready, we'll follow as what we've done with the introduction and then the --

MR. BRUCK:  Judge, there's one housekeeping matter, if I may.  Yesterday evening, after checking with your law clerk, we sent her a courtesy copy of a pleading that could not have been filed in the normal course.  It was under seal, and we -- it had to be written and filed outside of business hours unless we were going to give it to you when court resumed.

I just wonder if that's an acceptable procedure generally.  We don't want to start creating process without leave of the Court, but it just seems like, if the Court wants

to have advance notice of a filing that we're going to be making like that, would it make sense simply to serve the government and send a copy to your law clerk. And the Court would have the option of looking at it early or getting it in due course.

THE COURT: Mr. Weinreb?

MR. WEINREB: I have no objection.

THE COURT: That sounds fine.

MR. BRUCK: Thank you.

THE COURT: Okay. See you shortly.

(Recess taken at 8:47 a.m.)

(The Court and the venire entered the room at 9:10 a.m.)

THE COURT: Good morning, everyone.

THE VENIRE: Good morning.

THE COURT: Welcome back to the United States District Court for the District of Massachusetts. Thank you for being here. We're continuing the process of selecting a jury for the case of the United States vs. Dzhokhar Tsarnaev. As you know, Mr. Tsarnaev is charged in connection with the bombing that occurred near the finish line of the Boston Marathon on April 15, 2013, and that resulted in the deaths of three people. He's also charged in the death of an MIT police officer and other crimes that occurred on April 18 and 19, 2013. Some, but not all, of the crimes charged are, by statute, potentially punishable by death.

You will recall from my prior instructions that the jury will first consider and decide whether the government has proved Mr. Tsarnaev's guilt of any or all of the charges against him.  If he is convicted of any of the capital crimes, that is, crimes potentially punishable by death, the jury will then consider and decide whether he will be sentenced to death for any such crime or to life in prison without possibility of release.

Some of you may have wondered why the death penalty could be a possibility in this case in view of the fact that the laws of Massachusetts do not provide the death penalty for murder or any other violation of Massachusetts law.  The reason is that this is a federal case involving violations of the laws of the United States rather than a state case involving violations of the laws of Massachusetts.

If the jury convicts Mr. Tsarnaev of any of the capital crimes charged in the Indictment, the same jury will hear additional evidence and decide whether to sentence him to death or to life in prison without possibility of release.  So because the jury that is selected first to decide the question of guilt or innocence will also decide the punishment if the defendant is convicted, it is necessary to question you then in this process about your feelings and beliefs about the death penalty as part of the process.

So let me explain briefly the procedures that are

followed in a case in which the death penalty is or may be an issue. As in any criminal trial, initially the government will have the burden of proving that Mr. Tsarnaev is, in fact, guilty of any of the crimes with which he is charged. If he is convicted of a crime for which the death penalty may be imposed, then we will proceed to the second phase of the trial, sometimes referred to in shorthand as the penalty phase.

In that phase, the government will introduce -- that seeks to prove beyond a reasonable doubt, first, that Mr. Tsarnaev acted with the required intent or sufficient intent to be subject to the death penalty; and, second, that aggravating factors about the killings or about the defendant justify sentencing him to death. Aggravating factors are circumstances that, if proven, make the crimes particularly serious or blameworthy and, therefore, under the law, may justify imposing a more severe sentence on this defendant compared to other persons convicted of intentional killing or murder. The government bears the burden of proving any alleged aggravating factors to every juror beyond a reasonable doubt.

The defense will also have the opportunity to present evidence of what it will argue are mitigating factors in the case. Mitigating factors are usually circumstances about the crime or about the defendant's background or character that would suggest the death penalty is not the appropriate sentence for the case or that life imprisonment without possibility of

release is adequate to punish the defendant.  Unlike the proof of aggravating factors, a mitigating factor need only be proven by the greater weight of the evidence.  That is a less demanding standard of proof than proof beyond a reasonable doubt.  Again, unlike the proof of aggravating factors, mitigating factors do not have to be proven to the satisfaction of all 12 jurors.  Any juror who find or determines a mitigating factor to have been proven by a greater weight of the evidence may consider that factor in deciding the appropriate sentence in the case regardless of whether any or all of the other jurors agree that the mitigating factor has been proven.

After the parties have made their presentations during the penalty phase, the jury will weigh all the evidence. Before a jury could vote to impose the death penalty, every juror would have to be persuaded that certain threshold factors that make the defendant potentially subject to the death penalty have been proven beyond a reasonable doubt.  In addition, every juror would have to be persuaded that any proven aggravating factors sufficiently outweigh any mitigating factors found by any juror or jurors to justify a sentence of death.  Even if the jury did not find any mitigating factors in the case, it would still have to be unanimously persuaded that any proven aggravating factors were themselves sufficient to justify a death sentence.

You should understand that a jury is never required to find that a sentence of death is justified.  The decision whether the government has proven that a defendant should be sentenced to death must ultimately be made by each juror himself or herself.  If, however, every juror is persuaded that the death penalty should be imposed, I would be required, as the judge, to sentence the defendant to death.  In other words, I cannot change the jury's decision.  The jury, and not the judge, is responsible for determining whether a defendant who is convicted of a capital crime will live or die.

What I've just described is an overview of the law applicable to the jury's consideration of the death penalty.  If you are selected to serve on the jury and if you find the defendant guilty of a crime or crimes punishable by death, I will give you very detailed instructions concerning your duties in deciding whether to impose the death penalty or life imprisonment without possibility of release, and the law that pertains to the making of that decision.

As I told you when you were filling out your questionnaires, there are no right or wrong answers to any of the questions that you have been asked or that you will be asked today in furtherance of the process.  We're asking them because both the government and Mr. Tsarnaev are entitled to a jury that does not have its mind firmly made up one way or another before hearing the evidence and a detailed explanation

6-13

of the law.  That applies both to whether the defendant is guilty or not guilty of the specific crimes charged in the Indictment and, if he is convicted of a capital crime, whether he should be sentenced to death or to life imprisonment without possibility of release.

So today I'm going to question each of you individually about some issues that are relevant to the process of selecting a jury.  We're going to call you into the courtroom one by one to ask you some questions.  You'll see there are other people here in addition, mostly the lawyers and their staff, but there will be perhaps others in the back.  The proceedings are also being simultaneously transmitted by audio and video to overflow courtrooms.  We will not identify you by name but rather by number.  And you will be seated so that the video camera will be behind you, shooting over your head basically.  Your answers will generally be public, but if you believe a truthful answer would require you to reveal some sensitive personal information, we will temporarily stop the audio transmission to those courtrooms so that people observing there will not hear your answer.

Again, we do not expect or want any particular answer to any of the questions.  All we want and what the law expects is that you provide accurate and truthful answers to the questions you are asked.  If you do that, you will be doing your duty as a citizen and as a juror no matter what the

answers may be.

I want to remind you about some of my prior instructions. As I told you before, a jury's verdict must be based on the evidence produced at trial and must be free of outside influence. Therefore, I remind you again that it is extremely important that you do not discuss the case, including this selection process, with your family, friends, each other, or any other person, until you have been excused or, if selected as a juror, until the case has been concluded. Again, you are to refrain from any online research or otherwise reading, watching or listening to any reports about the case that may appear in the media.

When you signed your questionnaires, you signed under the penalties of perjury. It's a solemn occasion. And we now will ask each of you to take an oath to tell the truth when you answer my questions. And so we will ask the clerk -- the clerk will ask you to rise and administer that oath to you.

(Venire sworn.)

THE COURT: All right. You might as well remain standing because you're going to go back into the jury room. Thank you. We'll recess this part of the matter and begin our questioning of the individual jurors.

(The venire left the courtroom.)

THE COURT: We're beginning with No. 48, who was deferred from a prior day. I may say that this is -- and, I

guess, more for the public than for those here who know the answer -- that sometimes occurs. There's some anomalies and people have been shifted. They may be expected one day, and we, for various reasons, shift them to another day. And this is one of those.

MS. CLARKE: Your Honor, there may be an issue for the Court to address with this juror privately.

THE COURT: Okay.

THE JURY CLERK: Juror 48.

THE CLERK: Juror 48 right here, please.

THE JUROR: Good morning.

THE COURT: So your questionnaire that you previously filled out is there in front of you if you want to look at it. I would like to start by drawing your attention to Question 9. It's on Page 5. You listed some medications and things that you take there. Would any of those affect your ability to participate in this case as a juror?

THE JUROR: Friday I was excused for a cardiology appointment. I've since been diagnosed with a heart arrythmia.

THE COURT: I think this is medical information. I think we'll cut the audio on this.

(SIDEBAR CONFERENCE AS FOLLOWS:







. . . END OF SIDEBAR CONFERENCE.)

THE COURT:  I reminded the jurors this morning about not talking with anybody about the case and not following the media and everything.  Since you were here to fill out the questionnaire, have you been able to follow that?

THE JUROR:  Yes.

THE COURT:  We asked some questions about attitudes, including attitudes toward prosecution, lawyers, defense lawyers, and so on and so forth.  You had some reservations -- if you look at Paragraphs 44 through 46, I guess.  You seemed to say, both as to prosecutors and defenders, that you've yet to be in a court proceeding where they did a good job.

THE JUROR:  Yeah.  The last jury duty I was on in district court in Brockton, they -- we spent a week, and the prosecutor never asked the right question.  Even the judge, at the end of the trial, said the prosecutor did a poor job.  They brought in very expensive witnesses, DEA, FBI, and it cost a lot of money.  And it was -- just went out the window because they never asked -- they never asked the right question.  It was one simple question.  And there was -- the defense lawyer, it was her first time and she was brilliant, you know.  And it was sad that the seasoned prosecutor did such a poor job versus the first-time defense lawyer.

THE COURT:  In 46, you said -- concerning law enforcement officers, most seem overly aggressive.

THE JUROR:  That's for sure.

THE COURT:  Tend to get carried away with their powers.

THE JUROR:  Just from my own experience, my local town, seeing how they pick on the kids and --

THE COURT:  If you want to turn back to Page 12, earlier we asked a question about law enforcement persons as witnesses and asked whether you'd give greater or lesser weight to their testimony based on their status as a law enforcement officer.

In light of what you've just said in Question 46, would that affect your assessment of a law enforcement witness? Would you tend to be harder on them than others, or would you treat them as any other witness to be evaluated on the testimony?

THE JUROR:  Treat them as any other witness.

THE COURT:  Even though you had some --

THE JUROR:  Like I say, I think they overpower themselves with the younger crowd.  I mean, it was different when I was a kid.  They treated us different.

THE COURT:  Let me turn to Page 20, Paragraph 77.  In this question we're asking, as a result of things you've seen in the media, you've formed an opinion about certain matters, including whether the defendant is guilty or not and whether -- how he should be punished and so on.

Part A, you said that you had formed an opinion that he was guilty.

THE JUROR: Yes.

THE COURT: And then Part B and C, you didn't answer. But as to Part D, which said should he -- whether he should not receive the death penalty, you said you're unsure. So let me just ask about those questions.

Do you understand that in any criminal case a defendant is presumed to be innocent at the outset, and it's to be found guilty only if the government proves that he's guilty beyond a reasonable doubt by the evidence at trial. Do you understand that that's the principle on which we operate?

THE JUROR: Yup.

THE COURT: You say you formed an impression or an opinion about his guilt. Would you be able to, nonetheless, focus on the evidence presuming him to be innocent and convict him only if you were convinced by the evidence at trial, or would you be so affected by your --

THE JUROR: I just see the way that the government has felt -- he failed -- you didn't offer any bail, even if it was $200 million, something that was unreachable, I mean, showing the face that you have -- you've already convicted him. The government's convicted him because they've failed to show a bail. There's no plea agreement.

THE COURT: What I'm getting at --

THE JUROR:  There's no opportunity by the federal government to show that he's innocent.

THE COURT:  Right, right.

THE JUROR:  I mean, maybe I'm wrong.  You're in the business.  I'm not.

THE COURT:  So the question is -- because of the media attention, it's understandable people have impressions such as you've described.  The question is:  Will you insist that the government fulfill its burden of proof at trial, or have you already skipped to the next phase of the case in your head?

THE JUROR:  Well, I've already skipped to the next phase, but I'm open to suggestion.  I probably could be --

THE COURT:  Let me skip over to Question 82.  You said -- you have some Boston Strong T-shirts and jackets, you said, through Teamsters Local 25.

THE JUROR:  I do.

THE COURT:  Tell me what that phrase mean, "through the Teamsters union."  Did they distribute them to people?

THE JUROR:  They distributed them.

THE COURT:  When was that?

THE JUROR:  Since the incident and continuous.  They still provide them.

THE COURT:  I gather you're a member of the union?

THE JUROR:  Local 25, yes.

THE COURT:  Beginning with Question 88, we asked some

questions about the death penalty.  88 was a general question: What are your general views?  You said, "Unable to answer." The next question we asked you to express, on a scale from 1 to 10, what your views were.  And you were on the -- at a 3 on sort of the opposed side of the death penalty.  Then if you go to the next page, Question 90, we asked you to select a statement which was close to you -- closest to you or your views, and you said you're opposed to the death penalty and would have a difficult time voting to impose it even if the facts supported it.  Does that accurately summarize your view?

THE JUROR:  Yeah, I would say so.  I mean, I use that from the same fact that I was in the service during the Vietnam era.  I was opposed to the death -- you know, to pulling the trigger, going into war.

THE COURT:  Were you in combat in Vietnam?

THE JUROR:  No, I wasn't.  I was stateside.  That was part of the reason why I was stateside, because -- I also was generally discharged with an inhonorable (ph) discharge for part of that reason and fraudulently enlisted.

THE COURT:  Okay.  Let's go back to the statement in Question 90.  You say you're opposed and would have a difficult time voting to impose it.  The question is whether you could, on the basis of the evidence presented in the trial and particularly in the -- perhaps the penalty phase, would you be able to give careful consideration of that evidence and in --

is it foreseeable that the evidence could be such that you would consider --

THE JUROR: No.

THE COURT: -- imposing the death penalty?

THE JUROR: No.

THE COURT: Are there any circumstances you can think of that would lead you to vote in favor of the death penalty?

THE JUROR: I don't believe in it. I'm pro choice.

THE COURT: Any follow-up?

MR. WEINREB: Just one. Going back to what you said about it being a hardship to serve on the jury, you said to us you earn $1,500 a week as truck driver and will earn 600 a week on disability. If you're not on disability, in other words, if the -- because of your medical situation they take you off disability and you are selected to work on the jury -- to serve on the jury, what kind of a financial hardship will that be?

THE JUROR: It would be $40 a day.

MR. WEINREB: Yeah.

THE JUROR: I won't be able to pay my mortgage and my car payments.

MR. WEINREB: You would not be able to?

THE JUROR: No. I have bank statements showing you what it costs for me to live on a monthly basis.

MR. WEINREB: Thank you. That's all.

THE COURT: No? All right, sir. Thank you.

THE JUROR:  Leave this here?

THE COURT:  Yes.  Leave that there.  Thank you.

This next juror, Juror No. 58, I think by some Scribner's error, some of the pages in the questionnaire were misnumbered.  But I've think we've inquired and it is her questionnaire.

THE JURY CLERK:  Juror 58.

THE CLERK:  Juror 58.  Have a seat, please.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  You filled out the questionnaire earlier. It's in front of you.  We may look at it as I follow up on some things.

I want to start with Question 10 on Page 5.  You said you're the sole employee at your place of employment.

THE JUROR:  Correct.

THE COURT:  Can you tell us about that?

THE JUROR:  I have a letter from my employer.

THE COURT:  Just tell us about it.

THE JUROR:  I work for a very small company, and I am the only employee.  It's the owner and myself.  It's a tiny paint company in the city.  So when I'm not there, he has to be there.  And he would not pay me for any time out of work.

THE COURT:  How long have you worked for them?

THE JUROR:  Fifteen and a half years.

THE COURT:  How long has the business been there approximately?

THE JUROR:  About 120, forever, forever.

THE COURT:  You also say you have a planned vacation.

THE JUROR:  I do, February school vacation.  It's a destination wedding.  It's been paid for prior to this.

THE COURT:  Okay.  I don't think we need to have anything further.  Thank you.

THE JUROR:  Thank you very much.

THE JURY CLERK:  Juror No. 59.

THE CLERK:  Number 59, have a seat, please.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  As I reminded everybody again this morning, we asked potential jurors to refrain from discussing the case with anyone and also from being exposed to media reports on TV or in the paper and so on.  Have you been able to follow those instructions?

THE JUROR:  I have.

THE COURT:  That's the questionnaire you filled out when you were here before.  I'm just going to follow up on some of the answers you gave in that questionnaire.

THE JUROR:  Okay.

THE COURT:  First of all, if you want to look at it, it's Page 5, Question 10.  You had some concern because you had

just -- have just started a new job.

THE JUROR:  Uh-huh.

THE COURT:  Can you tell us whether that continues to be an issue?

THE JUROR:  Right now I'm just, you know, going through orientation.  They might need me to travel within the next couple weeks.  So, you know, I just don't want to -- I don't want to put that in jeopardy.  I know I can't lose my job from serving here, but it's still, you know, a cause of concern to my coworkers and my boss.

THE COURT:  Tell us a little bit about the employer.  How big a company is it and so on?

THE JUROR:  It's an international company.  It's about 2,000 employees.

THE COURT:  Locally, in the office that you would be working in, about how many employees?

THE JUROR:  About 200, I believe.

THE COURT:  How many people in your job category?

THE JUROR:  I think about ten.  So we do have other people that can, you know --

THE COURT:  You're working for a new employer, but you've been doing the kind of work you do for a while, is that right?

THE JUROR:  Correct, about four years.

THE COURT:  We asked a little bit about people's use

of social media in a couple of questions.  In 29, you said that you sometimes post opinions about events on Facebook.  Have you posted opinions about the subject matter of this case?

THE JUROR:  I posted my opinion about Dzhokhar being on the cover of -- I believe it was *Time Magazine*.

THE COURT:  *Rolling Stone*?

THE JUROR:  *Rolling Stone*.  And I thought it was very wrong.  I just said it was wrong, and it's not the kind of person you want on the cover of *Rolling Stone*.  That's all.

THE COURT:  Anything other than that about the case?

THE JUROR:  No, nothing else about the case really.

THE COURT:  In Question 30, you say you use Facebook and Instagram about once a day.  So you're a pretty regular user?

THE JUROR:  Yeah.  I take a lot of pictures.

THE COURT:  Are they generally about personal matters?

THE JUROR:  No.  It's more like travel pictures, nature pictures, things like that.

THE COURT:  We've asked about different experiences you may have had with the justice system including whether you've served as a juror.  I guess you have not served as a juror, but you had some experience with a civil court trial in which you were involved.

THE JUROR:  That's correct.

THE COURT:  Does that experience give you any positive

or negative feelings about court trials or anything that would interfere with your ability to be a fair juror in this case?

THE JUROR:  No.  It was very neutral.

THE COURT:  Was that a jury trial?

THE JUROR:  No.  It was a -- I don't know what you call a nonjury trial.

THE COURT:  Nonjury trial.

THE JUROR:  Nonjury trial.

THE COURT:  Okay.  Would you look at Question 59 on Page 17 and, actually, together with that, 64 on the next page?

THE JUROR:  I'm sorry.  What was the second question?

THE COURT:  59 and 64.

THE JUROR:  64.

THE COURT:  Those are about your attitudes towards Muslims in the community generally and particularly immigrant Muslims.

THE JUROR:  Uh-huh.

THE COURT:  You seem to have some relatively strong views about that.

THE JUROR:  Yeah.  I just -- you know, I feel like a lot of terrorist attacks have been by people who are Muslim. And I'm not saying overall as a religion it's bad, but it seems like the radical part of the religion is not good.  So it's hard for me to be unbiased about Muslims in that way, having radical Muslims here.  So I don't know how they -- if they ask

questions about that when people come into the country, but I think they should. That was my feeling about it.

THE COURT: Would those feelings, in your judgment, interfere with your fair-mindedness or your ability to judge the evidence in this case fairly and impartially?

THE JUROR: Yes, I believe so.

THE COURT: You think it would.

If you look at Question 77, we ask a series of questions about whether you formed an opinion about whether the defendant is guilty or not and, if so, what penalty might be imposed. And you've said, yes, you have formed an opinion that he's guilty.

As I think you've heard in my instructions, in a criminal case, the government has the responsibility of proving somebody guilty of what they're charged with in the case, in the trial. That's -- the defendant starts presumed not to be guilty, and the burden is on the government by evidence produced at trial to prove beyond a reasonable doubt that he is guilty of what he's charged with.

It's not surprising that people might have impressions or opinions going into that, but the question is whether a juror can set those preconceived ideas aside and pay attention to the case that -- the trial and the evidence produced in the trial and, on the basis of that, make a decision whether the government has proved the defendant guilty or not. So I guess

the question is:  Would you be able to hold the burden -- hold the government to its burden of proof, or are your feelings about this strong enough that you think that they would override that ability?

THE JUROR:  I feel like, even if I was shown evidence and heard it, I mean, I would like to be there, but I already feel that he's guilty and that he should have the death penalty.

MS. CLARKE:  Your Honor.

THE COURT:  Okay.  Thank you.

THE JUROR:  Thank you.

THE COURT:  Just leave the questionnaire there.

THE JUROR:  Okay.

THE JURY CLERK:  Juror No. 60.

THE CLERK:  Juror No. 60, over here, please.  Have a seat.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  As I reminded everybody again this morning, I've asked jurors to avoid any discussion of the case or the process as well as avoid any media reports about the case.  Have you been able to do that between the questionnaire and now?

THE JUROR:  Yes.

THE COURT:  So that's the questionnaire you filled out

when we were last here.  I'm going to follow up with some questions about some of your answers.  I'd like to start with No. 13, which is just basic about your family, I guess.  We asked about your spouse, and you say -- in terms of occupation, you say "retired."  Could you tell us what your spouse is retired from?

THE JUROR:  Sure.  He worked on the ambulance for the Fall River Fire Department, and he currently works as a starter at a golf course.

THE COURT:  That's a nice retirement.

THE JUROR:  Yeah, it is.

THE COURT:  How long was he with the fire department?

THE JUROR:  I would say 20 years.

THE COURT:  You say he worked on the ambulance.  Was he an emergency medical technician?

THE JUROR:  He was.

THE COURT:  And before he did that, did he have -- before he went to the fire department, what did he do?

THE JUROR:  He started very young on the fire department.  He retired because of a back injury, so he was relatively young when he retired.

THE COURT:  Okay.  So when was that?  When was his retirement?

THE JUROR:  Probably close to 20 years now.

THE COURT:  Okay.  Your own employment is as a manager

of social work and interpreter services at a health center.

THE JUROR:  South Coast Health, yes.

THE COURT:  Tell us what your daily activities are like.

THE JUROR:  I manage roughly 30 social workers for a three-hospital site system and probably 15 interpreters.  So the social workers deal with any barriers to discharge, any psychosocial issues that patients may have, and the interpreters provide interpreting services for patients within the hospital system.

THE COURT:  We asked some questions about whether there was any connection in the family with law enforcement, including prosecutors' offices and so on.  Interpreting the answers -- this is Question 33 on Page 11 -- that your daughter was, I gather, something like an intern in a DA's office while she was a law student?

THE JUROR:  Correct.

THE COURT:  Has she had any regular employment in a prosecutor's office?

THE JUROR:  No.  She works for the City of Fall River in their economic development.

THE COURT:  You had prior jury experience, I guess, in this court?

THE JUROR:  Yes.

THE COURT:  You said about ten years ago or so?

THE JUROR:  Actually, I think it was longer than that, probably closer to 15 or 20.

THE COURT:  You said it was a difficult process.  Can you tell us why you described it that way?

THE JUROR:  Actually, the court process was not.  It was very enlightening.  But the deliberation was difficult in that, for some reason though the majority of people felt the individual was guilty, the people who didn't, chose to focus on me to change my mind, and I'm not sure why that happened, but -- so it just felt difficult.

THE COURT:  Because you thought you were kind of being a focus of something?

THE JUROR:  Uh-huh.

THE COURT:  What was the ultimate verdict?

THE JUROR:  Guilty.

THE COURT:  Let me ask you to look at Page 20 and Paragraph -- excuse me, Question No. 77.  We ask whether you've formed an opinion about whether the defendant is guilty and, if so, what the penalty should be.  You say that you have formed an opinion that he's guilty based on media reports and other things.

THE JUROR:  Uh-huh.

THE COURT:  As I've instructed the jury generally, in a criminal trial, every defendant is, at the outset, presumed to be not guilty unless and until proved guilty by the

evidence.  And the government has that burden to prove a person guilty beyond a reasonable doubt.  It's not surprising that people might have some ideas coming in.  What we ask jurors to do is to put aside those ideas in favor of the process and listen to the evidence and, on the basis of that, decide whether the government has, in fact, proven the person guilty or not as it has the burden to do.  Would you be able to do that?

THE JUROR:  I think so.

THE COURT:  You also have a -- say you have an opinion about whether the death penalty should be imposed, although in the next question to whether he should not receive it, you're saying you're unsure.  Let's turn to the questions that focus on that, and that starts at Page 88 -- I'm sorry, Question 88 on Page 23.

We ask there generally what your views of the death penalty might be, and you say, "Certain crimes should be punishable by death."  Is that your general view?

THE JUROR:  Yup.  Theoretically, I believe in the death penalty, but it became very different, when you were looking at it, that you would be making that decision.  So, theoretically, yes, I do believe in it.

THE COURT:  In the next question, we ask you to put it on a scale from 1 to 10 where your views where, how strong they were.  You put it kind of in the middle with a 6.

Then on the next page, we asked you to select a statement that was closest to your view. And you said, "I am in favor of the death penalty, but I could vote for a sentence of life imprisonment without possibility of release if I believe that sentence was called for by the facts and the law in the case." Does that fairly and accurately summarize your view of the matters?

THE JUROR: Yes.

THE COURT: So in this case, would you be open, depending on the evidence, to a judgment that was -- assuming, obviously, conviction of a qualifying capital crime, you could -- could you vote for, on the one hand, the possibility of a death penalty but also, on the other hand, the possibility of life without release?

THE JUROR: Yeah.

THE COURT: If you look at the -- I guess Page 25, Question 95, at the very bottom, we asked, "If you decided the death penalty was the appropriate punishment, could you conscientiously vote for it?" You said you're not sure. Then on the next page, we asked the same question about life imprisonment and you said yes.

THE JUROR: Struggling a little bit with that. It's very different when you're just giving an opinion versus making a decision.

THE COURT: Of course. You're trying to predict what

you might think on some unknown body of facts, right?  But we are asking about dispositions and -- actually, the real issue is:  Are you open to consideration of the evidence so that you would possibly, depending on that evidence and how you assessed it, be persuaded to vote to impose the penalty of death or, alternatively, persuaded that life imprisonment should be the penalty?

THE JUROR:  Uh-huh, yes.

THE COURT:  Is that fair?

THE JUROR:  Yes.

THE COURT:  Question 94 expresses a rather harsh opinion by your husband.

THE JUROR:  Uh-huh.

THE COURT:  Would you feel pressured by him in making your decision?

THE JUROR:  No.

THE COURT:  Or his views if he were to say that again sometime?

THE JUROR:  No.

THE COURT:  Okay.  Follow-up?  Mr. Weinreb, anything?

MR. MELLIN:  Your Honor, may I ask a few questions?

THE COURT:  Go ahead, Mr. Mellin.

MR. MELLIN:  Ma'am, I'd like to go back --

THE COURT:  Just identify yourself.

MR. MELLIN:  I'm sorry.  I'm Steve Mellin.  I'm one of

the prosecutors along with the people at this end of the table.

You indicated that, theoretically, you support the death penalty, but then you were making a distinction.  It's one thing to have an opinion about the death penalty.  It's another thing to be in that position, right?

THE JUROR:  Uh-huh.

MR. MELLIN:  Do you believe that -- if you found that the evidence in this case would support the imposition of the death penalty, do you believe you would actually be able to vote to impose the death penalty?

THE JUROR:  I think I could, yes.

MR. MELLIN:  Okay.  All right.  Thank you.

THE COURT:  Any questions?

MS. CLARKE:  Yes, your Honor.  My name is Judy Clarke.  I'm one of the lawyers for Mr. Tsarnaev.  Good morning.

THE JUROR:  Good morning.

MS. CLARKE:  You mentioned that your husband retired from the fire department as an EMT 20 years ago.  Do you still have connections to people that work in the business?

THE JUROR:  No.

MS. CLARKE:  Twenty years is a pretty long time?

THE JUROR:  Yeah.

MS. CLARKE:  On Question 73, that asks about how much media coverage you had followed and you marked "a lot."  Can you tell us what you remember -- what stands out most in your

mind about what you read or heard?

THE JUROR:  Probably the boat incident, when it was covered by world news --

MS. CLARKE:  Can you tell us what you remember about that?

THE JUROR:  -- live.  Just kind of the chase situation.

MS. CLARKE:  Where were you that night?

THE JUROR:  Home watching television.

MS. CLARKE:  Very far away?

THE JUROR:  Somerset, Massachusetts.

MS. CLARKE:  Okay.  Anything else come to mind, stand out in your mind?

THE JUROR:  You know, just the scenes.  Obviously, I work in healthcare, so I think every hospital learned or became more aware of emergent needs in situations like that.  So, yeah, as part of my work, I think I became more aware as well.

MS. CLARKE:  Okay.  Did you have anything to do with any healthcare for people that were involved?

THE JUROR:  No, no, no.

MS. CLARKE:  It was interesting.  I don't know whether you've told your husband you wouldn't feel pressured by him.

THE JUROR:  He knows I wouldn't feel pressured by him.

MS. CLARKE:  The question -- I don't know whether most of us could confess that.

The Question 94 that the judge asked you about, that was in response to, Would somebody be critical of you, remember?

THE JUROR:  94, yes.

MS. CLARKE:  That's when you wrote that your spouse believes some rather harsh things, that he should have been shot in the boat.  Was that a conversation that night?

THE JUROR:  No.  Actually, that was a conversation that resulted from me coming here.

MS. CLARKE:  After you got your jury summons?

THE JUROR:  Yeah.

MS. CLARKE:  And your husband expressed that opinion?

THE JUROR:  Yeah.

MS. CLARKE:  Your husband expressed the opinion regarding guilt?

MR. WEINREB:  Objection, your Honor.

THE COURT:  Sustained.

MS. CLARKE:  Did you talk to your husband -- I think, if you look at 77 -- I don't mean to go too fast.  77 and 78, you discussed your opinion with your spouse.  We've gotten so used to reading these questions.

THE JUROR:  It's hard to remember, and it feels like you go back and forth with the answers.  I did anyway.  So I'm sorry.  What was your question again?

MS. CLARKE:  You discussed your opinion with your

spouse.

THE JUROR:  About the guilt?

MS. CLARKE:  Yes.

THE JUROR:  Probably -- that piece of it was probably watching television.

MS. CLARKE:  Number 78.  In 77, if I'm reading it correctly, you've concluded that your opinion is that Mr. Tsarnaev is guilty.

THE JUROR:  Uh-huh.

MS. CLARKE:  And that he should receive the death penalty.  And you were unsure whether you would be able to set aside your opinion.  Right?

THE JUROR:  Uh-huh.

MR. WEINREB:  Your Honor.

MS. CLARKE:  I'm going to ask.  Is that correct? You're unsure about setting aside your opinion.  About guilt or punishment?  Which one?

THE JUROR:  I was -- from the way I'm reading it now, I was unsure about the death penalty.

MS. CLARKE:  Okay.  The judge asked you a little bit about whether you could presume Mr. Tsarnaev not guilty and force the government to prove his guilt.

THE JUROR:  Uh-huh.

MS. CLARKE:  In reality, the first presumption is that he is presumed to be innocent.

THE JUROR:  Uh-huh.

MS. CLARKE:  How do you feel about that?

THE JUROR:  I think that's more difficult because of the media coverage.

MS. CLARKE:  So as you sit here today, you can or cannot presume him to be innocent?

THE JUROR:  I don't think I can presume him to be innocent.

MS. CLARKE:  When you answered Question 88, your answer was that certain crimes should be punishable by death. Can you help us know what you were thinking?

THE JUROR:  Sure.  The one that always comes to mind -- and I don't know a lot of the details of the location and things like that, but the doctor whose daughter and wife were killed by escaped convicts, I believe it was, who invaded their home.  That's --

MS. CLARKE:  That's what was in your mind?

THE JUROR:  Absolutely.

MS. CLARKE:  Okay.  Thank you very much.

THE JUROR:  You're welcome.

MR. WEINREB:  Your Honor, if I might, just one follow-up on that.

THE JUROR:  Sure.

MR. WEINREB:  In asking you whether, sitting here today, you can presume him to be innocent, the question isn't

whether you can presume him innocent based on what you've heard in the media or other things.  In fact, the question that I would like to ask you is not whether, based on what you've heard before, you presume him to be innocent; but when you sit in the jury box and it's your job to evaluate the case on the evidence and only convict him if the government proves him guilty beyond a reasonable doubt, can you set aside what you've heard before and at that point presume him to be innocent unless and until the government meets its burden?

THE JUROR:  I think I can.

THE COURT:  All right.  Thank you very much.

THE JUROR:  You're welcome.

MR. WEINREB:  Your Honor, can we pause for a moment?

THE COURT:  Yes.  Hold off.

MR. WEINREB:  This is on the record.  So the government objects in general to witnesses being asked if they can presume the defendant innocent without it being made clear that they're not -- whether they're being asked whether, based on what they've heard in the media, they believe him to be innocent or guilty versus whether they can sit in the jury box with the proper frame of mind, which is a presumption of innocence.  I think it's going to -- asking it in that -- without making that distinction is going to muddy the record with answers that don't truly affect the juror's ability to be fair and impartial.

MS. CLARKE:  Judge, there are two things going on here.  I think it was very muddled by Mr. Weinreb's final question.  There is the presumption of innocence, and then there is the government's burden of proof.

THE COURT:  Right.  But the presumption of -- I agree with Mr. Weinreb on this and was having the same -- it's -- the difference between a lay understanding of the term "presumption of innocence" and our specific understanding of it for these purposes, and it really is a duty to put your mind in a condition at the trial.  And I think it is that distinction between the lay understanding and the legal understanding is lost on most people, and it produces an ambiguity.

I would have concluded, notwithstanding her answer to Miss Clarke's question, based on her answer to my question earlier, that she was able to do that.  But I do think we should stay -- it will confuse the record if the -- if the jurors are confused about the manner in which the proposition is put to them.  As I say, it is a term of art.  It's fair to ask about whether previously formed impressions or conclusions about factual matters based on media reports, that's one thing.  But to ask whether a juror -- we ask it of jurors in every case.  And they have to answer that question, and it's a question that requires them to get into a role that they're not on a daily basis familiar with.  But it is -- it's really a question of good faith.  Will the juror be able, in good faith,

to assume the duties of being a juror and follow the instructions, which are, to put your mind in a condition where the burden is entirely on the government to prove the propositions.  And all we can do is try to gauge from the answer the demeanor of the witness -- of the juror, I mean, and other circumstances, whether an answer like this is a reliable one or not.  But it's not simply on the face of it kind of proposition.  So I think we can continue.

THE CLERK:  Number 61.

THE JURY CLERK:  Juror No. 61.

THE CLERK:  Sir, come up here, please.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  Have you been able to abide by my instructions when you were last here to avoid any discussion of the case or any exposure to the media reports about it?

THE JUROR:  As best I can, yes.

THE COURT:  You have your questionnaire in front of you, and I may refer to it as I follow up on some of the answers you gave.  I want to first address something you wrote in answer to Question 10, which is on Page 5 of the questionnaire.

THE JUROR:  Yes.

THE COURT:  You said you're due to go to work outside the country shortly.

THE JUROR:  Starting January 28th.

THE COURT:  Tell us about that.

THE JUROR:  Starting January 28th, I will be out of state.  Starting February 5th, I will be out of the country.

THE COURT:  For how long?

THE JUROR:  Second week of April.

THE COURT:  And this is for Levi Strauss?

THE JUROR:  Excuse me?

THE COURT:  Your employer, you say, is Levi Strauss & Company?

THE JUROR:  No.  The current employment that I will be outside of the country with is All Time Low Touring, Inc.  I'm a touring musician.

THE COURT:  What's your role with that?  One of the musicians?

THE JUROR:  Play guitar and sing.

THE COURT:  This is a concert tour for your group?  Is that the idea?

THE JUROR:  Yes.

THE COURT:  Thank you.

THE JUROR:  Thank you.

MS. CONRAD:  Judge, this next juror should be heard off the record.

THE COURT:  Now?

MS. CONRAD:  Well.

THE COURT:  Hold off, and we'll -- it's not off the record but it is sidebar, so we'll cut the audio.

(SIDEBAR CONFERENCE AS FOLLOWS:

6-48

THE CLERK:  We'll go back on the record.

THE COURT:  Not back on the record.  We're back on audio.

THE CLERK:  You know what I mean.

THE COURT:  No.  It's different.  We've got to be careful about that.  Audio.

.  .  .  END OF SIDEBAR CONFERENCE.)

THE JURY CLERK:  This is Juror No. 62.

THE CLERK:  Number 62, have a seat, please.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  Since the day you were here to fill out the questionnaire, have you been able to follow my instructions to avoid any discussion of the case or any exposure to media reports about it?

THE JUROR:  Yes, sir.

THE COURT:  Tell us what you do.

THE JUROR:  Postal worker.

THE COURT:  In a --

THE JUROR:  Clerk.

THE COURT:  In a --

6-49

THE JUROR:  In an area office, yes, station.

THE COURT:  You have, I guess, a son and a brother who are both involved in the correctional --

THE JUROR:  My brother is; my son was.  While he was going to school, he did it during the summertime.

THE COURT:  Tell me about your brother.  How long has he been a correction officer?

THE JUROR:  Probably, I'm going to say about 15 years. He works up in Woburn.

THE COURT:  In what -- is this a county facility -- or is this a court officer?

THE JUROR:  Court officer.

THE COURT:  Not a correction officer?

THE JUROR:  Not a correction officer, no.

THE COURT:  I see.  Let me cut the sound for a minute.

(SIDEBAR CONFERENCE AS FOLLOWS:



THE COURT:  Okay.  Thanks.  We can go back on the sound.

.  .  .  END OF SIDEBAR CONFERENCE.)

THE COURT:  Would you look at Page 15.  We asked about prior jury experience, and you said you had a case back in 1979, I guess.

THE JUROR:  Yeah.

THE COURT:  Then you said -- the next answer is what I'm interested in.  You could not serve, I guess, in that case; is that what you meant?  You had a hard time being impartial.

THE JUROR:  No.  I did serve in that case.  I was talking about this case.

THE COURT:  Oh, in this case?

THE JUROR:  Yes.  I misunderstood the question.

THE COURT:  Maybe you didn't.  Do you think, because of your -- something in your prior jury experience leads you to think that you would have trouble being impartial?

THE JUROR:  No.  I'm thinking it's just my knowledge of the case right now and how I feel in my beliefs.

THE COURT:  Okay.  We'll talk about that again in a minute.

We asked some questions about Islam and Muslims as well as people from other countries, including Russia, Kyrgyzstan, Chechnya, and so on.  Maybe you could just review your answers.  This is a series of questions beginning on Page 17 and going over to 18.

THE JUROR:  You want me to start with --

THE COURT:  Just review it because I just want to ask you generally about --

THE JUROR:  Okay.

THE COURT:  The questions I'm principally interested in are 59 and 65.

THE JUROR:  Okay.

THE COURT:  Any of your attitudes about people that you've expressed there, do you think they would have an impact on your ability to be an impartial juror in this case?

THE JUROR:  I would have to say yes, your Honor, to be, you know, completely honest with you.  I mean, I just feel, you know, they seem to be to me -- not knowing any of them

6-52

individually or anything like that, but they just feel like they're quite mixed up in their beliefs or the way they act in America.

THE COURT:  Let me ask you about -- on Page 20, Question 80, you said your wife was at the Pru at the time of the events?

THE JUROR:  Yes.

THE COURT:  And she participated in helping some of the victims?

THE JUROR:  Yes.

THE COURT:  Has she talked with you about that extensively?

THE JUROR:  Yeah.  Of course, when it happened that day and everything, I mean, I had to drive over to the Stockyard Restaurant and pick her up because basically the city became locked down.  She couldn't get her car or anything.  And the T was locked down.  We talked, you know -- I don't want to say extensively, but we talked about the whole situation and everything, you know.

THE COURT:  I assume that that may have been an emotional experience for her?

THE JUROR:  Oh, definitely was, yes.

THE COURT:  Did she convey that to you?

THE JUROR:  Yes.  It was quite upsetting to her to see all those people and the whole chaos and everything that

happened about the situation, you know.

THE COURT: Would that affect your ability to be a fair, impartial juror in this case, the way she feels about it?

THE JUROR: No.

THE COURT: You don't think so?

THE JUROR: No, I don't think so.

THE COURT: Let me ask you, on Page 23, Question 88, we asked about your general views of the death penalty. You said you believe in it.

THE JUROR: Strongly.

THE COURT: Strongly. Then we asked you to put that on a scale of 1 to 10, and you put 10, very strong, right? The next page we asked you to select a formulation that came closest to your view, and you selected F, which was you're strongly in favor, which is consistent with what you said on the other question, and would have a difficult time of voting for life imprisonment without the possibility of release regardless of the facts.

We want to understand whether that is a -- your view of the death penalty is so strong that you would find it very difficult, as you say, to vote otherwise no matter what the facts were. The question is: Would you be open to revising that opinion you have of yourself if the facts of the case suggested to you that in this case a death penalty was not appropriate, that the better penalty was life imprisonment

without parole -- without release?

THE JUROR: Life without parole.

THE COURT: Would you be able, if you heard facts that suggested that, to be able to follow that and conclude that life imprisonment was a satisfactory penalty in this case as opposed to the death penalty, or are your views about the death penalty so strong that virtually no set of facts could be proved that would lead you to think of a sentence other than the death penalty?

THE JUROR: That's a mouthful.

THE COURT: Could you meaningfully consider, conscientiously, after -- assuming appropriate facts, obviously, that you could come to the conclusion that, in this specific circumstance life imprisonment was an adequate punishment and the death penalty was unnecessary, or are your views about the death penalty so strong that you think you would in the end --

THE JUROR: I think my views right now in this case, your Honor, is the death penalty is in order.

THE COURT: And I guess my question is: Is that so firm an opinion that you could not move off it? That might be the case. Or is it possible, if you heard evidence that led you that way, you could think, No, despite what I generally think, this is not a case for it? Could you think that?

THE JUROR: I don't think I could sway my judgment.

It would take an awful, awful lot in this case.

THE COURT:  Okay.

MR. WEINREB:  We have no questions.

THE COURT:  No questions.  Thank you.  Just leave that there.  Thanks.

THE JURY CLERK:  Juror No. 63.

THE CLERK:  Number 63, have a seat, please.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  Since you were here to fill out the questionnaire, have you been able to abide by my instructions not to discuss the case with other people or to get exposed to media reports about the case?

THE JUROR:  Yes.

THE COURT:  That's the questionnaire you filled out.  And I'll have some questions about some of the answers you gave.  Tell me about -- if you'd look at Page 5, your answer to Question 10.

THE JUROR:  Yeah.  So my husband was a fisherman, and he was laid off about a year and a half ago due to regulations.  So I've had to start working to pick up where we lack.  And we're already two months behind in our mortgage, so we really wouldn't be able to sustain if I wasn't working.

THE COURT:  And what is it that you do?

THE JUROR:  I'm a bookkeeper.  So I'm not a salaried

-- I'm not salaried.  I work, like, consulting.

THE COURT:  Is this in addition -- I'm just reading what's in 26.

THE JUROR:  What page?

THE COURT:  They seem to be all kind of at the same time.

THE JUROR:  Yes.  Those are some of my clients.

THE COURT:  So those are accounts that you have?

THE JUROR:  Yes.

THE COURT:  Is it basically that you're self-employed?

THE JUROR:  Pretty much, yes.

THE COURT:  Okay.  Okay.  Enough?  Okay.  Thank you.

THE JUROR:  Thank you.

THE JURY CLERK:  This is Juror No. 64.

THE CLERK:  Juror No. 64.

THE COURT:  Morning.

THE JUROR:  Good morning.

THE COURT:  Since you were last here when you filled out your questionnaire, have you been able to abide by my instructions to avoid any discussion of the case?

THE JUROR:  Yes.

THE COURT:  Or avoid any media reports and so on?

THE JUROR:  Yes.

THE COURT:  Good.  I'm going to follow up on some of the answers you gave in your -- when you filled out the

questionnaire.  Your husband is a teacher?

THE JUROR:  Yes.

THE COURT:  Where does he teach?

THE JUROR:  The middle school at Marshfield.

THE COURT:  And he's done that for how long?

THE JUROR:  About 13 or 14 years.  It was, like, a change-of-life thing.

THE COURT:  You yourself are a lab manager?

THE JUROR:  Yes.

THE COURT:  What does that involve generally?

THE JUROR:  I oversee a lab in a hospital.  So there's about 50 or 60 people, from phlebotomists to the different departments that serve for all kinds of specimens in the hospital.

THE COURT:  Is your work principally management as opposed to clinical, you yourself?

THE JUROR:  I do both.

THE COURT:  You do both.  How about your use of Facebook, how do you use it and how often?

THE JUROR:  I set it up when my daughter was in college so I could see her friends but she's graduated.  So it's there, but I don't even know my password.

THE COURT:  We asked some questions about feelings about things we might call international events and so on and so forth, feelings toward Islam and Muslims, towards our -- the

government of the United States and so on and so forth.  You answered those all.  Have any of those -- mostly you said that you had no strong feelings about those matters.  There's been a lot of news lately about events in Europe.  Has that had any effect on your views about any of those matters?

THE JUROR:  Not really.

THE COURT:  Have you been following that closely?

THE JUROR:  No.  My mom had emergency surgery, so I've kind of been involved with her care.

THE COURT:  So distracted from --

THE JUROR:  So between work and her.

THE COURT:  Okay.  I'd like you to look at Page 20.

THE JUROR:  Uh-huh, yes.

THE COURT:  Question 77.

THE JUROR:  Yes.

THE COURT:  We asked whether you formed any opinions based on news media and so on about whether the defendant is guilty or not and what punishment he should get if he is.  As to the question whether he's guilty or not, you said, no, you hadn't formed any opinion.  As to the penalty part of the question, you said you're unsure.

THE JUROR:  I just don't understand.  I heard a little bit better today, mitigating, aggravating.  But honest and truly, law isn't my specialty.

THE COURT:  Okay.  So in any criminal case, including

this one --

THE JUROR:  Yes.

THE COURT:  -- a defendant who's charged with a crime is presumed to be innocent of that crime --

THE JUROR:  Yes.

THE COURT:  -- unless and until the government proves that he's guilty by evidence at the trial that is convincing enough so that the jurors have no reasonable doubt about the judgment that he's guilty.  Okay?

THE JUROR:  Yes.

THE COURT:  If you were a juror in this case, would you be able to apply those principles faithfully, that is, start out presuming that he is not guilty of what he is charged with unless the government proves otherwise by the evidence?

THE JUROR:  Yes.

THE COURT:  I think you had served as a juror before, did you?

THE JUROR:  Last year.

THE COURT:  Was that a criminal case?  I forgot to look.

THE JUROR:  In Hingham.  It was driving under the influence.

THE COURT:  You were a standby, so you didn't participate in the --

THE JUROR:  No, sir.

THE COURT: You're confident that you could fulfill that duty faithfully?

THE JUROR: Yes.

THE COURT: Now would you turn to Page 23?

THE JUROR: Yes.

THE COURT: You're asked a series of questions about your attitude about the death penalty generally. The first one was a general question. What are your general views? And you said, "None at this time. It depends on the case."

Is that an accurate representation of your view?

THE JUROR: Yeah. It just depends on what I learn from this whole process.

THE COURT: Then we asked you to put it on a scale from strongly opposed to strongly favor, and you circled 6, which is somewhere in the middle. Is that --

THE JUROR: You know, I don't know. I imagine this is going to be an educational process from all sides, and at that point, I'm sure I'll make an educated decision. It's a tough decision to make, but it's one that I will do.

THE COURT: Look at the next question.

THE JUROR: Yes, sir. Next page?

THE COURT: Next page, 90. Instead of putting it on a numerical scale, we asked you to select the statement that was closest to your view and you selected D, which was that you are not for or against. You could vote either way depending on how

you assess the facts in light of the --

THE JUROR:  If I had to do it, I would, but I would need some serious information.  That's nothing I would take lightly.

THE COURT:  But you're -- correct me if I'm wrong, but what I'm understanding you to say is that you would be prepared to listen to the evidence and make a judgment on that.  And in the end, you would be prepared, on the one hand, to impose a death penalty if that was what you felt was right?

THE JUROR:  If I felt -- absolutely.

THE COURT:  On the other hand, to vote for a life imprisonment if you thought that was an adequate punishment?

THE JUROR:  Yes, sir.

THE COURT:  Any follow-up?

MR. WEINREB:  No.

THE COURT:  Follow-up?

MR. BRUCK:  Just a couple things.  Ma'am, you mentioned --

THE COURT:  This is Mr. Bruck.

MR. BRUCK:  I'm sorry.  I'm David Bruck.  I'm one of the lawyers for Mr. Tsarnaev.

THE JUROR:  Hi.

MR. BRUCK:  You mentioned your daughter works or worked in a law office.

THE JUROR:  When she graduated from college, she

thought she was going to go to law school.  And she did administrative, like, paperwork, I guess.

MR. BRUCK:  What sort of a law firm, if you remember?

THE JUROR:  It was housing, like, people that needed, like, evictions and things like that, stuff like that.

MR. BRUCK:  She never worked for a prosecutor or a defense attorney?

THE JUROR:  No, no.

MR. BRUCK:  Ma'am, how do you feel about being on this jury?

THE JUROR:  A little nervous.

MR. BRUCK:  Are you hoping you will be excused or hoping you will be selected?

MR. WEINREB:  I object to that.  That's not a follow-up question.

THE COURT:  Go ahead.  You can answer that.

THE JUROR:  I feel that I'm going to go through the process honestly and whatever happens, happens.

MR. BRUCK:  I guess all I'm asking, if it was up to you, how you would feel.  Which would you prefer to do?

MR. WEINREB:  I object.  That's irrelevant.

THE COURT:  Go ahead.  Answer it if you're able to.

THE JUROR:  I don't know.  I -- I don't know.

MR. BRUCK:  Okay.  As far as knowing what case we're here for --

THE JUROR:  Yes, sir.

MR. BRUCK:  -- you know something about the Boston Marathon bombing.

MR. WEINREB:  Objection again.  That's --

THE JUROR:  It happened.

MR. BRUCK:  My question is:  Do you lean one way or the other as far as the death penalty for this case if you found Mr. Tsarnaev guilty beyond a reasonable doubt right now?

THE JUROR:  No.

MR. BRUCK:  Okay.

THE COURT:  Okay.  Thank you.

THE JURY CLERK:  Juror No. 65.

THE CLERK:  Number 65, step this way, please.  Have a seat right here.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  Since you were here to fill out the questionnaire, have you been able to abide by my instructions then to avoid any discussion of the case and any exposure to media?

THE JUROR:  Yes.

THE COURT:  So we have given you the questionnaire you filled out.  I'm going to follow up on some of the things you've said in the course of it.  I'd like you to look first at Page 5.

THE JUROR:  Uh-huh.

THE COURT:  Question 9, you have some concern about winter driving.

THE JUROR:  Yes.

THE COURT:  Perfectly rational concern.  You come some distance.  There is bus service, but what do you know about it?

THE JUROR:  I've taken it both times.  Both times that I've been here, I've taken the bus.

THE COURT:  Has that worked out?

THE JUROR:  It's worked out, yeah.

THE COURT:  And the schedule works?

THE JUROR:  Yes.

THE COURT:  Now, let's look at the next question.  You're concerned about the impact of your serving on finances, I guess?

THE JUROR:  Yes.

THE COURT:  Tell us a little bit about that.

THE JUROR:  Well, I'm single.  I don't have a roommate.  Don't have a husband.  I don't have another income that I can depend on.  I haven't had this conversation with my bosses yet, so I'm just a little bit worried about how I'm going to pay my bills.

THE COURT:  You don't know whether they'll continue to pay you?

THE JUROR:  I don't know.

THE COURT:  Are you paid on a salary basis?

THE JUROR:  Yes.

THE COURT:  Rather than an hourly wage?

THE JUROR:  Yes.

THE COURT:  Commission at all?

THE JUROR:  No.

THE COURT:  How big is the work force where you are?

THE JUROR:  Well, we're a small company.  There's probably under 30 of us.  It's a lumber company.  So with the office, the yard, the store.  I work in the showroom, so there's probably about -- I'm just going to count real quick.  There's possibly about ten of us in the showroom.

THE COURT:  Doing basically the same work or --

THE JUROR:  Well, some of the same work.  I don't know how descriptive you want me to be, but, I mean, there's -- for instance, there -- I work for a lumber company, so there's a Windows program that we use that four of us can use.  Three of the guys that can use it are road salesmen.  I'm the only one that stays on the inside.  You know, not a big deal, but, I mean, the schedule can be adjusted so that someone is always covering in the showroom to be able to do that if I'm not around.

THE COURT:  So in terms of social media, you use Facebook a little bit but not much?

THE JUROR:  Not much.  I have an account, but I'm not

on it all that much.

THE COURT:  You did use it when you were involved in a town issue a little bit to express opinions about that?

THE JUROR:  No, no.  Actually, I got an account when I became unemployed because I thought it would help with networking, and I just didn't like using it so I didn't stay using it.  But I do go on it from time to time because my company has a website, and sometimes they post, you know, job photos.  So I'll go on that from time to time for that.

THE COURT:  But you don't use it to express opinions about things or read other people's opinions?

THE JUROR:  You know what?  I did once.  I apologize. I did once when that whole town issue started just to let people know that there was going to be a vote happening but after that, nothing.  Just -- I'm sorry.  If I can add, there were a couple of blogs that I did respond on but it wasn't Facebook.  It was a couple of people that were involved, had their own blogs, so I did respond on those blogs.

THE COURT:  That was about the town issue?

THE JUROR:  Yes.

THE COURT:  Your sister works for a law firm?

THE JUROR:  She does.  I wrote the first name down wrong.  It's Madoff, and I didn't write Madoff because I thought I was thinking of Bernie Madoff.  So it's Madoff & Khoury is the law firm.

THE COURT:  Is she a lawyer?

THE JUROR:  No.  She's a legal secretary.

THE COURT:  What's the nature of the practice or the firm, do you know?

THE JUROR:  Real estate, bankruptcy.

THE COURT:  Coming back to the controversy, I guess, in the town that you were involved in.  There were a couple of sides, I guess.  You were on one, and people were on the other.  You thought that the police chief in particular was siding with the powers that be and was unfair in some way?

THE JUROR:  Well, he's employed by the town council, so his demeanor towards us was pretty apparent.  He's basically a pretty nice guy, but I think because we were in opposition and our opposition was mostly vocal.  We weren't all that disruptive except at town council meetings.  But his -- I don't know how to describe it.  It was just his manner towards us was very disrespectful and very apparent.

I mean, we had -- we were trying to get signatures regarding this issue, and we were standing at the town hall.  And we had to stand a certain number of feet back away from the entrance.  And when someone else from the opposition was doing that, too, they weren't -- they were a little bit closer, so, you know -- so the other side was allowed to do things that we weren't allowed to do.

THE COURT:  We asked if you had any negative

experiences like that, and you told us about it.  Then we asked whether that was going to affect you in any way if you were a juror in this case, say in an attitude towards law enforcement witnesses or something like that.

THE JUROR:  Right.

THE COURT:  You told us that, despite your answer to the other question, you had no hard feelings, is that fair?

THE JUROR:  That's correct.

THE COURT:  There would be no effect on you here from that unpleasant experience?

THE JUROR:  Oh, that's true.  I wouldn't hold -- I'm not resentful about it, yeah.

THE COURT:  Let me just ask the parties whether they are interested in a follow-up to Question 52.

THE JUROR:  What page is that?

THE COURT:  60.

MR. WEINREB:  No, your Honor.

MS. CLARKE:  No, your Honor.

THE COURT:  No.  I don't -- I agree with that.  We asked, on Pages 17 and 18, some general questions about attitudes towards Islam and perhaps the War on Terror and things like that.

THE JUROR:  Right.

THE COURT:  You gave us answers to those, except I think you may have skipped one probably unintentionally, No.

62.  Do you believe the War on Terror is overblown or exaggerated?

THE JUROR:  No, I do not.

THE COURT:  Since you filled out the questionnaire, gave those answers, there's been a lot of press about events in Europe and so on, other terrorism attacks and things.  Would that -- have you followed that at all or --

THE JUROR:  Are you talking about in France, what happened in France?

THE COURT:  Yeah, France.

THE JUROR:  Just what's on the news.  I haven't gone online to look anything up but just what I listened to on the news.

THE COURT:  Would that change any of your answers to any of these questions?

THE JUROR:  No.

THE COURT:  Or affect you any other particular way?  Would it have any effect on your view of this case?

THE JUROR:  Oh, no, no.

THE COURT:  I asked about talk radio.  It looks like you listen to a local program.  Is that about local affairs?

THE JUROR:  It is, yes.

THE COURT:  It doesn't get into international affairs or even national -- would it touch on subjects like the Marathon case?

THE JUROR:  Yeah, it will.  He doesn't do that consistently.  It's pretty much what's going on daily.  When the presidential election was going on, he'll talk about that.

THE COURT:  If the case came up, you would be able to --

THE JUROR:  I can turn it off, yeah.

THE COURT:  On Page 20, if you'd look at Question 77, we asked whether you formed some opinions about whether the defendant is guilty and, if so, what the punishment might be.  And you said yes to the question you'd formed an opinion about whether he's guilty.  But as to the penalty, you checked both boxes and said you were unsure.

Let me ask you about the first one.  It's not surprising that people have some ideas about what they think happened.  The question is:  Whenever a person is charged by the government with a crime, the person is, at the outset, presumed to be innocent -- that is, that's sort of the default position -- unless and until the government proves otherwise, proves that he's guilty by proof at trial with the evidence and proof that is beyond a reasonable doubt.  Notwithstanding the impression you have from what you've learned about the case informally, would you be able to conscientiously insist that the government prove its case by the evidence beyond a reasonable doubt even if that turned out -- even if it caused you to change your opinion?

THE JUROR:  I think so.  I think I understand what you're asking, but, I mean, I'd like to think I'm open-minded. I think I can listen to the evidence, but I know how I feel. You know, I do feel pretty strongly about that.  I'm just -- you know, I can listen to it.  I don't know that it would change my mind.

THE COURT:  Well, I'm not quite asking whether it would change your mind.  I'm asking whether you could start with -- sitting as a juror, with the proposition -- the government puts the proposition, the defendant is guilty of this crime.  At the outset you say, Prove it.  I'm not -- I am now prepared to say, No, unless you prove it.  That's what we ask jurors to put the frame of mind.  Then listen to the evidence and decide, after you've heard the evidence, whether the government has or has not proved it.

THE JUROR:  Okay.

THE COURT:  Part of the instructions we give in any criminal case is that, as I say, the defendant has no burden to prove that he's not guilty.  It's up to the government to have the burden to prove that he is guilty and to prove that beyond a reasonable doubt.  And the question is:  Do you think you could fulfill that obligation as a juror, or, alternately, do you think that your impressions are so strong that it would interfere with your ability to insist on the government's satisfaction of its burden of proof at trial?

THE JUROR:  I think I could listen to it and make a decision after I've listened to the evidence.

THE COURT:  Let me ask you about Question 81.  This is a couple of family steps, I guess.  Your brother-in-law's cousin is married to one of the victims.  Do you have a connection with that person?

THE JUROR:  No, no.  I've never met them.

THE COURT:  Does the fact that your brother-in-law's cousin is married to one of the victims -- would that have an effect on your ability to be a fair-minded, impartial juror?

THE JUROR:  No.

THE COURT:  Let me ask you -- we asked a series of questions about the death penalty.  Let me ask you to turn to Page 23, beginning with Question 88.  And this is a general question:  How do you feel about it?  You said you're generally opposed but could vote for it in this case.

THE JUROR:  I could.

THE COURT:  The next question, we asked you to select where, on a scale from 1 to 10, you were in terms of favoring or disfavoring death penalty, and you've selected 7, which is a little bit on the favor side.

And then on the next page, Question 90, we asked you not to pick a number but to pick the statement that came closest to what you thought about it.  And you picked C, which is that you're opposed to it but could vote to impose it if you

thought the particular facts of the case called for it.  Those are all kind of variations on a way of expressing it.

Maybe you could put it in words for us now.  What is your attitude toward the death penalty generally and what do you think your attitude would be if you were a juror having to make that decision in this case?

THE JUROR:  Well, I think, more often than not, I am opposed to the death penalty.  I think it -- for me it would be -- I would have more difficulty voting for it, but I believe I could do it.

THE COURT:  Would you look at the bottom of 25 and top of 26.  95, at the bottom, we asked, if you found him guilty and you decided the death penalty was appropriate, could you conscientiously vote for it, and you said you're not sure.

THE JUROR:  Yes.

THE COURT:  Then if you look at the next question, we asked sort of the other side of it.  If you find him guilty and decided life imprisonment was the appropriate punishment, could you vote for that, you said yes.  You're a little more sure about that.

THE JUROR:  Right.

THE COURT:  The question is:  Would you be able to consider -- give consideration to both possibilities, and if you found the facts to be supportive of either one of those, you could make that choice, or are your attitudes against the

death penalty such that it's unlikely that you would vote for it?  I'm just trying to guess where --

THE JUROR:  Yeah.  It's not that I'm not likely to vote for it.  I just think I would -- I would have difficulty, but I don't think I wouldn't be able to vote for it.  I think that, if the facts supported it, that I could do it.

THE COURT:  Any follow-up?

MS. CONRAD:  I have some.  Good morning, ma'am.  My name is Miriam Conrad.  I'm one of Mr. Tsarnaev's lawyers.

The judge asked you some questions about your brother-in-law and his cousin.  Is that a first cousin?

THE JUROR:  You know what?  I don't know.

MS. CONRAD:  Do you know if your brother-in-law went to the wedding?

THE JUROR:  He did.

MS. CONRAD:  What did he tell you about that, about either the relationship or about the wedding?

THE JUROR:  Well, they didn't really talk about the relationship.  It was my sister and my brother-in-law went to the wedding.  They talked more about the wedding, how beautiful it was.  My sister has spoken to me more about who we're speaking about.  And she told me about what has -- what he's going through, how he got harmed and what he has to face.  So that's what I know about that.

MS. CONRAD:  You say you haven't met that person.

THE JUROR:  I haven't.

MS. CONRAD:  Do you think that that's someone you might meet in the future at a family gathering at your sister's home?

THE JUROR:  I could, but I think it's a stretch that I would.  Mostly, when we gather, it's closer family.  So I can't tell you positively if I would ever meet him or not.

MS. CONRAD:  Does your sister know that you received a summons as a juror in this case?

THE JUROR:  She does.

MS. CONRAD:  Did she make any comment to you about that?

THE JUROR:  About?

MS. CONRAD:  About you possibly serving as a juror in this case.

THE JUROR:  We have talked about it because I didn't know when I first got the summons that it would be for this case.  And then, you know, again, because I watch the news quite a bit, I deduced that it might be for this.  So we did talk about it a little bit, yes.

MS. CONRAD:  What did she say?

THE JUROR:  About?

MS. CONRAD:  Your being --

THE JUROR:  Me serving?

MS. CONRAD:  Yes.

THE JUROR: She just kept saying, I'm so sorry, because she knew how difficult it was going to be for me.

MS. CONRAD: In answer to the question about how you felt when you got the summons, you indicated you didn't realize it was for this case. When you realized it was for this case, how did you feel?

THE JUROR: Devastated.

MS. CONRAD: Can you tell me more about that?

THE JUROR: Well, it's the distance. I've got this driving anxiety, but, you know, I've been able to work around it, so I can get myself in here if I had to. And then it's just the time frame involved. I work for a really small company. It's just -- I mean, you know, when I complain about this, you know, I just -- I feel horrible about it because I didn't get harmed. You know what I mean? It's just three or four months or five months, however long, out of my life. But it's still -- I'm still feeling kind of miserable about maybe being on the jury, frankly.

MS. CONRAD: We appreciate your candor, and that's all we ask, that you answer the questions as honestly as you possibly can.

Do you think that those concerns about work or about the travel back and forth will make it difficult for you to focus, say, you know, a month, two months, three months into the trial?

THE JUROR:  I'm not sure.  I mean, I'm worried about finances.  That's the No. 1 thing I'm worried about.  I don't think I'm going to lose my job over this, but, you know, I just -- it's going to be difficult because of my boss's reaction to it, too.  He's not real happy about it, but we all get it.  We all understand the responsibility and the obligation.  But it's just -- it's not going to be easy.

MS. CLARKE:  Your Honor.

MR. WEINREB:  I think we have concurred.

THE COURT:  I think that's all the questions.  Just leave the questionnaire there.

I think we'll take the break now.  We'll probably change reporters.

(Recess taken at 11:10 a.m.)

(After the recess:)

(The Court enters the courtroom at 11:37 a.m.)

THE COURT:  Okay?

MR. DOREAU:  Okay.

THE COURT:  Let's proceed with the next juror.

THE CLERK:  Juror No. 67, over here, please.  Have a seat.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE CLERK:  Talk into the mic so the reporter can hear you, okay?

THE COURT:  Have you been able to abide by the instructions I gave when we were last here to avoid any discussion of the case?

THE JUROR:  For the most part.

THE COURT:  How much is that?

THE JUROR:  Well, the news comes on, and I ride to work every day with WBZ Traffic on the 3s, so it does pop up occasionally.

THE COURT:  Are you able to put it aside?

THE JUROR:  Uh-huh.  Yes.

THE COURT:  Let's look at Question 10 on page 5.

THE JUROR:  Question 10?

THE COURT:  It's the next page.

You have some concern on how this will impact your employment?

THE JUROR:  Yes, I do.

THE COURT:  Tell us about that.

THE JUROR:  I'm a licensed administrator of a 170-bed rehabilitation and nursing center.  It's not-for-profit, freestanding, no corporate support.  I am the only licensed administrator.

THE COURT:  What does that mean?  What is the significance of a licensed administrator for a nursing home?

THE JUROR:  Well, every facility has to have a licensed administrator.

THE COURT:  Onsite or --

THE JUROR:  Onsite, yes.  Not from the phone.  I mean, I do some things from the phone, but I'm there all the time, five days a week.  And I have 24/7 responsibility for the --

THE COURT:  Licensing is State of --

THE JUROR:  State of Massachusetts, yes.

THE COURT:  And what are the kinds of considerations that go into licensing of an administrator?

THE JUROR:  I provide direction to all the department heads.  I'm responsible for following the regulations, federal and state regulations.  All the department heads report to me. I don't really have any backup as a freestanding facility. It's not like a corporate, you know, large company.

THE COURT:  And it's the only one?

THE JUROR:  It's freestanding, yes, by itself.

THE COURT:  Could we go off the audio for a minute?

(Discussion at sidebar and out of the hearing of the public:)

THE COURT:  You answered in a couple of questions that your fiancé is a lawyer and has done some criminal defense work?

THE JUROR:  Yes.

THE COURT:  Can you tell us his name?

THE JUROR:  Am I supposed to do it?

THE COURT:  This is just lawyers.  I do it because

some of the lawyers may recognize him.

THE JUROR:  Oh, ███████████.

THE COURT:  Where --

THE JUROR:  ████.

THE COURT:  That's all.

THE CLERK:  Back on with the audio.

(In open court:)

THE COURT:  Do we need to go further?

MR. WEINREB:  I don't believe so.

MS. CLARKE:  Not on the lawyer.

THE COURT:  No, in general.

MS. CLARKE:  Yes.  I mean -- would you just -- could you stop from confusing me?

(Laughter.)

THE COURT:  Yes, Question 10.

MS. CLARKE:  Can we ask a follow-up on the hardship issue?

THE COURT:  Yes, go ahead.

MS. CLARKE:  Hi.  My name's Judy Clarke.  I'm one of the defense counsel.  And I really sort of felt for you as you're explaining the hardship with the facility.

What happens when you're away on vacation?

THE JUROR:  Vacation?

MS. CLARKE:  Yes.  You don't get those?

THE JUROR:  Well, I don't think in this day and age

anybody is really away on vacation when you have your cell phones and your computers with you and you're on the phone. I get calls when I'm on vacation.

MS. CLARKE: Yeah, I kind of feel that way too.

THE JUROR: Yeah. I was on vacation once when we had a Department of Public Health survey and we had to file a deficiency report, so I had to do that while I was on vacation. I mean, I'm always pretty much on call. There is someone -- a director of nursing who is the next person in line, but she's not a licensed administrator.

MS. CLARKE: So nobody's able to fill in for you and take on those responsibilities?

THE JUROR: The paperwork, you know, signing off on things, there's people to do that, but not the overall job responsibilities, the big picture.

MS. CLARKE: So I hear it would be a big distraction for you sitting on this jury?

THE JUROR: It would be very difficult to be away for such a long period of time, four months or more.

MS. CLARKE: Okay. Thank you.

THE JUROR: It would be.

MS. CLARKE: Thank you.

THE COURT: Anything further?

MS. CLARKE: No.

MR. WEINREB: No.

THE COURT:  All right.  Thank you.

THE JUROR:  Thank you.

(The juror is excused.)

THE CLERK:  Juror No. 69.

Juror 69, have a seat, please.

THE COURT:  Good morning.

THE JUROR:  Hi.

THE COURT:  It's still morning.

Since you were last here, have you been able to abide by my instructions to avoid any discussion of the case or the selection process or -- and avoid any exposure to media stories in depth or anything about the case?

THE JUROR:  Yes.

THE COURT:  That's the questionnaire you filled out when we were here.  I'm going to follow up on some of the information you put in there, which is to clarify everything and perhaps expand on some of the answers you gave.

You are the director of medical coding --

THE JUROR:  Uh-huh.  Yes.

THE COURT:  C-O-D-I-N-G.

-- for the Mass. General Physicians Organization?

THE JUROR:  Yes.

THE COURT:  Tell us first what the Mass. General Physicians Organization is.

THE JUROR:  It's an organization of physicians that

treat patients at Mass. General Hospital primarily.  There are other hospitals that we do billing for, including Newton-Wellesley Hospital.

THE COURT:  So is it the organization that sort of handles the economics of patient care?  Is that what it is?

THE JUROR:  Well, I work for the billing office, which is a portion of the Mass. General Physicians Organization, or otherwise known as the MGPO.  The billing office is just one part of that.  It's called the Professional Billing Office of the MGPO.

THE COURT:  Okay.

THE JUROR:  So I work for the billing office, but I'm officially an employee of the Mass. General Hospital.

THE COURT:  So when one of the physicians in the organization sees a patient, there's some paperwork that gets generated in order to have the visit paid for?

THE JUROR:  Yeah, it's primarily electronic at this point.

THE COURT:  I use "paperwork" in the generic sense.

But it's the way that health insurance, Medicare, things like that, pay for the services, tests, clinical service and so on and so forth?

THE JUROR:  Yes.

THE COURT:  All right.  And the coding is the elaborate regulations to decide how much gets paid for how

many -- for what service?

THE JUROR:  The coding is the translation of the medical record into alphanumeric codes which are transmitted to the insurance company.  And based and those codes, the insurance company determines whether they're going to pay for the claim or not.

THE COURT:  You were previously at the Lahey Clinic?

THE JUROR:  Yes, sir.

THE COURT:  Were you doing similar things there?

THE JUROR:  Yes, sir.

THE COURT:  Okay.  Tell us to what extent you use social media, how frequently and whether it's personal or business-oriented.

THE JUROR:  Most often personal.  Facebook:  family and friends, mostly to look at pictures of my grandchildren and things like that.  Oh, and you asked how often?  I'm pretty much on Facebook daily.

THE COURT:  How about other media, Twitter, Instagram?

THE JUROR:  I don't use Twitter or Instagram.  I think I may have accounts, but since I signed up I don't think I've ever really gone on them.  I am also on LinkedIn, which is my professional social media.  I don't use it very often, but I have an account on there.  I can't think of any others.

THE COURT:  Could we cut the audio, please?

(Discussion at sidebar and out of the hearing of the

public:)





MR. WEINREB:  There's one more, 21.

THE COURT:  We haven't been focusing on that.  I actually don't think it's particularly relevant.

MR. WEINREB:  Just as a housekeeping matter.

THE COURT:  I've been skipping it.

MR. WEINREB:  That's fine.

(In open court:)

THE COURT:  We ask some general questions about attitudes of things that might affect current affairs or international events and so on, attitudes about Islam, Muslims, attitudes about the war on terror, so-called, and various things.  You answered those -- you remember some of those questions from the questionnaire?

THE JUROR:  Yes.

THE COURT:  Since you gave those answers, there have been some incidents in Paris and some other places in Europe that have brought things to the news.  Have you followed that news at all?

THE JUROR:  No, I haven't.

THE COURT:  You haven't.  Do you know what happened?

THE JUROR:  Not really.  I've particularly stayed away from any of that.

THE COURT:  Even those things?

THE JUROR:  Yes, sir.

THE COURT:  My question was going to be would that have affected any of your answers, but I guess if you hadn't heard it --

THE JUROR:  I really don't know what the situation is.

THE COURT:  All right.

On page 20 we asked -- in Question 77 we asked whether

you had formed any opinions about, you know, sort of the big issues in the case, whether the defendant is guilty and, if so, what might be the penalty, and you indicated no, you had not formed an opinion about those matters.

Could you tell us about that; amplify on that, perhaps?

THE JUROR:  I don't know that I -- I mean, I just don't think -- I haven't really decided.  I haven't really formed an opinion myself.  I believe that -- I do believe in the justice system, and I believe that it's up to the justice system to make that determination, so -- that's the only thing I can...

THE COURT:  Okay.  In any criminal case, under the law the defendant who is accused of a crime is presumed to be innocent of that crime unless and until the government proves that he's guilty and proves it by the evidence at trial, convincing the jury that the defendant's guilty beyond a reasonable doubt.  Those principles of the presumption of innocence and proof beyond a reasonable doubt are fundamental to our system.

THE JUROR:  Right.

THE COURT:  Would you have any difficulty in applying those principles in this case if you were a juror?

THE JUROR:  No.

THE COURT:  Was my summary of those responsibilities

more or less what you were trying to say?

THE JUROR:  I believe so, yes.

THE COURT:  I was getting that impression, that's why -- I don't want to put words in your mouth, but I want to -- your mind is in suspension until you're at the point of hearing the evidence and deciding.  Is that fair?

THE JUROR:  Yes, that's fair.

THE COURT:  In Question 79 you said you may have posted a Boston Strong picture on Facebook.  Can you remember --

THE JUROR:  At the time.

THE COURT:  At the time of the events?

THE JUROR:  Yes.  I mean, everybody was posting pictures of Boston Strong.  And, you know, I'm sure -- I don't know if I could go back and find that on Facebook, but I'm pretty sure I may have posted a picture.

THE COURT:  Since then, since the sort of immediate aftermath of events, have you had any postings like that?

THE JUROR:  No, not that I -- not that I can recall at all.

THE COURT:  Let me just come back to your employment.  Of course Mass. General was the scene of the treatment of a lot of victims.

THE JUROR:  Yes.

THE COURT:  Is there anything that concerns you about

your being in the environment of the hospital generally and your role that might have an effect on your service as a juror?

THE JUROR: Not really. I'm not located in the hospital. I work in the Charlestown Navy Yard. And, you know, as I was thinking about this since I came in originally, if I had access to the medical -- I mean, I do have access to the medical records.

THE COURT: Because you have access to all of them.

THE JUROR: Because of my job.

Pardon me.

THE COURT: Because you have access to all of them.

THE JUROR: Yes. But we do, obviously, sign confidentialities and all of that.

But I was thinking of my role there as it relates to what could potentially be here. And I'm a director, I have four operations managers who report to me and then about nine managers who report to them, and under them are team leaders and staff. It's my team leaders and staff who actually do the coding of the services, and so if there were any individuals that were treated by our physicians or the hospital, we could potentially do the coding for those cases. But I don't really have -- I mean, I have access, but I don't really see them. I'm so far removed from the day-to-day actual coding of those cases that I haven't seen anything. You know, in the future I don't know what I would see.

THE COURT: That's fine. And I also was getting at maybe the general atmospherics.

THE JUROR: Oh.

THE COURT: I mean, the fact that Mass. General was involved in some way and you're connected with the Mass. General, would there be any spillover from things like that?

THE JUROR: Not that I can think of. I mean, we just do our jobs. We go about our business. And, I mean, there hasn't been anything that I can think of really.

THE COURT: Okay. Okay.

Let me ask you to look at page 23. We asked a series of questions to gauge jurors' thoughts about the death penalty and whether the individual juror would be in a position to vote in favor of or against the death penalty. So on Question 88 we ask for general views, and you said that you didn't really have any general views. The next question, we asked you to put on a scale from 1 to 10 what your views were about it, whether you're opposed or in favor, and you selected 5, which is sort of in the middle.

THE JUROR: Yes, sir.

THE COURT: And then on the next page, Question 90, we asked you to select a statement of a number of statements that were put there that most matched your attitude towards the death penalty, or thoughts about it.

THE JUROR: Yes.

THE COURT:  And you selected D, saying you are neither for it nor against it but could vote to impose it or could vote to impose a sentence of life imprisonment, whichever you thought was called for by the facts in the case?

THE JUROR:  Yes, sir.

THE COURT:  Do those answers fairly represent your views about the death penalty --

THE JUROR:  Yes.

THE COURT:  -- and about your disposition to impose it or not impose it?

THE JUROR:  Yes.

THE COURT:  So to restate it, you could consider the evidence about what the penalty should be and you're open to being convinced that it should be the death penalty and you're open to being convinced that it should not be and should be life imprisonment.  Is that fair?

THE JUROR:  Yes.

THE COURT:  Do you want to qualify that in any way?

THE JUROR:  No.

THE COURT:  Follow-up?

MR. WEINREB:  Not from me.

MR. BRUCK:  A couple of things, if I might.

Ma'am, I'm David Bruck.  I'm one of Jahar Tsarnaev's attorneys.  And I just have a few things I'd like to follow up on, if I could.

THE JUROR:  Okay.

MR. BRUCK:  It would not be a hardship for you to leave your job for four months?

THE JUROR:  Well, as I mentioned before, I have a number of management staff who report to me, so...  I mean, it's a long time, you know, but I think Mass. General would support that.  And, you know, I think I have enough of a strong team that could manage the staff.

MR. BRUCK:  The judge asked you about Mass. General's role in treating wounded.  Do you recall anything else out of the ordinary that involved Mass. General in the week of the immediate aftermath of the bombing?  I guess I should be clearer.  You said you read a moderate amount -- you checked the box -- about this in the news media.

THE JUROR:  At the time, you mean?

MR. BRUCK:  At the time, right.

What does that mean?  Can you tell us what stands out about what you saw or read about the marathon?

THE JUROR:  I know I was watching the news during that time.  As far as what I saw or -- I don't recall reading anything because I don't really read newspapers.

MR. BRUCK:  Okay.

THE JUROR:  I don't know.  Just really what was --

MR. BRUCK:  As far as Mass. General.

THE JUROR:  Oh, as far as Mass. General?

MR. BRUCK:  I mean, that's just as an example.  Do you remember hearing anything --

THE JUROR:  The only thing I remember hearing about Mass. General was that it seemed like -- I remember that either there were people being brought to Mass. General or thought to be brought to Mass. General, but I'm not even sure -- I'm not even sure, like, who that was.

MR. BRUCK:  Do you remember that the President of the United States visited Mass. General?

THE JUROR:  I did not remember that.

MR. BRUCK:  That was not something that you recall?

THE JUROR:  No.  Now that you're saying it, I vaguely, maybe, remember that, but I did not remember it.

MR. BRUCK:  Okay.  And you didn't recognize the names of any doctors from Mass. General on the witness list?

THE JUROR:  No, I did not.  We have a lot of doctors there.

MR. BRUCK:  I understand.

How did you feel when you found out -- I don't know whether it was when you got your summons or later, but when you found out that you were being summoned for this case, what was your --

THE JUROR:  In general -- I didn't really find out that it was this case until I got here.

MR. BRUCK:  Right.

THE JUROR:  I mean, I thought it could potentially be, but I just didn't really know what other cases might be here, and I really didn't know.  And my whole thought about coming into this when I got my summons was that, as I mentioned, I do believe in the justice system, and I'm grateful that we have this in our country.  And so I looked at it as my duty, and even as a privilege, should I be asked to be a part of this.

MR. BRUCK:  My last question is:  If it was up to you whether to serve or to be excused, entirely up to you, you could choose on the jury or off, which would you choose?

MR. WEINREB:  Your Honor, I object.  There's nothing about that that could lead to a for-cause strike.

THE COURT:  Yeah, I agree.  You don't have to answer that question.

MR. MELLIN:  Your Honor, may I ask just a few questions?

THE COURT:  I want to be sure -- you did say it was your last question.

MR. BRUCK:  Well --

MR. MELLIN:  I didn't mean to hold Mr. Bruck to it.

THE COURT:  I've learned that that's not always the last word.

MR. BRUCK:  Well, if you'll bear with me just a moment, I asked you about Mass. General.  From the moderate amount of publicity, do you remember anything about -- hearing

about the defendant or about his family?

MR. WEINREB:  I object.

THE COURT:  Yeah, sustained.

MR. BRUCK:  Lastly, you mentioned WBZ.  Have you heard -- I understand not since you got your summons, but during the time have you heard very much discussion about this case or about the defendant or what ought to happen on the radio?

THE COURT:  I think that was the last juror.  Did you mention WBZ?

THE JUROR:  No.  I don't know if I did in my paperwork.

MR. BRUCK:  I think in the paperwork.

THE COURT:  Oh, in the paper?  I'm sorry.

MR. BRUCK:  In the questionnaire.

THE JUROR:  In the questionnaire.  Because I do I listen to WBZ radio sometimes.  So you said --

MR. BRUCK:  Has there been a lot of talk that you've heard about this case or about this defendant on the radio?

THE JUROR:  And you also asked about the family.  I don't recall hearing anything about the family.  About the defendant?  I mean, I've -- you know, just heard the name, that sort of thing, but I haven't -- in particular I can't think of what I've heard in particular.

MR. BRUCK:  That's all I'm asking.  Okay.  Thank you

very much.

MR. MELLIN:  Your Honor, if I may?

Good afternoon, ma'am.  I'm Steve Mellin, one of the prosecutors on the case along with this team right here.

You put yourself right in the middle of the road, kind of, when it comes to the issue of the death penalty in your questionnaire and even your answers here today.  Maybe if we could step back, though.

Theoretically I get that you are kind of in the middle of the road.  At some point, though, in this case you may come to a point where it's not really a theoretical question; it's really an actual question.  Do you believe that you would be able to impose the death penalty if you found that the evidence supported that?

THE JUROR:  Yes, sir.

MR. MELLIN:  Thank you.

Thank you, your Honor.

THE COURT:  All right.  Thank you.

(The juror is excused.)

MR. WEINREB:  Your Honor, before we call the next juror, I again want to interpose a general objection to asking about the specifics of what the jurors -- potential jurors may or may not have heard in the news.  I think that's not really a follow-up question; that is an additional question that was proposed and rejected.  And I'm not saying that there wouldn't

necessarily be cases where follow-up about specific things might not be called for; I'm just saying it seems to now be a general question that's being asked of every juror in every case, regardless of whether there's any special reason for it.

And I don't think that's appropriate, given both the law, which says that it makes no difference as long as the juror is not going to be influenced -- have a juror impartial by it, and also given the process that led to the formulation of this questionnaire and litigation over various questions.

MR. BRUCK:  I don't know if the Court needs to hear me.  I would like to be heard.

THE COURT:  Go ahead.

MR. BRUCK:  Our understanding, and the discussion about the questionnaire, was that those questions would not be on the questionnaire but that content questions about publicity would be fair game, or might be in the Court's discretion at this stage.  And especially for -- we think that there are some jurors that one cannot really gauge their impartiality without some probing.  There are a couple of jurors who seem very eager to be on the jury, and some of those jurors may be completely sincere and some of them may actually be harboring biases that they're not disclosing.

This was a juror who works for Mass. General, albeit not in the building, and didn't recall that the President of the United States visited Mass. General a few days after the

bombing.  Now, that's not impossible, but it's a little bit of a red flag that she is trying to make it seem that she is a complete blank slate.  She is a highly educated, very responsible lady, and there's an issue, that's all.

THE COURT:  Okay.  We're getting a little too specific to the juror.  I think the objection is a little broader than the juror.

There's no hard, clear line here.  The purpose of the person-to-person voir dire is essentially to follow up on questions from the questionnaire.  So I agree to that extent, that it should generally be in the realm of follow-up, but follow-up can be expansively understood as well.

I do think that some of the questions are too leading. I'm interested in what the jurors say in their own formulations.  I have -- I'm trying to avoid it myself.  I sometimes summarize just to make sure I'm not misunderstanding them, which I guess restates their evidence, but I want -- in the first instance it should be from them without the answer being presented to them in the question.  So I just make that comment as well.

MR. BRUCK:  The last thing I'd like to say for the record is that the question about what stands out was a question that was included in the *Skilling* questionnaire and cited with approval by the United States Supreme Court, excluded from our questionnaire, and we think that's all the

more reason why it should be asked.

THE COURT:  Okay.  Next juror, Juror No. 70.

THE CLERK:  70.  Have a seat.

THE COURT:  Good afternoon.

THE JUROR:  Hello.

THE COURT:  Since you were here to fill out the questionnaire, have you been able to abide by my instruction to avoid any discussion of the case or any exposure to the media reports?

THE JUROR:  I heard one thing.  I turned off the radio quickly.

THE COURT:  All right.

THE JUROR:  Some people did say some things to me but nothing like other -- nothing major, so...

THE COURT:  Okay.  You avoided any discussion with people --

THE JUROR:  Yeah.  Yeah, I mean, I would tell people, "No, I can't really talk about that."

THE COURT:  Fair enough.  That's what we ask you to do.

You're at home with your children right now?

THE JUROR:  Yes.

THE COURT:  And you -- you've thought about it and you don't think your family situation presents a hardship that would --

THE JUROR:  Well, I do, but, you know -- but I know everyone thinks that.  Do you know what I mean?  I think everyone thinks that being out of our life for that length of time is difficult.  But I -- but my husband is available and would be able to do some things.  I think it would be difficult for them but not an undue hardship, I guess.

THE COURT:  Okay.  All right.

You -- we asked some questions about social media, and you say you use Facebook.  And what you said was you read it daily and you post every few weeks.  Is that accurate?

THE JUROR:  Yeah.  Yeah.

THE COURT:  And what kinds of things do you put up?

THE JUROR:  I would say -- I don't know, mostly personal things.  Sometimes links to articles that interest me, so various stuff.  It's hard to say.

THE COURT:  Nothing about --

THE JUROR:  I did post something about this saying I was called to jury duty on the day that this was starting.  But it wasn't expressing an opinion about it, just saying, "Uh-oh, it looks like I'm having to do this."

THE COURT:  When was that, in the November --

THE JUROR:  The week leading up to -- December.

THE COURT:  December?

Have you posted anything since then?

THE JUROR:  No.  But -- and then I do participate, I'd

say, some political kind of things, commenting on, you know, blogs, I guess, but...

THE COURT:  On Facebook or directly on the blogs?

THE JUROR:  Well, that's related.  It seems to be -- see, if someone posts an article and then you comment on that article, it will have your Facebook profile having commented on that article.  Does that make sense?  So, for instance, Talking Points Memo --

THE COURT:  So somebody posts an article that has a comment stream after it?

THE JUROR:  Yes.  So I'd --

THE COURT:  You would be in the comment stream?

THE JUROR:  Yes.

THE COURT:  And it would have your Facebook --

THE JUROR:  It would have my Facebook profile.

THE COURT:  How common is that for you?

THE JUROR:  Somewhat -- a few times -- it's hard to give specifics.  I mean, it's not a daily thing, but I guess I am a little opinionated.

THE COURT:  Are there particular topics that you focus on?

THE JUROR:  Well, that was one of the things -- the recent things were like the Ferguson kind of -- in the media, that stuff.  And also when Ebola, when they quarantined somebody for that, I definitely -- I remember engaging in a

couple on that.  So it's various things.  I couldn't give you a summary of, like, for the year, everything I've said.

THE COURT:  You have a -- both an undergraduate and a graduate degree in psychology?

THE JUROR:  Yes.

THE COURT:  And have you worked in that field?

THE JUROR:  Yes.

THE COURT:  Before you had the family?

THE JUROR:  Yes, before I had children.

THE COURT:  Can you tell us a little bit about that and what you did and where?

THE JUROR:  The job I had previous to having kids was a school psychologist.  I worked at Manchester Middle-High School.  So it's a 7-through-12 school.  And the primary responsibility is doing testing, evaluations for cognitive and psychological profiles.  And like I say, I worked with from 12-year-olds to 18-year-olds at that time.  That was for about five years.  So it was right after I graduated from my master's program.

THE COURT:  So --

THE JUROR:  Should I go previous to that also?

THE COURT:  No.  Give us the years when that was.

THE JUROR:  Oh --

THE COURT:  Roughly.  Just give us --

THE JUROR:  -- I think '97 or '98 is when I started,

and my son was born in 2001, and so that was --

THE COURT:  So since then you've been home?

THE JUROR:  Yeah.  Yeah, a long time.

Should I -- any previous jobs?

THE COURT:  No, that's fine.

THE JUROR:  Because one was vaguely psychology related, I guess.

THE COURT:  If you want.

THE JUROR:  I don't know.  I worked for Child Protective Services in the past, previous to graduate school.

THE COURT:  Okay.

THE JUROR:  For two years in upstate New York.

THE COURT:  In the questionnaire we had asked some questions about attitudes towards broader issues in the world, like attitudes towards Islam or Muslims, attitudes towards the war on terror, for example, so-called and so on.  Do you remember those questions?

THE JUROR:  Yeah, somewhat.

THE COURT:  Since you filled out the questionnaire and you gave us those answers, there have been some events in Europe and Paris, for example, that have occurred.  Have you followed those matters?

THE JUROR:  Yes.

THE COURT:  How closely, not closely?  How would you say?

THE JUROR:  Well, I've certainly read articles about them and remained aware.  Not, like -- not continuous moment-by-moment what was going on, but just a general -- I was keeping track of, I guess, I mean.

THE COURT:  Would anything you saw about that or those incidents have changed any of the answers you gave about the attitudes towards --

THE JUROR:  I don't believe so, no.

THE COURT:  -- Islam or Muslims, for example?

THE JUROR:  No, because they're separate things, I think, you know, to me.

THE COURT:  If you'd look at page 20.

THE JUROR:  Okay.

THE COURT:  Question 77 we asked some questions about whether you had an opinion -- had formed an opinion about whether the defendant was guilty and, if so, what the penalty might be.

THE JUROR:  Yes.

THE COURT:  Do you see that?  It's a four-part -- actually, a five-part question if you take the paragraph below it.

So you said that you had formed an opinion about his being guilty of the offenses.

THE JUROR:  Yes.

THE COURT:  And that's based on things you saw and

heard, read about in the media, for example?

THE JUROR: Yeah.

THE COURT: What we ask jurors in any criminal trial to do is at the outset -- this is -- I may have said it. Let me just start the question again.

In any criminal trial we ask jurors to follow the law, which is that when somebody's accused of a crime, the person is presumed to be innocent, or not guilty, of the crime unless and until the government proves that he's guilty by evidence at the trial --

THE JUROR: Yeah.

THE COURT: -- and proves it beyond a reasonable doubt.

Does the fact that you have formed an opinion on the basis of reports you've seen and heard preclude you from being in that condition that you could presume that he's innocent unless the government proves his guilt by the evidence at trial?

THE JUROR: I think it's hard, you know, because if you have a belief in your head or if you already have heard so much about something that you're like -- that you believe something to be true, it's hard to set that aside. How do I put it? So, you know, I would try to. I don't know that I can say that that wouldn't influence my thinking at all, you know? Because it's hard to say that, like, "Oh, I can put all this

information out of my head," you know, and just pretend I don't know it. I don't know if the brain works that way.

THE COURT: Right. In part perhaps it's a question of focus; in other words, what you focus on is what has been produced during the course of the trial and you test that evidence to see how convincing it is.

Do you think you'd be able to do that?

THE JUROR: I can say that I certainly would try to do that.

THE COURT: So that was the first two parts of the question. The second two parts were: Do you think he should receive the death penalty, and you said no, and then the next one was that he should not, and you said yes. So the same sort of thought about that. I mean, you have that thought at this point?

THE JUROR: See, that one's even harder because it's not based on something that I've heard in the media; it's based on my personal beliefs about the death penalty. And so that's a harder thing to imagine setting aside because it's not just from what has the media told me; it's what have my lifelong beliefs been.

THE COURT: Okay. Let's turn to page 23.

THE JUROR: Okay.

THE COURT: And we ask at the beginning of 88 a series of questions to get your views about the death penalty.

THE JUROR: Yes.

THE COURT: The first one was sort of a -- in Question 88 was a general question about what your views are, and you wrote that you're opposed.

THE JUROR: Uh-huh.

THE COURT: The next question we asked you to tell us the strength of your conviction on that matter.

THE JUROR: Yeah.

THE COURT: And you selected 1 on the scale of -- 1 being strongly opposed.

THE JUROR: Yeah.

THE COURT: And then the next page, instead of using numbers, we tried to get you to express it in a proposition that you would agree with or disagree with, and you selected the first two and said it's somewhere between those two?

THE JUROR: Yeah.

THE COURT: Perhaps now could you just tell us in your own words what your feelings about the death penalty are in a case where someone has been -- the premise is, of course, you don't get to the penalty unless someone has been convicted of an intentional murder. So on that premise that the person has been convicted of an intentional murder --

THE JUROR: Okay. Well, my feelings are that I'm opposed to the death penalty even in that case because I think the government shouldn't impose the ultimate penalty. You

know, let me put this -- you know, I don't believe in an eye-for-an-eye justice because I think it puts us on an equal playing field, and I don't believe that when someone -- you know, if someone commits this heinous crime, I don't think you do the same thing back.  I think we need to stay -- I don't know.  I believe in life imprisonment and not in the death penalty.

THE COURT:  Could you envision that there could be circumstances about a crime, details of the crime, that would lead you to think it was so serious or so shocking that your ordinary position against the death penalty would be overridden and you could vote to impose the death penalty?

THE JUROR:  I don't -- no, because my ordinary position would be that there really is no case that it would be the right thing, if you know what I -- like it isn't a matter of how bad is the crime that's been committed whether somebody should die; it's only if it's in stopping a crime that -- do you know what I mean?  Self-defense.

If somebody -- if something's going to stop another crime from occurring, then I can imagine it.  But if it's like life in prison or death penalty, then there is in my mind no reason to choose the death penalty, in my belief system.  I guess that's what we're saying, right?

THE COURT:  So if you were a juror in this case, it wouldn't matter what the circumstances were, you would not be

6-110

able to vote for the death penalty?  Is that --

THE JUROR:  That's my belief in terms of, you know, where I stand on the death penalty, yes.

THE COURT:  Okay.

THE JUROR:  I guess is the way to put it.

THE COURT:  Any follow-up?

MS. CONRAD:  Yes.  Good morning.  No, good afternoon.  My name is Miriam Conrad.  I'm one of the lawyers representing Mr. Tsarnaev.

If you could just turn to page 24 of your questionnaire, please.

THE JUROR:  Yeah, I am there.

MS. CONRAD:  And you circled on Question 90 both A and B, and you wrote "somewhere between these two."

THE JUROR:  Yeah.

MS. CONRAD:  Could you tell us a little bit more about that?

THE JUROR:  About why?  I guess -- honestly, I guess I have a hard time with giving absolute responses sometimes.  I think in terms of -- so I think I was caught between them quite a bit.  Do you know what I -- like how do I say this?  That in terms of what my beliefs actually are, then I would say A.  Do you know what I mean?  And then if we get into a case of can I imagine?  Well, okay, there's 99 percent of the chance you could never vote for this.  Is there anything possible -- you

know, and I feel, like, well, it's hard to say there's nothing in the world that could influence me to change over that last -- and I guess that's why.  It was, how do I say this, equivocation?

MS. CONRAD:  So if -- I understand your beliefs and how you explain them, but if you were selected to be on this jury and you were instructed -- if the jury found the defendant guilty and then you were instructed on the penalty phase on considering aggravating and mitigating factors, would you be able to consider those in deciding whether or not to impose the death penalty?

THE JUROR:  See, I think that's very hard because it's kind of asking me to go against a core belief system, you know?  So I don't --

MS. CONRAD:  I'm not asking you to go against a core --

THE JUROR:  No, but it would be, wouldn't it?  I mean, if I were sitting there and having to make that decision at the end, it would be asking me to go -- be able to, you know, set aside a core belief and examine it from a different perspective of then what I believe.  I don't know if I'm being clear there.

MS. CONRAD:  I understand.  Thank you.

THE COURT:  Okay.  Thank you.

THE JUROR:  Okay.

THE COURT:  Just leave the questionnaire there.

That's fine.  Thank you.

(The juror is excused.)

THE CLERK:  Juror 71, have a seat, please.

THE COURT:  Good afternoon.

THE JUROR:  Hi.

THE COURT:  That's the questionnaire you filled out before when you were here.

THE JUROR:  Yup.

THE COURT:  We're going to follow up with some questions about it.  Since you filled it out, have you been able to follow my instructions about avoiding any discussion of the case with anyone, or any exposure --

THE JUROR:  Pretty much.  I mean, the people I work with know -- I told them I can't really say anything.

THE COURT:  Right.  And the same thing for media reports.  If you see a story, you turn away from it?

THE JUROR:  The news in the morning don't really talk too much about it, just the process of jury selection.  But it's only on for a couple of minutes.

THE COURT:  You're concerned -- tell us what you do for a living.

THE JUROR:  I work in a warehouse, a foreign company, warehouse worker shipping and receiving in Wilmington.

THE COURT:  So you're doing the shipping and receiving?

6-113

THE JUROR:  Yeah, shipping and receiving.  It's a two-person department.

THE COURT:  Uh-huh.  How long have you been doing that?

THE JUROR:  Five years.

THE COURT:  Question 10 on page 5 you said you had some concern about the loss of income from that?

THE JUROR:  Yeah, I mean, the employee handbook, the company only pays for a certain amount of jury duty time.  I've already put on three days of state duty.  And also, they have a pension plan, which I have to work 1,000 hours this year to fully vest in it.  So I kind of want to get those hours as fast as possible without delay or interruption.

THE COURT:  Let's take the last point first.  Is this something that you're newly eligible for or do you have to fulfill 1,000 hours every year?

THE JUROR:  I have to fulfill 1,000 hours to be 100 percent, fully vested for my 12 -- 14 -- I'm sorry -- after 12 I have to put in 1,000 hours, which is 25 weeks.

MS. CLARKE:  Your Honor...

(Pause.)

THE COURT:  Are you paid on an hourly basis?

THE JUROR:  Yes.  Uh-huh.

THE COURT:  Okay.  Satisfied?

MR. WEINREB:  Yes, sir.

6-114

THE COURT:  All right.  Thank you.

THE JUROR:  Okay.

(The juror is excused.)

THE CLERK:  Juror No. 73, have a seat here, please.

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon.

THE COURT:  That's the questionnaire you filled out when you were here before.

THE JUROR:  Yup.

THE COURT:  You may refer to it.  Since you filled it out, have you been able to abide by my instructions to avoid any discussion of the case or the process and avoid any media accounts that may bear on --

THE JUROR:  To the best of my abilities, yeah.

THE COURT:  Okay.  Tell us about your employment.

THE JUROR:  I work at Polcari's in Saugus, Massachusetts.

THE COURT:  In Massachusetts?

THE JUROR:  Yeah.  I'm a busboy.

THE COURT:  How long have you done that?

THE JUROR:  Coming up on two years now.

THE COURT:  Okay.  You graduated from community college?

THE JUROR:  Not yet.  I'm --

THE COURT:  You're in the process?

THE JUROR:  I'm a full-time student right now.

THE COURT:  Oh, you are?

THE JUROR:  Yeah.

THE COURT:  So you work in addition to your being a student?

THE JUROR:  Yeah.

THE COURT:  Okay.  Are you in school now?

THE JUROR:  I am, yeah.  Today was actually the first day.  I missed today.

THE COURT:  And you say it is full time.  What does that entail?

THE JUROR:  Four classes, which is --

THE COURT:  How many times a week?

THE JUROR:  I go Monday through Thursday.

THE COURT:  Okay.  It would be a burden to be here, then, instead of in school?

THE JUROR:  It would be.  I didn't put that in my questionnaire.

THE COURT:  All right.  Thank you.  That's all.

THE JUROR:  No problem.

All right.

(The juror is excused.)

THE CLERK:  Juror No. 74, have a seat over here, please.

THE COURT:  Good afternoon.

THE JUROR: Good afternoon.

THE COURT: We're going to just follow up on some of the questions you answered in your questionnaire, and that's it right there, so you may refer to it from time to time.

THE JUROR: All right. Thank you.

THE COURT: Since you were here to fill that out, have you been able to abide by my instructions not to talk about the case or the jury selection process or --

THE JUROR: Yes, sir. As much as possible.

THE COURT: Right. I mean, in general terms to tell people you were coming and so on and so forth, but not the details of the case or anything like that.

THE JUROR: Correct. Yes, sir.

THE COURT: And is the same true for avoiding any media reports about the case?

THE JUROR: As much as possible, yes.

THE COURT: Right. I know they sometimes hit you without you --

THE JUROR: Yeah, you know.

THE COURT: But when that happens, do you turn from them?

THE JUROR: I change the channel, yes, sir.

THE COURT: That's what we ask you to do.

Just sort of background questions, we had asked whether you had ever lived in another country, and you said

Scotland for six months?

THE JUROR:  Yeah.

THE COURT:  Was that a student matter?

THE JUROR:  Yeah, I studied abroad.

THE COURT:  When was that?

THE JUROR:  My junior year of college, so 2006.

THE COURT:  Okay.  You have two brothers who are both in the Marines?

THE JUROR:  Yes, sir.

THE COURT:  And one actually went to the Naval Academy?

THE JUROR:  Yes, sir.

THE COURT:  And I guess one served both in Afghanistan and Iraq?

THE JUROR:  Yes, sir.

THE COURT:  Do their -- would their service as Marines have any effect on your impartiality or fair-mindedness in a case like this?

THE JUROR:  I don't think so.

THE COURT:  Was the brother who was in Afghanistan and Iraq -- was he engaged in combat?

THE JUROR:  Yes, sir.

THE COURT:  Is he still -- is anybody still there? No?

THE JUROR:  No, neither -- neither are deployed at

this time.

THE COURT:  So again -- I actually was looking forward so I didn't hear your answer to the question whether it would affect you.

THE JUROR:  I don't think so, no.

THE COURT:  Have you talked to them about their experiences, particularly the one who was in combat?

THE JUROR:  Yes, sir.

THE COURT:  Were they both in combat or just --

THE JUROR:  Just my older brother, yeah.

THE COURT:  Okay.

THE JUROR:  As much as he would talk about it.

THE COURT:  Uh-huh.  Does the fact that he won't talk about it affect you?

THE JUROR:  No.  I don't -- I think he just -- he's pretty private.

THE COURT:  I see you went to UMass Dartmouth?

THE JUROR:  Yes, sir.

THE COURT:  You'll probably hear something about UMass Dartmouth in the course of the case.  You probably already know that.

THE JUROR:  Yes, yeah.

THE COURT:  Would that have any effect on your impartiality or fair-mindedness?

THE JUROR:  No.

THE COURT:  To the extent you've seen any names about people involved with UMass Dartmouth, have you recognized them as people you know?

THE JUROR:  They interviewed one of my professors -- one of my history professors after --

THE COURT:  Who's "they"?

THE JUROR:  The media.

THE COURT:  The media --

THE JUROR:  I'm sorry.  I saw one of --

THE COURT:  -- as opposed to government investigators?

THE JUROR:  No.  No, no, at least that I know of.  One of my history professors was on the news after the -- they figured out -- it was on the news.

THE COURT:  This was around the time events were unfolding?

THE JUROR:  Yes, sir.

THE COURT:  Close to the time of the --

THE JUROR:  Yes, sir.  Yeah.

THE COURT:  And you saw that or you just know it happened?

THE JUROR:  I saw it.

THE COURT:  Okay.  Any continuing impact of that on your ability to be a fair juror?

THE JUROR:  No.

THE COURT:  What did the history professor have to

say?

THE JUROR:  He was -- he was -- he taught a class on Chechnya, and I think that it had some relation to the defendant.  And so they were interviewing him about that.

THE COURT:  You may recall in the questionnaire we asked some questions about general attitudes towards things, including Islam and Muslims, the war on terror --

THE JUROR:  Yes.

THE COURT:  -- and so on and so forth, and you answered those.

THE JUROR:  Uh-huh.

THE COURT:  Since you filled out the questionnaire, there have been other incidents that could be called terrorism incidents in Paris and perhaps other places.  Have you followed those -- news reports about those things?

THE JUROR:  Some, yes.

THE COURT:  Give us an idea of "some."

THE JUROR:  I watch the nightly news, so I saw those reports.

THE COURT:  Okay.  Would they cause you to change any of the answers you gave previously?

THE JUROR:  No.

THE COURT:  If you want to look at them, they're on page 17 and 18.

THE JUROR:  Page 17?  It was a while ago.

(Pause.)

THE JUROR:  No, I don't think my answers would change.

THE COURT:  Would the reports have any other -- apart from the answers, would they affect you in any way that would affect your service as an impartial juror?

THE JUROR:  No.

THE COURT:  If you'd look at page 20, in Question 77 we asked whether -- on the basis of things you'd seen in the media, whether you formed an opinion about whether the defendant was guilty and, if so, what punishment might be imposed.

To the question about whether he was guilty, you said "unsure," and then to the question -- sort of paired question, whether he was not guilty, you said "no."  Those might be inconsistent in some way.  I mean, one was more absolute than the other.

Can you just tell us what you think your mental condition is about that -- or impression you have based on media reports?  I mean --

THE JUROR:  I mean, you're supposed to assume somebody's innocent until proven guilty, right?  So I think that's where maybe my "unsure" answer came from.  And then -- yeah, they do contradict each other, don't they, my two answers?

THE COURT:  I'm not sure they contradict, but they're

a little inconsistent.

THE JUROR:  Yeah.

THE COURT:  Let me just ask you the question that you raised.  In any criminal case, the defendant who is accused of a crime is presumed to be innocent of it unless and until the government proves he's guilty.  The government must prove that by evidence produced at trial, not what might be in the ether, and they must prove it to the jury beyond a reasonable doubt.

Would you have any difficulty in applying those principles, the presumption of innocence and proof by the evidence beyond a reasonable doubt, if you were a juror in this case?  Would you have any difficulty in faithfully applying those?

THE JUROR:  No.

THE COURT:  With respect to the second part of the question, about the penalty, you said you were unsure about whether he should or should not receive the death penalty if convicted, right?

THE JUROR:  Right.

THE COURT:  C and D.

THE JUROR:  Yes, sir.

THE COURT:  And what was the reason you checked those boxes?

THE JUROR:  I mean, I think you'd need to see all the evidence and all the proof before you can say that about -- you

know, make that decision.  That's a big decision to make.

THE COURT:  On the next page, you said your friends and boyfriend all live in Watertown and sheltered in place, but you were out of town and didn't, but you would have had to if you were there?

THE JUROR:  Yes.

THE COURT:  Does the fact that they went through that experience and that you might have, and sort of, I guess, have some empathy for them for having done it -- would that be something that would interfere with your impartiality in a case like this?  In other words, would you take this in some way personally that would affect your ability to be a fair juror?

THE JUROR:  No, I wouldn't take it personally.  It was scary for them, but I don't take it personally.

THE COURT:  And do you -- in the next question, you participated in an anniversary race?

THE JUROR:  Yes, sir.

THE COURT:  And the anniversary is of the marathon itself.  Is that the anniversary you're talking about?

THE JUROR:  I think this one was actually of the events -- no, it was before the marathon, so it was just --

THE COURT:  So it was approximate, is that what --

THE JUROR:  Yeah.

THE COURT:  It was for the week-long events?  Is that what --

THE JUROR:  Yeah, that kind of thing.

THE COURT:  And you own a Boston Strong T-shirt?

THE JUROR:  Yes, sir.

THE COURT:  Did you acquire that yourself?  Did somebody give it to you?

THE JUROR:  Another teacher at the school that I work at bought it for me.

THE COURT:  When?

THE JUROR:  Probably the week after the bombing.  We had a Boston Strong Day at school.

THE COURT:  If you'd turn to page 23, beginning with Question 88, we asked -- asked a series of questions about your attitudes -- attitude or attitudes toward the death penalty. 88 is a general question, and you said it's necessary but should be used only when a crime truly warrants it.

THE JUROR:  Yes, sir.

THE COURT:  And then the next question, we asked you to give us a sense of how strongly you had that view or favored the death penalty, and you circled 8 on a scale of 1 to 10, with 10 being strongly favor.

THE JUROR:  Uh-huh.

THE COURT:  Is that a good estimate of the strength of your belief on this?

THE JUROR:  Yes, I think if they've done something that warrants the death penalty, then that's something that

6-125

they deserve.

THE COURT:  If you could look at the next page, rather than a numerical scale, we asked you to tell us in a formulation of words what came closest to your view, and you selected E, which is that you're in favor of the death penalty but could vote for a sentence of life imprisonment without the possibility of release if you believed that sentence was called for by the facts and the law in the case.  Is that your view?

THE JUROR:  Yeah.

THE COURT:  So would you -- based on the full presentation, aggravating, mitigating, all that, would you be in a condition where you could be persuaded to vote in favor of the death penalty but also could be persuaded to vote in favor of life imprisonment?  In other words, do you have any -- let me just ask that question.

THE JUROR:  I mean, I think if the evidence warranted the death penalty, then I could vote for that.  But if it didn't, life in prison -- yeah, I could be persuaded either way.

THE COURT:  So you could consciously evaluate either possibility --

THE JUROR:  Yes.

THE COURT:  -- based on the evidence you heard?

THE JUROR:  Yes.

MR. BRUCK:  If I may?

THE COURT:  Go ahead.

MR. BRUCK:  Ma'am, I'm David Bruck.  I'm one of Jahar Tsarnaev's attorneys, and I've got a few things to ask you, if I may.

THE JUROR:  Yeah.

MR. BRUCK:  Thank you.  I want to ask you about the T-shirt.

THE JUROR:  Okay.

MR. BRUCK:  Why did the teacher buy you a Boston Strong T-shirt?

THE JUROR:  She's the leader of the team that I'm on. We work on teams in the school.  And so she bought everybody on our team -- so the five teachers, she bought us all Boston Strong T-shirts so we could participate in the Boston Strong Day.

MR. BRUCK:  On the Boston Strong Day?

THE JUROR:  The spirit day that our school had for Boston Strong.

MR. BRUCK:  Can you tell me a little bit more about that.

THE JUROR:  The spirit day?

MR. BRUCK:  Yeah.

THE JUROR:  We have spirit days throughout the school year.  Last Friday was Patriots Day-AFC Championship Day, so you got to wear your Patriots sweatshirt instead of your

teacher clothes.  So we had a Boston Strong one after the bombing.

MR. BRUCK:  And how long after?

THE JUROR:  We were on April vacation when it happened, so I think it was the week after.

MR. BRUCK:  And how often have you worn the shirt since then?

THE JUROR:  It's one of my gym shirts, so probably on a biweekly basis, maybe.

MR. BRUCK:  I can never remember.  "Biweekly" means twice a week or every two weeks?

THE JUROR:  Every two weeks.  I think that's what it means.

MR. BRUCK:  Your guess is better than mine.

And you also ran in the Watertown Strong race.

THE JUROR:  Uh-huh.

MR. BRUCK:  And at that time you lived in Watertown?

THE JUROR:  I lived in Newton, right on, like, the Newton/Watertown line kind of, but I -- I would say I used to live in Watertown.  I would say I did more things in Watertown than in Newton.

MR. BRUCK:  Now, maybe this is a silly question, but what does "Boston Strong" and "Watertown Strong" mean, if you could explain it to someone that didn't know anything that's been going on?

THE JUROR:  I think it was just sort of the spirit of resilience that the city felt after the bombings.  I mean, I really honestly think the Watertown Strong was a little silly, but the Boston Strong, you know, sort of all of us coming together as a city.  And that was sort of the feeling -- that's how I would explain it, at least.  I don't know if I'm being very articulate.

MR. BRUCK:  No, you're being very articulate.  Thanks.

Do you think -- and there's no right answer to this.  I just want to know what you think.  Do you think that being part of this trial is some of the -- also part of the community coming together or expressing resilience?

MR. WEINREB:  Objection.  That's a leading question.

THE COURT:  No, go ahead.  You can answer that.

THE JUROR:  Okay.  Maybe?  I'm not -- yes?

MR. BRUCK:  Is it to you?

THE JUROR:  Of the community coming together?  No.  I mean, I view this as a sad thing, like we shouldn't have to be doing this.

MR. BRUCK:  What do you mean?

THE JUROR:  I think bad things shouldn't happen.  We shouldn't -- I don't know.  Yeah.  That's not a good answer.

MR. BRUCK:  No, it's fine.  Whatever -- as the judge told you, whatever you really feel is a good answer --

THE JUROR:  Okay.

MR. BRUCK:  -- so...

Do you listen to Kiss 108?

THE JUROR:  I do.

MR. BRUCK:  Is there a lot of talk about this case on that?

THE JUROR:  Not -- I mean, like I said, I try to change the channel if they bring it up.

MR. BRUCK:  But I mean before you -- I mean in the year and a half --

THE JUROR:  Oh, so before I got a jury summons?

MR. BRUCK:  Yeah.

THE JUROR:  Not any more than -- not that it, like, stood out to me really.

MR. BRUCK:  Now, there might be evidence -- there probably will be evidence that the government presents in this case that the bombings were committed for reasons having to do against our involvement in Afghanistan and Iraq.

THE JUROR:  Uh-huh.

MR. BRUCK:  And you've said you have two brothers who are Marines officers and one brother has fought in both places.

THE JUROR:  Uh-huh.

MR. BRUCK:  Now, as you know, once you're on the jury if that begins to affect you in a personal way, it's too late, or it could be, so now's the only time we can ask you:  Do you think the fact that your brother served in combat in both of

6-130

those theaters could affect the way you look at this case in a way might affect your jury service?

THE JUROR: I really don't think so.

MR. BRUCK: How sure are you?

THE JUROR: I feel like when -- when you asked me the question I felt pretty sure about it. When you asked me the question now, I'm not so sure about it.

(Laughter.)

THE JUROR: I mean, I'm proud of the service that my brother did, and I'm proud of, you know, the military, but it's -- you know, it's just something that he had to do. It's not something that he necessarily felt strong about what he was doing over there.

MR. BRUCK: Well, I guess what I'm coming down to. You listed an awful lot of ways in which your life has intersected with this story.

THE JUROR: Yes.

MR. BRUCK: You went to Dartmouth. You talked to us about your professor.

MR. WEINREB: Objection, your Honor.

THE COURT: Yeah, I think this is argument.

MR. BRUCK: Well, just to remember all the --
Watertown and what you told us about your brothers, if you put all that together --

MR. WEINREB: This is -- objection, your Honor.

6-131

MR. BRUCK:  -- how sure are you?

THE COURT:  Yeah, sustained.  Never mind.

THE JUROR:  Okay.

MR. BRUCK:  I guess my last question is:  Just thinking over everything you've told us, are you confident that you could be a fair and impartial juror in this case or do you have some doubt?

THE JUROR:  I'm confident.

MR. BRUCK:  Okay.  Thank you.

THE JUROR:  You're welcome.

THE COURT:  Thank you.

THE JUROR:  No problem.  Thank you.

THE COURT:  Number 74.

(The juror is excused.)

THE COURT:  I think we'll break here for lunch.  We've only got about five more to go, so...

MR. WEINREB:  Can we hold for a second?  Can we actually hold that juror for one second?

THE COURT:  Okay.  Would you just keep her here for a minute.

MR. CHAKRAVARTY:  Your Honor, there was a -- I'm sorry.

THE COURT:  I don't know.

MR. CHAKRAVARTY:  It -- I don't think it has to be sidebar.  There was an individual that she was talking about

who was a history professor at UMass Dartmouth. We didn't ask for the name. On the government's witness list there is a professor from UMass Dartmouth who, based on my understanding, teaches a course about Chechnya. It's unclear whether that witness will be called for sure, but it's on the list.

It may be prudent just to inquire --

THE COURT: Okay. Does someone have the list? I don't have it handy. I think I have it in my other papers.

MS. CLARKE: Or just ask her the name of the professor.

MR. WEINREB: Yeah, we would recognize it.

THE COURT: Oh, you'll recognize it? Okay.

(The juror is re-called.)

MR. McALEAR: Juror No. 74.

THE CLERK: Have a seat.

THE COURT: This will be quick.

THE JUROR: Okay.

THE COURT: You told us you saw an interview with a history professor from UMass Dartmouth.

THE JUROR: Yes.

THE COURT: What was his name?

THE JUROR: Brian Williams.

THE COURT: Okay. Thank you.

THE JUROR: You're welcome. That's it?

THE CLERK: That's it.

(The juror is excused.)

THE COURT:  Since we made pretty good progress and we have about five left, instead of just taking a half-hour for lunch, take 45 minutes, shoot for quarter to two, roughly.  Is that reasonable?

(There is a recess in the proceedings at 12:56 p.m.)

(The Court entered the room at 1:47 p.m.)

THE COURT:  We're going to take a juror out of order, No. 79.  He is the landlord in a landlord/tenant relationship, and his tenant is having trouble, and he wants to go help.  We'll take him out of order to get him out.  That's my understanding.  I haven't talked to him.  That's what I was told.

THE CLERK:  79.

(SIDEBAR CONFERENCE AS FOLLOWS:

6-134

MS. CONRAD:  Thank you.

THE CLERK:  79.

.   .   .   END OF SIDEBAR CONFERENCE.)

THE JURY CLERK:  Juror 79.

THE CLERK:  Juror 79.  Have a seat, please.

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon.

THE COURT:  Since you were here last to fill out the questionnaire, have you been able to abide by my instructions to avoid discussing the case?

THE JUROR:  Only I got stuck on a bus, and there was someone listening to talk radio, and suddenly five people

around me were all discussing it.  So I tried --

THE COURT:  Tried to ignore it?

THE JUROR:  Tried to but it was 20 minutes of Mass. Pike trapped on a bus.

THE COURT:  Anything that you would be unable to discharge from your consideration, anything anybody said that would be -- interfere with your --

THE JUROR:  There were a couple things that kind of stuck in my head.

THE COURT:  Like what?

THE JUROR:  Just talking about the procedural parts of this week and the case, what was going on, that kind of thing.

THE COURT:  How would that affect you?

THE JUROR:  Only in the sense I thought we were not supposed to know any of those things.

THE COURT:  The substance of it, having unfortunately heard it, does what they were saying have any -- lead you to think differently about the matter than you used to?

THE JUROR:  I think it strengthened my opinion that I already had.

THE COURT:  About the case?

THE JUROR:  About the defendant being guilty.

THE COURT:  We'll come to that again when we get to those points.

Your form says that you are a self-employed consultant

to the construction industry.  What does that involve?

THE JUROR:  So I do project management for commercial construction essentially on a consulting basis.  So I work for myself, not for a big company.

THE COURT:  As somebody who's self-employed, how would you be impacted, if at all, by serving on a jury for three or four months?

THE JUROR:  It would be devastating being.  I'm a single dad.  I have a nine-year-old child who I'm the single breadwinner in the house and that's -- if I don't work, I don't get paid.  So it would be a massive decrease in pay for me.

THE COURT:  That's not something I don't think I found in the questionnaire.

THE JUROR:  Maybe I should have answered it.

THE COURT:  We did ask to the degree it would be a hardship for you on the schedule we put out so -- nothing wrong if you didn't.

THE JUROR:  I apologize.

THE COURT:  It just comes as a surprise.  Tell us -- it really -- you depend on your own labor to get money in the door?

THE JUROR:  Right.

THE COURT:  Okay.

THE JUROR:  Yeah, absolutely.

THE COURT:  All right.  Thank you.

THE JUROR:  All set?

THE JURY CLERK:  Right this way, sir.

THE CLERK:  75.

THE JURY CLERK:  Juror 75.

THE CLERK:  Juror 75, have a seat here, please.

THE JUROR:  Thank you.

THE COURT:  Hi.

THE JUROR:  Hi.  How you doing?

THE COURT:  Have you been able to abide by my instructions last time to avoid discussion of the case with anybody?

THE JUROR:  Yes.

THE COURT:  And to the best of your ability to avoid any media reports about it?

THE JUROR:  I have.

THE COURT:  Thank you.  That's the questionnaire you filled out in front of you.

THE JUROR:  Yup.

THE COURT:  I'm going to ask you some questions -- some follow-up questions on some of the things you've answered in the questionnaire.

Let's start with what you do.  You said -- it says you're a management consultant, and I'm not sure I'm reading the name.

THE JUROR:  Business Breakthroughs International.

THE COURT:  What is that?

THE JUROR:  Business Breakthroughs International is a management consulting company.  Tony Robinson is part of it.  Chet Holmes is part of it.  I work with companies to help them grow revenue from wherever to increase revenue.

THE COURT:  What's your daily or weekly routine like?

THE JUROR:  I have an office in my house, and so sometimes I'm in my house, working, you know, with clients, doing conference calls, webinars, things like that.  And then sometimes I'm at different clients' sites.

THE COURT:  We asked a question about whether the schedule of the case was going to be difficult for people.  You said no hardship to that.

THE JUROR:  It is a little bit of a hardship because I'll be -- I potentially could lose a lot of clients, so that's the answer.  If it's a three- or four-month trial, I could lose a lot of clients.

THE COURT:  Well, it's hard for us to assess the degree of the impact.  Everybody has some impact from serving.  Is it the kind of impact that is manageable, or is it something that would be very difficult?  I guess that's what we can't assess.

THE JUROR:  I guess it would be manageable.

THE COURT:  Because you can move your hours around and things like that?

THE JUROR:  I hope.  It depends on the case.

THE COURT:  We will take Fridays away from the case.

THE JUROR:  Okay.  I didn't know that.

THE COURT:  Part of the idea was to let people get back to the --

THE JUROR:  I forgot that.  Hopefully, it will be manageable.

THE COURT:  In terms of social media, the only thing you referenced was LinkedIn.

THE JUROR:  Right, correct.  I'm not on Facebook.

THE COURT:  Twitter?

THE JUROR:  No, none of that stuff.  LinkedIn, I am, but none of the other stuff, I'm not.  I don't have time for that stuff.

THE COURT:  We asked, in the questionnaires, a series of questions about attitudes towards current events and world affairs and things like that, attitudes about Islam or Muslims, attitudes about the War on Terror and so on.  You answered all of them.

Since you answered them, there have been some events in Europe and Paris.  There have been other instances of terrorist activity.  Have you followed that?

THE JUROR:  Not really.  I know what happened but not to the nth degree.  I haven't followed it that much.  More the Patriots.

THE COURT: Fair enough. I guess my question would be: To the extent you followed it, would you change any of your answers?

THE JUROR: No, not really. I haven't followed it. I've been very, very busy with work. That's the honest truth. And I haven't been watching the news very much because I'm so busy.

THE COURT: So if you'd turn to Page 20 in the questionnaire, Question 77, we asked about whether you had already formed some opinions based on the media or whatever else you may have heard about the events in the case, each of the subparts of that question you answered "unsure."

THE JUROR: Right.

THE COURT: Can you explain or amplify on that?

THE JUROR: Well, I think that if I am a juror in this case, I would listen to the case, both sides, the defense, the prosecution, and form an opinion based on what I would hear and subject to what's going on in the court. So that's what I think a juror is supposed to do. And I think I'm able to do that.

THE COURT: Okay. You're right. We do ask jurors to put themselves in that condition.

THE JUROR: Right.

THE COURT: That they presume, at the outset, that the defendant is innocent or not guilty of what he's charged with.

It's up to the government to present evidence that proves to the jury beyond a reasonable doubt that he is guilty.

THE JUROR:  Right.

THE COURT:  If they do that, then the jurors can return a verdict of guilty.  If the government doesn't convince them, then the verdict would be not guilty.  You don't have any problem with those principles?

THE JUROR:  No, I don't.

THE COURT:  And you didn't have any personal impact of the events of --

THE JUROR:  I did not.

THE COURT:  Beginning on Page 23, at Question 88, we ask a series of questions to try to gauge your thinking about the possibility of imposing a death penalty.  Question 88 asks you, in general, what your views about the death penalty may be.  And you say you are open to it in certain situations.

THE JUROR:  Right.

THE COURT:  In the next question, we asked you to tell us the strength of your opposition or favor of the death penalty, and you're pretty far over on the opposition scale, just one up from strongly.

THE JUROR:  Yeah.  Maybe --

THE COURT:  It does show you had some indecision about that perhaps.

THE JUROR:  Maybe 3 would be the right choice if I had

6-142

to say it now.  In general, you know, it would be for extraordinary cases, would I -- if I was a juror, would I say that the person should be put to death.  So I hope I'm answering your question.

THE COURT:  You are.  Could you perhaps flesh out a little what you mean by "extraordinary" to the extent you've --

THE JUROR:  Well, it would have to be -- it would have to be something horrendous.  It would have to be catastrophic.  It would have to be something where the person maybe didn't have remorse, things like that.

THE COURT:  Okay.  The next page, we asked if you could tell us which of the several possible statements best reflected your feelings about the death penalty in a case where someone had been proved guilty of an intentional murder.

THE JUROR:  I think I answered this -- I think I chose C, and I answered that.  That is my honest answer.  So, in general, I am opposed to the death penalty, but in certain circumstances, I could -- I could -- you know, could say that the person should be put to death.

THE COURT:  And then if you go to 25 and the top of 26, we asked questions that kind of paired together.  Question 95 is, if you found this defendant guilty and decided that the death penalty was the appropriate punishment, could you conscientiously vote for the death penalty?

THE JUROR:  Yes.

THE COURT:  You said yes.  Then the other side of the equation, in a sense, in Question 96, if you found him guilty and decided life imprisonment without possibility of release was the appropriate punishment, could you conscientiously vote for that as the penalty?

THE JUROR:  Yes, I could.  So it depends on the facts of the case.

THE COURT:  Any follow-up?

MR. MELLIN:  Your Honor, just a couple.  Good afternoon, sir.  I'm Steve Mellin.  I'm one of the prosecutors on the case.

You were just describing for the judge kind of what you mean by "extraordinary," and you said "horrendous" or "catastrophic."  Can you elaborate on that a little bit?  What do you mean by "horrendous" or "catastrophic"?

THE JUROR:  I would say multiple deaths, multiple deaths.  Can I think about it for a moment?

MR. MELLIN:  Sure, sure.

THE JUROR:  Terror, you know, world terror, I think things like that.

MR. MELLIN:  When you say "world terror," you mean something like Adolph Hitler?

THE JUROR:  No, on a smaller scale.

MR. MELLIN:  All right.  Thank you.  Thank you, your Honor.

MS. CONRAD:  If I may?

THE COURT:  Sure.

MS. CONRAD:  Good afternoon, sir.  My name is Miriam Conrad.  I'm one of Mr. Tsarnaev's lawyers.

THE JUROR:  Yes, hi.

MS. CONRAD:  The judge asked you some questions about your response to Question 77, which is on Page 20, if you wouldn't mind turning to that?  Sure, take your time.

THE JUROR:  77?  On Page 20, okay.  Yes.

MS. CONRAD:  And you told the judge that what you meant there is that, if you were selected for this jury, you could keep an open mind and listen to the evidence.

THE JUROR:  I could.

MS. CONRAD:  But this question, if I could just maybe frame it a little bit differently, as I read it, is, as you sit here now or as you sat there while you filled out this questionnaire, had you formed any opinion, leaving aside any instructions you might get in the case -- had you formed an opinion -- in other words, did you or do you believe that Mr. Tsarnaev is guilty?

THE JUROR:  No.  I have not formed an opinion on that at this point.

MS. CONRAD:  Okay.  The same thing as far as the appropriate punishment?

THE JUROR:  Appropriate punishment would be -- I mean,

aside from affecting my business, I think I would be a fair juror because I think I would listen to both sides of the case, and I could make a decision of innocent or guilt based on the facts of the case, and I could make a decision on the death penalty or life in prison.  But aside from the time commitments and affecting my business, I think I'm open to the facts of the case.

MS. CONRAD:  I understand that, sir.

THE JUROR:  Did I not answer your question?

MS. CONRAD:  My question is a little different.  My question is --

THE JUROR:  Okay.

MS. CONRAD:  -- putting aside whatever instructions you might get, have you formed an opinion as to whether or not, if Mr. Tsarnaev is found guilty, he should receive the death penalty?

THE JUROR:  No.  I have not formed an opinion about that.

MS. CONRAD:  And when you were responding to Mr. Mellin's questions about the types of cases that you think would warrant the death penalty, is this one of them?

MR. WEINREB:  Well, objection.

THE COURT:  Well, yeah.

MR. WEINREB:  I think -- reworded, I think it would be okay.

THE COURT:  Let me try to reword it.  You know what this case is about.

THE JUROR:  Sure.

THE COURT:  Generally, that is.  You know that there were bombings in which people were killed?

THE JUROR:  Yup.

THE COURT:  Can you tell us whether that is within or without your definition of extraordinary?

THE JUROR:  Based on not being -- the trial didn't start yet, yes, it is within my opinion that the death penalty should be implemented in this type of case without having the trial first to form an opinion.  Did that answer your question?

MS. CONRAD:  So just to follow up on that for one minute, if the defendant were found guilty of the charges against him, would you believe that he should get the death penalty?

MR. WEINREB:  Objection, your Honor.

THE JUROR:  I don't know at this point.

THE COURT:  I think he answered.

MS. CONRAD:  One other thing.  You said, aside from your business, you think you could be a good juror or you could be a fair juror in this case.  Can you explain what you mean by "aside from your business"?

THE JUROR:  Aside from my business, that I believe that this case could last three to four months or possibly

longer, and that's a long time for me to be without my clients or my clients to be without me.  And my business could potentially fall apart.  So that's what I meant.

MS. CONRAD:  Would that be something that would be a distraction or a concern to you as you sat on the case if you were to be selected?

THE JUROR:  It could be.  It could be, you know. That's my only reservation.  That's the only reservation I have.

MS. CONRAD:  Would you have an income while you were sitting as a juror?

THE JUROR:  I would not.

MS. CONRAD:  You wouldn't have any income?

THE JUROR:  No.

MS. CONRAD:  Would that impose a financial hardship on you?

THE JUROR:  Yes.

THE COURT:  Let me just follow up on that.  You had indicated earlier that you could do --

THE JUROR:  Catch up on Fridays.

THE COURT:  Fridays, evenings, weekends.

THE JUROR:  I could.

THE COURT:  Zero income?

THE JUROR:  No.  It would be some income.

THE COURT:  How do you bill, just generally speaking?

THE JUROR:  I bill by the project.  So it's a hundred percent commissions, and it really is by the project.  So if I'm working with -- can I mention a company's name?  It doesn't matter, right?  If I'm working with Fidelity, for instance, I would have to do work with Fidelity, with their salespeople, in order to get paid.  So if I don't -- if I don't do that work, I wouldn't get paid.  I could do some of that work in the evenings.  I could do some of that work on the weekends.  I could do some of that work on Fridays.  So that's what I'm trying to say.

THE COURT:  All right.  Thank you.

THE JUROR:  All set?

THE COURT:  Yeah.  Leave that there.

THE CLERK:  76.

THE JURY CLERK:  Juror 76.

THE CLERK:  Sir, over here, please.  Juror 76, have a seat, please.

THE COURT:  Good afternoon.

THE JUROR:  Hello.

THE COURT:  Since you were here last, have you been able to abide by my instructions to avoid any discussion of the case substance and avoid media as best you could about the case?

THE JUROR:  Yes.

THE COURT:  Tell me a little bit about your

professional employment.

THE JUROR:  I'm an architect.

THE COURT:  You're employed by a company Payette?

THE JUROR:  Payette, yes.

THE COURT:  Tell us about that.  How big a company?
What do you do for the company?

THE JUROR:  I've been there ten years.  It's probably
140 large, maybe 150 by now.

THE COURT:  Multiple locations?

THE JUROR:  We do research labs.  Singular location.
Lots of work on college and university campuses.

THE COURT:  You work on a project-by-project basis?
Is that --

THE JUROR:  I do, yes.

THE COURT:  At any given time, how many projects would
you have going?  Say, now, for example.

THE JUROR:  Let's say one and a half.  You have a
primary and there's always one cooking.

THE COURT:  When you're doing it, you're kind of
focused on one?

THE JUROR:  Oh, yeah, for the most part.

THE COURT:  Other than the company's website, it
appears from your answers to the questionnaire you don't really
use social media?

THE JUROR:  Correct.

THE COURT:  You had one experience with jury service.

THE JUROR:  Yes.

THE COURT:  When was that, do you remember?

THE JUROR:  I may not have this right, but I'll say seven years ago.

THE COURT:  Close enough.  What court?

THE JUROR:  Suffolk.

THE COURT:  Do you remember?

And it was a civil case?

THE JUROR:  Correct.

THE COURT:  Anything about that service that would have any affect on your ability to serve as a juror in this case?

THE JUROR:  No.

THE COURT:  We asked some general questions about possible attitudes towards some wider issues, exposure to Muslims, thoughts about Islam or Muslims, thoughts about the War on Terror and so on.  Do you remember answering those in the form?  If you don't, you can look at it.  It's Page 17 and a few on the top of the next page as well.

THE JUROR:  Okay.

THE COURT:  Since you've answered all those questions, there have been some world events, including the attacks in Paris.  Have you followed those at all?

THE JUROR:  I have not followed them.  I did hear

brief mention in passing.

THE COURT:  You're not really familiar with what happened?

THE JUROR:  I am aware of what happened.  I didn't follow it.  I stayed away from the media like I'm supposed to.

THE COURT:  All right.  Good for you.

So there's nothing about that that you've heard about that would change anything you've answered in these questions?

THE JUROR:  Correct.

THE COURT:  That's what I was getting to.  If you'd go to Page 20, Question 17 asked whether, on the basis of things you had heard, prior to filling out the questionnaire, from the media or otherwise, that you had formed -- whether you had formed an opinion about whether the defendant was guilty or not and, if so, what penalty he might receive.  And in this you indicated that you had an opinion from those sources that he was guilty; and then in Part C, you answered, yes, you had an opinion about the death penalty in this case.  Is that right?

Let's take the first part of that first.  I think I've already said at least once to the jury that in a criminal case, under the law, every defendant accused of a crime is presumed not guilty, or innocent, unless and until the government proves otherwise by the evidence at trial, proves it to that jury by the evidence beyond a reasonable doubt.  Understanding that you have what I might call an informal opinion about the matter,

would you be able to fulfill that duty that we impose on jurors to regard the matter as unproven until the government has proved it by the evidence beyond a reasonable doubt?

THE JUROR:  Yes.

THE COURT:  With respect to the second part, I want to -- actually, before we get to that, I'd like to look at Question 80.  Some -- I guess one friend and a daughter and that friend's daughter and then the daughter of another friend -- so I gather there were three people -- the friend, her daughter -- was it a he or she, the friend?

THE JUROR:  Female, she.

THE COURT:  Her daughter and the daughter of another friend of yours.

THE JUROR:  Correct.

THE COURT:  They were near the finish line at the time of the events?

THE JUROR:  Yes.

THE COURT:  Have you talked with those friends about their experience in that respect, or do you just know what happened?

THE JUROR:  I know what happened.

THE COURT:  Have they told you about what their feelings were or what they saw, didn't see, and so on?

THE JUROR:  No.

THE COURT:  In addition, you say the friend -- the

wife of a friend and coworker is a surgeon that was called in to help with the victims.

THE JUROR:  Correct.

THE COURT:  Do you know the wife?

THE JUROR:  Yes.

THE COURT:  Who was the -- that is, do you know the surgeon?

THE JUROR:  The surgeon, yes.

THE COURT:  Have you talked to her about her experience?

THE JUROR:  No.

THE COURT:  Are these -- give us some idea of what degree of friendship.  You say they're friends.  That's covering a range of possibilities.  Are these people you see a lot, once in a while?

THE JUROR:  The three that were at the Marathon, I see a lot.  The coworker's wife, I don't see a lot.

THE COURT:  Those who were there, are they sort of neighbors?  Are they friends from the community where you live?

THE JUROR:  Yeah.  Some of them go to school together.

THE COURT:  Does any of that give you any concern about how you might be affected by that if you were a juror on the case?

THE JUROR:  To some degree.  That's why I wrote it as being relevant.

THE COURT:  How powerful, I guess, an influence might it be if it's an influence?

THE JUROR:  I can keep my head about me.

MS. CLARKE:  I'm sorry, your Honor.

THE COURT:  Would you repeat that?

THE JUROR:  I could keep my head about me.

THE COURT:  I guess you were -- 81 on the next page, you were affected by the shelter in place.

THE JUROR:  Correct.

THE COURT:  I can't quite read the last sentence.  "I witnessed" -- I'm looking -- what's under the line there?

THE JUROR:  "I witnessed the increased law enforcement activity on the way home."

THE COURT:  Similar question for that.  Would that have any appreciable effect on your thoughts about the evidence in the case as you heard it and deliberated on it?

THE JUROR:  It contributed to it feeling close to home, so to that extent, yes.

THE COURT:  Would it -- I guess that question is how strong an influence might it be on the way you evaluated evidence or thought about the issues in the case.

THE JUROR:  I can be objective.

THE COURT:  Turn to Page 23.  Beginning with Question 88 and some of the following questions, we asked various questions about your views about the death penalty in general

and otherwise, I guess.  And with respect to the question for your general views, you wrote that, "If the law indicates the death penalty applies to a case and the verdict of a fair trial is guilty, then I am in favor of the death penalty."  Is that --

THE JUROR:  Yes.

THE COURT:  -- a summary?  Anything you want to add to that or qualify or amplify?

THE JUROR:  No.

THE COURT:  The next question, we asked you to tell us sort of the strength of your views, and you circled 10 on the 1-to-10 scale, strongly favor.  That seems a little stronger than the careful answer in the previous one.  Maybe you didn't -- maybe you intended it.  Maybe you didn't intend it.  Maybe I'm misreading that.

THE JUROR:  It's 10.  I can be objective, watching for the evidence I'm supposed to watch for for guilty or not guilty.  But if it's a subjective opinion about how the penalty is carried out, then it should be the most of what the law allows, in my opinion.

THE COURT:  So turn to the next page.  We asked which statement came closest to your view, and there was a range, obviously, from opposed unalterably and in favor strongly and would vote for it in every case.  That's G.  You selected E, that you are in favor of it, as you've told us, but could vote

for a sentence of life imprisonment without the possibility of release if you believe that sentence was called for by the facts and the law in the case.  That's an accurate --

THE JUROR:  Yes.  I think that's our responsibility.

THE COURT:  So the question is:  Can you think of the kinds of considerations that might lead you, in a given case -- maybe some general categories of factors that would lead you, on the one hand, perhaps to say this is an appropriate case for the death penalty and I will vote for it, or perhaps, in another case, to say this is not an appropriate case for the death penalty, although I generally favor it; and, therefore, I will vote for life imprisonment.  What are the kinds of things you would think about in making that discrimination?

THE JUROR:  My son is ten and my daughter is six. When what happened involves kids of that age, it's hard for me not to not make strong associations with my own children.

THE COURT:  So would you find it difficult to vote for a penalty that was not the death penalty, that was life imprisonment, in a case that involved the intentional murder of a child?

THE JUROR:  Yes.

THE COURT:  You know that that may be involved in this case, right?

THE JUROR:  Understood.

THE COURT:  So do you think it would be -- this would

not be a case where you would be open to life imprisonment as a penalty?

THE JUROR:  It's more difficult to remain so.

THE COURT:  Is it something you could in good conscience evaluate and think about with an open mind?

THE JUROR:  Yes.

THE COURT:  Or would you be, by your paternal extincts, compelled to go in the other direction, towards the death penalty?

THE JUROR:  Right now, I understand my paternal instincts a lot better than I understand whatever facts may or may not come out of the case.

THE COURT:  So are you suggesting that you could learn something in the course of the case that would override that instinct in this --

THE JUROR:  I suppose anything is possible.

THE COURT:  Just two more of the questions, 95 and 96. 95 asks, if you found the defendant guilty and you decided the death penalty was appropriate, could you conscientiously vote for it?  And your answer was yes.  The next question was sort of the reciprocal of that.  If you found the defendant guilty and you decided that life imprisonment without possibility of release was the appropriate punishment, could you conscientiously vote for that?  And you said yes.  Do you have any -- well, I'll just leave it at that.

THE JUROR:  I don't see these as exclusives to each other.

THE COURT:  Okay.

MR. WEINREB:  I have a few.  Good afternoon.  My name is Bill Weinreb.  I'm one of the prosecutors in the case.  I just want to ask a few questions to make sure I understand your answers.

Putting aside anything you may have heard about this case, just on your view of the death penalty in general, what is your view on whether all murderers deserve the death penalty regardless of the facts of the particular case?

THE JUROR:  I don't have an opinion about that.  I would want to know the case.

MR. WEINREB:  So, again, putting aside the facts of this case, as the judge instructed you earlier, in a capital case, in federal court, if a defendant is found guilty of a capital crime and he's found guilty of an intentional murder, then the jury hears evidence of aggravating factors, factors that the government believes make it an especially bad case or a case worthy of the death penalty, and you may -- you may also hear evidence of mitigating factors, factors that would suggest that the death penalty was not an appropriate punishment because of the circumstances of the offense or because of something having to do with the defendant.  Would you be able to consider both aggravating factors and mitigating factors in

determining an appropriate punishment?

THE JUROR: Yes. I heard that explanation for the first time this morning. I might have previously thought that evidence is all presented for guilty or innocence. I didn't really understand that there might be further evidence after that. Beyond that, it's hard to comment on without remotely knowing what that evidence might be or not.

MR. WEINREB: Okay. So, now, you indicated you've heard some things in the media about this case and about what some of the aggravating factors in this case might be. And based on that, you formed an opinion. At the actual trial, if the jury were to find the defendant in this case guilty, the same thing would happen. If they were to find him guilty of a capital offense involving intentional murder, you would hear evidence of aggravating circumstances and evidence of mitigating circumstances. In this case, would you able to consider both the aggravating circumstances and mitigating circumstances, genuinely consider them, and weigh them in determining what would be the appropriate penalty in this case?

THE JUROR: Yes.

MR. WEINREB: I have nothing further.

MS. CLARKE: Yes. I was going to call you Mr. 76. My name is Judy Clarke. I'm one of the lawyers for Mr. Tsarnaev. I just had a few questions if that's okay.

I get a little sense that you're very uncomfortable

about perhaps serving in this case, is that right?

THE JUROR:  Yes.

MS. CLARKE:  Could you tell us why?

THE JUROR:  Well, I expressed an inquiry that I have -- well, a concern about personal and career schedule issues, but I'm sure that's not your interest.

And I also -- I am concerned about how to go about impartiality given the circumstances of the case.

MS. CLARKE:  Certainly.  And the career and family scheduling coordination, I don't think we've heard much about whether that's a real hardship for you.  Could you tell us?

THE JUROR:  Sure.  At a family level, my -- well, perhaps it's shorter to say that things are manageable if the process did not go to sequester.  If it did, I would have no idea how to manage a few things.

And on a professional level, I have most of the imbedded knowledge personally for a very significant part of a project that means a lot to me that I also would not know how to deal with next steps.

MS. CLARKE:  How would that affect you if you were in this trial for the next three or four months?

THE JUROR:  That's what I'm saying.  I don't know.  For me personally, it would be upsetting.  How things play out, I don't know.  I suppose I would have lots of follow-up questions how things work.

MS. CLARKE:  Would there be a financial hardship to you?  Would you lose income?

THE JUROR:  To some degree, sure.

MS. CLARKE:  Could you tell us about that?

THE JUROR:  I make more than the amount that was noted.  That one isn't as high a priority than the others.  It's not insignificant.

MS. CLARKE:  I don't think anybody in the room is trying to create hardships, extraordinary hardships for folks.  And I think that's what we really want to know about, is how much of a hardship that is for you.

THE JUROR:  I'm much, much, much more concerned about schedule issues than financial.

MS. CLARKE:  Than financial.  Could you tell us a little bit more about the second thing that you mentioned a moment ago, that you're concerned about your ability to be impartial.

THE JUROR:  Yes.  I think I could say that for evaluating facts of the case to judge guilty or innocence, I understand how I could do that just fine and be objective.

If I'm asked to give a subjective opinion about whether one form of a penalty gets performed or not and it's truly my opinion as opposed to being governed by a set of rules that I'm expected to follow, then I have a real hard time with the -- with what I know of this case and how close it hits to

6-162

home.

MS. CLARKE:  In reality, in this case, it would be very difficult for you to consider life as opposed to death?

THE JUROR:  From what I know now.

MS. CLARKE:  From what you know now.  And that's based on what you've read in the paper?  Heard on the news?

THE JUROR:  Probably several sources I followed.

MS. CLARKE:  Could you help us understand what sources?

THE JUROR:  Sure.  At the time of the bombing and the days following, I was as attached to several different media sources as probably lots of people:  television, internet, newspaper.

MS. CLARKE:  And it sounds like, from a couple of the answers, that you've even discussed with your wife that you felt like the death penalty would be appropriate after a fair determination of it.

THE JUROR:  I discussed schedule concerns with my wife.  I thought that was -- to some degree, I think we were asked to go and find out work, home, otherwise, what the implications of possibly being seated would be.

MS. CLARKE:  Nobody is suggesting you did anything wrong there.  I was just looking at Question 75 on Page 19.  "I discussed with" --

THE JUROR:  I don't disagree with what that says.

MS. CLARKE:  So, in part, your opinion is formed and solidified maybe by the discussions with your wife?

THE JUROR:  Sure.

MS. CLARKE:  Do you think you could really ever realistically step back from that opinion?  You know, you know what the case is about.  You know that it involves the death of a child.  You know that it involves multiple deaths.  You know that it involves bombing.  You know -- you've written down your connections and how you were affected by it.

MR. WEINREB:  Your Honor, I object.  He doesn't know what the case is about.  He doesn't know any evidence in the case yet.

THE COURT:  I think in general terms, not in detail.

MR. WEINREB:  -- any evidence of mitigating factors.

THE COURT:  That's certainly true.  The selection -- I think the selection -- the selective selection of considerations is probably not appropriate so it's sustained.

MS. CLARKE:  In Question 77, if I could go to it because I'm really concerned -- I don't think anybody in the room wants you to feel like you have to give a correct response.  You're a dad.  You're concerned about this case involving the death of a child.  You've expressed that.  You've expressed concerns about impartiality.  I'm trying to get at, you know, the depth of the opinion that you hold on the death penalty in this case.  Do you --

MR. WEINREB:  That's not an appropriate question because he doesn't know anything about all the facts --

THE COURT:  The question is really more about predisposition and whatever tendency you might have now, the realistic possibility that you could evaluate the evidence, having heard it all, and have a view that would lead you to vote for life imprisonment rather than the death penalty.

THE JUROR:  Yes.  But I'm not quite sure I understand the difference between which evidence is presented when.  I thought all evidence would be presented at the time of deciding guilty or innocence.

THE COURT:  Not quite.  So in the penalty phase, as you heard, each side has an opportunity to present evidence that might not be particularly germane to the central question in the first phase, which is, is the defendant guilty of this specified crime or not?  Did he do the things that have to be done in order for there to be a crime of this sort?  That's the first question.

The second question is, if that answer is yes and it was -- and the crime was a capital crime, such as intentional murder, then the question is:  Okay.  We have someone convicted of intentional murder.  Now we have to decide what is an appropriate punishment between two available alternatives.  One side will argue that there are things that make this worse than the average case and so that this defendant deserves a

punishment greater than what some other person convicted of murder would otherwise get.

THE JUROR:  That would deliberately not be presented in the first part?

THE COURT:  Correct.  And then after that presentation, there would be a presentation:  But you should think about these things, which mean death penalty isn't appropriate, that the interests of justice are adequately served or properly served by the imposition of a penalty of life imprisonment without release.  Both sides would be making their presentation.  The jury will evaluate all those factors and come to some conclusions.  So that's the second -- that's the penalty phase process.

THE JUROR:  Understood.

THE COURT:  And so what everybody is trying to get a handle on -- and maybe you're trying to get a handle on it yourself in your own mind -- in a penalty phase under those circumstances, not knowing what the evidence is going to be in any detail or even any identification in a sense, is your tendency to be in favor of the death penalty and perhaps even for this case, is that tendency strong enough that it would realistically exclude the possibility of you giving meaningful consideration to an alternative sentence of life in prison?

THE JUROR:  I consider myself capable of looking -- of evaluating evidence and applying the laws that I am educated

about in the courtroom in the way you're supposed to do it. When that becomes a subjective opinion, I think in this case I do have a predisposition.  Of course, the first thing I said is I will be capable of listening to evidence.

THE COURT:  Not just listening to but acting contrary to your predisposition.

THE JUROR:  Oh, sure, if the evidence suggests otherwise.

MR. WEINREB:  All right.  You said -- I'm sorry.  I thought you were done but go on.

MS. CLARKE:  No.  It was my turn but it's okay.

Could I follow up on that just a bit?  And I have one other question I wanted to follow up on.

I don't think we want to leave you with the impression that there's a checklist you can go through in the second phase of this case.  Like in the first phase, the presumption of innocence, proof beyond a reasonable doubt, sort of an evaluation of facts and coming to an objective conclusion.  It is a subjective conclusion for a juror to make in the penalty phase that aren't rules that govern the decision.  There are rules that govern the process of --

MR. WEINREB:  Your Honor, I object to this.

THE COURT:  I'm not sure that's an accurate statement of the law.  I'm not sure it is really in the sense subjective. It's a judgment each juror makes.  There will be objective

criteria. There will be proof of circumstances that could be characterized as aggravating, proof of circumstances that could be --

MS. CLARKE: Sure.

THE COURT: Those are just as objective as other matters of proof in a --

MS. CLARKE: I don't want to mislead.

THE COURT: It's not just a choice by any juror. It's an evaluation of the evidence in a similar way to other fact-finding.

MS. CLARKE: Sure. I don't want to mislead you by any means that way. There's presentation of aggravation, presentation of mitigation. The jurors are supposed to find aggravation if it exists beyond a reasonable doubt; mitigation, there is a preponderance of the evidence. It gets very complicated. There's a weighing. But then it's an individualized determination of whether or not that justifies a sentence of death. Nobody can tell you how to make that individualized determination once the weighing is done.

And in a case that we're talking about, are you going to be able to weigh and make an individual determination of either sentence, or are you going to go to the death penalty?

THE JUROR: I can objectively evaluate evidence presented to me. When it's a subjective opinion, I understand my current tendency more than I understand where I'm going to

be -- if I were to hear lots and lots of evidence, where I would be on the other end of that.

MS. CLARKE:  After hearing all of these questions and us shooting some legal principles at you, are you still concerned about your ability to be impartial?

THE JUROR:  Yes, on things that are subjective in nature.

MS. CLARKE:  Judge, if I could follow up on one last question?  Number 80.

Your friend, her daughter, and the friend's daughter witnessed the explosions.  How did you learn about that?

THE JUROR:  They told us.

MS. CLARKE:  They told you.

THE JUROR:  The parents told you.

MS. CLARKE:  Did you talk about what that meant?

THE JUROR:  With the parents, not with the children.

MS. CLARKE:  What was the discussion?

THE JUROR:  That they were there to see the husband of the friend run the Marathon.  They were near the finish line. They saw and heard the explosions.  They ran to safety.  And I was told that everybody was okay, and they got back together with their dad.  That's about it.

MS. CLARKE:  I imagine -- or maybe you can tell us. Did that discussion make you put yourself in those shoes and worry about your child, yourself or your family?

THE JUROR:  Sure.  I happened to be at baseball practice with my son that day.  Otherwise, we would go watch the Marathon.

MS. CLARKE:  Because your family goes to the Marathon to watch?

THE JUROR:  Sometimes, yes.

MS. CLARKE:  So you worried at that time --

MR. WEINREB:  Objection to the leading.

THE COURT:  Leading, yeah.

MS. CLARKE:  Were you worried, following that discussion, that that could have been you?  I mean, were you trying to put yourself in their shoes and had an emotional reaction?

MR. WEINREB:  Objection.

THE JUROR:  I wasn't with them.  I felt sympathy and concern when I learned that they were there.  I didn't even know they were there.

MS. CLARKE:  Thank you.

THE COURT:  Did you have something else?

MR. WEINREB:  I have literally two questions.

Would you be able to -- assuming this case went to a penalty phase, so the penalty phase begins.  Would you be able to keep an open mind while listening to the aggravating evidence and the mitigating evidence and not make a decision until you've heard all the evidence?

THE JUROR:  I will try because I understand that's the duty of a juror.

MR. WEINREB:  Second question is:  If I were to tell you that the jury won't be sequestered and that you will have Fridays off so that, except on school vacation weeks when you'll have Mondays off, but basically that the jury will only sit four days a week and will not be sequestered, does that have any impact on the hardship that this would be?

THE JUROR:  Half of it.  It relieves some of my concerns about the family side of issues.  On the professional side, I would still be at a loss how to handle that.

MR. WEINREB:  Thank you.

THE COURT:  Can I come back to that last point?  How are you compensated?  Salary, commission?

THE JUROR:  Salary.

THE COURT:  Thank you.  That's it.

THE CLERK:  77.

MR. CHAKRAVARTY:  Your Honor, I think there was an issue with this juror.

THE COURT:  He's not here?  I'm told by the jury clerk this juror didn't show up today.

MS. CLARKE:  That makes that easy.

THE COURT:  I had heard earlier that there was one juror.  I didn't know who it was.  I understand that our staff has made some attempts to contact him.  Last I heard they had

been unsuccessful; but if they do, we'll plug him in some other place as we have with others.

MS. CONRAD:  Should we provide the Court with the information at this point?

THE COURT:  I think I just -- I'll get a copy of that.

Okay.  I think that then brings us to No. 80.  We already did 79.

MR. CHAKRAVARTY:  Your Honor, this juror also has something --

THE COURT:  I guess the way they were summonsed, she's first thing tomorrow.  She's the first one tomorrow.  She's not here either.  So we've run out.

So I think, as we did the other day, we'll take about a half an hour, and you can go over your notes and so on.  Then we'll come back and have a discussion, which will be in sidebar mode.

(Recess taken at 2:50 p.m.)

(After the recess:)

(The Court enters the courtroom at 3:33 p.m.)

(Discussion at sidebar and out of the hearing of the public:)

THE COURT:  Some of these we've implicitly resolved, I think, but we should go through them one by one.

First, 48, who was the add-on.

MS. CLARKE:  Is an agreed strike.

MR. WEINREB:  Yes.

THE COURT:  I agree.  Let me just say "agreed" may not necessarily always do it.  I may have a different view.  But I do agree.

MS. CLARKE:  Oh, okay.

THE COURT:  In other words, these "agreed" are a little bit different from the "agreed" on the paper only because I've seen all these people.  That's just a footnote to the process.  I'm reserving my prerogative.

MS. CLARKE:  In those situations, Judge, you may tell us that we're not quite done if we say, "Your Honor," because there could be more follow-up if the Court --

THE COURT:  It depends on the stage.  Sure.  That's right.

MS. CLARKE:  Fifty-eight is agreed.

THE COURT:  Yes, we suspended that early.

Fifty-nine?

MS. CLARKE:  Agreed.

THE COURT:  I can't remember.  She went pretty far into it, but I agree that she should be excused.

Sixty?

MR. BRUCK:  On 60, your Honor, we don't have a motion now but we wonder -- we'd like to review the transcript and be sure.  There's an issue that we wanted to review.  We were looking at notes, and it was pretty hard to tell if there was a

problem. There may not be a motion, but if we determine after reviewing the transcript tonight that we would like to make one, we would like leave to be able to do that tomorrow morning. It shouldn't take long.

MR. WEINREB: Your Honor, we'd prefer to do them the same day, move the process along.

THE COURT: Can you tell me what the issue relates to?

MR. BRUCK: Well, it has to do with her uncertainty as to her ability to accord the presumption of innocence. But we wanted to -- our notes were a little bit --

THE COURT: No, that got pretty fuzzy on a couple -- it's because laypeople have difficulty with separating what they think is their lay real-world understanding of thoughts about innocence or guilt and the duty that they perform when they are jurors. And I think a couple of them were getting confused on that because of the way the questions were answered.

I don't remember if this was the particular one who was the most confused, but she may have been. I don't think that would be an adequate -- as I recall it, and taking the whole thing into account, including the way she answered the questions. So I -- the transcript is what it is, but it is not the full presentation, which includes what we all observed and how that colors the transcript. So the fact that the transcript may include a formulation of words, that seems to be

one thing that is incomplete, I guess, and it has to be understood in the full context.

MR. BRUCK:  I suppose what I'm asking is just that if we should determine for the record that there should be a motion, could we make the motion in the morning rather than now?

THE COURT:  Well, here's a slight change on that.  I think she's qualified, okay?  If you think you can go to the transcript and develop an argument that would lead me to change that, I would be happy to entertain that.

MR. BRUCK:  Certainly thank you.

THE COURT:  So for now I'd put her in the qualified category.

Juror 61 we sent on his way.

Juror No. 62?

MS. CLARKE:  Is agreed.

THE COURT:  Yup.  I agree with that as well.

Sixty-three was a self-employment issue, if I recall?

MS. CLARKE:  Agreed.

THE COURT:  Sixty-four, the Carney Hospital lab manager.  Any?

MR. BRUCK:  We have no motion.

THE COURT:  All right.  So she's in.

Sixty-five?

MS. CLARKE:  Agreed.

THE COURT:  Here's one where I disagree with you.  If it's hardship -- is that what your -- basis for your agreement was?

MR. CHAKRAVARTY:  Hardship was the basis.

THE COURT:  I disagree.  I think she can bear it.  And I say this principally on her body language, frankly.  She's not like -- there was a woman earlier on who was the only person in the shop.  This one is not the only person.  It sounded like there was coverage for her duties.  It sounded to me like while she hadn't approached the subject explicitly with her employer, and while he had said some things, I was reading that to say she had gotten the go-ahead if she had to.

I could be wrong about that.  If I am wrong, she'll squeal, and we'll maybe re-examine it, but my sense was that it was a bearable burden.

MS. CONRAD:  Well, do you want to address this in terms of connections or do you want me to --

(Discussion off the record.)

MS. CONRAD:  If I may, your Honor, I would also challenge her based on her connections to the events.  Her sister attended the wedding of the brother-in-law's cousin who was a nurse to a victim who was recovering.  And we actually have the article from the *Boston Herald* about that.

THE COURT:  Is he going to be a witness?

MS. CONRAD:  I don't know.

THE COURT:  Well, is he on the witness list?

MS. CONRAD:  I don't know, but...

MR. CHAKRAVARTY:  I don't know the name of the person.

MS. CONRAD:  Well, I'll tell you in a second.  It looks like ███████████ and █████████████.  But I have a basis separate and apart from whether they're witnesses.

MS. PELLEGRINI:  They're not witnesses.  I don't believe either one of them are on the witness list.

THE COURT:  All right.  I left my witness list upstairs.

MS. CONRAD:  May I hand this up?

(Pause.)

THE COURT:  Okay.

MS. CONRAD:  So her sister goes to this wedding, and I guess she had heard about the connection.  And she said she hasn't met the cousin or the cousin's husband, new husband.  But that doesn't mean that, you know, a family gathering -- let's say the sister -- there's a family funeral, there's a -- for the in-laws, there's a wedding for the in-laws, the cousin's going to be there, just like the sister was at the cousin's wedding.  And this is somebody who was grievously injured in the bombing and was treated by -- during the recovery at Spaulding Rehab -- by this sister's cousin.  And it seems to me that that's too close a connection.

In addition, when she was asked about whether she

could presume Mr. Tsarnaev innocent, she said, "I think so." But she said, "I know how I feel. I feel pretty strongly. I don't know if I could change my mind." And it seems to me that that combination of factors requires that she be challenged as someone who cannot be fair and impartial.

She also -- everything was a little -- well, certainly short of certainty. She thought she could abide for the most part -- oh, I'm sorry. That had to do with following directions not to listen to anything.

Right. She also is uncertain about whether she'll get paid. So she's somebody -- it's unfortunate that she didn't speak with her employer before she came back in today, but it seems to me there's a high likelihood that even if she got on, then she would later on find out she can't get paid and she's going to want to get off.

THE COURT: That's possible. My instinct is against that, but it's possible.

Do you want to respond to the other points?

MR. WEINREB: We don't agree with any of the other points. We don't think any of them are a basis for striking her. Our main concern is the same, which is that -- she wrote here, "I'm a single household and don't have a cushion to pay mortgage and other bills," and our concern would simply be if the employer says, you know, "I'll pay you for five days or for ten days and then you're on your own" --

THE COURT: Right.

MR. WEINREB: -- what happens then?

I mean, what if she says, "If I stay on this jury I'm going to be homeless"?

THE COURT: I expect if that is the case, we'll hear from her. In my experience, if somebody has been passed on a denied hardship and it gets worse than they imagined, we usually hear back. And so that would not surprise me. And so we'll have room to substitute somebody. That's my view.

This is -- you know, it's an assessment of a burden which is sometime in the future. So it's not an automatic or easily ascertained quantification of the degree of discomfort and so on and so forth. So I just -- I didn't get the sense as you get from some others -- and some of this is personality, perhaps -- that this was going to be a real problem as opposed to one that might occur.

One might have thought, for example, that between the time she filled out the questionnaire and the time she came back today she would have had that discussion because it would have armed her more solidly than what she had today. So I'm reading between those lines and think that she had maybe gotten the signal that she will get paid.

MR. WEINREB: I'll only add that she wrote at the bottom here, "So I'll need your help with this should I be chosen." Maybe she didn't want to have the conversation until

she had something from the Court in hand.

THE COURT:  Maybe.  And if I'm wrong in my reading of her and she has that conversation that she's not going to get paid, we can revisit it, obviously.  But my sense of today was -- and I guess I say that in light of my overall assessment of her, which I thought she was a very thoughtful and careful question-answerer, and that's -- well, that influences my assessment of some of the other issues too, I guess.

So I don't know if you want to --

MR. WEINREB:  No, I have nothing further.

MR. MELLIN:  Your Honor --

THE COURT:  I think she explained the -- she gave good answers, I thought candid answers, about the cousin marrying the victim.  It doesn't seem like it's something present in her mind necessarily; no real relationship with that person.  It just didn't seem to be a strong influence on her thinking.  So I think she's okay.  I would pass her.

MR. MELLIN:  Your Honor, going forward, when one of these issues comes up and if we have agreed -- I think we had both stopped questioning these jurors -- is there some way that the Court wants us to kind of address that?

THE COURT:  She went pretty much to the end.

MS. CONRAD:  I had more for her, actually.  I think, for example, she said in response to Question 78 as far as whether you expressed your opinion to anyone else, she said, "I

expressed that I couldn't imagine what evidence would come forth that would prove him not guilty. And I hope this case would" -- I think it says "would not get moved elsewhere." But I certainly would have asked her about "I can't imagine what evidence would come forth that would make me prove him not guilty."

Now, your Honor did ask about the presumption of innocence and the burden of proof, but it still seems to me that that question bears exploring.

I also would note -- this is a more general point, but maybe it's appropriate to raise it now -- your Honor is framing the presumption of innocence as at the outset a defendant is presumed innocent when, in fact, the law is that the presumption of innocence remains with the defendant throughout the trial. And so we would object to the framing of "at the outset."

In addition, your Honor's saying, "Can you suspend your mind?" Well, it's more than suspending your mind to presume someone to be innocent. And I certainly would have explored that more with her had I not believed that she was going to be excused by agreement.

I think -- you know, the fact that she hasn't met this cousin doesn't mean she's not going to meet this cousin in the future. And to have a social or family interaction with someone who was grievously injured and whose cousin helped

bring them to at least some improved health and have to face them as a juror who potentially voted to acquit the defendant or rejected the death penalty it seems to me is going to be far more than just an awkward social situation when and if it comes up, and presumably it will come up.

When her sister's husband has a death in the family or has a wedding in the family, the cousin's going to be there, just like her sister was at that wedding. Who knows. It could even happen during this trial.

THE COURT: You were reading from an answer?

MS. CONRAD: Yes.

THE COURT: Can you tell me where it is?

MS. CONRAD: Page 20. I hope I have the right person. Yeah. Page 20, Question 78.

THE COURT: I don't think you have --

MS. CONRAD: I'm sorry. Am I looking at the wrong person?

THE COURT: I think you are.

MS. CONRAD: Oh, I'm sorry. I'll go back. No, I don't think I am.

THE COURT: Oh, wait a minute.

MS. CONRAD: Juror 65.

THE COURT: Oh, yes. I see it. Okay.

MS. CONRAD: Page 20, Question 78.

THE COURT: Oh, yes.

(Pause.)

THE COURT:  I see it.  Okay.

MS. CONRAD:  She also talks in Question 75 about the anxiety she experienced when she got the summons.  She said that when she realized it was for this case, she was devastated.  That was her word, "devastated."  Now, I don't know if "devastated" refers to the hardship or if that referred to the emotion relating to her own experience or her in-laws' experience.

THE COURT:  Okay.  All right.  We'll --

MS. CONRAD:  The other thing I would have asked her about is Number 93.  She said -- I certainly would have asked her about that.  I had it on my list of questions.  She says as far as life imprisonment, comparing it to the death penalty, "as long as he doesn't get solitary.  Put him in with the general population which, in my view, is less humane than death."

Now, numerous people have commented online, news reports, "Oh, why don't they just put him in general population and that will take care of him."  And it has that flavor of sort of street justice.  And I certainly would have asked about that had I not thought that there was no need for further questioning.

And if there is -- if she's not going to be excused, I would suggest that maybe she be brought back, we ask

about -- or maybe ask her to ask about the payment issue, and I be given an opportunity to follow up on these points that I didn't follow up on.

(Pause.)

THE COURT:  Well, I think perhaps I will yield on this in light of the termination of the examination early.  I guess I was reading it as we'd had a long examination and we were finished; I didn't realize we were cutting it short.  It wasn't really very short in toto.  But if there were things that would have been asked otherwise, I think that I will, as I say, yield to the view even -- anyway, I'll just leave it at that.  So we'll excuse her.

MS. CONRAD:  Thank you.

THE COURT:  But we'll have to work out a system for -- it's a little bit -- where it may be arguable but not unambiguous that -- for example, hardship is perhaps the -- a likely place where that might be true.

MS. CONRAD:  Well, would it make sense to address it at the time, maybe send the juror out momentarily, have that discussion on the record?  If the Court --

THE COURT:  Yeah, I guess the problem here was I didn't -- I thought people were just done questioning; I didn't think it was being suspended.  I thought people were just saying "we're through."  And maybe you were through, but it was for a reason that I misapprehended.

MS. CLARKE:  So perhaps we should say, your Honor, It appears the parties are satisfied or agreed, or the day is purple?

(Laughter.)

THE COURT:  Yeah, right.

MR. BRUCK:  Maybe it makes most sense if we can send the juror out but not discharge them, resolve what's going to happen, and then give the juror further instructions through the --

MR. WEINREB:  But if we have a lengthy discussion about it, then we're going to have to send the reporters out every time and turn off the sound every time.

THE COURT:  Yeah, so there are people that it's apparent immediately because we get to this hardship question early, if it's hardship that the issue is.  And so if it's suspended then, there are clearly other questions that would be asked about other issues, so it's obvious that that's it.  If at that point I was at odds with the parties' view of the hardship, I guess we could deal with that because it would be obvious.

The question is more when it goes deeper into the examination and a number of different issues are rather extendedly inquired about and then the parties say "that's enough," that's a pretty ambiguous signal.

MS. CLARKE:  Maybe the parties should say, "Should the

parties continue?"  We communicate across the table --

THE COURT:  Well, anyway, you could figure out a way to signal that you would have other questions, but...

MS. CLARKE:  The pearl is in the oyster.

MR. BRUCK:  Two if by land.

MR. WEINREB:  We're really going to date ourselves.

MS. CLARKE:  We are.

(Laughter.)

THE COURT:  66 I think you agreed.  We didn't even -- was that an issue about his language skills?

MS. CONRAD:  Yes.

MS. CLARKE:  Yes.

MR. WEINREB:  Yeah.

THE COURT:  Yeah.

MS. CLARKE:  67 was agreed.

THE COURT:  Yeah.  And let me just say on that, I actually had some concern on behalf of the institution that she works for, whether they needed a licensed administrator on premises for a certain amount of time and so on.  So it wasn't just her own problem; it struck me it might be a problem for the institution.  That was a guess.

69?

MR. BRUCK:  Yes, your Honor.  69 we do have a motion. And here, this is a somewhat unusual juror in that our concern comes from what was not said.  This is the case of the dog that

didn't bark.

This juror occupies a very highly placed position at Mass. General.  We recognize it's not physically in the hospital building, but she -- her questionnaire seems to have been studiously avoiding acknowledging things which any well-educated, aware person in Boston would likely have known in her position.  The fact that the President of the United States visited Mass. General, her hospital, three days after the bombing and toured the facility was something that she did not know, hadn't heard or didn't remember, strains credulity.

The President's host during at least part of this tour was a witness in this case, Dr. David King, who's the subject of a motion in limine from the defense to exclude his testimony.  There is a lot of Mass. General in this case, and this is a lot of risk.

Now, on top of that, this is a person whose work -- when she goes back to work on Friday has access to patient records.  She won't go looking for them -- or at least we haven't established that she will -- but they could pop up without any warning at any time.

She is just very deep into an institution which is very deep into this case in a legal sense, in a factual sense, and also in an emotional sense.  This is some very, very compelling, emotionally gripping testimony having to do with Mass. General.  And it just seems that her imperviousness to

this is suspicious.  Everything about her responses shout that she wants to be on this jury.  She wants to be on this jury badly.  She is auditioning for this jury.

It's a discretionary call, I realize.  We're asking the Court to draw comments and conclusion from things that were not said, but I think the conclusions are very clear, and that this lady -- given the challenges that we're facing in trying to find a jury in Boston, this is the kind of eyes in the back of your head that I think the Court has to have.  There are many more jurors in the pool, and I think we should go past this one.

MR. WEINREB:  Your Honor, we object to the motion.  I respectfully disagree with Mr. Bruck's assessment of this juror.  I saw nothing in her demeanor that suggested she was prevaricating or was being -- willfully denying things that were -- that were true.  And I -- so I don't think there was anything about her demeanor or about the nature of her answers, the way she looked or sounded, that suggested that she was lying.  And I also don't think there's anything suspicious about her answers.

Mass. General is part of Partners Healthcare.  It's the single largest private employer in the state.  It's a huge, huge corporation.  She does not work at Mass. General; she works for the MGPO, Mass. General Physicians Organization.  It's essentially a billing business.  Coding and billing.  She

works -- she doesn't work at the hospital; she doesn't work with the doctors.  She's a very high-level director with many, many levels of management beneath her.  To the point where she seemed to say with even a little bit of embarrassment that she didn't think she'd recognize any of the doctors' names, that's how distant she is from the institution.

I don't think it's a stretch to believe that a person who, again, keeps her nose to the grindstone and is working at this kind of job is not someone who would not necessarily know that the President visited Mass. General.  She wasn't there.  She doesn't seem to -- doesn't seem like she spends any time there.  She certainly doesn't work there.  I think it's just too speculative a ground on which to strike her.

THE COURT:  I don't think the connection with Mass. General is something we have to worry about with her.  I would reject the motion.  She is essentially a business person rather than a healthcare person, it seems.  She's on a different campus, focused on her own bureaucracy.  I don't see any reason in that to be concerned by itself, but also to doubt any of her other answers which seemed to be very thoughtful and careful and serious.  So I don't see any reason to excuse her.  I think she qualifies.

By the way, I didn't remember the President visited Mass. General, but that's because I'm getting old.

MS. CLARKE:  We agree to strike.

(Laughter.)

THE COURT:  Number 70.  This is the stay-at-home mother, but she also had -- is there a motion?

MR. WEINREB:  There is from the government.

Your Honor, this juror is prevented -- or at the very least substantially impaired from considering the death penalty.  She said she believed there was literally no case in which death penalty is an appropriate penalty no matter how bad the crime is.  It is her lifelong belief, and asking her to impose the death penalty would be asking her to go against one of her core beliefs that she said she could not set aside.

MR. BRUCK:  No argument.

THE COURT:  All right.  We'll excuse her.

71.  We may have terminated him early because of hardship, I think.

MR. WEINREB:  Yes.

THE COURT:  Yeah.  So he's excused.

Number 73 is the -- we learned today is a full-time student.

MS. CLARKE:  Same thing.

MR. WEINREB:  Yes.

THE COURT:  74.

MR. BRUCK:  Your Honor, we move to excuse Juror 74 based on the totality of the personal involvement that she has in this case.  We recognize that she is a very appealing young

woman who was trying very hard to think about being impartial, but there's just too much here.

She was in -- she was living in Watertown at the time, or on the very border, considered herself living in a Watertown community. She would have sheltered in place had she not been out of town. Her boyfriend and his roommates sheltered in place. She is a graduate of UMass Dartmouth. There's going to be a great deal of testimony about her alma mater and about how this greatly impacted and afflicted the university she went to.

In that connection, one of the witnesses on the government's witness list -- on the witness list -- is Professor Williams, who was her history professor, she said. She did not identify him on her juror questionnaire as a witness and -- although his name appeared. It could very well be that she'll find herself having another history lesson from her professor in this case if the government calls him and has him testify. There is going to be -- there well could be expert-type testimony about the sorts of areas that he taught. She was a history major.

I have to say this could well be the first case in which -- in the history of American jurisprudence in which the jury bought the T-shirt before they sat in the jury box, and this is one of those jurors. She was given a Boston Strong T-shirt. She wears it every other week. She ran in the Watertown Strong 5K race. She talked very articulately about

the meaning of Boston Strong and what it signifies.

And then there are her brothers.  And that was the point I think when she really -- her conviction that she could be impartial flagged for a moment.  She had to consider the question -- or she did -- was asked the question about "If there was evidence that this crime was committed because of the American war effort in Iraq and Afghanistan, would that affect your impartiality?"  And she really wavered on that.  In the end she said she thought she could put that and everything else aside, but it's too much to ask.

You know, to compare this juror to a normal trial where none of these issues come up for any of the jury -- members of the jury panel, again, it's -- you know, imagine 12 jurors that had her confluence of experience with witnesses, with ties, with connections, and no one would think we had a fair jury.  Well, what's true for 12 is true for one, and with all due respect to this young woman, who's very admirable and very likable and doing her best, but there's just too much here.

I think in the Court's discretion and to guarantee the right to a fair trial, she should be excused.

MR. WEINREB:  Your Honor, the government objects.  I disagree that this is a case where the whole is more than the sum of the parts.  And many of the parts are insubstantial, starting with the least of them, the T-shirt.  She explained it

was a gift from a supervisor who bought five people T-shirts. She said she wears it once every two weeks as a workout shirt. It does not seem to occupy a place of honor or any special place in her wardrobe.

She described the Watertown Strong race as being silly, obviously not something that she finds very moving or important to her. She -- my recollection is that she struggled to describe what Boston Strong meant and gave an answer that anybody who had heard the phrase and lived anywhere in the country, you know, could have given, nothing signaling any particular connection to this case or any particular care or thought to the idea of it any more than any intelligent person would give.

Again, with respect to living on the border of Watertown, she seemed very confident that that would have no impact at all on her ability to be fair and impartial. She graduated from UMass Dartmouth ten years ago, and so it's not like her connection there was that recent. And she, again, also without hesitation, said that it would not affect her ability to be fair and impartial.

Although it's true that Professor Williams is on the witness list, if she is a juror he will not be a witness, and, in fact, right now we don't intend to call him as a witness at all. But we can stipulate that if she's on the jury, he won't be a witness. So that is a nonissue there. There are 700-plus

people on the government's witness list.  Only a fraction of those are actually going to be called to trial.

As to why she didn't recognize his name, it is a pretty common name; it's not an employee who's identified as a professor.  And furthermore, his name is on the list as Brian Glynn Williams, which might have made it even less recognizable.  Indeed, if she's like me, she might not have known any of her professor's first names while she was in college, or not all of them.  And Williams is certainly as common as can be.

And then when it came to her brothers serving in the military, I would argue that the thoughtfulness with which she addressed that is actually a mark in her favor rather than one against her.  It's -- she obviously was not somebody who simply wants to be on the jury and was going to say whatever the obvious answer was to get her on.  She gave it very thoughtful consideration.  She didn't hesitate to say that that was -- of all these somewhat trivial concerns that have been voiced here, that that one was a non-trivial one and was one that would -- gave her some pause.

Again, after pausing she thought about it and she was confident that it would not affect her.  And, in fact, when Mr. Bruck was questioning her, in the very last question or -- I don't remember if it was Mr. Bruck or Ms. Clarke, but she was asked, "Do you believe despite all of these things that

we've talked about you could be fair and impartial?"  She said very firmly, "I'm confident that I can."  And I think the Court saw the way in which she said that and saw her demeanor throughout her questioning, and it was one that inspired confidence as well.

MR. BRUCK:  If I might very briefly, I mean, it raises these odd questions, the government now offers to trim their witness list around a juror.  It's conceivable that Professor Williams would be a witness for us, although we don't -- I mean, it's not beyond the realm of possibility.

It raises these strange questions:  Does she keep wearing her Boston Strong T-shirt while she's on the jury?  The brother -- she said one thing that was quite emotionally powerful.  It was understated.  She said he doesn't like to talk about it.  And that speaks volumes.  I mean, I know she was thoughtful but this is -- she was hit with this for the first time.  What is behind that silence of her brother's and what does she think is there and what judgments does she make about what he experienced and what the cost was to him?  And then to find out what was written on the boat, if she hadn't already read about it, there are just too many questions.

THE COURT:  You know, this is a kind of holistic assessment of people, and I think she's okay on balance.  She struck me as very serious, thoughtful, relatively articulate, and I thought -- this is -- this was sort of influential to

me -- consistent.  This process can produce multiple questions about the same issues, perhaps from different perspectives, and she would pause before answering and then give an answer that seemed to be the product of thought rather than rehearsal and was generally consistent among the questioners, so I took that as a sign of genuineness.  So I think her seriousness and thoughtfulness will make her a good juror.

75?

MS. CONRAD:  Yes, your Honor.  We would challenge him based on hardship.  He has said that he works on 100 percent commission.  He said he could lose lots of clients if he was on this jury.  He said that if he were on this jury for three to four months, his business could fall apart and that that could be distracting.  And throughout his answers when asked about impartiality, he interspersed the phrase "aside from my business."  And it seemed to me that was an ever-present concern on his mind.

He started out -- actually, when your Honor asked about whether he had followed recent events in Europe he said, well, he's been very, very busy at work.  And although he said he could do some of his work at night and on weekends, obviously he couldn't do that work to the same extent that he appears to be doing it now.

And I would submit that his concern about loss of income and also the overall lasting effect on his business in

terms of loss of clients is one that would interfere with his ability to serve in this case.

MR. WEINREB:  Your Honor, this juror perhaps more than any of the ones I think we've seen so far seemed perfectly able and willing to speak his mind, to express his opinion despite a lot of back-and-forth questioning by the attorneys and a lot of complex formulations of questions.  Every single one he gave it a great deal of thought and told us without unnecessary words exactly how he felt.

He was asked whether he had a hardship.  On Question 10 he wrote "no hardship."  He was given every opportunity to say:  This would be too big a financial burden for me.  This would be a financial burden that would be one that would leave me unable to pay the bills, unable to pay the mortgage, all the things that we have heard other jurors say, but he didn't go there.  And I think we can take him at his word.

He had two concerns that prompted some of his answers about anxiety about serving on the jury.  One had to do with scheduling, which he said was the primary concern; the second one had to do with the loss of income.  And he said knowing that he would not be sequestered and --

THE COURT:  No, that was the architect.

MR. WEINREB:  Oh, I'm sorry.

(Pause.)

MR. WEINREB:  Saving all of that for the next guy --

(Laughter.)

MR. WEINREB:  -- who we're going to say the same motion on the same ground, I'll say that this guy, he was not somebody who we heard so much from, and yet he did not say that it would be too much of a hardship, and, in fact, wrote "no hardship."  And based on that it seems speculative to say we need to strike him on that ground.

THE COURT:  Yeah.

MS. CONRAD:  Your Honor, if I may, though, the question doesn't say, "Do you have a hardship"; the question on the questionnaire says, "Does it impose a special hardship on you such that it would be difficult or impossible for you to serve?"  And I think in line with a lot of these jurors with respect particularly to the hardship question, they fill out the questionnaire and then they have ten days-two weeks to think about it.  And he did not say it would not be a hardship; he said that it could cause his business to fall apart.  And it strikes me that between now and when he gets seated, if he gets seated, he may come to the conclusion that he just can't do it because it's going to be such an impact on his income and on his business.

THE COURT:  I thought there was a disconnect between his saying that he thought it might cause his business to fall apart and his demeanor, which showed no concern about that occurrence.  I mean, he was a little bit remarkable in saying:

I'll lose clients and I'll lose income and, oh, well.  These things happen.

MS. CONRAD:  I think that's a cause for concern.

THE COURT:  I think it indicated that he didn't feel it as a hardship as he said in his written questionnaire.  But, of course, that's a summary, and then we get to hear more about it.  If it's a burden to him, it seemed a burden he was willing to accept.

MS. CONRAD:  But that raises questions.  I mean, he also -- and I realize Mr. Weinreb was talking about somebody else, but he consistently, when asked questions about, you know, "Have you formed an opinion about the defendant's guilt," he went to, "I could keep an open mind."  That's not the question.  The question is:  Have you -- do you have an opinion about the defendant's guilt?  And it strikes me that he's somebody who maybe has an agenda.

THE COURT:  Yeah.  I didn't get that -- I was alert to that because of what I referred to as the sort of disconnect, but I don't think so on my assessment.  He seemed straightforward to me, and I think we can take his answers at face value.

Now we have 76.

MR. BRUCK:  Yes.  Juror 76 -- and I'd like to say at the outset this was a very long examination.  It was complicated.  Depending on the Court's inclination at the end

of hearing us out, I think this may be a case where it might be best to defer a final ruling until we can review the transcript.  But I don't think that should be necessary because I think it is reasonably clear that this juror should be disqualified.

Let's look at what happened to him.  He first said that he -- not first, but he said he believed the defendant to be guilty and he believed the death penalty should be imposed.  He said that he had told his wife that he thought the death penalty should be imposed.  Later, on voir dire, he did not recall that.  When it was pointed out to him, he acknowledged that that was so.

I don't mean to suggest this is not a candid juror.  On the contrary.  I think the problem with this juror was that he came to court thinking that all of the decisions that a juror has to make are simple, factual ones.  And he said this several times over, that as to the factual issues, he could put what he had experienced and learned and knew out of his mind even though had had paid a great deal of attention to the media in this case, but as to -- what was the term he used -- "subjective," by which I think he used that as a synonym for "discretionary," the jury's discretion, he didn't realize that juries exercise discretion until you explained it to him and until the parties explained it to him, and then it became clear that there were two types of decisions that he had to make, and

he could be unbiased as to the facts but he could not be unbiased as to subjective decisions, discretionary decisions, what the Supreme Court has called a reasoned moral response to the evidence that is required of every juror in a capital case.

And then let's consider where these problems came from. He has a daughter -- I think a son who was ten and a daughter who was six. His friend took her children and her children's friends, including an eight-year-old child, to the marathon, and were so close -- I mean, they were there when the bombs went off. He heard about it from them.

He thought not only in a general way that this could have been his family, his children, but quite specifically said, "If we hadn't gone to a baseball practice that day" -- and he's not just thinking that he could have been -- that he could have been in his friend's situation; he's thinking he could have been in the Richards' family situation. That is clearly what was weighing on him. You were a little bit closer to him than me, but it looked to me like he was on the verge of tears, and this is a very controlled man.

His answers were remarkably clipped: "Yup." "Yes." He was cutting the words off in a way that suggested a real struggle to maintain control of his emotions. And who can blame him given these facts?

He also sheltered in place. He described the -- his direct personal involvement, the impact of the events of April

19th on him and his family.

Again, you know, the premise of being able to try this case in Boston was that there are 5 million people here. Well, there aren't 5 million people who have a story like that to tell.

There's no disrespect to this man. On the contrary. He is an admirable guy trying to be a citizen in the most admirable way, but that duty involves telling the truth and sorting out your feelings. And he finally did that.

Now, he gave answers which you can take out of context and say, Well, he did say he could do this and he did say he could do that, but we know what is really going on. And when he was speaking in his own words, he kept coming back to, "As to the facts, I can put this out of my mind. I can be objective. I can presume him innocent" or whatever, but as to the subjective issues, the fact that an eight-year-old boy -- his own son was eight years old two years ago, this is -- he said at one point in his own words, "I am concerned about my own impartiality." That's -- you know, the fact that he could be led to say, Well, but I can still do my duty, that doesn't help.

This juror really is not -- this is not the -- he would be a great juror in another case, but this is not the case for him.

MR. WEINREB: So first of all, I'll incorporate by

reference everything I said before --

THE COURT:  Revise and extend.

(Laughter.)

MR. WEINREB:  -- and add the following:  I understand -- well, I think Mr. Bruck has it wrong when he characterizes what the juror meant by "subjective."  I think what he is characterizing is what Ms. Clarke meant by subjective, moral versus factual, but that is not the way in which that potential juror was using the words.  I think it is quite clear he was using "subjective" to mean personal opinion based on what he has heard in the media, what his general beliefs are, personal comparisons between his own situation and what he has read about this case, and that he was using "objective" to mean a decision based on the facts and the law, a decision that would be based on the evidence put before him and the instructions the Court gave.

And so he kept saying that, you know, "I would decide the case objectively; I would not decide it subjectively."  And I don't believe what he meant by that is that he would not make a reasoned moral judgment or anything like that because that is a concept that most jurors would have absolutely no understanding of without -- until it is explained to them, that.

So I think that on the contrary this seemed to be a juror who understood extremely well the difference between a

6-203

decision based on the law and the facts, which is what the law requires, and decisions based on other things which he understands he would have to set aside.

And he seems to have given it -- he seems to be a very thoughtful guy. Every time he was asked whether he could do it, he gave it thought and knew. And every time he came out saying that he would be able to decide the case objectively, meaning on the law and the facts, and not based on subjective beliefs.

I think the fact of his clipped speech was not at all a sign that he was so emotional that he couldn't respond. He seems to be somebody who does not waste words. He thinks, he answers the question and he moves on.

I think it's inaccurate to say that he sheltered in place. I think what he said, unless I'm confusing him again, is that -- yes, that he went to his work on Congress Street, which is where people were told to shelter in place, and when he learned that everybody had to shelter in place there, he said, "I may as well just go home," and he drove home, seeming not to take the matter as seriously as one might imagine.

The fact that he has a son who is ten and a daughter who is six cannot disqualify him from being on the jury, that alone. I think nobody who has a child, or has ever had a child that age, will hear evidence that an eight-year-old was killed and that other children were injured and not draw those

comparisons.  No human being can be expected not to do that, and that wouldn't be an appropriate basis for striking somebody.

Jurors bring their common sense and their life experiences to the jury box, and that's something that we want. But what they have to set aside, is they have to be able to decide the case not based on emotion but on reason, and that was something he said repeatedly that he could do.

The fact that somebody might need to struggle to do that is not a strike against him, nor should it be a strike against him that he said "I'm concerned about my own impartiality."  That's a thoughtful juror.  That's somebody who has given some thought to the ways in which his own situation might affect him and has plumbed his own depths and asked himself:  Can I put aside my subjective feelings and decide the case objectively?  And that was the thing that he was quite confident and quite firm that he could do.

And on those grounds, he deserves an opportunity to sit on the jury.

MR. BRUCK:  If I can briefly respond --

THE COURT:  Not necessary.  I agree with the objection.  He's obviously an intelligent man and has thought about these things, but my impression is that he was struggling to keep control of his emotions, which is understandable, I agree with that, and at some level is tolerable.  It seemed to

be a -- almost a dual personality type of thing.

I think Mr. Bruck had it right when he pointed out that he was surprised by the two-phase format and what he would be asked to do in that second phase.  He hadn't really thought about that.  And I think it was hitting him that he might not be able to be as controlled under those circumstances as he would be in the first part.

So I think he should be struck for cause.





MS. CLARKE: And then 79, your Honor, I think we agreed.

THE COURT: I think we cut that short on his examination, that his income would be affected. I agree.

Okay. Now, so I guess -- I had thought Number 80 was here too, but I guess what happened was our jury administrator took literally the idea of 20 jurors, and so when we added someone at the beginning, we dropped someone off at the end. Let me admonish that that needn't be the case in the future. We can do 21 or 22 or 18. I just don't want to be reshuffling the deck every day.

MS. CLARKE: So we'll go from 60 to --

THE COURT: So can we catch up to where we would be,

whatever that is?

MS. CLARKE:  Is that 81?

THE COURT:  I don't have a list.  But whoever is in the next --

THE CLERK:  80 is next.

THE COURT:  80 is next but --

MS. CLARKE:  In order --

THE COURT:  Wait a minute.  Let me just -- before 80 got moved from this panel to the next, the next panel began with either 81 or some nearby number and ran to something else.

MR. McALEAR:  Yes.

THE COURT:  We'll use that same end number, whatever it is.  80 gets added to tomorrow.  If that makes it 21, that's fine.  But we'll catch up -- we won't be one juror off the rest of the sequence.

MR. BRUCK:  I think that's to 110, isn't it?

THE COURT:  Whatever it is.  Wherever the 20 is going to be when you assemble the packets.

MR. McALEAR:  And 45 will also be -- she's coming in too.

THE COURT:  Oh, that's right.  So it may even be 22 tomorrow.  I don't know.  45 was from last week.

Okay?  Very good.  That's it.

(The proceedings adjourned and the Court exited the courtroom at 4:32 p.m.)

C E R T I F I C A T E

We, Marcia G. Patrisso, RMR, CRR, and Cheryl

Dahlstrom, RMR, CRR, Official Reporters of the United States

District Court, do hereby certify that the foregoing transcript

constitutes, to the best of our skill and ability, a true and

accurate transcription of our stenotype notes taken in the

matter of Criminal Action No. 13-10200-GAO, United States of

America v. Dzhokhar A. Tsarnaev.


/s/ Marcia G. Patrisso
MARCIA G. PATRISSO, RMR, CRR
Official Court Reporter

/s/ Cheryl Dahlstrom
CHERYL DAHLSTROM, RMR, CRR


Date:  1/20/15