UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

Plaintiff,

v.

DZHOKHAR A. TSARNAEV, also known as Jahar Tsarni,

Defendant.

Criminal Action No. 13-10200-GAO

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

**JURY TRIAL - DAY SEVEN**

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts 02210
Wednesday, January 21, 2015
9:22 a.m.

Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts 02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

APPEARANCES:

OFFICE OF THE UNITED STATES ATTORNEY
By: William D. Weinreb, Aloke Chakravarty and
Nadine Pellegrini, Assistant U.S. Attorneys
John Joseph Moakley Federal Courthouse
Suite 9200
Boston, Massachusetts 02210
- and -
UNITED STATES DEPARTMENT OF JUSTICE
By: Steven D. Mellin, Assistant U.S. Attorney
Capital Case Section
1331 F Street, N.W.
Washington, D.C. 20530
On Behalf of the Government

FEDERAL PUBLIC DEFENDER OFFICE
By: Miriam Conrad, Federal Public Defender
51 Sleeper Street
Fifth Floor
Boston, Massachusetts 02210
- and -
CLARKE & RICE, APC
By: Judy Clarke, Esq.
1010 Second Avenue
Suite 1800
San Diego, California 92101
- and -
LAW OFFICE OF DAVID I. BRUCK
By: David I. Bruck, Esq.
220 Sydney Lewis Hall
Lexington, Virginia 24450
On Behalf of the Defendant

P R O C E E D I N G S

(The Court enters the courtroom at 9:22 a.m.)

(Discussion at sidebar and out of the hearing of the public:)

MR. WEINREB: Good morning.

THE COURT: Good morning.

COUNSEL IN UNISON: Good morning.

THE COURT: I just had a couple of things before we begin. I was told that counsel had perhaps agreed on one particular juror. When I went through this lot, I thought there were at least half a dozen people who could be excused on the basis of the questionnaire alone that were still in. This is a concern that I have, that we have some people who are pretty clearly -- for hardship reasons, self-employment, things like that, are pretty much in the zone of what we've been doing and I think will continue to do. There are two or three people here who have trips planned in February, there are a couple of people who are clearly wage-earners and so on.

So if you're talking about excusing one, I would like to expand the pool a little bit and maybe we can be more efficient. So if you want, I can tell you the ones that I think without further inquiry we could deal with beginning, actually, with the one who's been put over to today, Number 45, who says she's self-employed.

MS. CONRAD: We'd agreed on that.

THE COURT: The next one would be --

MS. CLARKE: If the Court could give us the list, we were working on a list already.

THE COURT: Yeah, that's what I'm going to do. But I was double-checking myself as I was doing it. Actually, I can do it from my notes.

Number 86: This is not so clear on the reasons -- so are clear by hardship and trips and things, and wage-earners. This guy just has a lot of noise of various kinds: His wife is pregnant; he's an MIT grad with two degrees from MIT; he was in the area and so on and so forth. It just seems he's not somebody for this jury. If you want to see him, we could see him, but I think his questionnaire --

MS. CLARKE: If the Court could give us the list because, seriously, we were working on it.

THE COURT: Okay. 88, 94. This is for travel plans. 95 didn't complete the questionnaire. I don't know that I want somebody completing a questionnaire orally in front of us, so that would be disqualifying. A substantial failure. I mean, a question or two is one thing, but she quit halfway through, it looks like.

99: a trip; 103: trip; 107: wage-earner.

THE CLERK: 107 was already excused. I have him down. Is that one of your joint ones?

MS. CLARKE: He was already excused.

THE CLERK: That was one of the joint ones.

THE COURT: That's news to me.

MS. CLARKE: Yes. We meant to if we didn't.

THE COURT: For that reason, I presume, because he's a wage-earner?

MS. CLARKE: I can't remember.

THE COURT: He's a factory worker or something, I think. So that was my list.

MS. CLARKE: Could the Court give us five minutes?

THE COURT: Fine. Let me just raise one other matter. Maybe I should raise this in public. If you think I should, I'll do it again.

The *Globe* has filed a motion concerning our procedures. I don't know whether the parties intend to weigh in on that or not. It's kind of an odd procedural issue. I guess the parties would have some right to be heard on it. I don't know. The Court has some right to be heard on it. I don't know whether -- maybe some of the U.S. attorneys are familiar with this. Sometimes a civil U.S. attorney represents the Court in matters like this. I don't know.

I'm a little uncomfortable being an advocate of our procedures and the decider of the motion. So I raise the question for you to think about. I'm not sure exactly how to proceed with respect to that motion.

MR. WEINREB: Yeah, I think for the government, we're

discussing it internally and we can report back to the Court.

THE COURT: Fine.

MS. CLARKE: Your Honor, there's one other matter still lingering, and that is the defendant's request for jury data.

THE COURT: We met yesterday afternoon, and Jim is going to start working on it. So as I understand it, there are -- I might have it here. But there are three --

MS. CLARKE: We have the data for the --

THE COURT: You wanted an update -- the previous data you got was through 2013.

MS. CLARKE: It was for the pool that indicted. This is for --

THE COURT: Whatever. Fine.

MS. CLARKE: Yes.

THE COURT: This would be basically updating through 2014, I believe.

MS. CLARKE: Yes.

THE COURT: And then you had some request for further information about disqualifications and undeliverables.

MS. CLARKE: I think that's included in the data we got.

THE COURT: It may be. I don't know. Anyway, Jim is -- because it was under seal he hadn't seen it until yesterday, so he's going to begin himself working on it. It

took some time last time and it will take some time because of the mining that has to be done to get it, but he's going to start promptly to do that.

MS. CLARKE: Thank you, your Honor.

THE COURT: Okay? All right. So if there's no issue, then we can just send those folks on their way and then we'll come out with the remainder and begin with the general instructions.

MS. CLARKE: Yes. Thank you.

THE COURT: Okay.

(There is a recess in the proceedings at 9:29 a.m.)

(In open court:)

THE CLERK: All rise for the Honorable Court.

(The Court enters the courtroom at 10:24 a.m.)

THE CLERK: Be seated.

THE COURT: All right. For the benefit of observers, press and the public, let me just tell you what has taken the time this morning. Both the parties and I have, in order to expedite the voir dire process, taken a second to look at the questionnaires and tried to determine where voir dire is really necessary and where it may not be necessary, and we've reduced the number of voir dire jurors as a result of our review of the questionnaires themselves. This is something that perhaps we can do to, as I say, expedite things. I just wanted to explain that to people who may be wondering why we're slow getting

started this morning.

We're going to call the remaining people who will be questioned into the box now and I'll give them the preliminary instructions, so...

(Pause.)

THE CLERK: All rise for the jury.

(The venire enters the courtroom.)

THE COURT: All right. You may all be seated.

Good morning, ladies and gentlemen.

THE VENIRE: Good morning.

THE COURT: Thank you for your patience. We want to welcome you back to the United States District Court for the District of Massachusetts and thank you for being here.

We're continuing the process of selecting a jury for the case of the United States versus Dzhokhar Tsarnaev. As you know, Mr. Tsarnaev is charged in connection with the bombing that occurred near the finish line of the Boston Marathon in April 2013 that resulted in the deaths of three people. He's also charged in the death of an MIT police officer and other crimes that occurred on April 18 and 19, 2013.

Some, but not all, of the crimes charged in the indictment are, by statute, potentially punishable by death. You will recall from my prior instructions when you filled out your questionnaires that the jury will first consider and decide whether the government has proved that Mr. Tsarnaev is

guilty of any of the charges -- any or all of the charges against him. If he is convicted of any of the capital crimes -- that is, crimes for which the death penalty is a potential punishment -- then the jury will consider and decide whether he will be sentenced to death for any such crime or to life in prison without the possibility of release.

Some of you may have wondered why the death penalty could be a possibility in this case in view of the fact that the laws of Massachusetts do not provide the death penalty as a punishment for murder or any other violation of Massachusetts law. The reason is that this is a federal case involving the alleged violations of the laws of the United States rather than a state case involving the violations of the laws of Massachusetts.

If the jury convicts the defendant of any of the capital crimes charged in the indictment, the same jury will then hear additional evidence and decide whether to sentence him to death or to life in prison without the possibility of release. Because the jury that is selected first to consider whether he's guilty or not of the crimes charged will also decide the punishment if he is convicted, it is necessary to question prospective jurors about your feelings and beliefs about the death penalty as part of the process of jury selection.

So let me briefly explain the procedures that must be

followed in a case in which the death penalty is or may be an issue. As in any criminal case, initially the government has the burden of proving the defendant is guilty of any crime with which he is charged. And as I say, if he's convicted by the jury of a crime for which the death penalty may lawfully be imposed, then there will be a second phase in the trial, and the second phase is usually referred to, in shorthand, as the penalty phase.

In that phase the government will introduce evidence that seeks to prove beyond a reasonable doubt: first, that Mr. Tsarnaev acted with sufficient intent or intention to be subject to the death penalty; and if, so, second, that certain aggravated -- aggravating factors about the events, the crimes or the defendant himself justify sentencing him to death.

Aggravating circumstances -- aggravating factors are circumstances that if proven would tend to make the crimes particularly serious or blameworthy and, therefore, under the law may justify imposing a more severe sentence on Mr. Tsarnaev compared to other persons who have been convicted of intentional killing or murder.

The government will bear the burden of proving any alleged aggravating factors to every juror beyond a reasonable doubt. The defense will have an opportunity to present evidence of what it will argue are mitigating factors in the case. Mitigating factors are usually circumstances about the

crimes or events or about Mr. Tsarnaev's background or character that would suggest that the death penalty is not the appropriate sentence in the case or that life imprisonment without possibility of release is adequate to punish the defendant.

Unlike the proof of aggravating factors by the government, a mitigating factor must be proven by the defendant only by the greater weight of the evidence. That is a less demanding standard of proof than proof beyond a reasonable doubt, which applies to the aggravating factors.

Again, unlike the proof of aggravating factors, mitigating factors do not have to be proven to the satisfaction of all the jurors. Any juror who finds or determines a mitigating factor to have been proved by a greater weight of the evidence may consider that factor in deciding the appropriate sentence in the case regardless of whether any or all of the other jurors agree that the mitigating factor has been proven.

After the parties have made their presentations concerning aggravating and mitigating factors, the jury will weigh all the evidence. Before a jury could vote to impose the death penalty, every juror would have to be persuaded that certain factors that make the defendant potentially subject to the death penalty have been proven beyond a reasonable doubt. In addition, in order to impose the death penalty, every juror

would have to be convinced beyond a reasonable doubt that any proven aggravating factors sufficiently -- they would have to find the aggravating factors beyond a reasonable doubt, and they would have to be persuaded that the aggravating factors sufficiently outweigh any mitigating factors found by any juror or jurors to justify a sentence of death.

Even if the jury did not find any mitigating factors in the case, it would still have to be unanimously persuaded that any proven aggravating factors were themselves sufficient to justify a death sentence. You should understand that a jury is never required to find that a sentence of death is justified.

The decision whether the government has proven that a defendant should be sentenced to death must ultimately be made by each juror himself or herself. If, however, every juror is persuaded that the death penalty should be imposed, I would be required as the trial judge to sentence the defendant to death; in other words, I could not change the jury's decision. The jury, and not the judge, is responsible for determining whether a defendant who is convicted of a capital crime will live or die.

I've just given you an overview of the applicable law pertaining to the jury's consideration of the death penalty. If you are selected to serve on the jury and if you have found the defendant guilty of a crime punishable by death, I will

give you very detailed instructions concerning your duties in deciding whether to impose the death penalty or life imprisonment without possibility of release, and I will instruct you in the law that must be followed in making that decision.

Now, when you filled out your questionnaires we told you there were no right or wrong answers to any of the questions that you have been asked, and that's true of any questions you'll be asked in this voir dire process. We ask them because both the government and Mr. Tsarnaev are entitled to a jury that does not have its mind firmly made up one way or the other before hearing the evidence and a detailed explanation of the law. That applies both to whether the defendant is guilty or not guilty of the specific crimes charged in the indictment, and also, if he is convicted of a capital crime, whether he should be sentenced to death or life in prison without the possibility of release.

So we're going to question each of you about some issues that are relevant to the selection of a jury. We're going to have you in the room you've been sitting in, and call you into the courtroom one by one to ask you some questions. There will be a few people in the room besides the lawyers and their staffs, and the proceedings will be simultaneously and are being now transmitted by video and audio to overflow courtrooms. We will not identify you by name, but rather by

number, and you'll be seated so that the video camera will be generally behind you.

Your answers will generally be public in the way -- because they're being made in a way that is available to the public, but if you believe that a truthful answer would require you to reveal sensitive personal information, we'll temporarily stop the audio transmission to those courtrooms so that people observing there will not hear your answer.

Again, we don't expect any particular answer to the questions; all we want and what the law expects is that you provide accurate and truthful answers to the questions you are asked. If you do that, you will be doing your duty as a citizen and as a juror no matter what the answers may be.

I want to remind you about my prior instructions. As I've told you before, the jury's verdict must ultimately be based on the evidence produced at trial. It must be free of outside influence. So, again, I remind you it is extremely important that you do not discuss the case, including this jury selection process, in detail with your family, friends, each other or other persons until either you have been excused or, if selected as a juror, until the case concludes. And again, of course, you're not to conduct any online or -- research or otherwise read, watch or listen to reports about the case in the media or elsewhere.

When you prepared your questionnaires, you were asked

at the end to sign affirming that the answers were true under the pains and penalties of perjury. Similarly, the oral examination, the questioning that we'll conduct today, must be done under oath, and this means that you will swear to answer the questions truthfully, completely and to the best of your ability.

The clerk will now administer the oath.

THE CLERK: Will the jurors please rise and raise your right hand.

(The venire is duly sworn.)

THE COURT: All right. The jurors will be excused now and we'll proceed with the voir dire.

(The venire exits the courtroom.)

MS. CLARKE: Your Honor, could we get a list of those that are remaining? We counted ten should be remaining, and nine appear.

THE COURT: Oh, one is ill.

MS. CLARKE: And that would be number --

THE COURT: Which one is -- I think it's 109.

MR. BRUCK: Before the first juror comes out --

THE COURT: She'll be rescheduled.

MR. BRUCK: Before the first juror comes out, your Honor, we do have a matter to -- for the Court.

MS. CLARKE: Could I finish up?

Otherwise, the entire list that we provided the

Court --

THE COURT: Yes. Yeah.

MS. CLARKE: Thank you.

THE COURT: Is this a sidebar matter or not?

MR. BRUCK: No.

We filed this morning a third request for follow-up voir dire questions, and I just wanted to very briefly explain what that is. We have re-filed publicity *Morgan* and *Witherspoon* questions, some of which are the same as the ones we filed before and some of which were different. It seemed better to file a complete new list each time we made substantial changes rather than asking the Court and asking the record to keep track of various discrete additional requests. So basically, this is everything. We don't mean to withdraw anything that's been asked before, but this is, going forward, the requests we're making. We also have some requests concerning the way voir dire is being conducted.

First, we would ask that the Court explore the facts before instructing the juror; that is to say, to find out what the juror thinks, what the juror knows, what the juror has heard, the basis of the juror's opinions, if they have any, before telling the juror what the law is and their obligation, if they can, to put those opinions aside.

We think that it's important to understand the underlying facts behind the juror's opinion in order to assess

its strength, and that's why we're asking that it be done in that order. The particular questions that probe for the facts are listed on the second page of our request.

We appreciate the latitude the Court has given us, and to the extent the Court does not itself ask these questions, we would -- we will seek to ask them ourselves, but we think it's better for the Court on the initial round to ask probing questions of the jurors because the Court has greater authority and greater prestige with each juror, and we just think we're going to get better results if that is done.

Second, the Court called me out more than once for asking leading questions over the last few days. It's not my place to critique something that I have never done and you have done for many, many years, but the fact is that when the Court has explained the legal principles to the jurors, we think the record reflects that it has done so in a leading manner, that is, a manner which conveys in the way the -- in both the quickness with which the Court goes to the legal matters after the opinion is expressed by the juror and the way the question is asked, we think it conveys very powerfully to the juror what the juror should say; that is to say, that the Court wishes the juror to be able to say, or to say, that he or she can put his opinions or her opinions aside and follow the law.

There is great social pressure for someone to say, "Yes, I can follow the law." It's hard for someone to say,

"No, I can't follow the law. If you tell me to do something, I won't do it. I can't do it." That is hard to do. And it's harder to do it if the questions are posed in a way that invite that pro-social response of, "Yes, I could put my feelings aside."

So we're asking the Court to be mindful of that problem so we could get to where the jurors really are given the exposure -- extraordinary exposure not only to publicity but to direct personal experience of the Boston Marathon bombing and its aftermath.

Then as to the questions that we're asking for, as I say, some of them are the same. We have added the question which we have attempted to ask of some jurors about, "How did you find out about the bombing?" that is Number 2, "Where were you? How did the news make you feel? And what, if anything, did you do?" And then Number 3 is, "Where were you and what did you do on April 19th?" That gets to shelter in place and is particularly appropriate for jurors who say they had no personal contact with the bombing or its aftermath even though they lived in an area where there was a general shelter in place in effect.

We continue to believe that Number 6 is a very appropriate question in some cases, for jurors who seem to be especially non-forthcoming, and raises the question of whether they are curtailing their responses or changing their responses

in order to be picked to serve.

And then we have rewritten *Morgan* questions to take into account the government's objection that we don't talk about mitigation before asking jurors whether they could ever vote for a sentence other than death. So we actually give examples of mitigation and then ask the juror whether they could consider mitigating factors and ever meaningfully consider a sentence of less than death in a case involving terrorism with multiple victims, in a case involving the death of a child. Our *Witherspoon* questions are unchanged.

So again, our overall request is that we prefer the Court to do the bulk of these questions with our being able to follow up, but we appreciate the latitude to ask these questions ourselves should the Court feel that is more appropriate.

THE COURT: Mr. Weinreb?

MR. WEINREB: Your Honor, as a general matter the government objects to these requests. And I say "as a general matter" because I think if the Court were to determine in a particular case that asking one or more of these questions made sense, we wouldn't necessarily object to it. But as a general matter, asking jurors the basis of their opinions I would suggest starts off voir dire in the wrong direction. It gives the jury -- it would suggest to the jurors that all the things that they have heard and seen in the press and the things that

they have -- the opinions they formed based on that is the important thing in this case, the important thing going forward, when they're not. The important thing is the jurors' ability to put aside what they have heard and what they might believe based on what happened outside the courtroom and decide the case based on the evidence inside the courtroom.

And I think that that same consideration counsels against asking in detail how you first heard about it, how did the news make you feel and so on. It suggests -- it will suggest to the jurors that all of those things are the essential considerations for them when, in fact, they are not.

And that leads to the third request which I think also -- I think we disagree with the premise of it, which is that the Court has asked leading questions about the jurors' ability to be fair and impartial. A leading question would be, "Now, you can set all that aside and decide the case based on the evidence, can't you?" And "You can apply the presumption of innocence, can't you?"

That's not what the Court has been doing. The Court has been simply asking -- instructing them what the law requires them to do and asking them whether they can follow the law and do it. That is the key question. That is where the jurors' minds should be focused.

They need to begin the process today of putting aside everything they have heard or might have thought about the case

and focusing on their duty, their obligation to decide the case based solely on the evidence applying all the legal principles. And we would suggest that the best way to begin the process of encouraging and helping jurors to do that and making sure that they can do it is by approaching the task of questioning them in that way, in a way that is consistent with that goal.

As for the *Morgan* questions that are proposed, we have the same objections to them that we've had all along. They're very specific about particular factors that will be essentially aggravating factors in this case. They are extremely general and non-suggestive, nonspecific about mitigating factors. The jurors are almost certainly going to hear, if this case proceeds to a penalty phase, a very in-depth, vigorous presentation of mitigating evidence along with lots of argument about why these factors are important and should make a difference. These questions do not even begin to convey any of that.

The jurors know virtually nothing about this defendant or anything that might mitigate the crimes. They may -- you know, the facts of the case themselves tell them a great deal about what might aggravate the crime, and it's simply misleading to ask the questions in this way because it suggests to them that is where they will be at the end of the process rather than, you know, where they are just coming into the process.

So again, we don't think *Morgan* requires that. It's not about that; it's about predisposition based on general views about the death penalty. And so this would both be unrequired legally and unwise.

MR. BRUCK: If I may respond very briefly, I don't want to prolong this unduly, but I do ask that the Court be mindful of the fact that if to the extent that the voir dire fails to plumb what the jurors are really thinking, the government is advantaged and the defendant is disadvantaged. We do not have an equal stake in this voir dire; and thus, it is unsurprising that the government asks for relatively formulaic probing whereas we are asking for something more.

I hope the Court will be mindful of the fact that we are sailing in unchartered seas. By that I mean that so far as we are aware, there has never been a court that has attempted to seat a jury in a community that has had an experience of the type of the Boston Marathon bombing. If it happened before, we don't know about it. And that means I think the Court must look with particular care at this process of eliciting the biases, the experiences, the opinions, the feelings, the emotions of these jurors. And that is the basis of our request.

THE COURT: Okay. I have your requests in mind. I think by and large the manner in which we've conducted the voir dire has been successful, and I don't think I intend to make

major changes in it. We've had the discussion about how to ask the questions about Question 77. I agree with the government with respect to that, that detailed questioning about what the juror thinks he or she knows about the events and the sources places the wrong emphasis for the juror. Many, obviously, have views about this because of the extensive publicity. That's far from limited to the local community. And to emphasize them, I think, misdirects things a little bit.

It's been my experience over the years that jurors take their responsibilities very seriously, including particularly the obligation to hold the government to its proof. I think reminding them of that is not -- and getting their reaction to that task that they will have, knowing what they know, I think is a way of determining whether the juror is prepared to undertake the service that we might ask of him or her.

Jurors tell me from time to time that they can't do that, so it's not an automatic answer, and it's one, of course, that we make observations of the juror as well when he or she is answering that question and can form some judgments about whether that's a rogue answer or a sincere one and a commitment to look forward to the presentation of evidence rather than look backward to the exposure to the events.

So in general I'm satisfied with the course we've been following and, again, subject to adjustment as necessary for

each witness -- sometimes we do have to get more specific because of what the juror says. But generally, I think as I say, I'm satisfied with the method we've been using.

So let's call in the first.

THE CLERK: Juror 83.

MR. McALEAR: Juror 83.

THE CLERK: Sir, over here, please. Have a seat, if you would.

THE COURT: Hello. Since you filled out the questionnaire and we're here, have you been able to abide by my instruction to avoid any discussion of the case?

THE JUROR: Yes, sir.

THE COURT: And any unnecessary avoidable exposure to the media reports?

THE JUROR: Yes.

THE COURT: So that's the questionnaire, and we may ask you to look at a couple of things as we follow up on some of the questions you gave.

THE JUROR: Sure.

THE COURT: It appears from your questionnaire that you are a student interrupted. Is that --

THE JUROR: Yeah. I was going to end up taking a break this semester anyways because my financial aid fell through, so...

THE COURT: So what are you doing?

THE JUROR: Well, I'm not employed right now because I lost my job. I was working seasonally at Best Buy. So right now I'm just at home.

THE COURT: Okay. What course were you pursuing at school?

THE JUROR: Psychology and a minor in neuroscience.

THE COURT: Neuroscience?

THE JUROR: Yes, sir.

THE COURT: Tell us about your social media use.

THE JUROR: Well, I mean, Facebook. I use Facebook, but I don't really put anything personal on there, and I definitely try to avoid political things for the most part. Usually I just -- you know, I used to be a personal trainer, so I put like training things or health-related fitness things and, you know, some funny memes every now and then.

I mean, I saw the movie "American Sniper" over the weekend and I did post something like that, but I didn't really get into the politics or anything.

THE COURT: So anything beyond Facebook? Twitter or Instagram or anything like that?

THE JUROR: No, I'm not a Twitter person. I have Instagram, but I don't use it.

THE COURT: Let me ask you to look at page 15, I guess, Question No. 50.

THE JUROR: Yes?

THE COURT: That asks what court cases you may have followed with interest and what interested you about them.

THE JUROR: Sure.

THE COURT: And you talk about the Michael Brown case.

THE JUROR: Yes.

THE COURT: That's the Ferguson, Missouri, incident?

THE JUROR: Yes.

THE COURT: What was it about that that interested you?

THE JUROR: It was more just the people's reaction to the case, the outcome of the grand jury choosing not to indict the officer who was charged with the shooting. I mean, there were mixed emotions. Some people said that was the right decision, and some people said that they were somewhat disappointed with how the case was handled.

Personally, I didn't -- it didn't really affect me too much because I don't like to dabble in those things, but, you know, there's just such a volume of people that, you know, post things on Facebook, it's kind of hard to avoid that at times. And I just thought there was a lot of charged emotion that kind of factored into people's view on the case, and that takes away from the legitimacy of, like, their views, actually, like, because they're speaking emotionally as opposed to logically.

So I thought due process was followed in that case and I thought the grand jury made the right decision.

THE COURT: Did you post anything about your own opinions about it?

THE JUROR: No.

THE COURT: On Facebook or anything?

THE JUROR: No.

THE COURT: Any other cases that -- I think that may be the one you particularly mentioned. Were there others --

THE JUROR: Yeah, that's really the only one that I remember. There was the Casey Anthony case a few years back as well, but, like, to be honest, all of the details have escaped my mind.

THE COURT: We asked a series of questions about attitudes to various potential issues including attitudes towards Islam and Muslims and the war on terror and so on.

THE JUROR: Yes.

THE COURT: And you tell us that your mother is a native of Iran. Is that right?

THE JUROR: Yes. Yes, she is.

THE COURT: And she is a -- just casually, I guess, a former Muslim who has changed to a different faith?

THE JUROR: Yes, that's correct.

THE COURT: How long has she lived in the U.S.?

THE JUROR: She came in '78, I believe, just before the Iranian Revolution.

THE COURT: Do you have family there now?

THE JUROR: Not anybody that I know.

THE COURT: In the region at all?

THE JUROR: No.

THE COURT: You answered these questions when you filled out the questionnaire, obviously. Since then there have been some attacks in Paris and events in Europe. Do you follow those, the news about those?

THE JUROR: Just vaguely. The first day it kind of happened, just to see what was happening, but after that --

THE COURT: No?

THE JUROR: -- I didn't really follow through.

THE COURT: Would -- did you have any reaction to those events that would have led you to change any of the answers you've put down in these matters?

THE JUROR: Not really. It obviously was not a good thing that happened at the time, but my views, from what I remember that I filled out, since then have not changed.

THE COURT: Okay. Looking at Question -- oh, Question 67. You know a little bit of Arabic?

THE JUROR: A little bit of Farsi.

THE COURT: Farsi?

THE JUROR: Yes.

THE COURT: Okay. Is that close to Arabic? I don't know the answer to that.

THE JUROR: The writing is somewhat similar. A lot of

the -- there are some Arabic roots. There are some French roots as well. I mean, Iranians are Caucasian in origin, so they're not Aramaic or Arabic, from my understanding.

THE COURT: Have you studied your heritage?

THE JUROR: A little bit. When I was a kid I took some, you know, like Farsi language classes, but it escapes me for the most part. Now I just know a few phrases and some very basic conversational things or, you know, words and phrases, like if I speak with relatives.

In terms of my culture or the culture that, you know, my mom is from and I share half my heritage with, there are some things that interest me, but it's more like -- like there's this thing called the Pahlevan, which is a house of strength in Iran, and they do like the Indian club swinging. Again, going back to the fitness, that's kind of what I was more interested in more than anything else.

THE COURT: Looking at Question 71, you seem to have sort of an international taste in news.

THE JUROR: Yes.

THE COURT: You pay attention to BBC America, Al Jazeera America?

THE JUROR: Every now and then. And, I mean, I probably watch like a little -- you know, the 30-minute news broadcast maybe once every other week or so.

THE COURT: Do that on the Internet?

THE JUROR: No, usually on the TV. If it just happens to be on. If it's not on, I don't really go out of my way.

THE COURT: Let me ask you to look at page 20, Question 77.

THE JUROR: Yes.

THE COURT: In that question we asked whether, based on things you'd seen or read, learned from any source, whether you had an opinion about whether this defendant is guilty or not and whether -- how he should be punished, if he is. And to each of the four parts of that question you answered that you were unsure.

THE JUROR: Yes.

THE COURT: Can you tell us about that answer.

THE JUROR: Sure. If I just may reread the --

THE COURT: Yeah. Go ahead. Take your time.

THE JUROR: Okay.

(There is a pause.)

THE JUROR: Okay. So I believe at the time my logic in saying "unsure" -- I'll start at the bottom. In regards to should he receive the death penalty or not receive the death penalty, I'm not sure because I don't really know much about the case outside of what I saw a couple of years ago and what we read in the brief, so I just felt that -- I didn't feel at the time that that was conclusive enough to be able to say whether I should -- whether I believe he should get that or not

get that, that penalty.

In regards to him being guilty or not guilty, obviously he was involved in something, but as it is my understanding that you're not guilty until proven -- you're innocent until proven guilty, I just thought it would be best to say "unsure."

THE COURT: Understanding you probably have things from the media and so on, recollections, you've referred to the presumption of innocence and proof beyond a reasonable doubt --

THE JUROR: Yes.

THE COURT: -- of guilt.

Do you have any concern or reservations about your own ability to apply that -- those principles?

THE JUROR: No, I don't.

THE COURT: Specifically to require the government to convince you beyond a reasonable doubt by its evidence at trial?

THE JUROR: Right. Wait. Could you repeat that one more time?

THE COURT: Well, as I think you've recognized, the government -- when someone is accused of a crime, the person doesn't have any obligation to prove he's not guilty of the crime; the government has to prove he is.

THE JUROR: Yes.

THE COURT: And that's done by evidence at trial to a

jury.

THE JUROR: Right.

THE COURT: And it's the obligation of the government to produce evidence that convinces the jury beyond a reasonable doubt; otherwise, the jury is required by law to find the person not guilty.

THE JUROR: Correct.

THE COURT: Is that something you'd be able to do?

THE JUROR: Yes, I would be able to do it.

THE COURT: I guess specifically what I want to know is how would you handle whatever ideas you've had from before the trial?

THE JUROR: Sure. Well, based on the evidence presented and -- you know, I do have a knack to listening to people and what they say. You know, you guys have to do a fair job in presenting the facts the best you can. Based on that, that's probably when I would -- that's definitely when I would make my decision because I think it would be wrong to do -- or to have any preconceived notion as to what he deserves or doesn't deserve otherwise until that happens.

THE COURT: You and your family, as far as you know, were not personally involved or affected by the events?

THE JUROR: No, nobody that I know in my immediate family was involved or affected.

THE COURT: Let me ask you to turn to page 23.

Beginning with Question 88, we ask people about some ideas they may have about the death penalty. And in 88 we asked in general terms what -- if you have any views about the death penalty, what they are. I have to confess I had a little trouble reading your writing. Maybe you can tell us what you wrote there.

THE JUROR: Yes. So I said that in certain cases, if the evidence and reason's fair and the punishment deemed as the death penalty, then I hope that it's given in the hope that it serves the purpose of justice as -- I guess as outlined by what your objective or idea of justice in terms of what he deserves as -- so, yeah, the standard -- whatever standard --

THE COURT: I'm trying to read the last phrase. "In fairness and equity of all involved"?

THE JUROR: Yes. To say that people weren't affected, obviously somebody or -- or something has to be held accountable in some regard for what happened during that time that he was accused of carrying out the things that you had mentioned. So, you know, it didn't just happen on its own.

THE COURT: Well, okay. So the question was asking about -- your general views about the death penalty. And now that you've read the answer -- but I mean apart from the answer, can you tell me in general terms what your view is?

THE JUROR: I think the death penalty is valid in terms of being a good punishment, but, again, it all depends on

the severity of what he did and how people around him -- or that were affected by his decisions were affected. So, you know, I think it would be merciful at times if you believe in an afterlife for the justice system to give someone the death penalty. Maybe it takes away some of the burden of the person's soul. But then again, I think that in certain cases, say, life in prison can also be an opening -- or eye-opening experience for a person as well. Maybe they'll change before the time that they naturally die.

And I also think that the death penalty is fair, you know? There has to be an appropriate punishment for certain crimes out there, and to not have that as an option on the table would be wrong. Not that I think it should always be pushed on people, but I think it is a valid punishment.

THE COURT: So you -- we asked you in Question 89 -- if you want to go back to that page.

THE JUROR: Sure.

THE COURT: -- if you could sort of give us where on a scale of 1 to 10 -- where you thought you were with respect to the death penalty, and you picked 6.

THE JUROR: Yes.

THE COURT: Which is sort of in the middle.

THE JUROR: Yeah. And I still feel that way. I mean, if you guys had, you know, like a 6-1/2 or a 7, I probably would have done a half of some sort.

THE COURT: On the next page, Question 90, we ask you to tell us not by a numerical scale but in words which statement came closest to your view, and you circled letter D.

THE JUROR: Yes.

THE COURT: That says you're not for or against the death penalty; you could vote to impose it or to impose a sentence of life imprisonment, whichever you thought you believe was called for by the facts and the law in the case.

THE JUROR: Yes.

THE COURT: Is that a fair summary of your view?

THE JUROR: Yes, I think that was the most accurate statement that reflected my views and does reflect my views currently.

THE COURT: So in this case after hearing the evidence would you be able to conscientiously consider a penalty of death?

THE JUROR: I believe I could.

THE COURT: And similarly, would you be able to conscientiously consider a life imprisonment?

THE JUROR: Yes.

THE COURT: Are you open to either depending on the evidence?

THE JUROR: I definitely am open to either.

THE COURT: So you wouldn't automatically vote for one or the other regardless of the facts in the case. Is that what

you're saying?

THE JUROR: Yeah, I couldn't do that. It would go against my principle, to be honest.

THE COURT: Mr. Weinreb?

MR. WEINREB: No questions, your Honor.

MR. BRUCK: Good morning. I've been calling you Mr. 83, of course trying to protect everyone's privacy by not using their name. I don't mean to be rude. My name is David Bruck, and I'm one of the attorneys for Jahar Tsarnaev, and I do have a couple of questions I would like to ask you, if I could.

THE JUROR: Sure.

MR. BRUCK: You mentioned that -- I think the words you used were "obviously he was involved in something."

THE JUROR: Yes.

MR. BRUCK: Tell us about that.

THE JUROR: I mean, just from media reports, I do remember his name being mentioned as well as -- I believe his brother's name being mentioned as well. So I mean, I don't know if this is a case of mistaken -- I don't know -- I don't think this would be a case of mistaken identity, so obviously he was involved in something. Just exactly what and how, I don't know.

MR. BRUCK: Well, do you know -- I mean, why he's the one charged rather than anyone else?

THE JUROR: No.

MR. BRUCK: Well, just based on what you've heard.

THE JUROR: Sure, based on what I've heard.

MR. BRUCK: Sure.

MR. WEINREB: Objection, your Honor.

THE COURT: Yeah, I think sustained. I think this goes beyond what we've outlined, so...

MR. BRUCK: All right.

You mentioned your mom changed her religious faith to Bahá'í.

THE JUROR: Yes.

MR. BRUCK: And I'm -- are you aware of the treatment of Bahá'í's in Iran?

THE JUROR: Yes. Yes, I am.

MR. BRUCK: It's extremely cruel.

THE JUROR: It is.

MR. BRUCK: And, of course, Iran is a -- styles itself as an Islamic Republic.

THE JUROR: Yes.

MR. BRUCK: If there was a great deal of information, of evidence about Islam and the defendant's Islamic faith and beliefs -- you see where the question is --

THE JUROR: Yes, I could see where that's leading.

MR. BRUCK: Can you answer it?

THE JUROR: Yes, I can. To be honest, I personally

have nothing against Islam, as well as I know that many Bahá'í's do not. You know, we are taught to respect all religions. And, you know, what the Iranian government decides to do against Bahá'í's in terms of human rights violations or the like, you know, that's a shame that they do that. But the governing body of the Bahá'í faith also say that Bahá'í's are supposed to follow the laws of the country and to respect the government and the rights and to help people regardless of whether they're Islamic or Bahá'í or Christian or whatever else. So I have nothing against Islam or the people of Islam.

MR. BRUCK: Okay. Well, thank you.

You said in response to the judge's question about the punishment that -- in this case you -- that what you know is not conclusive enough to base an opinion. I just wonder -- I guess I want to probe a little bit about that.

THE JUROR: Okay.

MR. BRUCK: As you sit here today, knowing that this case is the Boston Marathon bombing and its aftermath, and assuming now just for my question that he has been convicted -- let's picture that.

THE JUROR: Okay.

MR. BRUCK: -- proof beyond a reasonable doubt, the whole jury has agreed, so we're now in the sentencing phase. Do you lean one way or another regarding death penalty or life imprisonment?

MR. WEINREB: I object.

THE COURT: No, you can answer that.

THE JUROR: Do I lean one way or the other?

MR. BRUCK: Yes.

THE JUROR: If he's proven guilty, you said, correct?

MR. BRUCK: That's the assumption, right. Because you wouldn't have a decision to make until he was first proven guilty.

THE JUROR: I still -- I don't know. There's just -- I don't know enough. I mean, I would say definitely life in prison at this point, I mean, if I had to make a decision based on what you said, but in terms of the death penalty, I couldn't -- I couldn't say that right now.

MR. BRUCK: I see.

So I take it that there could be circumstances under which life imprisonment could be a sufficient punishment for this type of crime in your mind?

THE JUROR: I could see that as being an appropriate punishment, yes.

MR. BRUCK: Okay. And do you appreciate in the end it's up to the jury, not up to the law and up to the Court?

THE JUROR: I do.

MR. WEINREB: Objection, your Honor.

THE COURT: Well, the answer's given, so...

THE JUROR: I apologize.

THE COURT: No, that's fine.

MR. BRUCK: Do you remember -- you may have answered this already. Did you have any -- did you do any Facebook postings about this case?

THE JUROR: No.

MR. BRUCK: Or any friends' postings come up on your Facebook page?

THE JUROR: No.

MR. BRUCK: Would you like to be on the jury?

MR. WEINREB: Objection.

THE COURT: Sustained.

MR. BRUCK: Bear with me just a moment.

(Pause.)

MR. BRUCK: Thank you so much. That's all I have.

MR. WEINREB: Your Honor, I have one question, if I may, please.

Good morning.

THE JUROR: Good morning.

MR. WEINREB: My name is Bill Weinreb. I'm one of the prosecutors in the case. I just have one question which is you've talked about that you're open to the possibility that the death penalty would be an appropriate penalty and also open to the possibility that life imprisonment would be appropriate.

THE JUROR: Yes.

MR. WEINREB: My question is: If you determined after

hearing all the evidence --

THE JUROR: Yes.

MR. WEINREB: -- if the defendant were found guilty and you had heard evidence in the penalty phase and you had actually come to the belief that a death sentence was the appropriate sentence, would you be able to actually impose it, vote that somebody be put to death for a crime?

THE JUROR: Yes.

MR. WEINREB: Thank you.

THE COURT: Okay. Thank you, sir.

THE JUROR: All right.

(The juror is excused.)

MR. BRUCK: Before the next juror comes out, please, just for the point of view of the record, of course the government objected to a couple of the questions on our list. The Court sustained some. When the Court sustains an objection, do -- is the record complete or in -- or will it be necessary for me to -- or for the questioner, when the juror has been excused, to note our objection or --

THE COURT: I think asking the question makes your point.

MR. BRUCK: Very well.

THE COURT: I don't think it's necessary to take an exception --

MR. BRUCK: Well --

THE COURT: -- as we used to do.

MR. BRUCK: Right. You see that our issue --

THE COURT: I think your record is fine.

MR. BRUCK: Fine. Thank you. That's all we need.

THE CLERK: Juror No. 84.

MR. McALEAR: Juror No. 84.

THE CLERK: Ma'am, if you'd come over here and have a seat.

THE COURT: Good morning.

THE JUROR: Good morning.

THE COURT: Welcome back.

THE JUROR: Thank you.

THE COURT: Since you filled out the questionnaire, have you been able to abide by my instructions to avoid any discussion of the details of the case or any unnecessary exposure to media accounts or anything?

THE JUROR: Yeah, for -- I mean, I've talked just in general terms with my husband, but for the most part, yeah.

THE COURT: Oh, about that you're in this process?

THE JUROR: Right.

THE COURT: But not the details of the subject matter of the case?

THE JUROR: No.

THE COURT: One of the questions we asked on the questionnaire was about whether it would be a particular

hardship for the potential juror. You've noted that there might be an impact on -- you're a teacher?

THE JUROR: Uh-huh.

THE COURT: It might be an impact on your students, but as far as -- I want to make sure I'm understanding it. As far as you personally, it would not be a hardship?

THE JUROR: No, it would not.

THE COURT: And as you say, you assume that the school would find a substitute to fill in?

THE JUROR: Right.

THE COURT: Tell us about your use of social media. What is it and how much and so on? What do you do, if anything?

THE JUROR: I text -- ever since my kids were teenagers and I would need to know where they are, I text. And I'm also on Instagram with just family members.

THE COURT: No Facebook --

THE JUROR: No.

THE COURT: -- or Twitter or anything else like that?

THE JUROR: No.

THE COURT: We asked a series of questions in the middle of the questionnaire about attitudes towards some international issues, the war on terror, for example, attitudes towards Islam and Muslims and so on. Do you remember answering those?

THE JUROR: Yes.

THE COURT: Since you filled out the questionnaire there's been some events elsewhere in the world -- Paris, for example -- involving terrorist attacks. Would any of your answers that you gave change as a result of what you've seen or observed about those events?

THE JUROR: No, I don't believe so.

THE COURT: If you're uncertain, you could look at it. I'm not saying you have to or I'm not saying that you are uncertain, but it's -- the questions I'm referring to are pages 17 and 18 on the questionnaire.

(Pause.)

THE JUROR: No, my answers wouldn't change.

THE COURT: Okay. To what degree have you followed those news accounts of what's been happening in Europe or elsewhere, actually?

THE JUROR: Pretty closely.

THE COURT: You generally follow the news pretty closely?

THE JUROR: Uh-huh.

THE COURT: I'd like you to look at page 20, Question 77.

THE JUROR: Uh-huh.

THE COURT: We asked whether you had, on the basis of things you'd seen or heard or read about, formed an opinion

about certain issues, particularly whether the defendant's guilty of what he's charged with or not and what the penalty should be if he is guilty. And you answered that you do have an opinion about whether he's guilty.

THE JUROR: Uh-huh.

THE COURT: And that comes from things you've read and seen on TV or whatever?

THE JUROR: Yes.

THE COURT: The obligation of a juror would be to -- in a trial, to understand that the -- any defendant, any criminal defendant, is presumed innocent of any charge against him unless and until the government proves otherwise by the evidence at trial and proves it to a level of persuasion that the jury is convinced beyond a reasonable doubt that he is guilty.

Do you understand that that would be the obligation of a juror?

THE JUROR: Uh-huh. Yes.

THE COURT: As someone who has some impressions about whether he's guilty or not already, what would your self-assessment be about your ability to presume him innocent according to the law and require the government to prove him guilty by the evidence at trial?

THE JUROR: I'd like to think that ideally I could fulfill that role, but I can't say that I don't have an idea in

my head of my belief over his guilt or innocence.

THE COURT: And the question is whether you could evaluate the evidence and if it was consistent with that notion, act one way, but if the evidence, for example, was inconsistent with that preconceived idea, would you stick with the preconceived idea or would you amend it by reaction to something else you might learn?

THE JUROR: If I'm receiving new information and it changes what I think, I would amend. I would go with B.

THE COURT: Tell me about the -- you've said if he were to be convicted you were unsure about the death penalty or not. Tell us about what you were thinking about that.

THE JUROR: It's funny because you might think one way in your life how you believe about things and then when you're actually forced to act on those beliefs, things might change a little bit. But upon reflection, even I think since filling out -- filling this out, I strongly oppose the death penalty and I think -- I think my answer for D would be that he should not receive the death penalty.

THE COURT: Let's turn to page 23. We asked a series of questions about the death penalty at this stage, and the first one was Question 88, which was a general question, asks you about your general views.

THE JUROR: Yup.

THE COURT: And I guess you continue the answer at the

bottom of that page.

THE JUROR: Uh-huh.

THE COURT: Rereading that, does that still represent your views or have you changed your views as you thought about things?

THE JUROR: Just ultimately I -- I don't believe that you respond to killing by killing, and I don't feel that that would -- I don't feel like I would want to be responsible for somebody else's death.

THE COURT: On the scale -- in Question 89 we gave you a scale of how strong your views were, and you indicated it was pretty strong --

THE JUROR: Yes.

THE COURT: -- by selecting 1.

If you would turn the page to Question 90, instead of a numerical scale, here we ask you to select the statement that came closest to your view. You selected B. It said you were opposed to the death penalty and would have a difficult time voting to impose it even if the facts supported it. The question is whether you would automatically vote against the death penalty firmly, that is, without consideration of the facts -- in other words, it's not a question of whether the facts support it or not, you're against it -- or whether you could in some case imagine a case that -- although you're pretty much opposed to it, there could be some circumstances

you'd hear about that would be so awful that you would decide to vote for a death penalty.

So I guess I'm trying to gauge what you were thinking when you selected "difficult time." I mean, is a "difficult time" "might be difficult but I maybe could if the right circumstances were there" or is "difficult time" "I could never do it"? Do you see the difference?

THE JUROR: Yes. This was tricky because I've never -- I have no background, knowledge, nothing. I've never been in this situation. I've never been on a jury before, and I have never been on a jury that would consider the death penalty before. So it's very -- I'm very opposed to the death penalty. But I didn't want to say that there was never, ever, ever a case that I would not consider using it. So I --

THE COURT: Can you put some content into that? Can you think what kind of a case it might be that that would be the circumstance? In other words, is it just hypothetical or can you actually think of some circumstances where, "Yeah, this would be an exception to my general opposition, I would do it under these circumstances" or is it just that anything is possible?

THE JUROR: I think it's just that anything is possible. I didn't want to rule out that it could somehow sometime somewhere be possible, but I -- I can't think of a specific thing where I would say, "Yes, this person deserves

the death penalty."

THE COURT: Look at Question 92 and just take a minute to read your answer there.

THE JUROR: There's a grammatical error. Yup.

THE COURT: So that seems to indicate that you think that for what -- whatever you think these crimes were, you would not be able to vote for the death penalty for these crimes.

THE JUROR: Correct.

THE COURT: That's all I have.

MR. WEINREB: Nothing from the government, your Honor.

MS. CONRAD: Good morning, ma'am.

THE JUROR: Good morning.

MS. CONRAD: Thank you. My name is Miriam Conrad. I'm one of Mr. Tsarnaev's lawyers.

If you were selected for this jury, would you be able to listen to the evidence -- assume for a moment Mr. Tsarnaev is found guilty and you are convinced beyond a reasonable doubt of his guilt. Would you be able to listen to the evidence during the penalty phase that the judge described and listen to the law and consider the death penalty as an alternative to life without parole?

THE JUROR: Can you ask that one more time?

MS. CONRAD: Sure. I'm not sure if I can. I'll try it one more time.

THE JUROR: Yes.

MS. CONRAD: If you were on the jury and you -- and Mr. Tsarnaev were convicted and you were convinced beyond a reasonable doubt of his guilt and then asked to consider the penalty phase that Judge O'Toole described earlier, would you be able to listen to the facts and listen to the law and meaningfully consider the option of either the death penalty or life without parole?

THE JUROR: I would like to think I could, yes.

MS. CONRAD: Thank you.

MR. WEINREB: Your Honor, can I follow up?

MR. MELLIN: Can I follow up on that?

THE COURT: Do you want to fight about it?

MR. MELLIN: I don't really want to fight Mr. Weinreb, but, ma'am, just -- you were just asked if you can meaningfully consider --

And for the record, I've Steve Mellin. I'm one of the prosecutors in the case along with everyone else right here.

-- and you said that you would like to think that you could meaningfully consider.

Going a step beyond that, though, is at some point the jury's going to have to deliberate and go back into the jury room and to decide what the appropriate punishment is. And if you believed that the aggravating factors sufficiently outweigh the mitigating factors to justify a sentence of death, would

you ever be able to vote to sentence someone to death?

THE JUROR: No.

MR. MELLIN: Thank you.

THE COURT: Okay. Thank you.

(The juror is excused.)

THE CLERK: Juror No. 85.

JURY CLERK: Juror No. 85.

THE CLERK: Over here, sir, please. Have a seat.

THE COURT: Good morning.

THE JUROR: Good morning.

THE CLERK: Speak into the mic so everyone can hear you.

THE JUROR: Okay.

THE COURT: Before you is the questionnaire you filled out when you were here the last time. We may refer to it.

Since that time have you been able to abide by my instructions to avoid any discussion of the details of the case or to avoid any --

THE JUROR: Yes.

THE COURT: -- exposure to media accounts that you could avoid?

THE JUROR: Yes.

THE COURT: Yeah? So we're going to just follow up on some of the things you told us. If you look at page 5, we asked in Question 10 -- we asked whether -- we explained what

the schedule was going to be and what the likelihood of -- what it would mean for a juror to be here and so on, and then we asked if it was a special hardship of some kind, and you just said yes without explaining what the hardship would be.

So could you tell us why you think it would be a hardship for you to serve?

THE JUROR: Yeah, I got to bring the kid to school in the morning.

THE COURT: One?

THE JUROR: Hmm?

THE COURT: Just one child?

THE JUROR: Two child.

THE COURT: Two? How old are they? I guess it's in here someplace.

THE JUROR: Five and 12.

THE COURT: And what time do they go to school?

THE JUROR: One is 7:15 and the other is 7:30.

THE COURT: When was the first?

THE JUROR: 7:15.

THE COURT: 7:15 and 7:30?

THE JUROR: Yeah.

THE COURT: You live in Lowell?

THE JUROR: Yes, Lowell.

THE COURT: Would you be able to get here by nine o'clock?

THE JUROR: Yeah, I got to leave earlier.

THE COURT: I'm sorry?

THE JUROR: By nine o'clock?

THE COURT: Yeah. After dropping someone off by seven-thirty.

THE JUROR: With traffic.

THE COURT: We all know traffic. But assuming no major traffic problems --

THE JUROR: Yeah, I guess.

THE COURT: Was there anything else or was it just that, that you were concerned about the morning -- getting the kids to school?

THE JUROR: Yeah.

THE COURT: So tell me what you -- you say you're a staff accountant?

THE JUROR: Yes.

THE COURT: What kind of business is it?

THE JUROR: Web-posting company. A web-posting.

THE COURT: Web-posting?

THE JUROR: Web-posting.

THE COURT: Okay. And you've been doing that for about ten years or more?

THE JUROR: Yes.

THE COURT: I guess a little more than ten years.

THE JUROR: More than ten years.

THE COURT: Okay. Are you a salaried employee?
THE JUROR: Yes, I am.
THE COURT: Do you use -- I guess you say you use Facebook and Google Plus?
THE JUROR: Yes.
THE COURT: And do you make postings yourself?
THE JUROR: Yes.
THE COURT: What kinds of things do you talk about?
THE JUROR: Holiday, birthday, vacation photos. Sometimes I read the news.
THE COURT: I'm sorry?
THE JUROR: News sometimes.
THE COURT: Have you done any posting about this case?
THE JUROR: No, not at all.
THE COURT: I don't mean just since you've been a juror, but even back when things were happening?
THE JUROR: A little, yeah.
THE COURT: You did?
THE JUROR: A little.
THE COURT: Do you remember what kinds of things you might have posted?
THE JUROR: Some comment to, like, a friend's Facebook page, something like that.
THE COURT: And what were you commenting? Was it your feelings about the case, or what was your --

THE JUROR: Yeah, like how could anybody do that or do this? Do you know about this case, about the news, something like that.

THE COURT: Okay. So one of the questions we asked was whether in the past you had followed court cases with interest. Court, I guess, probably -- I guess it could be any court case. And you said not particularly but the Hernandez case is one that you hear a great deal about.

THE JUROR: Yes.

THE COURT: Is that something you have a particular interest in for some reason?

THE JUROR: Yeah, I like football, so I kind of follow that.

THE COURT: If you look at page 17 and 18 we ask some general questions about things that may be international affairs, sort of, the war on terror, attitudes towards Islam or Muslims and so on and so forth. Since you filled out the questionnaire there's been some incidents in Europe and Paris, for example, a shooting. Are you aware of that?

THE JUROR: Yes, I am.

THE COURT: Have you followed it closely or not closely or --

THE JUROR: Some quite closely. Not that much.

THE COURT: Okay. Do those events or things like them -- would they have any effect on how you would answer

these questions? Would you change any of your answers to these questions in light of those things?

THE JUROR: Maybe a little, yeah.

THE COURT: What would you change, do you think? And feel free to look at the answers you gave so you know what...

THE JUROR: What sort of question you ask?

THE COURT: Well, because we're asking about, you know, things like the so-called war on terror, your attitude towards Islam or Muslims and so on. Would any of those questions -- do you have anything that's been prompted by things recently that might change your -- alter what you've written here?

THE JUROR: Not quite so much, no.

THE COURT: Your reaction when you received the summons, and you thought it was for this case, was "OMG. Don't pick me." Was that really your reaction?

THE JUROR: Yeah.

THE COURT: Okay. Why was that? Why did you react that way, do you think?

THE JUROR: Because I know -- I've been following the news that the trial was starting this January, so when I got the summons I was like, "Oh, my God."

THE COURT: But was it the length of the trial --

THE JUROR: Yes.

THE COURT: -- or the subject matter of the trial?

THE JUROR: The length of the trial and the big decision that has to be made at the end of the trial, so...

THE COURT: Okay. So let me ask you about the big decision that has to be made at the end of the trial, as you put it. Turn to page 20, Question 77. We tried to gauge -- we asked jurors here whether as a result of what they've seen or read in the news they'd formed an opinion about whether he's guilty or not, and if so, what the penalty would be. There's a four-part question. You answered only the first part which you said you had formed an opinion that he's guilty.

If you were a juror in the case would you be able to presume that he is not guilty or innocent unless and until the government proves by the evidence at trial that he is guilty and proves it beyond a reasonable doubt? In other words, that's -- that's the requirement that -- the burden that is placed on the government in a criminal case is to present evidence to a jury that convinces the jury beyond a reasonable doubt of the defendant's guilt of the crime charged, or fails to do that, and jurors not being convinced by the evidence would be required to find the person not guilty.

Would you be able to fulfill that duty in light of the fact that you have some preconceived idea about whether he's guilty or not?

THE JUROR: No, I don't think so. I think he's still guilty.

THE COURT: No matter what you heard at trial. Is that it?

THE JUROR: Yeah.

MR. WEINREB: Your Honor, I think we've pretty much --

THE COURT: Let me just look through...

You were -- your company was shut down?

THE JUROR: Yes.

THE COURT: And that affected you personally?

THE JUROR: Yes.

THE COURT: Yeah. Where's -- what's the town?

THE JUROR: Burlington.

THE COURT: Burlington? Okay. Thank you. That's it. Thank you.

(The juror is excused.)

THE CLERK: Juror No. 90.

JURY CLERK: Juror No. 90.

THE CLERK: Ma'am, have a seat right here, if you would. Also, make sure you speak into the mic so everyone can hear you.

THE JUROR: Okay.

THE COURT: Good morning.

THE JUROR: Good morning.

THE COURT: There's a little bit of morning left.

THE JUROR: Yeah.

THE COURT: Since you were last here, have you been

able to abide by my instructions to avoid any discussion of the case in detail or any --

THE JUROR: As best as I can.

THE COURT: -- exposure to media reports or anything?

THE JUROR: Certainly NPR, you know, listening to the radio in the morning and things like that. But otherwise, no.

THE COURT: Have you been listening to reports about the case?

THE JUROR: They'll come on every once in a while. I try and turn it off.

THE COURT: So there's the questionnaire you filled out.

THE JUROR: Yes.

THE COURT: And we'll follow up on some of the questions you have -- you've answered there. Let me start, if you would look on page 5, Question 9, you have a chronic back problem that affects --

THE JUROR: Question 9?

THE COURT: Question 9, page 5.

THE JUROR: Yes.

THE COURT: -- that affects you if you sit for long periods of time?

THE JUROR: Long periods. Like just in the jury room, you know, I was standing up, walking around a lot. I try to do that as much as I can.

THE COURT: How frequently will you have to do that?

THE JUROR: Probably every hour, every two hours.

THE COURT: Okay. And you have to -- for another condition you have to have something regularly to eat too?

THE JUROR: Yeah.

THE COURT: But that's also roughly on a two-hour cycle?

THE JUROR: Yup.

THE COURT: So if you were sitting as a juror and there were breaks in the hour-and-a-half-to-two-hour range, that would be okay?

THE JUROR: I think so.

THE COURT: Tell us about your work.

THE JUROR: I'm a social worker at Mass. General. I work in pediatrics and cover a number of clinics, predominantly transplant.

THE COURT: I'm sorry. "Transplant," is that what you said?

THE JUROR: Yeah.

THE COURT: And generally what are your -- what's your daily activity, I guess?

THE JUROR: I work a lot with our team and the families. So if there's any psychosocial issues that are in the way of these kids and/or their families qualifying for transplant, we have to -- I, first of all, identify them and

then work it out. We have to help them figure out how to move forward, because otherwise they don't get listed for a transplant and these kids will die. So a lot of times -- and we're also mandated by Medicare to make sure that certain things are not in the way. So I tell families that it's not no; it's just not yet.

THE COURT: Okay. I skipped over something I wanted to ask you. We ask about people's spouses as well, and you say your spouse is retired?

THE JUROR: Yes.

THE COURT: From what?

THE JUROR: Let's see. She's -- well, I think she'd like to be retired from motherhood, but I hear you never do. She -- and then she worked -- she worked in youth ministry for a while, and then she most recently retired from North Shore Elder Services.

THE COURT: Is she a social worker?

THE JUROR: No, she -- she's unlicensed, but she was working as an ombudsman in a -- like for nursing homes and things like that.

THE COURT: Okay. Your own use of social media?

THE JUROR: Not much. I'm not on Facebook. I don't do Twitter or anything like that.

THE COURT: Okay. We asked -- and if you want to look at it, it's on pages 17 and 18, we asked some questions about

what you might call international affairs and so on, about the war on terror, attitudes towards Islam or Muslims and so on. Do you see those answers?

THE JUROR: Uh-huh. Uh-huh.

THE COURT: I just wanted to sort of update them. Since filling out some of these things, there's been some possibly relevant events occurring in Paris, for example. Are you aware of the shootings in Paris?

THE JUROR: Uh-huh. Uh-huh.

THE COURT: Did you follow that closely or not closely?

THE JUROR: Not closely but I know about it.

THE COURT: Would that affect any of the answers you gave here?

THE JUROR: No.

THE COURT: So if you'd turn to page 20, I want to focus on Question 77, which is where we asked about whether you have -- based on news reports or other sources of information, you have an opinion about whether the defendant's guilty or not, and if so, whether he should receive the death penalty or not.

THE JUROR: Uh-huh.

THE COURT: And let's take the first part, A and B. You checked that you had an opinion that he's guilty, and I guess you did not have an opinion that he was not guilty. They

go together, I guess. So in a criminal trial such as this, any defendant charged with a crime is presumed to be innocent unless and until the government proves he's guilty by the evidence at trial and proves it to the jury beyond a reasonable doubt.

If you were a juror, would you be able to discipline your mind so that you could make a judgment based on the evidence produced at trial rather than emotions you came into trial with, or would those pretrial ideas be so strong that they would control your thinking throughout the trial? Now, this is obviously a question about what you might think in the future.

THE JUROR: Sure.

THE COURT: So it's hard to answer in that sense.

THE JUROR: Yes.

THE COURT: But you know yourself, I guess, and you tell us what you think your best assessment would be.

THE JUROR: Honestly, I'd have to say that, you know, anyone who lives in the world, anyone who is -- lives in this area, anyone who works where I work, which is Mass. General, it would be -- it's a given that you're going to think that he's guilty. And, you know, whether I could put that aside or not, honestly, I don't actually think so. I think that I would be pretty still convinced that he was guilty, honestly.

THE COURT: Even if the evidence was unconvincing to

that effect at trial?

THE JUROR: If the evidence was unconvincing?

THE COURT: Yeah.

THE JUROR: To the --

THE COURT: In other words, if you were not convinced by the evidence but -- you would remain convinced by what you thought before you heard the evidence?

THE JUROR: If the evidence was not convincing? Where's the prosecution? You're killing me.

(Laughter.)

THE COURT: Well, I mean, that's the issue. People obviously know things about this because there's so much publicity about it.

THE JUROR: Yeah. Yeah.

THE COURT: But the jury as a whole will be asked to assess what is actually presented to them in the formal proceedings of the trial.

THE JUROR: Yeah.

THE COURT: And if they are convinced by it, consistent with what they've already thought, they will act accordingly. The question is if they're not convinced by the evidence -- and this is really about you now, you're not convinced by the evidence -- would you adhere to the prior notions realizing you're not convinced by the evidence?

THE JUROR: If I was not convinced by the evidence?

Maybe.

THE COURT: Okay.

THE JUROR: But I can't imagine not being convinced by the evidence.

MS. CLARKE: Your Honor, I think --

THE COURT: I understand that makes it difficult.

Let me just ask you about Mass. General.

THE JUROR: Yeah.

THE COURT: Did you get involved -- obviously, some people affected by this were treated at Mass. General. Were you involved in that at all?

THE JUROR: I wasn't in the ED that day. My colleagues who work directly in the ED were. I had to cover for them the following weekend in the ED because they were very traumatized, and understandably so. And so they needed to, you know, get some help in terms of coverage. And so I think being there that soon after and also having talked with them and just being a part of the hospital on a daily basis where we'd get bulletins and, you know, you'd just see the presence of so many officials and medical personnel and just the news media and everything like that, it was a very tough time.

THE COURT: Yeah. Okay. Thank you very much.

(The juror is excused.)

THE CLERK: Juror No. 92.

JURY CLERK: Juror No. 92.

THE CLERK: Ma'am, over here, please. Have a seat right here, if you would. Make sure you speak into the mic so everyone can hear you, okay?

THE JUROR: Okay.

THE COURT: Good afternoon.

THE JUROR: Good afternoon.

THE COURT: That's the questionnaire you filled out when you were here before.

THE JUROR: Yes.

THE COURT: And we may refer to it as we follow up on some of the answers you gave there.

Since the time when you were here and filled that out, have you abided by my instruction to avoid discussion of the case?

THE JUROR: Yes, I have.

THE COURT: And tried to avoid any exposure to media accounts of the proceedings?

THE JUROR: Yes.

THE COURT: Tell us what you do for work.

THE JUROR: I work for a private equity firm in Providence. I'm an executive assistant.

THE COURT: Providence, Rhode Island?

THE JUROR: Yes.

THE COURT: And you've been there --

THE JUROR: Fifteen years.

THE COURT: -- it looks like 15 years.

THE JUROR: Uh-huh.

THE COURT: Throughout -- the same job, basically, throughout --

THE JUROR: Yes.

THE COURT: You're -- it looks like from your answers that you don't really use social media?

THE JUROR: I can't stand it. Sorry.

THE COURT: That's a good reason. LinkedIn for professional connections?

THE JUROR: Yes, for my job.

THE COURT: At page 17 and 18 we asked some questions about what might loosely be called international issues, or the war on terror, attitudes potentially towards Muslims or Islam, and you answered all of those?

THE JUROR: Yes.

THE COURT: I just want to follow up on that. After you gave these answers, perhaps you've seen news reports about events in Paris, a shooting?

THE JUROR: I heard of it. I haven't watched the news.

THE COURT: You haven't really followed that, do you know?

THE JUROR: You said not to, so I haven't.

THE COURT: Fair enough.

So you don't have in-depth knowledge of what was going on over there?

THE JUROR: No.

THE COURT: I was going to ask whether it affected any of your answers, but if you don't know it --

THE JUROR: I know what happened, but other than that...

THE COURT: Okay. Would knowing what happened generally change any of your answers?

THE JUROR: No.

THE COURT: Now, we asked a couple of questions about your reaction when you got the response for the case. You said you were excited and interested?

THE JUROR: Yes.

THE COURT: And tell us about that.

THE JUROR: I just feel that -- I'm not in the military; I never served in the military. This is a way to do something for my country. I find certain things in life and different trials very interesting. I always have. No more really than that, other than I thought it was a great opportunity and something to be honored by.

THE COURT: Something -- is that an attitude you would have about any jury service, or is there something particular about this case?

THE JUROR: I've gotten excited when I've gotten jury

duty down in the local area just because I felt it was something different and out of the norm and interesting.

THE COURT: So you've been summoned before, but I think from the answers you gave you've never served?

THE JUROR: No, I've never served.

THE COURT: But you've been summoned before?

THE JUROR: Yes.

THE COURT: And I'm just trying to understand you. Did you have the same feeling then, is that it?

THE JUROR: Yes.

THE COURT: If you'd look at page 20, Question 77, we asked here if you've formed any opinion about whether the defendant's guilty or not, and if so, what the punishment might be. You indicated "unsure" throughout. Can you tell us why you selected "unsure"?

THE JUROR: When the incident first happened I paid attention for the fist few days and then I didn't pay attention after that. I, you know, from casual conversation with people in the last couple of years, that's been about all the information. I didn't pay attention to it in great detail. I mean, I know what happened and I can't say otherwise. I don't know all the information. I don't know who or what transpired as far as -- you know, there's a question in here someone asked -- that was asked about siblings. I mean, I'm an only child, so I don't know how other siblings affect other siblings

and...

THE COURT: So I want to be sure we understand what you're saying. You paid some attention when the events were happening?

THE JUROR: Some, yes.

THE COURT: You haven't paid much attention since then. Is that what you're saying?

THE JUROR: No.

THE COURT: And is it because you think you don't have enough information to have one that you don't have one, or is it that the information that you do have is ambiguous about these issues? I'm trying to understand why you said you don't have an opinion.

THE JUROR: Well, it's the information that I have. Obviously, I don't know all the facts. I haven't paid close attention to it. Yes, I certainly know of it and I have -- like I said, I paid attention to it in the first couple of days. I don't know the relationship between him and his brother. I know that was spoke [*sic*] about. I'm not sure.

THE COURT: Do you remember that Friday when the law enforcement people were searching for the people who had done the bombing?

THE JUROR: I do.

THE COURT: Where were you then?

THE JUROR: In my office.

THE COURT: Was that in Providence?

THE JUROR: Providence, yes.

THE COURT: You told me that. So you weren't in the Boston area when it happened?

THE JUROR: No.

THE COURT: So you weren't affected by that.

Did you follow that? I mean, a lot of people, whether at home or in the office, I imagine, were kind of glued to the TV watching things unfold.

THE JUROR: We don't have TVs or radios in our office. The Internet isn't really something we should be using during work hours on that Friday.

THE COURT: Well, apart from the shouldn'ts and so on, were you following it?

THE JUROR: I paid a little bit of attention to it, not --

THE COURT: How --

THE JUROR: Just through casual conversation. I wasn't glued to the TV. I don't watch a lot of TV.

THE COURT: You were also asked some questions about attitudes towards the death penalty, which is, as you have heard, a possibility on certain conditions in this case.

THE JUROR: Yes.

THE COURT: So turn to page 23, Question 88. We asked in that question if you had any general views about the death

penalty, and you said you were neither for nor against it.

THE JUROR: I feel if someone is found guilty and that is what their punishment is to be and it fits the crime, then I am for it; if they are not found guilty and that's not what they deserve, then I would not go for that.

THE COURT: So I explained this morning, generally speaking, the process in a penalty phase. If you assume that someone is guilty of an intentional murder, you get to the phase where the government would seek to convince the jury that there were certain aggravating factors that made this worse than your average murder; for example, that there's something special about this case that makes it worse. The defense might present evidence to show that there's something special about the case that would argue in this circumstance for something less than the death penalty, specifically, life imprisonment, and the jury would decide subject to some rules of law that I would provide whether one penalty was better or more appropriate than the other penalty.

Depending on the evidence you heard in that phase of the case, would you think that you are prepared to vote for the death penalty if you think it is warranted?

THE JUROR: Yes.

THE COURT: And on the other hand, to vote against the death penalty and for life imprisonment if you thought that was warranted?

THE JUROR: Yes.

THE COURT: Mr. Weinreb? Or Mr. Mellin?

MR. MELLIN: Your Honor, may I?

Good morning. I've Steve Mellin. I'm one of the prosecutors, along with everybody over here.

THE JUROR: Hi.

MR. MELLIN: I just want to make sure -- you gave an answer, and I just want to make sure we're all on the same page. Do you understand there would first be a phase where it would be called the guilt phase, where the jury would decide if the defendant was guilty or not guilty? Do you understand that?

THE JUROR: Yes.

MR. MELLIN: Okay. So if the jury does find him guilty, we would then go to the second phase. Do you understand that?

THE JUROR: Yes, I do.

MR. MELLIN: Okay. And it's at that phase where the question is: Is it going to be life imprisonment or would it be the death penalty? Do you understand that?

THE JUROR: Yes.

MR. MELLIN: Going into that phase, given the fact that you've already found him guilty -- all right, do you understand that -- would you go into that phase with an open mind and consider all of the evidence before you decided

between life or death?

THE JUROR: Yes, sir.

MR. MELLIN: Okay. Thanks a lot.

MS. CONRAD: Good morning, ma'am. My name is Miriam Conrad. I'm one of Mr. Tsarnaev's lawyers.

THE JUROR: Good morning.

MS. CONRAD: The judge asked you some questions about your experiences on April 19th, the day -- of 2013. And you said you were at work that day?

THE JUROR: Yes.

MS. CONRAD: So was this something that people were following on the Internet, other workers in your workplace?

THE JUROR: One of the higher-ups, the owner of the company, had mentioned it to us. Like I said, we don't usually go on the Internet that often. The owners obviously have the ability to do so, but as an employee, the Internet's not the one thing we should be on unless it's for business purposes.

MS. CONRAD: So was it something that people were talking about at work that day?

THE JUROR: Yes.

MS. CONRAD: And do you remember any of the things that were said?

THE JUROR: Just that there was a lot of stuff going on in the town that it was in and -- the higher-ups have their own offices. They carry their own meetings. I'm an executive

assistant. I don't sit directly near them. We don't, you know, have meetings in their office unless it's business related. But there was chatter.

MS. CONRAD: What about on April 15th, 2013, Marathon Monday; were you at work that day?

THE JUROR: No, I was not.

MS. CONRAD: Where were you?

THE JUROR: Las Vegas.

MS. CONRAD: And do you remember hearing about the bombing?

THE JUROR: Not when we were there. We were on a plane on the way home that day.

MS. CONRAD: So you didn't find out about it until you got home?

THE JUROR: Yes.

MS. CONRAD: And what was your reaction when you heard about it?

THE JUROR: Shocked, sad that it happened so close to home.

MS. CONRAD: And you said that you didn't know anybody who had -- this is your answer to Questions 81 and 82, that anyone was -- anyone who was personally affected or who participated in any Boston Strong-type activities?

THE JUROR: No, I don't know anyone.

MS. CONRAD: You don't know anybody who, for example,

has a Boston Strong bumper sticker or T-shirt?

THE JUROR: I do not.

MS. CONRAD: Now, you said on Question 13, I believe that's on page 6 --

THE JUROR: Yes.

MS. CONRAD: -- that your ex-husband is or was a firefighter?

THE JUROR: Yes.

MS. CONRAD: And so would that affect your reaction to testimony from witnesses who were first responders?

THE JUROR: No. We've been divorced for over six years now. It has no effect.

MS. CONRAD: And where was he a firefighter?

THE JUROR: Fall River, Massachusetts.

MS. CONRAD: Is he still a firefighter there?

THE JUROR: I believe so. I'm not sure.

MS. CONRAD: With respect to Question 77 -- I'm sorry I'm jumping around a little -- page 20 --

THE JUROR: Yes.

MS. CONRAD: -- you said -- certainly that's perfectly appropriate, that you don't have all the information. But based on the information that you do have right now, do you have an opinion -- not a final opinion but just an opinion, as to whether Mr. Tsarnaev is guilty?

THE JUROR: I really -- I don't know everything that

is involved in the case. I mean, I'm not -- I couldn't sit here and say, "Yes, I feel this way" or, "No, I feel that way." I don't know if he's guilty. I don't know. I can't say that I know he's innocent. I don't know that either.

MS. CONRAD: I just want to make sure we're understanding each other.

THE JUROR: Uh-huh.

MS. CONRAD: I'm not asking what kind of verdict you would return if you sat on the jury.

THE JUROR: Okay.

MS. CONRAD: Obviously, you would, we hope, listen to all the evidence and make a decision based on that.

THE JUROR: All right.

MS. CONRAD: But just based on what you've heard so far, just from the news media, from friends, neighbors, relatives, do you have an opinion --

MR. WEINREB: I object.

MS. CONRAD: -- one way or the other?

THE COURT: Yeah, I'll sustain the objection on that question. You don't have to answer that question. It's too specific. Too direct.

MS. CONRAD: And do you have an opinion based on what you've heard, read, seen, discussed whether if Mr. Tsarnaev was found guilty beyond a reasonable doubt of the crimes with which he's charged --

THE JUROR: I don't think I understand your question because -- is it the same question? I'm confused.

MS. CONRAD: No, I'm just getting to it.

THE JUROR: Okay.

MS. CONRAD: If he were found guilty, do you have an opinion sitting here now as to whether or not he should receive the death penalty?

THE JUROR: If he were found guilty right now and that's what the decision needed to be made, based upon life or death penalty? Life in prison --

MS. CONRAD: As the judge explained, if he were found guilty, then there would be a penalty phase.

THE JUROR: Yes.

MS. CONRAD: I'm not asking you what you might -- putting aside what you might hear during the penalty phase, based on what you know right now --

THE JUROR: Yes.

MS. CONRAD: -- do you have a belief as to whether or not he should receive the death penalty?

MR. WEINREB: I object. There's no foundation.

THE COURT: Yeah, I think -- sustained. You don't have to answer the question.

MS. CONRAD: I have nothing further. Thank you.

THE COURT: Let me just ask -- there were some questions about your ex-husband. I see there's another person

in your life. You say business owner?

THE JUROR: Yes.

THE COURT: What kind of business?

THE JUROR: He does home security systems.

THE COURT: Okay. All right. Thank you. Thank you.

THE JUROR: Thank you.

(The juror is excused.)

THE CLERK: Juror No. 98.

JURY CLERK: Juror No. 98.

THE CLERK: Sir, this way, please. Have a seat, if you would. Speak into the mic so everyone can hear you.

THE JUROR: Okay.

THE CLERK: Thanks.

THE COURT: Hi.

THE JUROR: Hi.

THE COURT: We put before you the questionnaire you filled out when you were here the last time. Since that time have you been able to follow my instructions to avoid any discussion of the case or try to limit your exposure to media accounts of anything connected to the case?

THE JUROR: Yes, I have.

THE COURT: Tell us about your employment.

THE JUROR: I currently am a senior software engineer for Safari Books Online where I'm working on a custom publishing software platform that is servicing Oxford

Encyclopedia, Wiley Reference, and a number of publishers in education.

THE COURT: And how long have you been working for --

THE JUROR: I've been working with Safari for about five months.

THE COURT: Would extended service on this jury, if you were selected, be a problem for you at work?

THE JUROR: I've already confirmed with work it would not be.

THE COURT: Okay. What prompted that was you're relatively new there, and seniority may have an effect on things.

And you've done similar software engineering work for other companies?

THE JUROR: I've primarily been in the field of educational technology and publishing, and I had a small stint in advertising technology.

THE COURT: Okay. You have a degree from MIT?

THE JUROR: Yes, I do.

THE COURT: One of the persons killed in the events that lead us to this trial was an MIT police officer.

THE JUROR: I understand.

THE COURT: Does your connection with MIT give you any concern about an emotional reaction to evidence about that that would affect adversely your ability to serve as a juror?

THE JUROR: I graduated in 1996 and really haven't had much connection with MIT since then.

THE COURT: So --

THE JUROR: So no.

THE COURT: -- the answer would be no?

THE JUROR: Correct.

THE COURT: Regarding -- we asked about posting messages or blogging on websites. And I guess you say you don't do any of that?

THE JUROR: Not generally.

THE COURT: Is there anything for the company -- it's an online company. Are there company websites or anything that you --

THE JUROR: Apparently I will be required to do at least one blog a year for Safari, usually based on some sort of technical concept, but I have not yet done one.

THE COURT: And then personally you use -- you use Facebook on a daily basis?

THE JUROR: Yes, I do.

THE COURT: Anything else? Twitter, Instagram or anything else like that?

THE JUROR: No, just Facebook and email.

THE COURT: At pages 17 and 18, if you want to look at it to refresh your memory, we asked some questions that dealt with sort of what you might call international affairs issues,

questions about the war on terror, perhaps attitudes towards Islam or Muslims and so on. Do you remember answering those?

THE JUROR: Yes.

THE COURT: Since you filled out those answers there have been some events in Europe, particularly Paris, that might be characterized as terrorist events.

THE JUROR: Uh-huh.

THE COURT: Are you familiar with those? Have you followed those at all?

THE JUROR: I am aware of the headlines, but I have not actually read those articles.

THE COURT: Okay. Whatever you do know about it, would any of that affect any of the answers you gave to these questions? Would you change anything as a result of knowing about those things?

THE JUROR: No.

THE COURT: Let me ask you to turn to page 20. In Question 77 we ask if, based on what you've seen or read or learned from anyplace else, had you formed an opinion -- have you formed an opinion whether the defendant's guilty or not, and if so, whether he should receive the death penalty or not, and you indicated yes to both of the questions about whether he's guilty or not and whether he should receive the death penalty.

We then asked whether you -- in the next paragraph, if

you had answered yes, whether you would be able to set aside that existing opinion and base your decision about guilt and punishment based solely on the evidence that would be presented in court. You said you would be able to.

THE JUROR: Yes.

THE COURT: Can you explain those answers for us?

THE JUROR: Sure. During the events that occurred I generally did no research, did not read into any of the evidence or any of the aspects of the case other than abiding by the lockdown, you know, don't go out, stay at home, that sort of stuff. Popular opinion and all media said this is -- the defendant's guilty, and so I just sort of accepted that at that time.

Since then I have not actually done -- I have obeyed what you ordered us to do, so... And so my thoughts are: I understand as an engineer the need for evidence, logic and following laws, and I also understand based on your instructions that if I were to be in this case, I must only accept whatever evidence is presented within the court. And logically I can do that, or at least I believe I can.

THE COURT: You mentioned sheltering in place. In Question 80 we asked people if they had been affected, including in that way. It indicates N/A, which I assume means "not applicable." So is that correct or were you affected? Did you shelter in place on that Friday?

THE JUROR: That particular Friday I happened to be working from home, so it didn't actually disrupt my work.

THE COURT: And so you continued working?

THE JUROR: Yeah.

THE COURT: Did you follow the events as they were unfolding?

THE JUROR: Not in particular.

THE COURT: The law enforcement pursuit and so on and so forth?

THE JUROR: No.

THE COURT: If you'd turn to page 23.

THE JUROR: Sure.

THE COURT: Beginning with Question 88, we asked a series of questions to gauge potential jurors' thinking about the death penalty, both generally and perhaps more specifically. So 88 was a general question, what are your general views, and you said you're in favor of it as allowed by law, especially for heinous crimes.

THE JUROR: Yes.

THE COURT: And then we asked in the next question if you could give us the strength of that view, and you circled 9 out of 10, again strongly in favor.

Then the next question on the next page we asked you to select which of the possible several statements that are presented, which best expressed your view, and you selected E

that says you're in favor of the death penalty but could vote for a sentence of imprisonment without the possibility of release if you believed that sentence was called for by the facts in the case.

THE JUROR: Uh-huh.

THE COURT: Is that accurate?

THE JUROR: Yes, it is.

THE COURT: Is that true about this case?

THE JUROR: Yes, it is.

MR. WEINREB: No questions, your Honor.

MR. BRUCK: Good afternoon.

THE JUROR: Good afternoon.

MR. BRUCK: My name is David Bruck. I'm one of Jahar Tsarnaev's lawyers. I won't keep you too long. I just have a couple of questions, if that's okay.

THE JUROR: Sure.

MR. BRUCK: You checked the box on Question No. 77, D, about -- I'm sorry -- 77, C.

THE JUROR: May I ask for a page number?

THE COURT: Twenty. Page 20.

THE JUROR: Thank you.

MR. BRUCK: You said it was your opinion when you filled this out that Mr. Tsarnaev should receive the death penalty. You checked yes. Can you tell me a little bit more about that? Why did you check "yes"?

THE JUROR: My understanding of what I believe happened, which obviously is just my opinion --

MR. BRUCK: That's what I'm asking you for.

THE JUROR: -- is it was a willful act of trying to harm as many innocent people as possible, including trying to kill them.

MR. BRUCK: And --

THE JUROR: And that, for me, qualifies as a heinous crime.

MR. BRUCK: Okay. Thanks, because you've answered my next question about heinousness, which is a term you used on your form.

The judge has explained to you this is a two-part trial.

THE JUROR: Yes.

MR. BRUCK: And at the -- if the jury finds beyond a reasonable doubt that the defendant is guilty and you go to the second part in which the aggravating evidence, circumstances of the crime, might be things about the defendant are presented by the prosecution --

THE JUROR: Uh-huh.

MR. BRUCK: -- in favor of a death sentence -- are you with me?

THE JUROR: Yeah, I'm following. And then the mitigations would be presented by the defense.

MR. BRUCK: Exactly. And that can involve things about the defendant or things about the crime that might weigh in favor of life. Given what you know about this case already, are there any circumstances that could ever be shown by the defense that would cause you to believe that life is the appropriate sentence in this case?

MR. WEINREB: Objection. That's mixing two issues. He hasn't heard any evidence in this case at all. He said he doesn't know anything about it other than what he's read in the news.

THE COURT: Go ahead. You can answer it.

I'll let you follow up.

THE JUROR: Okay. Based on the answers I gave in this questionnaire, my ability to be a juror is such that if the evidence is presented, I can be persuaded.

MR. BRUCK: Okay. Could there ever be a case involving an intentional act of terrorism that was intended to and did kill multiple people in which you could be persuaded by anything that the death penalty was not the appropriate punishment?

MR. WEINREB: Objection.

THE COURT: I will sustain the objection to that question, so you don't have to answer that.

MR. BRUCK: You've told us a little bit about -- or you've said that you followed some media and heard some facts.

Can you tell me what stands out? You've mentioned a couple of things. Can you tell me what stands out about this case in your mind based on everything you've heard or read or seen on the Internet?

MR. WEINREB: Objection to that too.

THE COURT: Sustained.

MR. BRUCK: Thank you so much. That's all I have.

THE JUROR: You're welcome.

THE COURT: Anything else?

MR. WEINREB: No, sir.

THE COURT: All right. Thank you, sir.

THE JUROR: Thank you very much.

(The juror is excused.)

THE CLERK: Juror No. 100.

JURY CLERK: Juror No. 100.

THE CLERK: Sir, over here, please. Have a seat right here. Thanks.

Also, make sure you talk into the mic so everyone can hear you, okay?

THE COURT: Good afternoon.

THE JUROR: How you doing? Good afternoon.

THE COURT: That's the questionnaire you filled out when you were last here. We may refer to it --

THE JUROR: Okay.

THE COURT: -- to follow up on some of the answers.

Since that time have you been able to follow my instructions about avoiding any discussion of the case or any exposure to the media accounts?

THE JUROR: Yes. It's not very easy, but I have done it.

THE COURT: Okay. You're employed as a glazier?

THE JUROR: Yes.

THE COURT: What does that involve?

THE JUROR: Glass work. I work mostly --

THE COURT: In detail, what do you do?

THE JUROR: Put glass in buildings, interior or exterior, all around this area basically.

THE COURT: So construction?

THE JUROR: Yeah.

THE COURT: Is this a union position?

THE JUROR: Yes.

THE COURT: And this could be an extended trial, as I think you know.

THE JUROR: Yeah, that causes me some conflict, mostly on insurance.

THE COURT: That's what I want to get at. Given the nature of your job -- are you an hourly-wage employee?

THE JUROR: Yes.

THE COURT: What would the impact on your work be if you're here?

THE JUROR: I wouldn't lose my job because I'm hourly and they always need help, but my biggest impact would be getting my insurance hours to carry on my healthcare. If I don't maintain 600 hours a half year -- at least 600, then I lose that. And I've never lost healthcare in 32 years I've been doing this. But it's a potential if it's that many months of the trial.

THE COURT: Yeah. I'm just trying to do the quick math, how many months 600 hours is.

THE JUROR: Well, you get 40 hours a week typically, so three months would wipe me out of like 12 weeks, you know? And so that's quite a few hours. I usually average about 200 to 220 a month in hours, just ballpark, with holidays and that.

THE COURT: Okay. And is that counting overtime hours? Do they count?

THE JUROR: Overtime hours count too.

THE COURT: And that, I guess, depends on the ebb and flow of work?

THE JUROR: Right. The last half of year I only got 650 hours from July to December, but that was a bad time, when it was slow. Normally I would get close to 900 for a half year. So that presents a problem.

THE COURT: I think that's all we need to know. Thank you.

THE JUROR: That's it?

THE COURT: Yeah.

THE JUROR: Okay.

(The juror is excused.)

THE CLERK: Juror No. 102.

JURY CLERK: Juror No. 102.

THE CLERK: Ma'am, have a seat right over here, if you would, please.

THE COURT: Good afternoon.

THE JUROR: Hi.

THE CLERK: Make sure you speak into the mic so everyone can hear you, okay?

THE JUROR: Okay.

THE CLERK: Thanks.

THE COURT: That's the questionnaire you filled out when you were here last. We may refer to it as we follow up on some of the questions you gave.

THE JUROR: Okay.

THE COURT: Since that time have you been able to follow my instruction to avoid any discussion of the process, the case?

THE JUROR: Yeah.

THE COURT: And tried to limit your exposure to any news accounts about things?

THE JUROR: Yeah.

THE COURT: So looking at your questionnaire, you were

until recently employed as an R.N. at the Good Samaritan Medical Center?

THE JUROR: Yes.

THE COURT: Where is that?

THE JUROR: In Brockton.

THE COURT: And it says that you left late December and are currently unemployed?

THE JUROR: Yes.

THE COURT: That's when you filled this out. Is that still the case?

THE JUROR: Yes.

THE COURT: Are you planning to reemploy or are you taking some time off or --

THE JUROR: I'm actually taking time off. I was -- well, we're planning on going cross-country. We were going to start in April when our lease was up, and just travel.

THE COURT: When you say "we" --

THE JUROR: My boyfriend and I.

THE COURT: You had that idea. Had you made specific plans for a particular time for your trip?

THE JUROR: Well, our lease is up. We have an RV. We were planning on going cross-country in the RV. And if I was called, we were just going to stay in the RV around here.

THE COURT: That was my question, if you were called and if the case continued beyond April, what would the impact

be on you. And you're saying you could adjust?

THE JUROR: Yes, definitely. We had already planned on making adjustments if I was chosen to sit, so...

THE COURT: Okay. Tell me just a little bit about your training and work as a nurse. Do you have any specialty?

THE JUROR: Yes; for the last ten years I've been in the emergency room.

THE COURT: Emergency room?

THE JUROR: Yup. Before that I was an LPN and worked for an agency, so I basically staffed nursing homes, rehabs, transitional care units, things like that.

THE COURT: Okay. But throughout your time at Good Samaritan, you've been in the ER?

THE JUROR: Yes.

THE COURT: Some but no extensive use of Facebook. Is that --

THE JUROR: Hardly any.

THE COURT: Okay.

THE JUROR: Basically, family, friends. I'm a cake artist, so I post cake pictures.

THE COURT: If you want to refresh your recollection, at pages 18 and 19 we ask jurors some questions about what might broadly be called international affairs issues, things about the war on terror, so-called, and perhaps attitudes about Islam and Muslims and so on and so forth. Since you filled out

the questionnaire and gave those answers, there have been some events in Europe involving some terrorist attacks. Have you followed those at all?

THE JUROR: I don't really know much about it.

THE COURT: You don't know what or where?

THE JUROR: I think France.

THE COURT: Right. Well, my question was going to be if what you knew about those things would affect any of the answers you gave here.

THE JUROR: No, I don't believe so.

THE COURT: Let me ask you to turn to page 20 and direct your attention to Question 77.

THE JUROR: Uh-huh.

THE COURT: That's a multiple-part question in which we asked whether you'd formed an opinion from things you'd seen in the media or heard otherwise about whether this defendant was guilty or not, and if so, whether he should be punished by the death penalty or not.

THE JUROR: Right.

THE COURT: And to each of those you indicated -- you checked the box that said "unsure."

THE JUROR: Right.

THE COURT: Would you explain that for us?

THE JUROR: I can't make a decision whether he's guilty or not until I hear evidence. I don't know really much

about it, so I can't tell you one way or the other if I think he's guilty now or not guilty. I don't know.

THE COURT: You probably heard some things about the case, right?

THE JUROR: Yes. I mean, I read what was -- the beginning of this that told facts.

THE COURT: That's on the next page, if you want to -- I think that's what you're referring to, the bottom of page 21?

THE JUROR: The facts. Yeah, so I read that.

At the time, bits of pieces of what was going on, but, still, I really could not tell you what the accounts of what happened. So I really don't know. I don't have enough information.

THE COURT: Do you remember following any of it as it unfolded at the time?

THE JUROR: I believe I was working at the time, so I really couldn't follow it step by step after the fact.

THE COURT: You're talking about the day of the marathon itself?

THE JUROR: Right.

THE COURT: Of course it continued into the end of the week, Thursday and Friday, as people were trying to --

THE JUROR: Yeah. I've worked nights for ten years, so having that shift, I really don't have much access to news.

I'm either sleeping during the day or working during the night.

THE COURT: All right. Now if you'd go to page 23, we asked a series of questions beginning with Number 88 about attitudes or beliefs, convictions about the death penalty and so on. And 88 is a general question, it says generally what your views are, and you said you didn't have any. Is that --

THE JUROR: I really don't. I -- I don't know. I would have to see what the charges were. I'd have to -- I'd have to weigh everything in order to have an opinion on that.

THE COURT: The next question was sort of asking you to put it on a scale where you were between strongly oppose and strongly favor, and you chose number 5.

THE JUROR: Right. I'm not either.

THE COURT: In the middle, is that it?

THE JUROR: Yeah.

THE COURT: The next question, Number 90, we ask you to select the statement that was closest to what your beliefs were about the death penalty. You selected D?

THE JUROR: Right.

THE COURT: It says you're not for it or against it and could vote to impose it or vote to impose, instead, a life imprisonment, whichever you thought was called for by the facts and the law in the case.

THE JUROR: Right.

THE COURT: Is that an accurate summary?

THE JUROR: Completely.

THE COURT: Do you feel confident that -- of course you don't know what the evidence is you're going to hear --

THE JUROR: Right.

THE COURT: -- but can you envision evidence that would lead you to feel that the death penalty was the right decision --

THE JUROR: If there was --

THE COURT: -- and vote for it?

THE JUROR: If there was evidence and if that was called for, then, yes, I guess I could.

THE COURT: And can you envision that there was evidence that you could consider that might lead you to conclude that the death penalty was inappropriate and that life imprisonment was the appropriate sentence?

THE JUROR: Definitely. I have no, like I said, views either way. I am really in the middle. I would have to hear everything and make an educated decision.

MR. WEINREB: Good morning.

THE JUROR: Hi.

MR. WEINREB: My name is Bill -- good afternoon.

THE JUROR: Oh, yes.

MR. WEINREB: Just so the record is clear.

My name is Bill Weinreb. I'm one of the prosecutors in the case. I just wanted to ask you a few questions about

the death penalty.

THE JUROR: Sure.

MR. WEINREB: Have you given a lot of thought to the idea of the death penalty in general?

THE JUROR: I have. You know, it's part of this case, so, you know, I've thought about it. And, again, I would have to make an educated decision about that.

MR. WEINREB: Okay. So you've told us that you could consider the evidence and you could consider both possibilities, but I want to ask you a slightly different question --

THE JUROR: Okay.

MR. WEINREB: -- which is, as you know, because the judge instructed you earlier, the jury -- if the defendant in this case is found guilty --

THE JUROR: Uh-huh.

MR. WEINREB: -- of one of the crimes that carries a potential penalty of death, then it will be up to the jury to decide whether he lives or dies.

THE JUROR: Right.

MR. WEINREB: You'll be one of those people who will have to make that decision --

THE JUROR: Right.

MR. WEINREB: -- on another human being.

My question is simply: Can you imagine yourself on

the jury thinking about whether this person sitting at the table should live or die? Would you be able to -- if you thought it was the appropriate punishment, would you be able to sentence him to death?

THE JUROR: If I felt it was appropriate.

MR. WEINREB: Okay. Thank you.

MR. BRUCK: Good afternoon.

THE JUROR: Hi.

MR. BRUCK: My name is David Bruck. I'm one of the attorneys for Jahar Tsarnaev, and I just have a few things I want to talk to you about.

THE JUROR: Sure.

MR. BRUCK: You live in Massachusetts now. Have you ever lived in other places?

THE JUROR: No.

MR. BRUCK: Okay. Understanding that you didn't follow all of the facts or that you weren't glued to the TV set the whole time when this was first happening, I'd like to ask you what stands out in your mind, if anything, about this case from anything you've heard, seen.

THE JUROR: The only thing that I definitely can remember from that time is probably after the fact when they showed the finish line. That's about it really.

MR. BRUCK: And did you have any feelings about what you remember of that scene?

THE JUROR: It was scary. There was a lot of confusion.

MR. BRUCK: Anything about the defendant?

THE JUROR: I honestly didn't even know the defendant until -- I didn't know what his name was until the court summoned me here.

MR. BRUCK: Okay. Anything else that you recall about any aspect of this case at all?

THE JUROR: No. Just personally I thought, my goodness, the ERs are going to be overloaded, how are they going to deal with that. It was just a work perspective.

MR. BRUCK: You've been asked a bunch of questions just now about the death penalty, mostly by the judge. I want to ask you something about it but in a slightly different way. Massachusetts doesn't have the death penalty, as the judge told you.

THE JUROR: Right.

MR. BRUCK: Some states used to have it and recently abolished it. If you were in the legislature and the issue came up should we have it on the books in the state, would you be in favor of having it as an option or would you think it would be just as well, or better, not to have it as an option?

THE JUROR: I don't know. I would need more information. I'm glad I don't have to make those kinds of decisions. And I was surprised when told that the death

penalty was on the table because I knew that Massachusetts didn't have it. Whether or not I would vote for it, I don't know. I'd have to think about that even more.

MR. BRUCK: How do you feel about serving on this jury?

MR. WEINREB: Objection.

THE JUROR: How do I feel?

THE COURT: No, you can answer that.

THE JUROR: Well, I feel as though I, you know, bring an honest and impartial view. I really, you know, have no opinion at this point. I would definitely need more information and facts before I could make any decisions on anything. I feel I'm a fair person. So I don't know if, you know, a feeling is a correct question. I'm not sure if I have a feeling.

MR. BRUCK: Let me ask it this way: Some people may get their jury summons and know it's for this case and say, "Oh, boy, I hope I don't get picked."

THE JUROR: No, I didn't know my summons was for this case. I had no idea at all.

MR. BRUCK: Would you have had that reaction?

THE JUROR: I don't think so. It's a case like any other case.

MR. BRUCK: Bear with me just a moment.

(Pause.)

MR. BRUCK: Thank you so much.

THE JUROR: Thanks.

THE COURT: Is that it? All right. Thank you.

THE JUROR: All set?

(The juror is excused.)

THE CLERK: Juror No. 108.

Ma'am, over here, please. Have a seat, if you would, please. Speak into the mic so everyone can be sure to hear you.

THE JUROR: Okay.

THE COURT: Good afternoon.

THE JUROR: Good afternoon.

THE COURT: That's the questionnaire you filled out when you were here last. We may refer to it, so we put it in front of you so you can look at if you want. We're going to follow up on some of the things that you wrote in the questionnaire.

THE JUROR: Okay.

THE COURT: Since you were here last and filled out the questionnaire, have you been able to live up to my instructions to avoid discussing the case or getting exposed to media accounts about the case?

THE JUROR: I think so. As far --

THE COURT: Okay. Let me just ask if you'd look at page 5, Question 10. You wrote -- and before I get into it

substantively, let me ask, because this is perhaps a personal matter, would you prefer that this not be public or do you not care?

THE JUROR: No, it's okay.

THE COURT: Okay.

THE JUROR: This is fine.

THE COURT: So when we asked would you have difficulty serving as a juror, you said you have a disabled daughter and sometimes have to go to meetings for her. Tell us what you were thinking about that.

THE JUROR: Should I tell you about my daughter, because that's what it has to do with.

THE COURT: I want to understand what the issue is.

THE JUROR: The issue is she just came out of the hospital about six months ago. She also -- she has cerebral palsy and she's mildly mentally retarded, and she has a mental illness on top of it. And she speaks very little. So I'm really the one that speaks for her, and that's the reason I said about the meetings. I have to go -- I'm her legal guardian, and I have to go to most of them.

THE COURT: What kinds of meetings are they? Are they medical meetings or --

THE JUROR: They're both. They're medical, what she will do for the -- you know, they have ISPs, and it tells them -- tells us what we're going to work on and what she needs

help with.

THE COURT: So therapy kind of things are you talking about?

THE JUROR: Yes. Yes.

THE COURT: And some of this sort of -- I don't know -- for lack of a better word -- you probably know the words better than I do -- but educational or something like that? I mean, activity-related or --

THE JUROR: She does do some activities, but for the past six months -- before that, a year before that, she did nothing. I used to have to bathe her. That's how bad it was. Then when she went to this program by the state, she really -- they took her off all her medications, and that really helped a bit. So, but like I said, she really doesn't explain herself well, so I'm there to help.

THE COURT: Can you give us some idea of how much on a weekly basis you're involved in these kinds of meetings?

THE JUROR: Well, the meetings take place sometimes once a month or once every six months. But if she has problems, then I see a doctor more often. I'll see a neurologist. There's a bunch of them. A psychiatrist. And it depends on what's going on with her at that time.

THE COURT: So it's somewhat unpredictable?

THE JUROR: It is. And she's a cutter. She cuts herself when she's under stress, so...

THE COURT: She's living at home with you?

THE JUROR: No, no, she lives in a group home. She lives like ten minutes from my house, yeah.

THE COURT: All right. Okay. Thanks.

THE JUROR: Oh, okay. You're welcome.

THE COURT: That's it.

THE JUROR: That's it? Okay. Thank you.

(The juror is excused.)

THE COURT: Okay. I'd suggest we take a break for lunch, perhaps come back at two. That will be a sidebar conference at that point; it will not be broadcast.

MR. MELLIN: Your Honor, can I raise one point before we do that?

Mr. Bruck asked the question of not this juror but the juror before about if she was aware that other states had abolished the death penalty recently and if she was on the legislature how would she vote. I think that's a completely objectionable question and I think it's completely inappropriate for Mr. Bruck to be trying to indicate to one of these jurors that there's some trend out there about the abolition of the death penalty or anything like that. And I think asking whether or not the juror would vote for or against the death penalty if they were hypothetically in the legislature is completely inappropriate.

THE COURT: Noted.

(There is a recess in the proceedings at 12:51 p.m.)

(The Court entered the room at 2:12 p.m.)

THE COURT: Good afternoon, everybody. So we'll run through the jurors we've seen and have not already dealt with. First one is 83.

MS. CLARKE: No motion.

THE COURT: No motion.

MR. WEINREB: No motion.

THE COURT: Now, I have to keep getting my list of those that have been cut out. 84.

MR. WEINREB: Your Honor, the government moves to excuse Juror No. 84. She made it quite clear that imposing the death penalty is just an entirely theoretical consideration for her. She made -- she said pointblank she would never sentence anyone to death, and she's preventive as well as substantially impaired.

MR. BRUCK: No argument.

THE COURT: Okay. She's out.

I think we excused No. 85 early by agreement.

MS. CLARKE: That's correct.

MR. WEINREB: Yes.

THE COURT: 86 was done this morning. 87 was done this morning. 88 was done this morning. 90.

MS. CLARKE: I think that was also agreed.

THE COURT: Was it here? That's right, yes, you're

right. She will be out.

92.

MR. BRUCK: No motion from the defense.

THE COURT: No?

MR. WEINREB: No motion.

THE COURT: Okay. 92 is in.

94 was previously excused; 95; 97. That brings us to 98.

MR. BRUCK: The defense moves to excuse this juror. I recognize that he gave the -- eventually came around to the legally appropriate responses. But we think, on consideration of all of the evidence, this juror should be excused. He filled out his questionnaire to say that he thought the defendant was guilty and further thought the defendant was -- should be sentenced to death. He later said he's an engineer, and he can put all that aside. Someone who thinks that somebody should be put to death based on their opinion of guilt has a very strong opinion of guilt. This is not a casual opinion, whatever he may say about it here. He also described an example of the sort of case that he believed the death penalty should be for. It's basically the government's case in here, the government's allegations for death in this case.

And so we think penetrating the -- all of the verbiage surrounding his voir dire, we really think that he is -- just has too much of an opinion. He tried to minimize his

sheltering in place by saying, Well, I was working at home anyway that day. Sorry. Bear with me.

(Discussion held off the record.)

MR. BRUCK: Right. And that was also a juror -- I think part of our grounds for disqualification is that I was not permitted to ask a *Morgan* question in light of all the circumstances disclosed by this juror's questionnaire in his other answers. And I was also not permitted to ask the *Skilling* question, which is, What stands out? What do you remember? And try to get at some sense of the content of what caused him to have the opinion not only that this defendant was guilty but that he should also be put to death. So under the totality of the circumstances, we move that he be excused.

MR. WEINREB: Your Honor, the government opposes the motion. This was a juror who seemed to understand perfectly the difference between having an opinion based on rumor and just things you hear in the press, or I think the way that he put it was that he didn't even follow any of the news but that he was basing his opinion on what he called popular opinion, what he heard in the hallways. He understood completely the difference between that kind of judgment and the judgment that you're required to make in a courtroom. There was no need to probe more deeply into exactly what he heard or when he heard it because he made it quite clear that he had not heard much. And he gave no indication whatsoever, through his demeanor or

any other thing, that he couldn't be taken at his word about his ability to be fair and impartial.

THE COURT: Yeah, I essentially agree with that. I think, based on not only what he said but, as you say, his demeanor. And I think he was asked and, I thought, satisfactorily responded that he would consider all the evidence in the case, and he could foresee being persuaded to vote in favor of the death penalty. And he could also foresee being able to vote for life imprisonment instead of that. I think he was fairly straightforward about that, it seemed to me. So I don't think he should be excused for cause.

Let me just parenthetically say about the so-called *Skilling* question, there was a question in the *Skilling* case that was paid attention to in the decision. The decision doesn't require that question to be asked in another case. The *Skilling* case was a very different kind of facts, very different kind of offenses charged. And it may have some relevance as a guidepost, as anything the Supreme Court says can be a guidepost. But it's -- I just want to note that it's not at the level of *Witherspoon*, *Morgan* questions. Just a -- close parentheses.

So 98 would be in.

99 was previously excused. We, I think, excused -- agreed on excusing 100 today on his exam.

Number 102, I think, is the next one to be considered.



MR. BRUCK: No motion from the defense.

MR. WEINREB: No motion.



MR. WEINREB: I believe the answer is that the Court's entitled to have these proceedings move forward in an ordinary fashion. And one way to ensure that is these kinds of issues should be addressed before the day begins, when the juror is here; and if the juror is here and the information is still not available, then it's possible to inquire of the juror. But to have the request be made, you know, during -- while the process is going on, you know, with the expectation that it's going to be handled during the lunch hour, that's not an appropriate or orderly way of --

MS. CONRAD: I noticed this last night. I raised it with Mr. Chakravarty first thing this morning, is my recollection.

Instead, we're relying on a handwritten notation that says "negative" as opposed to whatever printout was produced. I'm just asking for the printout. I asked that yesterday. We had that same --

THE COURT: What kind of printout gets produced when somebody doesn't have a record? Suppose somebody ran my record?

MS. CONRAD: It has the information, identifiers and so forth. Could I have that back? I'm not done. Thank you.

Kind of inconsiderate of the court reporter now.

When you run a record, you get a printout. If there's no record, it has the person's name, identifier. Then it will just have no entry. Sometimes it will have a restraining order or something of that like.

THE COURT: Are there records of that type, blank records, for people who don't have records?

MS. CONRAD: I mean, I don't know if the government printed them out?

THE COURT: In other words, does the Bureau of Probation have a record on me that would be blank?

MS. CONRAD: I think on a query they would get a printout result that would say no entries or something like that.

THE COURT: It would probably say don't know the person, don't recognize the -- do they have every person in the

world in there? That just seems odd. You would have to come to the attention of the Bureau of Prison -- I mean the Board of Probation, B.O.P., in some way for the record to be created, I would think. Do we have any state prosecutors here? Yes, we have a state -- former state prosecutor.

MR. CHAKRAVARTY: A former state prosecutor as well as I've kind of asked the FBI to run these records. The instructions were, if there's no record -- and B.O.P. does not maintain a record unless there's some information that's input into B.O.P., which comes in a state court proceeding, either from a restraining order or from a criminal arrest or something else.

In some cases, like a clerk's hearing, for example, in the state system, they may have created a record, but there's nothing -- there's no data that actually makes it onto the record even though there was a record of -- you know, Al Chakravarty might have a printout, but there's no entry underneath it because perhaps the clerk never issued a criminal complaint. So there is identifying information without actually any substance.

If, in this case, the FBI, who ran criminal records checks for everybody, they first, in some cases, had to identify whether the juror was a particular person with whom a record was associated; and to do that, they looked at motor vehicle information amongst other things. So often there is a

motor vehicles -- Registry of Motor Vehicle printout accompanying -- as I think your Honor has seen, accompanying a B.O.P. record and, in some cases, an NCIC or III, the Interstate -- the record.

In cases where there were no NCIC or B.O.P. positive hits, there was no paper generated to provide to the prosecutors or that we would provided to the defense.

THE COURT: So there is a RMV record if the person has a license?

MR. CHAKRAVARTY: There's a record of the --

THE COURT: Do those records link to each other? In other words, does the RMV record refer to a --

MR. CHAKRAVARTY: No. It's purely for identification. And along the same lines, it's not like the RMV record is a history of surchargeable events. It's rather just this is who this person is. It's used to help the data entry person identify that this is, in fact, the person with whom this record is associated.

With regard to this particular individual, this morning, Miss Conrad and I did have a have brief conversation, she recognized, as I have from time to time, we'll see that somebody reports on Question 40 that they have some involvement and then we have no record. There could be a variety of explanations. I think there was one person yesterday, and I think Miss Conrad mentioned there was somebody today. There

were several individuals who had criminal records today, but in this morning's proceeding, they all washed out with the exception of one who, I think, was the person who called in sick or was unable to come today. It was at that time that Miss Conrad recalled that this was a person that was somebody who listed a record on her Question 40 but for whom we did not have a printout. So, in practicality, we really didn't have time to go back and look.

I think what it suggests is, if there's a situation like this, that if we have advance notice before the juror is here, before the day begins, as Mr. Weinreb was explaining, we would be happy to spend the extra time to go do it. But afterwards it seems like it's just a recipe to create some issue with the juror when they forewent the opportunity to interview the person while they were here.

THE COURT: So my problem is that if you had raised this while she's still available, we could have asked her about if and cleared it up.

MS. CONRAD: But -- may I?

THE COURT: In other words, we could have said, You reported this incident.

MS. CONRAD: Do you know why there's no CORI record of it?

THE COURT: No. Just tell us about what happened. She might, in her nonprofessional, non-legal professional way,

describe, for example, a clerk's hearing at which no process issued, which is, I think, not an implausible scenario for this.

MS. CONRAD: Okay. Point taken going forward. However, I still think that the request that the government -- there's a possibility that the recording on the spreadsheet in handwritten -- I've got a copy of it here if the Court wants to look at it -- "negative" could be an error given the number of people we're talking about. So it doesn't seem asking too much for the government to provide the printout.

THE COURT: Yeah. Run it again.

MS. CONRAD: Thank you.

THE COURT: Let's try to raise issues that can be followed up with -- when the juror is still here.

Apart from -- I forgot where we were with this juror. No challenge, right? She's in.

103 was previously excused; 105; and 108 we dealt with by indication. 109 is the one, I guess, who had the flu, is that -- Jim?

THE JURY CLERK: She is still --

THE COURT: And so Jim is handling that. When she's able to come in, we'll have her in.

MS. CLARKE: 110 is gone.

THE COURT: Yes. Let me just -- there was something I was going to bring up I thought related. Anyway, go ahead.

MR. WEINREB: So the government had a proposal, which I believe defense concurs in, which is, the process this morning was very productive in the sense that the Court's proposing a list of jurors who appeared like they might be excused, especially for hardship, sort of focused the parties' attention on those and led to a lot of agreement.

If we could get a list like that from the Court in time to get back to the jury office and get the -- our agreement to them so that the jurors could be called off, then we wouldn't have to bring them in.

THE COURT: Right. We're going to try to do that. On that, I have two for tomorrow, two and a half. So 114 appears to be a full-time student. And in an advanced sense, 125 is also a student who says he has to defend his Ph.D. dissertation on March 11th. I thought we ought to let him prepare for that.

So those are my two suggestions. You might take a look -- these are people that -- I just -- they're not the same. They're not clear hardship or self-employment, but the totality led me to think there might be a high likelihood you might agree on it. And that would be 122 -- I think that's it, just 122. So those are the ones that will be in tomorrow's pool.

We're going to try -- actually, I'm thinking of ways successfully to push this out over a longer horizon to reduce those that are in this category that are a clear hardship,

clear financial burden, and so on and propose those. But to then sort of, I guess, bring in for consideration those pools that are free of those people and that I think it may help us pick up the pace because the likelihood of someone being chosen or not increases, it seems to me, when the people don't have these -- when the pool doesn't have people with these kinds of qualifications in it. In other words, we're going to kind of make it -- as a general matter, each day's pool will be more plausible jurors than having these people in, these kind of people. So that's a project we're going to work on. Yeah.

MR. WEINREB: Just one other thing. Go ahead.

THE JURY CLERK: No. Go ahead. And I'll say my idea after.

MR. WEINREB: With the Court's permission, we were intending, at least for the time being, not to submit written requests for follow-up questions.

THE COURT: Yes. That was the other point I was going to try to make. In light of the fact that we've now been allowing the follow-up questions, I think that's sufficient. As I went through in the first couple of panels and tracked both of your submissions, I'd say 90 percent of them were things I had already noted. Occasionally, there was something I had overlooked, and it was brought to my attention. But I think it's, frankly, a waste of your time to be compiling documents like that when we're pretty much focusing on the same

things. And to the extent I have missed something, you see it in the questionnaire and want to focus on it, we can do it that way. So, yes, I don't think you should have to do those filings anymore.

Jim?

THE JURY CLERK: I think entirely different than attorneys think, so I just want to point out, for example, the judge mentioned three jurors for attorneys to look at. They're in my next group of 20 people. If the attorneys agree to strike those, our pool now gets down to 17. Does your Honor -- I assume you want 20 people in. I know how you guys think. You guys think of blocks of 20. You might want to look out a few more. I would assume, if we want 20 people in, we would call in 137, 138, and 139.

THE COURT: I guess my reaction is wait a day on that. I want to think through and maybe play with the questionnaires a little bit to see how things look. I don't know the answer to the question from my own perspective. My hope would be that as we -- again, as we get more experienced with this process, we may be able to even, even with respect to the people we have here, you know, move the process forward a little faster. But I'm not sure exactly what it's going to look like.

But there was another point that I thought you were going to make, and that is, with respect to the people for tomorrow, if you could let Jim know this afternoon so he can

tell those people they don't have to come in rather than have them come in.

And if you, independently of our process, see other people, say, for tomorrow, that you, on reflection now, think you could jointly agree to, if you could give us that list so I could look at it since I want to have the last word on it. And if there was anybody that I thought I might disagree, we'd bring that person in. The others also could be excused. So if you want to take a look at tomorrow and see if there are people like this morning's people that could be eliminated beyond the ones that I've identified.

And then -- at some point, obviously, if we're just bringing in nine to eleven, that's not satisfactory. We should have more than that. But I want to see -- I want to get things stabilized a little bit on this new regime before we fully commit to that. Thank you. Take the rest of the day off.

(Whereupon, at 2:35 p.m. the trial recessed.)

C E R T I F I C A T E

We, Marcia G. Patrisso, RMR, CRR, and Cheryl Dahlstrom, RMR, CRR, Official Reporters of the United States District Court, do hereby certify that the foregoing transcript constitutes, to the best of our skill and ability, a true and accurate transcription of our stenotype notes taken in the matter of Criminal Action No. 13-10200-GAO, United States of America v. Dzhokhar A. Tsarnaev.

/s/ Marcia G. Patrisso
MARCIA G. PATRISSO, RMR, CRR
Official Court Reporter

/s/ Cheryl Dahlstrom
CHERYL DAHLSTROM, RMR, CRR
Official Court Reporter

Date: January 21, 2015