UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                                    )
UNITED STATES OF AMERICA,           )
                                    )
        Plaintiff,                  )
                                    )   Criminal Action
v.                                  )   No. 13-10200-GAO
                                    )
DZHOKHAR A. TSARNAEV, also          )
known as Jahar Tsarni,              )
                                    )
        Defendant.                  )
                                    )
```

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**JURY TRIAL - DAY EIGHT**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Thursday, January 22, 2015
9:12 a.m.



Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

8-2

APPEARANCES:

        OFFICE OF THE UNITED STATES ATTORNEY
        By: William D. Weinreb, Aloke Chakravarty and
            Nadine Pellegrini, Assistant U.S. Attorneys
        John Joseph Moakley Federal Courthouse
        Suite 9200
        Boston, Massachusetts  02210
        - and -
        UNITED STATES DEPARTMENT OF JUSTICE
        By: Steven D. Mellin, Assistant U.S. Attorney
        Capital Case Section
        1331 F Street, N.W.
        Washington, D.C.  20530
        On Behalf of the Government

        FEDERAL PUBLIC DEFENDER OFFICE
        By: Miriam Conrad, Federal Public Defender
        51 Sleeper Street
        Fifth Floor
        Boston, Massachusetts  02210
        - and -
        CLARKE & RICE, APC
        By: Judy Clarke, Esq.
        1010 Second Avenue
        Suite 1800
        San Diego, California  92101
        - and -
        LAW OFFICE OF DAVID I. BRUCK
        By: David I. Bruck, Esq.
        220 Sydney Lewis Hall
        Lexington, Virginia  24450
        On Behalf of the Defendant

P R O C E E D I N G S

THE COURT: Good morning, everyone. This is going to be brief, and then we'll bring the people out. I understand you've jointly agreed on some others. I will quickly look at it. I haven't yet because I just was given the list. Assuming I don't have any -- I actually recognize at least one that I know I looked at before. I just wanted to make sure we made a record of it. I don't know whether it is yet. The parties have agreed on 112, 117, 133, 135, 127, and 130. Is that accurate?

MR. CHAKRAVARTY: I think there were --

MS. CLARKE: There was more than that.

THE COURT: The three we talked about yesterday. Maybe that's not on the record yesterday. Those were 114, 122, and 125.

Now, so we'll follow the same procedure we followed yesterday. Those people will be told they can go along. There's no need for follow-up. And then we'll begin following up as usual with the remainder. It would be much better if we could get this the day before so those people don't have to come in. My goal actually -- and I'm still working out in my head the mechanics of this -- is to get this kind of thing done three or four days in advance so that we can backfill those slots with people who don't have this disability, that they're likely to be discharged for these agreeable reasons. I think

it will give us a richer pool, more likely to yield more progress. So that's the objective. I hope by next week we're on that plane. That's all. I wanted to make sure that was on the record.

I wanted to inquire whether either side intends to take a position, make any filing, with regard to the Globe's motion. If not, I'm not going to wait for anything, and I'll proceed to address it. But I didn't know whether the parties had any -- as I said, I think it's an odd posture. It's a --

MR. WEINREB: Your Honor, whether the government files something or not depends, in part, on the defense's position. As you know, from the start, our chief concern has been that the record reflect that there has been no infringement of the defendant's Sixth Amendment right to an open courtroom. We believe that that record had been made clearly and that the defense agreed that this was a public trial based on the measures the Court took and that, in addition, that they had essentially waived any right to a public trial beyond what they had agreed to with respect to the arrangements the Court made at the outset. If that is still the case, then we don't have -- we don't intend to file anything with respect to the Sixth Amendment.

As for the press's and the public's First Amendment right to be present in the courtroom, we do believe that, as the government, we have an obligation to safeguard that. And

one proposal that we thought we might float, not necessarily in a filing but in this situation, if the Court is not inclined to simply grant the Globe's motion, is to point out that the Court originally made provision for each side to designate five members of the public. So far it appears nobody's taken either side up on that invitation. But that seemed to reflect a belief from the Court's part that having ten people in the audience wouldn't unduly influence the jurors. And so having, let's say, ten reporters in might be, you know, somewhat short the relief the Globe is seeking but could be a potentially reasonable accommodation.

But, in general, the government doesn't oppose this -- the courtroom being open to the public and the press. And so unless either the Court itself or the defense takes a position that would necessitate our filing something, we wouldn't be doing so.

MS. CLARKE: I think that Mr. Weinreb is correct on the Sixth Amendment position that we took, and we're not retracting from that. And I don't -- we don't plan to file an opposition to the Globe's motion.

THE COURT: Okay. All right. That's all I wanted. So I'll address it then. Okay.

So we'll proceed to excuse or send on their way, I guess -- excuse is not the proper term -- send on their way, the jurors that have been designated.

MR. BRUCK:  After the jurors are instructed, we have two matters.  One is an objection to one of the government's questions that we'd like to be heard on, and the other is a request to reconsider the qualification of Juror No. 60 that we just wanted to very briefly argue.

THE COURT:  Okay.  All right.  That will be the next step, which will probably take a few minutes as Jim organizes the exodus.

(Short recess taken.)

THE COURT:  Once again, I wanted to just note that there are some jurors who the parties and I agreed need no follow-up, and they have been sent on their way, and we will proceed with the reduced number.  If you see fewer than you expected in the box, that's because we've determined that it's not necessary to conduct further voir dire with some of the members.  I think there are about 11 at this stage.  So we'll bring them in.

(The venire entered the room at 9:40 a.m.)

THE COURT:  Good morning, ladies and gentlemen. Welcome back to the United States District Court for the District of Massachusetts.  And thank you for being here.

We're continuing the process of selecting a jury for the case of United States vs. Dzhokhar Tsarnaev.  As you know, Mr. Tsarnaev is charged in connection with the bombing that occurred near the finish line of the Boston Marathon in April

2013, and that resulted in the deaths of three people there. He's also charged in the death of an MIT police officer that occurred on April 18 and 19 -- and other crimes that occurred on April 18 and 19, 2013.  Some, but not all, of the crimes he is charged with are, by statute, potentially punishable by death.

You will recall from my prior instructions that the jury will first consider and decide whether the government has proved Mr. Tsarnaev's guilt of any or all of the charges against him.  If he is convicted of any of the capital crimes, that is, crimes for which the death penalty is legally possible, then the jury will consider and decide whether he will be sentenced to death for any such crime or to life in prison without the possibility of release.

You may have wondered why the death penalty could be a possibility in this case in view of the fact that the laws of Massachusetts do not provide for the death penalty for murder or any other violation of criminal law.  The reason is that this is a federal case involving violations -- alleged violations of the laws of the United States rather than a state case involving violations of Massachusetts law.  So if the jury convicts Mr. Tsarnaev of any of the capital crimes charged in the Indictment, that same jury will hear additional evidence and then decide whether to sentence him to death or to life in prison without possibility of release.  Because the jury that

is now being selected to decide first whether he is guilty or not will also decide his punishment if he is convicted, it is necessary to question you about your feelings or beliefs about the death penalty as part of this process in selecting a jury.

Let me explain briefly the procedures that must be followed in a case in which the death penalty is or may be at issue.  As in any criminal trial, initially the government will have the burden of proving that Mr. Tsarnaev is, in fact, guilty of any crime with which he is charged.

If he is convicted by the jury of a crime for which the death penalty may be lawfully imposed, there will be a second phase of the trial.  The second phase is commonly referred to in shorthand as the penalty phase.  In that phase, the government will introduce evidence that seeks to prove beyond a reasonable doubt, first, that Mr. Tsarnaev acted with the necessary intent to be subject to the death penalty as a matter of law; and, second, that aggravating factors about the killings or the defendant himself justify sentencing him to death.  Aggravating factors are circumstances that, if proven, make the crimes particularly serious or blameworthy and, therefore, under the law may justify imposing a more severe sentence on this defendant compared to other persons who have been convicted of intentional killing or murder.  The government will bear the burden of proving alleged aggravating factors to every juror beyond a reasonable doubt.

The defense will have an opportunity in the penalty phase to present evidence of what it will argue are mitigating factors.  Mitigating factors are usually circumstances about the crime or the events or about the defendant's background or character that would suggest that the death penalty is not the appropriate sentence in the case or that life imprisonment without possibility of release is adequate to punish the defendant for his offenses.

Unlike the proof of aggravating factors, a mitigating factor need be proven only by a greater weight of the evidence.  This is a less demanding standard of proof than proof beyond a reasonable doubt.  Again, unlike proof of aggravating factors, mitigating factors do not have to be proven to the satisfaction of all 12 jurors.  Any juror who finds or determines that a mitigating factor has been proved by a greater weight of the evidence may consider that factor in deciding the appropriate sentence in the case regardless of whether any or all of the other jurors agree that the mitigating factor has been proved.

After the parties have completed their presentations during the penalty phase, then the jury will weigh all the evidence.  Before a jury could vote to impose the death penalty, every juror would have to be persuaded that certain threshold factors make Mr. Tsarnaev potentially subject to the death penalty, and the jurors would have to be persuaded that those threshold factors had been proven beyond a reasonable

8-10

doubt.  In addition, in order to impose the death penalty, every juror would have to be persuaded that any proven aggravating factors sufficiently outweigh any mitigating factors found by any juror or jurors to justify a sentence of death.  Even if the jury did not find any mitigating factors, it would still have to be unanimously persuaded that any proven aggravating factors were themselves sufficient to justify a sentence of death.  You should understand that a jury is never required to find that a sentence of death is justified.

The decision whether the government has proved that a defendant should be sentenced to death must ultimately be made by each juror himself or herself.  If, however, every juror is persuaded that the death penalty should be imposed, I would be required, as the judge, to sentence the defendant to death.  In other words, I could not change the jury's decision.  The jury, and not the judge, is responsible for determining whether a defendant who is convicted of a capital crime will live or die.

I've just given you an overview of the law applicable to the consideration of the death penalty.  If you are selected to serve on the jury and if you find that the defendant is guilty of a crime punishable by death, then after the penalty phase, I will give you some very detailed instructions concerning your duties in deciding on whether to impose the death penalty or the penalty of life imprisonment without possibility of release.  And I will instruct you in the law

that pertains to those matters.

You may recall that I told you when you filled out the questionnaires that there are no right or wrong answers to any of the questions you have been asked or to any questions you will be asked today in this process.  We ask them because both the government and Mr. Tsarnaev are entitled to a jury that does not have its mind firmly made up one way or the other on any of the issues before hearing the evidence and a detailed explanation of the law.  That applies both to whether Mr. Tsarnaev is guilty or not guilty of the specific crimes charged in the Indictment, and if he is convicted of a capital crime, whether he should be sentenced to death or to life in prison without possibility of release.

So today I'm going to have some questions of each of you individually about issues that are relevant to the selection process.  What we're going to do is have you go back to the room you've just been in.  We'll call you into the courtroom one by one to ask you those questions.  There will be a few people in the courtroom in addition to the lawyers and their staff who are taking part in the process.  These proceedings are being simultaneously transmitted by video and audio to overflow courtrooms.  We will not identify you by name but rather by number, and you will be seated so that the video camera will be behind you.

Your answers will generally be public, but if you

believe that a truthful answer would require you to reveal sensitive personal information, we'll temporarily stop the audio transmission to those courtrooms so that people observing there will not hear your answer.

Again, we do not expect or want any particular answer to any of the questions. All we want and the law expects is that you provide accurate and truthful answers to the questions that you are asked. If you do that, you will be doing your duty as a citizen and as a juror no matter what the answer may be.

I also want to take this moment to remind you about some of my prior instructions. As I told you, a jury's verdict must be made based on the evidence produced at trial and must be free from outside influence. Therefore, I remind you again that it is extremely important that you do not discuss the case, including the jury selection process, with your family, friends, or each other or any other person until either you've been excused or, if selected as a juror, until the case has concluded. And, of course, you're not to conduct any independent research online or otherwise or otherwise read, watch or listen to reports about the case while this process is ongoing.

When you signed the questionnaires, you did so under an affirmation that the statements were true and you were making the affirmation under the penalty of perjury.

Similarly, for the present purpose, we ask you to swear or affirm that in open court, and the clerk will now ask you to rise as he administers that oath.

THE CLERK:  Will the jurors please rise and raise your right hand.

(Venire sworn.)

THE COURT:  Okay.  Thank you.  We'll ask you now to withdraw, and we'll begin the process of voir dire examination.

(The venire left the courtroom at 9:54 a.m.)

THE COURT:  Mr. Bruck wanted a sidebar before we begin.  I don't think the camera -- it's off because they're going to move the camera.

Okay.  Mr. Bruck.

(SIDEBAR CONFERENCE AS FOLLOWS:

MR. BRUCK:  Thank you.  First, your Honor, we would like to register an objection and move that the Court not permit further questioning along the lines that are found at yesterday's transcript at 7-98 and 7-99.  Counsel for the government asked a juror, "Can you -- my question is simply can you imagine yourself on the jury thinking about whether this person sitting at the table should live or die?  Would you be able to if you thought it was the appropriate punishment? Would you be able to sentence him to death?"

We think that that is asking for a commitment not to be able to impose the death penalty in an appropriate case but

a commitment to sentence this defendant to death.  It is, in effect, conditioning the juror to render that verdict, and we think that goes much too far.  If ever there was a stakeout, that's it.  It's one thing to ask whether or not, in an appropriate case, the juror could actually impose a death sentence, making clear that the question is general, but not, Look right over there, you know.  Look that man in the eye.  Can you sentence him to death?  That is a commitment.  Granted, it's a conditional commitment, but we think it's highly prejudicial and improper, and we don't think the question should be asked.

MR. WEINREB:  So, your Honor, the proposition the government is trying to establish in asking that question is simply whether the juror can only consider imposing the death penalty as a hypothetical matter or whether they could actually envision sentencing another human being to death.  In asking whether they could sentence this defendant to death is just a way of making that proposition concrete.

But I think Mr. Bruck's objection is -- can be accommodated by the government simply by rephrasing the question by saying, Can you imagine considering whether a human being -- you could sentence a human being to death?

THE COURT:  We've had that general question with a couple of jurors -- more than a couple perhaps -- whether the juror could actually take personal responsibility for a verdict

that would result in the death penalty for an individual.  And I think that focusing particularly on the defendant is unnecessary and should be avoided.

MR. BRUCK:  Thank you.

The second matter, your Honor, something happened yesterday that crystallized our objection or our concern about the presumption-of-innocence questioning of jurors who hold an opinion that the defendant is guilty.  The Court -- both the government and the Court has been asking jurors whether they -- who hold an opinion of guilt, whether they could, in effect, suspend that long enough for the government to prove its case, if the government can.  And jurors will -- some jurors have said, yes, they could do that.

The juror -- I'm missing her number, but it is the juror who is the social worker from Mass. General -- responded to that question by -- you said, "Well, if the evidence wasn't convincing, could you put aside your prior conviction?"  And she said -- she answered, "If the evidence was not convincing, where is the prosecution?  You're killing me."  And there was some laughter in the courtroom.  And then she explained later, "But I can't imagine not being convinced by the evidence."

Now, that gets at something very important that is going on here.  Jurors who know this case and have -- who know -- are familiar with the enormous volume of information that has been put out and who have personal -- many of them personal

experiences with some aspect of the case, have a -- are likely to have a very high degree of certainty in their own minds coming to court that the defendant is, in fact, guilty. So the question, Could you put that aside and require the government to prove the defendant's guilt before you rendered your verdict, asks them to do a very sterile and, in effect, meaningless mental exercise. It's a little bit like saying, to use an absurd example that I think makes the point, let's say a lawsuit -- a case involved the question of whether pigs could fly. And the government's position was that the pigs could not fly. And the juror would come to court and say, Well, I believe that pigs can't fly. The juror was asked, Could you put that opinion aside and weigh the evidence on both sides? And if the government failed to prove that pigs can't fly, would you find that they could?

Now -- and the law requires you to do that, and that's what you're supposed to do. That's how our legal system works. Now, a juror could say, Sure, no problem. I could do that. But they could only do that knowing what the outcome was going to be from the beginning. There would be no suspense. It is not a real question.

And I think that's what's happening with some of these jurors. And this juror, the social worker from Mass. General, really brought that home when she said, "But I can't imagine not being convinced by the evidence." She went one way. Other

jurors could say just as easily, Well, it's a theoretical proposition, but, sure, if for some reason the government became catatonic at the start of their case and failed to call any witnesses and the FBI went on strike and there was no evidence presented, sure, I could find Mr. Tsarnaev not guilty. I know it's not going to happen, is what they're thinking, but I could do it.  And that is why we really think that these questions do not rehabilitate jurors, and they're unfair for that reason.

For a great many people, the trial of guilt or innocence is over.  It's already taken place.  It took place in the news media.  It took place in their day-to-day lives during the -- in the days after the bombing and the months after the bombing.  And they can tell you anything and be honest and be truthful.  But it has no legal meaning.  It has no real factual significance.

And that's why we think that these rehabilitating questions are simply inadequate to do the job.  There may be jurors who really don't have a strong opinion, but for the ones that do, we think that what is happening here is simply not adequate to assure a fair and impartial jury.

MR. WEINREB:  So, your Honor, I disagree with Mr. Bruck.  It seems to me that what he is -- he is calling into question the adequacy of a criminal justice system in which people drawn from the community are called upon to decide the

guilt or innocence of their fellow citizens.  The Supreme Court has made it quite clear that there is no problem with seating jurors who have knowledge of a case and who have formed an opinion about a case.  And, in fact, they have -- the Supreme Court has said repeatedly that, in a situation where you have a highly publicized case, any intelligent member of the community is likely to have formed an opinion and possibly a strong opinion.

The goal is simply to ferret out those who can go through the exercise of suspending that preconceived belief and deciding the case on the evidence from those who can't.  And that's the process we've been undertaking here.  And the most important part of that process is the Court's ability to observe their demeanor and hear their answers and size them up as whether they're both being honest about it and whether they really -- what they're saying can be trusted and is reliable.

And the government sees no evidence that that hasn't taken place in this case.  There's nothing particular about this juror that I would submit exposed anything, any weakness or problem in the process.  This is an example of the process working.  This is a case where follow-up questioning, probing questions by the Court and the parties helped elicit the strength of this particular juror's beliefs and her ability to do one thing or another and the -- this is the proof that the process is, in fact, working.

So to the extent that Mr. Bruck is arguing that anybody who says they have a preconceived opinion about the defendant's guilt or innocence cannot lawfully sit on the jury, the government believes that's incorrect.

MR. BRUCK:  That is not our position.  By the way, it's Juror 90, is the juror to whom I was referring.  Mr. Weinreb says, it's a question of whether the juror can suspend their opinion -- opinion.  That is not the test.  It's a presumption of innocence.  It's a frame of mind which truly regards the defendant or is able to regard the defendant as not guilty, not simply entering into a mental exercise, a sort of a make believe in which we're going to pretend until our opinion -- until my opinion is confirmed by evidence that he's not guilty, and then I'll go back to thinking what I thought before.  That's not a fair trial and that is not the presumption of innocence.

There are -- I don't -- we do not contend that every juror is the same.  We do contend this case can't be tried in Boston.  Of course, we have made that motion several times.  Certainly nothing that has happened causes us to retreat from that conviction.

But assuming we're going to try to get a jury here, and that's what we're here to do, there are jurors who have different levels of conviction.  I'm thinking about -- there's a -- about jurors who say not only that they believe the

defendant to be guilty and think he should be sentenced to death but that they come to court having filled out a questionnaire that says they cannot put that opinion aside. And then they are questioned according to these formulas and say, Well, I think maybe I could or, Yes, I think I could. That's where the problem is, or that's an example of where the problem is.

THE COURT:  This is a matter that may vary in degree from case to case, but it doesn't vary in kind.  It's a problem that we face commonly, particularly if there's been a good deal of publicity in cases.  My experience has been that jurors can be examined about their self-assessment of their ability to do what is required of them, to listen to the evidence in the case, and to make a decision based on that evidence.  Of course, I've seen publicized cases where the jurors come out contrary to the public pressure because that's what they've done.  They've set aside whatever impressions they may have had and focused on the evidence that they actually heard in the case.

We can keep debating this.  As I have said on a couple of occasions, we use the presumption of innocence as a term of legal art to describe the requirements of the justice system in proving somebody guilty of a criminal offense.  Jurors are not likely to understand it in the technical sense that we typically use it but rather in some lay and perhaps even

idiosyncratic sense.

This is not a -- there's no scientific way to answer the question whether a juror can -- who has some impressions will stick to them or will be open to changing, altering, even rejecting them at trial.  The best we can do is ask jurors for their honest self-assessment when asked to do what they will be asked to do at trial.  Can they focus on the evidence that is presented, consider the instructions of the law regarding the offenses and then make a verdict -- deliver a verdict that resolves factual issues and applies the law?  Can they do that faithfully without requiring the defendant to prove that he's not guilty?

We ask them to tell us.  And as we assess what they tell us, it's not simply the words they use but the manner in which they say it, the context in which they say it and so on.  So it's not simply focusing on a particular segment of their answers, but it's an assessment of them as a person who sits here, has expression and so on.

MS. CONRAD:  Your Honor, may I say something about this?

THE COURT:  No.  Well, let me finish.

MS. CONRAD:  Sure.

THE COURT:  Anyway, so I understand your view on it. I think the way we've been handling it is proper.  Miss Conrad.

MS. CONRAD:  Thank you, your Honor.  Sorry.  I thought

you were done.  I apologize.

Yesterday Mr. Weinreb said something that really struck me.  And this is, I think, on Page 20 of the transcript. He said, "The Court has been simply asking," and then he stopped himself and said, "instructing them what the law requires them to do and asking them whether they can follow the law and do it.  That is the key question.  That is where the jurors' minds should be focused."

It seems to me that is not where our inquiry should be focused.  It should not be focused on instructing them and getting them to promise that they will follow those instructions.  It should first be focused on truly exploring the strength of their belief in Mr. Tsarnaev's guilt, the strength of their belief that he should receive the death penalty, and why they said they would be unable, when they said that, to put that aside even when they said they would be able to.

It seems to me the focus of voir dire should be to probe the jurors' preconceived ideas and presumptions of guilt, not to simply elicit from them or instruct them that they must put those aside.  And I was disturbed when Mr. Weinreb said that.  He went on to say, "They need to begin the process today of putting aside everything they have heard or might have thought about the case and focusing on their duty, their obligation, to decide the case based solely on the evidence

applying all the legal principles.  The best way to begin the process to do that is by approaching the task of questioning them in that way in a way that is consistent with that goal."

The goal of voir dire is not to extract a promise or to order them to put aside their presumptions.  The goal of voir dire is to determine the basis, the extent, and the certainty of that presumption.

THE COURT:  Well, I'll only say that I think a juror should understand, if it's necessary to explain it -- and it isn't in every case, but it may be in some circumstances we conduct the dialogue.  But to the extent that it's necessary for the juror to understand what we mean when we say the presumption of innocence, I think it's appropriate.

So I think we're ready for the first juror.

.   .   .   END OF SIDEBAR CONFERENCE.)

THE CLERK:  Juror No. 111.

THE COURT:  Do we have any Question 40 issues in this panel?  I just would like a head's up if we do.

MR. CHAKRAVARTY:  I think there's one on 113, your Honor.

THE COURT:  All right.  So they will be soon.  Okay.

MR. MELLIN:  Your Honor, Juror 134 indicated that she had something to say privately about No. 40.

THE COURT:  Yeah.  I saw that.

THE JURY CLERK:  Juror 111.

THE CLERK:  Have a seat here if you would, please.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  You recall -- I referred to it earlier today, but you recall that when you were here before I asked you to avoid any discussion of the case or the process and avoid, as much as you could anyway, any exposure to media reports about it.  Have you been able to do that?

THE JUROR:  I tried.

THE COURT:  Have you succeeded?

THE JUROR:  I think so.

THE COURT:  Tell us what you do.

THE JUROR:  I'm an architectural draftsman.  I just recently started working at a small architecture firm.  I finished college this past May.

THE COURT:  You're concerned about the impact of your being called to serve for an extended period on that.  Can you tell us how that would affect you?

THE JUROR:  Not only is it a financial loss for me, you know, in the order of 12 to $15,000, but it's also -- this money is going towards graduate school, which I hope to attend in a year or two.  And I would like to save as much money as possible before attending graduate school.  And the work that I do is directly correlated towards my field of study, and having this work experience is very important for me to be successful

as an architect and in graduate school.

THE COURT:  Have you discussed this with your employer?

THE JUROR:  They've agreed to pay me for three days.

THE COURT:  Okay.  Thank you.

MR. BRUCK:  It will probably take longer than that.

THE COURT:  So hold off for a minute.  Do you have something on 113?

MR. CHAKRAVARTY:  Yes, your Honor.

THE COURT:  Is this -- why don't we just -- this may be a sidebar.

Okay.  We'll get to it in due course.

THE CLERK:  113.

THE JURY CLERK:  Juror 113.

THE CLERK:  Sir, right over here, please.  Have a seat.

THE COURT:  Good morning.

THE JUROR:  Morning.

THE COURT:  I referred to it earlier today, but do you remember, when you filled out the questionnaire, we asked you, as you left, to avoid any discussion of the case or the process and try to limit any exposure to the media accounts and so on?  Have you been able to do that?

THE JUROR:  I -- yes.

THE COURT:  So that is the questionnaire you filled

out.  We're going to follow up on some of the questions just to get a little more information.  I want to start with what you do for employment.

THE JUROR:  I am an employee benefits broker.

THE COURT:  Broker?

THE JUROR:  Yup, a consultant.

THE COURT:  Self-employed or --

THE JUROR:  No.  I work for a firm here in Boston.

THE COURT:  How big is the firm?

THE JUROR:  It's about 210 people.

THE COURT:  How many of those are broker consultants?

THE JUROR:  Probably 50 of us, and the rest is support.

THE COURT:  With respect to social media, you post sometimes on business-related blogs and so on?

THE JUROR:  That's about it.

THE COURT:  Do you do any --

THE JUROR:  LinkedIn, and I don't do Facebook or I'm not on Twitter or --

THE COURT:  Your daughter is employed by the Massachusetts Department of Correction.  What's her capacity there?

THE JUROR:  She works in the administrative office in Milford.

THE COURT:  Basic administrative kinds of things?

THE JUROR:  It is.  She -- she does -- I asked her this the other day because I knew you might ask me this.  She does statistical compliance checks, whatever that means.  I really wasn't sure what she does.

THE COURT:  At Pages 17 and 18, we asked some general questions about attitudes towards issues and international affairs and so on such as the War on Terror and perhaps attitudes towards Islam and Muslims and immigration and things like that.  Do you recall those?

THE JUROR:  Yes.

THE COURT:  You filled them out.

Since you gave us those answers, there have been some news reports about incidents in France, for example, of terrorism attacks and so on and so forth.  Have you followed those news reports about the -- about what's going on over there?

THE JUROR:  As much as any normal person would as far as peripherally.

THE COURT:  Would those events cause you to change any of the answers you've given previously?

THE JUROR:  No.

THE COURT:  Can we have a quick sidebar, which means we'll excuse the press?

MR. DOREAU:  Audio is off; video is off.

(SIDEBAR CONFERENCE AS FOLLOWS:





MR. DOREAU:  Video and audio on.

THE COURT:  Wait for the reporters to come back into the room.

.  .  .  END OF SIDEBAR CONFERENCE.)

THE COURT:  So I'd like you to turn to Page 20 and direct your attention to Question 77.  In this we asked whether, based on things you'd seen or heard in the media or otherwise, you'd formed an opinion about whether the defendant was guilty or not and, if so, what penalty he should receive, whether the death penalty or not the death penalty.  You indicated you did have an opinion about whether he's guilty or not, but you are unsure about the penalty.

So let's focus on the first part.  Obviously, there's been a lot of news accounts of the case.  The jurors will have to decide whether the government ultimately has proved the defendant guilty of any of the specified crimes in the Indictment beyond a reasonable doubt.  And I don't know -- I think you did not have any prior jury service, is that right?

THE JUROR:  No.

THE COURT:  In a criminal prosecution, the defendant who is accused of a crime is presumed to be not guilty or innocent of the crime unless and until the government proves that he's guilty beyond a reasonable doubt by the evidence at trial.  That requires any juror who's called to sit to set aside for the purposes of the trial any prior thoughts about any of the issues that would be presented and to consider the evidence along the lines that I've just outlined, that is, focus on the trial evidence and see whether the government has fulfilled its burden or not.  The defendant never has any burden to prove he's not guilty.  That's the default position.  If the government can change that by the evidence, then the jurors may convict; but if the government can't do that, then the jury is obliged to acquit.  Do you understand that those are --

THE JUROR:  I understand the distinction, yes.

THE COURT:  To the extent you have an opinion now that he's guilty of these offenses, would that interfere or prevent

you from fulfilling the job of a juror, as I've described it to you, at trial?

THE JUROR:  No, it wouldn't.  I would be able to separate whatever personal preconceived notions that I have based on what I was exposed to in the press or when it all went down.  I, obviously, like anybody, was watching it as it happened.  And that's how that feeling came out.  Now, obviously, listening to how you just described it, and I understood that a person in this country is innocent until proven guilty.  That would have to be done.

THE COURT:  Why are you confident that you could do that?

THE JUROR:  I just feel I -- I have the intellectual capacity to do that.

THE COURT:  Let's turn to the second part of the question.  You said you're unsure about the penalty that might be imposed.  Can you tell us why you answered that that way?

THE JUROR:  I think in one of the questions I was asked about it, and there were several questions about it, where -- you know, trying to get to your feelings about the death penalty.  And I'm philosophically --

THE COURT:  Actually, why don't we turn to those because you're right.  There are several.  And we're going to get to those.  Turn to Page 23.

So we asked -- beginning with 88, we asked a series of

questions about this.  88 was about general views about the death penalty.  And you said, generally, you're not in favor of it, but you understand that in certain extreme circumstances it may be warranted.  Is that a --

THE JUROR:  That's an accurate --

THE COURT:  Would you change that in any way?

THE JUROR:  No.  That's how I feel.  I think on one question I answered that it's a complex question that -- how did I word it -- can't be really answered in one question because there's so many moving parts to it, and there's so many circumstances that would be involved in considering that particular penalty.

THE COURT:  We asked in Question 89 for you to try to give us an idea of the strength of your view by indicating where on the scale, from strongly opposed to strongly in favor on a scale of 1 to 10.  And you picked a 7.  That's little bit toward favor.

THE JUROR:  Maybe that would be more of a 6.  No, I'm not going to change that.  It's -- it's just difficult to say one way or the other.  It all depends on the situation, so I -- it's just, like I said before, a tough -- a tough answer to give based on one type of question like that.

THE COURT:  If you'd go to the next page, Question 90, we asked, similarly, for you to pick one of the proposed statements that you thought closely -- most closely reflected

your view, and you picked (c), which is that you're opposed but could vote to impose it if you believe the facts and the law in a particular case called for it.  Is that --

THE JUROR:  That is probably -- that is my stand.

THE COURT:  And in 91, you said you've become more open-minded regarding it.  When you were younger, it was more black and white.  In what way was it black and white when you were younger and how -- what's the direction of open-mindedness?

THE JUROR:  I think, with more life experiences, I've probably just seen more, and I understand --

THE COURT:  In which direction have you moved, I guess is what -- my question:  more in favor or more opposed?

THE JUROR:  Again, I probably -- my view is just more gray as opposed to being black or white.  As I've become more open-minded, I'm more open to the discussion of whether something like this should be imposed.

THE COURT:  So what I'm --

THE JUROR:  I'm not answering your question.

THE COURT:  No.  I just want to be sure I understand it.  I think what you're saying is, you used to think it was a simple yes-or-no proposition.  Now you think it may depend heavily on the circumstances.

THE JUROR:  Correct, where before I wouldn't be as open to hearing all of the story.  I would pretty much hear

something and then snap to a quick judgment, as opposed to now, I think I'm at a point in my life where I can pretty much freely assess a situation and then come to a judgment about it. I don't know if that makes sense.

THE COURT:  Again, the next page -- I think it's the next page -- 95 and 96, which is on the following page.  95, we asked, if you found the defendant here guilty and you decided the death penalty was the appropriate punishment, could you conscientiously vote for the death penalty in this case?  And you said "not sure."  Then on the next question, we asked you sort of the reciprocal of that.  If you found Mr. Tsarnaev guilty and you decided life imprisonment without the possibility of release was appropriate, could you conscientiously vote and you said "yes."  So there's a little more certainty, I guess, in your second answer than in your first.  I just wonder if you could tell us about that.

THE JUROR:  Sure.  Because my view is -- and I answered that in 91.  I'm looking at the answer I gave.  My view is that death is the ultimate severity in penalty that you could impose on somebody, and I wouldn't have a hesitation about sentencing someone to -- I consider that below a death penalty.  So if the instructions were clear, I would follow the instructions to the letter.  I mean, if the instructions were clear, from a personal standpoint, would I have trouble doing it?  Yeah.  But if it was the instructions that I was to do

that, I would.  I wouldn't let my personal view get in the way of what the instructions were.

THE COURT:  Well, nobody is going to instruct you how to vote.  You will have to decide yourself how to vote.  And -- as I explained briefly and we'll -- if you're a juror, we'll get into it in more detail.  But in the penalty phase, when the focus is on the penalty, because the conviction at that time is presumed -- or it's happened in the real course.  But for these purposes, it's presumed that -- if we're talking about penalty, you can presume that we're talking about somebody who's been convicted by the jury of a crime that is punishable by death, an intentional murder, for example.

THE JUROR:  Right.

THE COURT:  So you have a person like that.  And then you'll hear things that say, This is a worst case than the average case, and it really deserves the death penalty.  You'll have other evidence that says, There are circumstances here that argue against the death penalty for this case.  Life imprisonment is more -- is the more appropriate punishment.  You'll have all of that and give that consideration.  But then the jury will have to decide that question.  It's not a question of being instructed to do something.  You then will have to weigh the aggravating and the mitigating.

The question is:  Assess it yourself.  If you thought that the aggravating circumstances outweighed any mitigating

circumstances, making it the death penalty appropriate in a sense, in a general sense, could you vote for it under those circumstances?

THE JUROR:  Verbally -- and I understand where you're going here because some of my answers are contradictory, and I can understand that might lead to a little confusion.  But if in -- in the circumstances where you do have extenuating circumstances and it's warranted based on -- and I'm not a lawyer but based on the evidence and based on how the law is explained -- and I guess the word "instructed," I guess I understand we're never going to be instructed to impose a penalty, but we'll have that as -- the answer is no, I would not have a problem.

THE COURT:  Would not have a problem, okay.  All right.

Follow-up, Mr. Mellin?

MR. MELLIN:  Thank you.  Good morning, sir.  I'm Steve Mellin.  I'm one of the prosecutors on the case.  If I could just follow up a little bit on what you've been saying.  It's a little hard to quite follow you completely on your explanations and that maybe on my fault.

THE JUROR:  No.

MR. MELLIN:  When you were saying that it depends on the circumstances, what are you trying to say there?

THE JUROR:  I would imagine that there are extenuating

circumstances where it's beyond what normal -- I guess the word "normal" can't be used here but what would be a life sentence versus the death penalty, I feel that the type of crimes that were committed in a situation where you're trying to decide whether it's one or the other, that's where I guess the difficulty could be for any person to make.  Where is that line drawn and where do you say this is where the line is crossed?  And it would have to be over the course of the trial that you would hear the evidence, and then, as a jury, you would make that decision.  I don't know if I'm being clear.

MR. MELLIN:  No, no, you are.  You've made reference to a lot of moving parts, and I'm assuming that plays right into the explanation you just gave us, is that right?

THE JUROR:  Yes.

THE COURT:  As I understand, then, you're saying that you would consider all the evidence, all of the aggravating evidence, all of the mitigating evidence, and then you would come to a conclusion?

THE JUROR:  Right.

MR. MELLIN:  If you believed, after hearing all that evidence, that you believed that the aggravating evidence sufficiently outweighed the mitigating evidence, the reasons why the death penalty should be imposed outweigh the reasons why it should not be imposed, would you be able to personally vote to impose the death penalty?

THE JUROR:  Yes.

MR. MELLIN:  Thank you.

THE COURT:  Mr. Bruck?

MR. BRUCK:  Good morning.  My name is David Bruck. I'm one of Dzhokhar Tsarnaev's lawyers, and I've got a few follow-up questions if that's okay.

I notice you live in Hopkinton?

THE JUROR:  I do.

MR. BRUCK:  That's a big Marathon town.

THE JUROR:  It is.  We're five years -- my wife and I downsized from Shrewsbury, where we lived for 20 years before that in Charlton, as we heard, back in the '80s, for a few years as well.

MR. BRUCK:  Well, that's a town, of course, where the Marathon starts, so it's identified with the Marathon.  Do you have any --

THE JUROR:  No connection really.  I live on the outer boundary area of Hopkinton.  I know what your question is.  Do I have any emotional connection to the fact that the road race starts in Hopkinton?  No, I do not.

MR. BRUCK:  Have you ever attended any Marathon?

THE JUROR:  I have not.

MR. BRUCK:  Do you know any runners?

THE JUROR:  Sure, uh-huh.

MR. BRUCK:  Do you know anyone that was running in the

2013 Marathon?

THE JUROR:  I do.

MR. BRUCK:  Have you talked to them about it?

THE JUROR:  It was a representative of Blue Cross that we know, was stopped before she got to the -- to where the area that was bombed.  But I'm not close with her if that -- you know, we just talked.

MR. BRUCK:  Any other personal interactions with people who were affected by the bombing at the --

THE JUROR:  Not really, no, no.

MR. BRUCK:  Now, you were asked some questions about the gray areas and the many moving parts, to use your phrase, which is a very good one.  It does describe the way the system is set up.

The judge has given a preliminary instruction.  He hasn't provided a lot of detail.  But I want to make sure we're on the same wavelength.  The mitigating factors and the aggravating factors cannot only concern the crime.  They can also concern the person who committed it.  Are you with me?

THE JUROR:  I am.

MR. BRUCK:  In other words, I guess what I'd like to know is, for example, a defendant could be older and have a very bad prior record, or he could be younger and have no prior record.  Those are -- can be an aggravating factor.  It could be a mitigating factor in a particular case.

You've been referring to the crime meriting the death penalty, if a crime was bad enough. And I guess my question is: If you decided that a crime was bad enough, could you also consider things about the defendant that might make you decide, even though the crime was bad enough, life imprisonment would be the proper sentence?

THE JUROR: That's a really good question. And I -- I totally -- part of my life experiences knows that there's people behind this and there's people that we're talking about and there's lives that we're talking about. I definitely would -- that would be in the total -- I would put it all into whatever conclusion I came up with. Could I separate the two, meaning the crime from the person and that they -- mitigating versus aggravating?

MR. BRUCK: I guess that's what I ask.

THE JUROR: I think that's what we were talking about, is that there would be obviously two sides to the trial. And that's what this would all be about, is hearing impartially and fairly both sides. I think I'm a good person. I think I'm able to do it -- to do that and to make the distinction and to weigh all that.

MR. BRUCK: Okay.

THE JUROR: It's easier said sitting here before it actually happens and you're in the midst of it. I guess that's the challenge before everybody, is trying to figure out that.

I don't know if I answered your question.

MR. BRUCK:  Since -- you said you were -- I'm afraid our questionnaire was not very well worded.  It said, Do you have an opinion about guilt and about the penalty?  And then it said, Yes, no, or unsure.  And I suppose somebody who works precisely in their job and thinks precisely might have noticed the "unsure" means you're not sure whether you have an opinion.  But a lot of people have just interpreted that to mean they're unsure about what their opinion is or unsure about whether the person should receive the death penalty.

I guess, when you wrote "unsure" to the questions about the death penalty, did you mean you were unsure whether you had an opinion or that you are unsure whether he should receive the death penalty or life imprisonment?

THE JUROR:  The latter.  I -- you know, I don't think you could ask anyone walking down the street what they think and they'd give you an opinion.  But until you're here -- I guess that's where the "unsure" part came from, is that you would have to hear and be part of the trial and get an educated, fully understandable decision that's based on fact where I think the public at large right now is walking around with a bunch of --

MR. BRUCK:  Has your thinking about this case changed at all from when you filled out the questionnaire on the 5th of January until today?

THE JUROR:  I've been thinking about it a lot.  It's been really heavy on my mind, distracting to the point where I find myself, you know, where I will be thinking about things not to do with this.  I find myself thinking about things like this, not the questionnaire and how I answered the questions.

MR. BRUCK:  I understand.  But the case?

THE JUROR:  The case, the situation.

MR. BRUCK:  Can you tell us if your thinking has changed in any way or led you in some direction that was not apparent to you when you filled out the questionnaire?

THE JUROR:  I guess -- I guess my thinking really is more on the fact of how important of a deal this is.  This is really important for everybody, I mean, to the community and to all the people involved and to -- to the country.  I mean, it's -- this is big stuff.  I didn't -- I don't -- my feelings haven't changed in any way.  I'm still probably as -- what's the word -- I don't want to use the word conflicted, but I have some reservations, the same ones I had before, about the whole thing as far as how this is going to go, I mean, whether I get selected as a juror or not.  I mean, now, whether I'm excused or not, I'll be totally in, like, engrossed in this, watching it, how it goes.  And probably from that standpoint, I reflect a little bit on that that I was kind of not as in tune with it, sort of the time element took -- it was a couple of years, so, you know.

8-43

MR. BRUCK:  I think that's all.  Thank you so much.  I appreciate it.

THE COURT:  Thank you.  That's all we have.  I appreciate it.

Next would be 115.

THE CLERK:  Juror No. 115.

THE JURY CLERK:  Juror 115.

THE CLERK:  Sir, over here, please.  Have a seat if you would.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  When you were last here and we had you fill out the questionnaire and I referred to it this morning and instructed everybody to avoid any discussion of the case or the process or to avoid any exposure to media stories about the case and so on, have you been able to do that?

THE JUROR:  I tried.

THE COURT:  Did you succeed?

THE JUROR:  Well, I didn't watch the news much, but, you know, you still hear from --

THE COURT:  Obviously, it's -- the real point is you didn't pay in-depth attention to any of the stories?

THE JUROR:  No, I didn't.

THE COURT:  So we have some biographical information.  We see you were born in Germany.

THE JUROR:  Yes, I was.

THE COURT:  Do you still have relatives there?

THE JUROR:  No.

THE COURT:  Family?

THE JUROR:  No.  My family was Lithuanian, from the war, from World War II, they moved there.  I really don't have any relatives.

THE COURT:  No ongoing contacts?

THE JUROR:  No.

THE COURT:  Tell us about your work -- well, tell us about the work before the work you do now.  You seemed to have had a change of career.

THE JUROR:  Yes.  I'm no longer working.  I'm retired.

THE COURT:  Even now.  It said "golf course."

THE JUROR:  Since I felt physically fit, I decided to take a job as -- just working 20 hours a week on a golf course so I could play golf for free.

THE COURT:  Fair enough.  Tell us about -- you worked for New Boston Fund.

THE JUROR:  Yeah, New Boston Fund.  It's a real estate development company that -- and I was basically in the commercial property management division.  I did some development, but it was mostly commercial property management.

THE COURT:  We asked for the last ten years.  Had you been in that field before that?

THE JUROR:  Yes.

THE COURT:  Real property?

THE JUROR:  That's basically been my career.

THE COURT:  Social media of any kind?  Facebook or anything like that?

THE JUROR:  No, no.  My kids do but I don't.  Am I supposed to follow along?

THE COURT:  No, not yet.  I will tell you when I want to direct you to something.

We did ask on Pages 17 and 18 -- and you can look at that now, I guess -- some questions about attitudes towards some issues in current affairs or international affairs, like attitudes about the War on Terror, for example, or attitudes towards Islam or Muslims and so on and so forth.  Do you remember those series of questions?

THE JUROR:  Yes, I to.

THE COURT:  You answered them here.  Have you followed the news reports about attacks in Paris and so on, in Europe?

THE JUROR:  Yes.

THE COURT:  In the last month or so?

THE JUROR:  I heard about it.  I really haven't read anything about it.

THE COURT:  My question was going to be:  Would any of those incidents or anything alter any of the answers you gave to these questions?

THE JUROR: No.

THE COURT: Now, let me ask you to turn to Page 20, Question 77. In that question we asked whether, based on things you'd seen or read in the newspaper or other news media or what you might know from other sources, whether you had any -- had formed an opinion about whether the defendant was guilty or not or whether -- and then, with respect to whether -- if he was, what the penalty might be, you indicated that you had formed an opinion about whether he was guilty; and as to the penalty, you were unsure. Can you just explain those answers for us?

THE JUROR: Well, you know, I think, you know, like the death penalty or life imprisonment, I think you have to know a little bit more about certain circumstances and how I feel about it. I think if -- you know, if there's a really horrendous crime or something that -- you know, the death penalty or some kind of lifetime imprisonment would warrant that. But I'm not hard fact on exactly what it would be. I think you have to look at a lot of the circumstances, you know, the victims, how the victims would react, if he was remorseful, you know, a lot of factors. I don't have, you know, just a clear-cut, black-and-white answer on that.

THE COURT: Before we get further into that -- and we'll talk about that a little bit more -- let me ask you about the opinion that he is guilty. That's based on news reports or

things like that?

THE JUROR:  Correct.

THE COURT:  If you were a juror on the case, of course, the first stage of the case requires the government to prove that he's guilty of what he's charged with.  The jurors would be instructed that the defendant is presumed to be innocent or not guilty of any charge that's made against him unless the government proves otherwise at trial and proves it by proof that is -- leaves the jury convinced beyond a reasonable doubt that he's guilty of the offense.

It's not unusual and it's not surprising that people might, in a publicized case, have some ideas going into the case.  The question is whether you, notwithstanding those ideas, would be able to follow what is required of a juror to put the government to its proof, not put the burden of proof on the defendant to prove that he's not guilty but to require the government to offer evidence that supports the charges that are made against him and convinces you beyond a reasonable doubt.  That's what we ask jurors to do.  Could you give us your assessment of whether any opinion you have now would interfere or prevent you from doing that?

THE JUROR:  Well, you know, I think, judging from what I know and the length of time, it -- they would have to change my mind at this point.

THE COURT:  Who would have to change your mind?

THE JUROR: The defendant.

THE COURT: You would --

THE JUROR: Because what I've -- through the media that I've seen, you know, television, you know, from all different sources, there's film on, you know, certain parts of the bombing, you know. So I think the defense would have to tell me that -- to show me proof. Right now I have an opinion, and -- you know, just based on all the information that was fed to me over the years.

THE COURT: Okay. Thank you very much.

THE JUROR: Okay. Thank you.

THE CLERK: Juror No. 116.

THE JURY CLERK: Juror 116.

THE CLERK: Ma'am, have a seat right here if you would, please.

THE COURT: Good morning.

THE JUROR: Hello.

THE COURT: When you were here last, I asked jurors to avoid any discussion of the case and to avoid as much as humanly possible media reports and so on. Have you been able to do that?

THE JUROR: Somewhat. I mean, it was my birthday that day, so people said, What did you do for your birthday? I said I was in federal --

THE COURT: I said you could say you were here. You

didn't talk in-depth about the case, the substance of the --

THE JUROR: No, no, no.

THE COURT: Your husband is a, you say, HVAC/fireman.

THE JUROR: Yeah.

THE COURT: Is it a part time --

THE JUROR: Yeah. The firemen, they work two 24s. He does stuff on the side.

THE COURT: He is a full-time firefighter?

THE JUROR: Yes.

THE COURT: He also, because of his schedule, is able to do other --

THE JUROR: Yeah.

THE COURT: How long has he been a firefighter?

THE JUROR: Maybe, like, 15 years. I'm not sure. Like, 15.

THE COURT: He is an EMT as well?

THE JUROR: I think so. They have to be trained, I think.

THE COURT: To some degree?

THE JUROR: In Boston, I think they do.

THE COURT: Does he work in Boston?

THE JUROR: Yes.

THE COURT: Boston Fire Department?

THE JUROR: Yes.

THE COURT: Boston Fire Department was involved in

response to the events of the Marathon bombing.  Was he?

THE JUROR:  No.

THE COURT:  Does he have coworkers, co-firefighters --

THE JUROR:  I would assume, yeah.  He probably knew a lot of --

THE COURT:  Do you know about it, or are you just guessing because it's a big department and he might?

THE JUROR:  We weren't there that day.  He wasn't working if that's what you're asking.

THE COURT:  What I was getting at, since then, has he talked with people who did take part and hear from them?

THE JUROR:  I would assume, yeah.  I don't know, you know, what his conversations are with his people.

THE COURT:  Have you talked with him about any of those conversations?

THE JUROR:  No.

THE COURT:  And you're employed as a real estate agent?

THE JUROR:  Yes.

THE COURT:  That's sort of make your own hours for that?

THE JUROR:  Yeah, self-employed, come and go as you want, make your schedule when needed.

THE COURT:  You won't be impacted if you're required to serve on a long case?

THE JUROR:  Well, I can make my schedule, do stuff at night and on weekends.

THE COURT:  I guess real estate agents do a lot on weekends anyway?

THE JUROR:  Yeah, they do.

THE COURT:  Do you use social media?

THE JUROR:  No, not really, just a little Facebook.  I probably have 20 friends on it, not a lot, just sort of see what other people post and --

THE COURT:  Do you use it in your business at all?

THE JUROR:  You're supposed -- not really, no, I don't.

THE COURT:  At Pages 17 and 18 -- that's your questionnaire you can just look at it -- we asked a series of questions about current affairs issues, issues about international events and so on such as the War on Terror, attitudes toward Islam or Muslims, so on and so forth.  Do you remember answering those questions?

THE JUROR:  Yeah, I remember.

THE COURT:  Since you answered them, there have been some events in Europe, including shootings in Paris and so on.  Have you read about those things?

THE JUROR:  Not really.  I mean, I heard about it.  I didn't focus on it.

THE COURT:  You don't know too much about it?

THE JUROR:  No.  It was two brothers.  That's all I know.

THE COURT:  Would that change any of your answers here to these questions?

THE JUROR:  No, no.

THE COURT:  If you turn to Page 20, Question 77, we asked -- we tried to get an idea --

THE JUROR:  77?

THE COURT:  -- whether you had any opinions about whether the defendant was guilty and, if so, what the punishment might be in Question 77.

THE JUROR:  Yeah.

THE COURT:  You answered, to Part (a), that, yes, you had an opinion that he was guilty.  You didn't answer the Parts (b), (c) or (d).  Could you tell us a little bit about your -- first your answer to Part (a)?  What led you to say that?

THE JUROR:  That he's guilty?

THE COURT:  Yeah.

THE JUROR:  Guilty means that he was there.  He was present.  That's what that means to me.  Yeah, he was there.  He was on the streets.  He was in a boat.

THE COURT:  Right.  So --

THE JUROR:  So if you have guilty --

THE COURT:  You seem to be suggesting that there's some limitation on what -- I'm not --

THE JUROR:  No.

THE COURT:  Some reservation?

THE JUROR:  No, no.  I mean, guilty opposed to not guilty?  I mean, he was there, so --

THE COURT:  So he's charged with a number of crimes in this case.  Anybody charged with a crime is presumed to be not guilty until the government, at trial, proves by the evidence that he is guilty of that crime and proves it beyond a reasonable doubt.

THE JUROR:  Right.

THE COURT:  The burden is not on the defendant to prove he's not guilty of what he's accused with.  He's presumed to be innocent, and the government has the burden of proving him guilty.

The question is:  If you were a juror in the case, would you be able to consider and fulfill your obligation -- your role as a juror faithfully to those principles?  In other words, would you require that the government prove by the evidence that he was guilty of any of the crimes he's charged with, or would you tend to shift the burden to him to prove that he was not guilty?

THE JUROR:  No.  I mean, what I know so much of the case, he was there, and they found him in the boat.  So that presumes he was there.  He was guilty.  If he's not guilty, he wasn't there.  Does that answer your question or --

8-54

THE COURT:  I guess I'm trying to guess -- gauge whether you are committed to that view and would not change no matter what happened at trial.  Let me ask it that way.

THE JUROR:  Well, you even said back on January 5th that the choices are life in prison or the death penalty so not guilty is not a choice.

THE COURT:  Oh, no.  The first -- the first step is that the defendant must be convicted at trial.

THE JUROR:  Okay.

THE COURT:  If he is convicted then -- you're right. After that, there is a question of what the penalty should be, and the same jury does it.  It's not just a question -- as we sit here today, he's presumed not guilty as far as the law goes.

THE JUROR:  Oh, okay.

THE COURT:  The government is required to first prove him guilty before the jury considers what --

THE JUROR:  Okay.

THE COURT:  So --

THE JUROR:  I mean, I don't -- are you asking me do I think he's not guilty?

THE COURT:  No.  I'm asking you if you could consider the evidence --

THE JUROR:  Definitely.

THE COURT:  -- at trial and convict him only if that

evidence convicted him and not --

THE JUROR:  Right.

THE COURT:  -- not your prior opinions?

THE JUROR:  Okay, yeah, once you get all the facts because I don't have all the facts.  I just know a few things.

THE COURT:  You went to a fund-raiser for the OneFund?

THE JUROR:  Yes.

THE COURT:  When was that?

THE JUROR:  Oh, God.  I don't remember really.

THE COURT:  Shortly after the events?

THE JUROR:  Probably, six or eight months.  I don't really recall.

THE COURT:  Okay.  Any follow-up?

MS. CLARKE:  Thank you, your Honor.

MR. WEINREB:  No.

THE COURT:  Thank you.

THE JUROR:  Should I take this?

THE COURT:  Leave it right there.

Why don't we take a break, switch stenographers. We'll take about a ten-minute break.

(Recess taken at 11:02 a.m.)

(After the recess:)

(The Court enters the courtroom at 11:22 a.m.)

THE COURT:  I think this is 118?

THE CLERK:  Yup.  Juror No. 118.

MR. McALEAR:  Juror 118.

THE CLERK:  Ma'am, have a seat right here, if you would.

THE JUROR:  Thank you.

THE CLERK:  Make sure you speak into the mic so everyone can hear you, okay?

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  When you were last here I asked prospective jurors to be careful about talking about the process with anybody and to try to avoid any news reports about the case.

Have you been able to do that, by and large?

THE JUROR:  With my family.  I said I had to come here.

THE COURT:  Sure.  That's obviously something you have to tell people.  But in terms of the substance of the case, have you had any discussions about the substance of the case?

THE JUROR:  Just that I had to fill out a questionnaire.  Substance?  Not really, no.  I think everybody knows -- or at least I feel like everybody knows what the facts are.

THE COURT:  Yeah, okay.  Let me -- you lived in Europe for a couple of years?

THE JUROR:  A year and a half.

THE COURT:  When and what were the circumstances?

THE JUROR:  1978 to '79.  I was a dental hygienist.

THE COURT:  You were working over there?

THE JUROR:  Yeah.

THE COURT:  You're now retired from dental hygienist?

THE JUROR:  Yeah.  My mom is ill, so I stopped working three years ago to -- I'm also a nurse.  I'm her healthcare proxy -- just to take her to appointments and, you know, whatever she needs.

THE COURT:  Do you use social media at all, Facebook, Twitter, anything like that?

THE JUROR:  No, I'm not that technically savvy.

THE COURT:  We asked a series of questions, if you want to refresh your recollection, at pages 17 and 18 about issues you might call current affairs or international affairs, such as questions about your opinions about possible statements about the war on terror or attitudes towards Islam or Muslims and so on.

Do you remember answering those?

THE JUROR:  Uh-huh.

THE COURT:  Have you seen any news reports about terrorist attacks in France in the last month or so?

THE JUROR:  Yes.

THE COURT:  Have you followed those stories closely or just kind of generally aware of them?

THE JUROR:  I watch the five o'clock news and listen to 1030 radio.  But other than that, I haven't, you know, looked anything up about them.

THE COURT:  Would they -- what you know about those events, would that have any effect on the answers you gave here?  Would you change any of the answers?

THE JUROR:  I don't think so.

THE COURT:  No?

THE JUROR:  No.

THE COURT:  On page 20 I'd like you to look at Question 77.  We asked questions about whether you had formed an opinion about whether the defendant is guilty and, if so, what his penalty might be.  And with respect to Part A, you said you had formed an opinion based on what you had seen.

THE JUROR:  My gut feeling is, yes, that I thought that he was guilty.

THE COURT:  Right.  You actually had said that earlier in Question 74, that that's a thought that occurred to you when you realized you were summonsed for the case?

THE JUROR:  Uh-huh.

THE COURT:  Under our criminal justice system, when the government accuses somebody of a crime, the person is presumed to be not guilty, or innocent, unless the government proves its allegations at trial by the evidence, proves it convincingly so the juror is convinced by that evidence that

there's no reasonable doubt that the defendant has committed the crime.

People sometimes have ideas from publicity and so on about the events of the case, but ultimately any juror would be asked to focus on the evidence at trial and to regard that as the basis for judgment and, in particular, to require that the government fulfill its obligation to prove convincingly beyond a reasonable doubt that the -- each of the charges is correct or not, and that the burden is never shifted to the defendant to prove he's not guilty.  The law gives him that condition as a presumption, and the burden is always on the government.

If you were a juror in the case, notwithstanding impressions, opinions you might have, would you be able or would you not be able to perform that responsibility to require the government to satisfy its burden of proof and not shift the burden to the defendant?

THE JUROR:  I think I would be able.

THE COURT:  And why do you say that?  Just give us your self-assessment.

THE JUROR:  I just think I'm an honest person.  So if I listened to what they had to say, I think I could -- I mean, I know what I feel now, but, I mean, I think I'm capable of listening to facts and making a judgment.  Not that I want to, but...

(Laughter.)

THE COURT:  And you could do that without placing the burden on the defendant to prove he was not guilty?

THE JUROR:  Yeah, I think so.

THE COURT:  We asked a couple of questions about whether you had participated in various events, you know, after the -- you said you bought a Boston Strong T-shirt for your son.

THE JUROR:  Oh, yeah.  At a mall.

THE COURT:  When was that?

THE JUROR:  I don't know.  It was just in the center of a mall.

THE COURT:  Was this shortly after the events occurred or sometime later?  When was it, do you remember?

THE JUROR:  I don't really remember.  I guess it must have been because it was just in one of those kiosks.

THE COURT:  Is that the only --

THE JUROR:  Yes.

THE COURT:  -- expression of --

THE JUROR:  Yeah.  It wasn't even so much that as it was kind of the cool thing for kids.  I don't know that it really -- it was more Boston than --

THE COURT:  How old is your son?

THE JUROR:  Twenty-five.

THE COURT:  Yeah, okay.

In Question 77 with respect to the questions about the

potential penalty, the death penalty or not the death penalty, you answered "unsure."

THE JUROR:  When it comes to that, I have -- I don't want to say a change of heart, but a little bit.  I've thought a lot about it.  In the past I never really -- I don't want to sound heartless, but I sort of always thought if someone did something horrible, fine, you know, I won't say kill them or whatever.  But now having to think about it so much because it's on my mind, I don't like the responsibility, or to think that that would be on my conscience, that I decided to do that.  It doesn't sit well with me.

THE COURT:  Well, if you turn to page 23, we asked a series of questions directed at your feelings on the death penalty.

THE JUROR:  Sorry about the handwriting.

THE COURT:  It starts at Question 88 where we asked generally what your views were, and you wrote that you weren't sure.  I'm not sure exactly what -- maybe you can translate.

THE JUROR:  I said I would have to have zero doubt but in general -- yeah, I do agree with this.  For me to be in prison for the rest of my life would be much worse.  I mean, I look at the death penalty a little bit like going to sleep.  That's not really a terrible punishment.  So imprisonment would be worse.  But the idea that it would be on me, I don't like the idea that it would be on me to have to decide someone

else's fate, life or death.  That's pretty horrible.

THE COURT:  If you look at page 24, Question 90, we asked -- posed a series of statements and asked if you could indicate what might come closest to your view, and you selected D, which is kind of in the middle.  It says, "I'm not for or against.  I could vote or I could not vote."

Are you telling us that you're sort of thinking -- since you filled this out, thinking about it, it changed your view?

THE JUROR:  Yeah, thinking about it I've changed my view.  Mostly, I mean, thou shall not kill.  I realize I wouldn't actually be doing it, but I would be voting to say yes.

THE COURT:  And are you saying you would be reluctant to do it or are you saying you would be unable to do it?

THE JUROR:  I don't think I could do it.

THE COURT:  The second?  You would be unable to do it?

THE JUROR:  I think so.

THE COURT:  In other words, if it came to --

THE JUROR:  If it came down to me, I would almost feel like I would be bullied into that.  Like I don't -- I don't -- I don't know.  I just don't want to walk around for the rest of my life thinking that I was responsible for taking someone's life.  It doesn't feel right.

THE COURT:  So you can't -- could you envision any

circumstance in which you could think you would not feel that and would feel okay in voting for a death penalty?

THE JUROR:  I don't think so.  I mean, it's...

THE COURT:  Do you have anything?

Go ahead.  All right.

MR. BRUCK:  Good afternoon -- well, it's still morning.

THE JUROR:  Yeah.

MR. BRUCK:  I'm David Bruck.  I'm one of Jahar Tsarnaev's lawyers, and I want to follow up a little bit on what you just talked with the judge about.  You haven't had a lot of instruction about the legal procedures yet from the Court, so I want to be sure we're on the same wavelength.

Talking about the death penalty now, of course a jury only gets to that once the person's been found guilty beyond a reasonable doubt.  So you know that?

THE JUROR:  Right.

MR. BRUCK:  Okay.  So it's -- and then once the -- you get to the sentencing phase, the jury will hear evidence of aggravation, things the government says make the crime worse or especially horrible, make the defendant especially horrible deserving the death penalty, and the defense gets to show the other side from that, things about the defendant that might show that life imprisonment would be an adequate punishment, right?

THE JUROR:  Uh-huh.

MR. BRUCK:  And the jury gets to hear all that.  And then assuming the government proves it's the kind of case that the death penalty can be imposed for, and it's entirely up to the jury to decide what to do, the death penalty or life imprisonment, the law never requires -- I think Judge O'Toole told you earlier that there's never a situation where you've made certain findings so the law says, Okay.  Now you have to sign for the death penalty whether you agree with it or not.

THE JUROR:  But I understood it has to be unanimous.

MR. BRUCK:  It does.

THE JUROR:  So that's what bothers me.  It's not that -- I don't want to sound callous.  It's not that the person -- that they would choose the death penalty; it would be that I would have to --

MR. BRUCK:  Right.

THE JUROR:  -- agree with that.

MR. BRUCK:  Now, of course you appreciate that serving on a jury is a responsibility that not that many people welcome; it's a duty like paying taxes or --

THE JUROR:  Right.

MR. BRUCK:  And you agree that that's an obligation?

MR. WEINREB:  Objection, your Honor.  This is leading and argumentative.

THE COURT:  Yeah.

MR. BRUCK:  Well, what I'm getting to, understanding that you would never want to, I think what the questions are really designed to get at is whether, if you found that it was the right thing to do based on your values and your view of the evidence, not would you want to, but could you vote for the death penalty to express what you concluded yourself?

THE JUROR:  I just don't -- deep down I think I would have a hard time living with the fact that I would be responsible for someone's death.  It's not -- it's not -- the death penalty itself, that someone -- I mean, this sounds awful, but if someone else did it, it doesn't bother me, but the fact that it would be me, so for the rest of my life having that -- be responsible, it feels bad.

MR. BRUCK:  I don't want to belabor this, but I want to be sure -- it would feel bad to a lot of people, don't you agree?

THE JUROR:  Right.  Well...

MR. BRUCK:  The question is not whether you'd feel good about it or feel bad but could you do it.

THE JUROR:  It's not bad, per se.  It feels wrong, like.

MR. BRUCK:  Could there never be a case -- I'm not talking about this one.  Could there never be a case where even though it felt wrong, you would be able to do it?

THE JUROR:  The only thing I could think of would be

if someone killed one of my children.  Then I'm not so sure.
But that's about all I could think of.

THE COURT:  I think we have her views.

MR. BRUCK:  Thank you.

THE COURT:  Thank you, ma'am.

MR. McALEAR:  Right this way, ma'am.

(The juror is excused.)

THE CLERK:  Juror No. 119.

MR. McALEAR:  Juror 119.

THE CLERK:  Ma'am, over here, please.  Have a seat.

THE JUROR:  Good morning.

THE CLERK:  Also, make sure you speak into the mic so
everyone can hear you.

THE JUROR:  Okay, great.  Thank you.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  Have you been able to abide by my
instructions given previously to avoid discussing the merits of
the case?

THE JUROR:  Yes, I have.

THE COURT:  And try to avoid any media accounts?

THE JUROR:  I have, yes.

THE COURT:  Okay.  That's the questionnaire you filled
out last time.

THE JUROR:  Yes.

THE COURT:  It's there.  We're going to ask you some follow-ups about some of the answers you gave.

Generally, you're a dental assistant?

THE JUROR:  Yes.

THE COURT:  And you answered a question it wouldn't be a particular hardship for you to serve on the case?  You could make whatever arrangements with your employer to work around the time?

THE JUROR:  Yes.

THE COURT:  Do you use social media?

THE JUROR:  I do.  I have been on Facebook daily, but I do it more -- it's more or less socializing with friends from high school.  It's more of a bragging thing with our children, you know, if they're doing something well, you're going to put it on Facebook.

THE COURT:  Anything besides Facebook?  Twitter, Instagram or anything like that?

THE JUROR:  No.  No.

THE COURT:  Have you posted anything about your service or --

THE JUROR:  No, not at this time.  No.

THE COURT:  We asked -- at pages 17 and 18, we asked some questions about current affairs, international events, things like that, such as the war on terror.  We also asked about possible attitudes towards Islam or Muslims and so on.

Do you remember answering those?

THE JUROR:  Not really much to answer.  I think a lot of my answers were no.

THE COURT:  Right.  Right.  I just want to sort of update.  I mean, since you filled out the questionnaire, there's been some attacks in Paris, shootings.  Have you read about those?

THE JUROR:  I actually didn't follow it.  I really stay away from --

THE COURT:  Okay.  Just that you know it occurred --

THE JUROR:  Absolutely.

THE COURT:  Possibly the same --

THE JUROR:  I have not been watching the news.  I really avoid it a lot.

THE COURT:  Fair enough.

In Question 74 we asked what was your reaction when you realized you had been summoned for possible service in this case.  You said, "Excited and nervous."  What were you --

THE JUROR:  Kind of how I feel right now.  Excited, nervous, anxious.  Overwhelmed.  A lot of emotions.

THE COURT:  I guess I'm interested in what the "excited" part is.  I mean, is this something you're interested in doing?

THE JUROR:  That's a tough question.  I don't know.  I'm not used to being in front of a panel like this, so being

spoken to like this is a little bit intimidating.

THE COURT:  Relax.

THE JUROR:  Yeah.

THE COURT:  We're fairly normal.

THE JUROR:  Okay.  Good.  Great.

MR. BRUCK:  Speak for yourself.

(Laughter.)

THE COURT:  So, no, seriously, is this something that you would actually affirmatively want to do or is it something that if you're called, it would be an exciting thing?  I'm trying to get what the phrase meant.

THE JUROR:  When I first filled this out I was very excited.  I kind of knew this was going to happen, it was coming when I got the jury paperwork.  And, yeah, I'm still ready.  I'm ready to do this, yeah.

THE COURT:  I think I -- you haven't had previous jury service.  Is that right?

THE JUROR:  Locally.  Nothing federal like this.  I've done district, but I've never actually been called, no.

THE COURT:  You've never actually been called --

THE JUROR:  I've been called in and --

THE COURT:  -- to the courthouse to be available in other cases?

THE JUROR:  I have been called to the courthouse, but then usually they settle out of --

THE COURT: Right. Right. But how many occasions have you actually been called to a courthouse?

THE JUROR: You mean as in jury duty, as in --

THE COURT: As a pool. As part of the jury pool.

THE JUROR: Five times in my whole life I've been. But I've never actually been in jury, but I have been called a lot. It seems my name comes up a lot.

THE COURT: Were they all state summonses, do you know?

THE JUROR: Yes.

THE COURT: If you look at page 20, Question 77 we ask about whether you've had -- formed some opinions about the case based on what you've seen in the media or otherwise learned.

THE JUROR: Right.

THE COURT: And first we asked if you had any opinion about whether the defendant was guilty or not, and you checked yes for that question. It's not surprising that people would have some thoughts about this case based on what they've seen and the ample coverage that has been given of the events and so on, and maybe other things that they may more personally or directly know.

In our criminal justice system every defendant who is accused of a crime is presumed to be not guilty until and unless the government proves that he is guilty beyond a reasonable doubt by the evidence at the trial. So the burden

is entirely on the government to establish guilt, in the legal sense, by proving it at trial, and a defendant is never required to prove that he is not guilty of what he's accused of.

If you are a juror in this case, would you be able to consider the evidence at trial and find guilty or not guilty based on that evidence and not based on what you might know or think you know from outside the case?

THE JUROR:  I do.

THE COURT:  Would you be able to do that?

THE JUROR:  Yes.

THE COURT:  And in particular, would you be able to make a judgment without shifting to the defendant the burden of proving that he is not guilty of what he's charged with?

THE JUROR:  I do.

THE COURT:  And can you just give us a little sense of why you are confident of that?

THE JUROR:  I feel that you can't turn a blind eye -- when it actually happened -- I mean, the media was just throwing in your face wherever you went.  So here we are, you have the prosecutor's team, the defense team, and they both have to bring in what they know, and you have to kind of see if the defense can actually bring forth something different than what the media has brought to us.

THE COURT:  Well, see, that's what I was just getting

at.  You just said the defense can bring that forth.  And you may be confused, so let me make it clear we did talk about two different phases of the trial.  So the first phase is to determine whether the defendant is guilty of any of the crimes he's charged with.  He's charged with a number, and the indictment sets them out.

As to the -- proving the defendant guilty of any of the crimes he's charged with, the burden is entirely with the government, and the defendant has no obligation to explain things or to show that he's not guilty of the offenses.

If he is convicted on that standard by the jury, in the second phase there will be considerations about what should be an appropriate penalty, and both sides will likely present evidence then.  And the defendant may seek to show you that there are circumstances we call "mitigating circumstances" that would argue against the harsh penalty of a death sentence and in favor of life imprisonment.  So in that sense the defendant has some -- undertakes some effort to convince the jurors to think along the way the defense would like you to think about the mitigation issues.  That's different from in the first sense when the defendant has no obligation to show that he's not guilty.

Do you understand the distinction?

THE JUROR:  It's a little confusing.

THE COURT:  Yeah, it is.

THE JUROR: It is.

THE COURT: It's a little technical.

THE JUROR: There are two parts to it.

THE COURT: But I want to focus on the first part, not explaining away what kind of sentence should be imposed.

He's accused in the indictment of a number of specific crimes, and the government has to prove him guilty of any of those by showing through the evidence to a degree that is so convincing that jurors have no reasonable doubt that it's true that he is guilty. That's the government's burden. And during that phase of proving somebody guilty or not, the defendant does not have a burden to prove that he's not guilty. That doesn't mean there won't be active back-and-forth about the evidence and what jurors should think about, but in the end it's not which side has convinced me; the question is always: Has the government convinced me that he's guilty of this particular crime that he's charged with?

Are you following me?

THE JUROR: I'm trying.

THE COURT: And the question is whether in that phase, the first phase to determine whether he's guilty or not, whether you would be able to judge that evidence along those lines that I've just outlined, or whether because of some information you have from other sources prior to the trial you would be unable to discharge that responsibility.

THE JUROR:  I think I could go through that and listen to what they have to say and prove their point, prove the first phase of it.

THE COURT:  And I guess give us a sense of your confidence, your level of confidence in that.

THE JUROR:  Give my sense of level?

THE COURT:  Yeah.  I mean, is it just that you think you might be able to do it, or are you confident that you would be able to do it?

THE JUROR:  I think I'm confident I could do that, yes.

THE COURT:  Now, let's talk about the second phase, which is the penalty phase.  And obviously one of the key questions is -- concerns the possibility of a death penalty. We ask in some questions beginning on page 23 about some of your attitudes towards the death penalty.

In Question 88 we ask in general whether you have some views, and you said N/A, which I guess means not applicable?

THE JUROR:  Not available.  Yeah, I just didn't have an opinion at that point.

THE COURT:  Okay.  In the next question, 89, we ask you to kind of give us, on a scale of strongly opposed to strongly favor, where you might be, and you signaled -- you circled 8, which is a relatively -- relatively on the strongly favor side.  It's not the most strong but it tends there.

And this is, again, as a general matter, right?  Is that a fair --

THE JUROR:  Yeah.  Yes.

THE COURT:  -- assessment of how you --

THE JUROR:  Yes.

THE COURT:  The next question, instead of numbers, we asked you on a series of statements to indicate which statement came closest to you, and you said -- you circled E, "I am in favor of the death penalty but could vote for a sentence of life imprisonment without possibility of release if I believed that sentence was called for by the facts and the law in the case."

THE JUROR:  Correct.

THE COURT:  Is that still your --

THE JUROR:  Yes.  Basically, when you asked me that question earlier, I was confused, stating that if the defense comes there and gives more facts.

THE COURT:  So, again, I described the process:  You'd hear from both sides, the government would have the opportunity to present aggravating circumstances that it said it would contend make this a crime that -- first of all, it would assume somebody that had been convicted, obviously.  You don't get to the penalty until you've been convicted of an intentional murder.

So the government would try to produce evidence in

support of what it would call "aggravating circumstances or factors" that would call perhaps for a harsher penalty for this offense than for others of the same general nature. The defense would present evidence of mitigating factors: We would say for this case, for this offense or for this defendant, there are things that you should consider that point away from the death penalty. And then the jurors would be asked to weigh all that. That's what I was saying earlier this morning.

THE JUROR: Uh-huh.

THE COURT: So the question is: Are you predisposed to either side of that, either the death penalty or life in prison without release, or are you in a condition where you could evaluate all that and be open to and prepared to vote for either one depending on how you assessed the circumstances of the case?

THE JUROR: I would say the second half of what you just said is what I would go with.

THE COURT: Let me just come at it again a little bit. If you look at Question 95, we asked if you found the defendant guilty and decided the death penalty was an appropriate punishment, could you conscientiously vote for it, and you said yes.

THE JUROR: Yes.

THE COURT: If you'd go over to the next question on the top of the next page, we ask sort of the other side of

that, if you found him guilty and decided life imprisonment without the possibility of release was appropriate, could you vote for that, and you said you're not sure?

THE JUROR:  Very interesting.

(Laughter.)

THE COURT:  So I guess my question is:  Is there a reason why you were a little bit more --

THE JUROR:  I think I'm leaning more towards --

THE COURT:  You were certain on the first question and less certain on the second question.  Is there a --

THE JUROR:  As of right now because I don't know the facts.  I mean, I'm going by what media has told us.  So, yes, according to media, yes.  But once you hear the full story and all the facts, there could be a change.  It just totally depends on the whole story.

THE COURT:  Are you committed in either direction?

THE JUROR:  Am I committed?  I'm leaning more towards the death, but I -- again, I feel like this happened on U.S. grounds and it's unacceptable, and if it's what happened and it comes forth that he's guilty, then yes, but...

THE COURT:  "Yes" what?

THE JUROR:  Then yes the death penalty; however, again, facts.

THE COURT:  Okay.

MR. WEINREB:  I'd just like to ask a few questions.

THE JUROR:  Sure.

MR. WEINREB:  Good morning.  My name's Bill Weinreb. I'm one of the prosecutors in the case.

THE JUROR:  Good morning.

MR. WEINREB:  So when the judge referred to the government having to prove the case -- that's the people you see here -- it will be our obligation to put in evidence at the trial to prove that the defendant's guilty, so you said that based on what you've heard in the media or, you know, press reports, you formed an opinion that the defendant is guilty, that he did it.  Is that correct?

THE JUROR:  Correct.

MR. WEINREB:  Okay.  So -- but you haven't heard any evidence yet because the trial hasn't begun yet.

THE JUROR:  Correct.

MR. WEINREB:  So the question is:  I understand you to say, and tell me -- you can tell me if I'm wrong -- that if you have an opinion about something outside based on what you've heard in the media, unless you hear something else, you have no reason to move off that opinion.

THE JUROR:  Correct.

MR. WEINREB:  Is that correct?

THE JUROR:  Yes.

MR. WEINREB:  Okay.  But when the trial begins, what you've heard in the media and all of that, that's not the

evidence; the evidence is what will be offered at the trial. And really the question is: Can you put aside what you've heard and decide the case based solely on the evidence, not on anything you've heard in the press?

THE JUROR: Yes. I just feel like the media -- it just seems like so long ago and things have kind of calmed down a little bit. It was just so crazy when it first happened and it was just thrown at you every which way, and it's kind of quieted down a little bit.

MR. WEINREB: Okay. And going even beyond that, coming into the trial, as the judge told you, the defendant is presumed innocent.

THE JUROR: Yes. Innocent until proven guilty, correct.

MR. WEINREB: Okay. And that's the state of mind that you would need to be in, that he's innocent unless and until the government can prove him guilty.

THE JUROR: Yes.

MR. WEINREB: Do you think you would be able to achieve that state of mind?

THE JUROR: Yes.

MR. WEINREB: Are you confident of that?

THE JUROR: I think so.

MR. WEINREB: All right. So now let me move on for a bit to the question of the death penalty. If the defendant is

proved guilty beyond a reasonable doubt of one of the crimes that carries the death penalty, then the trial enters another phase, as the judge explained, the sentencing phase. And at that phase the jury decides what the penalty will be, a death sentence or a sentence of life without parole, okay?

Now, again, putting aside anything you've heard in the media about this case -- right now you haven't heard any evidence in the penalty phase. There hasn't been a penalty phase. Maybe there never will be one. But assuming there is one, again, can you go into that phase of the trial, put aside anything you've read or seen or heard, and make that decision, the penalty decision, based just on the evidence in the case?

THE JUROR: Yes.

MR. WEINREB: And during the penalty phase would you be open -- genuinely open -- to considering both penalties, a death sentence or a sentence of life without parole, depending on what the evidence showed you about which sentence was more appropriate in this case?

THE JUROR: Can you repeat that?

MR. WEINREB: Sure. So you'll hear evidence of what are called "aggravating factors," factors that the government believes make this a case where the death penalty is appropriate, but you'll also hear evidence of mitigating factors, factors that the defense believes make the death penalty -- make life without parole the appropriate sentence.

And those factors -- mitigating factors, like aggravating factors, they're things that relate to the offense itself, how bad or heinous the crime is, and they're things that relate to the defendant, about him as a person, about his character.

Could you go into the sentencing phase with an open mind, open to hearing evidence of aggravating factors and mitigating factors, and genuinely weigh them and consider which is a more appropriate sentence, a death sentence or a sentence of life without the possibility of release?

THE JUROR:  I could, yes.

MR. WEINREB:  Are you confident?

THE JUROR:  Yes.

MR. WEINREB:  Thank you.

THE JUROR:  You're welcome.

MS. CONRAD:  Good morning.  My name is Miriam Conrad. I'm one of Mr. Tsarnaev's lawyers.

I think you said something about the media was thrown in your face.  What sticks out in your mind about what you heard, read about this case or about the events?

THE JUROR:  The day it occurred there was no school, obviously.  It's a holiday.  And my son and I went to lunch that afternoon.  And I didn't really pay attention to what happened at that time.

I think it was later on during the week when some

other incidents had happened where I followed a little bit more, not so much on the -- Boston itself but out of Boston, the Watertown.  That's when everything just started coming together.

So I think I focused more on that, the whole Watertown incident.  But other than that...

MS. CONRAD:  And how old is your son?

THE JUROR:  He will be 15 in March.  He's a freshman in high school.

MS. CONRAD:  But about -- you said that you focused more on the Watertown?

THE JUROR:  I think just because it was -- at the time it happened, nobody really knew what was going on, and then later on as the week went on, just so much -- just the constant -- just constant media.

MS. CONRAD:  And were there any particular facts that stand out in your mind as you sit here today?

THE JUROR:  Not necessarily, no.

MS. CONRAD:  Well, you said that based on what you've read and heard you've formed an opinion that Mr. Tsarnaev is guilty.  So what were the facts that you read or heard that caused you to form that opinion?

THE JUROR:  The capture of him.  The day of the capture.

MS. CONRAD:  Anything in particular about that --

THE JUROR:  Sure.

MS. CONRAD:  -- that stands out?

THE JUROR:  Hiding in the boat.  I think that's the biggest thing that sticks in my mind, is the whole town being closed down and looking for the individual.

MS. CONRAD:  Were you personally affected by that?

THE JUROR:  No.  No.

MS. CONRAD:  And you said originally when Judge O'Toole was asking you some questions that, you know, you would have to wait and see if there was -- there was evidence that changed your mind about his guilt.

What kind of evidence would you look for?

MR. WEINREB:  Objection.

THE COURT:  Yeah, I think that's too speculative, so...

MS. CONRAD:  If you didn't hear anything different from what you already know, would you then find him guilty?

MR. WEINREB:  Well, I'll object just to the way that's phrased.  If the evidence at trial is -- coincides with what's been in the press, is that the question?

THE COURT:  Well, even that formulation I think is problematic.

MS. CONRAD:  Can I try it a different way?

THE COURT:  Yes.

MS. CONRAD:  If you didn't hear anything different

from what you've heard in the press, would you find him guilty?

MR. WEINREB:  No, I think I'll object because it's too --

THE COURT:  The problem I have with asking what the finding would be, what we're trying to determine is the open-mindedness of the juror to follow the instructions and so on and so forth.  That's the -- to say what -- you suggest a scenario of particular facts and ask now for what the jurors' vote on the verdict would be I think is inappropriate.

MS. CONRAD:  Well, what would you -- what would you -- if the defense did not offer any evidence, would you rely on what you've already -- on the opinion you've already formed?

THE JUROR:  I would have to also hear the other side, the prosecuting team versus the defense team.  I'm not going to go by just media.

MS. CONRAD:  Well, I guess the question I have, then, is:  If the government produced evidence, but the evidence at trial by itself was not enough to convince you beyond a reasonable doubt, would you find the defendant not guilty or would you go back to what you had heard before in your previous belief?

THE JUROR:  If we were only just going by what I heard before, then guilty like I had put in my paperwork here.

MS. CONRAD:  So you would not be willing to find the

defendant not guilty even if the government's evidence did not prove his guilt beyond a reasonable doubt?

THE JUROR:  I misunderstood you.  Can you please explain that?

MS. CONRAD:  That was confusing.  Let me try again.

THE JUROR:  Yeah, you're throwing all this at me.  I just...

MS. CONRAD:  If the government's evidence, just what you heard at trial, was not enough to prove his guilt beyond a reasonable doubt --

THE JUROR:  Good question.  Tricky.

MS. CONRAD:  -- but you have --

THE JUROR:  Correct.

MS. CONRAD:  -- in your mind a previously formed opinion, would you find him guilty or not guilty?

THE JUROR:  I would have to go by what I know from the media and whatever they have come forth with.

MS. CONRAD:  So that would still be there?

THE JUROR:  I think so, yes.

MS. CONRAD:  And you said that when you received the summons, you were excited and nervous, right?

THE JUROR:  I didn't know it was for this case, though.  I had no idea.

MS. CONRAD:  Right.  So my next question is:  When you realized it was for this case -- and I don't know when that was

or how that was.

THE JUROR:  The day of.

MS. CONRAD:  When you came in to fill out the questionnaire?

THE JUROR:  Yes.

MS. CONRAD:  So at that point how did you feel, realizing that it would be for this case?

THE JUROR:  A little nerve-racking sitting here because I knew there would be some procedures to get through to this point, and it's -- I'm not really a public speaker.  And being in front of all these people, it's a little intimidating.

MS. CONRAD:  You're doing fine.

THE JUROR:  Thank you.

MS. CONRAD:  And what about the excited part?

THE JUROR:  Just the excitement of being in front of a court, because I've never been to something so big.  I mean, I'm like the country bumpkin up at home, so...

MS. CONRAD:  Did you feel more or less excited when you realized what case it was?

THE JUROR:  About the same.

MS. CONRAD:  And you said you're ready to do this. What do you mean by that?

THE JUROR:  Financially, hardship-wise.

MS. CONRAD:  Okay.  Is there a financial hardship?

THE JUROR:  No.  No.  No.

MS. CONRAD:  I see.

THE JUROR:  Sorry.

MS. CONRAD:  On Question 93, if you could just turn to that, I think it's page 25, you wrote in a response there that "I just feel with the particular case if he gets life imprisonment he will still be treated better than other inmates, solitary confinement, et cetera."

THE JUROR:  Yeah.

MS. CONRAD:  Explain what you meant by that.

THE JUROR:  I just feel that if he gets life in prison he's going to get special -- special -- I don't know what the word that I'm looking for -- privileges, maybe?

MS. CONRAD:  And why do you think that?

THE JUROR:  I don't know.

MS. CONRAD:  Has someone told you that?

THE JUROR:  No, just something...

MS. CONRAD:  What kind of special privilege?

THE JUROR:  I don't know.  Would he be with the general public?

MS. CONRAD:  Do you think that would be better or worse?

MR. WEINREB:  Objection, your Honor.

MS. CONRAD:  Also, it's based on the question.

THE COURT:  No, you can have that.

THE JUROR:  I think he should be with the general

public just like everybody else.  If we're treating this and doing a case and -- with the jury, just like any other particular person.

MS. CONRAD:  Why would you think being with the general public would be worse than being separated?

THE JUROR:  I don't know.  Good question.

MS. CONRAD:  Do you think he would be more at risk with the general population?

THE JUROR:  More at risk?

MS. CONRAD:  At risk.

THE JUROR:  Possibly.

MS. CONRAD:  And you think that would be something you would want to see happen?

THE JUROR:  Not necessarily.

MS. CONRAD:  Do you think solitary confinement is a privilege?

MR. WEINREB:  Objection.  This is going on too long.

THE COURT:  Yeah, I think --

MS. CONRAD:  Okay.  I'll move on, your Honor.

When you put down on Question 96 that you were not sure whether you could vote for life imprisonment, could you tell us what you were thinking?

THE JUROR:  To be honest with you, at the time it was -- the whole packet was overwhelming.  It depends on the case.  I don't know at the time I checked that off.  I guess it

8-89

depends on the whole -- situation as a whole.

MS. CONRAD:  But you told us that sitting here today you're leaning more towards the death penalty?

THE JUROR:  Slightly, yes.

MS. CONRAD:  And you said when I think the judge was asking you questions and explaining about the penalty phase, you said you would look to what they have to say and whether they proved their point.  Are you talking about the defense there?

THE JUROR:  Both sides.  And I -- actually, at the time I wasn't aware that it was two phases.  So if that's the second phase -- I was a little confused when he was explaining that to me earlier, the judge.

MS. CONRAD:  Okay.  So understanding that the first phase would be the guilt or innocence phase, whether or not the government had proved the defendant guilty beyond a reasonable doubt, if you and the rest of the jury had concluded that he was guilty beyond a reasonable doubt and then you moved to the penalty phase, would you automatically conclude that he deserves the death penalty if he were found guilty of this crime beyond a reasonable doubt?

THE JUROR:  So you're saying second phase he was found guilty?

MS. CONRAD:  Right.

THE JUROR:  If he was found guilty through the whole

process?

MS. CONRAD:  Yes.

THE JUROR:  Yes.

MS. CONRAD:  You would automatically impose the death penalty?

THE JUROR:  No.  Impose?  I'm sorry.  No.

MS. CONRAD:  I'm sorry.  Vote for the death penalty?

THE JUROR:  Yes.

THE COURT:  What's the distinction between "impose" and "vote for"?

THE JUROR:  It sounds --

MS. CONRAD:  It was my poor phrasing.

THE COURT:  Well, no, it sounded like the witness understood it as creating different options.

THE JUROR:  I thought she meant impose as in I were against it versus if I would vote for it.  I kind of got a little confused with her questioning.

THE COURT:  You're thinking of opposed -- "impose" was the word.

THE JUROR:  Oppose?

THE COURT:  "Impose" and "vote for" might be the same.

THE JUROR:  Okay.  I didn't hear her correctly.  I'm sorry, the wording.

THE COURT:  Why don't you ask the question again making that clear.

MS. CONRAD:  I'll try.

THE JUROR:  I'm sorry.

MS. CONRAD:  No problem.  My fault for not being clearer.

If you were a member of a jury that found Mr. Tsarnaev guilty beyond a reasonable doubt of the crimes he's charged with, would you, once you got to the penalty phase, automatically vote for the death penalty?

THE JUROR:  Yes.

THE COURT:  Anything else?

MR. WEINREB:  Yeah, can I ask with two quick follow-ups?

THE COURT:  All right.

MR. WEINREB:  Let me just follow up on that.  So the question is if the defendant is found guilty beyond a reasonable doubt of the crimes charged in the indictment and the case moves to a penalty phase, would you automatically vote for the death penalty or could you wait till the end of the penalty phase, first listening to all the aggravating factors and all the mitigating factors, and then make a decision whether to impose the death penalty?

THE JUROR:  Yes, I agree with that.  I could wait until the end.

MR. WEINREB:  And secondly, on the case -- the issue of the presumption of innocence, if the government puts on its

case but fails to prove the defendant guilty beyond a reasonable doubt, so the evidence doesn't convince you beyond a reasonable doubt that he's guilty, would you find him guilty anyway?

THE JUROR:  Not necessarily, no.

MR. WEINREB:  Well, you say "not necessarily."  Is there any chance you would --

THE JUROR:  So you're speaking just on the government's side.  If you came --

MR. WEINREB:  Right.  So there is no defense side. The defense has no obligation to put on any evidence at all. Do you understand that?

THE JUROR:  Yeah.

MR. WEINREB:  Okay.  You're not a lawyer, so you're not expected to know these things.  That's why we're saying them ahead of time, so you understand sort of what the ground rules are.  So the ground rules are you walk into the courtroom, you don't know anything about the case.  Anything you've heard in the media and so on shouldn't be influencing you.

THE JUROR:  Right.

MR. WEINREB:  The government goes first and it has to produce evidence at the trial to prove the defendant's guilt beyond a reasonable doubt.  The defense has no obligation whatsoever to offer any evidence to try to prove him innocent

because he's presumed innocent.  He walks in there innocent unless and until he's proved guilty.

Are you with me on that?

THE JUROR:  I'm trying, yes.  Yes.

MR. WEINREB:  Okay.  The question is:  If the government went through its whole case, put on evidence in court, but it didn't convince you beyond a reasonable doubt that the defendant was guilty, would you find him guilty anyway?

THE JUROR:  Good question.

MR. WEINREB:  I just want your honest answer.  There's no right or wrong answer.

THE JUROR:  If you weren't able to prove it?  Again, just going by what was told through the media and what I have known from the past, I look at guilty again.  But, again, the media's vicious.  They tell us too much.

THE COURT:  Okay.  All right.  Thank you.

THE JUROR:  Thank you.

THE COURT:  Just leave the questionnaire there.

THE JUROR:  Sure.

(The juror is excused.)

THE CLERK:  Juror No. 126.

MR. McALEAR:  Juror No. 126.

THE CLERK:  Sir, come over here, please.  Take a seat.

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon.

THE COURT:  Since the time you filled out the questionnaire, have you been able to avoid talking about the substance of the case, the facts or anything about the case with anybody?

THE JUROR:  Yes.

THE COURT:  And have you been able to avoid media accounts concerning the case?

THE JUROR:  Yes.

THE COURT:  Okay.  So that is the questionnaire you filled out.  We're going to ask you some follow-up questions about it.

Let me cut the audio for a minute, and I want to look at page 5.

MR. DOREAU:  Video is cut.

THE COURT:  Thank you.

(Discussion at sidebar and out of the hearing of the public:)













MS. CONRAD:  And how do you get to work?

THE JUROR:  I get a ride.

MS. CONRAD:  I guess this goes into Question 10, so I don't have anything further on that question.

THE COURT:  We'll continue back on the audio.

MR. DOREAU:  Audio is back online.

(In open court:)

THE COURT:  Let me focus you on Question 10.  You said you would have some transportation difficulties.  Do you live in Plymouth?

THE JUROR:  Yes.

THE COURT:  Have you explored the bus service from Plymouth to Boston?

THE JUROR:  No.

THE COURT:  Do you know that there is a bus service from Plymouth to Boston?

THE JUROR:  No, I don't.

THE COURT:  If there were a bus service that left early enough in the morning to get you here by nine o'clock, would that solve the problem?

THE JUROR:  Sure.

THE COURT:  You say you work at a tanning salon doing various things, I guess --

THE JUROR:  Yes.

THE COURT:  -- including reception and so on.

How long have you been doing that?

THE JUROR:  About two years.

THE COURT:  And what -- do you have a regular schedule during the week?

THE JUROR:  Kind of, yeah.

THE COURT:  What would your normal schedule be, or if it varies from week to week, give us some sense of that.  What hours do you work --

THE JUROR:  I usually work between 14 to 20 hours a week.

THE COURT:  So it's a part-time job?

THE JUROR:  Yeah, part-time.

THE COURT:  And so how are your hours set?  Who sets them?

THE JUROR:  I think the manager does.  The manager sets them, yes.

THE COURT:  And are they the same -- like is it every Tuesday certain hours and every Thursday certain hours?  Is it a regular --

THE JUROR:  It varies a bit, but it's pretty regular.

THE COURT:  So give me -- say, last week what was your schedule like?

THE JUROR:  I usually work, like, three to six and the next day three to ten, a day off, and then work the other two days.

THE COURT:  What are the hours the salon is open?

THE JUROR:  I work sometimes at two different salons, the same company.

THE COURT:  So for each of them, what are the hours generally?

THE JUROR:  The hours are three to ten for one of them, then the other one is nine to eight.

THE COURT:  Three to ten is 3 p.m. to 10 p.m.?

THE JUROR:  Yes.

THE COURT:  And nine to eight is 9 a.m. to 8 p.m.?

THE JUROR:  Yes.

THE COURT:  Okay.  Social media:  You said you -- in the questionnaire you had Facebook but deactivated it?

THE JUROR:  Yes.

THE COURT:  So you don't use it anymore?

THE JUROR:  No.

THE COURT:  And Twitter you use a little bit but not much?

THE JUROR:  I have it, but I don't use it.

THE COURT:  You had an uncle who worked -- this is Question 34 if you want to look at it.  An uncle who was employed, you said, for SWAT police?

THE JUROR:  Yeah.  I wasn't 100 percent positive on what he does.

THE COURT:  Where would that be, do you know?

THE JUROR:  Kansas City, Missouri.

THE COURT:  Is this somebody -- obviously he lives out there and you live here.  Do you see him very often?

THE JUROR:  I haven't seen him in a couple of years.  Not often.

THE COURT:  If you would go to page 20, Question 77.

MR. WEINREB:  Your Honor, we skipped over page 17.

THE COURT:  Right.

MR. WEINREB:  Okay.

THE COURT:  In Question 77 we asked some questions about whether you had formed any opinion about whether this defendant is guilty or not guilty, and if so, what penalty he might receive.  And as to the guilty or not guilty, you said you're unsure?

THE JUROR:  Yeah.

THE COURT:  As to whether he should receive the death penalty, you said no, and as to whether he should not receive the death penalty, you said yes, okay?  So I want to focus first on the first two, A and B, the ones you said you were not sure.

Can you tell us what led you to indicate that you were not sure about that, do you remember?

THE JUROR:  I'm just not sure about it.  I don't know enough.

THE COURT:  You haven't made any decision about it?

THE JUROR: No.

THE COURT: With respect to the others, about the penalty possibility, we ask some specific questions about attitude toward the death penalty.

THE JUROR: Yes.

THE COURT: If you look at page 23, Number 88, we asked for general attitude toward the death penalty, and you said, "I will not make the decision" -- "that decision to put another human to death."

THE JUROR: Yes.

THE COURT: Is that your -- the next question we asked you to tell us where on a scale from strongly opposed to strongly favor, you circled 1 indicating strongly opposed.

THE JUROR: Yes.

THE COURT: And then on the next page, if you turn to Question 90, we ask which of the suggested statements closely matched your attitude, and you said A, "I'm opposed to the death penalty and will never vote to impose it in any case no matter what the facts."

THE JUROR: Yes.

THE COURT: Is that your view?

THE JUROR: Yes.

THE COURT: There's no case you can imagine that you would vote in favor of the death penalty?

THE JUROR: I would never.

THE COURT:  I'm sorry?

THE JUROR:  I would not.

THE COURT:  Any follow-up?

MS. CONRAD:  Yes.  Understanding that you don't support the death penalty, could you listen to the evidence in the penalty phase -- if the defendant were convicted, could you listen to the evidence from both sides -- and meaningfully consider it and not be already decided against the death penalty?

THE JUROR:  No.

THE COURT:  Okay.  All right, sir.  Thank you.

MR. McALEAR:  Right this way, sir.

(The juror is excused.)

THE CLERK:  Juror No. 128.

MR. McALEAR:  Juror No. 128.

THE CLERK:  Sir, come right over here, if you would.  Have a seat.

THE COURT:  Good afternoon.

THE CLERK:  Make sure you speak into the mic so everyone can hear you, okay?

THE JUROR:  Okay.

THE CLERK:  Thanks.

THE COURT:  Have you been able to follow my instruction when you were last here to avoid discussion of the substance of the case?

THE JUROR:  I tried like heck, yup.

THE COURT:  And to avoid media reports about the case?

THE JUROR:  Yeah.

THE COURT:  Okay.  That's the questionnaire you filled out.  That's in front of you if you want to refer to it from time to time.  Actually, if you'd look at page 5 -- you'd turn to page 5.

Question 9:  You have some arthritis that bothers you if you sit for too long?

THE JUROR:  I have rheumatoid arthritis, so...

THE COURT:  I'm sorry?

THE JUROR:  Rheumatoid arthritis.

THE COURT:  And it bothers you if you sit too long?

THE JUROR:  Long periods.

THE COURT:  Give us an idea of what length of time would be.

THE JUROR:  Four hours.  So as long as I could get up --

THE COURT:  It gets relieved if you get up and move around?

THE JUROR:  Yeah.

THE COURT:  Okay.  So that wouldn't be a serious impediment, if you're able to do that?

THE JUROR:  Shouldn't be.

THE COURT:  Yeah.

THE JUROR:  Yeah.

THE COURT:  You are currently retired?

THE JUROR:  Yes.

THE COURT:  And before that tell us what you did.

THE JUROR:  Forty-five years for the department of public works.

THE COURT:  Town department?

THE JUROR:  Town of Redding, yes.

THE COURT:  And what was your employment level when you left?

THE JUROR:  Supervisor, highway and vehicle maintenance.

THE COURT:  Stay closer to the mic.

THE JUROR:  Sorry about that.

THE COURT:  Just say that again.

THE JUROR:  Supervisor for highway and vehicle maintenance.

THE COURT:  On Question 34 we asked whether you or anybody in the family or close friends worked for various law enforcement agencies.  You say you have a close friend who works for the Cambridge police?

THE JUROR:  That's correct.

THE COURT:  You don't have to identify the person, but could you tell us maybe what his or her, I guess I should say, rank is?

THE JUROR:  He's patrolman.

THE COURT:  And he's been doing that since 2006.  Is that what you said?

THE JUROR:  I think eight years that he's been there.

THE COURT:  Cambridge is one of the communities where some events occurred that may be relevant to the case.

THE JUROR:  Right.

THE COURT:  Do you know whether this friend had any involvement in any of those?

THE JUROR:  Yes, he did.

THE COURT:  He did?

THE JUROR:  Yes.

THE COURT:  In particular, the week of April 15th?

THE JUROR:  I'm pretty sure that he was involved in -- after the fact of the bombing, that he was one of the officers that got the call for the shooting.

THE COURT:  You're talking about the shooting of the MIT police officer?

THE JUROR:  The shooting of the MIT police officer.

THE COURT:  So he was actively involved in that?

THE JUROR:  I think so.

THE COURT:  Have you had any discussions with him about his experiences during that week?

THE JUROR:  Before I got picked on the jury, yes.

THE COURT:  Can you give us some sense of how much you

discussed with him or how much in detail you discussed with him?

THE JUROR:  Well, he's close.  I mean, so --

THE COURT:  Yeah?

THE JUROR:  Quite a bit.

THE COURT:  Again, there's no right or wrong answers.

THE JUROR:  Well, quite a bit.  Quite a bit of discussion.

THE COURT:  Okay.  All right.

THE JUROR:  You know.

THE COURT:  Give us an idea, you say he's a close friend.  In a week how many times would you talk to him?

THE JUROR:  In a week?

THE COURT:  In a week?

THE JUROR:  Four, five times.  He was at the house yesterday.

THE COURT:  Again, without necessarily getting into things that are too personal, how do you know him?

THE JUROR:  Short story or long story?

THE COURT:  Let's start short.

THE JUROR:  Okay.  Short story:  Knew the family, worked with the grandfather, put him on as summer help at the garage.  From summer help he progressed to full time.  Full time, I helped him get him on the Reading police force. Reading police force, transferred to Cambridge.  He lives one

house down from me.  He does stuff for me; I do stuff for him.

THE COURT:  So he's a neighbor?

THE JUROR:  Yup.

THE COURT:  But also, in a sense, you've been his mentor?

THE JUROR:  Well, I've known the family for just about, you know, forever.

THE COURT:  Okay.

THE JUROR:  You know.

THE COURT:  Let's go back a minute.  This is on page 19.  And Question No. 74 we asked what did you think or feel when you got your jury summons, and you wrote, "Miss my trip to Florida."

THE JUROR:  That's correct.

THE COURT:  Do you have a trip to Florida planned?

THE JUROR:  We've rented a house for the month of March, and we were leaving the middle of February.  Now, I've been informed no matter what she's going.

(Laughter.)

THE COURT:  Fair enough.

THE JUROR:  So it puts me in my place.

THE COURT:  Okay.  But you've -- as you say, you've actually made the arrangements to rent a place to stay down there?

THE JUROR:  Yes.

THE COURT:  I think this is...

(Pause.)

MR. WEINREB:  Your Honor, I think we're...

THE COURT:  Okay.  Thank you.  We're done.

THE JUROR:  Questions?

MR. McALEAR:  Right this way, sir.

(The juror is excused.)

MR. WEINREB:  Just for the record, we do believe that the person he was referring to will be a witness at the trial.

THE CLERK:  Juror No. 129.

MR. McALEAR:  Juror No. 129.

THE CLERK:  Ma'am, right over here, please.  Thanks.  Have a seat.  Make sure you speak into the mic so everyone can hear you.

THE JUROR:  Okay.

THE CLERK:  Thanks.

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon.

THE COURT:  Since you were here when you filled out the questionnaire, have you been able to abide by my instruction to avoid discussing the substance of the case with anybody?

THE JUROR:  Yes.

THE COURT:  And avoid any media reporting of it and so on?

THE JUROR:  Yes.

THE COURT:  You're employed at the Federal Reserve Bank?

THE JUROR:  I am.

THE COURT:  And you've been there some years, I guess?

THE JUROR:  I have.

THE COURT:  You put down in your -- in the questionnaire I guess you've progressed through different job descriptions?

THE JUROR:  Yes, I have.

THE COURT:  But it's all been with the bank?

THE JUROR:  With the Federal Reserve.

THE COURT:  And you wouldn't have any hardship employment-wise in serving on the jury?

THE JUROR:  No, I would not.

THE COURT:  You in Question -- if you want to look on. That's why we give it to you so you can follow along.

THE JUROR:  Okay.

THE COURT:  And I'm on page 10 --

THE JUROR:  Sure.

THE COURT:  -- Question 28, we asked if you had written anything, published or unpublished and so on, and you said an article on -- I can't quite get it.

THE JUROR:  It's an article on change management.  So how to facilitate change within your organization.

THE COURT:  I see.  And when was this that you wrote that?

THE JUROR:  It was probably back in 2002-ish.

THE COURT:  And where was it published?  Was it published?

THE JUROR:  It was published online.

THE COURT:  And published in what?

THE JUROR:  It's HR.com, was the website.

THE COURT:  You're a Facebook user?

THE JUROR:  Yes.

THE COURT:  And you said daily?  Pretty much daily?

THE JUROR:  Pretty much daily, yes.

THE COURT:  And personal only?

THE JUROR:  Personal, yes.  That's all we're allowed from a work standpoint.

THE COURT:  Have you posted anything about your being involved in this?

THE JUROR:  No, I did not.

THE COURT:  Your former husband worked as a police officer?

THE JUROR:  He had applied to several departments but during our time together was not selected to be part of a --

THE COURT:  I see.  It says that, right.  All right.  Fair enough.

At page 17 and 18 we asked some questions about what you might call current events or international issues of one sort or another, including things about the war on terror, so-called, or attitudes towards Islam or Muslims and so on.  Do you remember those questions?

THE JUROR:  Yes.  Yup.

THE COURT:  Are you aware of events in Paris and Europe in recent weeks?

THE JUROR:  Yes, I am.  Yes.

THE COURT:  Those happened after you filled out these answers, so my -- have you followed that closely or are you kind of just generally aware of it or --

THE JUROR:  Just generally aware of it.

THE COURT:  Would anything you heard about those incidents change anything you wrote in these answers?

THE JUROR:  Not that it relates to how I answered this, no.

THE COURT:  Has it had any other impression on you?

THE JUROR:  Just personally makes me more nervous about things that are going on in the world, but not as it relates to this case.

THE COURT:  The bottom of page 19, Question 74 and 75, we asked sort of some reactions you might have had when you were summoned, received the jury summons, and what you may have said to others or others said to you.  In 74 you said you

thought it would be very interesting.  Can you just tell us about that.

THE JUROR:  You know, I've been called to district court before, have never been selected.  But I thought in the grand scheme of things if I was asked to do jury duty, it would be meaningful to do it with something that was as significant as this type of case as compared to some other cases that I might have been placed on in district court.

THE COURT:  Are you referring to this district court or state district court?

THE JUROR:  State district court.

THE COURT:  This is a district court too.  We call ourselves the same thing, but we have different subject matters, but we call ourselves the same, that's why I wasn't sure what you were talking about.

Then on the next page, section -- I mean, Question 77, we asked if you could tell us whether you have some opinions about several matters including -- based on what you've seen or heard before this, whether you have an opinion that the defendant is guilty or not, and then with respect to a penalty that might be imposed if he is guilty.

THE JUROR:  Uh-huh.

THE COURT:  You checked "unsure" for all of them, but you added to the first one "but probably."

THE JUROR:  Sure.  So I think it's hard to not think

that he is guilty just given everything that's been in the news over the course of the last couple of years.  But for me to say with utmost certainty that I know it to be true, I couldn't say that.

THE COURT:  So in our system of justice, criminal justice, when the government charges somebody with a crime, the case will ultimately come to trial, presumably.  A person charged with a crime is presumed not guilty, innocent of the crime, unless the government proves the opposite, proves that he is guilty by proof at the trial which persuades the jury beyond a reasonable doubt that the person is guilty.  And if the jury is not so persuaded, the jury is instructed to return a verdict of not guilty.

The burden of proof is always on the government and never shifts to the defendant.  It's never a question of "Which side has persuaded me on the question of guilt or innocence?" It's:  "Has the government persuaded me that he's guilty?"  And if it has not, he remains not guilty.

Do you understand those principles?

THE JUROR:  Uh-huh.

THE COURT:  Do you have any difficulty in faithfully applying those if you were a juror in this case even in the face of some preconceived ideas about what may or may not be true?

THE JUROR:  I personally think I would not because

I've done so many -- in my management roles, in my human resources role I have to do a lot of employment relation cases. So I may have a preconceived notion in my head, but if I'm going to go through the investigative process, I have to be sure I'm not using that in any part of the investigation or in any of my conclusions.

THE COURT:  Can you tell us a little bit more about that, what your job responsibilities are with respect to considering, investigating -- I don't know what to call them -- complaints or issues in deciding whether -- whether to take some HR action of some kind?

THE JUROR:  Sure.  So it's going to sound probably very childlike, but sometimes employees can accuse each other of something not going the way they wanted or that somebody talked to them in a way that they felt uncomfortable or thought inappropriate; sometimes there are people who are around in that situation.  If the employee makes a formal complaint either in my management role or if they escalated it to HR, I would need to investigate anybody who was potentially involved in that situation, anybody who might have overheard it, anybody who might report to either one of those to see if that was something that might be a pattern in this person's behavior and try to come to a conclusion either to help them mediate the situation, to help them resolve it themselves or, unfortunately, sometimes to take action, disciplinary action,

against an employee.

THE COURT:  And so I want to focus on perhaps your role as a decision-maker as opposed to an investigator.

THE JUROR:  Sure.

THE COURT:  From what you said earlier, you've had the experience of perhaps changing your point of view as you had further information.  Is that what you're telling us?

THE JUROR:  Yes.

THE COURT:  Is that what you meant to say?

THE JUROR:  Yes.

THE COURT:  Can you think of a particular instance when that happened?

THE JUROR:  Well, sometimes there can be people who have a reputation of being complainers, if you will.  So you might go into an investigation with that point in mind, and after you've talked to everybody who's involved you may find out that that person had a legitimate gripe in this situation, regardless if maybe they didn't have a legitimate gripe in previous situations.

THE COURT:  Okay.  On page 21 at Question 82 we asked you if you had personally participated in various, maybe call them supportive activities of one sort or another.  I guess there are two.  You said you have a bracelet?

THE JUROR:  Yes, I have the Boston Strong bracelet.  And there was a concert at TD North where bands came in support

of victims.

THE COURT:  Yeah.  When was the concert, do you remember?

THE JUROR:  I'd say maybe the fall after the marathon? I can't recall for sure.

THE COURT:  Who did you go with?

THE JUROR:  There was my husband and eight other couples.

THE COURT:  Were any of them involved in the events?

THE JUROR:  No.

THE COURT:  Or personally affected by them?

THE JUROR:  No.

THE COURT:  This is just general support for --

THE JUROR:  General support.  And interested in seeing the bands.

THE COURT:  Okay.  How was the concert?

THE JUROR:  It was very good.

THE COURT:  And the bracelet is, what, one of those sort of rubber like --

THE JUROR:  The rubber one with the silver.

THE COURT:  -- things that has the logo and stuff?

Do you wear it?

THE JUROR:  I do wear it.

THE COURT:  When do you wear it?

THE JUROR:  Well, I wore it to the concert for sure,

and then I might wear it based on what I'm wearing.

THE COURT:  Because it goes with the outfit?

THE JUROR:  Because it goes with the outfit.

THE COURT:  All right.  I'm just looking for my witness list.  You recognize somebody on Attachment A?

THE JUROR:  I did.

THE COURT:  I guess I don't have it.  Does somebody have a witness list?

THE CLERK:  Judge.

THE COURT:  The person is an FBI agent.

THE JUROR:  He was a former FBI agent.

THE COURT:  He now works for the bank, is that it?

THE JUROR:  He does.  He's in charge of our law enforcement.

THE COURT:  Do you interact with him on a regular basis?

THE JUROR:  Given my current role, we do have interactions, I'd say, a couple of times a month.

THE COURT:  Is he under your supervision or are you under his supervision?

THE JUROR:  No, we're peers.

THE COURT:  We also asked some questions about the death penalty as a possible penalty in the case, and that begins at Number 88 on page 23.  First we asked for a general overview kind of question, how do you feel about it, and you

say, "I'm not sure.  I can argue both sides of the issue."

THE JUROR:  Yes.  So I knew this would get me an interview.  So I really don't know.  I can say in some situations that I have said in my life that I believe in an eye for an eye.  I think that if somebody is guilty of a crime and they receive the death penalty, I'm not sure that's really a punishment for that person; I think it's a punishment for the people in their lives more so.  At the same time, I think that if somebody is sentenced to life in prison with no chance of parole and isn't rehabilitated, should taxpayers have to pay for that?  So I really don't have a strong opinion either way. I can see multiple sides to that.

THE COURT:  And you're talking about the general question of the advisability of the death penalty?

THE JUROR:  Yes.

THE COURT:  Question 89 asked whether you had any strong views about whether the death penalty should be imposed whenever the defendant has been convicted of intentional murder.  And of course we don't get to the discussion of penalty until that's happened, somebody has been convicted of intentional murder, right?

THE JUROR:  Right.

THE COURT:  You selected 5, which I guess sort of puts you in the middle.

THE JUROR:  Yes.

THE COURT:  And I think that's consistent with what you --

THE JUROR:  I think that's consistent with what I just said, and perhaps in that situation where the person was involved or their mental state or there's probably other factors that might sway me one way or another.

THE COURT:  And then on the next page, Question 90, we asked you to select which of the various possible options of statements proposed closely -- most closely reflected your view, and you picked D, "I am not for or against the death penalty.  I could vote to impose it or I could vote to impose a sentence of life in prison without possibility of release, whichever I believed was called for by the facts and the law in the case."

Does that fairly state your view on this?

THE JUROR:  I do.  I hope that sounds consistent with what I explained here.

THE COURT:  So I want to -- I take from that that you think that in a particular case -- now, this is not a general proposition, but in a particular case -- after having evaluated the evidence along with your fellow jurors, if you thought the evidence and the instructions -- consistent with the instructions of law if you thought the evidence supported the imposition of a death penalty, you could do that?

THE JUROR:  Yes.

8-124

THE COURT:  And if you thought the evidence, considered again in light of the legal instructions, called instead for life imprisonment without possibility of release, you could vote for that?

THE JUROR:  Yes.

THE COURT:  And you don't have any pre-commitment to either of those in the abstract without assessment of the particular facts?

THE JUROR:  I don't have any moral or religious foundational belief that would sway me in either direction.

THE COURT:  Is there any reason your attitude as expressed in that selection would not apply to this case?

THE JUROR:  I don't think so.  I can't think of a reason that it would.

THE COURT:  I'm looking at the last -- page 27. You've been there?

THE JUROR:  I did go to Jamaica.

THE COURT:  Okay.  Mr. Weinreb?

MR. WEINREB:  Thank you.  Good afternoon.  I'm Bill Weinreb.  I'm one of the prosecutors in the case.  I just wanted to follow up on your answer about the death penalty.

THE JUROR:  Yes.

MR. WEINREB:  So you were talking about whether you think it's a good idea or not to have a death penalty, and some of these questions, you know, can be read to ask about that

sort of thing. Have you given that a lot of thought, whether there should be -- the death penalty should even exist or not as an option?

THE JUROR: I haven't given it in sort of those general terms, no. It's hard not to think about it as it relates to this specific case, but what may or may not -- what I would think -- what worries me about being a juror on this case is because I don't have a strong opinion either way, I don't know if I would be -- I don't know if I would be wishy-washy in my thinking and that is a good thing or a bad thing to be as a juror.

MR. WEINREB: Well, where I was going to go next, and I don't know if this is related to what you just said or not, but have you given a lot of thought to the -- how you would feel if you were a juror in this case and the jury found that the defendant was guilty of one of the crimes charged in the indictment that carries the death penalty, and now you're hearing evidence about whether the defendant should get the death penalty or not.

MS. CONRAD: Objection.

THE COURT: Is this the "capable" question?

MR. WEINREB: Yeah.

THE COURT: Yeah, why don't you get to it.

MS. CONRAD: But about this case?

THE COURT: All right. Make it more general. Yes,

right.  Fair enough.

MR. WEINREB:  Let me rephrase that a little bit.  Have you given a lot of thought to if you were a juror in a case in which the defendant was facing the death penalty and you were on the jury, whether you personally, if you decided it was the appropriate punishment, could do it, whether you could vote to give someone a death sentence?  Have you given thought to that?

THE JUROR:  Well, I have given thought to that.  So I think if the evidence supported that and that was what was required, then I could do it.  Would I be emotional?  Would I have awkward feelings about that?  Absolutely.  But I would hope that I would be able to do what was required of me.

MR. WEINREB:  Okay.  So as the judge will instruct you, nobody's ever required to impose the death penalty in any case.  Even if the death penalty is a possibility -- the juror in a case, hypothetically it could be you, hears aggravating -- evidence that might support the death penalty as being the appropriate sentence and hears evidence that might support life without the possibility of release as being the appropriate sentence, and then that juror has to decide on his or her own which is the appropriate sentence.  There's no requirement either way.

THE JUROR:  Yeah.  I mean, I would hope that I could do what is the right thing.  Whatever that decision is, whether the right decision is to vote for life or to vote for death, I

hope -- I'm confident that I could think about it analytically. What I was getting at is the part that would be hardest for me is living with that decision either way.  I think both outcomes are a terrible situation, but I would think -- I would hope that based on the facts that were presented to me, I would make the best decision regardless of how I felt about either one personally.

MR. WEINREB:  So you're telling us you would give it thoughtful consideration.  You would take the decision seriously?

THE JUROR:  Oh, absolutely.  Absolutely.

MR. WEINREB:  But knowing that that's the kind of person you are, who would give it thoughtful consideration and take it seriously, my question is:  Would your concerns about whether you could live with yourself if you gave someone a death sentence -- would that prevent you from giving it in the end, just that concern alone, or would you be able to give it if you believed, based on the evidence that you had heard, that it was the appropriate sentence?

THE JUROR:  So having never faced that, it's hard to say 100 percent, but I believe I could do that.

MR. WEINREB:  Thank you.

MS. CONRAD:  Good afternoon, ma'am.  My name is Miriam Conrad.  I'm one of Mr. Tsarnaev's lawyers.

You had said that you work with/speak with an

individual who's listed on the witness list?

THE JUROR:  Yes.

MS. CONRAD:  If that person were to testify and you were on the jury, would you tend to give that person's testimony more weight or more credibility or look at his credibility differently than someone you didn't know?

THE JUROR:  Well, since I didn't know him in that capacity, I think I would look at him as any other witness.

MS. CONRAD:  So you would be able to evaluate whether or not you thought he was being truthful?

THE JUROR:  Yes.

MS. CONRAD:  And you also indicated that you -- I think it was -- if you could just turn to page 20, your answer to Question 80.

THE JUROR:  Yes.

MS. CONRAD:  Is that somebody that you know personally?

THE JUROR:  I do.  It's my husband's best friend's sister-in-law.  So I don't know -- I'm not close with her.  I see her at occasional holiday parties, that sort of thing.

MS. CONRAD:  And how did you find out that she was there?

THE JUROR:  I think as soon as the event happened everyone was asking if anybody knew someone who was there and if they were home safe and that sort of thing.

MS. CONRAD:  And was that somebody that you were concerned about when you heard --

THE JUROR:  I didn't know at the time that she was there.

MS. CONRAD:  And so when did you first find that out?

THE JUROR:  It was probably within 24 to 48 hours.

MS. CONRAD:  And do you know if she was physically harmed in any way?

THE JUROR:  She was not.

MS. CONRAD:  Do you know if she was emotionally harmed?

THE JUROR:  She was emotionally.  The fact that she still hasn't talked about it, about what she saw that day, I would say that she's emotionally impacted.

MS. CONRAD:  Now, you said that this was your husband's best friend's sister-in-law?

THE JUROR:  Yes.

MS. CONRAD:  Has your husband's best friend talked about how she was affected?

THE JUROR:  Just the fact that she still hasn't spoken about it.

MS. CONRAD:  Would that relationship -- do you think that would affect you as a juror listening to the evidence and having to make decisions about guilt and perhaps ultimately about penalty?

THE JUROR:  I don't think so because of -- I mean, I'll be honest.  If she was physically impacted by the event, that would be a totally different story, but not understanding where she's at with this, probably not.

MS. CONRAD:  Has your husband's best friend made any comments to you about this case or the possibility that you might be a juror?

THE JUROR:  Well, before coming here and figuring out that this was the case that we were being called to, all my friends told me I would be crazy not to just make some crazy statement to make sure I got off the case.  So a lot of people have said a lot of things to me but nothing specific about what I should do either way if I was selected.

MS. CONRAD:  And I think you said you post on Facebook daily and you hadn't posted anything about your jury service in this case.  Have you ever posted anything about the marathon bombings or the aftermath at all?

THE JUROR:  Well, on that Friday our building was in lockdown, and so I did post something about being locked down with police with semiautomatic rifles or something.

MS. CONRAD:  So you were actually at work?

THE JUROR:  I was at work that day.

MS. CONRAD:  So you had to stay at work?

THE JUROR:  I had to stay at work.

MS. CONRAD:  And how did you feel at that time?

THE JUROR:  Well, it was a pretty eerie feeling.

MS. CONRAD:  And how would that affect you as a juror in this case?

THE JUROR:  You know, I think if I was around the marathon, that might have a different feeling than being in that situation.  We've been in lockdown for other reasons.  I'm not trying to make light of that, but it wouldn't have an impact.

MS. CONRAD:  You said that your ex-husband was -- never got a job as a police officer while you were together?

THE JUROR:  Yes.

MS. CONRAD:  Do you know whether he became a police officer after that time?

THE JUROR:  Actually, I don't.

MS. CONRAD:  And you also said that you have a cousin who served in Iraq?

THE JUROR:  Yes.

MS. CONRAD:  Would that affect you in any way as a juror in this case given that you may hear evidence about the motive for these crimes being related to American involvement?

THE JUROR:  You know, I didn't think about it in terms of motive, but I don't think so.  He and I have never talked even about the marathon.

MS. CONRAD:  Thank you.

THE COURT:  Okay.  Thank you, ma'am.

THE JUROR:  You're welcome.

(The juror is excused.)

THE COURT:  I think we only have two more.  I'd just as soon keep going so they don't have to sit around for another hour, if everybody's okay with that.  Are you okay with that?

MR. WEINREB:  That's fine.

THE COURT:  Next would be 132.

THE CLERK:  Juror No. 132.

MR. McALEAR:  Juror No. 132.

THE CLERK:  Ma'am, over here, please.  Have a seat, if you would.

THE JUROR:  Thank you.

THE CLERK:  Speak into the mic so everyone can hear you.

THE JUROR:  Okay.

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon.

THE COURT:  Have you been able to abide by my prior instructions to avoid talking about the substance of the case and to avoid any exposure to media reports about the case and so on?

THE JUROR:  Yes.

THE COURT:  Okay.  That is the questionnaire you filled out before you, and we may be referring to some of the answers you gave because we're going to follow up on some of

them and talk a little bit more about them.

THE JUROR:  Okay.

THE COURT:  You're employed in a district attorney's office?  I guess I'm inferring it's Essex?

THE JUROR:  Correct.

THE COURT:  Tell us about that, how long you've been with the DA's office and what do you do there.

THE JUROR:  I've been with the DA's office now for almost two years, and I work in admin support with the ADAs over there.

THE COURT:  Give us a little more day-to-day kind of idea.

THE JUROR:  Day-to-day?  We do a lot of data entry which we usually put in the arraignments.  We'll get the arraignments; we'll come down; we'll enter the information on the arraignments.  We update cases.  We're in the courtroom bringing casework up.  Telephone calls, answering questions on the phone.  Victims will call in.  We do -- victim/witness advocates will be there on-call.

THE COURT:  Is this -- I don't know how the organization is set up.  Is this what I would call, and you can correct me if it's wrong, the main office?

THE JUROR:  It's not the main office; it's a branch of the main office.

THE COURT:  What town?

THE JUROR:  Newburyport.

THE COURT:  You're in Newburyport?

THE JUROR:  Uh-huh.

THE COURT:  And so there's a district court in Newburyport?

THE JUROR:  Correct.

THE COURT:  So is most of the work focused on the district court --

THE JUROR:  Yes.

THE COURT:  -- rather than the superior court?

THE JUROR:  Yes.

THE COURT:  And therefore, all of the DAs, ADAs would be people who would be principally doing district court work?

THE JUROR:  Correct.

THE COURT:  And you've worked for lawyers in private practice before that?

THE JUROR:  That's correct.

THE COURT:  What kind of work did you do there?

THE JUROR:  It varied.  We -- it was a general practice law firm.  There was personal injury; there was real estate work.  I'm trying to think of what else.  Civil litigation.

THE COURT:  Did any of the lawyers you worked for or with do criminal defense work?

THE JUROR:  No.

THE COURT:  I presume they didn't do any prosecuting either because they were in private practice.

THE JUROR:  Right.

THE COURT:  I'll ask you that anyway.  Did they do any?

THE JUROR:  No.

THE COURT:  What led you to go to the DA's office from a private firm?

THE JUROR:  Basically benefits wise.  I needed health insurance, and the practice that I was working for, the attorneys there didn't offer vacation pay or sick pay or healthcare, so...

THE COURT:  Okay.  So I guess this is sort of an obvious question for someone working for a prosecuting office, whether in a criminal case, if consciously or perhaps more likely unconsciously, subconsciously you would be rooting for the prosecutor in the case.

THE JUROR:  I probably would sway maybe 80 percent that way.  I generally want to know what the facts are, what the evidence is in order to make a sound decision.  But, again, working for the prosecutors, I tend to sway more so probably that way.  I don't know.

THE COURT:  Well --

THE JUROR:  It depends.

THE COURT:  So I guess the question is whether it

would actually have an effect on your ability to impartially assess the evidence, fairness to both sides. So let me just -- I'm sure you know this, but in a criminal prosecution a defendant is presumed not guilty, or innocent, unless proved guilty by the evidence at trial.

THE JUROR: Correct.

THE COURT: And it's always the burden of the government to prove that by the evidence at trial.

THE JUROR: Right.

THE COURT: And a defendant never has any burden to prove that he's not guilty. You understand that?

THE JUROR: Right. Yes.

THE COURT: Now, when you said you would sway towards the prosecution's side to some degree, do you think that would interfere with your fulfilling those obligations; in other words, would you sort of lessen the burden on the prosecution to win its case, or would you impose some burden on the defendant to prove the contrary of what the prosecution was saying?

THE JUROR: Well, again, I think it -- the bottom line, it comes down to I have to know the facts and I have to know the evidence and I have to know the law in order to put the pieces together in order to make a sound decision.

THE COURT: Let me ask you to turn to page 20 of the questionnaire. And I want you to look at Question 77.

THE JUROR:  Okay.

THE COURT:  There we asked whether -- based on things you'd seen in the media and heard from people and so on, whether you had an opinion --

THE JUROR:  Right.

THE COURT:  -- whether the defendant was guilty or not and whether he should be punished by the death penalty or not, and to both of those you indicated yes, you did have an opinion based on what you had heard and seen.

THE JUROR:  Right.

THE COURT:  So I want to ask sort of a similar question of what I've just asked.  Again, as a trial juror, we ask jurors to decide -- I want to separate the question of guilt from the question of punishment first.  Let's just focus on the defendant's guilt.  The burden is always on the government to prove by the evidence at trial convincingly, beyond a reasonable doubt, that the person is guilty of the particular crime he's charged with.

THE JUROR:  Right.

THE COURT:  You understand that?

And people may come into the -- jurors may come into the trial having some impressions from what they've seen.  And the question is whether the jurors, and you in particular, having those impressions, can nonetheless listen to the evidence at the trial and make a decision based only on that

and decide whether the government has fulfilled its burden or not based on the trial evidence, not on what you've heard someplace else.

So the question is:  How do you assess your ability to do that given the proposition that you have some ideas already?

THE JUROR:  Well, like I said, I think, given what I've seen and heard up to this point, I would -- that's why I said yes to that question; however, once I am able to hear, like I said, the rest of the facts, the evidence, the law, and try and put the pieces together, then I might have a different opinion.

THE COURT:  And how would your sway, I think as you put it, towards the prosecutor affect that balance?  Would that be an extra benefit to the prosecution in the case?

THE JUROR:  Not necessarily.  I don't -- I don't believe -- like I said, I think I would have to base my opinion on what I've seen, what I've heard and what I've learned in order to make a correct assumption.  Whether -- just because I work where I work doesn't necessarily mean that my opinion would be more sided with the prosecution.

THE COURT:  Let me turn to the second part of the question concerning that, your opinion about the death penalty. I explained this morning about the process.  The first important part of the trial is whether the government can prove the defendant guilty of what he's charged with.  If the jury

concludes that he's guilty, and if he's guilty of intentional murder, for example, we'd proceed to a second phase where the question would be not guilt or innocence but what should be done, death penalty or life in prison without release.

And that's a little bit different from the first phase because in this phase both sides would be presenting evidence. The government would present evidence of things that made this case seem worse than the normal -- the average case and, therefore, called for a more serious penalty; the defense would likely present evidence that would say there are things about this that aren't related to the guilt question alone but are considerations that you should think of in -- and, they would argue, conclude that the death penalty is not appropriate here but life in prison is. So you hear the aggravating and the mitigating and so on.

Let's turn to page 23. We asked some questions there about the death penalty and your views about it. And in Question 88, you said, "I strongly believe in the death penalty."

THE JUROR: Correct.

THE COURT: And we asked you then in the next question to give us on a scale of 1 to 10 what your belief was regarding whether the death penalty should be imposed whenever the defendant has been convicted of an intentional murder. Now, of course that would be the predicate of the consideration in the

first place, that the defendant has been convicted of intentional murder.  You said "strongly favor" in that case.

THE JUROR:  Uh-huh.

THE COURT:  Does that accurately present your views?

THE JUROR:  Yes.

THE COURT:  The next question, page -- Question 90 on page 24, we asked you to select the statement that was closest to your view from a range of options.  You selected E, that you're in favor of the death penalty but you could vote for a sentence of life imprisonment without the possibility of release if you believed that sentence was called for by the facts and the law in the case.

THE JUROR:  Right.

THE COURT:  I guess I'm -- there's a -- and I know this is -- could be just a result of the drafting of the questions, but that's a little bit inconsistent with the 10 on the previous one where you said you thought it should be imposed -- the death penalty should be imposed -- whenever the defendant has been convicted of intentional murder.  And that, of course, is always going to be true when you're considering the death penalty, right?

THE JUROR:  Right.

THE COURT:  Here you suggested your position is not that absolute and you could consider life imprisonment if you thought the facts called for that.  So I guess I'm not sure

which answer you've come down on.  Those seem -- do you see what I'm getting at?

THE JUROR:  I do see what you're saying.  And I think at the time when I read the question I was probably thinking in my own mind it depended upon whether or not a person who intentionally murdered, you know, with malice or whatnot, then I would probably strongly go for the death penalty.  But if someone were, say, an accomplice in a situation, then maybe I might just go for a life sentence or something like that.  So I guess it's kind of, like, a border.

THE COURT:  So can you envision an array of facts that could lead you to vote for a life imprisonment instead of a death penalty in a case of intentional murder?

THE JUROR:  Probably not.  For an intentional murder, probably not.

THE COURT:  Okay.  No?  All right.

I was asking for follow-up.  There's no follow-up.  So thank you very much.

THE JUROR:  Okay.

(The juror is excused.)

THE COURT:  This is 134.

THE CLERK:  Juror No. 134.

MR. McALEAR:  Juror No. 134.

THE CLERK:  Ma'am, over here, please.  Have a seat.

THE JUROR:  Thank you.

THE CLERK:  Speak into the mic when you're giving your answers so everyone can hear you.

THE JUROR:  Okay.

THE CLERK:  Thanks.

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon.

THE COURT:  Since the day you were here to fill out the questionnaires, have you been able to abide by my instructions not to discuss the substance of the case with anybody?

THE JUROR:  I think so.  It's funny, people ask questions and you go, "I'm court ordered not to talk about it," and they go, "Oh, oh," and they walk away.

THE COURT:  That's a good answer you can give them, right, because you can blame me.

THE JUROR:  Right.

THE COURT:  And have you been able to avoid as much as possible any media accounts of what -- either the case or things related to it?

THE JUROR:  Yeah.  Yeah.

THE COURT:  I'm just -- of course you recall we asked a lot of information about people --

THE JUROR:  Yeah.

THE COURT:  -- including some overseas residencies, and you have a couple.  I'm just curious about them.  Can you

8-143

tell us?  The UK and Brazil.

THE JUROR:  No, I'm just a travel bug.  Yeah, for grad school I realized in order to do a full-time program I was going to have to quit my job, and so I decided to make an event out of it.  And I just went to London for grad school.  And then I came back and wanted to see more of the world and found a job in Brazil, and went down there for a few years.  And then there was too much family things going on, and so I decided it was time to grow up and come back, and now I'm here.

THE COURT:  What kind of work did you do when you were in Brazil?

THE JUROR:  I'm a teacher, so I taught at an American school.

THE COURT:  Okay.  And I guess I was just looking at what you filled out.  You're an art teacher essentially?

THE JUROR:  Uh-huh.

THE COURT:  And have done that for a number of years but at different places.  Is that it?

THE JUROR:  Yes.

THE COURT:  And you were asked about blogs or posting messages or opinions on websites.  You say you do that promoting your art exhibits?

THE JUROR:  Not very often, but if a friend will send a promotion for their exhibit, I'll just write a note like, "Hey, congrats," or something like that.  So I think if you

Google my name, it will pop up, just little things like that, but not --

THE COURT:  Do you have your own website for your own artwork?

THE JUROR:  I do.  Just for my shows, yeah.

THE COURT:  And then besides that, we asked about other social media, and I guess you --

THE JUROR:  I have accounts at many places, but I'm not very active.

THE COURT:  You don't seem to use them very much.

THE JUROR:  No.

THE COURT:  And nothing about this case on there?

THE JUROR:  No.  You can check.

THE COURT:  Okay.  They probably have.

(Laughter.)

THE COURT:  So you've served a couple of times on juries.  In Massachusetts state court both times?

THE JUROR:  Massachusetts loves me.  Every three years, like on the calendar, I get called, including last year.

THE COURT:  But, as you seem to have indicated -- if you want to follow along, I'm not trying to ask you blind questions.

THE JUROR:  No, I remember.

THE COURT:  You said both experiences were interesting and educational and you'd gladly serve again.  So you found it

to be a worthwhile experience?

THE JUROR:  Yeah.  You know, it's tough for everybody to get a few days out of work, but it's always really interesting.  I've never had to deliberate.  It's always been settled somehow.

THE COURT:  Oh, I see.

We asked on pages 17 and 18 some questions about things that you might class as current events or international affairs and so on such as the war on terror and its impact on people, feelings about Islam or Muslims and so on and so forth. You answered all of those.  Do you remember that?

THE JUROR:  Yeah.

THE COURT:  In the last month or so since you've done the questionnaire there's been news reports of shootings in Paris and so on.  Have you followed that at all?

THE JUROR:  Not closely because I've been afraid to. Every once in a while I'll have my fiancé look at something and he filters for me.  Like what's going on in the world that I'm allowed to know about?

THE COURT:  Would -- what you do know about those events, would they have any effect or change any of the answers you gave in this section of the questionnaire?

THE JUROR:  I don't think so.  You're talking about 17 and 18?

THE COURT:  17 and 18 principally, yeah.

THE JUROR:  I don't think so.

THE COURT:  If you'd flip to page 20, and I direct your attention to Question 77 where we ask some -- we ask whether you had -- based on what you had seen or read in the media, heard from people or otherwise learned, whether you'd formed an opinion about, first, whether this defendant was guilty or not, and then secondly, if so, what the penalty might be.  And there were some boxes --

THE JUROR:  Right.

THE COURT:  -- and you could select, and you selected "unsure" for each of those answers except that for the first question about whether he's guilty or not you said "unsure but likely."

THE JUROR:  So, I mean, I think I said "likely" just because I would be surprised if it would go this far if there wasn't some evidence.  But I don't know what all the evidence is which is why I couldn't say yes.

THE COURT:  So in our criminal justice system when a person is accused by the government of a crime, the person is presumed to be innocent, or not guilty, of that crime unless at trial the government proves the person guilty of the offense by the evidence, proves it to the jury so the jury's convinced beyond a reasonable doubt.  The government has, as we say, the burden of proof in the case.  And it is always with the government.  A defendant never has any burden to prove he's not

guilty of what he's accused of.  Even if a defendant opposes the government's evidence, takes a position in the case, he doesn't assume the burden of proving himself not guilty.

THE JUROR:  Yes.

THE COURT:  You understand those principles generally?

THE JUROR:  Yes.

THE COURT:  Would any opinion you have, like the one that says it's likely based on your impressions -- would any of that prevent you from faithfully applying the principles that I've just summarized for you and insist that the government prove its case beyond a reasonable doubt without shifting any responsibility for proving -- the defendant to prove himself not guilty?

THE JUROR:  Right.  No, I've been thinking -- you've given us three weeks to really think about this, and I don't think so.  I feel like the other times I've been called to jury duty, I take it very seriously.  And I like living in a place where we have to prove guilt, and so I don't think --

THE COURT:  So even if you thought from the things you've heard that it was likely that he's guilty of one or more of the offenses that he's charged with, if after evaluating the evidence you thought the government had fallen short in its proof, would you be able to return a verdict on that matter of not guilty?

THE JUROR:  Not if the government doesn't have enough

proof. I don't think so, no. So I feel like the government has to have proof.

THE COURT: Right. If the government's proof fell short in your view, you were not in the condition where you were convinced of the guilt of a particular offense beyond a reasonable doubt --

THE JUROR: Right.

THE COURT: -- could you/would you return a verdict of not guilty in that case because the government had failed to --

THE JUROR: I would have to, I think.

THE COURT: Would you be able to?

THE JUROR: Yeah, I do.

THE COURT: I'd like you to look at Question 80 further down the page. Somebody that teaches at your school was physically injured in the bombing. How do you know about that? I ask that because you say you have not had a direct conversation with her.

THE JUROR: I just remember when the marathon came up this year -- we're at lunch and somebody said something about it and they said, "Oh, did you know that" -- I know she's a runner because she's the track coach. And they're like, "Oh, Jen was there and I think she actually has -- has a scar but she wasn't badly hit or anything like that."

And I don't -- I don't see her very often. We don't have lunch together, and so I have not actually talked to her

about it.  So that's why I put her name down.  She wasn't on the list.

THE COURT:  Do you have some understanding about how severely or not she was hurt?

THE JUROR:  I think not severely, no, or I'd think she'd be more -- I don't know.

THE COURT:  Would you feel uncomfortable as a juror in making a decision that might be different from the one she would prefer or you might think she would prefer?

THE JUROR:  I really don't know her that well.  I think I would feel awkward if -- I don't know.  I would feel -- I don't even think she knows that I'm here.  If she knows I'm here and we were having lunch together all the time, I think that would be a different situation.  Like I said, I haven't talked to her about it.  You know, I assume it probably is something she feels strongly about.

THE COURT:  The question really is how, if at all, that would affect you.  Assume she would feel strongly about it.

THE JUROR:  Right.

THE COURT:  How, if at all, would that affect you?

THE JUROR:  I don't think she is somebody who would affect me.  I think there are other people in my life who would, and I wouldn't put her in that category.

THE COURT:  How big is the school?  How many teachers?

THE JUROR:  Sixty?

THE COURT:  On Question 81, you said you sheltered in place on the Friday?  You were in Jamaica Plain?

THE JUROR:  Oh, yeah, in our house.

THE COURT:  Yeah.

THE JUROR:  I wasn't a teacher then.

THE COURT:  Would that affect you, having done that?  I mean, having been compelled to do that, would that have any effect on your fairness or impartiality in the trial?

THE JUROR:  I don't think so.

THE COURT:  In Question 85 you recognize a name that is not that distinctive a name, I guess, and you're wondering if it's the same person.

Does anybody have the answer to that question?

(Pause.)

MR. CHAKRAVARTY:  Sorry.  No, your Honor.

THE COURT:  Who is the person -- you went to college with somebody?

THE JUROR:  It's somebody I haven't seen in 20 years, but I was scared not to say something.

THE COURT:  So the person you went to college with, you don't know what he's doing?

THE JUROR:  I don't know where he's living.  It's just the same name.

THE COURT:  Now, we also ask some questions about the

death penalty.  That begins on page 22 with Question 88.  And 88 was to ask in general about attitude towards the death penalty, and you said you're not 100 percent in either direction and you're glad that it's a decision you've never had to make.  Let's take the first part of that about not being 100 percent in either direction.

THE JUROR:  I don't like it.  I mean, it's one of those things where, you know, I've never -- like I'm not going to show up on a protest for either side.  I have been lucky that it's not a decision that I've ever had to make, so it's never been on my conscience.  I'm glad that we don't take it lightly in this country.

THE COURT:  In the next question we ask if you could kind of weigh your opinion a little bit.

THE JUROR:  Right.

THE COURT:  But this is from strongly opposed to strongly in favor, and the question asked [sic], "The death penalty should be imposed whenever the defendant has been convicted of an intentional murder."  Of course we don't get to the death penalty question at all unless the person has been convicted of an intentional murder, so --

THE JUROR:  I feel like I would be teetering in the other direction for that question.  I think I read it wrong.

MS. CONRAD:  I'm sorry, I didn't hear that.

THE JUROR:  I'm sorry.  I think I read that one wrong.

I would definitely say I'd be more of a 4 than a 6.  I'm definitely more on the "I'm uncomfortable with it" than "I'm excited about it" side.

THE COURT:  Okay.  If you'd look at the next page, and Question 90, we then asked you to choose from among a number of possible statements what matched your views, and you selected D, that you were not for or against; you could vote to impose it or you could vote to impose a sentence of life imprisonment without possibility of release, whichever you believed was called for by the facts and the law in the case.

Is that a fair summary of your view?

THE JUROR:  I think so, yeah.

THE COURT:  And so you don't have a pre-commitment or a predisposition that is so strong that you would automatically go to one side or the other?

THE JUROR:  No.

THE COURT:  You would evaluate it on the evidence?

So it is -- I guess let me ask it this way:  Can you envision facts or circumstances that you would find would influence you to decide that this case called for -- I don't mean "this case," I mean the case you're considering -- the hypothetical case you're considering called for the imposition of a death penalty, can you envision that there would be such facts and circumstances that you could feel that it was appropriate that the death penalty would be imposed?

THE JUROR:  It's hard.  I mean, I think there are.  I mean, you know, like I said, I'm always -- I've been fortunate that it's not -- that's not what I do, but it's hard to be an absolute no.

THE COURT:  And the other side as well:  You envision facts and circumstances where the death penalty is an issue and you can decide that under the circumstances of the case it's not the appropriate punishment and life without release is a more appropriate punishment.

Could you envision that there would be facts and circumstances --

THE JUROR:  That would be easier, yes.

THE COURT:  In Question 95 on page 25 --

THE JUROR:  Yeah.  I mean, I feel that that is something -- like it's -- until you're there, it's hard to say for sure.  I think you have to go through the process and see what the evidence is and --

THE COURT:  Well, so this question asks whether, again, presuming the base fact that the defendant is guilty of a qualifying crime, if you decided that the death penalty was appropriate could you conscientiously vote for it, and you said you're not sure?

THE JUROR:  Okay.  So, I mean, yes.  If I decided that the death penalty was appropriate, yes, I would be able to vote for it.

THE COURT:  So the unsureness is about whether it's appropriate.  Is that it?

THE JUROR:  Yes.

THE COURT:  Is that what you thought?

THE JUROR:  Yes.

THE COURT:  Okay.  Okay.  Any follow-up?

MR. MELLIN:  Good afternoon, ma'am.  I'm Steve Mellin. I'm one of the prosecutors on the case along with this team right here.

Let me ask you a couple of questions about the death penalty.  You indicated that -- you said you -- when you were going through this questionnaire and thinking about it, that the questionnaire and just the idea made you think about your position on the death penalty, and then we've gone through it a little bit today.  How would you say your thoughts about the death penalty are evolving, or have they evolved?

THE JUROR:  I guess I just think it should be reserved for the most extreme cases, and it's -- it can't be taken lightly and there has to be incredible evidence and -- I mean, the death of anybody, anything, animal, you know, it's hard to say that it's something that you're for.  And so I feel like it may have its place but it has to be for something extreme.

THE COURT:  Can you elaborate a little bit on what you mean by "extreme"?

THE JUROR:  I mean, I guess -- murder is extreme.  But

whether -- I mean, I don't feel that every person who's currently in prison for murder should be on death row as well, and so -- I mean, I don't know. I would have to -- it's a case-by-case thing and it has to be serious. And all murder is serious. It's hard for me to articulate this.

MR. MELLIN: We understand this, and this is a difficult issue. I'm sure you don't sit here and think about this.

THE JUROR: No, I'm like shaking here.

MR. MELLIN: We don't want you to shake.

You said earlier that you don't like the death penalty in answer to one of Judge O'Toole's questions.

THE JUROR: Right.

MR. MELLIN: When you say you don't like it, what don't you like about it?

THE JUROR: That it's killing someone.

MR. MELLIN: In the common questionnaire you mentioned that you were glad you never had to really address this issue ever before.

THE JUROR: I mean, I guess the fear is what if I was wrong. It doesn't happen very often, but there's always that, you know, you're responsible for it and you just have to really make sure that you are correct.

MR. MELLIN: Would that fear keep you from not being able to ever impose it?

THE JUROR:  I mean, I don't think.  I think just, you know, being part of a jury is an incredibly important thing. And I think that if -- you know, sometimes you have to step up to the plate, and if that is what the task is, it's an unfortunate task, but it has to be dealt with.  And so I would not want it as my job.  I would not want to have to, you know -- I don't know.  I'm...

MR. MELLIN:  And that's what we're kind of getting at. You know, at some point this theoretical position about not liking it but --

THE JUROR:  Right.  It becomes real.

MR. MELLIN:  It becomes real and you do have to step up to the plate.

THE JUROR:  Right.

MR. MELLIN:  So we're trying to figure out when you step up to the plate, if you believe that the death penalty was appropriate based on the evidence that had been presented to you, would you be able, yourself, to actually vote to impose the death penalty against someone else?

THE JUROR:  Right.  I think that if -- if it seemed like it was the right thing that I would be able to.  But, again, until you're in that situation.  I mean, again, it's hard because I've never been in that situation and it's scary. And I know that I'm not here saying, "absolutely not"; I'm saying that I'm open and I would listen and -- I'm really

nervous.

MR. MELLIN:  That's fine.  And just one last question, your Honor, if I may.

I appreciate that you're open to it and you could consider it and everything, but what I'm trying to find out is if you really came to that position, do you believe you could do it if you felt it was appropriate?

THE JUROR:  And I'm saying I think so but I won't really know until I'm there, or I'm not there, I don't know.

MR. MELLIN:  Thank you, Judge.

MS. CONRAD:  Good afternoon, ma'am.  My name is Miriam Conrad.  I'm one of Mr. Tsarnaev's lawyers.

THE JUROR:  Hello.

MS. CONRAD:  Understanding that a juror is never required to vote for the death penalty, could you consider the evidence and if you thought that voting for the death penalty was the right thing to do, would you be able to vote for it?

THE JUROR:  I think if I thought it was the right thing to do that I could.

MS. CONRAD:  I have nothing else.  Thank you.

THE COURT:  All right.  Thank you very much.  You may go along.

MR. McALEAR:  Right this way.

(The juror is excused.)

THE COURT:  Okay.  Well, thank you for sitting through

that, but I think she gets on her way faster this way.

I'm suggesting 2:30 to reconvene.  This will be in sidebar mode at 2:30.

MS. CLARKE:  Thank you, your Honor.

(The Court exited the courtroom and there is a recess in the proceedings at 1:41 p.m.)

(The Court entered the room at 2:43 p.m.)

THE COURT:  Okay.  So I think the first person -- well, actually, I forget who we've short-sheeted.  Number 111, I think, was one of those, right?

MS. CLARKE:  Agreed.

MR. WEINREB:  Yes.

THE COURT:  I think the next one we saw was 113.

MS. CLARKE:  Neither party has a motion.

THE COURT:  Okay.  113 is added.

I think we had an agreement on 115.

MS. CLARKE:  Yes.

MR. WEINREB:  Yes.

THE COURT:  And I think the same for 116.

MS. CLARKE:  Yes.

MR. WEINREB:  Yes.

MS. CLARKE:  Same now for 118 and 119.

THE COURT:  Okay.  I think we may have done 118 or maybe not.  Did we discuss it?

MS. CLARKE:  No.

THE COURT:  It's just obvious to everybody.  I think it was just obvious to everybody.

MS. CLARKE:  We stopped on both.

THE COURT:  119, you agreed on?

MS. CLARKE:  Yes.

THE COURT:  I agree as well.

MS. CLARKE:  126, we agreed on.

THE COURT:  That brings us to 128.  He has the trip to Florida.

MS. CLARKE:  Right.  And a connection to --

THE COURT:  I think that's why we stopped the inquiry, when we learned he had a paid holiday.

129.

MS. CLARKE:  Neither party has a motion.

THE COURT:  Okay.

MS. CLARKE:  132, I think both parties agree.

THE COURT:  I agree.

MS. CLARKE:  It's nice when we're in sync.

THE COURT:  Let's do it more.

134.

MS. CLARKE:  Neither party has a motion.

THE COURT:  I think that's it.

135, but he was --

MS. CLARKE:  And 135 was an agreed.

THE COURT:  Right, from before.

So I think the yield today is three:  113, 129, and 134.  I think we're all on the same page.

I don't know if you've talked about tomorrow.

MR. BRUCK:  Before we get to tomorrow, maybe this is the time to take up our motion to reconsider No. 60, just whenever you would prefer to do it.

THE COURT:  I thought we -- well, go ahead.

MR. BRUCK:  I have a copy of her --

THE COURT:  Yeah, I've looked at it.

MR. BRUCK:  -- of her voir dire.

THE COURT:  I don't think I brought it in with me.

MR. BRUCK:  I've marked up a little of it.  This was a juror who said on her questionnaire she thought -- held an opinion that the defendant was guilty, that he should be sentenced to death, and then she wrote in "unsure" next to whether she could change her opinion.  And on inquiry, it turned out that what she was unsure about was on the penalty end.  So the inference was left that she meant to say on the questionnaire that she could not change her opinion as to -- she would be unable to set aside her opinion as to guilt.  That's where she was coming in.  There is no juror as yet qualified who has said that they were unable -- in their questionnaire, unable to put aside their opinion of either guilt or punishment except for in this somewhat ambiguous way but not really, this No. 60.

So our point about her is I think she is a little bit of an artifact of the first two days when everyone was feeling their way. And I have my doubts -- I really do doubt that she would have been qualified today. And I'd like to just go quickly through why we think that. I mentioned that she is the juror who most clearly of everybody that has made the cut so far indicated that she could not set aside her opinions, at least on guilt. And she went back and forth on whether -- on the presumption of innocence. The Court questioned her in a fairly brief question on Page 6-34 and 35. And her answer finally was, "I think so," which, granted, it's an affirmative answer, but it's not exactly a ringing affirmation of her ability to set her opinion aside.

MR. WEINREB: I'm sorry. Mr. Bruck, can I interrupt you for a second? Are we talking about Juror 60 or 90?

MR. BRUCK: 60.

MS. CLARKE: Correct, 60.

MR. WEINREB: And you're saying that Juror 60 said she was unable to set aside her opinion in the questionnaire?

MR. BRUCK: In the questionnaire.

MR. WEINREB: On Number --

MR. BRUCK: 77. She has -- I'm sorry. She wrote in "unsure." That's how I should have -- and then that was in turn clarified.

MR. WEINREB: So she changed "able" and then wrote the

word "unsure."

MR. BRUCK:  That's right.  I should have made that clear.

MR. WEINREB:  I just want to make sure we have the right juror.

MR. BRUCK:  Yeah, you do.  And then on inquiry, when Miss Clarke inquired about that, she said she was unsure about the penalty which left the inference that she was not unsure about guilt, which makes sense.  I mean, most jurors, I think, are reporting greater bias as to guilt than as to punishment.

Then on Miss Clarke's examination, she acknowledged, "I don't think I can presume him to be innocent, that is to say, today, sitting here in light of..." she said, "I think that's more difficult because of the media coverage."  She was, I suppose you could say, rehabilitated by a single question of Mr. Weinreb's, which is the one that we think really does not adequately state the presumption -- the presumption of innocence and the burden of proof.  But, you know, it's a shaky record to begin with and a thin record.

And this is also the juror who, on the day that she came to court, was told by her husband, a retired firefighter, that the defendant should have been shot in the head when he was in the boat and presumably knowing that his wife was a juror on the way to court.  When that happens in the middle of a trial, it is an extremely serious problem.  And the trial

began on January 5th.  Granted, she hadn't been instructed, and she didn't make the statement.  But that is a -- that's tampering.

The -- Miss Clarke reminds me, He should have been shot to save the cost of a trial.  Now, she said that he -- she wouldn't -- that she wouldn't pay attention to him and so on and so forth.  But this is serious business.  This is really serious business.  And I think that this juror would look different to us today now that we have seen a much larger array of who's available on this.

Yesterday, you know, the theory on which we are proceeding here is that there are five million people in this division, and there were 3,000 summonses that went out.  Both the fairness of the trial and the reputation of this Court, I think, counsels in favor of not having on the jury somebody with all these red flags.  So we think this case merits reconsideration.

MR. WEINREB:  Your Honor, the government opposes the motion for two reasons.  First, we do not believe a motion for reconsideration of a juror should be heard unless there is new information brought to the Court's attention that was not available the first time around.  This is simply rearguing the very same things that were argued the last time, maybe in a slightly different way, simply asking the Court to change its mind.  We don't think it's appropriate either as a legal matter

or as a prudential one.  It's not going to contribute to a fair and orderly process for picking a jury.

Secondly, the argument, I would submit, is not convincing.  I think that we've had many discussions back and forth about jurors' understanding of what it means to presume someone innocent and that this was a quintessential case where the question was initially interpreted by the juror not in the legal sense but in the sort of lay sense, and then later she understood it in the legal sense and answered it in a way that showed she could be fair and impartial.

As for there being some kind of jury tampering, to say that the trial began on January 3rd --

THE COURT:  5th.

MR. WEINREB:  I'm sorry, January 5th -- I think, is not well-taken.  It may have begun on January 5th for purposes of 18 U.S.C. 3432, if I cited that correctly, but it did not begin for purposes of these kinds of questions, not to mention that, when the juror was asked whether she would be influenced by what her husband said, she laughed it off in a manner that made it perfectly clear to everybody in the room that it would have zero effect on her.  So for all of those reasons, we oppose.

THE COURT:  Okay.  I'll read the whole transcript of her interview overnight and let you know tomorrow morning.  I will say, as to the husband's remark, I'm in agreement with

what Mr. Weinreb just pointed out.  We saw her reaction to it. The nonverbal part of the reaction was -- I think demonstrated her ability to be independent of anything her husband thought of.

As for going forward, I'm sure that she and other jurors can have the point impressed upon them that they have to keep themselves away from people who would make those kinds of remarks, and people who might should know that and respect their need in that respect.

As to the presumption of innocence, back-and-forth dialogue, I'll look at the transcript and let you know.

I would also say I don't necessarily take an absolutist position about motions to reconsider based on the transcript.  I would not think it should be an ordinary course both for procedural reasons perhaps of moving forward but also because it really is harder to assess things on the cold record than it is when the person is sitting right here and you're making judgments as the person is doing that.  So I think that the process structurally has some deficiencies that make it probably unwise for it to be a regular thing.  That, of course, would go to either side of the case.  Okay.

So what I was going to proceed to, if it's time, was my thoughts about some of the people in tomorrow's panel and if you can let us know, you know, so that Jim could call people off tomorrow.  I don't think we're going to be in a position to

backfill for tomorrow from the next scheduled panel on Monday, but I'm going to see if we can do something so that we can begin to do that next week at some point, if not Monday, soon. That's high on my agenda.

So let me just tell you the numbers that I have and see what you think about them. Some of these are the simple markers that we've done: wage employee, self-employed people whose income depends on their being able to work; scheduled absences from the state or whatever else; and full-time student status. So -- but I have also put in a couple -- I think I have two -- that, when you look at the complex of all circumstances, including some relationship questions, you may agree on them.

So they are the following numbers: 137 -- let me just give you the shorthand, my reason for picking the person. This would be one of the last category I was talking about, multiple potential issues that you should look at. That's 137. 144 is scheduled to be in California for an adoption in the course of the trial. 146 is another multiple-factor possibility. 147 and 154 appear to be wage employees. 155 has scheduled vacations, says two. That's a lot of vacations. And 162 is a full-time student. Maybe you have others.

MS. CLARKE: So that's 137, 144, 146, 147, 154, 155, and 162?

THE COURT: Correct.

I see there's been a new motion filed with respect to venue.  What troubles me about it is that it quotes from the juror questionnaires, and it's filed in the public record.  I don't think that's right because it's one thing to quote things that have been said here, but there are jurors we have yet to see, including one of these, as a matter of fact, one of the ones I just mentioned, whose questionnaire is quoted in the motion and is in the public record.  I'm going to instruct that it be placed under seal.  The damage has probably been done, but I think we have to be cautious about that.

MS. CLARKE:  Does the Court prefer a redacted version to replace that?

THE COURT:  If you think it's worth the trouble.

MS. CLARKE:  Yeah.

THE COURT:  Okay.

MS. CONRAD:  Just to clarify, the issue is with the quotes, not with the numbers, so we don't need to redact the numbers, just the quotes?

THE COURT:  Well, the numbers -- to the extent it says what Juror 278 said about something, it's -- indirect quotes would be included, is what I'm saying.

MS. CONRAD:  I don't mean in numbers of jurors.  I mean the percentage of questionnaire that indicate --

MS. CLARKE:  Just the quotation.

THE COURT:  I haven't looked at the motion enough to

know what that is.  Okay.

MR. WEINREB:  Your Honor, I think we would ask -- I haven't had time to review it either, but for the time being, in any event, we would ask that it all be kept under seal and no redaction --

THE COURT:  Yes.  Let's take that -- we can always, if it seems prudent -- I think that's a good idea.  I would like to see a redacted version before it goes on the record so I can see whether there are any marginal problems of any kind.  So right now we'll have it placed under seal, but as I say, they probably already copied it.  I think that's it.  Am I forgetting anything?  No, okay.

I do have one funding-related matter that I could talk to you just quickly about.

MS. CLARKE:  Certainly.

(Whereupon, at 3:00 p.m. the trial recessed.)

C E R T I F I C A T E


We, Marcia G. Patrisso, RMR, CRR, and Cheryl Dahlstrom, RMR, CRR, Official Reporters of the United States District Court, do hereby certify that the foregoing transcript constitutes, to the best of our skill and ability, a true and accurate transcription of our stenotype notes taken in the matter of Criminal Action No. 13-10200-GAO, United States of America v. Dzhokhar A. Tsarnaev.


/s/ Marcia G. Patrisso
MARCIA G. PATRISSO, RMR, CRR
Official Court Reporter


/s/ Cheryl Dahlstrom
CHERYL DAHLSTROM, RMR, CRR
Official Court Reporter


Date:  January 22, 2015