UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                                    )
UNITED STATES OF AMERICA,           )
                                    )
        Plaintiff,                  )
                                    )   Criminal Action
v.                                  )   No. 13-10200-GAO
                                    )
DZHOKHAR A. TSARNAEV, also          )
known as Jahar Tsarni,              )
                                    )
        Defendant.                  )
                                    )
```

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

### JURY TRIAL - DAY NINE

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Friday, January 23, 2015
9:26 a.m.

Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

APPEARANCES:

    OFFICE OF THE UNITED STATES ATTORNEY
    By: William D. Weinreb and Aloke Chakravarty,
        Assistant U.S. Attorneys
    John Joseph Moakley Federal Courthouse
    Suite 9200
    Boston, Massachusetts  02210
    - and -
    UNITED STATES DEPARTMENT OF JUSTICE
    By: Steven D. Mellin, Assistant U.S. Attorney
    Capital Case Section
    1331 F Street, N.W.
    Washington, D.C.  20530
    On Behalf of the Government

    FEDERAL PUBLIC DEFENDER OFFICE
    By: Miriam Conrad, Federal Public Defender
    51 Sleeper Street
    Fifth Floor
    Boston, Massachusetts  02210
    - and -
    CLARKE & RICE, APC
    By: Judy Clarke, Esq.
    1010 Second Avenue
    Suite 1800
    San Diego, California  92101
    - and -
    LAW OFFICE OF DAVID I. BRUCK
    By: David I. Bruck, Esq.
    220 Sydney Lewis Hall
    Lexington, Virginia  24450
    On Behalf of the Defendant

P R O C E E D I N G S

(The venire enters the courtroom at 9:26 a.m.)

THE CLERK:  All rise for the Honorable Court.

(The Court enters the courtroom at 9:27 a.m.)

THE CLERK:  Be seated.

THE COURT:  Good morning, everyone.

THE VENIRE:  Good morning.

THE COURT:  Welcome back to the United States District Court for the District of Massachusetts.  We thank you for being here and being part of this process.

We're continuing the process of selecting a jury for the case of United States versus Dzhokhar Tsarnaev.  As you know, Mr. Tsarnaev is charged with some criminal charges in connection with the bombing that occurred near the finish line of the Boston Marathon in April of 2013 that resulted in the deaths of three people.  He's also charged in the death of an MIT police officer and other offenses occurring on April 18 and 19, 2013.

Some, but not all, of the crimes charged in the indictment are, by statute, potentially punishable by death.  You'll recall from my prior instructions when you filled out the questionnaires that the jury will first consider and decide whether the government has proved Mr. Tsarnaev's guilt of any or all of the charges made against him.  If he is convicted of any of the capital crimes, that is, crimes potentially

punishable by death, the jury will then consider and decide whether he will be sentenced to death for such crime or to life in prison without the possibility of release.

Some of you may have wondered why the death penalty could be a possibility in the case in view of the fact that the laws of Massachusetts do not provide the death penalty as a punishment for murder or any other violation of the law.  The reason is that this is a federal case involving alleged violations of the laws of the United States rather than a state case involving violations of Massachusetts law.

If the jury convicts Mr. Tsarnaev of any one of the capital crimes charged in the indictment, the same jury will then proceed to hear additional evidence and decide whether to sentence him to death or to life imprisonment without the possibility of release.  Because the jury that is selected to decide, first, the question of guilt or innocence will also decide the punishment if he is convicted, it is necessary to question potential jurors such as yourselves about your feelings and beliefs about the death penalty as part of the process of picking the jury.

So let me explain briefly the procedures that must be followed in a case in which the death penalty is or may be at issue:  As in any criminal trial, initially the government will have the burden of proving that Mr. Tsarnaev is, in fact, guilty of any crime with which he is charged.  If he is

convicted of any crime for which the death penalty may lawfully be imposed, then there will be the second phase of the trial, sometimes referred, in shorthand, as the penalty phase.

In that phase the government will introduce evidence that seeks to prove beyond a reasonable doubt, first, that Mr. Tsarnaev acted with sufficient intent to be subject to the death penalty; and, second, that aggravating factors about the events or the killings of the people who were killed or about the defendant -- aggravating factors justify sentencing him to death.  Aggravating factors are circumstances that, if proven, make the crimes particularly serious or blameworthy, and, therefore, under the law, may justify imposing a more severe sentence compared to the sentence for people convicted -- other people who are also convicted of intentional killing or murder. As I say, the government will bear the burden of proving aggravating factors to every juror beyond a reasonable doubt.

The defense will have an opportunity in the penalty phase to present evidence of what it will argue are mitigating factors.  Mitigating factors are usually circumstances about the crime or the events or about the defendant's background or character that would suggest that the death penalty is not the appropriate sentence in the case or that life imprisonment without possibility of release is adequate to punish the defendant.

Unlike the proof of aggravating factors, a mitigating

factor must be proven only by a greater weight of the evidence. That is a less demanding standard than proof beyond a reasonable doubt. Again, unlike the proof of aggravating factors, mitigating factors also do not have to be proven to the satisfaction of all 12 jurors. Any juror who finds or determines a mitigating factor to be proven by a greater weight of the evidence may consider that factor in deciding the appropriate sentence in the case regardless of whether any or all of the other jurors agree that the mitigating factor has been proven.

After the parties have made their presentations in the penalty phase, the jury will then weigh all the evidence. Before a jury could vote to impose the death penalty, every juror would have to be persuaded that certain threshold factors that make the defendant potentially subject to the death penalty have been proven beyond a reasonable doubt. In addition, in order to impose the death penalty, every juror would have to be persuaded that any proven aggravating factors sufficiently outweigh any mitigating factors found by any juror or jurors to justify a sentence of death.

Even if the jury did not find any mitigating factors, it would still have to be unanimously persuaded that any proven aggravating factors were themselves sufficient to justify a death sentence. You should understand that a jury is never required to find that a sentence of death is justified. The

decision whether the government has proven that the defendant should be sentenced to death must ultimately be made by each juror himself or herself.

If, however, every juror is persuaded that the death penalty should be imposed, I would be required as the judge to sentence the defendant to death; in other words, I could not change the jury's decision.  The jury, and not the judge, is responsible for determining whether a defendant who is convicted of a capital crime will live or die.

What I've just described is only an overview of the law applicable to a jury's consideration of the death penalty. If you are selected to serve on the jury and if you find the defendant guilty of a crime punishable by death, I will give you very detailed instructions concerning your duties in deciding whether to impose the death penalty or a penalty of life imprisonment without the possibility of release and the law that must be followed in making those decisions.

When you filled out your questionnaires, we told you there are no right or wrong answers to the questions you have been asked or will be asked in the process.  We ask them because both the government and the defendant are entitled to a jury that does not have its mind firmly made up one way or the other before hearing the evidence and a detailed explanation of the law.  That applies both to whether Mr. Tsarnaev is guilty or not guilty of the specific crimes charged in the indictment,

and if he's convicted of a capital crime, whether he should be sentenced to death or to life in prison without possibility of release.

So today we're going to follow up on the questionnaire and individually ask you questions one by one. We'll shortly ask you to go back into the room where you were assembled and we'll call you into the courtroom one by one to ask the questions. There will be a few people here in the courtroom in addition to the lawyers and their staffs. And the proceedings are being simultaneously transmitted by video and audio to overflow courtrooms where there are people viewing.

We will not identify you by name but rather by number, and you'll be seated so that the video camera will be behind you. Your answers will be generally public, but if you believe a truthful answer would require you to reveal sensitive personal information, we will temporarily stop the audio transmission to the other courtrooms so that people there will not hear your answer.

Again, we do not expect or want any particular answer to any question, all we want and what the law expects is that you provide accurate and truthful answers to the questions you are asked, and if you do that, you'll be doing your duty as a citizen as a juror no matter what the answers might be.

I do want to take a moment to remind you of some of my prior instructions. As I told you earlier, the jury's verdict

must be based on the evidence produced at trial and must be free of outside influence; therefore, I remind you again it is extremely important that you do not discuss the case, including the jury selection process, with family or friends or each other and any other person until either you have been excused from service or, if you're selected, until the case has concluded.  And, again, of course you're not to conduct any independent research online or otherwise, and to avoid reading or watching or listening to any reports about the case in the media for the same duration.

When you executed the -- signed the questionnaires, you did so under an affirmation that your statements were true and you were making the affirmation under the penalty of perjury.  Similarly, we'll ask you to take an oath now that the answers you'll give in the oral examination will be true, complete to the best of your ability.

So the clerk will now ask you to rise to take that oath.

THE CLERK:  Will the jurors please rise and raise your right hand.

(The venire is duly sworn.)

THE COURT:  Jurors, we'll now excuse you back to the room in the back and we'll proceed to have you out one by one.

(The venire exits the courtroom at 9:38 a.m.)

THE COURT:  I just want to finish off a piece of

business from yesterday.  I've reviewed the transcript with respect to Juror No. 60 and see no reason to change my assessment made at the time when we were observing her reactions and assessing her answers in light of all circumstances, including the way she answered the questions. So I'm satisfied that she's properly included.

MR. BRUCK:  If I may, before the next -- first juror comes out, I wanted to raise an issue respecting the record on *Morgan* qualification.  As the Court has been extremely patient in hearing us out as to our position on the right to be able to pose life-qualifying questions that assume the actual charge in this case, such as weapon of mass destruction, the Court has ruled.  We have attempted to pose that question, the government has objected, the Court has consistently sustained the objection and reaffirmed the ruling.  And that leaves us in a position where we don't really want to go through this objection and sustaining if we can avoid it with each juror; on the other hand, we have to make our record.

So what I'm requesting is that we make a standing request for the *Morgan* questions, beginning with Question 7 on our third list, and including as alternatives the reformulations that we posit, 8, 9 and 10, and that that be treated as a standing request on our part on which the Court has ruled as a matter of law that we may not ask those questions; otherwise, we'll have to keep asking the question

and having the objection and having the ruling.

MR. WEINREB:  Your Honor, I think the motion that the defense filed is on the record, and if they want the record to reflect that the motion applies to each juror who's summoned, I don't have any argument with that.  But I don't think that the record should reflect that the motion has been denied in whole or even in part with respect to each juror.  That is something that remains to be seen.

And so the record will be what it is with respect to what questions were actually asked of the juror in the end, but to the extent that the request is simply that the record reflect that it's -- it applies to each juror, we have no problem with that.

THE COURT:  Okay.  I think that's what you were asking.

MR. BRUCK:  Well, no.  Yes, if it means that it applies to each juror.  What we don't want to have a situation is that you've ruled as to every time we ask the question, but if we don't keep asking the question, an appellate court would say, Well, they didn't ask that juror the question.

THE COURT:  No.  The request is made, it hasn't been withdrawn, and it continues.  And as jurors are examined, what happens with the examination can be compared against the request.

So I think it's sufficient that it's noted, and I

think it's obvious anyway, that the request has been generally made and generally I've adopted a different method of examining, and if the witness isn't examined as you have requested, that will be clear from the record and the request applies.

MR. BRUCK:  Well, the problem is that you have granted us, which we greatly appreciate, considerable latitude in follow-up questioning.  And we don't want it to appear that we should have used that latitude to go back to Question 7, 8, 9 and 10 and chose not to do so.  If the record can be clear that that's not what happened, we'll be okay.

THE COURT:  I was with you until -- I didn't quite get the "not what happened."  But I think it is clear that you want that done on any witness to whom it may apply where there's a *Morgan* issue, if we could call it that, and the examination will stand against it.  And the appellate court, I think, will see the issue and the context from the record.  I don't -- so you don't have to -- as far as I'm concerned --

MR. BRUCK:  Yes.

THE COURT:  -- you don't have to renew it.

I understand that it applies consistently when there's a *Morgan* issue.

MR. BRUCK:  And when you say we don't -- I'm sorry.

THE COURT:  And we'll proceed the way we have been because of the attitude I've taken towards that line of

questioning.  I can't speak for the appellate court.

MR. BRUCK:  I understand.  But just -- it's amazing what is clear at trial and becomes an issue of contention later.  When the Court says we don't have to renew it, do you mean that to be we don't have to pose the question to the juror?

THE COURT:  Yes.

MR. BRUCK:  Very well.

MS. CONRAD:  So just so I understand so the record is clear for purposes of appeal, we have a continuing objection to those questions not being asked by your Honor and to us not --

THE COURT:  In this form.

MS. CONRAD:  -- being permitted to ask the question in that form.

THE COURT:  Fair enough.

MS. CONRAD:  Just so we don't have to keep asking the question, have an objection, have it sustained and take more time --

THE COURT:  Yes.

MS. CONRAD:  Thank you.

I don't know if Mr. Bruck had something else.  I had something about a juror we've already seen and also one who's coming up.

Did you have something, Ms. Clarke, first?

MS. CLARKE:  I do on Juror No. -- the first juror, but

I thought I'd wait until we got there.

THE COURT:  Okay.  So we're ready for --

MS. CLARKE:  We do have something on the first juror, your Honor.

THE COURT:  Wait.  Before the juror comes in --

MS. CLARKE:  There's a Question 40 issue.

THE COURT:  Okay.  Well, actually, let's deal with any other Question 40 issues.  Are there others in this group?

MS. CONRAD:  There's a similar-type issue but it's not a Question 40 issue.

MR. WEINREB:  Your Honor, I've been asked to hand this up as well from Ms. Conrad.

THE COURT:  Okay.  Let me just get where I am now.

(Pause.)

THE COURT:  What's this?

MS. CONRAD:  It's Juror No. 140, your Honor.

MR. WEINREB:  It looks like what I just handed to you, your Honor.

MS. CONRAD:  I think it's the same thing.  It came in both directions.

THE COURT:  All right.

(Pause.)

THE COURT:  Okay.  So I haven't looked at this yet because -- is this a separate issue or is this related to --

MS. CONRAD:  This is on Juror No. 140, your Honor, the

Twitter pages, and she -- I believe it's her.

THE COURT:  140?  Wait a minute.  Well, there two different things coming up.  We're dealing with a Question 40 issue and this is not a Question 40 issue.

MS. CONRAD:  It's not a Question 40 issue; it's a Question 29 and 30 issue.

THE COURT:  Okay.  Let's deal with Juror No. 138 and Question 40.  Is there anything -- I see what I see.

MS. CONRAD:  Right.

THE COURT:  I guess we'll ask about it, okay?

MS. CONRAD:  Yeah.  I just wanted to alert the Court.

THE COURT:  All right.

THE CLERK:  Ready?  Juror No. 138.

MR. McALEAR:  Juror 138.

THE CLERK:  Sir, over here, please.  Have a seat. Make sure you speak into the mic so everyone can hear you.

THE COURT:  Good morning.

THE JUROR:  How are you doing?

THE COURT:  Good.  When you left last time you were here, I had instructed everyone to avoid any discussion of the subject matter of the case with anybody.  You could talk about coming here, obviously, but -- and also to avoid any exposure to media articles about the case.

Have you been able to do that?

THE JUROR:  Yeah, I haven't looked at anything.

THE COURT:  Keep your voice up so everyone can hear you.

THE JUROR:  Yeah.  No, I haven't talked to anybody about it.

THE COURT:  Okay.  Tell us what you do for employment.

THE JUROR:  I work for the City of Peabody.  I'm in the water department.

THE COURT:  What do you do?

THE JUROR:  I'm in the distribution.  I work out in the street doing water breaks, services, fixing all the mains.

THE COURT:  And what is the basis of your compensation?  Are you salaried or hourly or --

THE JUROR:  I'm hourly.

THE COURT:  What would happen if you were on this case for an extended period of time?  Would you be paid?

THE JUROR:  Yeah, as far as I know I'm getting paid. Yes.

THE COURT:  Even though you'll be here?

THE JUROR:  Yes.

THE COURT:  And is that -- you say as far as you know. Is that because you talked with higher-ups about it?

THE JUROR:  My foreman actually was picked for jury duty like a month ago, and he served on a case for a week.  So he got paid for the week.  If they stop that after a certain time or what, I could find out.

THE COURT:  You haven't specifically asked anybody?

THE JUROR:  No.

THE COURT:  Let me ask -- we asked you a little bit about social media, and you said you use Facebook?

THE JUROR:  Yes.

THE COURT:  I guess you post to it once or twice a week but you check it every day or something like that?

THE JUROR:  Yeah.  We drive around in the city truck. If I'm not driving, I'm sitting in the passenger seat just playing on my phone unless we're working.  But other than that, I don't really -- I'm not posting on it or talking to people on it.

THE COURT:  What's the nature of your use of it?  Is it essentially personal, social-type things?

THE JUROR:  Yeah.

THE COURT:  Do you comment on public affairs or anything like that?

THE JUROR:  Yeah, I see what my friends are doing and comment on that.

THE COURT:  Anybody commenting about this trial?

THE JUROR:  No.

THE COURT:  Could we cut the audio for a minute and excuse the reporters?

(Discussion at sidebar and out of the hearing of the public:)





(In open court:)

THE COURT:  That is the questionnaire you filled out, so we may refer to some of the questions and it might help you to take a look at it.  I'm looking at page 19, Question 74.  We asked did you have a reaction when you received the summons to possibly serve on this case, and you said "interested."

Can you tell us what you were thinking when you wrote that; what you might have meant by that?

THE JUROR:  I wasn't sure what to really expect at all.  I didn't expect it to be like anything I'd ever done, so I was curious, basically.

THE COURT: Did you have a reaction one way or the other in terms of it would be interesting to serve or just interested to find out and then get excused or what was your --

THE JUROR: More like to see what it was all about, I guess. I mean, like interested in what would be going on, not like looking to get out of work for a month or nothing like that.

THE COURT: Okay. On the next page, Question 77, we asked people if they had from any source, media or otherwise, formed an impression about whether the defendant was guilty or not or whether he should be punished in a certain way or not, and you answered "no" to all of those questions.

THE JUROR: Yeah. I wasn't going to make any decisions until I'd seen everything that was presented, basically, in front of me.

THE COURT: In other words, if you were a juror, you would wait to hear what the evidence was before making up your mind. Is that what you're saying?

THE JUROR: Yes. Yes.

THE COURT: In any criminal case -- you may know, but I'll lay it out, the basics anyway -- in any criminal case a person accused of a crime under our system is presumed to be innocent, or not guilty --

THE JUROR: Yes.

THE COURT: -- unless and until the government proves

otherwise by evidence at trial, and convinces the jury that the person is guilty by proof that leaves them with no reasonable doubt.

THE JUROR:  Uh-huh.

THE COURT:  Do you have any concern or hesitation about your ability to -- if you were a juror to ensure that the government proved any crime beyond a reasonable doubt?

THE JUROR:  Yeah, if the evidence was there, yes, I'd be able to make the right decision.

THE COURT:  But if it wasn't there, is really I guess what I'm asking, would you then accept that the government had failed and that the verdict should be not guilty in that circumstance?

THE JUROR:  Yes, I would be able to go both ways, whether it's right or wrong.

THE COURT:  We asked a series of questions about attitudes or beliefs concerning the death penalty.  That's on page 23.  It's kind of -- a general question in 88 asks if you have any views in general, what are they, and you said "none." Is that --

THE JUROR:  Yeah.  I mean, I've never really -- I don't know.  Other than seeing anything on, like, movies or TV shows, I've never really known much else about the death penalty.  And -- I don't know.  I mean, it never really interested me too much but...

THE COURT: Okay. The next question we asked a slightly different question which was on a scale of 1 to 10 from strongly opposed to strongly favor -- do you -- and you selected 8 indicating -- so you're sort of on the favor side of the weighing there of the death penalty but not quite at the highest level.

THE JUROR: Yeah, I'd say I'd be more going on the circumstances of the event or -- what happened for, like, each individual, like, that would be that -- the death penalty would be addressing.

THE COURT: You heard me explain this morning the penalty phase where there would be consideration of things --

THE JUROR: Yes.

THE COURT: -- that might aggravate the seriousness of the offense and things that might mitigate the punishment that should be imposed?

THE JUROR: Yes.

THE COURT: You've heard about that?

On the next page we asked in Question 90 for you to indicate which of a number of possible statements was closest to your view. You circled E which says, "I'm in favor of the death penalty but I could vote for a sentence of life imprisonment without the possibility of release if I believed that sentence was called for by the facts and the law in the case."

Does that represent your view?

THE JUROR:  Yeah.  Yes.

THE COURT:  So you would be able to, after hearing all the evidence, consider carefully the alternatives that were available and decide based on your evaluation of the evidence?

THE JUROR:  Yes.

THE COURT:  Is that what you're saying?

THE JUROR:  Yes.

THE COURT:  You would be open to either?  You're not predisposed -- or precommitted, I guess --

THE JUROR:  Yeah, I'd be open to either.  Earlier you mentioned something if he is to -- or we do decide to say he's guilty, you said that we would be presented with more evidence.

THE COURT:  Yes.

THE JUROR:  Why would we be given more evidence after we make our decision depending on --

THE COURT:  Because the first decision is actually whether he committed the crime, he's proved guilty of the crime, okay?  That's the first stage.  It doesn't consider what penalty might be imposed; it just asks whether you are persuaded by the government's evidence that he has -- he is guilty of a charged crime.

THE JUROR:  Uh-huh.

THE COURT:  The second phase is then to consider what the penalty should be for that crime having found him guilty of

a capital offense.  It would typically be -- or for -- not typically, but an example of a capital offense of which he would be convicted would include an intentional murder, okay?

Once the jury had concluded that the government had proved that, the jury would then decide what penalty should be imposed between two alternatives:  the penalty of death or the penalty of life without possibility of release, okay?  And in that phase the government would present factors -- evidence about what we call "aggravating factors" that make the crime more serious than other crimes of intentional murder and argue that -- the government would argue that would mean the death penalty is appropriate.

The defense would present evidence about the events or about the defendant himself or other things that might mitigate the punishment and lead the jury to think that the death penalty was not appropriate for him but life imprisonment was better as a penalty for him, okay?

Are you following that?

THE JUROR:  Yeah, yeah, it's that --

THE COURT:  So that's why we ask what your disposition is.  Are you open to the consideration of either alternative depending on your evaluation of the evidence?  That's really the question.

THE JUROR:  Yeah, yeah, yeah.  Yes, I am.  I'm not more in favor of one way or the other; it would all depend on

the outcome of everything presented.

THE COURT:  Not to belabor this too much, but let me ask you to look at page 25 at the bottom.  Question 95 we ask if you found the defendant guilty and you decided the death penalty was an appropriate punishment, could you conscientiously vote for the death penalty, and you said, "I'm not sure."  And if you go to the next question, sort of the other alternative is asked:  If you found him guilty and you decided life imprisonment without possibility of release was the appropriate punishment, could you conscientiously vote for life imprisonment, and you voted that "I'm not sure."  So you gave "I'm not sure" to both.  I just want to --

THE JUROR:  I think you kind of answered my question. We were just talking about it would all factor on how everything is presented to me how I would make my decision with that.

THE COURT:  So earlier, I think with respect to the question -- we were looking at Number 77, we asked whether you had an opinion about whether he was guilty and what the penalty should be, you said you were reserving until you heard --

THE JUROR:  Yeah, I don't really have an opinion as of now.

THE COURT:  Is that the same thing you were saying here?

THE JUROR:  Yes, basically.  I would have to wait.

THE COURT:  Okay.  Follow-up?

MR. WEINREB:  Just a bit.  Good morning.

THE JUROR:  How are you?

MR. WEINREB:  My name's Bill Weinreb.  I'm one of the prosecutors in the case.  I just wanted to follow up with you very briefly on the questions the judge asked about the death penalty.

So as the judge just explained to you, if the jury were to find the defendant guilty of a crime that is potentially punishable by death, then -- in a capital case, then it's up to the jurors to decide what the penalty should be.

THE JUROR:  Yeah.

MR. WEINREB:  The law doesn't require one penalty or the other; each juror has to make a decision.

THE JUROR:  Uh-huh.

MR. WEINREB:  Have you thought about, at all, what it would be like to sit on a jury in a capital case and decide whether someone lives or dies?

THE JUROR:  Yeah, it's a pretty serious situation.

MR. WEINREB:  And although you've never been in that situation, having to make that decision, do you believe that you could sentence someone to death if you thought that that was the appropriate sentence given the circumstances of the case and the characteristics of the defendant?

THE JUROR:  Yeah, I guess I could -- I can't really say for sure until I would know all the facts in front of me, but if I had to -- if that was the right decision to be made, then I would make the right decision, yes.  If that was what I had to do, that's what I would do.

MR. WEINREB:  Okay.  And just so I'm clear and I understand you, you're using "if I have to."  You understand that you would never have to, it would be up to you.  You'd make the decision one way or another.

THE JUROR:  Yeah, I'd be able to make the decision. Yes.

MR. WEINREB:  All right.  Thank you.

THE JUROR:  Yup.

MS. CLARKE:  Good morning.  It's over here now.  My name is Judy Clarke.  I'm one of the lawyers for Mr. Tsarnaev.

THE JUROR:  Uh-huh.

MS. CLARKE:  And I had just a few follow-up questions.

The judge asked you about your answer to Question 74, if you want to take a look.  It's at page 19.

THE COURT:  19, yeah.

MS. CLARKE:  And you talked to him about that.  I wondered if you would take a look at 75.  You indicated that a few people were jealous.  Can you explain that to us a little bit more, talk to us a little bit more about that?

THE JUROR:  I think it was right around Thanksgiving I

had mentioned it right when I got the whole packet about having to come here, and a few people just mentioned that I was lucky, in their words, and they wished that they got the chance to be here. That was basically it. And I just told -- I was saying that I wasn't really sure how I felt about it yet, it all just came on so quick, so...

MS. CLARKE: Feeling lucky because why?

MR. WEINREB: Objection. I don't know why it's relevant what other people felt.

THE COURT: Well, did other people explain to you why they thought you were lucky?

THE JUROR: No, it didn't really go much further than that. I really wasn't too interested in talking about it. It was like a family dinner, so we were, like, eating.

THE COURT: So these were family members who were saying it?

THE JUROR: Yes.

THE COURT: Okay.

MS. CLARKE: What did you take that to mean?

MR. WEINREB: Objection. Same objection.

MS. CLARKE: I'm just trying to get to the --

THE COURT: No, you could answer that, what you thought --

THE JUROR: I mean as --

MS. CLARKE: Lucky because?

THE JUROR:  I'm not sure.  I mean, these weren't like close family members; these are like distant cousins and stuff. It wasn't people I see and interact with frequently.  But I'm not -- it's maybe something that they were more interested in than I was or --

MS. CLARKE:  So you took no meaning from them saying "Hey, you're lucky you get to go.  I wish I could go"?

THE JUROR:  My uncle is -- the only thing I could see him saying --

MR. WEINREB:  Your Honor, objection.  This is asking him to speculate about what other people felt.  He's already said that he --

THE COURT:  No, go ahead.  Go ahead.  Tell us what --

THE JUROR:  I think he's more interested in, I don't know, I'd say like -- I don't know how to put it.  I'd say more interested in, like, more action-type things and like excitement, and he'd be more, like, locked in and like more interested in everything that would be going on.  Like he would take a lot of interest in this type of stuff, I think.

MS. CLARKE:  One more question about that:  Was it clear to you that the conversation was about this case coming up?

THE JUROR:  Yes.

MS. CLARKE:  For this case?

THE JUROR:  I just assumed it was because a few days

before I had noticed on the news that this case was -- the jury selection for this case was supposed to start January 5th along with Hernandez's case. And so that was just what -- I was going under the assumption that it was for this case.

MS. CLARKE: If I could take you to Question 19 on page 8. Are you with me?

THE JUROR: Yes.

MS. CLARKE: And apparently your sister has a role in your life, right?

THE JUROR: Yes.

MS. CLARKE: And have you talked to her about the jury summons?

THE JUROR: Not that I recall. I mentioned it to her, that was about it. I don't recall anything other than her just knowing that I'm here and stuff.

MS. CLARKE: Have you talked to her about the Boston Marathon bombing?

THE JUROR: Yeah, that was more closer to the event and the time. Nothing recent or since that other than being picked for this.

MS. CLARKE: And did you express any opinion to her about it?

THE JUROR: No.

MS. CLARKE: Then or now?

THE JUROR: I'd say then I was more interested in what

was really going on and curious to see how everything was going to turn out.

MS. CLARKE:  What do you mean?

THE JUROR:  The whole, like, few days -- everything was going on at the time of the event, like.  That was about it.

MS. CLARKE:  Where were you on that marathon Monday?

THE JUROR:  I was at work.  I was right at the end of my day.  We leave work at three, so we're usually back a little before -- like 2:40 or so -- watching TV.

MS. CLARKE:  And did you watch the events unfold on TV?

THE JUROR:  Yeah.  Yes.

MS. CLARKE:  And the 19th of April, the last day of the week when Mr. Tsarnaev was arrested, where were you then?

THE JUROR:  We were still working.  I think I was -- I think I worked every day that week.  I'm trying to remember.

MS. CLARKE:  Let me ask this:  Did you follow the events on TV or radio?

THE JUROR:  Not really a lot.  I mean, here and there I would catch bits and pieces of it, but it was mostly watching for the weather-wise.

MS. CLARKE:  Okay.  I'd like to ask a couple of follow-up questions about Question 21, your Honor.

THE COURT:  Fine.  We'll cut the audio, please.

9-32

(Discussion at sidebar and out of the hearing of the public:)









MS. CLARKE:  I had some public follow-up.

THE COURT:  I'm sorry.  We'll go back on the audio.

(In open court:)

THE COURT:  We're back on?  Okay.  Go ahead.

MS. CLARKE:  If I could take you back to page 25, Question 93, you answered that life in prison without the possibility of release is less severe than the death penalty, and your explanation was that someone being allowed to live their life after taking someone else's life is not always fair. Can you elaborate on that a little bit?

THE JUROR:  I guess it would be more -- I guess it would be more of how the person took the life, it wouldn't be as fair -- if somebody's suffering -- if somebody is killed and they're suffering the whole time, I'd feel that -- I'm not really sure.  The death penalty seems like sometimes it could be an easy way out, how it would -- it could go both ways, I guess, but I'm really not sure.

MS. CLARKE:  Well, I guess one of the questions is --

and only you know --

THE JUROR:  Yeah.

MS. CLARKE:  -- is are you looking solely to the crime itself or something else?

MR. WEINREB:  Objection.  I don't understand the question.

THE COURT:  Yeah, I think it's too vague a question.

MS. CLARKE:  The judge has explained that there are two phases to a capital case, the first phase where the jury makes a determination of whether or not the person is guilty beyond a reasonable doubt of the capital crimes.

THE JUROR:  Uh-huh.

MS. CLARKE:  And that means, and I think the judge has explained, that you would never get to the penalty phase unless the person were found guilty of the crime, an intentional murder.

THE JUROR:  Yes.

MS. CLARKE:  Not a self-defense, not a duress, no excuse.

THE JUROR:  Uh-huh.

MS. CLARKE:  Intentionally kill, okay?

THE JUROR:  Yes.

MS. CLARKE:  So I'm wondering if that's where you stop in making your determination of whether somebody should get the death penalty or not or whether you want to know more.

THE JUROR:  Yeah.  I mean, I can't really say I have a certain line of where I'm going to make my decision or not.  It would more depend on the outcome of how everything was presented to me and what -- how everything, like, really played out.

MS. CLARKE:  Let me ask it this way:  If you made a decision that the person was guilty of an intentional murder, no excuses, in the penalty phase would you be giving consideration, meaningful consideration, to the fact that someone may have had a bad childhood?

THE JUROR:  Yes.

MR. WEINREB:  Objection.

MS. CLARKE:  Would that make a difference?

MR. WEINREB:  I don't think it's appropriate to ask particular mitigating factors.

THE COURT:  I think we've ruled that out before.  I mean, I think we can keep coming at this.  I think the witness has expressed his disposition -- the witness, the juror.  I keep calling him "the witness."

MS. CLARKE:  Mr. 138.  Thank you.

THE COURT:  Anything else?  You're done?

Anything else?

MR. WEINREB:  No.

THE COURT:  Okay.  Thank you, sir.

THE CLERK:  Right this way, sir.

THE JUROR:  Thank you.

(The juror is excused.)

THE CLERK:  Juror No. 139.

MR. McALEAR:  Juror 139.

THE CLERK:  Sir, over here, if you would, please. Have a seat.  Make sure you speak into the mic so everyone can hear you, okay.

THE JUROR:  Sure.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  Have you been able to follow my instructions the last time about not discussing the case with anybody or try to avoid any --

THE JUROR:  Correct.

THE COURT:  -- avoidable contact with media stories about this?

THE JUROR:  Correct.

THE COURT:  Tell us what you do for a living.

THE JUROR:  I'm an IT professional.  So I work for a large computer manufacturer developing platforms for cloud solutions.

THE COURT:  And how long have you been doing that?

THE JUROR:  I've been in this role for two and a half years.  I've been with the company for about 30 years in the IT space working on different technologies around Microsoft.

THE COURT:  And sort of in the hierarchy of employment in the part of the company that you work in, where would you be?  Fairly senior in at least longevity.  Is that senior in rank as well?

THE JUROR:  Basically I've been staying in the engineering curriculum of my work.  I'm fairly high up.  I'm at an expert level in the group.  I lead the day-to-day activities as a tactical lead.  So I have nine engineers and developers that work under me, under my guidance of doing the R&D planning for the product.

THE COURT:  That, by the way, is your questionnaire that you filled out, and we may refer to it from time to time.  So I just wanted to -- if you look at it on page 5, we asked you whether it would be a significant hardship for you to participate in the case.  You said you thought it would be difficult from a work perspective.

Could you tell us a little bit about why you think that's the case?

THE JUROR:  The concerns I would have is really around my active role in the day-to-day management of the products and such.  I've had to, you know, alert my management on the potential risk of duration for this trial and concerns around the financial aspects that had to go up through our legal department to get clarity on due to the length of the case.  Typically, you know, their policy goes to three weeks, but this

is kind of an exception to that.

THE COURT:  And have they made an exception --

THE JUROR:  Yes, they have.

THE COURT:  -- if you were called to serve?

THE JUROR:  Yes, they've provided that guarantee to me.

THE COURT:  Okay.  With respect to your use of social media, I see you use LinkedIn, I guess.  Do you do anything else?  Facebook?

THE JUROR:  Occasionally Facebook for family.  I'm not particularly a person who enjoys social media.  You know, I use LinkedIn professionally.

THE COURT:  Right.  Question 33 you said you had a son who was an intern with the U.S. Marshals Service?

THE JUROR:  Correct.

THE COURT:  Where was that?

THE JUROR:  Where?

THE COURT:  Where, yes.

THE JUROR:  In Washington, D.C.  He went to the Washington Center as part of an internship, and they offer various internships.  And he was offered one at the U.S. Marshals.

THE COURT:  Was he in college or something?

THE JUROR:  Yes.

THE COURT:  So this is part of his --

THE JUROR: Part of his academic.

THE COURT: -- college career?

THE JUROR: Correct.

THE COURT: Where was he in school?

THE JUROR: He's at UMass Lowell.

THE COURT: So he's been -- I guess this past fall?

THE JUROR: Correct. He was actually responsible for managing the -- the detectors that we walk through in the courts, doing the paperwork, managing that. Not particularly exciting but that's what you get as an internship.

THE COURT: I have to ask the question. He didn't have anything to do with this case in any way, did he?

THE JUROR: No, they would not have that level of privilege or access.

THE COURT: Right. Right. Is he back at school now?

THE JUROR: Yes. And I apologize for my handwriting. I spend most of my time on the computer and not by pencil.

THE COURT: We've seen worse.

THE JUROR: Thank you.

(Laughter.)

THE COURT: I guess that was a compliment.

THE JUROR: I'll take it as a compliment.

(Laughter.)

THE COURT: On pages 17 and 18 we asked a few questions about issues that might arise in current affairs or

international matters and so on related to the War on Terror, so-called, and attitudes towards Muslims and Islam and so on and so forth, and you answered those at the time. I just wanted to follow up because since you filled out the questionnaire there have been some incidents it Europe, particularly the Paris shooting.

Are you aware of that, what went on in Paris?

THE JUROR: I am aware. I've been trying to minimize my watching of headline news.

THE COURT: Even of that? Okay.

My question was going to be whether anything you knew about that would affect or change any of the answers you gave in this section of the --

THE JUROR: No, they would not.

THE COURT: Would you look at Question 65? It's on page 18. We asked whether you had any beliefs, attitudes or opinions regarding Kyrgyzstan, Russia, Chechnya or Dagestan or the people that live there, and so on, that might make it difficult for you to be completely fair and impartial, and you said you had some concern about that.

Would you tell us what you meant by that?

THE JUROR: I think in the headline news, those states have been, you know, related to radicalization, so there is some concern there. I haven't studied that. But, you know, in fairness of disclosure, that would be something that I would

have to understand.

THE COURT:  Where have you read about radicalization in connection with those areas?

THE JUROR:  Just in the headline news you hear about, you know, things that are happening and where some of this radicalization may happen.  I don't have any expertise in that area nor have I done much study.  But, you know, in full disclosure, there's some concern.

THE COURT:  Okay.  Would you look at page 19 and Questions 74 and 75.  I actually can't read the fourth word in 74.

THE JUROR:  "The significance of this case."

THE COURT:  Okay.  So you expressed some concern about that as an issue -- you've translated it for me now, the significance of the case and its visibility and so on.  Tell us what your concerns are and what -- perhaps a little bit about what strengths they are; how concerned are you?

THE JUROR:  Well, to be frank, I haven't had an opportunity to be a juror before.  And, you know, this is kind of going to the other end of the spectrum from doing a trial where, you know, it's not of noteworthy news information.  So it is a big case, the concerns to be a part of that as an individual.

THE COURT:  I guess I'm trying to get to the nature of -- are you concerned that you won't be able to do a good job

at it, are you concerned that people will be watching you and perhaps critical of you?  What's the content of the concern, I guess is what I'm getting at?

THE JUROR:  As a professional, you know, you have an expertise within the work you do.  Here, this is outside of my wheelhouse, so it's all new to me.  There's this general lack of understanding of what happens in the process, the etiquette, the rules, understanding.

THE COURT:  So it is -- and correct me if this is wrong.  I'm just trying to translate it.  Is it your concern that you don't know what's coming and you don't know whether you'll be ready for the unknown?

THE JUROR:  That's a fair assessment, yes.  In my job I have to be prepared to, you know, give leadership, give decisions, give quick action.  Here, this is a completely different set of circumstances where I believe as a juror I don't get to ask questions and get feedback; it's all presented to me, and I have to internalize that.  So it's -- you know, my concern is just more not knowing, you know, the process, not being told the process before.

THE COURT:  Okay.  Let me ask you about the next page, page 20, Question 77.  We asked in this part of the questionnaire whether based on what you'd seen or learned in the media or otherwise you had formed an opinion whether the defendant was guilty and then whether you had an opinion about

what the penalty might be, and to Part A of that question you said yes, you had an opinion about whether he was guilty, and to Part C you said you were unsure with respect to the penalty.

So let me focus on the first of those, the opinion about whether he's guilty or not.

THE JUROR:  Part A?

THE COURT:  Yeah.  It's understandable that people in this case have some impressions about what they think the facts of the case are from the news.  If a person is selected to be a juror, that person would hear the evidence in the case presented by both parties and make the decision on the basis of that information base rather than prior --

THE JUROR:  Correct.

THE COURT:  -- reporting and so on.

In a criminal case, every defendant under our system of justice is presumed to be innocent, or not guilty, of the charge made against him unless and until the government proves otherwise, proves him guilty at trial by the evidence to a level of proof that leaves the jury satisfied that they have no reasonable doubt about his guilt.  We ask jurors to focus their attention on the evidence presented in the case and make their judgment on that.  The burden is always on the government to prove that a person is guilty of what he's charged with; a defendant never has a burden to prove he's not guilty or explain away the charge.

If you were a juror in the case would you be able to apply those principles to your own deliberations?

THE JUROR:  Can I embellish a little bit just to explain?

THE COURT:  Yes.

THE JUROR:  I think the way I had to answer A was based on subjective news information I had formed an opinion. So I am not necessarily the ideal juror in the sense of true impartiality in that sense.  But if I was in this role, I understand the role and I understand the responsibilities of focusing on the presentations, the evidence, presentations from both sides and that, you know, I would have to follow -- or remove those preconceived subjective notions and look purely at the objective process.

THE COURT:  And one possibility for somebody who comes into a case with an idea about it, you know, before you've heard any of the evidence, is that you might sort of give the government a head start on that and reduce its burden of proof in practice if not in theory.

Do you think that would be a danger for you?

THE JUROR:  It's certainly something that, you know, weighed into how I had to hit that check box.  But, again, I believe it would be my responsibility in this role to become much more objective and take that preconceived notion away.

THE COURT:  So if, with respect to any of the charges,

after hearing the evidence you thought the government had not proved its case, would you be in a position and would you vote to acquit under those circumstances?

THE JUROR:  That would have to be the case.

THE COURT:  On the next page we asked whether you had any participation in various events after the bombings.  You say you may have family members who contributed to the One Fund or something else, you just don't know.  Have you inquired after filling out the questionnaire knowing we were interested in that, whether anybody had done it?

THE JUROR:  Well, I believe I was under instructions not to talk about any of the questions, so I instructed my family on that and that did not come up.  I personally don't know if, you know, there was a check box during charging something in a store or if I donated or anything like that, but there's nothing of significance that I can remember personally, and that's as best I can answer that question at the time.

THE COURT:  Okay.  Let's go to page 23, Question 88.  We began a series of questions here about your attitudes or beliefs concerning the death penalty.  Question 88 is a general one.  It says basically if you have any views in general, what are they.  And you said you're not sure of what your position is.

Is that an accurate reflection of where you are on that as a general matter?

THE JUROR:  Yeah.  Yeah, I mean, it's not something I've had to face before other than, you know, talking in a casual setting, you know, on something.  But the reality is that it would be a difficult decision just to, you know, go through that process and make that decision, so I would have to take that through a deep thought process.

THE COURT:  You're talking about if you had to do it in a particular case.  This question I think is a little more -- is a little broader than that.  It's sort of do you have any policy views about it in part, the propriety of it, either as a policy matter or as a philosophical matter or anything like that?

THE JUROR:  It is sort of in my Christian views of, you know, life that, you know, I'm generally against it, but in the court setting, again, it would have to be weighed in.

THE COURT:  Okay.

THE JUROR:  I'm not -- I'm not saying -- you know, it's undecided at this point based on where I am in this process.

THE COURT:  The next question we asked you to provide us some idea on a scale where you were from strongly opposed to strongly in favor, and you have a 6, kind of in the middle.

THE JUROR:  Yes.  At this point it kind of goes to the unsureness.  It's a neutral position at this point in my views. I'm not strongly for it, I'm not strongly against it.

THE COURT: Okay. We came back at it another way, the next page, Question 90, where we asked you to indicate which of the suggested statements reflected most closely your own assessment, and you selected C, "I'm opposed to the death penalty but I could vote to impose it if I believed the facts and the law in a particular case called for it." Is that --

THE JUROR: Yes, I could make the decision based on the situation.

THE COURT: And you could not just come to the conclusion that it was appropriate but you could actually vote that the person at the bar would be sentenced to death? You could actually cast that vote?

THE JUROR: Yes. If that's the decision, then I would have to support that decision.

THE COURT: Well, it would be your decision.

THE JUROR: Correct. In the context of me making that decision, I would support my decision.

THE COURT: Follow-up?

MR. MELLIN: Very briefly, your Honor.

Good morning, sir. I'm Steve Mellin. I'm one of the prosecutors on the case.

Just if we could follow up a little bit with the death penalty questions. And we all appreciate we gave you this questionnaire and kind of hit you out of the blue when you came in to fill it out.

Having had a little bit of time to think about your answers in the questionnaire and kind of what was going to happen today, do you still kind of put yourself really kind of right in the middle of the road?

THE JUROR:  I probably would be more towards the right, more decision-based on that based on the evidence and understanding of that.  So I don't think that would be an impediment to my decision-making process of my own personal values based on what I'm being asked as a juror to do.

MR. MELLIN:  Okay.  Maybe I didn't understand.  When you said "more to the right," what did you mean by that?

THE JUROR:  More towards being able to make a decision and, you know, back that decision.

MR. MELLIN:  Now, the judge talked to you this morning a little bit about the process.  And do you understand that if the jury finds the defendant guilty of one of these capital offenses, the jury would then decide between life imprisonment and the death penalty.  Do you understand that?

THE JUROR:  Right.

MR. MELLIN:  And in that process the jury is going to receive information from the government about what we call aggravating factors or reasons why we think it's appropriate, and the defense has the opportunity to put on evidence why they believe the death penalty is not appropriate.

You understand that, right?

THE JUROR:  Yes.

MR. MELLIN:  Okay.  So in weighing those, though, there really is no objective kind of engineering kind of boxes that you checked, you appreciate that, that that's ultimately going to be a personal decision for each juror?

THE JUROR:  Yes, it will be very subjective.  And I believe at that point as a jury we need to come to some consensus.

MR. MELLIN:  Right.  You're also going to have to come to your own conclusions, right?

THE JUROR:  Right.  And advocate to the jury what my conclusions are, if I understand my role correctly.

MR. MELLIN:  Okay.  And you believe that in going through that process, that if you did believe that the aggravating factors supported the death penalty and outweighed the mitigating factors, that you yourself could vote to impose the death penalty?

THE JUROR:  Yes.

MR. MELLIN:  Thank you.

MR. BRUCK:  Good morning.  I'm David Bruck.  I'm one of the attorneys for Mr. Tsarnaev, and I just have a very few questions to ask you, if that's okay.

THE JUROR:  Sure.

MR. BRUCK:  You put in the questionnaire that your wife has a degree -- a master's degree in social work?

THE JUROR:  Yes.

MR. BRUCK:  And is employed now as a social worker?

THE JUROR:  Yes.

MR. BRUCK:  Can you tell me what sort of work she does?

THE JUROR:  She works in -- she goes out to houses and works with families in crises.  She usually has one individual child that she's working with, but her focus is to assist the family in working through that crisis.  If it's, you know, attempted suicide or an addiction or something like that, she'll work with that family to give them the support and structure to work through that.

MR. BRUCK:  And what is the structure of her employment?  Does she work for a government agency, is she self-employed and have referrals, or how does it work?

THE JUROR:  She works for a private agency that is paid through -- I think it's Mass. Health, so it's part of an insurance process that their agency, you know, bills for their services.

MR. BRUCK:  I see.  And it mostly has to do with child services or children --

THE JUROR:  Yes, her role would be in the youths.  It could be a young child or a teen.  She specializes in teens right now.  She's, you know, just finished her -- graduated in the spring, and now she's several months into this employment.

MR. BRUCK:  Okay.  And what sort of work -- did she work outside the home before she had gone back to school to --

THE JUROR:  Yeah.  She was a life coach in kind of a private setting for years as she, you know, brought up our children, and then she decided to progress more into the social-worker skill from there.

MR. BRUCK:  I see.  Judge O'Toole told you in the instructions -- and I know there was a lot of law coming at your group all at once, but one of the things he told you was that a verdict for the death penalty has to be unanimous.

THE JUROR:  Yes.

MR. BRUCK:  Did you catch that?

THE JUROR:  Yes.

MR. BRUCK:  And if you do the math on that, that means -- it's not even math, it's logic -- that each juror has to make an individual decision if the death penalty is going to be imposed.

THE JUROR:  Yes.

MR. BRUCK:  So that while the jury deliberates and talks and shares their opinions, in the end it comes down to each individual juror.

THE JUROR:  Correct.

MR. BRUCK:  You've talked about you have a role in life and in work which involves leadership and giving direction to others.  Do you think -- recognizing that -- let me back up.

The decision that you make -- and I think Mr. Mellin talked to you a little bit about this.  In the end at the penalty phase, the sentencing phase when a case gets that far, is, as you say, a subjective decision.

THE JUROR:  Correct.

MR. BRUCK:  Right?

And it's inevitably a moral decision.

THE JUROR:  Yes.

MR. BRUCK:  People differ --

MR. WEINREB:  Objection, your Honor.  This a lot of instruction with no question attached.

MR. BRUCK:  I'm getting to my question.

THE COURT:  Let's get to it.

MR. BRUCK:  Do you think you could make your own moral choice based on your own values and your own view of the evidence?

THE JUROR:  I would have to make my own choice first.

MR. BRUCK:  And by the same token, do you think everyone else on the jury would be entitled to make their own moral choice?

THE JUROR:  Yes.

MR. WEINREB:  Objection, your Honor.  This is not fairly characterizing what goes on in the jury room, or what should go on in the jury room.

MR. BRUCK:  Asked and answered.

THE COURT:  It's a hypothetical but he's answered that anyway.

MR. BRUCK:  I think on the questionnaire you said you had seen a lot of media coverage.

THE JUROR:  Of the marathon?  The incident's been out for several years.

MR. BRUCK:  Right.

THE JUROR:  In my engineering role, I am more of a critical thinker, so the information I'm seeing in breaking news in sound bites is not particularly factual enough in nature to make any decisions.

MR. BRUCK:  Judge O'Toole asked you, I think, whether the information that you had been exposed to, like a lot of people have been exposed to, did that give -- I can't remember the phrase, but it was, in effect, would that help the government with its burden of proof on the issue of guilt, and you said no, you could put that aside.

THE JUROR:  Yes.

MR. BRUCK:  Do you remember that?

THE JUROR:  As a role of a juror, it would be my responsibility to take my preconceived notions and look straight at what's being presented to me.

MR. BRUCK:  Well, I want to ask you the same question about the more subjective issue, as you've described it, of the sentence and penalty phase if you were on the jury and it got

to that point.  You've been exposed to a lot of information. Do you think that that -- the information that you've received would give the government some momentum with respect to the more subjective question of the death penalty, in your mind?

THE JUROR:  I believe if that's really a separate phase of the trial the conclusions are going to be heavily weighted on the decision we make at the first -- at the sentencing phase, I believe is --

THE COURT:  No, the first phase is the phase that determines whether he's guilty of any of the crimes or not.

THE JUROR:  The determination of guilt, that would set the stage to -- looking at what's coming in that sentencing phase.

MR. BRUCK:  Sure.

THE JUROR:  Again, I don't -- you know, I've never been through these mechanics, so it's, you know, what I'm thinking the process would be like.

MR. BRUCK:  Well, understanding -- if you were instructed that -- if you got to the sentencing phase, the scales would be rebalanced, in effect, there would be no assumption -- presumption that the death penalty should be imposed, would you be comfortable with that given everything you know?

THE JUROR:  I don't understand the question in terms of rebalancing because -- you're saying new information is

coming in and I have to reassess based on that information. What's --

MR. BRUCK: Right. Well, it's a separate question. There's an issue of guilt or innocence and that gets decided, and then there's an issue of penalty at the second phase. And I think you said that the second-phase decision would have to be largely based on the first. That's what I'm questioning you about.

MR. WEINREB: Your Honor, I object to this because --

THE COURT: Yeah. I think as the juror has suggested, he's talking about a course of events he's unfamiliar with, and it's a little hard to press him, I think, on matters he's really hearing about for the first time this morning. So I think it has to be a broader approach, I guess, to what you're getting at.

MR. BRUCK: If the -- if the defendant were convicted -- if you were on the jury and he was found guilty beyond a reasonable doubt of, in effect, the charges involving the Boston Marathon, the ones you heard about from Judge O'Toole, could you still go in to the penalty phase with an open mind about what the penalty should be?

THE JUROR: Yes, I would -- I would be given instructions by Judge O'Toole how to proceed into that.

MR. BRUCK: Yes.

THE JUROR: And I would follow those processes that

had been asked for us.  And if part of that is coming in with an open mind similar to the first phase, then that's how I would proceed.

MR. BRUCK:  Okay.  What do your sons study at college? What are the fields they've gone into?

THE JUROR:  One is in business and the other is criminal justice/political science, but he tells me he wants to be a salesperson, so I don't know what that means.

MR. BRUCK:  Very good.  Well, I appreciate your bearing with me with these questions.  Thank you very much.

THE JUROR:  Hopefully I was clear, but it's a little difficult under the circumstances.

THE COURT:  I just noticed a couple of things I missed and I wanted to ask you about.  If I'm reading this right, Question 25, way back on page 9, it says you are currently a night student?

THE JUROR:  Correct.

THE COURT:  What are you studying?

THE JUROR:  I'm taking -- you know, in my 30 years, I have never completed my bachelor's, so I'm pursuing that.

THE COURT:  Where?

THE JUROR:  That's also at UMass Lowell.

THE COURT:  Okay.  That was really it.  I just wanted to follow up on that.  Thank you.  Leave the questionnaire right there.

MR. McALEAR:  Right this way, sir.

(The juror is excused.)

MR. WEINREB:  Your Honor, can I be heard for a minute before we call the next juror?

THE COURT:  Yes.

MR. WEINREB:  It will be just a moment.  I would like to -- I don't know how exactly to characterize it -- but effectively make a motion in limine to preclude questioning of jurors about whether they would attempt to be leaders in the jury box or followers or whether they would respect the rights of the other jurors to make up their own minds or try to influence them.

First of all, none of those questions could possibly lead to a motion for cause because if -- there's no causing a juror off the jury based on their predicted behavior in the jury box with respect to other jurors; and secondly, it's just a way of trying to pre-instruct the jurors on what the defense hopes they will do when they're in the jury box.  And it's improper.  It doesn't serve any purpose related to voir dire, any legitimate purpose related to voir dire, and it has the genuine danger of confusing the jurors and potentially inhibiting them from acting the way that they would normally be inclined to act in the jury box, which is something they're entitled to do.

MR. BRUCK:  Well, this was an unusual juror.  He

talked about his sense of anxiety about the jury and he did it in the context of being a leader, a team leader.  He's a man that in some ways thinks around square corners, and I just felt I was entitled, and it was appropriate to explore the question, since he had talked about his worry about being in this very, very different setting, whether or not he could, in effect, not be a team leader but be a team player and a member of the jury.

THE COURT:  Okay.  I hear from that that it was targeted at this particular juror so we'll -- I don't think it's necessarily inappropriate and I think that explanation actually makes sense.

MR. BRUCK:  Okay.

THE COURT:  But I do agree that trying to get these laypeople -- I keep coming back to this, that don't -- who don't think like lawyers -- to accept our categories and speak either fluently or even sensibly about things that -- around the corner they can't even anticipate is not very fruitful. I'd just make that as a general observation.

MR. BRUCK:  Well, I suppose since that has been somewhat our position with respect to the questioning on guilt or innocence, we can't really disagree with that statement.

THE COURT:  Before we have the next juror, we'll cut the audio and have a sidebar conference.

(Discussion at sidebar and out of the hearing of the public:)

THE COURT:  I guess I have two copies of the same thing here, the two sources.

MS. CONRAD:  One went around from the government side and one went around from Mr. Lyness, so I guess both roads lead to one.  I just want to point out a few things.

First of all, this -- I believe it's the same person. I looked at her, I looked at the photographs that are online, and I think it's the same person.  Also, the various searches that we've done link her to this email account and link her to a Facebook page which then links to the Twitter account.  But of course we can find that out from her.

With respect to use of social media, she said in response to Question 29 that she posts on Facebook "but not pertaining to anything other than my life."  With respect to Question 30, she did not list Twitter as one of the social media things that she uses.  And I just want to point out in the packet that I handed to the government and to your Honor, first of all, as of last night the Twitter feeds that she's following include a reporter at WBZ currently live tweeting the federal trial of accused Boston Marathon bomber Dzhokhar Tsarnaev.  She's following that now.  She's -- okay.

MR. WEINREB:  Let's ask her.  I think we should ask her, and if Miss Conrad is correct --

THE COURT:  Yeah.  You'll have to slow down.  I don't do this stuff.

MS. CONRAD:  So at the very first page it says "███████████████████."  So these are the Twitter feeds she's following.  The second one is a reporter at WBZ who is live tweeting.

MR. WEINREB:  We'll just agree.  Obviously, if this is true, she doesn't belong on the jury.

MS. CONRAD:  And the other thing I would point out is on --

MR. WEINREB:  We're in agreement.

MS. CONRAD:  You're in agreement?  Okay.

THE COURT:  You've won.

MS. CONRAD:  Fine.

MR. BRUCK:  This should be on the record, though.

MS. CONRAD:  Well, I would like to put on the record that this juror, first of all, not only said that -- did not list that she has a Twitter account, but she also said she only posts about personal matters on Facebook.  She indicated no preference or no opinions about this case, she indicated --

MR. WEINREB:  Your Honor, this isn't about striking this juror; this is about something else.

MS. CONRAD:  It is, actually, and I would like --

MR. WEINREB:  The questionnaire speaks for itself.  We've agreed to strike the juror.  Simply trying to make an argument that because people are untruthful about one thing, that other jurors may be untruthful about other things is not

an appropriate purpose for voir dire.

MS. CONRAD:  It's not a question of voir dire; it's a purpose of illustrating that there are people who portray themselves as neutral and uninformed when, in fact, this juror --

MR. WEINREB:  I object to this whole thing.

MS. CONRAD:  -- tweeted on April 19th --

THE COURT:  That's a broader issue than whether the juror is suitable, and that's what we're considering.

MS. CONRAD:  I know.  But I want the record to be clear --

THE COURT:  I'm sure there will be some occasion when you'll have the opportunity to make this argument, but I don't think it pertains to whether Juror 140 should be seated or not. That's settled.  I'm sure -- anyway.  I'll just leave it at that.  All right.  So we'll pass on 140.  So that brings us to 143.

So I had a request that the reporters change.  Should we take a break?  We'll take a 10, 15-minute break.

(There is a recess in the proceedings at 11:01 a.m.)

(In open court:)

(The Court entered the room at 11:19 a.m.)

MR. BRUCK:  We have a matter before the first juror comes.

THE COURT:  Okay.

MR. BRUCK:  Judge.

THE COURT:  Are we on?

MR. CREPEAULT:  Yes.

MR. BRUCK:  This is a time, I think, when we really need to renew our ability to ask jurors whether they want to be on the jury, and this is in light of what we just discovered regarding Juror 104.  Without -- I'm sorry, 140.  Without quoting anything, this was a juror who represented -- made representations about her lack of relevant social media use under oath on her questionnaire and gave an obscene statement of exultation on Twitter when the defendant was arrested on April 19th.  These are not consistent.

If this juror was, in effect, trying to get onto the jury to carry out the emotion and the intention that she expressed on Twitter on the night this man was arrested, there are very few questions that would get at it.  But I would submit that one question that is especially likely to elicit revealing body language or revealing inability to give a glib answer is the question:  Do you want to be on this jury?  A juror like that would not have known what to say, and we think that this is -- this is not a question that is appropriate in a lot of cases, but we have just seen the most dramatic possible illustration of why it is appropriate in this case.

I don't know how we're going to find these jurors.  They are out there.  We submitted 32 pages of similar online

comments at the beginning of this process of examples of people just like Juror 140. They all come to court on their best behavior. That's the scary part. And we think we should be allowed to ask that question.

THE COURT: I don't think so as a general matter. It may be -- and I had the feeling about one or two people we've seen over the last week so that it was appropriate to go ahead and do that because of something they indicated here. With respect to Juror 140, it's obvious you don't need to ask the question to find her. You can do it online. I don't want to revisit that.

It's not absolute. Generally, no. But if there's something in the demeanor or in the answers here that suggests an inappropriate eagerness to participate in this because there's an agenda, then by -- I think we should explore it, by all means. But I don't think we should ask everybody that question. You know -- anyway, just -- if this is something that arises as we are otherwise examining, that may be -- that may be appropriate, and we can do that. I think we have, as a matter of fact, in a couple of questions.

MS. CONRAD: May I just add something, your Honor?

THE COURT: P.S.?

MS. CONRAD: There very well may be many jurors whose questionnaires look like Juror 140's, totally neutral on everything, haven't made up their mind about anything, don't

have an opinion about anything.  And it just so happens that we have her Twitter account.  For many of those other jurors, we may not be able to locate it, identify it, and so forth.  And I think we should be -- given the high emotions about this case, we should be -- err on the side certainly about -- of trying to identify those jurors who present one face to the court and another face to their friends, families, and the public.

THE COURT:  Okay.  I understand.

THE CLERK:  Juror No. 143.

THE JURY CLERK:  Juror 143.

THE CLERK:  Sir, if you would, please, have a seat.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  Between the time you left us last and now, have you been able to abide by my instructions to avoid discussion of the subject of the case?

THE JUROR:  Yes.

THE COURT:  And to try, as much as you can, to avoid any exposure to media articles about the case?

THE JUROR:  Yes.

THE COURT:  Thank you.

THE JUROR:  You're welcome.

THE COURT:  Tell us about your work.

THE JUROR:  I work at the Harvard Film Archive, and what I do is oversee the public screenings that we do.  We show

films four nights a week to the general public, semi-tech-type programming. So it's mostly retrospectives of the work of various directors, overviews of national cinemas from various parts of the world. That is to show either old films or contemporary works that isn't going to have a theatrical release.

THE COURT: Four days a week?

THE JUROR: Yes.

THE COURT: That's a lot of films.

THE JUROR: Yes. It's a lot of work and it's a small staff.

THE COURT: Where do you show them?

THE JUROR: Where?

THE COURT: Yeah.

THE JUROR: At the Carpenter Center for the Visual Arts. It's on Quincy Street. There's a theater in the basement. It seats 200 people.

THE COURT: And you've been doing that for some time?

THE JUROR: Yes. Well, I've been at Harvard for seven years. Before that I did a similar job in Los Angeles.

THE COURT: Okay. I note that you indicated that you'd spent a year in France.

THE JUROR: Yes.

THE COURT: Would you tell us when that was and what the circumstances were?

THE JUROR:  Sure.  It was 1992.  It was almost exactly a year, from August of 1992 to August of 1993.  I was there as a graduate student.  I got a stipend to go and take courses, although I had actually already finished my coursework for my degree.  So it was mostly just a chance to live in Paris for a year.

THE COURT:  You occasionally publish reviews of films and articles about film?

THE JUROR:  Yes, not that often, but I do occasionally, not -- yes, mostly small reviews of documentaries for a magazine called *Cineaste*.  That's most of what my recent publications have been.

THE COURT:  How many a year?

THE JUROR:  One or two.

THE COURT:  We asked -- again, that's your questionnaire if you want to review it.

THE JUROR:  You want me to follow along?

THE COURT:  We're following up on some of the answers you gave.

THE JUROR:  Sure, sure, sure.

THE COURT:  This is at Page 10, 29 at the bottom.  29 and 30 were about your use of social media.  This one was whether you blog or post messages or opinions on websites.  Describe that.  You say, "Personal and political things on Facebook occasionally."

THE JUROR:  Yes.

THE COURT:  Just amplify on that a little bit.

THE JUROR:  I realize that one of the things I tend to do when I'm on Facebook is pontificate on my ideas about various political events.  It's true.

THE COURT:  Have you talked about this case?

THE JUROR:  No.  Well, not since I -- I did blog about the events at the -- not blog.  I did post things about the events on Facebook at the time.

THE COURT:  As they were unfolding, you mean?

THE JUROR:  Yes, yes.  Since I started jury duty, no, nothing, ever since I was summoned here.

THE COURT:  Right.  But -- so during the week of the events, were you in Cambridge during that time?

THE JUROR:  Yes, yes.

THE COURT:  I don't know what you -- we did ask at one point whether you sheltered.

THE JUROR:  I did shelter in place.

THE COURT:  We'll come back to that, I guess.

So you posted what?  On Facebook some comments about what was going on?

THE JUROR:  Yes.  It was mostly -- not about the Marathon, not about the bombing itself.  It was mostly the shelter-in-place order as I recall.

THE COURT:  Well, let's actually talk about that as

long as we've gotten to it.  It's on Page 21 and it's Question 81.  You say you were asked to shelter in place and had to reschedule an important event at the film archive that evening.

THE JUROR:  Yes.

THE COURT:  The 19th, which was the Friday, I guess.

THE JUROR:  Yes.  We had brought a filmmaker to Cambridge to present his work that night, and because the university closed for the day, we had to cancel the screening and bring him back another time.

THE COURT:  Do you remember when that was?

THE JUROR:  When we brought him back?

THE COURT:  Yeah.

THE JUROR:  It was last -- I don't remember exactly. It was probably later in 2013, or it might have been last year. I can't remember to be honest with you.

THE COURT:  Does that occurrence -- would it -- does it affect you in any way that would affect your service as a juror in the case?

THE JUROR:  I don't think so personally.

THE COURT:  I assume you were annoyed by it.

THE JUROR:  Yes, yes, yes, yes.

THE COURT:  The question is whether that's a current issue for you.

THE JUROR:  Oh, no, no, no.  It's been resolved now.

THE COURT:  You don't have any holdover feelings about

it that would creep into the case?  That's what I'm wondering.

THE JUROR:  Oh, right.  No.

THE COURT:  What kinds of things did you post?  Did you complain about having to do that or something?

THE JUROR:  Yes.

THE COURT:  You were linking your posting that time to the --

THE JUROR:  Well, that was -- when you asked if I talked about events relevant to this case on Facebook, it was mostly I felt that the shelter-in-place order seemed like a bit of overreach by the government and set a bad precedent.

THE COURT:  So did you post anything after April 19th about the case?

THE JUROR:  I don't --

THE COURT:  Let's do a very broad time.  From April 20, 2013, until the day you got the summons in this case.

THE JUROR:  It would have been maybe in the week or two after the event.  It's not something that I lingered over.  I mean, my opinion hasn't changed since then.

THE COURT:  Do you have some, even if it's imprecise, recollection of having done so?

THE JUROR:  Of having posted?  I'm pretty sure.  I think I did.

THE COURT:  Do you know what it would have said?

THE JUROR:  Like I said, I think I complained that --

about shutting down the entire city for a manhunt and about the fact that, in fact, Mr. Tsarnaev was apprehended once the shelter-in-place order was lifted.  And so, like I said, it seemed to me sort of a dangerous precedent to disrupt everyone's life.

THE COURT:  So your focus of any postings, at least as you now remember it, was mostly about the sheltering in place?

THE JUROR:  Yes.

THE COURT:  Rather than the events of the bombing or the pursuit or anything like that?

THE JUROR:  Yes.  I may have posted something on Facebook after the -- right after the bombings to say I was safe because a lot of people were posting things like that. But I don't remember if I did -- I don't remember if I did or not.

THE COURT:  But, say, in the last year or so?

THE JUROR:  No, no.

THE COURT:  We asked some questions on Pages 17 and 18 about general views about some things, including the War on Terror and attitudes towards Islam and Muslims and so on.  You answered all those at the time.

You had some -- looking at 61 and 62, you think that the War on Terror unfairly targets Muslims and is overblown and exaggerated?

THE JUROR:  Yes.

THE COURT:  I don't know how --

THE JUROR:  Do you want me to expand?

THE COURT:  Yeah.  Tell us a little bit about that.

THE JUROR:  I mean, I don't know if -- 62, I mean, I definitely believe that there are interests -- there are powerful interests that are invested in instilling fear in the general population and in ways that I think are harmful for a society but benefit certain political interests, certain industries, that kind of thing.  I mean, I think the fact that there was one attempted shoe bombing and we have to -- we had to take off our shoes for 12 years.  In other countries, when you get on a plane, you don't have to do that.  I definitely have opinions, yes, about the War on Terror.

THE COURT:  You're aware of some recent events in Paris, shootings and so on and so forth?

THE JUROR:  Yes, of course.

THE COURT:  How closely have you followed that?

THE JUROR:  Fairly closely.  I mean, I have friends who live in Paris.  I go back there every year or so.

THE COURT:  You do.

THE JUROR:  Yeah.  The last time I was there was April of last year, staying not that far --

THE COURT:  Are these social events, or are you going in connection with your work?

THE JUROR:  It's mostly social, social and just

vacation and a little bit of work related stuff as well, yeah.

THE COURT: Those events have occurred since you filled out the questionnaire.

THE JUROR: Yes, that's true.

THE COURT: Would you add anything to what you said in the questionnaire or change anything in the questionnaire as a result of thinking about those events?

THE JUROR: I don't think so. I have very complicated feelings about those events, but I think that, for the most part, no, I don't think I really -- I don't think I need to change anything on the questionnaire because of those events or because of what I know about those events.

THE COURT: Do you think those events would affect you in any way if you were called to be a juror here? In other words, is there anything about them that's -- either given you some new idea or insight or changed your evaluation of --

THE JUROR: No. It's caused me to sort of go over my ideas, I think, but I don't think they've changed much. I have thought about them, but I haven't really changed them.

THE COURT: Were any of your friends in Paris affected by them in a personal way?

THE JUROR: No.

THE COURT: Are they near anything or --

THE JUROR: I take that back. I have one acquaintance who I heard from another person who lives quite near -- who

heard -- who actually heard the shooting apparently.

THE COURT:  That's not somebody you've talked to, though?

THE JUROR:  But I haven't talked to him directly.

THE COURT:  Let me ask you to turn to Page 70 -- wait a minute.

THE JUROR:  Question 70 or Page 70?

THE COURT:  I don't know.  What did I say?  20.  I meant to say 20.

THE JUROR:  Question --

THE COURT:  Question 77.

THE JUROR:  Yes.

THE COURT:  We asked on this -- in this question whether, as a result of things you'd seen and learned about from any source, the media included, you had formed an opinion whether the defendant was guilty or not and, if so, what might be an appropriate penalty.  Did you -- you checked "unsure" to all of those.

THE JUROR:  Yes.

THE COURT:  Would you tell us what you were thinking when you made that choice?

THE JUROR:  Sure.  I mean, based on what I -- based on what I've heard about the case, it seems to me that the defendant certainly participated in the bombing.  I guess my question was I don't -- whatever argument there might be about

mitigating circumstances, that --

THE COURT:  Let me try to separate it so we don't cross wires on some of these issues.  Let's focus first on the (a) and (b), which is the question of guilty or not guilty.

THE JUROR:  Right.

THE COURT:  We'll come back to the penalty issues, mitigating and aggravating.  The first one is whether he's guilty or not.

THE JUROR:  Right.

THE COURT:  As I'm sure you appreciate, in our criminal justice system, when a person is charged with a crime by the government, he's presumed to be innocent, or not guilty, unless the government proves at trial by the evidence that he is, in fact, guilty and convinces the jury of that fact beyond a reasonable doubt.

People may come to a -- jurors may come to the beginning of a trial having some impressions from the media about things, but we ask them to set those aside and pay attention to what is presented in the case and make a judgment of guilt or not based only on the evidence in the case.

THE JUROR:  Right.

THE COURT:  Respecting that the government has the burden of proof.

THE JUROR:  Right.

THE COURT:  The defendant has no burden to prove that

he's not guilty.  It's entirely on the government.  Then we ask the jurors to consider that evidence and tell us whether it has convinced them that the defendant is guilty of the crime charged or has failed to convince them.

THE JUROR:  Right.

THE COURT:  So the question is:  How would you evaluate your ability to approach issues in this case in that way if you were a juror?

THE JUROR:  I believe that I could be impartial, I mean, as impartial as anybody who lives in Cambridge could be.  I mean, I think that the presumption of innocence is a really important part of our criminal justice system.  And so, I mean, you know, I wanted to be clear on this questionnaire about my political ideas, my ideas about the case, et cetera.  On the other hand, I believe that I could be impartial.

THE COURT:  So that if -- there are a number of different charges in the case.

THE JUROR:  Yes, exactly.

THE COURT:  The jury will be asked to make a judgment about each of them.

THE JUROR:  Exactly.

THE COURT:  If, with respect to any of them, you thought the government had failed to produce sufficient evidence of guilt to lead you to be satisfied beyond a reasonable doubt, would you be able to vote for not guilty

9-78

under those circumstances?

THE JUROR:  Yes.

THE COURT:  Now, with respect to the penalty, where, as you heard this morning, it's a separate phase.  It starts with the premise, the precondition really, that the person has been convicted of an intentional murder.

THE JUROR:  Right.

THE COURT:  And then proceeds to consider the question:  What is the appropriate punishment for that given the two alternatives, which are death penalty or life without possibility of release.  And that's where the aggravating and mitigating factors come in.

You probably didn't know all that when you said you were unsure here about the penalty, but maybe you can tell us what you were thinking about and --

THE JUROR:  Sure.  The reason I put unsure is because I am opposed to the death penalty, as I think I indicated elsewhere on the questionnaire.  At the same time, I've never been in a position of having to decide in a particular case whether or not it's applicable.

I'd like to think that my beliefs could stand up to that, but I didn't want to make that assumption.  And for that matter, I think that I have strong feelings about the failings of our penal system, and so I feel that life imprisonment without the possibility of release is also a dire sentence.

THE COURT:  Let's turn to Page 23.  This begins a series of questions about your attitudes or beliefs regarding the death penalty.  Question 88 is a general question.  If you have any views about the death penalty in general, what are they?  And you wrote, "I believe strongly that the government should not execute people."

THE JUROR:  Uh-huh.

THE COURT:  Could you maybe flesh that out a little?

THE JUROR:  Sure.  Well, I think that my opposition to the death penalty is the same as most people who are opposed to the death penalty, which is that, I mean, for one thing, I have a problem with the state taking -- the right to take someone's life because that is, to me, a punishment of a considerably different order than imprisonment, even imprisonment without the possibility of parole.  I also believe that the criminal justice system shouldn't be about revenge but precisely about justice.  And so the death penalty seems to me to be, you know, a case of an eye for an eye, tooth for a tooth.  And I think that, as a society, we should be on a higher moral standing than people who want to take away someone's life because of disagreements with them.  Is that --

THE COURT:  Okay.

THE JUROR:  Okay.

THE COURT:  Well, no.  You're the judge of that.

THE JUROR:  I guess, I mean -- I suppose I could keep

going.  I think at a certain point I'll start repeating myself or pontificating.

THE COURT:  Look at the next question.  There we ask you to kind of indicate the intensity, if I could say it that way, of your feelings.

THE JUROR:  Yes.

THE COURT:  On a scale of 1 to 10, where strongly opposed, No. 1, reflects the belief that the death penalty should never be imposed.  You selected 2, which is a little bit lesser than absolute perhaps.

THE JUROR:  Like I said, there's this pragmatic side of me that wanted to -- I didn't want to be dogmatic, I guess.  So that's why I put a "2" as opposed to a "1."  I do oppose the death penalty.  At the same time I realize that this would be a test of those -- of what have been primarily philosophical ideas for me.

THE COURT:  Let's turn to the next page, Question 90.  Here we ask you to select one of the proposed formulations that best matched your view.

THE JUROR:  Yes.

THE COURT:  You selected (b) that said, "I'm opposed to the death penalty and would have a difficult time voting to impose it even if the facts supported it."

THE JUROR:  Uh-huh.

THE COURT:  Can you amplify?

THE JUROR:  Again, I think there was -- I was -- I was trying to avoid appearing overly dogmatic but at the same time wanting to signal the depth of my opposition to the death penalty.

THE COURT:  Letter (b) says you would have a difficult time.  That's in contrast to letter (a), which says "would never."

THE JUROR:  Right.  It's hard for me to imagine myself voting for the death penalty.

THE COURT:  Well, that was going to be my next question.  You said "difficult time."  Can you in some way think of a real-world situation where you could think that the death penalty was the right punishment to be imposed and vote for it?

THE JUROR:  Not -- no, not to date.  Like I said, no.  The reason I put (b) as opposed to (a) is simply because I never had to actually sit through the evidence, et cetera, I mean, so no.  My opposition is deep-seated and long-lasting.

THE COURT:  So is it just a hypothetical or theoretical possibility that you could vote for it and not a real one?  Is that -- that's what we're getting at.

THE JUROR:  Right.

THE COURT:  Is there a real possibility that in a given case, in an appropriate circumstance, you could weigh that and you could decide, yes, this is a case for the death

penalty?

THE JUROR: Perhaps. I'd like -- like I said, I'd like to think that my ideas wouldn't be changed by the evidence in a case, et cetera.

THE COURT: Let me just have you turn to the next -- I think it's the next page, Question 95. We asked you there, "If you found this defendant guilty and decided the death penalty was appropriate, could you conscientiously vote for it?" This is a slightly different take. And you said "not sure." I guess, given what you've said, that's a little different from what -- you might have said "no" instead of "not sure." The "not sure" suggests sort of an openness to the possibility.

THE JUROR: Yes. I guess, in that case, I mean, I'm trying to err on the side of a sense of not having prejudgment.

THE COURT: Okay. I think that's what I have.

Miss Clarke?

MS. CLARKE: It is morning. Good morning.

THE JUROR: Just about.

MS. CLARKE: My name is Judy Clarke. I'm one of Mr. Tsarnaev's lawyers. Let me just go straight to the death penalty views because I certainly appreciate the position that you've expressed.

I guess what we're really trying to figure out is how to compose a jury that has both pro and con views, right?

THE JUROR: Uh-huh.

MS. CLARKE:  Because I don't think the Court wants to seat a jury that is all in favor of the death penalty or all opposed to the death penalty, right?

THE JUROR:  I would hope so.

MS. CLARKE:  Right.  So we need to figure out whether somebody who's opposed to the death penalty can actually give it consideration in a given case.

THE JUROR:  Right.

MS. CLARKE:  Right?  So I hear you, as a policymaker, you wouldn't have it.  You would not vote for the death penalty as a policymaker.

THE JUROR:  Oh, no, no.  I mean, one of the things that I admire about Massachusetts is the fact that it doesn't have the death penalty.

MS. CLARKE:  Certainly.  So here's the question:  If, in a particular case, knowing that you do not ever have to vote for the death penalty, could your conscience allow you to consider -- if you thought it was appropriate, could your conscience allow you in that case to impose the death penalty if you thought, given those facts presented to you, it was an appropriate punishment?

THE JUROR:  Yes.  If I understand the question, I think I could answer that yes.

MS. CLARKE:  The question here will be, at a penalty phase, there's evidence of aggravation.

THE JUROR: Right.

MS. CLARKE: And evidence of mitigation.

THE JUROR: Right.

MS. CLARKE: And the jury is instructed to weigh those factors and then come to a conclusion. The question is: Can you give fair assessment to the penalty of death in a particular case if you thought it was the appropriate punishment?

THE JUROR: Yes, I think so.

MS. CLARKE: And if you thought it was the appropriate punishment and could give fair consideration to it, could you actually vote for it in a given case because that's what the law would require you to be able to do?

THE JUROR: Yes, I know. That would be difficult for me.

MS. CLARKE: Could you do it?

THE JUROR: I don't know. Perhaps.

THE COURT: Okay.

MR. CHAKRAVARTY: Your Honor, some follow up?

MS. CLARKE: Thank you.

MR. CHAKRAVARTY: Good morning. I'm Al Chakravarty, one of the prosecutors in the case. I'd just like to follow up on some of the questions.

Just as a matter of housekeeping, there were several questions on the questionnaire which you answered "no" to if

you didn't have a response to, but there were several which you didn't answer at all.  Was it because you didn't have a responsive answer, or was there some substance there that --

THE JUROR:  I think -- I'm not aware of any questions that I didn't answer.  There may have been times when there was space to elaborate that I didn't take advantage of it.

MR. CHAKRAVARTY:  We don't have to go through every one, but I'm just thinking of Question 9, Question 11, Question 23, 31, 32, 43 through 47.

THE JUROR:  I see.  I'm sorry.  Those are all -- I mean, for instance 9 is like a -- it's basically a no.  I don't believe that I have any of those things.

MR. CHAKRAVARTY:  Going to the series from 44 through 46, that's on Page 14.

THE JUROR:  Uh-huh.

MR. CHAKRAVARTY:  These refer to, you know, just views of counsel, amongst other people.  You left these blank.  But you told us a little earlier that you did actually have some strong views about maybe government overreaching particularly in terms of the shelter in place.

THE JUROR:  Yes.

MR. CHAKRAVARTY:  Are there other types of experiences that would have been responsive to these questions?

THE JUROR:  No.  Other types of experiences?  You mean experiences that I've had with the law or with the legal

system?

MR. CHAKRAVARTY:  Or observations, anything that would be positive or negative.

THE JUROR:  No.  I feel my disagreement is with the policies and not necessarily with the people who enforce those policies because I know that there can be sometimes some distance between those, that sometimes -- it's somebody's responsibility to enforce something that he doesn't or she doesn't personally support, et cetera.  So that's why I left all of those things blank.

MR. CHAKRAVARTY:  And for 51, also left blank, is it -- have you participated in any kinds of organizations that have issues particularly related to the issues in this case, like prisoners' rights or human rights or things related to, you know, the penal system?

THE JUROR:  No.  When I was younger, I was active to some extent in -- with the Queer Nation in Los Angeles, active around AIDS, AIDS activism, and that sort of thing, but I'm not active in any of the kinds of groups that are listed here.  I may have on occasion given money to, like, the ACLU or something like that.

MR. CHAKRAVARTY:  Let's -- on the death penalty question --

THE JUROR:  Yes.

MR. CHAKRAVARTY:  -- is it fair to say that for you to

impose a death penalty would go against your own moral compass as to what is an appropriate penalty in our society?

THE JUROR:  Yes.

MR. CHAKRAVARTY:  Thank you.

THE COURT:  Okay.  Thank you, sir.

THE JUROR:  Thank you.

THE COURT:  Just leave the questionnaire right there.

THE CLERK:  Juror No. 145.

THE JURY CLERK:  Juror 145.

THE CLERK:  Ma'am, step up here, if you would, please.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  Barely.

THE JUROR:  Okay.

THE COURT:  Since you were here to fill out the questionnaire, have you been able to abide by my instructions to avoid any discussion of the substance of the case or any exposure to the media reports about it pretty much?

THE JUROR:  Media only when there's football talk, I guess, and it kind of falls into that.  So it's information that just happens to be there.

THE COURT:  Right.  I'm talking about information about the case.

THE JUROR:  No, no.

THE COURT:  Any reports about the case.

THE JUROR:  No, no.

THE COURT:  Okay.  There is a lot of football news, I guess, lately.

THE JUROR:  Yeah.

THE COURT:  So you are -- according to the form that you filled out -- and it's there for you to refer to as we go through some of these.  You describe yourself as a stay-at-home mom but also self-employed as an accountant.  You say --

THE JUROR:  Correct.

THE COURT:  If you want to look -- this is on Page 10, Question 27, you describe yourself actually as a full-time mom but also self-employed.

THE JUROR:  I work out of my house and take care of my children at the same time.

THE COURT:  Right.  Is the accounting business sort of a part time or is it -- do you consider -- I'm just focusing on you said full-time mom.  I'm wondering if you mean full time applies to the accounting as well.

THE JUROR:  Oh, no.  I am, No. 1, a full-time mom.  I do work for somebody that allows me to work out of my home to do accounting work.  That's basically at my leisure when I have the time available to do that.

THE COURT:  The reason I'm interested in it is whether it would be difficult for you to serve on the jury because it would mean you would have to forego perhaps some income that

comes from that.  You had said to the questionnaire -- question about hardship that it would not be a hardship.  I just want to follow up on that.

THE JUROR:  My work is the type of work that -- from what I understand, court would be over by 4:00 in the afternoon.  So it's something where I could go home and complete my work at night.

THE COURT:  Might be something you do anyway because you've got the kids during the day?

THE JUROR:  Correct, exactly.

THE COURT:  I just wanted to be sure about that.

THE JUROR:  Thank you.  Yes.

THE COURT:  Tell us about your use of social media, if any.

THE JUROR:  Yeah, just Facebook, more like I "like" things as opposed to posting things.  It's basically just to keep up with friends.  I'm not one of those people though that rants and raves.

THE COURT:  Okay.

THE JUROR:  It's more out of boredom, just kind of flipping through a little bit.

THE COURT:  Do you do more looking than posting?

THE JUROR:  Correct, yes, looking.

THE COURT:  And I assume you haven't posted anything about the case?

THE JUROR:  No, not at all.

THE COURT:  If you want to take a peek at Pages 17 and 18, we asked some broad questions about attitudes towards events, current events, international matters, and so on and so forth, such as the War on Terror and perhaps any attitudes towards Muslims or Islam and so on and so forth.  You answered those at that point.

Since you've answered those, there have been some events which could be characterized as terrorist events in Paris, for example.  Have you read about or seen about those?

THE JUROR:  Briefly on the news, yes.

THE COURT:  You say "briefly."  You haven't followed it particularly?

THE JUROR:  No.

THE COURT:  Would what you know about what happened in Paris or anything like that affect any of the answers you gave?

THE JUROR:  No, not at all because I don't know enough.  I don't turn the news on to indulge myself in that type of activity, so --

THE COURT:  Okay.  On Page 19, look at Question 74.

THE JUROR:  Yup.

THE COURT:  We asked what your reaction was when you got a summons, and you said you were honored to be possibly part of the proceedings.

THE JUROR:  Correct.

THE COURT:  Tell us a little bit more about that feeling.

THE JUROR:  Well, previous to being called to federal, I had gotten state a couple of times in the mail.  You call in and they tell you you don't have to go, and I was kind of bummed out a little bit.  I think more so for me, it's a day out of the home so --

THE COURT:  This is going to be several months out of the home.

THE JUROR:  Exactly, I know.  That's okay.  So, yeah, I vote for a reason, and this is expected.  So my time has come.

THE COURT:  So I guess -- it's my understanding, when you got the state summonses, you were kind of disappointed that you didn't get a chance to --

THE JUROR:  To go, yes.

THE COURT:  Was it about jury service principally or was it about this case principally?

THE JUROR:  Well, if I may elaborate a little bit on this case, I didn't even realize -- and I say this in here -- that my summons had anything to do with this case until the day prior to arriving here.  We'd been out of state for two weeks in North Carolina, so they don't have things like this on the news there, whereas they do more so here.  And I just happened to be watching TV and they were talking more about this

particular case. And all of a sudden I just kind of connected dots that that's where I have to go tomorrow. So it was kind of a little shocking to me at first. Like, wow, of all the people who are registered to vote and I'm the one that's getting to go. So I kind of just got over that a little bit and set my alarm clock and showed up.

THE COURT: Okay. On Page 20, would you look at Question 77?

THE JUROR: Page 20, 77. Okay, yup.

THE COURT: In that question we asked whether -- on the basis of things you'd seen or read in the media or perhaps learned from other sources, whether you had formed an opinion about whether the defendant was guilty or not and then what the penalty might be. Let's talk about first the guilt or not part.

THE JUROR: Okay.

THE COURT: You answered Part (a) of that question "yes," you had formed an opinion.

THE JUROR: Based on the media, yes.

THE COURT: You understand that in our criminal justice system a defendant who's charged by the government with a crime is presumed innocent of the crime unless and until the government proves that he's guilty by evidence in the trial that the jury finds acceptable and persuasive so that they can -- the jury can decide that the government has satisfied its

burden of proof.

THE JUROR:  Yes.

THE COURT:  And on that basis find the person guilty. And, of course, the related point is that, if the jury is not satisfied that the government has done that, it's obliged, actually, to find the defendant not guilty if the government hasn't proven guilt beyond a reasonable doubt.  Do you understand those principles?

THE JUROR:  I do, yes.

THE COURT:  If you were a juror in the case, understanding you may have some opinions from the media, would you be able to fairly and impartially judge the evidence in the case notwithstanding what you might have heard beforehand?

THE JUROR:  Absolutely, yes.

THE COURT:  Would you -- you understand the defendant never has a burden to explain himself or to prove that he's not guilty?  The burden is always with the government?

THE JUROR:  Correct.

THE COURT:  Would the fact that you might have some ideas before the case, do you think lead you in any degree to expect the defendant to explain things, or would you be able to focus on the government's discharge of its burden, if you understand the question?

THE JUROR:  His lawyers were speaking on his behalf?

THE COURT:  Sure.  There's -- two sides participate in

the trial.

THE JUROR:  Yes.

THE COURT:  But the question is the burden of proof is always with the government.  Do you understand that?  The defendant doesn't have to --

THE JUROR:  Okay, yes.

THE COURT:  Doesn't have to prove he's not guilty.

THE JUROR:  Okay.

THE COURT:  Do you understand that?

THE JUROR:  Understood, yes.

THE COURT:  The question is whether, knowing something or thinking you know something before the case, whether that would interfere with your ability to hold the government to its responsibility without putting any burden on the defendant.

THE JUROR:  Repeat the question.

THE COURT:  The government has the obligation to prove a defendant guilty of a charged crime, beyond a reasonable doubt, by evidence at trial.

THE JUROR:  Okay.

THE COURT:  The jurors are instructed that if, after consideration of the evidence, they have some reasonable doubt or even considerable doubt about whether the government's case is convincing or not, then the defendant is entitled to the benefit of the doubt and is to be found not guilty.

THE JUROR:  Okay.

THE COURT:  Another way of describing that principle is to say that the burden of proof is on the government, meaning it has the responsibility to succeed in persuading the jurors that the defendant is guilty by the evidence.

THE JUROR:  Okay.

THE COURT:  Or failing to succeed.  If it succeeds, the jurors are authorized to find the person guilty.  If the government fails to succeed in convincing them of the person's guilt beyond a reasonable doubt, the defendant must be found not guilty.

THE JUROR:  Understood.  Okay, yup.

THE COURT:  So the question is:  If you were a juror in the case, would you be able to be faithful to those principles?

THE JUROR:  Yes.

THE COURT:  Another question we asked is -- at the bottom of Question 77 is asking maybe what I've been asking but in a slightly different way.  To the extent you have any opinion from the news accounts or whatever, do you think you would be able to -- able or unable to set aside that opinion if you were a juror and focus only on the evidence presented at the trial?

THE JUROR:  Yes, I would be able to do that.

THE COURT:  On the next page, in answer to Question 82, I just want to understand.  A friend of yours was running

in a race that was going to raise money for the One Fund, and you donated through that mechanism, is that --

THE JUROR:  Correct.

THE COURT:  Do you remember to what extent?

THE JUROR:  The amount of money?

THE COURT:  Yes.

THE JUROR:  $25.

THE COURT:  Any other expressions of support for the OneFund or Boston Strong or anything like that?

THE JUROR:  No.

THE COURT:  Let's turn to Page 23, Question 88. Beginning with Question 88, we ask a series of questions about your beliefs or attitudes towards the death penalty.

THE JUROR:  Yes.

THE COURT:  88 is a general question.  It says, if you have any views in general, what are they?  You said "none."

THE JUROR:  Correct.

THE COURT:  Does that accurately summarize?

THE JUROR:  Yes.

THE COURT:  Then in the next question, we asked to circle where you were on the spectrum, from strongly opposed to strongly in favor, and you picked No. 5, which is pretty much right in the middle.

THE JUROR:  Uh-huh.

THE COURT:  Does that reflect "none"?

THE JUROR:  Well, I've got to know all the facts so I can make a decision.  So it's --

THE COURT:  Yeah.  There are two ways of thinking about this question.  One is, in a particular case, what would you do?  Another is, as a general matter, as a matter of policy --

THE JUROR:  Okay.

THE COURT:  -- is it a good idea that the death penalty is available as a punishment, or is it a bad idea?  Some people have views about that.  For example, someone who's a 1 would strongly oppose the use of the death penalty, maybe ever and vice versa.  There might be somebody at strongly favor at No. 10 who would think that maybe any time somebody is convicted of murder they should have the death penalty.  This is kind of gauging where you think --

THE JUROR:  I understand.

THE COURT:  Kind of as a policy matter first.

THE JUROR:  So I guess to the degree -- I mean, I don't know previously, like, where the death penalty has ever gone through to that degree of level as to why it happened.  So I guess I would have to see all the reasons why the death penalty was in place.

THE COURT:  You mean in the factual context of particular cases?

THE JUROR:  Correct, yes, to know the degree as to why

the death penalty was given because I don't -- I don't have that thought process to understand, from one murderer to the next, as to why one is guilty and why does one get the death penalty.

THE COURT:  I think I understand.  As a general matter, you don't feel well enough informed about --

THE JUROR:  Yeah.

THE COURT:  -- about the circumstances under which it might or might not be imposed?

THE JUROR:  Circumstances, yes.  You could have two people commit the same type of murder, but one gets the death penalty and one gets life in prison.  Why does one get one and one gets life in prison.  That's why I'm a 5 because I can -- case by case, I suppose.

THE COURT:  Okay.  All right.  So let's go to Question 90.  Here we asked you to tell us which among the several proposed statements seemed to match your view about the death penalty in a case with somebody who has been proven guilty of murder.  Of course, that's the premise.  We don't get to talk about whether there should be a death penalty unless the person has been convicted of intentional murder.  That's sort of the given.  And then the question is --

THE JUROR:  Yes.

THE COURT:  -- what might be the penalty.  You say you're not for or against.  You could vote to impose it, or you

could vote to impose a sentence of life imprisonment without possibility of release, whichever you thought was called for in that particular case, I guess.

THE JUROR:  Yes, going back to what I just previously said, yes.

THE COURT:  So you're prepared, I guess, depending on how you hear and evaluate the evidence, on the one hand perhaps, if that's the way you were led, to vote in favor of the death penalty; and on the other hand, if that's the way you heard the evidence, to vote in favor of life imprisonment --

THE JUROR:  Correct.

THE COURT:  -- without any --

THE JUROR:  Show me --

THE COURT:  -- pre-commitment to either --

THE JUROR:  Yeah.

THE COURT:  -- tendency.

THE JUROR:  Walking into the room, you mean, and have my mind made up already?

THE COURT:  Not even made up but tending partially to one or the other.

THE JUROR:  No, I'm not.

THE COURT:  Okay.

MR. WEINREB:  Just briefly, your Honor.  Just -- good afternoon.

THE JUROR:  Good afternoon.

MR. WEINREB:  My name is Bill Weinreb.  I'm one of the prosecutors in the case.  I just want to ask you two quick follow-up questions.

You mentioned that when you received the summons you felt honored that you might be able to perform jury service, and you also mentioned that a couple other times you were summoned but you were disappointed because you didn't get picked.

THE JUROR:  Correct.

MR. WEINREB:  Have any of your feelings about receiving the summons or not being picked in the past and so on, have those feelings -- do those feelings influence the way you answered any of the questions on the questionnaire?

THE JUROR:  No.

MR. WEINREB:  You didn't shade your answers one way or the other?

THE JUROR:  No.

MR. WEINREB:  And the second question is:  Sounds like, when it comes to the death penalty, just whether it should exist or not, do you have a view on that, whether it should exist or not, as a possibility in some cases?

THE JUROR:  Yes, of course.

MR. WEINREB:  What's your view?

THE JUROR:  I mean, if it's there as an option, I mean -- and that's why we're here today so -- I just have to

take what's in front of me in that moment and use the resources, I suppose, to -- or evidence to decide either way.

MR. WEINREB:  Okay.

THE JUROR:  I hope I'm making my point --

MR. WEINREB:  I asked a bad question.

THE JUROR:  -- understandable.

MR. WEINREB:  My question was too vague.  I guess what I was asking is, if it were up for a vote whether there should be a death penalty at all or not in any case, have you given that --

THE JUROR:  Well, who's voting?

MR. WEINREB:  You are.

THE JUROR:  Me and -- okay.

MR. WEINREB:  It's up to you.

THE JUROR:  Oh, yes, I mean, yes, yes.

MR. WEINREB:  Since you learned that this case that you might be selected for involves the death penalty, have you given any thought, not with respect to this case in particular but just in general?  If you were on a jury and the jury had to decide at the end of the case whether the defendant should live or die, whether if you concluded that a death sentence was the appropriate sentence, whether you could actually do it, whether you could vote for it?  Have you given that any thought?

THE JUROR:  No, because I -- this is where I'm at today in the process.  So I've just come to this point, and I

just need to live the day to day and then just deal with what's in front of me at that time.  I can't -- I don't want to think too far ahead at this point.

MR. WEINREB:  I appreciate that it's hard to predict how you would behave in any future situation, and I'm certainly not asking you to predict what you'll do in this case if you're picked as a juror.  But I am -- this is our last time to ask you questions.

THE JUROR:  Okay.

MR. WEINREB:  And we're -- one of the things we're trying to figure out is whether -- is what to make of some of the answers in the questionnaire.  And so let me just ask you to give it some thought, if you would, and imagine yourself, you know, in a situation where you have to make a decision about whether somebody should live or die.  You've heard the evidence.  You've weighed the evidence, and you've decided that this is a case where the death penalty is an appropriate sentence.

But now there comes a separate step where you've not just decided that that's the appropriate sentence.  Now you actually have to do it.  You have to --

MR. BRUCK:  I'd like to object to this unless it's been made clearer than it has been that Mr. Weinreb is not asking about this case.

THE COURT:  I think he said that, but if you want to

emphasize that.

MR. WEINREB:  I want to emphasize I'm absolutely not asking you to make any prediction about how you would vote in this case.  You haven't heard any evidence in this case.

THE JUROR:  Correct.

MR. WEINREB:  Some other hypothetical case where you've heard all the evidence and you have personally weighed all the evidence, the factors that the judge has told you are important to weigh, and you've come to the decision that this is the kind of case where the death penalty is an appropriate sentence.  Could you do it?  Could you vote for it knowing that you were sending someone to their death and you couldn't take that back?

THE JUROR:  As a juror, yes.

MR. WEINREB:  Thank you.

THE COURT:  Mr. Bruck?

MR. BRUCK:  Good afternoon.

THE JUROR:  Hi.

MR. BRUCK:  My name is David Bruck, and I'm one of Dzhokhar Tsarnaev's lawyers, and I have a few more questions, if you don't mind, if that's okay.

THE JUROR:  Of course.

MR. BRUCK:  You remember, when Judge O'Toole talked to the group of you earlier today, and I think maybe also when you first came to court, he said that if you -- what he wants from

everybody is to say how you really and truly feel.  And if you do that, you will be doing your duty as a citizen and a juror, no matter what you say.  Are you with me?

THE JUROR:  I'm with you, yes.

MR. BRUCK:  So I want to drill down a little bit.

THE JUROR:  Okay.

MR. BRUCK:  Because sometimes people feel like they're supposed to say something.

THE JUROR:  Okay.

MR. BRUCK:  And that's not what we want.

THE JUROR:  All right.

MR. BRUCK:  We want to know what's really there.  When you came to court and you saw Dzhokhar Tsarnaev, what did you feel?  What did you think?

MR. WEINREB:  I object.

THE COURT:  Sustained, yeah.

MR. BRUCK:  I'll ask you a different way.  You said that you had the opinion, based on everything you've heard, read about the case, that he should receive the death penalty. You filled that out on your questionnaire, No. 77.

THE JUROR:  Based on media, correct.

MR. BRUCK:  Right.  Understanding that it was based on -- not on evidence at trial, you know, being a juror.  It was based on whatever it was based on.  My question is:  What was it based on?  What -- why did you feel that way?

THE JUROR:  What did I hear in the media that made me form that opinion?

MR. BRUCK:  Exactly.

THE JUROR:  Everything, the death of the four people and the actions that were taken to make the unfortunate happen.

MR. BRUCK:  Can you tell me a little more about that?

MR. WEINREB:  I object.

THE COURT:  I think that was a full answer.

MR. BRUCK:  Okay.

THE COURT:  As full as we require, I guess I should say.

MR. BRUCK:  And that led you to conclude that -- based on those facts, that the death penalty would be appropriate?

THE JUROR:  Yes.

MR. BRUCK:  Okay.  And if you were on the jury and the jury convicted Mr. Tsarnaev and you went into the penalty phase, having reached that conclusion based on the publicity that's been -- that you've heard, been exposed to, do you think that you might still be leaning in favor of the death penalty rather than against it?

MR. WEINREB:  Objection.  I think that's too confusing.

THE COURT:  Yeah.  I think it is a little.  Try again.

MR. BRUCK:  Okay.  You said you formed the opinion, based on what you heard, that the death penalty was

appropriate.  And now I'm asking you to assume that you're on the jury.  The jury has convicted him, has found that he committed the Boston Marathon bombing or played a role in it.  And you're now with the rest of the jury going in to make the decision about what the punishment should be.  The only options are life imprisonment without release and the death penalty.

Based on the fact that you have already formed -- that you already formed an opinion, do you feel like you are -- you would, when you reach that point, already be leaning in favor of one decision or the other?

MR. WEINREB:  I object.

THE COURT:  Go ahead.  You can answer that.

MR. WEINREB:  It's not relevant.

THE COURT:  No.  Go ahead.

THE JUROR:  I think, going back to my previous comment is that, based on the evidence, I don't know as to what gravity a crime needs to be committed to then have someone have the death penalty.  So I can't give an honest answer right now because I don't -- nothing has been given to me to have -- to say, yes, I would go with the death penalty or, no, he should have life in prison.

MR. BRUCK:  I guess the question -- I understand that you haven't made a final decision.  I guess my question is: Given the opinion that you said you had on the questionnaire, whether you -- whether the government is ahead in your mind,

whether you lean one way rather than the other?

MR. WEINREB:  Your Honor, I object because the question is not making it clear that there will be a whole penalty phase where evidence will be presented both for and against the death penalty.  Given that --

THE COURT:  Well, take that into --

THE JUROR:  Can I add to that a little bit?

THE COURT:  Yeah, go ahead.

THE JUROR:  If the facts are there and I've given thought to it and it's in that -- it's crossed that line where, yes, there should be death penalty, then that's what it is.  If it hasn't crossed that line and it's life in prison, that's what it is.  I'm not against it, and I'm not for it.

MR. BRUCK:  You have two very small children, and you're a full-time mom.

THE JUROR:  Yes.

MR. BRUCK:  Are there child-care arrangements you could make if you were on this trial for four months?

THE JUROR:  Yes.  It would be difficult, but I would have to make it happen.

MR. BRUCK:  Okay.  Excuse me just a moment.

In deciding whether to impose the death penalty, the jury not only considers the facts of the crime -- I think Judge O'Toole told you a little bit about this -- but also considers mitigating factors, which might include the age of the

defendant or things like the age of the defendant, whether he had a prior record, what his family record is.  Are those things, for a person that commits an intentional murder, that could ever -- could you give meaningful consideration to those factors for someone who has beyond a reasonable doubt committed an intentional murder?

THE JUROR:  Are they factors that are going to be presented during the trial?

MR. BRUCK:  If they were.

THE JUROR:  Then if they're part of the trial, then I would have to go along with that as part of the trial in my decision.

MR. BRUCK:  Okay.  We need to check with everybody to see if they have a Twitter account.  Do you?

THE JUROR:  No.

MR. BRUCK:  Okay.  Have you had a Twitter account?

THE JUROR:  Never.

MR. BRUCK:  Okay.

THE COURT:  All set?

MR. MELLIN:  Can I just ask one other area that nobody has talked about yet?

THE COURT:  Okay.

MR. MELLIN:  Ma'am, could I have you look at Page 25, Question 93?  And we ask you there to kind of describe if you believe life without release is more severe or less severe than

the death penalty.  Do you see that list of questions or boxes?

THE JUROR:  Yes.

MR. MELLIN:  You checked "more severe than the death penalty."  Can you just explain your selection?

THE JUROR:  Kind of basing it off my explanation, I don't know what kind of captivity he's going to be in, if he is in, like -- if it comes that he has life in prison.  Someone of this stature, like, what kind of imprisonment is it?  Is he with the public or is he not?  Is it going to be worse?  If he's with the general public, then maybe that would be less severe than the death penalty.  But if there was a captivity involved, then maybe it would be more severe than the death penalty so -- and I don't know.  Maybe I'm just naive with all of this.

MR. MELLIN:  No.  That's fair.  We kind of catch you off-guard.  I apologize.  I'm one of the prosecutors as well. We kind of catch you off-guard with these questions.

If the judge were to instruct you, if you're on the jury and we get to this penalty, that between the two punishments, the death penalty is a more severe punishment than life imprisonment, would you be able to follow that instruction?

THE JUROR:  Yes.

MR. MELLIN:  So you would understand that, when you're weighing these options, that the more severe of the two would

be the death penalty?

THE JUROR:  Yes.

MR. MELLIN:  Okay.  Thank you.

THE JUROR:  I understand the question.  Yes.

THE COURT:  Okay.  Thank you.

THE JUROR:  All set?

THE COURT:  Yes.  Just leave the questionnaire.

THE JUROR:  Thank you.

THE COURT:  Before the next person comes in, which is 152, I think, could we cut the sound, cut the audio?

(SIDEBAR CONFERENCE AS FOLLOWS:

MS. CONRAD:  I'm sorry?

THE COURT:  It seems consistent with his answer.

MS. CONRAD:  Yes.

THE COURT:  So no inquiry about it?

MS. CONRAD:  Correct.

THE COURT:  That's all.  Now we can go back on.

.  .  .  END OF SIDEBAR CONFERENCE.)

THE COURT:  Maybe we should just give them noise-canceling earphones so they don't have to keep getting up.

MR. CHAKRAVARTY:  Your Honor, if your Honor is seriously considering that as an option, we can inquire with

our -- the law enforcement agencies to see what they might have available to --

THE COURT:  Might be.  It would save them bouncing up and down.

MR. WEINREB:  That was raised by our first assistant who thought we could make it happen if the Court wanted.

THE COURT:  Something we can talk about.

MR. WEINREB:  Okay.

THE COURT:  Okay.

THE CLERK:  Juror No. 152.

THE JURY CLERK:  Juror No. 152.

THE CLERK:  Sir, over here, please.  Have a seat.

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon.

THE COURT:  Since you filled out your questionnaire when you were here a few weeks ago, have you been able to abide by my instruction to avoid any discussion of the substance of the case?

THE JUROR:  I have.

THE COURT:  And to avoid any contact with the media, reports about the case?

THE JUROR:  Yes.

THE COURT:  Thank you.

THE JUROR:  Yup.

THE COURT:  Tell us a little bit about what you're

doing now.  You're working, it says, for Roche Brothers.

THE JUROR:  Yup.  So I'm just finishing up school right now.

THE COURT:  Well, let's do that before I hear about Roche Brothers.

THE JUROR:  Absolutely, yup.  So went to school at UMass Amherst, finishing up with a degree, political science.

THE COURT:  Are you in school this semester?

THE JUROR:  I just finished winter classes, so I will be getting my degree.

THE COURT:  That wrapped it up with the winter -- the semester that just ended in the winter?

THE JUROR:  Yes.

THE COURT:  When do you get the degree, in May still? Is there a winter ceremony, I guess, is what I'm saying?

THE JUROR:  No, I don't believe so.  I'm not quite sure to be honest.  I'm still kind of in that process.  I just finished up school.

THE COURT:  All right.  So the employment you have is temporary employment or something, is that it?

THE JUROR:  It is, yes.

THE COURT:  Are you looking for something more permanent?

THE JUROR:  I will be.  I'm not quite sure exactly what I want to do so --

THE COURT:  Okay.  What I'm getting at is whether it somehow is going to be difficult for you as a personal matter if you're, you know, working -- I assume this is an hourly wage job that you have?

THE JUROR:  It is, yeah.

THE COURT:  If you're unable to do that because you're selected for the jury, it's going to cost you some money and so on.  Is that a problem?

THE JUROR:  Right now, I'm in kind of a transition period.  I'm working part time.  I was working part time so I could finish up classes.  Right now I'm part time, and I don't think that they're going to hire me back at the moment full time for -- I don't think they can for another year.  So as of right now, I'm waiting for my degree to come in, and I'm waiting -- I'm kind of searching around trying to find a full-time job.  I don't think it's going to be too much of an issue to answer your question.

THE COURT:  From something you said, it sounded like you're not in a big rush to find something.  Is that unfair?  Do I sound like your father?

(Laughter.)

THE JUROR:  Exactly, yeah.  I'm looking.  I'm looking.  That's the answer I'll give my father, too.  I'm looking.

THE COURT:  Okay.

THE JUROR:  Living at home is pretty nice so I can't

complain.

THE COURT:  All right.  So you say that's not an issue.  If you got placed on the jury, you could serve out, and it wouldn't be a problem for you?

THE JUROR:  Yup.

THE COURT:  That's your questionnaire.  We're going to follow up on some of the answers you gave.  That's really one of the principal purposes for this, is to make sure we can explore something a little more than the questionnaire allowed.

THE JUROR:  Yeah, definitely.

THE COURT:  Let me just ask you, on Page 7, Question 16, your sister is a journalist?

THE JUROR:  She is, yes.

THE COURT:  Can you give us some idea what she does?

THE JUROR:  She works for -- I believe it's the Somerville Daily Times, I believe, some paper in Somerville.

THE COURT:  Local?

THE JUROR:  Local paper, yup.

THE COURT:  How long has she been doing that?

THE JUROR:  She's been a journalist for, I'd say, about four or five years.

THE COURT:  Always with the same paper?

THE JUROR:  No.  She's been kind of all around, working for something called Wicked Local, doing different towns, I guess.  I know she was working in Lincoln, Sudbury for

awhile.  But she's been all over the place, doing free-lance and whatnot.

THE COURT:  Is she, to your knowledge, doing anything to cover this case?

THE JUROR:  I do not believe so, no.

THE COURT:  Have you talked with her about your possible service as a juror on this case?

THE JUROR:  Yes.  She knows about that, yes.  I haven't mentioned anything about the case, but --

THE COURT:  You know that if you were selected, you would have to avoid that entirely with her?

THE JUROR:  Oh, yeah, absolutely.

THE COURT:  You spent some time at the American University in Beirut.  You had a semester abroad?

THE JUROR:  I was, yes.

THE COURT:  Tell us a little bit about that.  How was that?

THE JUROR:  It was in the winter in 2013.  I went with a friend of mine.  We both studied political science and concentrated on the Middle Eastern studies, Middle Eastern politics.  I figured it would be fitting to at least go to the Middle East itself before -- you know, just to get a better idea.  I had a great time there.

THE COURT:  Give us the time frame if you could.  From when to when were you there?

THE JUROR:  It was from the end of January to, I'd say, the end of May.

THE COURT:  2013?

THE JUROR:  In 2013, correct.

THE COURT:  So you were there when the Marathon events happened?

THE JUROR:  I was, yes.

THE COURT:  Was there significant coverage news-wise or otherwise of the Marathon events while you were in Beirut?

THE JUROR:  No.

THE COURT:  Did you know about it?

JUROR:  I did know about it.  To be honest, I wasn't -- I was checking American news, obviously, the day, but from -- and people I'd heard of had heard what happened, but I don't think it was as big of a media frenzy over there than it was here.

THE COURT:  Did you, after you learned -- did you learn about it right around the time that it happened or some days afterwards or what?

THE JUROR:  Right around the time.  It was actually a funny story.  I was in a class on -- it was, like, an international relations class.  And I was talking with a guy, and we were saying how Beirut has a perception of being very dangerous; but when you're there, it doesn't seem as dangerous to you.  And people from, you know, I guess, Europe or the U.S.

would think that you're more likely to get attacked.  And I was talking to this guy about it.  He said, That's really funny that you said that because there was just a bombing in Boston.  I was, like, I didn't know anything about that.  I called my folks and everything, and they had told me it was.  But for me, it was hard to find coverage on it.  It was hard to find a lot of sources out there.

THE COURT:  You looked a little to learn about what had happened?

THE JUROR:  Oh, yeah, yeah, absolutely.

THE COURT:  The events continued for the rest of that week.  I think you've heard some of the other dates that it involved in this case, including the charges that are made, were the 18th and 19th of April, which are the end of the same week.  Were you still trying to follow it at that point?

THE JUROR:  Yeah, I was.

THE COURT:  Did you continue after that, continue to follow it?

THE JUROR:  Yeah, I followed it a little bit.  I never tried to follow it too in-depth.  But I did -- you know, I did try to find out, you know, if everyone was okay from my family first off and, you know, kind of what was going on.

THE COURT:  How were you trying to follow it?  Through the internet or --

THE JUROR:  Yes, through the internet.

THE COURT:  Trying to find news sources there?

THE JUROR:  Yup.

THE COURT:  This is skipping around a little bit, but in Question 67, it says you have studied beginners Arabic.  So you know some level of Arabic?

THE JUROR:  Correct.  I knew a lot more when I was in Beirut.  Obviously, not having used it, I've forgotten a lot of it.  But I know kind of how to read the alphabet, how to read and write, not -- I know very beginner's vocab, but a lot of it has gone just through memory, through not using it.

THE COURT:  Was that a course you took while you were in Beirut, or you had you taken it before you went?

THE JUROR:  I had taken a semester before as well at Amherst College.

THE COURT:  At Pages 17 and 18, we asked some general questions about the War on Terror, about relationships with Muslims or the religion of Islam and so on.  You answered all those things.  That's where we learned about you knew some Arabic.

THE JUROR:  Yup.

THE COURT:  Since the -- let me actually go back a page.  Actually, I guess it probably begins at the bottom of 16.  You indicated you were very familiar with the teachings of Islam.  Again, could you tell us how you are very familiar with that?

THE JUROR:  Just having studied it.  I don't read the Qur'an or anything like that, but I've taken a lot of classes that kind of go through that.  So I figured, comparatively, at least to a lot of people, I know a good amount.  I guess that's comparing to a lot of my friends who don't know anything about it but --

THE COURT:  Your major was international studies, is that --

THE JUROR:  Is political science.

THE COURT:  Political science.  But you --

THE JUROR:  Had a concentration --

THE COURT:  You had a concentration, and it was Middle Eastern?

THE JUROR:  It was, yes.

THE COURT:  That's how you --

THE JUROR:  Just through classes, yeah.

THE COURT:  If you'd turn to Page 20, in Question 77 we asked a four-part question about whether you had formed an opinion from the media or other places about whether the defendant was guilty or not and then whether he should receive the death penalty or not.  I want to focus on the first two of those first, guilty or not guilty.  To both of those you checked "no," you hadn't formed an opinion, but you also checked "unsure" with respect to the first one.

THE JUROR:  Yeah.

THE COURT: Can you maybe explain what you had in mind when you filled those boxes?

THE JUROR: Yeah, absolutely. So I think I'm more towards unsure about what the opinion would be, but for me, finding someone guilty is having looked through all the evidence and whatnot. So I wouldn't just assume someone's guilty right off the bat.

THE COURT: So in our criminal justice system, every defendant who's accused of a crime is presumed to be not guilty, presumed to be innocent.

THE JUROR: Yes.

THE COURT: Unless and until the government proves otherwise by proving at the trial that he's guilty by the evidence.

THE JUROR: Yeah.

THE COURT: I guess you're a political science major. You probably understand that.

The burden is always on the government to prove its case, therefore, to prove somebody guilty. A defendant never has any burden to prove he's not guilty. He can oppose the government's case, but by opposing it, he doesn't have to convince anybody of anything. The question is always -- it's not which side has convinced me, but has the government convinced me beyond a reasonable doubt that he is guilty.

THE JUROR: Yes.

THE COURT: Would you be able to faithfully apply those principles if you were a juror deliberating on guilt or innocence in this case?

THE JUROR: Yes.

THE COURT: Now let's turn to the penalty issue. If you'd look to Page 23, we ask a series of questions beginning at Question 88 about your views about the death penalty. First, in general terms, Question 88 asks if you have any views about the death penalty in general, that is, as opposed to any particular case, what are they? And you said basically you're undecided.

THE JUROR: Yeah.

THE COURT: Do you want to amplify that or --

THE JUROR: I kind of lean more strongly towards not giving the death penalty. Now, that doesn't mean to say that I am for or totally against the death penalty. I just think it needs to be to certain cases. I know there would have to be, for me, a strong opinion -- a good amount of evidence given for that person to have to receive the death penalty. There has to be a strong persuasion on my part or a good persuasion. So I generally lean against opposing the death penalty, but that doesn't mean I'm throwing it out the window, so to speak.

THE COURT: In the next question it asks, sort of to take your temperature on that, it runs from strongly opposed to strongly favor, 1 to 10, and you selected 4. Is that

consistent, you think, with what you just told us?

THE JUROR:  Absolutely, yes.

THE COURT:  Slightly on the side of opposed but somewhere in the middle?

THE JUROR:  Yeah.  But I feel, like, for some circumstances, it could be given, but I do generally oppose the death penalty, yes.

THE COURT:  Okay.  So that 4 might have been a 3?

THE JUROR:  3, 4, 3.5.  I'll meet you right in the middle.

THE COURT:  All right.  Look at Question 90 on the next page.

THE JUROR:  Absolutely.

THE COURT:  Here we asked you, rather than picking a number, to express -- to look at one of these options to put in words, and you selected (c).  And you said, "I'm opposed to the death penalty, but I could vote to impose it if I believed that the facts and the law in a particular case called for it."  Is that --

THE JUROR:  That represents how I feel, yes.

THE COURT:  That's, I guess, pretty much what you've already told us.

THE JUROR:  Yes.

THE COURT:  So you're not prepared to go into a case committed to one way or the other?  You're going to --

THE JUROR:  Absolutely.

THE COURT:  -- take each case on its own?

THE JUROR:  Absolutely.

THE COURT:  Let me ask you to look at Question 93 because it sort of relates to what we've been trying to assess here.  The comment you wrote in 93 is, "Life imprisonment is a great" -- I think that's what it says, "a great alternative to the death penalty."

THE JUROR:  Yes.

THE COURT:  Can you --

THE JUROR:  You want me to explain that?

THE COURT:  Yeah.

THE JUROR:  I think that -- well, from what I've heard -- not from what I heard but -- I would say that life imprisonment is generally what I would give to people just being mostly opposed to the death penalty.  That's not to say that, again, I'm throwing -- I'm wicked opposed to the death penalty.  However, I just think that, through a lot of these cases, if it's not a completely special circumstance, that life imprisonment is an alternative that can be used.

THE COURT:  Okay.

MR. WEINREB:  Good afternoon.

THE JUROR:  Good afternoon.

MR. WEINREB:  My name is Bill Weinreb.  I'm one of the prosecutors in the case.  I just want to ask you a couple of

follow-up questions about the death penalty.

THE JUROR:  Absolutely.

MR. WEINREB:  It sounds like you're a person who has given some thought to whether the -- you're for or against the death penalty in general.

THE JUROR:  Yes.

MR. WEINREB:  But a lot of times people don't really give a lot of thought to the question of -- a slightly different question, which is, if you were personally on a jury that had to consider whether someone should live or die for a crime that they had been convicted of, whether you could actually impose the death penalty.  Have you given that any thought?

THE JUROR:  I have, yes.

MR. WEINREB:  And so the question is -- not talking about this case, just in general, as a -- if you were on a jury where the jury had convicted the defendant of a crime for which the death penalty was a possible sentence; and then taking it the next step, you had heard evidence for and against the death penalty in that particular case, and you had decided that this was one of those rare cases where the death penalty was an appropriate sentence.  Could you do it?  Could you vote to send someone to their death knowing you could never take that back?

THE JUROR:  I could, yes.

MR. WEINREB:  Thank you.

THE JUROR:  Yup.

MS. CONRAD:  Good afternoon.  My name is Miriam Conrad.  I'm one of Mr. Tsarnaev's lawyers.

THE JUROR:  Good afternoon.

MS. CONRAD:  I just have a few questions for you.  I think it's on Question 81 on Page 21.  You indicated that your sister reported on the events surrounding the Marathon bombing.

THE JUROR:  Yes.  She -- from what I do remember, she reported something along the lines of -- I know she was working for *Somerville Times*.  I believe she reported something like -- just a small thing on kind of what had happened.

MS. CONRAD:  So she wasn't physically at the scene?

THE JUROR:  I don't believe so.  I cannot tell you exactly where my sister has been.

MS. CONRAD:  But has she told you anything about what she did or what she saw?

THE JUROR:  From what she told me, she -- I know she was gathering facts the night of -- I believe what had happened was a car chase.  And she said she was trying to gather, like, facts from witnesses or something like that.  I don't know what was said.  I didn't even read the article.

And another thing she had told me was that during -- I know there was a curfew.  During the curfew, a lot of people were inside.  And she said -- she had mentioned to me that the only thing open was a Dunkin' Donuts, which, being from here, I

could believe.

But from that, that's pretty much all I've heard about that.  I don't know really -- I haven't read what she had written, and I don't really know much up until that.  But I do know that she had written some kind of story regarding the events.  I don't know how in-depth or in detail it was but --

MS. CONRAD:  And have you ever seen the story or read the story?

THE JUROR:  No, I have not.

MS. CONRAD:  You also -- if I could just ask you to turn to two pages back, on Page 19.  You said, in answer to Question 74, that you were interested, when you got your jury summons, in the fact that this is a publicized case.  Can you just tell me a little bit more about that?

THE JUROR:  I was interested -- let me see.  Yes.  I had heard from friends -- when I -- previously, when I got the jury summons, I had no idea.  So the night before I had heard from friends, oh, you might get this case.  So, to me, I believe that is a little bit interesting just because, being anyone from Boston, you've heard of what happens -- or what happened.  I don't know.  I don't know what else to say from that.  I believe -- I don't know.  It is kind of interesting to me to see but -- yeah.

MS. CONRAD:  Did your friends say anything to you about the possibility that you might be on the jury in this

case?

MR. WEINREB:  Your Honor, I object to all these questions about what friends thought and felt.  It's not really about whether this juror should be struck for cause.

THE COURT:  I think I'll allow this.  The Question 75 said you told friends about it.  I guess we can find out what you may have been thinking as a result of those conversations.

THE JUROR:  Absolutely.  I'm sorry.  Could you ask the question one more time?

MS. CONRAD:  I just wanted to know what your friends said when they realized you might be on this jury.

THE JUROR:  They just thought it was a big deal.

MS. CONRAD:  Thank you.

THE JURY:  Absolutely.

THE COURT:  That's it?  Okay.  Thank you, sir.

THE CLERK:  156.

THE JURY CLERK:  Juror 156.

THE CLERK:  Sir, over here, please, if you would. Have a seat right here.

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon.

THE COURT:  Since you were last here and filled out the questionnaire, have you been able to abide by my instructions not to discuss the substance of the case with anyone and to try to avoid any media coverage of the case?

THE JUROR:  Yeah.

THE COURT:  So that is the questionnaire you filled out last time, and we're going to basically ask some follow-up questions to some of the things you've indicated in the questionnaire.  Let me start with:  You're a graduate of Middlebury College?

THE JUROR:  Yup.

THE COURT:  What year?

THE JUROR:  2010.

THE COURT:  I guess, after graduating, you were a teacher for a couple years, and now you're with Galatea Associates?

THE JUROR:  Yeah.  Teacher for two years, and I've been at Galatea since then.

THE COURT:  What is Galatea Associates?

THE JUROR:  We do IT consulting for investment banks.

THE COURT:  What do you do particularly?

THE JUROR:  Actually a mix of software development, so actually writing code and also kind of business analyst.

THE COURT:  We asked, in Question 10 on Page 5, if you want to look at it -- you don't have to -- if you were selected to serve on the jury in this case, because of the length of the trial and so on, whether it would be a significant hardship for you.  Does it present you with any problems at work?

THE JUROR:  No.  I mean, yes.

THE COURT:  It does for anybody.  The question is:  Would it be unusually difficult or anything?

THE JUROR:  I think no, I think no.

THE COURT:  Social media, you indicated in Question 30 that you're on LinkedIn, but you don't use it very often.

THE JUROR:  That's correct.

THE COURT:  Do you use any other social media?

THE JUROR:  No.

THE COURT:  Twitter, Facebook, Instagram?

THE JUROR:  I don't have any of those.

THE COURT:  You live in the software world, right?

THE JUROR:  Yeah.  I used to have a Facebook, but it just was -- I don't know.  It's a waste of time.

THE COURT:  Okay.  In Question 42, we asked about prior jury service, and you said you were summonsed but not chosen for jury duty in state court last year, I guess, 2014.

THE JUROR:  That was -- yup.

THE COURT:  Where was that?

THE JUROR:  Woburn.

THE COURT:  Did you report?

THE JUROR:  Yup.

THE COURT:  And then you spent the day hanging around and got discharged or something, is that right?

THE JUROR:  Yup.

THE COURT:  Is that -- okay.  On Pages 17 and 18, we

asked a series of questions about attitudes about current events or also other issues, such as attitudes towards Islam and Muslims and so on, some of the things that might come up during the course of the trial.  You answered all those.  One of the answers you gave on Question 62 is that you think that the War on Terror is overblown or exaggerated.  Could you just amplify on that?

THE JUROR:  Sure.  I think -- I just -- I don't really know what the War on Terror means.  I don't know.  It's just one of these things that's been going on for a while.  You wonder what's actually being accomplished or what's actually being done that's good.  So it's one of those things that I'm not, I don't know, thrilled about it, I guess is maybe what I was indicating there.

THE COURT:  Have you noticed or followed reports about a shooting in Paris in the last month or so?

THE JUROR:  Yup.

THE COURT:  How closely have you followed that?

THE JUROR:  I would, like, read some of the news articles on my phone on the train ride in, kind of thing, not -- I don't know, so some articles, I guess, not --

THE COURT:  Okay.  Knowing about that, does that change any of the answers you gave in these questions?

THE JUROR:  No.

THE COURT:  Let me ask you to look at Page 19,

Questions 74 and 75.  You said you were a little annoyed when you got the summons because you had just gotten a summons.

THE JUROR:  Yup.

THE COURT:  And a little nervous as well.  And then somebody asked you if you had tried to get out of it, and you replied you would just be honest.  Can you maybe tell us what you were thinking when you gave us those answers?

THE JUROR:  Sure, yeah.  The little annoyed, it's because I had just had the jury summons.

THE COURT:  What month was that, by the way?

THE JUROR:  Yikes.  April.

THE COURT:  Okay.

THE JUROR:  Plus or minus a month maybe.  Of course, then it was explained to me that it's -- federal is unrelated.  The nervous, it's just a nervous -- it's a -- it's something I'm not -- I don't do every day, right?  This is something different.

Yeah, you know, people, you know, when I -- people say would you try and get out of it or do you want to do it or you don't want to do it?  I kind of just decided, well, I'm not going to have an opinion.  I'll just answer all the questions and whatever happens, happens.

THE COURT:  All right.  Turn to the next page.  At Question 77 we asked whether, as a result of things you've read or seen in the news or maybe you learned from other sources,

whether you had formed an opinion about, first, whether the defendant was guilty or not guilty and then, secondly, if he was, what penalty might be imposed.  You checked "unsure" for each of those.  Can you just explain why you made that selection or what you intended to convey by that?

THE JUROR:  Yeah.  I think I was intending to convey that I don't know.  I mean, I don't -- I don't know.

THE COURT:  We ask jurors to -- who actually participate in a criminal trial to listen to the evidence in the trial and determine whether on that evidence the government's proved its case or not.  You understand that every criminal defendant is presumed at the outset, until the jury verdict, to be innocent and that the burden is upon the government to prove otherwise at trial.  Do you understand that that's the basic premise of our criminal justice system?

THE JUROR:  Yup.

THE COURT:  The question is never in the -- this is -- I'm referring to -- in this case, it would be what might be the first phase of a two-phase trial.  But it would come first, and it would be -- the proposition would be, charged with this crime, is he proved guilty of that crime or not?  And the government bears the burden of proving it.  They make the proposition, and they have the responsibility and the burden of proving it.  And if they don't carry the burden, the defendant's entitled to be found not guilty.  Right?

THE JUROR:  Uh-huh.

THE COURT:  The burden never shifts to the defendant to explain why he is not guilty.  The burden is with the government to prove that he is by the evidence.  Do you have any -- think you would have any difficulty faithfully applying those principles if you were a juror in this case?

THE JUROR:  No, I don't see any problem with that.

THE COURT:  You were -- turn the page to the next, Question 81.  You sheltered in place with other people.  You said --

THE JUROR:  Sure.

THE COURT:  -- it impacted you and your friends.

THE JUROR:  Yeah.  On that --

THE COURT:  Where were you living then?  Were you living in Cambridge then?

THE JUROR:  Yeah, I was living in Cambridge.  On that day actually -- I take the red line to work.  I left early for work.  The red line was closed, so I had to actually bike to work that day.  But then I had to then shelter in place at the office.  I was at the office.

THE COURT:  Was the office also in Cambridge?

THE JUROR:  Somerville.

THE COURT:  When did you get to leave?

THE JUROR:  I don't know, in the afternoon sometime.  I don't know anymore.

THE COURT: Does having done that, does that -- actually having been compelled to do that, does that leave you with any resentment or any other feelings that would interfere with your ability to be a fair judge of the evidence in this case?

THE JUROR: I don't think so, no.

THE COURT: Let's turn to the questions about the potential penalties. Beginning -- this is Page 23. Beginning at Question 88, we asked for some -- first, there's a series of questions that deal with your attitudes or beliefs about the death penalty. The first one asks, in general, what your views may be. And you said, in general, not a huge fan. Can you maybe tell us what you meant by that?

THE JUROR: Yeah. I guess it's something I think I've thought about before and certainly since filling out this questionnaire. I think I just don't -- in general, I think that's true. I'm not a huge fan of the death penalty, but I think I also know that I don't really know. It's been -- I don't really know how to think about it properly or -- I don't know. So, in general, it seems like one of those things that -- you know, maybe one of those things that you wish we would never need to do, but maybe there are times when we need to do it.

THE COURT: Okay. In the next question, we asked you to kind of indicate on a scale from 1 to 10, from strongly

opposed to strongly favor, where you might be.  You selected 4.
As you think about it, do you think that was the right choice
for you to indicate the view you had?

THE JUROR:  Yeah.

THE COURT:  That's -- okay.

THE JUROR:  Yeah.

THE COURT:  And then, if you turn to the next page,
Question 90, instead of asking you to pick a number, here we
ask you to pick a statement that you thought came close to you.
You picked (d), which was, you're not for or against the death
penalty.  You could vote to impose it, or you could vote to
impose a sentence of life imprisonment without release
whichever you thought was called for by the facts and law of
the particular case.  Is that a --

THE JUROR:  Yeah, I think that's correct.  I agree.

THE COURT:  Just to push you a little on that, what
you previously told us might be closer to (c)?

THE JUROR:  Yeah.  That's fair, yeah.  I guess what I
was getting at in this question, I think, was the point which
said whichever I believe was called for by the facts and the
law kind of, you know.  I think I could -- I don't know.

THE COURT:  That's the important part of the
statement, either one of those statements; is that what you're
saying?

THE JUROR:  I suppose that statement is in both

anyway, yeah.

THE COURT:  So, in summary, if you had the decision to make in a particular case, as I'm hearing what you say, you would have to hear the evidence, perhaps the evidence favoring the imposition of a death penalty and the evidence opposing it, and then evaluate all that and make a decision, is that -- is that what you're saying essentially?

THE JUROR:  Yeah, yeah, I think so.

THE COURT:  Okay.

MR. WEINREB:  Good afternoon.  My name is Bill Weinreb.  I'm one of the prosecutors in the case.

So I wanted to ask you if you could elaborate a bit on some of those answers.

THE JUROR:  Sure.

MR. WEINREB:  As you know, this is a case in which, if the defendant is found guilty, the death penalty will be a possibility if he's found guilty of a capital crime.  And so we're trying to get a sense of whether jurors can fulfill their duties in that respect.

So turning back to your answer to 88, you said, "In general, I'm not a huge fan of the death penalty."  Could you explain a little more why you're not a huge fan of it?

THE JUROR:  Yeah.  I guess it kind of comes down to, I think, like, it's -- I don't know.  I guess probably, if I were the one to write the laws or if that were a choice, I probably

wouldn't -- I don't know if I would make the death penalty an option perhaps.  But that being said, I recognize that, you know, I think about it, and you think that perhaps there's a situation that -- where it would be warranted.  I guess I just don't know.  It's kind of a conflicting thing.

MR. WEINREB:  Well, let me ask you to stick with the first part of that for a minute.

THE JUROR:  Sure.

MR. WEINREB:  Why wouldn't you, if you were writing the laws, not make it an option?  What would be your reason for doing that?

MS. CLARKE:  Your Honor, is this an appropriate area to question?

THE COURT:  Well, I think -- yeah.  I think the follow-up on the -- I think what we want to get at is your views of the death penalty as a matter of public policy, whether you think it's -- you would be inclined to think it's good public policy to have it available or if you think it's a good public policy that it not be available, whatever.  I think that's what the questions are trying to get at.

MR. WEINREB:  Well --

THE COURT:  As a general --

MR. WEINREB:  That actually wasn't my question.  I'm sorry.

THE COURT:  Can you answer that one?

THE JUROR:  Whether I think it's a useful public policy or --

THE COURT:  Useful, beneficial, moral or otherwise. I'm not trying to put the words in your mouth.  I want you to say it.  That's the sort of idea we're getting at.

THE JUROR:  I don't -- it's one of those things, if I think about it in the abstract or some sort of place that doesn't exist, some sort of philosophical domain, it seems like it makes sense in certain cases.  I don't really know what that means, "in certain cases" or what.  I think then you think about it in practice, and I wonder whether, in the real world where we live, you know, whether or not -- what is it -- what does it accomplish or other -- I don't know -- other problems associated with it.  I don't know.

THE COURT:  Okay.  Ask your question.

MS. CLARKE:  Well, that was what I was trying to stop.

THE COURT:  Well, I want to hear it again.

MR. WEINREB:  First of all, do you think it's immoral?

THE JUROR:  No, I don't think that.

MR. WEINREB:  So here we are in the real world, and it's not a theoretical question.  There is a death penalty, as you know.  And the question that we need to know -- or the question I would like to know the answer to from you is -- I'm not talking about this case or this defendant but just imagining yourself in a situation where you're on a jury and

the jury has convicted the defendant of a capital crime. And now you have to decide, you personally, whether to sentence this person to life or death.

THE JUROR: Uh-huh.

MR. WEINREB: And you'll have the benefit of a penalty phase of the trial where you'll hear evidence that may suggest to you that one penalty is the appropriate one or the other one is the appropriate one. But either way, it won't be a theoretical question anymore. It will be -- if you vote for death, you will be handing out a death sentence to another human being. Otherwise, you will be handing out a life sentence to somebody who may have done something that you find was very serious. Putting yourself in that situation, can you see yourself actually sentencing someone to death?

THE JUROR: Yeah, I think I could, yeah. If it -- I think what -- with the right -- I guess my role there would be to decide what's the criteria for which direction I should choose.

MR. WEINREB: Let's say that the Court gave you some guidance on that.

THE JUROR: Yup.

MR. WEINREB: And then you heard evidence one way -- you heard evidence both suggesting that this was an appropriate case for the death penalty, and you heard evidence that this was not an appropriate case for the death penalty. But in the

end, there's no formula, no checklist, for determining it. It's up to you.  You have to weigh the evidence and decide ultimately whether you believe that it's the appropriate sentence and not just as a theoretical matter, but you have to decide whether an actual human being should live or die.  Could you do it?

THE JUROR:  Yeah, I think I could.

MR. WEINREB:  Okay.  And I appreciate your trying -- your effort here.  But rather than -- it's hard to put yourself in that position.  It's hard to predict.  But I'd like to see if I could push you a little beyond "I think I could."

MS. CLARKE:  Your Honor, I think he's trying to push for a commitment.

THE COURT:  Yeah, I think so too.  I think the last answer was fine.

MR. WEINREB:  Let me ask you another thing.  Just to make it a little less hypothetical, can you imagine circumstances in your mind where the death penalty would be an appropriate sentence?

MS. CLARKE:  Your Honor, I think that's a stakeout.

THE COURT:  Yeah.  I think we have to be careful of that.  I agree.  It comes close.

MR. WEINREB:  Okay.  I'm not asking you to imagine what the particular circumstances would be, but can you imagine -- is there any case in your mind, in other words, so not just

that it's hypothetically possible, but as a real practical matter, is there any case that -- in which the death penalty would be appropriate, actually appropriate?

MS. CLARKE: I think this --

THE COURT: No. I think that one is okay. Go ahead and answer that.

THE JUROR: I guess I don't quite understand the question. You said not hypothetical, but could I imagine a scenario?

MR. WEINREB: I'm trying to avoid suggesting to you or having you suggest to us what the actual criteria would be for you imposing the death penalty but get at a slightly higher level of abstraction, which is, simply, is it a real thing that you could do -- could you really imagine a situation where you have concluded that the death penalty is appropriate, or is that something that just really exists only as a hypothetical possibility for you?

MS. CLARKE: Your Honor, he's answered.

THE COURT: No. He can answer that.

THE JUROR: Yes. I think there are -- there is a circumstance or scenario where I think it would be warranted.

MR. WEINREB: Okay. Thanks very much.

MS. CLARKE: Thank you.

THE COURT: Nothing?

MS. CLARKE: Thank you very much.

THE COURT: All right. Thank you. Just leave that there. We'll put it back together. I guess we have three left. I think we'll break, come back at 2 if that's okay.

MR. BRUCK: Sure.

(Luncheon recess taken at 1:11 p.m.)

(After the recess:)

(The Court enters the courtroom at 2:06 p.m.)

THE COURT: Ready for 158?

THE CLERK: Juror No. 158.

MR. McALEAR: Juror No. 158.

THE CLERK: Sir, over here, please. Have a seat, if you would. Make sure you speak into the mic so everyone can hear you.

THE COURT: Good afternoon.

THE JUROR: Good afternoon.

THE COURT: That's the questionnaire you filled out when you were last here. I'm going to follow up on some of the answers in there and ask a few other questions.

Since that day when you filled it out have you been able to abide by my instructions not to discuss the case with anybody and to kind of avoid any media accounts that touched on the case?

THE JUROR: Correct, right.

THE COURT: You're a graduate of Assumption College?

THE JUROR: Yes.

THE COURT:  What year did you graduate?

THE JUROR:  2011.

THE COURT:  Question 24, apparently you say you took a course on "Terrorism in Modern Society"?

THE JUROR:  Yup.

THE COURT:  Could you tell us what that content -- the course content was, generally speaking?

THE JUROR:  Yeah.  I was a political science minor and I took several political science courses, and one of them was terrorism my senior year.  And it basically went through different histories including some in Russia, some in the Middle East, as well as -- like my focus on there was -- we were taking a different organization and recounted the history and wrote several reports on different aspects of that organization.  My particular one was the NIRA, which was the northern Irish terrorist group.

THE COURT:  Okay.  So was this like a team, you have -- were you working by yourself on that project?

THE JUROR:  Yes.

THE COURT:  Each student had a separate organization?

THE JUROR:  Yes.

THE COURT:  Sometimes you work in teams.

THE JUROR:  Yeah.

THE COURT:  And what were some of the others?  After you did that and you did your report, you presented it to the

class or just to the teacher?

THE JUROR:  Just to the teacher.  It was different reports.  Like one was -- it was 2011.  I'm trying to remember everything.  But, yeah, like the resources, how they would recruit people and how they would make their money and how they would spread their message, basically was each different report.

THE COURT:  Okay.  I see.  Okay.  And was this a full semester course?

THE JUROR:  Yes.  Yes.

THE COURT:  And while you were focused on the Northern Ireland group, did you also -- you also learn about or study what I guess would be characterized as terrorist groups from other parts of the world?

THE JUROR:  Yeah, correct.

THE COURT:  Including the Middle East?

THE JUROR:  Including the Middle East.

THE COURT:  Including South Asia?

THE JUROR:  Yup.

THE COURT:  Including the Caucasus region?

THE JUROR:  Yeah.

THE COURT:  All those?

THE JUROR:  Yeah.

THE COURT:  Any others?

THE JUROR:  South America as well.

THE COURT:  South America?

THE JUROR:  And Africa, yeah.

THE COURT:  East Asia?

THE JUROR:  East Asia, yeah.  Mostly --

THE COURT:  When I said South Asia before, I was thinking of Afghanistan and the Kazakhstan area.

THE JUROR:  A lot of the more modern stuff was more Middle East; the rest of it was other parts of the country focused mainly on -- not the country but the world -- was history related, so early 20th century.

THE COURT:  Early 20th century?

THE JUROR:  Yeah.

THE COURT:  I was going to ask how far back in history did you go.  Just early 20th century?

THE JUROR:  Yeah, I guess World War I and a little bit before that as well, yeah.

THE COURT:  Okay.  That was your minor?  What was your major?

THE JUROR:  History.  History was my major.

THE COURT:  And now you're employed as a contractor?

THE JUROR:  Yeah.  It's --

THE COURT:  For the Federal Department of Transportation doing programming?

THE JUROR:  Yeah, it's a system analyst.  And it's basically what I do is I work on a safety program and that

works with different DMVs.  So it's basically I help people with the files to understand them, if they have any questions.  It deals with, like, trucks and motor carriers and seeing which ones are safe and should be on the road.

THE COURT:  Your direct employer is -- I can't read the writing.

THE JUROR:  JJJ Microsystems.

THE COURT:  JJJ?

THE JUROR:  And they're contracted by the Federal Department of Transportation.

THE COURT:  All right.  Is this a salaried position?

THE JUROR:  Yeah.

THE COURT:  And you'll be okay if you get picked for this jury --

THE JUROR:  Yeah.

THE COURT:  -- salary-wise?  Yeah, okay.

Tell us about what you do on social media.  You note, I guess here, that you are sometimes on Twitter and occasionally on Facebook.

THE JUROR:  Yeah.  Facebook:  I don't do a whole lot of Facebook.  Basically, I'm there to get invites to different events.  And then I do check Twitter every day.  I have a lot of sports things that I look at entertainment-wise, but I don't really post a lot.

THE COURT:  To the extent you do post, is it in that

subject matter, sports and stuff?

THE JUROR:  Yeah, yeah, yeah.  TV, sports.

THE COURT:  Nothing about this, I presume?

THE JUROR:  No.

THE COURT:  We asked you some questions on pages 17 and 18 about your attitude towards various topics including the War on Terror.

THE JUROR:  Yeah.

THE COURT:  Attitudes towards Islam or Muslims and so on and so forth.  Do you remember answering all those?

THE JUROR:  Yeah.

THE COURT:  Have you paid attention to the recent events in Paris, the terror attack there?

THE JUROR:  Not a whole lot, but I understand what happened in a minimal sense, yeah.

THE COURT:  Would anything about that lead you to change any of the things you said in response to the questions on 17 and 18 roughly?

THE JUROR:  Not entirely.  I mean, yeah, I did see one, like, news story that changed my mind -- not entirely -- but a little bit.  Yeah, it did affect me a little bit.

THE COURT:  In what respect?

THE JUROR:  Let's see.  Yeah, I missed -- I misspoke there.  Yeah, I agree with my answers.  I was thinking about something else.  No, but I agree with my answers there.

THE COURT:  Okay.  Most of them were sort of negative.  No content, I guess.

THE JUROR:  Yeah.

THE COURT:  One, 62, said, "Do you believe the War on Terror is overblown or exaggerated?" and you said yes.  Can you tell us a little bit about your thoughts on that matter?

THE JUROR:  Yeah, I believe in regards to the War on Terror that -- yeah, some people have unfairly targeted Muslims, and that's what I think.  When I think "overblown," I don't think a lot of people are as informed as they should be.  And that's mainly what I think:  If they were more informed, then they would have a better, more reasonable approach to that I'd say is what I mean.

THE COURT:  In Question 74 we asked what your reaction was when you received your jury summons.  You said you were surprised.  And then you said you were worried about missing work.

THE JUROR:  Yeah.

THE COURT:  But I've asked you about that and you said that's not a concern at this point?

THE JUROR:  Well, I started the job around five months ago so it's a new job.  What I was saying worried about missing work was more training aspects.  Sometimes we go on-site training which I haven't been a part of yet.  That's mainly what I mean.  I'm not worried about my responsibilities being

taken care of; I'm more worried about missing opportunities, basically.

THE COURT:  So if there was an off-site training or something like that during the period you were serving, would you be able to make it up and catch up later or not?

THE JUROR:  Yeah.  Yeah, we do trainings every year.

THE COURT:  So that's manageable?

THE JUROR:  Yeah, manageable.  Definitely.

THE COURT:  All right.

On page 20, if you look at Question 77, we asked you to let us know whether you had formed an opinion based on news media and so on, and about -- the first two parts are whether the defendant is guilty or not guilty, and then the second two parts relate to the potential penalty.  This is not entirely clear to me, what your answers are on that response.  Focus on A and B for now.

THE JUROR:  Yeah.  A, I said yes, and then B is -- it was unsure.  What I mean by saying -- I believe there's a measurement of guilt there.

THE COURT:  There is what?

THE JUROR:  I think there's guilt there, I just don't -- I'm unsure of the extent.  I'm a fact-oriented person. I like to know facts before I make my decision up.  And when I say "guilty," I think there's not 100 percent innocence there, is basically --

THE COURT: Well, if you look down to what you wrote under Question 78, you said, "I think he's not 100 percent innocent or 100 percent guilty. I want to hear the facts." Is that what you're trying to say now?

THE JUROR: Yeah, basically.

THE COURT: Well, you understand that in our criminal justice system a person is accused of a crime is -- just because of the accusal is presumed to be innocent of that unless the government proves at trial that he's guilty of what he's been charged with.

THE JUROR: Yeah, I understand that. But more what I mean is I think that, like, officers do their job and there has to be a reason why someone is brought in. I'm not saying that -- I guess I'm just -- basically what I said. I don't believe --

THE COURT: Well, I guess what I was trying to get at was if you were a juror in the case, would you be able to put aside any thoughts you might have had from prior to the beginning of the case and listen to the evidence presented in the case and make a judgment about guilt or innocence based solely on the evidence presented in the trial guided by the law, obviously --

THE JUROR: Yeah.

THE COURT: -- rather than being influenced by a pretrial, if I can call it that, pretrial opinion.

THE JUROR:  Yeah.  If I saw, like, facts and evidence supporting innocence, then, yeah, I would definitely listen to those.

THE COURT:  Well, you say "supporting innocence."  You know that the defendant does not have a burden to prove he's not guilty.

THE JUROR:  Yeah.

THE COURT:  The burden is always with the government.  So it's really a focus on whether the government's evidence has been convincing enough as to guilt, and in the absence of convincing evidence, the jury's obligation would be to find that the person is not guilty.

THE JUROR:  Again, I like making the decision based on facts.  So if -- again, I would be open to changing my mind based on the facts I saw.

THE COURT:  But you have to change your mind.  I guess that's what I'm trying to get at.

THE JUROR:  Yeah, yeah.

THE COURT:  So you start with the presumption against the defendant?

THE JUROR:  Yeah.

THE COURT:  Okay.  Let me ask you about the death penalty questions.

THE JUROR:  Okay.

THE COURT:  Let's start at page 23, Number 88.

MR. BRUCK:  Okay.

THE COURT:  I'm sorry?

MR. BRUCK:  We're content.

THE COURT:  You don't need any follow-up on these questions?

MR. BRUCK:  No.

THE COURT:  All right.  So that takes away my last question.  So thank you.

MR. McALEAR:  Thank you, sir.

(The juror is excused.)

THE COURT:  I just wanted to be sure I had the signal correct, that's all.

Hold off a minute.

(Pause.)



THE CLERK:  Are we back on, Judge?

THE COURT:  Yes.  Bring him in.

MS. CLARKE:  Your Honor, he apparently marked another one private.

THE COURT:  We'll do that with him when he's here.

Which one?  What number?

MS. CLARKE:  Number 41.

THE COURT:  All right.

(In open court:)

THE CLERK:  Juror No. 159.

MR. McALEAR:  Juror No. 159.

THE CLERK:  Sir, over here, if you would, please.
Have a seat.

THE JUROR:  Thank you.

THE CLERK:  And make sure you speak into the mic so
everyone around here can hear you.

THE JUROR:  All right.

A little too much.

THE COURT:  Powerful.

Good afternoon.

THE JUROR:  Good afternoon.

THE COURT:  That's the questionnaire you filled out
when you were last with us.  Since that time have you been able
to abide by my instructions to avoid discussion of the case
with anyone?

THE JUROR:  I think I misinterpreted -- some of the
substance itself of the case, no; some of the logistics I have
looked into -- or people have talked to me about jury selection
somewhat, but not knowing specifics, just told me --

THE COURT:  Like what?  People who have been through

the process?

THE JUROR:  No, no, no, people just heard the news and said, "Well, I heard that they were going to pick 100" and this and that type of thing.  That kind of information has not been in my mind -- at the time was not something that I should not be discussing.  I was thinking more of the details of the particular case.

THE COURT:  What we're mostly concerned about is the substance of the case.

THE JUROR:  Right.  The substance of the case, no.  I have avoided conversations, I have walked away from discussions.

THE COURT:  Have people tried to discuss it with you?

THE JUROR:  Somewhat.  They know I'm a potential.  It's just natural in the marketplace, I mean, to -- for people to be interested -- and not to learn from me as much as share their opinions, possibly.

THE COURT:  To try to maybe influence you?

THE JUROR:  I wouldn't think as much influence.  The people that I'm thinking of is it's just a conversation point of interest.

THE COURT:  All right.  How about avoiding any extended exposure to media coverage of the --

THE JUROR:  No media coverage.

There is one other aspect of the -- well, it's not an

aspect of the case, but in terms of my questionnaire.  I have done -- in my questionnaire -- well, I have done more soul-searching, I guess, on the death penalty.

THE COURT:  We'll come to that.

THE JUROR:  Okay.  Thank you.

THE COURT:  We'll come to that.  That's one of the things we're going to follow up on.

THE JUROR:  All right.

THE COURT:  Tell us what you do.  You work for Gloworks, it's called?

THE JUROR:  Gloworks.  It's a lighting showroom -- electric lighting showroom, a very small business.  And I'm one of -- besides the owner, I think I'm one of three full-time employees.  It's a small business.

THE COURT:  Okay.  One of the questions we asked early in the questionnaire was -- after describing the schedule we're going to follow and the likely length of the trial and so on and so forth, we asked whether you thought this was going to be an exceptional hardship for you if you were called to serve, and you wrote "Do not know until confer with employer."

THE JUROR:  Correct.

THE COURT:  Have you done that?

THE JUROR:  I have.  And he was very negative to the possibility of paying me for my regular hours.  You know, it would be a financial hardship at $40 a day.  It would be a

hardship, not necessarily could not be overcome.

THE COURT:  How would it be overcome?

THE JUROR:  It would probably be overcome from summertime with money and potentially -- potentially talking to him because I was -- I was willing -- I'm willing to go in work Fridays and Saturdays, if that's acceptable to the Court.

THE COURT:  Sure.

THE JUROR:  And even --

THE COURT:  One of the reasons we set the schedule the way we did, so people would have Friday at least.

THE JUROR:  Yeah, Friday and evenings.  So I would hope he may -- I think his biggest concern is that it could harm the business itself.  I asked him this past week if he could -- if I did not need to get paid at all, would he still feel the same way and he said, "You know, we had a hard time when you were on vacation," so...

THE COURT:  So this is a showroom?

THE JUROR:  Yeah.

THE COURT:  Is this where both contractors and, say, homeowners --

THE JUROR:  Builders and homeowners.

THE COURT:  -- would come in?

So you have all the display and then people --

THE JUROR:  Correct.

THE COURT:  -- talk to somebody like yourself about

what they might want to buy and so on and so forth?

THE JUROR:  Like myself, right, about something they want to buy.  I will do the sales and I will do the purchasing as well.  So I'm pretty much -- I've been there longer than the boss, the owner has, so I pretty much do soup to nuts.

THE COURT:  The traffic of customers might be different in terms of its ebb and flow of it depending on whether you're talking about the contractors or the homeowners.  Would that be true?  Let me just say one thing:  I was thinking for homeowners, it might be evenings and Saturday that you would see --

THE JUROR:  We're open just nine to five-thirty and then Saturday nine to three.

THE COURT:  Okay.

THE JUROR:  But a good majority of my work is actually doing the ordering and troubleshooting.

THE COURT:  Back office kind of thing you mean?

THE JUROR:  Hmm?

THE COURT:  Not on the sales floor, if you can call it that?

THE JUROR:  The good majority is not on the sales floor.  I -- we have some capable salespeople that -- a couple that will -- I do have some regular customers that are very important but potentially could keep track of them.

I think the biggest concern for me is my employer.

And, you know, you had even mentioned if I was a potential juror and you felt I was important -- you had mentioned you could potentially even call, which I don't know if that's a possibility, but...

THE COURT:  Well, it sounds like you're pretty unsure about what the impact would be.  Is that it?

THE JUROR:  Yeah, I'm pretty unsure myself of what the impact would be.

THE COURT:  Okay.

MR. BRUCK:  Bear with us just a moment.

(Pause.)

MR. BRUCK:  It might make sense to go right to the concern expressed by the juror.

THE COURT:  Yeah.  So let me actually ask a few lead-up questions.  We may jump around a little bit.  We asked about whether you'd been -- had been at all involved in -- this is Question 39, if you want to look at it.  It's on page 13. Involved in any effort to reform the laws, and you say you attempted to get a pro-life question on the Mass. ballot several years ago?

THE JUROR:  Yes, I did some door-to-door -- there was a -- Massachusetts had a potential ballot question that was -- enough signatures were garnished but it was turned down by the attorney general.  This must have been back in the early '80s.  And it was a question about when life begins.

THE COURT:  Okay.  So let's talk about your attitude towards the death penalty.

THE JUROR:  Uh-huh.

THE COURT:  This is on page 23.  Beginning with Question 88 we began to ask a series of questions to try to find out in different ways what your attitudes toward the death penalty would be.  The first one was a very general one, whether you had any views about the death penalty in general, and if so, what were they.  And you wrote, "Having a hard time with this question.  Understand justice but let him who is without sin cast the first stone."

Could you interpret that for us or tell us what you were getting at?

THE JUROR:  Sure.  I've never put deep thought into the question.  I always considered -- I think another point I considered myself against the death penalty.  And the justification for my viewpoint in that was when Jesus dealt with the woman caught in adultery and they were -- they wanted to -- and Pharisees wanted to stone the woman.  And Jesus did not say that the penalty -- the crime did not fit the penalty but he told the group that wanted -- actually, they brought the woman to him as a test, and his response was not that the penalty was not right but that anyone without sin should cast the first stone.

THE COURT:  You take that to heart?

THE JUROR:  I have -- I have -- that was in my limited research and limited soul-searching on the issue.  That was the strongest statement I had to sway my viewpoints.  I have since had stronger.

THE COURT:  Tell us about that.

THE JUROR:  Well, when I -- when I got my summons and it was for January 5th and I realized that January 5th was the beginning of this trial and suspected that there was a good possibility that this was the trial I was being summoned to, I immediately questioned because of the -- what I understood it to be was, you know, what would happen if I was -- had to make the decision.  So I started do some soul-searching, some research.

And before we met for this questionnaire I had actually talked to six people that I had respected, and at the time when I walked in here had not had anyone articulate clearly enough for one side or another.  And so when I filled this out, I was quite confused on the issue.  I had three people on one side of the issue and three people on the other but none really articulated very well.

And then I ended up reading a statement by Chuck Colson, a personal statement written by Chuck Colson, which is called "Personal Statement" -- his personal statement on capital punishment, and I found an articulate reason to believe that capital punishment was a very necessary part of our

laws -- body of laws, and without it there could be no true justice, there could be no true mercy.  Actually, without the ultimate justice, there could be no true mercy.

So I came to -- and he basically summed up his viewpoint three ways -- in three statements.  Should I make those statements?

THE COURT:  If they're what you're thinking about, yes.

THE JUROR:  The first statement is that capital punishment preserves the sacredness of life and its protection; the second is that -- excuse me.  It's for the respect of life, respect of the sacredness of life.  Respect for the sacredness of life and its protection.  The second reason, the second necessity, is for preservation of law and order in society; and the third is for the point -- purpose of attainment of justice through the law.

And I have come to believe that there needs to be a civil law with the ultimate penalty for the ultimate crime, but I do not discount the possibility that mercy can be pleaded for and requested, especially for those who are closest to the situation.  I would not -- even though the -- even though the law is there, I think it would be admirable for those closest to the situation to plead for mercy but I have -- I have begun to wonder if seated on a jury, if I would be representing civil authority and would not have the right from my vantage point or

being unaffected, if I would have the right to be calling for mercy. That is something that I would continue to work through.

THE COURT: Okay.

MR. BRUCK: That clears it up for the parties. Thank you.

THE COURT: All right. Satisfied?

Thank you very much.

THE JUROR: All right.

(The juror is excused.)

THE COURT: Hold on a sec.

MS. CONRAD: There's an issue here, your Honor.

THE COURT: Yeah, okay.

All right. You can bring him in.

THE CLERK: Juror No. 161.

MR. McALEAR: Juror No. 161.

THE CLERK: Sir, over here, please. Have a seat, if you would. Make sure you speak into the mic so everyone can hear you.

THE JUROR: Sure.

THE COURT: Good afternoon.

THE JUROR: Good afternoon.

THE COURT: Since you were here when you filled out the questionnaire, have you been able to follow my instructions to avoid discussion of the case?

THE JUROR:  Yes.

THE COURT:  And to avoid as best you could any media reporting of the case?

THE JUROR:  Yes, sir.

THE COURT:  Okay.  The first thing I want to ask you about, I see from the form your wife is a lawyer?

THE JUROR:  Yes.

THE COURT:  What type of law does she practice?

THE JUROR:  It's basically general practice.  For the most part she does a lot of medical malpractice representing Southcoast Hospital groups.  And then she does a lot of other stuff.

THE COURT:  Is it mostly a civil practice as opposed to criminal law?

THE JUROR:  Correct.

THE COURT:  Does she do any criminal law?

THE JUROR:  No.

THE COURT:  Has she ever?

THE JUROR:  No.

THE COURT:  Like been in a DA's office or anything like that?

THE JUROR:  Class-action civil litigation before that, and that's it.

THE COURT:  You yourself are -- it looks like it says manager of the restaurant group?

THE JUROR:  Correct.

THE COURT:  How many restaurants?

THE JUROR:  In total under the Newport Restaurant Group we have seven, and then we've also acquired six Paparazzi restaurants as well under a separate umbrella, under the Newport Harbor Corp.

THE COURT:  And what is the role of the manager? That's you.

THE JUROR:  I'm in charge of the day-to-day operation at my location at my particular business.

THE COURT:  You have a particular restaurant location that you manage?

THE JUROR:  Correct.  Correct.

THE COURT:  Okay.  We'd asked -- we'd set out earlier in the questionnaire the schedule we're going to be following and so on, and asked whether that was going to be a problem of serious nature for somebody to serve on, and you said no.  Are you satisfied with that?

THE JUROR:  Yeah.  I mean, I would be fine.  I work ridiculous hours.  I mean, the schedule itself was not a problem.

THE COURT:  What is the -- where -- never mind.  I don't care.

Let me ask it the other way.  What are the hours of the restaurant you work at?

THE JUROR:  Well, we open for business Monday through Saturday at 11:30 a.m., and we stop serving at nine Monday through Thursday.  Friday is ten; Sunday we open early.

THE COURT:  Right.  But so Monday through Thursday, which is what our trial schedule would be, you'd be missing the lunchtime but you'd be back for dinner and afterwards.  Is that possible?

THE JUROR:  That depends.  Probably not.

THE COURT:  It's a long day.

THE JUROR:  Probably not.  I wouldn't want to drive from Boston down to Tiverton to go to work.

THE COURT:  Is that where it is, Tiverton?

THE JUROR:  Tiverton, Rhode Island.

So it would be pretty difficult.  I understand I would be here till four, so...

THE COURT:  Yeah, right.

Social media:  What do you use and how often?

THE JUROR:  Facebook every day and I have a LinkedIn account.  I check it every once in a while.  That's mostly professional, for networking and such.

THE COURT:  What do you use Facebook for?

THE JUROR:  Spying on friends, I guess you would say?  You know, I don't do much communication on there, but...

THE COURT:  So you mostly check out what other people put on there?

THE JUROR:  Basically the feed that comes up.  And that's about it, yeah.  And there's cool videos on there sometimes.

THE COURT:  You have a cousin who had two tours in Afghanistan?

THE JUROR:  That's correct.

THE COURT:  I assume that you mean the U.S. military tours?

THE JUROR:  That's correct.

THE COURT:  How close is the cousin to you?

THE JUROR:  Very.

THE COURT:  Do you see him a lot?

THE JUROR:  I don't anymore.  I mean, we both have families.  He has a family, I work a lot.  We grew up together, though.  His dad was basically a substitute dad for me so... He's since gone.

THE COURT:  Similar age?

THE JUROR:  No, he's younger.

THE COURT:  Is he finished with the military now or is he still in?

THE JUROR:  He's in the reserves, so I don't believe he's finished.  You know, he signed up for a second -- for his second tour.  I don't -- I'm not sure whether he's getting out now.

THE COURT:  You note in his first tour he saw combat?

THE JUROR:  That's correct.

THE COURT:  It's hard to be in the Afghanistan and not.

THE JUROR:  Yes.

THE COURT:  Has he talked to you about that?

THE JUROR:  Yes.

THE COURT:  Extensively?

THE JUROR:  Yes.

THE COURT:  Question 42 you said you had been a witness in a murder case in New Bedford?

THE JUROR:  Correct.

THE COURT:  When was that?

THE JUROR:  Oh, boy.  I can't remember.  It was a long time ago.  I don't remember a specific year but, yeah, I must have been 18 years old, 19 years old or so, if I remember correctly.  It was quite some time ago.

THE COURT:  How old were you?

THE JUROR:  Almost 18.

THE COURT:  The late '90s, maybe?

THE JUROR:  I would say so, yeah.  I believe I was out of -- I was definitely out of high school by then, I would say.

THE COURT:  What was your contribution to the trial? I mean, you said you were a witness.  What were you able to provide as evidence and for which side, I guess?

THE JUROR:  Well, the gentleman who murdered his wife

and child was a friend of mine and we were together the day before the incident.

THE COURT:  So you were a defense witness or a prosecution witness?

THE JUROR:  Unfortunately, the prosecution.  I mean, I was for the DA.

THE COURT:  Okay.  Has that experience left you with any feelings about the criminal justice system that might interfere with your ability to be a fair juror in this case?

THE JUROR:  I don't believe so.  I believe in the judicial system so I don't think so.

THE COURT:  Do you think it worked in that case?

THE JUROR:  Absolutely.  Absolutely.

THE COURT:  Let me just ask you to turn, if you would, to page 13.

Actually, I think we'll cut the audio for a minute here.

(Discussion at sidebar and out of the hearing of the public:)





(In open court:)

THE COURT:  Okay.  On pages 17 and 18 we ask some questions about -- you might call it current events or international events and so on, a couple of questions dealing with the War on Terror, some questions about attitudes towards Islam or Muslims and so on and so forth.  Do you remember filling all that out?

THE JUROR:  Yes.

THE COURT:  Let me have you look on page 17, 61 and 62.  We asked whether you thought the War on Terror unfairly targeted Muslims and whether you thought it was overblown and exaggerated, and there are marks for yes or no and you added "don't know."  Can you just tell us what your reason for that was?

THE JUROR:  Well, very rarely do I watch anything on the news or read the paper or -- I stay away from a lot of media, so I don't know much about the issues here.  I don't know much about War on Terror or Muslims or -- I'm, unfortunately, very uneducated in that category.

THE COURT:  Okay.  On page 20, Question 77 near the top we asked based on what you'd seen or read in the news or

maybe from any other source, whether you'd formed an opinion about various matters:  first, in A and B, whether the defendant was guilty or not guilty; and then second, in C and D, what the penalty might be.

Let me ask you about A and B first.  Well, let me ask you about all of them.  All four you checked you're unsure.

THE JUROR:  Correct.

THE COURT:  Can you tell us why you thought that was the appropriate selection?

THE JUROR:  I'm unsure because I don't know all the facts of anything really.  I know a little bit of what the media tells you, which I don't necessarily believe in the media.  I believe that I'm unsure unless I hear all the facts from both sides.

THE COURT:  So you've participated as a witness in a criminal case --

THE JUROR:  Correct.

THE COURT:  -- right?  A serious criminal case, I guess.

THE JUROR:  Right.

THE COURT:  So you understand that in any criminal case a defendant who is accused of a crime is presumed to be innocent --

THE JUROR:  Innocent.

THE COURT:  -- unless and until the government proves

that he's guilty beyond a reasonable doubt.

THE JUROR:  Correct.

THE COURT:  Right?  The burden is always with the government and the defendant never has any burden to prove that he's not guilty.  He can oppose the government's case, obviously, but in the end the question is not which side has convinced me but has the government convinced me the defendant is guilty.

Do you understand all of those principles we apply?

THE JUROR:  I do.

THE COURT:  And would you as a juror be able to faithfully apply those principles if you were a juror in this case?

THE JUROR:  I believe I would.

THE COURT:  To the extent you have any ideas about whether the defendant was guilty or not from other sources before the case commenced, would you be able to put those aside and concentrate only on the evidence or would those ideas intrude in some way as you listen to the evidence in the case?

THE JUROR:  I would like to believe that they would not intrude.  I believe that I could be objective, I guess -- or, you know -- but I don't know.  I'm not currently in that position under those stresses or circumstances.

THE COURT:  We're talking about something that is off in the future and it's under conditions we don't know exactly

what's obtaining, but this is really in part a question about you rather than about the evidence.

THE JUROR:  Right.

THE COURT:  Would you be able to focus your attention on what's in the trial and put aside other things, or, again, would you think you would find those other things filtering in and affecting and being a problem for you in trying to focus only on the --

THE JUROR:  No, I believe I could stay focused.

THE COURT:  If you'd turn to page 23, beginning with Question 88 we asked a series of questions about the death penalty.  And in 88 there was a question in general, "What do you think of the death penalty?"  And you said, "Do not know."

Do you want to perhaps expand on that or tell us what you were thinking when you wrote that?

THE JUROR:  Sure.  Let me just read through the question one more time --

THE COURT:  Yeah.  Take your time.

THE JUROR:  Thank you.

(Pause.)

THE JUROR:  Well, I've never --

THE COURT:  Let me just make sure that you understand we're trying to find out what your views are, okay?  So -- the question literally is asking for what you thought when you wrote that.  I want to let you know if you think something

different since you've written that, we should know that too, okay?  So I just want to -- if, for example, you didn't know then but now you have a better idea about what you think, then we want to know.

THE JUROR:  I think that's probably the case.  I think that, you know -- at the time I never had to think about the death penalty before.  It's never been a topic or a subject that I've ever had to consider or think about, so I don't know what my views are or were.  I think now that with some reflection -- I think that maybe that would have been -- would be an applicable punishment for something.  I don't know what that something is but there's -- I'm sure at this point there's, you know, a level of heinous crime that may deserve that.  So does that help?

THE COURT:  Okay.  So let's look at 89.  We asked you to locate on a scale where your opinion might be from 1 to 10, 1 being strongly opposed to the death penalty and 10 being strongly in favor, and you selected 6.  Would that still -- as you've now explained your further thinking on that, would that still be where you would place that assessment or would you change that?

THE JUROR:  Yeah, I was using 6 as slightly above somewhere in the middle, I guess was my thought process there.

THE COURT:  Right.

THE JUROR:  You know?

THE COURT:  And I guess my question is now that you've thought further about the issue since you filled out the questionnaire, would you still put it in 6 or would you put it someplace else?

THE JUROR:  I think I would leave it in 6, somewhere in the middle.

THE COURT:  On the next page, Question 90, here we ask you instead of putting it on a numerical scale, we asked you to try to find the statement that came closest to what you might think about it.  You circled E which is, "I'm in favor of the death penalty but I could vote for a sentence of life imprisonment without the possibility of release if I believed that sentence was called for by the facts and the law in the case."

Why don't you just -- because you've had some development in your thinking, why don't you just read through that entire question and see if that still represents the view you would -- whether that's the best choice to represent your views.

(Pause.)

THE JUROR:  Again, I believe that D would be the 5 mark for me, and I guess I'm a 6.  I'm slightly in favor of and could, if needed to, if I felt that was the right punishment for a crime.  So slightly above --

THE COURT:  So it says, as you want to put it,

slightly in favor of the death penalty?

THE JUROR:  Uh-huh.

THE COURT:  But despite being slightly in favor, you could vote for a sentence of life imprisonment instead of the death penalty if you thought that was the appropriate sentence on all the facts of the case?

THE JUROR:  Correct.

THE COURT:  And then if you'd go to 25 and 26 -- 25 at the bottom, 95, this is really two paired questions.  95:  "If you found the defendant guilty and decided the death penalty was the appropriate punishment, could you conscientiously vote for it?" and you said you're not sure.  Then if you look at 96, it was kind of a companion question.  "If you found the defendant guilty and you decided life imprisonment without the possibility of release was the appropriate punishment, could you conscientiously vote for life imprisonment without the possibility of release?" and you said you're not sure.

So in other words, you said "not sure" to both of those options.

THE JUROR:  Right.

THE COURT:  Could you maybe tell us what you were thinking?

THE JUROR:  I think the way that I feel is that it was very difficult for me to make that decision without knowing whether I'm really for or really against or somewhere in the

middle.  I've never been in that situation to know whether I could.  You know, I'm not sure if I --

THE COURT:  And that's sort of the question.  If you had the idea that -- for example, if the death penalty was appropriate for this offense and this offender and you were on the jury and it was not just a statement of opinion but it was something that would actually result in the imposition of the death penalty and your vote would be part of that process, would you be able to conscientiously vote for that?

THE JUROR:  I believe I could.

THE COURT:  And the same for the life imprisonment?

THE JUROR:  Correct.

THE COURT:  Mr. Mellin?

MR. MELLIN:  Thank you, your Honor.

Good afternoon, sir.  I'm Steve Mellin.  I'm one of the prosecutors in the case.

THE JUROR:  Good afternoon.

MR. MELLIN:  Let me start with what you just said. You said you thought you could.  Now that we're kind of drilling down to really this issue of -- you know, it's no longer really a theoretical question just kind of floating out there, there may come a point in time where you're going to be asked that question.

When you say you think you can, is there a reason why there's the hesitation that you kind of expressed?

THE JUROR:  I think the hesitation is because I haven't -- I haven't had to think about something like that ever before, you know, whether I could or would do something like that.  I'd like to say, you know, I have -- I'm a man of character and I make good decisions now -- obviously, after -- my record doesn't show I made great driving decisions, of course -- but I'd like to say that I make educated decisions and critically think about things.

And I believe at this point, you know, the "not sure" is because I hadn't critically thought about how I would answer questions.  And I think, you know, that's kind of the "I'm not sure," you know, part of me going:  I haven't thought about this.  I don't know.  I've never been in that position.  I don't have all the facts.  I don't know all the details.  I've stayed away from all information regarding any of this.

So I think that that's why -- you know, where the "I'm not sure" would come from, you know?  I think after hearing all the facts, then I would be able to critically think and make the right decision, if that makes any sense.

MR. MELLIN:  No, it does.  And we appreciate that we're asking you something that people don't typically talk about, people don't typically think about, and then we're asking you something that comes with a substantial burden which is deciding whether or not someone is going to live or die. We're just trying to get a sense if you are in that position,

would you be somebody who is able to do that and is not morally opposed to it or something along those lines?

THE JUROR:  I think that I could.

MR. MELLIN:  Okay.  On Question 93 on page 25 there's a list of boxes that talk about life imprisonment relative to the death penalty, and you checked the box that life in prison is more severe than the death penalty.  Do you see that?

THE JUROR:  I do.

MR. MELLIN:  Can you just explain to us kind of why you checked that box?

THE JUROR:  Like I wrote, I could not spend the rest of my life in prison.  I think, and maybe this is bad to say, but I'd almost rather have the former -- or latter, or however you want to say it.  I think that -- I think being locked up forever is worse, personally, for myself, anyway.

MR. MELLIN:  Right.  If the jury were to get to this stage where the jury's deciding life or death, would you be able to follow Judge O'Toole's instructions that the death penalty is the more severe --

MS. CONRAD:  Objection.

MR. BRUCK:  Objection.

MS. CLARKE:  Objection.

MR. BRUCK:  The death penalty is or is not the worse punishment.

MS. CONRAD:  That is not the law.

THE COURT:  I think it is.

MR. MELLIN:  It is the law.

THE COURT:  I think the law regards the death penalty as the more severe punishment.

MS. CONRAD:  I object to that, your Honor.  I mean, it's a personal decision to the juror.

THE COURT:  Do you know the case?

MR. MELLIN:  I don't know the case off the top of my head, your Honor, but I know that is the law.  I'm happy to provide.

THE COURT:  I'm sure I've read it.

MS. CLARKE:  You've just had three people on this side of the table objecting, so...

THE COURT:  No, I understand.

Go ahead with it.

MR. MELLIN:  Would you be able to follow the instruction and consider that the death penalty is the most severe of these two possibilities?

MS. CONRAD:  Objection.

THE COURT:  Let's put it this way:  If you were instructed that that was the law, contrary to what -- you might have your own assessment, would you be able to follow the instruction?

MS. CONRAD:  Your Honor --

THE COURT:  There's a debate as to whether it's the

law.  So on the hypothesis that it is -- that the law would have a way of ranking these as which is worse than the other, or which is more severe than the other, and you were told that and it went against your instinct, would you be able to go against your instinct and follow the law?

MS. CONRAD:  But, your Honor, excuse me.  If I may, that suggests that the law would instruct the juror as to which penalty to choose --

THE COURT:  Correct.

MS. CONRAD:  -- as opposed to it being a question of individual conscience and --

THE COURT:  I understand.  That's why I'm phrasing it as a hypothetical:  If that's the law.  We'll find out whether it's the law.  If he were to get an instruction to that effect, that's all.

MS. CONRAD:  But that would not be outcome determinative even if that were the law.

MR. MELLIN:  Your Honor, the reason why this issue has ever even been brought up is because defense attorneys in other cases claim there's penalty inversion that goes on if the jurors don't --

MR. BRUCK:  I'd object to this, your Honor.  This is not proper.

THE COURT:  You can have the hypothetical question as -- do you want to say it or I'll repeat it?

MR. MELLIN:  Your Honor can repeat it.  That's fine.

MS. CONRAD:  Note our objection.

THE COURT:  Okay.  So you could see there's a dispute about whether the law has a position on that and we'll solve it, okay?

THE JUROR:  So is the --

THE COURT:  So on the hypothesis, which is just that, that the law has a ranking and ranks death penalty as more serious than life imprisonment as a consequence for some purpose, and that was inconsistent with what your own personal assessment might be, would you be able to follow the instructions?

THE JUROR:  I could certainly follow instructions and follow the law if that's -- if that's the law.  Just because something is the law doesn't mean that you have to agree or approve, but you do have to follow it.  So if the law says that that is, then that is.

THE COURT:  That, of course, doesn't -- I think part of the concern on the other side of the table is that doesn't mean that you have to necessarily make a choice in favor of or against either of the possibilities.  This is just a question of whether you would be committed to following legal instructions.  I guess that's really what it is.

THE JUROR:  Yes, I'm committed to follow legal instruction.

THE COURT:  I don't know if that's --

MR. MELLIN:  Thank you.  That's fine, your Honor.

And then let me jump back to the case where you were a witness.  How were you treated in that case by the prosecutors?

THE JUROR:  I'm not sure how you mean.  How was I treated?

MR. MELLIN:  Yes.  Is there anything about that that you felt as if you were forced to testify?  Because there was a little bit of -- I sensed the little -- even emotion to this day when you were talking about that, and I was just wondering what's the genesis of that emotion.

THE JUROR:  I was not forced to testify.  I was asked, not forced.  I was not under duress.  There is emotion.  She was one of my friends.  And, you know, I now have a child and he killed his child.  So it does bring up emotion.  But at the time I was happy to testify, if that makes --

MR. MELLIN:  Sure.  Understood.  Was there anything about that process that you hold either against the prosecution or defense attorneys in this case?

THE JUROR:  No, sir.

MR. MELLIN:  Okay.  Thanks.

MS. CONRAD:  Good afternoon.

THE JUROR:  Good afternoon.

MS. CONRAD:  I'm Miriam Conrad.  I'm one of Mr. Tsarnaev's lawyers.

Following up on the last question, I understand this is an emotional subject for you, but am I understanding correctly that it's not your experience of testifying but the underlying facts of the case about which you were testifying that is emotional for you?

THE JUROR:  Correct.

MS. CONRAD:  And how old was the child?

THE JUROR:  Just a couple of months old.

MS. CONRAD:  And how long ago was this?

THE JUROR:  Oh, my God.  18 years ago, if I remember correctly.

MS. CONRAD:  And you mentioned that you have a child now?

THE JUROR:  I do.

MS. CONRAD:  And you know that in this case one of the things that's at issue is the death of a child.  How would your experience in that case, your experience being a father, affect you in listening to testimony and seeing evidence about the death of a child?

THE JUROR:  Well, I was not aware that there was a child involved, first off.  I'm, again, not familiar with all of the facts of the case.  I saw very limited coverage.  And in my house that stuff does not go on TV.  I have a three-year-old at home, so we don't watch things like that.  So I was not aware that there was a child involved.

Would it affect me to see details about that?  Of course.  I think it would affect anyone to see details of that.

MS. CONRAD:  Would that affect your ability to be impartial in evaluating the evidence or would you think your emotions, which of course are understandable, would make that difficult for you, especially if you were to see graphic images of an injured or dead child?

THE JUROR:  I think the whole process would be difficult but I don't think it would inhibit my ability.

MS. CONRAD:  Do you think in a case where one of the deaths that occurred was the death of a child you would be able to consider a sentence of life without parole or life without possible release.

MR. MELLIN:  Objection.

MR. WEINREB:  Objection.

THE COURT:  Yeah, I think -- yes.  It's too isolating.

MS. CONRAD:  Okay.  I'll go to something else and then I'll think of a different way to ask something similar but not exactly like that.

You said that your cousin, I think it was, who you're close with, was in combat and spoke with you about that?

THE JUROR:  Yup.

MS. CONRAD:  And that was in Afghanistan, I think you said?

THE JUROR:  Correct.

MS. CONRAD:  And how -- can you tell us a little bit about how he was affected by that experience?  I'm assuming it's a he.

THE JUROR:  It is a he.  You want to know about the incident that happened while he was there?

MS. CONRAD:  I didn't know there was an incident but --

THE JUROR:  Well, that's what he told us about, our family.  He came home injured.  An IED hit his Hummer and blew up in the front seat and flipped it over.  He came home with shrapnel in his face and in his arm, and was attacked.  So he saw actual combat and injury and was sent home.

MS. CONRAD:  Does he still have physical injuries to this day?

THE JUROR:  No.

MS. CONRAD:  What about emotional?

THE JUROR:  I don't believe so.  Again, we're not as close now as we used to be.  Again, we lived side by side for most of our life, but since he has a family and I have a family, we're not as close.  So I honestly couldn't tell you if he has emotional or --

THE COURT:  Could I just interject, when was the incident in Afghanistan, do you know?  What year?

THE JUROR:  Oh, boy.  I'm terrible with time frames and days but I would have to say it was five, six -- five or

six years ago.  He just came home now from his second tour.  He just came home last month, so I would have to say it was five years ago?

THE COURT:  Okay.  All right.  Go ahead.

MS. CONRAD:  And I'm not sure if you're aware of this, but you may -- the jury in the case may hear evidence that a motive for the bombing was -- had to do with American involvement, military involvement, in Afghanistan and Iraq.  Do you think that your cousin's experience and your relationship with your cousin would affect your ability to listen to that evidence or would you have an emotional reaction to that?

THE JUROR:  I don't believe I would have a problem listening to those facts or have an emotional reaction.

MS. CONRAD:  Turning to Question 77 on page 20, and the judge asked you some questions about this --

THE JUROR:  I'm sorry.  What page did you say?

MS. CONRAD:  Page 20.

THE JUROR:  Okay.

MS. CONRAD:  When Judge O'Toole asked you about this, you said, well, you'd have to hear all the facts.  So the question -- or at least my question here is:  As you sit here today, do you have an opinion about whether Mr. Tsarnaev is guilty or not?

THE JUROR:  Yes, I guess I do have an opinion.

MS. CONRAD:  And what is that opinion?

THE JUROR:  My opinion is that he's innocent until proven guilty.

MS. CONRAD:  My question is not what the legal requirement is but based on what you've heard about this case through the news media or from talking to other people, whether you have an idea in your mind -- not a legal decision, but an idea in your mind -- about whether he's guilty or innocent?

MR. MELLIN:  Objection, your Honor.  Asked and answered.

THE COURT:  Go ahead.  You could answer.

THE JUROR:  Okay.

I'm not exactly sure how to answer it.  I believe that he had involvement and was involved in what happened.  I do not know to what extent.  So I guess if the involvement itself is -- means that he's guilty, I guess that would be a yes.  I don't know to what extent his involvement is.

MS. CONRAD:  If the government presented evidence that showed his guilt but was not enough to show his guilt beyond a reasonable doubt of some or even all of the charges against him, would you be able to return a verdict of not guilty?

THE JUROR:  Yes.  If they could not prove beyond a reasonable doubt that he was guilty?

MS. CONRAD:  Right.

THE JUROR:  Then yes.

MS. CONRAD:  And would you be concerned about how

others would react to that?

THE JUROR:  No.

MS. CONRAD:  Do you have an opinion as you sit here about whether he should receive the death penalty if he is found guilty?

THE JUROR:  No, I do not have an opinion on that.

MS. CONRAD:  You said in response to -- I think this is on page 19 -- that someone said to you that it would be awesome if you were picked for this case?

THE JUROR:  Uh-huh.

MS. CONRAD:  And how did you respond to that?

THE JUROR:  I think the response was, "Awesome for who," you know?  I stayed away from talking about or questions. I basically deflected, you know, the questions or any comments, so...

MS. CONRAD:  On 74 you said you didn't know that the summons was for this case?

THE JUROR:  Correct.

MS. CONRAD:  How did you feel when you realized it was?

THE JUROR:  I was definitely in shock.  I was surprised, you know, that that was the case.  I mean, I've had jury duty for very small things, and just what are the chances, was my feeling.  What are the chances that I was picked for this?  This is a major thing.  That's how I felt.  I was

surprised that I was part of that pool, I guess, so far away from where I live.  You know, that would be my answer.

MS. CONRAD:  Were you hoping you would get picked?

THE JUROR:  You know, I have to be honest.  In the beginning, no.  I was hoping that I would not be picked.

MS. CONRAD:  What about now?

THE JUROR:  Now I kind of am.  When I was in the first room and everybody was saying how they were going to do everything they could not to get picked, and I was kind of ashamed of most people at that point and ashamed of myself for feeling the same way.  And I said, Do you know what?  Somebody has to sit and do this.  Somebody has to be a part of this.  And so now I definitely have changed my mind as to whether I would want to be a part of this.

MS. CONRAD:  And why would you want to be a part of this?

MR. WEINREB:  Objection.  I think we're taking this --

THE COURT:  Yeah, I think so.  I think we'll just leave it at that.

MS. CONRAD:  Can I turn for a minute to your job.  You said you would not be able to go there on the Monday through Thursday days, and you only may have some Friday days as well.  So would you still get paid?

THE JUROR:  I don't know.  That's a major fear for my family, actually, what would we do.  You know, those are the

only conversations that I've had with my wife, you know, is what kind of financial burden would that be if my company didn't pay us -- didn't pay me, you know.

MS. CONRAD:  And what is your answer to my question?

THE JUROR:  That is certainly a concern.  That is a concern.

MS. CONRAD:  And would that be something that would make it be a distraction to you?

THE JUROR:  I would say at a point if my -- if my family was suffering in any way, you know, couldn't pay the mortgage or -- you know, I have a child at home, I'm sure it would affect me.

MS. CONRAD:  And do you have personal childcare responsibilities?

THE JUROR:  I have my son on Thursdays, if that's what you mean.  My son lives with me.  I take care of him every morning.  I drop him off at daycare every day because I start later than my wife, I bring him to my mom's house, my mother-in-laws's house.

MS. CONRAD:  I didn't mean to get into those details, I was just wondering whether you being here, especially so far away from home, would be -- would create any difficulties in terms of childcare since your child is so young.

MR. WEINREB:  Objection, your Honor.  I think we can take him at his word about whether it would be a hardship or

not.

THE COURT:  Yeah.  Yeah.  Yeah.

MS. CONRAD:  You said that -- it sounds like you've given a lot of thought to -- well, at least more thought, I should say, to the death penalty questions since you were last here, and I think you said something like -- please correct me if I've got this wrong -- but that you could see it being appropriate for a heinous crime.  Is that more or less what you said?

THE JUROR:  Correct.  That's what I said, yeah.

MS. CONRAD:  And if the crime were heinous, would that be the end of it for you?

MR. WEINREB:  Objection.

MR. MELLIN:  Objection.

THE COURT:  Yeah, sustained.

MS. CONRAD:  There was some discussion about instructions and whether the death penalty is more severe or less severe than life and so forth.  And first of all, I just want to make clear that the instructions that you'll get in this case will not tell you --

MR. WEINREB:  Objection, your Honor.  That's not a question.  That's to pre-instruct.

MS. CONRAD:  You know, Mr. Weinreb went on at some length to --

THE COURT:  Go ahead.

MS. CONRAD:  Thank you.  I'm just trying to clear up a misunderstanding.

THE COURT:  Yup.

MS. CONRAD:  Thank you.

You -- it's not like there's a checklist, it's really -- it would be your own personal decision.  And would you be able to consider things about the defendant's personal background such as, you know, if he had a difficult childhood or his age or other personal factors in addition to what you thought of the crime in deciding whether or not for you personally the death penalty was an appropriate sentence to vote for?

THE JUROR:  I'm not sure exactly what you mean.  In making that decision would I consider...

MS. CONRAD:  Things about the defendant or just --

THE COURT:  Well, I think it should properly be phrased consistent with my earlier instructions that if he heard -- if there was evidence about those things, that would come into the rubric of what I described as mitigating factors. Remember I told you that in a penalty phase after a person has been convicted of an intentional murder both sides get to present additional evidence that bear on the appropriateness of the punishment options, and the government would presumably present evidence that if they're arguing for the death penalty, to try to show this was the kind of aggravated offense that

should qualify for the death penalty; on the other hand, the defense would be likely to present evidence of things that might mitigate against the death penalty and argue instead for life imprisonment.

So I think it has to be put in the context of -- some examples that Ms. Conrad gave, age, background, so on and so forth, could be conceivably mitigating factors which would be part of the mix that you would consider.

MS. CONRAD:  But my question is:  Would you only focus on the nature of the crime or would you be -- would you consider things about the defendant?

THE JUROR:  I believe before I made that decision I would consider everything.  I would consider every -- every detail of the case to make my decision.

MS. CONRAD:  Okay.  Just to be totally clear --

THE JUROR:  Yes.

MS. CONRAD:  -- when you say "detail of the case" --

THE COURT:  Well, you know --

MR. WEINREB:  Objection.

THE COURT:  -- let me interject here.

As a practical matter, the jurors will have a verdict form which will present for their consideration aggravating factors and mitigating factors.  It's almost necessary in completing the form that mitigating factors would be considered to some degree.  So the question kind of asks -- outside that

framework may be misleading.  I mean, the juror doesn't know how factors are going to be presented for consideration.  I think it's a little unfair to try to get an uneducated answer to it.

MS. CONRAD:  Well, what my question, then, is:  If you and the rest of the jury had found the defendant guilty of a crime that you considered to be heinous, would you automatically --

MR. MELLIN:  Objection again, your Honor.

THE COURT:  Yeah.  I think we'll leave it where it is.  I think -- I understand your point, but I don't think it's getting at it the right way.

MS. CONRAD:  Thank you very much.

THE JUROR:  You're welcome.  Thank you.

THE COURT:  All right.  Thank you, sir.  Just leave the questionnaire there.

THE JUROR:  Thank you.

(The juror is excused.)

THE COURT:  So we'll break for now and resume in sidebar mode.  How long do you think?

MR. WEINREB:  I think four o'clock would be fine.

THE COURT:  Four o'clock?  Agreed?  All right.  We'll see you at four o'clock.

MR. WEINREB:  We could meet at quarter to four.

THE COURT:  Quarter to four?

MR. WEINREB:  Or even ten minutes, frankly.

THE COURT:  Why don't we say quarter to four.

(The Court exits the courtroom and there is a recess in the proceedings at 3:26 p.m.)

(The Court entered the room at 4:05 p.m.)

THE COURT:  I apologize for being delayed.  I got caught on a phone call.

Okay.  So let's run through the people we saw today and entertain any cause objections.  Number 138.

MR. WEINREB:  No motion.

MS. CLARKE:  No.

THE COURT:  Number 139.

MR. WEINREB:  No motion.

MS. CLARKE:  No.

THE COURT:  Number 143.

MR. WEINREB:  So we have a motion on him, your Honor.  ███████████, is, again, somebody who seems like the quintessential example of somebody who, if not prevented, then is certainly substantially impaired about his opposition to the death penalty.

He is, again, somebody who indicated quite clearly he did not want to appear to be an absolutist but, as a practical matter, could not imagine a real-world situation where he would impose the death penalty.  And I think that really his views were very neatly encapsulated by his answers to Miss Clarke's

last two questions to him.  She asked two nonleading questions that were, nevertheless, fashioned in such a way as to elicit from him an affirmative answer to the question whether he could actually impose the death penalty if -- in a real-world situation.  And the best he could muster at the end was "perhaps."  And that's not a qualified juror under *Witherspoon* and *Witt*.

MR. BRUCK:  No argument.

THE COURT:  No argument on 143?

MR. BRUCK:  No.

THE COURT:  Okay.  He will be excused.

145.

MR. BRUCK:  No motion.

THE COURT:  No motion.

152.

MS. CONRAD:  Your Honor, we found some material online.  I think I had Mr. Lyness give you one document.  There's also Twitter feed by his sister and a posting by him online.  And we would move to strike him for cause.

MR. WEINREB:  Your Honor, as a general matter, we don't believe that flyspecking Facebook for any little thing that might seem inconsistent with what a juror said on a questionnaire is a basis for striking them, especially when it's been done after the fact when it could have been before the fact, to ask him about it and clear it up.  Since it wasn't

in this case done before the fact to ask him about it to clear it up, we're not going to oppose this --

THE COURT:  All right.  If there's no opposition, we'll strike him.

So that gets us to No. 156.

MR. WEINREB:  So, your Honor, the government has a motion on ████████.  We acknowledge he's not a clear-cut case like ████████████████.  Nevertheless, I think this is a quintessential case that somebody, with the Court's ability to observe his demeanor, his manner in answering the questions, is crucial in the realization that he is substantially impaired in his ability to impose the death penalty.

He gave many, many nonverbal cues through his hesitancy, his seeming uncomfortableness, his -- his almost visceral dislike of having to even think about the death penalty, let alone having to focus on the possibility of him imposing it.  That betrayed, I think, so much of a reluctance to do it that he is fairly considered substantially impaired.

He said, about the death penalty, I wish there wasn't one.  What does it even accomplish?  And when asked whether he could actually impose it, he said perhaps there's a situation but said it in such a way that suggested that it was really more of a theoretical proposition for him too.  When asked pointblank, could you impose it?, he said, "Yeah, I think I could."

But I think that that -- merely uttering those words should not, in general, and certainly not in this case, be enough to cross the line to establishing that as somebody who can genuinely perform the duties of a juror in a capital case. You have to be somebody who actually could give it meaningfully consideration and impose it in a case where the facts and circumstances show it as being appropriate. And this individual just gave every situation that he's either not that kind of person or is so uncertain whether he's that kind of person that he's not a qualified juror.

MR. BRUCK: Does the Court need to hear argument on this?

THE COURT: I don't think so. I'm not persuaded. I read him the other way, frankly, and I think -- I think we're going to see a number of people like this -- we saw perhaps more than one today -- who have never really thought about this question and now are confronted with it. It's difficult for them to formulate a coherent philosophy about it on the spot, as it were. And I think there's some awkwardness with it.

I don't think he is -- I don't think I could find, on the basis of not only his answers but my observations of him -- he has perhaps some distinctive personality characteristics. I'm not sure that I would read what you read into them. So I think I would not excuse him for cause.

Mr. 158.

MR. BRUCK:  I think he was excused.  We discontinued questioning him.

THE COURT:  That was the one we discontinued.

I think we may have discontinued 159 as well.

MR. BRUCK:  We did.

THE COURT:  That brings us to the last gentleman.

MS. CONRAD:  Last one is 161, I believe, your Honor.

THE COURT:  161.

MS. CONRAD:  We would challenge him.  Two bases, your Honor:  one cause and one hardship.  He works at a restaurant in Little Tiverton.  He lives two hours away.  He said he didn't know that he would get paid.  He's the manager of the restaurant.  He said he would not be able to get there after completing service during the day.  He would be able to get there, I guess, on Fridays, on those Fridays that we don't sit. I think he said Saturdays the restaurant was only open 11 to 3.

He said that he had concerns about the impact on his ability to pay the mortgage.  He also has a young child under the age -- I think under the age of three or under the age of five, for whom he has some childcare responsibilities, although he acknowledged that he could deal with that.

I think that, looking at the totality, the financial impact on him would be quite great and would be certainly difficult.  And I would hate to get a month or two into trial and lose somebody because they simply couldn't pay their rent

or their mortgage.  I don't have good notes on exactly what he said.  I don't know if Mr. Bruck or Miss Clarke can help me out on exactly what he said about that, but my overall sense was that it certainly was a financial difficulty for him.

THE COURT:  And the other ground?

MS. CONRAD:  The other ground, your Honor, is sort of a totality as well.  First of all, he has a cousin who was injured by an IED in Afghanistan but not just a cousin but someone about whom he seemed to feel like a brother.  He said his father was sort of a substitute father for me.  That person was injured.  Of course, there are going to be photographs and videos of bombings, of people injured by bombings.  I believe there's a doctor who's going to testify about the impact of an IED, the physical impact of those injuries.

And ▮▮▮▮▮ was at times a pretty emotional person.  And it seems to me -- I was just looking to see, and I couldn't find it offhand -- the question about seeing graphic injuries.

THE COURT:  Question 87.

MS. CONRAD:  Thank you.  I didn't remember that.  Do you have this whole thing memorized?

THE COURT:  I've read this so many times.

MS. CONRAD:  I don't have the numbers memorized.  He said none -- I'm sorry.  I'm looking at the wrong question.  He says "no."  It just says, "Severe injuries."  But the IED aspect, I think, is significant.  Coupled with that, your

Honor, is the fact that he got emotional talking about the murder case in which he was a witness. And he said it was the fact that a child was killed, his friend killed his child. And now that I have a child, you know, and then he sort of choked up a little bit.

It seems to me -- he said he didn't know that there was a death of a child in this case, which surprised me. I think it probably surprised all of us. Now, it's possible, I suppose, that he just doesn't know much about it, but I think that's unlikely. But especially if you turn to Question -- I think it is 82 -- where there's a summary of the events. It specifically lists Martin Richard (8) as his age. And I can't recall. I was about to look to see whether the Court's preliminary instructions, before the questionnaires were filled out, referred to the fact that a child was killed. But either he's just remarkably uninformed or that response was not a hundred percent truthful.

I think his credibility is also called into question





And I would submit that the combination of all of those factors, his emotional response and the financial hardship, and the suggestion of some -- something falling short of the candor that your Honor has urged upon these prospective jurors warrants him being excused.

MR. BRUCK:  If I could very briefly add one thing to the grounds that were just stated, on the issue of the IED, his cousin being wounded by an IED, the Court has before it a motion in limine challenging the testimony of the Mass. General trauma surgeon, Doctor David King, who the government proposes to explicitly describe for the jury his own experience of treating soldiers in Iraq and Afghanistan who are the victims of IED explosions and making the direct link between those injuries and the injuries that he saw on the afternoon of April

15, 2013.

So the connection -- now, of course, your Honor is in a much better position to know than we the fate of our motion in limine.

THE COURT:  Not yet he isn't.

MR. BRUCK:  Pardon?

THE COURT:  I said, "Not yet, he isn't."

MR. BRUCK:  Fair enough.  So long as there is even a possibility that the government will be allowed to do that, this is a very -- this is a very tight connection between this juror's cousin's injury and the trial.

MR. WEINREB:  Your Honor, we oppose the motion.  With respect to the question of hardship, this was not a juror who seemed to have any issue stating his mind on any topic.  He was asked specifically in the beginning about whether this would be an undue hardship for him, and then Miss Conrad pursued the matter at some length.

He said that he was someone who initially was reluctant to serve and was among people who were discussing ways to get out of it but then that he decided he was someone who did not want to.  So, obviously, it's not something that he feels -- he's too shy or too reluctant to even consider the possibility of asking to be excused.  He thought about it.  He thought it over.  He said he talked it over with his wife.  His wife is a lawyer.  They're a dual-income family.  He -- not

working nights or certainly not working on Fridays and Saturdays, he said he might be able to retain some income there. He's a manager. He could easily have said that, as the manager, I'm indispensable. They can't do without me. But he didn't go there.

He's just given every indication that a person can give that a jury service is a sacrifice for everybody, for some people more than others. But he gave every indication a person could give that he understood what the sacrifices would be, and he was prepared to make it, and it wouldn't be an undue sacrifice for him.

With respect to the IED issue, he said that it was his cousin who had been injured but that the cousin had suffered no lasting injury physically. And whether he was asked whether he had any lasting injury emotionally, he wasn't even sure about that.

Those types of questions, whether you have experienced anything in your life that you may be hearing evidence about in the case, a "yes" answer to those kinds of questions is never automatically disqualifying. The question is always whether the fact of the coincidental -- the coincidence of fact would prevent you from being fair and impartial. And he was asked that. He was asked whether it would creep in, whether it would interfere. He was asked in several different ways. Each time he gave it some thought, and he said confidently that it would

not.

He also, in response to Question No. 87, which warns jurors that they will be seeing graphic injuries -- graphic photos of injuries and other things, said that it wouldn't disturb him, indicating that he's not somebody who is easily upset or made emotional by reminders of what may have happened to his cousin.

The fact that he served on a murder case 18 years ago --

MS. CONRAD:  Not served on.

MR. WEINREB:  I'm sorry, was a witness in a murder case 18 years ago, and when he thinks about it today, he still feels some emotion about it, I would argue, is a mark in his favor.  We don't expect jurors to be emotionless.  The kind of emotion that a juror needs to show during voir dire to warrant excusing them is the kind of emotion that overtakes them, overwhelms themselves, and suggests that, if something triggered that same emotion during the trial, they wouldn't be able to give attention to the evidence or decide the case on the evidence.  He gave no indication whatsoever of that.  The fact that he got emotional over the murder of a child just means that he's a normal person.  Anybody would.



The idea that -- the fact that he said he wasn't aware that a child was killed, Miss Conrad seems to suggest that the lack of exposure to pretrial publicity somehow means that there's something implausible about him as a juror, and that can't be. He's someone who said he doesn't read the news. He doesn't like to look at it. He's got a three-year-old at home. He doesn't turn that kind of thing on at home. That was certainly sufficient explanation for that answer.

I would just say, in general, with respect to that juror, it's perfectly understandable why the defense would like to strike him. But the truth is that he is somebody who has a lot to recommend him as a juror. He's somebody who candidly admitted that when he was younger, he made some bad decisions.

But he obviously now has a very responsible position in his job. He's married. He has a young child. He obviously cares a lot about that child. He cares about what he's exposed to at

home.  He's an admirable guy.  And he seemed to think hard about the questions the Court asked and struggled to give honest, candid answers.  He's someone we should welcome onto the jury.

MS. CONRAD:  May I just respond?

THE COURT:  No.  I'm going to grant the strike.

MS. CONRAD:  Thank you.

THE COURT:  Not for the hardship reasons.  I think we assess those principally on the temperature of the juror, and he didn't seem -- but the thing that troubles me is the IED connection.  Whether he thinks it's a problem now, I think it is very likely to become one.  I guess as an add-on to that, even the fact of two tours of duty in Afghanistan by a very close relation, when, I expect -- I don't know what all the evidence is going to be in this case, but I expect there may be some computer evidence speaking to the U.S. venture in Afghanistan and play some role in the government's strategy here.

So I just think it's too -- it's the kind of thing that he may not be reliably assessing himself now, but it is predictably a problem, I think, in the case.  So I think that's my principal reason for thinking this is not the case for him.  I don't think I have to address the other issues with respect to him.

So we have looked at Monday and have identified five

that I think are fairly un- -- I was going to say undisputed but they're not -- undisputable.  Fairly clear cases of what we've been doing on hardship.  So let me just give you the numbers, and you can look at them:  163, 165, 166, 170, and 178.  Operating from memory -- I don't have the forms in front of me -- I believe the first three, the 160 series, are all wage earners.

MR. WEINREB:  We've already agreed on all five of them.

THE COURT:  You have, fine.  We're going to fill in then with the first five from what would have been Tuesday.  In other words, this is our plan, to bring forward the people --

MR. WEINREB:  So, your Honor --

THE COURT:  You can look at the Tuesday the next five people -- I can tell you the numbers, actually.

MR. WEINREB:  Before we on to Tuesday, so we actually have --

THE COURT:  You have more?

MR. WEINREB:  Three that the parties agree.

THE COURT:  Okay.

MR. WEINREB:  That would be -- Judy, correct me if I get anything wrong.

MS. CLARKE:  167.

THE COURT: Okay. Then in that case, I'll look at that, and presumably they will be excused. I don't have a problem with that. So we'll add the next eight.

When I say -- I don't know what -- I haven't really looked at Tuesday yet. When I say the next eight, I mean the next eight net. So that if, as we go through Tuesday, there are some clear wage earners or there's somebody else who's a full-time student or one of the criteria we've been applying, we'll take that out. If you're scoping it out by looking at who they will likely be, we can tell you that.

MR. WEINREB: So the Court doesn't have through Tuesday?

THE COURT: I have some upstairs. I don't have them here. That's the point. I've looked at the Monday people, which resulted in this. I have not yet looked at the Tuesday people, so I can't say the first eight is clear sailing. It might go 1, 2, 3, 6, 7, and -- you know.

MR. WEINREB: Are we going to try to --

THE COURT: I'll try to get you that soon.

MR. WEINREB: Did we --

THE COURT: Probably by 5:00. I'll go up and I'll look through it now. Again, I'm looking at not arguable ones but, I think, ones that everybody will agree on.

MR. WEINREB: Can I ask Mr. McAlear, with respect to -- since it will be after 5:00 -- he had told us earlier that

he needed the information by 5.  Since it's a Friday, I don't know if that still applies.

THE JURY CLERK:  I can push it a little.  I can't go close to 6, but I could probably go to, like, 5:40.  I know you'll take me for every second I give you.

THE COURT:  Because you might add to it?

MR. WEINREB:  No.  If the Court gives us a proposed list for Tuesday but -- by 5:00 today, then we'd need to review it and get back to Mr. McAlear.

MS. CLARKE:  I don't think that's what you're saying.

THE COURT:  I'm not talking about a -- only indirectly.  I'm talking about finding eight from Tuesday who are free of being discharged on our criteria.  It may be that is 1 through 8.  It may be it's 1 through 12 with four exceptions or whatever.

MS. CLARKE:  Are we supposed to look at those additional ones that the Court is going to tell us by 5:00?

THE COURT:  I guess it will be ideal.  That's right. Say it has to be 1 through 12, because I've selected four of those for the automatic kind of thing, that's what I want to tell you by --

MS. CLARKE:  We should look at --

MR. WEINREB:  If you tell us by 5 --

THE COURT:  That won't tell you the rest of Tuesday. I'm just looking for the people who would fill in the eight

slots on Monday.  That's all.

MR. WEINREB:  In order for Mr. McAlear to know, he needs us to get back to him once we --

THE COURT:  Correct.

MR. WEINREB:  He had told us that he needed that information by 5.

THE COURT:  So we'll do it as quickly as possible, and maybe we'll do it by quarter of 5.

THE JURY CLERK:  I have the numbers if you want.

THE COURT:  No.  I have to look at the forms.

MR. BRUCK:  Given the rate we've been going, 20 may be a little ambitious in any event.  If it turned out we had 16 or 18, I think it will be fine.

THE COURT:  I'm hoping we can get more expeditious.

MS. CONRAD:  Judge, I had an issue with a juror we saw this week.  But given the press of time on these things, perhaps it will be better if I hold it until --

THE COURT:  Some day.

MS. CONRAD:  -- next week.  I'm sorry?

THE COURT:  I said "some day."



MR. MELLIN:  Your Honor, on the penalty inversion issue, if I can cite the Court to *United States vs. Ronell Wilson*, 493 F Supp 2d, 415, it's a case out of the Eastern District of New York in 2006.  In that case, one of the jurors indicated to the Court that he believed life imprisonment was more severe than the death penalty.  The Court indicates that the Court at that time told the juror that the law deemed death to be the harsher penalty and then went on to ask the question of the juror:  "Will you follow the Court's instructions that the penalty of death is a greater penalty and the penalty of life in prison is not as extreme a penalty?"  So that is the case.

THE COURT:  That may be the case I read.  I don't know.  That sounds awfully familiar.  That's not precedential.

MR. MELLIN:  It's not precedential, but what it is, your Honor, though, is that it's an indication that that is the law.  In fact, I would direct the Court then to *Woodson*, which is a Supreme Court case.  *Woodson* talks about how, when you're talking about a capital case, there is going to be greater focus on the sentencing because it is a capital case, and that there is nothing that can compare to the death penalty as opposed to life imprisonment.

THE COURT:  Right.  We'll look into it.  I'll just leave it at that for now.  We'll try to get you some numbers soon.

(Whereupon, at 4:35 p.m. the trial recessed.)

C E R T I F I C A T E


        We, Marcia G. Patrisso, RMR, CRR, and Cheryl

Dahlstrom, RMR, CRR, Official Reporters of the United States

District Court, do hereby certify that the foregoing transcript

constitutes, to the best of our skill and ability, a true and

accurate transcription of our stenotype notes taken in the

matter of Criminal Action No. 13-10200-GAO, United States of

America v. Dzhokhar A. Tsarnaev.


/s/ Marcia G. Patrisso
MARCIA G. PATRISSO, RMR, CRR
Official Court Reporter


/s/ Cheryl Dahlstrom
CHERYL DAHLSTROM, RMR, CRR
Official Court Reporter


Date:  January 23, 2015