UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                                    )
UNITED STATES OF AMERICA,           )
                                    )
        Plaintiff,                  )
                                    )    Criminal Action
v.                                  )    No. 13-10200-GAO
                                    )
DZHOKHAR A. TSARNAEV, also          )
known as Jahar Tsarni,              )
                                    )
        Defendant.                  )
                                    )
```

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

**JURY TRIAL - DAY TEN**

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Monday, January 26, 2015
9:31 a.m.

Marcia G. Patrisso, RMR, CRR
Official Court Reporter
Loretta Hennessey, RDR, CRR
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

APPEARANCES:

    OFFICE OF THE UNITED STATES ATTORNEY
    By: Aloke Chakravarty and Nadine Pellegrini,
       Assistant U.S. Attorneys
    John Joseph Moakley Federal Courthouse
    Suite 9200
    Boston, Massachusetts  02210
    - and -
    UNITED STATES DEPARTMENT OF JUSTICE
    By: Steven D. Mellin, Assistant U.S. Attorney
    Capital Case Section
    1331 F Street, N.W.
    Washington, D.C.  20530
    On Behalf of the Government

    FEDERAL PUBLIC DEFENDER OFFICE
    By: Miriam Conrad, Federal Public Defender
    51 Sleeper Street
    Fifth Floor
    Boston, Massachusetts  02210
    - and -
    CLARKE & RICE, APC
    By: Judy Clarke, Esq.
    1010 Second Avenue
    Suite 1800
    San Diego, California  92101
    - and -
    LAW OFFICE OF DAVID I. BRUCK
    By: David I. Bruck, Esq.
    220 Sydney Lewis Hall
    Lexington, Virginia  24450
    On Behalf of the Defendant

P R O C E E D I N G S

(The venire entered the courtroom at 9:31 a.m.)

THE CLERK:  All rise for the Honorable Court. Be seated.

THE COURT:  Good morning.

THE VENIRE:  Good morning.

THE COURT:  Welcome back to the United States District Court for the District of Massachusetts.  Thank you for being here.

As I'm sure you understand, we're continuing the process of selecting a jury for the case of United States versus Dzhokhar Tsarnaev.  Mr. Tsarnaev is charged in connection with, in connection with a bombing that occurred near the finish line of the Boston Marathon on April 15, 2013, that resulted in the deaths of three people.  He's also charged in the death of an MIT police officer and other offenses that occurred on April 18 and 19, 2013.

Some, but not all of the crimes charged are by statute potentially punishable by death.  You'll recall from my prior instructions that the jury will first consider and decide whether the government has proved the defendant's guilt of any or all of the charges against him.

If he is convicted of any of the capital crimes, that is, crimes potentially punishable by death, the same jury will then consider and decide whether he will be sentenced to death

for any such crime or to life imprisonment without the possibility of release.  Some of you may wonder why the death penalty could be a possibility in this case in the view of the fact that the laws of Massachusetts do not provide the death penalty for murder or any other violation of Massachusetts law.

The reason is that this is a federal case involving alleged violations of the laws of the United States rather than a state case involving violation of Massachusetts law. So if the jury convicts Mr. Tsarnaev of any of the capital crimes charged in the indictment, the same jury will hear additional evidence after that verdict, and then decide whether to sentence him to death or life imprisonment without the possibility of release.

Because the jury that is selected to decide the defendant's guilty will also decide his punishment if he is convicted of a capital crime, it is necessary to question you about your feelings and beliefs about the death penalty as part of the process of selecting a jury.

So let me briefly explain the procedures that must be followed in any case in which the death penalty is or may be an issue.  As in any criminal jury, initially the government will have the burden of proving that Mr. Tsarnaev is in fact guilty of any crime with which he is charged.  If he is convicted by the jury of a crime for which the death penalty may lawfully be imposed, there will be a second phase of the trial, which is

often referred to in shorthand as the penalty phase.

In the penalty phase, the government will introduce evidence that seeks to prove beyond a reasonable doubt first that Mr. Tsarnaev acted with sufficient intent to be subject to the death penalty; and second, that aggravating factors about the killings or about the defendant himself justify sentencing him to death.  Aggravating factors are circumstances that if proven make the crimes particularly serious or blameworthy and therefore under the law may justify imposing a sentence, a more severe sentence on Mr. Tsarnaev compared to other persons convicted of intentional killing or murder.

The government will bear the burden of proving any of the alleged aggravating factors to every juror beyond a reasonable doubt.

The defense will have an opportunity to present evidence of what it will argue are mitigating factors. Mitigating factors are usually circumstances about the crime or the events or about the defendant's background or character that would suggest that the death penalty is not the appropriate sentence in the case or that life imprisonment without the possibility of release is adequate to punish the defendant.

Unlike proof of aggravating factors, a mitigating factor must only be proven by the greater weight of the evidence.  This is the less demanding standard of proof than

proof beyond a reasonable doubt.

Again, unlike the proof of aggravating factors, mitigating factors do not have to be proven to the satisfaction of all 12 jurors.  Any juror who finds or determines a mitigating factor to have been proven by a greater weight of the evidence may consider that factor in deciding the appropriate sentence in the case, regardless of whether any or all of the other jurors agree that the mitigating factor has been proven.

After the parties have made their respective presentations during the penalty phase, the jury will weigh all the evidence.  Before a jury could vote to impose the death penalty, every juror would have to be persuaded that certain threshold factors that make Mr. Tsarnaev potentially subject to the death penalty had been proven beyond a reasonable doubt.

In addition, in order to impose the death penalty, every juror would have to be persuaded that any proven aggravating factors sufficiently outweigh any mitigating factors found by any juror or jurors to justify a sentence of death.

Even if the jury did not find any mitigating factors, it would still have to be unanimously persuaded that any proven aggravating factors were themselves sufficient to justify a death sentence.

You should understand that a jury is never required to

find that a sentence of death is justified.  The decision whether the government has proven that a defendant should be sentenced to death must ultimately be made by each juror himself or herself.  If, however, every juror is persuaded that the death penalty should be imposed, I would be required as the judge to sentence the defendant to death.  In other words, I could not change the jury's decision.  The jury and not the judge is responsible for determining whether a defendant who is convicted of a capital crime will live or die.

What I've just described is only an overview of the law applicable to the jury's consideration of the death penalty.  If you are selected to serve on the jury and if you find the defendant guilty of a capital crime, I will give you very detailed instructions concerning your duties in deciding whether to impose the death penalty or life imprisonment without the possibility of release, and I will give you the law that must be followed in making that decision.

When you filled out the questionnaire, we told you there were no right or wrong answers to the questions.  And we are asking the questions that we are because both the government and Mr. Tsarnaev are entitled to a jury that does not have its mind firmly made up one way or another before hearing the evidence and a detailed explanation of the law.  That applies both to the question whether Mr. Tsarnaev is guilty or not guilty of the specific crimes charged in the

indictment, and also if he is convicted of a capital crime, whether he should be sentenced to death or life imprisonment without the possibility of release.

We're going to follow up on your answers in the questionnaire by questioning each of you individually now in the process of selecting the jury. We're going to excuse you back into the room where you've been assembled and then call you into the courtroom one by one to ask you some questions. There will be a few people in the room in addition to the lawyers and their staffs present here, and the proceedings are also being simultaneously transmitted by video and audio to overflow courtrooms. We will not identify you by name but rather by number, and you will be seated so that the video camera will be behind you.

Your answers will be generally public, but if you believe a truthful answer would require you to reveal sensitive personal information, we will temporarily stop the audio transmission to those courtrooms so people observing there will not be able to hear your answer.

Again, we do not expect any -- expect or want any particular answers to the questions. All we want and what the law expects is that you provide accurate and truthful answers to the questions you are asked. If you do that, you will be doing your duty as a citizen and as a juror, no matter what your answers will be.

I also want to take a moment to remind you about some of my prior instructions.  As I told you before, a jury's verdict must be based on the evidence produced at trial and must be free from outside influence.  Therefore, I remind you again, it is extremely important that you do not discuss the case, including the jury selection process, with your family and friends, with each other, or any other person until either you have been excused or, if selected as a juror, until your service has concluded.  And of course you're not to conduct any independent research, online or otherwise, or read, watch, or listen to reports about the case in the media.

When you signed the questionnaires, you may recall that you signed under a statement that the answers were true, and you affirmed that under the pains and penalties of perjury. For this oral questioning now, it is required that you similarly affirm or swear to the truth of your answers, and the clerk will now ask you to stand and he will administer that oath.

THE CLERK:  Will the jurors please rise and raise your right hand.

(Venire sworn.)

THE COURT:  All right.  The jury will now withdraw and we'll begin the one-on-one questioning.

(Venire leaves the courtroom at 9:44 a.m.)

THE COURT:  Good morning, everyone.

MS. CLARKE:  Your Honor, there are some Question 40 issues.

THE COURT:  Yeah, can we just have a preview of this.

MR. DOREAU:  There is currently no audio or video.

(Discussion at sidebar and out of the hearing of the public:)



MS. CLARKE:  We had a list of 19 and I think we counted 18.  We'll see how it goes.

THE COURT:  We'll see who isn't here.  Jim can explain to all of us.

MR. McALEAR:  Juror No. 188 is not in the state right now.  We found that out at 8:05 this morning.  So we're expecting him on Friday at 8 a.m.

THE COURT:  Okay.

THE COURT:  Okay.  Before we -- we can go live.

MR. DOREAU:  As soon as you tell me.

THE COURT:  That's it.

MR. DOREAU:  We're going live with audio and video.

(In open court:)

THE COURT:  All right.  Before we begin with the jurors, I thought I would take note of the weather.  It seems pretty clear that we're going to have a serious storm tomorrow, and my thought is since we're bringing people in from around the eastern part of Massachusetts, we just skip tomorrow, regardless of what the Court does as a whole, and Judge Saris hasn't made that decision yet, but I think we will prudently

just skip tomorrow.

I'm sorry we'll miss a day.  We have been moving a little bit more slowly than perhaps we anticipated but I'm not discouraged by that at all.  I think we're making real progress and progress isn't necessarily measured by how long it takes to get to a good result.  So we'll keep going.  I hope we can accelerate in some ways and we're trying to do that by some further advanced screening to take people who are clearly suffering from a hardship or something else out of the picture.  But I'll just leave it at that.

Now, with respect to Wednesday, that's still iffy and we'll just a keep an eye on what things look like for Wednesday.  Apparently we won't be able to tell that until sometime tomorrow unless we can see what the long term of the storm may be.

Okay.  I guess we can begin.

THE CLERK:  Juror 109.

(Juror 109 enters courtroom.)

MR. McALEAR:  Juror 109.

THE CLERK:  Ma'am, over here.  Have a seat, if you would.

Make sure you speak into the mic so everybody can hear you.  Thanks.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  Welcome back.  When we left last time, I had asked people to avoid any discussion about the case with anybody, except logistical to tell people they have to be here and also to avoid any media coverage of the trial or the underlying events or anything.  Have you been able to do that?

THE JUROR:  As much as possible.

THE COURT:  Tell us about your work.

THE JUROR:  I work for a school district.  I work with special needs children on the autism spectrum.  I feel it would be very difficult for me to take the time away from them because they need the routine, and for me to be gone for three to four months would be very hard on them.

THE COURT:  What arrangements might be made for that, by the school system?

THE JUROR:  They would have a sub come in, but not a steady one; it could change daily.

THE COURT:  Someone qualified in the same area.

THE JUROR:  I don't know that.

THE COURT:  Have you had any discussions with the administration?

THE JUROR:  I have not.

MS. CLARKE:  Your Honor.

MR. MELLIN:  That's fine.

THE COURT:  All right.  I think that's fair enough.

MR. McALEAR:  Right this way.

(The juror is excused.)

THE CLERK:  Juror 169.

(Juror 169 enters courtroom.)

MR. BRUCK:  This will be one of the Rule 140.

THE COURT:  Yes.  I have it.  Thank you.

MR. McALEAR:  Juror 169.

THE CLERK:  Sir, over here, if you would, please.
Speak into the mic so everyone can hear you.

THE COURT:  Good morning.  Since you were last here,
have you been able to abide by my instructions to avoid any
conversations --

THE JUROR:  Yup.

THE COURT:  -- and try to avoid any exposure to media
reports about the case?

THE JUROR:  Yup.

THE COURT:  Okay.  Let me ask you, you had a concern
about the schedule in the case and how long it would take in
terms of its impact on your child care responsibilities, taking
care of the children.  Can you tell us a little bit more about
this?

THE JUROR:  I have a three-month-old and
two-and-a-half-year-old.  I'm responsible for taking them to
day care and picking them up.  My wife works in town, so it's
not possible for her to do that.

THE COURT:  Where do you work in terms of --

THE JUROR:  In Boxborough, Massachusetts.

THE COURT:  Okay.  So what time do you drop the kids off?

THE JUROR:  7:30, 8:00.

THE COURT:  Okay.  And then pickup?

THE JUROR:  Pickup, 5:30 I'm supposed to be there. 5:30, I'm supposed to be there at 5:30.

THE COURT:  Sometimes are you late?

THE JUROR:  Sometimes I'm later.

THE COURT:  Okay.  Well, apparently you have a fair hike from Boxborough.

THE JUROR:  Yeah.

THE COURT:  Where does your wife work?

THE JUROR:  MGH.

THE COURT:  She's a nurse practitioner.

THE JUROR:  Yes.

THE COURT:  Is she in a particular unit or department?

THE JUROR:  Cardiac.

THE COURT:  Let's -- jumping ahead a little, maybe, but people who were injured in the bombing events, some were taken to Mass. General for treatment.

THE JUROR:  Uh-huh.

THE COURT:  Was she involved at all in that --

THE JUROR:  No.

THE COURT:  -- in any way?  I mean, that would

include, for example, backfilling for somebody else?

THE JUROR:  No.  The only -- she knew some doctors who were there at the race.  Other than that, no.

THE COURT:  Was she on duty that day --

THE JUROR:  Yes.

THE COURT:  -- at the hospital?

THE JUROR:  Yup.

THE COURT:  But her work wasn't interrupted or affected --

THE JUROR:  No.

THE COURT:  -- in any way?

THE JUROR:  No.  Well, there was a delay in getting home, but other than that, nothing, no.

THE COURT:  All right.  So just a little bit about your work.  What do you do?

THE JUROR:  I'm an engineer.  Voice networking engineer, so voice over IP.

THE COURT:  In terms of social media, you said rarely.

THE JUROR:  Maybe once or twice a day.

THE COURT:  That's what interested me.  You define that rarely as once a day.

THE JUROR:  I'll hop on for five or ten minutes.  Some people are on all day.

THE COURT:  Just checking.

THE JUROR:  Yeah.  See which one of my friends -- it's

usually pretty much just a bunch of reposted junk that you don't really want to see, but...

THE COURT:  We asked about, you know, whether they had relatives or friends in various employment categories.

THE JUROR:  Yup.

THE COURT:  For law enforcement, you have a friend who is with the US Marshals?

THE JUROR:  No.  He did an internship with the US Marshals.  He was attempting to go that route.

THE COURT:  Okay.  And somebody else -- it says "friend with police."

THE JUROR:  Yup.

THE COURT:  What police department?

THE JUROR:  Reading.  Reading Police Department.  He works -- yeah, Reading Police Department.  Something to do with the FBI but I'm not sure other than that.

THE COURT:  How close are you to him?

THE JUROR:  My wife's best friend's husband.  So they went to high school together, they live in the same town, they live like a mile away.

THE COURT:  Can we cut the audio for a minute.

MR. DOREAU:  Audio's cut.

(Discussion at sidebar and out of the hearing of the public:)

THE COURT:  That's the questionnaire --



THE JUROR:  Yes.

THE COURT:  -- you filled out?

THE JUROR:  Yup.



THE COURT:  Okay.  We can go back on.

MR. DOREAU:  Okay.  Audio and video on.

(In open court:)

THE COURT:  I'd like you to look at Page 20, Question 77.  In that question we asked whether as a result of things you had seen or read in the newspaper or from any other source, whether you had formed an opinion about whether the defendant was guilty or not, and what penalty might be imposed if he were guilty.  Let me focus you on A and B which were the guilty or not guilty.  You answered yes to part A and no to part B.

THE JUROR:  Yes.

THE COURT:  Can you just tell us what you were thinking when you --

THE JUROR:  In regards to parts A and B?

THE COURT:  Yeah.

THE JUROR:  That's my opinion, that, yes, he is guilty

and no, he's not guilty.

THE COURT:  It's based on news reports.

THE JUROR:  Yeah, pretty much.  Yeah, inundated with that for quite some time, so yeah.

THE COURT:  Yeah.  In our criminal justice system, every defendant is presumed to be innocent if charged with a crime unless and until the government proves at trial that he is guilty by the evidence beyond a reasonable doubt.  To the extent that jurors may have prior ideas about those questions, we ask them to concentrate on the evidence and not what other information they may have and make a judgment that requires the government to satisfy its burden by holding the government to that burden and requiring that the evidence be such that it convinces the jury beyond a reasonable doubt.

THE JUROR:  Uh-huh.

THE COURT:  A defendant never has any burden to prove that he is not guilty or explain things away.  It's always the government's burden.  Do you understand those principles?

THE JUROR:  Yup.  Yup.

THE COURT:  Given that you've said you have an opinion as of this time, would you be able to set that aside at trial and pay attention to the evidence presented and decide the case only on the evidence presented?

THE JUROR:  Honestly, I'm inclined to say no.

THE COURT:  Why do you think that?

THE JUROR:  The media coverage was so vast, there was so much evidence, basically, you know, it's tough to overcome that, in my opinion.  And every time you think of people who lost their lives, who got hurt, so that's pretty much...

THE COURT:  Tell us about your answer to C and D.

THE JUROR:  Yeah.  See, there's -- that's basically -- I mean, given that each situation, there's different circumstances, you know, I didn't feel comfortable saying yes to those questions.

THE COURT:  Okay.  Let me ask you --

THE JUROR:  Different extenuating circumstances I'm not familiar with.

THE COURT:  Let me ask you to turn to Page 24. Beginning at 88 we asked you a series of questions about your attitude toward the death penalty --

THE JUROR:  Uh-huh.

THE COURT:  You were asked in that question whether you had any general views, and you said "no" or "none."

THE JUROR:  Uh-huh.

THE COURT:  The next question, we asked you to circle from 1 to 10, 1 being strongly opposed, 10 being strongly in favor, where you might be, and you circled 7.

THE JUROR:  Uh-huh.

THE COURT:  And if you go to the next question, 90, we ask you to indicate which of the following statements most

describe your feelings about the death penalty.

THE JUROR:  Uh-huh.

THE COURT:  You chose E.  It said you were in favor of the death penalty but could vote for life imprisonment without the possibility of release if you thought that was called for by the case.  Does that represent your view?

THE JUROR:  Yes.  Yeah.  As -- as a generality, yes, absolutely.  Depending on the case.

THE COURT:  Depending on the facts presented?

THE JUROR:  Exactly.

THE COURT:  You heard what I said earlier about the penalty phase --

THE JUROR:  Yes.

THE COURT:  -- when those kind of issues will be presented to the jury?

MS. CLARKE:  Your Honor.  Is that right?

MR. MELLIN:  That's fine.

THE COURT:  No follow-up?  Okay.

THE CLERK:  Right this way, sir.

(The juror is excused.)

THE CLERK:  Juror No. 171.

(Juror No. 171 enters the courtroom.)

MR. McALEAR:  Juror No. 171.

THE CLERK:  Ma'am, over here.  Make sure you speak into the mic so everybody can hear you.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  Were you able to abide by my instructions that I gave you last time to avoid any discussion of the substance of the case and to try to avoid any media reports about it?

THE JUROR:  Yes, I did.

THE COURT:  Thank you.

I just want to follow up on some of the answers you gave in the questionnaire.  That's the questionnaire if you want to look at it.

First one I wanted to ask about is Page 5, Question 10, where you --

THE JUROR:  Okay.

THE COURT:  -- you indicated that you -- were asked about the impact of the extended trial on people and so on.  And you indicated you have some job training to start soon.  Could you just tell us about that?

THE JUROR:  Yes, my job training was supposed to start this morning, and I received a call and I had to cancel with my supervisor.

THE COURT:  So tell me about the training, what kind of training or courses.

THE JUROR:  I am a PACU nurse, and I was supposed to receive training so I can be aboard to help surgeon and

anesthesia with ECT treatment of depress and mental health people.

THE COURT:  What is ECT?  Electric convulsive therapy?

THE JUROR:  Yup.

THE COURT:  Okay.  You work at the Lemuel Shattuck?

THE JUROR:  Yes, I do.

THE COURT:  And are you in a particular ward or...

THE JUROR:  I work in the post-anesthesia care unit.

THE COURT:  Okay.  And would this training allow you to move to a different unit?

THE JUROR:  No.  I will stay on my unit, but I will be more qualified to assist anesthesia with that kind of treatment.

THE COURT:  Okay.  How frequently does the opportunity to get the training come up?

THE JUROR:  Excuse me?

THE COURT:  How frequently does the opportunity to get the training come up?

THE JUROR:  As far as I know this week, it was going on this week, and I was the first, first -- one of two people that was going to go to Beth Israel hospital to receive it today.

THE COURT:  I guess my question is when is the next chance you'll have?  Do you know?

THE JUROR:  I would have to work that out with my

supervisor.

THE COURT:  Okay.  Let me just ask you -- you don't have to read the answer.  Will you look at Question 11 on Page 6.  And I just want to know if that would cause you trouble if you're sitting for a couple of hours at a time.

THE JUROR:  Sitting?

THE COURT:  If you were sitting in the jury for a couple of hours at a time, would No. 11 --

THE JUROR:  As long as -- I, you know, I think it would be disturbing to get up in the middle of something, but at work I do work that out.  You know, I can manage my time, but I cannot manage my time.

THE COURT:  I guess what I'm wondering is how frequent is frequent?  Every hour?  Every two hours?

THE JUROR:  In the morning, maybe every hour.

THE COURT:  Yeah.  Okay.  All right. Let me ask you to turn to Page 20, Question 77 near the top of the page.

THE JUROR:  Uh-huh.

THE COURT:  That is a multipart question.  We asked whether you, when you filled out the questionnaire whether you had formed an opinion based on the news media or other sources as to whether the defendant is guilty or not.  And then the second part of the question is whether he should receive the death penalty or not.  As to the first part, you indicated that

you had formed an opinion about whether he was guilty.

THE JUROR: Uh-huh.

THE COURT: In our criminal justice system, any defendant charged with a crime is presumed to be innocent unless and until the government proves that he's guilty at the trial by the evidence that's presented. The government has the burden, in other words, of proving people guilty of the charged offenses. And jurors are instructed that they are to regard the person as not guilty unless and until the government has proved otherwise beyond a reasonable doubt.

If you were a juror in this case, would you be able to fulfill that obligation?

THE JUROR: I don't know.

THE COURT: You don't know? Because of what you think already?

THE JUROR: (Juror nods.)

THE COURT: Could you tell us a little --

THE JUROR: Because I had been around -- my family had to shut off the TV because I get very emotional when things come up on TV. And when I saw the people that were victim of that thing and the little boy and that young lady and everything, and I will be very, very emotional, and my daughters would have to turn off the TV every time they were in the room and I'm watching it.

THE COURT: Okay. Thank you very much.

MR. McALEAR:  Right this way, ma'am.

THE CLERK:  Just leave that right there.

(The juror is excused.)

THE CLERK:  Juror No. 172.

(Juror 172 enters courtroom.)

MR. McALEAR:  Juror No. 172.

THE CLERK:  Ma'am, over here, please, if you would.
Have a seat.

THE JUROR:  Thanks.

THE CLERK:  Make sure you speak into the mic so
everybody can hear you.  Okay?

THE JUROR:  Okay.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  Since you were here to fill out the
questionnaire, have you been able to abide by my instructions
to avoid any discussion about the case or about the events?

THE JUROR:  I've tried.  It comes up on the radio and
the news, so I turn the channel.

THE COURT:  That's what we asked.  Thank you.
Tell us about your employment.

THE JUROR:  I work at the Broad Institute.  I'm in
computers.  I run the high-performance computing environment.

THE COURT:  Broad Institute is a joint venture between
MIT and Harvard?

THE JUROR:  Yup.  Yes.

THE COURT:  It's in the life sciences.

THE JUROR:  Yup.  Yeah.  Joint research.

THE COURT:  MIT obviously has some place in the course of events, including in the loss of one of its police officers. The fact that you're employed at MIT, would that have an effect on your ability to be an impartial juror?

THE JUROR:  I don't believe so, no.

THE COURT:  Let me just ask about social media, which we're always concerned about.  You say you use Facebook about once a month?

THE JUROR:  Yes.

THE COURT:  And for what purposes?

THE JUROR:  Pictures, mostly.  I put pictures of my dog up.

THE COURT:  Okay.  Your former husband is an attorney, it says, personal injury.

THE JUROR:  He was at one point.  I think he does insurance now.  I think he does insurance now.

THE COURT:  Oh.  Okay.  But his law practice was on the civil side, anyway, not criminal?

THE JUROR:  Yes.  Yeah.

THE COURT:  Let me ask you to turn to Page 20.  In Question 77 we asked people whether, based on what they had seen or heard from various sources, whether they had formed an

opinion that the defendant was guilty or not.

THE JUROR:  Uh-huh.

THE COURT:  Then if so, what the penalty might be.  We gave some boxes for you to select.  You indicated in part A that you had formed an opinion about whether he was guilty or not, right?

THE JUROR:  Uh-huh.

THE COURT:  The others -- as to the penalty, you said you were unsure.  And then further down, whether you would be able to set aside any opinions and so on, you said "maybe."  So let me just ask you about those --

THE JUROR:  Uh-huh.

THE COURT:  -- answers.

You probably understand that in our criminal justice system every defendant is presumed to be innocent of any charges made against him unless and until the government proves he is guilty at the trial by the evidence and convinces the jury of the defendant's guilt beyond a reasonable doubt.  So jurors are told that if the government fails to satisfy its burden of proving guilt beyond a reasonable doubt, that it's the obligation of the jurors to find the defendant not guilty.

If you were a juror in this case, would you be able to faithfully apply those principles of the presumption of innocence, proof beyond a reasonable doubt by the evidence at trial, or would you find difficulty in doing that because of

your opinion formed on the basis of the -- , what you've seen and heard?

THE JUROR:  Truthfully, I probably could.

THE COURT:  Could what?

THE JUROR:  Could put aside any previously formed opinions.  Not that I'm interested in serving on the jury for as long as I think this will take, but truth be told, I probably could.

THE COURT:  The second part of the question was about whether the death penalty might be imposed if he were convicted of a capital crime, and you indicated "unsure" there.

Let me ask you to turn to Page 23.  We've asked a series of questions about the death penalty and what you might think about it.  It begins with page -- with Question 88 on Page 23.  And we asked a general question, first whether you had any views on the death penalty in question, and you wrote "N/A," which I guess means no.

THE JUROR:  Yeah, I don't.

THE COURT:  And then in the next question, we ask you to circle on a scale from 1 to 10 where your views might be in terms of opposed or in favor of the death penalty.  And you circled 7?

THE JUROR:  Yup.

THE COURT:  Which is sort of on the favor side but not strongly in favor?

THE JUROR:  Yes.

THE COURT:  Is that a fair assessment of your view?

THE JUROR:  Yup.

THE COURT:  Then if you turn to the next question on Page 24, 90, we ask you to circle which of the statements came closest to your view, and you selected D, "I am not for or against the death penalty.  I could vote to impose it or I could vote for life imprisonment without the possibility of release whichever I believe was called for by the facts and the law on the case."

THE JUROR:  Uh-huh.

THE COURT:  Does that fairly represent your view on the matter?

THE JUROR:  Yup.

THE COURT:  So until you heard the facts and law on the case -- you've heard me describe this morning the penalty phase where that decision will be made?

THE JUROR:  Yes.

THE COURT:  -- you are prepared to consider either possibility based on your assessment of that evidence?

THE JUROR:  Yeah.

THE COURT:  And then, the last couple of questions, 25 and 26, Questions 95 and 96, the bottom of -- Question 95 where you said if you found the defendant guilty and decided the death penalty was appropriate, you could conscientiously vote

for that?

THE JUROR:  Yes.

THE COURT:  Similarly on the next page, if you found him guilty and decided life in prison would be the appropriate punishment, you could conscientiously vote for that?

THE JUROR:  Yes.

THE COURT:  Those fairly represent your views?

THE JUROR:  Uh-huh.

THE COURT:  Follow-up?

MR. MELLIN:  Thank you, your Honor.

Good morning, ma'am.  I'm Steve Mellin, one of the prosecutors on the case.  Just to follow up on what Judge O'Toole was asking you about concerning the media coverage that you had seen, and you said you could probably set that aside.

THE JUROR:  Uh-huh.

MR. MELLIN:  Right?

And does that mean that as you sit here now, you're saying you would be able to set that aside, and you would listen to the evidence in this case, and if you were on the jury, that you would decide the case based on what you heard in court as opposed to anything you may have read outside the courtroom?

THE JUROR:  Yes.

MR. MELLIN:  Any concerns you have about being able to do that?

THE JUROR:  No.

MR. MELLIN:  Okay.  And then the judge also asked you about your answers to Questions 95 and 96 about whether you could conscientiously vote for the death penalty or for life imprisonment.  Remember those?

THE JUROR:  Uh-huh.

MR. MELLIN:  My question is:  If you got to that stage hypothetically in a case where you were serving as a juror and you decided that the aggravating factors outweighed the mitigating factors to sufficiently justify a penalty of the death penalty, would you be able to vote to sentence someone to death?

THE JUROR:  Yes.

MR. MELLIN:  Okay.  Thanks.

THE JUROR:  Uh-huh.

MS. CLARKE:  Good morning.  My name is Judy Clarke. I'm one of the attorneys for Mr. Tsarnaev.  And I had just a couple of questions I wanted to follow up on what the prosecutor was just asking you, and the judge did too, in 77, Question 77, when you said "maybe."  Could you elaborate on that a little bit more, because you've been a little bit stronger today, but maybe setting aside your opinion.

THE JUROR:  Which one is 77?

MS. CLARKE:  I'm sorry, Page 20.

THE JUROR:  And you're referencing this last bit, "if

you answered yes to any of these questions?"

MS. CLARKE:  Yes.

THE JUROR:  Because I've never been put in this situation before.  I think if you get anyone who sits here and says wholeheartedly they'd be able to do one thing or another, they're lying, I'm sorry.

MS. CLARKE:  I guess I was just sort of trying to explore what you were thinking when you filled out the questionnaire with the "maybe," and today you've gotten a little bit more strong in your sort of thinking that you could set aside your previous opinion.

THE JUROR:  I think I could.  But if you want me to be a hundred percent truthful, I don't think you're going to get anyone in here being wholeheartedly able to tell you what they would be thinking or able to do when put in a situation like this because I can't say any juror has ever been put in a situation like this.  I think it would be shocking if you got someone a second time around doing this.

MS. CLARKE:  What do you mean?

THE JUROR:  Being on a capital case in Massachusetts as a juror.

MS. CLARKE:  It would be shocking to think what?

THE JUROR:  That you get a person doing this a second time around.  So you're getting a pool of individuals who have never done this before, so if they can honestly tell you a

hundred percent one way or another, I would find that shocking.

MS. CLARKE:  I see.  So did the "maybe" refer to the opinion regarding guilt, or did the "maybe" refer to the opinion unsure regarding the death penalty?

THE JUROR:  Guilt.

MS. CLARKE:  To guilt.

In Question 74, when you were asked about what you thought about the summons, and you said, "I found out it was in this case, it is a more daunting task to consider."  Can you tell us what you were thinking?

THE JUROR:  Because it's the biggest case I've ever been around.  The death penalty is a big deal.  I don't think any individual should take that lightly, even giving -- even given the circumstances.

MS. CLARKE:  That's what you were thinking with "daunting"?

THE JUROR:  Yup, that's what I meant.

MS. CLARKE:  Okay.  And several people apparently responded to you when you said "I got a summons to come on jury duty," and No. 75, "you should be honest, you should try to get out of it, what if you're sequestered."  Very natural questions.

THE JUROR:  Uh-huh.

MS. CLARKE:  What did you respond to those comments?  You don't have to use the actual words.

THE JUROR:  Yeah.  I think I was probably more concerned about the sequestered bit.  But people have their opinions of jury duty.  I was more worried about being sequestered.

MS. CLARKE:  So you didn't really have any responses to people when they talked to you?

THE JUROR:  No.  Everyone told me ways of trying to get out of it.  But they were all kind of ridiculous.

MS. CLARKE:  The judge asked you about your connection to MIT and Harvard through your very impressive work, it sounds like.

THE JUROR:  Thanks.

MS. CLARKE:  Is where you work very close to where Officer Collier was killed?

THE JUROR:  I honestly don't know.  I've only worked there for five months.

MS. CLARKE:  So you weren't working there at the time?

THE JUROR:  No.

MS. CLARKE:  And are there any colleagues or co-workers who were there at the time?

THE JUROR:  One co-worker actually told me he knew one of the victims, but I told him not to talk to me about that.

MS. CLARKE:  This is since?

THE JUROR:  This is since, yeah.

MS. CLARKE:  And he didn't say anything more than

that?

THE JUROR:  Uh-huh.

MS. CLARKE:  How did it come up that you had been summonsed?

THE JUROR:  I had mentioned to my employer that I had to come back today.

MS. CLARKE:  And this was the employer that you were talking about --

THE JUROR:  Uh-huh.

MS. CLARKE:  -- who knew one of the victims?

THE JUROR:  Yup.

MS. CLARKE:  You also -- one of the victims was a Boston University graduate.

THE JUROR:  Uh-huh.

MS. CLARKE:  Did you work at Boston University at the time of --

THE JUROR:  Yes.

MS. CLARKE:  -- the bombing?

THE JUROR:  Yup.

MS. CLARKE:  Were you involved or know about any of the efforts to, you know, raise money or --

THE JUROR:  No.  I mean, there was certainly BU-wide emails put out, but I didn't attend any.

MS. CLARKE:  Were there any discussions among you and your colleagues, co-workers about the efforts at BU?

THE JUROR:  No.

MS. CLARKE:  I take it you listen to Kiss 108?

THE JUROR:  Uh-huh.

MS. CLARKE:  Yes?

THE JUROR:  Yup.

MS. CLARKE:  The court reporter doesn't like it when we don't answer.

THE JUROR:  Oh, sorry.

MS. CLARKE:  And did you hear any comments on "Matty in the Morning" --

THE JUROR:  Yeah.

MS. CLARKE:  -- about this case?

THE JUROR:  I'm sure most of the population might have that day.  Yes.

MS. CLARKE:  And can you recall what you heard?

THE JUROR:  They were being ridiculous about Billy's son being called.

MS. CLARKE:  Did you hear that whole story?

THE JUROR:  I did, because that was the same day I was initially called.

MS. CLARKE:  Right.

THE JUROR:  So I was driving in --

MS. CLARKE:  You hadn't gotten --

THE JUROR:  -- when they were talking about --

MS. CLARKE:  -- the strong admonition by the judge

yet?

THE JUROR:  Yeah.

MS. CLARKE:  So can you recall the story?

THE JUROR:  Yeah.  They were trying to come up with a way to -- I think they were trying to come up with a way to distract people to possibly do harm.  It was a joke, but...

MS. CLARKE:  In the courtroom?

THE JUROR:  In the courtroom.

MS. CLARKE:  In the big assembly room?

THE JUROR:  Yup.

MS. CLARKE:  And what did you think about that at the time?

THE JUROR:  I thought they were being goofballs.

MS. CLARKE:  You answered the question regarding pictures, if I can find it, No. 87.

THE JUROR:  What question?  I'm sorry.

MS. CLARKE:  No. 87, Page 23.

THE JUROR:  Yup.

MS. CLARKE:  Again, "maybe."  Can you tell us what you meant by that?

THE JUROR:  I've seen graphic images only on TV, so I don't know what it would feel like to see graphic images that I know are real.

MS. CLARKE:  And did you observe any of that when the bombing occurred on TV or in the news?

THE JUROR:  No.  I generally try to not see graphic, real-life imagines.  I find them to be inappropriate.

MS. CLARKE:  Do you think it would be a distraction or be an emotional issue for you?  I'm just trying to --

THE JUROR:  I would hope so.  If I was unbearably cold to something like that, I think that would be strange for me.

MS. CLARKE:  Now, that makes absolute sense.  I guess we're just trying to figure out whether this is a case for you or another case that would not have these graphic images.  I absolutely get what you're saying about that.

THE JUROR:  And truthfully, I don't know how I will react to it.

MS. CLARKE:  Okay.  In Question 93, in weighing your answer about whether a life sentence is more severe than a death sentence --

THE JUROR:  Yup.

MS. CLARKE:  -- you indicated, "there are too many factors to have an opinion."  And it really sort of focused on the conditions of confinement.

THE JUROR:  Uh-huh.

MS. CLARKE:  Why did you go there?

THE JUROR:  Because in some circumstances, I believe prisoners might have a better life in prison than some individuals on this planet.  So life imprisonment could be good, subjectively.

MS. CLARKE:  It could be good or it could be horrible?

THE JUROR:  Uh-huh.  Depending on those perks I mentioned.

MS. CLARKE:  Okay.  Could I have just one moment?

(Discussion off the record.)

MS. CLARKE:  I guess I probably ought to ask a couple of questions, because it looks like sort of the thinking about the death penalty is sort of new for you.  Is that right?

THE JUROR:  Uh-huh.  Yup.

MS. CLARKE:  And could you tell us, if you were in the Legislature, as a matter of policy, would you vote to have a death penalty or not have a death penalty?

MR. MELLIN:  Object to the question, your Honor.

THE COURT:  Yeah.  That's not what she's being asked to do here, so I don't think we have to worry about that.

MS. CLARKE:  I guess I'm trying to explore the evolving thinking, your Honor.  Perhaps the Court --

THE COURT:  I think we have a good understanding.  I think we could go on forever on this.  I want to get where there's really an issue.  I'm satisfied with what I've heard --

MS. CLARKE:  Well, then, thank you very much.

THE JUROR:  Thank you.

THE COURT:  -- on that subject.

THE CLERK:  Right this way.

(The juror is excused.)

THE COURT:  Before we bring out the next one, this next juror is like one, I guess, maybe the second or -- second woman we saw, where a date that's relevant to hardship has come and gone.  Are we're going to see more of those, I think.  I don't know if we can project forward and try to head off that issue for people, because we're getting to the reading of the -- I certainly am getting to the reading of the question as sometime after a date when something was supposed to happen, like the juror's training.  This juror has a similar -- we're after the date, if you look at Page 5, Question 10.  We'll ask her about it.  But I'd like to see if we can do some kind of advanced screening for maybe just this question for dates to see whether we can help people out of a situation where by default they've already fallen into the problem.

MS. CLARKE:  Right.

THE COURT:  So that's more an observation than anything else.

THE CLERK:  Juror No. 173.

MR. McALEAR:  Juror 173.

(Juror 173 enters the courtroom.)

THE CLERK:  Ma'am, over here, have a seat.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  Since you were last here, have you been able to live up to my instructions to avoid discussing the

case --

THE JUROR:  Yes.

THE COURT:  -- and try to avoid any media exposure about the case?

THE JUROR:  Yes.

THE COURT:  Okay.  That's the questionnaire --

THE JUROR:  Yup.

THE COURT:  -- you filled out when you were last here. And I want to start by -- mostly we're going to follow up on your answers to questions there.

THE JUROR:  Yup.

THE COURT:  I want to start with question 10 --

THE JUROR:  Okay.

THE COURT:  -- on Page 5 where you were describing the schedule difficulties because you were expecting to start a class, teaching a class --

THE JUROR:  Right.

THE COURT:  -- in the mornings --

THE JUROR:  Uh-huh.

THE COURT:  -- last week, I guess.

THE JUROR:  Yes.

THE COURT:  Did you?

THE JUROR:  Did start last week.  I did start the class last week.

THE COURT:  Are we -- so are you committed to that now

for the rest of the semester or can arrangements --

THE JUROR:  I could -- well, as I think I tried to explain, I think with technology today, meeting would be optional.  It's an elective for graduate students, so I have 17ish in the class.  And -- but, you know, it's part of what students pay for.  So I would anticipate that we could move the day if the schedule allotted, and/or go online or hopefully the students are in second year, would be okay with not taking my class and finding something else this semester.  But it is an elective, so it's not a required course.

THE COURT:  We -- what's going on?

MS. CLARKE:  Weather.

THE CLERK:  Sounds like mice.

THE JUROR:  It's starting to snow.

THE COURT:  One thought we had when we set the schedule for the case was it would be Monday through Thursday --

THE JUROR:  Right.

THE COURT:  -- which would leave Friday open --

THE JUROR:  Right.

THE COURT:  -- for people.  This would be an example where Friday --

THE JUROR:  Right.

THE COURT:  Friday might be a good place for it to be moved.  Have you explored that at all.

THE JUROR:  I have looked at the schedule.  I think -- I haven't -- it was one of my questions today is if -- I didn't know at what point I should follow up with the dean, you know, as to -- I didn't want to, quote, unquote, "stress anybody out."

We're starting with a large pool.  But I did think that was a possibility, and their courses -- because they are graduate students, most of them also earn public health and medicine, so there a lot of evening courses, so there could be that possibility, but, you know, I --

THE COURT:  Could you step a little bit back?  I wonder if that's the speakers, the noise you're hearing.

THE JUROR:  You said make sure talk into it.

THE COURT:  That's all right.  I'm sorry if I interrupted.

THE JUROR:  No.  Yeah.  So I have not explored, because I didn't know at what point I should really start any -- I didn't want to make any prejudgments or where this would fall based on the original jury pool that was brought forth.

THE COURT:  When does the course finish?

THE JUROR:  End of April.

THE COURT:  So it's weekly every --

THE JUROR:  Every Tuesday, one chunk of time.

THE COURT:  Okay.  So let's move on to some other questions.  Why don't you tell us a little bit about what you

do --

THE JUROR:  Okay.

THE COURT:  -- besides teaching the class?

THE JUROR:  Right.  The majority of my job is actually research.  I do large government-funded trials on physical activity and nutrition and health outcomes mostly in underserved populations.  So right now I'm leading a big trial across Massachusetts putting in physical activity programming, looking at cognitive health and academic achievements in these populations.  I'm just finishing another large funded grant in the Boston area looking at urban kids and vitamin D and cardiometabolic disease risk.

So my opportunity -- my studies are out in the community.  And I do monthly publish-or-perish grant writing route for my job.  So, you know, I write grants to support my salary.  And I teach the one course because I love it, not necessarily because I have to.  Yeah.

THE COURT:  Okay.  And you've been doing that, it looks like, at Tufts for about ten years?

THE JUROR:  Correct.

THE COURT:  Just a little basic information about your husband.  You say he's in finance.  Could you tell us a little more what he does?

THE JUROR:  Oh, geez.  I should have quizzed him. Yeah.  He actually works for a firm out of Miami, and he works

about five minutes from home.  But he commutes down to Miami maybe, you know, once a month for a few days to meet there.  So he sort of does private equity work.  He had been in real estate.  He's gone from working at large firms like State Street to small start-ups.

THE COURT:  Okay.  You have a personal website that you use for your work?

THE JUROR:  Yes, unfortunately.

THE COURT:  But for other use, nonprofessional, you use Twitter a little bit and Facebook a little?  Is that right?

THE JUROR:  Rarely Facebook.  Twitter, you know, when there's something about physical activity and health, I usually tweet about it, yes.  But I would say it's about once a month.

THE COURT:  And when you use Twitter, its generally usually professionally related?

THE JUROR:  Completely professional, yeah.

THE COURT:  I'd like you to turn to Page 20, question 77.

THE JUROR:  Uh-huh.  Yup.

THE COURT:  We ask there whether you had formed any opinion --

THE JUROR:  Uh-huh.

THE COURT:  -- whether the defendant was --

THE JUROR:  Right.

THE COURT:  -- guilty or not or what punishment might

be imposed if he were based on media accounts --

THE JUROR:  Right.

THE COURT:  -- so on.

You checked "unsure" --

THE JUROR:  Right.

THE COURT:  -- which is one of the available options on each of those.

With respect to, let's focus on A and B, guilty or not guilty.

THE JUROR:  Right.  Uh-huh.

THE COURT:  Could you tell us what you're thinking when you picked "unsure."

THE JUROR:  I think that -- I think it was a little unfair of me to be biased one way or another based on media. You know, I think if my life were hanging on the line and I had to pick one, I could probably go one way or the other.  But most people, based on my professional development, that I typically -- depending on what the charge is, I'd have to qualify my answer.  So there wasn't a space necessarily to qualify the "unsure" thing, but based on what we know, I couldn't say convincingly one way or the other that he's definitely guilty of all those things unless I had all evidence in front of me, so I didn't think it was right to go one way or the other.

THE COURT:  So I'm sure you understand this, but in

our criminal justice system every defendant accused of a crime is presumed to be innocent --

THE JUROR: Right.

THE COURT: -- unless and until the government proves he's guilty --

THE JUROR: Right.

THE COURT: -- at trial and convinces the jury beyond a reasonable doubt that the person is guilty.

THE JUROR: Right.

THE COURT: If the government fails to do that, if its evidence is not sufficient to convince people beyond a reasonable doubt -- "people" meaning the jury -- their obligation is to find the guilt not guilty.

THE JUROR: Right.

THE COURT: Is that -- do you have any reservations about your ability to fairly hear the evidence and to abide by those principles?

THE JUROR: No.

THE COURT: I was just looking back. You had some jury service?

THE JUROR: Yes.

THE COURT: But it was a civil case --

THE JUROR: It was a civil case.

THE COURT: -- not a criminal case. The next parts of -- the second half of question 77 was about

the death penalty.

THE JUROR:  Yeah.

THE COURT:  But we asked further about that --

THE JUROR:  Yeah.

THE COURT:  -- later on.  That's at Page 23.

THE JUROR:  Yup.

THE COURT:  Question 88 asks for your general view --

THE JUROR:  Right.

THE COURT:  -- about the death penalty.  And have you a fairly extended answer.  But could it be fairly characterized that you're undecided as a general proposition?

THE JUROR:  Yes.

THE COURT:  In the next question we asked if you could perhaps place yourself on a scale --

THE JUROR:  Uh-huh.

THE COURT:  From strongly opposed to strongly favor, and you selected 4, which is slightly to the opposed side of the middle?

THE JUROR:  Right.

THE COURT:  Again, this is a fairly --

THE JUROR:  Right.

THE COURT:  You're a researcher.  You understand this is a fairly crude instrument --

THE JUROR:  Yes, right, right, right.

THE COURT:  -- that we're using.

But is that a fair?  Would you stick with that today if you had to do it again?

THE JUROR:  Yeah, I would.  I'd be in that ambiguous area.

THE COURT:  Then in the next page, question 90, we asked you to find the formulation in words that seemed to best express your attitude towards the death penalty, and you selected D, not for or against --

THE JUROR:  Right.

THE COURT:  -- could vote to oppose it, or could vote for life imprisonment without the possibility of release, whichever you thought was called for by the facts and the law of the case?

THE JUROR:  Right, right.

THE COURT:  So this morning you heard me talk about the penalty phase --

THE JUROR:  Right.

THE COURT:  -- where we'll hear things that might aggravate the penalty, and other things that might mitigate the penalty.  That's more or less what would be the facts and the law --

THE JUROR:  Right.

THE COURT:  -- for that penalty phase.

Are you confident that you'd be prepared to vote in either direction based on your assessment of what you hear in

the penalty phase?

THE JUROR:  Yeah.  I would have to be, based on law and facts.  I'd do my best.

THE COURT:  Well, not on what you'd have to be.  Would you be able to be?

THE JUROR:  Yes, yes.

THE COURT:  In other words, is this your -- now, obviously we're predicting how you'll react --

THE JUROR:  Right.

THE COURT:  -- on unpredictable data.

THE JUROR:  Right, right.

THE COURT:  But the question is, do you -- I guess it's a gauge of what -- how you feel about the death penalty in part.

THE JUROR:  Yeah.

THE COURT:  You are perhaps open to it, and perhaps open to the alternative of life imprisonment and can't say more specifically until you hear the evidence?

THE JUROR:  I would have to hear the evidence.  And I think that, you know, I sort of fall on the fence, whether that's good or bed.  I think that I wouldn't like to say that I would have to be -- you know, say yes, someone that needs to have the death penalty, but I think I could be unbiased going into it, and do the right thing based on the facts and the laws of the nation.

THE COURT:  At the bottom of Page 25, Question 95, we asked:  "If you found the defendant guilty and decided that the death penalty was the appropriate punishment" --

THE JUROR:  Right.

THE COURT:  -- "could you conscientiously vote for it?"  And you said you're not sure.

THE JUROR:  Yeah.  I think it weighed on me.  And walking into the courtroom that morning, having thought about this extensively, I don't know how my conscientious (sic) would -- what it would be like to do that.  I have no concept of that.  I have killed spiders, and that's about it.  So I'm hoping that it could be a decision that I could live with based on all the evidence that I thought I could live with.  So I think I'm unsure because I won't know that until I would be at that place in life.

THE COURT:  Okay.  Finally, Question 98.  You've run the marathon yourself a couple of times?

THE JUROR:  Yes.  Right.

THE COURT:  So does that have any effect on your ability to be an impartial juror?

THE JUROR:  I mean, in a way yes and no.  I mean, I know what it's like.  I wasn't impacted.  I've been involved extraneously with the Marathon.  I'm an athlete.  But I know what it's like to be in a big crowd.

I think anybody can put themselves there.  I've

never -- I've rarely stood on the sidelines and watched. I've participated. So I don't -- you know, if I were sitting on the other side, I don't know if that really impacts how I feel. I mean, most of us in the Boston area have touched it in some way, yeah.

THE COURT: Well, I guess the question is: Do you think it would have a skewing effect of any kind on your ability to be a fair juror?

THE JUROR: No.

THE COURT: Thank you.

Follow up?

MR. MELLIN: I'm Steve Mellin. I'm one of the prosecutors.

THE JUROR: Yeah.

MR. MELLIN: Just to follow up a little bit on your feelings about the death penalty. You say you're pretty much undecided about it?

THE JUROR: Yeah.

MR. MELLIN: You mentioned in the questionnaire in answer to Question 88, you said, "Today I think the evidence/science has greatly improved."

THE JUROR: Yeah.

MR. MELLIN: What did you mean by that?

THE JUROR: Well, I mean this, again, was my shaking, nervous response.

I think that there's -- I don't follow these things closely. I'm one of these people that I don't know a lot about it. But I know what DNA evidence is, like people have been convicted and then, you know, given the death penalty and found out they might have been innocent after the fact.

I think we have better technology these days to sort of air on the positive or negative. And I'm not sure what the evidence is in the case that would sort of fall on the technological sphere, meaning, you know, maybe video cameras and cell phone use. But I do think that we've come a long way in the past hundred years probably with the weight of the evidence and what people have as evidence in front of them to judge with.

MR. MELLIN: Okay. And just turning to Question 95 and 96. In 96 you said "yes," but in 95 you said you're not sure.

THE JUROR: Yup. Yup. 95 and 96.

MR. MELLIN: Why did you give a definitive answer to 96, which was a "yes," but then it asked if you could conscientiously vote for the death penalty, you said "I'm not sure."

THE JUROR: Okay. So 95 was unsure. Could I conscientiously do that? I'm not sure.

MR. MELLIN: It's essentially the same question, but one says the death penalty and one says life imprisonment?

THE JUROR:  I think just as a living being, it's probably easier to vote for life in prison then committing someone to death, I think innately.  That's not to say, yeah -- but I think I allude to at some point for some people, if they were in that situation, they might prefer, you know, one over the other personally in terms of being in prison for life, in this case a young individual, versus, you know, being put to death.  So, I mean, I'm just sort of going off that, yeah.

MR. MELLIN:  Okay.  And then let me ask you one final question --

THE JUROR:  Yeah.

MR. MELLIN:  -- which is, putting aside kind of the theoretical position you're in, which is you're undecided but you think it could be in some cases and not in others, when you get to the practical --

THE JUROR:  Right.

MR. MELLIN:  -- when you get to the reality of the being on a jury --

THE JUROR:  Uh-huh.

MR. MELLIN:  -- and being somebody who if you believe that the aggravating evidence --

THE JUROR:  Yeah.

MR. MELLIN:  -- sufficiently outweighed the mitigating evidence --

THE JUROR:  Yup.

MR. MELLIN:  -- that the sentence of death was justified --

THE JUROR:  Yup.

MR. MELLIN:  -- would you be able to vote to sentence someone to death?

THE JUROR:  I think based on facts, if I had everything in front of me, I could do the right thing, yes.

I think that it's -- I'm definitely one of those people, like I want all the facts in front of me, and it has to be -- you know, whatever the rules are, the mitigating versus aggravating, and if it tips one way, I would have to do that. Yeah.  I would do that, yeah.

MR. MELLIN:  Okay.  All right.  Thank you.

MR. BRUCK:  Good morning.

THE JUROR:  Good morning.

MR. BRUCK:  My name is David Bruck, and I'm one of Janar Tsarnaev's lawyers.  And I don't have a great deal to ask you but I have a couple of things to ask you.

THE JUROR:  Right.

MR. BRUCK:  I'm never close enough to the mic, apparently.

THE JUROR:  I've been too close.

MR. BRUCK:  So on average, we're doing good. I want to follow up on what you just told Mr. Mellin --

THE JUROR:  Yeah, yeah, yeah.

MR. BRUCK:  -- and maybe make sure --

THE JUROR:  Yeah, yeah.

MR. BRUCK:  -- we're on the same wavelength as far as how the system works, talking about the death penalty.

The judge told you that the system is you weigh the aggravating and you weigh the mitigating.  But it's not a mathematical formula or anything like that.

THE JUROR:  Uh-huh.

MR. BRUCK:  In fact, in the end the jury is asked whether the aggravating evidence sufficiently outweighs the mitigating --

THE JUROR:  Uh-huh.

MR. BRUCK:  -- in order to justify the death penalty, rather than --

THE JUROR:  Right.

MR. BRUCK:  Are you with me?

THE JUROR:  Yup.

MR. BRUCK:  And Judge O'Toole told you that the jury is told, and the law is that you are never required to impose the death penalty.

THE JUROR:  Right.

MR. BRUCK:  So in the end, it's really a moral, subjective decision.

THE JUROR:  Right, right.

MR. BRUCK:  And that puts a lot of weight on people.

THE JUROR:  Right.

MR. BRUCK:  Knowing that this is the Boston Marathon bombing case, I understand you haven't heard the evidence --

THE JUROR:  Right.

MR. BRUCK:  -- but you live in Boston, do you feel that you lean one way or the other as far as the death penalty, assuming that there was proof beyond a reasonable doubt?

THE JUROR:  I think inherently I probably would say -- I mean, based on my sliding scale, I'm more on the end of like would hate -- not "hate."  I would like to say that I am sort of -- you know, I probably prefer the life imprisonment route, but given the laws, I will do the right thing.  You know, I'd be able to base my evidence -- I think -- it's so hard until you know that you've been presented with all the evidence in trial, and doing that, and I think, yeah, I can understand it's not math, and I can understand the jury are gonna have a visceral feeling on the weight of the evidence.  And from what I understand, it's not like we can take notes, you know -- can we?  I sat on a jury before.

THE COURT:  Probably.

THE JUROR:  Okay.  Good.  Just because I'd be weighing it heavily.

MR. BRUCK:  Right.

THE JUROR:  But, yeah, I would say that, you know -- yeah, I'm more in that 3, 4 range where I prefer not to have

that option, but I could probably go that way if the evidence was there.

MR. BRUCK:  If the evidence justified it to you?

THE JUROR:  Right. And I guess sort of how I thought about this the last couple of weeks before I knew I was going to be called back in, you could almost say that I don't want the death penalty, and would have to make that decision, but if someone said, "If that was your daughter at the finish line, how would you feel," you know, it changes things.  So, you know -- and I think you wouldn't know that until you sat in the room

MR. BRUCK:  Well, and that gets to my last question --

THE JUROR:  Yes.

MR. BRUCK:  -- and I hope this isn't too personal. I've noticed on your form you have two children?

THE JUROR:  Right.

MR. BRUCK:  You heard from Judge O'Toole that one of the victims in this case was eight years old.

THE JUROR:  Right, right.  So that's where --

MR. BRUCK:  I have to finish the question.

THE JUROR -- I have to be realistic and I can be very honest.  My mother-in-law just said, "just say you're against the death penalty."  But I'm really, you know -- I said, but if they said, you know, your daughter who's 8 at the finish line watching you run, you know, that changes things.

So I think that I would have to get immersed in the case, which I haven't been. The day of I was out with my kids in Harvard. The week afterwards, we were in Florida with our kids, so I couldn't watch anything, and I'm not -- I work a lot. So, you know, my spare time reading is not a newspaper. So I knew what was going on, but I displaced myself, you know.

So it's a hard thing, yeah. But I think I -- I'm in a profession where I weigh evidence a lot. So I would just want to do the right thing.

MR. BRUCK: I think that's all. Let me just be sure. It is. Thank you.

THE COURT: Thanks very much.

THE JUROR: Thanks.

THE CLERK: Just leave that right here.

(The juror was excused.)

MS. CONRAD: It's not a Rule 40, but there is an issue.

THE COURT: Well, I have an issue before you. And my issue is I think he's not eligible as a juror because he's a firefighter.

MS. CONRAD: That's what I was going to raise.

THE COURT: I think -- I was just calling for the statute: No. 28. Sorry. That's the civil code. Sorry.

As I recall, and we'll confirm it, the statute can disqualify certain public safety people I think as a member of

a fire department.  This fellow set out the argument in his papers.  He's somewhere in between.  He's not full time, he's not a volunteer, he's a part-time regular, it looked like.  And my sense was that that falls in the scope of the statutory exclusion.  Let me just find it.

So this is in Section 1863(b)(6), it looks like, setting forth the requirements of the jury plan.  I haven't actually checked our plan, but I assume it meets this, and "specify that the following persons are barred from jury service on the grounds they are exempt:  Members of the fire or police departments of any state, district," so on and so forth.

MS. CLARKE:  The Mass. plan does exempt firefighters.

THE COURT:  I assume it follows that.  So I think he falls within that and is therefore exempt from service.

MR. MELLIN:  That's agreed.

THE COURT:  So we'll skip him.

(Discussion off the record.)

THE COURT:  Let me just look at the --

MS. CLARKE:  Question 40?

THE COURT:  Yeah.  Okay.  Is there anything you want to raise before we -- no.  We'll just see what he says.

THE CLERK:  Ready?

THE COURT:  Yes.

THE CLERK:  Juror No. 176.

(Juror 176 enters the courtroom.)

MR. McALEAR:  Juror 176.

THE CLERK:  Sir, over here, please.  Have a seat, if you would.  Speak into the mic, keep your voice up so everyone can hear you.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  Have you been able to follow my instructions given last time to avoid any discussion of the case?

THE JUROR:  Yes, I have.

THE COURT:  And tried to avoid any media coverage as well?

THE JUROR:  Yes, I have.

THE COURT:  Okay.  Thank you.  That's the questionnaire you filled out when you were last here and we're just going to follow up on some of the questions.  And you can look at it as you need to.  I'm going to proceed more or less front to back through the questionnaire.

You're currently retired?

THE JUROR:  Yes, I am.

THE COURT:  And tell us what you most recently were employed doing.

THE JUROR:  I worked as a college instructor for ITT Tech.  I teach technical drawing.

THE COURT:  Technical drawing.

THE JUROR:  AutoCAD, blueprint drawing.

THE COURT:  Prior to that you worked for the Boston public schools?

THE JUROR:  Yes.

THE COURT:  Teaching what?

THE JUROR:  I taught technical drawings and sometimes woodshop, things like that.

THE COURT:  That's something you've been doing for a long time?

THE JUROR:  Yes.

THE COURT:  I see you have a daughter who is a nurse.

THE JUROR:  Yes.

THE COURT:  Where does she work?

THE JUROR:  She works at the Neponset health clinic in Dorchester.

THE COURT:  Does she have a specialty?

THE JUROR:  Pediatrics, children.

THE COURT:  Okay.  And I guess you're fairly active online from what you tell us.  Can you tell us what you do?

THE JUROR:  I do a lot of drawing.  I do some short story writing.

THE COURT:  For -- as a hobby?

THE JUROR:  Yes.

THE COURT:  I mean, it's not --

THE JUROR:  Nobody pays me for anything.

THE COURT:  Okay.  If you want to look at it, I'm looking at Page 10, this is Question 29, asking about websites or blogs, and you said, "Wordpress, literature and art blog." Can you expound?

THE JUROR:  Wordpress is a website where you can have a blog without any advertising or anything like that, so I can just put any drawings I have or any short stories or things like that online.

THE COURT:  So just to understand the words here, Wordpress is a place?

THE JUROR:  It's a company that features -- for instance, Mayor Walsh, his website, I think he had things on Wordpress and on Vimeo.

THE COURT:  And "literature and art" is what you put there?  Is that what you --

THE JUROR:  Yes, yes.

THE COURT:  Okay.  I was just trying to follow the answer a little bit.

THE JUROR:  When I was in college, I wrote short stories, so I still haven't been paid for it.

THE COURT:  Still hoping?

THE JUROR:  No.  I just want people to read it.

THE COURT:  In Question 30, this is more social media, Dailymotion, LiveJournal?

THE JUROR:  Yes.

THE COURT:  Most of which I've never heard of.

THE JUROR:  LiveJournal is just another, it's just like Wordpress.  It's another place where you can put a blog on, and if one isn't working, the other one might be working.  Or -- it's like Blogger, if you know Blogger.

THE COURT:  Okay.  Have you blogged anything about this case --

THE JUROR:  No, I have not.

THE COURT:  -- or the underlying events or anything like that?

THE JUROR:  No.

THE COURT:  At the time things were happening, did you put --

THE JUROR:  No.  My stuff is mostly like literature, more like Alice in Wonderland.

THE COURT:  Could we cut the audio, please, for a minute.

MR. DOREAU:  Audio cut.

(Discussion at sidebar and out of the hearing of the public:)





THE COURT:  Okay.  You sat a couple of times.  I'm now looking at Page 15.  I'm sorry, we can go back on audio.

MR. DOREAU:  Audio's on.

(In open court:)

THE COURT:  Page 15, Question 47 -- actually we should probably -- have you ever served on a jury before?  And you indicate two Superior Court -- Massachusetts Superior Court times when you served?

THE JUROR:  Yes.

THE COURT:  That's through a full trial?  They're both criminal cases?

THE JUROR:  Yes.  Yes.

THE COURT:  Okay.  But you haven't served since 1995?  You've been called but haven't served?

THE JUROR:  I have -- I get called every three years.  Yes, I believe that is the last time I was on a jury that sat and deliberated.

THE COURT:  Okay.  Let me ask you to turn to Page 20, Question 77.  Near the top it says, "Whether as a result of things you had seen or read on the news or otherwise learned from any source, had you formed an opinion as to whether the defendant here is guilty?"  And you checked "yes," and then left unanswered the rest of the question.

And then further down we asked, "If you answered yes, would you be able or unable to set aside your opinion and decide the question of guilt or innocence based on what you've said in court?"  And you said "able."

I wonder if you could explain both your answers and your omission to answer some of the questions?

THE JUROR:  Well, from evidence that I have seen in the American media and other media, yes, I think that this young man had done that.  However, I understand a formal court proceeding is very different from newspapers and newspaper accounts, etcetera, and that that is where guilt or innocence should be decided.

THE COURT:  Yes.  So you understand that any person

charged with a crime is presumed innocent --

THE JUROR:  Yes.

THE COURT:  -- unless and until the government --

THE JUROR:  Yes.

THE COURT:  -- proves otherwise at trial --

THE JUROR:  Yes.

THE COURT:  -- and proves the defendant's guilt beyond a reasonable doubt?

THE JUROR:  Yes.

THE COURT:  And you feel you would be able to hold the government to that burden if you were a juror in this case notwithstanding having some impression beforehand?

THE JUROR:  Yes.

THE COURT:  You didn't check anything about the C and D parts of the answer, which relate to whether the death penalty should be imposed.  Let's turn to Page 23, where we have, we begin a series of questions about your views concerning the death penalty.  Question 88 asks -- take your time to read it if you want -- but it asks for your general views about the death penalty, if any.  And you've said "N/A," or I interpret that to mean "not applicable."

THE JUROR:  The death penalty should be used rarely.

THE COURT:  Okay.

THE JUROR:  And that's why I put, I think, a 5 in the middle.

THE COURT:  In Question 89 we asked if you could locate yourself on a scale between 1 and 10, 1 being strongly opposed, 10 being strongly in favor.  You're somewhere in the middle of that?

THE JUROR:  Yes.

THE COURT:  That's -- okay.  Now, if you turn to the next question on the next page, here we asked, rather than a numerical scale, we ask you to consider some possible expressions of your attitude or beliefs on the death penalty here.  And you've selected D.  It says, "I'm not for or against the death penalty.  I could vote to impose it, or I could vote to impose a sentence of life imprisonment without the possibility of release, whichever I believed was called for by the facts and the law in the case."

THE JUROR:  Yes.

THE COURT:  As you read that, does that today --

THE JUROR:  Yes.

THE COURT:  -- sound like --

THE JUROR:  Yes, I agree with what I said.

THE COURT:  So you heard me this morning describe in general terms the so-called penalty phase where the question would be what is the penalty.

THE JUROR:  Yes.

THE COURT:  And there will be aggravating factors presented, perhaps, and mitigating factors, and that's some of

the matter you'd consider as a juror before deciding on which penalty you thought was more appropriate. So is it your --

THE JUROR: Yes. I still agree with that. I'm not for or against the death penalty. I'll vote to impose it or I could vote to impose a penalty of life imprisonment, just as it says here.

THE COURT: All right. Follow-up?

MR. CHAKRAVARTY: Good morning still. Aloke Chakravarty. I'm with the prosecution team over here.

So I may have misheard you, but did you serve on a jury last year?

THE JUROR: I was called for jury duty in Superior Court for a case of murder and was not selected for the jury. So that was in February.

MR. CHAKRAVARTY: You weren't impaneled?

THE JUROR: No, I was not.

MR. CHAKRAVARTY: The incident that we talked about when the -- when the audio feed was cut involved apparently your --

THE COURT: We can cut it again if you're going to get into the details?

MR. CHAKRAVARTY: It's more of the association. I think it might be safe just to cut it.

THE COURT: Why don't we cut the audio briefly.

MR. DOREAU: Audio cut.

(Discussion at sidebar and out of the hearing of the public:)







MR. MELLIN:  Your Honor, I think we're in agreement.

THE COURT:  Okay.  Any follow-up on this question?

MS. CLARKE:  No, thank you.  Thank you very much.

THE COURT:  Okay.  Yeah.  Thank you.  And we can invite them back in, and they go out.

MR. DOREAU:  Audio back online.

(In open court:)

THE CLERK:  Thank you very much.

(The juror is excused.)

(Discussion off the record.)

THE CLERK:  Juror No. 181.

(Juror 181 enters courtroom.)

THE COURT:  I don't have -- oh, I do.  Sorry.

MR. McALEAR:  Juror No. 181.

THE CLERK:  Sir, over here, if you would, please.  Have a seat.  Speak into the mic, if you need to, so everybody can hear you.

THE JUROR:  Good morning.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  Since you were last here, have you been able to abide by my instructions to avoid any discussion about the case with anybody?

THE JUROR:  Yes.

THE COURT:  And also to try to avoid any media --

THE JUROR:  Yes.

THE COURT:  -- exposure or coverage?

THE JUROR:  Yes.

THE COURT:  That's the questionnaire you filled out last time.

THE JUROR:  Yes.

THE COURT:  We're going to follow up on some of the answers.

If you leaf through it, I'm looking at Page 5 and 6 at the beginning here, and then a couple of places on section 9. There were questions you didn't have any answer to.  And it may have been the way the questions were phrased.  So if you look, for example, at Page 9, I mean Page 5, Question 9 says, "If you believe you have a physical condition, please explain."  And so you didn't explain anything.  Is that because you took the "if you believe" --

THE JUROR:  Right.

THE COURT:  So you thought it was not necessary to answer that question?

THE JUROR:  Correct.

THE COURT:  Okay.  The same with respect to Question 10, whether it would be a difficulty because of the schedule of the case.  I guess because you didn't answer it, you don't have a difficulty, is that it?  I explained the schedule, the days we would conduct the case.

THE JUROR:  Yes.  I don't see any problem with that.

THE COURT:  Right.  Okay.  So can we generally take it that if the answer is negative to one of these "if" questions, you haven't filled anything out?

THE JUROR:  Yes, I would say.  Because I did read them all thoroughly.

THE COURT:  Okay.  That's what I was asking. So tell us about your occupation and employment a little bit.

THE JUROR:  I'm a marine engineer.  I work on a boat down in New York Harbor, which I work a week on, a week off.

THE COURT:  Where do you work?

THE JUROR:  In New York.  And I work Wednesday to Wednesday, so I should be going to work tomorrow night --

THE COURT:  Right.

THE JUROR:  -- to be there Wednesday morning.

THE COURT:  Well, just looking at the question that said did you have difficulty with the schedule, so what would

you do if you were on the case?

THE JUROR:  Oh, I'd stay home.

THE COURT:  Okay.  And would that be a financial hardship to you?

THE JUROR:  Rumor has it the company pays.  They did pay for the week I was out.  So as far as I know, no hardship.

THE COURT:  Okay.  Are you paid a salary or an hourly rate?

THE JUROR:  It's based on an hourly rate but it is a salary.

THE COURT:  Is this a unionized position?

THE JUROR:  Yes.

THE COURT:  Okay.  Look at Page 6, Question 13.  This is about present or former spouse.  It says your deceased wife used to work at the Quincy District Court.  Can you tell us a little about what she did there?

THE JUROR:  Yes.  She worked in the court office, the clerk's office.

THE COURT:  Clerical staff or was she --

THE JUROR:  Yes, I guess so.

THE COURT:  Did she -- was she like a courtroom clerk?  Did she --

THE JUROR:  She did go in the courtroom occasionally.

THE COURT:  Did she, kind of like our eminent courtroom clerk, did she, you know, help keep cases running?

THE JUROR:  I believe so, yes.

THE COURT:  Okay.  All right.  I guess you're not really sure what she did.  Is that fair?

THE JUROR:  That's probably fair.

THE COURT:  Okay.

THE JUROR:  I know towards the end she was not in the court.

THE COURT:  She was not?  She was generally in the office?

THE JUROR:  Yeah.

THE COURT:  And when was that?  What were the years she was doing that?

THE JUROR:  She was there for 20-odd years, and she passed away -- probably '08 she retired.

THE COURT:  Tell us about your use of any social media including Facebook.

THE JUROR:  It's very seldom.  I do have a Facebook account, but more just to see what other people are saying.  Instagram, I am, but I don't think I ever used it.  My daughter set it up.

THE COURT:  Okay.  So she could send you pictures?

THE JUROR:  I have no idea.  Maybe, yeah.

THE COURT:  But you haven't looked?

THE JUROR:  Not in a while.

THE COURT:  Let me ask you to look at Question 34 on

Page 12.

THE JUROR:  34?

THE COURT:  34.  Whether you have any relatives or close friends who are involved in any law enforcement agency, particularly, so you have a cousin in law who works presently for the Drug Enforcement Agency?

THE JUROR:  Yes.

THE COURT:  Tell us a little about that, who he is and what he does.  Not his name, but --

THE JUROR:  I can't.

THE COURT:  Where is he stationed?

THE JUROR:  Somewhere in Mass.

THE COURT:  Oh, you don't know?

THE JUROR:  No.

THE COURT:  Okay.  Someone you see regularly?

THE JUROR:  No.  Just at like family functions.

THE COURT:  Okay.  And you had an uncle who was on the Massachusetts State Police?

THE JUROR:  Yes.

THE COURT:  Tell us about that.  When did he serve?

THE JUROR:  Over 20 years ago.  He's deceased now.  He was over in Nantucket --

THE COURT:  Okay.

THE JUROR:  -- for most of his career.

THE COURT:  Could we cut the audio, please.

MR. DOREAU:  Audio cut.

(Discussion at sidebar and out of the hearing of the public:)









THE COURT:  Okay.  I think that's all we need to know about that.  Thank you.  I think we're finished.  And we can bring in the press.

MR. DOREAU:  Audio is currently off.

THE COURT:  You're all done?

THE CLERK:  You can bring it on.

MR. DOREAU:  Audio on.

(In open court:)

THE COURT:  Actually, we're going to take a break for the stenographer at this point.

(There is a recess in the proceedings from 11:30 a.m. to 11:55 a.m.)

(After the recess:)

(The Court enters the courtroom at 11:55 a.m.)

THE CLERK:  Juror No. 183.

MR. McALEAR:  Juror No. 183.

THE CLERK:  Ma'am, over here, please.

Have a seat, if you would.  Speak into the mic so everybody around you can hear you, okay?

THE JUROR:  Okay.

THE COURT:  Hi.

THE JUROR:  Hi.

THE COURT:  Since you were last here when you filled out the questionnaire, have you been able to abide by my instructions to avoid discussing the case with anybody?

THE JUROR:  Yes.

THE COURT:  Except you appearance here, obviously.  People have to know where you're going.

THE JUROR:  Yes.

THE COURT:  And avoid any media about the case?

THE JUROR:  Yes, I have.

THE COURT:  Okay.  Would you tell us a little bit about your employment, what you do.

THE JUROR:  I'm an assistant team leader with Whole Foods in their seafood department.  So I'm full time there and just -- basically an assistant manager.

THE COURT:  I'm sorry?

THE JUROR:  I'm an assistant manager basically with the company working specifically in seafood, so...

THE COURT:  Do you work in a particular location or do you kind of work in a headquarters location?

THE JUROR:  I work in Woburn right now.  I just transitioned, so I'll be working in the Woburn store.

THE COURT:  Okay.  And what does your work involve?

THE JUROR:  I supervise the department, doing orders for fresh products or supplies, helping customers, cleaning, basic maintenance.

THE COURT:  Okay.  And you don't -- based on your answer to Question No. 10 which asks whether it would be difficult for you to serve on the jury because of its length of time, you don't see an impact significantly on your job?

THE JUROR:  It would be financially difficult, most likely, but they would hold my position.  They can't fire me, basically, but it would be a financial issue.

THE COURT:  Well, how significant?

THE JUROR:  If we --

THE COURT:  Would you be able to make up loss -- are you paid by the hour or by a salary?

THE JUROR:  I'm paid by the hour.

THE COURT:  Okay.  So would you be able to -- on the time when we weren't sitting, would you be able to put in time that would --

THE JUROR:  I have some vacation time, but it depends on how long it ran for, how much of an issue it would be.  It would be -- sorry.  I don't know how much you get paid normally here.  If it's $40 a day, it would be a bit of a financial struggle for that long a period of time.

THE COURT:  Okay.  Well, I guess it's -- you're the one who can assess it.  I mean, that's the kind of thing we have in mind when we ask, for a case that's going to go for some extended period of time, what the burden would be.  And, you know, if it's too great a burden, then we won't ask you to do it.  So I guess that's what we're trying to figure out, what is the level of burden on you particularly financially, or can you moderate it by weekend hours or something like that?

THE JUROR:  If I was going to be able to work -- like because I know we don't have court on Fridays, I would be able to work on the weekends, so I would be able to do it with vacation time and help from family, if they needed to.  But as long as I could work three days a week, I could probably make up most of it.

THE COURT:  All right.  The store is open all weekend, I assume?

THE JUROR:  Yeah.  Yeah.

THE COURT:  Okay.  Facebook.  Daily you look at Facebook?

THE JUROR:  Yeah, usually on breaks at work and things

like that.

THE COURT:  Anything else?  Do you both post and --

THE JUROR:  Periodically I post.  Mostly it's just out of boredom.

THE COURT:  Just checking what's going on?

THE JUROR:  Yeah.

THE COURT:  Yeah.

How about anything else, Twitter or Instagram or anything like that?

THE JUROR:  I don't have any of their accounts.

THE COURT:  Okay.  I just want -- there's something I noticed I just wanted to have you explain.  In Question 13 we asked you to identify any current or former spouse, and you said none, but in Question -- and you can look at this, Question 31 and 32 you refer to your ex, E-X.  Is that an ex-spouse or ex-boyfriend or --

THE JUROR:  Ex-boyfriend of two years.  He's currently in the Army.  He was recently deployed.

THE COURT:  "Ex" is sometimes used to refer to an ex-husband, so that was my confusion.

THE JUROR:  No.

THE COURT:  So he was deployed in Afghanistan?

THE JUROR:  Yes.

THE COURT:  When was that?

THE JUROR:  He got back in September of this year.

THE COURT:  How long was he there?

THE JUROR:  For nine months.

THE COURT:  In combat?

THE JUROR:  Yes, I believe so.

THE COURT:  Okay.  And did he come back okay?

THE JUROR:  Yes.

THE COURT:  How long ex?

THE JUROR:  We broke up in November.

THE COURT:  So let me ask you to turn to page 20, Question 77 near the top of the page.  There we asked whether, based on things you'd seen or read in the news or from other sources perhaps, had you formed an opinion about whether the defendant was guilty or not or what penalty might be imposed, and you said no to all of those questions.

Can you tell us a little bit about that?

THE JUROR:  I haven't really seen anything in the media about the whole situation.  I knew what was going on when it was happening, but I'm not really -- I don't really focus on the news that much, so I didn't really hear much about what was going on during the whole process till after.  I know somebody was caught.  But up until then I wasn't really paying attention to any of the details or privy to any information or anything like that, things like that.

THE COURT:  Uh-huh.  You may know that in our criminal justice system any defendant -- any person who is charged with

a crime and becomes a defendant in the case is presumed to be innocent, or not guilty, unless and until the government proves that he is guilty, and proves it by the evidence at trial to a jury that must be convinced beyond a reasonable doubt in order to convict the person, and if the jury is not convinced beyond a reasonable doubt that the person is guilty, the jury will be instructed it is their duty to find him not guilty.

Do you understand those principles in general?

THE JUROR:  Yes.

THE COURT:  Would you have any difficulty in -- if you were a juror in this case in applying those principles fairly and impartially?

THE JUROR:  No, I wouldn't.

THE COURT:  And you'd require the government to prove guilt beyond a reasonable doubt and you would not presume the defendant guilty, but rather innocent.  Is that fair?

THE JUROR:  Yes.

THE COURT:  If it's not, tell me.

THE JUROR:  No, it is.

THE COURT:  Would you look at page 23 -- well, before we get there, that was concerning the first part of 77, which was about guilt or not.  Also we asked about the death penalty, and you answered no to that.

We asked some more questions about the death penalty beginning on page 23.  In Question 88 we asked sort of a

general question about your views on the death penalty.  You say you're not really for or against but you feel better about life imprisonment than the death penalty?

THE JUROR:  Yes.

THE COURT:  Is there anything you want to add to that or explain or -- you don't have to.  I'm just asking you.

THE JUROR:  No.  I guess I've never really formed an opinion strongly one way or the other, but if it came down to it, I would probably say death is not necessary.

THE COURT:  I couldn't quite hear that.  If you want to push that maybe a little closer to you, that's fine.

THE JUROR:  Sorry.  I was just saying I've never really formed an opinion one way or the other, but I probably would go more -- I feel life in prison is a stronger punishment because you actually have to spend time thinking about the consequences of your actions as opposed to death.

THE COURT:  In Question 89 we asked you to kind of place yourself on a scale from 1 to 10 of strongly opposed at 1 up to strongly favor -- this is the death penalty -- at 10, and you selected 4, indicating somewhere on the opposed side of the middle, I think.  Is that fair?

THE JUROR:  Yes.

THE COURT:  And then if you go to the next page, Question 90, we asked you to select which statement came the closest to representing your view of the death penalty, and you

selected D:  Not for or against, could vote to impose it or vote for life imprisonment depending on your assessment of the facts and the law in the case.  Does that still represent your --

THE JUROR:  Yeah.

THE COURT:  -- position on this?

THE JUROR:  Definitely.

I've never actually been in a position --

THE COURT:  I'm sorry?

THE JUROR:  I have never really been in the position to think about it one way or the other, so I think depending on what the facts are, what information I heard would form a stronger opinion for myself.

THE COURT:  And on page 25 at the bottom, that's 95, and on the next page, 96, they're kind of paired.  The first question said if you found the defendant guilty and you decided the death penalty was the appropriate punishment, could you conscientiously vote for the death penalty, and you indicated yes.

THE JUROR:  Yes.

THE COURT:  And on 96, the next question was kind of the companion to that on the other side:  If you found him guilty and you decided life in prison without the possibility of release was the appropriate punishment, could you conscientiously vote for that, and you said "yes" as well.

THE JUROR:  Yes.

THE COURT:  So what I'm hearing is that you think that based on your evaluation of the evidence you could possibly vote for either depending on how you assess the evidence.  Is that fair?

THE JUROR:  I think that's a very fair assessment.

MR. MELLIN:  Just a few, your Honor?

THE JUROR:  Sure.

MR. MELLIN:  Good afternoon.  I'm Steve Mellin.  I'm one of the prosecutors on the case.

I would like to go back to just the questions about the financial hardship because today's really the last day we have to talk to you about that, and we want to make sure that two months into this trial you're not sitting on the jury and then you have to raise your hand and say, "I just can't afford to be here."

Are you confident that this isn't going to be a financial hardship for you?

THE JUROR:  As long as I could work on the weekends, it wouldn't be.  And I can lean on my family.  They told me that if I ever needed help, they would be willing to help.  But as long as I could work like a Friday through a Sunday, I could work a good 30 hours, and I have a good amount of vacation time saved up.

THE COURT:  Could I follow up on that?

As far as you know -- you've worked there for a while?

THE JUROR:  Yes.

THE COURT:  -- weekend work is available to you?

THE JUROR:  Oh, yeah.  I do it on a regular basis.  My schedule is always changing.

MR. MELLIN:  And just following up on the death penalty questions, Judge O'Toole just talked to you about your answers to Questions 95 and 96 where you said that to both you could conscientiously vote for the death penalty over life imprisonment.  Do you remember those questions?

THE JUROR:  Yes.

MR. MELLIN:  So do you believe that if you found that the evidence supported the death penalty in a case like this, that you would be able to vote to send someone to death?

THE JUROR:  If that was what was proven to be the best option and what the evidence was proven for, I would vote for it.

MR. MELLIN:  Okay.  Thanks.

MS. CONRAD:  Good afternoon.  My name is Miriam Conrad.  I'm one of Mr. Tsarnaev's lawyers.

You mentioned that your ex saw combat in Afghanistan.  You were involved -- you were in a relationship at that time?

THE JUROR:  Yes, I was.

MS. CONRAD:  Can you tell me a little bit about what you learned about that and what the impact was?

THE JUROR:  He didn't really talk a lot about what was happening during the deployment.  We would get to Skype and talk periodically, but we never really discussed what was happening over there, mostly just when he got back, just different personality changes.

MS. CONRAD:  And do you know what type of combat he saw?

THE JUROR:  He was a gunman on top of a lot of the trucks, so he was a mechanic and a motorman, I think it was.  But he either worked on the trucks or ran the guns on top of the trucks.

MS. CONRAD:  Now, if there might be some evidence that motive for the bombings related to American involvement in Afghanistan and Iraq, would your relationship with this person and his experience affect you in any way in evaluating the evidence?

THE JUROR:  I honestly never had an opinion about the war one way or the other.  I just always supported our troops and whatever, I mean, men and women we had from our country fighting over there.  But I would rather they all be home, so I understand both sides of the view, but I just mostly support our troops and whatever they feel is right that they're doing.

MS. CONRAD:  You said that when you got the jury summons you didn't know it was for this case?

THE JUROR:  No, I didn't.

MS. CONRAD:  When you realized it was for this case -- I don't know how you came to realize that, but at whatever point, how did you feel about possibly serving on this jury when you figured that out or learned that?

THE JUROR:  It was very surprising and intimidating. This is a very big, important case, so it was a little intimidating to know that this could be a possibility.  But just mostly I was surprised.  I didn't even know this was really happening.

MS. CONRAD:  When you say "intimidating," can you tell me a little bit more about in what way?

THE JUROR:  Just I know this is a very big, very important case, and so whoever does get chosen for this jury, they really have to be very conscious of what's going on and really paying attention to the material and really focused on, you know, making the right decision and listening to all of the evidence.  So it's very important.

MS. CONRAD:  Did anybody make any comments to you about -- maybe if you said anything to them about the fact that you might be serving as a juror on this case, any reactions that you got from people?

THE JUROR:  No, everybody's been really respectful, understanding that I have jury duty, and they're like, "All right.  Just let us know when you have to go in," and understand I'm not allowed to talk about it or discuss it.  And

everybody has been very respectful of that.

MS. CONRAD:  Were you in the Boston area when the bombings occurred?

THE JUROR:  No, I wasn't.

MS. CONRAD:  You didn't live here at the time or --

THE JUROR:  No, I lived -- well, I mean, I lived in Chelmsford.  So I was working.  I might have actually been in New Hampshire at the time working.  That's where my current store used to be.  So I wasn't really anywhere locally.  So I honestly didn't really hear about it till after it happened.

MS. CONRAD:  Do you -- I think there may be one or more victims or survivors of the bombing who live in the Chelmsford area.  Do you know any of them personally?

THE JUROR:  I don't know them personally.  I think I know someone from the Chelmsford area that wrote a book, but I don't know him personally.  But I have heard of someone who was involved, but I'm not positive what his name was.  But I just know there was someone from Chelmsford but...

MS. CONRAD:  Have you gone to any events related to that book coming out or any events in Chelmsford related to that --

THE JUROR:  No, I haven't.

MS. CONRAD:  Thank you very much.

THE COURT:  All right, ma'am.  Thank you.

THE JUROR:  Thank you.

(The juror is excused.)

THE CLERK:  Juror No. 184.

MR. McALEAR:  Juror No. 184.

THE CLERK:  Ma'am, over here, please, if you would.

Have a seat.  Speak into the mic so everyone around here can hear you, okay?

THE JUROR:  Okay.

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon.

THE COURT:  Since you were here last, have you been able to abide by my instructions to avoid any discussion of the case?

THE JUROR:  Uh-huh.

THE COURT:  And as much as possible to avoid any exposure to media reports about the case?

THE JUROR:  Yes.

THE COURT:  So that's the questionnaire you filled out before, and we're going to follow up by asking you some questions about some of the answers you gave --

THE JUROR:  Okay.

THE COURT:  -- in the questionnaire.  And, of course, congratulations on your condition.

THE JUROR:  Thank you.

THE COURT:  Tell us about your childcare concern that -- and if you want to look, I'm looking at page 5,

Question 10.

THE JUROR:  So I work full time as a teacher.  I drop off my son normally around 6:25 every morning.  And I live in Holbrook.  I drop him off in Stoughton and then I have to drive to Boston.

THE COURT:  About how many miles is that from your home to the daycare?

THE JUROR:  From my home, maybe five to ten miles?  I'm not exactly --

THE COURT:  All right.  How long does it usually take you --

THE JUROR:  From my house to daycare, usually 15 to 20 minutes.

THE COURT:  How about at the end of the day going the other way?  Is the traffic worse?

THE JUROR:  Yeah.

THE COURT:  What would it take then?

THE JUROR:  From work?

THE COURT:  No, from daycare back home.

THE JUROR:  Yeah, about 25, 30 minutes.

THE COURT:  Yeah, okay.

I interrupted.

THE JUROR:  No, it's just driving to work, driving in to Boston that's the challenge.  It's not so much getting from home to daycare.

THE COURT:  Right.  Where's the school?

THE JUROR:  Boston Public Schools in Dorchester, TechBoston Academy.

THE COURT:  So after you -- how do you come?  Do you come up the expressway?

THE JUROR:  No, I actually drive the back roads.

THE COURT:  Yeah.  So what's a typical drive from Stoughton to school?

THE JUROR:  It takes about 45 minutes total.

THE COURT:  Is that the concern, the commuting time and --

THE JUROR:  My main concern actually that I didn't bring up earlier is that I actually have a family trip planned for the week of the 14th, so I won't be --

THE COURT:  February?

THE JUROR:  February, yeah.  So I won't be in Boston during that time.  I didn't mention that on the -- as a concern, but that was the main...

THE COURT:  What's the nature of the --

THE JUROR:  It's a family trip.  I plan it a year in advance.

THE COURT:  Your family:  You, your husband and child?

THE JUROR:  Uh-huh.

THE COURT:  And is it prepaid?

THE JUROR:  Yeah.

THE COURT:  Okay.  I think that's all we have to hear.

THE JUROR:  Okay.

THE COURT:  We'll miss you, but enjoy your trip.

(Laughter.)

THE JUROR:  Okay.  Thank you.  Thank you.

(The juror is excused.)

THE CLERK:  Juror No. 185.

MR. McALEAR:  Juror No. 185.

THE CLERK:  Ma'am, over here, please.  Have a seat.

Just make sure you speak into the mic so everyone can hear you, okay?

THE JUROR:  Will do.

THE COURT:  Not too close.

(Laughter.)

THE COURT:  Tell us about your employment.

THE JUROR:  I'm a risk manager.

THE COURT:  First I have to ask, since you were last here, have you been able to abide by my instructions not to talk about the details of the case with anybody?

THE JUROR:  As much as I possibly can.

THE COURT:  Okay.  And to avoid as much as you possibly can unwanted exposure to media stories about the case?

THE JUROR:  That's correct.

THE COURT:  Okay.  Go ahead now.  Tell us about your employment.

THE JUROR:  Okay.  I'm a risk manager and a contracts manager for a construction company.

THE COURT:  And what does that involve?

THE JUROR:  That involves reading a lot of contracts and managing the corporate insurance program.

THE COURT:  Okay.  What kind of contracting does the company do?

THE JUROR:  Electrical.  We're a local electrical contractor.

THE COURT:  How big is the company?

THE JUROR:  Well, they have several companies.  It's probably running 160, 180 million, so they're a big company.

THE COURT:  And you've been doing this particular job for about ten years or longer?

THE JUROR:  More like 30.

THE COURT:  Thirty?  All right.

THE JUROR:  I worked for another electrical contractor.

THE COURT:  The same kind of work?

THE JUROR:  The same kind of work.

THE COURT:  All right.  How about social media use by yourself?  Do you use it at all?

THE JUROR:  Absolutely not.  I'm a dinosaur.

THE COURT:  In the course of your work I guess you've had the experience of having your deposition taken a couple of

times?

THE JUROR:  That's correct.

THE COURT:  Those are both civil cases?

THE JUROR:  That's correct.

THE COURT:  And when were they?

THE JUROR:  One was a case in New York City that centered around contract language and the interpretation of the insurance requirements of the contract.

THE COURT:  Yeah.  When was that?

THE JUROR:  That was -- I can't even remember.  Maybe 15 years ago, 18 years ago, something like that.

And then the other was in a large lawsuit in Connecticut, a claim involving a man named Avery.  It was a death claim.  And I was deposed because the two insurance companies were having an issue about how the claim was managed.

THE COURT:  Okay.  If you'd turn to page 19 in your questionnaire, I wanted you to look at the bottom of page 74 and 75.  We asked about reactions when you received the summons and then also when you realized it was this case we were empaneling for.  In answer to Question 74 you said, "It is an honor to be asked to serve."

THE JUROR:  That's correct.

THE COURT:  Can you tell us why you said that?

THE JUROR:  Why did I say that?

THE COURT:  Yeah.

THE JUROR:  Because I believe that probably -- the right to a fair and impartial trial is probably the most important right that we as individuals have.

THE COURT:  And you're honored to take part in that. Is that what you're telling us here?

THE JUROR:  Correct.

THE COURT:  The next question you said you had some mixed feelings because of the time commitment --

THE JUROR:  That's correct.

THE COURT:  -- I guess.

THE JUROR:  Yeah.

THE COURT:  Is that right?  Is that what you were conveying there?

THE JUROR:  Of course.

THE COURT:  But then you go on to add, "Could be the experience of a lifetime."

THE JUROR:  Yeah.  I think everyone could -- in this position would probably -- should probably have a lot of mixed feelings about the situation.  I'm a single mother, you know, but I do have a support network, so...  I have plans to do things this spring, and I know this trial is going to be a lengthy time commitment; but on the other hand, as a risk manager, I've been faced with situations where decisions that were wrought by a jury were pretty bad, and I know that if people like me don't serve on juries, that that is what you can

expect.  So one has an obligation.

THE COURT:  Okay.  If you'd turn to the next page, Question 77, we asked whether you had formed an opinion about things you'd seen in the media, and so on, about whether the defendant was guilty or not and what the penalty might be, and we gave you three options, yes, no and unsure, and you checked "unsure" for each of the questions.

Can you explain what you were thinking as you did that?

THE JUROR:  Well, I've spent a lot of time -- when I finally did realize this was the case that I was being summoned to serve on the jury for -- as to what I had actually seen on the news media.  And I watched the full -- I turned on the TV on marathon day five minutes before the blast went off, so I saw the whole first response; I saw the bomb go off.  I saw everything that day.

I also saw pretty much everything that happened from very early on Friday morning, because I get up at four -- so from the minute I turned on the TV to see what the weather was going to be -- because I had a scheduled vacation day, I was looking to see what I could do -- I saw the full media coverage for everything that happened on Friday, okay?

But what I think I'm missing from that is that in the days that followed -- again, I'm a single mom; I have a big job -- I did not see a lot of media coverage thereafter.  So in

looking back upon what I saw, I don't think that I saw anything that was completely conclusive; just indications. I saw bits and pieces of information. So I remain somewhat on the fence.

THE COURT: So in a criminal trial when someone's accused of a crime, they're presumed to be innocent of the crime they're charged with unless and until the government proves they're guilty by the evidence at trial, proves it beyond a reasonable doubt. If the government fails to convince the jury to that degree so the jurors cannot say they're convinced beyond a reasonable doubt that the person has committed the crime, it's the duty of the jury to find the person not guilty.

If you were a juror in this case, would you be able to do that?

THE JUROR: I don't think I'd have an issue with it, no.

THE COURT: The second part of the question refers to attitude about the potential penalty, and we asked some more questions about that beginning on page 23 with Question 88 where we asked for you to tell us what your general views about the death penalty might be. And you said "It could be an appropriate punishment but may not be the most appropriate punishment."

Can you just tell us what you were thinking when you made that answer?

THE JUROR:  Well, I don't know that -- I mean, death is something that we all face, and sometimes I think that life imprisonment can be a fate worse than death, particularly if one is thrown in with common criminals and treated as a common criminal and forced to live the rest of their lives with people that have committed heinous acts.

THE COURT:  In the next question we asked you to sort of place yourself on a scale of the strength of your views from strongly opposed to strongly favor, and you put yourself sort of in the middle.  Is that --

THE JUROR:  That's correct.  I don't think that death is necessarily the greatest punishment of all.

THE COURT:  If you'd turn to the next page, 90, Question 90, we asked you to state which of the possible formulations represented -- best represented your view, and you picked D, which was not for or against, could vote to impose it or could vote to impose life imprisonment, whichever you believed was called for by the facts and the law in the case.

Today would you still say that represents your choice among --

THE JUROR:  Yeah, I would say so.

THE COURT:  So I'd now ask you to turn to page 25 and Question 95, and 96 at the top of the next page.  They're kind of a pair of questions.  95 asks if you found the defendant guilty and you decided that the death penalty was the

appropriate punishment, could you conscientiously vote for it, and you said "yes."

THE JUROR:  That's correct.

THE COURT:  And the next question we asked the other side of that question:  If you found him guilty and decided life imprisonment without release was the appropriate punishment, could you conscientiously vote for that, and again you said "yes."

THE JUROR:  That's correct.

THE COURT:  So depending on your assessment and weighing of the evidence, it's possible you could find yourself voting to impose the death penalty or voting to impose life imprisonment but -- is that --

THE JUROR:  That's correct.

THE COURT:  -- a fair summary?  Okay.

MR. MELLIN:  Just a few.  Thank you, your Honor.

Good afternoon, ma'am.  I'm Steve Mellin.  I'm one of the prosecutors.

THE JUROR:  Hi.

MR. MELLIN:  You said this morning -- or this afternoon that you think that life imprisonment may be a fate worse than death.  Can you expand on that a little bit?

THE JUROR:  Well, I would think, to me, to be thrown in with the dregs of society, to have to live among rapists and murderers and live amongst that general population would be, to

me, a fate far worse than death.  We all face death.

MR. MELLIN:  When you think about the appropriateness of the death penalty in certain types of cases, are there certain cases that come to mind for you that you do think it's appropriate for?

THE JUROR:  The one case that -- well, the type of situation for sure would be a prisoner that would be too dangerous to lock up with other prisoners.

MR. MELLIN:  Okay.  Can you think of any other examples?

THE JUROR:  Well, I think if you want to set an example of someone.  I think the death penalty is perceived by others probably to be the greatest penalty, so perhaps in that way some crimes, particularly crimes committed against the state, would be punishable by -- justifiably punishable by same.

MR. MELLIN:  And just to wrap up, if you believed that the aggravating factors in this case or any case sufficiently outweighed the mitigating factors, would you be able to vote to impose the death penalty on someone else?

THE JUROR:  That's correct.  I really don't have anything against the death penalty itself.  I think it is a fitting punishment for certain types of crimes and for wantonly taking the life of another person.

MR. MELLIN:  Okay.  Thanks.

MR. BRUCK:  Good afternoon.

THE JUROR:  Good afternoon.

MR. BRUCK:  My name is David Bruck, and I am one of Jahar Tsarnaev's lawyers, and I just have a few things I would like to go over with you, if I could.

Question 85 on your questionnaire.

THE JUROR:  Okay.

MR. BRUCK:  Can you tell us about that witness or the -- you know the parents of the witness.  Is that right?

THE JUROR:  That's correct, yes.  Just socially. She's a young doctor, and she was the treating physician for the young MBTA policeman who was shot.  And I know her parents socially.

MR. BRUCK:  Do you know the doctor?

THE JUROR:  No.

MR. BRUCK:  Okay.

THE JUROR:  I probably have met her, but I don't really know her.  I probably met her through her mother.

MR. BRUCK:  Have you talked to her mom and dad about what all she did that night, her experience?

THE JUROR:  No, but I've heard through other third parties of that long before I was expected to come here.

MR. BRUCK:  Sure.  There's been a lot of publicity about how she did.

MS. PELLEGRINI:  Objection.  I request that be

stricken.

THE COURT:  All right, it's...

MR. BRUCK:  Do you think that would have any effect on the way you look at this case?

THE JUROR:  Not at all.

MR. BRUCK:  Okay.  You bought your son a Boston Strong T-shirt?

THE JUROR:  That I did.

MR. BRUCK:  And can you tell me what the circumstances were?

THE JUROR:  Just coming into town the week after and there was a huge crowd of people shopping on Boylston Street. And I think it was just part of the Boston Strong sympathy that weekend that we were going to go about business as usual.

MR. BRUCK:  And what did the Boston Strong T-shirt mean to you?

THE JUROR:  What did the Boston Strong T-shirt mean to me?  I think it's just the spirit of Boston, that despite whatever happens, that we will continue.

MR. BRUCK:  You said that one idea, when Mr. Mellin was asking you questions, about when the death penalty might be appropriate would be for a crime against the state.  And I guess that brings up the question of this case.  Understanding that you haven't heard the case and haven't reached a decision, do you lean one way or the other about whether the death

penalty is appropriate for the Boston Marathon bombing?

THE JUROR:  I'm very torn about it.  I have a 17-year-old son, so I can't help being a mother too.

MR. BRUCK:  And what -- I guess what's the answer to my question about whether you're here, here, here (indicating)?

THE JUROR:  I would need to see the evidence.  I would have to know what actually happened.  All I know is what was in the media circus.

MR. BRUCK:  It's a two-part trial, as Judge O'Toole has explained to you, so by the time the jury gets to decide the punishment, they're past the question of whether they've got the right guy.  You don't decide punishment until you know beyond a reasonable doubt that the defendant did the crime. Picture yourself at that point having found that Mr. Tsarnaev is guilty.  I'm just supposing we get there.  Do you have an opinion at that point?

MR. MELLIN:  Objection.

THE COURT:  Sustained.  I think that's just a -- re-asking the form of the question.

MR. BRUCK:  Okay.

Do you think there's anything else that the Court or we should know now that you've had a chance to talk this through?

MR. MELLIN:  Objection.

THE COURT:  Yeah, I think we'll just leave it at that

unless there's something particular.

THE JUROR: Okay. Thank you.

MR. BRUCK: That's all I have.

THE JUROR: Thank you.

(The juror is excused.)

THE CLERK: Juror No. 186.

MR. McALEAR: Juror 186.

THE CLERK: Ma'am, over here, please, if you would.

Have a seat. Make sure you speak into the mic so everyone can hear you.

THE JUROR: Okay. Thank you.

THE COURT: Good afternoon.

THE JUROR: Good afternoon.

THE COURT: Since you were here last to fill out the questionnaire, have you been able to abide by my instructions to avoid any discussion of the substance of the case?

THE JUROR: Yes.

THE COURT: And to avoid, as much as you could, media --

THE JUROR: As much as I could.

THE COURT: -- exposure? Yeah.

Tell us about your employment.

THE JUROR: I work as an HR director at a high-tech software company in Waltham.

THE COURT: And are you the director?

THE JUROR:  Yes.

THE COURT:  In other words, you head up the HR?

THE JUROR:  I have a VP of HR above me, but I'm in charge of global operations from an HR perspective.

THE COURT:  How big is the company?

THE JUROR:  Worldwide we're almost 6,000.

THE COURT:  You say you don't -- in connection with your work, I guess -- use blogs.  Do you have anything to do with the company website?

THE JUROR:  No.

THE COURT:  But personally you use Facebook and Instagram?

THE JUROR:  Not really.  I have 11 friends on Facebook.  I'm on it just because people were sending invites, so they made me.  I'm not even on as myself.  I have an alias on there.  Because of what I do for a living, it's not advisable.  And I'm on Instagram because my 11-year-old niece just joined, so I felt the need to keep an eye on what she was doing.

THE COURT:  Okay.  So let me just ask you to turn to page 19 of your form.  We asked at the bottom, 74 and 75 -- we asked a couple of questions about what you thought when you received the summons and what people might have said to you and so on and so forth.  And in 74 you said you were anxious about how long the trial could be and how that would impact your job.

THE JUROR:  Uh-huh.

THE COURT:  Back in the beginning we had set out in Question 10 the schedule, and so on, and asked whether you thought it would be very difficult for you to serve, and you said no.  Did you sort of satisfy yourself about the impact or --

THE JUROR:  You know, it's not necessarily about the time.  It's more about the -- this is going to sound really silly, but the judgment that people would have.  Because so many people were making comments about, "Only dumb people end up on juries.  You have to be smart enough to get yourself out of jury duty."  So I feel like I would be criticized for not getting myself out of jury duty.

THE COURT:  How would that affect you?

THE JUROR:  It's hard to explain the people I work for.  They're -- it's hard to explain.  It's...

THE COURT:  Do you mean the people at work would think you owed it to them to talk your way out of it?

THE JUROR:  Yes.  My job should be my priority, and so shame on me if I wasn't able to be smart enough to get myself out of jury duty because I should be making my job my priority.

THE COURT:  And what do you think about that?

THE JUROR:  I disagree completely.  Completely.

THE COURT:  Okay.  On page 20, Question 77, we asked whether you'd had -- whether you had formed an opinion based on

things you'd seen and read in the media and otherwise whether the defendant was guilty or not, and then if so, what the appropriate punishment should be.  And you said -- to both -- "Do you have an opinion whether he's guilty?" you said "yes"; and "Do you have an opinion that he should receive the death penalty?" and you said "yes."  We asked down below whether -- if you had formed an opinion on those sources, whether you would be able to set that aside and base your decision about guilt or punishment only on the evidence presented at trial, and you said "able."

THE JUROR:  Uh-huh.

THE COURT:  So I want to ask you about those things.

THE JUROR:  Sure.

THE COURT:  You understand that in our criminal justice system anybody who is accused of a crime is presumed to be innocent, or not guilty, of the crime, and that presumption continues until the government changes it by proving otherwise at trial, by proving beyond a reasonable doubt that the person is, in fact, guilty.

Do you understand that that's --

THE JUROR:  Yes.

THE COURT:  -- sort of the basic principle under our prosecution of crime?

You say you formed some opinions.  If you were a juror in the case, would you be able to strictly apply those

principles that the government has the responsibility of proving at trial by the evidence, guilt beyond a reasonable doubt, and that the defendant has no burden to prove that he's not guilty?

THE JUROR: Yes. I do it for a living. There are situations that we have to investigate that you immediately go into assuming one set of facts is the truth, and then there's always another set of facts that you come to learn and your opinion changes. I'm not saying that it's my idea to be on the jury, but I do believe I could do it.

THE COURT: So we asked -- in Questions 80 through 82 we asked, you know, to try to gauge your personal involvement in any of the events. You had some friends who were nearby, I guess, if you look at your answer to Question 80.

THE JUROR: Yup.

THE COURT: Maybe you could tell us about that.

THE JUROR: Yes. We traditionally go in to the Red Sox game on Marathon Monday. And this was the first year in a long time that I wasn't able to join them because of work. So my friends -- I knew logically our routine, and so I guessed they would be at Who's On First, but I wasn't sure.

THE COURT: That's a restaurant?

THE JUROR: It's a bar on Yawkey Way, and so people tend to go there after the Red Sox game. And what we usually do is we go to the bar, and then about four o'clock we go and

cheer in the late runners, the ones -- we don't usually go to the finish line, but we go and cheer on the late runners.  So I logically had an idea of where I thought my friends would be, but I was anxious for a few minutes.

THE COURT:  So, what, the information you got from them you put in 80 you got later?

THE JUROR:  I was able to get ahold of them.  And I offered to go pick them up, and we realized very quickly that I wasn't going to be able to do that, and they felt a little bit stranded in town.  But one of the friends they were with was a Cambridge firefighter, and he somehow had a connection that was able to get them out of town.

THE COURT:  How long have you been doing this with this group?

THE JUROR:  Oh, jeez, probably since about 2000.

THE COURT:  Then on the top of the next page, you both in terms of your residence and the company, I guess, were impacted by the closures, the sheltering and so on?

THE JUROR:  Yes.

THE COURT:  Would that have any effect on you if you were a juror in the case?

THE JUROR:  No.  I lost a little bit of sleep, but that was fine.

THE COURT:  And then the next answer, you made some substantial contributions to the One Fund --

THE JUROR:  Uh-huh.

THE COURT:  -- and attended some events, I guess?

THE JUROR:  Yes.

THE COURT:  I don't know the facts behind the assessment, but it seems like that's a rather strong commitment to the fund.  Would that have any --

THE JUROR:  I tend to give to any natural disaster or any sort of -- you know, the one -- what's that, the Cancer Society, things like that, I tend to do that.  I think this one because it was so prevalent, there were so many opportunities to give, I probably donated more than I normally do.  There was a fundraiser in my town that was at a bar that I normally frequent, so I went.  I went to the Boston Strong concert.  It was a fun concert.

THE COURT:  It was at the TD Garden?

THE JUROR:  At the Garden, uh-huh.

THE COURT:  After -- any recent, in the last year or so?

THE JUROR:  No.  Honestly, now that I think about it, probably since the concert, that was probably the last.

THE COURT:  That was in the summer sometime?  People here probably know.

THE JUROR:  I'm not even sure, to be honest with you.

THE COURT:  Beginning on page 23 at Question 88, there are some questions to gauge your views about the death penalty

in general and potentially in this case.  So 88 asks for your general views.

THE JUROR:  Uh-huh.

THE COURT:  And you said, "I'm for the death penalty."

THE JUROR:  Yes.

THE COURT:  Do you want to explain that a little or --

THE JUROR:  I think there are some crimes that are so heinous that if the person is found guilty, the death penalty is warranted.

THE COURT:  In Question 89 we asked you to put yourself on the scale from strongly opposed to strongly favor, and you put 8, which is up towards the strength side favoring. As you think about it, is that about where you should be?

THE JUROR:  I think so.

THE COURT:  And then on the next page, in Question 90, we ask you to select which of the following possible statements best describes your feelings about the death penalty when somebody's been proved guilty of murder, and you selected E, you're in favor of the death penalty but could vote for a sentence of life imprisonment without the possibility of release if "I believe that sentence was called for by the facts and the law in the case"?

THE JUROR:  Uh-huh.

THE COURT:  Does that accurately represent your view?

THE JUROR:  Yes.  I think as you stated earlier, there

would be instructions with the case that would say what criteria needs to be met in order for the death penalty to be an applicable punishment, and if that was the case, then yes.

THE COURT:  And if you thought on the evaluation of that evidence it was not the appropriate punishment, would you be open to voting for life imprisonment instead?

THE JUROR:  Yes.

THE COURT:  Even though you tend to be in favor of the death penalty?

THE JUROR:  Yes.

THE COURT:  We asked at the bottom of 25 and the top of 26 a pair of questions that go together, really.  95:  "If you found the defendant guilty and decided that the death penalty was appropriate, could you conscientiously vote for it?" and you said "yes."

THE JUROR:  Yes.

THE COURT:  And then similarly on the next page, "If you found him guilty and decided that life imprisonment without the possibility of release was the appropriate punishment for him, could you conscientiously vote for that?"  And again you said "yes"?

THE JUROR:  Yes.

THE COURT:  Do those answers represent where you are on this issue?

THE JUROR:  Uh-huh.

MR. MELLIN:  Thank you.

Good afternoon, ma'am.  I'm Steve Mellin.  I'm one of the prosecutors in the case.

I just want to follow up.  On Question 77, Judge O'Toole asked you about your feelings after seeing the news media, and you said that you're able to set aside those feelings because I think you said that you do that all the time in your work, right?

THE JUROR:  Uh-huh.

MR. MELLIN:  There's also -- if you turn the page back to page 19, Question 75, that asks about what did others say to you about your possible jury service in this case.  And you said, "Most commented on the fact that we should skip the trial and go right to sentencing."  Is that right?

THE JUROR:  Many people have said that to me, yes.

MR. MELLIN:  Okay.  And do you understand that's not the process?

THE JUROR:  Yes.

MR. MELLIN:  Okay.  And is there anything about that that you would have a problem following the process in this court, which is first there's a guilt phase and you have to decide the guilt or innocence of the defendant based on the evidence here in court?

THE JUROR:  No, I have no problem understanding that it's a two-phase process.

MR. MELLIN:  Okay.  Very good.

And then just going on to the -- Judge O'Toole asked you about the contributions to the One Fund.  Is there anything about your contributions to the One Fund that you think would affect your ability to be a fair and impartial juror in this case?

THE JUROR:  No.

MR. MELLIN:  Okay.  And finally, about the -- just a couple of questions about the death penalty.  After hearing the instructions this morning, do you understand that if the jury is to get to the penalty phase, the jury would have already found the defendant guilty.

You understand that, right?

THE JUROR:  Yes.

MR. MELLIN:  And that in the penalty phase, there's this time when the government would put on aggravating evidence, or evidence that we think supports the death penalty, and the defense can put on what's called mitigating evidence, or reasons why they believe life imprisonment's appropriate.

Do you understand that?

THE JUROR:  Yes.

MR. MELLIN:  And while that is going on would you keep an open mind before making a decision?

THE JUROR:  Yes.

MR. MELLIN:  Okay.  So the fact that you'd already

found the defendant guilty, would you wait until the end to make a decision or would you automatically vote to impose the death penalty just because you found him guilty?

THE JUROR:  So again, if I understand the process correctly, it's a two-phase process.  So guilt is one piece of it, sentencing is another, and there will be different evidence to support life in prison versus the death penalty?

MR. MELLIN:  Correct.

THE JUROR:  It's two separate processes.  Yes, I could make the distinction.

MR. MELLIN:  Okay.  And during that second process you would keep an open mind to consider the evidence?

THE JUROR:  Yes.

MR. MELLIN:  Okay.  Thank you.

MS. CONRAD:  Good afternoon.  My name is Miriam Conrad.  I'm one of Mr. Tsarnaev's lawyers.

Following up on something Mr. Mellin asked you, when people said to you "we should just skip the trial," what did you say back?

THE JUROR:  I agreed in some -- in some conversations I agreed.

MS. CONRAD:  So as you sit here today do you agree?

THE JUROR:  No.  I mean, these were conversations when the whole thing first happened and I wasn't as thoughtful about it; I was more emotional.

MS. CONRAD:  And what time frame would you say this was?

THE JUROR:  I would say probably months after it happened, within that.

MS. CONRAD:  And how many people would you say you said that to?

THE JUROR:  I have no idea.

MS. CONRAD:  And what was behind that?  Can you just -- I mean, I appreciate your candor.  I really do.

THE JUROR:  No, no, I understand.

MS. CONRAD:  I'm just wondering what you said --

THE JUROR:  There were children involved.  There were children involved.

MS. CONRAD:  And when you got your summons -- I just want to -- did you realize it was for this case?

THE JUROR:  I had no idea.

MS. CONRAD:  But you said that, if you'd just turn to 19, Question 75, when people found out that you'd received a summons for this case --

THE JUROR:  No, it had nothing to do with that.  It was when I actually had to take the 5th off, January 5th off, and people started making the connection for me.  Quite frankly, I don't follow the news that closely.  I wasn't aware that the trial was starting.

MS. CONRAD:  Okay.  But at that point when people

learned that you might be in the jury pool for this case --

THE JUROR:  Uh-huh.

MS. CONRAD:  -- they commented that -- they expressed their view that "we should skip the trial."

THE JUROR:  I don't recall anyone specifically saying that.  I don't...

MS. CONRAD:  Can I just ask you to read your answer?

THE JUROR:  Yeah.  Sorry.

(Pause.)

THE JUROR:  Oh, possible jury service.  I don't think I read that fully.

MS. CONRAD:  But the question before that was about the jury summons.

THE JUROR:  Yeah, so you're right.  I must have -- I must have had conversations; I'm just not recalling anything specific.

MS. CONRAD:  Well, to the best of your ability to recall those conversations, at that point once you received your summons and realized that you might possibly serve as a juror in this case, when people expressed that view to you, how did you respond?

THE JUROR:  Again, I apologize because I'm not recalling specifically right now, so I don't remember what my response would have been.

MS. CONRAD:  Do you remember how you felt about it?

THE JUROR:  The overall feeling I had was sitting there feeling very anxious that this could be months of my life in a trial.

MS. CONRAD:  But when you -- did you have any feelings -- or do you have any feelings or reaction to the possibility of being a juror in this case?

MR. MELLIN:  Objection, your Honor.  Asked and answered.

THE COURT:  Yeah, I think we've been over it.

MS. CONRAD:  Okay.  Let me ask you something else, then.

You mentioned -- or you told us about your annual tradition of going to the Red Sox game on Marathon Monday.  Did you do that again this past year?

THE JUROR:  I did.

MS. CONRAD:  In 2014?

THE JUROR:  Yes.

MS. CONRAD:  And did they have any sort of ceremony honoring the victims and survivors of the marathon?

THE JUROR:  If I recall, I believe it was the day before.

MS. CONRAD:  So you weren't there for that?

THE JUROR:  No.

MS. CONRAD:  Did you go and watch the runners at the end of the marathon in 2014?

THE JUROR:  Yes.

MS. CONRAD:  And where did you watch?

THE JUROR:  I apologize.  I'm not aware of the exact address, but it's right there where the McDonald's and Pizzeria Uno's are.  It's, like, I think at the end of --

MS. CONRAD:  Do you know what T station it's close to?

THE JUROR:  No, I'm not very good about that.

MS. CONRAD:  Do you usually walk over from Fenway?

THE JUROR:  That's exactly it; we walked.

MS. CONRAD:  So when you first heard about the bombing in 2013, how long was it from when you heard about it to when you found out that your friends were safe?

THE JUROR:  Probably 15 minutes.  We heard about it pretty quickly.

MS. CONRAD:  So -- but you were able to reach them pretty quickly?

THE JUROR:  Yes, on cell phones.

MS. CONRAD:  What was your first reaction when you heard about the bombings?  Was it concern for their safety?

THE JUROR:  Yes.

MS. CONRAD:  And you told us that you had -- and again, we appreciate your honesty, but you told us that you had formed an opinion that Mr. Tsarnaev is guilty and should receive the death penalty.  And I appreciate your expressing your understanding of the legal principles, but we're all

human.

THE JUROR:  Right.

MS. CONRAD:  So can you first tell me what's behind it?  What formed your opinions or what influenced your opinions?

THE JUROR:  Do you want to know specifically or --

MS. CONRAD:  Sure.

THE JUROR:  Yeah, I think seeing the Lord & Taylor video was evidence of my opinion; the incident that happened in Watertown, the fact that he was literally right there with a gun in hand.  That's what formed my opinion.

MS. CONRAD:  And you -- what about your opinion about whether -- that he should receive the death penalty?  What formed --

THE JUROR:  I mean, that's not necessarily specific to him.  There's -- I think crimes involving children I have strong feelings about.

MS. CONRAD:  But the question on page 20 was whether you had formed an opinion that he should receive the death penalty, and you said "yes."  So it was specific to this case.

THE JUROR:  Again, there was a child involved, and I have a strong opinion about the death penalty when children are involved.

MS. CONRAD:  And I appreciate that.  So when Judge O'Toole was asking you some questions about the presumption of

innocence and the government having the burden of proof, you said that if you heard different facts at trial you could apply the burden of proof.  Is that what it would take for you to find Mr. Tsarnaev not guilty?

MR. MELLIN:  Objection.

THE COURT:  Sustained.

Yeah, you don't have to answer that question.

MS. CONRAD:  Let me ask it a different way, then.  Let me reframe the question.

Would you expect the defense to produce evidence that Mr. Tsarnaev did not commit the crimes?

THE JUROR:  So if I'm understanding your question correctly, if you were to present contradictory evidence to what I believe I have seen in the past, would I be able to believe that evidence?

MS. CONRAD:  That's a great question, but that wasn't my question.  My question is -- but can you answer that question?

THE JUROR:  Yes.  Yes.

MS. CONRAD:  Okay.  What if the defense didn't present any evidence, and the government presented evidence but that evidence was not sufficient to provide proof beyond a reasonable doubt?

THE JUROR:  We're talking reasonable doubt?

THE COURT:  On behalf of the process, I'm going to

object to that.

MS. CONRAD:  Well, your Honor --

THE COURT:  No, the defense will -- it's getting too technical in the mechanics of litigation, what the defense presents and doesn't present; for example, evidence is presented through cross-examination.  And so it's -- I think it's a very misleading, difficult question for a layperson to answer.

MS. CONRAD:  Well, your Honor, I really think it goes back to the presumption of innocence, so if I could take another --

THE JUROR:  Could I try to answer it for you?

MS. CONRAD:  Sure.

THE JUROR:  I think I understand what you're getting to.  My grandfather was a defense attorney in Boston for over 45 years.  I feel that I understand the defense process.  And so I believe, again, if it was not warranted to find a guilty plea, I would be able to do that.

MS. CONRAD:  I appreciate that you understand our role.  I'm asking about you as a human being, whether you would be able to return a verdict of not guilty in this case.

MR. MELLIN:  Objection.

THE COURT:  I think it's already been answered, but go ahead, answer it.

THE JUROR:  Yes.

MS. CONRAD:  And how much money have you donated to the various Boston Strong --

THE JUROR:  I'm not sure.  Some of it was through your cell phone when a number would come up on the screen and you'd just hit it; I participated in a charity auction that I think I bought a $100 salad bowl.  I think it was a $50 donation just to get in the door; concert tickets.  As I said, I'm not sure.

MS. CONRAD:  So -- but you said "hundreds," so can you give us a ballpark?

MR. MELLIN:  Objection.

THE COURT:  Yeah, I think that's enough.

THE JUROR:  I just did.

THE COURT:  I think we're ready to move on unless you have another topic.

MS. CONRAD:  Okay.

(Pause.)

MS. CONRAD:  Thank you very much.

THE JUROR:  Thank you.

(The juror is excused.)

THE COURT:  I'd like to do the next one because I think it might be quick, if you'd look at Question 10.

(Discussion off the record.)

THE COURT:  Oh, that's the one that's not here?  That was quicker than I thought.

MR. BRUCK:  That was quick.

THE COURT:  Then I think maybe -- let me just look at my notes for the next -- yeah, the next one will be more extended, so why don't we take the lunch break.  What do you think, two o'clock?  Quarter to two?  Whatever?  Two o'clock?  I think we're going along pretty expeditiously, generally speaking.  It looks like we have about five left.  That's not too bad.  As long as --

THE CLERK:  We have six.

THE COURT:  Do we have six?  Yeah, I created two piles.  That's still not bad.  All right.  So we'll see you about two o'clock.

(The Court exits the courtroom, and there is a recess in the proceedings at 1:00 p.m.)

AFTERNOON SESSION

(The Honorable Court entered the courtroom at 2:14 p.m.)

THE CLERK:  Juror No. 189.

MR. McALEAR:  Juror 189.

THE CLERK:  Sir, over here please.  Have a seat. Thanks.  Make sure you speak into the mic so everyone can hear you.

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon.

THE COURT:  Since your last visit with us when you filled out the questionnaire, have you been able to abide by my request that you avoid any discussion of the case as much as possible and avoid media accounts of the case?

THE JUROR:  Yes, I have.

THE COURT:  Okay.  Tell us a little bit about your employment, what you do?

THE JUROR:  Sure.  I currently work for a nonprofit here in Boston called City Year.  We're an education-focused nonprofit that has recent high school and college graduates volunteer in high poverty urban schools in 26 cities in the country.

THE COURT:  And your position?

THE JUROR:  Vice-president of corporate partnerships.

THE COURT:  So you're...

THE JUROR:  So I work with companies that help fund our efforts.

THE COURT:  Trying to enlist support?

THE JUROR:  Absolutely.

THE COURT:  Okay.  Tell us about social media that you use.

THE JUROR:  Sure.  I use a variety of social media, both personally and as part of my job.

THE COURT:  And do you use different media for different purposes?

THE JUROR:  For both.  Use them in different ways.  I mean, each particular piece of social media is used in a different way based on the audience, based on how you would use it.

THE COURT:  How about Facebook, for instance?  How would you use it?

THE JUROR:  Primarily for personal information for Facebook, friends, families, et cetera.

THE COURT:  And Twitter?

THE JUROR:  Stuff with my kids.  Twitter is a little bit different.  Twitter is more of a business purpose for me but trying to sprinkle in both personal as well to give more context.

THE COURT:  I assume City Year has a blog?

THE JUROR:  Yes.

THE COURT:  A website and a blog?

THE JUROR:  We also have a blog, yes.

THE COURT:  Do you contribute to that?

THE JUROR:  Not personally yet, no.

THE COURT:  Your wife has a cousin who was injured in Iraq?

THE JUROR:  Yes.

THE COURT:  When was that?  When was he injured?

THE JUROR:  It was hard for me to place the exact year.  I want to say probably about eight years ago.

THE COURT:  So 2007, 2006?

THE JUROR:  Sounds right to me.

THE COURT:  How serious was the incident.

THE JUROR:  Pretty serious.  He's lost some function in his right leg.  He was injured in the head and chest.  But he's made a very strong recovery, so he walks with some support, but is doing well.

THE COURT:  And what's he doing now?

THE JUROR:  He's in school and living with family.

THE COURT:  It says he was a sniper injured by an IED?

THE JUROR:  Yes.

THE COURT:  Do you know the details at all?

THE JUROR:  Other than he was with his platoon and things went wrong.

THE COURT:  And you can take a look at -- we'll follow

it up with questions --

THE JUROR:  Sure.

THE COURT:  -- the answers you gave to the questions in the questionnaire.  I'm looking now at Page 11.

THE JUROR:  Uh-huh.

THE COURT:  And question 33 now.  Three relatives -- two relatives and a friend --

THE JUROR:  Correct.

THE COURT:  -- friend of a relative, I guess, who are lawyers, you say, in private practice.  Do you know what kind of work they do, what subject matters?

THE JUROR:  My brother-in-law is in private practice; he's a defendant or defense lawyer.

THE COURT:  Criminal defense or civil defense?

THE JUROR:  Civil defense, I believe.

THE COURT:  Is he in a firm?

THE JUROR:  His family firm.

THE COURT:  Okay.  And how about the others?

THE JUROR:  The other is my uncle who is in private practice.  I'm not sure what area he focuses in these days.

THE COURT:  And the wife's friend?

THE JUROR:  My wife's friend?  Also a family firm currently doing mostly real estate and --

THE COURT:  As far as you know, all of them are doing civil work?

THE JUROR:  As far as I know.

THE COURT:  And where?  Are they all around here?

THE JUROR:  No.  Brother-in-law and uncle are in greater St. Louis area, and my friend and my wife's friend is here locally.

THE COURT:  Okay.  So I'm now at Page 19.  We asked a couple of questions about your reaction when you realized you might be a possible juror in this case and then what people may have said or you said to them about it.  You said you were surprised when you learned what the case would be.  "Emotional when I remembered the bombing.  Intrigued at the process of a case like this."

Can you explain the answer a little?

THE JUROR:  Sure.  A variety of things.

THE COURT:  Yes.

THE JUROR:  I think, one, I had a lot going on at the time so I hadn't realized I was being summonsed for a federal trial at the time and got the automatic phone call the day before and was surprised; and then, two, putting two and two together as far as what case we were talking about surprised me as well, and the magnitude of that.

From a personal standpoint, I -- in my career, I worked for an event that takes place along the route of the Boston Marathon, fundraiser for the first five years of my career, got to know all the folks that organize the race, the race director, pretty

10-141

well in a professional relationship.  After that, ended up being a participant in the Marathon three separate times, including once with my wife, and once where I had a medical emergency, was transported to the finish, and then again a third time successfully completing it.  So it's a fairly emotional race for me personally

THE COURT:  So let me ask you this:  Do you think you're too close to the race to be a juror for this case?

THE JUROR:  I believe I would be.

THE COURT:  You would be too close?

THE JUROR:  Yes.

THE COURT:  Anybody want to just follow-up on that?

MR. MELLIN:  No.

MR. BRUCK:  Yes, please.
There are a lot of people in Boston that are connected to the Marathon.

THE JUROR:  Of course.

MR. BRUCK:  If there's going to be a jury in Boston, it's going to be composed of people who remember this event.

MR. MELLIN:  Objection.

THE COURT:  Well, go ahead.

MR. BRUCK:  An awful lot of people feel emotional about the bombing at the marathon in Boston.  And you're one of those people.

THE JUROR: (Juror nods.)

MR. BRUCK:  Juries are supposed to be composed of people who have different feelings, not people who all feel the same way.

THE JUROR:  Right.

MR. BRUCK:  Do you think that that's important, that there be a cross-section?

MR. MELLIN:  Objection.

THE COURT:  Yeah, I don't think that's all -- with all due respect, whether he thinks that's important, we're trying to get at his ability to be a fair and impartial juror.  That's the question.

MR. BRUCK:  Fair enough.

When you say -- of course the law requires jurors to put aside if they possibly can their own -- what they know, what they read, what they've heard, even what they feel, if they can do it, and be objective and be guided by the evidence presented in court.  And that's the real question.  Put that way, do you think you could put aside your emotional connections long enough to be an objective juror and be fair to both sides?

THE JUROR:  I believe deeply in the process and the importance of the process.  What I can tell you is I've been often surprised by the level of emotion that comes to me when dealing with this particular race and my personal experiences with that.  In addition, a significant number of people that I

know, that I've worked with, were in the immediate area and potentially at harm.  And I think it would be difficult for me to separate that as part of a trial in digging back into the specific events of that day.

MR. BRUCK:  Very well.

THE COURT:  Okay.  I think we'll stop here.  Thanks.

THE JUROR:  Thank you.

(The juror was excused.)

THE CLERK:  Juror No. 190.

MR. McALEAR:  Juror No. 190.

(Juror 190 enters the courtroom.)

THE CLERK:  Ma'am, over here, please.  Have a seat. Make sure you speak into the mic so everybody around here can hear you.  Okay.  Thanks.

THE COURT:  Good afternoon.

THE JUROR:  Hello.

THE COURT:  Since you were last here to fill out the questionnaire, have you been able to abide by my instructions to avoid any discussion of the case, except for logistical --

THE JUROR:  Yes, sir.

THE COURT:  -- things?

And as much as possible avoid any exposure to media accounts?

THE JUROR:  Yes.  I don't read the paper or anything.

THE COURT:  Okay.  Thank you.

I just want to ask a couple of employment questions first.  And you can follow along if you want.  I'm looking at Page 6, Question 13, where we ask about in this case your husband's employment.  You say he's a senior project manager, but I want to get an idea of what kind of field he's in.

THE JUROR:  He works for an excavation company, James W. Flett Company in Belmont.  They do a lot of dirt work, they call it.  You know, they dig the foundations and things like that.

THE COURT:  And how long has he done that?

THE JUROR:  I think my son's 27.  So 27 to 28 years.

THE COURT:  I see he has a business degree.  Is his work business work or is it engineering work?

THE JUROR:  He's not an engineer.  When he got his job, they kind of taught him.  He does project management and he also does estimating.

THE COURT:  Okay.  Now yourself?

THE JUROR:  I'm an operations manager in a nonprofit in Gloucester for an elder home care agency.  I do all the scheduling.  I'm in charge of the 400 clients and 100 home health aides.

THE COURT:  100 home health aides?

THE JUROR:  Yup.  We keep the elderly in their homes. We send the girls out to do showers, housekeeping, laundry, in order to keep them home from the nursing home.

THE COURT:  So you, among other things I'm sure, but you sort of oversee the assignments?  Is that one of the things you do?

THE JUROR:  I'm in charge of everybody.  There's a director over me and I'm kind of like the central command.

THE COURT:  Okay.  We asked about social media, and you identified Facebook.  It says you don't post messages or opinions, you just play games.

THE JUROR:  No, I don't.  I talk to my sister and play the slot games.  That's it.

THE COURT:  So let me ask you to turn to Page 20.  We asked here to try to ascertain whether you had formed an opinion about issues in this case, in particular whether you had formed, based on the media or other things you had seen or heard about, whether you had an opinion whether the defendant is guilty or not guilty, and whether he should receive the death penalty or not.  And as to the first two, you said you had formed an opinion that he was guilty.  As to the second two, you said you were unsure about the death penalty.

And then below those we asked if you answered yes to any of the questions, would you be able or unable to set aside your opinion and base your decision about guilt or punishment solely based on the evidence presented in court, and you said you thought you would be able.

You understand that in a criminal prosecution in this

country, a person accused of a crime is presumed to be innocent of the crime charged unless and until the government proves that he's guilty by the evidence at trial and convinces the jury collectively that he is guilty beyond a reasonable doubt.

Do you understand --

THE JUROR:  Correct.

THE COURT:  -- that those are the rules that apply?

THE JUROR:  Yeah.

THE COURT:  So what we ask jurors to do is set aside notions they may have from other sources and to pay attention to the evidence at trial, focus their attention on that.

THE JUROR:  Uh-huh.

THE COURT:  And if they are convinced beyond a reasonable doubt, to say so.  But if they're not convinced by that evidence, no matter what else they've heard, they -- and cannot find beyond a reasonable doubt that the defendant is guilty of the charge, their obligation is to find the defendant not guilty.  Do you understand that?

THE JUROR:  I do.

THE COURT:  So in this question it appears you're telling us that you have an opinion, but then later we asked could you set it aside and pay attention to the evidence at trial and make your judgment on that.

THE JUROR:  What I meant by that was based on what I had heard in the news and the media and everything, I believe

him to be guilty based on what I had heard and seen.  But I'm open to, you know, listening, to hear the facts, and I would be able to set that aside and listen to the facts and form an opinion after that.

THE COURT:  Actually, we ask you to do it in a slightly different order.

THE JUROR:  Okay.

THE COURT:  First we ask you to set it aside, and then listen to the facts.

THE JUROR:  Okay.

THE COURT:  And the distinction is the defendant has no obligation to prove that he's not guilty.  The defendant is always presumed to be guilty unless the government has proven otherwise.  So I don't know if you meant to suggest it, but I heard it in the answer that if --

THE JUROR:  I think I'm a little nervous.

THE COURT:  Fair enough.  And you're a lay person in a highly --

THE JUROR:  I think, because I'm a little nervous, I just mixed it up.

THE COURT:  Fair enough.  But I just want to be sure that's the case --

THE JUROR:  Yes.

THE COURT:  -- that you do understand, the defendant doesn't have any obligation to explain himself or to show you

that he is not guilty.  The burden is always on the government to prove he is guilty.

THE JUROR:  I understand.

THE COURT:  Another way of putting it is:  The question is never "which side has convinced me," it's "has the government convinced me by the evidence that he's guilty."

THE JUROR:  Right.

THE COURT:  You understand that?

THE JUROR:  I do.

THE COURT:  Okay.  And so tell us what you think your condition of mind would be if you were a juror in this case with respect to those matters.

THE JUROR:  Meaning how would I find him guilty?

THE COURT:  No.  Would you be able to put aside prior impressions or conclusions --

THE JUROR:  Uh-huh.

THE COURT:  -- and concentrate solely on the evidence at trial and make your judgment about that, or would your prior thoughts about the case, opinions, conclusions, interfere with your ability to judge the case solely on the evidence produced at trial?  Which do you think it would be?

THE JUROR:  I don't believe that would get in the way. I'm pretty open-minded.  I work in a nonprofit.  We see a lot of different people and different things.  At first sight -- you usually at first sight sometimes first form a first opinion

about somebody without getting to know them and hearing the facts. I think I'm pretty open-minded that I would be able to do that.

THE COURT: We also asked you some questions about your attitude toward the death penalty.

THE JUROR: Okay.

THE COURT: That begins on Page 23, a group of questions. The first one is 88, which asks for your general views on the death penalty, if you had any. And you said, "I do believe in the death penalty if the crime is severe enough and warrants it."

THE JUROR: Uh-huh.

THE COURT: Does that represent your view?

THE JUROR: Uh-huh.

THE COURT: Do you want --

THE JUROR: No.

THE COURT: -- to qualify that or expand on it?

THE JUROR: I haven't had -- in my lifetime, I haven't had to think about it too much. But I do believe on certain things, if it's premeditated or if they set out to do something purposefully and to harm people or kill people, depending on the circumstances, I do believe in it.

THE COURT: In the next question, 89, we asked you to give us some measure of how firmly or strongly you believe it from 1 to 10, with 10 being strongly favor. And you selected

7, sort of above midpoint, but not at the extreme.

THE JUROR: Uh-huh.

THE COURT: Is that what you meant to convey?

THE JUROR: Yes. Uh-huh.

THE COURT: Question 90 on the next page, which asked you to select which of the potential statements or which of the proposed statements best describes your view of the death penalty in a case involving someone proven guilty of murder, and you selected E, which is "I'm in favor of the death penalty but I could vote for a sentence of life imprisonment without the possibility of release if I believe the sentence was called for by the facts and the law in the case."

THE JUROR: (Juror nods.)

THE COURT: As you're here today, does that still represent your views?

THE JUROR: It does, yes, sir.

THE COURT: So depending on the -- you heard me this morning describe the so-called penalty phase, where there will be additional information, assuming -- you don't get to the penalty phase unless somebody has been convicted of a qualifying crime. So that's the premise --

THE JUROR: Right.

THE COURT: -- that the person is guilty of intentional murder, for example.

THE JUROR: Right.

THE COURT:  And in the penalty phase, then you'd hear evidence that might be directed at persuading you that one penalty was better than the other for this case.

THE JUROR:  Uh-huh.

THE COURT:  By this, are you conveying that you are open to consideration of that evidence and potentially could be persuaded in either direction by that evidence?

THE JUROR:  Yes.  That's what I'm trying to say. Depending on the circumstances and what I hear as facts, I could maybe be swayed either way.

THE COURT:  Okay.  Look at Page 25, the last question on that page.  We asked if you found the defendant guilty and decided that the death penalty was the appropriate punishment, could you conscientiously vote for the death penalty?  And you said yes.

THE JUROR:  I believe I could.

THE COURT:  And the next question on the top of the next page we ask the other side of that page.

THE JUROR:  25?

THE COURT:  26, Question No. 96.

THE JUROR:  Okay.

THE COURT:  So this question now asks the other side and says, "If you found him guilty and you decided life imprisonment without the possibility of release was the appropriate punishment, could you conscientiously for that

penalty?"

THE JUROR:  Yes.

THE COURT:  And you said yes.

THE JUROR:  Yes.

THE COURT:  Any follow-up?

MR. MELLIN:  Thank you, your Honor.

Good afternoon.  I'm Steve Mellin.  I'm one of the prosecutors in the case, and I've been told to slow down.  If I'm talking too fast, please let me know that I'm talking too fast.

THE JUROR:  Okay.

MR. MELLIN:  Just following up a little bit on what you were just talking to Judge O'Toole about, the death penalty, you indicated or said if it was premeditated or there's a killing, you would be open to the idea of the death penalty.  Is that right?

THE JUROR:  Yes.

MR. MELLIN:  And just for the record, you have to say yes or no for the court reporter.  Okay?

THE JUROR:  Yes.  I'm sorry.

MR. MELLIN:  Okay.  And in determining or deciding the appropriate punishment, do you understand that the jury would have already found the defendant guilty of one of these capital accounts -- capital counts.  Do you understand that?

THE JUROR:  I do.

MR. MELLIN:  Okay.  So by time you get to the penalty phase -- the government would be putting on evidence of these aggravating factors, the reasons why we think it's appropriate. Do you understand?

THE JUROR:  Yes.

MR. MELLIN:  And the defense has an opportunity to put on mitigating evidence or evidence they would argue is the reason why life imprisonment is appropriate.  Do you understand that?

THE JUROR:  I do.

MR. MELLIN:  Okay.  And when you're listening to that information, are you going to have an open mind in deciding the appropriate punishment, or because you've already found him guilty of the capital offense, are you already going to determine what you think the appropriate punishment is?

THE JUROR:  I've never been in that circumstance to, you know, be in that position, but I'm hoping I would be open minded.  I feel like I am that kind of person.  I'm an educated person, someone who works with all kinds of people in my job, and I would hope I would be.  I can't say for certain, I've never been in that position, but I really think I could be.

MR. MELLIN:  And if you get to the point -- and if you were in a case in which you found these aggravating factors sufficiently outweighed the mitigating factors to justify a sentence of death, would you be able to vote to impose a

sentence of death on someone?

THE JUROR:  I've thought about it, and I believe I could.

MR. MELLIN:  All right.  Thank you, your Honor.

MS. CONRAD:  Good afternoon.  My name is Miriam Conrad.  I'm one of Mr. Tsarnaev's lawyers.

First of all, could I ask you to tell us a little more about your career?  You told us that you are an operations manager.  It sounds like you're supervising a lot of people.  I assume you didn't start out at that level and you sort of worked your way up?

THE JUROR:  No.  I actually started my job when my youngest son went to kindergarten as a way to get out of the house.  I was doing scheduling.  And then over the last 18 years, I've built up in my position, being in charge of everybody.  There's a director over me who does more of the paper work and things, but I'm the one who runs the business part of it.

MS. CONRAD:  Have you during your career -- I know you're a licensed social worker.

THE JUROR:  (Juror nods.)

MS. CONRAD:  I just need you to answer out loud for the court reporter.

THE JUROR:  Oh, okay.

MS. CONRAD:  When you nodded your head, you meant yes,

right?

THE JUROR:  Yes.  I'm sorry.

MS. CONRAD:  It's okay.  It's not a normal conversation, unfortunately.

And have you at any point had direct client contact as a social worker?

THE JUROR:  Previous to my position I'm in now, I did work for the Commonwealth of Massachusetts in the Welfare Department.

MS. CONRAD:  Can you tell me a little bit about what kind of work you did in that capacity?

THE JUROR:  I was a social worker, and we calculated food stamps, AFDC, General Relief, things like that.

MS. CONRAD:  You had a case load, I assume?

THE JUROR:  Yes.

MS. CONRAD:  And I also just have to ask you.  You said your father was a statue maker.  Can you tell me what that means?

THE JUROR:  My dad was born in Italy, and he worked for Bay State Statuary.  He made statues.

MS. CONRAD:  Interesting.

You said you had obviously, as most people have been, been exposed to news reports and media reports about the Boston Marathon bombing.  Can you tell us what sticks out in your mind about what you have seen, heard, read?

THE JUROR:  After it happened what sticks out in my mind that I read?

MS. CONRAD:  Yeah.  Just everything you've been exposed to.  What are the main things?

THE JUROR:  Just about how many people did get injured, and, you know, how people were in shock, and the horrificness [sic] of it.

MS. CONRAD:  And if the defendant were found guilty of committing the marathon bombings --

THE JUROR:  Yes.

MS. CONRAD:  -- is that the type of crime that you would consider warrants the death penalty?

MR. MELLIN:  Objection.

THE COURT:  I think it's a stake-out.

MS. CONRAD:  Well, you told us, I think it was in your questionnaire, that you said if the crime was serious enough.

THE JUROR:  Uh-huh.

MS. CONRAD:  Is that the type of crime that you would consider serious enough?

THE JUROR:  Yes.

MS. CONRAD:  And would you be able to consider things like the defendant's background, lack of a criminal record, age, in determining -- having already hypothetically found him guilty -- determining whether or not the death penalty was an appropriate punishment?

MR. MELLIN:  Objection to the specifics.

THE COURT:  Well, go ahead, you can answer.

THE JUROR:  Yes.

MS. CONRAD:  Now, you told us you like to think of yourself as an open-minded person.  I think we all would like to be open-minded.  But this is different, presumably, from anything you've ever been asked to do before.

THE JUROR:  I understand.

MS. CONRAD:  And we're really just asking for the most honest answer you can give us.

THE JUROR:  Uh-huh.

MS. CONRAD:  There's no right or wrong answers.

THE JUROR:  Okay.

MS. CONRAD:  And you know yourself better than we know you, obviously.  You said in your questionnaire that you had already formed an opinion that he was guilty.

THE JUROR:  (Witness nods.)

MS. CONRAD:  I'm sorry?

THE JUROR:  Yes.

MS. CONRAD:  And if you were chosen as a juror for this case, would you truly be able to put that out of your mind and presume him to be innocent?

THE JUROR:  I have never been in that position.  I hope I could.  I couldn't guarantee it.

MS. CONRAD:  And if the government did not prove his

guilt beyond a reasonable doubt, would you be able -- do you know whether you'd be able to return a verdict of not guilty?

THE JUROR:  If they were not able to prove their case?

MS. CONRAD:  Beyond a reasonable doubt?

THE JUROR:  I'm not sure.

MS. CONRAD:  Thank you.  I have nothing further. Thank you very much.

THE COURT:  Anything else?  Okay.  Thank you.

(The juror was excused.)

THE CLERK:  Juror No. 191.

THE CLERK:  Juror No. 191.

Have a seat here, if you would, please, sir.  Speak into the mic so everybody can hear you.  Okay?

THE JUROR:  Okay.

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon.

THE COURT:  Since you were here to fill out the questionnaire that we've put in front of you, that's your questionnaire, since that time, have you been able to avoid any discussion of the substance of the case with anybody?

THE JUROR:  Yes.

THE COURT:  And also as much as possible avoid exposure to any media articles about it?

THE JUROR:  Yes.

THE COURT:  Okay.  So we're going to follow up on some of the answers you gave so you may want to follow along as we do that.  First I want to turn to page, I guess it's Page 6, Question 13.  We asked about how your wife is employed and so on.  She's an RN?

THE JUROR:  Yes.

THE COURT:  Where does she work?

THE JUROR:  Hebrew Rehab Center.

THE COURT:  Okay.  In West Roxbury, Jamaica Plain?

THE JUROR:  Yeah, Roxbury.

THE COURT:  And then yourself.  You work at Newton Wellesley Hospital?

THE JUROR:  Yes.

THE COURT:  What kind of work do you do there?

THE JUROR:  I'm a patient care assistant plus a unit coordinator.

THE COURT:  What does a unit coordinator do?

THE JUROR:  More like a secretary.

THE COURT:  Okay.  To keep track of --

THE JUROR:  Like -- it's mostly to -- we put like transfer order.

THE COURT:  Patients coming in and going out, is that what you mean?

THE JUROR:  Yes.  And whenever the doctor, they put in orders for the patient, we would actually confer them over to the nurse, nurses.

THE COURT:  Okay.  And we also asked, you'll see at the bottom of Page 10 and top of Page 11, what social media you might use, Facebook, Instagram.

THE JUROR:  Yes.

THE COURT:  And it's on Page 10, at the bottom we

asked if you posted messages or things.  And you said, "pictures, quotes, nothing too personal."

THE JUROR:  Yes.  Exactly.

THE COURT:  How often would you be using those?

THE JUROR:  Actually I don't really use it as much.  I would say probably once a -- once, twice a week.

THE COURT:  Either of them?  Either Instagram or Facebook?

THE JUROR:  Both.

THE COURT:  Both?  Okay.  You think your father-in-law -- this is question 33 on Page 11.

THE JUROR:  Yes.

THE COURT:  Your father-in-law may have worked for a prosecutor's office or public defender's office or some other law office?

THE JUROR:  Yes.

THE COURT:  What can you tell us about that?

THE JUROR:  He used to -- he used to live in Boston.  He's an attorney.  But he had moved to Atlanta.  And that's like long before I came to Boston.

THE COURT:  Do you know what kind of law he did?

THE JUROR:  I don't know what he did then.  But now he do immigration law.

THE COURT:  Okay.  In Atlanta?

THE JUROR:  In Atlanta.

THE COURT:  Could we cut the audio, please.

MR. MacELHINEY:  Cut.

(Discussion at sidebar and out of the hearing of the public:)

(In open court:)

THE COURT:  In question 42 on Page 14, you said you've served as a juror?

THE JUROR: Yes.  Yes, I have.

THE COURT:  What court was that?

THE JUROR:  I don't remember the name of the court, but it's in Dedham.

THE COURT:  Dedham?

THE JUROR:  Yes.

THE COURT:  Was it a civil case or a criminal case?

THE JUROR:  Civil.

THE COURT:  Do you remember what it was about?

THE JUROR:  There was this guy, he fell off his motorcycle, and it was at the intersection, this guy was coming out with his truck, and at the same time, he was riding the motorcycle, and they almost collide, and he fell.

THE COURT:  Okay.  Was it -- was the trial completed to a verdict?

THE JUROR:  Yes.

THE COURT:  I'm now on Page 19.  Question 74 and 75, we ask for some reactions you may have had when you got the summons for this case.  And you said, "No difference whether I'm chosen or not."  That was your thought at the time?

THE JUROR:  Yes.

THE COURT:  Indifferent either way?

THE JUROR:  No.  Haven't changed.

THE COURT:  Okay.  And the next page, look at question 77.  We asked whether you had formed an opinion about this defendant's guilt based on information you had from the news

media or otherwise, and also whether you had formed any opinion about a potential penalty.  In part A of question 77, that was the question whether you had an opinion about his guilt, and you said "no."  As a matter of fact, you said "no" to all four of the questions.  I wonder if you could tell you what your thoughts are about that.

THE JUROR:  To be honest, I haven't formed an opinion against the situation because I actually wasn't following it.

THE COURT:  You didn't follow the events when they happened?

THE JUROR:  No.  Actually, more than what was here on the news, other than that, no.

THE COURT:  Okay.  So if you were to be a juror in this trial, you would not have any opinion one way or the other on the way in, at the beginning of the case, is that what you're saying?

THE JUROR:  Well, yeah, definitely.  I would have an opinion based on what -- if I'm chosen, if I'm to serve.

THE COURT:  Let me -- let me rephrase it.  So you've just been a juror in a civil case?

THE JUROR:  Yes.

THE COURT:  You understand that decisions by juries in cases, both civil and criminal, are made on the basis of what's presented in the course of the trial?

THE JUROR:  Okay.

THE COURT:  Was that your experience in the civil case?  I mean, the jury decided the civil case.  Right?

THE JUROR:  Yes.

THE COURT:  And that was based on the jury's consideration of the evidence?

THE JUROR:  Yes.

THE COURT:  Okay.  It's similar in a criminal case, except because what's at stake in a criminal case it's more important that jurors understand their responsibility.  So under our system, any person who's charged with a crime is presumed to be innocent of the crime unless and until the government proves at trial by the evidence that he is in fact guilty of the charge, of the offense.  The government's burden is to prove to the jury the fact of guilt beyond a reasonable doubt.  Okay?  Do you understand?

THE JUROR:  Yes.

THE COURT:  That's the -- so a defendant never has any burden to prove he's not guilty.  It's always the government's burden to prove that he is guilty, and that's by the evidence produced at trial.  So what we ask jurors to do is pay attention to the evidence as presented, and then when they deliberate among themselves, consider that evidence and decide what it means to them, has the government proved the person charged is guilty of the crime that he's accused of, or not. We say that has to be proved to a level that the jury can say

they really don't have any reasonable doubt about the fact that he is guilty of the offense.  Okay?  Are you with me?

THE JUROR:  Yes.

THE COURT:  If you were a juror in this case, would you be able to listen to the evidence, debate and deliberate with your fellow jurors, and convict the defendant of any of the crimes he's charged with only if you were convinced beyond a reasonable doubt that he was guilty of those offenses?

THE JUROR:  Yes.

THE COURT:  Do you have any of hesitation about that?

THE JUROR:  No.

THE COURT:  Let me ask you to turn to page.

MS. CLARKE:  Your Honor, I think the parties have no more follow-up, unless the Court does.

THE COURT:  Yeah, I do.

MS. CLARKE:  Okay.

THE COURT:  I want to run through this series for completeness.
We asked a series of questions about your thoughts about the death penalty beginning on Page 23, No. 88.  The first one was whether you had any general views -- this is Question 88 -- any general views about the death penalty.  You can take the clip off if it's easier for you.  And you said "not sure."

THE JUROR:  Yes.  I did say that.

THE COURT:  Can you tell us what your view is?

THE JUROR:  Actually, I don't have anything against death penalty, and I don't have anything against life imprisonment, so either way.

THE COURT:  In Question 89, we asked you to rate yourself on a scale from strongly opposed to the death penalty to strongly in favor.  And first you marked 3 and then it looks like you changed it to 8.  I don't know if you remember filling out the form.

THE JUROR:  Yes, cause actually I was looking at it wrongly.  I was more thinking strongly favor would be from...

THE COURT:  You had the ends mixed?

THE JUROR:  Yes.

THE COURT:  You had them transposed?

THE JUROR:  Exactly.

THE COURT:  So you are relatively strong in your feeling, but not the most, is that right?  When you picked 8 --

THE JUROR:  Yes.

THE COURT:  -- you signalled relatively strong in your feeling?

THE JUROR:  Yes.

THE COURT:  Okay.  Now, if you go to the next page, Question 90, we asked you to tell us which of the various statements best describes your feeling about the death penalty in a case involving someone proved guilty of murder.  You picked E.

THE JUROR:  Yes.

THE COURT:  Does that still represent your --

THE JUROR:  Yes.

THE COURT:  I mean, if you had to fill this out again today, is that what you would say?

THE JUROR:  Yes.

THE COURT:  Okay.  Any follow-up?

MS. CLARKE:  Unless the Court has a problem with the parties' joint position?

THE COURT:  I don't know yet.

MS. CLARKE:  Hi.  My name is Judy Clarke.  I'm one of the lawyers for Mr. Tsarnaev.  Good afternoon.

THE JUROR:  Good afternoon.

MS. CLARKE:  Could I ask you about Question 93 on Page 25.  Do you see that question?  It was asking you to describe your opinion about whether life imprisonment is more or less severe than the death penalty.  Do you see the question?

THE JUROR:  Yes.

MS. CLARKE:  Can you help us understand your answer? "Less severe means the person is not fault a hundred percent but more than 50 percent" -- or I'm not sure I'm reading your writing right.

THE JUROR:  Actually, if a person is not found guilty, what more -- if a person is not found guilty for the death penalty, but found guilty for sentencing, for life imprisonment

-- what was the question again?

MS. CLARKE:  I was just asking, on Question 93, you have an explanation for your answer.

THE JUROR:  Yes.

MS. CLARKE:  I was hoping you could help us understand what you meant.  The question was asking whether or not life imprisonment without the possibility of release is more or less severe than the death penalty in your opinion.  And you had explained your answer.  I was just sort of asking for a little help in understanding that explanation.

THE JUROR:  If a person's guilty, guilty, found guilty, but not for the death penalty, but they can also say they're found guilty for life imprisonment, but not for the death penalty.

MS. CLARKE:  I think what the question was asking is, if you've got two penalties, life imprisonment without the possibility of release or the death penalty, those are the two choices, which one was more or less severe in your opinion?  And you marked that life imprisonment without the possibility of release was less severe than the death penalty, but you had an explanation for that answer.  And that's what I was just trying to follow up on.  Does that make sense?

THE JUROR:  I'm not sure exactly what you're asking.

MS. CLARKE:  I was --

THE COURT:  Can I try?

MS. CLARKE:  That would be great.

THE COURT:  When you filled out the questionnaire --

THE JUROR:  Okay.

THE COURT:  -- apparently you meant to convey something when you wrote what you wrote there.  Can you remember what it was you were thinking and what you tried to convey when you wrote that?

THE JUROR:  Well, my thought about this question is if a person, a person can find guilty, found guilty, but it doesn't have to be the death penalty, but, which is, I would say, a hundred percent, but they're found guilty for more than 50 percent, which probably life imprisonment.

THE COURT:  Did you mean to -- if this is not right, tell me.  I'm trying to understand.  Do you mean that in order to impose the death penalty on someone, you, if you had to vote for it, you would have to be a hundred percent sure?

THE JUROR:  A hundred percent sure.

THE COURT:  But you wouldn't have to be that sure to decide life imprisonment was the better punishment?  Is that what you meant to say?

THE JUROR:  Yes.

MS. CLARKE:  Well, let me take that just a step further.  You understand that there's not even a question of the sentence, life imprisonment or death penalty unless the jury has unanimously agreed beyond a reasonable doubt that the

person is guilty of intentional murder, right?

THE JUROR:  Uh-huh.

MS. CLARKE:  So you don't even consider penalty until after that happens.

If you have made a decision that someone is a hundred percent guilty, could you consider any sentence other than the death penalty?

THE JUROR:  Oh, yes, sure.  Sure.  It doesn't have to be death penalty for a person to be a hundred percent guilty.

MS. CLARKE:  So you would weigh life imprisonment versus the death penalty after conviction?

THE JUROR:  Yes, definitely.

MS. CLARKE:  You just wanted us to make sure that we knew that you wouldn't give the death penalty unless you were a hundred percent sure?

THE JUROR:  Yes.

MS. CLARKE:  What kind of considerations would you have in mind in imposing the death penalty versus life imprisonment?

THE JUROR:  It depends on -- can you phrase the question again?

MS. CLARKE:  What kind of considerations would you want to have in mind in considering the death penalty versus life imprisonment without the possibility of release.

THE JUROR:  To be honest with you, that's kind of like

a hard question to answer, because I really don't know what's a possibility of the case gonna turn out, so it's kind of like a difficult question to answer at this point.

MS. CLARKE:  Okay.  Let me take you back to question 77 on Page 20.  Did you find it okay?

THE JUROR:  Yes.

MS. CLARKE:  And that was the series of questions the judge talked to you about where you said no, you had not formed an opinion as to whether Mr. Tsarnaev was guilty, and you had not formed an opinion as to the penalty, right?

THE JUROR:  Yes.

MS. CLARKE:  And I think you mentioned to Judge O'Toole you hadn't formed an opinion because you hadn't really been following the event.  Is that right?

THE JUROR:  Yes.

MS. CLARKE:  There was a point that the questionnaire asked you how much of the media coverage you had seen about this case.  Do you remember that?

THE JUROR:  Yes.

MS. CLARKE:  And you marked, and I'll -- it's not a trick question, but the page before, Question 73, you marked that you had seen a moderate amount.

THE JUROR:  Yes.

MS. CLARKE:  Is that right?

THE JUROR:  Yes, that's right.

MS. CLARKE:  Can you tell us what stands out in your mind as to what you saw or heard in the media?

THE JUROR:  When it first happened, it was basically all over the news.  And in the beginning actually I -- what I saw was -- the thing was the whole, the beginning of everything, of what took place.  After that, it fade out.  That was it.  Is not something I like go on Internet or something to follow up or something like that.  If it's on the news, maybe I might work and start playing on the television or something, and people talking about it.  That's basically all I learned about it.

MS. CLARKE:  And did anything stand out in your mind that you heard or learned about?

THE JUROR:  Not really.

MS. CLARKE:  Okay.  You and your wife are both in the health care business?

THE JUROR:  Yes.

MS. CLARKE:  Right?

THE JUROR:  Yes.

MS. CLARKE:  She's a nurse, and you're in patient care work as well?

THE JUROR:  Yes.

MS. CLARKE:  Two different medical facilities?

THE JUROR:  Yes.

MS. CLARKE:  Did either one of you have any

interaction with people that were harmed as a result of the Boston Marathon bombing?

THE JUROR:  No.

MS. CLARKE:  Any treatment?

THE JUROR:  No.

MS. CLARKE:  Any conversations with other health care professionals who may have?

THE JUROR:  We -- no.  I don't know if she has, but not on my part.

MS. CLARKE:  And did you talk with your wife about whether she had any connection to people harmed?

THE JUROR:  No.  No.

MS. CLARKE:  Your work as a patient care assistant, is that hourly work or salaried?

THE JUROR:  It's hourly.

MS. CLARKE:  Will you have any difficulty getting paid if you're on this case for three or four more months?

THE JUROR:  No.

MS. CLARKE:  So no financial hardship?

THE JUROR:  No.  I will still get paid.

MS. CLARKE:  I'm sorry?

THE JUROR:  I will still get paid.

MS. CLARKE:  You'll still get paid?

THE JUROR:  Yes.

MS. CLARKE:  One last question, I think, about the

news coverage.  Do you remember anything about the news coverage that you saw?

THE JUROR:  Yes.

MS. CLARKE:  What?

THE JUROR:  I remember the guy -- I remember this old guy that was Jack Ryan, and when he -- the explosion went off, and he fell.  Yes.  I remember that.

MS. CLARKE:  Were you watching the television as it occurred, or was this playbacks?

THE JUROR:  No, this is playback.

MS. CLARKE:  Where were you on the 15th of April, 2013, the day of the marathon?

THE JUROR:  April 15?  I'm not sure.  I'm not sure.  Probably sleeping, because I work nights, so I sleep during the day.

MS. CLARKE:  What about on the Friday of that week, the 19th?

THE JUROR:  I'm not sure.  The 19th?  I'm not sure.

MS. CLARKE:  That Friday was when there was the shelter-in-place order.  Do you remember that?

THE JUROR:  Yes.

MS. CLARKE:  Does that help at all?

THE JUROR:  I think I was either home -- I'm not sure, to be honest with you.

MS. CLARKE:  Okay.  Thank you very much.

MR. MELLIN:  Very quickly.

THE COURT:  If you have something, go ahead.

MR. MELLIN:  Sir, we've talked to you about the penalty phase where there would be this time where the jury will be weighing the aggravating factors and mitigating factors.  Do you understand what we're talking about?  If you get to the sentencing phase, the punishment phase?

THE JUROR:  Uh-huh.  Yes, sir.

MR. MELLIN:  Do you understand the phase I'm talking about?

THE JUROR:  Yes, sir.

MR. MELLIN:  First the jury would have to find the find the defendant guilty, before the jury would then -- if the jury finds him guilty, then we'd move to the punishment phase. Are you with me?

THE JUROR:  Okay.  Yes, sir.

MR. MELLIN:  Okay.  And at that phase, that's when the jury would be hearing evidence about aggravating factors and mitigating factors.  Do you understand that?

THE JUROR:  Yes, sir.

MR. MELLIN:  And the jury then is deciding and you as a juror in a case like this would be deciding between life imprisonment and the death penalty, right?

THE JUROR:  Yes, sir.

MR. MELLIN:  You're with me on that?

THE JUROR:  Yes, sir.

MR. MELLIN:  If you're in that point in time when the jury's deciding and you come to the conclusion that the factors justify a sentence of death, would you actually be able to vote to impose a sentence of death?

THE JUROR:  Yeah, sure.

MR. MELLIN:  All right.  Thank you.

THE COURT:  Okay, sir.  Thank you very much.

MR. McALEAR:  Right this way, sir.

(The juror was excused.)

THE CLERK:  195.

MR. McALEAR:  Juror 195.

THE CLERK:  Ma'am, over here, please.  Have a seat.

THE JUROR:  Thank you.

THE CLERK:  Speak into the mic.

THE COURT:  Good afternoon.

THE JUROR:  Hello.

THE COURT:  Since you were here to fill out that questionnaire, which is the one we put in front of you, your questionnaire, have you been able to follow my instructions to avoid any discussion of the substance of the case?

THE JUROR:  Yes.

THE COURT:  And as little as possible, any exposure to the news reports or anything?

THE JUROR:  Yup.

THE COURT:  Okay.  So we're going to just follow up on some of the questions, the answers you gave to the questions in the questionnaire.

THE JUROR:  Okay.

THE COURT:  And it may help for you to thumb through as we do it.

Your first years were spent in the U.K.?

THE JUROR:  Three years.

THE COURT:  Yeah.  Are your parents American citizens?

THE JUROR:  Yes.

THE COURT:  That's why your citizenship predates your residence here?

THE JUROR:  Yes.

THE COURT:  Okay.  Where is Frimley?

THE JUROR:  It's a little outside of Surry, so it's near London.

THE COURT:  That's just curiosity.  So you're currently not employed?

THE JUROR:  No.

THE COURT:  What are the prospects?

THE JUROR:  I'm still looking.

THE COURT:  Okay.  Are you in a particular area?  It looks like you had a year of college.

THE JUROR:  Yes.

THE COURT:  But that --

THE JUROR:  Wasn't a fan of college.

THE COURT:  Okay.  Let me ask you to turn to Page 19. We asked a couple of questions at the bottom about how you reacted to being summonsed for jury service and what people might have said to you and you to them.  And so I'm looking at Question 74.  You said you were conflicted.

THE JUROR:  Yes.

THE COURT:  "I didn't know if I could go into this case and look at it fairly.  I didn't know if I could handle the responsibility, but I always believed in innocent until proven guilty."

Maybe you can explain --

THE JUROR:  Yeah.

THE COURT:  -- or amplify on your answer there.

THE JUROR:  Well, when I first got the summons, I was out of town, so I didn't know that it was for a federal case. So it was a couple of weeks later I found out it was for a federal case, and I was a little nervous about how big of a case it is and how important it is.  And I didn't know, with all the media coverage, if I could look at it fairly.  But the more I thought -- I've always believed in innocent until proven guilty, so the more I thought about it, the more I realized, I just have to look at all evidence, and I can't make my mind up before I see everything.

THE COURT:  You say you've always believed in innocent

until proven guilty.  How long have you thought about that question?

THE JUROR:  A lot.  There's a lot of school reports about all that.

THE COURT:  Okay.  So if we go to page 20, we asked you in Question 77 whether you'd formed any opinions about what you had seen or read in the news media or from other sources, and particularly whether you thought the defendant was guilty or not guilty and if so what the penalty might be.

THE JUROR:  Uh-huh.

THE COURT:  And we gave you a selection of answers and you chose "unsure" for each of those.

THE JUROR:  Yes.

THE COURT:  Can you tell us what you were thinking about when you answered that way?

THE JUROR:  Well, there's more -- there's a lot of counts that are against him, so I can't say for sure if he's guilty or not guilty without looking at all evidence for each specific count.

THE COURT:  Okay.  And that was one of the things you were thinking when you answered this way?

THE JUROR:  Yes.

THE COURT:  To the extent you might have any opinion about any of the counts -- the other question we asked was if you did have an opinion based on information you had seen prior

to the trial, could you set that aside and make the decision even as to those matters that you thought you had an opinion about based on the evidence at trial, and not on the preconceived ideas.

THE JUROR: Yeah.

THE COURT: And you indicated on your form that you were able to do that. I would just like you to maybe tell us a little bit more about that.

THE JUROR: Well, looking at all the media coverage, a lot of people assume he's guilty, but if I -- evidence can change my mind. If someone convinces me otherwise, it's easy for me to change my mind about that.

THE COURT: So in a criminal trial, as I guess you probably know, the defendant, any defendant who is charged with a crime is presumed to be innocent --

THE JUROR: Yes.

THE COURT: -- unless the government proves otherwise. The government always has the burden of proof in a criminal case. It's up to the government to produce enough evidence of guilty that the jury is convinced that the person charged is guilty and that the jury has no reasonable doubt about that. If they are in that condition, they can properly find the defendant guilty.

THE JUROR: Right.

THE COURT: If the jury is not convinced beyond a

reasonable doubt by the evidence, their obligation is to find the defendant not guilty, even if they might think he's probably guilty.  Right?  You understand that?

THE JUROR:  Yes.

THE COURT:  The burden is always on the government to prove guilty; it's never on the defendant to prove he's not guilty.

THE JUROR:  Right.

THE COURT:  You said "if I could be convinced otherwise."

THE JUROR:  Well, if the evidence --

THE COURT:  I just want to be sure you weren't thinking that the defendant has --

THE JUROR:  If the evidence doesn't show that he's guilty, then I can say that he's not guilty.

THE COURT:  Okay.  Do you understand, though, that the question is never "which side has convinced me;" it's "has the government convinced me he's guilty beyond a reasonable doubt." Do you understand that?

THE JUROR:  Yes.  Yes.

THE COURT:  And -- okay.  You got a Boston Strong T-shirt from your mother?

THE JUROR:  Yeah.

THE COURT:  Or hat.  You didn't get it?

THE JUROR:  My mom bought a Boston Strong hat, yes.

THE COURT:  Like a baseball cap?

THE JUROR:  Uh-huh.

THE COURT:  Do you have any Boston Strong merchandise yourself?

THE JUROR:  No.

THE COURT:  Beginning on Page 23 at Question 88, we asked a series of questions about your attitude toward the death penalty.  Question 88 itself was a general question, what are your general views.  And you said you would "think really hard if that is the right sentence.  I think death penalty depends on the case."
Anything you want to expand on or codify for us?  What are your general views about the death penalty?

THE JUROR:  I mean, it's not something to take lightly.  I don't know.  If it warrants the death penalty, then I'd be willing to think about it, and I would be willing to impose the death penalty, but, I don't know, it's difficult.

THE COURT:  Question 89, we ask you to tell us on a scale of 1 to 10 how strongly in favor or opposed you were, and you circled No. 6, which is slightly above middle, perhaps.

THE JUROR:  Yeah.

THE COURT:  Is that about where you are --

THE JUROR:  Yes.

THE COURT:  -- in terms of how strong your feelings are about it?

THE JUROR:  Yes.

THE COURT:  Then in the next page, Question 90, we asked you to pick the statement that seemed best to describe your feelings about the death penalty in a case involving someone who had been convicted of murder.  And you selected D, which said, "I'm not for or against the death penalty.  I could vote to impose it or I could vote to impost a sentence of life of imprisonment, which ever I believe is called for by the facts and the law."

THE JUROR:  Yes.

THE COURT:  Is that a fair statement of your actual beliefs?

THE JUROR:  Yes.

THE COURT:  You heard me this morning describe the penalty phase, if it gets there.  Of course the penalty phase assumes that the jury has just concluded that the defendant is guilty of an intentional murder that warrants or for which the penalty is a possible punishment.

THE JUROR:  Uh-huh.

THE COURT:  So you start from the premise that you have a person guilty of murder.

THE JUROR:  Right.

THE COURT:  And then there would be evidence of mitigating factors and aggravating factors, and so on.  How would you approach that task?

THE JUROR:  Well, first I have to figure out if he's guilty or not guilty.  And then --

THE COURT:  We're taking that that's been done.  You, because you're part of the jury --

THE JUROR:  Right.

THE COURT:  -- and he has to be unanimously found guilty, you've already found him guilty.  Okay?

THE JUROR:  Right.  I would say, like, how many counts he was guilty for, and then if the death penalty is warranted for all those counts, then I'd have to think about if I'm willing to impose the death penalty.  Yeah.

THE COURT:  Okay.  On Page 25 at the bottom, Question 95, we asked, "If you found him guilty and decided the death penalty was the appropriate punishment, could you conscientiously vote to impose the death penalty?"  And you said "yes."

THE JUROR:  Yes.

THE COURT:  And there's a related question on top of the next page.  "If you found him guilty and you decided that life imprisonment without the possibility of release was the appropriate punishment, could you conscientiously vote for life imprisonment without the possibility of release?"

THE JUROR:  Yes.

THE COURT:  Follow-up?

MR. MELLIN:  Thank you, your Honor.

Hi.

THE JUROR:  Hello.

MR. MELLIN:  I'm Steve Mellin.  I'm one of the prosecutors on the case.  I'd like to go over Question 88 again with you which is on Page 23.

And you wrote in, "If the case warrants the death penalty, then I would think really hard if that is the right sentence."  Right?  Is that what you wrote?

THE JUROR:  Yes.

MR. MELLIN:  What do you mean by that?  Because you said "if the case warrants it," but then you said -- that's when you'd think about it.  You didn't say "then I would impose it."

THE JUROR:  Because I don't think about the death penalty for every single case that's out there.  So if all the counts that he's found guilty for warrant the death penalty, that's when I would really think about what it should be like in prison or the death penalty.

MR. MELLIN:  Right.  You mentioned that -- just a minute ago you said, "If it warrants it," then you said, "it would be difficult," or "it's difficult."

THE JUROR:  But it's not like -- I would be willing to impose the death penalty, it's just difficult on like anybody that --

MR. MELLIN:  Right.

THE JUROR:  -- that you gave someone the death penalty.

MR. MELLIN:  Right.  Understood.  That's where I'm trying to drill down to, is theoretically I understand you chose 6 out of 10 for where you kind of fall on this spectrum.

THE JUROR:  Right.

MR. MELLIN:  But if you are in the situation where it becomes more a reality --

THE JUROR:  Then I would be -- then I would do it.

MR. MELLIN:  You would be able to vote to impose the death penalty?

THE JUROR:  Yes.

MR. MELLIN:  Okay.  Thanks.

MR. BRUCK:  Good afternoon.

THE JUROR:  Hello.

MR. BRUCK:  Hi.  My name is David Bruck, and I'm one of Jahar Tsarnaev's lawyers.  And I just have a few questions.

THE JUROR:  Okay.

MR. BRUCK:  You live in Brighton?

THE JUROR:  Yes.

MR. BRUCK:  Do you live at home or --

THE JUROR:  At home.

MR. BRUCK:  With your parents?

THE JUROR:  Yes.

MR. BRUCK:  Can you tell us, were you living -- you

were living in Boston at the time of the marathon bombing?

THE JUROR:  I've been living in Brighton for four years now.

MR. BRUCK:  Right.  Do you remember the day of the bombing?

THE JUROR:  Yes.

MR. BRUCK:  How did you first hear about it?

THE JUROR:  I was at home, but my brother, who lives in New York, called me and told me about it.  So I found out from my brother in New York, which is find of funny, but...

MR. BRUCK:  Did you know anyone who was --

THE JUROR:  No.

MR. BRUCK:  -- near the scene or --

THE JUROR:  No.

MR. BRUCK:  What did you feel when you heard about it?

THE JUROR:  I was shocked.  I was -- it was a hard thing to like actually realize that that actually happened.

MR. BRUCK:  And what about on the following Friday, remember what day that was?

THE JUROR:  Yes.

MR. BRUCK:  Tell me about that day for you.

THE JUROR:  Well, I was -- I woke up to the news of the MIT officer that got shot.

MR. BRUCK:  Right.

THE JUROR:  I was about to go to sleep, actually.  And

me and my family just was watching the TV the whole day and just...

MR. BRUCK:  Did you stay at home?

THE JUROR:  Yes.

MR. BRUCK:  Did you shelter in place that day?

THE JUROR:  Yes.

MR. BRUCK:  With your parents?

THE JUROR:  Yes.

MR. BRUCK:  How did you feel?

THE JUROR:  It was scary to be locked in your house, couldn't leave, and we're not that far from Watertown, so it was a little on edge all day.

MR. BRUCK:  Thinking that something more could happen right where you were?

THE JUROR:  Yeah.

MR. BRUCK:  Okay.  The -- have you talked to your parents about their feelings about whether Mr. Tsarnaev is guilty or whether he deserved the death penalty?

MR. MELLIN:  Objection.

THE COURT:  No.  Go ahead.

THE JUROR:  I haven't really talked to them about what they think.  I just talked about me being on the trial.  They haven't given me their opinions on it.

MR. BRUCK:  Have you talked to them about what you think?

THE JUROR:  Yes.

MR. BRUCK:  And what did you tell them?

THE JUROR:  I told them that I'd be willing to impose the death penalty, but it's just having to hear everything and...

MR. BRUCK:  That was during a discussion about whether to impose the death penalty in this case?

THE JUROR:  Yes.

MR. BRUCK:  How did that come up, if you don't mind my asking?  I mean, tell us more about --

THE JUROR:  Well, my parents asked me how I would feel if I had to give the death penalty, and they were more just wondering how I felt about it.

MR. BRUCK:  Did they say how they felt?

THE JUROR:  No.

MR. BRUCK:  Do you know how they feel?

THE JUROR:  No.

MR. BRUCK:  Or your brothers?

THE JUROR:  Nope.

MR. BRUCK:  Okay.  Have you talked to any friends about their feelings about the death penalty?

THE JUROR:  No.  Only my family knows I'm actually here.

MR. BRUCK:  Okay.  And of course I think you have a good understanding of the procedure, the two parts, and the

separate decision to be made about sentencing.  Judge O'Toole said -- it was actually in the questionnaire.  They gave you the ages of the victims.

THE JUROR:  Yes.

MR. BRUCK:  29, 23, and 8.  So there's a child.

THE JUROR:  Yeah.

MR. BRUCK:  Did you know that already?

THE JUROR:  Yes.

MR. BRUCK:  Knowing -- understanding that, you know, you would put everything you could out of your mind and start over again, we're all human.

THE JUROR:  Yes.

MR. BRUCK:  And the only person who knows how you really feel is you.

THE JUROR:  Uh-huh.

MR. BRUCK:  Knowing what you know, do you feel that you could really vote for a life sentence in this case?

THE JUROR:  Yes, I do.

MR. BRUCK:  This case?

THE JUROR:  Yes.

MR. BRUCK:  Okay.  Would you be concerned if you voted for a life sentence that people would be angry or critical of you?

MR. MELLIN:  Objection about this case, your Honor.

THE COURT:  Well, no.  Go ahead, you can answer that.

THE JUROR:  Well, I would expect no matter what the sentence is that people have their own opinions.  And if I know that I went with what I felt was right, then I'd be fine with what everybody else thinks.

MR. BRUCK:  Okay.  You understand, I'm sure, that everyone on the jury has to make his or her own decision?

THE JUROR:  Yes.

MR. BRUCK:  It's not like you average out everyone's feelings --

THE JUROR:  Yeah.

MR. BRUCK:  -- or defer to the person who has the strongest opinion.  You'd have to make your own decision.

THE JUROR:  Yes.

MR. BRUCK:  Would you do that?

THE JUROR:  Yes.

MR. BRUCK:  And bear with me just a minute.  I think that's all.  Thank you so much.  That's all.

THE JUROR:  Thank you.

THE COURT:  All right.  Thank you very much.

(The juror was excused.)

THE CLERK:  Juror No. 198.

MR. McALEAR:  Juror 198.

THE CLERK:  Sir, over here, please.  Have a seat.  Make sure you speak into the mic so everybody can hear you.  Okay?

THE JUROR:  Okay.

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon.

THE COURT:  Before we get into the questionnaire, have you been able to follow my instructions to avoid any discussion of the substance of the case?

THE JUROR:  Yes.

THE COURT:  And minimize, at least, your exposure to any media reports about the case?

THE JUROR:  Yeah, trying.  It's tough, but yeah.

THE COURT:  Well, we want the effort.  That's what we're looking for.

THE JUROR:  Yeah.

THE COURT:  So that's the questionnaire you filled out, and we're going to follow up on some of the questions -- the answers you gave in the questionnaire.

THE JUROR:  Okay.

THE COURT:  Let's start with your concern about the schedule in the case and your family situation.  Could you tell us about that?

THE JUROR:  So I have my two small boys.  I drop them off at day care every morning, and I pick them up every afternoon.

THE COURT:  What are the times?

THE JUROR:  I have to be at work by 8:30, so I usually

drop them off by 8:00.

THE COURT:  How early can they be dropped off?

THE JUROR:  7:45 is the earliest.  It's home day care.

THE COURT:  What town is that in?

THE JUROR:  Waltham.

THE COURT:  So just to understand, if you were dropping them off and coming here --

THE JUROR:  Yes.

THE COURT:  -- you would, what, come the Pike or something like that?

THE JUROR:  Yeah, I would say so.  Yeah.

THE COURT:  Is there another -- there's Waltham and there's Waltham.  So it depends on --

THE JUROR:  That would be the only way to do it.  Probably the Pike.  I never come into Boston, so...

THE COURT:  What time do you pick them up?

THE JUROR:  They get out of school by 3:30, so usually by 4:00 at the latest.

THE COURT:  How late does the day care --

THE JUROR:  The latest I've picked them up is 5.

THE COURT:  Some have a pretty firm --

THE JUROR:  No.  She doesn't usually have a firm time, it's just that's usually when everyone else is picking up at the same time.

THE COURT:  Figuring your -- you're the usual dropper

off-er and picker upper?

THE JUROR:  Yes.

THE COURT:  Your wife travels?

THE JUROR:  She's started a new job not too long ago, and travel is a requirement.  Apparently she's not traveling now until June, but it is an option.

THE COURT:  She knows that far in advance?

THE JUROR:  That's what they told her.  They said January, but then they changed it to June.

THE COURT:  And you're a Grade 1 teacher?

THE JUROR:  Yes, sir.

THE COURT:  And you've been doing that for about six years or so?

THE JUROR:  Six years, yes.

THE COURT:  And you said the school day usually ends around 3, 3:30, 4?

THE JUROR:  Kids are dismissed by 3.  We can leave by 3:15, 3:30.

THE COURT:  Tell us about the social media that you might use yourself.

THE JUROR:  The only thing I usually use is Facebook, but that's just for photos of the kids or whatnot.

THE COURT:  Your brother-in-law is a correctional officer someplace?

THE JUROR:  Yeah.  He's a correctional officer in

Connecticut.

THE COURT:  Let me ask you to turn to Page 20.

THE JUROR:  Sure.

THE COURT:  Question 77.

THE JUROR:  Yes.

THE COURT:  We asked a multi-part question, I guess, about whether you had an opinion about some matters concerning the defendant's guilt or not and what punishment might be imposed or not.  And you had some choices to indicate your answer.

THE JUROR:  Uh-huh.

THE COURT:  You indicated as to whether you had formed an opinion the defendant is guilty, you checked the box "yes."  And then you checked as well in part C the box that you had an opinion that he should receive the death penalty.  Down below, right below those questions, we asked, "If you answered yes to any of the questions, would you be able or unable to set aside your opinion and base your decision about either guilt or punishment based solely on the evidence that would be presented to you in court?"  And you indicated "able."

Could you maybe tell us what you were thinking when you answered all of those questions?

THE JUROR:  I feel if enough was presented to me, that I could possibly change my mind, but it would take a lot.  So I think I would be able to, but it would take a lot to convince

me otherwise.

THE COURT:  Do you think the defendant would have to persuade you to change your mind?

THE JUROR:  Yes.

THE COURT:  You sheltered in place?

THE JUROR:  No.

THE COURT:  Just friends?

THE JUROR:  A lot of colleagues, yes.

THE COURT:  Was Waltham included in that?

THE JUROR:  Yes.

THE COURT:  You weren't there that day?

THE JUROR:  No.  We were on school vacation.

THE COURT:  Oh.  I guess that's right.

You indicated that you knew one of the witnesses.  I just want to look it up.  Question 85.

THE JUROR:  Yes.

THE COURT:  You said that you recognized somebody on the witness list because you work with his wife?

THE JUROR:  Yes.

THE COURT:  I don't know the likelihood.  This is obviously an expansive witness list.  But would you be unable to be a fair judge of his testimony because you're acquainted with his wife?  In other words, could you be as critical, thinking critically about his evidence as much as you would anybody else --

THE JUROR: Yes.

THE COURT: -- or would you tend to give him a little free reign because he's married to somebody you know?

THE JUROR: No. I think I could answer look at it critically, yes.

THE COURT: Okay. We asked you a series of questions about the death penalty beginning on Page 23, No. 88.

THE JUROR: Uh-huh.

THE COURT: First, that question asked for your general views. And you said, "It is necessary for the most heinous of crimes."

THE JUROR: Yeah.

THE COURT: The next question we asked you to tell us the strength of your view or your attitude towards the death penalty by circling a number on the scale, and you selected 8 in 1 out of 10. Then on the next page we asked you "which of the following best describes your feelings about the death penalty in a case involving someone proven guilty of murder?" You selected E as the statement that represented your view, which was, you're in favor of the death penalty, but could vote for a life imprisonment without the possibility of release if you believed that the sentence was called for by the facts and the law of the case.

THE JUROR: Yes.

THE COURT: Does that continue to be your view about

that matter?

THE JUROR:  Yeah, I feel the same way.

THE COURT:  So you heard me this morning describe the penalty phase --

THE JUROR:  Yes.

THE COURT:  -- of a potential death penalty case.  You understand in order to get to the penalty phase, you have already convicted the person of a crime for which the death penalty is possible punishment, right?  You start from the premise that you have a person guilty of that kind of crime, right?  Are you with me?

THE JUROR:  Yes, I'm with you.

THE COURT:  So then the question is, what is the appropriate penalty for this conviction?  And you'll hear evidence that may suggest that this is particularly serious and blameworthy, hear evidence that there are mitigating circumstances about the events or the defendant that make life imprisonment a more appropriate penalty in this case, and the jury is to weigh all that and come to a conclusion.
By this answer, are you indicating that you're prepared to weigh the penalty phase evidence --

THE JUROR:  Yeah.

THE COURT:  -- and possibly decide in either direction depending on how you evaluate it?

THE JUROR:  I believe I could.  I believe I could,

yes.

THE COURT:  Do you believe you have any predisposition towards one side or the other?

THE JUROR:  Not really, no.

THE COURT:  Page 25, Question 95, we asked, "If you found the defendant guilty and decided that the death penalty was the appropriate punishment, could you conscientiously vote to impose the death penalty?"  And you answered "yes."

THE JUROR:  Yes.

THE COURT:  The companion question on the next pages says, "If you found him guilty and decided life imprisonment without possibility of release was the appropriate punishment, could you conscientiously vote for that penalty?"  And you said "yes."

THE JUROR:  Yes.

THE COURT:  And both of those are true?

THE JUROR:  Yes.

MR. CHAKRAVARTY:  Good afternoon.  My name is Aloke Chakravarty.
I'm going to go straight to one of the questions that I'm not sure whether I understood what you wanted to say.

THE JUROR:  Right.

MR. CHAKRAVARTY:  It was Question 77, if you could turn to that.  The judge asked you if you thought the defendant would have to present evidence to countervail what you already

might have in your head.  And what we're trying to figure out is whether, regardless of what you heard outside of a courtroom, you know, all that information has given you some kind of predisposition as to what you think the evidence shows.  But could you set that aside and consider evidence in the courtroom as the basis of your conclusion as to whether, as to whether somebody was guilty or whether somebody had not met its burden to prove beyond a reasonable doubt that somebody was guilty?

THE JUROR:  After seeing and reading all that, it would be tough to put it aside.

MR. CHAKRAVARTY:  So is it the notion that there are things that you have seen that you consider evidence that you cannot disregard, or is it just that you've only seen some of the things --

THE JUROR:  I mean, I've seen, between the news reports and what I've read, a lot of it is -- it's tough to forget and put aside.

MR. CHAKRAVARTY:  So you don't think you could suspend your consideration of that material?

THE JUROR:  I don't think I could put it out of my mind completely, no.

MR. CHAKRAVARTY:  So there's this notion in America that people are presumed innocent and it's the government's burden.  So the fact that you have seen this material means

that you cannot give a defendant a presumption of innocence. Is that what you're saying?

THE JUROR:  I don't think I could honestly, no.

MR. CHAKRAVARTY:  Thanks.  That's all I have.

THE COURT:  Okay.  Thank you, sir.  Just leave that there.

(The juror was excused.)

THE CLERK:  Juror No. 199.

MR. McALEAR:  Juror 199.

THE CLERK:  Ma'am, over here, please.  Have a seat.

THE JUROR:  Thank you.

THE CLERK:  Speak into the mic so everybody can hear you.  Okay.

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon.

THE COURT:  That's the questionnaire you filled out when you were last here.

THE JUROR:  Uh-huh.

THE COURT:  We're going to follow up on some of your answers.

THE JUROR:  Okay.

THE COURT:  Since you've been here, have you been able to follow my instructions to avoid any discussion of the substance of the case with anybody?

THE JUROR:  Yes.

THE COURT:  As much as possible to limit your exposure to any media reports or accounts of the case?

THE JUROR:  As much as possible.

THE COURT:  Right.  It's everywhere.  I understand.

THE JUROR:  Uh-huh.

THE COURT:  You've made an effort to do that, to turn the page?

THE JUROR:  Yes.  I'm done with it.

THE COURT:  Okay.  I want to ask a little about your employment and your husband's employment.  You say he's an independent sales rep.  What field is he in?

THE JUROR:  He sells packaging, like it's very specific foam-in-place.

THE COURT:  I'm sorry?

THE JUROR:  Foam-in-place packages.  It's very -- it's very specific.

THE COURT:  Okay.  You're an RN?

THE JUROR:  Yes.

THE COURT:  And you work now at where?

THE JUROR:  Well, the company was just bought over a couple of weeks ago, and I don't even remember the name of it, it's on my cell phone, which is downstairs.  But it's Health Solutions.  We do health screenings for corporations, usually set up by the insurance companies.

THE COURT:  These are perspective hires or people

getting health insurance --

THE JUROR:  No.

THE COURT:  -- through the company?

THE JUROR:  Yes.  They already have health insurance. We go in to set up programs to do cholesterol, blood sugar.

THE COURT:  To keep them healthy?

THE JUROR:  Exactly.  It's a wellness program, basically, but sponsored by the insurance companies.  But I'm an independent, so I contract with them.

THE COURT:  Contract with?

THE JUROR:  This company.  But I'm independent.  They call me, say, "We have this job.  Do you want to do it?"

THE COURT:  I see.

THE JUROR:  That sort of thing.

THE COURT:  I see.

THE JUROR:  It's per diem.

THE COURT:  Per diem?

THE JUROR:  Uh-huh.

THE COURT:  Okay.  And how active are you in doing that?  How many days would you be doing it?

THE JUROR:  Well, I was doing it a lot more frequently, but my daughter had twins so I took some time off to be with her.  And then the holiday season is very slow for that business, so we were just picking up.  I haven't booked anything since I got this notice because I don't know what to

do.

THE COURT:  I guess one of the questions is some people are unable because of their work to take the time out that this case may take without having some serious financial or other burden.  I guess it's hard to assess for us without knowing your situation.

THE JUROR:  I'll be honest with you, I could not work.  I would rather work.  But I won't lose my house if I don't.  Is that what you're asking?

THE COURT:  Right.  Well, maybe that's the extreme.  But you will probably -- I guess if you work on a per-diem basis and four out of the five days you're spending it here, that would be a substantial impairment of your ability to work on that basis.  You still would have Fridays, I guess.  But I don't know.

THE JUROR:  No, I could do it.

THE COURT:  Okay.  It's up to you, I guess, to assess that.

THE JUROR:  Would I chose to do it?  Probably not.  But I understand this is important.

THE COURT:  Okay.  I appreciate your candor.  How much do you use Facebook?

THE JUROR:  Rarely.  I just got on it because I was trying to keep up with relatives in other states and got so much grief from everybody.  I probably look at it once a week,

sometimes not even.  It just depends on if someone in the family says, "Oh, did you see so-and-so did this?"  And then I'll look at the pictures, or whatever.  But I don't use it for communication or -- and I probably haven't even been on it a year.

THE COURT:  Again, you can follow along.  I'm on Page 11 right now, looking at Question 33.  You have a friend who's a lawyer, looks like?

THE JUROR:  Yeah, I have several actually.  Two close friends.

THE COURT:  What kind of law are they involved in?

THE JUROR:  One does mostly real estate.  And the other is in the court in -- it's not Dedham.  Hyde Park?  Is there a court there?  Somewhere out that way.

THE COURT:  When you say "in the court," what --

THE JUROR:  He's a clerk?  I don't know what he does.

THE COURT:  He works for the Massachusetts court system?

THE JUROR:  Uh-huh.  We don't talk business.

THE COURT:  Happens to be a lawyer, but he has more --

THE JUROR:  Yes.

THE COURT:  -- of a clerical or administration position?

THE JUROR:  Yes, yes.  Correct.

THE COURT:  Okay.  So let me ask you about Question 77

on Page 20.

THE JUROR:  Okay.

THE COURT:  This is a question where we asked you to tell us if you had formed an opinion about the defendant's guilt or not, or an appropriate penalty, if so, based on things you may have seen or read in the news or from perhaps other sources.  And in part A you indicated, yes, you had formed an opinion.

THE JUROR:  Uh-huh.

THE COURT:  And part C and D, which pertain to the potential penalty, you checked the box "unsure" for each of those.

THE JUROR:  Uh-huh.

THE COURT:  Below that we asked, "If you had answered yes to any of those questions, would you able or unable to set aside your opinion and base your decision about guilt and/or punishment solely on the evidence presented in the course of the trial?"  And you checked "able" and then you added on the side "I would hope so."

THE JUROR:  Right.

THE COURT:  Could you tell us a little about what you were thinking when you gave us those answers?

THE JUROR:  Well, I think it's difficult to say unless you're in that position how you're going to really feel.  I mean, I don't know all the information, but, you know, I would

hope that in any case I could be impartial, but everything that I saw and read, it's difficult to unring a bell. So I'm just being honest. Honestly, I don't know. I guess it would depend on how everything was presented.

THE COURT: You probably understand this, but let me just set it out. In our criminal justice system, anybody who is accused of a crime is presumed to be innocent unless and until the government proves that he's guilty --

THE JUROR: Correct.

THE COURT: -- by evidence at a trial. It's the government's burden to produce enough evidence to convince the jury beyond a reasonable doubt that the person has in fact committed the crime charged. The jury -- if the jury is so convinced beyond a reasonable doubt, then the jury may return a verdict of guilty. But if the jury has a reasonable doubt or is not convinced by the evidence by the government, then it's the jury's duty to return a verdict of not guilty. The burden is always on the government; it doesn't shift to the defendant to prove he's not guilty.

THE JUROR: Correct.

THE COURT: So the question is, accepting you may have some ideas from the media and so on and so forth, if you are a juror in this trial, would you be able to focus on the evidence produced in the trial and assess the charges as they are debated, based on that evidence and not on some preconceived

notion, or do you think, as you put it, the bell would be hard to unring and you wouldn't be able, notwithstanding the government's case, failure to make the case adequately, you wouldn't be able to set aside the prior information you thought you had and that would continue to influence you?  So, again, this is -- it's hard.  We're talking about a situation in the future --

THE JUROR:  Right.

THE COURT:  -- what would you do under certain conditions, but it really is a question about, in a sense, whether you feel that you've been so influenced about what you've seen that you would not be able to do the job that we ask jurors to do?

THE JUROR:  No.  I think I could.  I mean, there's many times you think you know all the information and you formulate an opinion, and then once you get all the information, it changes.

THE COURT:  Right.

THE JUROR:  So, I think it's important to be open-minded.  Because, I mean, I know the media doesn't tell you everything.  They color things the way they want.  We all know that.  So I do get it.  But I did want to say that I do feel that way now.

THE COURT:  Right.

THE JUROR:  I didn't want to lie about it.

THE COURT:  No, no.  That's why we ask the question. Sometimes it's inevitable that people have ideas about things before trial.

THE JUROR:  Right.

THE COURT:  Let me ask you this.  It's not unusual for people in your profession to be involved in court cases.  Have you ever --

THE JUROR:  No.

THE COURT:  -- participated as a witness or anything for anybody?

THE JUROR:  No.

THE COURT:  And no jury service yourself.

THE JUROR:  No.

THE COURT:  You contributed to some of the funds, the One Fund, and you have some Boston Strong merchandise?

THE JUROR:  Uh-huh.  Uh-huh.

THE COURT:  When did you do those things?

THE JUROR:  Oh, shortly after -- as soon as the bracelets came out, I think.

THE COURT:  So in the late spring of 2013?

THE JUROR:  Yeah, I would guess.

THE COURT:  We also asked jurors about their attitude towards the death penalty, and those questions began at No. 88 on Page 23.  We asked you if you had general views about the death penalty, and you said, "In general, I'm against it.

However, a convicted terrorist" -- maybe that should be plural -- "are in a category by themselves."

THE JUROR:  Yeah.

THE COURT:  "I see it as a war crime."

THE JUROR:  Uh-huh.  I do.

THE COURT:  Just tell us a little more about what you were thinking when you gave us that answer.

THE JUROR:  Okay.  When you ask about the death penalty, the reason I'm against it is because it's so final, and recently there's been a lot of guys that were on Death Row that never committed the crime, and you can't undo when someone's been executed, so for that reason I'm against it. However, having said that, if someone or a group of people plot, carry out a terrorist act on my country, I don't have a problem with them being executed.

THE COURT:  Is it your view if someone is guilty of a terrorist crime, that they would always get the death penalty, or you think it's you would make an exception to your other view?

THE JUROR:  Again, I think you need all the information.  You talked earlier about mitigating circumstances.  And I think that sort of plays into almost everything.  You know, you need to have the whole story.

THE COURT:  If you turn to page 24, Question 90.

THE JUROR:  Yup.

THE COURT:  We asked:  "Which of the following statements best expressed your view about the death penalty in the case of someone proven guilty of murder?"  And you picked the last possibility:  None of the statements above adequately describe your feelings about the death penalty.  And we asked you to explain.  And you said, "I would have to have particular facts and law to assess my judgment."

THE JUROR:  Uh-huh.

THE COURT:  Can you tell us what you mean by that?

THE JUROR:  Well, obviously I'm not a lawyer.  And, you know, you think you know the law, but you really don't know it.  You guys are the ones that are the experts in that.

THE COURT:  Thank you.

THE JUROR:  So I would assume you would share what those parameters were with lay people, and we'd have to go by those instructions.  And so I would just have to feel that I can't make a judgment on that because I don't know the law.  I mean, I know some of the law, of course.

THE COURT:  Yeah.  This morning I described --

THE JUROR:  Right.

THE COURT:  -- the penalty phase, as we called it.

THE JUROR:  Yes.

THE COURT:  So you don't get to a penalty phase until the jury has convicted somebody of a crime for which the death penalty is possible.  Right?  So you've -- in the first phase

you've found the person guilty.  Then the question is, what should be the sentence?  Should it be death, or should it be life imprisonment without the possibility of release?  And as I described it, each side gets to make presentations, the government seeking the death penalty would likely present evidence showing this is the worst crime than other crimes for -- other murderers, for example, and therefore this one -- this crime deserves a greater imprisonment than we might otherwise impose.  Those are the aggravating factors.  Those are the aggravating factors calling for a more serious penalty.

The defense will present evidence that pulls in the other direction, suggesting there are factors about this case, about the defendant himself, that would argue that a death penalty is not the appropriate penalty and life imprisonment is a better way to punish these crimes by this defendant.

And the jury would then consider all that, come to their own conclusions about all that, and decide on which course each individual juror would think is the right penalty for the crime that they all have convicted the defendant of. Right?

So is that what you're getting at, that you would have to --

THE JUROR:  Yeah.

THE COURT:  -- assess all that information before --

THE JUROR:  Right.

THE COURT:  -- you could give us a firm answer?

THE JUROR:  Right.

THE COURT:  That was why you couldn't pick one?

THE JUROR:  It's too complicated.

THE COURT:  So is it possible, as you assess yourself --

THE JUROR:  Uh-huh.

THE COURT:  -- that after that process, you could find yourself in a frame of mind that would say, yes, I think the death penalty is appropriate; or, alternately, you could similarly find yourself in a frame of mind and say, on the basis of all that evidence, I don't think we need the death penalty here, I think life imprisonment is enough?  Could you be in the condition where you could go in either direction depending on your assessment of penalty-phase evidence?  Or would you tend one way or another because of the nature of the crime?

THE JUROR:  No.  No.  I think --

THE COURT:  You've identified it as a terrorist crime.

THE JUROR:  If someone were convicted by all 12 jurors and without a reasonable doubt --

THE COURT:  Right.

THE JUROR -- I'd be good with that like if the person is either guilty or not guilty, and I would live with whatever that was.  If it came to a guilty verdict and we had the penalty phase, as you said, it would be a lot of discussion.

And if it came down to the death penalty, could I do it?  Is that what you're asking?  Could I actually put my John Hancock on it and say, yeah, okay?

THE COURT:  That's one of the things.

THE JUROR:  Okay.  I don't know.  I think I could, but I don't know.  I'm being honest.  I mean, this is someone's life.  I'm in the business of, you know, keeping people healthy and alive.  But I have strong feelings about people that don't respect life and take it from other people.  So I --

THE COURT:  So let me ask you, I know this is hard, because it's to a great degree hypothetical.

THE JUROR:  Yeah.

THE COURT:  It depends on what you are yet to hear.  At the bottom of 25, Question 95, we asked that question you just kind of put to yourself:  "If you found him guilty and you decided the death penalty was the appropriate punishment, could you conscientiously vote for the death penalty?"  You said, "I'm not sure."  Right?

THE JUROR:  Uh-huh.

THE COURT:  Now if you go to the next question, we asked kind of a companion question:  "If you found him guilty and you decided life imprisonment without the possibility of release would be the punishment, could you conscientiously vote for that?"  And you again said, "I'm not sure."

Is it just because it's speculative or hypothetical,

you just can't give a firm answer?

THE JUROR:  Yeah.

THE COURT:  Is that what it is?

THE JUROR:  Yeah.  And also, too, this question here, I would have to know all the other stuff to say -- like what I thought he was guilty and everybody else -- you know, I don't know.  I would just have to have more information.

MS. CLARKE:  Your Honor, I think the parties --

THE COURT:  Okay.

MS. CLARKE:  -- have no more.

MR. MELLIN:  Yes.

THE COURT:  Well, we got to the end anyway.

Thank you.  Thank you very much.

THE CLERK:  Just leave that right there.

THE JUROR:  Okay.  Thank you.

THE COURT:  About 20 minutes or so.  Does that sound right.

(Recess.)

(After the recess:)

(The Court enters the courtroom at 4:34 p.m.)

THE COURT:  Okay.  I believe the first three we saw, 109, 169 and 171, we've already, I think, resolved.

MS. CLARKE:  That's right.

MR. MELLIN:  Correct.

THE COURT:  172?

MR. BRUCK:  No motion.

MR. MELLIN:  No motion.

THE COURT:  Okay.

173?

MS. CLARKE:  Same.

MR. MELLIN:  Same.

THE COURT:  174 we regarded as ineligible.

176, 181, I think as to them we are agreed.

183.

MS. CLARKE:  I don't think either party has a motion.

MR. MELLIN:  No motion.

THE COURT:  Okay.  184, I believe --

MS. CLARKE:  Was agreed.

THE COURT:  -- has a trip.  We agreed.

185.

MR. MELLIN:  No motion.

MS. CLARKE:  No motion.

THE COURT:  186?

MR. BRUCK:  Defense has a motion to excuse.

THE COURT:  Go ahead.

MR. BRUCK:  Your Honor, you'll recall this is a juror who wrote on her form that she believed the defendant to be guilty and she believed he should be sentenced to death.  She said she was able to put those aside, and she gave textbook, you know, explanations of the civic duties of a juror and how people -- you know, in isolation she said some very heartwarming things that went to her being qualified.

But the Court has gone behind that and really needs to go behind this.  This is a juror with more connections than most of the jurors we have seen.  I probed about why she thought he was guilty.  She gave detail that no other juror has given.  The Lord & Taylor photographs.  The Lord & Taylor photographs were made famous by the "60 Minutes" program with Rick Deloria pointing out and speaking very dramatically.  This is what this juror has seen and it's what's stuck in her mind.  I don't know if it was on "60 Minutes" or somewhere else.  This video should never have been released, but it was.  And she also refers to the defendant having a gun in Watertown.  Well, he didn't have a gun, but that stuck in her mind.  It's at a level of detail that most jurors have not given.

This is a juror who wrote on her form she has given hundreds of dollars, and seemed to want to back that -- walk that back a little bit, sort of -- it was a sense in which she

was minimizing it when she was probed.  This is a juror who really wants to be on this jury.  She made that clear in a lot of ways.

She made a point, which was correct, that the anniversary Red Sox observance was the Sunday rather than Marathon Monday, but the Marathon Monday game to which she went renewing her tradition of 15 years was one in which the victim Marc Fucarile threw out the first pitch.  We just found this in the newspaper.  We didn't know it when we talked to her, but we'll make it an exhibit if need be.  The Red Sox players used "Boston" jerseys rather than "Red Sox" which -- sort of symbolically marking the anniversary of Boston Strong and the attacks that day when she was there.

She's also of course -- and there was tremendous cheering at Fenway when they televised the winner of the marathon.  It may not have been the actual Red Sox memorial ball game on the first anniversary, but there was a lot there, none of which she mentioned.

She also is -- I'm trying to remember what she said about Watertown or -- but the -- this is a juror who just -- there's just too much -- too much there, and I don't think any juror -- there have been very few jurors qualified who started out at guilty and death penalty, and she is one of them.

Oh, so, it was very interesting.  In her form she said

that other people had told her, "Why is he" -- isn't she the one who said, "What's the point of the guilt phase, why don't they just go to punishment?" and on questioning, if I am remembering this right, it turned out she had said that herself, whereas the form had attributed it to other people. You put all this together, and this is just not the sort of juror who's qualified.

MR. MELLIN:  Your Honor, we disagree.  She is very intelligent, thoughtful, honest with her responses.  She discussed how when she first filled out the questionnaire she gave her responses on Question 77 about how she felt at the time, but she said at that time she was emotional about what had happened and that was the basis of why she was saying the things she said.

She was very clear that she would be able to set aside those feelings.  She said that in the questionnaire on Question 77, as well as to the Court when the Court asked her and when I asked her if she would be able to follow the rules and set that aside and decide the case.  If you'll recall, she's the one who said that she does this for a living.  So she's able to do some amount of investigation in her work.  She says she comes to an opinion at one point, but then she hears the evidence and then she changes her opinion based on the evidence.  That's what she said she would be able to do in this case.

I completely disagree that any of her answers were

textbook answers. I thought her answers were thoughtful and intelligent responses to the questions that were asked.

She said that she would be able to follow the process, that she would not automatically impose the death penalty, and that she would weigh the aggravators and mitigators. And she indicated that on her questionnaire as well at Questions 95 and 96.

MS. CONRAD: Your Honor, may I just say one thing about this just to follow up on something Mr. Bruck mentioned? And this really struck me. She first said, "Oh, yeah, people said, 'Why are they bothering with the trial?'" and then she admitted that she had said that herself before she got the summons. She said it was at the time.

She sort of kept insisting that it was at the time of the events that these discussions took place, despite the fact that in her answer to Question 75, which was, "What kinds of things did you say to others or did others say to you regarding your possible jury service in this case?" -- and that's where she wrote down, "Most commented on the fact that we should skip the trial, go right to sentencing" because of the assumed guilt of the various crimes that he's accused of.

And it took awhile for her to sort of acknowledge that. It seemed like she was, frankly, dissembling a little bit about that. And given that, given the fact that she said she had said things like that, it seems to me that it's very

likely that that is her attitude as she sits here -- or sat here today.  And I think that raises serious questions about her credibility.

THE COURT:  I think she would be an ideal juror in another case but not this case.  I base that principally on her -- I guess what Mr. Bruck was primarily addressing, was her traditions -- her personal traditions involved.  She's very close to this race and the event, and I think that this is -- while she's otherwise obviously intelligent -- and I think the HR thing impresses me generally, I'll say.  If we get any more -- I'll give you that hint, as someone who is a fact-finder, has some experience at it.  But I think her relationship to this case is too close.

Number 189 there was an agreement on.

Number 190?

MS. CLARKE:  I think the parties have agreed on 190, your Honor, on the presumption of innocence, unable to presume him innocent or to find him not guilty.

THE COURT:  Okay.

191.  I didn't know what you were up to.

MS. CLARKE:  We just did not feel like he understood.

THE COURT:  It was language?

MS. CLARKE:  It was the -- understanding the writing, understanding the questions.  I think both parties felt that way.

THE COURT:  I couldn't tell whether he was having trouble understanding -- after all, as far as I understand, English is the first language of Jamaica.  I just was wondering whether he was thinking about things.  I agree that it was -- he took a long time to answer, but he wasn't translating, I don't think.

MS. CLARKE:  I don't think it was the English language; there seemed to be a capacity-to-understand issue.

THE COURT:  You know, he had the sort of obscure answer to Question 93, but I think I untangled it for him.  Do you know where I think that came from?  Was his civil trial.  He had a negligence trial.  And they had the, undoubtedly, contributory negligence instruction of greater than 50 percent and so on, but that may simply be an illustration of the point you're making.

MS. CLARKE:  I think so.

THE COURT:  All right.  We'll excuse him.

MS. CLARKE:  There's no motion on 195.

THE COURT:  195?

MS. CLARKE:  And the parties have agreed on --

THE COURT:  198?  I think you had substantive -- I agree there because I thought the hardship was a valid one too.

THE CLERK:  That was 198?

THE COURT:  Yes, and that brings us to 199.

MS. CLARKE:  And the parties have agreed on 199.

THE COURT:  I'm not sure I agree.  Tell me about it.

MS. CLARKE:  This was the hard to unring a bell -- oh, I know what the Court did not cover, and since we agreed we did not cover, there were pretty substantial connections to the marathon bombing --

THE COURT:  Yeah, that's true.  We didn't cover that. All right.  You don't have to go into detail.  Okay.

So I have as having passed the bar here 172, 173, 183, 185, 195.

MS. CLARKE:  That's correct.

MR. MELLIN:  Correct.

THE COURT:  Now, we're not -- we won't be here tomorrow.  I'm advised that the Boston schools have already announced they're closed for Wednesday.  I don't -- for these purposes I don't think we have to necessarily follow the Boston schools, which is an odd rule anyway in modern times, but there it is.  We're more in control of this than -- because Jim is in contact with individual jurors every night anyway.

But just before I came down I did go to WBZ and check school closings, and I see there are other communities that are closing on Wednesday as well, so maybe the places where these folks would be coming from may be closing on Wednesday.  So I think we'd better skip Wednesday as well.

MS. CLARKE:  So we'll take the Tuesday group and move it to Thursday?

THE COURT:  Yes.  So what we're doing is trying to compress things.  And actually, we'll probably spend a good part of Wednesday doing that, and do it a little bit more.  We have -- this is for the next-up panel, right, which was -- all the dates are getting messed up.  So this was for the Tuesday.  1/27 was for the Tuesday?

LAW CLERK:  Yes.

THE COURT:  Do you have multiple copies?

LAW CLERK:  I printed two.

THE COURT:  She printed two.  We'll give you this.  So these are what I would propose as excused from the next group.

MS. CLARKE:  Can you give us the numbers?

THE COURT:  Yeah, I'll give you the sheet.  If you want, I'll read them off.

MS. CLARKE:  Sure.

THE COURT:  201, 202, 203, 206, 209, 212, 213.  We would then go to the next batch, and after a similar exercise of proposed excuses, take the net and move the next seven into the Tuesday position; in other words, replacing those seven, if that's all done, with seven who have already been scoured, okay?  So that's what this sheet -- so to explain the sheet, the range of people who would be substituted in is from 217 to 232.  In that group, actually, because we're 216, are people that I would similarly propose to be out.  So the bottom group is net of these, if you're following this.

MS. CLARKE: So you've got seven you've kicked, in the Court's mind that we should look at, and then the next range becomes 216 to 232, and you have another seven, it looks like.

THE COURT: Another eight proposed for that range to be out and a net of -- well, I don't know if there are people left in the pool.

MS. CLARKE: I see that your law clerk is rubbing her head.

(Laughter.)

THE COURT: This is, you know -- we're not good with numbers; that's why we became lawyers, you know?

This is just to replace into the tomorrow -- for convenience we'll call it the "Tuesday pool," but it's going to be Thursday by now. There may still be other people left in this pool. We went up through -- maybe you know the answer to this. This is seven plus eight is 15. There might be one or two left there, okay? If there are, they'll stay in the Wednesday-Friday position and will be backfilled by another 18 that we'll do by the same process and hope to have enough of that so you can review it and see where you -- we're trying for the excuses to be -- the ones that have been pretty established by our common law now as not debatable or doesn't need further explication.

So there are some people who look like they might have a financial hardship or a child-care issue that we'll have to

have them explain.  It's not so clear, for example.  We're trying to do it so that -- because, frankly, I don't want debates about whether it's right or wrong, and if it's close, we'll include them.  But the ones we think are really clear I'm proposing out to try to move everybody forward, okay?

MS. CLARKE:  And when could we get back to you?

THE COURT:  Well, as soon as possible.  I guess -- I don't know.  I mean, I think, from our point of view, we expect to be operational on Wednesday, you know, up in chambers and so on and so forth.  I expect you probably do too, perhaps maybe as well tomorrow.

So I don't know.  The Court's going to be closed tomorrow.  I'll still be looking at email.  I'll be working from home.  I supposed everybody else will.

MS. CLARKE:  So we ought to be able to get together by email.

THE COURT:  Sure.

MS. CLARKE:  And then send it to Jim?

THE COURT:  Sure.

MS. CONRAD:  Judge, I'm sorry.  There's something that I wanted to raise.  There were two things I was going to raise today.  I know it's late and everyone wants to beat out the storm, and none of it -- well, one of them has to do with a juror we've already seen that we've found some additional social media on.

THE COURT:  We'll deal with that later.

MS. CONRAD:  Okay.  And another, though, has to do with a memorandum that went out about new security measures around the courthouse.  So that's arguably more pressing.

I have a --

THE COURT:  That is out of our control.

MS. CONRAD:  Well, yes.  But --

THE COURT:  I mean, literally.  That is done by the Boston Police Department.

MS. CONRAD:  Well, I think part of it is.  This says "By order of the City of Boston Police Department in cooperation with the U.S. Marshals and the Federal Protective Service," and it goes on to describe not just street closures but also canine -- explosive-sniffing canine-screening vehicles in the area, and we're concerned about its impact on prospective jurors.

THE COURT:  I have some concern along those lines.  I cannot alter it.  I'll just tell you that.

MR. BRUCK:  The question becomes after two weeks was it necessary to begin this now as opposed to the beginning of the trial?

THE COURT:  Off the record.

(Discussion off the record.)

MS. CONRAD:  Just for the record, we also note the presence -- I know this is probably -- your Honor's going to

say the same thing, but we also note the presence of Coast Guard gunboats in the harbor visible to prospective jurors, and just the kind of show of force and security precautions really has a prejudicial impact on prospective jurors and ultimately jurors.

MR. CHAKRAVARTY:  The boats have been there, and counsel hasn't asked about any of the jurors' perspectives.

THE COURT:  It is what it is.

MS. CLARKE:  Friday?  Friday at nine?

THE COURT:  Thursday.

MS. CLARKE:  Thursday.  I'm off a day.

(The Court exited the courtroom and the proceedings adjourned at 4:54 p.m.)

C E R T I F I C A T E


        We, Marcia G. Patrisso, RMR, CRR (pages 87 - 135 and

217 - 230), Official Reporter of the United States District

Court, and Loretta Hennessey, RDR, CRR (pages 1 - 86 and

136 - 216), do hereby certify that the foregoing transcript

constitutes, to the best of our skill and ability, a true and

accurate transcription of our stenotype notes taken in the

matter of Criminal Action No. 13-10200-GAO, United States of

America v. Dzhokhar A. Tsarnaev.


/s/ Marcia G. Patrisso
MARCIA G. PATRISSO, RMR, CRR
Official Court Reporter

/s/ Loretta Hennessey
LORETTA HENNESSEY, RDR, CRR



Date:  1/26/15