UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   )   Criminal Action
v.                                 )   No. 13-10200-GAO
                                   )
DZHOKHAR A. TSARNAEV, also         )
known as Jahar Tsarni,             )
                                   )
          Defendant.               )
                                   )

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

## JURY TRIAL - DAY 12

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Friday, January 30, 2015
10:25 a.m.

Marcia G. Patrisso, RMR, CRR
Lee A. Marzilli, RPR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

APPEARANCES:

      OFFICE OF THE UNITED STATES ATTORNEY
      By: William D. Weinreb, Aloke Chakravarty and
         Nadine Pellegrini, Assistant U.S. Attorneys
      John Joseph Moakley Federal Courthouse
      Suite 9200
      Boston, Massachusetts  02210
      - and -
      UNITED STATES DEPARTMENT OF JUSTICE
      By: Steven D. Mellin, Assistant U.S. Attorney
      Capital Case Section
      1331 F Street, N.W.
      Washington, D.C.  20530
      On Behalf of the Government

      FEDERAL PUBLIC DEFENDER OFFICE
      By: Miriam Conrad, Federal Public Defender
      51 Sleeper Street
      Fifth Floor
      Boston, Massachusetts  02210
      - and -
      CLARKE & RICE, APC
      By: Judy Clarke, Esq.
      1010 Second Avenue
      Suite 1800
      San Diego, California  92101
      - and -
      LAW OFFICE OF DAVID I. BRUCK
      By: David I. Bruck, Esq.
      220 Sydney Lewis Hall
      Lexington, Virginia  24450
      On Behalf of the Defendant

P R O C E E D I N G S

(10:25 a.m., jury venire enters the courtroom.)

THE CLERK:  Are we all ready, everyone?  All rise for the Honorable Court.  Please be seated.

THE COURT:  Good morning, everyone.  Thank you for braving the weather to be here.  I appreciate it.  It's caused us some time issues, but that's all right, we'll get going.

As you know, we're continuing the process of jury selection for the case of *United States v. Dzhokhar Tsarnaev*. Mr. Tsarnaev is charged in connection with the bombing that occurred at the finish line of the Boston Marathon on April 15, 2013, that resulted in the deaths of three people.  He is also charged in the death of an MIT police officer and other offenses occurring on April 18 and 19, 2013.

Some, but not all, of the crimes charged are by statute potentially punishable by death.  You will recall from my prior instructions that the trial jury will first consider and decide whether the government has proved Mr. Tsarnaev's guilt of any or all of the charges against him.  If he is convicted of any of the capital crimes -- that is, crimes potentially punishable by death -- the jury will then consider and decide whether he will be sentenced to death for any such crime or to life in prison without the possibility of release.

You may have wondered why the death penalty is a possibility in this case, in view of the fact that the laws of

Massachusetts do not provide for the death penalty for murder or for any other violation of Massachusetts law.  The reason is that this is a federal case involving alleged violations of the laws of the United States rather than a state case involving violations of Massachusetts law.

If the jury convicts the defendant of any of the capital crimes charged in the indictment, the same jury will hear evidence and then decide whether to sentence him to death or to life in prison without the possibility of release.  And because the jury that is selected to decide, first, the defendant's guilt or innocence will also decide his punishment, if he is convicted, it is necessary to question potential jurors about your feelings and beliefs about the death penalty as part of this process of picking a jury.

So let me briefly explain the procedures that must be followed in a case in which the death penalty is or may be at issue.  As in any criminal trial, initially the government will have the burden of proving that Mr. Tsarnaev is in fact guilty of any crime with which he is charged.  If he is convicted by the jury of a crime for which the death penalty may be lawfully imposed, there will be a second phase of the trial.  The second phase is referred to usually in shorthand as the "penalty phase."  In that phase, the government will introduce evidence that seeks to prove beyond a reasonable doubt, first, that the defendant acted with sufficient intent to be subject to the

death penalty as a matter of law, and, second, that aggravating factors about the killings or events or about the defendant justify sentencing him to death.  Aggravating factors are circumstances that, if proven, make the crimes particularly serious or blameworthy, and therefore under the law may justify imposing a more severe sentence on this defendant compared with other persons convicted of intentional killing or murder.  The government will bear the burden of proving alleged aggravating factors to every juror beyond a reasonable doubt.

The defense will have the opportunity to present evidence of what it will argue are mitigating factors. Mitigating factors are usually circumstances about the crimes or about the defendant's background or character that would suggest that the death penalty is not the appropriate sentence for the case, or that life imprisonment without possibility of release is adequate to punish the defendant.

Unlike the proof of aggravating factors, a mitigating factor must only be proven by a greater weight of the evidence. That is a less demanding standard of proof than proof beyond a reasonable doubt.  Again, unlike the proof of aggravating factors, mitigating factors do not have to be proven to the satisfaction of all twelve jurors.  Any juror who finds or determines a mitigating factor to have been proven by the greater weight of the evidence may consider that factor in deciding the appropriate sentence in the case, regardless of

whether any or all of the other jurors agree that the mitigating factor has been proven.

After the parties have made their presentations during the penalty phase, the jury then will weigh all the evidence. Before a jury could vote to impose the death penalty, every juror would have to be convinced that certain threshold factors make the defendant potentially subject to the death penalty and that those factors had been proved beyond a reasonable doubt. In addition, in order to impose the death penalty, every juror would have to be persuaded that any proven aggravating factors sufficiently outweigh any mitigating factors found by any juror or jurors so that a sentence of death is justified. Even if the jury did not find any mitigating factors, it would still have to be unanimously persuaded that any proven aggravating factors were themselves sufficient to justify a death sentence.

You should understand that a jury is never required to find that a sentence of death is justified. The decision whether the government has proven the defendant should be sentenced to death must ultimately be made by each juror, himself or herself. If, however, every juror is persuaded that the death penalty should be imposed, I would be required, as the trial judge, to sentence the defendant to death. In other words, I could not change the jury's verdict. It is the jury, not the judge, that is responsible for determining whether a defendant who is convicted of a capital crime will live or die.

What I have just described is only an overview of the law applicable to a jury's consideration of the death penalty. If you are selected to serve on the jury, and if you find the defendant guilty of a crime or crimes punishable by death, then at an appropriate time I will give you very detailed instructions concerning your duties in deciding whether to impose the death penalty or life imprisonment without possibility of release and the law that must be followed in making that decision.

When you filled out your questionnaires, we told you that there were no right and wrong answers to any of the questions you've been asked, and that's true of any that you'll be asked in this further process of interviews. We asked the questions because both the government and Mr. Tsarnaev are entitled to a jury that does not have its mind firmly made up one way or the other before hearing the evidence and a detailed explanation of the law. That applies both to whether Mr. Tsarnaev is guilty or not guilty of the specific crimes charged in the indictment, and, if he is convicted of a capital crime, whether he should be sentenced to death or to life in prison without possibility of release.

So today we're going to question each of you individually about issues that may be important to selecting a jury in the case. We're going to ask you to go back into the room that you've just been in, and we'll call you into the

courtroom one by one to ask you some questions.  There will be a few people in addition to the lawyers and their staffs present in the courtroom during the process, and the proceedings will be simultaneously transmitted by video and audio to overflow courtrooms where there are members of the public and the media present.  We will not identify you by name but rather by number, and you will be seated so that the video camera will be behind you.  Your answers will generally be public, but if a truthful answer would require you to reveal sensitive personal information, we will temporarily stop the audio transmission to the overflow courtroom so that people observing there will not hear your answer.

Again, we do not expect or want any particular answer to any question.  All we want and what the law expects is for you to provide accurate and truthful answers to the questions you will be asked.  If you do that, you will be doing your duty as a citizen and as a juror, no matter what your answers may be.

I do want to remind you about some of my prior instructions.  As you know, a jury's verdict must be based on the evidence produced at trial and must be free of outside influence.  Therefore, I remind you again that it is extremely important that you do not discuss the case, including the jury selection process, with your family, friends, each other, or any other person until either you have been excused, or, if

you're selected as a juror, until the case concludes.  And, of course, you're not to undertake any independent inquiry or research, including online research of any kind, or otherwise read, watch, or listen to reports about the case that may be in the media.

When you signed your questionnaires, you did so under an affirmation that the information provided was true, and you affirmed that that was the case under the penalties of perjury.  Similarly, your answers here will be sworn or affirmed, and we ask you now to stand while the Clerk administers the oath to you.

THE CLERK:  Will the jurors please rise and raise your right hand.

(Jury venire duly sworn.)

THE COURT:  Okay, Jim will take you back into the room, and we will begin by asking you one by one to come into the courtroom for some questions.

(Jury venire excused.)

MS. CLARKE:  We don't know who's here.

THE COURT:  We're starting with No. 219.  I'll run through my -- 243.

MS. CLARKE:  219 what?

THE COURT:  243, 244, 245, 246.  248 is not here because of a family emergency.  250, 251, 253 -- oh, no, 253 is not here.  Hang on just a minute.  255, 258, 259.

MS. CLARKE:  But 253 is not here?

THE COURT:  253 is not.

MS. CLARKE:  And 240?

THE COURT:  240 is not.

MS. CLARKE:  Is 253 coming back in, or was that an excuse?

THE COURT:  I don't think she's coming back in.

MS. CLARKE:  So that's eleven?

THE COURT:  It's ten.  It's ten.  So the first one will be 219.  So we're ready to go, I think, with 219.

THE CLERK:  Juror No. 219.

THE JURY CLERK:  Juror 219.

THE CLERK:  Ma'am, over here, please.  Have a seat.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  A little louder.

THE JUROR:  Oh, good morning.

THE COURT:  Have you been able to abide by my instructions given when you filled out the questionnaire not to discuss the case with anybody and to avoid as much as possible any media accounts of the case?

THE JUROR:  Uh-huh.

THE COURT:  You have to answer affirmatively for the Court Reporter.

THE JUROR:  Okay.  Sorry.

THE COURT:  So we have the questionnaire there, and we may refer to it a little bit as we go along, okay?

THE JUROR:  Uh-huh, okay.

THE COURT:  Let me ask you to turn to Page 5, Question 9.

THE JUROR:  Uh-huh.

THE COURT:  Would that have any effect on your ability to participate and follow what was going on?

THE JUROR:  No, no.

THE COURT:  Something you've adjusted to?

THE JUROR:  Yes, I'm used to, uh-huh.

THE COURT:  Tell us a little bit about your work.

THE JUROR:  Right now I'm unemployed, but I'm a medical assistant.

THE COURT:  How long have you been unemployed?

THE JUROR:  For, like, six months.

THE COURT:  Do you have prospects of employment in the near future?

THE JUROR:  Yes.  It was because of medical issues, so --

THE COURT:  I see, okay.

MR. WEINREB:  I'm sorry, your Honor, I can't hear.

THE COURT:  Medical issues.  Speak up a little louder, please.

THE JUROR:  Okay, sorry.

THE COURT:  So do you have a plan to return to work?

THE JUROR:  Yes, I do.

THE COURT:  When do you plan to return?

THE JUROR:  Well, I'm going to look for a job after all this ends.

THE COURT:  So I guess we're trying to determine whether serving on the jury would be a hardship for you or particularly difficult because of your employment.  Are you saying that you're prepared to serve on the jury if necessary and then resume employment?

THE JUROR:  Uh-huh, yes.

THE COURT:  Okay.  Tell us a little bit about -- you use Facebook and Instagram?

THE JUROR:  I do.

THE COURT:  Tell us how you use it and how often.

THE JUROR:  I use Facebook almost every day, but Instagram I don't use.  Well, I have an account, but I don't use it too much.

THE COURT:  Okay, how do you use Facebook?  What do you use it for?  Do you make postings as well as read other's?

THE JUROR:  I just want to take a look, but I don't post much.

THE COURT:  You don't post much.

THE JUROR:  No.

THE COURT:  So I guess I'd like you to turn to Page 20

of your questionnaire.  Question 77, we asked people if -- I'm going to ask you in particular, I guess, in this questionnaire, if you had, as a result of anything you'd seen or read in the media or otherwise, formed any opinion about various matters set forth in A, B, C, and D.  The first was whether the defendant was guilty or not guilty, and then a question about, if so, what penalty might be imposed, and let's take a look at the first answer first.  You said that you had formed an opinion that he was guilty.

THE JUROR:  Yes.

THE COURT:  And then as to the penalty questions, you said you were unsure.  We also asked if you were able or unable, if you had an opinion, if you were able or unable to perhaps set that aside and listen to the evidence in the case and make a decision based only on the evidence in the case rather than a preconceived idea from the media, and you indicated you would be unable to do that.  Did you understand the question?

THE JUROR:  No.

THE COURT:  Well, let me come at it this way:  Do you understand that in the criminal justice system, our system of justice, a defendant who is charged with a crime is presumed to be innocent of the crime, not guilty, unless the government proves otherwise at trial by the evidence that's produced at trial?  So the burden of proving somebody guilty of a crime

that they're accused of rests with the government, and if the government fulfills that burden and satisfies the jury beyond a reasonable doubt that the person in fact committed the crime, then the jury is authorized to find the person guilty on that basis; but if the government fails to prove to the jury's satisfaction beyond a reasonable doubt that a person is guilty of the crime, the presumption of innocence continues, and the jury is obliged under that circumstance to find the person not guilty.  Do you understand those principles?

THE JUROR:  Yes, I do.

THE COURT:  And the question would be, if you were a juror in this case, notwithstanding things you might have heard or opinions you may have formed, would you be able to as a juror insist that the government satisfy you beyond a reasonable doubt by the proof at trial rather than based on things you had heard outside the trial?

THE JUROR:  Yes.

THE COURT:  You think you could do that?

THE JUROR:  Uh-huh, I could.

THE COURT:  We asked, because as I have just said to you all, the death penalty is a possibility in the case under some circumstances, if the defendant is convicted of certain crimes, so we also have asked you some questions about your attitude toward the death penalty.  I'm on Page 23 now, and beginning with Question 88, we first asked if you had any views

on the death penalty in general, and, if you did, to put them down.  You didn't make a response to that question.  Do you have any general views about the wisdom or appropriateness or even morality of the death penalty?

THE JUROR:  No.

THE COURT:  In Question 89 we asked if you could kind of indicate whether you were strongly opposed or strongly favored or somewhere in between of the death penalty.  You selected No. 5, which is sort of in the middle.

THE JUROR:  Uh-huh.

THE COURT:  Can you tell us why you selected 5?

THE JUROR:  Uhm, it depends on the things that he did in the case, so I'm not sure.

THE COURT:  Turn to the next page, Question 90.  Here we asked you not on a scale of numbers but in words to select a statement among the possibilities that you thought best described your feelings about the death penalty in a case of somebody who's been proven guilty of murder, okay?  You selected C, which says, "I am opposed to the death penalty, but I could vote to impose it if I believed that the facts and the law in a particular case called for it."  Does that represent your attitude about the death penalty?

THE JUROR:  Yes.

THE COURT:  And about whether you could consider it and possibly vote to impose it --

12-16

THE JUROR: Uh-huh.

THE COURT: -- in a case?

THE JUROR: Yes.

THE COURT: If you turn to Page 25, I'm going to ask you about Question 95 and then 96 at the top of the next page. They go together in a sense. 95 is, "If you found this defendant guilty and you decided that the death penalty was the appropriate punishment for him, could you conscientiously vote for the death penalty?" And you selected the box that said "I'm not sure."

THE JUROR: Uh-huh.

THE COURT: If you look at Question 96 on the next page, it asks sort of the other side of that question: "If you find the defendant guilty and you decided life imprisonment without the possibility of release was the appropriate punishment, could you conscientiously vote for life in prison without the possibility of release?" and you said "yes" to that. So could you maybe explain a little bit about your answer that you were not sure to the first one and your answer "yes" to the second one.

THE JUROR: Well, I think that if his, uhm -- sorry, I'm nervous.

THE COURT: Yes, relax. I know that's easier for me to say, but take it easy.

THE JUROR: Uhm, I'm not sure if I voted for the death

penalty. I'm just, uhm -- because I don't know too much about the case.

THE COURT: Yes, that's right, so we're not asking you to make up your mind about the penalty at this stage. Obviously you haven't heard what you would ultimately hear. The question is, is there some reason you would find yourself unable to consider seriously the death penalty if you thought it was an appropriate punishment? In other words, even if you thought it was appropriate, would you hesitate or be reluctant to vote in favor of the death penalty for any reason? Or, as the question asks, if you decided that the death penalty was appropriate, could you conscientiously vote to impose it?

THE JUROR: I would have no problem. I would have no problem deciding.

THE COURT: You would have no problem if you thought it was appropriate to vote for it?

THE JUROR: Yes.

THE COURT: Okay, follow-up? Each of the lawyers may follow up a little bit here. Not each of the lawyers, one for each side.

MR. WEINREB: Good morning.

THE JUROR: Good morning.

MR. WEINREB: My name is Bill Weinreb. I'm one of the prosecutors in the case. I just wanted to ask you a few follow-up questions.

THE JUROR:  Okay.

MR. WEINREB:  So in answer to Question No. 77, I think it was, you said you had an opinion, you had formed an opinion that the defendant is guilty?

THE JUROR:  Uh-huh.

MR. WEINREB:  It would probably help if you said "yes" or "no."

THE JUROR:  Yes.  Sorry.

MR. WEINREB:  Just for the Court Reporter.

THE JUROR:  Sorry.

MR. WEINREB:  Is that still your opinion?

THE JUROR:  Yes.

MR. WEINREB:  And you understand that if you're selected as a juror, there will be a trial, and the government will put on evidence to try to prove that the defendant is guilty?

THE JUROR:  Okay.

MR. WEINREB:  Are you able to put aside your opinion and just focus on the evidence at trial?

THE JUROR:  Yes, I could.

MR. WEINREB:  Or would your opinion be there -- would you have your opinion in mind, and would that influence --

THE JUROR:  I think I would have my opinion in mind, but I can change my mind if I see the evidence and all.

MR. WEINREB:  But what if you saw no evidence that the

defendant was guilty?  What if the government didn't put on a lot of evidence, would that affect whether you --

MR. BRUCK:  I think you covered this, and he hasn't really explained the situation.

MR. WEINREB:  I'm trying to make sure we -- maybe I could ask it a different way.

THE COURT:  I think it's a little speculative, I guess is the problem.

MR. WEINREB:  Can you explain what your mindset would be during the trial.

THE COURT:  I think that may not be specific, and I'm not sure that the juror would truly understand what you're asking.  Try it again.

MR. WEINREB:  Okay, fair enough.  Let me try to ask you a better question.

THE JUROR:  Okay.

MR. WEINREB:  So the Judge explained that it's the burden of the government to prove the defendant guilty.

THE JUROR:  Yes.

MR. WEINREB:  Do you understand that?

THE JUROR:  Yes, I do.

MR. WEINREB:  Okay.  And that means that the government has to put on evidence that the defendant is guilty.

THE JUROR:  Okay.

MR. WEINREB:  Evidence that persuades you beyond a

reasonable doubt that he's guilty.

THE JUROR:  Uh-huh.

MR. WEINREB:  If the government did not put on evidence that persuaded you beyond a reasonable doubt that the defendant was guilty, would the opinion you have right now that he's guilty, would that affect how you voted, guilty or not guilty?

THE JUROR:  I think if I don't see too much evidence, I would still -- I would still get to that answer that he's guilty.

MR. WEINREB:  Let me just ask about something else too.  You mentioned that you have three kids at home?

THE JUROR:  I do.

MR. WEINREB:  And do they take care of themselves when you're not there, or do you have somebody else?

THE JUROR:  Well, right now they're by themselves.

MR. WEINREB:  Okay.  So if you were on the jury, would that be a problem, your not being home?

THE JUROR:  Hmm, no.

MR. WEINREB:  Could you say more about -- in your answer to Question 95 -- I just want to make I understand correctly -- where you were asked if you could conscientiously vote for the death penalty if you decided it was an appropriate sentence in a case and you said "Not sure," what did you mean by that?

THE JUROR:  'Cuz I don't -- I don't know how to explain that, but the death penalty is something serious that I'm not sure if I could...I'm not sure.

MR. WEINREB:  What are you not sure about?

THE JUROR:  I don't know.  My mind is blank.

MR. WEINREB:  You know, it's not a quiz where there's a right answer or a wrong answer.  Really, we're just wondering what's on your mind about these issues.  And I'm sure you're a little nervous, but take your time.

THE COURT:  Just focus on the question.  Just take your time, read the question, give it a little thought, and then see if you can explain what your answer is.  And, frankly, your answer may be the same as you gave then, or maybe, if you've thought about it and you understand the question slightly differently, maybe your answer changes.  So we just want you to focus on the question, I guess, and we'd like to know what your answer to that question would be.

(Juror examining questionnaire.)

THE COURT:  First of all, I guess I want to be sure you understand the question.  Is it confusing you at all what the question is asking you?

THE JUROR:  No.  It's just that I don't know how to express myself too much because I'm really nervous.

THE COURT:  Let me try to rephrase the question.  The question is asking in part, if you became convinced after the

penalty phase that I described, where you have aggravating factors and mitigating factors -- and this, by the way, you don't get to the penalty consideration, you don't get to think about whether a penalty is imposed unless you have already as a jury convicted the defendant and find him guilty of a crime that qualifies for the death penalty, right?  So start from that proposition.  We're talking about a person who has been convicted of a serious crime that could be punished by death. So then the question is, you'll hear the evidence in what we call the "penalty phase" of the trial, some pro, some con with respect to the imposition of the death penalty.  What this question is asking is, if you became convinced after considering all of that evidence, pro and con, aggravating and mitigating, and you concluded that for this offense the death penalty is the appropriate punishment, okay, so now you think it's the right thing to do, I think the question is, could you conscientiously cast that vote knowing that it would result in somebody being sentenced to death?

THE JUROR:  Yes, I would.

MR. WEINREB:  And so the question I was getting at is, when you marked that on your questionnaire, you said "Unsure."

THE JUROR:  Uh-huh.

MR. WEINREB:  But when you marked the next question, which asked whether you could sentence someone to life imprisonment, you said "Yes," and what I'm really wondering

about is why the different answers there.

THE JUROR:  Because it's two different, uhm -- because I think my opinion that, uhm, the person will suffer more, uhm, in prison than dying.  I'm not...

MR. WEINREB:  Your Honor, at this point we'd like to ask the question that drew an objection the last time.

THE COURT:  Yes, I think you should not.  I've reconsidered it, actually.  I'm not sure of the law on that point.  You're talking about the --

MR. WEINREB:  Yes.

THE COURT:  Yes, I'm not sure of it.  I know there's a case, but I'd like a little better authority on that, so I think we'll just avoid it for now.

MR. WEINREB:  Okay.  Is that the only reason you answered that way?

THE JUROR:  Uh-huh, that's the only.

MR. WEINREB:  So if -- can I ask it as a hypothetical?

THE COURT:  No.

MR. WEINREB:  Are your views open to being changed on that subject about which is the worse punishment?

THE JUROR:  No.

MR. WEINREB:  Excuse me.

(Discussion between government attorneys.)

MR. WEINREB:  So on the questionnaire, in response to Question 88, so 88 you said you had no views on the death

penalty, and then for 89 you circled 5, and I'm just curious about that pair of answers.  Where did the 5 come from if you have -- so what did you mean to say by circling 5?

THE JUROR:  I didn't do anything on 88.

MR. WEINREB:  Right, but then on 89 you circled 5.

(Juror examining questionnaire.)

THE JUROR:  I'm not sure.  I'm not sure.

MR. WEINREB:  Okay.  Well, then let's -- it says, "Please circle one number that indicates your opinion about the death penalty."  Do you have enough of an opinion that you could circle one of those numbers and it would be an accurate statement of your opinion?

THE JUROR:  No.

(Discussion between government attorneys.)

MR. WEINREB:  Well, let's turn to 90 then.  So for 90 you circled C, that you're opposed to the death penalty.  Are you opposed to the death penalty?

THE JUROR:  Uh-huh, I am.

MR. WEINREB:  Could you say more about that?  Why are you opposed to it?

THE JUROR:  It's not the case that I'm opposed.  It's that I don't want to be -- I don't want to have a life in my hands.  It's just my opinion, my case.

MR. WEINREB:  Well, what do you mean, you don't want a life in your hands?

THE JUROR:  I don't want to decide nobody's life.

MR. WEINREB:  You don't want to decide if somebody should live or die?

THE JUROR:  Uh-huh.

MR. WEINREB:  Well, that's a big responsibility.  I think a lot of people might feel that way.  Do you feel like you could handle the responsibility?

THE JUROR:  No.

MR. WEINREB:  Do you understand that if you're a juror on this case, that would be your responsibility, if the defendant is convicted?

THE JUROR:  Yes.

MR. WEINREB:  Do you think you could handle being a juror on this case?

THE JUROR:  No.

MR. WEINREB:  Okay, thank you very much.

MR. BRUCK:  Good morning.

THE JUROR:  Good morning.

MR. BRUCK:  My name is David Bruck, and one of Jahar Tsarnaev's lawyers, and I just want to ask a few questions, okay?

THE JUROR:  Okay.

MR. BRUCK:  Do you want to take a deep breath?  I know this is nerve-wracking, isn't it?  Try to relax, and we'll just talk about this for a minute, okay?

THE JUROR:  Okay.

MR. BRUCK:  I think what everyone is asking you, there are two things.  Probably nobody wants to be on a jury, do they?  And you don't especially want to be on this jury.

THE JUROR:  No.

MR. BRUCK:  But it's a job that someone has to do.

MR. WEINREB:  Objection, your Honor.  This is leading, one leading question after another.

THE COURT:  No, go ahead.  I'll allow a little exploration here.

MR. BRUCK:  It's a job that somebody has got to do.

THE JUROR:  (Nodding affirmatively.)

MR. BRUCK:  So the question is, first of all, could you keep an open mind about whether the man is guilty or innocent, first up, wait for the evidence?

THE JUROR:  Yes.

MR. BRUCK:  Would you base your decision on whether he's guilty or innocent on the evidence you heard in court --

MR. BRUCK:  Yes.

MR. BRUCK:  -- and not on the publicity or what you heard on the news?

THE JUROR:  No.

MR. BRUCK:  Okay.  Then let's talk about the death penalty.  That's a separate question.  I understand that it makes you very uneasy.

THE JUROR:  Uh-huh.

MR. BRUCK:  But the question is, could you keep an open mind?

THE JUROR:  I'm not sure.

MR. BRUCK:  I'm sorry?

THE JUROR:  I'm not sure.

MR. BRUCK:  You're not sure.  When you say you're not sure, does that mean you're not sure about how you would decide the case?

MR. BRUCK:  About the death penalty, I'm not sure.

MR. BRUCK:  Tell me more about what you mean by that.

MR. BRUCK:  I'm not sure if I -- if -- if I'm changing my mind about what I think.

MR. BRUCK:  You're not sure if you're changing your mind about what you think?

THE JUROR:  Uh-huh.  I'm opposed to the death penalty.

MR. BRUCK:  I'm sorry?

THE JUROR:  I'm opposed.

MR. BRUCK:  Well, even being opposed, could you wait and hear the evidence in the case and then make up your mind about whether to vote for it?

THE JUROR:  No.

MR. BRUCK:  No?

THE JUROR:  No.

MR. BRUCK:  Can you tell me why.

THE JUROR:  Like I said, I don't want to be responsible for somebody dying.

MR. BRUCK:  Okay, thank you.

THE COURT:  Can I just ask, have you talked about this with any of your close friends that you might be on this case and might have to consider these questions?

THE JUROR:  No.

THE COURT:  No?  You have a sister and a brother?

THE JUROR:  Uh-huh.

THE COURT:  Have you talked with them about it?

THE JUROR:  I -- I said about that I'll be here, but which case --

THE COURT:  But you didn't talk about the death penalty is what I'm --

THE JUROR:  No.

THE COURT:  You haven't had any family discussions about that?

THE JUROR:  No.

THE COURT:  All right, thanks.

(Juror excused.)



Yes, you can bring her in now.

THE CLERK:  Phil, back on.

(End of sidebar discussion.)

THE CLERK:  Juror No. 243.

THE JURY CLERK:  Juror 243.

THE CLERK:  Ma'am, over here, if you would.  Have a seat, and speak into the mic so everybody can hear you.  That would be great, okay?

THE JUROR:  Yes.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  Thanks for being here on a crummy day.

THE JUROR:  What else are you going to do?

THE COURT:  Have you been able, since you were here and filled out the questionnaire, have you been able to follow my instructions to avoid any discussion of the substance of the case --

THE JUROR:  Yes.

THE COURT:  -- or the processes?  And also, as best you could, to avoid any media accounts of what's going on, either in the case or what has gone on in the past?

THE JUROR:  Yes.

THE COURT:  Okay, good.  Thank you.  So tell us about your employment.  You used an acronym.  I don't know what it means, HIM.

THE JUROR:  Health information management.  I'm employed at BI Deaconess Medical Center as the operations specialist, training all the ambulatory and inpatient units on creating the electronic health record under HIPAA and federal laws.

THE COURT:  Okay.  And you've been at your current place of employment for a couple of years, it looks like?

THE JUROR:  June of 13 I started at the BI.

THE COURT:  Yes, and in answer to one of the earlier questions -- it was really a question about whether it would be difficult to serve on the case -- you indicated you've had a

recent promotion?

THE JUROR:  Yes, I did, into the operation management position.

THE COURT:  Okay.  You put that information in the questionnaire under the question about hardship or difficulty serving.  Are those related?  Is your promotion --

THE JUROR:  Well, it's a new position.  It would be a concern, but, uhm, I mean, the hospital would be fine with it, I guess.

THE COURT:  Tell us about social media.  I guess you indicated you use Facebook a little bit but not much.

THE JUROR:  Just to follow my children and nieces and nephews.  That's all.  I don't post.

THE COURT:  Check up on them.

THE JUROR:  Yeah, I do.  I don't post.  I don't use Tweet.  I don't --

THE COURT:  Okay.  Let me ask you to turn, if you would, in the questionnaire to Page 20, and you can take the clip off if it makes it easier for you.  Question 77, we asked whether, if you'd seen or read things in the media about the case, had you formed any opinion about, as you see in Subparts A, B, C, and D, whether the defendant is guilty or not, and, if so, whether he should be sentenced to death or not.  We gave you some available choices, "Yes, No," and "Unsure," and you checked "Unsure" for all of those.  Can you

explain why you selected that answer?

THE JUROR:  Well, let me reiterate my answer and the way I perceived the question as, okay?

THE COURT:  Yes, yes.

THE JUROR:  Personally, do I believe he's guilty? Yes, with some sort of involvement.  The reasons why, I don't know.  That's what we're here for.  The death penalty, I'm not sure --

THE COURT:  Well, let's stick with the guilt or innocence --

THE JUROR:  Okay.

THE COURT:  -- because you said you were unsure about those things as well.

THE JUROR:  Well, because I -- I believe in the law and the justice system in order to wait and get the true evidence from both sides.  Then I would make my full opinion. My personal opinion is, yes, he's guilty.

THE COURT:  Okay, so it's not unusual for people, particularly in cases that have had publicity, to have some ideas about it.  That's what the stories have been indicating, of course.  So the question is whether someone who has an idea because there has been publicity about a case, a person who's serving on the jury can set aside those ideas and decide the case entirely on the basis of what is presented in the course of the trial.  So that's the question that we're trying to get

at.  If you were a juror, to the extent you had any opinion before the trial, would you be able to put it aside and listen to the evidence and make a decision only on that information base, or do you think that it would be too difficult to set aside the opinion you've already formed and isolate it from the consideration in the trial?

THE JUROR:  I'd like to believe I would because of the justice system and what we know and learn.  Uhm, I'd like to believe that I am capable of that.

THE COURT:  Yes, so let me just be a little more specific in terms of the legal rules that apply.  Under our system, whenever anyone is accused of a crime formally, the person is presumed to be innocent of the crime.  The default position, as it were, is "not guilty" unless the government proves at trial by the evidence that the person is guilty of the offense; and that proof has to be strong, strong enough so that the jurors have no reasonable doubt about the fact that the person is guilty.  So would you be able to adhere to those principles of presumption of innocence and proof by the evidence beyond a reasonable doubt if you were selected as a juror in this case?

THE JUROR:  I believe I would.

THE COURT:  I'm going to ask you some questions about the death penalty in a minute, but on Page 21 we asked whether you or anybody in your family or household had taken part in

various support activities after the event, contributed to the One Fund or buy Boston Strong merchandise. You indicated "Not sure." Is that just because you don't know what other family members would have done? Take your time to read it, yes.

(Witness examining questionnaire.)

THE JUROR: Because I'm not sure. I don't know.

THE COURT: You do know about yourself, though, I guess, right?

THE JUROR: Yes. I have not participated in anything.

THE COURT: Okay, all right, that's what I was trying to get out.

THE JUROR: Okay, not myself.

THE COURT: It's an ambiguous question. I just wanted to be sure that the answer was about other people you haven't inquired of and you don't know.

THE JUROR: Correct.

THE COURT: If you turn to Page 23, beginning at Question 88, we asked a series of questions to see if we could get you to express in various ways what your attitude might be about the death penalty, both in general and then perhaps as applied in this case. Question 88 asked if you had any general views about the death penalty, and you said "No." Is that accurate?

THE JUROR: Uhm, it was accurate that day, okay, when I was filling it out. I don't know if other people here

presented -- you have a lot of time to think about it between day one and today.

THE COURT:  Precisely.  If it's evolved, if you've thought more about it and want to expand on that answer, or even change it entirely, that's what we'd like to know.  That's why we have you here.

THE JUROR:  Uhm, the death penalty.  Again, depending on the evidence and without reasonable doubt, I suppose we could impose the death penalty.  I will say that I'm not sure I'd want to be one of the people that make that decision, but under the law, if we had to, uhm, then I suppose it could be imposed.  But I'm a little betwixt and between on that, and, the, you know, karma isn't good.

THE COURT:  I'm not sure what --

THE JUROR:  That would be bad karma.

THE COURT:  Okay, well, I think we'll come back to that, actually.  Let's look at 89.  Here we kind of asked you to put on a numerical scale where you thought you might be, strongly opposed at one end, strongly in favor.  You selected 3, which is on the "opposed" side of the scale.

THE JUROR:  Uh-huh.

THE COURT:  You know, every person who answers this question would perhaps have a different way of distinguishing 1 from 2 from 3 to 4, and so on, but you picked 3.

THE JUROR:  Well, I'm opposed, uhm, because of that

reasonable doubt, but, again, if it goes through the court system and there is no reasonable doubt, then I guess I would have to agree with it.  I'm betwixt and between on that one. I'll be honest.

THE COURT:  Have you ever been aware of a case, probably through the media or otherwise, where the death penalty was an issue, and you kind of were paying attention to it, and you had a reaction to what was happening in that case?

THE JUROR:  No.

THE COURT:  If you'd go to the next page, Question 90, here, rather than a scale of numbers, we asked you to see if there was a statement among the various ones proposed that you thought best described your feelings about the death penalty in a case where someone has been convicted of murder, okay?  You have to take that as a given, but, of course, we don't get to the question of whether there's a penalty or not unless somebody has been convicted of a capital offense first, okay? You selected D, which was "I'm not for or against the death penalty."  Basically you could vote for it or vote for an alternate sentence of life in prison without the possibility of release depending on what you thought was called for by the facts and the law in the case.  That seems a little different from what you've told us this morning.

THE JUROR:  Again, it's been -- you know, when you're sitting here as a first-time juror and you're called in and

you're answering these questions, and then you have time to think in preparation for being called back...

THE COURT: Sure.

THE JUROR: I'm not sure how you want me to answer this.

THE COURT: Well, I guess at least when you filled out the questionnaire -- you know, your views may have changed a little bit -- at least when you did that, you said this statement was a description of your own attitude in a case where the death penalty might be imposed, and I guess the question is, on reflection, do you still think that is --

THE JUROR: Maybe C would be a better.

THE COURT: Okay, C says, "I am opposed to the death penalty," I guess probably as a general matter is what it means --

THE JUROR: That's correct.

THE COURT: "-- but I could vote to impose it if I believed that the facts and law in a particular case called for it."

THE JUROR: That's correct.

THE COURT: Do you think that's a better expression?

THE JUROR: That is, yes.

THE COURT: Then if you go to the bottom of Page 25, Question 95, and then I'm going to ask you about 96 which is the top of the next page, 95 is, "If you found this defendant

guilty and decided that the death penalty was an appropriate punishment for him, could you in that circumstance conscientiously vote to impose the death penalty?"

THE JUROR:  I'm going to answer the same.  It's difficult.  If the true facts were there, then, yes, I would, I would.

THE COURT:  Okay, you said you're going to answer the same.

THE JUROR:  Yes.

THE COURT:  You saw that you had selected "Not sure" on that.

THE JUROR:  Yes, yes.

THE COURT:  Okay.  Is your reservation about being asked to express an opinion about facts you haven't considered yet, or is it a hesitation for some reason that your conscience would object to --

THE JUROR:  Well, I'd have to say it's probably conscience, and I'm not, you know -- I am a Catholic.  I've been brought up, you know, none of us can do any more than God in my strict Catholic, you know.  But it comes back, the parochial school upbringing comes back.  So I just want to do what's right at the time for the case, and that's --

THE COURT:  Well, I guess what the question is asking, if intellectually you thought it was right that the death penalty should be imposed, could you personally vote to do

that?

THE JUROR:  Yes.

THE COURT:  We asked a similar question in 96 on the top of the next page, which is the other side of that question, of course:  "If you thought that life imprisonment was the appropriate punishment, could you vote conscientiously for that?"

THE JUROR:  Yes.

THE COURT:  Okay, I'll leave it there.

MR. WEINREB:  Good morning.

THE JUROR:  Good morning.

MR. WEINREB:  My name is Bill Weinreb.  I'm one of the prosecutors in the case.  I just wanted to follow up on a few of those things just to make sure I understand correctly.  You indicated that if you were answering Question 90 today, you'd probably put a C, that you're opposed to the death penalty but could vote to impose it.  Why are you opposed to it?

THE JUROR:  Once again, it's, uhm, my conscience, my upbringing, that none of us can take a life except for God, the spirits, however, and that's my reservation.  And my other side of me, you know, being a citizen and making a clear judgment would be on the facts of the law and the evidence.  I've got to be honest, there's the other side of the reservation.

MR. WEINREB:  Well put.  So some people have such a strong opposition to the death penalty that they can't set it

aside; they feel that they couldn't set it aside in any case and vote for it. Some people have a moral or a conscientious objection to it, as you say, but feel like, if it was their job to consider it and impose it, if they believed that the facts and the law justified it, that they could put aside their conscience about it, their moral views, and do that, consider it and vote for it. Would you put yourself in the first camp or the second?

MS. CLARKE: Your Honor, I'm not sure that a juror ever has to set aside conscience or moral views.

THE COURT: Yes, I'm not sure that the choices are the only available choices. I think the two-part -- try it again. And, also, for the benefit of the juror, long questions with alternatives -- I've done it too, so I'm not -- with alternatives may be hard to absorb and follow.

MR. WEINREB: Okay. Some people are so morally opposed to the death penalty that they feel they couldn't impose it in any case, but some people are morally opposed to it but could still impose it in a particular case, if they concluded that the facts and the law justified it. How would you describe yourself?

THE JUROR: So either A or B, I'd go with B, your second statement.

MR. WEINREB: Okay. Excuse me one second.

(Discussion between government attorneys.)

MR. WEINREB:  Well, I'll just ask.  98, you said something about access to Mr. Tsarnaev's medical records.  Are you just saying that that's something that you're worried could happen or --

THE JUROR:  No, I'm not worried about it.  I just thought it was important in this case.  It's my job, so I just made the statement.

MR. WEINREB:  So if something came up with the medical records, couldn't somebody else take care of it?

THE JUROR:  Oh, absolutely, and I wouldn't access it and I haven't, but I just thought it would be --

MR. WEINREB:  Okay, thanks very much.

MS. CLARKE:  I want to thank you very much.

THE JUROR:  Thank you.

THE COURT:  No questions.  Okay, thank you.  Just leave that right there.  We'll put it together.

(Juror excused.)

THE CLERK:  Juror No. 244.

MR. BRUCK:  We need some latitude on chicken raising here.

THE COURT:  I was just going to point out, it wasn't about feeding.  It was about tending.

THE JURY CLERK:  Juror 244.

THE CLERK:  Over here, please, if you would.  Have a seat.  And if you could speak into the mic so everybody around

the table can hear you, that would be great.

THE COURT: You can adjust it. Good morning.

THE JUROR: Hello.

THE COURT: Have you been able to since you were last here follow my instructions not to discuss the case in any substance with anybody or --

THE JUROR: Yes.

THE COURT: And to avoid as much as you could any contact with media stories about the case?

THE JUROR: Yes.

THE COURT: Okay, thank you. So feel free to follow along as I ask about the -- we're going to follow up on some particular questions and answers that you gave. I want to start actually at the bottom of Page 4, and if it's convenient, you can take the clip off. Question 8, you said you have trouble understanding people with accents. Could you just explain that a little bit.

THE JUROR: It seems to be something about growing older and having worse hearing. I used to be able to understand accents better.

THE COURT: Are there particular kinds of accents that you have difficulty with?

THE JUROR: It doesn't -- I've never really figured that out.

THE COURT: Okay. On the next page, I guess in both

questions really, you're sort of concerned about, one, the stress, but also being away from your home and what you do there and so on.  Could you just tell us a little bit about why you think this would be a difficult case for you.

THE JUROR:  Well, my husband travels sometimes for work, and I have twenty-one chickens that need to be taken care of.  And so I'm not really sure.  Like, if I were to get put into a hotel like they sometimes do --

THE COURT:  Are you thinking if you were sequestered?

THE JUROR:  Right.

THE COURT:  That's not going to happen during the presentation of the case.

THE JUROR:  Okay.

THE COURT:  So, I mean, if this was all related to that concern that you'd be really taken away from home for months at a time, that's not going to be the case.

THE JUROR:  That's good.

THE COURT:  To be candid with you, I mean, because you're concerned about the commute, it would be a daily commute.

THE JUROR:  Yeah, that would be hard.  It takes -- I had to get up at 4:00 to get here by 8:00, so it's a far distance for me.

THE COURT:  Did you drive?  I mean, did you come by --

THE JUROR:  I drove to the Ayer station and took the

commuter rail.

THE COURT:  From Ayer?

THE JUROR:  Yes.

THE COURT:  Into North Station?

THE JUROR:  Yes.  So it's like a half an hour just to Ayer and then pretty long on the commuter rail.

THE COURT:  But just to be clear, if you were commuting back and forth on a daily basis, that would not raise the question that you were concerned about, for example, tending the flock.

THE JUROR:  Chickens.  Yes, it's a flock.  Yeah, it just means I have to get up and do my chores really early and take care of them at night.

THE COURT:  All right, thanks.  On Page 6 you tell us that your husband is a marketing executive.  Can you tell us for whom he works.

THE JUROR:  He works for, uhm -- it's escaping me right now.  He works in microwave, like -- it's a company in Billerica.  I'm under pressure.  I can't think.

THE COURT:  All right.  You yourself used to be formerly a software engineer?

THE JUROR:  Yes.

THE COURT:  How long since you've done that?

THE JUROR:  Twenty-one years.

THE COURT:  And to the extent -- do you have current

employment?  You refer to a market that you worked at for a few months.

THE JUROR:  I don't work there anymore.  I only worked there a little while.

THE COURT:  Okay.  And tell us about your social media.  I'm looking at Question 29 and 30.  In 29 we asked you if you blogged or posted on websites and so on, and you listed a number of topics that you like to talk about, but it wasn't clear the medium, whether this was on a blog or something similar, 29 on the bottom of Page 10.

THE JUROR:  So what are you asking?

THE COURT:  You talked about the subjects you like to, you said, talk with people about, and it wasn't clear whether you were exchanging comments on a blog or Facebook or something.  I just was wondering how you carried on those conversations.

THE JUROR:  Right.  Well, they're, like, websites that you join, and you talk --

THE COURT:  Post comments?

THE JUROR:  Yeah.  You talk with other people who have similar interests.

THE COURT:  Okay.  And Question 30 on the next page, you said you're on Facebook daily?

THE JUROR:  Yeah, about.

THE COURT:  That was an estimate?

THE JUROR:  Yeah, not every day, close.

THE COURT:  Do you make posts there as well?

THE JUROR:  Yeah, sometimes, uh-huh.

THE COURT:  You refer in a couple of places to the Weston Price Foundation.  Can you tell us what that is?  This is Question 39 and 51.

THE JUROR:  Okay, that is a -- Weston Price was a dentist, and he did some nutrition research in the 1930s.  And so this is a nutrition-based group that cares a lot about, like, our rights to food.  Like, some people want to have raw milk, even though it might be illegal in their state, or other people might want to see more breast-feeding done, or not have soy fed to prisoners or things like that, so it's all about food.

THE COURT:  Okay, and you're, I guess, a chapter leader, you say?

THE JUROR:  Yeah.  That's just a volunteer position, and people might call me up and say, "Well, where can I find a farmer?"

THE COURT:  So you're kind of an information source for people who have similar interests?

THE JUROR:  Yeah.

THE COURT:  Is that a fair way to characterize it?

THE JUROR:  Yes, exactly, uh-huh.

THE COURT:  I'm now at Page 19.  Why don't you look at

Question 74.  We asked about your reaction when you realized you might be called to be a juror in this case, and you said you're concerned about the stress it would cause you.  Can you just tell us a little bit about that.

THE JUROR:  I don't deal with stress well anymore.  I don't know if it's just being my age.  It's hard being in your fifties when you're a woman.  You go through emotional times.  And I kind of come from a family that's very homebody-ish anyways.  I think probably that's why I never went back to being an engineer.  I'm kind of an introvert, and so I -- I know it's going to be very draining on me, and, you know, I wondered if I'd even be able to do it without bursting into tears or something.

THE COURT:  I want to now bring in your answer to Question 75, and I guess before getting into what the relationships among these students may be, is that a cause of the stress?

THE JUROR:  Oh, uhm, no.  I would say it's much more general.  Yeah, it's much more general.

THE COURT:  Does this figure in the mix or not?

THE JUROR:  Uhm --

THE COURT:  I mean, maybe it doesn't.  I'm just asking.

THE JUROR:  No, I would say that's not what the stress is from.

THE COURT:  And I think you told us a little bit more about it later on.  It was Question 83.  So your daughter has a boyfriend, currently still?

THE JUROR:  No.  They've recently broken up.

THE COURT:  All right, but her recent boyfriend knows the defendant from Cambridge Rindge and Latin?

THE JUROR:  That's right.

THE COURT:  And also from UMass Dartmouth?

THE JUROR:  Uhm, he was friends with some of those kids that got arrested at Dartmouth.

THE COURT:  Oh, also from high school, though?

THE JUROR:  Yes.

THE COURT:  The friendship wasn't while they were both at UMass Dartmouth?  Did the boyfriend go to UMass Dartmouth?

THE JUROR:  No.  UMass Amherst.

THE COURT:  Okay, but he knew the kids from Dartmouth because he had been with them at Cambridge --

THE JUROR:  Yes, yes.

THE COURT:  How would that, if at all, affect you if you were a juror in this case?

THE JUROR:  I think it makes me, uhm, a little bit sympathetic because I feel like my kid that age is still such a kid.  It makes me think it's going to be hard for me to think of him as a grown-up, especially where they were linked so closely to me, you know.  It's like seeing my own kid in court.

THE COURT: Okay. I'm now on Page 20, Question 76. We asked whether after you had received the jury summons, and I guess after you realized that this was the case that you might be appearing in the process for, whether you did any research, and you explained that you did some online research?

THE JUROR: Yes.

THE COURT: When was that? Was it at the end of the -- so you came in, I guess, January 5, the first Monday in January? Is that when you filled out the questionnaire?

THE JUROR: I don't remember, but if you say so.

THE COURT: So was it in the December range that you did the research?

THE JUROR: Right, when I had been summoned, but I didn't know what case I'd be on, but --

THE COURT: Well, but here you say you looked up some of the countries involved. We had asked back a little earlier about some countries that, you know, you might hear evidence about in some way or another, Kyrgyzstan, Russia, Chechnya, Dagestan, and so on. Are those the countries you looked up?

THE JUROR: Yes.

THE COURT: And then you say you looked at some of the conspiracy theories.

THE JUROR: Right.

THE COURT: What was that?

THE JUROR: Well, they do exist, the conspiracy

theories that say the whole thing was a false flag, or that it was pinned upon Jahar and his brother, that it was other people doing it, and they were just standing there or whatever. There were some backpack questions and pictures of backpacks and pictures of hats, and trying to determine if they were the actual ones who did it.

THE COURT: Tell me if I'm wrong, but it sounds like you spent a fair amount of time doing that.

THE JUROR: I kind of like conspiracy theories anyways, so --

THE COURT: Okay, let's move on to the next question, 77. There we asked whether from things you'd seen or read about, whether as of the time you filled out the questionnaire you had formed an opinion about whether the defendant is guilty or not -- that was Part A and B of Question 77 -- and then whether you'd formed an opinion that he should be punished by the death penalty or not. And as to the first two, A and B, you indicated you were unsure. In other words, as to A, "Have you formed an opinion that the defendant is guilty?" you said "Unsure." And then, B, "Have you formed an opinion that he was not guilty?" you'd said "Unsure." Can you explain why you selected that option of the three options you had?

THE JUROR: I suppose it's because I haven't formed an opinion.

THE COURT: Okay. So you understand, of course, that

in a criminal prosecution, the defendant is presumed to be innocent unless and until the government proves that he's guilty by evidence at the trial.  So it has to be convincing enough that the jurors have no reasonable doubt about the fact that the person has committed the crime.  If you were a juror, would you be able to adhere to those principles and judge the case solely on the evidence produced at trial?

THE JUROR:  I think so.

THE COURT:  Now, with respect to the next two, you were firmer.  You said, no, should not receive the death penalty, yes, he should not.  I asked the question badly, but you see what I mean.  Rather than being unsure about this part of the question, you had a view.

THE JUROR:  Yes.

THE COURT:  Can you tell us a little bit about that.

THE JUROR:  Uhm, I feel like his -- his youth is one of the reasons that I wouldn't want to see him put to death because, you know, like, I could see Jeffrey Dahmer, you know, after a lifetime of killing people, you know, he needs to be put to death; but this kid is so young, and I wonder if he's just made a really huge mistake, and I guess that's my biggest qualm.

THE COURT:  So later in the form we asked some questions about your view on the death penalty.  Let's turn to those.  It's on Page 23.  It begins with Question 88, and we

asked about general views about the death penalty, if you had any, and you wrote there something similar to what you've just said, right?

THE JUROR:  Right.

THE COURT:  Then in the next question we asked you to place yourself on a scale from 1 to 10 of strongly opposed to strongly favor, and you selected 6, which is sort of in the middle.  And then on the next page, Question 90, we asked if one of the statements set forth described well your feelings about the death penalty in a case of someone who's been proven guilty of murder, and you didn't think any of the available statements did, so then you wrote your own answer.

(Witness examining questionnaire.)

THE JUROR:  I guess I, you know, still agree with my answer there, that it's --

THE COURT:  Okay.  Would you add anything to it or qualify it in any way?

THE JUROR:  I guess, if I ruled the world, it would be on a case-by-case basis.  I guess it's hard to do that when you're a government, though.

THE COURT:  Let me turn to Page 25, Question 95 at the bottom.  This is now more particularly focused on this case, and, "If you found this defendant guilty and you decided that the death penalty was appropriate, could you conscientiously vote for the death penalty?" and you said "No."

THE JUROR:  I don't think I could.

THE COURT:  You've told us some of the reasons already.  Anything beyond that, or would what you've already told us be the reasons?

THE JUROR:  Yes, I think -- I think I've explained it.

THE COURT:  Okay, any follow-up?

MR. WEINREB:  Yes.  Good morning.

THE COURT:  For some reason the form was missing Page 15.  I don't know if anybody noticed it.  Let me just run through the -- well, actually, let me ask counsel whether they want me to ask the questions or not.  They're questions we haven't usually worried about.  By the way, the form on the disk also is missing the page, so --

MS. CLARKE:  Right.

(Discussion between defense counsel.)

MR. BRUCK:  I don't think so.

MR. WEINREB:  I only ask that 46 be.  The rest need not be.

THE COURT:  All right, let me ask two questions.  I'll ask 46 and 47.  No, I guess I don't need to ask 47.  So, actually, go back to Page 14.  So beginning with 44, we asked three questions about whether you had strong positive or negative views about different categories of people.  We asked you whether you had positive or negative views about prosecutors.  You said "None."  Then we asked that about

defense lawyers. You said "None." On the next question which is missing, the next question would have been, "Do you have strongly positive or negative views about law enforcement officers?" if you do.

THE JUROR: No.

MR. WEINREB: So good morning again.

THE JUROR: Hello.

MR. WEINREB: I'm Bill Weinreb, and I'm one of the prosecutors in the case. I just wanted to ask you to elaborate on a number of your answers. So you said in answer to Question 9 that you don't deal with stressors well, and I heard you say earlier that, you know, as you've gotten older and maybe more emotional or you feel more stressed out, but when you say you don't deal with them well, did you have something in mind there?

THE JUROR: Like I said, I -- I could end up getting pretty emotional. I don't know if it's just being fifty-one or what, but it -- it seems like I'm emotional. And also I set people off too. I don't know if it's being perimenopausal or what. And it seems to be something that my friends go through now too, just more thin-skinned.

MR. WEINREB: Has it interfered at all with your life or your relationships?

THE JUROR: I think so. I think that's kind of why I'm a hermit.

MR. WEINREB:  So trials are often emotional, and feeling emotions or even expressing them when you're on a jury is not normally a problem, but I'm wondering whether you think it might be a problem for you.  You said something about your current state has made you so emotional that you're afraid that it would interfere with your ability to serve as a juror.

THE JUROR:  It's not like I'm seeing a shrink or anything.  You know, I don't have any diagnosed condition, but I would say that I am pretty much reclusive and introverted and shy, and so it would be hard on me emotionally.  And I would hope, you know, that I could withstand it, but I wonder, you know?  I do sort of wonder if I'm strong enough.

MR. WEINREB:  And when you say you wonder if you could withstand it, do you have some thought in mind of what would happen if you couldn't withstand it?

THE JUROR:  I -- I guess just emotionally break down or something, you know?

MR. WEINREB:  We asked a question about this, and I'm not sure what the answer was, but I'll ask it again.  This trial is going to involve evidence that will be a lot of emotional testimony and disturbing pictures and that sort of thing.  Would that contribute in any way to your stress, do you think?

THE JUROR:  I think it would be hard on me.  My husband was actually worried about whether I'd be able to

handle seeing pictures of blown-up people and stuff.

MR. WEINREB:  And when you say whether you'd be able to handle it, you mean in the same sense, that it would just overwhelm you emotionally?

THE JUROR:  Right, yes.

MR. WEINREB:  I guess what we're -- maybe you've already gathered this from my questions, but what we're trying to figure out here really is to what degree that might impair your ability to serve as a juror, to perform all the functions as a juror, and it's a little hard for us to know.  We kind of need to rely on you to tell us, if you can.

THE JUROR:  Well, I don't have any sort of, you know, doctor's note or anything, so I have no real -- I just know about myself that I tend to be very thin-skinned lately, and it just seems to be getting worse, and also I tend to have the minority opinion and get people mad at me.

MR. WEINREB:  So let me move to that part then.  So part of, you know, a jury's job in the end is to deliberate. That means talk to one another about the decision.  Do you have any concerns about your ability to do that?

THE JUROR:  I guess I do, yes.

MR. WEINREB:  What are those concerns?

THE JUROR:  I would hate to be, you know, the one juror who can't vote the way everyone else wants to vote.  That would be a nightmare.

MR. WEINREB:  Well, that's probably true for a lot of people who sit on juries.  Again, we're trying to figure out whether there's something about your condition, your view of your own condition that would make it too much for you, basically, so you just feel like you really couldn't do it.

THE JUROR:  Well, I don't know if you guys can tell, but I am sitting here kind of shaking just talking to you, so I'm just a very shy, introverted person and sensitive.  And my husband said to tell you that if 95 percent of people think one way and 4 percent think another way, I'm the 1 percent that will think a third way, so...

MR. WEINREB:  You said that in order to get your chores done and get here on time, you needed to get up at 4:00 in the morning?

THE JUROR:  Right.

MR. WEINREB:  So I don't know if you recall, the Judge had told you previously that the trial generally will go from 9:00 to 4:00 every day except Fridays --

THE JUROR:  Right, right.

MR. WEINREB:  -- generally speaking, the Court won't sit.  So with that schedule in mind, what would be the situation on the other end after you got home?  Do you know how long it takes to get back, and then what would you have to do then?  I'm just trying to get a sense of --

THE JUROR:  It's pretty much like bookends, you know.

MR. WEINREB:  So how many hours back, would you say?

THE JUROR:  So, like, a couple hours.  It's like an hour and a half on the train, you know, with the T and then the commuter rail, and then a half-an-hour drive home from the station, so two hours, I guess.

MR. WEINREB:  Okay, and then are there chores you would need to do to --

THE JUROR:  Yes.

MR. WEINREB:  How long would that take you, do you think?

THE JUROR:  It's like a half an hour with the chickens.

MR. WEINREB:  And that's it, or are there more chores?

THE JUROR:  Well, in summertime I do raise crops and stuff too, so I guess I wouldn't even be getting them in probably if I -- if I was here, or I'd be planting less probably.

MR. WEINREB:  So jury service involves hardship for everybody.  I'm sure you understand that.

THE JUROR:  Right.

MR. WEINREB:  But, again, what we're normally trying to figure out here, even if it's not a hardship or you just can't do it, you're going to lose your house or something, do you think it might interfere with your ability to focus on what's happening in the trial?  In other words, is your mind

going to be elsewhere?  Are you going to be --

THE JUROR:  No.

MR. WEINREB:  It sounds like you talked to your husband a bit about coming in today?

THE JUROR:  Sure.

MR. WEINREB:  Have you talked to him about the case at all?

THE JUROR:  Well, yeah.  Even before I knew I was going to be a juror, we talked about it.  I mean, everyone talked about it, so --

MR. WEINREB:  Does he have strong views about it that he's told you about?

THE JUROR:  Uhm, not really, no.

MR. WEINREB:  So turning again to Question --

Your Honor, it would be helpful to ask the names of the people who are involved in the answers to 75.  Should we do that in sidebar mode?

THE COURT:  I think we should, yes, sidebar mode.

(Courtroom cleared.)

SIDEBAR CONFERENCE:



12-61





(End of sidebar discussion.)

MR. WEINREB:  We'll go on?

THE COURT:  Yes, we'll go back on for the next person. I guess we probably should have ended that.

MR. BRUCK:  I was right about the chickens.

THE COURT:  You were.

MR. WEINREB:  We're never going to hear the end of that.  Every time an objection is granted he's going to say, "But I was right about the chickens."

(Laughter.)

THE CLERK:  Juror No. 245.

THE COURT:  Okay, sidebar mode.

(Courtroom cleared.)

SIDEBAR CONFERENCE:

(End of sidebar discussion.)

THE CLERK:  Juror 245.

THE JURY CLERK:  Juror 245.

THE CLERK:  Sir, come over here, please.  Have a seat, if you would.

THE COURT:  Good afternoon.

THE CLERK:  Speak into the mic so everybody can hear you, okay?

THE COURT:  And adjust it as you want, up or down, whatever you want to do.

THE JUROR:  Okay.

THE COURT:  So we appreciate you being here.  Have you been able to follow my instructions I gave the last time to avoid any discussion of the case?

THE JUROR:  Yes.

THE COURT:  Or as much as you can, to avoid any media reports and so on?

THE JUROR:  Yes.

THE COURT:  Okay, thank you.  So we're going to follow up on some of the answers you gave in the questionnaire.  You have it there so you can follow along.  I just wanted to ask -- we asked a little bit of family information, and you said your wife is in customer service?

THE JUROR:  Yes.

THE COURT:  Could you tell us for whom she works?

THE JUROR:  She works for Woodworth.  It's called Woodworth Auto Sales.  She's in -- auto loan is the actual division that she works for.

THE COURT:  And so it's a finance company for automobiles?

THE JUROR:  Correct.

THE COURT:  Yes, okay.  And you are a medical interpreter?

THE JUROR:  At this time, yes.

THE COURT:  And you've been doing that for I guess a

couple years?

THE JUROR:  Just a couple years, correct.

THE COURT:  Tell us about how much and how you use Facebook and Instagram.

THE JUROR:  Instagram not so much.  Facebook, every other day possibly, about every other day.

THE COURT:  Do you post as well as see other people's postings --

THE JUROR:  No.  I very rarely --

THE COURT:  -- or is it just viewing?

THE JUROR:  Viewing for the most part.

THE COURT:  Keeping up on the news?

THE JUROR:  No.  Keeping up with my friends.

THE COURT:  That's what I meant.

THE JUROR:  Oh, yes.

THE COURT:  I'm being flip.  Page 12, the top question, you have a close friend who's on the state police?

THE JUROR:  Yes.

THE COURT:  Okay, could you tell us a little bit about your relationship.

THE JUROR:  Uhm, a very good friend of mine, best man in my wedding.  We grew up together.

THE COURT:  Okay, so virtually a lifelong friend?

THE JUROR:  Yes.

THE COURT:  Okay.  Would having a close friend in a

law enforcement position have any effect on your ability to be a critical judge of the evidence in this case?  I mean, would you have any tendency to favor the law enforcement side of things because of your friend?

THE JUROR:  It's difficult, hard to say, but I may favor the side of the law.

THE COURT:  I suppose everybody does to some degree. I mean, that's why we live in a lawful society.  The question is, would you give undue attention to what, say, Massachusetts state troopers would testify to as opposed to somebody else?

THE JUROR:  No.

THE COURT:  Let me direct you to -- oh, actually, I have to cut the audio again.  Sorry about this.

THE CLERK:  Cut the audio.

(Courtroom cleared.)

SIDEBAR CONFERENCE:



(End of sidebar discussion.)

THE COURT:  Let me ask you to turn to Page 20.

THE JUROR:  Yes.

THE COURT:  Question 77, in this question we asked whether based on things you'd seen or read in the news media, whether you'd formed an opinion, first, that the defendant was guilty, and then some other possibilities that he's not guilty, and then about the penalty, but let me ask about the first one. Oh, we asked also further down that if you had answered "yes" to any of these questions, would you be able to set aside or would you be unable to set aside your opinion, if you were a juror in the case, and consider the guilt or innocence question based solely on the evidence in the case.  So I gather from

your answer that you have, based on the media, formed some opinion about the defendant, whether he's guilty?

THE JUROR:  Yes, I have.

THE COURT:  Would you be able to put that aside and consider only the evidence presented in the course of the case in deciding the question of whether he should be found guilty by the jury or not?  In other words, let me perhaps set the stage by reminding you of the law pertaining to criminal prosecutions.  Any person who's charged with an offense, a criminal offense, is presumed to be innocent of the offense by the law unless and until the government proves that he's guilty by proving at trial by the evidence the fact of his guilt; and the jurors who are asked to consider those questions are asked to focus on the evidence produced, think about it, talk about it with themselves, and then decide whether the government has convinced them beyond a reasonable doubt that the person has in fact committed the crime that he's charged with.  So that would be the obligation you would undertake if you were a juror in the case, and the question is, would you be able to be faithful to those principles and decide the question of guilt or innocence based solely on the evidence and the instructions in the case, or would you still be influenced by what you had learned before the case from the media or other things?  Compartmentalize I guess is one way of asking it.

THE JUROR:  It would be hard to isolate just to go by

the evidence presented in the case.  I've heard a lot of the media from before, a lot of news from before, and it's kind of difficult to set that aside and just isolate yourself based on just the evidence, so it would be a bit difficult for me to do that, in all honesty.

THE COURT:  Would it make a difference if the evidence was similar to what you heard or different from what you heard?

THE JUROR:  It might make a difference.

THE COURT:  How?

THE JUROR:  Uhm, well, there's a lot of facts that haven't been brought to light that would be probably brought to light in the courtroom that haven't been given to the news media.  I mean, we only hear what we want to hear or what we're told.  I know the courtroom has both sides.  You get to hear both sides, the defense as much as the prosecution, so that would make a difference.

THE COURT:  If at the end of the trial you were asked to decide whether on the evidence presented in the trial the government had convinced you or not, would you be able to answer that without reference to things outside the trial?

THE JUROR:  Yes.

THE COURT:  That was kind of a definite answer, I guess.  Before you were a little unsure.

THE JUROR:  Yes.

THE COURT:  So, I guess, could you help us?  What is

your self-assessment, I guess?

THE JUROR:  I'd have to go based on the evidence. There's a lot of media coverage on this, but based on the evidence, you know, on what would be presented in court, it would definitely allow me to make a better decision.

THE COURT:  We asked some questions about your attitude towards the death penalty, both in general and perhaps particularly to this case.  Turn to Page 23.  Question 88 is where we begin, and we asked there, if you have any views about the death penalty in general, what are they?  You said "None." Does that still represent your thinking on the matter?

THE JUROR:  Yes.  I don't think it, uhm, it makes a difference.  I don't have any positive views about the death penalty, and I don't have any negative views.

THE COURT:  Have you thought about it much?

THE JUROR:  No, I honestly haven't really thought about the death sentence.  I just don't know if anything positive would come of that, so it's not something that I really base any information on.  I don't -- I don't tend to lean toward the death penalty.

THE COURT:  Well, in the next question, 89, we asked you, on a spectrum from strongly opposed at 1 to strongly favor at 10, where do you think you might be?  And you selected 7, which is a little on the favor side.

THE JUROR:  Uh-huh.

THE COURT:  Then in the next question on the next page, we asked, if you could put that in words, was there a statement in the several letters suggested there that seemed to represent your views about the death penalty in a case involving someone who's been found guilty of murder, and you selected E.

THE JUROR:  Yes.

THE COURT:  Which is, "I am in favor of the death penalty, but I could vote for a sentence of life imprisonment without the possibility of release if I believed that that sentence was called for by the facts and the law in the case."  Does that represent your view about the death penalty?

THE JUROR:  Yes, pretty much.  Every case is different.  I think the death penalty in some cases, if there's a very heinous crime, uhm, may have me lean toward the death penalty.

THE COURT:  But you would, I gather, come to that conclusion after considering the facts and the law in the particular case?  Is that fair?

THE JUROR:  Yes, that's fair.

THE COURT:  In other words, you don't have sort of an automatic yes or no on either side --

THE JUROR:  No.

THE COURT:  -- without hearing the particulars of the case?

THE JUROR:  Correct.

THE COURT:  On the bottom of 25 we asked -- now it's getting from the sort of general case to perhaps this case -- "If you found this defendant guilty and you decided that the death penalty was appropriate punishment for him, could you conscientiously vote for the death penalty in this case?"  You answered "Not sure."  Can you tell us what you were thinking about when you made that selection.

THE JUROR:  Uhm, again, I wasn't sure because I'm not -- every case is different, but we're talking specifically about this case.  The death penalty in this case...  I don't know.  Everybody has -- as I stated there, everybody has their own opinion.  My personal opinion would be, I would like to vote against the death penalty -- I wouldn't like to vote for the death penalty in this case.  Uhm, I just don't believe in the death penalty.  That's just my own personal opinion.

THE COURT:  And that's sort of what the question is getting at.  If you had concluded, following the evidence that you heard and the instructions and the law and so on and so forth, that the death penalty was an appropriate punishment as a -- well, let me just leave it at that -- if you concluded it was an appropriate punishment, could you then act on that conclusion and actually vote to impose the death penalty?  I think that's what the question is asking.

THE JUROR:  Yes, yes, if that's exactly what you're

asking, then the answer is "yes," I could vote for the death penalty.

THE COURT:  So just to be clear, on the condition that you had concluded based on your evaluation of the evidence that it was appropriate for this case, you would be able then to cast a vote that said this defendant should receive the death penalty?

THE JUROR:  Yes.

THE COURT:  Question 96, we asked a similar question about life imprisonment.  We said, "If you found the defendant guilty and you decided that life imprisonment without the possibility of release was the appropriate punishment, could you vote for life in prison without the possibility of release?"  You said "No."  Could you explain that.

(Witness examining questionnaire.)

THE JUROR:  I'm not, uhm -- I'm not sure I have the -- the -- a solid explanation for answering "no" to that particular question.

THE COURT:  To be frank, one of the things that occurred to me was that it was a mistake.  Was it?

THE JUROR:  It could have easily been a mistake.

THE COURT:  What would your answer today to that question be?

THE JUROR:  Yes, I could go ahead, and, again, it's based on the evidence.  Everything would have to be based on

the evidence.  I don't know if based on the evidence it would be -- it would be conscientious to vote for life imprisonment without parole, then I would be able to vote for that; but in the same token, I might be able to vote for the death penalty.

THE COURT:  I guess, with respect to Question 96, I'm just curious whether you have any different or greater reservation about voting for life in prison without possibility of release than you have for voting for the death penalty.  Do you understand the question?

THE JUROR:  Yes.  I would be -- I would probably be more apt to vote for life in prison without the possibility of parole.

THE COURT:  That's all I have.  Do you have anything?

MR. WEINREB:  I think the parties feel this --

THE COURT:  I'm not so sure.

MS. CLARKE:  We'll go forward.  Sorry, we just --

MR. WEINREB:  Oh, okay.  No, that's fine.  Then I just wanted to ask a question.

THE COURT:  Yes, go ahead.

MR. WEINREB:  Okay.  Good afternoon.

THE JUROR:  Good afternoon.

MR. WEINREB:  My name is Bill Weinreb.  I'm one of the prosecutors in the case.

THE JUROR:  Yes.

MR. WEINREB:  I wanted to ask you a few more questions

about the death penalty issue.

THE JUROR:  Yes.

MR. WEINREB:  I wrote down your answer to one of the questions, and I may have written it down wrong.  You tell me if I did, but you said, when you were asked about your answer to Question No. 95 -- can you take another look at that one.

THE JUROR:  Yes.

MR. WEINREB:  So you said -- just take a moment to read it.

(Witness examining questionnaire.)

MR. WEINREB:  So that question asked specifically about this case, and you said, "I wouldn't like to vote for the death penalty in this case.  I don't believe in the death penalty."

THE JUROR:  Correct.

MR. WEINREB:  What did you mean by that?

THE JUROR:  I -- I'm not -- I don't like the death penalty.  That's just my personal opinion, and that's the reason the answer is marked "I'm not sure."

MR. WEINREB:  Okay, so you say you don't like the death penalty, but let me ask you to turn your attention back to Question 89.  So there you were asked to circle a number that represented your opinion about the death penalty from strongly opposed to strongly favor, and you circled 7, which is on the strongly favor side.

THE JUROR:  Correct.

MR. WEINREB:  So I'm confused by that.  Maybe you could help me understand.

THE JUROR:  On 89 we weren't speaking specifically about this case; is that correct?

MR. WEINREB:  That's correct.

THE JUROR:  Okay.  Then that's the reason for the 7 because it would be -- it would have to be based on the crime. There are some crimes that may make me think or make me lean toward the death penalty more than other cases.  It's all depending -- in my mind, it's all depending on what the case -- what's being presented, what's the case about.  That's why.

MR. WEINREB:  So have you already decided that in this case, you don't believe that the death penalty is the appropriate punishment?

MS. CLARKE:  I object.  That's asking for --

THE COURT:  No, no.  I think, because of trying to get the difference between 95 and 96, I think I'll allow it.  Go ahead.

THE JUROR:  So you're talking about -- I'm sorry?

MR. WEINREB:  So are you already of the opinion that in this case, the death penalty isn't the appropriate sentence?

THE JUROR:  No, no, I'm not -- I'm not at that -- I'm not answering that on that, that it's appropriate.  It's, uhm, it's -- it's not appropriate.

MR. WEINREB:  It's not appropriate in this case?

THE JUROR:  It's not appropriate in this case.

MR. WEINREB:  And you've made up your mind about that?

THE JUROR:  No.  I can't make up my mind because I don't have all the details of the case, and I apologize if I'm not -- if I'm wishy-washy.

MR. WEINREB:  No, not at all.

THE JUROR:  I'm trying to be as honest as I possibly can.

MR. WEINREB:  And we appreciate that.  Why is it not appropriate in this case?

THE JUROR:  I just, uhm...  I don't know.  I don't have a solid answer for that.  I just don't feel that it's -- that it's -- not that it's not appropriate.  I just don't have enough, let's say, I guess, enough evidence to sway me in that -- toward that decision.

MR. WEINREB:  Okay.  In fact, so far, you have no evidence.

THE JUROR:  Correct.

MR. WEINREB:  So as the Judge explained earlier, there will be a trial in this case, and if you're picked as a juror, the first part of the trial will be to determine if the defendant actually committed any of these crimes or not; and only if the jury finds him guilty of the crime that carries the penalty, the possible penalty of death, will we go forward, and

then there will be a second phase.

THE JUROR:  Right.

MR. WEINREB:  And at that phase the jury will hear more evidence, and the government will offer evidence suggesting that the death penalty is an appropriate sentence, and the defense will offer evidence that the death penalty is not an appropriate sentence.  At that point, when you enter that second phase of the trial, if we ever get there, will you have an open mind and be able to listen to the evidence and go whichever way the evidence tells you to go, or will your mind already be made up going into that second phase?

THE JUROR:  No.  I can go in that with an open mind.

MR. WEINREB:  Okay.  And if you're convinced that the death sentence is an appropriate penalty, you're prepared to impose a sentence of death?

THE JUROR:  Yes.

MR. WEINREB:  And if you believe that life imprisonment is the appropriate penalty, you're prepared to impose that sentence?

THE JUROR:  Yes.

(Discussion between government attorneys.)

MR. WEINREB:  Thank you.

MS. CLARKE:  Could I have just one moment, your Honor?

THE COURT:  Yes.

(Discussion between defense counsel.)

MS. CLARKE:  Okay, hi.  My name is Judy Clarke.  I'm one of the lawyers for Mr. Tsarnaev.  Good afternoon.

THE JUROR:  Good afternoon.

MS. CLARKE:  And thank you for your answers and your consideration of the questions.  You mentioned having a very good friend, in fact the best man at your wedding, is with the Mass. State Police.

THE JUROR:  Yes.

MS. CLARKE:  Has he talked to you about this case at all?

THE JUROR:  No.

MS. CLARKE:  So you haven't heard his opinion one way or the other?

THE JUROR:  No.

MS. CLARKE:  There was a police officer -- the allegation is, a police officer was killed.  Do you know if he has any relationship to that police officer?

THE JUROR:  Not that I'm aware of.

MS. CLARKE:  And do you know whether he was involved at all in the investigation of this case?

THE JUROR:  No, I don't know.

MS. CLARKE:  Thank you very much.

THE COURT:  Do you know what his general assignment is?

THE JUROR:  I believe he works --

THE COURT:  Is he in a cruiser?

THE JUROR:  No, no, no.  He's, I believe -- is this confidential, or does it matter?

THE COURT:  I don't know.  We'll take the precaution.

THE JUROR:  I believe he works --

THE COURT:  Cut the audio first.

THE JUROR:  I apologize.

THE COURT:  That's all right.

(Courtroom cleared.)

MS. CLARKE:  It's a flick of a switch, sort of.

THE COURT:  Just wait for a second.

SIDEBAR CONFERENCE:



THE COURT:  Back on.

(End of sidebar discussion.)

THE COURT:  And I think that's it for now.  Thank you. We appreciate it.

THE JUROR:  Okay, thank you very much.

(Juror excused.)

(Break to change court reporters, 12:30 p.m.)

THE CLERK:  Juror No. 246.

MR. McALEAR:  Juror No. 246.

(Juror No. 246 enters the courtroom.)

THE CLERK:  Right over here.  Have a seat.  Speak into the mic so everyone can hear you, okay?

THE JUROR:  Okay.  Sure will.

THE CLERK:  This is adjustable, so you can just move

it around.

THE JUROR:  Thank you.

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon.

THE COURT:  Thank you for being here.  We appreciate your persistence in navigating.

THE JUROR:  My pleasure.

THE COURT:  So we're going to follow up on some of the answers you gave in your questionnaire when you filled it out before.

THE JUROR:  Okay.

THE COURT:  Let me just ask you, since that time have you been able to follow my instructions to avoid any discussion of the case?

THE JUROR:  Yes, I have.

THE COURT:  And as much as possible to avoid contact with any media reports about this case?

THE JUROR:  Yes, I've avoided that.

THE COURT:  Thank you.

THE JUROR:  Sure.

THE COURT:  Tell us about your employment.

THE JUROR:  I am a senior contracts administrator for Johnson & Johnson, and I work in their relatively new office which is located in Kendall Square, Cambridge.

THE COURT:  Okay.  You have been doing that for a

couple of years, I guess?

THE JUROR:  Yes.  I started in late July of 2013.  And that office actually just opened up in April of 2013.

THE COURT:  Okay.  In the form we asked about use of social media.  If you want to follow along, you can do that.  I'm on page 10 at the bottom.

THE JUROR:  Okay.

THE COURT:  And if you want to take the clip off for convenience, you can do that.

THE JUROR:  Sure.

THE COURT:  It looks as if you use Facebook?

THE JUROR:  Yes, I do.

THE COURT:  And you both -- it says in Question 29 and 30, actually.  They're kind of asking different things.  29 was focusing on whether you blogged or do anything like that.

THE JUROR:  And I do not blog.  I'm just very active on Facebook.

THE COURT:  And "active" means you both post and see other people's postings?

THE JUROR:  I do.  And I have friends all over the world, and that's really my best means of staying in touch with them.

THE COURT:  Okay.  And in addition, for job-related matters you're on LinkedIn?

THE JUROR:  I am, exactly, for networking purposes.

THE COURT:  Does the company require that?

THE JUROR:  They do not require it, but they strongly recommend that we have a LinkedIn account so that we can occasionally publicize what Johnson & Johnson has accomplished.

THE COURT:  Okay.  Page 15, Question 47 we asked about prior jury service.  And you served, I guess, once in about 2003, you said, in a state case?

THE JUROR:  Yes.  It was a long time ago, and my memory of that may be a little sketchy.  It was in Woburn.  And that was my only experience, actually, serving on a jury before.  It was a week-long trial.

THE COURT:  Okay.  And it was a criminal case?

THE JUROR:  It was.

THE COURT:  That resulted in a guilty verdict?

THE JUROR:  Correct.

THE COURT:  We asked on pages 17 and 18 various questions about potential current affairs, I guess is the general topic, a topical description.

THE JUROR:  Uh-huh.

THE COURT:  Attitudes about, perhaps, the War on Terror or the government's attitudes and so on, your personal experience with people of the Islamic faith and so on and so forth.  The one I'm interested in is you trace some of your lineage back to Russia.

THE JUROR:  Yes.

THE COURT:  Can you just tell us a little bit about that?

THE JUROR:  Sure.  My dad was -- he's deceased now, but he was a first-generation American.  Both of his parents were from Russia.  And on my mother's side of the family, her great-grandparents were from Russia and Poland.  I didn't know any of them.  Actually, they all died before I was born.

THE COURT:  What parts of Russia were they from?

THE JUROR:  Ukraine and Lithuania, to the best of my knowledge.

THE COURT:  And as you say, you didn't know any of them?

THE JUROR:  No, I never met them.  Uh-uh.

THE COURT:  On page 19 we asked a little bit about how you reacted and perhaps how others around you reacted when you and they learned that you might be a juror in this case.  You said -- at the end of your answer to Question 74 you said, "I welcome the opportunity to participate in such an important case."

THE JUROR:  Yes.

THE COURT:  Do you want to expand on that at all?

THE JUROR:  Yeah, I don't -- although I welcome the opportunity, it's because I think it's important.  And I think it's an important right that we have as citizens, but it doesn't mean that I'm kind of jumping up and down in my seat

saying, "Oh, wow, this is great."  I welcome it because I think it's a duty, and I would like the chance to exercise that duty realizing that there would be a lot of constraints to make that type of commitment.  Nevertheless, I think it's important.

THE COURT:  Okay.  Let me ask you to turn to the next page and Question 77.  In that question we asked whether prospective jurors had formed an opinion about certain matters based on things seen and read in the newspaper, and obviously this case has had a lot of publicity.

THE JUROR:  Right.

THE COURT:  And the first one -- I want to focus on A and B first before we go to C and D.

THE JUROR:  Sure.

THE COURT:  We asked whether you had formed -- based on the media coverage and so on, and other things, had you formed an opinion that the defendant was guilty, and you said, "Unsure but likely guilty."

THE JUROR:  Right.

THE COURT:  And then you expanded on that a little bit.

And then to the second one, "Have you formed an opinion that he was not guilty?" you checked "unsure" for that as well.

THE JUROR:  Yeah.

THE COURT:  Can you tell us what your thinking is

about those --

THE JUROR:  Sure.  I think my thought was, you know, I recognize when I wrote that -- I think I was realizing that no one really should be termed guilty until their case is heard. So I kind of had that in the back of my mind.  And I had also -- before I was even called for this case I knew that there was a potential impact that the older brother had played in terms of influencing the defendant, and in my mind I wasn't quite sure how that translated in terms of making the defendant really guilty or not.  So that kind of left me feeling unsure to both questions.

THE COURT:  Okay.

THE JUROR:  Yeah.

THE COURT:  So your prior jury service was in a criminal case.

THE JUROR:  Yes, it was.

THE COURT:  So you understand that in our justice system anybody who is accused of a crime is presumed to be innocent, or not guilty, until the government proves otherwise by the evidence at trial?

THE JUROR:  Yes, I do.

THE COURT:  And the proof has to be convincing enough that the jury is satisfied there's no reasonable doubt about the fact of the defendant's guilt.

THE JUROR:  Absolutely.

THE COURT:  Do you have any difficulty in applying those principles if you were a juror in this case?

THE JUROR:  No.  I'm aware of that, and I think I also had that in the back of my mind when I answered those questions.  You know, I'm unsure because, you know, I don't know all of the facts of the case; I only know what the media has told us about the case.  And because I don't know all the facts, I'm going to have to -- I cannot say for sure that the defendant is guilty or not guilty until I have a chance to know all the facts.

THE COURT:  In the bottom part of that long question it begins, "If you answered yes to any of the questions."  Of course you didn't.

THE JUROR:  Right.  I know.

THE COURT:  We asked whether -- if you had an opinion based on things you'd seen or read, whether you would be able to set that aside and decide the case based solely on the evidence produced at trial.  We asked would you be able or unable to do that, and you checked "able."

THE JUROR:  Able.

THE COURT:  Can you tell us about that?

THE JUROR:  Yes.  My expectation is that if I were a juror on the case, I believe I would hear information or learn information that no one else knew, and so I would then use that information to help me make my decision on whether the

defendant was guilty or not.  So I'm trying to kind of keep an open mind about that, so...

THE COURT:  You also indicated that -- in the C and D parts of the question that you were also unsure whether -- if guilty of a capital crime that the defendant should receive the death penalty or not.  You were unsure as to that as well?

THE JUROR:  I think I was wondering about the motive, you know, whether he was influenced or whether it was kind of, for lack of a better word, willful intent.  And in my mind I was kind of thinking, well, if it was willful intent, then I think he probably should receive the death penalty, and if it's something else, maybe influenced, then I was not so convinced that he should receive the death penalty.  But I'd like to know more about the circumstances, and once I knew more about the circumstances, I believe I could say either way whether he should receive the death penalty or not.

THE COURT:  We asked later on in the form some questions specifically about attitudes -- your attitude toward the death penalty.  And if you'd turn to page 23, starting with Question 88, we asked if you had any views on the death penalty in general, and you wrote, "I believe the death penalty should be given in very serious, egregious crimes."

THE JUROR:  Yes.

THE COURT:  Is that -- that still remains your view?

THE JUROR:  It is.  And from what I know about this

crime, I personally classify it as an egregious crime. I'd just like to know more about the motive of the defendant. But I do feel this is an egregious crime.

THE COURT: Okay. So you think this case might be one of the cases where you think as a general proposition it is important to consider the death penalty?

THE JUROR: Yes, I do.

THE COURT: Okay. The next question we ask you to kind of gauge how strongly you viewed the matter, from strongly oppose to strongly favor. You circled 6, which is sort of in the middle.

THE JUROR: Yeah. You know, in retrospect now that I think about it, I would probably rank it a little bit higher than 6, but I wouldn't say that I strongly favor the death penalty. I think the circumstances really have to warrant it. And so I think that's what I had in mind when I circled 6. Now, honestly, having the chance to think about it, I'd probably push it up to 8.

THE COURT: Okay. Well, let me have you look at the next question, Number 90, and there we ask you to select one of the statements, if you could, that best describe your feelings about the death penalty in a case involving someone who's proven guilty of murder. And of course when we're talking about the penalty, we are necessarily talking about someone who has already been convicted of an intentional murder.

THE JUROR:  Okay.  Gotcha.

THE COURT:  Right?  We don't get to the penalty question unless someone has been convicted of the intentional murder, right?

THE JUROR:  I see.  Uh-huh.  That makes sense.

THE COURT:  You selected D, which said you're not for or against the death penalty and could vote to impose it or vote to impose a sentence of life imprisonment without the possibility of release as you believe either was called for by the facts and the law in the case.

You seem to be a little stronger today in favor of the death penalty.

THE JUROR:  Yeah, I feel that I am.  I think when I circled D here I was really zeroed in on the sentence, whichever I believed was called for by the facts and law in the case.  I think when I filled out this questionnaire, I was really tuned in and focused on, you know, the point that I really wanted to know the facts and the law before locking myself in one way or the other.

But I think what you're saying is assuming I knew the facts and the law, could I vote for the death penalty.  And if that's the question, then the answer is yes, if I believed it was warranted.

THE COURT:  Well, would you just take a minute and read E, F and G, which are options that begin, "I'm in favor of

the death penalty," and they have different gradations there, and see if there's one of those that you think might now better express your views.

(Pause.)

THE JUROR:  I think that E is probably a slightly better fit.  I'm going to say E.

THE COURT:  E?

THE JUROR:  Yes.

THE COURT:  Which is that you are in favor of it, as you've told us here today --

THE JUROR:  Yes.

THE COURT:  -- but you could vote for a sentence of life imprisonment without the possibility of release if you believed that sentence was called for by the facts and the law in the case?

THE JUROR:  Yes.  And I think, again, I'm really focusing on my desire to know the facts and the law in the case, and that was kind of what was driving that response.

THE COURT:  Let me ask you to go to the bottom of page 25, Question 95, and I'm going to ask you about 96 as well, which is the other -- sort of a companion question to 95.  95 is, "If you found this defendant" -- now we're going from general propositions, you know, the death penalty in general, your views about it.  Focusing on this particular case, if you found the defendant guilty of a capital crime in this case and

decided that the death penalty was the appropriate punishment, could you conscientiously vote to impose it in this case?

THE JUROR:  Yes.

THE COURT:  And 96 asks, as I say, the companion question:  If you found the defendant guilty of a capital crime in this case and you decided that life imprisonment without the possibility of release was the appropriate punishment for him, could you conscientiously vote for life imprisonment without the possibility of release?

THE JUROR:  And I said yes.  And the reason I said yes to that was if I decided that life imprisonment without the possibility of release was the appropriate punishment, if I made that decision there would have been something triggering that such as his motivation when he committed the crimes or was he put up to it or did he do it on his own.  I think the motivation of the defendant is what I would need to know.  I would need to know more information about that.

THE COURT:  Well, you heard me this morning describe the procedure that would be followed if he was convicted of a capital crime.  The first phase determines whether he's guilty or not of what the crimes are that he's charged with.  If there is a guilty verdict by the jury and if you were on the jury you would be part of that verdict.

THE JUROR:  Right.  Right.

THE COURT:  If you found him guilty of a capital

crime, then we would proceed to the penalty phase, as I've called it.

THE JUROR:  Yes.

THE COURT:  And the government would offer evidence of what are called aggravating factors, and that they might tend, to use your terminology, to show that it was an egregious offense, for example, and the defense would offer evidence of what are called mitigating factors.  There are reasons like the absence of particular motivation, for example, that might argue against the imposition of the death penalty and in favor of life imprisonment instead.

If you were a juror in the case, despite what you may have in your mind as of this time, would you be able to consider and evaluate all that evidence of aggravation and mitigation and take it all into account and then make a decision based on your processing of that information --

THE JUROR:  Yes.

THE COURT:  -- rather than sticking with an idea that you may have at this point in time?

THE JUROR:  Yes.  In fact, my belief in the death penalty is not so strong that it overrules every circumstance in every single instance, so I would be able to decide.

THE COURT:  Follow-up?

THE JUROR:  I do believe that the death penalty is warranted in egregious crimes.

MR. WEINREB:  Good afternoon.

THE JUROR:  Hi.

MR. WEINREB:  My name is Bill --

THE JUROR:  Good afternoon.

MR. WEINREB:  My name is Bill Weinreb.  I'm one of the prosecutors in the case.

THE JUROR:  Nice to meet you.

MR. WEINREB:  You too.

I just want to follow up on one thing, which is you talked a lot about motivation --

THE JUROR:  Yeah.

MR. WEINREB:  -- that that's important.

And I think the judge just explained that if this case has a penalty phase, you'll hear evidence of aggravating factors, factors relating to the offense, things the government believes makes it worse than the average murder or the typical murder, if there is one, and you may hear things about the defendant that the government thinks makes this an appropriate case for the death penalty, and you'll also hear evidence from the defense about things that you may conclude make this an inappropriate case for the death penalty.

THE JUROR:  Uh-huh.

MR. WEINREB:  And those won't necessarily be limited to absence of motive; it might be evidence of something else that they consider mitigating.

THE JUROR:  Okay.

MR. WEINREB:  Are you able to enter the penalty phase with an open mind and listen to all that evidence and consider it?

THE JUROR:  Yes.

MR. WEINREB:  Think about it in making your decision?

THE JUROR:  Yes.  In fact, it's my desire for that information and to get the facts.  That was kind of the motivating factor for me in wanting to participate.

MR. WEINREB:  Thank you.

THE JUROR:  Yes.  Sure.

MS. CONRAD:  Good afternoon.

THE COURT:  I didn't know who to look to.  Go ahead.

MS. CONRAD:  Good afternoon.

THE JUROR:  Good afternoon.

MS. CONRAD:  My name is Miriam Conrad.  I'm one of Mr. Tsarnaev's lawyers.

THE JUROR:  Nice to meet you.

MS. CONRAD:  Nice to meet you.

I thought you said something about, you know, you would be able to listen to what the evidence was because you recognize that you don't get all the information --

THE JUROR:  That's right.

MS. CONRAD:  -- from the media.

Would you -- if you didn't -- would you expect to hear

something different from what you've heard before, and if you did not hear something different -- sorry.  Let me go back.  That's too many pieces in that question.  Let's see if I could do this right this time.

Would you look to hear from the defense evidence that contradicted or differed from what you've already heard in the media?

THE JUROR:  I am not sure that "contradicted" would be the right word for me, but I think I would be expecting supplemental evidence, insofar as that's the right word, that the general public wasn't aware of that would only be heard within the courtroom and that would, in effect, be reserved for a trial.

MS. CONRAD:  So if you didn't hear such evidence from the defense and if the prosecution did not present evidence to prove beyond a reasonable doubt that the defendant was guilty of the crimes with which he's charged, would you still go back to what you've already heard and find him guilty?

MR. WEINREB:  I object.  That's too complicated.

MS. CONRAD:  Well --

THE COURT:  No, if you understand it.

THE JUROR:  I think I understand it --

THE COURT:  You may follow up.

THE JUROR:  -- so I think I can take a stab at it.

I think that I would -- if I understand correctly, I

think that I would base my decision on what I was hearing during the trial. And I think what you're asking me was if I didn't hear any extenuating circumstances that I wasn't aware of, would I go back and find him guilty. I would take that to mean that I had learned all the facts, and whatever those facts were that I had learned them, whether they were facts that I had heard before the trial or -- I would trust that all of the information was being brought to the trial for me to hear and I would then make the best decision I could.

MS. CONRAD: So you would still be considering what you've heard before the trial?

THE JUROR: I would do my best to not consider that.

MS. CONRAD: That's the question.

THE JUROR: Yeah, okay. All right. I understand.

MS. CONRAD: I understand it was difficult and I'm trying to put you in a situation you're not in right now --

THE JUROR: It was confusing. Got you.

MS. CONRAD: -- but we really just want to know as honestly as you can tell us whether you truly believe that that would not be in your mind or whether that would still be in the back of your mind.

THE JUROR: I can tell you that, knowing myself the way I do, I would do my level best to make my decision based on what I was hearing in court.

MS. CONRAD: I appreciate that. But my question is

whether you are sure that you could do that.

MR. WEINREB:  That's been asked and answered now several times.

THE COURT:  Yeah, I think we'll take the last answer.

MS. CONRAD:  Well, I'm sorry, but just to make -- maybe I misunderstood your answer.  You said you would do your best, right?

THE JUROR:  Yes.

MS. CONRAD:  But do you think you would be able to do it?

MR. WEINREB:  I object.

THE COURT:  Well, you can answer that.

THE JUROR:  I do think I'd be able to do it, yes.

MS. CONRAD:  And I think you indicated that you'd heard or read a lot about this case.

THE JUROR:  Yes.

MS. CONRAD:  Can you tell us what you heard or read?

THE JUROR:  I would say probably the -- I don't know anybody personally involved in the case at all.  No one.  When I looked at the list of names, I didn't know a single name.  So to be honest, I've heard really what the general public in this area has heard.

MS. CONRAD:  What?

THE JUROR:  Anything that was on TV at the time, you know.  The day that basically Boston was shut down, I was

working at a job in downtown Boston that day, and I was one of the many people who was inconvenienced in terms of transportation issues.  So really I've heard kind of what everybody else has, but I recognize that sometimes the media can be inaccurate.  I can tell you that I recall hearing conflicting reports on aspects of this case depending on what channel I was watching.

This is going back to the time of the case.

MS. CONRAD:  Sure.

THE JUROR:  And I remember feeling frustrated, Well, those two things contradict each other.  They can't both be right.

MS. CONRAD:  Do you remember what it was that was the conflict?

MR. WEINREB:  I object.

THE COURT:  Yeah, sustained.

THE JUROR:  So I remember feeling confused about the media reports, but I think it's safe to say that I've heard just about the same thing that most people living in this area have heard.

MS. CONRAD:  Is there anything in particular that stands out that you heard?

MR. WEINREB:  I object.

THE COURT:  You can answer that.

THE JUROR:  I'm trying to think -- different -- I

can't tell you with clear preciseness, but I remember hearing conflicting reports about what the friends of the defendant heard at different times and where they were at different times, and I just remember not getting consistent reports from the media about that.  That does stand in my mind.  And I remember feeling aggravated at times and snapping the TV off and saying, Enough of this already.

MS. CONRAD:  You mentioned -- I'm sorry.  Were you finished?

THE JUROR:  Yes.

MS. CONRAD:  You mentioned that you were in downtown Boston at the time, I guess, of the -- that the bombing occurred or during the manhunt?

THE JUROR:  I was working in downtown Boston on the day that the bombing occurred.  I was not associated with the Boston Marathon; I was doing my job at work.  And we all heard about it on the news, and people were told that they could start to go home earlier that day.

MS. CONRAD:  And did you go home early?

THE JUROR:  Yes, I did.

MS. CONRAD:  And you said you were inconvenienced. Can you tell me a little more about that?

THE JUROR:  Yeah, the trains were messed up.  And I take a commuter rail, and for some reason the commuter rail was off schedule and we were waiting.  And it took me double time

to get home that day.

MS. CONRAD:  How far away were you?

THE JUROR:  I live in Stoneham, and I was working in downtown Boston.  So my typical commute is to get on Downtown Crossing, go to North Station, switch from North Station to the commuter rail and go to the Reading Commuter Depot, which is right next to where I live.

MS. CONRAD:  So how far were you away from the actual scene of the bombing?

THE JUROR:  I worked in the Downtown Crossing area, so I wasn't -- I didn't even know anything was going on until people started talking about it.

MS. CONRAD:  And did you shelter in place or were you not affected by that?

THE JUROR:  We were not affected by that.

MS. CONRAD:  And did you know anybody who was physically at the marathon that day?

THE JUROR:  No, no one.

MS. CONRAD:  Do you know the Nordens at all if you live in Stoneham?

THE JUROR:  I know the name, and only since it's come out in the case and I thought, "Stoneham?"  And I'm like, "Oh, wow.  They live in Stoneham."  I don't know them personally, no.

MS. CONRAD:  Do you know anybody who knows them?

THE JUROR:  No.

MS. CONRAD:  You asked -- going to some of your -- the questions that you were asked about the death penalty.

THE JUROR:  Yes.

MS. CONRAD:  And you said it would make a difference to you if it was willful.  Before the jury ever was able to consider whether or not to impose the death penalty or what the penalty should be, they would have to have found beyond a reasonable doubt that the defendant committed an intentional murder.

THE JUROR:  Uh-huh.

MS. CONRAD:  So if -- and you said this was the type of egregious murder that you think the death penalty should apply to.

MR. WEINREB:  Objection.  That's -- I don't think that's accurate.

THE COURT:  Well, go ahead.

MS. CONRAD:  So if the defendant were found guilty in this case of intentionally committing the crimes with which he's charged, would you automatically vote for the death penalty?

MR. WEINREB:  Objection.  That's a pre-commitment question.

MS. CONRAD:  No, it's not.

THE COURT:  No, you can answer whether it would be

Case 1:13-cr-10200-GAO   Document 1014-1   Filed 02/05/15   Page 104 of 184

12-104

automatic or whether you would do it on the basis of your evaluation of the penalty phase.

MR. WEINREB: It's asking about this case in particular.

MS. CONRAD: Which was something that was already referred to in previous answers.

THE COURT: I've given it to you.

THE JUROR: Okay. So the word "automatically" confused me a little bit when you said "would I automatically vote for the death penalty," because I'm not quite sure I understand "automatically." And the reason I'm confused about it is "automatically" to me means off the top of my head, boom, that would be it. Would I do that without discussing with the other jurors or wanting to work through it with them? And I think it's the latter: I would want to work through it with them.

MS. CONRAD: Thank you. I appreciate that. I didn't ask the question --

THE JUROR: It's okay.

MS. CONRAD: -- in a fair way, so let me just rephrase that.

THE JUROR: Sure.

MS. CONRAD: Would you tend to vote for the death penalty unless you heard something from the defense that changed your mind?

MR. WEINREB:  Objection.

THE COURT:  Yeah.  I think we've been over her --

MS. CONRAD:  Okay.  Let me ask a different question, then, that I don't think we covered.  And I realize this has to do with your religious beliefs, and I realize that's a very private, personal thing.

THE JUROR:  Sure.

MS. CONRAD:  So I hope I'm not offending you by asking you that, and of course if you want those questions to be private, I'm sure the judge would allow you to do that.

THE JUROR:  I'm okay with it.  And I know there were questions of that nature also on the questionnaire, so I'm prepared.

MS. CONRAD:  Okay.  Okay.  Thank you.

You said that you had talked to some church leaders about the appropriateness, if you will -- or about the church's position on the death penalty?

THE JUROR:  Yes.

MS. CONRAD:  So can you tell us a little bit more about, first of all, why you did that; and, second of all, what you took away from those discussions.

THE JUROR:  Sure.  So I'm actually a convert to the Mormon church.  And the official name of that church is the Church of Jesus Christ of Latter Day Saints.  And I believe in the church, and it's a huge part of my life, and so when I

heard that I was called as a potential juror in this case, I did go to the leaders of my church and I asked them if the church has an official policy or stand on the death penalty because I didn't know the answer to that.  And they told me that the church actually does not have an official policy or stand on the death penalty and they place that decision squarely in the hands of the individual members of the church.

And the reason I asked is because -- because the church is so important to me and my religion is so important to me, I wouldn't want to go against them.  And so once they told me that they didn't have an official stand, I took that to mean that I'm able to -- I'm able to feel good about making my own decision, which I do.

MS. CONRAD:  And did you do any research, online research, for example, about the church's position on the death penalty apart from what you just told us about?

THE JUROR:  No.  I knew that if I asked, they would give me the information I needed, and it was easier for me to do that.

MS. CONRAD:  Sure.  And if I could just ask you about part of what you wrote on page 26 in response to Question 98.

THE JUROR:  Okay.

MS. CONRAD:  You wrote, I believe, that people can be forgiven by God if they choose to repent.  And I'm wondering how that plays into your views on the death penalty.

THE JUROR:  Yeah.  That's a strong religious belief of mine, and that's one of the things that the church I belong to teaches, that no matter how horrible the crime was, that a person can be forgiven by God if they really desire to be forgiven and if they repent; however, I'm not assuming that that is the situation in this case.  But I'd be open to learning more about that if it were, and I think, you know, if a person were to indicate that they had repented, it might make me think twice about the death penalty.  It's a tough call, to be honest with you.

MS. CONRAD:  Can you -- can you tell me a little bit more about that?  You said it's a tough call.  It sounds like there are a couple of different things --

THE JUROR:  Well, yeah.  I stated that because it is such a firm religious belief of mine, and I feel like I've already explained how important the church is in my life.  So I believe everyone has the ability to repent and be forgiven; however, I also believe they can be forgiven even under the circumstances of the death penalty.

MS. CONRAD:  Can you tell me what you mean by that?

THE JUROR:  It's just my own personal feeling.  I believe that, you know, a person repenting doesn't necessarily mean that they will not be found guilty and be given the death penalty anyway, even if they repent.

MS. CONRAD:  Thank you very much.

THE JUROR:  Sure.

MS. CONRAD:  I'm sorry.  One second, please.

(Pause.)

MS. CONRAD:  I'm sorry.  Can I just ask one more question?

THE COURT:  One?

MS. CONRAD:  One.  Just one.  Thank you.

I'm sorry.  I apologize.

THE JUROR:  It's okay.  No problem.

MS. CONRAD:  In talking about looking to the defendant's motive and that being important to you, would you also be able to -- or would you consider facts regarding the defendant himself, his background, his age, his lack of a prior record, for example, in deciding whether to impose the death penalty?

MR. WEINREB:  Objection.

THE COURT:  It's a stakeout question, I think.

MS. CONRAD:  Your Honor, respectfully, I --

THE COURT:  No, I think so.

So anyway, we've had a very thorough examination of this juror.

MS. CONRAD:  Well, can I just rephrase it?

THE COURT:  No.

Thank you very much.

THE JUROR:  Thank you very much.  I appreciate it.

Thank you.

THE CLERK:  You can leave that right there.

THE COURT:  We'll take, I think, a break for lunch and resume at two.  Does that sound about right?

COUNSEL IN UNISON:  Sure.

(The Court exits the courtroom and there is a recess in the proceedings at 1:07 p.m.)

(After the recess:)

(The Court enters the courtroom at 2:07 p.m.)

THE COURT:  Okay.

THE CLERK:  Audio on.

THE COURT:  We're ready.  250.

THE CLERK:  Juror No. 250.

MR. McALEAR:  Juror No. 250.

(Juror No. 250 enters the courtroom.)

THE CLERK:  Sir, if you would sit over here, please, take a seat and speak into the mic.

THE JUROR:  Okay.

THE COURT:  Hi.

THE JUROR:  Hello.

THE COURT:  Since you filled out the questionnaire when you were here, have you been able to follow my instruction to avoid discussing the case with anyone?

THE JUROR:  I have.

THE COURT:  And to avoid, as much as you can, any

exposure to media articles about the case?

THE JUROR:  Uh-huh.

THE COURT:  You have to say yes or no for the reporter.

THE JUROR:  Yes.

THE COURT:  She can only write down words.

THE JUROR:  Yes.  Hmm.  Yes.  Sorry.

THE COURT:  If I could just get to the -- so this says -- we have, you know, the information you gave us about your employment.  You are a designer for Boston Beer Company?

THE JUROR:  Yes, I am.

THE COURT:  Tell us what you do.

THE JUROR:  I design point of sale for the sales force across the country.

THE COURT:  What do you mean, point of sale?

THE JUROR:  Banners, posters, menu cards, anything that they need to help sell their products.

THE COURT:  Marketing media?

THE JUROR:  Yeah, marketing media.  Yeah.

THE COURT:  And you've been doing that for about five years?

THE JUROR:  Uh-huh.

THE COURT:  Tell us about your use of social media.

THE JUROR:  Very active, Facebook, Instagram, Tumblr. I have a big presence in a band.  I do a lot of networking.

THE COURT: You're in a band?

THE JUROR: Yeah, I'm in a band. Yup. So we play in Boston.

THE COURT: So you do kind of promotion of the band on --

THE JUROR: Yeah, a lot of promotion, meeting a lot of people in the area and out of the -- out of state as well.

THE COURT: If you want you can follow along because we're going to follow up on some of these questions.

THE JUROR: All right.

THE COURT: I'm looking at page 10, Question 29. You said about blogging, you said, "Personal posts fairly frequently about my life."

THE JUROR: Uh-huh. Yeah, general. I guess it's -- yeah, it's all personal-based. It's my performance as an artist, musician, just everything that I've been up to, day-to-day activities, stuff like that, yup. Very transparent.

THE COURT: I'm looking at 30, which is the top of the next page, Facebook, Instagram, Tumblr very frequently, Twitter?

THE JUROR: Yeah, I don't use Twitter. Yeah, I don't use Twitter.

THE COURT: And have you blogged or posted anything about your being called for jury service or anything like that?

THE JUROR: I don't believe I did. I don't -- I don't

think so.

THE COURT:  You shouldn't --

THE JUROR:  I don't remember talking about that to anyone.

THE COURT:  -- just for your information.

Let me ask you to look at page 15, Question 46 at the top.  We asked if you had strong positive or negative views about law enforcement officers, and you said, "I believe some law enforcement officers are power hungry and lose sight of being objective."

THE JUROR:  Yup.  I think that it's -- I mean, it's sort of the spectrum of the role.  There are certain people in law enforcement that overstep their bounds and certain ones that are not.  But from, I think, currently what I've been exposed to has been a lot of that as of late.  So that's just --

THE COURT:  Personally?

THE JUROR:  No, media.  Definitely media, friends.

THE COURT:  You're talking about things like Ferguson and things like that?

THE JUROR:  Yeah, sort of on that line, and just around me, everything friends and family are displaying, posting.  It's been a lot of, you know, more negative things, so it's been as of late.  But I think -- I don't think that everyone is power hungry, but...

THE COURT:  Obviously in a criminal prosecution, as this is, there will be a lot of law enforcement people involved in testifying.

THE JUROR:  Yup.

THE COURT:  Would your feelings in this respect have any skewing effect on your ability to be a fair-minded judge of their evidence as well as everybody else's?

THE JUROR:  Only if they seemed aggressive, maybe.

THE COURT:  Depending upon the individual?

THE JUROR:  Yeah, depending on the individual. Absolutely.  It is on an individual basis.  I don't think that all of them are as such.

THE COURT:  So it's not a categorical basis for you?

THE JUROR:  Yeah, it's personal.  It's definitely just a general feeling, I guess.

THE COURT:  With respect to any witness with any background --

THE JUROR:  Absolutely.

THE COURT:  -- who testifies, we ask you to evaluate the witness's testimony.  You may find it believable; you may find it unbelievable.

THE JUROR:  Absolutely.

THE COURT:  As long as you do it on an individualized basis.

THE JUROR:  Yup.

THE COURT:  Actually, just because of something you said, we had asked you earlier on, and this is page 5, Question 10, describing the schedule in the case and so on and so forth, whether it was an unusual hardship for you.  Obviously it's going to be a burdensome proposition for anybody who serves on the jury to serve on a long case like this.

I had been -- and you answered no, and I've been thinking of that in light of what your employment is and so on and so forth, but you just described your musical activity.  Would that have any impact on your service?

THE JUROR:  Yeah, it would.  It would.

THE COURT:  Do you tour or anything like that?

THE JUROR:  Yeah, currently we're in the phases of working on a tour on the West Coast this summer.  The end of this summer.

THE COURT:  The end of the summer?

THE JUROR:  Yeah, more August time.  August-September.

THE COURT:  Before then it wouldn't be a problem?

THE JUROR:  Yeah, before then we're just sort of focusing on fund-raising and playing around locally.

THE COURT:  You won't be away?

THE JUROR:  Yeah, we're not playing away.  We're playing locally, yeah.  Yup.

THE COURT:  On page 20, Question 77, on this we asked whether on the basis of what you'd seen or read in the news

media or what you'd learned from other sources you had formed an opinion, A, that the defendant was guilty; B, that he was not guilty, and then we'll go on to the penalty in a minute, but I wanted to ask about those two.

So you indicated that you do have an opinion based on what you've seen in the media about whether he's guilty.

THE JUROR:  Yeah.

THE COURT:  Below we asked -- if you'd answered yes to any of those questions, which you had, we asked whether you thought you would be able or unable to set aside that opinion and base your decision about guilt and punishment solely on the evidence presented in court in the course of the trial, and you checked "able."

THE JUROR:  Yup.

THE COURT:  Okay?

THE JUROR:  Yup.

THE COURT:  Can you give us what you were thinking about when you made that choice?

THE JUROR:  I mostly appeared as I needed to be objective, but it's difficult because, I mean, I can't -- I know as a juror I would have to be objective and to come in and be ready to take the evidence as it is, but at the same time I feel like everything that has happened, it's incredibly hard to refute how I feel and how the media has portrayed everything. And so I still -- I feel the same way.  I would ultimately try

to be able to do that, but that's really a hard position to take, I guess.

THE COURT: Well, what we ask jurors to do, as you recognize, I think, is to pay attention to the evidence as presented in the trial, focus on that evidence, because in the process that's the evidence that must prove the defendant guilty or he is not guilty. He can't be declared guilty on the basis of something that isn't in the trial.

THE JUROR: Absolutely.

THE COURT: So the question is: It may require some mental discipline to do that, and some people may be able to do it and some people may not. And so we're looking for kind of a self-assessment whether you think you could -- for the purposes of deciding the issues in the case as they're presented, whether you could focus only on that body of evidence, whatever it may be -- we don't know what it may be necessarily at this stage -- and make a decision focused on that or whether what you think you know from other sources would interfere with your ability to focus only on the trial evidence and make a decision just on that.

THE JUROR: Yeah.

THE COURT: I know it's a prediction about what you do in the future.

THE JUROR: Yeah, it's difficult to understand. I feel slightly determined already as to how I feel, so it would

be difficult to be utterly objective as if I had never heard of this situation before.

THE COURT:  Okay.  Do you work in an office or a location?  Where is it, what city?

THE JUROR:  Boston.

THE COURT:  So were you there when the events occurred?

THE JUROR:  Yes, I was working in our Boston office when the events occurred, and I had coworkers down at the marathon that day because we are the official beer sponsor of the marathon.

THE COURT:  Okay.  Were they people you had worked with on -- I imagine there was some promotion going on.

THE JUROR:  Yeah, yeah, they were up and down the route passing out point-of-sale pieces.

THE COURT:  Some of your stuff?

THE JUROR:  Yeah, some things we'd designed.  And then we have, like, an after party afterwards.  Everything, of course, was cancelled, but...

THE COURT:  And that Friday when people sheltered in place, do you remember that?  Were you in Boston when that happened?

THE JUROR:  I was, actually.  I drove into the city because I had a Zipcar at the time and I needed to bring it back in the morning, and later that day Zipcar said that you

didn't have to because of the events that were occurring.  But anyways I drove in to Boston, and I was at work that day when -- yup.

THE COURT:  Beginning on page 23 we asked a series of questions about your attitude toward the death penalty.

THE JUROR:  Uh-huh.

THE COURT:  88 was a general question, do you have any views about it in general, and you said, "I don't think we have the right or justification to murder people even for heinous crimes.  An eye for an eye makes the whole world blind."

THE JUROR:  Yeah.

THE COURT:  That's your general view of the death penalty.

THE JUROR:  Yeah, I do feel...

THE COURT:  Actually, the next question we ask you to kind of indicate on the scale of 1 to 10 from strongly oppose to strongly favor, and you circled Number 3.

THE JUROR:  Yup.  It's -- I mean, yeah, I still feel the same way.  It's very -- I understand that we're going to kill people, but I don't necessarily agree with the -- you know, with the death penalty, with that as a form of punishment.

THE COURT:  Right.  It just struck me that there might be a little bit of difference between what you wrote in 88 and what you wrote in 89.

THE JUROR: Uh-huh. Because I didn't choose 1 or --

THE COURT: Well, yeah.

THE JUROR: Yeah. Yeah. True. I understand. It might as well be 1, then. I just...

THE COURT: I'm not telling you to choose 1.

THE JUROR: Yeah, yeah, yeah, I know.

THE COURT: I'm actually trying to get at whether you are more a 3 than a -- in answer to Question 88 -- or whether you're more a question -- answer to Question 88 than you are a 3.

THE JUROR: I get you.

THE COURT: Which is really a better description of you, if either? There may be a third possibility.

THE JUROR: No, I think 88 is -- that is my views on the death penalty. I haven't believed in that for a long time. Ever since I was little, I always thought it was just one way to perpetuate negativity in the world, so it hasn't been something I believe in. But I understand it as well and I know -- that's why I probably gave it a 3, but it should be less for sure.

THE COURT: When you say you understand it, you mean you understand why society might choose to have it available. Is that what you mean?

THE JUROR: Yeah. Yeah.

THE COURT: Would you look at Question 90 on the next

page.  Here we asked -- rather than circling a number, we asked you to choose a statement that you thought described your feelings about the death penalty in a case where a person has been proven guilty of murder.  I mean, that's the premise, of course, you can't get to the penalty until you've convicted someone of murder.

So here, again, you didn't select the most extreme; you selected B, which was "I'm opposed to the death penalty and would have a difficult time voting to impose it even if the facts supported it."

THE JUROR:  Yup.  And I've had more time, I guess, to think about it after we've done this, and I didn't really anticipate that day necessarily what I was going to be answering.  And that was an intense one.  I've never had the situation of having to decide that -- decide someone's fate.

So the more thought I put into it the more I thought this is definitely something that I wouldn't -- I don't believe in and it would be -- like I said, it would be incredibly difficult.  So it's something that I really would not be considering.

THE COURT:  So could you -- I guess that's the question:  Could you conscientiously consider voting for the death penalty if you thought that the case had been made for it?

THE JUROR:  I wouldn't agree with it.  Yeah, I would

not agree with it.  If the case had been made for it, I would not agree with death.

THE COURT:  Follow-up anybody?  No?

MR. WEINREB:  I don't think so.

THE COURT:  Okay.  Thank you.

THE JUROR:  Thank you very much.

MR. McALEAR:  Thank you very much, sir.

(The juror is excused.)

THE CLERK:  Juror No. 251.

MR. McALEAR:  Juror 251.

(Juror No. 251 enters the courtroom.)

THE CLERK:  Sir, you're going to come right over here, please.  Have a seat right over here and speak into the mic so everyone can hear you.  That would be great.

THE COURT:  Hi.

THE JUROR:  Hi.

THE COURT:  Thank you for your patience.  We appreciate it.

That's the questionnaire you filled out when you were here last time.  We put it there because we may refer to it as we follow up on some of the answers that you've given.

THE JUROR:  Okay.

THE COURT:  First of all, let me ask, have you been able to follow my instructions not to discuss the case or your possible participation in it other than to tell people you're

here?

THE JUROR:  I haven't said anything.

THE COURT:  And have you been able to avoid news stories about the case?

THE JUROR:  Yes.

THE COURT:  Okay.  Good.  Thank you.

Looking at page 10 of the report, we asked about your employment.  I actually couldn't quite read your writing.

THE JUROR:  Okay.  Yeah, most people can't.  I work at Titleist.  I am a flex associate.  I do several different jobs.

THE COURT:  Okay.  Can you just tell me what the words are there and then we'll --

THE JUROR:  Stylus finish side flex.

THE COURT:  Finish side flex?

THE JUROR:  Yes.

THE COURT:  So now tell us what that means.

THE JUROR:  I do several different jobs finishing the golf balls for Titleist.

THE COURT:  You're on the finish side of the production process?

THE JUROR:  Yes.

THE COURT:  All right.  What are the kinds of jobs you do?

THE JUROR:  I'll do inspection; we will spray the balls, prime or clear; we could do pressure buffs, which gets

the balls ready to be primed or cleared; buffing, which you buff up the line going around the balls' molding.

THE COURT: Okay. Let me ask you about your compensation. Is this an hourly-wage job?

THE JUROR: Yes.

THE COURT: If you were here for three or four months on jury duty, would that impact your wage earning?

THE JUROR: I mentioned it to them, and they said that I would be fully compensated for the whole time because they didn't pay me for the 5th when I went because we were actually not working.

THE COURT: So you've been assured that you won't lose any income by serving?

THE JUROR: I would ask again, but he said I would --

THE COURT: No, okay. If you think you got an answer, I just -- you and your boss are the ones that know, and I just want to know what you think the answer is and you told us so.

All right. Moving on. You use Facebook daily?

THE JUROR: Yes, pretty much.

THE COURT: What do you do?

THE JUROR: Just see whatever my friends have put on it.

THE COURT: Do you post things sometimes?

THE JUROR: Periodically I'll put something. If I got a funny joke sent to me, I'll send it back, but I'm not really

into the whole thing.

THE COURT:  Okay.

MS. CONRAD:  Sorry.  I just couldn't hear the last answer.

THE COURT:  Would you say that again just so --

THE JUROR:  I'm not really into the technology stuff, but you've got to go with the flow a little bit, so...

THE COURT:  Okay.  Let me ask you to look at page 20, Question 77.  In this question we asked whether, based on things you'd seen or read in the news or learned otherwise, had you formed an opinion that the defendant is guilty or that he is not guilty and that he should receive the death penalty or that he should not receive the death penalty, and to each of those questions you checked that you are unsure.  Let me focus on the first question and the companion one to that, which is the second.

Can you tell us what your thinking was as you decided that "unsure" was the right answer for you to give to that question?

THE JUROR:  I really do not watch the news.  I mean, I see what's on at work because it's on.  And so I really never really thought much about that.  I didn't even know I was here for this when I came here on the 5th.  That's why I did not know what to put.

THE COURT:  Okay.  So a possible answer under those

circumstances would be no, you don't have an opinion, or is your -- so you probably heard something about the case.

THE JUROR: Oh, yes, I did, because I had seen some of the stuff at work, but I don't --

THE COURT: But not enough for you to have an opinion?

THE JUROR: I honestly just didn't know what to put. That's why I put that.

THE COURT: Okay. Well, let me ask you this: If you were a juror in the case we would ask you, as all the other jurors, to listen to the evidence presented in the case. In a criminal prosecution, a defendant is presumed to be not guilty, or innocent of the charge, unless the government proves that he's guilty by the proof at the trial, right? Do you understand that?

THE JUROR: Yes.

THE COURT: So we call it the presumption of innocence. And what it really means is that the government has the burden of providing enough convincing information to the jury that they, at the end of the case, would conclude that the government had proved the person guilty of the crime charged, and that they would have to have that conclusion without any reasonable doubt about whether it was the proper conclusion or not. They would have to be convinced beyond a reasonable doubt that the person was guilty.

Do you understand that?

THE JUROR:  Yes.

THE COURT:  The burden is always on the government.  A defendant doesn't have a burden to prove he's not guilty.  So if the question -- the question is not which side has convinced me but has the government convinced me beyond a reasonable doubt that this person is guilty of what he's charged with.

Would you be able to faithfully apply those principles in deliberating on the evidence in this case if you were a juror?

THE JUROR:  I think so, yes.

THE COURT:  We also asked a series of questions about the -- well, let me just preface that by saying in the second part of 77 there were two questions about your attitude towards the death penalty, or whether you formed an opinion about the death penalty for this case, and you said "unsure" to both of those.  Later on we asked some questions about your attitude to the death penalty generally and perhaps specifically.

Would you turn to page 23?  Question 88 we asked if you had any views on the death penalty in general, would you tell us what they are, and you said, "If found guilty, the punishment should fit the crime."

THE JUROR:  Yes.

THE COURT:  That doesn't really directly answer the question.  Do you have any specific views about the appropriateness of the death penalty as a general matter?

THE JUROR:  I really didn't know what else to put.  If something was done that was really, really wrong and this is what the punishment was, then it should be.

THE COURT:  Okay.  In the next question, 89, we asked you to tell us where on a scale of 1 to 10 you might put yourself, with 1 being strongly opposed to the death penalty and 10 being strongly in favor, and you selected 5.  Can you tell us what you were thinking when you did that?

THE JUROR:  Again, I would need to have more information to know which way I'd want to go.  I couldn't base it on what I know because, like I said, I'm not a big media person.  I don't watch the news.

THE COURT:  We're not necessarily talking about this case in that question but as a general matter about the policy of having a death penalty or whether it's a good idea or bad idea to punish people by sentencing them to death and so on.  So this is really more your general views than your view about this particular case.

Do you have any -- and maybe you don't.  I mean, I'm just asking whether you think you're somewhere in the middle of opposing and being in favor, which is what the 5 seems to indicate.

THE JUROR:  I would think it would depend on what the crime was, that's why I think I put the 5, because I really didn't know which way I would go.  It depends on why.

THE COURT:  Okay.  Turn to the next page, 24, Question 90.  In this we asked if one of the statements listed described your feelings about the death penalty in a case where someone had been proved guilty of murder, and you didn't make a selection.  I don't know if it was an oversight.

THE JUROR:  I think it was an oversight.  I tried to be careful.

THE COURT:  Would you take a minute to read through it carefully now?  And take your time because I want to be sure you've absorbed it before -- at the end I'm going to ask you if there's one that you would select.

THE JUROR:  Okay.

(Pause.)

THE JUROR:  I think maybe D.

THE COURT:  D?

THE JUROR:  Yes.

THE COURT:  "D" as in "David"?

THE JUROR:  Yes.

THE COURT:  That says, "I am not for or against the death penalty.  I could vote to impose it or I could vote to impose a sentence of life imprisonment without the possibility of release, whichever I believed was called for by the facts and the law in the case."  Is that your view?

THE JUROR:  Yes.  Yes.

THE COURT:  So you wouldn't have any predetermined

commitment to either the death penalty or life imprisonment in a given case; you would wait to hear what's presented and then make a decision?

THE JUROR:  Yes.

THE COURT:  You heard me this morning talk about the process a little bit, about how after someone's found guilty for a crime for which the death penalty might be imposed we go to the penalty phase, and the government would produce evidence of aggravating factors that might make this seem a worse crime than others -- other crimes of murder?

THE JUROR:  Yes, I recall.

THE COURT:  And then there would be mitigating evidence presented by the defendant that might say this is not a case that needs the death penalty; that life imprisonment is an appropriate sentence?

THE JUROR:  Yes.

THE COURT:  And so are you prepared to listen to all of that and make an individualized decision based on your assessment of that evidence?

THE JUROR:  Yes.

THE COURT:  And finally, if you'd look at 95 and 96, the bottom of page 25 and the top of 26, they're kind of a pair of questions together.  This now -- it comes away from the general a little bit to the specific and says if you found this defendant guilty and you decided the death penalty was the

right punishment -- appropriate punishment for him, could you conscientiously vote to impose the death penalty, and you said yes.

THE JUROR:  Yes.

THE COURT:  Do you see that?

Then at the top of the next page we asked the other side of that question:  If you found the defendant guilty and you decided life imprisonment without the possibility of release was the appropriate punishment, could you conscientiously vote for life imprisonment without the possibility of release?

And you said yes to that, right?

THE JUROR:  Yes.

THE COURT:  And that's your view as to both of those?

THE JUROR:  Yes.

THE COURT:  Any follow-up?

MR. WEINREB:  No, your Honor.

MS. CONRAD:  I do.  Thank you.

THE COURT:  Okay.

MS. CONRAD:  Good afternoon, sir.  My name is Miriam Conrad.  I'm one of Mr. Tsarnaev's lawyers.

Let me just ask you a few questions, if I might. Going back to Question 77 on page 20, I'm not sure if I understood your answer or maybe I was just having a little trouble hearing you at that point, but I thought you said

something about, well, you didn't even know that the summons was for this case.

But the question is not what your verdict would be if you were a juror in this case but whether you have an opinion, or had an opinion, even, before you got your summons about whether Mr. Tsarnaev was guilty or not. So taking out of it sitting as a juror, just do you have an opinion?

THE JUROR: No, because I don't know all the facts. How am I going to make an opinion?

MS. CONRAD: Well, you did say in Question 74 -- 73, excuse me -- that you had seen a moderate amount of media coverage in this case.

THE JUROR: I seen it at work, which I'm in the break room 10 to 15 minutes three times a day.

MS. CONRAD: Okay. I'm just asking you, sir. I'm sorry. I'm just trying to find out what you've seen about this case and how it might affect your thinking about the case.

THE JUROR: Okay.

MS. CONRAD: So can you tell me what you have seen or read about this case?

MR. WEINREB: Objection.

THE COURT: Well, no, go ahead. You can -- in general terms.

THE JUROR: Honestly, I don't -- it was, what, over a year ago? So, I mean, I don't live around here so I

wouldn't -- I didn't pay as much attention, probably, to people that live up here, but I know something bad happened.

MS. CONRAD:  Okay.  Anything else that stands out in your mind?

THE JUROR:  No, just what was on TV for the few days that it was.

MS. CONRAD:  So you did watch some of the reports on TV?

THE JUROR:  In the break room at work, yeah.  The TVs are on.  There's three TVs.

MS. CONRAD:  Sure.  And you also get some news from the Internet?

THE JUROR:  I don't have anything listed on my thing. I just get whatever comes up on my phone.

MS. CONRAD:  Yeah.  But, no, you said on 68 "What is your primary source of news?" you said the Internet.

THE JUROR:  That's my phone.

MS. CONRAD:  I'm just asking you --

THE JUROR:  Maybe I wasn't -- I really don't watch the news, okay?  Whatever comes up on my phone -- if I see something that's posted, then I'll read it.  That's it.  I'm not chasing after anything.

MS. CONRAD:  Sir, I'm sorry.  I didn't mean to suggest that you were.  I'm just trying to find out what you might have seen or heard about this case.

THE JUROR:  Well, I said Fox at work too.  On 71?  Yeah, that's where I've seen it, is Fox at work.  They have Fox at work in the break room.

MS. CONRAD:  Were you at work on the day of the bombing?

THE JUROR:  I honestly couldn't tell you.  I don't remember.  What day was it on, what time?  I work second shift.

MS. CONRAD:  April 15, 2013.

THE JUROR:  What time?

MS. CONRAD:  About 2:30, 2:40 in the afternoon.

THE JUROR:  I would just be going to work.

MS. CONRAD:  Okay.  And you don't remember -- do you not remember how you found out about the bombings?

THE JUROR:  Probably at break while the TVs were on.

MS. CONRAD:  It wasn't something that people were talking about when you got to --

THE JUROR:  I would just be going to work at three o'clock.  I'm not with a bunch of people.

MS. CONRAD:  Okay.  You said in your answer to Question 31 that you were in the U.S. Army for three years?

THE JUROR:  Absolutely.  82nd Airborne.

MS. CONRAD:  Okay.  And where were you stationed?

THE JUROR:  I was stationed down at Bragg in North Carolina, and then I went to Fulda, Germany, for a year and a half.  The first of the 11th Cav.

MS. CONRAD:  I'm sorry?

THE JUROR:  First of the 11th Cav.

MS. CONRAD:  So, I'm sorry, I don't know much about this, but is 82nd Airborne and 11th Cav two different things?

THE JUROR:  Yes, they are.  They're two different assignments.

MS. CONRAD:  Okay.  And did you see combat at all?

THE JUROR:  No, I did not.

MS. CONRAD:  And are you aware -- well, let me rephrase that.  If you were to hear evidence in this case that one of the -- or a possible motive for the bombings was related to military action by the United States overseas, would your past military service affect the way that you viewed that evidence?

THE JUROR:  I don't know.  I'm pretty proud of my service for this country, so maybe it would.

MS. CONRAD:  So would it make it harder for you to be impartial?

THE JUROR:  I don't think so.

MS. CONRAD:  You said that you -- I think in your questionnaire that you are on Facebook on a daily basis?

THE JUROR:  Yes.

MS. CONRAD:  Is that also on your phone?

THE JUROR:  That is my phone.  That's what I use.

MS. CONRAD:  And have you ever posted anything on

Facebook about political issues?

THE JUROR:  No, I'm not into politics.

MS. CONRAD:  And have you ever posted anything on Facebook about Muslims?

THE JUROR:  I've never posted anything, no.  I do have a lot of friends that are military that still are.  I mean, I get all kinds of stuff on my phone from whatever they send.  I have no control --

MS. CONRAD:  So you're telling us you've never posted anything about political issues?

THE JUROR:  Political?  No, I don't think so.  I'm not really into the politics.

MS. CONRAD:  Okay.  I just want to show you something, if I might.

THE JUROR:  You can -- if my friend sent it to me, I might have sent it back out, which I probably did.

MS. CONRAD:  I'm sorry.  Are you saying you never sent back out something --

THE JUROR:  No, no, I'm saying if I get something and I think it's funny, I'm going to probably send it back out, absolutely.

MS. CONRAD:  And have you sent anything back out that relates to Muslims?

THE JUROR:  Yeah, probably.

MS. CONRAD:  And what have you sent back out?

THE JUROR:  I couldn't tell you offhand.

(Pause.)

MS. CLARKE:  Do you want to mark it?

MS. CONRAD:  Sure.  One's for him and one's for the judge.

Could I have that marked, please?

THE CLERK:  I'm sorry?

MS. CONRAD:  Could I have that marked, please?

THE CLERK:  What do you want it marked as, 1 or A?

MS. CONRAD:  Sure.  Either or both.

THE CLERK:  Defendant's 1 is marked for identification.

(Defendant's Exhibit No. 1 marked for identification.)

MS. CONRAD:  Do you recognize the image?

THE JUROR:  Absolutely.

MS. CONRAD:  And that's something that you posted.

THE JUROR:  That's something that somebody sent me and I put it back out, yes.

MS. CONRAD:  All right.  Can you explain to me -- or describe what that depicts?

THE JUROR:  The same thing that's happening to -- actually, I don't really read this part of it.  I don't understand what that is, but I'm assuming it's going to the bathroom on something.

MS. CONRAD:  So it depicts -- it's a cartoon of a boy

with the American flag urinating on something.

THE JUROR:  Whatever that is, yeah.

MS. CONRAD:  And -- well, it has some Arabic writing on it, right?

THE JUROR:  I don't read Arabic, but, yes, you're right.

MS. CONRAD:  So what was in your mind when you posted that?

THE JUROR:  It was funny when I got it, and I sent it back out.

MS. CONRAD:  But what did it --

THE JUROR:  I didn't create it; I just sent it back out the same way I got it.

MS. CONRAD:  Actually, it was your profile picture, right?

THE JUROR:  Yeah, at one time it was.  It was funny.

MS. CONRAD:  So you changed your profile picture to this image?

THE JUROR:  If you go back and check, I change my profile picture probably every week.

MS. CONRAD:  Sir, I'm sorry.  I'm just asking whether, in fact, you changed your profile picture.

THE JUROR:  Yes.

MS. CONRAD:  And when you changed your profile picture to this image, what did you intend to convey?

THE JUROR:  To get a laugh, just like I got a laugh when I got it.

MS. CONRAD:  Okay.  And you thought it was funny why?

THE JUROR:  Because it's just funny.

MS. CONRAD:  Were you trying to make a statement about Muslims?

THE JUROR:  No.  Do you know what?  Maybe I was.  I don't know.

MS. CONRAD:  Well, sir, only you know.  That's why I'm asking.

THE JUROR:  Yeah, I don't know.  I thought it was funny.  There's a lot of stuff -- if you've got my stuff there, then you'll see there's a lot of funny stuff on there.

MS. CONRAD:  Yeah, there's a lot of stuff about politics too --

THE JUROR:  That stuff is whatever gets sent to me.  I'm not into politics.  Do you know what?  If you knew me, you'd know.

MS. CONRAD:  But you frequently changed your profile --

THE JUROR:  I always do.  It's a joke.  It's Facebook.

MS. CONRAD:  Okay.  But, sir, we asked you some questions in the questionnaire about whether you have strong feelings, for example, about Muslims, right?

THE JUROR:  My feelings have got worse and worse with

ISIS --

MR. WEINREB:  Excuse me, sir, for a moment.

I object on the grounds that this is both -- this is not a cross-examination; it's an attempt to just elicit information by asking open-ended questions.  Also, it's badgering the witness.

THE COURT:  Yeah, I think the point's been made here.

MS. CONRAD:  Well, I would like to go, then, to one of the questions in the questionnaire.  And I think you started to say something.  I would like to hear the rest of your statement.

THE COURT:  No, ask the question.

MS. CONRAD:  I'm sorry?

THE COURT:  Ask the question in the questionnaire.

MS. CONRAD:  Okay.  So you were asked on the questionnaire if you have strongly held thoughts or opinions about Muslims or about Islam, and so I'd like to ask.

THE COURT:  This is Question 59 on page 17.

THE JUROR:  Yes.  And I answered no because I don't know any.

MS. CONRAD:  No, that's Question 58.  My question is about 59.

THE JUROR:  Okay.  And I said no.

MS. CONRAD:  I understand you said no.  My question is:  As you sit here today do you have any thoughts or opinions

about Muslims?

THE JUROR:  Just as much as anybody else does.  Now it's even more, I guess.  But when I read this, I think I read it a little bit different.  I don't have an opinion unless you're doing something to hurt an American, then I will have an opinion.

MS. CONRAD:  Okay.  Why don't you tell me what that opinion is?

THE JUROR:  What do you mean, an opinion?  If you're hurting a U.S. citizen, why wouldn't I have an opinion?

MS. CONRAD:  Sir, I didn't -- I'm sorry.  Maybe I'm not asking the questions the right way.  Please understand that I'm not trying to dispute your opinions or argue with you; I'm just trying to find out what those opinions are.

THE JUROR:  Okay.  If a Muslim is taking the head off of a U.S. citizen, I will have an opinion.  Is that what you mean?  If something's going to give me that opinion, yeah, that would give me an opinion, a strong one.  But when I read the question I said no because I didn't really have that much of an opinion.  Most of my stuff on Facebook is a joke because it's Facebook.

MS. CONRAD:  Sir, I didn't say anything about Facebook in this last question.  I'm asking you about your opinions about Muslims.

THE JUROR:  And I just said --

MS. CONRAD:  So my question is -- and again, I'm really just trying to find out how you feel.  And we really just want you to be honest about your opinions.  It's not that your opinions are right or wrong or people might agree or disagree with them; it's just about whether you can honestly tell us what those opinions are.

So my question is whether your obviously strong feelings, which you're completely entitled to, about the military, about terrorists, whether those influence your views about Muslims generally.

MR. WEINREB:  Objection.  I think that's a -- that's not a -- it's a question whose premise suggests --

MS. CONRAD:  Well, I'll strike the premise, your Honor, and I'll ask the question again.

What, if any, opinions do you have about Muslims generally?

THE JUROR:  I really don't know any, so I don't.  But if they're hurting U.S. citizens, I have an opinion.

MS. CONRAD:  What, if any, opinions do you have about the religion of Islam?

THE JUROR:  I know nothing about it.

MR. WEINREB:  Objection.

THE JUROR:  No, I'll answer.  I know nothing about it.

THE COURT:  Well, that was an answer to the question.  Anyway, I think you've made your point.

Do you have another area?

MS. CONRAD:  Sure.

Question 63 asks whether you have feelings -- strong feelings about laws or government policies concerning legal immigration.

THE JUROR:  Why would I have feelings about legal immigration?  I mean, someone's coming into this country legally?  I'm asking.

MS. CONRAD:  Sir, the question is just what the question is.  Just please understand we don't know you when you walk in the door here.  We're trying to find out what some of your thoughts and opinions are.  So really, it's just -- the question is just do you have any strong feelings about legal immigration.

THE JUROR:  No.

MS. CONRAD:  Do you have any -- have you posted anything about immigration?

THE JUROR:  I don't know.  Probably if I got something funny, I probably sent it right back out.

MS. CONRAD:  Or changed your profile picture.

THE JUROR:  Probably.  I do it all the time.

MS. CONRAD:  And --

THE JUROR:  It's Facebook.

MS. CONRAD:  You said in response to Question 44 -- excuse me -- 74, this is on page 19 -- sorry -- and 75 --

that when you got the summons you didn't know it was for this case?

THE JUROR:  I said I did not know until I got up here.

MS. CONRAD:  Right.  So when you realized it was for this case, how did you feel?

THE JUROR:  I don't really recall.  I know it's a burden to me to drive from Fairhaven up to here, especially through traffic, and that would have been something that was on my mind just like today.

MS. CONRAD:  I'm asking about how you feel about jury service in this case.

THE JUROR:  Right now?

MS. CONRAD:  Yes.

THE JUROR:  I don't know.  I'm here.  They asked me to be here.  I would be honest as much as I can.  You don't know my jokes are my jokes, whatever.  But that's all I know.

MS. CONRAD:  One moment.

(Pause.)

MS. CONRAD:  Sir, regarding your views on the death penalty which the judge asked you about, I may have gotten this wrong so let me just make sure I've got it right.  You said it would depend on the crime, right?

THE JUROR:  Yes.

MS. CONRAD:  Okay.  And you understand that -- or do you understand that the death penalty wouldn't even be an issue

unless the defendant were found guilty of an intentional murder?

THE JUROR: Okay. Honestly, I didn't even know Mass. had a death penalty. But under different circumstances, no, I didn't know.

MS. CONRAD: Sir, I'm just asking you when you say it should fit the crime, do you think the death penalty should be imposed in any intentional murder?

THE JUROR: Yes.

MS. CONRAD: Thank you.

THE COURT: Okay, sir. Thank you. You may step out. Just leave the form right there.

THE JUROR: You can keep my joke.

THE CLERK: Just leave that right there.

(The juror is excused.)

THE CLERK: Juror No. 255.

MR. McALEAR: Juror 255.

(Juror No. 255 enters the courtroom.)

THE CLERK: Ma'am, over here, please. And if you would talk into the mic so everyone around the table can hear you, that would be great.

THE JUROR: Okay. Thank you.

THE COURT: Good afternoon.

THE JUROR: Hi.

THE COURT: Thank you for your patience.

Since you were last here when you filled out the questionnaire, have you been able to follow my instructions to avoid discussing the case with anybody?

THE JUROR:  Yes.

THE COURT:  And also to avoid, as much as you can, any media reports about the case?

THE JUROR:  Yes.

THE COURT:  So I do want to follow up on some of the answers in your questionnaire, and you can follow along as we do that.  I just wanted to ask you first about your work, where you're employed and what you do and so on.  Can you just tell us briefly?

THE JUROR:  Sure.  I'm in the social work field.  I currently work for a nonprofit, and I do work with children and adolescents that have mental health conditions.  And I work with them one-on-one.  I bring them into the community and help them develop skills.

THE COURT:  Okay.  Daily-living skills, that kind of thing?

THE JUROR:  Yup.  Yup.  Just coping skills, daily-living skills.

THE COURT:  We asked jurors about use of social media.

THE JUROR:  Yes.

THE COURT:  And that's in Questions 29 and 30.

You say you have a Facebook page but you don't post

anything; you use it just to keep up with what other folks are posting, I guess.

THE JUROR: Yup.

THE COURT: Is that right?

THE JUROR: Yes.

THE COURT: And you say also you have a Twitter account you don't use?

THE JUROR: Yes.

THE COURT: Do you check that -- anybody else's Twitter feeds or anything?

THE JUROR: Infrequently, just once in a while.

THE COURT: Do you use it to follow news events or anything like that?

THE JUROR: I haven't in the recent past.

THE COURT: So let me jump ahead to page 19.

THE JUROR: Uh-huh.

THE COURT: At the bottom two questions, 74 and 75, we asked a little bit about your reaction, and maybe your friends' and family's reaction, to your getting a summons and when you realized it might be this case.

THE JUROR: Yes.

THE COURT: To 74 you said you were worried about missing work but was interested in what the experience would be like.

THE JUROR: Uh-huh.

THE COURT:  Can you tell us a little bit more about that answer?

THE JUROR:  Yup.  I definitely am very worried about missing work because my work does not cover the time that I'm away, so I would be losing my income.  And I recently moved out of my parents' house, so if I was on this case, it would be a financial issue for me.

THE COURT:  How are you compensated?  Salary, wages, commission -- not commission -- per diem or --

THE JUROR:  It's essentially like a fee-for-service type of thing.

THE COURT:  Yeah.  Okay.

THE JUROR:  Yeah.

THE COURT:  So it's an equivalent of if you don't perform the service, you don't get the fee?

THE JUROR:  Right.  Yes.

THE COURT:  Okay.  Well, you may have not thought about that when you filled out the questionnaire, but on page 5 we asked, you know, if the kind of schedule we were going to follow would be a serious hardship for you and you said no.  Was it just your --

THE JUROR:  I think I just wanted to try to, like, honor my civic duty and try to --

THE COURT:  But the truth is it would be a serious -- have a serious impact on you money-wise?

THE JUROR:  Yes.  Yes.

THE COURT:  Okay.  Thank you.

THE JUROR:  All right.

(The juror is excused.)

THE CLERK:  Juror No. 258.

MR. McALEAR:  Juror 258.

(Juror No. 258 enters the courtroom.)

THE CLERK:  Ma'am, over here, please, if you would.
Have a seat.

If you could speak into the mic so everyone can hear
you, that would be great.  This is adjustable, so...

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon.

THE COURT:  Thank you for your patience.

THE JUROR:  You're welcome.  Interesting.

THE COURT:  We want to follow up on some of the
answers that were in your questionnaire just to get a little
more information about some of those things, okay, and that's
the questionnaire so you can follow along.  If you want to take
the clip off, feel free to do that.

First let me just ask -- have you been able to follow
my instructions to avoid discussing the case --

THE JUROR:  Yes.

THE COURT:  -- in substance?

THE JUROR:  As much as possible.

THE COURT:  And as much as possible to avoid media reporting on the case?

THE JUROR:  Yes, yes.

THE COURT:  Okay.  I first wanted to ask you about -- this is on page 7, one of your sons is a police detective?

THE JUROR:  Correct.

THE COURT:  In Santa Barbara, California?

THE JUROR:  Yes.

THE COURT:  How long has he done that?

THE JUROR:  He retired from Brookline -- he's been there now seven years.

THE COURT:  He had previously been a Brookline police officer?

THE JUROR:  Yes.

THE COURT:  How long had he done that?

THE JUROR:  Twenty.

THE COURT:  Okay.  Now, I gather you're retired?

THE JUROR:  I am, so to speak.

THE COURT:  So to speak?  Retired but active?

THE JUROR:  Very.

THE COURT:  Okay.  And the last job you had, you worked for the -- I can't quite --

THE JUROR:  My writing is terrible.  I worked for the Chelsea public schools.

THE COURT:  Public schools?  That's what I thought.

THE JUROR:  Agency director.

THE COURT:  Director of?

THE JUROR:  Special education, pupil personnel.

THE COURT:  And you retired about six years ago, 2009?

THE JUROR:  2009.

THE COURT:  We ask people about their use of social media.  You say you use Facebook infrequently?

THE JUROR:  Yes.  I use it primarily to keep in touch with my grandkids.

THE COURT:  Okay.

THE JUROR:  Or to post something I'm doing in the town.

THE COURT:  Okay.  Some of your --

THE JUROR:  I'm involved.

THE COURT:  -- civic activities?

THE JUROR:  Cultural council.

THE COURT:  I'm sorry?

THE JUROR:  Cultural council, arts.  Those are primarily my interests.

THE COURT:  Uh-huh.

I'm on page 12 now.  And the Question 34, I can't quite --

THE JUROR:  You can't read my writing.

THE COURT:  Your brother?

THE JUROR:  My brother was a police detective and --

THE COURT:  Where?

THE JUROR:  In Lewiston, Maine.

THE COURT:  I thought it said Lewiston, but I wasn't sure.

Was.

THE JUROR:  Was.  He's retired from that.

THE COURT:  You had previous service as a juror in a state case?  I'm looking at Question 47.

THE JUROR:  Lynn District Court.  It was the only experience I had, was under Judge Dever.  And I was allowed to sit through hearing the evidence, but because it involved a police person, when it came to deliberation, I was excused.

THE COURT:  Okay.  Was it your choice to be excused?

THE JUROR:  No.

THE COURT:  Did you think that the fact that you were related to police officers was a skewing factor in your ability to be a juror in a case?

THE JUROR:  In that case, no, I did not.

THE COURT:  How about any case, including this one?

THE JUROR:  Well, I like to think of myself as fair, and I tend to want to hear all sides of the story before making a final judgment.

THE COURT:  Obviously in a criminal prosecution there are law enforcement officers who are witnesses --

THE JUROR:  Uh-huh.

THE COURT:  -- commonly.  Their testimony has to be evaluated as everybody else's.

Would you have any different rules for evaluating their testimony, the testimony of a law enforcement person, as opposed to someone else?

THE JUROR:  No, none that I'm aware of.

THE COURT:  In other words, would you hold --

THE JUROR:  Would I have a prejudice?

THE COURT:  Would you have a higher standard or lower standard or would you tend to be more easily persuaded by them or would you tend to be more critical of them?  Anything.

THE JUROR:  I don't think so.  I think it would depend how it's presented, if I feel it's honest or makes sense to me, I certainly would weigh it as a factor.

THE COURT:  There's also -- the defendant is also charged with the murder of a --

THE JUROR:  Police officer.

THE COURT:  -- police officer.  An MIT police officer.

You have a brother who was a police officer, you have a son who is a police officer.  Would that present any difficulty for you in being an impartial juror on that kind of an issue?

THE JUROR:  I honestly -- I can't say I know because I haven't been confronted with that, but to project, I would try

to be considerate of all data and to weigh the facts.  It would depend on how it was presented, I guess.

THE COURT:  Okay.  I'm on 19 now, Question 74.  We asked what your reaction might have been when you received the summons for this case.

THE JUROR:  When I first received a summons, I didn't even think about this case.  I didn't think it was even there.

THE COURT:  That was going to be my question.  In the second line you said "not clear of," quotes, "case."

THE JUROR:  I thought it would be interesting and a learning experience to be part of a federal -- the process would be fascinating.  I had no clue.

THE COURT:  When did you find out, when you got here?

THE JUROR:  When I got here.

THE COURT:  And did you have a reaction then?

THE JUROR:  I did have a reaction when I saw the actual defendant.  It was like, ah.  To be honest with you, I had to sort of take a breath.  And then I thought, you know, you're here to do a civil duty.  It's part of the law.  We need to think carefully.  That's -- I mean, to be honest with you.

THE COURT:  Okay.

THE JUROR:  Yes.

THE COURT:  Let's turn to the next page.  I want to ask you about Question 77.  This is a multiple-part question asking a series of things.  And the first thing is asking

whether as a result of things you'd seen or read in the news or learned from other sources had you formed an opinion, A, that the defendant was guilty, or, B, that he was not guilty, and you said yes to the first and no the second.

THE JUROR:  Yes.  From the information initially presented through the media or the news or TV, et cetera, I saw film, and I assumed he was guilty.  So that was my first reaction.

THE COURT:  Right.  Right.  So then further down in that same question we ask if you answered yes to any of these questions, would you be able or unable to set aside your formed opinion and to base any decision about guilt or punishment as a juror on the evidence presented in the court, and you said you thought you were able to do that.

THE JUROR:  Yes.

THE COURT:  Could you tell us about that, why you think that?

THE JUROR:  Well, I think it's a major responsibility to be part of this process -- or for anybody, and I feel strongly that we need to weigh the facts seriously.  We need to determine if the presentation is believable, does it make sense.  I mean, those are things that I think as part of my duty.  Not to overstate it, but that's basically where I'm at. From what I know at this point when I answered this question and even today I saw data that said this young person was

guilty --

THE COURT:  Right.

THE JUROR:  -- of a horrendous crime.

THE COURT:  So what we ask jurors to do is once they --

THE JUROR:  Put it aside.

THE COURT:  -- begin to hear a case, is to pay attention to the evidence in the case and use that as -- you use the word "data" -- use that as the database for examining the issues.

THE JUROR:  Yeah.

THE COURT:  And I'm sure you understand this, but I just want to preface the question with it.  You understand that the burden of proof in a criminal case is always with the government to prove a person guilty beyond a reasonable doubt by the evidence at trial and that a defendant never has any obligation or burden to prove he's not guilty.  The burden never shifts to the defendant to explain things, right?  You understand that?

THE JUROR:  I do.

THE COURT:  So the question is never which side has convinced me but has the government convinced me that this person is guilty beyond a reasonable doubt.

If you had the responsibility of being a juror in this case, would you be able to faithfully apply those principles

and assess the evidence and see whether you were convinced by the evidence beyond a reasonable doubt or not?

THE JUROR:  I believe I would be able to.

THE COURT:  And just to push it a little bit further, if as to any of the charges you thought the government's proof was not convincing beyond a reasonable doubt, would you be able to vote not guilty?

THE JUROR:  Given --

THE COURT:  In other words, if the --

THE JUROR:  Yes.  Yes.

THE COURT:  -- the government's evidence did not --

THE JUROR:  Did not meet those guidelines, I would have to assume I would be able to vote not guilty.

THE COURT:  Okay.

The second part of the Question 77 asked about the death penalty, and you indicated you were unsure about that. Let me ask you to turn to page 23.  And beginning with Question 88, we asked a series of questions focusing on the death penalty, first in general, and then getting down to specifics or the particular case.

So 88 was a general question about views on the death penalty, and you said, "In general I oppose the death penalty." Do you want to tell us any more about that?

THE JUROR:  Correct.  Yes.  I have always been opposed to the death penalty.  The state, in general, is opposed to the

death penalty.  I certainly understand it's a federal case, a federal crime, and that allows the death penalty to be considered as punishment for the wrongdoing.  And if that's the law, I mean, that's the law.  That's the way it is.  And either way, it's going to get dragged on so...

THE COURT:  Okay.  In Question 89 we then asked you to kind of give us a sense of how strongly you felt about it on the scale of 1 to 10, and you chose 2, which is pretty close to the end.

THE JUROR:  And philosophically, I don't feel much is gained by administering the death penalty in general.  I'm not a proponent of someone taking their own -- if someone took their own life, that would be their decision, but to take another's life, do we take their life, does that change anything?  In my head, those are always the issues I deal with. So I'm sure I didn't answer your question.

THE COURT:  Well, this is -- I guess this is kind of a temperature gauge, in a sense.  It's how strongly or less strongly do you feel.  And you didn't go to the polar position of 1, but you're pretty close.

THE JUROR:  Yeah.

THE COURT:  Is that a good reflection of --

THE JUROR:  Yes.

THE COURT:  Again, this is --

THE JUROR:  I've worked to support this, that there be

no death penalty in Massachusetts, and I was part of an active campaign in the '80s and 90s, whenever that was done, and --

THE COURT:  What did you do?  I mean --

THE JUROR:  Well, I supported so that the -- I supported politicians to make sure that we would do away with the death penalty.  I think at the time there were lots of wrongs that had been committed and people had been given the death penalty.  Did it change the way society thought, the way society -- did it change behavior?  No, there is no way that -- there's no evidence that it does.  So that's my feeling.

THE COURT:  Yeah, but -- okay.  I was sort of getting at what -- you said you supported candidates for office, I guess, that had your view.

THE JUROR:  Yes.

THE COURT:  Did you do other things, petition drives or information programs or anything like that?

THE JUROR:  No.  I think I went the route of the politician I would support and elect.

THE COURT:  All right.  Let me ask you to turn to page 24 and Question 90.  There, instead of a number, we asked you to select, if you could, a statement that came closest to your belief about the death penalty in the case of someone who's been proved guilty of murder.  And, of course, you understand that the penalty question arises only after someone has been

convicted of intentional murder.  So that's the premise, that the person has been convicted.

And so you circled C --

THE JUROR:  Uh-huh.

THE COURT:  -- which is that you're opposed to the death penalty but you could vote to impose it if you believed that the facts and the law in the particular case called for it.

THE JUROR:  Yes.

THE COURT:  Is that your view?

THE JUROR:  That is my view.

THE COURT:  So you do feel strongly against it?

THE JUROR:  I do.

THE COURT:  But you do think that in an appropriate case if the facts that you learned in the case suggested or said to you that this is an appropriate case for the death penalty, despite my general views, you could vote to impose it. Is that what you're saying?

THE JUROR:  I believe I could.

THE COURT:  Let me ask you to look at the bottom of page 25 and the top of 26.  First 95.  95 and 96 are kind of paired -- they're either side of the question, in a sense.

So 95 is if you found the defendant guilty and you decided that the death penalty was an appropriate punishment, could you conscientiously vote for the death penalty, and you

said you weren't sure.  And then the next question, if you found the defendant guilty and you decided that life imprisonment without the possibility of release was the appropriate punishment, could you conscientiously vote for life imprisonment, and you said yes.

THE JUROR:  Yes.

THE COURT:  So there's a slight variation in your -- how sure you are, I guess, might be one way of putting it.

THE JUROR:  Yes.

THE COURT:  Can you tell us a little bit about what you think about those?

THE JUROR:  Well, it would be difficult, if he were found guilty by the jury I was present on, to rule for the death penalty if there was an option for life imprisonment without parole.

THE COURT:  Let me just stop you right there because those are the two options.  There are no other options in this federal death penalty case.  The jury will have the choice of the sentence of death or sentence of life imprisonment without the possibility of release.  Those are the two available options.

So given that, I guess to pick up on what you were just saying, life imprisonment without the possibility of release is a possible option depending on how the jurors see

it.

So knowing that that would be an option, let's go back to Question 95 and the way it's asked.  First, the introductory clause to Question 95 is if you found the defendant guilty of a capital crime, right, and you would have voted for that verdict of guilty if you were part of the jury -- and he would have to have been unanimously convicted.  So it presupposes that you've already voted to find him guilty of a capital crime.  So then after evaluating the penalty phase evidence you decided that the death penalty was an appropriate punishment -- that's positing that you have decided that -- would you be able to then act on that decision and vote to impose the death penalty?

I think that's what the question is trying to get at.

THE JUROR:  I'm not sure.

THE COURT:  That's what you said.  Can you help us any more with that or we just have to leave it at that?

THE JUROR:  I think I'm going to leave it at that.

THE COURT:  Okay.  All right.  Any follow-up?

MR. WEINREB:  Sure.  Good afternoon.  My name is Bill Weinreb.  I'm one of the prosecutors in the case.

These questions are all sort of variations on a theme and they get at slightly different things.  So I want to follow up, if I could, on just a couple of things.  So you wrote that you're generally opposed to the death penalty.

THE COURT:  Can I just call a time out here?  The

reporters have to change.  I would like to do it when we change jurors, but there's a schedule issue.  So just to -- I'm sorry to interrupt.  Just do a quick change.

(Break to change court reporters, 3:30 p.m.)

(Resumed, 3:23 p.m.)

THE COURT:  Okay, go ahead, Mr. Weinreb.

MR. WEINREB:  So you told us on your questionnaire and here too that you're opposed to the death penalty, and that in fact you were part of an active campaign to abolish it in Massachusetts.

THE JUROR:  Uh-huh.

THE COURT:  You have to answer in words.

THE JUROR:  I'm sorry.  Yes.  I'm sorry, yes.

MR. WEINREB:  And so I gather your feelings in opposition to it are pretty strong.

THE JUROR:  Yes.

MR. WEINREB:  And in fact you said you think it serves no purpose.

THE JUROR:  The death penalty in general.

MR. WEINREB:  Serves no purpose.

THE JUROR:  And research indicates to me it does not serve -- it doesn't change behaviors.

MR. WEINREB:  Okay.  So given all of that, is it -- I mean, despite all of that, could you impose it?  Could you actually vote to impose it in any case?

THE JUROR:  It would depend on case and the factors. I mean, it would depend on the case.

MR. WEINREB:  So even though you believe it doesn't change any -- serves no purpose and you're opposed to it, you could still vote to impose it?

THE JUROR:  If the circumstances warranted, if it -- yes.

MR. WEINREB:  And what are some of the circumstances that could warrant imposing it?

MS. CLARKE:  That may be --

THE COURT:  No, I think I'll allow that question.

THE JUROR:  I think that the actions were so horrendous, uhm, the person had absolute intention of doing something so terrible, could I impose it because there was no chance that that person would be able to change?  Or would he be rehabilitated or she be rehabilitated?  I'd have to really be looking at the specifics of what the crime was, and if the person was totally in control and really, uhm, there are some things, uhm...  To purposely kill a child, uhm, I think that would be -- and even then, I would have to look very carefully at what the motivation was, where that person came from, what that person's background was.  I mean, there are a number of factors.  Maybe I mull things over too much.  I don't know.

MR. WEINREB:  Well, I'm not asking you to say, really, under what circumstances you would or wouldn't impose the death

penalty.  What we're really trying to get at here, or at least what I'm trying to get at, is whether your belief that the death penalty serves no purpose would prevent you -- whether you could impose a punishment despite believing it served no purpose.

MS. CLARKE:  Your Honor --

MR. WEINREB:  Just in any case really.  I guess you could say I'm a little hung up on that statement of yours, and maybe I misunderstood what you meant to say.

THE JUROR:  No, no, you probably understood my vagueness.  And the other piece is, it's part of the law.  So would I break the law?  No.  I mean, if I were a part of the process and -- now he's really confused.  If that's one of the choices in a case like this, then I would have to consider it.

MR. WEINREB:  Okay, fair enough.

THE JUROR:  Would I -- I mean, I will have to -- if that's the way it falls out, then I will have to consider it. I would not not consider it if it's a directive of the Court or of the law.

MR. WEINREB:  Okay.  And you do understand that the law never requires anyone to impose the death penalty.

THE JUROR:  I do.

MR. WEINREB:  It always would be a decision for each individual to make.  So all that the law requires is exactly what you said, that it be something that you could give genuine

consideration to and actually do if you believed that this was the exceptional case; despite the death penalty serving no purpose, it was the case that was an appropriate one for it in your mind.  Could you do all that?

MS. CONRAD:  Objection, your Honor.  I think this has been covered and asked and answered.

THE COURT:  Go ahead.  You can answer.  It's kind of a convoluted question, but --

MR. WEINREB:  Do you want me to reword it or no?

THE JUROR:  No.  You're asking questions the way I answer them.

(Laughter.)

THE JUROR:  I would be able to follow the direction of a court in the case.  I would not not do that.  And I tend to consider all sides, all the factors.  So that's the best I can give you.  I cannot say today how I'm going to feel or how I would feel should I be part of this process.  I do not know, except for I wanted to be honest with you.

MR. WEINREB:  Sure, and nobody can predict exactly how they're going to feel in any situation.  I don't want to belabor this too much.  All I want to do is just get a sense of whether your best assessment of yourself is that if you were instructed that during the penalty phase, if there is one, you should consider everything that you heard, and at the end of it make a decision, an intellectual decision, a moral decision, a

decision that takes into account your values, but if having done all of that and deliberating with the other jurors you came to the conclusion that this was the kind of case where the death penalty was appropriate, could you actually do it?  Could you vote to sentence someone to death?

THE JUROR:  I'm not sure.

MR. WEINREB:  I thought I would trick you into a better answer, but, okay.

THE JUROR:  I'm being honest.

MR. WEINREB:  I appreciate that.

MS. CLARKE:  Hi.  Good afternoon.

THE JUROR:  Good afternoon.

MS. CLARKE:  My name is Judy Clarke, and I'm one of Mr. Tsarnaev's lawyers.  And I feel your struggle and certainly appreciate your views, but I'm going to ask you a couple of things, if I can, about the death penalty.  What I hear you saying is that as a matter of policy, as a legislator, you would not vote to have a death penalty.  In fact, you'd vote against the death penalty.

THE JUROR:  Correct.

MS. CLARKE:  But as a citizen facing jury duty, you also would recognize that we want people in the jury box in a capital case who are both for and against the death penalty, right?

THE JUROR:  Yes.

MS. CLARKE:  I mean, it wouldn't be right, I guess, to have everybody in the jury box who is --

THE JUROR:  Had the same --

MS. CLARKE:  Or who is in favor of the death penalty or against it.

MR. WEINREB:  Your Honor, I object to this.

THE COURT:  Yes, I think so.

MS. CLARKE:  Sorry.

THE COURT:  A different question.

MS. CLARKE:  Oh, I'm going on.  I apologize to the Court, but I think we know where we're headed.  Mr. Weinreb asked you and the Judge asked you if you could sit with fellow jurors essentially and weigh the evidence, weigh the aggravation and waive the mitigation, and give fair consideration to whether the death penalty was appropriate, right?

THE JUROR:  Correct.

MS. CLARKE:  And what I hear you saying is that you could give that fair consideration.

THE JUROR:  I could.

MS. CLARKE:  And knowing that no juror ever has to vote to impose the death penalty, but if after fair consideration with the people in the jury room with you your conscience told you that the death penalty was an appropriate penalty in the particular case, the "not sure" answer you've

been giving us, what we really need to know is, could you vote to impose the death penalty?  If in your conscience, after a full and fair deliberation, you decided that was the right penalty, could you so vote?

THE JUROR:  I could, and I thought I had said that prior.  Yes.

MS. CLARKE:  So that's a little bit different than "I'm not sure."  I think that's all we're getting as to the gradation --

THE JUROR:  Oh, okay.

MS. CLARKE:  -- because we're sitting kind of on the fence, and the question is, if in fact you can give fair consideration to opposing views, weigh the aggravation and mitigation, and decide in your conscience that the death penalty is the right sentence in that particular case, could you actually vote for the death penalty?  And that's really the bottom line.

THE JUROR:  I could if -- yes.

MS. CLARKE:  If that's what you decided was right?

THE JUROR:  Yes, yes.

MS. CLARKE:  I won't badger you anymore.

MR. WEINREB:  Could I have one last follow-up question?

MS. CLARKE:  He will, but I won't.

(Laughter.)

THE COURT:  I think you just got permission.

MS. CLARKE:  Overruled.

MR. WEINREB:  Can you just explain, why before were you saying "I'm not sure" to that question and now you're saying you could?  Was it a different question, or is it just you changed your mind?

THE JUROR:  No.  Perhaps I didn't understand what you asked me.

MR. WEINREB:  Okay.

THE JUROR:  I'm not sure.  Do you want to rephrase your question or help me understand?

THE COURT:  I think we've been over it enough.

THE JUROR:  Okay, there's some ambivalence, so let's not deny that, on my part; but given the situation, mitigating circumstances, whatever it is, if I were part of a jury and that was the directive, I would give full consideration to all.  That's who I am.  That's all I know.

MR. WEINREB:  But the question was just, having given the consideration and you having determined that this was an appropriate sentence in the case, could you personally actually vote to sentence someone to death?

MS. CLARKE:  I think the question is if she thought it was the right thing to do.

THE JUROR:  I'll give you the same answer I gave your opposition:  Yes, I would consider all factors to the best of

my ability and to the completeness of my ability.

THE COURT:  Okay, thank you very much.  Just leave that there, the questionnaire.

(Juror excused.)

THE COURT:  Could we just cut the audio for a second.

(Courtroom cleared.)

SIDEBAR CONFERENCE:

THE COURT:  Before I bring the next, I had understood that the parties thought they had an agreement on this next juror.  I didn't see it, so that's why I didn't take him out. I didn't know what the issue was.

MS. CLARKE:  Police officer and official.

MS. CONRAD:  Exempt under the plan.

THE COURT:  Oh, oh, he's disqualified.

MS. CONRAD:  Yes.

THE COURT:  I missed it entirely.  There's no need to talk to him then.  So I guess we're done.  4:00 o'clock?

MS. CLARKE:  Sure.

THE COURT:  Is that okay?

(A recess was taken, 3:36 p.m.)

(Resumed, 4:06 p.m.)

THE COURT:  Okay, should we just run through the list?

MS. CLARKE:  Yes.

THE COURT:  219?

MR. WEINREB:  The government moves to strike 219.

MS. CLARKE:  And we have no argument to make.

THE COURT:  Yes, I'll strike that.  I think there are a number -- you know, it didn't necessarily appear -- I'm not sure whether she was having any language difficulty, but she seemed completely intimidated by the process, and I don't think that that's something we want in a juror who's sitting there. And then she gave some answers that also were disqualifying, but I might have done it just on her demeanor generally anyway, so she's out.

243?

MR. WEINREB:  No motion.

MS. CLARKE:  No motion.

THE COURT:  Okay.  244?

MR. WEINREB:  I think we agreed.

THE COURT:  I think so, yes.  245?

MR. WEINREB:  No motion.

MS. CLARKE:  No motion.

THE COURT:  246?

MR. WEINREB:  No motion.

THE COURT:  Okay.  250, I think we --

MR. WEINREB:  We agreed.

THE COURT:  -- agreed on.

MS. CLARKE:  We felt disqualified on guilt, but I think we agreed on --

THE COURT:  I think the -- yes, okay.

251?  Can I just say, something like that, if you could bring it up in advance, we could have saved 20 minutes by getting to the point.

MS. CONRAD:  I'm not sure -- you mean just the Facebook posts?

THE COURT:  Yes.  I mean, it was inconsistent with --

MS. CONRAD:  It wasn't necessarily inconsistent.  If it was flatly inconsistent, your Honor, then I would agree; but it was only when I inquired further that it was inconsistent. I mean, I have checked pretty carefully to see if it was inconsistent with the questionnaire.  I mean, ultimately I think it was in terms of his views about Muslims, but I'm not sure it was --

THE COURT:  I'm not so sure of that actually.

MR. CHAKRAVARTY:  Your Honor, I actually wanted to make a record on that one.  We're not opposing --

THE COURT:  Yes, I, by the way, and I'll maybe go last, have reasons apart from that.

MS. CONRAD:  Okay.  Yes, well, there's a *Morgan* issue.

MS. CLARKE:  So there's a strike?

THE COURT:  Yes, he'll be stricken, but do you want to say something on the record?

MR. CHAKRAVARTY:  So just another utility of having something like that that a juror is going to be confronted with being made known to the parties beforehand is not only so we

can know and prepare, but two things:  One is the fact of this Facebook post which depicts the ISIS flag, which is a terrorist organization which in October of 2014, when the profile picture was changed, had just beheaded I think its fourth aid worker, and the U.S. military was in an active bombing campaign and is in an active bombing campaign, and this person was a member of the 82nd Airborne.  The fact that this was on his profile page, to suggest that he somehow harbored an animus towards Muslims is an extension.  It's not that it wouldn't be fair cross-examination for a witness in trial, but using that as a premise to encourage this juror to confess some sort of animus or bias against Muslims I suggest to you is -- it's unfair to this untrained, unexpecting, a guy who already had his back up, frankly, is not used to these kinds of environments, and suggests, you know, a more hostile reaction than -- I mean, obviously he was more hostile than he ought to have been, but that was a defense mechanism, but it's less likely to get to the truth of what his feelings are is my point.

If we had it beforehand and we knew that that was going to be the intention of how it was going to be broached, we may have been able to explore more in a less confrontational way before than asking him to explain these other things.

A related point is, in addition to overextending, in my opinion, the animus towards Muslims, the other items which Ms. Conrad may have had to impeach him with with regard to what

other political views he had went to whether he had other opinions, which was not the question in the questionnaire. The questionnaire talked about whether somebody harbored strong opinions about certain things, whether about Muslims, about political affairs, these types of things. And it appeared in the line of questioning that that was taken as an open door to ask him about anything that he believed in and try to create a candor issue out of it. I think that's a dangerous road to go with any of these jurors, and they don't sign up for that when they come in here.

MS. CONRAD: May I respond to that, your Honor?

THE COURT: Yes.

MS. CONRAD: First of all, a couple of things: One, this juror's questionnaire presented as someone who is completely straight down the middle on everything, had no opinions about anything, hadn't formed any beliefs about the defendant's guilt or about punishment, was straight down the middle. On the death penalty, I mean, completely bland, and the Facebook page presented a different point of view.

Now, you know, I certainly was trying very hard not to be confrontational. My perception of this juror was, before I even opened my mouth, he was hostile to me. And I can't remember what the first question was, but it was something pretty bland. I think it was about Question 77, and, you know, not because his response had indicated -- you know, he didn't

even know it was for this case, had been sort of nonresponsive, and he was immediately hostile to me.

And so, you know, this is the problem, Judge.  You know, I mean, on the one hand, your Honor is suggesting that we front these issues.  If the response is going to be what I'm hearing Mr. Chakravarty say is, we shouldn't even get to ask him about it, he's presenting as having no views about Muslims whatsoever.  I understand that having a view about ISIS may be something different, but that's why I asked him what that cartoon represented to him, and he didn't say anything about ISIS in response to that question.  So this is why we need an opportunity to ask about these questions.

THE COURT:  Okay.  I still think it's helpful, if an issue like that comes up, just like the criminal record history, for us perhaps to have an opportunity to think about it and evaluate it before it gets sprung in the course of the voir dire itself.  I can tell you it would be helpful to me to think about what the parameters ought to be, okay?

MS. CONRAD:  Sure.  I appreciate that.

THE COURT:  So, anyway, so I think that's -- I don't want to weigh in on the merits of the controversy of what the content and effect of his opinions may or may not be.  What concerns me about him is his volatility.  And perhaps he was pushed a little bit, but, you know, some of the others get pushed too.  So I don't want a juror with a short fuse of the

type that he displayed, so that's a prime reason for me thinking that he should not be on this jury.

I do have some sense that he was not as candid as he should have been in the questionnaire, although I don't know that it's necessary to plumb that too deeply, but I don't think he's a proper juror for this case.

MS. CLARKE: So is that an agreed strike or a defense strike granted or a Court's getting rid of him anyway?

MS. CLARKE: All of the above.

(Laughter.)

THE COURT: 255 we excused for hardship. We designated for excuse, I should say.

MS. CLARKE: Yes.

MR. WEINREB: Right.

THE COURT: Since we have not excused anyone yet. We have designated them for excuse.

MS. CLARKE: Right, for hardship.

THE COURT: 258?

MR. WEINREB: No motion from anyone.

THE COURT: No motion, okay. So the net I have is 243, 245, 246, 258.

MS. CLARKE: That's correct.

THE COURT: Now, for next week, have you been able to look at the takeouts?

MS. CLARKE: We have. Yes, we've been able to look

all the way through the Court's list, and there are some discussions going on about any additional ones.  The government has proposed some, we've proposed some, and we're still looking at them.

THE COURT:  Well, I don't know how deep -- this is the next topic -- how deep we want to go into the list for Monday and Tuesday.  At least for Monday, I'd like to have that set because Jim can then --

MS. CLARKE:  And I think that's what he was about to finish with us.

THE COURT:  Okay, I don't think I brought that list.  Do you have a copy?  The list of numbers?  Let me see if it's in my pile here.

MS. CLARKE:  This list?

THE COURT:  That one, yes.

MS. CLARKE:  There it is.  I can tell you, Judge, who we've agreed on, agreed with the Court on.

THE COURT:  Okay, is it easier to say that or the ones that you have an issue with?

MS. CLARKE:  Easier to say the ones we've disagreed with.

THE COURT:  Yes, okay.

MS. CLARKE:  311, 358, 393, 414, and 421, and I'm speaking for both parties.

THE COURT:  Okay, then we'll leave them in.  I won't

even look at them.  We'll just leave them in if you both want to see them.

MS. CLARKE:  Well, there wasn't agreement on all four, all of them, but --

MS. CONRAD:  One party or the other --

MS. CLARKE:  One party or the other --

THE COURT:  So your treaty is that you'll respect each other's objections, and you will put them in rather than argue about it.

MS. CLARKE:  Right.

THE COURT:  Fine, fine.

MR. WEINREB:  Generally they're ones who I think, at least from the government's point of view, seems there's enough ambiguity that we'd like to ask them.

THE COURT:  Okay, so we're around 260, I think is the next one.

MS. CLARKE:  There's another one in the group that would come in on Monday, or whenever the snow stops, that I think the parties have agreed to.

THE COURT:  Agreed to be excused?

MS. CLARKE:  Yes.  276.

THE COURT:  Well, wait a minute.  First of all, let me get the range.

THE JURY CLERK:  So 237 is actually the first juror, but that's because of a trip.  And then we've got 260 through

298 is the twenty, depending on how deep you wanted to go.

MR. WEINREB:  298 or 296?

MS. CLARKE:  You stopped on eighteen.

THE JURY CLERK:  I stopped on eighteen.  296 was eighteen, 297 and 298 --

THE COURT:  I think eighteen is fine actually.  I mean, we took a long time today, so --

THE JURY CLERK:  But there's also, I think, one other juror that --

MS. CLARKE:  276 would be the one of that potential that --

THE COURT:  That you agree should go out?

MR. WEINREB:  Yes.

THE COURT:  Can I just see who that is.  Okay, I haven't looked at that one.  So, okay, on agreement we'll exclude, at least for the time being.  I'll look at it.  If I disagree, we'll bring her in some other time.  Okay.  So if we went eighteen but -- so to 2 -- what was it?  What was the high number?

THE JURY CLERK:  296.

THE COURT:  So there would be three numbers in -- does that take account of 282, 291, and 294?

THE JURY CLERK:  It does.  It takes them, yes.

THE COURT:  Okay.

MS. CLARKE:  And 248 would come in on a different day?

THE COURT: Yes. It's a family situation. She has a -- she actually put this in her -- it was one of the things I was going to ask her about in her hardship, that her grandmother was ill, and the report we got this morning was, she was on her way to the hospital, her grandmother was dying. So we just don't know what the circumstance is or how long that would be. Jim can tell you, but she otherwise seemed responsive to the idea of coming in at some point. She just couldn't do it today.

MS. CLARKE: Sure.

THE COURT: So we'll monitor that. I guess that's it.

MS. CLARKE: Your Honor, well, while all parties are still here, we still have an outstanding request for the jury data. Now, I know there are only seven days in the week and --

THE COURT: We'll get the order done. It's still in process, right?

THE LAW CLERK: It is.

THE COURT: Yes, yes. We have the order all prepared. We just haven't filed it. It's going to mimic the order you had before pretty much, and they've already started working on it, so that's where it is.

THE JURY CLERK: We're working on it. The snow threw us off with childcare issues with the IT person that is helping me, so I will touch base with him hopefully -- I think he might have left, but I will touch base with him first thing on Monday

morning, snow pending.

MS. CLARKE:  Thanks.

THE COURT:  Okay?  Can I just mention -- yes, go ahead.

THE JURY CLERK:  Snow.

THE COURT:  Yes, I don't know.  I mean, it changes -- I thought today was going to be worse than it was based on what people were saying.  You get into this mode where you have a big snowstorm, and then everybody freaks at the next half inch.

MS. CLARKE:  That would be a fair assessment.

(Laughter.)

THE COURT:  So --

THE JURY CLERK:  And the only reason I ask is --

THE COURT:  I don't know, we'll just have to make a call, I think, on Sunday when we have a report of some kind, I guess.

MS. CLARKE:  Well, if the schools are closed --

THE JURY CLERK:  That's kind of what I was thinking.  Like, we were discussing earlier about the Court's policy.  Do we play it by ear?  Because, I mean, I can do it from home, so --

MR. WEINREB:  The thing about the schools closing is that if you have a jury trial ongoing, you need all twelve jurors, so if school is closed, you're almost guaranteed to miss one, and there's no point the rest coming in.  But here,

if a few can't make it, we can go ahead with the ones who do make it.  I'm not sure it makes the same -- it doesn't automatically make sense if the schools are closed.

THE COURT:  Yes, and I guess my reservation about this longstanding policy is, it's a pretty blunt instrument, and it's being made on criteria that we would not necessarily be using.  You know, there's school kids, there's buses, and a lot of kinds of things that the superintendent, or whoever makes the call, might be thinking of that don't really pertain to the difficulty that our people would have coming in.  So where it's a smaller -- I don't know, and where our technology has increased in the communications, it might be better to have our own system rather than just rely on that one.  And so that's what I started to say is, if we could see what the conditions seem to be, and maybe Jim and I can talk on Sunday afternoon or something like that --

MS. CLARKE:  Just e-mail us?

THE COURT:  -- and just let you know if we think the storm looks imminent and bad enough that we should call it off, and then the jurors can be called, I guess, right?

THE JURY CLERK:  And as a Giants fan, I'll not be --

(Laughter.)

THE JURY CLERK:  -- the Superbowl, so --

THE COURT:  We'll do it before then.

MR. WEINREB:  Yes, since nobody will be answering

their phone during that time anyway.

THE COURT:  I guess that's it.  Okay, good.  Thank you.

(Adjourned, 4:23 p.m.)

C E R T I F I C A T E


         We, Marcia G. Patrisso, RMR, CRR, and Lee Marzilli,

RPR, CRR, Official Reporters of the United States District

Court, do hereby certify that the foregoing transcript

constitutes, to the best of our skill and ability, a true and

accurate transcription of our stenotype notes taken in the

matter of Criminal Action No. 13-10200-GAO, United States of

America v. Dzhokhar A. Tsarnaev.


/s/ Marcia G. Patrisso
MARCIA G. PATRISSO, RMR, CRR
Official Court Reporter

/s/ Lee Marzilli
LEE MARZILLI, RPR, CRR


Date:  1/30/15