UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                                    )
UNITED STATES OF AMERICA,           )
                                    )
         Plaintiff,                 )
                                    )   Criminal Action
v.                                  )   No. 13-10200-GAO
                                    )
DZHOKHAR A. TSARNAEV, also          )
known as Jahar Tsarni,              )
                                    )
         Defendant.                 )
                                    )
```

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

**JURY TRIAL - DAY THIRTEEN**

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, February 4, 2015
10:11 a.m.

Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

APPEARANCES:

    OFFICE OF THE UNITED STATES ATTORNEY
    By: William D. Weinreb and Aloke Chakravarty,
    Assistant U.S. Attorneys
    John Joseph Moakley Federal Courthouse
    Suite 9200
    Boston, Massachusetts  02210
    - and -
    UNITED STATES DEPARTMENT OF JUSTICE
    By: Steven D. Mellin, Assistant U.S. Attorney
    Capital Case Section
    1331 F Street, N.W.
    Washington, D.C.  20530
    On Behalf of the Government

    FEDERAL PUBLIC DEFENDER OFFICE
    By: Miriam Conrad, Federal Public Defender
    51 Sleeper Street
    Fifth Floor
    Boston, Massachusetts  02210
    - and -
    CLARKE & RICE, APC
    By: Judy Clarke, Esq.
    1010 Second Avenue
    Suite 1800
    San Diego, California  92101
    - and -
    LAW OFFICE OF DAVID I. BRUCK
    By: David I. Bruck, Esq.
    220 Sydney Lewis Hall
    Lexington, Virginia  24450
    On Behalf of the Defendant

P R O C E E D I N G S

(The venire enters the courtroom at 10:11 a.m.)

THE CLERK:  All rise for the Honorable Court.

(The Court enters the courtroom at 10:12 a.m.)

THE CLERK:  Be seated.

THE COURT:  Good morning.

THE JURORS:  Good morning.

THE COURT:  Thank you for being here.  We're continuing the process of selecting a jury for the case of United States versus Dzhokhar Tsarnaev.  As you know, Mr. Tsarnaev is charged in connection with the bombing that occurred near the finish line of the Boston Marathon on April 15, 2013, and that resulted in the deaths of three people. He's also charged in the death of an MIT police officer and other offenses that occurred on April 18 and 19, 2013.

Some, but not all, of the crimes charged are, by statute, potentially punishable by death.  You will recall from my prior instructions that the jury will first consider and decide whether the government has proved Mr. Tsarnaev's guilt of any or all of the charges against him.  If he is convicted of any of the capital crimes, that is crimes potentially punishable by death, the jury will then consider and decide whether he will be sentenced to death for any such crime or to life in prison without the possibility of release.

Some of you may wonder why the death penalty could be

a possibility in this case in view of the fact that the laws of Massachusetts do not provide for the death penalty for murder or any other violation of Massachusetts law.  The reason is that this is a federal case involving violations -- alleged violations of the laws of the United States rather than a state case involving violations of the laws of Massachusetts.

If the jury convicts the defendant of any of the capital crimes charged in the indictment, the same jury will hear additional evidence and then decide whether to sentence him to death or to life imprisonment without the possibility of release.  Because the jury that is selected to decide the defendant's guilt or innocence will also decide his punishment if he is convicted, it is necessary to question prospective jurors about your feelings and beliefs about the death penalty as part of the process of selecting the jury.

Let me briefly explain the procedures that must be followed in a case in which the death penalty is or may be at issue.  As in any criminal trial, initially the government will have the burden of proving that Mr. Tsarnaev is, in fact, guilty of any crime with which he is charged.  If he is convicted by the jury of a crime for which the death penalty may lawfully be imposed, there will be a second phase to the trial, usually referred to, in shorthand, as the penalty phase.

In the penalty phase, if there is one, the government will introduce evidence that seeks to prove beyond a reasonable

doubt, first, that Mr. Tsarnaev acted with sufficient intent to be subject to the death penalty; and, second, that aggravating factors about the killings or the defendant justify sentencing him to death.

Aggravating factors are circumstances that, if proven, make the crimes particularly serious or blameworthy and, therefore, under the law may justify imposing a more severe sentence on this defendant compared to other persons who are convicted of intentional killing or murder.  The government will bear the burden of proving any alleged aggravating factors to every juror beyond a reasonable doubt.

The defense will have the opportunity to present evidence of what it will argue are mitigating factors. Mitigating factors are usually circumstances about the crimes or about the defendant's background or character that would suggest that the death penalty is not the appropriate sentence in the case, or that life imprisonment without possibility of release is adequate to punish the defendant for the crimes.

Unlike the proof of aggravating factors, a mitigating factor need only be proven by a greater weight of the evidence. That is a less demanding standard of proof than proof beyond a reasonable doubt.  Again unlike the proof of aggravating factors, mitigating factors do not have to be proven to the satisfaction of all 12 jurors.  Any juror who finds or determines that a mitigating factor has been proven by a

greater weight of the evidence, may consider that factor in deciding on an appropriate sentence in the case regardless of whether any or all of the other jurors agree that the mitigating factor has been proven.

After the parties have made their presentations during the penalty phase, the jury will then weigh all the evidence. Before a jury could vote to impose the death penalty, every juror would have to be persuaded that certain threshold factors that make Mr. Tsarnaev potentially subject to the death penalty have been proven beyond a reasonable doubt.  In addition, in order to impose the death penalty, every juror would have to be persuaded that any proven aggravating factors sufficiently outweigh any mitigating factors found by any juror or jurors to justify a sentence of death.  Even if the jury did not find any mitigating factors, it would still have to be unanimously persuaded that any proven aggravating factors were themselves sufficient to justify a death sentence.

You should understand the jury is never required to find that a sentence of death is justified.  The decision whether the government has proven that a defendant should be sentenced to death must ultimately be made by each juror himself or herself.  If, however, every juror is persuaded that the death penalty should be imposed, I would be required, as the trial judge, to sentence the defendant to death.  In other words, I could not change the jury's decision.  The jury, and

not the judge, is responsible for determining whether a defendant who is convicted of a capital crime will live or die.

What I've just described is only an overview of the law applicable to the jury's consideration of the death penalty. If you are selected to serve on the jury and you find the defendant guilty of a crime or crimes punishable by death, I will give you very detailed instructions concerning your duties in deciding whether to impose the death penalty or life imprisonment without possibility of release and the law that must be followed in making that decision.

When you filled out the questionnaires, we told you that there were no right or wrong answers to any of the questions that you were being asked in the questionnaire, and that is true of the questions being asked today. We are asking these questions because both the government and the defendant are entitled to a jury that does not have its mind firmly made up one way or another before hearing evidence and a detailed explanation of the law. That applies both to whether the defendant is guilty or not guilty of the specific crimes that are alleged in the indictment, and if he's convicted of a capital crime, whether he should be sentenced to death or to life in prison without the possibility of release.

So today we're going to follow up on some of the answers you gave in your questionnaires by questioning each of you individually about issues that are pertinent to the

selection of the jury.  We will call you into the courtroom one by one.  You'll go back to the room that you've just been in and you'll come back into the courtroom one by one and we'll ask you some questions.  There will be a few people in the room in addition to the lawyers and their staffs.  And the proceedings are being simultaneously transmitted by video and audio to overflow courtrooms.

We will not identify you by name, but rather by number, and you'll be seated so that the video camera will be behind you.  Your answers will generally be public, but if you believe a truthful answer would require you to reveal sensitive personal information, we will temporarily stop the audio transmission to those other courtrooms so that people observing there will not hear your answer.

Again, we do not expect any particular answer to any of the questions.  All we want, and what the law expects, is that you provide accurate and truthful answers to the questions you are asked.  If you do that, you will be doing your duty as a citizen and as a juror no matter what the answers may be.

I want to take a moment to remind you about some of the prior instructions.  As I told you before, the jury's verdict must ultimately be based on the evidence produced at trial and must be free of outside influence.  Therefore, I remind you again that it is extremely important that you do not discuss the case, including the jury selection process, with

your family, your friends, each other or any other person until either you have been excused or, if selected as a juror, until the case has concluded.  And, of course, you're not to conduct any independent research about the case either online or otherwise, and to avoid reading, watching or listening to news reports about the case through the media.

When you signed the questionnaires, you may recall that you signed under the statement that the answers were true, you were affirming that under the penalties of perjury.  It's a solemn undertaking to assure the truthfulness of the answers.  Similarly, with respect to the questions today, the law requires that you take an oath to be truthful in your answers, and the clerk will now administer that oath to you.

THE CLERK:  Will the jurors please rise and raise your right hand.

(The venire is duly sworn.)

THE COURT:  Okay.  Jurors, we'll ask you to withdraw now, and we'll have you back one by one to proceed with the questioning.

(The venire exits the courtroom at 10:23 a.m.)

THE COURT:  Off the record for a minute.

(Discussion at sidebar and out of the hearing of the jury:)

THE COURT:  We have Juror 248 who was postponed because of a family situation.  I don't know if you know the

outcome of the situation.

Can you ask Jim?

(Pause.)

THE COURT:  Are we on?

JURY CLERK:  Audio is off.

THE COURT:  We're ready to be on.  We can be on.

MR. CHIAVARAS:  Okay.  We're ready to roll.

THE COURT:  Okay.  Go.

(Laughter.)

(In open court:)

THE CLERK:  Juror No. 237.

THE COURT:  237?

MS. CLARKE:  237 and then 248.

THE COURT:  I didn't have 237.

THE CLERK:  I have her questionnaire right here.

THE COURT:  I was told 248 but I was not told about 237.  So we'll have to wait on that.  Can I just see the --

THE CLERK:  Yeah.  Yeah.

THE COURT:  I guess we can do it.  I'll just go through it.

THE CLERK:  Juror 237.

THE JURY CLERK:  Juror 237.

THE CLERK:  Sir, over here, if you would.

(The juror enters the courtroom.)

THE CLERK:  Have a seat.  Speak into the mic so

everybody around here can hear you, okay?

THE JUROR:  Yes.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  Since you were last here, have you been able to follow my instructions to avoid any discussion of the case or any exposure to media accounts of the proceedings?

THE JUROR:  Yup.

THE COURT:  Yes?

THE JUROR:  Yes.

THE COURT:  The stenographer is taking down what we say so you have to answer --

THE JUROR:  Okay.

THE COURT:  -- in a way she can hear it.

So that's the questionnaire that you filled out, and I'm going to follow up on some of the questions you gave.  You were concerned about the -- I guess the time implications of your serving on the case.  Can you tell us about that?  I'm looking at page 5, Question 10.

THE JUROR:  Yes.

THE COURT:  Could you explain that?

THE JUROR:  Page 5 is projects.  I have two projects currently that would be coming, you know, an issue.

THE COURT:  Tell us about it.

THE JUROR:  No one else --

THE COURT:  How would it be an issue?

THE JUROR:  Because no one else would be working on it.  So that would be -- that would be one of the issues.

THE COURT:  So let's -- I want to go -- I'm now looking at Question 26 which is where we ask about your employment.  Can you tell us about your employment.

THE JUROR:  Number 26?  I'm an architect.

THE COURT:  Yeah?

THE JUROR:  I --

THE COURT:  Who do you work for?

THE JUROR:  I work for TRO Jung Brannen in Boston.

THE COURT:  And what is your position there?

THE JUROR:  I'm an associate principal.

THE COURT:  What does that mean?

THE JUROR:  I'm a partner of the firm.

THE COURT:  And --

THE JUROR:  One of the partners.

THE COURT:  How big is the firm?

THE JUROR:  150 people.

THE COURT:  And how many associate principals are there?

THE JUROR:  I believe there's 15.

THE COURT:  It indicates that you supervise people?

THE JUROR:  Yes, I do.

THE COURT:  How many people do you supervise?

THE JUROR:  About five.

THE COURT:  Are they -- is that sort of a regular team or do the five people you supervise change from time to time?

THE JUROR:  They change from time to time.

THE COURT:  And in general terms what are the projects you're concerned about?  What kinds of projects are they?

THE JUROR:  Projects overseas.

THE COURT:  Where?

THE JUROR:  In Kuwait and Saudi Arabia.

THE COURT:  And does it require you to travel?

THE JUROR:  Yes, I do.

THE COURT:  Do you have travel planned in the next few months?

THE JUROR:  The plan changes all the time.  I just came back from a trip last week.

THE COURT:  To the Middle East?

THE JUROR:  Yes.

THE COURT:  And how long were you there?

THE JUROR:  A week.

THE COURT:  Do you have -- do you currently have plans to return?

THE JUROR:  The end of February is the first trip, and possibly the end of March.

THE COURT:  Is there anything further?

MS. CONRAD:  If I may on the hardship issue, your

Honor?

THE COURT:  Go ahead.

MS. CONRAD:  Thank you.  Good morning, sir.  My name is Miriam Conrad.  I'm one of Mr. Tsarnaev's attorneys.

THE JUROR:  Good morning.

MS. CONRAD:  Are there other people working with you on these projects?

THE JUROR:  Yes.

MS. CONRAD:  And would they be able to fill in while you were serving on this jury?

THE JUROR:  They would have to.

MS. CONRAD:  And so would that be sufficient to keep the project on track?

THE JUROR:  I'm not sure.

MS. CONRAD:  Is it something where, given the schedule of nine to four, Monday through Thursday, you would be able to maintain supervisory responsibility either remotely or on the days that we're not sitting for trial?

THE JUROR:  It would be difficult.

MS. CONRAD:  I understand it would be difficult and I appreciate that.

THE JUROR:  Because this is a very large project and we only have a time frame of one year.

MS. CONRAD:  What's the deadline for completion of the project, if you don't mind my asking?

THE JUROR:  2018.

MS. CONRAD:  And so it's in the early stages at this point?

THE JUROR:  Yes.  The design phase is only until the summer.

MS. CONRAD:  And when you travel to these locations in the Middle East, do other members of your firm or other employees of your firm travel with you?

THE JUROR:  Yes, there will be engineers.

MS. CONRAD:  I'm sorry?

THE JUROR:  There are engineers.

MS. CONRAD:  And are you the only architect that travels?

THE JUROR:  There's another architect.

MS. CONRAD:  So would these trips be able to go forward in your absence?

THE JUROR:  It would have to.

MS. CONRAD:  Thank you.

THE COURT:  Okay.  Let me ask you to look at page 15.

THE JUROR:  Yes.

THE COURT:  We asked actually -- beginning on page 14 with Question 44, we asked a series of questions about whether you had strongly positive or negative views about first prosecutors and then about defense attorneys, and then in Question 46, if you had strongly positive or negative views

about law enforcement officers, and you wrote, "Feeling distrust of law enforcement in the current high-profile events covered in the media."

THE JUROR:  Right.

THE COURT:  Tell us about --

THE JUROR:  That was -- at the time I think most people would feel the same way, you know, similar way because of the events that happened.

THE COURT:  What are the events you're talking about?

THE JUROR:  Ferguson and some other cities.

THE COURT:  Okay.

THE JUROR:  It was televised.

THE COURT:  Do you think that would affect your attitude toward law enforcement witnesses in this case?

THE JUROR:  I'm not sure.  And it was -- at the time, you know, there was influence on how people think.

THE COURT:  Okay.  Looking at the -- at page 19, Question 74, we asked what did you -- what your reaction was, I guess, when you got a jury summons, and you thought it was for this case.  And you said, "It felt somewhat emotional."  Can you explain what you meant by that?

THE JUROR:  Well, I live in Boston, you know, and just like most people in Boston, they're affected by this particular case.  And I think -- you know, I think everyone would have imagery, you know, remind of the event that happened at that

time.  We live in Boston, we are 24/7, you know, we got informed about the case at the time.  And also friends, they're in the Marathon.  And so that's why.

THE COURT:  And do you think that your experience in seeing those things at the time is something you would not be able to set aside in listening to the evidence in the case and -- what we ask jurors to do is in any case -- and I guess you've had service on a jury before, a criminal jury?

THE JUROR:  Yes.

THE COURT:  So you know that in a criminal trial the defendant is presumed not guilty unless the government proves by the evidence at trial that he's guilty and proves it beyond a reasonable doubt.

THE JUROR:  Correct.

THE COURT:  So it's not surprising that people have some ideas about the events that underlie this case.  The question is whether a juror can compartmentalize or set those previously held ideas aside, pay attention to the body of evidence produced in the case and make a decision about whether the defendant is guilty or not guilty of any of the charges based on that body of evidence and not knowledge from any other source.  So I guess the question is:  Would you be able to do that?

THE JUROR:  I think because of this particular case, it was widely televised, excessively, so it's different than

the case I served before.  I did not have much information, much knowledge about those cases.  But this particular case is so excessively televised that it would be hard to believe the evidence otherwise.

THE COURT:  Okay.  Let me ask you to look at page -- the bottom of page 20, Question 80.  One of your coworkers was near or at the scene of the explosion.  Can you just --

THE JUROR:  She was in the restaurant.  I think she -- she was right at the -- she saw.

THE COURT:  Was she injured in any way?

THE JUROR:  No, she was inside the restaurant.  They won't allow her to go out.

THE COURT:  And your best friend's father, you say, was in the race?

THE JUROR:  Yup.

THE COURT:  Was he harmed in any way?

THE JUROR:  No.

MR. WEINREB:  Your Honor, I think...

THE COURT:  Are you all set?

MS. CLARKE:  Yes.

THE COURT:  All right.  Thank you, sir.

(The juror is excused.)

THE CLERK:  Juror No. 248.

THE JURY CLERK:  Juror 248.

(The juror enters the courtroom.)

THE CLERK:  Over here, please.  Have a seat, if you would.  Speak into the mic so everyone around here can hear you, okay?

THE JUROR:  Okay.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  Since you were here to fill out the questionnaire, have you been able to follow my instructions to avoid any discussion of the case and as much as possible to avoid any exposure to media accounts?

THE JUROR:  Just work knows I'm here.

THE COURT:  I'm sorry?

THE JUROR:  Just work knows I'm here.

THE COURT:  That's the questionnaire you have -- you filled out.  And we have it in front of you because I'm going to follow up on some of the questions.

Let me ask you to turn to page 5.

THE JUROR:  Okay.  Sorry, I'm nervous.

THE COURT:  And your answer to Question 10.  Can you expand on that or tell us what the situation is these days?

THE JUROR:  Yeah.  She's actually currently in ICU.  And she's a little more stable now, but we don't really know what's going to happen.  She has kidney failure and a parathyroid issue and some other stuff going on.

THE COURT:  And how will it affect you personally in terms of your schedule, or particularly your ability to serve on the case?

THE JUROR:  I've been there almost every day since she's been in ICU.  So depending on how things go, it probably will affect, I think, my ability to come, I believe, depending on her condition.

THE COURT:  In addition to visiting her, are there things you have to do?

THE JUROR:  My mom is her proxy, so there's nothing I really have to do; it's just being there for moral support.

THE COURT:  Okay.  Tell us what you do for employment.

THE JUROR:  I'm in construction project management, so...

THE COURT:  How big is the company?

THE JUROR:  About 100 people.

THE COURT:  Okay.  And how many -- it says on the form you're an assistant project manager?

THE JUROR:  Yup.

THE COURT:  How many assistant project managers are in the company?  How many other people do the work you do?

THE JUROR:  I would say there's 15 of us, maybe a little less.  It depends on interns and stuff too.

THE COURT:  We asked about your social media use, and you use a variety of things, I guess, with varying degrees of

frequency.

THE JUROR:  Uh-huh.

THE COURT:  Is it mostly personal, family/friends kind of things?

THE JUROR:  Yeah.

THE COURT:  Do you do any business posting or anything like that?

THE JUROR:  LinkedIn but nothing really.

THE COURT:  Any commentary on public affairs or anything on any of --

THE JUROR:  Not really, no.  I mean, Patriots stuff maybe.

THE COURT:  Looking at page 12, Question 34, we asked if you or a family member or somebody close to you worked for a law enforcement agency.  And you said your --

THE JUROR:  My step uncle.

THE COURT:  -- step uncle.

Sort out the family relationship a little bit there.

THE JUROR:  Yeah.  My stepdad has been my stepdad since I was about four, and it's his brother.  And he's with the Waltham Police Department.

THE COURT:  And is it somebody you see on a regular basis?

THE JUROR:  Holidays sometimes.

THE COURT:  I think you said later in the form -- I'm

looking at page 20, the bottom, Question 80 I think is the same person --

THE JUROR:  Yes.

THE COURT:  -- was on a SWAT team during the events related to this case in Watertown?

THE JUROR:  Yup.

THE COURT:  Have you talked to him about that?

THE JUROR:  No; my mom just told me.

THE COURT:  How long has he been with the Waltham police, do you know?

THE JUROR:  As long as I've known him, so probably at least 20 years.

THE COURT:  Yeah, okay.

There are probably going to be Waltham police officers involved in this case.  I don't know that for sure but I wouldn't be surprised.

MR. WEINREB:  I don't believe there are.

THE COURT:  Oh, you don't?  Okay.

Well, there will be people who participated in the Watertown events who are police officers.  The fact that you have a relative who was in that position, would that affect your impartiality in assessing that evidence?

THE JUROR:  I don't think -- I didn't talk to him about it so I don't think that would really affect anything.  I mean, I know it was stressful for my cousins but -- because he

has two young kids, but that's all I really know.

THE COURT:  Can we cut the audio?

(Discussion at sidebar and out of the hearing of the public:)





THE COURT:  We talked about the uncle that you said works for the -- step uncle that works for the Waltham Police Department.  Are there other family connections to law enforcement?

THE JUROR:  They have another brother but I think he works in Rhode Island, and I haven't talked to him in a very long time.  Probably more than five years.

THE COURT:  Is he a law enforcement officer?

THE JUROR:  I think so.  I don't know if he's a trooper.  I don't know what he's been up to.

THE COURT:  What does your father do?

THE JUROR:  My dad?

THE COURT:  Or your stepfather.

THE JUROR:  My stepfather works in construction as well.

THE COURT:  Okay.  Would that experience have any effect on your service as a juror?

THE JUROR:  No, I just wanted to note it, I guess.

THE COURT:  Let me ask you to turn to page 20 again.

THE CLERK:  Judge, do you want to go back on?

THE COURT:  I'm sorry.  Yes.  Thank you for reminding me.

(In open court:)

THE COURT:  I draw your attention to Question 77 on page 20.  In that question we asked whether you'd formed an opinion about whether the defendant was guilty or not and then about possible punishments.  And as to whether he's guilty, you said "yes"; as to possible punishment of the death penalty or not, you said "unsure."  And then below that we asked if you had answered yes to any of the questions, would you be able or unable to set aside your opinion and base your decision about guilt and punishment solely on the evidence presented in court, and you said you thought you were able to.

THE JUROR:  Uh-huh.

THE COURT:  So it's not surprising that people have some ideas about what happened in this case because of the extensive coverage of it.

In any criminal prosecution a person accused is presumed innocent unless the government proves otherwise by the evidence at trial, and proves the person is guilty beyond a reasonable doubt.  We ask jurors to focus on the evidence at trial and make their decision solely on that basis.

If you were a juror in the case do you think you would be able to set aside what you might have learned from publicity, and so on, and focus on the evidence in the case and make a judgment about that in accordance with the expectations?

THE JUROR:  I'm not sure.  I want to say yes but I don't know if, in the moment, I would be able to.  I don't know.  I'm sorry.

THE COURT:  In Question 78 you said, "I would be willing to hear both sides."  That was kind of volunteered by you.

THE JUROR:  Yup.  I've had a little bit more time to think about it.  And just being in that room the first time kind of -- and like seeing and everything, kind of, it made me think about things a little more once I was at home, not just in a room trying to fill things out.

THE COURT:  Okay.  Why don't we go to the next page.

THE JUROR:  Yeah.

THE COURT:  You were affected in that you sheltered in place along with other people?

THE JUROR:  Yup.

THE COURT:  And then the next question we asked about, you know, Boston Strong merchandise and things like that.  You said, "I live in the Boston area.  It's everywhere."

THE JUROR:  Yeah.

THE COURT:  Do you have any Boston Strong things,

stuff?

THE JUROR:  Yeah, like family members do and -- yeah.

THE COURT:  But you do?

THE JUROR:  Yeah, like bracelets or whatever, yeah.

THE COURT:  We asked a series of questions about the death penalty beginning on page 23.

THE JUROR:  Yup.

THE COURT:  In Question 88 we asked for your general views.  You said you thought it was acceptable in some cases.

THE JUROR:  Yup.

THE COURT:  Then you added that in this case you thought it was the easy way out?

THE JUROR:  Yeah.

THE COURT:  So you have an opinion already about the death penalty in this case?

THE JUROR:  Well, I think in all kind of acts like this, that people go into it thinking that they're going to be a martyr for their cause, and they kind of go into it accepting that it's a possibility that they could die anyways.  So I don't know if that was the defendant's thoughts going into it, but in general I think that's the -- kind of the idea behind these kinds of acts.  So I don't know if that's the right punishment or not.

THE COURT:  I explained briefly this morning how the process goes.  If there's a conviction of a capital crime,

there would be -- the government would produce information about aggravating factors that made the crime seem particularly serious that perhaps deserving greater punishment than the average intentional murder, and then there would be mitigating evidence that might show that the death penalty was not the appropriate penalty and that life in prison might --

THE JUROR:  Yeah.  I don't know enough about what the mindset and everything was behind it, I guess.

THE COURT:  Well, I guess the question is would you be able to, if you were a juror, reserve your judgment on the question of the punishment until you've heard all the evidence in the penalty phase, in addition to whatever was heard in the first phase of the trial, and make a judgment following as best you could do conscientiously the legal instructions that you would get at that point or are you affected by the events, having personally lived through them and seen them and so on, in a way that would prevent you from fulfilling that duty as a juror?

THE JUROR:  I think -- I don't know.  This is hard.  I think I've already kind of formed this opinion.  I don't know if I could look past it as of right now.  Yeah, I don't know.  Sorry.

THE COURT:  Follow-up?

MR. WEINREB:  No.

MS. CLARKE:  I think we're agreed.

THE COURT:  Okay.  All right.  Thank you.

THE JUROR:  Okay.  Thanks.

THE COURT:  Just leave the form there.

THE CLERK:  Just leave it there, ma'am.

(The juror is excused.)

THE CLERK:  Juror No. 260.

THE JURY CLERK:  Juror No. 260.

(The juror enters the courtroom.)

THE CLERK:  Sir, over here, if you would, please. Have a seat.  And if you could do me a favor and speak into the mic so that everyone around the table can hear you, okay?

THE JUROR:  Okay.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  Since you were last here, have you been able to follow my instructions about refraining from discussion of the substance of the case --

THE JUROR:  Yes.

THE COURT:  -- and any media accounts as well?

THE JUROR:  Yes.

THE COURT:  So that's the questionnaire you filled out.  We're going to follow up on some of the answers.

I see that you are a graduate of MIT --

THE JUROR:  Yes.

THE COURT:  -- with a degree in electrical

engineering?

THE JUROR:  That is correct.

THE COURT:  Could you tell us the year of the degree.

THE JUROR:  1972.

THE COURT:  As you probably know, I think I may have even said it this morning, an MIT police officer was killed in the events that this case relates to.  Would your affiliation with MIT have any effect on your ability to be impartial in judging that particular charge or any of the other charges in the case?

THE JUROR:  No.

THE COURT:  Are you particularly active as an alumnus?

THE JUROR:  No.

THE COURT:  Tell us what you do for a living.

THE JUROR:  I'm a software architect working for a local company.

THE COURT:  What's the nature of the business of the company?

THE JUROR:  The company is developing software for the mortgage market.

THE COURT:  Okay.  We asked in Question 29 and 30 about -- and this is on page 10 and 11 -- about social media use.

THE JUROR:  Uh-huh.

THE COURT:  First on page 29 is whether you blog or

post messages, and so on, on other sites, and you've given us actually some websites that I guess you do.

THE JUROR:  Yes.

THE COURT:  Can you tell us a little bit about that?

THE JUROR:  Those are just websites associated with a science fiction publisher Baen and with one particular author whose works I'm interested in, Weber.  And they're just discussing the various science fiction books.

THE COURT:  Okay.  So that's kind of a hobby of yours?

THE JUROR:  Yes.

THE COURT:  Sci-fi?

THE JUROR:  Yes.

THE COURT:  Okay.  And then as to social media, LinkedIn and Facebook?

THE JUROR:  I attempt to stay active on LinkedIn largely for industry connections and job -- remaining active and networking in jobs.  My family is active on Facebook, and I occasionally look at it to see pictures that have been posted or whatever, but I avoid posting on it myself.

THE COURT:  Okay.  We asked about any family members in law enforcement.  You have a sister who's a, it says police dispatcher, in Eureka, California.

THE JUROR:  She was a police dispatcher a couple of years ago.

THE COURT:  Oh, I see the years.

THE JUROR:  That was a while back.  She is currently the teacher in the juvenile corrections department's prison.

THE COURT:  Also in Eureka?

THE JUROR:  Also in Eureka.

THE COURT:  I'd like you to turn to page 20.  I direct your attention to Question 77.  In this question we asked whether as a result of seeing things in the media you'd learned anything and formed an opinion about the case in particular -- we asked a multiple-part question first -- whether the defendant was guilty, and you said "yes"; and then in the C and D parts regarding whether he should be penalized by the death penalty, and you wrote "unsure."

THE JUROR:  Yes.

THE COURT:  And then below those questions we asked if you had formed an opinion whether you thought you'd be able or unable to set it aside and base your decision about guilt or punishment based on what you heard at the trial in evidence, and you indicated "able."

THE JUROR:  Yes.

THE COURT:  So I want to ask you about that.

THE JUROR:  Okay.

THE COURT:  It's not surprising in this case that people have some ideas about what happened.

THE JUROR:  Uh-huh.

THE COURT:  In a criminal prosecution, as I'm sure you

know, a defendant is presumed innocent unless the government proves him guilty by the evidence at trial, and proves it beyond a reasonable doubt.  We ask jurors to focus on the evidence at trial, to pay attention to that, and base their decision on that body of evidence without regard to things they might know from other sources.

And so the question I guess is:  Would you be able to do that if you were a juror in this case?

THE JUROR:  Yes.

THE COURT:  Can you tell us why you're confident of that?

THE JUROR:  I suppose I would have to say that I believe so.  I have never been a juror so I suppose I cannot claim experience, but I am familiar with making decisions based on specific sets of evidence and ignoring things that are unproven or that are not immediately relevant to a particular decision.  That's part of what I do in my job.

THE COURT:  Okay.  You personally weren't affected in any way by the unfolding of events surrounding the Marathon?

THE JUROR:  No, other than watching a lot of TV for a day or two.

THE COURT:  Okay.  I'd like now to -- we asked a series of questions about the death penalty and your attitudes towards it.  If you would turn to page 23, in Question 88 we began with asking a sort of general question, if you have any

general views, what are they.  You wrote, "Sometimes appropriate."

THE JUROR:  Yes.

THE COURT:  Could you maybe expand on that a little?

THE JUROR:  I believe that there are crimes and times for which a death penalty is the appropriate punishment.  That it is obviously a dangerous thing since you can't undo it, but given how long it takes before the death penalty is, in fact, enforced, it's not as immediately dangerous in terms of being -- in terms of miscarriage of justice as perhaps it could have been in the old days of give a fair trial in the morning and hang him that afternoon.  But this is one of the areas where because men are humans and not archangels, no perfect answer to the problem can be found.

THE COURT:  Okay.  In Question 89 we asked you to indicate on a scale of 1 to 10 where you might locate yourself in terms of strongly opposed to strongly favor.  You picked 7. Is that --

THE JUROR:  I think that's about...

THE COURT:  Okay.  In other words, you tend to favor but not -- it's not a strongly held or --

THE JUROR:  No.

THE COURT:  Okay.  Then in Question 90 we tried it a different way by asking you if there was a statement among the suggested ones that represented best your views about the death

penalty for someone who's been proven guilty of murder, and you selected D, which is, "I'm not for or against the death penalty.  I could vote to impose it or I could vote for life imprisonment without release, whichever I believe was called for by the facts and the law in the case."

THE COURT:  That's what you meant to select?

THE JUROR:  Yes, it is.

THE COURT:  And is that a fair summary of your attitude on the death penalty?

THE JUROR:  I believe so.

THE COURT:  In Question 95 and 96 we asked sort of related questions.  First -- this is at the bottom of page 25. First, in 95 we asked if you found the defendant guilty and decided the death penalty was the appropriate punishment, that's a decision you were making, could you conscientiously vote to impose the death penalty, and you said "yes."

THE JUROR:  Yes.

THE COURT:  And then we asked the same question about the other available penalty, if you thought -- if you found him guilty and you decided that life in prison without the possibility of release was the appropriate punishment, could you conscientiously vote for that punishment instead.

THE JUROR:  Yes.

THE COURT:  Follow-up?

MR. WEINREB:  No, your Honor.

THE COURT:  Follow-up?

MR. BRUCK:  Yes, please.

Good morning.

THE JUROR:  Good morning.

MR. BRUCK:  My name is David Bruck and I'm one of Jahar Tsarnaev's attorneys.  And I have a few follow-up questions, if that's okay.

THE JUROR:  Certainly.

MR. BRUCK:  You filled out on your form that the death penalty is sometimes appropriate, and then when the judge was questioning you, I think you said that "I believe there are times and crimes to which the death penalty is the appropriate punishment."

My question is, of course you know what case this is?

THE JUROR:  Yes.

MR. BRUCK:  And I understand you haven't heard all of the evidence --

THE JUROR:  Uh-huh.

MR. BRUCK:  -- but knowing what everyone has heard and assuming that, of course, you don't decide on the death penalty until the person's convicted -- so if you can sort of put yourself past the guilt phase of the trial and into the stage where a person's already been convicted, is this one of the times or one of the crimes for which the death penalty is the appropriate punishment --

MR. WEINREB:  Objection.

MR. BRUCK:  -- in your view?

MR. WEINREB:  For one thing, the premise of the question is "you know what everyone has heard," which is not an appropriate --

THE COURT:  Right.

MR. BRUCK:  Perhaps I could rephrase it?

THE COURT:  Rephrase it.  Let me suggest the category of case rather than this case.

MR. BRUCK:  Right.

We're -- of course, Mr. Tsarnaev is charged with the use of a weapon of mass destruction.

MR. WEINREB:  Objection.  We've gone through this many times.

MR. BRUCK:  Really what I'm just getting to, I think, is whether knowing the type of case that we're concerned with, whether you have an opinion about whether this is an appropriate case for the death penalty, understanding you haven't heard everything yet but as you sit here today.

MR. WEINREB:  I object.  That's not the relevant question.

MR. BRUCK:  It's not the ultimate question but it is relevant.

THE COURT:  Well, you did indicate that you thought in some circumstances it could be an appropriate punishment, and I

guess the question is:  Could you suggest what you think some of those circumstances might possibly be?  Or perhaps you could do it by exclusion.  You know, what are the circumstances where it would not be appropriate?  But you should also keep in mind that anybody who is at the stage of -- where the consideration is whether the penalty should be imposed or not, the person has been convicted of willful murder.  So that's a given in any case.

MR. WEINREB:  Your Honor, asking him to commit ahead of time to which are the appropriate ones --

THE COURT:  I'm trying to gauge -- let me come at it a little different way.  These questions were put to you under circumstances you probably weren't necessarily prepared for and so it may be that this is or is not something you've given deep thought to.  So we don't want to put you on the spot that you have to think through some of these issues in kind of real time, but if it is something you've thought about and you're able to give some idea of what you meant when you said "appropriate circumstances," then that would be helpful.  If you can't do that because you really haven't thought it through, that's a different matter and it might actually be not helpful for you to speculate when you're just doing it off the cuff.

So you see what I'm trying to get at?

THE JUROR:  Yeah, I see what you're trying to get to.

I have not spent -- it is not something I've spent a lot of time on.  The outline you gave of how to make the decision of aggravating and mitigating factors seems a reasonable one to me, and I would want to hear what, in fact, they have done.  I would not want to make up my own rules for this kind of thing and would prefer a thought-out and time-proven framework for decision.

THE COURT:  Okay.

MR. BRUCK:  On -- if you could turn to page 25.

THE JUROR:  Uh-huh.

MR. BRUCK:  Question 93.

THE JUROR:  Uh-huh.

MR. BRUCK:  I see you made an observation about your views on whether the death penalty was more severe or less severe.  Can you tell me more about what you wrote there, what your knowledge or experience or information --

THE JUROR:  What I basically said is that increasingly over the last, I don't know, 20, 30 years, we have observed that persons who have been convicted of quite atrocious crimes and have then been sentenced to life beyond -- without parole have, in fact, found someone to let them go, so that I do not believe that a sentence of imprisonment without possibility of release is, in fact, the real case; it is really a sentence of imprisonment without perhaps a small chance of release or a large chance of release, depending on how political life

evolves over the next 20 years.

MR. BRUCK:  So you would think that if the president or political figures are elected in the future, it would change the likelihood of whether a person sentenced to life without release would really be released?

THE JUROR:  Yes.

MR. BRUCK:  And your expectation is that there's a pretty substantial chance --

MR. WEINREB:  Objection, your Honor.  That's a leading question.

THE COURT:  Rephrase it.

MR. BRUCK:  I'm trying to hear what you just told me. Do you feel that the chance -- even though the sentence is life without release, that there's a good chance it wouldn't really mean that?

MR. WEINREB:  That's been asked and answered.

THE COURT:  Go ahead.  You can answer it.

THE JUROR:  It is very hard to make predictions, especially about the future.  I believe, however, that there is some chance of this happening.

MR. BRUCK:  And is that a factor that would weigh in your thinking in deciding whether the death penalty should be imposed rather than life without release as it's described by the judge?

MR. WEINREB:  Your Honor, I object to that because he

hasn't been instructed --

THE COURT:  I agree.  That's getting into hypothetical decision-making.

MR. BRUCK:  Okay.  Excuse me.  Bear with me.

(Discussion off the record.)

MR. BRUCK:  I think that's all I have.  Thanks so much.

MR. WEINREB:  Your Honor, may I inquire about that?

THE COURT:  All right.  Briefly.

MR. WEINREB:  Good morning.  My name is Bill Weinreb.  I'm one of the prosecutors in the case.

No one can gainsay your own experience, however, my question is:  If you were instructed that the only two possible punishments in this case were the death penalty and life imprisonment without release, and you were instructed that those would, in fact, be -- if the punishment was the death penalty, that the defendant would get the death penalty, and if he was sentenced to life without -- life imprisonment without release, he would, in fact, serve life imprisonment without release, could you put aside what you've learned about other cases in other places and accept that and make your decision based on that instruction?

THE JUROR:  This does not appear to me to be a case where the jury should worry about deeper issues.  So, yes, I think I could accept that as a framework for decision.

THE COURT:  All set?  Okay.  Thank you, sir.  Just leave the questionnaire there.

(The juror is excused.)

THE CLERK:  Juror No. 263.

THE JURY CLERK:  Juror No. 263.

THE CLERK:  Sir, over here, if you would.

(The juror enters the courtroom.)

THE CLERK:  Have a seat.  Speak into the mic so everyone can hear you.

THE JUROR:  Okay.

THE CLERK:  Okay?  Thanks.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  Since you were here to fill out the questionnaire, have you been able to follow my instructions to avoid discussion of the case?

THE JUROR:  Yes.

THE COURT:  And also, as much as possible, to avoid any media accounts about the case?

THE JUROR:  Yes.

THE COURT:  That is the questionnaire you filled out.

THE JUROR:  Yes, it is.

THE COURT:  I want to follow up on some of the questions you gave.

THE JUROR:  Okay.

THE COURT:  I see you are a retired truck driver?

THE JUROR:  Yes.

THE COURT:  Any employment now?

THE JUROR:  No.

THE COURT:  Anything part time or anything?

THE JUROR:  Nope.

THE COURT:  Okay.  You were -- back in the late '60s-early '70s you were in the Army and served in the military police?

THE JUROR:  Yes, sir.

THE COURT:  Any further connection with service as a police officer since then?

THE JUROR:  I took the police officer's exam back then.

THE COURT:  Back then?

THE JUROR:  I was accepted in the Town of Spencer, but I passed on that hoping to get something closer.  That never came about.  And then I took the firefighter's exam, passed that, but was passed over because at that time they were taking minorities.  And I lived across the street from a retired fire chief, and even with a high score he said, "They're not going to call you."

THE COURT:  So this was when, again, back in the --

THE JUROR:  Back in the '70s.

THE COURT:  So any efforts since then to --

THE JUROR:  No.  I took up a trade, did that for 25 years, and then switched to truck driving after I got too old for that trade.

THE COURT:  What was the trade that you did for 25 years?

THE JUROR:  Installing carpet, ceramic tile.

THE COURT:  Okay.  Let me ask you to turn to page 20.  Oh, let me --

THE JUROR:  I have my wrong glasses on.  My other one is in my coat.

THE COURT:  My review is that there is no substantial Question 40 issue, so I just -- I'm passing by that.

Question 77, we asked if as a -- as a result of things that you'd read or seen about the events that underlie this case, whether you had formed an opinion about whether the defendant was guilty or not guilty or should receive the death penalty or not, and you wrote "unsure" as to each of those.

THE JUROR:  I have no idea if he's guilty, innocent, and I wouldn't even begin to think without hearing the testimony that's to be put forward to the Court.

THE COURT:  You've had a recent experience as a juror in a criminal case --

THE JUROR:  Yes.

THE COURT:  -- in the state?

THE JUROR:  Yes.

THE COURT:  So you've been through the process through to a verdict?

THE JUROR:  Yes.

THE COURT:  So I'm sure you were instructed in that case that a defendant who is accused of a crime is presumed innocent unless and until the government proves that he's guilty by the evidence at trial, and proves that fact by proof beyond a reasonable doubt.

THE JUROR:  Yes.

THE COURT:  So you have recent experience with that. And if you were a juror in this case would you be able to fulfill that duty here as well?

THE JUROR:  Oh, yes.

THE COURT:  You found that --

THE JUROR:  100 percent.

THE COURT:  -- jury duty to be, I think you said, satisfying?

THE JUROR:  Yes, it was.  I enjoyed being on the jury duty.  I feel it's part of my duty as, you know, a citizen, to serve if I can.

THE COURT:  Okay.  We asked also in the questionnaire some questions about attitudes towards the death penalty.  If you turn to page 23, the beginning of Question 88, we asked a general question, do you have any views about the death penalty in general, and you said "none."

THE JUROR:  No.

THE COURT:  But then in the next question, 89, we asked if you could put on a scale from 1 to 10 whether you believe the death penalty should ever never be imposed or that it should be imposed whenever the defendant has been convicted of an intentional murder and you "strongly favor," Number 10, can you tell us -- that that seems a little bit inconsistent with no view.

THE JUROR:  I believe in the death penalty if the case warrants it.  I'm not one to take someone's life unless circumstances and evidence promotes that, but I do believe in the death penalty.

THE COURT:  If you'd go to the next page, in Question 90 there are a number of possible statements set forth, and the question asks if you could select one that best describes your feelings about the death penalty in a case where someone has been proven guilty of murder, and you selected E, which is, "I'm in favor of the death penalty but could vote for a sentence of life imprisonment without the possibility of release if I believe that sentence was called for by the facts and the law of the case."

Does that still represent your view --

THE JUROR:  Yes.

THE COURT:  -- in summary form?

THE JUROR:  Yes.

THE COURT:  So are you saying, then, that you would be open to -- though you favor the death penalty as a general matter, you would be open to --

THE JUROR:  Yes.

THE COURT:  -- a sentence of life imprisonment?

THE JUROR:  Open to both depending on the circumstances and the testimony I would hear.

THE COURT:  On the next page, at the bottom, Question 95, we asked if you found -- I'll wait till you get there.  If you found the defendant guilty and you decided that the death penalty was the appropriate punishment for him, could you conscientiously vote for the death penalty --

THE JUROR:  Yes.

THE COURT:  -- and you said "yes."

And then on the next page at the top I asked the other side of that question, if you found the defendant guilty and you decided that life in prison without the possibility of release was the appropriate punishment, could you conscientiously vote for life in prison without the possibility of release, and you said "yes."

THE JUROR:  Yes.

THE COURT:  Are you sticking to those answers?

THE JUROR:  Yes.

THE COURT:  Go ahead.

MR. MELLIN:  Thank you, your Honor.

Good morning, sir.  I'm Steve Mellin.  I'm one of the prosecutors in the case.

THE JUROR:  Good morning.

MR. MELLIN:  I want to follow up a little bit on your answers about the death penalty.

You heard the judge this morning describe a little bit about the proces how if the jury gets to the point where the jury is deciding sentencing, the jury will have already found the defendant guilty of one of these capital offenses.  You understand that?

THE JUROR:  Yes.

MR. MELLIN:  So moving into that process, then the government would put on evidence that we believe tends to show why the death penalty is appropriate and the defense can put on evidence of why they believe life imprisonment is appropriate. Do you understand that?

THE JUROR:  Yes.

MR. MELLIN:  Would you -- even though you found the defendant guilty, would you be able to keep your mind open to carefully consider all of the information before you decided what the appropriate sentence would be?

THE JUROR:  Absolutely.

MR. MELLIN:  Thank you.

Thank you, your Honor.

MS. CONRAD:  Good morning, sir.

THE JUROR:  Good morning.

MS. CONRAD:  My name is Miriam Conrad.  I'm one of the Mr. Tsarnaev's lawyers.

You said that when you received the summons -- this is Question 75 on page 19.  I'm sorry.  Do you have that in front of you?

THE JUROR:  I believe so.  I have the wrong pair of glasses on.

MS. CONRAD:  Let me just read it to you, then.  You wrote -- the question was, "To the best of your recollection, what kinds of things did you say to others or did others say to you regarding your possible jury service in this case?"  And you wrote, "To my wife, would be proud to serve on this case and jury."

And I just was wondering if you could tell us a little bit more about that.

THE JUROR:  My wife -- I'm very open-minded to just about everything and my wife thinks, for one thing, I'm an alien because of -- I'm very -- I have a very open mind, okay?  And as far as something that pertains to, like, this case here, she feels that the defense would love to have me on the jury, and that's where that came from.

MS. CONRAD:  But you said you would be proud to serve on this case.

THE JUROR:  I would be proud to serve on any jury.

MS. CONRAD:  But is there something in particular about this case that you would be especially proud of or especially interested?

THE JUROR:  Especially interested in?  I would like to serve on a jury.  I would like to serve on any jury because I feel that's part of my duty to do as a citizen.

MS. CONRAD:  Sure.

THE JUROR:  And to protect and serve the country.

MS. CONRAD:  But is there any -- but is there anything particular about this case that you feel would make it even more of an honor or to serve?

MR. WEINREB:  Your Honor, I object.  That's been asked and answered three times.

THE COURT:  He's already answered that question.

MS. CONRAD:  Do you know why your wife thinks that the defense would love to have you on this jury?

MR. WEINREB:  I object to that.

THE COURT:  Yeah, I think we'll leave it at that.

MS. CONRAD:  I would think the government would want to know the answer to that question.

You were in Vietnam?

THE JUROR:  Yes.

MS. CONRAD:  And did you see combat there?

THE JUROR:  Yes.

MS. CONRAD:  And where specifically did you serve?

THE JUROR:  I was there from -- I believe it was May of '67 through June of '69, and I was stationed pretty much in two-thirds of the country.  I was moving around an awful lot.  And I was military MP, I escorted POWs, escorted convoys, ran down modes first in the morning to clear them of mines.  I was with the Australians for a short period of time.  I was with the Navy Seabees for a short period of time.  So I pretty much was all over.

MS. CONRAD:  I'm sure you saw many difficult things.  I'm wondering if you saw anyone injured or killed by an explosion.

THE JUROR:  Probably far more than you would like to see.

MS. CONRAD:  And given that this case involves bombings, do you think that your past military experience would make it difficult for you to see graphic videos of that?

THE JUROR:  No.

MS. CONRAD:  There may be evidence in this case that the bombings were motivated, at least in part, by military action in the Middle East.  Would your past military service affect your ability to listen to that evidence?

THE JUROR:  No.

MS. CONRAD:  In response to Question 77 on page 20 -- if you're having trouble with your glasses -- this part's really small so I'll just try to read it to you.  But in this

question you were asked whether you have formed an opinion about the defendant's guilt or about the appropriate penalty.

THE JUROR:  No, I have not.

MS. CONRAD:  I'm summarizing.

And I appreciate that you understand how important it is to -- for jurors in this case to keep an open mind and listen to the evidence, but I guess I want to ask the question a slightly different way, which is before you were called for jury duty in this case, did you have an opinion about the defendant's guilt?

MR. WEINREB:  Your Honor, I object.  This is following up on a negative answer.

THE COURT:  Well, that's all right.

Go ahead.  You can answer.

THE JUROR:  No.

MS. CONRAD:  And when you learned that you were summonsed in this case, did anybody else express their opinion about Mr. Tsarnaev's guilt to you?

THE JUROR:  No.

MS. CONRAD:  In response to Question 89 you selected 10 as your position -- as your view on the death penalty.  And the question says that -- in describing what the different numbers mean, that 10 reflects a belief that the death penalty should be imposed whenever the defendant has been convicted of intentional murder.

THE JUROR:  I believe in the death penalty if it's premeditated murder.  If, again, I say circumstances and evidence warrants, whatever the case may be, if it calls for the death penalty, I am for it.

MS. CONRAD:  So if in a case where the defendant was convicted of intentional murder, premeditated murder, of more than one victim, would you automatically vote for the death penalty?

MR. WEINREB:  Objection.  That's a pre-commitment question about --

THE COURT:  Let me ask it a different way.

Are there any circumstances in which you would automatically vote for the death penalty without evaluating the pros and cons?

THE JUROR:  No, not automatically.

MS. CONRAD:  I guess, sir, I'm just confused because that's what 10 reflects --

MR. WEINREB:  I think he explained that.

MR. MELLIN:  Objection.  It's commentary.

MS. CONRAD:  Let me follow up.

Would you always vote for the death penalty in a case of intentional premeditated murder?

MR. MELLIN:  Objection, your Honor.

THE COURT:  Yeah, he's answered it.

MS. CONRAD:  I'm sorry.  I'm asking it, I think, a

little differently than your Honor did.

THE COURT:  Not quite.  Well, yes, it is a little different but not enough.

MS. CONRAD:  You said that you would -- you believe in the death penalty if the case warrants it, so would your decision about whether to vote for the death penalty depend only on the facts of the crime itself or would you be able to -- or would you meaningfully consider facts about the defendant?

THE JUROR:  I would take into consideration facts about the defendant, what led up to what took place.  That's why I say the death sentence is not automatic.

MS. CONRAD:  Okay.  So can I just ask when you chose 10 on that scale of 1 through 10 --

THE JUROR:  Okay.

MS. CONRAD:  -- what you were thinking?

MR. WEINREB:  Objection, your Honor.

THE COURT:  Yeah, I think we've been over it.

MS. CONRAD:  Can I rephrase that?

THE COURT:  No, I think it's been explored.

MS. CONRAD:  Okay.  Thank you very much.

THE JUROR:  You're welcome.

THE COURT:  All right, sir.  Thank you.  You may step out.  And just leave the form there.

THE JUROR:  Okay.  Thank you.  Have a good day.

MR. WEINREB:  You too.

(The juror is excused.)

THE CLERK:  Juror No. 264.

THE JURY CLERK:  264.

(The juror enters the courtroom.)

THE CLERK:  Juror No. 264, would you come over here, please.  Have a seat.  If you could, speak into the mic so everyone around the table can hear you, okay?

THE JUROR:  All right.

THE CLERK:  Thanks.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  Since you were last here, have you been able to follow my instructions to avoid any discussion of the substance of the case with anybody?

THE JUROR:  Yes.

THE COURT:  And as much as possible to avoid any media accounts about what's going on or about the case itself?

THE JUROR:  Yes.

THE COURT:  Okay.  So that's the questionnaire you filled out.  We're going to follow up on some of the questions just to fill in some additional information.

Let me ask you to look at -- well, I'm looking at page 6.  The question is:  We asked about what your spouse might do for employment.  You wrote criminal justice for your wife.

THE JUROR:  I was nervous.  I just filled it out quick.  But she works for an insurance company.  She took criminal justice.

THE COURT:  Oh, she took that in school?

THE JUROR:  Yes.

THE COURT:  But she hasn't worked in criminal justice?

THE JUROR:  No.

THE COURT:  What kind of insurance, auto insurance --

THE JUROR:  Auto insurance and homeowner.

THE COURT:  And you work for an auto dealer.  Is that it?

THE JUROR:  Yes, sir.

THE COURT:  Can you tell us what you do?

THE JUROR:  I'm a service advisor at Commonwealth Motors in Lawrence, Mass.

THE COURT:  And you just deal with people who bring their cars in for repairs.  Is that the idea?

THE JUROR:  I'm the guy who's got to tell you you need a brake job, unfortunately.

(Laughter.)

THE COURT:  You indicated in an earlier question that you would have no difficulty in serving on the case even though it was a long case?  It wouldn't impact your employment in any significant way?

THE JUROR:  It probably would.  I answered that

because I was being selfish, honestly, thinking about -- not thinking about, you know, my job, having an issue with it. Most likely they might have an issue with it.

THE COURT:  I don't really care as much about them as about you.  Would it affect you?  Will you get paid if you were here four days a week instead of being on the job, I guess is the question.

THE JUROR:  Probably not.

THE COURT:  Have you talked about that with them?

THE JUROR:  No, I never thought that -- you know, I never think that I was going to get this far.

THE COURT:  Yeah.  What's the basis of your compensation?  Is it an hourly rate or is it a salary or --

THE JUROR:  Salary.

THE COURT:  Salary?

How many service advisors are there?

THE JUROR:  We're short-staffed.  There's always one person out all the time, so there's like three of us.  So we're a growing dealership, so we're getting pretty busy, so...

I speak Spanish so they need somebody that speaks Spanish there all the time, you know.

THE COURT:  So you don't have any firm idea whether you would be paid or not if you -- or do you have an idea?

THE JUROR:  I don't have an idea, to be honest with you, because I didn't think I was going to be here again.  To

be honest with you, I thought that was a one-day thing, I guess. But I guess you're still going through the process of everything else.

THE COURT: Okay.

MR. WEINREB: Your Honor, I think we're --

THE COURT: Yeah. Okay. Thanks. That's all.

THE JUROR: Thank you.

(The juror is excused.)

THE CLERK: Juror No. 267.

THE JURY CLERK: Juror 267.

(The juror enters the courtroom.)

THE CLERK: Sir, over here, please. Have a seat. Do me a favor and speak into the mic so everyone can hear you, okay?

THE JUROR: Okay.

THE COURT: Good morning.

THE JUROR: Good morning.

THE COURT: Since you were here to fill out the questionnaire, have you been able to follow my instructions to avoid discussion of the case with anyone?

THE JUROR: Yes.

THE COURT: Except your presence here, obviously that you had to come.

THE JUROR: Yes.

THE COURT: And also to avoid any media accounts of

the case or proceedings?

THE JUROR:  Yes.

THE COURT:  Okay.  So that's the questionnaire, and we're going to follow up on some of the answers that you gave. I want to start with page 5, Question 10, where you indicated it would be difficult, you thought, to serve on an extended case like this.  Can you tell us a little bit about that?

THE JUROR:  Basically, I'm involved in general management of a lumberyard, and the ownership does travel for different conferences and things, different trade shows, which would leave us short of help as far as management goes at the business at the time.

THE COURT:  Only when they're traveling?

THE JUROR:  Only when they're traveling.

THE COURT:  So how often would that be during the course of, say, three, four months?

THE JUROR:  It could be two to three times.

THE COURT:  You recall that the schedule for the case would be Monday through Thursday, so Fridays, you know, which would normally be a business day -- I assume Saturday at a lumberyard would be a business day too, correct?

THE JUROR:  Correct.

THE COURT:  So you would be available on those days.

THE JUROR:  No problem.

THE COURT:  The next page, in Question 13 we asked

about your spouse's employment.

THE JUROR:  Yes.

THE COURT:  She's an administrator.  Can you just tell us --

THE JUROR:  She's a principal in an elementary school.

THE COURT:  I see.  You have -- I'm looking at Question 34 on page 12.  You have a couple of friends who are police officers:  one a state police officer and one a Falmouth police officer?

THE JUROR:  Correct.

THE COURT:  Can you give us some idea of what your relationship is with those folks?

THE JUROR:  Social.  You know, not -- I wouldn't say best friends by any means, but definitely social events.  One I see more than the other.  One I deal with at work quite often.

THE COURT:  Is that the Falmouth officer?

THE JUROR:  Yes.  Because he's also a contractor, you know, so he does both.

THE COURT:  And how about the state police officer?

THE JUROR:  The state police officer I see mostly on social events; not on a daily basis by any means.  Maybe two, three times a year type thing.

THE COURT:  Okay.  Obviously in a case like this there will be law enforcement personnel testifying as witnesses and so on.

THE JUROR:  Yes.

THE COURT:  Would your friendship with these two folks affect in any way your ability to be an impartial judge of all that testimony?

THE JUROR:  No, not at all.

THE COURT:  Let me ask you to look at page 20 and Question 77.  In this question we asked whether based on what you'd seen or read, or from any other source, that you formed an opinion that the defendant was guilty or not guilty or that he should receive the death penalty or not, and you answered "yes" to you formed an opinion that he was guilty and you had formed an opinion that he should receive the death penalty.

We then asked if you had answered yes to any of the questions, would you be able or unable to set aside your opinion and base your decision as a juror about guilt and/or punishment based only on the evidence presented in court, and you said "unable."  You would be unable to set your prior decisions aside and do that.

THE JUROR:  Correct.

THE COURT:  Could you explain that for us?

THE JUROR:  The evidence would have to be very compelling for me to think otherwise of what I know or what I've seen, I guess.  I don't really know anything more than what we've read or what we have seen in the media, you know, prior to this situation.

THE COURT: Well, in our criminal justice system a defendant who's accused of a crime is presumed to be innocent of the crime unless the government bears its burden of proof by proving at trial that he's guilty beyond a reasonable doubt.

THE JUROR: Correct.

THE COURT: We ask jurors to faithfully apply those principles in a case which requires the jurors to focus on the evidence presented in the case, evaluate it, and then decide whether that evidence convinces them that the defendant is guilty of the crime he's charged with or not to a degree that they can say they have no reasonable doubt about it. We also tell jurors that they're to focus only on the evidence in the case and not things they may think they know from other sources.

From your answer it appears you think you would be unable to do that, and that's what I'm probing a little bit.

THE JUROR: I would feel strongly that I would probably be unable do that knowing what I know. I'm not saying I couldn't, but I feel strongly that I probably wouldn't. The evidence would have to be, I guess, pretty compelling or reverse what I've seen or thought I've seen in my mind as far as what has been happening.

MR. BRUCK: I think the parties are in agreement.

THE COURT: All right, sir. Thank you.

THE JUROR: All right.



(The juror is excused.)

THE COURT:  I didn't -- 269 I wanted to see.

MR. CHAKRAVARTY:  Just for context, your Honor, the question -- there are some answers on the questionnaire that could put some context into this.

THE COURT:  Let me take a minute to read this.

(Pause.)

THE COURT:  Could we cut the audio for a minute?

(Discussion at sidebar and out of the hearing of the public:)



(In open court:)

THE COURT:  271?

THE CLERK:  Juror No. 271.

THE JURY CLERK:  Juror 271.

(The juror enters the courtroom.)

THE CLERK:  Ma'am, come over here, if you would.  Have a seat.  And if you could talk into the mic so everyone at the table can hear you.

THE JUROR:  Okay.

THE CLERK:  Okay.  Thanks.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  Since you were last here, have you been able to follow my instructions to avoid discussion of the substance of the case with anybody?

THE JUROR:  Yes, I've avoided.

THE COURT:  And also, as much as possible, avoid any media accounts or reports on the case?

THE JUROR:  Yes.

THE COURT:  So that's the questionnaire you filled out.  We're going to have some follow-up questions for you.

THE JUROR:  Okay.

THE COURT:  You expressed some concern about being absent from your job for an extended period of time.  Can you tell us about that?

THE JUROR:  Sure.  I teach sixth grade, middle school, language arts, and it's a burden on my students to be absent.  It's really hard to be out.  It's hard to find a permanent sub who has my background and my education.  And I've been teaching for 12 years.  I teach in a challenging district that is not easy to find substitute teachers.  We really struggle with that in my district.  So it would be hard.

THE COURT:  Would you continue to be compensated during a jury service?

THE JUROR:  I don't believe so.  I think there is a certain amount of days I'm compensated.  That would all be on

my contract, so I would have to read my contract.  But I don't believe I would be compensated for very long.

THE COURT:  Your husband is a teacher as well?

THE JUROR:  He is.

THE COURT:  Where does he teach?

THE JUROR:  Waltham, Mass.

THE COURT:  In --

THE JUROR:  High school.

THE COURT:  High school?

THE JUROR:  Yeah, he teaches high school.

THE COURT:  Any particular concentration of subject?

THE JUROR:  Yeah, he teaches special education, kids with disabilities.

THE COURT:  Use of social media?  You use Facebook?

THE JUROR:  I do.

THE COURT:  That's it?  None of the others, Instagram, Twitter or anything like that?

THE JUROR:  I don't even know what those are.  But, yes, Facebook.

THE COURT:  How do you use it?

THE JUROR:  Really to get informed about moms' groups now that I work.  I stayed home for several years with my kids, and now that I work, I find out all stuff that's going on in the town.  So I read it every day.

THE COURT:  Let me ask you to turn to page 20 of your

questionnaire.  In Question 77 we asked whether based on things you'd seen or read, learned from other sources, whether you'd formed an opinion whether the defendant was guilty or not or whether he should receive the death penalty or not, and to each of those questions you answered "unsure."

THE JUROR:  Uh-huh.

THE COURT:  Can you explain that, why you made that choice?

THE JUROR:  Sure.  I don't know.  I guess being in education for so long, I really try not to be judgmental.  It's just how I've been.  I've been a special educator for years and I've always fought for students' rights.  Now I teach in a very challenging district, in a very challenging school.  I believe that you need to be educated and informed before you make judgments.

Obviously, I've heard a lot about the case, clearly. I remember when I heard about it and where I was.

THE COURT:  Where were you?

THE JUROR:  I was in my car on my way to Costco in New Hampshire about to get off the Chelmsford exit when we received a phone call from a good friend.  So I certainly remember details.  I have family members who have ran the Boston Marathon, so only I know --

THE COURT:  That year?

THE JUROR:  No.  My father ran it years ago.  Yeah,

years ago.

But I just feel like I like to be educated and I like to know what I'm talking about.  Maybe that's my educator brain.

THE COURT:  Okay.  Well, I'm sure you know that in any criminal prosecution the burden is on the government to prove what it alleges, that the defendant is guilty.  A defendant who is accused of a crime is presumed innocent, or not guilty, unless the government proves otherwise by the evidence at trial, and proves it to a degree that the jurors are left with no reasonable doubt about whether the defendant is guilty of what he's charged with or not.

What we ask jurors to do is to listen to the evidence, at the end of the case evaluate it, talk about it with each other, and then decide whether the government has satisfied that burden of proof by the evidence or not.  And if it has, the government is entitled to the verdict of guilty, but if it has not, the defendant is entitled to, and actually must be acquitted if the government has failed in its burden.

Do you understand those principles in criminal law?

THE JUROR:  Yes.

THE COURT:  Would you be able to faithfully apply those if you were a juror?  Would you be able to, first of all, resolve the case on the evidence presented only without outside influence?

THE JUROR:  I would hope.  I think a really important factor for me is that I have a seven-and-a-half-year-old son and a six-year-old daughter.  So I think for me that would be very challenging.

THE COURT:  You're referring, I think, to the fact that one of the victims of the bombings was a child.  Is that right?

THE JUROR:  Yes.  Yes.

THE COURT:  Would that affect both your ability to assess guilt or innocence and the punishment or one or the other?

THE JUROR:  It would concern me, yes, if --

THE COURT:  I didn't ask the question very well. There may be two phases.  The first would be to decide whether the defendant is guilty or not.

THE JUROR:  Uh-huh.

THE COURT:  Of course, if he's not guilty, that's the end of the matter.  The second phase would be the penalty phase.  What I'm asking is:  You think you may be affected because there was a child victim involved.

THE JUROR:  Right.

THE COURT:  I'm asking:  Would that be in the first phase or the second phase or both, that you think you might be affected in that way?

THE JUROR:  I would say both.  I would definitely

think the first phase.  I would say both.  I would say -- yeah.

THE COURT:  In Question 82 on page 21 you indicated that your husband has some Boston Strong items and so on and you also attended a book signing for, I guess, one of the victims?

THE JUROR:  Uh-huh.

THE COURT:  Can you tell us about that, what led you to go to the book signing?

THE JUROR:  With all of the media attention and my kids being in school -- they're young but they're old enough to have heard things and heard people talking about it.  We -- my husband and I thought very hard and long about how to present what had happened to them.  When Jeff Baumann had come to Acton, which is next door to where I live, he was doing a book signing at a local bookstore that we frequent.  It's a family-run bookstore.  We thought that that might be the best way to present it instead of as this horrific tragedy, as maybe someone who had overcome something so horrific.  And we thought since they were so young, that might be more appropriate to talk to them about what had happened and use that as a starting point for a conversation.

THE COURT:  All right.  Thank you very much.

(The juror is excused.)

THE CLERK:  Juror No. 274.

THE JURY CLERK:  274.

(The juror enters the courtroom.)

THE CLERK:  Ma'am, over here, if you would, please.  Have a seat.  Speak into the mic so everyone will hear you.

THE COURT:  Good morning.

THE JUROR:  Hi.

THE COURT:  Actually, good afternoon.

Since you were here to fill out the questionnaire, have you been able to follow my instructions to avoid any discussion of the substance of the case with anyone?

THE JUROR:  Uh-huh.

THE COURT:  And as much as possible to avoid any media accounts of the case?

THE JUROR:  Yup.

THE COURT:  So we're going to follow up on some of the questions -- answers you'd given to the questions in the questionnaire.  Tell us about your employment a little bit.

THE JUROR:  I'm a research analyst with a firm called InfoTrends in Weymouth, Mass.  More than that?

THE COURT:  What do you do?

THE JUROR:  Okay.  Sorry.  I'm nervous.

I attend events sometimes, and I write, like, show reviews on them.  And I analyze data; I write surveys, and I collect the results from the surveys; and I create graphs, PowerPoints, and I write reports about them.  And we mostly deal with business office document technology.  Some of our

clients -- and like digital peripherals.  So some of our clients including Riko, Toshiba, Samsung.  I just went to a Samsung event a few months ago.

THE COURT:  So you're analyzing their marketing efforts, is that what you're doing?

THE JUROR:  So we come up with business strategies, we do some consulting work, and we come up with marketing strategies for our clients and do custom projects for them.  Mostly I do business process automation, so I'm studying how much paper is used in offices.  And we've done different verticals, so I've looked into healthcare, legal.  Yeah.

THE COURT:  Okay.  The company has a website that you sometimes blog on.  Is that it?

THE JUROR:  Yup.

THE COURT:  What frequency?

THE JUROR:  Once a month.

THE COURT:  Once a month?

THE JUROR:  Yup.

THE COURT:  And then personally you use Facebook, Twitter, Instagram?

THE JUROR:  Yup.

THE COURT:  For social matters mostly?

THE JUROR:  Yeah.  Posting pictures of, like, places I go and stuff like that.

THE COURT:  You indicated that you have a friend who's

in the police.  That's Question 34 on page 12.  Could you tell us a little bit more about that?  What police force, how close a friend and that sort of thing.

THE JUROR:  A roommate from college, her boyfriend is a cop in -- they live in Rehoboth.  He's a cop in Portsmouth and --

THE COURT:  Rhode Island?

THE JUROR:  Yeah.  I went to school with them.  We all went to school together.  And a couple of his buddies who I'm also acquaintances with are cops too, all in Rhode Island also.  One of them is a state cop and one of them is a cop in -- there's Portsmouth and Middleboro -- or Middletown.  Sorry.  Yeah.

THE COURT:  Okay.  Would you look at page 12?  Looking at Question 36, it, first of all, notes that jurors are instructed that the testimony of law enforcement people is to be treated the same way, analyzed the same way, understood and criticized the same way as any other witness.  They don't get any special consideration because they're law enforcement, either positively or negatively.

And then we asked if you had any concerns about your ability to do that and you said no, but then you wrote something that it seems like maybe there's a reservation on that, and I wondered if you could explain that.

THE JUROR:  Yeah.  I just feel like if they're a law

enforcement person they should definitely be telling the truth. But, I mean, I guess they could lie too.  I don't know.

THE COURT:  Well, again, as the sort of text to the question indicates, what we ask witnesses to do is to take each witness who testifies individually and make some judgments about that particular person based on any variety of things, the content of the testimony, the manner of testifying and so on and so forth, but not to have any -- give any special consideration one way or the other, positively or negatively, to law enforcement people solely by reason of their office but to be -- to apply the same standards of judgment to a law enforcement witness as would be applied to any other witness.

And so the question is:  Would you be able to do that? You say you have a number of friends who are on police forces. Would you be able to treat any law enforcement witness the same way you treat any non-law enforcement witness?

THE JUROR:  Right.  Yeah, I think so.

THE COURT:  Let me ask you to turn to page 20.  In Question 77 we asked whether you'd formed certain opinions based on things you'd seen or heard in the media or otherwise. You indicated that you thought you had -- that you had formed an opinion that the defendant was guilty and you were unsure about the penalty.

THE JUROR:  Uh-huh.

THE COURT:  We then asked if you had an opinion about

any of those matters -- this is in the text below the multiple-choice questions -- if you had an opinion, would you be able or unable to set it aside and base your decision based only on the evidence presented in the course of the case in court, and you said you thought you would be unable to do that.

Can you tell us about that?

THE JUROR:  I just -- I don't really see how he isn't guilty.

THE COURT:  And that's actually what you indicated on the answer to Question 78, I guess, a little bit, right?

THE JUROR:  Uh-huh.

THE COURT:  The question isn't just whether you think that, you have an opinion, the question is whether you could pay attention only to the evidence in the case and decide the issues presented in the case based on that body of evidence and not on things that you thought from other sources.

THE JUROR:  I think it would be really hard not to consider how I already feel.

THE COURT:  Okay.

MR. BRUCK:  We're satisfied, your Honor.

THE COURT:  All right.  Thank you.

(The juror is excused.)

THE CLERK:  Juror No. 275.

THE JURY CLERK:  275.

(The juror enters the courtroom.)

THE CLERK:  Sir, please have a seat.  And do me a favor and speak into the mic so everyone can hear you, all right?

THE JUROR:  Okay.

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon.

THE COURT:  Since you were last here, have you been able to follow my instruction to avoid discussion of the case with anybody?

THE JUROR:  Yes.

THE COURT:  And also to avoid as much as possible any media accounts of the case?

THE JUROR:  Yes.

THE COURT:  Okay.  Thank you.

Tell me about your employment.

THE JUROR:  So I am a business development manager for a company called Everbridge.  And Everbridge provides mass and emergency notification systems.  So I manage a team of 11 business development reps.

THE COURT:  Business development being marketing and --

THE JUROR:  Yes.

THE COURT:  -- sales?

THE JUROR:  Yeah, pretty much sales.

So basically I'm a sales manager, yeah.

THE COURT:  Okay.  Tell me a little bit about the product?

THE JUROR:  So it's -- the City of Boston uses Everbridge to send out weather alerts.  So if you have the snow emergencies or anything like that, that's what the city will use.  A lot of hospitals and corporations will use us for employee safety and sending messages out in the case of an emergency.

THE COURT:  Is it software that you provide or software and hardware or what --

THE JUROR:  It's software, yup.  Yup.  Cloud.

THE COURT:  And it's somebody else's hardware?

THE JUROR:  It's cloud-based, so you could access it from anything, phone, website.

THE COURT:  So you say the City of Boston uses it, including the Boston Police Department?

THE JUROR:  Including the Boston Police Department, yes.

THE COURT:  I think you said in the questionnaire it was used actually during the events of the Marathon bombing.

THE JUROR:  Yes, the police used us to coordinate with the first responders during the bombing.  The City of Watertown is also a client, so they used us for sending out notifications to the citizens for the shelter in place.  A lot of the local corporations and hospitals would use our system to ensure, like

I said, employee safety because the cell towers went down, so they needed other ways to make sure the staff was safe.

THE COURT:  When you say "use our services" or "use us," does that involve active participation by Everbridge employees or is this if you have the software, you can do it? In other words, is there interaction between someone using the system and employees of Everbridge when it's being used?

THE JUROR:  It depends on the department, I guess. So for -- if you're in the support, sort of customer service departments, then you'd be involved.  And, you know, for us, we were -- obviously it was a pretty unique case from when we were using it during that time, so there were discussions about using the service and, you know, how the first responders were using it to kind of coordinate and keep up to date with what was going on.

THE COURT:  Were you involved in interacting with anybody who was a first responder or the Boston police or anything?

THE JUROR:  Not personally, no.

THE COURT:  Are there people in your circle at work who were, typically you'd come into contact with on a regular basis at work?

THE JUROR:  I believe so, yeah.  We had -- so my department had pretty much the only TV in the office, so during that time I was at work and most people came in the back and,

you know, discussing it amongst ourselves.  And there were customer support people back there talking about how the system was used.  And our company would -- also used our service to send out notifications to all the staff later that week, too, for the shelter in place.  And our office was based in Waltham at the time.

THE COURT:  You use social media, Facebook, Instagram --

THE JUROR:  I do.

THE COURT:  -- for social matters?

THE JUROR:  Yup.  Yup.

THE COURT:  Not for professional?

THE JUROR:  I use LinkedIn for professional purposes.

THE COURT:  Let me ask you to turn to page 20 of the questionnaire.

THE JUROR:  Okay.

THE COURT:  In that question we asked whether you had -- based on things you'd seen or heard or read in the media whether you had formed an opinion about whether the defendant was guilty or not and, if so, whether he should receive the death penalty or not.  You indicated you had formed an opinion based on those sources that he was guilty and that he should receive the death penalty.

THE JUROR:  Uh-huh.

THE COURT:  And then below that, the question went on

to say, If you answered yes to any of these questions, would you be able or unable to set aside your opinion and base your decision about guilt and punishment solely on the evidence presented to you in court, and you picked "able."  Would you tell us about that?

THE JUROR:  Yes.  So I think the more, as I thought about this trial, it's probably swayed more so to "unable" just due to the sort of personal nature of it with the company I work for, you know, speaking with emergency preparedness coordinators, you know, marketing materials for how our company used it during the Boston bombings, you know, I was very active on some online sites trying to help with the manhunt.  So it might be a little bit tougher than I originally thought to --

MR. BRUCK:  We're satisfied, your Honor.

THE COURT:  All right.  Thank you.  Appreciate it.

THE JUROR:  Thank you.

(The juror is excused.)

THE CLERK:  Juror No. 281.

THE JURY CLERK:  Juror No. 281.

(The juror enters the courtroom.)

THE CLERK:  Sir, have a seat over here and speak into the mic so everyone can hear you.

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon.

THE COURT:  Since you were here to fill out the

questionnaire, have you been able to follow my instruction to avoid talking about the substance of the case with anybody?

THE JUROR:  Yes, I have.

THE COURT:  And also to avoid any exposure to media accounts in the case?

THE JUROR:  Yup.

THE COURT:  Okay.  So we're just going to follow up on some of the questions and answers you gave.

Are you currently working?

THE JUROR:  I'm plowing right now for the Town of Waltham.

THE COURT:  Plowing?

THE JUROR:  Uh-huh.

THE COURT:  That should be lucrative.

THE JUROR:  Yeah.

THE COURT:  You say "right now."

THE JUROR:  Right now.  I mean --

THE COURT:  Is that a stopgap kind of thing?

THE JUROR:  Yeah.

THE COURT:  You're just available and can do it?

THE JUROR:  Yeah.

THE COURT:  According to -- I'm looking at page 10, if you want to look at it.  We asked about employment.  And you had last worked -- well, the date range was 2014 to 2014.

THE JUROR:  Uh-huh.

THE COURT:  So it looks like it had finished then.  I couldn't quite read where it was you were working.

THE JUROR:  It was Cavicchio Greenhouses.

THE COURT:  I'm sorry?

THE JUROR:  Cavicchio Greenhouses.

THE COURT:  A nursery?

THE JUROR:  Yeah.

THE COURT:  And that ended -- was that seasonal employment?

THE JUROR:  Yeah.

THE COURT:  Question 27, you indicated you were a student.

THE JUROR:  Uh-huh.

THE COURT:  Are you currently a student?

THE JUROR:  Yes.

THE COURT:  Where?

THE JUROR:  At Middlesex Community College.

THE COURT:  Full time?

THE JUROR:  Not right now.  I haven't registered for classes and I don't think I will this semester.  I think I ran out of time.

THE COURT:  So you'll do some plowing, and if something else comes along, you'll look for that?

THE JUROR:  Yeah.

THE COURT:  If you had to serve on this case for, say,

three or four months, would that be a financial hardship for you?

THE JUROR:  Not really, no.

THE COURT:  Why not?

THE JUROR:  Well, I --

THE COURT:  Do you live at home or --

THE JUROR:  Yeah.

THE COURT:  We asked about social media use.  You indicated Facebook, Instagram, Twitter all rarely used.

THE JUROR:  Yeah, I don't really use -- just it's on my phone.

THE COURT:  You have a close friend who's in the Marines?

THE JUROR:  Yup.

THE COURT:  Tell us how close.

THE JUROR:  I, like, grew up with him.

THE COURT:  And he spent four months in Afghanistan?

THE JUROR:  That should be nine.

THE COURT:  Nine?

THE JUROR:  Yeah.

THE COURT:  Did he -- he himself participate in combat operations as far as you know?

THE JUROR:  I don't think it was combat operations but I know he was overseas.

THE COURT:  Do you know what he did?

THE JUROR:  I think they were training people.

THE COURT:  Has he -- is he back now?  Is he in the U.S.?

THE JUROR:  Yes.

THE COURT:  Is he around here?

THE JUROR:  He's in Shrewsbury.

THE COURT:  Is he out of the Marines?

THE JUROR:  No, he's not out of the Marines yet.  He's in the reserves.

THE COURT:  Okay.  Have you and he talked about his time in Afghanistan in any detail?

THE JUROR:  Not in great detail, no.

THE COURT:  I'd like you to take a look at page 20, Question 77.

THE JUROR:  Uh-huh.

THE COURT:  There we asked whether based on things you had seen or heard you had formed an opinion about various matters including whether the defendant was guilty, and you said yes, and then about the potential penalty, and you said you were unsure about that.  And then below that we asked if you had answered "yes" to any of the questions, would you be able or unable to set aside your opinion and base any decision about guilt or punishment based only on the evidence presented in the course of the trial in court, and you checked the box "able"; you thought you could set it aside?

THE JUROR: Yeah.

THE COURT: Tell us about that?

THE JUROR: Well, all I know is what I saw briefly on the news when he was captured right after the events, after the bombing, but that's really all I know. So I guess there could be more information I don't know.

THE COURT: Okay. So you understand in our criminal justice system that a person who's accused of a crime is presumed innocent of the crime unless the government proves him guilty by the evidence at trial --

THE JUROR: Yes.

THE COURT: -- and that the proof must be beyond a reasonable doubt. And if there is a reasonable doubt or if the proof is otherwise insufficient, it's the obligation of the jury to find the person not guilty of the crime.

THE JUROR: Yup.

THE COURT: In other words, the question is never which side has convinced me, but has the government convinced me beyond a reasonable doubt that he's guilty.

Do you understand that?

THE JUROR: I understand that.

THE COURT: Would you be able to apply those principles if you were a juror in this case?

THE JUROR: I think so, yes.

THE COURT: In Question 82 you indicated you own a

Boston Strong T-shirt?

THE JUROR:  Yeah.  They were selling them at a place I was at so I just bought one.

THE COURT:  Any other participation in support of events or anything like that?

THE JUROR:  Not really, no.

THE COURT:  Beginning on page 23 at Question 88 we asked some questions about attitudes towards the death penalty, and 88 asked in general terms if you had views about the death penalty, and you said "none."

THE JUROR:  Uh-huh.

THE COURT:  Then in 89 we asked if you could put on a scale from strongly opposed to strongly favor where you might be as to whether the death penalty should be imposed whenever someone had been convicted of intentional murder, and you picked 8.

THE JUROR:  Uh-huh.

THE COURT:  So a tendency to favor it, I guess?

THE JUROR:  Yeah, I'd say so.

THE COURT:  Then in Question 90 we asked if you could select which statement of the several proposed closest -- came closest to describing your own feelings about the death penalty in a case of someone who has been proved guilty of murder, you selected D which is, "I'm not for or against the death penalty. I could vote to impose it or I could vote to impose life

imprisonment without the possibility of release, whichever I believe was called for by the law and" -- "the facts and the law in the case."

Does that represent your view?

THE JUROR:  Yeah, D or E, in between the two.

THE COURT:  Yeah, okay.  I was going to ask about E because E sounds a little more consistent with the previous answer.

THE JUROR:  Uh-huh.

THE COURT:  But the question is whether you would be -- if you found somebody guilty of murder -- that's the premise.  You don't get to the penalty unless -- you're at that stage, right?  So if you found the person guilty of murder, you would be open to the possibility of either voting for the death penalty or voting for life imprisonment without the possibility of release instead of the death penalty depending on how you evaluated the presentations that were made in the course of that trial?

THE JUROR:  Yeah.

THE COURT:  Is that fair?

THE JUROR:  Uh-huh.

THE COURT:  You have to say "yes" or "no."

THE JUROR:  Yes.  Yes.  Sorry.

Although now looking at it again and thinking about it, I probably would change that to E if I could.

THE COURT:  Then looking at the bottom of page 25 -- some of these questions obviously are asking similar things in different ways just to try to see how...

Question 95 asks if you found this defendant guilty and you decided the death penalty was an appropriate punishment for him, could you conscientiously vote to impose that penalty, and you said "yes."

THE JUROR:  Yes.

THE COURT:  And is that still your view?

THE JUROR:  It is.

THE COURT:  Then at the top of the next page there's a related question:  If you found the defendant guilty and you decided that life imprisonment without the possibility of release was the appropriate punishment, could you conscientiously vote for that, and you said "yes" to that as well.

THE JUROR:  Yeah.

THE COURT:  Okay.

MR. WEINREB:  No questions, your Honor.

THE COURT:  No questions?  Go ahead.

MR. BRUCK:  Good afternoon.

THE JUROR:  Good afternoon.

MR. BRUCK:  I think it's afternoon.

THE JUROR:  Almost.

MR. BRUCK:  My name is David Bruck and I'm one of

Jahar Tsarnaev's attorneys and I just would like to follow up on a few of the questions the judge asked you, if that's okay.

THE JUROR:  Okay.

MR. BRUCK:  You -- right now you're living at home. Is that right?

THE JUROR:  Yes.

MR. BRUCK:  With your folks?

THE JUROR:  Yeah.

MR. BRUCK:  Have you and your parents talked about this case?

THE JUROR:  Not really, no.

MR. BRUCK:  You don't know whether they have any opinions about --

THE JUROR:  We don't really talk about it, so...

MR. BRUCK:  I don't mean now.  I mean at any time since the time of the bombing.

THE JUROR:  Well, I don't really watch much news.  My parents do.  We don't talk about the news either.

MR. BRUCK:  So you don't know how they feel about --

THE JUROR:  I could guess maybe but I'm not sure.

MR. BRUCK:  Okay.  You told us about your friend who's served in Afghanistan with the Marines and now he's in the Marines reserve?

THE JUROR:  Yeah.

MR. BRUCK:  You have not discussed the Marathon

bombing with him at all, at any time at all?

THE JUROR:  Not really, no.

MR. BRUCK:  What do you mean "not really"?

THE JUROR:  Well, I mean, everyone just brought it up and then, like, yeah, that sucks.  Like that's awful, it's horrible, but not really, like, in detailed discussion about anything.

MR. BRUCK:  Okay.  Do you remember when that was, when people just brought it up?

THE JUROR:  Not really.  It wasn't recent.

MR. BRUCK:  Okay.  Of course there's nothing wrong with that.

THE JUROR:  I understand that.

MR. BRUCK:  I mean, there's probably very few people in Boston who haven't talked about it, right?

THE JUROR:  Yeah.

MR. BRUCK:  Okay.  Now, there may be evidence in this case that the motive or part of the motive for the bombing was retaliation for -- or opposition to what our Marines and soldiers have been doing in Afghanistan and Iraq.

THE JUROR:  Uh-huh.

MR. BRUCK:  Did you know that?

THE JUROR:  I didn't know that, no.

MR. BRUCK:  Well, given the fact that you have a close friend who's served over there and is back here now and you see

him, do you think your relationship with him might affect the way you look at the decisions that the jury would have to make in this case if there was evidence like that?

THE JUROR:  Somewhat.

MR. BRUCK:  How do you mean?  Can you tell me more?

THE JUROR:  Well, I don't know.  I might be more likely to find him guilty in that situation.

MR. BRUCK:  And what about if he was -- if you found him guilty and you had to decide between the death penalty and life imprisonment, do you think your loyalty to your friendship with your -- with your friend might affect the way you looked at the punishment too if there was evidence like I described?

THE JUROR:  I do consider loyalty to my friends a little bit more important than most things, so maybe.

MR. BRUCK:  Okay.

THE JUROR:  Not having been put in a situation like that, I can't tell.

MR. BRUCK:  Sure.  Well, that's why we're asking you these questions, because as Judge O'Toole has told you, the law is that if you can, a juror is supposed to put everything to one side.

THE JUROR:  Yeah, I understand.

MR. BRUCK:  But the law doesn't ask more of people than they're capable of doing, and we're all human.

THE JUROR:  Uh-huh.

MR. BRUCK:  And you're the only one who knows that sitting here.  So that's why it's terribly important for you to really look inside.

THE JUROR:  I understand.

MR. BRUCK:  Are you telling me that you think your friendship might interfere with your ability to be a fair juror in this case?

THE JUROR:  I think I could put it out of the way, at least for the case.

MR. BRUCK:  How sure are you?

THE JUROR:  85 percent sure.

MR. BRUCK:  85 percent?

THE JUROR:  Yeah.

MR. BRUCK:  That's a very exact statistic.  Does that mean there's some chance you couldn't but you'd do your best?

THE JUROR:  Yeah, I think there's a slim chance I couldn't, 15 percent-ish.

MR. BRUCK:  Now, the judge asked you about the death penalty, and you've put on the form and you've told him that you're unsure how you feel about the death penalty in this case.

THE JUROR:  Uh-huh.

MR. BRUCK:  As you sit here today, do you lean one way or another on whether the death penalty is appropriate in this case?

THE JUROR:  I'm leaning more towards the death penalty is appropriate.

MR. BRUCK:  You are?

THE JUROR:  Uh-huh.

MR. BRUCK:  Can you tell me a little bit more about that?  Why is that?

THE JUROR:  Well, just with that many charges that could get the death penalty, I would think that's probably more likely that that would be the right outcome.

MR. BRUCK:  Okay.  And do you think -- I guess maybe the question is if you were on trial and -- would you be satisfied with a juror who had about the frame of mind you have?

MR. WEINREB:  Objection.

MR. BRUCK:  That's the question from *Irving v.*  --

THE COURT:  I know.  But the circumstances are very different.  I think I'll sustain the objection.

MR. BRUCK:  Would it take evidence from the defense to change your mind about whether the death penalty should be imposed?

MR. WEINREB:  Objection.

THE COURT:  That's sustained.  I mean, I explained the penalty phase and the process earlier.

THE JUROR:  Sure.

MR. BRUCK:  Do you think that the death penalty should

be imposed whenever it's proven beyond a reasonable doubt that someone is guilty of an intentional murder?

MR. WEINREB:  Objection.  He needs to be instructed first before he can answer that.

THE COURT:  Yeah, I think that's right.  I agree with that.

MR. BRUCK:  Well, I'll rephrase it.

Understanding that there's a whole second trial at which you'd consider mitigating and aggravating facts, remember, the judge told you about that this morning when you were in the jury box, but now I'm asking about what you think.

THE JUROR:  Uh-huh.

MR. WEINREB:  I object to the extent that suggests there's a difference between what he might think and what he might do in the jury box.  That's a bad question, I think.

THE COURT:  Well, start again.

MR. BRUCK:  He hurt my feelings.

MR. WEINREB:  A well-meaning question but...

MR. BRUCK:  Thank you.

I guess what I'm getting at is whether your own personal feelings about the death penalty -- as you said are very supportive of capital punishment -- would they cause you to automatically vote for the death penalty once it was proven beyond a reasonable doubt that the person was guilty of an intentional murder?

THE JUROR:  I think that there are very few circumstances where I wouldn't go for capital punishment.

MR. BRUCK:  You say "very few."

THE JUROR:  Yeah.

MR. BRUCK:  Can you tell us what --

THE JUROR:  I can't think of anything off the top of my head, no, but, I mean, there could be something that...

MR. BRUCK:  Well, I don't want to ask the same question twice --

THE JUROR:  I don't want to make it absolute.  I can't say absolutely yes or absolutely no, but...

MR. BRUCK:  But you cannot think of example of an intentional murderer --

THE JUROR:  Intentional, no.

MR. BRUCK:  -- that you would not give the death penalty to?

THE JUROR:  No.

MR. BRUCK:  Okay.  And that's understanding how the system is set up?

THE JUROR:  Yeah.

MR. BRUCK:  Thank you.

THE COURT:  Anything else?

MR. WEINREB:  No, your Honor.

THE COURT:  Okay.  Thank you.

(The juror is excused.)

(Break to change reporters, 12:37 p.m.)

THE CLERK:  Juror No. 283.  Ma'am, over here, please, if you would.  Have a seat.

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon.

THE COURT:  Since you were here filling out the questionnaire, have you been able to follow my instruction to avoid any discussion of the substance of the case with anyone?

THE JUROR:  Yes.

THE COURT:  Also, as much as possible, to avoid any media accounts of the case?

THE JUROR:  Yes.

THE COURT:  Thank you.  So we're going to follow up on some of the answers in the questionnaire.

You're currently a grad student?

THE JUROR:  Yes.

THE COURT:  At MIT?

THE JUROR:  Yes.

THE COURT:  So what does that mean in terms of your daily life?

THE JUROR:  It means I go to campus and I do research, and I take maybe one class a semester.

THE COURT:  Are you taking a class this semester?

THE JUROR:  No.

THE COURT:  So what -- give us an idea of the kind of

research you do and how you do it on a daily basis.  What do you do?

THE JUROR:  I do research in computer science in the field of databases.  And so my research mostly consists of writing code, meeting with my collaborators on campus and via teleconference and writing papers to submit to international conferences.

THE COURT:  Is any of this research time-sensitive or any deadlines or things like that?  What I'm getting at, sort of sometimes research is supported by grants.

THE JUROR:  Yes.

THE COURT:  The grant may have a time frame, a delivery date, things like that.  Do those things apply?

THE JUROR:  Yes.  Yeah, I do have some deadlines coming up in the next month or so, and also, like you said, research is time-sensitive.  If I were to lose, say, three to five months of research time, then I could -- potentially some other researchers somewhere in the world could be -- could do work that would put my -- the work I've done so far, make it irrelevant.

THE COURT:  Do you work on the research projects by yourself or with a team?  I think you said something about a team.

THE JUROR:  With a team.

THE COURT:  How big is the team?

THE JUROR:  Four people, four or five people.

THE COURT:  All grad students?

THE JUROR:  Three grad students, two professors.

THE COURT:  Okay.  Staying on the MIT theme, you know that one of the charges in the case relates to the death of an MIT police officer.  You're at MIT now.  I think you said one of the support things you did after the Marathon events was to have -- I think it was -- was it a T-shirt, an MIT Strong T-shirt?

THE JUROR:  Yes.

THE COURT:  Does the fact that there was an MIT police officer killed in the events, would that have an effect on your ability to be a fair and impartial in this particular case?

THE JUROR:  I don't think so.

THE COURT:  Okay.  Tell us why you don't think so.

THE JUROR:  I did not know the police officer.  None of the -- none of my close friends knew -- I know people -- or I know of people who knew him, and I think I could set aside my connection with MIT for this case, if necessary.

THE COURT:  Do you do any blogging or posting on websites as part of the -- your research duties at all?

THE JUROR:  No.

THE COURT:  We asked about social media, and you indicate that, as a personal matter, I guess, you use Facebook and Twitter?

THE JUROR:  Yes.

THE COURT:  Twitter, just personal?

THE JUROR:  Yes.

THE COURT:  Let me ask you to turn to Page 20, Question 77.  In this question we asked whether, based on things you'd seen or read or learned from any source, had you formed an opinion the defendant was guilty or not and whether he should be punished by the death penalty or not.  The first two, guilty or not guilty, you said, no, you had not formed an opinion.  And as to -- or -- anyway, you selected the box "no."  And then on the next two you selected the box "unsure."  Let me ask you about the first two, (a) and (b).  Have you formed an opinion about whether the defendant is guilty or not?

THE JUROR:  No.

THE COURT:  You've heard things about the events, I gather?

THE JUROR:  Yes.

THE COURT:  But that hasn't led you to form any opinions?

THE JUROR:  No.

THE COURT:  Is that -- can you tell us why?  I mean, in other words, have you purposely -- sort of consciously avoided drawing -- forming an opinion?

THE JUROR:  I think that I haven't seen all the evidence -- certainly I followed the news after the events

happened, but there's a lot of information out there that I just haven't seen, haven't had access to, that I feel could weigh in either way. So I haven't formed an opinion on that.

THE COURT: You probably understand that in a criminal prosecution, when someone is accused of a crime, the person is presumed to be not guilty or innocent unless and until the government proves the person is guilty of the crime charged and does that by the evidence at trial to the extent that the jury is convinced beyond a reasonable doubt that the fact of guilt is true. You understand that's the general framework in which we conduct prosecution?

THE JUROR: Yes.

THE COURT: The burden is always with the government to prove guilt beyond a reasonable doubt; and if the government does that, it's entitled to a verdict of guilty. But if it fails to do that, the defendant is entitled to be and must be acquitted; do you understand those principles?

THE JUROR: Yes.

THE COURT: So if you, after evaluating the evidence on any of the charges, concluded that the government had failed to convince you beyond a reasonable doubt that the defendant was guilty of that offense, would you be able to find the defendant not guilty?

THE JUROR: Yes.

THE COURT: With respect to the death penalty, let me

go over to Page 23.  We asked, beginning with Question 88, some general questions -- some questions about the death penalty, beginning with a general one, which is 88, about whether you had any views.  You said you generally oppose the death penalty.

THE JUROR:  Yes.

THE COURT:  Do you have anything to add to that?  Is that a sufficient statement of your view?

THE JUROR:  I think that's a sufficient statement of my view.

THE COURT:  Then we asked you to circle on the scale, from strongly opposed to strongly favor, where you might be as to whether the death penalty should be imposed when someone has been convicted of intentional murder.  You selected 3, which is on the opposed side of the spectrum but not all the way.  That, you think, is a good indicator of the strength of your views on this?

THE JUROR:  Yes.

THE COURT:  And in the next one, 90, on the next page, we asked if you could find a statement among the several proposed that seemed to come closest to your feelings about the death penalty when somebody has been proved guilty of murder. You selected (b), and you said, "I'm opposed to the death penalty and would have a difficult time voting to impose it even if the facts supported it."  Does that represent your

view?

THE JUROR: Yes.

THE COURT: Could you tell us a little bit more about your thought that you would have a difficult time even if you thought the facts supported it?

THE JUROR: So I personally oppose the death penalty, but I feel that if I were ordered by, you know, the judge to consider it under specific criteria that I would be able to make a decision either way. But I personally would have a hard time coming to terms with that decision.

THE COURT: But would you be genuinely open to a decision in favor of it if the facts and the -- as you evaluated them with your fellow jurors and by yourself, led you to think that in this -- in the circumstances you're thinking about it was an appropriate penalty?

THE JUROR: Yes.

THE COURT: If you'd look at Question 95, at the bottom of Page 25, we asked -- now, this is sort of focusing not on general views about the death penalty but proposing a hypothetical about this case. If you found the defendant -- this defendant guilty and decided the death penalty was appropriate for him, could you conscientiously vote for the death penalty? And you said, "I'm not sure." I just want to see how that relates to the last questions we were talking about. It -- in other words, let me -- and correct me if I'm

understanding you wrong.  To the other questions, you seemed to be saying you would have a difficult time, but if you came to the point where you thought it was appropriate, you could do it.  That indicated sort of overcoming the difficulty that you would have.

THE JUROR:  Yes.

THE COURT:  This puts it more in equipoise.  It's a little harder -- I'm just wondering if there's any inconsistency there or if this is consistent with what you were saying before.

THE JUROR:  I feel this response is consistent with what I put before.

THE COURT:  The next page, just to finish it off, there's sort of a reciprocal question.  "If you found him guilty and you thought that life imprisonment without the possible of release was the appropriate punishment, could you conscientiously vote for that penalty?  And you said "yes."  And that's without, I guess, reservation?

THE JUROR:  Yes.

THE COURT:  Follow-up?

MR. WEINREB:  Yes.  Thank you.  Good afternoon.  My name is Bill Weinreb.  I'm one of the prosecutors in the case.

I wanted to follow up on a few of your answers.  One thing I was having a little trouble figuring out from when you were talking about your job as a researcher, so are you -- is

this a paid position?

THE JUROR:  Yes.  I am paid a stipend by the university.

MR. WEINREB:  Will you continue to be paid if you serve on this jury?

THE JUROR:  I don't know.  I asked my employer about that, and no one -- this is something that has never come up for them before so they're not sure.

MR. WEINREB:  But you're paid out of the grant?

THE JUROR:  Yes.

MR. WEINREB:  Do you have reason to believe the grant says anything about jury service?

THE JUROR:  No, I have -- I don't know.

MR. WEINREB:  If money from the grant couldn't be used to pay you to be a juror -- or pay you if you're not researching, if you're being a juror instead, would that be a financial hardship for you?

THE JUROR:  Yes.

MR. WEINREB:  Would you be able to pay your bills?

THE JUROR:  No.

MR. WEINREB:  Or pay your mortgage?

THE JUROR:  (Shakes head.)

MR. WEINREB:  Is that a concern for you as you sit here today?

THE JUROR:  This is actually not something that I

thought about before you brought it up so I don't know.

MR. WEINREB:  Take a moment.  But let me know -- one of the things we're concerned about is whether -- when we ask people about various kinds of hardship is whether it's the kind of hardship that's going to be a real distraction for them in the jury box, make them worried, sort of distract them from what's going on in the courtroom.  So that's where I'm leaning with this, is now that you've had a moment to think about it, is that possible?

THE JUROR:  That could be a possibility.  That is a thing I would need to follow up with my employer.  And I was told by my employer that there is probably mechanisms in place that they can draw upon, but I have been given no concrete answers.

MR. WEINREB:  Well, let's talk then about the research itself.

THE JUROR:  Sure.

MR. WEINREB:  So is this research you've been working on for some time?

THE JUROR:  Yes.

MR. WEINREB:  How long?

THE JUROR:  This particular project, for about six months.

MR. WEINREB:  And you said that if you had to take four or five months to be -- or three or four months even to be

a juror, there would be a risk that somebody else would publish first.

THE JUROR:  Yes.

MR. WEINREB:  Now -- and then the judge asked you, Well, do you have other people working with you on this, and you said you did.

THE JUROR:  Yes.

MR. WEINREB:  I guess the final question is:  Does that -- the fact that there are other people working with you on it, does that take away that concern, or is that concern still there that somebody else would still publish first?

THE JUROR:  That concern is still there.  If you take away a third of the manpower, then the research is also affected.

MR. WEINREB:  So it would affect you, and it would affect your colleagues in that sense?

THE JUROR:  Yes.

MR. WEINREB:  Is that something that you would be concerned about if you were sitting on the jury?

THE JUROR:  Yes.  But if I were sitting on the jury, I would probably also be working in the evenings on my research as well.

MR. WEINREB:  Would that be sufficient to take care of all your concerns?

THE JUROR:  Yes.  I mean, I wouldn't be able to work

100 percent on my research, obviously, but for the main projects that I'm a part of, that would be sufficient.

MR. WEINREB:  Okay.  So it addressed a concern about the need to publish on time?

THE JUROR:  Yes.

MR. WEINREB:  So to speak?

THE JUROR:  Yes.

MR. WEINREB:  You said that you're a computer science major at MIT?

THE JUROR:  Yes.

MR. WEINREB:  You work in a building at the corner of Vassar and Main Streets?

THE JUROR:  Yes.

MR. WEINREB:  Is that the Stata Center?

THE JUROR:  Yes.

MR. WEINREB:  You're aware that Officer Sean Collier was murdered right outside the Stata Center, just feet away?

THE JUROR:  Yes.

MR. WEINREB:  Do you know the spot where he was murdered?

THE JUROR:  Yes.

MR. WEINREB:  Do you go by there?

THE JUROR:  Occasionally, I do go by there.

MR. WEINREB:  You know that there's a courtyard there?

THE JUROR:  Yes.

MR. WEINREB:  Let me take a step back.  I anticipate in this trial there will be a lot of testimony about that area.

MS. CONRAD:  Objection.

THE COURT:  I don't understand the objection.

MS. CONRAD:  Well, this whole area.  I'm objecting to this whole area.  I'm not sure where this is going.

THE COURT:  No.  Go ahead.

MR. WEINREB:  There will be a lot of testimony about that particular location.  And do you have personal knowledge of that location?

THE JUROR:  Yes.

MR. WEINREB:  Is that something you will bring with you into the jury box?

THE JUROR:  Could you clarify that?

MR. WEINREB:  Okay.  So if you hear testimony about that location and it disagrees with your personal observations of it, is that something that would cause you problems in evaluating -- in believing the testimony, the mere -- the fact that your own personal knowledge of it from outside of the courtroom conflicted with what you heard on the witness stand?

MS. CONRAD:  Objection, your Honor.

THE COURT:  Yeah, sustained.  It's just too speculative.

MR. WEINREB:  Are you capable of completely putting out of your mind all the information -- all the personal

experience you have with that location?

MS. CONRAD:  Objection.

THE COURT:  I think that's -- I don't think this is going in a productive direction.

MR. WEINREB:  Okay.  You know there's a courtyard there?

THE COURT:  So, I mean, I don't know what the evidence you have in mind is.  Is it about lines of sight or something like that?  Is that -- physical arrangement?

MR. WEINREB:  Yes.  It's -- it's not just about lines of sight.  That whole -- a lot happened in that whole area. There's surveillance video.

MS. CONRAD:  Objection, your Honor.  This could apply to --

THE COURT:  I don't think we have to go into this.  I mean, you know, somebody could be a juror in a crime committed on Main Street.  The fact that they're familiar with Main Street shouldn't be an impediment.  I think we can go to a different area.

MR. WEINREB:  Excuse me one moment.

So turning your attention back to Question 88 for a moment, if you don't mind.

THE JUROR:  Yes.

MR. WEINREB:  Could you say -- can you tell us why you generally oppose the death penalty?

MS. CONRAD: Objection.

THE COURT: No. Go ahead.

THE JUROR: I think it's hard to say that I would have the authority to end someone's life and to put someone to death. I don't know what -- I don't feel like I have that power.

MR. WEINREB: Well, you do understand that if you were -- if you were to sit on a jury in a death penalty case, then you would be potentially given that power? If the defendant is found guilty of a capital crime, then you have to decide, along with 11 other people, whether he lives or dies.

THE JUROR: Yes.

MR. WEINREB: And so can you -- how do you reconcile that with saying you don't believe you have that power? Are you saying -- I'm not sure I understand. Are you saying you don't believe you should have that power or you couldn't exercise the power?

THE JUROR: Yes. I mean, I don't feel like I should have that power.

MR. WEINREB: Do you believe that that feeling, that you don't believe you should have the power, would make it impossible for you to exercise the power?

THE JUROR: No.

MR. WEINREB: I think you said earlier that, although you don't believe in the death penalty, you could follow the

rules of a capital case as they were explained to you.  And it's obvious you understand that the rules are that you can vote one way or the other on the death penalty or life imprisonment.

THE JUROR:  Yes.

MR. WEINREB:  But you understand that there will be no -- you won't be given a formula or some set of criteria where, if they are met, you must vote for the death penalty or, alternatively, that you must not.  So it's not like there are going to be a set of rules where you can just sort of follow them and arrive at the death penalty decision.

MS. CONRAD:  Objection, your Honor.

THE COURT:  No.  Go ahead.

MR. WEINREB:  It's always going to be up to you in the end to weigh aggravating factors and mitigating factors and decide whether, in your view, the death penalty is appropriate. Do you understand that?

THE JUROR:  Yes.

MR. WEINREB:  Okay.  So knowing that, can you -- do you still -- is it still your answer that you could apply the death penalty in a case where the facts, in your view, supported it?

THE JUROR:  If the facts, in my view, supported it, then, yes, I could.

MR. WEINREB:  Okay.  And by "the facts," we're talking

about the facts that would be presented to you in court during the trial?

THE JUROR: Yes.

MR. WEINREB: Were you at MIT on the night that Sean Collier was murdered?

THE JUROR: I was on -- I was not in the Stata Center. I was on campus.

MR. WEINREB: Were you in the area --

THE JUROR: No.

MR. WEINREB: -- where it occurred?

Thank you very much.

MS. CONRAD: I have no questions. Thank you very much.

THE COURT: All right. Thank you, ma'am.

We'll take a break for lunch, come back at 2.

(Luncheon recess taken at 1:00 p.m.)

(The Court entered the courtroom at 2:05 p.m.)

THE CLERK: Juror No. 286. Ma'am, over here, please, if you would. Have a seat.

THE COURT: Good afternoon.

THE JUROR: Good afternoon.

THE COURT: Since you were here to fill out the questionnaire, have you been able to follow my instructions to avoid discussing the substance of the case?

THE JUROR: I have.

THE COURT:  And as much as possible, to avoid any media accounts?

THE JUROR:  Yes.

THE COURT:  Thank you.  Tell us about your work.

THE JUROR:  I'm a general manager of a restaurant.

THE COURT:  And you've been doing that for a couple of years?

THE JUROR:  No.  I've been doing it for about a year and a half.  I've been with the same restaurant for about 24 years.

THE COURT:  So you were recently promoted to general manager?

THE JUROR:  Correct.

THE COURT:  How big -- how many staff people do you supervise?

THE JUROR:  About 50.

THE COURT:  We asked a little bit about social media you use.  You use what?  Facebook?

THE JUROR:  Facebook, Twitter, Instagram.

THE COURT:  Mostly for family or social?

THE JUROR:  Yeah, just social.  Facebook, I keep up with friends and relatives.  Twitter, I watch TV and kind of tweet while I'm watching TV with other people that are watching the same programs that I'm watching.

THE COURT:  Does that include news programs?

THE JUROR:  No.

THE COURT:  You have prior jury experience in the Suffolk Superior Court?

THE JUROR:  I do.

THE COURT:  That was a civil commitment?  Was that what it was?  What was it?

THE JUROR:  It was a --

THE COURT:  A patient?

THE JUROR:  Right.  He was kind of -- I guess they had stated that he wasn't going to be allowed back out into the public, and he was kind of appealing, I guess, that decision.

THE COURT:  When was that?

THE JUROR:  Probably about four years ago.

THE COURT:  What was the decision?

THE JUROR:  He was sent back to Bridgewater State Hospital.

THE COURT:  So if you'd turn to Page 20, I want to direct your attention to Question 77.  In that question we asked whether, based on what you'd seen or read in the media or heard from any other source, had you formed an opinion the defendant was guilty or not guilty or should receive the death penalty or should not receive the death penalty.  To each of those you answered, no, you hadn't formed an opinion.

THE JUROR:  Correct.

THE COURT:  Is that accurate?

THE JUROR: Yes.

THE COURT: You probably have seen things about the case?

THE JUROR: Absolutely.

THE COURT: But that hasn't led you to form any --

THE JUROR: I'll tell you, I watch the news. I've seen reports of the -- everything on the news. When I read those questions, I was kind of -- you know, you're putting it on me, and I don't feel I knew enough of the facts to base a decision. I assume while I'm watching the news that I'm -- the police or whatever have done -- they got who they were looking for. I kind of left it at that. When it was being pinpointed at me, I wasn't comfortable with the information I knew to make an accurate decision.

THE COURT: You know that in a criminal prosecution anybody who is accused of a crime is presumed to be innocent, not guilty, unless the government proves otherwise, proves the person guilty by evidence at the trial.

THE JUROR: I understand.

THE COURT: The evidence has to be convincing to the degree of -- the jurors would be convinced of his guilt beyond a reasonable doubt. Corollary of that is, if the jurors are not so convinced, it's their obligation to find the government has failed its burden of proof and to find the defendant not guilty.

THE JUROR:  Correct.

THE COURT:  Would you be able to faithfully apply those principles if you were a juror in this case?

THE JUROR:  I would.

THE COURT:  With respect to guilt or innocence?

THE JUROR:  Absolutely.

THE COURT:  You say you went to the Boston Strong concert at the Garden and bought a T-shirt there?

THE JUROR:  Yeah.  Actually, I was -- I realized afterwards that I bought the T-shirt actually for the concert. I thought, when I was filling out the questionnaire, that I had bought it at the concert.  But I bought it to attend the concert.

THE COURT:  Do you still use it?

THE JUROR:  No.  I'm not really a T-shirt -- I'll tell you the last time I remember wearing it was at Disney World a year and a half ago only because so many people commented on it when we were there, but I'm not really a T-shirt, jeans-type person.

THE COURT:  We asked a series of questions about attitudes towards the death penalty in general and perhaps more particularly.  If you'd turn to Page 23, with Question 88, we started by asking you if you had any views about the death penalty in general, what are they, and you said you don't really have any.

THE JUROR:  I don't.

THE COURT:  Is it something you've thought about over the years or not thought about it over the years?

THE JUROR:  I never really thought it.  It doesn't really apply to me or my life.  That maybe sounds selfish, but I just --  if it doesn't apply to me, I don't really give it much thought.

THE COURT:  Okay.  In the next question, we asked you to indicate where you thought you might fall on a numerical scale from 1 to 10, from strongly opposed to strongly favor.  You're sort of in the middle.

THE JUROR:  I'm in the middle, yeah.

THE COURT:  And then Question 90 on the next page, there's a series of propositions that go from opposition -- strong opposition to strongly in favor.  And we asked you to pick the statement that might best capture your own point of view on this.  And you've selected (d), which is, "I'm not for or against the death penalty.  I could vote to impose it, or I could vote to impose a sentence of life imprisonment, whichever I believed was called for by the facts and the law in the case."  That's what you selected then.  Does that -- today, that does seem to still be the way you would be on the scale of things?

THE JUROR:  Yes.

THE COURT:  You heard me this morning talk about how

there would be a penalty phase and there would be presentations probably about aggravating factors and mitigating factors. Would you be able to listen to all that evidence and in the end decide which, assuming -- of course, you don't get to the penalty phase until you found the defendant guilty of intentional murder. That's the premise. Would you be able in the penalty phase then to consider all the aggravating, mitigating circumstances, anything else that seemed important to you and be able to choose in either direction depending on how you weighed the evidence?

THE JUROR: I could.

THE COURT: The bottom of 25, Question 95, and then 96 on the top of the next page, we asked first -- now, these are not about general views about the death penalty but kind of bring you to this case. If you found this defendant guilty and you decided that the death penalty was an appropriate punishment, could you conscientiously vote for the death penalty?

THE JUROR: Yes.

THE COURT: You said "yes."

THE JUROR: Uh-huh.

THE COURT: The other side of that is the next question. If you found him guilty and decided on the other hand that life imprisonment without possibility of release was the appropriate punishment, could you conscientiously vote to

impose that --

THE JUROR: Yes.

THE COURT: -- punishment?

Okay. Anything? Mr. Mellin.

MR. MELLIN: Good afternoon, ma'am. I'm Steve Mellin. I'm one of the prosecutors on the case. I want to go right where Judge O'Toole was asking questions about the death penalty. If we can just kind of see if we can dig down a little bit on that. You say you were kind of not for it, not against it. But where -- when you think about it, I mean, what impressions do you have of the death penalty?

THE JUROR: I don't really have any. I mean, I could -- it doesn't bother me. I don't feel like -- I guess I don't feel like I'm the one that's sentencing somebody to death or prison for the rest of their life. It's their own actions that are determining that factor. If I'm following the law or whatever -- it's kind of the same thing with my job. I fire people, and they're, like, How can you do that to somebody? I'm, like, I didn't do that. They did that. They consciously made the effort to not come to work or to steal or be late or whatever. I feel the same way with being a juror, being told to follow the law and what I've heard, and I'll decide that by what I've heard in the courtroom.

MR. MELLIN: You've heard a little bit about how this process works. But if the jury does find the defendant guilty

of one of these capital offenses, the jury would go on to decide whether it will be life imprisonment or death penalty; do you understand that?

THE JUROR:  I do.

MR. MELLIN:  So it really is going to be up to the jurors to make the call between does the evidence support the death penalty or does it support life imprisonment.  And it's going to be a call that you will have to make.  And if you believe that the aggravating factors sufficiently outweigh the mitigating factors to justify a sentence of death, would you actually be able to vote to sentence someone to death?

THE JUROR:  I could.

MR. MELLIN:  Thank you.

THE JUROR:  You're welcome.

MS. CLARKE:  Hi.  My name is Judy Clarke.  I'm one of Mr. Tsarnaev's lawyers.

THE JUROR:  Good afternoon.

MS. CLARKE:  You're a supervisor?

THE JUROR:  I'm a general manager, supervisor.

MS. CLARKE:  A big supervisor --

THE JUROR:  Yes.

MS. CLARKE:  -- of a good number of people, it sounded like.  A jury, everybody is sort of equal.  Have you thought about how that might work for you?

THE JUROR:  No.  I mean, I kind of almost prefer it.

I don't like being the center of attention. I kind of actually like being -- it would be more comfortable for me actually.

MS. CLARKE: Can you help us understand that a little bit more? More comfortable --

THE JUROR: I took the position. It was offered to me. I actually said no six times to my boss. I didn't want the position. I didn't want the responsibility. I was kind of guilted, I guess, into it, but they didn't have anybody else that they felt comfortable doing it. I've had a problem with that decision since the day that I've taken the job. I've played the lottery more in the last year and a half then -- hoping for that retirement. It's not a comfortable position for me. It's -- so being level with everybody and equal with everybody is a lot more comfortable for me personally.

MS. CLARKE: Not having anybody to boss around?

THE JUROR: Right, or being responsible for somebody.

MS. CLARKE: Well, it's huge responsibility being on a jury deciding whether somebody is going to live or die based on their actions or not. How do you think you would cope with that responsibility?

MR. WEINREB: Objection.

THE COURT: No. I think you can answer that. Go ahead if you're able to.

THE JUROR: Yeah. I don't feel like I would have an issue with it. I've done -- it hasn't been a death penalty

case before, but I've been on a case before and I've had no problem.

MS. CLARKE: With your prior jury service? You said that was a positive experience, I think.

THE JUROR: Yeah. Actually, it's, like, when you were giving our instructions on day one, you have this sense of pride coming out of there, whatever, that you've done something very important. Somebody like myself, I haven't really gone to college. I was a waitress for years. I feel the same way when I come out of the voting booth every time I vote. It's something very important that I've done. It's probably one of the most important things that I will do in my life.

MS. CLARKE: Okay. At the restaurant, did your employees or coworkers, colleagues, talk about the Boston Marathon bombing when it happened?

THE JUROR: No. I work 20 miles out of the city. We were actually really busy. I was a waitress at the time. I was kind of like joking with my boss I wanted to go home. Boston was -- I live in Boston, and Boston was on lockdown. I'm, like, I have to go home. We're on lockdown. We were really busy. All the restaurants around rely on people coming from public transportation. It was shut down. We were already there and open. It's a breakfast restaurant so all -- we open at 7 a.m. We were all there at 6:00 in the morning. Yeah, we were busy. We were working.

MS. CLARKE:  But you knew about it?

THE JUROR:  Yeah, yeah.

MS. CLARKE:  Over the course of time, have people there talked with you about it?

THE JUROR:  No, not really.

MS. CLARKE:  All right.

THE JUROR:  No.

MS. CLARKE:  Family or friends talk with you about the Marathon bombing?

THE JUROR:  No.

MS. CLARKE:  Or any of the events of that week?

THE JUROR:  No.  I remember talking to my kids about it explaining situations with them.  There was something else going on at UMass Boston when the bombing was all going on.  I was a lot more concerned about what was going on there.  I guess it ended up being like a -- I can't think of the word but an explosion of an AC unit or something.

MS. CLARKE:  Oh.

THE JUROR:  I have a brother that works over there, so I was more concerned about what was going on over there than what was actually going on in Downtown Boston.

MS. CLARKE:  All right.  You've just not had any conversations really about this case?  I mean, before the judge instructed you.

THE JUROR:  Before, yeah.  I mean, maybe in general or

something but not really.  It didn't really -- I don't attend the Marathon.  I don't go into Downtown Boston.  I didn't know anybody that was affected from it.  Maybe just in general.  You know, I mean, just in general.  Hey, did you hear what happened at the Marathon?, something like that.

MS. CLARKE:  I think you said in the questionnaire that you'd read a moderate amount of the press coverage.  That's Question 73 if you wanted to take a look.  Can you tell us what stands out in your mind that you read about it?

MR. WEINREB:  Your Honor, I object.

THE COURT:  Yeah.  I think so.

MR. WEINREB:  We've already plowed this ground.

THE COURT:  She's already indicated what her attention was to it.  I think that's enough.

MS. CLARKE:  You mentioned you went to Disney World, I guess the Florida --

THE JUROR:  Right.

MS. CLARKE:  -- version of it.  And people commented on your Boston Strong shirt.  What were those conversations like?

MR. WEINREB:  Objection.

THE COURT:  You can summarize what people may have said.

THE JUROR:  It was more or less, like, Oh, cool.  Cool shirt.  They would point or whatever.  It was -- my boyfriend

and I attended the concert together.  It only stood out in my mind because I had worn it that day, and then the very next day, he wore his.  I said, Oh, you just got jealous about all the attention I got yesterday from my shirt.  But there were people, like, Cool shirt, high five.  They'd walk by and be like, Hey.

MS. CLARKE:  He did get the appropriate attention, I take it?

THE JUROR:  He did.

MS. CLARKE:  And was one up on you, I take it?

THE JUROR:  Right.

MS. CLARKE:  Let me go back to your job very quickly.  You're a general manager.  If you're in trial here for three or four months, do you get paid okay?

THE JUROR:  You know, it's not something I discussed with my boss.  She's not on-site.  I'm the only one on-site.  She knows about my service here.  I just kind of, I guess, taken it into my own that we're here Monday through Thursday.  I could really work Friday, Saturday, Sunday.  And we're not here on holidays.  Most of my job is, when everybody else isn't at work, that's when I work.  I work weekends.  I work holidays so -- and they'll have to cover, you know, or not cover, whatever.

MS. CLARKE:  So you're not evaluating this as a hardship for you if you were to actually serve?

THE JUROR:  No.  I could probably squeeze in most of my hours with the schedule of the court.

MS. CLARKE:  All right.  Just one second, Judge.

Thank you very much.

THE JUROR:  You're welcome.

THE COURT:  That's it.  Thank you.  Just leave that there.

THE CLERK:  Juror 288.  Ma'am, over here, please.  Have a seat.

THE COURT:  Good afternoon.

THE JUROR:  Hello.

THE COURT:  Since you were here last, have you been able to follow the instructions not to discuss the case with anyone except to tell them you're here?

THE JUROR:  Yup.

THE COURT:  And also to avoid any media reports?

THE JUROR:  Yup.

THE COURT:  So we have your questionnaire.  That's the one you filled out.  I'm going to follow up on some of the information you gave us.  You can see I'm turned to the page where you've listed your employment.  It looks like you're doing kind of two different jobs at the same time.  Is that fair?

THE JUROR:  Yup.

THE COURT:  You're a supermarket deli clerk, and you

also do work as a massage therapist.

THE JUROR:  Yes, sir.

THE COURT:  How do you work that out?

THE JUROR:  I work part time for both jobs.  I'm subcontracted as a massage therapist.

THE COURT:  What does that mean?

THE JUROR:  It means that I can make my own hours, so, like, I -- basically I have a set schedule at Market Basket, and I work during, like, the mornings during the week.  And then I massage on the weekends and some nights.

THE COURT:  We had asked in Question 10, which is on Page 5, whether serving on a case of this length would represent any serious hardship to you including, of course, financial hardship.  You said "no" there.  But I notice later on, in answer to Question 75, which begins on Page 19 and then goes over, actually, to Page 27 where it's completed, we asked, when you got a summons for the jury service, what kinds of things did you say to others or they say to you.  And you said, "I said that I couldn't believe you could be called for that long.  How can anyone be without work for that long and still afford to pay rent and other bills?"  And you said, "Others told me that this case would be part of history."

I guess the question is:  Would you be impacted by the inability to earn enough to pay rent and other bills?

THE JUROR:  To pay other bills, yes.  But I'm lucky

enough to live with my mom still, so I don't pay rent.  I'm --

THE COURT:  So I guess I'm trying to -- I take it that -- I think you said you're sort of a subcontractor as a massage therapist, so you get paid for the services.  You give somebody a massage.  Then you get a payment for that.  So it's, as you work, you get paid.  If you don't work, you presumably don't get paid.

THE JUROR:  Don't get paid.

THE COURT:  At the supermarket, are you an hourly employee?

THE JUROR:  Yes.

THE COURT:  So it would be pretty much the same thing?

THE JUROR:  Yeah.

THE COURT:  If you work, you get paid; if you don't, you don't?

THE JUROR:  Yeah.

THE COURT:  I understand, for both kinds of jobs, you could have, say, hours other than 9 to 5 on a regular basis, either evenings and weekend.  What I'm trying to get at is how much of a burden it would be for you to be asked to serve on this case.  We don't want somebody to take a serious financial hit in order to serve on the case.  But you're the best one to tell us how tough it would be.

THE JUROR:  The only reason that it wouldn't be hard for me is because I could still work weekends.  I can make my

own hours with the massage.  So that's helpful for me.  But it obviously, like, even just coming in for jury duty has been hard.  Like, I didn't really make enough money in the past month to pay my bills, so I had to borrow from my mom.  But --

THE COURT:  Well, you had told us you didn't think it was a hardship.

THE JUROR:  I shouldn't have wrote that.

THE COURT:  It seems like it might be, and so I'm just trying to -- but you're the one that's going to feel it.  I just --

THE JUROR:  I'm already feeling it.

THE COURT:  I guess is that a reason why this isn't the case for you?  Or do you think you could do it and --

THE JUROR:  I don't know.  I think that I could probably handle it because I could continue to work.  I just, like --

THE COURT:  Here's what we don't want.  We don't want you to get six weeks into the case and then say, I've got to go.

THE JUROR:  Yeah.  Well --

THE COURT:  You know?  But you're the best judge of that.  We're hearing what you say, but you've got to be the one that says, That's too much for me or I can handle that.  And it's --

THE JUROR:  I think that the hardest part right now is

not knowing when I have to be here so I can't, like, tell my boss.

THE COURT:  We're in this process where it's not regulated.

THE JUROR:  I had to call out three days this week because we were supposed to be here Monday and then Tuesday.

THE COURT:  Blame Mother Nature.

THE JUROR:  Yeah.

THE COURT:  That would be -- it would be a different story once you were on a regular schedule and you could predict that --

THE JUROR:  Yeah, because I --

THE COURT:  -- you have to be in court Monday through Thursday next week?

THE JUROR:  Only because I could tell them, and then I could work opposite from when I was here.

THE COURT:  Okay.  You use Facebook, it says, weekly.

THE JUROR:  Uh-huh.

THE COURT:  Compared to some people, that's not that much, I guess.  What do you do on Facebook?

THE JUROR:  Just, like, checking on people.

THE COURT:  Do much posting yourself?

THE JUROR:  Not really.  Sometimes.  I like to post pictures.

THE COURT:  You have an uncle who's a police officer?

THE JUROR:  He was.  He's retired.

THE COURT:  Or was.  I see.  Where was he a police officer?

THE JUROR:  In Amesbury, Massachusetts.

THE COURT:  How long did he do that?

THE JUROR:  I'm not really that sure.  It was, like, his career so --

THE COURT:  And he retired, I guess, 2012?  That's what you put on the --

THE JUROR:  I'm pretty sure it was 2012.

THE COURT:  Is he doing anything now?

THE JUROR:  No.  He's in Florida.

THE COURT:  So if you'd look at Page 20, Question 77, near the top, in this we asked whether, based on things you'd seen or read in the news media or from other sources, had you -- at the time you filled out this form, the questionnaire, had you formed an opinion that the defendant was guilty or not guilty and then whether he should receive the death penalty or not receive the death penalty.  Let's take the (a) and (b) part first.  You said "unsure" as to whether you had formed an opinion that he was guilty or that he was not guilty.  Can you explain what you were thinking when you chose "unsure" as your answer?

THE JUROR:  I wasn't really -- like, I haven't seen that much about it in the news.  I was in Virginia.  I was

living down there when it happened.  And so I, like, didn't have internet or cable, so I didn't actually hear that much about it.  And so I really don't know.  Like, I didn't follow the case.  I didn't pay attention to it.

THE COURT:  Did you know that had happened?

THE JUROR:  Yes.

THE COURT:  Even though you don't know that much?

THE JUROR:  I knew that happened.  My brother was in Boston when it happened.

THE COURT:  Okay.  Were the news reports carried in Virginia about it?

THE JUROR:  I'm sure they were.  But, like I say, I didn't have cable.

THE COURT:  I see.  So you understand that in our criminal justice system a person who is accused of a crime is presumed to be innocent of the crime unless and until the government proves that he's guilty of it by evidence at the trial that convinces the jury that, in fact, he committed the crime charged and that they're convinced of it beyond a reasonable doubt.  Do you understand those principles?

THE JUROR:  Yup.

THE COURT:  If you were a juror in this case, would you be able to faithfully apply those principles, hold the government to its burden of proof?

THE JUROR:  I think so.

THE COURT:  And if the government failed in its burden of proof as to any of the charges, would you be able to find the defendant not guilty?

THE JUROR:  I think so.

THE COURT:  I just want to -- before moving to some other questions, at the bottom of the page, you say your brother was at the Red Sox game.  I presume you mean the day of the Marathon.

THE JUROR:  Yup.

THE COURT:  When he heard what happened.

THE JUROR:  Yeah.

THE COURT:  First of all, how do you know that?

THE JUROR:  Because he told me.

THE COURT:  When?

THE JUROR:  Because he's my brother.  Recently.  I actually didn't even know.

THE COURT:  He didn't tell you at the time?

THE JUROR:  No.

THE COURT:  He didn't say, You won't believe what happened today?

THE JUROR:  No.  I actually heard from my mom.

THE COURT:  Did he tell you anything about things he saw, heard?

THE JUROR:  No.

THE COURT:  We asked a series of questions about

attitudes towards the death penalty, and they begin on Page 23, at No. 88.  That's a general question.  If you have any views about the death penalty in general, what are they?  And you wrote, "I don't agree with the death penalty."  Is that a fair statement?

THE JUROR:  Yes.

THE COURT:  Anything you want to add to that as a general proposition, what you think generally about it?

THE JUROR:  I just think that -- I don't really know.  The death penalty is, like -- I don't know.  I just feel like when people serve, like, a sentence in jail, they actually have to deal with what they did.  And the death penalty is kind of like getting them out of that.  They don't have to, like, sit there and think about it.

THE COURT:  So your opposition is not because you think it's --

THE JUROR:  Cruel.

THE COURT:  -- unusually cruel?

THE JUROR:  Well, it is cruel but --

THE COURT:  But that's not the basis of your reservation?  Your reservation is that isn't severe enough?

You have to answer verbally for the court reporter.  You can't shake your head.

THE JUROR:  It isn't severe enough.

THE COURT:  In Question 89 we asked you to put

yourself on a scale from 1 to 10, strongly oppose; 10 is strongly favor.  You selected 2.

THE JUROR:  Yeah.

THE COURT:  Is that put -- you think that gets the flavor of your opposition?

THE JUROR:  Uh-huh.

THE COURT:  If you look at Page 24, Question 90, we asked if you would agree with one of the statements that had different positions about the death penalty and what might happen.  You chose (c).  "I am opposed to the death penalty but I could vote to impose it if I believe the facts and the law in the particular case called for it."

THE JUROR:  Yup.

THE COURT:  Does that accurately sum up your view about it?

THE JUROR:  Yeah.

THE COURT:  While you were opposed to it and have some --

THE JUROR:  I guess, like -- is it okay if I --

THE COURT:  Yes, go ahead.  I want to hear from you.

THE JUROR:  I understand that in some cases the death penalty, like, should be used.  I just like -- I feel like some people, like, don't -- I don't know.  I don't really know how to explain it.  Like, it's not that, like, I think the death penalty isn't, like, severe enough.  I think that, like, it's

allowing them to, like -- it's, like, escape -- I don't know how to say it.  But I do believe that, like, I could, like -- I don't know.

THE COURT:  Well --

THE JUROR:  I get really nervous talking in front of people.

THE COURT:  Understandable.  Let me ask you this:  Is this something that you -- your position on the death penalty is something you had thought of before we asked you these questions or --

THE JUROR:  Not really.

THE COURT:  -- is this something you were reacting to when you filled out the questionnaire?

THE JUROR:  I was reacting to it when I filled it out.

THE COURT:  Not having thought about it much before?

THE JUROR:  Yeah.

THE COURT:  Have you thought about it much since filling out the questionnaire?

THE JUROR:  A little bit, not that much.

THE COURT:  One thing -- that's why I guess we're asking the questions whether this really does represent your views.  I mean, we understand the circumstances under which you are asked to do this, to fill out the questionnaire.  Has your thinking changed in any way from, say, letter (c) -- why don't you look at it -- which is the one you selected?  And if it has

changed, if you'd tell us how.  And if it hasn't, that's fine, too.  You can tell us that.

Actually, as do you that, you might look at some of the others as well.  Don't just focus on that.  Review them and see if that still does best represent where you think you are.

THE JUROR:  I think that I could change that to (d).

THE COURT:  (d)?

THE JUROR:  Yes.

THE COURT:  (d) is, "I am not for or against the death penalty.  I could vote to impose it" --

THE JUROR:  Yup.

THE COURT:  -- "or vote to impose a sentence of life imprisonment without possibility of release, whichever I believe was called for by the facts and the law of the case"?

THE JUROR:  Yes.

THE COURT:  You think that's a better statement of your views than (c)?

THE JUROR:  Yes.

THE COURT:  So you heard me this morning describe the so-called penalty phase, potential penalty phase of a death penalty case?

THE JUROR:  Yes.

THE COURT:  This morning?

Of course, you only get to the penalty phase if you've convicted the person of intentional murder.

THE JUROR:  Yup.

THE COURT:  So if (d) is your view, then is it the case that you would make the decision between the alternatives: on the one hand, the possibility of a sentence of death; on the other hand, the possibility of a sentence of life without possibility of release?  You'd make that decision, evaluating the evidences in the penalty phase, and go where you were led by that evidence?

THE JUROR:  Yes.

THE COURT:  Do you have any reservations about that?

THE JUROR:  Honestly, like, the whole thing makes me kind of nervous.  I don't --

THE COURT:  Yeah.  It's serious issues.

THE JUROR:  I don't want to be the -- you know, I don't know.  I feel like anybody -- nobody wants to be the person to, like, put somebody to death, you know.

THE COURT:  Well, let's turn to the next page, 25, on that subject.  The question at the bottom of the page, 95, if you found the defendant guilty and if you decided that the death penalty was the appropriate punishment for him, could you conscientiously vote for it?  That brings up what you were just talking about.  You said "yes" then.  Are you less sure now?

THE JUROR:  I'm a little bit less sure.  I think, like, I could do it.

THE COURT:  Reluctantly?

THE JUROR:  No, I don't think it would be reluctant, you know, depending on, like, the evidence.

THE COURT:  We asked the other side of that question at the top of the next page.  If you found him guilty and you decided life imprisonment without possibility of release was appropriate as punishment for him, could you conscientiously vote for that?  And you said "yes" to that as well.

THE JUROR:  Yeah.

THE COURT:  Any reservations about that?

THE JUROR:  No.

THE COURT:  Any follow-up?

MR. WEINREB:  Just a few questions.  Good afternoon.

THE JUROR:  Hi.

MR. WEINRAB:  My name is Bill Weinreb.  I'm one of the prosecutors in the case.  I just wanted to follow up on a couple things.  First, can you just clarify, when were you living in Virginia?

THE JUROR:  I was there in 2012 and the beginning to, like, middle of 2013.

MR. WEINREB:  And then you moved back?

THE JUROR:  Yeah.  I was basically -- like, I lived down there with my ex-boyfriend.  We were on his family farm.  So I wasn't, like, really living there, but I was down there.

MR. WEINREB:  Since you've moved back, you've been here?

THE JUROR:  Yeah.

MR. WEINREB:  On the issue of the death penalty, if I could turn you back to your answer to 88 for a minute.  So for a bit there, I thought I understood what you were saying, but now I'm not so sure based on what you said later.  So let me just ask you again.  So you wrote, "I don't agree with the death penalty."  And I thought I heard you say that you don't agree with it because you think that it's not a harsh enough punishment.

But then later on you talked about how -- it sounded like the reason you would be -- you were saying that you would be hesitant to impose the death penalty is that because it is a harsh sentence.

THE JUROR:  Well, of course, it's harsh, but it's harsh for, like, me to say, like, that you should be sentenced to death.  But I almost feel like it's not harsh enough for the person that's committed the crime.  I don't think that really makes sense, but --

MR. WEINREB:  Is life imprisonment harsher?

THE JUROR:  I believe so.

MR. WEINREB:  But you said you would have no problem imposing a sentence of life imprisonment, but you would have a problem imposing a sentence of death?

THE JUROR:  No.  I said "yes" to both.

MR. WEINREB:  I thought just now you said you were --

you said that -- well, let me ask you:  So you think that they're both -- are they equally bad, or is one harsher than the other?

THE JUROR:  I think that, like, for a person to serve life in prison, it's harsher for them because they have to deal with their consequences.  But, like, for the community, it's harsher for the death penalty.

MR. WEINREB:  And what about for you?

THE JUROR:  I think that serving life in prison is harsher because you have to deal with what you did.

MR. WEINREB:  I guess I don't mean how do you feel about it.

MR. BRUCK:  I think we've covered this.  I object to going over this.

THE COURT:  I don't know.  Let me hear the question. We have been over the territory, but maybe this is a new question.  I don't know.

MR. WEINREB:  I guess what I'm trying to understand is -- the judge explained that at the sentencing phase you weigh aggravating factors and mitigating factors.  Aggravating factors are factors the government believes justify a sentence of death, and mitigating factors are factors that the defense believes justify a sentence of life imprisonment instead of death.

THE JUROR:  Okay.

MR. WEINREB:  So if you found that the aggravating factors outweighed the mitigating factors, so this was a particularly heinous crime, would you be more inclined to impose a life sentence because that's the harsher sentence in your view?

THE JUROR:  No, because that's -- the death penalty is what is, like -- what is -- like, that's what the charges are -- the consequence of the charge is the death penalty.  I, like, agree with that.  I agree with our government.

MR. WEINREB:  Okay.  So if I understand you correctly, your understanding of the -- of the sentencing phase is that society considers the death penalty worse than --

MR. BRUCK:  I object to this.  We're getting into the same area again.

THE COURT:  Well, yeah, yeah.  I think we should leave it.

MR. WEINREB:  Okay.  So let me return for a minute to another question and make sure I understood your answer to that correctly.  One of the things you said in your follow-up is that -- to Question 19 -- so this is on your Page 27, the very last page -- well, the second-to-last page, I guess.

So you talked about that your sibling helped you grow into a compassionate, honest, loving person, all of which are qualities that I'm sure you bring to whatever you do.

MR. BRUCK:  I object to -- this isn't a question.

THE COURT:  Yeah.  Get a question.

MR. WEINREB:  And the question is:  Would those qualities, in your mind, impair your ability to actually sentence someone to death --

MR. BRUCK:  Objection.

MR. WEINREB:  -- if you believed that the facts of the case justified a death sentence?

THE COURT:  No.  You can answer that.

THE JUROR:  I'm not really sure.

MR. WEINREB:  So it's possible that you could decide that the facts justified a death sentence, but you wouldn't be able to do it?

MR. BRUCK:  This is leading.

THE COURT:  That was leading.

MR. BRUCK:  I think we've been over this.

THE COURT:  You don't have to answer.

MR. WEINREB:  So let me just ask you again then.  If the facts justified a death sentence and -- in your mind, and after -- would you actually be able to do it, to sentence someone to death knowing that that was something you could never take back and that you and the 11 other people would be responsible for his receiving the death penalty?

THE COURT:  That's too argumentative, I think.

This really comes back to Question 95 and we talked a little bit about when I asked you.  If you found this defendant

guilty of a capital crime and you decided that the death penalty was the appropriate sentence, could you conscientiously vote for it?  On the form you said "yes."  Earlier here this afternoon you indicated that maybe you weren't sure.  I think maybe people are wondering where you end up having thought about that a little bit.  Are you a yes or are you a not sure or are you a no?

THE JUROR:  I'm not sure.

THE COURT:  You're a not sure.  Okay.  I think we'll leave it at that.

MR. WEINREB:  Thanks very much.

THE COURT:  Okay.

MR. BRUCK:  I just want to clarify the last thing we talked about just so I'm sure we're talking about apples and apples.

I'm David Bruck, by the way.  I'm one of Jahar Tsarnaev's attorneys.

THE JUROR:  Okay.

MR. BRUCK:  I just want to be sure that the judge and everybody understands -- that we all understand your feelings about the death penalty.  I know this is all a new subject, so it's not surprising that it's hard.  But I think the question that everyone really is asking you in different ways is, if you heard all of the evidence, all of the reason in favor of the death penalty, all of the evidence in favor of life

imprisonment, and you -- you yourself came to the conclusion that the death penalty was the right sentence, could you go ahead and vote for the death penalty based on your conclusion that it was the right thing to do?

THE JUROR:  I'm not sure.

MR. BRUCK:  When you say you're not sure, is that because you don't know what the evidence is or is it because you don't know if you could vote for the death penalty even if you decided that it was right?

THE JUROR:  I really just, like -- I don't know if it's the evidence or if it's just that I couldn't -- like, I don't know if I could handle that.  I just don't know.

MR. BRUCK:  Then is it something that you wouldn't know until you got in the situation?

THE JUROR:  Maybe.

MR. WEINREB:  Objection, your Honor.  That's everybody who's asked --

THE COURT:  Yeah.  The answer was "maybe," which is probably the best answer.

MR. BRUCK:  Okay.  But you've told us that the death penalty is not something you oppose --

MR. WEINREB:  Objection.

THE COURT:  Leading.

MR. BRUCK:  That's all.

THE COURT:  I think we're done.  Thank you very much.

Just leave the clip there.

THE CLERK:  Juror No. 292.

MS. CLARKE:  Your Honor, we did have an issue to address before --

THE CLERK:  Hang on one second.

THE COURT:  Sorry.  We have something.

MS. CLARKE:  I apologize.  We think this juror may be exempt.  He's employed by the Plymouth Sheriff's Department as a corrections --

THE COURT:  I had that thought, too.  I didn't look it up.  Can you grab the statute book, civil?

MS. CLARKE:  The plan --

THE COURT:  I think this is fine.  We don't need to cut the audio for this.

MS. CLARKE:  Here's the plan, Judge, if you want that.

THE COURT:  Both, yeah.  1863, maybe.  This is not --

MS. CLARKE:  Is that not the plan?

THE COURT:  That's not the plan.

MS. CONRAD:  What was it?  Sorry.

THE COURT:  It's *Morgan* questions.

MS. CLARKE:  However subtly we can get to you.

(Laughter.)

MS. CONRAD:  I was just checking to see if you were paying attention.  I pulled something out that had staples in it.  There was also a case that I gave to Mr. Weinreb.

MR. WEINREB:  I gave it back.

MS. CLARKE:  I have it.  But I was going to send my dinner plans over instead.

THE COURT:  It more or less quotes the statute.  It's pretty much the same thing.  It says -- the statute says, "Members of fire or police departments of any state or subdivision," and then "public officers in executive, legislative or judicial branches of any state or subdivision." I don't think it's entirely clear.  He's employed by a subdivision of the state.  That's clear.  It's a public office in the sense that the Sheriff's Department is a public office. I guess it's part of the executive.

MS. CLARKE:  We think so.

THE COURT:  Where is it?  Which county?

MS. CLARKE:  Plymouth.

THE COURT:  Is Plymouth one of the real counties, or is that one of the former counties?  I think it's one of the former counties.

MR. CHAKRAVARTY:  You're right.  I think it's a district now essentially.  It's not a county.

THE COURT:  Right.  I think the only so-called -- I'm being maybe a little flip with it.  Some countries still have their traditional status.  I think those are mostly the western counties.  Most of the Boston and eastern counties, I believe, the county government has been abolished.  So I actually don't

know where the Sheriff's Department fits these days.

MR. WEINREB:  We were going to propose going ahead with the juror, reserving ruling on a strike on this ground, that he's exempt.  We'd like to research the issue a bit, see if we can shed any light on it.  We obviously don't want a juror on the jury who's exempt, but we do want to not exclude somebody just because we didn't have -- we didn't have time.

THE COURT:  I guess, if he's here, it doesn't hurt to ask him the questions.  We can deal with it.

THE CLERK:  Juror No. 292.  Sir, over here, please, if you would.

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon.

THE COURT:  Since you were here to fill out the questionnaire, have you been able to follow my instructions to avoid talking about the case?

THE JUROR:  Yes.

THE COURT:  And to, as much as possible, avoid media accounts of the case?

THE JUROR:  Yes.

THE COURT:  So you're employed as a correctional officer?

THE JUROR:  I am.

THE COURT:  You've done that, it looks like, for about ten years?

THE JUROR:  Coming up on ten this spring.

THE COURT:  Always at the same place?

THE JUROR:  Yes.

THE COURT:  Any special responsibilities, duty assignments, anything like that?  Are you kind of a line officer or what?

THE JUROR:  No, normal officer, I guess.

THE COURT:  What do you do?  Let me ask it that way.

THE JUROR:  I'm a correctional officer.

THE COURT:  No.  I mean, what are your duties?

THE JUROR:  Security rounds.

THE COURT:  In the --

THE JUROR:  Inside the facility.

THE COURT:  In the Plymouth County House of Correction?

THE JUROR:  Yes.

THE COURT:  As opposed to jail?

THE JUROR:  House of Correction.

THE COURT:  Are they distinct in Plymouth County? Jail being pretrial detention; House of Correction --

THE JUROR:  Both.  I'm involved in both.

THE COURT:  Are they co-located?  I should know this.

THE JUROR:  They're separated -- they're segregated but they're in the same building.

THE COURT:  Which side are you on?  You do both?

THE JUROR:  I've done both, yes.

THE COURT:  What are you doing now, which side?

THE JUROR:  Right now I'm in pretrial.

THE COURT:  How long have you been doing that?

THE JUROR:  A couple months.

THE COURT:  That's the questionnaire you filled out, so it may help to look at it from time to time as I follow up on some of the questions.

If you look at Page 12, at the bottom, Question 36, you referred to this defendant's codefendant?

THE JUROR:  Yes.

THE COURT:  He actually doesn't have a codefendant. Who were you thinking of, do you know?

THE JUROR:  Last name was Matanov.

THE COURT:  Okay.  And he's housed in the --

THE JUROR:  He was.

THE COURT:  -- in the pretrial?

THE JUROR:  He was in the Pretrial Segregation Unit.

THE COURT:  Did you have any contact with him?

THE JUROR:  I did.

THE COURT:  How much?

THE JUROR:  A few days.

THE COURT:  Anything unusual?

THE JUROR:  No, not at all.

THE COURT:  Let me ask you about some of your

relatives that you've told us about.  Your father is a retired police officer?

THE JUROR:  Yes.

THE COURT:  Where was he a police officer?

THE JUROR:  Abington.

THE COURT:  How long did he do that?

THE JUROR:  Around 35 years.

THE COURT:  So it was basically his single career?

THE JUROR:  Yes.

THE COURT:  He's now doing some private security?

THE JUROR:  Right.  He retired from there.

THE COURT:  But his career was as an Abington police officer?

THE JUROR:  Right.

THE COURT:  You said -- this is in Question 16, on Page 7 -- that you have a brother who is a "federal officer."

THE JUROR:  Yes.

THE COURT:  Do you know more specifically?

THE JUROR:  I don't have much details.

THE COURT:  Do you know what agency he works for?

THE JUROR:  No.

THE COURT:  How long has he done that?

THE JUROR:  Say, about four years.

THE COURT:  Is it a law enforcement officer?  Is that what you're thinking?  Or are you thinking the officer of a

federal civil agency?

THE JUROR:  I'd say more law enforcement.  He's contracted out from what I know.

THE COURT:  Does security of some kind?

THE JUROR:  Yes, yes.

THE COURT:  For a federal agency?  In other words, he's -- there's a contractor that provides security services for, say, the Department of Agriculture or something like that; is that what you're thinking?

THE JUROR:  I would say yes.

THE COURT:  Coming back to your work, we asked people -- we told people about the schedule in the case and so on and then asked if they thought it would be a special hardship to serve on a case that will perhaps have the length that this case will have.  And you wrote that it would be a personal hardship with work and after-work responsibilities.  I think that's what that says.

THE JUROR:  Yes.  I'm a high school basketball coach.

THE COURT:  So what does that involve for you?

THE JUROR:  After-work practice, games.

THE COURT:  On a weekly basis, what are we --

THE JUROR:  Six days a week.

THE COURT:  When -- give me the time frame.  I assume it's after school?

THE JUROR:  After school.

THE COURT:  Is it late afternoon, early evening?

THE JUROR:  2 to 7, roughly.

THE COURT:  This is public high school?

THE JUROR:  Public high school.

THE COURT:  Are you the basketball coach?  Are you assistant coach?

THE JUROR:  Assistant varsity; head J.V. coach, junior varsity.

THE COURT:  At the bottom of Page 14 and onto the top of 15, we asked some series of questions about whether you had strong negative or positive views about, first, prosecutors, then defense attorneys, and then law enforcement officers.  You said you didn't as to the prosecutors or law enforcement officers, but you said that you might question their line of work about defense lawyers.  Can you tell us what led you to have that view or say that in the form?

THE JUROR:  For me -- and I feel like my line of work, you can't prejudge people.  But for some charges, it would be -- if I was a defense attorney, it would be hard for me to back that person, I would say.

THE COURT:  Somebody charged with particular offenses, you think that should be difficult -- defense attorneys should have a difficult time representing somebody with --

THE JUROR:  Me personally.

THE COURT:  Okay.  Page 19, Question 74, we asked what

you thought when you first received the summons in the case. You said you weren't thrilled. Can you flesh that out a little bit?

THE JUROR: Well, it's been a long day today, sitting in that room. Missed a practice I would have liked to have been to. This isn't the most comfortable situation, everyone staring at me. So, yes, I would say I wasn't that thrilled.

THE COURT: Okay. On the next page, we asked, in Question 77, whether, as a result of things you'd seen or read, you had formed an opinion at the time you filled out the questionnaire that the defendant was guilty or not. And then we asked about what penalty he might get. You answered the four parts of that question by saying, yes, you had formed an opinion that he was guilty. You are unsure about what the penalty -- you had not, I guess -- or were unsure about what the penalty should be.

Then we asked, if you had answered yes to any of the questions, would you be able or unable to set aside your opinion that you had formed and base a decision about guilt or punishment solely on the evidence presented in the trial, and you checked "unable." Can you tell us what you were thinking when you gave that answer?

THE JUROR: This was a highly -- the media was all over this case, and I feel like you guys are dealing with this more than anyone, that everyone that comes in here, maybe nine

out of ten, has a strong opinion of what happened and their view of it.  So before I sat down with that trial, before I even got to day one, I would have my opinion, guilty, before I even sat.

THE COURT:  The question is whether you could, thereafter, in the course of the case, listen to the evidence presented by both sides really but principally by the government in the guilt phase and base an evaluation, as to any particular charge, whether the defendant was guilty or not, base an evaluation on the evidence you heard in the case and not on things you might have known from other sources.  Would you be able to do that, is the question.

THE JUROR:  I don't think I would.  I've got a strong -- from what I saw, I've got a strong opinion what my beliefs are.  I don't know.  I stick with my gut instinct on a lot of things.

MS. CLARKE:  Your Honor, I think the parties are in agreement.  Thank you.

THE JUROR:  What's that?

MS. CLARKE:  Thank you.

THE JUROR:  You all set?

MS. CLARKE:  He gets to make that call.

THE JUROR:  Okay.  Sorry.

THE COURT:  Okay.  Yeah.  Thank you.

THE JUROR:  Thank you.

THE CLERK:  Juror No. 296.  Sir, over here if you would, please.  Have a seat.

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon.

THE COURT:  Since you were here to fill out the questionnaire, have you been able to follow my instruction to avoid discussing the substance of the case?

THE JUROR:  Yes, yes.

THE COURT:  And also to avoid, as much as you can, media accounts about the case?

THE JUROR:  Certainly, yeah.

THE COURT:  Let's start with a little personal information about you.  You're currently retired?

THE JUROR:  Yes, I am.

THE COURT:  You had been a software engineer?

THE JUROR:  Yes.

THE COURT:  Any particular emphasis, field of practice?

THE JUROR:  Software quality control, quality assurance.

THE COURT:  You did that for?

THE JUROR:  About 14 years.

THE COURT:  Before that?

THE JUROR:  I worked in the biomedical/biotech field.

THE COURT:  You don't use social media?

THE JUROR:  I don't use it at all.  I have no interest in it.

THE COURT:  Let me ask you to turn to Page 20.

THE JUROR:  Yes.

THE COURT:  In Question 77 we asked whether, based on things you'd heard or seen in the media or otherwise, you had formed an opinion, (a), that the defendant was guilty or (b) not guilty; and if so, (c), should he get the death penalty or (d) not get the death penalty.  You indicated, as to (a), "yes," that you had formed an opinion, based on those sources, that he was guilty.  And then you said you were unsure about the penalty.

Following that series of questions, we asked in the next paragraph, if you answered yes to any of those, which you did, would you be able or unable to set aside your opinion and base your decision about guilt -- and let's focus on that because that's what you answered -- solely on the evidence that would be presented to you in court?  And you indicated "able." So, in other words, I understood what you were saying is you thought you would be able to set aside the opinion and base a decision --

THE JUROR:  Yes.  It's not contradictory.  The evidence has to stand on its own merits.  I mean, if A, B, and C points to a certain conclusion, then subsequently you find out that A, B, and C is not what it appeared to be, then you

have to change your conclusion.  So that's what I mean.

THE COURT:  Right.  You understand that in our criminal justice system a person accused of a crime is presumed to be innocent of the crime unless and until the government proves he's guilty by the evidence at trial and proves it beyond a reasonable doubt.

THE JUROR:  Right.

THE COURT:  So in a criminal trial, the focus is on the evidence produced during the course of the trial.

THE JUROR:  Right.

THE COURT:  And that's the, if you want to call it, information base on which jurors are to make their decision.

THE JUROR:  Right, right.

THE COURT:  What we ask jurors is to put aside other ideas they might have about what is true or false from other sources and focus on the trial evidence.  Would you be able to do that?

THE JUROR:  Sure, yes, I would.

THE COURT:  And would you be able to come to a conclusion that was different from or perhaps even opposite to what you thought provisionally before that?

THE JUROR:  It's possible.

THE COURT:  You say "it's possible."  Go ahead.

THE JUROR:  I mean, you know, there's been such a volume of publicity about this and information from reliable

sources.  So when you ask me do I think that Mr. Tsarnaev is guilty, I had to check off "yes" because I believe he is guilty.  I would say it comes down to probabilities.  I mean, sure, under the theory of anything is possible, he could be innocent.  But I believe there is such an overwhelming amount of evidence that indicates that he is guilty, I would have to say that the possibility, the probability, of him being found innocent, it would approach zero.

THE COURT:  The question really that I'm getting at is not the likelihood of his being convicted or not but whether you can make that decision yourself in a trial based on the evidence in the trial as opposed to things you thought your --

THE JUROR:  That's why I checked I was able, yes, sir.

THE COURT:  We asked some questions about the death penalty and attitude toward it.  This is beginning on Page 23.

THE JUROR:  Yup.

THE COURT:  In Question 88, we asked, in general, do you have views about the death penalty, and you wrote, "I cannot firmly say I am in favor of the death penalty."

THE JUROR:  Right.

THE COURT:  Would you tell us what you were thinking when you wrote that?

THE JUROR:  Well, it's probably even more firm that I am not in favor of the death penalty than I may have indicated.  You know, I have a number of arguments with the death penalty.

Nothing to do with this case in particular, my argument would be with capital punishment as an institution.  So, you know, there is a number of arguments that I believe are valid for not imposing the death penalty.  Some are mundane statistical and some go all the way to the other end of the spectrum that would verge on moral considerations.

One thing that troubles me particularly is the subjectivity involved.  In one case, you might get a set of jurors who vote to impose the death penalty.  But in another instance, you would have a set of jurors that would say that they would not impose that.

THE COURT:  On the same set of facts?

THE JUROR:  On the same set of facts.  I'm uncomfortable with the subjectivity involved with that, which is different from saying some people -- you know, if it could be said of anybody, that they deserve to receive the death penalty, sure, I think there are a lot of instances that, if you look at it, you say, definitely, this person should pay the full price for his crimes.  But, you know, when you're sitting in the actual jury, I have problems with it.

THE COURT:  I understand.  We're just trying to find out what your views are.  In Question 89 you indicated that you were pretty strongly on the strongly oppose pole.

THE JUROR:  Yes, yes.

THE COURT:  And then the next page, Question 90, we

asked you to select a statement that came the closest to your views.  You selected (b), which was you're opposed to the death penalty and "would have a difficult time voting to impose it even if the facts supported it."  Is that --

THE JUROR:  Yes, that's correct.

THE COURT:  Is that what you've been telling us here this afternoon as well?

THE JUROR:  That's right; that's right, yeah.  I think possibly -- you know, maybe it should be utilized in very rare circumstances, maybe a presidential assassination, something like that.

THE COURT:  So the selection you made said you would have a difficult time voting to impose it even if the facts supported it.  Can you envision voting to impose it?

THE JUROR:  Maybe it would be more than difficult, yup.  I don't think I could impose it in this particular case.

THE COURT:  Okay.  We asked, on Page 25 at the bottom, Question 95, about this case.  It said, "If you found this defendant guilty and you decided the death penalty was the appropriate punishment for him, could you conscientiously vote for the death penalty?"  Your answer was "no."

THE JUROR:  No.

THE COURT:  Is that still your answer to that question?

THE JUROR:  That's still the same.

THE COURT:  Any follow-up?

MR. BRUCK:  Please.  Hi.  I'm David Bruck, and I'm one of Jahar Tsarnaev's lawyers.  I just want to follow up on the questions that the judge asked you about the death penalty for a minute.

Do you remember when you came and filled out the questionnaire, and before you filled it out, Judge O'Toole talked to you -- to everybody about the responsibilities of serving on a jury?

THE JUROR:  Yes.

MR. BRUCK:  At the end he said, We need your help.

THE JUROR:  Yes.

MR. BRUCK:  Well, that's kind of what I want to talk to you about.

THE JUROR:  Okay.

MR. BRUCK:  I hear what you've said about the death penalty.  I'm not going to try to change your mind.  I would be the last person to do that.  But the question is really whether a juror can go out of their comfort zone and follow the law and make a fair decision between two options that the law provides and make themselves be open-minded to both, or is a juror -- have they closed their mind to one possibility and they're saying, I could only vote for life; I could never vote for death, no matter what the facts.

That's a long build-up, but you see what my question

is.  Which group are you in?  Could you go out of your comfort zone and be fair to both sides?

THE JUROR:  Because of the ambiguity that I have, I would have to state today that I would not vote to impose under any circumstances.

MR. BRUCK:  Okay.  Well, thanks very much.

THE COURT:  Thank you, sir.  That's it.  Thank you.

So about quarter of 4?  Does that sound okay?  Okay. We'll see you back here at quarter of 4.

(Recess taken at 3:18 p.m.)

(The Court enters the courtroom at 3:52 p.m.)

THE COURT:  Okay.  Just running through the numbers. 248 I think was agreed?

260?

MS. CLARKE:  237 was agreed.

THE COURT:  Right.  Yes.  I don't have his sheet. Sorry.

260?

MR. BRUCK:  260 we have a motion.

Your Honor, this is the juror who said that -- on his questionnaire, which I don't think the Court actually asked about but it was gone over -- oops.  On the questionnaire he wrote on page 25, explaining the answer that life imprisonment was less severe than the death penalty, "Consistently some governor or president decides to release those sentenced to

'without release' or a judge decides to let them go."

I'll go into what he said in a moment, but I think it's worth beginning this by pointing out that we have now, by our count, questioned 129 jurors individually, and not one but Juror 260 has expressed this particular misconception, and it is a misconception, about the meaning of a life-without-release sentence.

Of all of the biases and pieces of misinformation and sort of jury room mythology that exists in our legal system, this is the most dangerous and the most pernicious in a capital case. It implicates the holdings of *Simmons v. South Carolina* which is the case in which the Supreme Court held that it violates due process to conceal from the sentencing jury the fact that life imprisonment means life without parole.

Now, it's not -- this is not on all fours with *Simmons*, but the point is that in *Simmons*, the Supreme Court accorded constitutional stature to the importance of the jury understanding that life without parole is the alternative to the death penalty. Now, there are lots of jurors who might say, Oh, well, I've heard that it doesn't really mean what it says, or I heard that Charlie Manson came up for parole or whatever, little bits and pieces, but this juror is in a different category. Consistently, he says. He's got a story in mind.

And then when I asked him about it here today he told

a very integrated narrative, very fact-based.  "Increasingly, over the last 20 to 30 years" -- he even had a time period in mind -- "we have observed that persons who have been convicted of atrocious crimes and sentenced to life without parole have, in fact, found someone to let them go so that I do not believe that a sentence of life without parole is, in fact, really the case [*sic*].  It is, in fact, a sentence of imprisonment with perhaps a small or large chance of release depending on how political life evolves over the next 20 years."

And here you have the real core of the problem, that this is about politics.  It's about people's views of whether President Obama or this president or that president or the Democrats or the Republicans are soft on crime and they're going to let people out and commute folks.  And it's all based on fantasy.  There is no factual basis to any of this.  No capital murderer in the federal system sentenced to life without parole has ever been released, and it's never going to happen.  It certainly is not the case that over the last 20 to 30 years it's been happening increasingly or that we have observed it.  This is just not true.

Now, there has been research done on this particular topic all over the country.  There's a Law Review article by William Bowers from here at Northeastern who is the principal researcher of the Capital Jury Project, which is this extremely ambitious National Science Foundation-funded attempt to open

the black box of what jurors do when they sentence to death or to life in capital cases.

And Professor Bowers has documented in ten different states the pervasiveness of this misconception, the myth of early release, it's called, and how jurors who hold to this myth get everything wrong about the capital sentencing system. Jurors who believe someone is going to be released early give less weight to mitigating factors and more weight to aggravating factors; they are quicker to find the defendant is dangerous than jurors who don't hold that belief. And it actually can be mathematically calculated because you can ask people when do you think defendants get out if they're not given the death penalty, and jurors give a number. And you can actually correlate the number to the degree to which jurors make harsher judgments across the board. So this is not something that we don't know about. This is a classic form of bias.

Now, I realize that good lawyer that he is, Mr. Weinreb got the desired response at the end which was, and I quote, asked -- Mr. Weinreb posited an instruction that I have never heard given in any case, which was not just can you accept that the verdict of life without release or death, but if you were instructed that life without release means that there -- I can't remember exactly but it was something like means exactly what it says and you are not to speculate

otherwise, or words to that effect -- now, maybe the Court intends to give some type of table-pounding instruction like that, but as I say, I don't think it's an instruction that has ever been given before.  We can't assume that it's going to be given.

And the juror's -- the most revealing thing about the juror's response was not what he said but the 15 seconds of silence that followed the question.  He just sat there and thought about it.  And then he said very carefully, "This isn't the case that a jury should worry about deeper issues."

Well, that is very thin ice to rest the fairness of these proceedings on.  And as I say, this is -- with 129 jurors we've encountered this problem exactly once.  There is no reason to qualify this juror and take the risk that this highly educated juror who may well persuade the rest of the jury to his point of view that life doesn't really mean life and you're going to see Jahar Tsarnaev back on the street in 20 or 30 years if you don't give him the death penalty -- there's no reason to take that risk.

On top of that, I have to say, and I don't want to reargue the issue about *Morgan* qualifications, but we were really closed in in asking this juror the most basic questions.  He described -- he posited types of cases -- or he described a case in which the death penalty would be appropriate and we weren't allowed to ask:  Is it this case.

So there are really a lot of unknowns about this juror.  And everything on balance -- I appreciate your hearing me out at great length -- but we think this is huge, and on balance, we think he should be excused.

MR. WEINREB:  Your Honor, the government opposes the motion.  This was the kind of juror who I think we've seen several of over the course of the proceedings here, which is an engineer who is quite confident in his ability to put aside anything that he may feel.  Jurors put it differently, sometimes they put it as their personal views, sometimes they put it as their subjective views and decide the case objectively according to the instructions that they're given, based on the evidence in court.  And there's no reason to doubt that this juror would be any different, that when I asked him whether if he were told that the choice was between life in prison without possibility of release and death, whether he could accept that those were the two choices, and those would be the two things he would be deciding between.

And I dispute the characterization that there was a 15-second pause.  I don't think that's true at all.  I think he was simply trying to, as these types of jurors often do, find the words to express himself precisely.  And it sounded like what he was saying is that regardless of what I may believe might be true in connection with other cases, it wouldn't affect me in this case because I don't see it as being an issue

in this case.  And that, again, is even more reason why I think that this -- this objection is not well taken in this case.

That response, I think, leaves no reason to worry that he will try to convince the other jurors that Mr. Tsarnaev will be released one day, because he just told us that he believed the exact opposite would be true if he were sentenced to life without parole, and there's no reason to believe that he would try to foist his views of extraneous matters onto the other jurors as well.

He didn't strike me as that kind of person, and I just think that this is -- I could imagine situations or cases where a juror seemed to cling tenaciously to views of the law or to views of the proceedings that were contrary to the law or to instructions or who didn't seem to understand what the law or the instructions meant, but this is not that juror.  He understood perfectly, he understood what was being asked of him, and he gave a reassuring answer.

MR. BRUCK:  Very briefly --

THE COURT:  I don't think he's finished.

MR. WEINREB:  I'm sorry.  I just wanted to point out he did say, "I don't want to make up my own rules for this."

MR. BRUCK:  Very briefly, he -- the final answer really was a little evasive, but on top of which what is so pernicious about this is that he will listen to you instruct on the law, but he has told us not once but in the questionnaire

and again today that he doesn't think you really know what's going to happen.  This is not a legal issue, this is a factual issue, and one that he has observed over 20 to 30 years.

So he can accept what you say as being what you say and yet he knows what's what.  The extent to which this will color his judgment -- even if as an engineer he says, Okay, I'm going to treat this as what it is, and yet it infects the way he looks at everything in the case.  And that is why this is such a dangerous misconception.

THE COURT:  I'm satisfied with him.  I think he presented as an intelligent, precise kind of person.  He, I think, described himself as dealing with data sets and making conclusions about them to the exclusion of other things.  To the extent there's a danger about misconception, I think it can be cured by an appropriate instruction -- or not cured, precluded, I guess, is a better way to put it, by an appropriate instruction.

I think 262 was removed during the interview.

That brings us to 263.

MS. CLARKE:  There is a defense motion.

MR. BRUCK:  Yes, your Honor.  This is the juror who served in Vietnam.  He didn't actually mention it but the period of his service coincided with the Tet Offensive.  He was there from 1967 until the middle of 1968.

The Court has excused jurors who were friends with or

related to -- I think one was a cousin -- who had come back from Afghanistan and had seen or been exposed to or perhaps having been wounded by an IED and recovered.  Quite indirect.  This is the juror himself.

In response to a question from the defense about have you seen, did you see people in -- who were injured or killed by explosives, which is what we are dealing with in this case, that was the one point of real drama in what otherwise was a very unremarkable voir dire examination.  He said, "More than you would ever want to know about" or words to that effect.  There was some real emotion there.

He is going to see things which trigger that in this case.  He is way too close.  This is absolutely no disrespect to people that went over to Vietnam and had these experiences, it's just that the evidence in this case is too close -- or it may become too close.  There is reason to believe -- I've talked before about the fact that we have a pending motion to try to resist the government's none-too-subtle attempt to make this seem like a military attack where you will have a trauma surgeon from Iraq and Afghanistan who was at Mass. General describing how he knows that these are IEDs because he can describe the IED wounds that he saw suffered by our troops in both of those countries during his tour as a combat trauma surgeon.  It's all going to come back.

This is also a juror who used almost military

terminology to express his eagerness to serve. It was all very admirable. I don't mean to be critical. But we all are aware of the issues surrounding this case and the fact that everybody knows about it and everybody -- almost everybody has strong feelings about it. And on balance, this is a juror who ought to be disqualified.

MR. WEINREB: Your Honor, the government opposes the motion. The whole point of asking questions like the ones on the questionnaire is to give an opportunity to follow up and determine whether a yes answer will mean that the juror will not be able to sit fairly and impartially.

This juror gave absolutely nothing in his response to the follow-up to that question to indicate that it would in any way affect his deliberations in this case in contrast to some of the other people who may have been one step removed knowing someone else who was there who said that it would weigh on their mind, it would be something that would affect them. No one would know better than he whether he will be affected by it, and he told us that he would not be.

I also think as a general proposition it's simply speculative to say that because you observed something at some point in your life that you will not be able to set that aside and decide a case on the evidence. In wars, people shoot at each other too with guns, but it's not the case that every single person who has served in the military and ever seen

combat is excluded from serving as a juror on any violent crime case that involves guns.  You know, they use fire in wars to burn things but we don't exclude all our veterans who saw combat from serving on arson cases or cases that involve fire.

There's no point to keep going on and on.  The point is that it may be legitimate to ask the juror whether that experience would have an effect on him, but it's not legitimate to simply speculate that it must have an effect on him despite his saying to the contrary.

THE COURT:  Okay.  I think he's satisfactory.  I think there's a significant difference between experiences, direct or indirect, with Afghanistan and Iraq, on the one hand, and Vietnam several decades ago on the other.  The conflicts themselves were different.  It's not just the remoteness but some differences in kind, I guess.

My impression of this fellow was he's a very interesting guy who seemed committed to the task of doing the right thing as a juror.  I mean, he expressed it in patriotic terms, I guess, but he seemed like somebody -- if I recall, he had recent jury experience, found it satisfying, and was ready to saddle up and do it again.  I don't think that's a -- I think that's fine.

MS. CONRAD:  May I just say one thing, though, your Honor?  I believe with this juror I was the one asking him questions, and I may be mixing it up with some other jurors,

but there were some questions about views on the death penalty which were shut down by objections sustained by the government. My recollection was that in particular that he -- I think he had selected 10 as reflecting his views, and my efforts to follow up on that were curtailed.

Your Honor, I think, asked whether he would automatically vote for the death penalty in any case in which it applied, and he said no. And I attempted to ask whether he would vote for it in any intentional premeditated -- "premeditated" being his word -- murder case, and I was not allowed to ask that question which goes straight to the *Morgan* issue.

And so I think it's the combination of those two things. And I think that the fact that he selected and stood by 10 as the correct place, which is essentially a *Morgan* juror, is another basis for striking him.

THE COURT: Yeah. He gave a different answer to Question 90, and I think I was satisfied with that and the follow-up on those questions, so I'll clear him.

I think the next one was a hardship excuse.

MS. CLARKE: 264.

THE COURT: 264?

MS. CLARKE: Agreed.

THE COURT: 267 I think was agreed?

MS. CLARKE: Right.

MS. CLARKE:  Oh, right.

MR. WEINREB:  So that was agreed.

MR. BRUCK:  That was agreed.

THE COURT:  Yeah.  He's out.

MS. CLARKE:  You have different stacks than us.

THE COURT:  271, I think, was agreed.

MS. CLARKE:  Agreed.

THE COURT:  274 --

MS. CLARKE:  Agreed.

THE COURT:  -- as well?

275 -- yeah, 275 again.

277 was before we interviewed.

281?

MS. CLARKE:  I think that's a defense motion for a strike that the government does not oppose.

THE COURT:  I thought he was okay but I could be talked out of that.

MR. BRUCK:  I think he ended up with pretty clearly disqualify things.

THE COURT:  I think he -- he said different things.  I agree with that.  It's hard to -- I think it's asked the same thing by three different people three different ways, it's not surprising that it comes out sometimes in different ways.  It

really is kind of an assessment of which one is closest to what he really thinks. And I guess I thought it was -- he was more, I guess, comfortable with his answers, which I took as they were more what he really thought when I was asking him the questions in the beginning and he was allowing that he could do either -- make either choice. I know he got twisted around later. If you looked only at the cold record, it would be confusing. He seemed like an honest young man who would try to make a call.

I guess the one point I was concerned about is his loyalty to his friends, and he had a friend who served in Afghanistan. And perhaps that's a more important reason than the way he answered the questions, so...

MR. BRUCK: We still make the motion, and I don't know that the government opposes it.

MR. WEINREB: Yeah, your Honor, we don't oppose the motion. Although I don't take issue with anything the Court said, we're naturally thinking ahead to the record on appeal, and we are concerned about what it's going to look like on a cold record.

THE COURT: Yeah, of course. Yeah, there is always the footnote to the cold record that it is only a cold record.

MR. WEINREB: Absolutely.

THE COURT: And that's why I wanted, where it's appropriate, and if there's body language that seems to affect

my judgment, I want to make sure that's clear.  I don't know that -- how much weight that will carry in the end but it's...

MR. BRUCK:  The First Circuit will have the novel question of whether 15 percent loyalty to one's friend is too much.  He quantified it.

THE COURT:  I thought 85 percent sure was pretty good, but that was the other side of the --

MR. BRUCK:  But that left 15 percent unsure.

MR. WEINREB:  I don't think that's a fair objection to him because that question could have been interpreted as meaning -- by him as meaning that that would essentially be an aggravating kind of factor, not necessarily that he would allow personal feelings to interfere with a rational evaluation of the evidence.  But, I mean, our only concern is the one we voiced.

THE COURT:  Well, I guess if there's no opposition to it, I'll allow it.

283?

MR. WEINREB:  So, your Honor, the government has a motion on 283 solely on grounds of hardship.  We have been routinely striking full-time students of all stripes.  I recognize that this student is not currently taking classes or having paid tuition, so she's in a different class, but if she turns out to be essentially an hourly worker who will plainly be impaired -- I'm sorry -- a salaried --

THE COURT:  "Stipened," I think is the word she used.

MR. WEINREB:  But I think what she said in the end is that she's on a grant, that basically they wrote into the grant money for her, and I think it's fair to infer that she needs to do the work, or work on the grant, to get the money.  And she -- you know, she made it clear -- unlike a lot of other jurors who have said, you know, they could get by one way or another, she made it clear that if she didn't get paid, she couldn't pay the bills and that it would be, you know, a huge problem for her.

So everything depends on whether she actually is going to get paid or not and she really doesn't know.  And she said that she hadn't really thought until she got here today about how -- what -- you know, how essentially catastrophic it would be for her from a financial perspective if she didn't get paid.

That is a very risky person to put on the jury.  And given the number that we have to pick from, it just seems like there's no reason to risk it.  You know, many jurors who know that they're facing potential financial hardship find out about it.  They find out what the situation is so they can come in here and say it.

And, you know, for us to seat her now and then have her find out after the trial starts, which could be as early as, you know, a week or ten days from now that she's not going to get paid, there's no reason to take a risk like that when we

have alternatives.

And I think it's also fair to consider in conjunction with that the detriment to her professional career. She is in -- she is a -- getting a Ph.D. that's all about doing research and publishing it. She said she spent six months working on this, and that if somebody else beats them to the punch it all would have been wasted, not just for her but for her colleagues.

She said that although she has other people who are working on it, they would -- her absence would be felt and would impair the effort, maybe defeat the effort, in which case she'll have suffered a hit to her career that seems like a big one.

And she said that even though she could work on the -- do research, you know, at nights or on weekends and so on, that, again, is asking her to do, you know, essentially two full-time jobs when it's an unnecessary burden for her when somebody else could serve in her place.

So she seems like she would be a good juror in many cases but it seems unfair to force her to serve for three to four months under these conditions, especially when others in like circumstances have been excused.

THE COURT: Before I hear from the defense, let me -- this is kind of an aside because I don't know anywhere near what you know about the evidence, what was all the

significance of the courtyard?

MR. WEINREB:  So Officer Sean Collier was murdered in between two buildings, one, the building she works in every day, and another building called the Koch Center.  There was a surveillance video taken of it but it was taken from the top of a very tall building from very far away, so it's not possible to see the faces of the figures or what exactly they do.  What you can do, you can see them rounding the corner from Ames Street walking along the length of the Koch Center, walking around the corner to where the car is parked, retreating in the same direction.  And then there will be -- there's other video of a car, which the government will argue was their car, driving down Ames Street at a certain time on a certain surveillance video.

So the geography of the area is going to figure importantly in the government's case.  Whether the brothers could have come from that direction, whether the two people on the video could have -- could have shot somebody, executed them right there in this courtyard where people come and go, whether it's typically crowded at that time of night or not, whether it would be -- you know, people would be too worried that others might see them from the windows or not.

It's not like what happened on Boylston Street, which is not really in dispute.  There was videotaped and photograph from any number of directions and there were tons of

eyewitnesses to the event. There's no eyewitness to the murder here. And it's just a concern that if questions arose of the type that I've just mentioned, wouldn't somebody have heard it, you know, wouldn't somebody have seen it, that she would wind up being a witness in the jury room potentially to those things: "No, from the Stata Center you can't hear anything," or "There are no windows that face that area," or something like that. That's yet a third reason why she's not the right juror for this case.

MR. BRUCK: Well, I don't know if the Court really needs to hear from me about this. It's quite obvious that Mr. Weinreb said he was concerned for this young woman's professional career has to do with her views on the death penalty, which are not be favorable to the government, although she is clearly qualified under *Witherspoon*.

The Court gave her every opportunity to claim a hardship and she thought about it. She's obviously an extremely educated, intelligent person and she thought about it, and she feels like Fridays and weekends and evenings are enough. She's a single person, she doesn't have any family responsibilities that -- or at least we can infer that. There is just no reason not to take her at her word that she can manage this.

And I don't think any other juror's had sort of a hardship excuse imposed on them, and I don't think just because

she's against the death penalty the government ought to successfully be able to argue it should be done in this one instance.

As far as -- I mean, the Court has already said if you're going to be familiar with Main Street, does that mean that you can't sit on a jury for a crime that occurs on Main Street? None of the issues that Mr. Weinreb has talked about are going to be in any great contention in this trial.

And even if they were, she's at MIT. A lot of other people who the government likes just fine work at MIT and this issue has never been raised before. The nub of the problem is that they hoped that she would say that she could never impose the death penalty and she absolutely never said that and is a perfect example of the sort of juror that must be found qualified under *Witherspoon*, so that the government has been extremely creative in thinking of other ways to get rid of her, but none of them have any merit.

THE COURT: One reservation about the geography issue, if I can call it that, if she were on the jury she would finish her day here and go back to the Stata building every day. Isn't that a tricky problem?

MR. WEINREB: I think it is, again, for this reason: That if the question --

THE COURT: Let me just expand on it. It's a little -- I used the example of Main Street, but perhaps

there's a little bit more than just knowing Main Street. I mean --

MR. BRUCK: If there was an issue.

THE COURT: -- she's going back to work in the venue, I guess.

MR. BRUCK: If there was an issue about all of the things that Mr. Weinreb is describing, if these things were going to be in dispute, but I mean, she also --

THE COURT: I guess I'm just thinking about the ethos generally, the atmosphere. Not necessarily what she could specifically say about the place, but she's going to be surrounded by MIT people every night after trial.

MR. BRUCK: Well, that would be a concern -- I mean, that would be a concern for us, but we don't express it. We don't make that motion. We're fine with it.

THE COURT: I guess that's what I wanted to be certain of.

MR. BRUCK: Absolutely. We're prepared to take that minimal risk.

THE COURT: So I do not think she's disqualifiable on the hardship. The way I heard it, she hasn't nailed it down. And it's interesting how many people have not. I would think that would be one of the first things that you would find out. And so I'm perhaps reading a little between the lines of those that haven't found out really have and it's not so bad. I

don't know how strictly grant money is accounted for.  They suggested that if they couldn't get it out of the grant, they would find it somewhere else.

MR. BRUCK:  She said there were mechanisms.

THE COURT:  It looks like they're going to take care of her.  So I don't think the hardship is sufficient, and so I think she's passable.  We'll accept her.

The next is 286.  Anything?  Anything on 286?  No? Okay.  She's passed.

288?

MR. WEINREB:  Your Honor, the government has a motion. Does the Court need to hear argument on it?  We thought it was pretty clear at the end that she --

THE COURT:  Is there disagreement on it?

MR. BRUCK:  I don't think it was clear at all, no.

THE COURT:  Go ahead.

MR. WEINREB:  So this is a juror who by the end of the voir dire was extremely clear in her -- that she was impaired in her ability to impose the death penalty.  She was asked no fewer than four times, sometimes by me and sometimes by Mr. Bruck, who was trying to rehabilitate her at the time whether she could impose the death penalty.  And four times she said, "I'm not sure."  "I am not sure that I could do it."

And this was not the kind of "not sure" like "I think I could do it but, you know, you have to be there to know in

the end," this was somebody who was really stating her belief that she was so opposed to the death penalty, confused about her views on it, was unsure she could handle it.  In fact, she said, "I don't know if I could handle the responsibility of it," that she seemed quite unsure whether she could ever do it in any case.

And I think it's telling that her answers really evolved just during the questioning that she -- as she thought about it more and more sitting there, it seemed to become clearer and clearer to her that she was impaired in her ability to do it.  And I think had the questioning gone on even further, she would have made it to "I don't think I can do it" or "I can't do it" as we have seen many jurors do sitting in that chair.

It's one thing to think about it in the abstract ahead of time, it's another thing to really have to face the prospect of possibly having to impose it.  Sitting in this room is a very important step towards that process.  You're sitting at the table with the defendant, you're realizing that this is something that you might actually be in a position to do.  And the more she thought about it, the less certain she was that she would be able to do it.

And the government is not -- is entitled to jurors who can do it; not ones who can't, not ones who are not sure, but ones who can, albeit even -- even if it's only in limited

cases.  But that's not what she was saying.  She was talking about any case.

MR. BRUCK:  This juror was pretty much a carbon copy of the juror against whom you denied a challenge last week. That is the situation of a juror who is asked to hypothesize a future situation which she had never thought about before in which very few people can predict with certainty what their reaction will be.  And that's what she was unsure about.  Not that she couldn't do it, not that she didn't think she could, but that she was unsure, projecting herself into this rather strange hypothetical situation which the questions were posited.  If you leave that aside, she was perfectly qualified. She even changed her estimation of her own position on Question 90 from C to D as she worked through this process.

Now, there's nothing unusual about a juror whose positions are slightly evolving or shifting.  We had two or three or four jurors who said the same thing today, that they were changing their thinking a little bit, or had changed it within the last little while, since this process began.  So that doesn't single her out or make her subject to disqualification at all.

And she had many, many responses which were qualifying.  And the only ambiguity at the end was being unsure what would happen at the end of the process if she was confronted with the actual decision.  A young lady said exactly

the same thing last week and the government made exactly the same objection and the Court found that she was qualified on the grounds that this is just too thin a hypothetical read to find someone disqualified under *Witherspoon*.

And we think the government may not want her on the jury, they may well strike her, and they may mostly be concerned that, like many jurors, she takes full account of the retributive impact of a life without parole sentence on a 19-year-old defendant. And that's not good for the government's case for the death penalty but that's no grounds for disqualification.

MR. WEINREB: Your Honor, if I can just respond for one moment? This is not like other jurors we have heard in that this juror is very much like the juror in *Mu'min* who seemed confused by the questions, seemed -- was very confused in her answers. There was a long -- a lot of talk about her opposition to the death penalty being it isn't severe enough and yet being reluctant to impose it because of how severe it is, and she -- as it was -- as she continued with her somewhat confusing and ambiguous answers, it became clear that she is not the kind of juror who is reluctant to impose the death penalty, has decided that she could do it in an appropriate case and simply is not sure she could actually cast the vote because never having been there, she doesn't know if she'll be able to make it over that final hurdle, which I think are the

jurors who the Court in the past week may have qualified.

This is a juror, who thinking about it, really grappling with it for the first time sitting in that chair came to the conclusion that she was really not sure she could ever impose the death penalty because of her feelings about it.

THE COURT:  Yeah, I think the place she came to rest was "not sure" on Question 95, which is a change from what she had put on the questionnaire, and it seemed to me anyway as she was thinking further about this whole issue and as she was giving some of these "not sure" answers that her face colored a little.  She seemed to be having some emotion with that.  And I think that I would have to conclude that she is substantially impaired in that respect.

I think the remaining three are all resolved as out.

MS. CLARKE:  290 was an agreed --

THE COURT:  290.  292 was the corrections officer.

MS. CLARKE:  And 296 is a government's motion.

THE COURT:  Maybe I'm tipping my hand here.

MR. WEINREB:  Is this one in which the Court needs to hear argument?

THE COURT:  Yeah, because I think the opposite so...

MR. WEINREB:  Oh.

THE COURT:  If you're moving -- oh, no.  You're moving to strike him?

MR. WEINREB:  I'm moving to strike him, yes.

THE COURT:  Is that opposed?

MR. BRUCK:  No.

THE COURT:  Yeah, okay.  All right.

Could we have the recap?  The ones cleared would be 260, 263, 273 --

THE CLERK:  286.

THE COURT:  -- 286.

I think that's it.  Okay?  Done for the day.

MR. WEINREB:  At least we got four.

THE COURT:  I don't think I have the -- I left it probably in the back.  There was one that I think you had agreed on, 276, and I said I would look at it.  I think I'd like to have him interviewed.

MS. CLARKE:  Okay.  So can Jim tell us who's coming in?

THE COURT:  But that will probably be Monday, Jim said.

THE JURY CLERK:  Yeah, so he won't be until Monday.

THE COURT:  Okay?  All right.  Thank you.  See you tomorrow.

(The Court exits the courtroom and the proceedings adjourned at 4:35 p.m.)

C E R T I F I C A T E


        We, Marcia G. Patrisso, RMR, CRR, and Cheryl

Dahlstrom, RMR, CRR, Official Reporters of the United States

District Court, do hereby certify that the foregoing transcript

constitutes, to the best of our skill and ability, a true and

accurate transcription of our stenotype notes taken in the

matter of Criminal Action No. 13-10200-GAO, United States of

America v. Dzhokhar A. Tsarnaev.


/s/ Marcia G. Patrisso
MARCIA G. PATRISSO, RMR, CRR
Official Court Reporter

/s/ Cheryl Dahlstrom
CHERYL DAHLSTROM, RMR, CRR


Date:  2/4/15