UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,        )
                                 )
        Plaintiff,               )
                                 )    Criminal Action
v.                               )    No. 13-10200-GAO
                                 )
DZHOKHAR A. TSARNAEV, also       )
known as Jahar Tsarni,           )
                                 )
        Defendant.               )
                                 )

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

**JURY TRIAL - DAY FOURTEEN**

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Thursday, February 5, 2015
10:00a.m.

Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

APPEARANCES:

    OFFICE OF THE UNITED STATES ATTORNEY
    By: Aloke Chakravarty, Assistant U.S. Attorney
    John Joseph Moakley Federal Courthouse
    Suite 9200
    Boston, Massachusetts  02210
    - and -
    UNITED STATES DEPARTMENT OF JUSTICE
        By:  Steven D. Mellin, Assistant U.S. Attorney
    Capital Case Section
    1331 F Street, N.W.
    Washington, D.C.  20530
    On Behalf of the Government

    FEDERAL PUBLIC DEFENDER OFFICE
    By: Miriam Conrad, Federal Public Defender
    51 Sleeper Street
    Fifth Floor
    Boston, Massachusetts  02210
    - and -
    CLARKE & RICE, APC
        By:  Judy Clarke, Esq.
    1010 Second Avenue
    Suite 1800
    San Diego, California  92101
    - and -
    LAW OFFICE OF DAVID I. BRUCK
    By: David I. Bruck, Esq.
    220 Sydney Lewis Hall
    Lexington, Virginia  24450
    On Behalf of the Defendant

P R O C E E D I N G S

THE COURT:  Good morning, everyone.  Thank you for being here.  We are continuing the process of selecting a jury for the case of United States v. Dzhokhar Tsarnaev.  As you know, Mr. Tsarnaev is charged in connection with a bombing that occurred near the finish line of the Boston Marathon on April 15, 2013, and that resulted in the deaths of three people.  He's charged in the death of an MIT police officer and other crimes that occurred on April 18 and 19, 2013.  Some, but not all, of the crimes charged are, by statute, potentially punishable by death.

You will recall from my prior instructions that the jury will first consider and decide whether the government has proved Mr. Tsarnaev's guilt of any or all of the charges against him.  If he is convicted of any of the capital crimes, that is, crimes potentially punishable by death, the jury will then consider and decide whether he will be sentenced to death for any such crime or to life in prison without the possibility of release.

You may wonder why the death penalty could be a possibility in this case in view of the fact that the laws of Massachusetts do not provide the death penalty for murder or any other violation of Massachusetts law.  The reason is that this is a federal case involving alleged violations of the laws of the United States rather than a state case involving

violations of the laws of Massachusetts.

If the jury convicts Mr. Tsarnaev of any of the capital crimes that are charged in the Indictment, the same jury will hear additional evidence and then decide whether to sentence him to death or to life in prison without the possibility of release.

Because the jury that is selected to decide the defendant's guilt or innocence will also decide his punishment if he is convicted, it is necessary to question jurors about -- prospective jurors about your feelings and beliefs about the death penalty as part of the process of selecting a jury.

Let me briefly explain the procedures that must be followed in a case in which the death penalty is or may be at issue. As in any criminal trial, initially, the government will have the burden of proving that Mr. Tsarnaev is, in fact, guilty of any crime with which he is charged. If he is convicted by the jury for a crime for which the death penalty may lawfully be imposed, then there will be a second phase of the trial, usually referred to in shorthand as "a penalty phase."

In the penalty phase, the government will introduce evidence that seeks to prove beyond a reasonable doubt, first, that Mr. Tsarnaev acted with sufficient intent to be subject to the death penalty; and, second, that aggravating factors about the killings or about the defendant justify sentencing him to

death.  Aggravating factors are circumstances that, if proven, make the crimes particularly serious or blameworthy and, therefore, under the law, may justify imposing a more severe sentence on this defendant compared to other persons who have been convicted of intentional killing or murder.  The government will bear the burden of proving any alleged aggravating factors to every juror beyond a reasonable doubt.

The defense will have the opportunity to present evidence of what it will argue are mitigating factors. Mitigating factors are usually circumstances about the crime or about the defendant's background or character that would suggest that the death penalty is not the appropriate sentence in the case or that life imprisonment without possibility of release is adequate to punish the defendant.

Unlike the proof of aggravating factors, a mitigating factor must only be proven by the greater weight of the evidence.  That is a less demanding standard of proof than proof beyond a reasonable doubt.  Again, unlike the proof of aggravating factors, mitigating factors do not have to be proven to the satisfaction of all 12 jurors.  Any juror who finds or determines that a mitigating factor has been proven by the greater weight of the evidence may consider that factor in deciding the appropriate sentence in the case regardless of whether any or all of the other jurors agree that that mitigating factor has been proven.

After the parties have made their presentations during the penalty phase of aggravating and mitigating factors, the jury will weigh all the evidence.  Before a jury could vote to impose the death penalty, every juror would have to be persuaded that certain threshold factors that make the defendant potentially subject to the death penalty had been proven beyond a reasonable doubt.

In addition, in order to impose the death penalty, every juror would have to be persuaded that any proven aggravating factors sufficiently outweigh any proven mitigating factors found by any juror or jurors to justify a sentence of death.  Even if the jury did not find any mitigating factors in the case, it would still have to unanimously be persuaded that any proven aggravating factors were themselves sufficient do justify a death sentence.  You should understand that a jury is never required to find that a sentence of death is justified.

The decision whether the government has proven that a defendant should be sentenced to death must ultimately be made by each juror himself or herself.  If, however, every juror is persuaded that the death penalty should be imposed, I would be required, as the trial judge, to sentence the defendant to death.  In other words, I could not change the jury's decision. The jury, and not the judge, is responsible for determining whether a defendant who is convicted of a capital crime will live or die.

What I've just described is only an overview of the law applicable to a jury's consideration of the death penalty. If you are selected to serve on the jury and if you find the defendant guilty of a crime or crimes punishable by death, I will give you very detailed instructions concerning your duties in deciding whether to impose the death penalty or life imprisonment without the possibility of release and the law that you must follow in making that decision.

As we told you when you filled out your questionnaires, there are no right and wrong answers to the questions you have been asked or that you will be asked in the process. We ask them because both the government and the defendant are entitled to a jury that does not have its mind firmly made up one way or the other before hearing the evidence and a detailed explanation of the law. That applies both to whether the defendant is guilty or not guilty of the specific crimes charged in the Indictment and, if he's convicted of a capital crime, whether he should be sentenced to death or to life imprisonment without possibility of release.

So today we're going to follow up on your questionnaire answers by questioning each of you individually about matters that are relevant to the selection of a jury. When I've finished these brief remarks, you will go back into the room you have been in and one by one come into the courtroom to answer some questions.

There will be a few people here in the courtroom in addition to the lawyers and their staffs, and the proceedings are being simultaneously transmitted by video and audio to overflow courtrooms.  We will not identify you by name but rather by number, and you will be seated so that the video camera will be behind you.  Your answers will be generally public, but if you believe a truthful answer would require you to reveal sensitive personal information, we will temporarily stop the audio transmission to those courtrooms so that people observing there will not hear your answer.

Again, we do not want or expect any particular answer to the questions.  All we want and what the law expects is that you provide accurate and truthful answers to the questions you will be asked.  If you do that, you will be doing your duty as a citizen and as a juror no matter what your answers are.

I want to remind you of something I told you in my prior instructions.  A jury's verdict must be based on the evidence produced at trial and must be free of outside influence.  Therefore, I remind you again that it is extremely important that you do not discuss the case, including this jury selection process, with your family, friends, each other or any other person until either you have been excused or, if you're selected, until the case concludes.  Again, of course, you're not to conduct any independent research online or otherwise or read or watch or listen to reports about the case in the media.

When you finished filling out the questionnaire, you signed it, and you signed under a statement that indicated that the answers were true and accurate and that you were making them -- affirming them under the pains and penalties of perjury.  For this process, we ask you to similarly take an oath or affirmation that your answers will be true, and the clerk will now administer that to you.

THE CLERK:  Will the jurors please rise and raise your right hand.

(Venire sworn.)

THE COURT:  All right.  So the jurors will now withdraw, and we will begin the process one by one of interviewing you.

(The venire left the courtroom.)

THE CLERK:  Juror No. 299.

THE JURY CLERK:  Juror 299.

THE CLERK:  Sir, over here, please, if you would.  Have a seat.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  Since you were last here, have you been able to follow my instructions to avoid any discussion of the case with anybody and also to avoid, as much as possible, any news accounts about the case?

THE JUROR:  That's correct.

THE COURT:  That's the questionnaire that you filled out, and we're going to follow up on some of the answers you've given and get a little more information.

THE JUROR:  Okay.

THE COURT:  Let me ask you -- first of all, you tell us that your wife is a nurse.  I'm just curious where she works.

THE JUROR:  She works at MIT.

THE COURT:  Is there a health clinic there or --

THE JUROR:  That's correct.

THE COURT:  Was she working there at the time of the Marathon events?

THE JUROR:  That's correct, yup.

THE COURT:  You know that one of the charges in the case involves the death of an MIT police officer?

THE JUROR:  Right.

THE COURT:  Do you know of her connection with the MIT police in any way?  Does she interact with the MIT police force?

THE JUROR:  Just the average worker, just going to work, nothing outside of the conventional means of seeing police officers working and --

THE COURT:  I mean, one thing that may occur is somebody gets injured or something, the police might escort the person to the clinic and interact that way.  Do you know if she

has that kind of interaction?

THE JUROR:  Not that I know of, unfortunately.

THE COURT:  How long has she been at MIT?

THE JUROR:  For close to five years.

THE COURT:  As far as you know, did she have any personal relationship with the officer who was killed?

THE JUROR:  No.

THE COURT:  Actually, I should ask that a little bit different.  I asked "as far as you know."  Do you know that she didn't?

THE JUROR:  I know that she did not.

THE COURT:  Would her employment by MIT affect you in any way if you were a juror in the case?

THE JUROR:  No.

THE COURT:  So let me ask about your own employment.  I have to confess I had a little difficulty reading the handwriting.  I'm looking at Page 10.  It's Question 26, is where we asked for the employment.  Looks like, on the first two lines, mental health staff?

THE JUROR:  Correct.

THE COURT:  Tell us about what you do and for whom.

THE JUROR:  During the time, I worked as a mental health counselor for mentally retarded clients, and they range from the ages of, like, 25 to 60.  So these are individuals with -- who have Down Syndrome, Klinefelter Syndrome, and the

likes. And they just need assistance with their ADLs.

THE COURT: ADL, activities of daily life?

THE JUROR: Correct.

THE COURT: The employer on the first line, I can't read.

THE JUROR: MAB Community Services.

THE COURT: What is that?

THE JUROR: Mass. Association For the Blind Community Services.

THE COURT: You're currently working there?

THE JUROR: I work as a per diem staff there, yeah.

THE COURT: Okay. As per diem, how often per week do you work?

THE JUROR: I have not been picking up shifts from there.

THE COURT: Have not?

THE JUROR: No. The last time I picked up a shift was over two months ago.

THE COURT: Okay. So on Question 27, looks like you have two other things going. One is you're an Uber driver, which is interesting. You're our first Uber driver.

THE JUROR: Awesome. It's snowing outside. I wish I could be outside driving.

THE COURT: Would you be surging?

THE JUROR: Yes, yes. It's killing me. It's killing

me so --

THE COURT:  But -- so how much time per week do you do that?

THE JUROR:  Seventy hours a week.

THE COURT:  That's a lot.

THE JUROR:  Yeah.

THE COURT:  On a daily basis, what is the time you usually do?

THE JUROR:  3 a.m. in the morning up until around noontime.  Then I come back around 4:00 and then until everything dies down and then do it again and again and again.

THE COURT:  What's, under 27, the first entry?

THE JUROR:  It's a start-up company that I'm currently working on right now.  It's a financial tech company.  I have a background in entrepreneurship, so that's what I'm doing right now.

THE COURT:  Okay.  Let me bring you back to Question 10 on Page 5 where we set out the schedule in the case, which we plan to, once we get going with the actual presentation of the case, would be a Monday through Thursday, 9 a.m. to 4 p.m., four days a week, Fridays off, of course, weekends.  How would that affect your ability to earn a living, I guess, is the best way to put it?

THE JUROR:  Yeah.  So the majority of the -- the thing of this, the majority of the time that I do, like, there's

morning rush hour right at 9:00. It kind of dies, like, right around that time. So in order to get here on time, I have to actually kill an hour off my time. I also pick up my daughter from school at 4:00. There's a window of 30 minutes. She's in Dorchester. So from here and there, depending on how traffic is, I might get late. So I usually pick her up and then transfer her to my wife in Cambridge, who's coming halfway, and then I hit the road, you know. That's usually how I do it. So that's a challenge. The $34 parking is just not fun.

THE COURT: You'll get reimbursed for the parking. That's not the biggest issue. The issue is how much it would affect your life generally, I guess, on that kind of a schedule but also --

THE JUROR: Correct.

THE COURT: -- but also your pocket book.

THE JUROR: It will diminish my income because I do work with Uber. That would diminish my income. That would cut at least a good 20, 30 hours a week of my time. So that's going to be challenging, so for -- that's one of the reasons why, financially, I would opt not to be here, you know, because I've got to pay the bills.

THE COURT: That's why I'm asking the questions.

THE JUROR: Right.

THE COURT: There are some burdens that are tolerable. This is going to last for a while. And there are some that are

pretty serious.  So we really rely on you to tell us.  If it's a kind of thing that you could tolerate for three or four months, that's one thing.  But if you think it would be a significant hit, then we don't want to make people do that.

THE JUROR:  Correct.  One of the things that -- I have a 2015 car.  It's a brand-new car.  It's a pretty expensive bill.  Everybody has nice cars with Uber, but they've got to pay the bill, and that's why I have to be on the road for so long.  At first it was, like, okay, yeah.

THE COURT:  I think it's too -- maybe the parties agree.  I think we would be asking too much of you to ask you to sit on this case.

THE JUROR:  Definitely.

THE COURT:  Okay.  Thanks.

THE CLERK:  Juror No. 303.

THE JURY CLERK:  Juror 303.

THE CLERK:  Ma'am, over here, please, if you would.  Have a seat.

THE COURT:  Good morning.

THE JUROR:  Hi.

THE COURT:  Since you were here to fill out the questionnaire, have you been able to follow my instruction to avoid any discussion of the case other than to tell people where you're going?

THE JUROR:  Right.  I've done the best that I can.  I

work in PR, so the industry kind of forces me to look at the news. But I didn't read any articles, but I saw some headlines every now and then.

THE COURT: Thank you. That's the questionnaire you filled out. We're going to follow up with some further questions.

Let me ask, on Page 6, Question 13, you said your wife is a Ph.D. student.

THE JUROR: Yes, sir.

THE COURT: What's her field?

THE JUROR: Psychology. She's completing her dissertation now. She should be done in the spring on -- psychology is what she's doing.

THE COURT: Where is she studying?

THE JUROR: URI, University of Rhode Island.

THE COURT: As to yourself, you're -- you just said public relations, I guess, senior account executive. Tell us what your work is like.

THE JUROR: Sure. So work is different every day, obviously, as you can expect. So I work for -- can I say who I work for?

THE COURT: It's up to you.

THE JUROR: I work for a local firm in Boston, in the healthcare and life science industry. Basically work with a lot of local companies in the area and nationwide to help them

generate awareness about their products or experts, physicians, whoever they are.

THE COURT:  The form indicates you supervise other employees.

THE JUROR:  I do.

THE COURT:  How many?

THE JUROR:  It varies on every account so every client that I have.  No less than probably, say, six.

THE COURT:  Okay.  I guess, inevitably, you use various social media.

THE JUROR:  I do.

THE COURT:  Do you use it both personally and for business?

THE JUROR:  I do, yes.

THE COURT:  Does the company have a website, I presume?

THE JUROR:  Correct.

THE COURT:  And you post there, or are you active on the company website?

THE JUROR:  They do have a blog, a company blog, which we are asked to provide blogs every now and then, probably once a quarter, if so, but they do have a social media, which we're active in as well.

THE COURT:  So this is Question 30 on Page 11.  You say you use Facebook rarely, Instagram daily, Twitter weekly.

THE JUROR:  Right.

THE COURT:  And Google Plus rarely.

THE JUROR:  Yes.

THE COURT:  Are those all a mix of business and personal?

THE JUROR:  Correct, yes.  Usually I use social for my own personal and then business for clients, pages or whatever they have.

THE COURT:  So let me turn to Page 19.  In Question 74, we asked what you thought or felt when you got the summons for this case.  And you said, "Optimistic and intrigued."  Would you tell us about those --

THE JUROR:  Yes.

THE COURT:  -- reactions?

THE JUROR:  Optimistic.  I mean, any time -- I've been called for jury once more.  It was probably about six or seven years ago.  And it was an interesting experience.  I wasn't sure I was going to hear anything.  But I feel like any time you're chosen to do something like this in this country, to remain optimistic is probably your best bet.  A lot of people, when they're called for jury duty, aren't excited about it and -- I'm sorry to say this in front of you but -- thank you.

THE COURT:  You think I don't know?

(Laughter.)

THE JUROR:  I'm sure that you do.  I try to keep an

open mind about it.  Once I found out which trial it was, I was very intrigued, obviously.  So that's -- those are my answers.

THE COURT:  In the answer to your next question, you said your wife expressed her concern if you were on this case.

THE JUROR:  She did.  We live in the area, and she was just concerned about family well-being.  If I would be gone for a good amount of time, obviously, you know, how we would care for a child.  We have a daughter.  She's 14 months old.  And also just she expresses -- expressed -- how do I say -- interest in security as well, the safety of our family and me as well so --

THE COURT:  Do you have those concerns?

THE JUROR:  Not really, but I understand where she's coming from.  I would probably have those concerns for her but not for myself.

THE COURT:  Okay.  We had set out earlier in the questionnaire the schedule we're going to follow.  Basically four-day workweek generally, typically Monday through Thursday, 9 to 4 would be the jurors' time commitment here.  I'm thinking in particular of child care.  That is manageable for you in child care?

THE JUROR:  That would be fine, yes.  Just wasn't sure if we were going to be asked to be taken away basically.

THE COURT:  Jurors sometimes have that question about sequestration.  I'm not sure where it comes from.  We rarely

sequester jurors.  There's no plan to sequester jurors in this case.

THE JUROR:  Okay.

THE COURT:  Let's turn to Page 20, Question 77.  In this question we asked whether you had formed any opinions about whether the defendant was guilty or not and, if so, what punishment might be imposed.  We gave a choice of yes, no, and unsure.  You selected "unsure" for each of those.

THE JUROR:  Correct.

THE COURT:  Can you tell us why you chose that answer?

THE JUROR:  You know, I was around on that day.  I was at work, obviously.

THE COURT:  Which is where?  What town?

THE JUROR:  In Boston, Downtown Boston.  So I, you know, heard what I've been in front of, basically some of the media and talks and just being around.  But if it were to come down to a certain decision that I would have to make, I'm not positive that I could make one over the other.  So I said "unsure" because at that point I didn't know.  You know, after all of this time, a month after, and talking about it, I'm still a little weary about which choice I would make, but I am leaning in one area.  I understand that there is, you know, things to be heard, facts to be presented and everything, but even with all of that, I'm slightly confident that I would go one way over the other.

THE COURT:  I'm not sure I know what you mean.  Since then you would -- would you change any of those answers?

THE JUROR:  Probably.

THE COURT:  What would you change?

THE JUROR:  So what page is it on?

THE COURT:  It's on 20.

THE JUROR:  And it was No. 77?

THE COURT:  Yeah.  It was, as you see, a four-part.

THE JUROR:  So Part (c) and (d), which were kind of -- seemed like the same question, just opposite.  Would you like me to tell you how I would --

THE COURT:  Let me first focus on (a) and (b) if we could.

THE JUROR:  Sure.

THE COURT:  Which asked whether you formed an opinion about whether he's guilty or not.  As I'm sure you know, in a criminal prosecution, a defendant is presumed to be innocent unless the government proves that he's guilty by the evidence at the trial.

THE JUROR:  Right.

THE COURT:  And proves that beyond a reasonable doubt.

THE JUROR:  Right.

THE COURT:  So the burden of proof of guilt would rest with the government; and if the government, to your satisfaction, persuades you beyond a reasonable doubt that, as

a matter of fact, the defendant is guilty of one or more of the crimes he's charged with, then, of course, you would be justified in returning -- voting for a guilty verdict.  But if the government failed to convince you beyond a reasonable doubt on any of the counts, then your duty would be, if you were not so convinced, to return a not guilty verdict.  Would you be able to do that in this case?

THE JUROR:  I think I would, yes.

THE COURT:  So let's -- the other two questions relate to the -- your attitude toward the death penalty.  And we have some other questions directed to that beginning at Page 23, so let's perhaps turn to those.

THE JUROR:  Okay.

THE COURT:  So at Question 88, we asked -- you can take the clip off.  We asked a general question.  If you had any views about the death penalty, in general, what are they?  And you wrote that you "don't feel I could or have the right to take someone's life."  And you said, "I would not sentence anyone with the death penalty but then again I have never been in this position."

THE JUROR:  Correct.

THE COURT:  I guess you sort of indicated something similar now.

Does that still represent your general view about the death penalty?

THE JUROR: Yes, yes.

THE COURT: Do you want to add to that at all or alter it in any way?

THE JUROR: No. I mean, it's basically what I was alluding to in the previous question. Just if it were to come down to that, for me, personally, I don't think --

THE COURT: Keep your voice up, please.

THE JUROR: Sure, sorry. I don't agree -- I don't think, for me, I would be able to do something like that, make that decision.

THE COURT: In Question 89, we asked you to put it on a numerical scale where you were from strongly opposed to strongly favor. You're not quite at the polar end but you're pretty close.

THE JUROR: Correct.

THE COURT: Would that still be your answer to Question 89?

THE JUROR: Most likely, yes. It would not change.

THE COURT: And then on Question 90, on the next page, we asked you to consider various formulations of attitudes and select what best represented your feelings about the death penalty in a case involving someone who is guilty of murder. And you actually circled two. I presume that indicated some ambivalence between the two?

THE JUROR: Yes.

THE COURT:  You want to explain?

THE JUROR:  I apologize for circling two.  I understand that you wanted one.

When I came in that day -- I think it was January 5th -- I was taken aback and very off my game here.  I didn't actually expect it to be the -- this trial.  So I was obviously a bit unsure, unbalanced here for this Question 90.  But, you know, unfortunately, having time to think about it, I agree with my (b).  So if I could take (c) away, I would.  But I just wanted to express and tell you why.

THE COURT:  So (b) says that you're opposed to the death penalty, as you've said, and would have a difficult time voting to impose it even if the facts supported it.  That's what your self-assessment would be, is that right?

THE JUROR:  Correct.

THE COURT:  I guess the question is whether you could meaningfully consider the possibility of voting for the death penalty and act on that consideration if you thought it was an appropriate sentence given the facts of the case.

THE JUROR:  Do you think I could or not?

THE COURT:  I'm asking you if you could meaningfully consider the possibility of a death sentence.

THE JUROR:  I don't know.  I don't think I could.

THE COURT:  We also asked you on Page 25 at the bottom of 95, "If you found this defendant guilty and you decided the

death penalty was an appropriate punishment for him, could you conscientiously vote for the death penalty?"  You said, "No." It sounds like that's what you're saying today.

THE JUROR:  Correct.

THE COURT:  Follow-up?

MR. BRUCK:  If I could.  Thank you.  Good morning.

THE JUROR:  Hi.

MR. BRUCK:  My name is David Bruck, and I'm one of Jahar Tsarnaev's lawyers.  I just want to follow up on the discussion you just had with Judge O'Toole about the death penalty.

THE JUROR:  Sure.

MR. BRUCK:  And I'm not going to go over what you already said because I understand where you're coming from.

Remember when everyone came in and you filled out the forms and before that the judge gave you a talk about the jury system, all of you, and at the end, he said, "We need your help"?  Do you remember that?

THE JUROR:  Uh-huh.

MR. BRUCK:  And this morning he told you, Both the government and the defendant are entitled to a jury that does not have its mind firmly made up before hearing any of the evidence, right?

THE JUROR:  Uh-huh, correct.

MR. BRUCK:  Well, that's sort of the premise that I

want to look at this.  It sounds to me like the death penalty is way out of your comfort zone.

THE JUROR:  Correct.

MR. BRUCK:  But the question is whether jurors, when they're asked to do so, are capable of going out of their comfort zone and giving both sides a fair trial whether they want to or not.  Now, if they're not, fine.  But if you are, we need you to tell us that.

THE JUROR:  Sure.  To be honest, I don't think I am comfortable with the other choice that we would have.

MR. BRUCK:  Just so I'm sure -- I get that you're not comfortable.  The question is could you do it in an appropriate case?

THE JUROR:  I don't believe that I could.  I'm sorry.

MR. BRUCK:  Okay.

THE COURT:  Anything?  No.  Thank you very much.

THE JUROR:  Thank you.

MR. CHAKRAVARTY:  Your Honor, before the next juror comes in, Mr. Bruck formulated that last series of questions first citing to something that you had instructed the jurors when they first came in on January 5th, that quote, "We need your help."  Yesterday he formulated a similar question, following it up immediately with a plea to a juror, somebody who has evidenced they're anti-death penalty bias, in order to basically plead with the person as if to say, We need your

help.

That context, even those aren't the words that he asked of the juror, they were virtually the same when he asks basically, Can you weigh both of the positions and give meaningful consideration in the context of "we need your help." I think it's an objectionable question.  I think that it's confusing in front of this juror, for example, who clearly was prepared to have raised it.

But that concern, it's a real one, and I think, going forward, we don't want to be objecting to legitimate questions to tease out whether somebody is a *Witherspoon* precluded juror. But, conversely, it ought not be done in a way that suggests to a juror that one side or another really wants a specific juror.

MR. BRUCK:  I was using the Court's words.  We early on asked that the Court not, in effect, tell the jury about their -- the fact that the system needs their help.  The Court ruled otherwise.  And I think it's perfectly appropriate to invoke the Court's language.  It was balanced.  I was saying, If you can't, tell us that.  But if you can, jurors are supposed to go out of their comfort zone if they can.

THE COURT:  Well, I do think the context is a little bit different from the general address that I gave to the group as a whole.  This is kind of saying, "you," we need you as an individual juror.  And it's a little pushy, I think.

I will say this:  The juror will give an answer, and

it will be evaluated by me as to whether it truly represents the juror's condition or not.  So it's not necessarily that the answer automatically, to use that word, would control the outcome.

MR. CHAKRAVARTY:  Thank you.

THE CLERK:  Juror No. 306.

THE JURY CLERK:  Juror 306.

THE CLERK:  Sir, over here, please, if you would.  Have a seat.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  Since you were last here, have you been able to follow my instructions to avoid any discussion of the case with anyone?

THE JUROR:  Yes.

THE COURT:  And also, as much as possible, to avoid any media accounts of the matters at hand?

THE JUROR:  Yes.

THE COURT:  Thank you.

THE JUROR:  Somewhat here and there but I haven't --

THE COURT:  You have --

THE JUROR:  I've seen things.

THE COURT:  You get exposed to things.  What we ask is that you put them aside.

THE JUROR:  Right.

THE COURT:  So tell us about your employment.  You're a financial/operations analyst.

THE JUROR:  Yup, for a consulting group in Boston so --

THE COURT:  So what's the nature of what you do?

THE JUROR:  Well, I'm starting a new job this week, actually, so it's actually inconvenient that I'm picked for this jury.  Before I was doing healthcare claims, operations work.  This new job I have is it's more of a financial analyst role so --

THE COURT:  Well, is it for the same employer?

THE JUROR:  Yeah, same employer, different side of the office.

THE COURT:  What is the -- your current job entail?

THE JUROR:  A financial analyst?

THE COURT:  Yeah.

THE JUROR:  I'm basically doing bank recs and cash receipts and stuff like, reporting and data entry.  It's my first job out of college, so there's a lot of data entry work.

THE COURT:  And you said something about you being concerned about it, service on the case.

THE JUROR:  Yeah.  Just because this is my first week in the job, and I kind of want to get acclimated, and it's kind of a hindrance to that so --

THE COURT:  How serious a problem is it?

THE JUROR: I don't know. I feel like, if I were to have a option, I'd feel like I would rather be at the office. That's my first job.

THE COURT: Has anybody, any supervisor or anything, said something to you about being, say, disappointed that you have --

THE JUROR: No, no.

THE COURT: We've asked everybody about their use of social media, and you list Facebook, Twitter, Snapchat, LinkedIn, those --

THE JUROR: Yup.

THE COURT: LinkedIn, I presume, is professionally related?

THE JUROR: Yup, yeah.

THE COURT: The others, personal or professional or both?

THE JUROR: Personal, yeah, personal.

THE COURT: So let me ask you to turn to Page 20, Question 77, near the top. So in that question we asked, as you filled out the questionnaire, whether at that time you had formed an opinion about various matters including whether the defendant was guilty or not and, if so, what penalty might be imposed. And you answered that you had formed an opinion that he was guilty, and you are unsure about the penalty.

And then below that, we asked you, if you had answered

yes to any of the questions, would you be able or unable to set aside your opinion and base your decision about guilt or punishment solely on the evidence presented in court, and you said "able."  Could you tell us a little bit why you made those selections?

THE JUROR:  At the time -- so I believe he's guilty to this day, but at the time of the questionnaire, I was unsure if, you know -- I still don't know if I think the death penalty is the correct option.  As I stated, I think, somewhere else, I truly believe that in a sense that it could be the easy way out for the defendant.  He could may want that.  So that's why I said that.

But as far as this next part, again, at the time I said -- I thought about it a lot since I did this questionnaire.  I don't know if I would be able to say he's not guilty.  I think, no matter what, he's guilty, no matter what.  As far as the death penalty, though, I still -- I wouldn't have an issue, you know, agreeing to the death penalty, but, yeah, it's the easy-way-out thing.  I'm not sure.  That's the main thing for me.

THE COURT:  Well, let me --

MR. MELLIN:  Your Honor, I think we have --

THE COURT:  Okay.

MR. BRUCK:  We're not agreed.

THE COURT:  I'm sorry?

MR. BRUCK:  We are not.

THE COURT:  So let me ask you about forming -- of course, there's been a lot in the news about this event.  Where were you when it occurred?

THE JUROR:  I was in school at Bryant University.

THE COURT:  In Rhode Island?

THE JUROR:  Yes.

THE COURT:  Did you follow it then?

THE JUROR:  What's that?

THE COURT:  You followed the news accounts of --

THE JUROR:  Yes, yes.

THE COURT:  So it's not surprising that people have impressions about the issues in the case.  In any criminal prosecution, though, we proceed in accordance with some principles of laws, one of which is that the defendant is presumed to be innocent unless the government proves at trial that he's guilty beyond a reasonable doubt.

THE JUROR:  I understand that, yeah.

THE COURT:  And so we ask jurors to focus on the evidence presented at the trial and decide whether that evidence convicts the defendant or not and not some other information that is different from the evidence.

So the question is whether, as a juror, you would be able to listen to the evidence presented in the course of the case and decide whether that evidence is --

THE JUROR:  I honestly -- I could listen to it, but I honestly don't think that I could actually believe that that would be true and to follow along with saying he's not guilty. I know for a fact -- not for a fact, obviously, but I've formed my own opinion that he is guilty just by watching everything that happened, when it was happening, and just how much news coverage it got and stuff, but -- at this time, when I was doing this, the whole death penalty, life-in-prison thing, I'm still unsure.  I was unsure about it.  But as far as being guilty, I'm confident in my belief that he is, and I don't know if I could --

THE COURT:  Okay.

MR. BRUCK:  Could you let us confer for a moment?

THE COURT:  Yeah.

(Discussion held off the record.)

MS. CLARKE:  I think we're agreed, your Honor.

THE COURT:  All right.  Thank you.

THE JUROR:  Thanks.

███████████████████████

████████████████████████

THE CLERK:  Juror No. 308.

███████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████████████

███████████████████

THE JURY CLERK:  Juror 308.

THE CLERK:  Ma'am, over here, please, if you would. Have a seat.

THE COURT:  Good morning.

THE JUROR:  Good morning.  How are you?

THE COURT:  Good.  Thank you for being here again.

THE JUROR:  Thank you.

THE COURT:  Since you were last here, have you been able to follow my instructions to avoid any discussion of the case in substance other than to tell people where you're going?

THE JUROR:  Yes.  It's been difficult but, yes.

THE COURT:  Why?  Have people tried to talk to you about it?

THE JUROR:  They'll just start talking in general, but, really, I just exit the room or ask them to stop.

THE COURT:  Also, have you been trying to avoid any media reports about the case?

THE JUROR:  Yes.

THE COURT:  So that's the questionnaire that you filled out.  I just want to follow up on a couple of the matters that you gave us in there.  Tell us a little bit about your employment.  You're running a program at Northeastern?

THE JUROR:  Yes.  I'm an associate director of a youth program.  It's called YDIP, Youth Development Initiative Project.  It's at Northeastern University.  And we work with 20 families to sort of help them be -- have better parenting skills so that their kids could be successful.

THE COURT:  What are the ages of the kids?  Any age?

THE JUROR:  Right now -- it's a cohort.  So we start with sixth graders and follow them up until they graduate, twelfth grade.

THE COURT:  How long have you been doing that?

THE JUROR:  Five months.

THE COURT:  Okay.

THE JUROR:  Just started.

THE COURT:  But you were at Northeastern before that in another capacity?

THE JUROR:  Yes.

THE COURT:  What were you doing then?

THE JUROR:  I was working for the Public Safety Division at the time.  It's now labeled "police department."

THE COURT:  I see.  What did you do for the Public

Safety Department?

THE JUROR:  I was a community service officer, also a dispatcher.

THE COURT:  Two different job descriptions?

THE JUROR:  It falls within the criteria, but if you get the training to become a dispatcher, then you're -- it's essentially an additional responsibility to the community service officer.

THE COURT:  Tell me about the community service officer part.

THE JUROR:  We patrol and maintain the safety of campus, and at times we have to work the front desk, call taking, taking emergency calls.

THE COURT:  Is it a uniformed position?  You wear a police uniform?

THE JUROR:  Security.

THE COURT:  Security.  Police like?

THE JUROR:  Yes, police like.

THE COURT:  Carry a weapon?

THE JUROR:  Yes, mace and baton, expandable baton.

THE COURT:  How long did you do that?

THE JUROR:  Five years.

THE COURT:  You were actually doing that around the time -- during the time of the events of the Marathon, right?

THE JUROR:  Yes.

THE COURT:  I think you said someplace that you were actually working dispatch at least at the end of that week.

THE JUROR:  Yes.

THE COURT:  Were you involved in some way in what was unfolding --

THE JUROR:  Yes.

THE COURT:  -- as the dispatcher?

THE JUROR:  The day of the capture, I was dispatching for 16 hours.

THE COURT:  Do you remember particular things about what you were doing that related to the search going on and so on?  What were you dispatching, I guess?

THE JUROR:  Well, Northeastern was -- is close to the Boston Marathon event, and so a lot of our officers were forced to come into work and maintain the safety of the campus.  But my primary role was to monitor Boston's channel, and that kind of monitors the whole area.  So we were in communication with Boston Police and any local surrounding agencies.

THE COURT:  Okay.  Do you remember the hours that you were doing that on the 18th and 19th?  Was it overnight or --

THE JUROR:  8 a.m. to midnight.

THE COURT:  8 a.m. to midnight on the 18th, which was the Thursday?

THE JUROR:  Yes.

THE COURT:  Did you work on the Friday?

THE JUROR:  Yes.

THE COURT:  So that, you know, before midnight on the 18th, were you following activity in Watertown?

THE JUROR:  Yes.

THE COURT:  How many channels would you be monitoring?

THE JUROR:  I can't be sure on the number, but I think it expands to three miles from the center of the campus, which is 360 Huntington Avenue.

THE COURT:  Okay.  So you would get broadcasts within that radius?

THE JUROR:  Yup, Chelsea, Everett.  I can't be sure of Watertown but --

THE COURT:  It reaches as far as Chelsea?

THE JUROR:  Yes.

THE COURT:  Different subject.  You use Facebook and Instagram pretty regularly?

THE JUROR:  Yes, every day.

THE COURT:  Do you use it professionally or personally?

THE JUROR:  Personally mostly.  Well, also professionally now.  I have to monitor the youth program's Facebook.

THE COURT:  The kids that are in the program, do you monitor them?

THE JUROR:  Yes.

THE COURT:  Question 34 -- I guess we're coming back to the security police issue.  It says, the Everett Police, you worked there as well in 2013 and 2014?

THE JUROR:  No.  I reapplied for a volunteer position, and I also applied for the police department.  And I already did an extensive background check with them.

THE COURT:  But you --  so that was under the -- I think the question asked whether you applied for a job, and that was the --

THE JUROR:  Yes.

THE COURT:  Let me ask you to turn to Page 19.  We asked what you -- your reaction was when you realized you had a summons for this case, and you said "cool."  What were you thinking?

THE JUROR:  Well, I just thought it would be nice to be a part of history.  It seems like -- this case seems -- is very high profiled and very important to the community of Boston and maybe even extend to the community of New England.  So I thought it was cool to be a part of history.

THE COURT:  Okay.  In the next question you said you had the thought, if you were selected, you won't have a life.  Did you regard it as burdensome to serve on this particularly given what your activities are?

THE JUROR:  Well, I don't know too much about the person in question, but it seems a little bit nerve-racking to

know that, you know, he might have connections other than what we know.  And given the list of people that was on the other list --

THE COURT:  So would you be concerned for your personal security?  Is that what you're saying?

THE JUROR:  At this time, no, but maybe in the long run.

THE COURT:  Okay.  On the next page, 20, Question 77, we asked whether you'd form any opinions about whether the defendant was guilty or not and, if so, what the penalty might be.  We gave you a choice of three boxes for each of those subparts.  And you picked "unsure" for each of those.  Can you tell us what you were thinking when you made those choices?

THE JUROR:  Well, I picked "unsure" because I was working so -- that night of capture, so the whole time, you know, we were told, This is what we're looking for, and this is the person in question.  But we were never given the evidence. And I can't base my decisions off of hearsay or what people were -- or what was going on that day because there's nothing factual at this time.

THE COURT:  So I'm sure you understand that in a criminal prosecution when somebody is accused of a crime they're presumed innocent of a crime unless and until the government proves they're guilty by the evidence at the trial and proves that to the jury beyond a reasonable doubt.

THE JUROR:  Right.

THE COURT:  You know those principles?

THE JUROR:  Yes.

THE COURT:  Would you have any personal difficulty in faithfully applying those principles if you were a juror in this case?

THE JUROR:  No, I wouldn't have any trouble with that.

THE COURT:  In particular, if you thought as to any of the criminal charges -- and you know there are a number of ones -- the government had failed to prove a particular charge beyond a reasonable doubt, would you have any difficulty in returning a not guilty verdict for that particular count?

THE JUROR:  Yes.

THE COURT:  Would you have difficulty doing it?

THE JUROR:  Difficult?  I mean, I would have -- no.  I think I would have to look at the evidence before I could convict or --

THE COURT:  In other words, the burden is always on the government to prove a person guilty.  A person accused doesn't have a burden to prove he's not guilty.  If the government is successful in persuading the jury beyond a reasonable doubt that the person is guilty of the crime, then a guilty verdict would be appropriate.  But if the government doesn't do that, then the law requires the jury to find the person not guilty.  I guess that's my question.  Would you be

able to find him not guilty if you thought the government's proof had fallen short?

THE JUROR:  Yes.

THE COURT:  And do you think you could make your judgment in the case without being influenced by things you heard as you worked as a dispatcher on the 18th?

THE JUROR:  I think dispatcher might have a little influence over my judgment just because I was working that day. But I'm not sure if that will be the case if I was to be selected as a juror because things will come up that I wasn't aware of.

THE COURT:  Okay.  Let me ask you about Question 82. We asked if people participated in various ways in supporting the One Fund or Boston Strong and so on.  You said you bought a T-shirt and bought a bracelet that said "Boston Strong."  Do you still have those items?

THE JUROR:  Yes.

THE COURT:  Do you still use them?

THE JUROR:  Yes.

THE COURT:  How commonly?

THE JUROR:  The T-shirt, I wear it every now and then if I have to work out.  The T-shirt, I bought it because it was to fund-raise for Sean Collier's family so --

THE COURT:  In any of your work in security or otherwise, have you had any direct contact with the MIT police?

THE JUROR:  No.

THE COURT:  Were they part of what you were monitoring on dispatch?

THE JUROR:  Yes.

THE COURT:  Did you hear dispatches about Sean Collier that night?

THE JUROR:  No.  I was not working the night of the incident.

THE COURT:  Which night were you working?

THE JUROR:  The night of the capture.

THE COURT:  Oh, okay.  I thought -- so it was the Friday rather than the Thursday?  The events were Thursday into Friday.

THE JUROR:  Thursday into Friday.  So Friday, the day they captured, I worked from 8 a.m. to midnight.

THE COURT:  I thought you said the other day before.

THE JUROR:  Sorry.  I was confused.

THE COURT:  That was the day that everybody sheltered in place?

THE JUROR:  Right.

THE COURT:  We asked a series of questions about the death penalty, your attitude towards it, beginning on Page 23, starting with Question 88.  And in Question 88 it was a general question.  If you have any views about the death penalty, in general, what are they?  You said, "Not for and do not object

to the death penalty," I guess, indicating --

THE JUROR:  I'm still unsure, yeah.

THE COURT:  Then in Question 89 we asked you to put yourself on a scale from 1 to 10.  You put yourself sort of in the middle there.

THE JUROR:  Yes, 5.

THE COURT:  Then on the next page, we asked you if there was a statement under the several suggested that you thought captured your feelings or attitude about the death penalty in the case of someone who was guilty of murder -- you can take the clip off if you -- it's Page 24 that we're looking at right now.

THE JUROR:  Okay.  Got it.

THE COURT:  So to this question you selected the statement letter (d).  You said, "I'm not for or against the death penalty.  I could vote to impose it or I could vote to impose a sentence of life imprisonment without the possibility of release whichever I believed was called for by the facts and the law in the case."

THE JUROR:  Correct.

THE COURT:  That's what you thought.  At least when you filled out the questionnaire, that summarized your views?

THE JUROR:  Yes, that still stands.

THE COURT:  Is that still true?

THE JUROR:  Yes.

THE COURT:  You heard me explain this morning the penalty phase of the case that the government would argue shows aggravating factors and the defense would suggest mitigating factors.  Would you be able to consider all that evidence and everything you've heard in the course of the case and, if you thought it was appropriate, choose the death penalty and, if you thought it was appropriate, choose life imprisonment without release?

THE JUROR:  Yes, I can choose one or the other.

THE COURT:  In Question 92, you wrote that you thought it was against your religion to cause someone's death.  Would that religious belief interfere with your ability to decide that the death penalty ought to be imposed in the case?

THE JUROR:  Well, the conservative point of view of my religion would suggest that we shouldn't cause -- be the cause of someone's death.  But I'm conservative, so I wouldn't object to it.

THE COURT:  So you -- well, all right.  Let me go to the question at the bottom of the page, Question 95.  If you found this defendant guilty and thought -- decided that the death penalty was an appropriate punishment for him, could you conscientiously vote for the death penalty?  And at the time you indicated you weren't sure.

THE JUROR:  Right.  I'm still unsure.

THE COURT:  Well, the question is not what would you

do but what could you do.  In other words, would you be prepared under the circumstances to vote for the death penalty if you thought it was appropriate, or is it the kind of thing you're not sure that you could do even if you thought it was the right thing to do?  That's what the question is trying to get at.

THE JUROR:  I think, based on the factual evidence, I will be able to make a definitive answer.  But I'm still unsure about that.  I don't know if I could vote yes or no.

THE COURT:  Some people might not want to feel personally responsible for the fact that a person was sentenced to death.  That's sort of what this question is getting at.  Even if you intellectually believe that it was the right thing, could you personally do it, is the question.

THE JUROR:  I'm still not sure.

THE COURT:  That's fair.  As I said, we want the answer you think is really the correct -- I mean, the true answer.

THE JUROR:  Yes.

THE COURT:  On the other hand, on the next page, top of 96 we asked the other side of that question.  If you found this defendant guilty and decided life imprisonment without possibility of release was appropriate, could you conscientiously vote for that?  There you said "yes."

THE JUROR:  Yes.

THE COURT: You don't have any difficulty with that proposition.

THE JUROR: Right.

THE COURT: Okay. Follow-up?

MR. CHAKRAVARTY: So I'm going to pick up where the judge left off. My name is Aloke Chakravarty. I'm one of the prosecutors in the case.

THE JUROR: Okay.

MR. CHAKRAVARTY: So the way the questionnaire asks questions sometimes asks about just generally, you know, what are your feelings about the death penalty, and then it asks you about particularly whether you could actually do it. And so noticing some hesitation, is there something about -- you explained that your religious beliefs influence your view on the death penalty, is that right?

THE JUROR: Yes.

MR. CHAKRAVARTY: And you also suggest in one of your answers, I think on 94, that there are family members or others close to you who share those religious beliefs. Is that fair to say?

THE JUROR: Yes.

MR. CHAKRAVARTY: It sounds like there's constellation of people around you who wouldn't support the death penalty, is that right?

THE JUROR: That's correct.

MR. CHAKRAVARTY:  Do you think, given that, you know, constellation of people around you, that if, after the process plays out and you follow the law and you weigh the factors, the aggravating and the mitigating factors and you assess those facts, at some point you have to make your own judgment.  Your judgment will lead to a consequence that would be either the death penalty or life imprisonment.  Could you make that judgment?

THE JUROR:  Yes.  I will be able to make the judgment call.

MR. CHAKRAVARTY:  Even knowing that if you -- it's your decision independently to sentence somebody to death, you think you can do that?

THE JUROR:  Yeah.  I'm still not comfortable with either side, yes or no.

MS. CLARKE:  I'm not sure the question was all that clear.

THE COURT:  Try again.

THE JUROR:  Well, if -- you're asking if I could -- if he was convicted, if I could basically rule that his conviction is served as either the death penalty or the life imprisonment.

MR. CHAKRAVARTY:  If we get to that stage, those are the only two choices you'll have.

THE JUROR:  Yes.  I feel comfortable with the life imprisonment and saying yes to that, but I can't be sure, to be

completely 100 percent comfortable with the death penalty.  I think that's something not only that I grew up religiously believing that it's wrong, but it's also been something that's been debated in school for a long time.  And I can recall on a paper that I wrote that I couldn't be too sure that I could sentence someone with the death penalty, but I wouldn't object to it for special crimes.

THE COURT:  Let me ask it a slightly different way.  You say you can't be sure you could do it.  Can you be sure you couldn't do it?

THE JUROR:  If it came down to it, I can do it.

MS. CLARKE:  Can?

THE JUROR:  Can.

MR. CHAKRAVARTY:  Is there some -- why -- why do you have the confidence that you can do it?  Is there something in your life that --

THE JUROR:  Factual evidence.  Basically, if -- there's no doubt that the Boston Marathon caused a lot of fear in the city.  If the prosecution can prove that he was the cause of it and the cause of three people dying, then, yes, death penalty would seem appropriate.

MR. CHAKRAVARTY:  Okay.  It's not a question of whether you would seek it in this case.  It's a question of whether you, as a juror, could weigh the evidence.  After somebody's been convicted of all those aggravating factors as

well as whatever mitigating factors, which could include characteristics about the defendant himself, not about his actions, at the end of that, do you think you can say -- if you believe the facts and the law justify it --

THE JUROR:  Right.

MR. CHAKRAVARTY:  -- that you can say, I sentence this person to death?

THE JUROR:  Yes.

MR. CHAKRAVARTY:  Just one other point of clarification I wanted to make.  It sounds like you were working later on the Friday, the 19th.  And it sounds like it was after a suspect had already been identified, was that right?

THE JUROR:  Yes.

MR. CHAKRAVARTY:  So it wasn't during any of the events that led to the crimes that are going to be on trial here?

THE JUROR:  Right.  I was on a day off when the incident occurred.

MR. CHAKRAVARTY:  Okay.  That's all I have.

THE COURT:  Okay.  Anything?

MS. CLARKE:  I think so.  Hi.  My name is Judy Clarke. I'm one of the lawyers for Mr. Tsarnaev.  Good morning.

THE JUROR:  Good morning.

MS. CLARKE:  I guess I'm a little perplexed.  I sort

of feel your agony over the death penalty.  But it sounds like with one of the answers to the prosecutor you said that you would impose the death penalty in this case if Mr. Tsarnaev were convicted.  Did I hear that right?

THE JUROR:  I'm just -- if he was to be convicted and I have to make the decision to rule death penalty, I would have to say that I can do it.

MS. CLARKE:  You can do it?

THE JUROR:  Yeah.

MS. CLARKE:  I think that the judge has sort of made clear or will make clear that no juror ever has to vote for the death penalty.

THE JUROR:  Right.

MS. CLARKE:  All that is expected of a juror is that they will listen to the evidence, deliberate with their fellow jurors, and when it comes to punishment, make their own personal, moral judgment.

THE JUROR:  Yes.

MS. CLARKE:  Is that where you are?

THE JUROR:  Yes.  That's where I stand.  I can make my own --

MS. CLARKE:  Consider the views of others, consider your own views, and then make up your mind?

THE JUROR:  Yes.

MS. CLARKE:  And not automatically vote for death

because it was the Boston Marathon bombing?

THE JUROR:  Yes.  I can make my own choice based on factual evidence and my personal beliefs.

MS. CLARKE:  You have a lot of connections to security and police officers and applying for jobs and wanting to work in that area.

THE JUROR:  Yes.

MS. CLARKE:  Did I hear you right about that?

THE JUROR:  That's correct.

MS. CLARKE:  Is there any concern about going back to that community if you were a juror here and you returned a life verdict?  Would you have any concern about going back to that community and explaining your vote?

THE JUROR:  Yes, I would have some concern.

MS. CLARKE:  Can you tell us about that?

THE JUROR:  Well, still -- like, I still have access to the police department.  So they still, you know, welcome me, and I still work alongside with them.  In fact, some of them still say, Hey, come back.  And if an opportunity with the Everett Police Department was to open up, then I'd like to take it without restrictions.

THE COURT:  I'm not sure she understood the question.

MS. CLARKE:  Yes.  Could I try it again?

THE COURT:  Yes.

MS. CLARKE:  With that interest in going back to the

police or working in the security field or with police officers, do you think that if you returned a verdict of life, not death in this case, it would make it hard for you to go back to that community?

THE JUROR:  No, it wouldn't make it hard for me at all.

MS. CLARKE:  Then I guess we were maybe on different planes there.

THE JUROR:  Yeah.  I was thinking more alongside this conversation after the trial.  I think people will be curious and that -- you know, and question the decisions made by the jurors.  And that would make it difficult especially if it wasn't what they expected.  But as far as going back into the -- working into the field, it wouldn't be difficult.

MS. CLARKE:  What do you think that community expects -- would expect of you sitting in the jury?

MR. CHAKRAVARTY:  Objection, your Honor.

THE COURT:  I'll sustain that objection.

MS. CLARKE:  What would be hard about the conversations that you would have after this trial?

THE JUROR:  Well, we were on -- everybody was forced to work that day, so I think -- and people were -- I mean, we just are the initial responders and get forced to do our job and protect the community.  And a lot of people said, you know, This is what we're looking for.  They gave the description.

They gave the nature of the crime.  And people were searching for hours so --

MS. CLARKE:  How do you think that that would influence you in deliberating in this case?

THE JUROR:  I think I will be -- I will be able to make a decision based on facts.

MS. CLARKE:  And go back to that same law enforcement community and justify it?

THE JUROR:  Yes.

MS. CLARKE:  If you were on a jury that -- I'm sorry. If you were on a jury that acquitted Mr. Tsarnaev, found him not guilty, could you go back to that community and explain that?

MR. CHAKRAVARTY:  Objection, your Honor.  It suggests that she will be talking to them about the jury deliberations.

THE COURT:  Yeah.  I think we've explored it.

MS. CLARKE:  You think I'm done?

THE COURT:  Yeah.

MS. CLARKE:  Thank you.

THE JUROR:  Thank you.

THE COURT:  Thank you.  Thank you very much.

THE JUROR:  Thank you.

THE COURT:  We have to make a changeover with the stenographers at this point.

(Recess taken at 11:21 a.m.)

(The Court enters the courtroom at 11:41 a.m.)

THE CLERK:  Juror No. 311.

THE JURY CLERK:  Juror No. 311.

(The juror enters the courtroom.)

THE CLERK:  Ma'am, over here, please.  Have a seat. And do me a favor and keep your voice up so everyone at the table can hear you.

THE JUROR:  Okay.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  Since you were last here have you been able to follow my instructions to avoid discussion of the substance of the case with anybody?

THE JUROR:  Yeah.

THE COURT:  And also, as much as possible, avoid any media reports or --

THE JUROR:  Yeah, to the best of my ability.

THE COURT:  You see them, but you put them aside and hope when you see them?

THE JUROR:  Yeah.

THE COURT:  So that's the questionnaire you filled out.  We're going to follow up on some of the questions.  And I just wanted to start with your employment.

THE JUROR:  Yeah.

THE COURT:  Tell us what you do.

THE JUROR:  I'm a behavior therapist for children with autism.

THE COURT:  And you work for an agency?

THE JUROR:  Yeah.

THE COURT:  Tell us about your relationship with the agency and how you work and --

THE JUROR:  Well, like, it's called applied behavior analysis, but I'm a per-diem worker.  And I'm also actually starting a new job next week.

THE COURT:  Different from this one?

THE JUROR:  Yeah, same job but different company. But, so, like, it's -- probably you're familiar with per diem. But when I don't work, I don't get paid.

THE COURT:  That's what I was going to ask.

THE JUROR:  Yeah.

THE COURT:  You put it in your form that you were per diem.

THE JUROR:  Yeah.

THE COURT:  When you are working for an agency, do you have work just about every day?

THE JUROR:  Yeah, their sessions are about two hours each.  Probably up to three a day you can have.

THE COURT:  So on a given day you might have a session with one client in the morning and one midday, one later in the afternoon?

THE JUROR:  Yeah.  I go to their homes.

THE COURT:  What would you average on a day?

THE JUROR:  Five to six a full day, hours, yeah.

THE COURT:  Five to six hours?

THE JUROR:  Uh-huh.

THE COURT:  So I was counting clients.  So two, three clients?

THE JUROR:  Two, three clients a day.

THE COURT:  And that would be five days a week?

THE JUROR:  Yeah.

THE COURT:  So you only get paid if you do that?

THE JUROR:  Uh-huh.

THE COURT:  Okay.  It would be difficult, then, I assume, for you to serve for three months?

THE JUROR:  Yeah.

MR. BRUCK:  Could I inquire?

THE COURT:  Go ahead.

MR. BRUCK:  You heard the judge say there will be no court on Fridays, and of course weekends are free.  This is not an option to work -- and also, the court will end at four o'clock in the afternoon.

THE JUROR:  Yeah.

MR. BRUCK:  Are those options where you could rejigger your schedule and --

THE JUROR:  I think four o'clock would be a little too

late to start.  But maybe weekends?  I'm not sure with my new company how they work, really, because I haven't started it yet, and their hours and stuff.  Potentially.  I'm not sure.

MR. BRUCK:  Yeah.

THE COURT:  Okay.  Thanks.  We're not going to ask you to serve.

THE JUROR:  Thank you.

THE COURT:  Just leave it there.

(The juror is excused.)

THE CLERK:  Juror No. 314.

THE JURY CLERK:  Juror 314.

(The juror enters the courtroom.)

THE CLERK:  Sir, over here, please, if you would.

Have a seat.

THE JUROR:  Thank you.

THE CLERK:  And if you could do me a favor, keep your voice up, speak into the mic so everyone around this table can hear you.

THE JUROR:  Okay.  Great.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  Since you were here to fill out the questionnaire, have you been able to follow my instructions to avoid any discussion of the case with anybody?

THE JUROR:  Yes.

THE COURT:  And also, as much as possible to avoid any media reports about the case?

THE JUROR:  Yes.

THE COURT:  Good.  Thank you.

So that is the questionnaire.

THE JUROR:  Okay.

THE COURT:  We're going to follow up on some answers. I want to start with your answer to Question 10 on page 5.

THE JUROR:  Sure.

THE COURT:  And if -- there are two parts to that as I read it.  If the first part is private, we can kill the audio, or if you're comfortable discussing it.

THE JUROR:  No problem.

THE COURT:  Okay.  So this -- you say your wife is ill --

THE JUROR:  Has rheumatoid arthritis.

THE COURT:  -- and needs some help?

Can you tell us how that would be affected if you were serving as a juror in the case?

THE JUROR:  It's just -- right now she's doing fine, so it's just a sporadic thing that comes up from time to time where she has some issues and had several surgeries over the years and things of that nature, so...

THE COURT:  How would it impact your, say, daily schedule?

THE JUROR:  More so just if -- you know, if I needed to help out with things if she was down for a period of time, but other than that, not.

THE COURT:  Okay.  The other part of the answer in 10 was about your work.

THE JUROR:  Yes.

THE COURT:  Tell us about your work, first, before we get to any difficulties.

THE JUROR:  Sure.  I work in a reinsurance base with responsibilities across North America for a segment of our business.  So a lot of travel, a lot of time on the road.  In fact, when I got the call last night -- or when I called in last night, I was in New York City, so I scrambled back on the last train.  I got in about one in the morning this morning, so...

THE COURT:  We appreciate that.  So --

THE JUROR:  So, you know, the --

THE COURT:  You do a lot of travel, is that it?

THE JUROR:  Probably about half my time is on the road, yes.

THE COURT:  And for what purposes?  I mean, what --

THE JUROR:  Clients as well as, you know, working with the team that I have that's spread across the country.

THE COURT:  How many people do you supervise?

THE JUROR:  There are about 12 in various capacities

in something that could be -- you know, it's an issue, but it's not -- I'm not sure it would be the end of the world in terms of that situation.

THE COURT:  In part we set the schedule that we anticipate following with an eye to perhaps providing some space for people to get back to work --

THE JUROR:  Sure.

THE COURT:  -- either later in the day, or particularly on a Friday to have a full day to attend to things.

THE JUROR:  And my local office is right over on High Street, so...

THE COURT:  So I guess the question is you know the schedule, Monday through Thursday, nine to four, generally.  Is that something that you could -- while, you know, it would be inconvenient, is it something that would be tolerable for the time that we're expecting, three to four months?

THE JUROR:  I think I could find a way to make it work, yes.

THE COURT:  We asked about social media, and the only one you identified was LinkedIn?

THE JUROR:  Yeah, I don't have a Facebook page.  I don't -- my kids give me a hard time about that all the time, but I've stayed away from it for the most part.

THE COURT:  How old are the kids?

THE JUROR:  I think I actually have a Twitter account, but I don't think I've ever been on there.

Sixteen and 18.  Two high school kids, yes.

THE COURT:  And LinkedIn is for professional purposes, I gather?

THE JUROR:  Correct.

THE COURT:  You have never, I guess, been a juror.  You follow civil cases because they're related to your job.  Is that it?

THE JUROR:  Correct.

THE COURT:  Do you follow any criminal cases?

THE JUROR:  Not too much.  You know, the occasional thing I'd see across the news and -- I guess from a business perspective, a 9/11-type event where that impacts us from a business standpoint, you know, things of that nature come up.

THE COURT:  Any business connection to the marathon bombing?

THE JUROR:  No, none.

THE COURT:  So let me turn to page 20.

THE JUROR:  Okay.

THE COURT:  And Question 77.

THE JUROR:  Yes.

THE COURT:  In that question we asked whether you had formed an opinion about several different matters.  A and B dealt with whether the defendant was guilty or not guilty, and

to that you said you had formed an opinion that he was guilty and you checked the box "yes"; and then C and D were about what the penalty should be, and for that you chose the "unsure" box.

THE JUROR:  Correct.

THE COURT:  Then farther down just under that we asked, "If you answered yes to any of these questions, would you be able or unable to set aside your opinion and base your decision about guilt and punishment solely on the evidence that would be presented to you in court," and you checked "able."

THE JUROR:  Yes.

THE COURT:  Would you tell us about that?

THE JUROR:  Sure.  About the "able" piece?

THE COURT:  Well, both.

THE JUROR:  Both?

THE COURT:  How they fit together.

THE JUROR:  In terms of the feelings on guilt, I think that just comes from the initial things in the news when the event happened and seeing all that.  So that's kind of formed that perspective.

THE COURT:  Let me just ask about that.  You followed it as it was unfolding?

THE JUROR:  Yeah, over the few days when everything was happening.

THE COURT:  Did you have to shelter in place that day?

THE JUROR:  I did not, no.

THE COURT:  Where were you?

THE JUROR:  I was actually home that day.

THE COURT:  Okay.  So I interrupted to ask that question.

THE JUROR:  That's okay.

In terms of the "able" piece, as I thought about that, you know, most of my working life has kind of been analyzing risk and things of that nature, where you're taking in a set of facts and a set of information and kind of working through it as someone's trying to sell you on the idea.  And, you know, you're then responsible for taking hold of, you know, what you feel about that and how you approach it.

So I kind of use that in my own mind as something where I thought that, while very different, a little bit akin to maybe what would happen in a trial scenario where you're getting different pieces of evidence and having to analyze that in your mind in terms of what actually happened and making a decision at the end of that process.

THE COURT:  I'm sure you know this, but I'll just summarize it for you.  In our system of criminal justice when the government accuses somebody of a crime, the person is presumed to be innocent of the crime unless and until the government proves that he's guilty by the evidence at the trial, and proves it so the jury is convinced beyond a reasonable doubt of the fact that he's guilty.  And the jury's

obligation is to weigh the evidence in the trial and see whether the government has fulfilled its burden or not. And if it has not, the obligation on the jury is to find the person -- the accused not guilty.

Do you understand all that?

THE JUROR: Yes, sir.

THE COURT: Would you be able to faithfully apply those principles in practice if you were a juror in this case?

THE JUROR: I think I could, yes. It's a -- you know, it's a scenario where, you know, as you laid out there, there would be the evidence presented, and that would have to show that, you know, it met the case for the needs before going in that direction.

THE COURT: At the bottom of page 20 you made a note about a coworker who was running and so on.

THE JUROR: Oh, yes.

THE COURT: Can you tell us a little bit about that.

THE JUROR: Just somebody I work with locally in Boston who's run the marathon several years, and she happened to be running it that year. And as I said here, she finished probably 15, 20 minutes ahead of the events that happened that day.

THE COURT: And how do you know that?

THE JUROR: Just from knowing that she was running and speaking to her after the fact.

THE COURT: Was she in any way affected by the -- personally affected by the events?

THE JUROR: She was not, no.

THE COURT: And Question 82 on the next page, you made some contributions?

THE JUROR: I did. A friend was -- I guess it must have been the anniversary of the event. A friend was running the marathon that year for -- is it the MR8, I think -- the young boy who was killed on that day -- for the team that ran for him. So she was -- this woman was running for that team, and my wife and I had given some money to her for that.

THE COURT: So this is where you pledge to donate if the runner runs and so on?

THE JUROR: Correct. Exactly.

THE COURT: Do you remember how much it was?

THE JUROR: Maybe $50 or so. Less than a hundred.

THE COURT: And Boston Strong T-shirts?

THE JUROR: Yes. I believe my wife purchased some of those for myself and the kids.

THE COURT: Do you use yours?

THE JUROR: I don't think mine fit, actually. I don't think I've ever worn it.

THE COURT: Okay. Beginning at page 23, Question 88 we asked about views concerning the death penalty both in general and perhaps specifically. So Question 88 asks if you

have any views on the death penalty, in general what are they, and you wrote, "Okay with death penalty for appropriate crimes."

THE JUROR:  Yeah, I was thinking about that.  As you -- I forget the terminology you used this morning.  Is it aggravated?

THE COURT:  Aggravating factors on the one hand and mitigating factors on the other hand.

THE JUROR:  You know, obviously that's a tough one when you are making that -- or are asked to make that type of decision, but I believe in cases where there would be shown to have those type of aggregating [*sic*] factors that you mentioned, I believe that could be warranted in a case.

THE COURT:  The next question, we asked you to indicate on a scale of 1 to 10 where you thought you might be from strongly opposed at number -- the death penalty at number 1 to strongly favor at number 10.

THE JUROR:  I misread that at first, which is why that was crossed out there.

THE COURT:  Well, the 1 is -- as the question is phrased, a 1 reflects a belief that the death penalty should never be imposed, and 10 reflects a belief that it should be imposed whenever a person has been convicted of intentional murder.  You first picked 8 and then you changed that to 6.

THE JUROR:  Then I reread the question.  And as I

said, I misread that when I initially read that.

THE COURT:  As you look at it now, do you think that's still the right choice to reflect your views?

THE JUROR:  In the 5 or 6 range, yes, again, with the caveat that those aggregating factors were shown to have existed in the case.

THE COURT:  On the next page in Question 90 we set forth a number of statements, and you possibly -- we asked if you could select one that reflected best your views about the appropriateness of a death penalty in a case involving someone who's been found guilty of murder.  You chose E that said you were in favor of the death penalty but could vote for a sentence of life imprisonment without possibility of release if you believed that sentence was called for by the facts and the law in the case.

THE JUROR:  Uh-huh.

THE COURT:  Is that the best representation of your views from the selection here?  And you could take a moment to review them.

THE JUROR:  Sure.  Thank you.

(Pause.)

THE JUROR:  Actually, I may be between D and E there. I was just looking at "oppose" versus "in favor of," and as I look at them now, I can see the for/against, which as I've kind of explained in relation to the other answers I've given on

that topic, that I could be open to it if the, you know, aggregating factors were there, and certainly if not, if mitigating factors were shown to have existed, be open to going with the life sentence as well on that front.

THE COURT:  Yeah, I just want to be sure -- the factors that I'm referring to are aggravating factors.  I think you've been saying "aggregating factors."

THE JUROR:  Yes.

THE COURT:  I just want to be sure that you understand that these -- they're aggravating in the sense that they distinguish this offense from other offenses and makes it more serious.  That's the point.

THE JUROR:  Yes.  Warped terminology.  I'm getting too close to "aggregating" and "aggravating," so I apologize.

THE COURT:  Right.  You probably do some aggregating in your work.

THE JUROR:  Yes.

THE COURT:  Anyway...

So let me ask:  You said you're a little bit more towards D than E or you want to put those two together and circle both of them at the same time or --

THE JUROR:  Yeah, I think probably more towards D as I read it now.  I may have -- looking at this question, I may have missed that one a little bit and just seen either "opposed" or "in favor of," which was, in my mind, the least of

the in-favor-of scenario.

THE COURT:  Okay.  And just from what you said, it may be that the instructions that I gave this morning might have influenced you to have that view or not?

THE JUROR:  No, I don't think so.  No.

THE COURT:  Okay.  So just to be sure we understand where you are on this, you don't have a firm commitment to either the death penalty or life imprisonment, yet you could consider either as a possible outcome of your deliberations on the penalty phase?

THE JUROR:  Yes.

THE COURT:  Okay.  Just to finish up on this, at the bottom of page 25 --

THE JUROR:  Okay.

THE COURT:  -- and the top of 26 we'll get to second.

Question 95 we asked about this case, if you found this defendant guilty and decided that the death penalty was an appropriate punishment for him, could you conscientiously vote to impose it, and you said yes.

THE JUROR:  Yes.

THE COURT:  Then in the next question we asked the other side of that:  If you found him guilty and you decided life imprisonment without the possibility of release was the appropriate punishment, could you conscientiously vote for that penalty, and you said yes.

THE JUROR:  Uh-huh.

THE COURT:  Do those represent your --

THE JUROR:  Those aren't contradicting themselves, are they?  I think that goes towards kind of the D answer there in Question 90.  So, yes, that's my...

THE COURT:  Okay.  That's what I have.  Anybody else?

MR. MELLIN:  Your Honor, if I might?

THE COURT:  Go ahead.

MR. MELLIN:  Good afternoon, sir.  I'm Steve Mellin.  I'm one of the prosecutors on the case.

Just kind of following up on that 95 and 96, those answers about could you conscientiously vote for it or for life imprisonment, both of those you said yes, right?  And again, you're shaking your head up and down, but for the court reporter you have to say either yes or no.

THE JUROR:  Yes.

MR. MELLIN:  Okay.  And at this point now you understand from hearing the judge's instructions that if the jury gets to this sentencing phase where the call is either life imprisonment or the death penalty, the jury will have already found the defendant guilty.  You understand that, right?

THE JUROR:  Yes.

MR. MELLIN:  Okay.  And that's the time that we, the government, would be putting on evidence concerning these

aggravating factors and the defense has the right to put on mitigating evidence as well.  You understand that, right?

THE JUROR:  Yes.

MR. MELLIN:  Going into that phase, would you be able to keep an open mind and consider all of the evidence before you decided what you thought was the appropriate punishment in the case?

THE JUROR:  Yes, I could.

MR. MELLIN:  Okay.  And I just want to follow up a little bit on your answer concerning 82 where you said that you contributed some money to the fund for the young boy that was killed, right?

THE JUROR:  Yes.

MR. MELLIN:  And you understand that's going to be some of the evidence in this case as well concerning that, right?

THE JUROR:  Yes.

MR. MELLIN:  Okay.  Is there anything about that that you feel would impact your ability to be fair and impartial in this case?

THE JUROR:  No.

MR. MELLIN:  Okay.

THE JUROR:  That was a second, third, no relation of mine, just a friend-of-a-friend-of-a-friend kind of situation.

MR. MELLIN:  Fair enough.  And then I think, as you

disclosed in the questionnaire, you didn't have any personal involvement or personal connection to the Boston Marathon on that day, correct?

THE JUROR:  I did not.

MR. MELLIN:  Okay.

And then finally, the Question 95 asks about you being able to conscientiously vote for the death penalty.  If you believed that the aggravating evidence sufficiently outweighed the mitigating evidence to justify a sentence of death, would you be able to vote to sentence someone to death?

THE JUROR:  Yes, I would.

MR. MELLIN:  All right.  Thank you, your Honor.

MS. CLARKE:  Hello.  My name is Judy Clarke.

THE JUROR:  Hello.

MS. CLARKE:  I'm one of Jahar Tsarnaev's lawyers.  Good afternoon.

I wanted to follow up just a little bit because this is your chance to really sort of tell us if this is a hardship for you.  And I don't think the judge talked to you about whether this would be a financial hardship, but you indicated that it was a potential financial hardship.  Can you help us think about that?

THE JUROR:  Only in the -- from the -- I put that in there.  I'm not sure the perspective of my employer, how that all works, to be honest with you, in terms of --

MR. BRUCK:  Whether you would be paid?

THE JUROR:  -- if I'm gone for three or four months, how that would work.

MS. CLARKE:  Have you talked to them about that?

THE JUROR:  I have not, no.

MS. CLARKE:  All right.  So you don't know the answer to that?

THE JUROR:  I do not.

MS. CLARKE:  What happens -- I was a little concerned about your wife as well, and I'm glad that she's not in an episode now.  But what happens if that flares up during this next three to four months?  What would happen?

THE JUROR:  It would be -- you know, I've got a 16- and 18-year-old at home that can bear some of that.

MS. CLARKE:  Or could wreak some more havoc.

THE JUROR:  True.  We've got some other family.  My wife's mother lives local, and my parents are not too far off as well.  So we could have some other support systems to assist in that situation.

MS. CLARKE:  It's really, really very generous of you to say that you can work it out.  I think this is the one and only time that you really have to tell us whether or not this three to four months is something that you should have to bear.

MR. MELLIN:  Objection, your Honor.  The "should," and also, this has been asked and answered.

THE COURT:  Yeah, I think we have the answers, actually.

MS. CLARKE:  Do you feel like we've got the answers okay?

THE JUROR:  I think so.

MS. CLARKE:  Okay.  And if your employer did not pay, could you go three months without --

THE JUROR:  I could not.

MS. CLARKE:  You could not?

THE JUROR:  No.

MS. CLARKE:  On Question 77, if I can take you there, I think that's page 20 -- yes, 20 -- and you mentioned -- are you with me yet?

THE JUROR:  Yes, I am now.

MS. CLARKE:  All right.  In C and D, and I am not sure we covered that with you, you answered that you were unsure whether Mr. Tsarnaev should receive the death penalty.  Could you tell us what you were thinking when you marked "unsure"?

THE JUROR:  Well, I have not heard anything about the situation or what the evidence is, what would come out in the case, so it's hard to have a firm grasp of whether that's deserved or not in this situation at this point.

MS. CLARKE:  And in 77A you had reached a conclusion that he was guilty but not a conclusion whether -- which punishment was appropriate?

THE JUROR: Correct.

MS. CLARKE: Because you don't think you've heard the fullness of the story?

THE JUROR: Exactly, yes.

MS. CLARKE: In your answers about the death penalty -- and not to trick you, page 23, Question 88 -- you indicated that the death penalty was -- you were okay with the death penalty for appropriate crimes.

THE JUROR: Okay.

MS. CLARKE: Now, is that a little bit in conflict of your thinking about the crimes for the death penalty as opposed to the fullness of the picture for the death penalty? Does that question make sense?

THE JUROR: I understand what you're asking. I think it's a little bit of semantics, probably, in terms of the way I wrote it in there. And maybe more appropriate is instead of "crimes," "appropriate circumstances surrounding crimes that existed."

MS. CLARKE: And how did you come about your beliefs about the death penalty?

THE JUROR: I don't know that I have an answer for that, just what I've grown to believe in over the years. Nothing in particular that's driven me in that direction. Not an influenced situation on family, just my own personal feelings.

MS. CLARKE:  Because of some case or some political discussion or discussion in Massachusetts about it?

THE JUROR:  No.

MR. CHAKRAVARTY:  Objection, your Honor.  He answered the question.

MS. CLARKE:  I'm just trying to --

THE COURT:  Well, he said no.  I guess that's the end of that.

MS. CLARKE:  Talked about in the family home at all?

MR. CHAKRAVARTY:  Objection, your Honor.

THE COURT:  Go ahead.

THE JUROR:  With regards to the case?

MS. CLARKE:  No, the death penalty.

THE JUROR:  Just the death penalty in general?  No, not really.  No.

MS. CLARKE:  Has the -- I'm sorry.  You were about to say something?

THE JUROR:  Yeah, I was going to say, you know, I'm sure in the past my wife and I have probably talked about it at some point in time, but I can't put my finger on any specific conversations that we've had along those lines.

MS. CLARKE:  Sure.  Conversations in the family home about this case?

THE JUROR:  Just in relation to my involvement in these proceedings but not --

MS. CLARKE:  Not before?

THE JUROR:  Not before, no.

MS. CLARKE:  I thought you indicated in 77, that's that series about guilty/not guilty, death/no death, that you had discussions with your wife about those issues.

THE JUROR:  As they occurred?  What questions are we looking at?  Excuse me?

MS. CLARKE:  78.

THE JUROR:  78?  That would be relating to, again, as I mentioned earlier, the time surrounding the events over the several days when things unfolded back at that point in time.

MS. CLARKE:  Back in April of 2013?

THE JUROR:  Correct.

MS. CLARKE:  All right.  On Question 89, if I can flip you back forward, and I think the judge asked you about this, whether it was 6 or 8, and you had scratched out 8?

THE JUROR:  Uh-huh.

MS. CLARKE:  Can you help us understand how you were reading the question that made you go with 8 initially?

THE JUROR:  I think I didn't read it in its completion when I first -- and it was -- I think I initially read it as would you be willing to consider the death penalty.  And in that case it would have been further out in that line that I would consider it.  But as I reread it and saw "for any case" --

MS. CLARKE:  Okay.

THE JUROR:  -- "whenever the defendant has been convicted," then that's -- then that's -- then I realized I had misread that.

MS. CLARKE:  Okay.  So you were thinking 8 if it was regarding this case and 6 --

THE JUROR:  No.  No.

MR. MELLIN:  Objection, your Honor.

MS. CLARKE:  No, that's not correct?

THE JUROR:  No.  I was thinking 8 in terms of my openness to the death penalty in general as a feeling, as a thought, not -- and as I reread it and said "whenever a defendant has been convicted of intentional murder," that was not the same feeling as I saw that, getting back to the mitigating and aggravating factors.

MS. CLARKE:  Or aggregating the two of them together?

THE JUROR:  Yes, exactly.

MS. CLARKE:  Let me just ask you about the coworker who finished shortly ahead of the explosions.

THE JUROR:  Sure.

MS. CLARKE:  And you spoke with her after the fact.

THE JUROR:  Uh-huh.

MS. CLARKE:  Did she express any opinions to you?

MR. MELLIN:  Objection.

THE COURT:  Go ahead.  You could answer.

THE JUROR:  Opinions regarding?

MS. CLARKE:  What happened, what should happen?

THE JUROR:  No, not at all.  It was just at the time when it happened, it was just kind of a harried situation for her trying to get out of the area, frankly, was the genesis of the conversations that we had.

MS. CLARKE:  Were you concerned for her safety when the explosions occurred?

THE JUROR:  Yes, sure.

MS. CLARKE:  And what did you do to check on her safety?

THE JUROR:  We had had -- when you run the marathon, you have a timing device that's attached to your shoes or something of that nature, so we knew she had finished before that once we looked into the timing of it all.

MS. CLARKE:  And it alleviated your concerns?

THE JUROR:  It did.

MS. CLARKE:  Can I just have one moment, your Honor?

(Pause.)

MS. CLARKE:  Thank you very much.

THE COURT:  I just have a couple.

Just on sort of the last series, where is your office in Boston?

THE JUROR:  We're at 125 High Street, just over the bridge.

THE COURT:  And you apparently have a fair amount of longevity with the company.

THE JUROR:  Correct.

THE COURT:  Does that translate into seniority?

THE JUROR:  Yes, it does.

THE COURT:  It says you're a vice president.  Can you give me some idea of where that is in the hierarchy of the management?

THE JUROR:  We're set up, and we have basically three operating divisions.  My boss runs all of North America for all our business within the division that I work on, and I'm responsible for a portion of that across North America.

THE COURT:  How many vice presidents in the North American division?  Of your rank, is what I'm getting at.

THE JUROR:  I would probably be the most senior in our group.  In terms of that title, there's probably 20.

THE COURT:  Okay.  All right.  Thanks.  I guess that's -- thank you.

THE JUROR:  That's it?

THE COURT:  Yes.

(The juror is excused.)

THE CLERK:  Juror No. 318.

THE JURY CLERK:  Juror 318.

(The juror enters the courtroom.)

THE CLERK:  Ma'am, over here, if you would.  Have a

seat.

Do me a favor, keep your voice up, speak into the mic so everyone can hear you.

THE JUROR: Okay.

THE CLERK: This is adjustable, and you can move it around.

THE JUROR: Okay.

THE COURT: Good afternoon.

THE JUROR: Good afternoon.

THE COURT: Have you been able to abide by my instructions to avoid any discussion of the substance of the case since we were last here?

THE JUROR: Oh, yes. Yes.

THE COURT: And how about avoiding media accounts of the case?

THE JUROR: Yes.

THE COURT: Okay. Thank you.

So that's the questionnaire that you filled out.

THE JUROR: Uh-huh.

THE COURT: And we have some follow-ups on some of the answers. The first question I have is: You indicated that your husband is a chief of security?

THE JUROR: Yes.

THE COURT: Can you tell us where he works?

THE JUROR: City Hall, Boston.

THE COURT:  He's chief of security for the city hall or for something else?

THE JUROR:  It's out of City Hall and it's -- he just started.  He was a probation officer at West Roxbury court up until he just started in January at City Hall.

THE COURT:  Okay.

THE JUROR:  So I don't know all the aspects of his job.  It's for like different -- like the Boston Water & Sewer, he's connected to, that type of thing, in security in the hall.

THE COURT:  So is he sort of in, I guess for lack of a better term, planning for security?  Is that -- I'm not sure.

THE JUROR:  Like events.  If somebody's coming into downtown -- to be honest with you, he doesn't know all the aspects of his job yet either, it's that new to him.  So it's a learning process for him now too.

THE COURT:  Okay.  Before that he was a probation officer?

THE JUROR:  Yes, in West Roxbury court.

THE COURT:  And how long did he do that?

THE JUROR:  How long was he there?

THE COURT:  Yeah.

THE JUROR:  Twelve years or so.

THE COURT:  Okay.  And anything before that?

THE JUROR:  He was a constable for the City of Boston.

THE COURT:  Working for the sheriff's department or in

the --

THE JUROR:  No, it was a private company.

THE COURT:  He was --

THE JUROR:  Bernie Whitten.

THE COURT:  Okay.  And then in terms of other family members, you have a brother who's a Boston police officer?

THE JUROR:  I do.

THE COURT:  How long has he been doing that?

THE JUROR:  I believe my brother's been on the Boston police for over 30 years.

THE COURT:  Any special assignments?  What's his rank?

THE JUROR:  I don't think he's ever gone up in the rank.  Right now he's towards retirement.  He's at the shooting range.

THE COURT:  Do you know if he had any active participation in the marathon events?

THE JUROR:  I believe he did.  I believe he did.  I believe most were called in to come down.  What -- how big of a role he played, I don't know.

THE COURT:  You haven't talked to him about what he might have done those days?

THE JUROR:  My brother doesn't really get into specifics with his job.  I mean, before where he is now, he was out in Roxbury, and he doesn't talk a lot about -- he's an ex-Marine, and you have to pull it out of him.

THE COURT:  The strong, silent type?

THE JUROR:  Yeah.  He has seven daughters.

THE COURT:  Maybe he can't get a word in edgewise.

THE JUROR:  That could be the case.

THE COURT:  And then you have a son who's a corrections officer.  Is that right?

THE JUROR:  Yes.

THE COURT:  Where does he work?

THE JUROR:  He works for the Norfolk County Sheriff's in Dedham.

THE COURT:  How long has he been doing that?

THE JUROR:  He's going into his third year.

THE COURT:  And he's at county jail or the house of correction?

THE JUROR:  Jail in Dedham.  Norfolk.

THE COURT:  And you're employed by the Town of Brookline?

THE JUROR:  I am.

THE COURT:  Looks like you have kind of two areas of responsibility, crossing guard and --

THE JUROR:  Meter maid.

THE COURT:  Is there a polite way of saying "meter maid"?

THE JUROR:  There is.  Meter maid.

(Laughter.)

THE COURT:  Okay.  How long have you been -- it says you've been doing it for a number of years?

THE JUROR:  Fourteen years.

THE COURT:  If you were called to serve on the case and were to be here four days a week from nine to four, would that be a problem for you employmentwise?

THE JUROR:  Not at all.

THE COURT:  No?

THE JUROR:  No.

THE COURT:  Do you know whether you would get paid or --

THE JUROR:  Yes, I would.

THE COURT:  You would?  Okay.

I'm looking at page 11 now, Question 31.  One of your sons --

THE JUROR:  I only have one son.

THE COURT:  Okay.  He was in the Navy and was at Guantanamo?

THE JUROR:  Yes.

THE COURT:  As it was a -- this is post-9/11, I take it, so it was as it was being a facility for detention of --

THE JUROR:  He never saw the prison side.

THE COURT:  Oh, okay.  Just on the naval base side?

THE JUROR:  Yeah, he was a military police officer, but he never went over to the prison side.

THE COURT:  So he didn't have anything to do with the detention facility?

THE JUROR:  No.  No.

THE COURT:  Could we cut the audio?

(Discussion at sidebar and out of the hearing of the jury:)







(In open court:)

THE COURT:  So let me ask you to turn to page 20 of the questionnaire.  In Question 77 near the top of the page we asked if, based on the things you'd seen in the media or otherwise, had you formed an opinion about various matters that the defendant was guilty or that he was not guilty or that he

should receive the death penalty or should not, and to each of those you selected the option "unsure."

THE JUROR:  Unsure.

THE COURT:  Can you tell us a little bit about what you were thinking when you answered that question?

THE JUROR:  I didn't feel like -- I followed the case -- I had enough facts to form an opinion, so I was unsure of each one of those.  I wasn't positive yes or positive no.

THE COURT:  Okay.  I'm sure you realize that in our criminal justice system when somebody's accused of a crime they are presumed innocent unless and until the government proves by the evidence at trial that the person is guilty.

THE JUROR:  Yes.

THE COURT:  And proves that beyond a reasonable doubt.

THE JUROR:  Yes.

THE COURT:  So the burden of proving someone guilty of a crime is always on the government, and it must do it by sufficient evidence at trial to convince jurors beyond a reasonable doubt of the fact that the person is guilty.

If you were a juror in this case, would you have any difficulty in applying those principles and being sure that the government is held to its burden of proof in this case?

THE JUROR:  I wouldn't have any difficulty with that, no.

THE COURT:  A corollary of that is if you, after

evaluating the evidence, thought the government had not proved one of the charges or more, had fallen short in doing what it had to do, would you be able to return a verdict of not guilty?

THE JUROR:  Yes.

THE COURT:  We've asked in Question 82 on the next page about whether you had made any contributions or wore Boston Strong things.  You say you have a Boston Strong T-shirt or --

THE JUROR:  It no longer fits me after the snowstorm. I got larger; it got smaller.  I don't know.  But, yes, I did purchase a Boston Strong T-shirt at my niece's -- she's -- does the cross-fit and they were selling them there, so I bought one.

The bumper sticker, my daughter --

THE COURT:  When was that, near the event?

THE JUROR:  No, this was quite a while afterwards.  It was an event in Canton much --

THE COURT:  Give us an idea.

THE JUROR:  I'm trying.  Dates I'm not good with.  It was at least a year later.  It wasn't anytime right after.

And the bumper sticker --

THE COURT:  There were some sort of anniversary events.

THE JUROR:  Yeah, no.  They had a tent set up at the affair, the cross-fit affair, with all the Boston Strong

memorabilia, articles.

THE COURT:  And your daughter has a -- bought a bumper sticker?

THE JUROR:  She bought it for me.

THE COURT:  Was it at the same event?

THE JUROR:  No, she had given it to me at Christmas.

THE COURT:  Did you use it?

THE JUROR:  It's on the car.

THE COURT:  In Question 83, you said your son went to UMass Dartmouth for a semester?  When was that?  What year was that, if you remember?

THE JUROR:  I believe it was 2008.

THE COURT:  Beginning on page 23 at Number 88 we asked a series of questions about attitude towards the death penalty in general and perhaps with reference to this case.  88 asks for general views on the death penalty.  You said "none."  Does that represent your --

THE JUROR:  I hadn't -- well, the question just had appeared -- I really have not thought about it until this question came up, so I didn't want to put down something that I really, on a day-to-day basis, never gave any thought to.  So to put anything else down I didn't think would be fair.

THE COURT:  Would you change that answer today?

THE JUROR:  Would I change that answer today about the death penalty?  The only thing I would add to it is I would

have to hear the evidence before I could decide whether I thought the death penalty -- I mean, I could go either way.  It would all depend on what evidence I heard.

THE COURT:  In the next question we asked if you could indicate on a scale from 1 to 10 where you might locate yourself, a 1 being belief that the death penalty should never be imposed, a 10 reflecting a belief that it should be imposed whenever a defendant has been convicted of intentional murder. And so you selected 7.

It may be a false precision to using numbers, but can you tell us what led you to make that choice?

THE JUROR:  I'm reading it over myself because I don't want to --

THE COURT:  Take your time.

(Pause.)

THE JUROR:  I think I put 7 because it's not something that I'd go for a 10 or -- I'd have to -- I wouldn't take it lightly -- a decision like that lightly.  I would have to give it a lot of thought and time.  So I think a 7 is where I still feel.  It isn't something I could just decide, you know, on a moment's...

THE COURT:  So then on the next page, Question 90, we asked it sort of a different way.  We put it in words and asked you to pick which of the various options, if any, you thought expressed best what you were thinking about the death penalty,

and you chose D:  "Not for or against.  Could vote to impose it or could vote to impose a sentence of life imprisonment without possibility of release, whichever I believed was called for by the facts and the law in the case."

Today would you say that represents your view?

THE JUROR:  Yes.  Yes.

THE COURT:  So you heard me this morning explain a bit about the process in the penalty phase where the government would offer evidence of what are called aggravating factors that made this crime perhaps worse than others --

THE JUROR:  Uh-huh.

THE COURT:  -- for which -- when someone's been convicted of murder, and then there would also be mitigating factors presented by the defense that would say that it's not the right penalty for this case.

Would you be able to evaluate all that with your fellow jurors and come to your own decision about whether the death penalty was the right choice --

THE JUROR:  I believe I could, yes.

THE COURT:  -- or that life imprisonment without the possibility of release is the right choice?

THE JUROR:  Yes, I could come to my own conclusion.

THE COURT:  Either way?

THE JUROR:  Either way.  Either way.  Either way.

THE COURT:  At the bottom of page 90 -- I'm

sorry -- 25, Question 95 -- now kind of focusing on the case at hand, it asks if you found Mr. Tsarnaev guilty and you decided that the death penalty was the appropriate punishment for him, could you conscientiously vote for the death penalty.  And you wrote, "I'm not sure."

THE JUROR:  And now I don't know why I did that because if I found he was guilty and there was enough evidence and the appropriate one was the death penalty, then I would have to vote yes, so I would change that.  That's after I heard all the facts and I felt that was the appropriate punishment.

THE COURT:  Part of what the question might be getting at is even if you intellectually believed it was the right thing to do, could you personally do it?

THE JUROR:  Yeah.  Yes.

THE COURT:  And then Question 96 is sort of the companion question to that, asks the other side of the equation.  If he was guilty and you decided life imprisonment without the possibility of release was the appropriate punishment, could you conscientiously vote for life imprisonment without the possibility of release?

THE JUROR:  Yeah, I stand by that.  Yes.

THE COURT:  Okay.  Follow-up?

MR. CHAKRAVARTY:  Just briefly.  Good afternoon.  My name is Aloke Chakravarty.  I'm one of the prosecutors.

I just wanted to tease out your answers to those last

few questions the judge asked you.  You said that you checked off the "I'm not sure" on that Question 95, and you would change now.  Was it -- could you explain why the --

THE JUROR:  Yes, I can.

MR. CHAKRAVARTY:  -- what the misunderstanding was?

THE JUROR:  The misunderstanding was I probably didn't read it correctly because it's saying in there if I found that the evidence was presented and I came to the conclusion that there was enough evidence.  I didn't read that correctly at the time.

MR. CHAKRAVARTY:  Okay.  So you think -- because some of the earlier questions were just about your feeling about the death penalty in general, and for that you said you're not sure, it depends on the case.

THE JUROR:  Well, what I meant when I wasn't sure, I didn't have any evidence.  I'd have to hear the evidence before I made that decision, so...

MR. CHAKRAVARTY:  And so understanding you're going to get instructed again, and the judge gave you some instructions this morning, about how to go through the process after a defendant has been convicted of a crime and after aggravating factors have been presented and after mitigating factors have been presented, some of which could include factors about the defendant, not necessarily the crime, could you weigh both of those and ultimately decide that death is the appropriate

punishment and then vote for death?

THE JUROR:  I'm going to say you confused me a little with all that.

MR. CHAKRAVARTY:  I'm sorry.  There was a lot there, so that's a fair question.

THE JUROR:  There was.  I'm not sure how to answer it.

MR. CHAKRAVARTY:  I'll rephrase it.  I'll rephrase it.

At the end of the process --

THE COURT:  Actually, I think it's been answered.

MR. CHAKRAVARTY:  If I may, just one?

THE COURT:  All right.  If it can be targeted.

MR. CHAKRAVARTY:  The vote that you would have to make is not -- I think you suggested that you -- if that's the choice that you would have to make, you never have to vote for death.  Every juror always has an option not to vote for death.  But so it's actually an affirmative choice that you, as a juror, would have to make like every other juror.

Could you make that choice based on your own beliefs coupled with the facts and the law?

THE JUROR:  I don't know if it would be my beliefs that would lead me to that decision; it would be what was said in the court and what the facts were.  And I think it would be up to everyone at this table to help me make that decision.  So I can't answer that right now because I don't know what I'm basing it on.

MR. CHAKRAVARTY:  So I'm just trying to understand whether, in fact, you could -- even given what you just said, that -- whether you could or could not vote if you were persuaded --

MR. BRUCK:  Haven't we covered it?

THE COURT:  I think we've had enough of it.

MR. CHAKRAVARTY:  Fair enough.  I think so too.

One other point, your Honor?

THE COURT:  A different area?  All right.

MR. CHAKRAVARTY:  I think you said there was a Boston Strong bumper sticker on the back of your car that your daughter gave you?  Does that affect your ability to be fair and impartial in this case?

THE JUROR:  It does.  The Boston Strong bumper sticker to me doesn't represent -- it represents to me the way the city came together and helped, and just showing the unity of Boston. That's what it represents to me.  Not the crime itself; it's the aftermath of how everybody came together and supported each other and helped each other out.  And it was -- that's what it means to me.  I'm sure it has different meaning to different people.

MR. CHAKRAVARTY:  And there were several people that you had noted on your questionnaire around you with family members or friends who are in law enforcement.  Does the fact that you know so many people in law enforcement -- does that

affect your ability to be fair and impartial in this case?

THE JUROR: No, it doesn't.

MR. CHAKRAVARTY: Thank you.

MR. BRUCK: Good afternoon.

THE JUROR: Good afternoon.

MR. BRUCK: I've got good news for you. I'm the last person to ask you questions and I don't have too many.

THE JUROR: I'm catching a two o'clock train anyway so you can take your time.

(Laughter.)

MR. BRUCK: Well, don't feel singled out.

THE COURT: It will be there about three, by the way.

(Laughter.)

MR. BRUCK: Everyone is asking all the jurors questions like this, so it's not just you.

I'm David Bruck, and I'm one of Jahar Tsarnaev's attorneys, and I just wanted to clarify a few things.

You are an employee of the city of Brookline?

THE JUROR: The Town of Brookline, yes.

MR. BRUCK: The Town of Brookline. Okay.

And your husband, if I heard correctly, is now the head of security for City Hall?

THE JUROR: Yes.

MR. BRUCK: Okay. And how many -- that is a -- not a police --

THE JUROR:  He's not a police officer, no.

MR. BRUCK:  It's like a security --

THE JUROR:  But when I think of security, I think of the white shirt and little badge.  He doesn't wear any of that.  He's -- I wish I had more specifics.  It's a brand-new job in January.  So it's -- it's more of the City of Boston, like when there's events coming, he has police officers that work under him.

MR. BRUCK:  They work under him?  Okay.  So it's a law enforcement position, in a sense, although he's not a police officer?

THE JUROR:  It's not really law enforcement, no.

MR. BRUCK:  Okay.

THE JUROR:  We do communicate, but it's -- we do speak, it's just...

MR. BRUCK:  I got you.  I understand.

You said that -- the judge asked you a lot of questions, and so did the prosecution, about the death penalty, and I just want to be sure I'm clear.  You said -- first of all, on guilt or innocence, you picked "unsure" because you hadn't heard the evidence.  And of course "unsure" covers a lot.  I'm unsure if it's going to snow in the next few days, but I think it will because I've read the forecast.  But if someone made me check, I'd say "unsure."

And that's what I want to ask you about.

Understanding you're unsure about guilt or innocence, do you have an opinion as you sit here about whether they got the right guy?

MR. CHAKRAVARTY:  Objection, your Honor.

THE COURT:  Yeah, I think the question is formally objectionable.

MR. BRUCK:  Do you have an opinion today based on anything -- everything that you've heard about whether Mr. Tsarnaev is guilty?

THE JUROR:  No, I don't -- I'd have to hear the evidence.  I don't know what role -- I have no idea until you tell me, until someone tells me.  So I have no opinion right now.

MR. BRUCK:  Okay.  Now I'd like you to assume -- I know it hasn't happened, but I'd like you to assume you're on the jury and the evidence was presented by the government that convinced you beyond a reasonable doubt that he was guilty of the charges in connection with the marathon and you heard the charge involving Officer Collier.  So we're beyond that.  Guilt beyond a reasonable doubt.  You've heard the evidence, and you've rendered your verdict.

And of course the law then allows more evidence to be presented, aggravating, mitigating.  But understanding that at that point you will have heard the evidence that convinces him -- convinces you that he's guilty, has convinced you, do

you have an opinion then about what the penalty should be --

MR. CHAKRAVARTY:  Objection, your Honor.

MR. BRUCK:  -- as you sit here today?

THE COURT:  I think it's a confusing question.

MR. BRUCK:  If you assume guilt -- I know you're not assuming guilt, but I need to get you to imagine that -- imagine with me that he's guilty and you found that -- you're satisfied by the evidence on guilt, do you have an opinion as you sit here today about what the punishment should be, life or death?

THE JUROR:  No, I don't.  Because I can't -- I can't go there in my mind.  It's too important to guess how I'd be feeling.  So I'm not -- I'd rather not answer it.  I don't know.

MR. BRUCK:  Okay.  And one last thing.  I mean, the judge will instruct you about -- excuse me just a moment.

(Discussion off the record.)

MR. BRUCK:  You mentioned that you knew one person on the witness list.  I'm sorry, that's Question 85.

THE JUROR:  Billy -- I know who it is.

MR. BRUCK:  And that -- can you tell us about what --

THE JUROR:  My relationship with him?

MR. BRUCK:  Yeah.

THE JUROR:  I went to high school with Billy.  I don't see -- I don't really see him.  I know him.  His wife is a -- I

grew up with.  And I don't even know what role he played when all this happened.  So I have no connection in that area with him.  And I probably haven't seen him, himself, in years.  But I do know him.  When I saw his name, I recognized the name.

MR. BRUCK:  And he's a police officer?

THE JUROR:  He is.

MR. BRUCK:  Okay.  Would the fact that a police officer has been killed -- that's one of the charges in this case -- and your relationship with him or all of the other law enforcement family connections and professional connections that you have in your own work, would any of that, or all of that put together, affect the way --

THE JUROR:  Absolutely not.  Absolutely not.

MR. BRUCK:  -- you look at this case?

Are you sure?

THE JUROR:  I'm positive.  Now would be my time to tell you.  I'm positive.

MR. BRUCK:  That's exactly right.

And if the police officer that you said you know testifies in the trial, do you think you would look any differently at his testimony --

THE JUROR:  No.

MR. BRUCK:  -- as compared to anybody else?

THE JUROR:  Nope.

MR. BRUCK:  Okay.  Thank you very much.

THE COURT:  Would you write down for me the name -- your husband's name?

THE JUROR:  Sure.

THE COURT:  I don't want you to say it for the record.

THE JUROR:  Sure.  I'll draw a stick figure.

(Witness complies.)

THE COURT:  Make it smile.

(Laughter.)

THE COURT:  Thank you.

THE JUROR:  You're welcome.

THE COURT:  And that's it.

THE JUROR:  Thank you very much.

(The juror is excused.)

THE COURT:  We'll do one more and then break for lunch?  Hold off just a minute.

THE CLERK:  Hold off.

THE CLERK:  Are you ready?

THE COURT:  Yes.

THE CLERK:  Juror No. 321.

THE COURT:  I'm going to go directly to the death penalty questions on this fellow.

MR. BRUCK:  What about to the music questions?

THE COURT:  Do you want to find out?

THE JURY CLERK:  Juror No. 321.

(The juror enters the courtroom.)

THE CLERK:  Sir, over here.  Have a seat if you would, please.

THE JUROR:  Okay.

THE CLERK:  Do me a favor and speak into the mic so everyone around the table can hear you.

THE COURT:  Good afternoon.

THE JUROR:  Hello, Judge.  How are you?

THE COURT:  Have you been able to follow my instructions to avoid any discussion of the case --

THE JUROR:  Yes.  Yup.

THE COURT:  And as much as possible to avoid any exposure to media articles about the case?

THE JUROR:  Yes.

THE COURT:  Or shows, I guess?

THE JUROR:  Yup.

THE COURT:  So we have the questionnaire that you filled out --

THE JUROR:  Yes.

THE COURT:  -- and we're going to follow up on some of the questions.

I think we're all interested to know about your

career.

THE JUROR:  Really?  A singer-musician.  I play all around -- different Irish bars around pretty much New England, and had done it in Ireland as well.

THE COURT:  Okay.  I want to, I think, actually start with the end of the form, in a sense.

THE JUROR:  Sure.

THE COURT:  And that's where we ask about your attitudes and beliefs concerning the death penalty.

THE JUROR:  Yes.

THE COURT:  So if you'd turn to page 23, it would help to follow.  If you want to take the clip off for convenience, you can do that.  Page 23.  It's pretty close to the end.

THE JUROR:  Okay.

THE COURT:  Got it.

THE JUROR:  Yes.

THE COURT:  So Question 88, this is where we ask a series of questions related to the death penalty and its implications and so on.  So this asks for general views in Question 88.

THE JUROR:  Yes.

THE COURT:  And you wrote, "I don't agree with the death penalty.  Don't think it is right."

THE JUROR:  Yes.

THE COURT:  Is there anything else you want to add to

that?  Do you want to qualify it, explain it, amplify on it?

THE JUROR:  I suppose just pretty much on the moral purpose, I think that the death penalty is -- I wouldn't be in agreement with it myself.  I think there could -- that there's too many mistakes and too many things that have went on over the years with death penalty cases that I think one person that could be in the wrong, it's not a fair enough answer for me, if you understand what I mean.

THE COURT:  Okay.  In the next question we tried to gauge the strength of your views on this by asking you to put yourself on a spectrum from strongly opposed to strongly favor, where strongly -- according -- as you see in the preamble, a 1 reflects a belief that the death penalty should never be imposed.

THE JUROR:  Yes.

THE COURT:  And you selected that.

THE JUROR:  I agree with that.

THE COURT:  Does "never" mean "never"?

THE JUROR:  "Never" means "never."

THE COURT:  And we tried again in Question 90, the next one --

THE JUROR:  Yes.

THE COURT:  -- to gauge it differently, by words rather than numbers?

THE JUROR:  Yes.

THE COURT:  And here you selected, "I'm opposed to the death penalty and will never vote to impose it in any case no matter what the facts."

THE JUROR:  That hasn't changed.

THE COURT:  That's your view?

THE JUROR:  That's my view.

MS. CONRAD:  May I, your Honor?

THE COURT:  Go ahead.

MS. CONRAD:  Good afternoon, sir.  My name is Miriam Conrad.  I'm one of Mr. Tsarnaev's lawyers.

THE JUROR:  Good afternoon.

MS. CONRAD:  You mentioned that one of the things that concerns you about the death penalty is the possibility of a mistake?

THE JUROR:  Yes.

MS. CONRAD:  Understanding that if you were a juror in this case you would not even be considering the death penalty as an option unless the jury had found beyond a reasonable doubt that Mr. Tsarnaev was guilty, so if the jury had made that conclusion and understanding that a juror is never required to vote for the death penalty, would you be able to meaningfully consider the aggravating and mitigating circumstances in deciding whether you personally thought the death penalty was the appropriate punishment in this case?

THE JUROR:  I still don't think that the death penalty

is appropriate.

MS. CONRAD:  Thank you very much.

THE COURT:  Thank you, sir.

THE JUROR:  Thank you.

THE COURT:  That's it.

THE JUROR:  That's it?

THE CLERK:  Leave the questionnaire here.  We'll take care of it.

(The juror is excused.)

THE COURT:  Why don't we break.

MS. CLARKE:  Why don't we what?

THE COURT:  Why don't we break.  We have five more. So we'll come back at two?

MR. BRUCK:  Sure.

(The Court exits the courtroom and there is a recess in the proceedings at 12:50 p.m.)

(The Court entered the courtroom at 2:05 p.m.)

THE CLERK:  Juror No. 323.

THE JURY CLERK:  Juror No. 323.

THE CLERK:  Sir, over here, please, if you would. Have a seat.

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon, sir.

THE COURT:  We need the mics not only for us but because it's being --

THE JUROR: That's quite all right.

THE COURT: Thanks for your patience.

THE JUROR: Okay.

THE COURT: Have you been able to follow my instructions not to discuss the case with anyone since you were here last time?

THE JUROR: Yes, sir.

THE COURT: And, as much as possible, to avoid any exposure to media stories about the case?

THE JUROR: Well, I read the paper every day, and I watch the news two hours every day. So over the course of the past year, I've obviously seen and read and heard quite a bit.

THE COURT: Right. But since January 5th, have you been able to avoid those as I asked you to?

THE JUROR: I'm not talking to anybody about it. I have avoided it, yes.

THE COURT: So let me -- this is the questionnaire you filled out. Let me follow up on some of the --

THE JUROR: Certainly.

THE COURT: -- questions and answers in the form.

Tell us what you do for a living.

THE JUROR: I work at the Souvenir Store directly across from Fenway Park, and I handle retail sales inside Fenway Park.

THE COURT: When you say "handle," I presume you don't

do it all yourself.  You manage, supervise?

THE JUROR:  I'm the manager.  I manage sales.  And we have quite a few personnel that work at vending locations there, and I stock them, and I keep inventory on them and settle them out at the end of the weeks and years.

THE COURT:  So I'm just learning this as a Red Sox fan.  That's all Twins Enterprises inside the park as well as across the street?

THE JUROR:  Uh-huh.  We got a contract there probably five or so years ago.

THE COURT:  Let me ask you to turn to Question 74.

THE JUROR:  Page number, please?

THE COURT:  19.

THE JUROR:  Page 19.  Okay.

THE COURT:  In answer to Question 74, you said -- we asked, What did you feel or think when you received the juror summons.  You said, "I felt nothing could change my mind of his guilt."

THE JUROR:  That's correct.

THE COURT:  Turn to the next page.

THE JUROR:  Yup.

THE COURT:  Question 77, we asked there whether you had formed an opinion based on things you'd seen and heard --

THE JUROR:  Yup.

THE COURT:  -- that he was guilty.  And you said

"yes."

THE JUROR:  Uh-huh.

THE COURT:  There were other parts to that question you didn't answer.  Then below that we asked, If you had answered yes, which you did, would you be able or unable to set aside your opinion and base your decision about guilt solely on the evidence that was presented to you in court?  And you said you would be unable.

THE JUROR:  I believe that would be true.  It's kind of like saying erase everything you have in your head from something.  I don't know that I would be able to erase my memory of everything that I've read, seen, and heard.

THE COURT:  Yeah.  Let's come back to that in a minute.  But let's go to the day of the Marathon itself.

THE JUROR:  Yes.

THE COURT:  Of course, the Red Sox played that day.

THE JUROR:  I was working that day.

THE COURT:  You were there.

THE JUROR:  Uh-huh.

THE COURT:  What happened?  What did you see?

THE JUROR:  The game had actually ended right around the time of the incident.

THE COURT:  Now, on a day like that -- or actually on that day, as the game ended, where were you?

THE JUROR:  I would be inside the park.

THE COURT:  You would be inside the park.

THE JUROR:  But as the game ends somewhere near -- once the game is over, I would go back to Twins, which is across the street, two totally separate entities really.  Twins is not owned by the Red Sox.  Red Sox don't own Twins.  Two totally separate entities.  I work for the Souvenir Store who has rights to sell merchandise in the park.

THE COURT:  So did you continue working that afternoon at the store?

THE JUROR:  I remember walking into the store and somebody said something just happened at the Marathon.  And we have TVs in the store, and it was like everybody was looking at what happened.  I ended up having to come back into the city that night to have the police go through all our stands to be sure that there were no other problems within our locations. So I came back into the city that evening.

THE COURT:  Okay.  And then I presume you followed events during the week and --

THE JUROR:  Absolutely.  How could you not?

THE COURT:  Right.  So it's perfectly understandable that people have impressions about what happened.

THE JUROR:  Uh-huh.

THE COURT:  The question is whether, in the formal trial process, you could do what we ask jurors to do, and that is, in accordance with the law, to presume somebody innocent

unless proven guilty; to require the government to prove by evidence at trial the fact of guilt if it is to be proved.

THE JUROR: Uh-huh.

THE COURT: And to hold the government to its burden of proof, which is beyond proving guilt beyond a reasonable doubt.

THE JUROR: Uh-huh.

THE COURT: So that's really the question. Do you --

THE JUROR: I believe I would have a difficult time doing it.

THE COURT: You think you would have a difficult time?

THE JUROR: Absolutely.

THE COURT: Is it partly because of your personal involvement in events, your closeness?

THE JUROR: It might be that. I'm not sure. I remember seeing some raw footage that day which I'll never forget. Yeah, there was a lot going on that day, and it really struck me deeply.

THE COURT: Okay. On this topic, does anybody want to follow up?

MS. CLARKE: Your Honor, could the Court go to the Series 88 and forward and inquire about those?

THE COURT: All right. On Page 23, beginning with Question 88, we asked about attitudes toward the death penalty.

THE JUROR: Yup.

THE COURT:  88 was a general question.  If you have views, what are they?  And you said you think "death is too easy a punishment.  I believe rotting in a cell for 50 years is a more appropriate punishment."

THE JUROR:  I would feel that way if it was a sentence done to myself.  I would rather be dead than spend 50 years in jail.

THE COURT:  This is sort of a general question, so it's kind of asking you what you think about the death penalty as a policy matter or something like that.

THE JUROR:  Uh-huh.

THE COURT:  Do you think that is a --

THE JUROR:  I'm opposed to the death penalty on a moral basis.  I don't think that any human being has the right to decide whether somebody else should live or die.  I feel like that's up to God and not up to myself.

THE COURT:  The next question we asked you to sort of indicate on your -- on a scale of 1 to 10, from strongly opposed to strongly favor.  You selected "3," which is on the opposed side, but it's not as strong, I guess, is the way to say it, as it might be.

THE JUROR:  Uh-huh.

THE COURT:  And particularly in light of what you just said --

THE JUROR:  Uh-huh.

THE COURT: -- do you think 3 does represent your view?

THE JUROR: Probably not, probably not. Probably more towards 1 than 3.

THE COURT: Then on Question 90 --

THE JUROR: Yup.

THE COURT: -- we asked if you would look at a series of statements and see if one there selected --

THE JUROR: Yes, sir.

THE COURT: -- might represent your view. You picked (c), which said, again, you're opposed to the death penalty, but it says, "I could vote to impose it if I believed the facts" --

THE JUROR: I was trying to be a little, you know, objective in some manner. But I'm very deeply opposed to it.

THE COURT: Okay. Any? I think that's all I have.

MS. CLARKE: Could I ask just a couple of questions?

THE COURT: Okay. All right.

MS. CLARKE: On Question 89 -- good afternoon. I'm sorry. My name is Judy Clarke. I'm one of Mr. Tsarnaev's lawyers.

THE JUROR: Okay.

MS. CLARKE: On Question 89 you went from -- today from a 3 to a 1. Could you help us understand what changed your mind?

THE JUROR:  I was just trying to be a little objective to this, but I'm very opposed to the death penalty.

MS. CLARKE:  Am I hearing you --

THE JUROR:  Yup.

MS. CLARKE:  -- tell us that you would be unable to deliberate with other jurors, consider their views, weigh the aggravation and mitigation and, even though a juror is never required to impose a death sentence, consider it if you thought it was appropriate?

THE JUROR:  As I said, I don't think that another human being has a right to decide whether somebody else should live or die.  I don't think I should have that power.

MS. CLARKE:  And if the judge tells you you do have that power and it is an obligation of citizenship to weigh and consider all options --

THE JUROR:  I would have an extremely difficult time.

MS. CLARKE:  Okay.  Thank you.

THE COURT:  All set?  Thank you, sir.

THE JUROR:  All done, sir?

THE COURT:  Yup.

THE JUROR:  Should I take this?

THE COURT:  No.  Just leave it.  We'll collect it.

THE JUROR:  Thank you, everyone.

THE CLERK:  Juror No. 324.

THE JURY CLERK:  Juror 324.

THE CLERK:  Sir, over here, please.  Have a seat, if you would.

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon, your Honor.

THE COURT:  Thanks for your patience.  I appreciate that it's a long process.

Have you been able to follow my instructions given at the last occasion to avoid talking about the case with anybody?

THE JUROR:  I didn't really talk about it, but you really can't avoid the media completely.

THE COURT:  What we ask -- obviously, you see headlines.  A news report comes on TV.  What you can do is avoid it when you've seen it.  Have you been able to do that?

THE JUROR:  Yes.  Like the Globe last week, the front page of the Globe and in the Globe Magazine, but my wife read them.  I didn't.

THE COURT:  All right.  That's what we ask.

You're currently retired?

THE JUROR:  Yes.

THE COURT:  Doing anything part time or anything.

THE JUROR:  I do some consulting, but I haven't done much over the winter.

THE COURT:  Tell us what you did before you retired.

THE JUROR:  I designed and built power plants, both nuclear and fossil-fired generating electricity.

THE COURT:  How long did you do that?  What was your career?

THE JUROR:  Forty-five years.

THE COURT:  And so after a 45-year career in that industry, I manage you got a pretty senior position when you left.

THE JUROR:  Fairly senior.  I stayed within the design end of it rather than the engineering or the management because I really enjoyed that part of it.

THE COURT:  The employer that you worked for, it says the Shaw Group.  Is that --

THE JUROR:  Shaw Group bought Stone & Webster Engineering out of bankruptcy.

THE COURT:  It had been Stone & Webster?

THE JUROR:  Yes.

THE COURT:  Okay.  We asked about social media.  You say you use Facebook a little bit.

THE JUROR:  I do.

THE COURT:  For social matters or do you --

THE JUROR:  Just social, just keeping in touch with people, nothing -- I don't get onto any of these chat rooms or any of that kind of thing.

THE COURT:  News sites or anything like that?

THE JUROR:  I do use news sites.  But, again, it's easy enough to avoid.

THE COURT:  So would you take a look at the questionnaire.  We put yours in front of you.  And I want you to look at Page 20 -- let me ask you this before we get to that.  I think it said you retired in 2013?

THE JUROR:  Yes.

THE COURT:  When during the year did you retire?

THE JUROR:  September, I think it was.

THE COURT:  So you were still working at the time of the Marathon bombing events and so on?

THE JUROR:  Yes, I was.

THE COURT:  Where were you?

THE JUROR:  I was here in Boston.

THE COURT:  On the channel here?

THE JUROR:  No, no, I'm sorry.  I mean in the area.  I was at my office.  We were in Stoughton at that time.

THE COURT:  I see.  When you said "Boston," you meant the Boston area?

THE JUROR:  Boston area.

THE COURT:  But you were in Stoughton?

THE JUROR:  Yes.

THE COURT:  There used to be a Stone & Webster building across the channel.

THE JUROR:  Yeah, the Fidelity building right there at South Station was the Stone & Webster building.

THE COURT:  You were in Stoughton?

THE JUROR:  Stoughton, yes.

THE COURT:  Okay.  Now let's come to this page. Question 77 we asked whether, as a result of things you'd seen in the news media or learned from any other source, had you formed an opinion that the defendant was guilty, and you checked the box "yes."  And then we asked further in that question whether you had formed an opinion that he should receive the death penalty or should not.  For both of those you checked "unsure."

And then we asked, If you had answered yes to any of these questions, which you did, would you be able or unable to set aside your opinion and base your decision about guilt and punishment solely on the evidence that will be presented to you in court?  And you selected the box that said "unable."  Would you tell us what you were thinking as you answered this question?

THE JUROR:  Well, I'm afraid I'm pretty biased.  I just can't help it.  But I'm not really sure that anyone should receive the death penalty.  I don't -- I probably -- you know, it's very true that --

THE COURT:  We'll come to that.  I want to explore that with you.  Let's talk first about -- you said you had an opinion that he was guilty.  As I'm sure you know, that in a criminal prosecution in our system, a person who is accused of a crime, the person is presumed to be innocent unless the

government proves that he's guilty by evidence presented to the jury during the course of the trial.

THE JUROR:  I understand.

THE COURT:  And convinces the jury beyond a reasonable doubt that he is, in fact, guilty of the crime.  And we ask jurors to pay attention to that body of evidence that's produced and decide whether it is convincing to establish that the person is guilty of the crime.  We ask people to put aside things they may have from other sources in making that decision and focus only on the trial evidence.

Do you mean to indicate by your answer here that you think you would be unable to do that?

THE JUROR:  I would say I'm about 90 percent sure I would not be able to do that, yes.

THE COURT:  Why do you think that?

THE JUROR:  Just from everything I saw during that week of all the media coverage.  And I did not know anyone specifically involved in it, but friends of friends and friends of law enforcement officers that were involved in everything, it just makes it very hard for me not to have that opinion.

THE COURT:  Okay.  Let's turn to Page 23.  We asked a series of questions about your attitude toward the death penalty.  You started to get there and I interrupted and now coming back to that.  So Question 88 we asked, if you had any general views about the death penalty, what they were.  And you

said, "Not to be taken lightly."  Can you tell us what you meant by that or what you think about it?

THE JUROR:  I'm not necessarily a pacifist, but I don't necessarily believe it's right to take anyone else's life as punishment for something no matter what the circumstances.  I don't say I wouldn't, but it would be -- I would have to really seriously consider everything.  I would find it very, very hard.

THE COURT:  Of course, it's a serious decision, obviously.

Let's look at the next question, 89.  We asked you to indicate where you were on a spectrum from strongly opposed to strongly favor in the case of someone who had been convicted of murder, and you selected No. 4.

THE JUROR:  Yes.

THE COURT:  Which is sort of in the middle rather than either end.  It doesn't seem as strong as what you were just saying.

THE JUROR:  Well, it's below the middle a little, but it's still not something that I could completely put aside that that could happen.

THE COURT:  Okay.  Let's look at the next page.  We asked the question a slightly different way.  Question 90, we set forth a number of possible positions and asked you to pick one that you thought came close to yours or represented yours.

You circled (d), which was you're not for or against the death penalty. You could vote to impose it or could vote for a life imprisonment, whichever you believed was called for by the facts and the law in the case. That also seems a little different from what you're saying here.

THE JUROR: Well, I meant it to be pretty much the same thing, that, you know, it's just not something that is to be taken lightly at all. It's something that enormous consideration has to be given to.

THE COURT: Well, I guess one way of asking the question is: If, after having given it enormous consideration, serious consideration, along with other jurors, could you come to a decision that you thought the death penalty was appropriate and should be imposed?

THE JUROR: If I thought it was appropriate, I guess I would, yes.

THE COURT: And, similarly, if you thought life imprisonment without possibility of release was --

THE JUROR: Same thing.

THE COURT: You would do the same?

THE JUROR: Yes.

THE COURT: And that actually -- if you look at the bottom of Page 25, we asked you a pair of questions. The first one, we asked if you found this defendant guilty and you decided that the death penalty was the appropriate punishment

for him, could you conscientiously vote for the death penalty, and you said "yes."

THE JUROR:  Yes.

THE COURT:  Turn the next.  Next question, we asked the same thing about life imprisonment.  If you found him guilty and you decided life imprisonment without the possibility of release was the proper punishment, could you conscientiously vote for life imprisonment without the possibility of parole.

THE JUROR:  Yes.

THE COURT:  And you said "yes."  So I guess I'm a little puzzled in the end where you come down on this.  Are you able, though you would find it difficult, as anybody understandably might -- are you able to say, that after consideration of the evidence, depending on how you assessed it and weighed it, you could possibly vote for the death penalty or you could possibly vote for life imprisonment?

THE JUROR:  Yes.

THE COURT:  And you won't know until you're in that position?

THE JUROR:  Exactly.  That's -- that is what I meant to convey, yes.

THE COURT:  Okay.  But if you're in that position and you come to a judgment that the death penalty is appropriate, would your views about whether it's appropriate to take

somebody's life have an effect on your ability to actually vote to impose the death penalty?

THE JUROR:  No, depending on the evidence.  I could do that if the evidence warrants it.

THE COURT:  Okay.  Follow-up?

MR. MELLIN:  Yes, your Honor.  Thank you.  Good afternoon, sir.  I'm Steve Mellin.  I'm one of the prosecutors on the case.  If I can just follow up a little bit with the questions Judge O'Toole was asking you and, in particular, your statement that you said, I think that -- you don't believe it's right to take a life no matter what.

THE JUROR:  No, I don't under any circumstances.  I don't believe anyone has the right to take anyone else's life.  But under the laws of this country, if I'm given the responsibility of making that kind of a decision, then I'll have to deal with that.

MR. MELLIN:  That's what we're all trying to drill down a little bit on that and try to figure out how does your internal belief that you don't have to take a life, how does that play in the situation where you would be deciding whether or not to take someone's life?

THE JUROR:  I don't understand.

MR. MELLIN:  Well, there would come -- there could come a point where the jury would be deciding between life and death.  You understand that, right?

THE JUROR:  Right.

MR. MELLIN:  You heard a little bit of the instructions this morning about how this would work, right?

THE JUROR:  I understand that, yes.

MR. MELLIN:  So there could come a time where, after the jury finds the defendant guilty, the jury would be deciding the sentence.  You understand that, right?

THE JUROR:  Absolutely.

MR. MELLIN:  And if you were on the jury, you would be deciding whether or not to take someone's life.

THE JUROR:  That's right.

MR. MELLIN:  And how would you be able to do that given your own internal belief that you don't believe that it's right to take a life?

THE JUROR:  It's all based within the law.  I personally -- I couldn't pick up a gun and hurt anybody.  But if the law states that this is the penalty for whatever has been decided, then that's what I've got to decide within those parameters.

MR. MELLIN:  Right.  But you understand from the judge's instructions this morning that at no time is the jury mandated or directed what the appropriate sentence is, right?

THE JUROR:  No, but there are guidelines.

MR. MELLIN:  Right, right.

THE JUROR:  That's what I'm speaking to.

MR. MELLIN:  The guidelines are about aggravators and mitigators, and the jury would then weigh those aggravators and mitigators.

THE JUROR:  Yes.

MR. MELLIN:  But then there is no guidelines for what is the appropriate punishment.

THE JUROR:  This is the guideline, right here.

MR. MELLIN:  Right.

THE JUROR:  I would have to decide that at the time.

MR. MELLIN:  Right.  And when you -- just for the record, you indicated that it's really your heart or your body and soul that's going to make that call.

THE JUROR:  Right.

THE COURT:  As you come into that though with a belief that it's not right for anyone to take someone else's life, how would you ever be able to consider the death penalty as an appropriate punishment?

THE JUROR:  I believe it's not right to take anyone else's life.  But if we're speaking specifically to this case, someone has already done that.  I have to decide what his punishment will be for that.

MR. MELLIN:  Right.

THE JUROR:  Are we going to go back to the Bible and say an eye for an eye?  That will have to happen when it happens or if it happens.

MR. MELLIN:  Let me change horses real quick.  We were talking about coming into the case with a bit of a bias.  And I think that you, in fact, said that you felt you were biased in this case.

THE JUROR:  I'm sorry.  I am, yes.

MR. MELLIN:  Fair enough.  We appreciate your honest answers to those things.  When you say you're biased, I think you indicated that you're saying that you would not be able to put aside what you've already heard and read and seen in the media and decide this case just based on the evidence in the courtroom.

THE JUROR:  I wouldn't say I wouldn't be able to put aside.  But based on everything that we've been shown here so far, with the list of potential witnesses and whatnot, I guess I'm from Missouri.  Show me.  Show me that I'm wrong in saying that I've got a bias here.

MR. MELLIN:  Right.  But when you say "show me I'm wrong," then are you putting the burden on the defendant to show you that he's not, in fact, guilty?

THE JUROR:  Yes.

MR. MELLIN:  Okay.  Thank you.

MR. BRUCK:  Good afternoon.  My name is David Bruck, and I'm one of Jahar Tsarnaev's lawyers.  I just have one or two questions to ask you.

In talking about the death penalty decision, did you

gather from the judge's instructions this morning that the way that works is that the death penalty is never the -- the crime never requires the death penalty.  The jury never has to impose the death penalty --

THE JUROR:  I understand that, yes.

MR. BRUCK:  -- after there's been a conviction.  The jury can consider mitigating factors, such as things about the defendant that might have nothing to do with the crime but might show that a life sentence is more appropriate, the fact that the person is young, for example.

THE JUROR:  Exactly.

MR. BRUCK:  Right.  And those are the things that a jury can consider.  And then the government gets to show things that make the crime worse.  And then the jury has the freedom to decide which is the penalty that should be imposed.

THE JUROR:  I -- like I just finished saying, show me that I'm wrong in believing that this man committed these crimes.

MR. BRUCK:  Okay.  I'm talking now about the death penalty.  You don't have a fixed opinion about the -- what the punishment should be.

THE JUROR:  No, I do not.

MR. BRUCK:  You have an open mind about that.

THE JUROR:  Yes, I do.

MR. BRUCK:  Excuse me.

(Discussion held off the record.)

MR. BRUCK: That's all. Thank you.

THE COURT: All right. Thank you. You may step out. Just leave the form there. We'll collect it.

THE CLERK: Juror No. 328.

THE JURY CLERK: Juror 328.

THE CLERK: Ma'am, over here, please. Have a seat, if you would.

THE COURT: Good afternoon.

THE JUROR: Good afternoon.

THE COURT: Thanks for your patience.

Have you been able to follow the instructions I gave last time to avoid discussing the case in any substance with anyone?

THE JUROR: Yes.

THE COURT: And also, as much as possible, to avoid media accounts or reporting on the case? You have to say yes for the court reporter.

THE JUROR: Yes.

THE COURT: So that's the questionnaire you filled out. We're going to follow up on some of the answers you gave and perhaps ask you to elaborate on some of the things.

First, I want to focus on your employment, what you do and how the trial might affect that.

THE JUROR: I work at a company largely in the

customer service role.  We deliver meals to schools and elder services.  So I'm talking with clients mostly all day and also business development to bring in more clients.

THE COURT:  If you want to look at the form, we asked -- we set out -- this is on Page 5, Question 10.  We set out the schedule that we would be following.  It's basically a four-day-a-week, 9-to-4 proposition, and that it might last a number of months.  And we asked if there was any special hardship if you had to serve on that schedule.  You said, "Yes, I work at a salaried job and could need that income."

There are two things I want to ask you about that. Sometimes salaries continue.  A wage earner who has to be there on an hourly basis to get an hourly wage might be one thing, but sometimes salaries might continue.  Do you know in your situation whether your salary would continue if you were serving as a juror?

THE JUROR:  I have not confirmed that they would keep my income coming in.  I really doubt it because I don't think that they would.  So that's why I would kind of need that income.  I would have to confirm with my job.

THE COURT:  Why do you think they would not?

THE JUROR:  They don't have a history of paying past -- like, just on personal leave and different things, they haven't kept up with that.

THE COURT:  Okay.  And the second part of it, you said

you could -- is it would or could?  I'm reading it wrong.  I guess it's "would need."

THE JUROR:  "Would need," sorry.

THE COURT:  So give me an idea of your daily routine, I guess, at work.  What would a typical day involve?

THE JUROR:  Usually in the morning, I'm on the phone most mornings if the meals aren't at the appropriate locations or dealing with different clients.  And the rest of the day, I'm working on contracts or on the phone with new clients as business and sales and also working on longer projects such as events or other special projects.

THE COURT:  Where is the business located?

THE JUROR:  Roxbury.

THE COURT:  The form indicates -- we had a box for you to check if you supervise people.

THE JUROR:  I supervise one person.

THE COURT:  How big is this -- is the company?

THE JUROR:  Administrative staff is about ten people.  But in the kitchen, like, making meals, it's about 20 to 30.

THE COURT:  You use Facebook, Twitter, and Instagram, you say?

THE JUROR:  Uh-huh.

THE COURT:  Any others?

THE JUROR:  Nope, not really.

THE COURT:  It looks like from your answer the one you

use the most is Instagram.

THE JUROR:  Yes.

THE COURT:  Is that all mostly social matters?

THE JUROR:  Yes.

THE COURT:  Related to your work or anything?

THE JUROR:  No, just social.

THE COURT:  I'd like you to look at Page 19.  The Question 70 at the top of the page, we asked what radio programs you might listen to.  One of the ones you listed was Matty in the Morning.  Is that during a commute?

THE JUROR:  Yeah.

THE COURT:  You came in here on January 5th, I think?

THE JUROR:  Uh-huh.

THE COURT:  What was the date of the broadcast?  The 5th or the 6th, Matty in the Morning, I'm told, had a -- there was some discussion of this case during one of those.  Did you hear that?

THE JUROR:  Yeah, I did.

THE COURT:  Was that the morning you came here?

THE JUROR:  Uh-huh, when I was driving.

THE COURT:  What did you think of it?

THE JUROR:  They were just -- they weren't really talking too much about the case.  It was mostly just that it was happening and that they knew someone being called for jury service.

THE COURT:  Okay.  Let me ask you to look at Question 77 on the next page.  In this question we asked whether you'd formed an opinion on various matters based on things you'd seen in the media or learned otherwise.  And one was whether you had formed an opinion that the defendant was guilty or not guilty.  And to those two, first, it looks like you indicated "unsure" and then you changed it to say, "yes," you had an opinion that he was guilty and, "no," the converse of that, that you didn't have an opinion he was not guilty.  Am I right that you moved on that?  You first thought unsure, and then you changed it to yes and no?

THE JUROR:  Yes.

THE COURT:  Can you tell us what you were thinking about when you made those --

THE JUROR:  Well, the question doesn't have guilty of what, and I know there are several charges.  But if it was guilt of the actual event of the bombing, then I have -- yes, I've already made up my mind that the defendant has played an active role in that.  Not guilty, I'm not sure because I didn't know to what extent of guilt there is.

THE COURT:  Okay.  Down in the answer to 78 you wrote -- and this is in your own words -- "I believe he is guilty of the explosions and aftermath but do not know to what extent."  That's more or less what you sort of just indicated.

THE JUROR:  Yes.

THE COURT:  I'm sure you understand that in a criminal prosecution the person who's accused of committing a crime is presumed innocent, or not guilty, as sort of the default position unless the government moves the jury off that position by producing evidence at trial which convinces them beyond a reasonable doubt that, as a matter of fact, he is guilty.  Do you understand those principles?

THE JUROR:  Yeah, yup.

THE COURT:  So we ask -- it's not surprising that jurors would have some impressions about what happened, perhaps things stronger than impressions.  We ask them if they are able to concentrate on the evidence presented at the trial and limit their judgment to that evidence and decide on the basis of that whether the government has fulfilled its burden of proof in the case and satisfied the jury by the evidence that the defendant was guilty or not.  That involves, as I say, setting aside other ideas from other sources.

We asked at the bottom part of the question, if you had formed an opinion, if you had answered yes to any of the questions, would you be able or to unable to set aside your opinion and base your decision about guilt and/or punishment solely on the evidence presented in the course of the trial.  And you checked the box indicating that you were able to do that.  Can you tell us about that?

THE JUROR:  I feel like in every situation I always

try to look at both sides of every story.  And if there was evidence presented that I had never heard of or that would -- obviously, you have to start with a blank slate in every case, is what you were describing, of the laws of our country.  So, yes, I would be able to put aside my previous decision.  But just answering that question truthfully, that is where I am at currently.

THE COURT:  But you feel that you could focus on the trial evidence --

THE JUROR:  Yes.

THE COURT:  -- and make that the basis for your decision-making?

THE JUROR:  Yes, of course.

THE COURT:  At the bottom of the page, Question 80, you say that a close friend was near the second bomb when it went off.

THE JUROR:  Yes.

THE COURT:  Would you tell us about that?

THE JUROR:  Two of my -- a friend and her friend were near the finish line at the explosion.  They were really rattled, and then they had to walk home.  And they found other friends on their way back.  They lived in South Boston.  And they didn't really know what was happening until way later.  I was at home.  I was going to go into the Marathon that day, but I had to work.

THE COURT:  You were working from home, is that --

THE JUROR:  At that time I was working -- I was waitressing so --

THE COURT:  That was before you went to your current job?

THE JUROR:  Uh-huh, yeah.

THE COURT:  Well, does the -- does the experience of your friend -- would it have any effect on you as you listen to the evidence in the case and made whatever decisions you had to make?

THE JUROR:  I mean, I did know that friend and a good number of other people that were there, and I have heard their stories and they have -- I did know what they had to go through in the months afterwards but --

THE COURT:  Likely, people talked about it in the days and weeks right after it.  Have you had conversations with them as time has gone on about --

THE JUROR:  Yes.

THE COURT:  -- events?  Does it come up from time to time?

THE JUROR:  Yeah, less frequently in the past six months to a year.

THE COURT:  Question 81 on the next page, you said you know someone who had part of an ear torn off by shrapnel.  Can you tell us about that?

THE JUROR:  Uh-huh, yes.  His dad was running, and he was trying to meet his family.  And he came off the T, and he was on the other side of the street near the finish line when the bomb went off.  And so he -- yeah, his ear got torn, and he was rushed to the hospital.  And his dad kept going, just kept running because he found out that his son had been hurt.  So his dad ran to the hospital after the race.

THE COURT:  You say you know someone.  Can you tell us --

THE JUROR:  I went to high school with him so friends of friends.

THE COURT:  Somebody you currently see as a friend or just --

THE JUROR:  We have an acquaintance but, like, friends of friends.

THE COURT:  But you have contact, say, on an ongoing basis even if it's sporadic?

THE JUROR:  Yeah.

THE COURT:  How is he doing?

THE JUROR:  Fine.

THE COURT:  In Question 82 we asked about whether you took part in any activities after the events such as One Fund or the Boston Strong merchandise and so on.  You indicated that friends and family have done so, but apparently you haven't yourself, is that it?

THE JUROR:  I've supported to the One Fund as well.

THE COURT:  You have, okay.

THE JUROR:  Yeah, donated.

THE COURT:  Do you have any Boston Strong merchandise?

THE JUROR:  I don't think I have.  I do.  But I have friends that do, yeah.

THE COURT:  Beginning on Page 23, at Question 88, we ask a series of questions about jurors' attitudes towards the death penalty.

THE JUROR:  Uh-huh.

THE COURT:  88 itself is a question about the death penalty in general.  If you have some views, what are they?  And you said you're not completely against the death penalty, and I'm not -- the next sentence is, you say, "Keeping a person alive to feed and shelter them for the rest of their life is another way of death."  And then, finally, you say, "I have never" -- I guess you meant "been" -- "in a situation where I had to pick a side" except when you had a debate in school, right?

THE JUROR:  Uh-huh.

THE COURT:  We'll put that aside.  Tell us about the first two sentences of that, how that expresses your view about the death penalty in general.

THE JUROR:  If I would say, like, looking at the scale of 89, I'm definitely -- I lean towards opposing it, but I'm

not completely against it.  I've read research supporting both sides on, like, economical benefits.  And I find cases in both sides to say one is better for the economy, as in moral reasons.  If someone does something so horrible that -- as a justice system, that's what the jury sees fit, then I'm not against that.

THE COURT:  So it sounds like you've done a fair amount of reading about the subject.  Is there a reason why?

THE JUROR:  Like past, during -- in school.

THE COURT:  Sorry?

THE JUROR:  In the past, like, during school, for various projects but nothing very recent.

THE COURT:  If we go to the next page, Question 90, we asked you if there was a statement among the several you had to choose from that best described your feelings about the death penalty in a case involving someone who's been proven guilty of murder, and you selected (c), which is, you're opposed to the death penalty but could vote to impose it if you believed the facts and the law in a particular case called for it.  Is that a fair summary of your attitude?

THE JUROR:  It is while I'm sitting here, but if I was put in that situation, I think it's a very different situation to talk about it than being in it.  That's kind of how I see myself right now.  If I was placed, I don't know if I could actually go ahead with it.  But, again, you're on a jury of

more than yourself.  So if there are other people in that group, then you're making a decision as a group.

THE COURT:  Well, as I said this morning, of course, each juror makes his or her own decision and doesn't have to agree with the others at all.

THE JUROR:  True, too.

THE COURT:  I think you're referring to what you wrote in at the bottom.  You said, "I'm not completely against the death penalty, but it would be hard to live with the knowledge that I was part of sentencing someone to it."  Is that what you were saying?

THE JUROR:  Yeah.

THE COURT:  So let's actually turn to the next page, at the bottom, Question 95.  Getting more specific, we say, If you found this defendant guilty and you decided that the death penalty was the appropriate punishment for him, could you conscientiously vote for the death penalty?  And you indicated you're not sure.

THE JUROR:  Yeah.  I mean, on paper, I would lean towards yes if all evidence and that is what I felt was needed as me as a juror.  But, again, I don't know what I could do personally if I'm put into that situation.

THE COURT:  Because you're not sure that, even if you were intellectually satisfied that it was appropriate, you're not sure you would want to be the one who made that decision --

THE JUROR: Yes.

THE COURT: -- is that what you're saying?

THE JUROR: Yeah, uh-huh.

THE COURT: Okay.

MR. CHAKRAVARTY: Just a few more. At the risk of belaboring this issue, I'm going to ask it a little bit differently. You say that there are family members or friends that might look at you differently if -- depending on what you vote for in the case. Can you explain what that concern is?

THE COURT: Is that 94?

MR. CHAKRAVARTY: I think 94.

THE COURT: Question 94 on Page 25.

THE JUROR: I guess I took it -- I placed myself in that situation. And even though I am open-minded to both sides, if I came across someone that I knew they were part of a jury and sentenced someone to death, I mean, I would definitely just look at them very differently than, I don't know, anyone that I just met.

MR. CHAKRAVARTY: Do you think -- when you say "look at them differently," what do you mean?

THE JUROR: I guess it's not like better or worse. It's more just you went through something very hard, and you know that that's on your conscience for the rest of your life.

MR. CHAKRAVARTY: I'm sorry. I didn't introduce myself. I'm one of the prosecutors.

On Question 90 you said -- you wrote in that you would have to live with the knowledge that you were part of a sentence.  The weight of living with the knowledge, is that something that would affect your ability to vote for the death penalty?

THE JUROR:  Again, I -- I would like to say it wouldn't affect my ability to do so, but I'm not in that situation right now.  So I don't know what I would actually do.  I feel like I would be able to listen to the evidence and do what is needed to me as a juror.  But if I was actually presented with it, I don't know morally if I could go through with it.  I mean, I think I could, but I'm not in that situation yet.

MR. CHAKRAVARTY:  That's -- the only reason I'm asking the questions about that is because we're trying to figure out whether you can actually do it if it comes down to it, and that's a choice that you individually have to make.

THE JUROR:  Yeah.

MR. CHAKRAVARTY:  Is there any reason to believe, I guess, that you can think of that suggests that you can do it at that point?

MS. CONRAD:  I'm sorry.  I couldn't hear the end of that question.

MR. CHAKRAVARTY:  Is there any reason that you can offer us to suggest that you can do it at that point?

MS. CONRAD:  Objection.

THE COURT:  No.  You can answer it if you are able to.

THE JUROR:  Could you restate that, just --

MR. CHAKRAVARTY:  Sure.  You've -- at the risk -- I'm not trying to put words in your mouth.  I'm trying to digest what I think you've been telling us, which is, until you're in that situation -- sorry.  When you envision yourself in that situation, you're not sure whether you can do it or not.  That's a different analysis than the cerebral analysis of whether it's justified under the law and the facts.  And I'm trying to see if there's anything that you can kind of draw on to suggest that at that moment that you actually would say, yes, I can sentence this person to death?

MS. CONRAD:  Objection, your Honor.  That's --

THE COURT:  No.  You can answer it if you understand it and are able to.

MS. CONRAD:  I'm not sure I understand it, but I think there's a false premise there.

THE JUROR:  Are you -- can I ask a question?

THE COURT:  Go ahead.

THE JUROR:  Are you looking for me to think of things that would make me believe that I could do it or make me think of things to make me believe that I couldn't do it or either way?

MR. CHAKRAVARTY:  I'm not trying to change your mind.

You've expressed some hesitation, reluctance to say that you can do it, and you haven't actually said that yet.  I'm trying to see if there's a circumstance in which you could say yes.

MS. CONRAD:  Well, objection.  That's a stakeout.

THE COURT:  Well, I don't know if it is, but -- I think the issue is:  There's maybe a difference between considering something sort of in the abstract and considering it in the real world where you actually have to do -- make the decision.  I think that's what these questions are getting at.  Could you -- let me put it in the negative.  Do you have a reason to believe that, if you came to the point where Question 95 is, where you -- the defendant has been found guilty and you have decided that the death penalty is an appropriate punishment for his offense, could you conscientiously vote for the penalty?

Now, it's not a hypothetical or an abstract proposition.  It's a real one.  And it's perfectly okay to say, I don't know because I haven't been there yet or -- and that might be the case, or it might be that there's something inside of you that says I don't know if I really could do that.  We're trying to gauge that difference, if you can follow that.

THE JUROR:  From everything that I've been saying, everything that I've always thought, I guess I will answer, if that -- if the evidence is there and that's what I felt needed to happen, then I would -- yes, I would agree to the death

penalty just from what I've always been telling myself even though --

THE COURT: Okay.

THE JUROR: -- it would be very hard.

MR. CHAKRAVARTY: You said based on what you have always been telling yourself.

THE JUROR: Like, how I answered this and how I see myself in what I've always -- how I've always said my opinion of it was. I've never once been, I guess, against it or outright against it, so I feel I could -- because I'm not in that situation, it's hypothetical, I don't think it would be fair to say that I'm opposed to it when I haven't said that I ever have. I don't know. It's really hard to answer that.

MR. CHAKRAVARTY: I think -- okay. I think that's all.

MS. CONRAD: One moment, please.

(Discussion held off the record.)

MS. CONRAD: Thank you very much. I don't have any questions.

THE COURT: All right. All done. Thank you.

THE CLERK: Juror No. 333.

THE JURY CLERK: Juror 333.

THE CLERK: Ma'am, over here, please. Have a seat.

THE COURT: Good afternoon.

THE JUROR: Good afternoon.

THE COURT:  Thanks for your patience.

THE JUROR:  No worries.

THE COURT:  Have you been able to follow my instructions given last time to avoid talking about the substance of the case with anyone?

THE JUROR:  Yes.

THE COURT:  And also, as much as possible, to avoid news coverage.

THE JUROR:  Yes.

THE COURT:  I know there's been a lot of it.  You've been able to turn away if you've seen it?

THE JUROR:  Yes.

THE COURT:  So that's the questionnaire you filled out.  I have it there for your convenience.  If it's easy to take the clip off --

THE JUROR:  Thank you.

THE COURT:  -- you can do that.  We're going to follow up on some of the questioning.

You're a senior risk manager for a bank?

THE JUROR:  Correct.

THE COURT:  Can you tell us what that work involves?

THE JUROR:  Right now, just mainly working with federal regulatory agencies:  The OCC, FRB, FDIC, and managing examinations for Citizens Bank.

THE COURT:  Okay.  Your office is in Downtown Boston?

THE JUROR:  No.  It's actually in Providence.

THE COURT:  Oh, in Providence, okay.

In terms of social media, we asked you, and you say you use Facebook but rarely.

THE JUROR:  The only reason why I got it was for when my daughter was in college years ago.  But, no, I'm not on it. I don't utilize it.

THE COURT:  Okay.  Looking at Page 12, you had -- your father worked for the Rhode Island Department of Corrections for a while?

THE JUROR:  Correct.

THE COURT:  What did he do?

THE JUROR:  He was a guard.

THE COURT:  How long did he do that, do you know?

THE JUROR:  I don't remember.  I know he had an injury and was on disability from a -- when I was quite young.

THE COURT:  Okay.  So really he was not doing that while you were growing up basically?

THE JUROR:  Correct.  He was always home.

THE COURT:  You've had jury service in Rhode Island.

THE JUROR:  Correct.

THE COURT:  So I gather you've moved from Rhode Island to Massachusetts --

THE JUROR:  I have.

THE COURT:  -- at some point?

THE JUROR:  Yes.

THE COURT:  When was that?

THE JUROR:  It's been three years.

THE COURT:  Okay.  And the trial you refer to in Question 47, on Page 15, and you think it was in the federal court in Providence?

THE JUROR:  It was, yes.

THE COURT:  When was that?

THE JUROR:  I want to --

THE COURT:  Approximately.

THE JUROR:  About five, six years ago, give or take.

THE COURT:  And it was a mixed verdict in the end, some guilty, some not guilty?

THE JUROR:  Correct.

THE COURT:  What were the charges generally, do you remember?  What kind of a case was it?

THE JUROR:  It was a federal case where the -- it was against, I want to say, National Grid or thereabouts, where improper storage of uncap mercury in their facility in -- I think it was Pawtucket.

THE COURT:  Okay.  So let me ask you to look at Page 20, Question 77.  In that question we asked whether, based on things you'd seen in the media, you had -- or from other sources, you had formed an opinion that the defendant was guilty or not and that he should receive the death penalty or

not.  And you answered that you had formed an opinion that he was guilty, and you had formed an opinion that he should receive the death penalty.

THE JUROR:  Correct.

THE COURT:  Let me take those separately.  With respect to Part (a) -- well, actually, let me -- since they're both the same direction, let's do it together.

Down below you answered -- we asked further, that if you answered yes, as you did, to any of the questions, would you be able or unable to set aside the opinion you had formed and base your decision about guilt and punishment solely on the evidence that would be presented to you in the court?  And between the choice of able and unable, you "chose able."  Can you tell us why you thought you would be able to do that?

THE JUROR:  Maybe more so on the fact that maybe that was the right thing to do, but I'm kind of torn.

THE COURT:  When you say "the right thing to do," I think you may be referring to the process of a trial.

THE JUROR:  The process, correct.

THE COURT:  You understand that under our system of justice that if person is accused of a crime, he's presumed to be innocent of the crime.

THE JUROR:  Correct.

THE COURT:  You can describe it as the default position.  If nothing else happens, he's innocent.  The

government has to, during the trial, produce evidence sufficient to convince the jury that he's guilty beyond a reasonable doubt. Of course -- and the burden of proof obviously always remains with the government. The defendant doesn't have to prove he's not guilty. The government has to prove that he's guilty. So we ask jurors to put their minds in that condition in order to hear and consider a criminal case.

And I guess the question here to you is: You've said you have some opinions already. Would you be able to put those to the side, focus on the evidence in each phase of the case, if there are two, and make your decisions of guilt or innocence, appropriate punishment, based only on the trial evidence and not on ideas you've had from other sources? It's a self-assessment question. Do you think you would be able to do that?

THE JUROR: I'm hesitating only because, to be truthful, I feel pretty strongly that he's guilty.

THE COURT: So you think that that would interfere with your ability to fairly judge the trial evidence?

THE JUROR: I would find it hard to believe at this point to find anything that would change my mind about that.

THE COURT: Okay. Let me ask you a series of questions -- we did ask you a series of questions -- I want to follow up on them -- concerning your attitudes towards the death penalty. That begins at Page 23 and it's Question 88.

MR. MELLIN:  We're fine, your Honor.

THE COURT:  I think we'll go through these anyway.  We asked for a general view, and you said you do believe in the death penalty.

THE JUROR:  Absolutely, yes.

THE COURT:  And then you indicated the strength of that a little bit on the next scale.  It's toward the top, not at the top but fairly strong.

THE JUROR:  Yup, uh-huh, yes, correct.

THE COURT:  Question 90, we asked if you could select the view that came closest to your view, and you selected (e), that you're in favor of the death penalty, as you just said, but you could vote for a sentence of life imprisonment without the possibility of release if you believed that sentence was called for by the facts and the law of the case, is that accurate?

THE JUROR:  Correct.  Yes, that is accurate.

THE COURT:  Then on the next page, at the bottom, Question 95, we asked, If you found this defendant guilty and you decided the death penalty was the appropriate punishment, could you conscientiously vote for the death penalty?

THE JUROR:  Yes.

THE COURT:  You said "yes."  And then on the next page, at the top -- turn the page.  26, at the top.

THE JUROR:  26, yes.

THE COURT: 96, we asked a similar question about the other available punishment. If you found the defendant guilty and you decided that life imprisonment without the possibility of release was the appropriate punishment, could you conscientiously vote for life imprisonment without the possibility of release.

THE JUROR: Potentially, yeah.

THE COURT: Okay.

MR. CHAKRAVARTY: Your Honor, can I just ask a follow-up?

THE COURT: Go ahead.

MR. CHAKRAVARTY: Going back to Question 77, your -- about your strong feelings of guilt, I want to ask a slightly different question. It's not whether you think the defendant is guilty or not but whether you can only -- you can set aside those feelings and consider the evidence that you hear in the courtroom in order to make that decision, or will what you think right now, based on what you've seen in the media, is that going to invariably play some influence on your decision-making?

THE JUROR: Hard to say based on, you know, again, from what I know and what I've seen. It would be hard for me to imagine what evidence that could be provided that would indicate anything else.

MR. CHAKRAVARTY: So, you know, under our system, the

defendant is presumed --

THE JUROR:  I know.

MR. CHAKRAVARTY:  -- innocent until proven guilty. And so it's not a matter of the defendant having to present any evidence.  It's a matter whether the government has met the burden of proof, which would be beyond a reasonable doubt.  So given that until you actually see the evidence in court, you actually don't have any information that's lawfully --

THE JUROR:  I only -- that's correct.

MR. CHAKRAVARTY:  So could you suspend your whatever you saw in the media or anything else in order to just assess the evidence to see if the government has proved it beyond a reasonable doubt?

THE JUROR:  Yes.

MR. CHAKRAVARTY:  And so that doesn't mean the defendant would have to present any evidence, but the key that I'm trying to get at is -- I think it's a different question as to whether you think he's guilty because of what you've seen in the media versus what you've seen in the courtroom.  Could you consider only what you see in the courtroom?

THE JUROR:  I'm hesitating again only because, based on what is in the media, I don't know if that will be shown in the courtroom or not.  So it's hard to go back on what you've seen versus what's being presented.

MR. CHAKRAVARTY:  Okay.  All right.  Thank you.

MS. CONRAD:  Good afternoon, ma'am.  My name is Miriam Conrad.  I'm one of Mr. Tsarnaev's lawyers.  Thank you, first of all, for being here, and thank you for your candor.

I think what we're really asking is for you to just tell us as honestly as you possibly can what you think is possible, not -- and what you would do in this situation understanding that you -- we can't -- no one can go beyond what's humanly possible.  And you've said a couple of times -- are we all set?

MS. CLARKE:  I think the parties have agreed.

MR. MELLIN:  Yes, your Honor.

THE COURT:  You don't want to finish the question?

MS. CONRAD:  I don't need to.  I can but --

THE COURT:  Okay.  Thank you.

MS. CONRAD:  Thank you.

THE CLERK:  Juror No. 337.

THE JURY CLERK:  Juror 337.

THE CLERK:  Ma'am, over here, please, if you would.

THE COURT:  Good afternoon.

THE JUROR:  Hi.  How are you?

THE COURT:  Have you been able to follow my instructions about not discussing the case in substance with anyone?

THE JUROR:  Absolutely.

THE COURT:  Avoiding, as much as you can, media

coverage although there's a lot of it?

THE JUROR:  Yes.

THE COURT:  I actually want to go to a question later in the form here.  You tell us -- that's the questionnaire if you want to follow.

THE JUROR:  Okay.

THE COURT:  You can take that apart.

THE JUROR:  Thank you.

THE COURT:  First I want to begin on Page 19, at Question 75.  This was after you got called to jury service. We asked what did people say to you, you say to others.  And you wrote that -- I guess somebody said to you that you would be disqualified due to your late father's long service as --

THE JUROR:  Treasurer.

THE COURT:  -- treasurer of the BAA, Boston Athletic Association.

THE JUROR:  Correct.

THE COURT:  And our family's closeness to the Marathon.  Then if you'd go to Page 26, Question 97, we asked sort of a catchall question.  Anything else --

THE JUROR:  Yup.

THE COURT:  -- that we should know.  You said your late father served on the BAA Board of Governors over 25 years, 25, plus or minus, and have been involved and connected to the Marathon and its organization for many years.  Part of your

family traditions.  Your brothers continue as BAA members.  All that is accurate?

THE JUROR:  Correct.

THE COURT:  So I guess the question is:  Is this a case that you could sit as a fair and impartial juror on?  Do you think you could be fair and impartial?  Given your family's traditions and association with the Marathon because the Marathon is involved --

THE JUROR:  Correct.

THE COURT:  Would that emotionally or otherwise affect you in a way that might skew your ability to be a fair and impartial juror?

THE JUROR:  I feel like it could because of my bias -- potential bias towards the Marathon and that event itself.  Knowing so much about the Marathon and the event and the activities that are involved and having been involved in it so long.

THE COURT:  All right.  Let's leave that for a minute.  I'm jumping around a little bit here.  But now let's go to Page 20, Question 77.  There we asked whether you'd form an opinion from the media or otherwise that the defendant was guilty or not, and you said you had formed an opinion that he was guilty.  And then we asked had you formed an opinion that he should receive the death penalty or that he should not receive the death penalty.  And you said -- I take the way you've checked

the boxes to indicate that you have formed an opinion that he should not receive the death penalty. That's Part (d) in the question.

THE JUROR: Have I formed an opinion that he -- that's kind of a backwards --

THE COURT: It is an awkward question.

THE JUROR: Right? It's awkward. Have I formed an opinion should not receive, and I said yes.

THE COURT: You have an opinion that he should not receive the death penalty?

THE JUROR: Which now that I'm rereading the question, that doesn't -- that's backwards, right?

THE COURT: Well, if you look, (c) -- it asks both sides of the possible opinion. (c) says, Have you formed an opinion that he should receive the death penalty?

THE JUROR: Right.

THE COURT: (d) says, Have you formed an opinion that he should not receive the death penalty? They could be different opinions. We're trying to explore the range of opinions, I guess, and didn't do it all that artfully.

THE JUROR: I think I remember thinking that. Was that a trick question?

THE COURT: Let's talk about -- let's separate the two questions of guilt from the question of punishment.

THE JUROR: Okay.

THE COURT: In Part (a), you said -- this might be clearer -- have you formed an opinion that he is guilty, and you said "yes."

THE JUROR: That's clear.

THE COURT: Is that accurate?

THE JUROR: That seems clear and I agree.

THE COURT: Now, we also asked down below, if you had said yes to any of the questions, would you be able or unable to set aside the opinion that you had formed and base your decision about, in this case guilt, solely on the evidence that would be presented to you in court? And you indicated you thought you would be unable to do that. Is that accurate?

THE JUROR: Correct, because I can't unforget what I know.

THE COURT: So what we ask trial jurors to do is to make their decision based on the trial evidence. You understand that, in a criminal prosecution, the -- anybody accused of a crime is presumed innocent unless and until the government proves that he's guilty by the evidence at trial.

THE JUROR: True.

THE COURT: And proves it beyond a reasonable doubt. So when we ask jurors to decide the issues in a criminal case, we ask them to listen to the evidence and, in the end, after being instructed in the law, to consider whether, as to any particular charge, the government has proved as a factual

matter that the person is guilty of what he is charged with, okay? The burden is always on the government to prove guilt. A defendant doesn't have any obligation to prove he's not guilty. In other words, the question is never which side has convinced me. It's has the government convinced me that this person is guilty of what he's charged with? Do you understand that?

THE JUROR: Yup, I'm with you.

THE COURT: It's not surprising that people have impressions or understandings about cases that have received a lot of publicity. There's information out there. The question is: Can a prospective juror enter upon that duty with the -- and commitment to making a decision only on the basis of what is presented in the course of the trial and not on extraneous information? And that's what we mean to ask here. I'm not sure how clear it was, whether you thought -- if you were a juror, would you be able or unable to do that?

THE JUROR: And I think not, that I would not be able to set aside what's already in my head, so to speak, or in my mind. When I answered the question, I thought that, and I still feel that way. I think it would be difficult for anyone actually.

THE COURT: Okay. Let me just go back over some of the other questions. Page 6, No. 13, you indicated your husband is retired.

THE JUROR:  Yes.

THE COURT:  Would you tell us what he retired from?

THE JUROR:  He was a contractor.  He did painting and remodeling.

THE COURT:  Self-employed?

THE JUROR:  He had a -- his own business, small business.

THE COURT:  Now, let's -- let me go to Page -- I guess it's 20 again, at the bottom.  You said your brother was at the finish line right before the bombs went off.

THE JUROR:  He was, one of my brothers.  I have two.

THE COURT:  I guess he was in a -- it says he was in a bar when it occurred.  So he was there just as a spectator?  He wasn't --

THE JUROR:  Running?

THE COURT:  He wasn't running, but he also wasn't part of the staff that was working the Marathon?

THE JUROR:  No, he wasn't a volunteer this year, no. He was just a spectator.

THE COURT:  Has he been in the past, a volunteer?

THE JUROR:  Yes.

THE COURT:  Have you?

THE JUROR:  I have not, no.

THE COURT:  The next page, Question 82, it doesn't say -- it says, If you or anybody else, it says, donated.  Your

answer was "donated to One Fund and other fund-raisers for victims (Martin Richard)."  Was that you personally or other members of the family or both?

THE JUROR:  That was me.  Both of those were me personally.

THE COURT:  Beginning on Page 23, we ask a series of questions about the death penalty.  Question 88 is a general question about views in general.  If you have any views on the death penalty, what are they?  And you wrote, "People should pay for their crimes on this earth where they committed them. Allowing them to die is letting them off without punishment." I'm not sure I quite follow that.  Could you tell us what you were thinking?

THE JUROR:  So I personally believe that there's a life after this life, and so that life may be a more forgiving place than here.  And so I feel like, when people commit crimes, they should pay for those crimes here.  Did I answer your question?

THE COURT:  Okay.  Let me move to the next question. We asked you to rate yourself on a scale from strongly opposed to strongly in favor of the death penalty, and you picked 2, which is on the strongly opposed side.  Is that another way of saying what you were trying to say in 88?

THE JUROR:  Yes, because I would be opposed to that because that would mean that people would then potentially not

serve their punishment here on this earth.

THE COURT:  The next question on the next page, we asked you to pick which of a number of statements might match your own views.  And you picked (b), "I'm opposed to the death penalty and would have a difficult time voting to impose it even if the facts supported it."

THE JUROR:  Correct.

THE COURT:  Does that accurately represents your view?

THE JUROR:  Yes.  I do agree with that still.

THE COURT:  And then on the next page, again, Question 95, at the bottom we asked, If you found this defendant guilty and you decided that the death penalty was the appropriate punishment, could you conscientiously vote for the death penalty?  And you said "no."

THE JUROR:  Correct.

THE COURT:  Is that --

THE JUROR:  I still agree with that, yes.

THE COURT:  Okay.

MR. MELLIN:  Just a few questions, your Honor.

THE COURT:  Go ahead.

MR. MELLIN:  Good afternoon, ma'am.  I'm Steve Mellin.  I'm one of the prosecutors on the case.

THE JUROR:  How are you?

MR. MELLIN:  Just to follow up on the last couple of questions the judge was asking you about on the death penalty.

Are you indicating that you would not ever be able to impose the death penalty given your own beliefs?

THE JUROR: I believe that, yes.

MR. MELLIN: Okay. Thank you.

MS. CLARKE: Hi. One more shot at you.

THE JUROR: That's okay.

MS. CLARKE: My name is Judy Clarke. I'm one of the lawyers for Mr. Tsarnaev.

I guess we'll just go straight to the capital punishment question. I can certainly appreciate your view on that. And I think the bottom line is that you heard the judge instruct on the 5th of January and then again today that the jury is expected to weigh aggravation and mitigation, talk about it, deliberate about it, and then make a decision; that no juror is ever required to vote for the death penalty, but what is required is to honestly be able to say that you can talk about it with your fellow jurors and reach a considered decision. So with that as a preface, the question is not whether or not right now that you could impose the death penalty, but could you meaningfully consider aggravation and mitigation in discussions with your fellow jurors?

THE JUROR: I think, yes. I mean, you're basically saying would I listen to opposing opinions to mine with an open mind?

MS. CLARKE: Yes. I guess that's the question.

THE JUROR:  I wouldn't say no, that I couldn't listen to those.

MS. CLARKE:  And that's important.  I think we probably all agree that it's important to have in a jury room, that sort of openness to opposing viewpoints.

Then the question is whether or not in your conscience you decided that the death penalty was the appropriate sentence, given the aggravation in the case, if you decided that in your own mind and your own heart that that was the right penalty to impose, the question is:  Could you then vote to impose it?

MR. CHAKRAVARTY:  Objection to the question without -- I think Miss Clarke just said with "aggravation."  It should be aggravation and mitigation in the case.

MS. CLARKE:  Well --

THE COURT:  That is -- that's a fair objection.  Start again.

MS. CLARKE:  All over?  I mean, the question -- after you've debated --

THE JUROR:  Right.

MS. CLARKE:  -- discussed, listened to opposing viewpoints, you make a decision in your own conscience, in your own heart, that the aggravation justifies a sentence of death -- that's the decision you've made in your own mind -- could you then vote to impose it?

THE JUROR: I don't think so because it would go against kind of my core values.

MS. CLARKE: Okay. Thank you.

THE COURT: Thank you very much.

THE JUROR: Thank you.

THE COURT: Just leave that there. We'll put it back together.

So about quarter to 4 we'll reassemble in sidebar mode.

MS. CLARKE: Sure. Thank you, Judge.

(Recess taken at 3:24 p.m.)

(The Court enters the courtroom at 3:47 p.m.)

(Discussion at sidebar and out of the hearing of the public:)

THE COURT: All right. First let's -- just for record-keeping, I'd note that the following jurors were, by agreement, not interviewed during this process: 297, 298, 300, 313, 331, 336.

So let's go through the people we did see, some of which I think have already been resolved. Number 299 I think there was an agreement, as I believe was 303?

MS. CLARKE: I think that's a government strike.

MR. CHAKRAVARTY: Yes, that's our -- we would move --

THE COURT: Well, okay.

MR. CHAKRAVARTY: I don't know if argument is

necessary.

MR. BRUCK:  And we have no argument on 303.

MR. CHAKRAVARTY:  This is the one --

THE COURT:  No, I know who she -- I remember her. Okay.  Without opposition.

THE CLERK:  She's gone?  All right.

THE COURT:  Number 306 was in agreement?

MR. BRUCK:  That's a defense strike.

MS. CLARKE:  No, that was agreed.

THE COURT:  I think it was agreed, yes.

So I think the first one as to which we did not make a decision was 308.

MR. BRUCK:  No motion for the defendant.

MR. CHAKRAVARTY:  No motion for the government.

THE COURT:  Okay.  308.  I mean, it probably is irrelevant, but I found her pretty impressive, actually, in control of her own thoughts, which we haven't seen among jurors.

Yeah, Number 311 I think was in agreement based on her hardship.

314?

MR. BRUCK:  314 is a defense strike on the basis of hardship.  This is a juror who said that he would -- words to the effect -- have a severe financial impact if he wasn't being paid and he doesn't know if he's being paid, so there's really

no basis to conclude that this is not a hardship.  He requested a hardship excuse.  On the assumption that he would be paid, it seemed to kind of -- it ceased to be an issue during the discussion, but there's no basis on which to support that, no evidence.

He also indicated his wife presented a potential -- if she had flare-ups of her rheumatoid arthritis, which is obviously unpredictable, that would present another obstacle. We don't say that that presented a hardship all by itself, but the totality of circumstances.

We'd note that the government and the defense agreed that this was a hardship.  I realize the call in the end is with the Court, but I think we've seen a sufficient playing out of the basis of the agreement that this hardship excuse should be granted.

MR. MELLIN:  Your Honor, we completely disagree.  As concerning his wife's situation, he said he has plenty of local support in the area to handle that situation.  He was the man who said that he could rely on his older children to help out as well if there was an issue with his wife.

Regarding the hardship, this juror is no different than Juror 283 who we saw the day before who was the MIT researcher who said that she hadn't even thought about whether or not there was a hardship issue but that we allowed her to stay on as well.  So I think he's in exactly the same situation

where if there is a hardship, he will let the Court know, and at that point, then the Court can remove him.

THE COURT:  So the reason that I had asked -- notwithstanding what had been said to me about the parties perhaps agreeing on it, that I asked he be interviewed because I wasn't satisfied from the questionnaire that his situation did present an actual excusable hardship and I wanted to hear him on that.  And I am convinced he does not.

He is at a -- it appears that he's at a level at his company that it will not be a problem for him.  He doesn't strictly know, but if he was seriously concerned about it, it would have shown up in his body language, which it did not.  It was actually the opposite.  It seemed to me he stepped away from his statements in his questionnaire on both counts, both as to his wife's medical condition and as to the seriousness of the hardship.  Even in the questionnaire he described it as a potential financial hardship from work without any backup.

You know, a fellow at this level, in his line of work, will actually be working to some degree at some level, and I'm confident the company is going to continue his compensation. And there's certainly no indication that it won't.  And as I say, his demeanor was such that he was not genuinely worried about that.  I think he was more worried about not getting to go on some of his trips than he was about getting paid, but...

So anyway, I don't think he qualifies as a hardship.

And if that's the sole basis, which I think it was, I don't see a reason to excuse him.

MS. CLARKE:  Judge, if I might, and I absolutely understand the Court's ruling and don't want to debate it, but it's a little confounding because there are compromises that the parties reach and are recommending joint excuses to the Court.  And I understand the Court can override, but it's a little concerning to me that we reached that agreement with the government and the government right now opposes the excusal of the juror.  I think that, you know, there are compromises.  We give on certain people and --

THE COURT:  Well, yeah, I appreciate that.  And, I mean, I'm generally not going to inquire into it, but I had formed this impression of him before I heard about all that.  And so it was not so much that I was coming to the evaluation after I heard that the parties were in agreement but -- because it was before -- I wanted to still follow through on it.

It might help if, when you tell us that you have agreements, you could signal those that are, to use your word, compromises rather than those that are, you know, fully assented to on the merits, and we can be sensitive to it.  I don't know -- my disposition is to not do this regularly but, again, as I said, I'd already had an impression of him on my own and didn't see what the -- except the possibility of hardship, didn't see what it was.  And my evaluation was we had

to know more about it.  And as I say, as I think I did learn more about it, I was satisfied it was not a hardship.

MS. CLARKE:  I just think the government should be aware that the compromise was completely violated by their opposition.  And I understand the Court's --

THE COURT:  I would have ruled this way without the opposition.

MR. MELLIN:  And for the record, I don't believe anything was compromised by our opposition.  Once the person comes in and answers questions, we are all going to decide what to do at that point.

MR. CHAKRAVARTY:  Without engaging on that issue, the compromise, but I think it is helpful going forward so that the parties are clear as to what we're agreeing to if there is an agreement between the parties, as to whether we are simply offering for suggestion individuals who might be appropriate strikes for hardship or one of the criteria that you've discussed before, understanding that you have the ultimate word on it, versus something that's more of a horse strayed in the classic sense of each side saying we will give up one party versus the other when, understandably, you're the ultimate call on it.

THE COURT:  Was there a question in that?

MR. CHAKRAVARTY:  I guess my point is, you know --

MS. CLARKE:  Objection to the question.

THE COURT:  Whatever it was.

MR. CHAKRAVARTY:  There are several lawyers at the table.  Each one of us may have a slightly different interpretation of what an agreed-upon recommendation is.  And I think for the benefit of everyone, so that there is no animus based on a negotiation, I think it's important that we are all aware of it.

THE COURT:  Right.  So I think if you could, in a word, you know, so present this guy as a potential agreed, you say "hardship," or you say "Question 77" or "Question 90" or whatever it might be, or "death penalty" or something like that, then, you know, I can interpret that in light of what is in the information.  It just helps -- it would help me to do that.

And I guess part of the problem may be that this sometimes happens not all at once but in waves, as it were.  And so you may have one half of the compromise in one part of the wave and the other in the other half, or it straddles the presentation to me of the list.  So I think if that can get buttoned down a little bit more, I think we can avoid the problem.

I also think it will be rare that I will, you know, want to proceed in the face of an agreement.  Among other things, it just takes more time.

MS. CLARKE:  I absolutely appreciate it, but I can

tell Mr. Mellin that he was given the choice to pick one of two that they wanted off in exchange for agreeing to 314, and the agreement, I think, was violated.

THE COURT:  All right.  But, again, I would just say I would have chosen him even if the government agreed with you on the strike.

That brings us to 318.

MS. CONRAD:  Yeah.  Defense challenge.  This particular juror has many ties to law enforcement, particularly her brother who's a Boston police officer currently who was working on the night of the marathon, she believes.  She was a little vague on that.  She said she has to pull it out of him.  But we know that everybody was working on the night -- I mean, not the night of the marathon, but after the marathon bombing and during the ensuing events.  Unless he was completely out of town or out of the country, he must have been involved during that week.

She also knows one of the witnesses, she -- a Boston police witness.  Now, this is not just somebody whose brother is a police officer in Raynham or Taunton; this is a Boston police officer.  I did a quick run-through of the list of witnesses that was given to the jury.  There are, by my count, 57 Boston police officers who are witnesses.  She grew up with one of the witnesses, and her childhood friend is married to that witness.

The -- you know, I would -- she also had -- I think she's got a brother -- I'm sorry.  Her husband is currently chief of security at Boston City Hall.  I mean, he has police officers who work under him, Boston police officers.  Think about what it would mean for this juror to be on a jury that acquitted or gave a life sentence to the Boston Marathon bomber when she has these immediate family ties with Boston police that are so deep and great.

And, you know, it makes me think of the juror -- I can't remember her number, but it was ███████████ who was a defense lawyer who was never even asked about how her position as a defense lawyer would affect her ability to be fair and impartial.  And your Honor excused her for cause on the grounds that as a defense lawyer, she has an allegiance to one side.

Now, in this case we don't just have an allegiance to one side through close family ties, but this is a case involving the alleged murder of a police officer, and within the police ranks no crime is considered to be worse.  And here she is with her husband working with police officers on a daily basis, her brother is actually a Boston police officer.  It seems to me as much as she may like to think or may like to tell us that she can absolutely be fair and impartial, I do not see how she possibly can be.

Add to that the fact that she has a Boston Strong

bumper sticker on her car that she presumably is going to be driving every day, or at least when she's not here, throughout the trial. She said to her that symbolizes the unity of the city and the resilience of the city. And that's all very laudable, but what does that translate into when push comes to shove and she has to render a verdict?

The other thing about this witness is she was -- as self-described, a meter maid in Brookline. And speaking as one who lives in Brookline, the marathon goes right down Beacon Street, right through the heart of Brookline. And it is a very, very big deal in Brookline. It shuts down traffic. It shuts down parking. Although she wasn't asked about it, it is hard for me to imagine that on the day of the marathon she was not directly impacted. As a meter maid, she works directly with the police. And her ties are simply too close.

She also, I think, indicated some other police ties. I think she may have had a son who had -- somebody was a corrections officer, her husband was a former probation officer. Yes, she's got a son who is a corrections officer. She's got a daughter who's the keeper of records at South Bay prison. She's got the brother who is a police officer. I think she also had a relative who was stationed at Guantanamo, and even though not involved in the detention end of things, Guantanamo is Guantanamo.

On top of all of that, your Honor, and I apologize

that I hadn't pulled this up when she was being questioned, we identified a Facebook page that we believe to be her husband's which has two notable posts that I can maybe forward to Mr. Lyness.  If necessary, we can print it out.  One is "Stop the building of a mosque next to Ground Zero in New York," and the other is "Boycott Rolling Stone" for its cover, and the cover presumably refers to the cover photo of Mr. Tsarnaev that created so much controversy.

This is not a neutral and impartial juror, your Honor, and we would ask that she be excused for cause.

MR. CHAKRAVARTY:  Your Honor, the government opposes the motion.  The fact that she has a brother -- she has a brother who's a Boston police officer who she doesn't know his assignment -- I think she said he works in firearms now -- did not know what he was doing during the marathon, but because everybody was involved somehow in response to the marathon that he must have done something, in light of the candor, the lack of hesitation with which she was answering the questions about whether these things actually affect her, I think has to be placed in context.

She was open about the fact that she has people in her family who are affiliated in some way with law enforcement, but she did not blink -- and it wasn't like a preprogrammed calculated manner of trying to navigate the questions of the lawyers in order to get on the jury; it was she was what she

is, which is somebody who immediately reacts, responds and pushes back if she doesn't understand the question, as she did to me when I asked an extended question that was compound. When she didn't understand, she didn't agree. She would push back.

Given that, when she says that she would not be affected by these relationships in terms of her assessment, then Ms. Conrad is asking us to disregard that, and rather supplant the litany of hypotheticals which she poses in terms of suggesting there's no possible way that this woman could be actually telling the truth.

With regard to apparently the Facebook stuff, which I haven't seen yet, but, first, if -- you know, the defense was certainly able to ask the witness about these things when she was here if, of course, they were at all relevant. But what a husband posts on his Facebook page somehow attributed suggesting by inference this witness -- this juror must be -- lack of candor on the questionnaire or somehow categorically excludable I think is not using the social media aspect authority that the Court gave us as the measure of whether a juror is qualified. What a juror's husband posts or family members post ought not to be directly imposed upon a juror, again, not having seen what this information is and --

MS. CONRAD: Well, I can show you.

MR. CHAKRAVARTY: Thank you. Even in seeing it, it

doesn't sound like any of that is categorically suggestive of a bias in this case.

And then finally on the point of she has a friend who Ms. Conrad calls somebody she grew up with, somebody she went to high school with who happens to be a Boston police officer, he is on the witness list. He is a potential witness. The government may not call him. Obviously, if the government calls him, then that's a separate issue. But if this juror is seated, then the government is not inclined to call this witness.

That being said, the witness said very clearly she hasn't had contact with that witness for -- I think she said something, comma, years, and that if that witness testified, she would remain fair and impartial and it wouldn't affect her impression at all.

THE COURT: I think I'm going to reserve on this. I would like to have you direct us to whatever you have seen.

MS. CONRAD: Sure. And can -- but can I just correct a couple of things that Mr. Chakravarty said? With respect to the witness, the witness was someone she went to high school with. He is married to a childhood friend. She said she had not seen the witness in many -- in a number of years. She did not say the same thing about the witness's spouse who she described as a childhood friend. I did not say and she did not say that the witness was a childhood friend; that was the

spouse.

THE COURT:  Okay.

MS. CONRAD:  And should I just submit this -- email this to -- to Mr. Lyness or would you prefer that I print it out and bring it in?

THE COURT:  No, just --

MR. BRUCK:  One of them did.

THE COURT:  There's more, I think.

MR. BRUCK:  There's more, so we should collect it and --

MS. CONRAD:  Sure.  In the more appropriate fashion?

THE COURT:  Correct.

All right.  So let's move to -- 321 I think was already --

MS. CLARKE:  That was a government strike.

THE COURT:  -- agreed.

Then we've got to get to the afternoons.

MS. CLARKE:  Your Honor, I think 321 was a government strike with no response.

MR. BRUCK:  We do not argue.

THE COURT:  I thought we interrupted to excuse him, didn't we?

MR. BRUCK:  We did.  I mean, we're not moving to excuse people on grounds of their opposition to the death penalty.  If the government has an objection and we can't in

good conscious oppose it, then it's a government strike which will be granted.

MR. MELLIN:  The government objects, your Honor.  We challenge him.

THE COURT:  That would be an appendix, I guess.

Anyway, 323?

MR. MELLIN:  The government challenges that juror as well, your Honor, on two grounds.  The first is that that is one of the jurors who said that he could not set aside his opinion that the defendant is guilty.  That was Question 77. And more emphatically, he said in answer to Question 74, he said, "I felt nothing could change my mind of his guilt."

Your Honor, regardless of what these jurors' positions are on the death penalty, we all have an obligation to make sure no juror is seated who is not going to follow the Court's instructions, who is not going to presume the defendant guilty, and, in fact, is going to put some burden on the defendant.

So I think -- later this afternoon we started getting into a situation where the defense, regardless of the answers to Question 77, is still wanting to see if there's some way to salvage these jurors.  And frankly, your Honor, we have an obligation not to have jurors like that on this jury.  We cannot allow a juror to be seated who says they will not follow the Court's instructions and presume the defendant guilty -- excuse me -- and presume the defendant innocent.

Secondly, Juror 323 said that he was deeply opposed to the death penalty.  He is the man who changed his ranking from 3, and while in court he changed it to a 1.  He said he's morally opposed to the death penalty and he does not believe any human being has the right to decide who lives or dies.

MR. BRUCK:  We have no argument with respect to the *Witherspoon* issue.

THE COURT:  Yes.

MR. BRUCK:  I think we're about to get to Mr. Mellin's concern in the next juror.  I think we're getting a preview of the government's position.

THE COURT:  Well, okay.  Yeah, I will excuse -- or mark for excuse, I guess, 323.

324?

MR. BRUCK:  No motion from the defendant.

MR. CHAKRAVARTY:  The government has a motion, your Honor, and as Mr. Bruck perceived, we can't have jurors in good conscience, regardless of where they fit on the death penalty, who can't presume the defendant innocent.  And Mr. -- this Juror 324 can't do that.

In his words, he is pretty biased, and then he said that there's -- from what he has seen, he has made up his mind with regards to the defendant's guilt, and he was 90 percent sure that he would not be able to put that information aside. In other circumstances during voir dire we have seen where it's

frequently the defense suggesting that any substantial inability to hold that aside is a basis for exclusion, and, you know, that goes both ways.

The -- his sentiment on that was solid even after pressing, and I think both compared to 323 as well as other jurors that we've seen all along, he was as impaired with regards to just the guilt or innocence presumption as any juror that we've seen.

But we also have a motion based on his substantial impairment on the death penalty, your Honor.  He said as a moral matter that he doesn't think it's right, quote, no matter what the circumstances.  And while he ultimately agreed that under certain circumstances -- excuse me -- that if he found that the penalty was appropriate and he could agree with it, he never indicated in any way that inspires any confidence that he personally could cast a vote that would ultimately, you know, pass that kind of judgment on somebody.

And when asked how he would make that decision, he patted on his chest, and all of what that means, means he was allowing his heart and his, you know, soul, I think is the characterization that Mr. Mellin gave, in order to make that decision.  But it wasn't the circumstance where, you know, "I don't know how I'm going to react until I'm there"; it's rather, "I'm opposed to this.  I don't think I can do it.  My brain will tell me to do something, but ultimately, I'm going

to have to go with my heart as to whether I should do it."

And at the end of the day I think we want jurors making their decisions with every aspect of their faculties, not just their emotional faculties.

MR. BRUCK:  If I may, I'll take the last point first, which I don't think will require much discussion.  This juror is clearly not substantially impaired with respect to the death penalty.  He said, "If I thought it was appropriate, yes, I would.  Exactly.  That is what I meant to convey.  No, I could do that if the evidence warranted it.  It's" -- and on and on.  I mean, it was not even close.  See, this is the classic example of a juror who is -- who opposes the death penalty as a general matter but is prepared to follow the law, to put his views to one side and to view -- and to impose either the death penalty or life imprisonment based on the evidence presented.  He could not have made that any clearer, so much so that I went back to be absolutely sure that he was prepared to consider mitigation, and he verified that he was.

Which gets us to the real problem.  The government is not -- it is the government's death penalty concerns, the fact that they are not -- he's not an ideal death penalty juror from the point of view of the government that has caused them to assert, apparently on the defendant's behalf, a motion he does not make, which is to strike the defendant based on his expression that he's 90 percent sure that he could not put

aside the publicity that he's heard.

So we come to a very solemn problem. It is not unusual that defendants in one situation or another are put to a choice between one constitutional right and another, and we submit that here in this division of the District of Massachusetts attempting to select a jury in the Boston Marathon bombing case has put this defendant to a choice between the empanelment of a fair jury on the issue of guilt and the empanelment of a fair jury on the issue of punishment. It is a choice which we should not have to make.

As the Court is aware, we have moved for a change of venue, and that would resolve the issue. But up until now the change of venue has been denied, and we have to make the best of what we believe is a very bad situation. Therefore, we have to decide: Should we give up this man's right to a representative jury on the issue of punishment by agreeing to dismiss jurors who have relatively favorable views, as we're constitutionally entitled to have represented on the jury like this juror, because there are so many jurors, including this one, who have been inundated by all the personal connections and publicity -- and in this case it's primarily publicity -- bearing on the issue of guilt or innocence?

We have made our choice. We have chosen to opt for a more favorable outcome on the issue of penalty. And we know -- we are well aware that we are giving up the right, which

undoubtedly exists and which we could assert if we wished to, if we felt ourselves able to -- giving up the right to disqualify this juror based on his bias on the issue of guilt. We are giving that up.  And the government does not have, in order to advantage their own pursuit of the death penalty, the right to make that choice for us.

And I think it would violate *Witherspoon* and violate the most fundamental concept of due process for the government to assert the defendant's right to a fair trial on the issue of guilt by requiring us to have this juror disqualified, supposedly to protect Mr. Tsarnaev's right on the issue of impartiality on guilt or innocence, and thereby see the disqualification of a juror that the government thinks might be unwilling, given the case that's going to be presented, to impose the death penalty on the issue of sentence.

Now, there is no inconsistency.  The government seems to take the view that there is something wrong about the defendant picking and choosing jurors who are biased on guilt and impartial on penalty and deciding to challenge some and not others.  There is no inconsistency.  It is consistent because of the fact that we are in Boston trying to pick a jury from a venue that has been so roiled and so prejudiced and so overwhelmed not only by publicity but, as we've seen day after day, by personal raw emotional connections between the trauma of the Boston Marathon bombing and its aftermath and these

people.

It's been rather inspiring to see the people of Boston come through this courtroom. There is no disrespect intended. On the contrary. But what makes the spirit of this city and this community so inspiring and what makes for a fair trial are two different things. And we, in this juror, come to this conflict. And so we move that this juror be found qualified, or whether he is qualified or not, that he be qualified, and that the -- for the grounds I've stated, and that the government's challenge be denied.

THE COURT: Well, I find that entirely unpersuasive. We have been able to, we will continue to be able to, seat people who are satisfactory on both the question of guilt and punishment. There is no forced choice. It seems to me to be a contrived dilemma, frankly, perhaps to bolster the venue arguments.

So I reject the proposition that the defendant is being put into that position where he has to yield on one of his constitutional rights. And I will say that if he won't move to protect it himself, I will. We will have jurors who meet all the proper standards for open-mindedness and receptivity to the evidence in the case.

Let me just say particularly with respect to this Juror No. 324, and actually it applies to 323, I found them to be not credible, particularly -- I think the most -- the more

dramatic of the two was Mr. 324 who shifted as the wind as he was trying to gauge where he was going as he answered the questions.  And I just found him completely unreliably -- he changed -- he not only changed from the questionnaire, he changed from what he said from one side to the other side, and I just found him unbelievable.  I think he was trying to get out of jury service, frankly.

I think the same was true largely of 323.  I don't know that it was the same motive entirely.  I think he feels very strongly about this because of his association with the Red Sox and the Red Sox association with events of Patriots' Day.  But I found him to be untruthful.  I actually wrote a note down on my paper when he was -- I wrote the word "truth" and put a slash through it.  I just didn't think he was telling the truth.

So that apart from anything else, I would not have qualified either of these men because I don't believe their answers.

So 324 is also excused, or will be excused.

328?

MR. CHAKRAVARTY:  The government has a motion, your Honor.

THE COURT:  Go ahead.

MR. CHAKRAVARTY:  Let's start with what I think is dispositive, but we'll move on.  There are three bases:  One is

hardship; two is the -- her substantial connections to events or people involved in the case; and then three, her substantial impairment on the death penalty issue.

But the hardship is one in which she made clear that when she doesn't work, she doesn't get paid, and that -- it's a salaried job; she needs that income.  Her -- unlike some of the others that we've talked about today, she had actually confirmed that her employer does not have a history of paying for people who -- perhaps not in a long jury service, but for things, I think she said, like sick leave or other kinds of paid leave.  So she is not confident at all, and it will be a distraction for her as we proceed.

In terms of some of the connections that she has, let's start first with her relationship to some of the victims. One, one of her very, in her words, close friends was present at the -- at one of the -- near one of the crime scenes near the finish line, and that's somebody that she continues to have contact with.  And as expected, and I think the Court was trying to tease out, "Well, how much contact?" and she was very reluctant to suggest that it was, you know, incidental contact at or near the time of the marathon.  This is something that extended well over a year, she said it was something that has waned over time, but she continues to talk about the experience somewhat less frequently, but she still continues to talk about it over time.

Her friend -- I believe it was a high school friend -- who was physically injured, she -- obviously it made an impact about this emotional story about his father continuing to run to the hospital.  It's that type of detail that suggests that this is something that she has internalized in terms of the events that happened that prevent her from being fair and impartial in this case.

She also -- you know, it's the amalgamation of factors that maybe if any one of them were there, as we've seen in some other jurors, it's not necessarily debilitating, but here she's given to the One Fund, she's -- and she also had separately done -- and perhaps it goes to the substantial impairment on the death penalty, but I think it goes more to the substantial connections here, she had done research on the relative merits -- and perhaps it was in an academic course, but she has done a deeper dive and thought about the issues that come out of this case more than other jurors.

And in the end -- and this brings us to the third point -- she said, "I don't know that I can do it, but if we're there" -- "if we're ready to do it as a group, then perhaps I could."  And, you know, the issue is not that -- whether she can divest herself of responsibility by having -- by going along with the rest of the jury, but whether she can actually make the call.

She did not inspire confidence.  In her Question 95

she said clearly that "I am not sure."  And I'd suggest to you her body manner and her demeanor all were consistent with that. She doesn't want to make that decision and there was nothing she gave, no matter how many times we tried to, you know, tease that out.  In one formulation I think I had asked -- I asked it a couple of ways.  Once I kind of reversed the paradigm that we've been using in order to see if there was a circumstance in which she could do it, and she couldn't quite answer that.

Eventually the answer that she gave when she said that, yes, she could do it, she said she could do it but for reasons that she couldn't explain except that that's what she has said to herself, that she could do it.

So it was one of these notions of purely being a theoretical exercise of "I know I will be able to build up the courage to be able to make this decision."  But there's nothing in evidence, on the record here or that she cited to us or in the questionnaire, that led us to believe that she actually can go ahead and make this decision.  And I'd suggest that that is what the government is entitled to.

The government is also entitled -- and this is a brief rejoinder to Mr. Bruck's earlier point, the government wants a fair and impartial jury here that is obviously legal, and that applies both to the liability as well as the death penalty phase.  If somebody qualifies as a *Witherspoon* juror, then so be it, we'll have to decide our peremptory strikes on that.

But what we can't have is an infirm juror, people who don't meet the definitions.  Obviously it's your Honor's assessment of their credibility and their answers that lets us determine that, but the government's goal here is to do justice; it's not just to beat the defense at picking a better jury.

And I think this juror gives us significant concerns for all three of those reasons that she just would not make a good juror.

MR. BRUCK:  Does the Court need to hear from us?  We don't really think that there's even colorable merit to this issue, but I'm happy to tell you --

THE COURT:  Which issue?

MR. BRUCK:  To any of the government's objections.

THE COURT:  Yeah, I actually think the hardship issue is a real one.

MR. BRUCK:  Well, she's in the same box as the juror we made the hardship motion for.  She says she doesn't know, and in the end didn't assert the hardship as -- when you gave her every opportunity to do it.  As far as she knows now, the likelihood is that she -- that she doubts that her company will pay her, but she doesn't know.  And to assert that for her, I think, really is without basis.  It's not as though this young woman wasn't capable of figuring out on her own, yes, she needed to tell you that she couldn't do it.  You gave her every

chance to do it, and she didn't.

We don't think it's fair to treat the insurance executive one way and to assume without evidence that -- or without clear evidence that he can make a go of it when he says that if they don't pay him, he'll be in serious trouble, and then for this young woman to make the opposite assumption and disqualify her after she was given every chance to disqualify herself, in effect. We think that really would be inconsistent treatment, and we would object to it.

THE COURT: Well, okay. I think it's a judgment that I make based on the information I have. They both asserted it in their questionnaire. She said she would lose her salary, income in answer to Question 10.

I think what influenced me, why I think there's a difference between the two circumstances, is the former juror works for a very large company. He has a senior executive position where he is likely to be treated with greater deference and given greater leeway. She works for a small outfit that apparently has an administrative staff of ten people. If an outfit like that were to lose one of its administrators, it's a significant reduction in their workforce. She says they don't do it in other circumstances. I think it's sufficient for me to infer that they would probably not do it for her either. And so what would happen would be, we would put her in, and a week or two later we would

learn that she comes back out. And I just think that's very likely under what she's told us, and I think it's sufficient to excuse her --

MR. BRUCK: If I may, your Honor, I'm not thinking of the name of the case. It's a grand old case from 1945, a Supreme Court case on Blue Ribbon juries that found it unconstitutional to say basically that wage-earners were excluded and only salaried -- and that's what we've got, in one way or another, here.

THE COURT: Well, this isn't categorical, this is --

MR. BRUCK: I understand it is not on all fours, but it partakes of this class issue in which jurors would be treated differently based on their economic status in society; therefore, I would simply ask that the Court defer ruling, that the jury clerk direct the juror to get an answer from now, when it's not too late, and come back and report back whether she's got a real hardship or whether it's been cleared up, and then we'll know.

THE COURT: Okay. No, I'm satisfied that it's sufficient to excuse her, so I will.

MR. BRUCK: If I may, we would like to note our objection on the constitutional grounds stated a moment ago.

THE COURT: All right. Okay.

MS. CONRAD: May I just add one thing on this juror with respect to the hardship, if I might? It's not clear to me

that -- she said they provide meals to schools and elder care. It's not clear to me -- and she also said that she provides customer service, which presumably is early in the morning, and also, she does, I think, strategic planning.

It's not clear to me -- and she wasn't asked -- how much of that work or whether any of that work is something she could accomplish on the day off from trial and in the evenings and weekends.

THE COURT:  Okay.

MS. CONRAD:  So I would submit that in the absence of that, having been established in the negative, that there is not a sufficient basis for -- to find that she could not make up the pay in some other way if she were deprived of the pay.

THE COURT:  Okay.  Juror 333?

MS. CLARKE:  I think that that is --

MR. MELLIN:  I think that's agreed.

THE COURT:  We agreed.  Correct.  And 337?

MR. MELLIN:  That's a government challenge, your Honor, both for the answers on Question 77 and also concerning the death penalty.  I'm not sure there's an opposition.  If there is, I can go on.  But the answers to my questions were that she would never be able to impose the death penalty given her beliefs, and I believe in answer to a question from Ms. Clarke, she said it would go against her core values.

THE COURT:  Is there an objection?

MS. CLARKE:  No.

THE COURT:  I'll excuse her.  I would add I find a sufficient alternate basis in their family connection with the marathon.  It's longstanding and apparently thoroughgoing.  And she may be a good juror on some case, but I don't think this is the one.

All right.  So I think we have two that have passed and one that I'm suspending on, and we'll look for some information from you.

MS. CONRAD:  Yes.

THE COURT:  Now, the juror who is first up tomorrow has -- you know the number?

MR. McALEAR:  338.

THE COURT:  -- has -- this is one you may recall.  She has to go someplace, Texas someplace, for an interview.  She's a pastor.  She's also -- do you know her?

MS. CONRAD:  I do know her.

THE COURT:  Anyway, I was just getting to the trip issue.  I think the first day of the trip was tomorrow.

I don't know if you've talked to her about that.

MR. McALEAR:  She's contacted us a few times.  She says -- we don't have the questionnaire, so we don't -- you know, we gave the questionnaires out to you.  We can't review the questionnaire as they're talking to us.  She said she wrote "extensive trips" on her questionnaire.  That's all I could

relay.

THE COURT:  I don't have the questionnaire with me, but she did say she had a crucial interview at some time in February.  She didn't identify a specific date when she would -- I don't know if it was qualifying her for a position in the church or something, but she -- it was something that sounded like it came along every once in a while and --

MS. CONRAD:  It's a job interview, I think.

MS. CLARKE:  I thought we agreed to her.

MR. CHAKRAVARTY:  We proposed her and you didn't agree to her.

THE COURT:  I would say -- my recollection is -- I looked at it earlier today --

MR. CHAKRAVARTY:  Here it is.

THE COURT:  -- and she's also pretty adamant in her opposition to the death penalty.  She's a 1 and an A, I think, for religious reasons.

MS. CLARKE:  I think we had already agreed to her. I'm sorry.

THE COURT:  I didn't hear that, but I don't know. Anyway, I raise it because tomorrow's the 6th, which is the day she said she had her first trip.  If there's no interest in having her in, we'll let her go about her business.

MR. McALEAR:  Thank you.

THE COURT:  Okay.  We'll start with the next number,

which would be?

MR. McALEAR:  340.

THE COURT:  Okay.

MS. CLARKE:  Thank you, your Honor.

(The Court exits the courtroom and the proceedings adjourned at 4:35 p.m.)

                    C E R T I F I C A T E


          We, Marcia G. Patrisso, RMR, CRR, and Cheryl

Dahlstrom, RMR, CRR, Official Reporters of the United States

District Court, do hereby certify that the foregoing transcript

constitutes, to the best of our skill and ability, a true and

accurate transcription of our stenotype notes taken in the

matter of Criminal Action No. 13-10200-GAO, United States of

America v. Dzhokhar A. Tsarnaev.


/s/ Marcia G. Patrisso
MARCIA G. PATRISSO, RMR, CRR
Official Court Reporter

/s/ Cheryl Dahlstrom
CHERYL DAHLSTROM, RMR, CRR


Date:  2/5/15