UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,      )
                               )
        Plaintiff,             )
                               )   Criminal Action
v.                             )   No. 13-10200-GAO
                               )
DZHOKHAR A. TSARNAEV, also     )
known as Jahar Tsarni,         )
                               )
        Defendant.             )
                               )

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

### JURY TRIAL - DAY NINETEEN

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Tuesday, February 17, 2015
10:56 a.m.

Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

APPEARANCES:

    OFFICE OF THE UNITED STATES ATTORNEY
    By: Aloke Chakravarty and Nadine Pellegrini,
       Assistant U.S. Attorneys
    John Joseph Moakley Federal Courthouse
    Suite 9200
    Boston, Massachusetts  02210
    - and -
    UNITED STATES DEPARTMENT OF JUSTICE
      By:  Steven D. Mellin, Assistant U.S. Attorney
    Capital Case Section
    1331 F Street, N.W.
    Washington, D.C.  20530
    On Behalf of the Government

    FEDERAL PUBLIC DEFENDER OFFICE
      By:  Miriam Conrad, Federal Public Defender
    51 Sleeper Street
    Fifth Floor
    Boston, Massachusetts  02210
    - and -
    CLARKE & RICE, APC
      By:  Judy Clarke, Esq.
    1010 Second Avenue
    Suite 1800
    San Diego, California  92101
      - and -
    LAW OFFICE OF DAVID I. BRUCK
      By:  David I. Bruck, Esq.
    220 Sydney Lewis Hall
    Lexington, Virginia  24450
    On Behalf of the Defendant

19-3

P R O C E E D I N G S

THE COURT:  Good morning, everyone.  Thank you for being here.  Welcome back.

We are continuing the process of selecting a jury for the case of United States vs. Dzhokhar Tsarnaev.  As you know, Mr. Tsarnaev is charged in connection with a bombing that occurred at the finish line of the Boston Marathon on April 15, 2013, and that resulted in the deaths of three people there.  He's also charged in the death of an MIT police officer and other crimes that occurred April 18 and 19, 2013.  Some, but not all, of the crimes charged are, by statute, potentially punishable by death.

You will recall from my prior instructions that the trial jury will first consider and decide whether the government has proved Mr. Tsarnaev's guilt of any or all of the charges against him.  If he is convicted of any of the capital crimes, that is, crimes potentially punishable by death, then the jury will consider and decide whether he will be sentenced to death or will be sentenced to life in prison without the possibility of release for any such crime.

You may wonder why the death penalty could be a possibility in this case in view of the fact that the laws of Massachusetts do not provide for the death penalty as a penalty for murder or any other violation of Massachusetts law.  The reason is that this is a federal case involving alleged

violations of the laws of the United States rather than a state case involving violations of Massachusetts law.

If the jury convicts Mr. Tsarnaev of any of the capital crimes charged in the Indictment, the same jury will hear additional evidence and then decide whether to sentence him to death or to life in prison without the possibility of release.

Because the jury that is selected to decide, first, the defendant's guilt or innocence will also decide his punishment if he is convicted, it is necessary to question you about your feelings or attitudes towards the death penalty as part of the jury selection process.

So let me briefly explain the procedures that must be followed in a case in which the death penalty is or may be an issue.  As in any criminal case, initially, the government will have the burden of proving that Mr. Tsarnaev is, in fact, guilty of any crime with which he is charged.  If he is convicted by the jury of a crime for which the death penalty may lawfully be imposed, there will be a second phase of the trial usually referred to in shorthand as the "penalty phase."

In the penalty phase, the government will introduce evidence that seeks to prove beyond a reasonable doubt, first, that the defendant acted with sufficient intent to be subject to the death penalty; and, second, that aggravating factors about the killings or about the defendant himself justify

sentencing him to death.  Aggravating factors are circumstances that, if proven, make the crimes particularly serious or blameworthy and, therefore, under the law, may justify imposing a more severe sentence on this defendant compared to other persons who are convicted of intentional killing or murder. The government will bear the burden of proving alleged -- any alleged aggravating factors to every juror beyond a reasonable doubt.

The defense will have an opportunity to present evidence of what it will argue are mitigating factors. Mitigating factors are usually circumstances about the crime or crimes or about the defendant's background or character that would suggest that the death penalty is not the appropriate sentence in the case or that life in prison without the possibility of release is adequate to punish the defendant.

Unlike the proof of aggravating factors, a mitigating factor must only be proved by a greater weight of the evidence. That is a less demanding standard than proof beyond a reasonable doubt.  Again, unlike the proof of aggravating factors, mitigating factors do not have to be proven to the satisfaction of all 12 jurors.  Any juror who finds or determines a mitigating factor to have been proven by a greater weight of the evidence may consider that factor in deciding the appropriate sentence in the case regardless of whether any or all of the other jurors agree that the mitigating factor has

been proven.

After the parties have made their presentations during the penalty phase, the jury will weigh all the evidence. Before a jury could vote to impose the death penalty, every juror would have to be persuaded that certain threshold factors that make the defendant potentially subject to the death penalty have been proven beyond a reasonable doubt.

In addition, in order to impose the death penalty, every juror would have to be persuaded that any proven aggravating factors sufficiently outweigh any mitigating factors found by any juror or jurors to justify a sentence of death. Even if the jury did not find any mitigating factors in the case, it would still have to be unanimously persuaded that any proven aggravating factors were themselves sufficient to justify a death sentence.

You should understand that a jury is never required to find that a sentence of death is justified. The decision whether the government has proven that a defendant should be sentenced to death must ultimately be made by each juror himself or herself. If, however, every juror is persuaded that the death penalty should be imposed, I would be required, as the trial judge, to sentence the defendant to death. In other words, I could not change the jury's verdict. The jury, and not the judge, is responsible for determining whether a defendant who is convicted of a capital crime will live or die.

What I've just described is only an overview of the law applicable to a jury's consideration of the death penalty. If you are selected to serve on this jury and if you find the defendant guilty of a crime or crimes punishable by death, I will give you very detailed instructions concerning your duties in deciding whether to impose the death penalty or life imprisonment without the possibility of release and the law that must be followed in making that decision.

When you were here last and filled out the questionnaires, we told you that there were no right or wrong answers to any of the questions that you've been asked or that you will be asked in this process. We ask them because both the government and Mr. Tsarnaev are entitled to a jury that does not have its mind firmly made up one way or another before hearing the evidence and a detailed explanation of the law. That applies both to whether the defendant is guilty or not guilty of the specific crimes charged in the Indictment and, if he is convicted of a capital crime, whether he should be sentenced to death or to life in prison without the possibility of release.

We're going to have some questions for each of you individually on matters that are pertinent to the process of selecting a jury. In a moment we're going to ask you to go back into the room you just assembled in, and one by one we'll have you come back into the courtroom to ask those questions.

There will be a few people in the courtroom in addition to the lawyers and their staffs, and these proceedings are also being simultaneously transmitted by video and audio to overflow courtrooms where there are other people who are watching and listening.  We will not identify you by name but rather by juror number, and you will be seated so that the video camera will be behind you.  Your answers will be generally public, but if you believe that a truthful answer would require you to reveal sensitive personal information, we will temporarily stop the audio transmission so that -- to those courtrooms so that the people observing there will not hear your answer.

Again, we do not want or expect any particular answer to any of the questions.  All we want and what the law expects is that you provide accurate and truthful answers to the questions you're asked.  If you do that, you will be doing your duty as a citizen and as a juror, no matter what the answers may be.

I want to remind you about some of my prior instructions.  As I told you earlier, a jury's verdict must be based on the evidence produced at trial and must be free from outside influence.  Therefore, I remind you that it is extremely important that you do not discuss the case, including the jury selection process, with your family or friends or each other or any other person until either you have been excused or, if you serve as a jury, until the case has concluded.

Again, of course, you're to avoid any independent research, online or otherwise, about the case, and you're to avoid reading, watching, or listening to any media reports about the case.

When you completed your questionnaires, we asked you to sign at the bottom of the last page under a statement that you're making the true answers and that you're doing so under the pains and penalties of perjury.  We ask now that you make a similar -- take a similar oath or affirmation, and the clerk will administer that to you now.  If you'd rise, please.

(Venire sworn.)

THE COURT:  All right, jurors.  We'll ask you now to withdraw to the other room, and we'll have you back one by one to follow up on the questionnaires.

(The venire left the courtroom at 11:07 a.m.)

MR. BRUCK:  We have a couple matters to take up before the first juror if we could.  First, your Honor, we would ask that when a juror indicates that they have been exposed to some publicity in response to your initial question that the Court follow up on that right away.  I think it's a lot easier for the Court to probe than it is for us to do it later.  Obviously, the question -- when people say, Well, as much as I could, or, you know, ambiguous responses, we think it would be good to find out what the problem is.

We've noticed a tendency over the last week or so for

the government to really pepper the defense follow-up questioning with objections which have tended to become a little, we think, excessive.  And, now, it could be that, with all due respect to our absent colleague, the change in the lineup across the table may resolve the problem.

MS. PELLEGRINI:  That would be doubtful.

MR. BRUCK:  But I'm told that it wouldn't.  We will do our best not to object unless it's absolutely necessary, and we would ask that the government do the same.

In that connection, this continual objection has been coming to our simply asking jurors really tracking Question 77, about whether the juror had an opinion about this case prior to the time that they received their summons or prior to the time that they found out what case they were being summoned for. We've found from experience -- I think we've all learned -- that a lot of the "unsures" are a response not so much to the juror's state of mind but to the fact that they have been summoned for jury duty.  In other words, Well, I'm unsure because I haven't heard the evidence now that I'm a juror.  But that doesn't answer the question of whether the juror had an opinion about either guilt or punishment back when they were just regular members of the community.  That is clearly an issue we are entitled to probe in order for the Court to be able to assess the reliability of their opinion, if they have one, that they could put those opinions aside.  We first have

19-11

to know what they thought.  Those are not stakeout questions in any way, shape or form.  Those are questions about impartiality.

They're important for the Court's determination, and they're important for our right to establish a record on the impartiality of the jury panel as a whole.  So I think we should be allowed to ask them.  I could point to examples in the record where we weren't or where there were so many objections to our asking that pretty straightforward question that the process just bogged down, and I hope that won't happen anymore.

The -- finally, the questions about Question 95, could the juror -- would the juror actually impose the death penalty if the juror thought it was appropriate?  The Court, I think very correctly, some many days ago, stated that -- and I'm quoting now -- "I think there's a difference between intellectually being unable to vote for the death penalty and not being sure here that at some future occasion, on some body of evidence emotionally, she will be able or unable to do it." In other words, it's a rather useless inquiry to ask people hypothetically what they would be able to do in the event of many events that haven't yet occurred, about the evidence in the case and the juror's thought processes.

And the government has increasingly tended to place great emphasis on that question.  I'm not sure that if we had

19-12

to do it over the question should even belong in the questionnaire.  But since it's there, it gives the government information that they are entitled to rely on in the exercise of peremptory challenges, but it does not advance the question of the qualification of jurors.  And we really think that it ought not to be focused on to the extent that it has been.

So those are our observations based on what's happened to date.

MR. CHAKRAVARTY:  Brief response, your Honor, just the -- the way to avoid objections is to not ask objectionable questions.

The defense appears to want it both ways with regard to the questionnaire.  The questionnaire was agreed upon. Reasonable follow-up is being allowed.  When they want to inquire more about something that suits their interests, Mr. Bruck raises the point that the uncertain -- or unsure answers require much more follow-up, whereas the questions that the government has an interest on and the defense suggests that we should just stick with the answer in the questionnaire.  The truth is this is an art, and the Court is navigating both the questionnaire and the juror's responses to the questions.  And sometimes even hypothetical questions yield a lot more information from nonverbal communication as well as from just somebody's reaction as well as the fact that the question is being put to them orally.  All of those factors influence a

juror's response and the ability to assess whether it's a qualified juror.

The government is satisfied with how the voir dire is proceeding. It's proceeding with a questionnaire that was agreed upon, a process that has been -- that has evolved into something that is, I think, yielding qualified jurors. And I think there is no reason to change that process, your Honor.

THE COURT: Let me just say with respect to the first point, I think both sides have increasingly prefaced questions to the jurors with long, stage-setting statements. And I think that is often the source of objections, and I'd encourage both sides to get to the questions a little more directly. That's what we're trying to get. We're not trying to engineer the juror into a particular answering frame of mind but to determine what's in the juror that we have to learn about. So I just make that observation. I think it's bilateral.

I'd just briefly say that I think asking about Question 95 continues to have utility. There are some cases where it's more meaningful than others, but I think it's -- it does -- I think it has surfaced some people who affirm that it's not just an intellectual matter. It's a matter of their moral responsibility and whether they can align those two things when they sometimes might seem that they're not aligned. Anyway, I think 95 still has utility. Okay.

THE CLERK: Juror No. 446.

THE JURY CLERK:  Juror No. 446.

THE CLERK:  Juror No. 446.

THE JUROR:  Yes.

THE COURT:  Good morning.  You can adjust the microphone.  It's more that you speak into it.

THE JUROR:  Okay.

THE COURT:  Thank you.  Since you were here last, have you managed to avoid talking about the case with other people?

THE JUROR:  Yes.

THE COURT:  And also, as much as possible, to avoid any exposure to media accounts?

THE JUROR:  Yes.  There have been some ten-second things on the news that -- not time enough to get out of the room.

THE COURT:  Can you --

THE JUROR:  Nothing of any --

THE COURT:  Teasing of a story a little later to come on or something like that?

THE JUROR:  Just about jury selection, how things were moving along.

THE COURT:  I see.  Okay.  So that's the questionnaire you filled out when you were last here.  We're just going to follow up with some of the matters that have surfaced in the course of the process.

You are presently retired.

THE JUROR:  Yes.

THE COURT:  Is that right?

Prior to that you, I guess, worked in a retail store?

THE JUROR:  Yes.

THE COURT:  Let me just ask you to turn to Page 20. And if it's convenient, you can take the clip off if it's easier.  In Question 77, near the top of the page, we asked whether -- as a result of things you'd seen or read in the media or had learned otherwise, whether you formed any opinion that the defendant was guilty or not, that he should receive the death penalty or not.  And to (a) and (b), which are the guilty or not guilty parts of the question, for (a) you checked "yes," that you had an opinion.  Then you checked "unsure" and you wrote "probably."  And then for (b) you checked "no" and "unsure."  Can you tell us a little bit more fully perhaps how you would answer those questions.

THE JUROR:  I think I was very confused about my feelings.  I think that there are shades of guilt, and I don't -- I didn't know how to address that exactly.  Also, I think that there are the various charges, and I -- it wasn't clear whether I was saying I thought he was guilty or not guilty on all charges.  So I -- I think that -- that's a hard one.  It's a hard one.  I have not made up my mind either way.  I have not made up my mind.

THE COURT:  Okay.  As I'm sure you know, in our

criminal justice system, a person who's accused of a crime is presumed to be innocent unless and until the government proves that he's guilty beyond a reasonable doubt by the evidence at trial.  What we ask jurors to do is to focus on the evidence that's produced in the trial and, in light of the instructions on the law that are applied, to consider whether the government has fulfilled its burden of proof and convinced the jury that the defendant is guilty of specific crimes.

THE JUROR:  Right.

THE COURT:  If you were a juror in this case, would you be able to fulfill those obligations?

THE JUROR:  Yes, I believe so.

THE COURT:  Let me just add to that.  You understand the burden is always on the government to prove guilt.  It's never a burden for the defendant to prove that he's not guilty.

THE JUROR:  Correct.

THE COURT:  The burden of proof never shifts.  Do you understand that?

THE JUROR:  Yes, I do.

THE COURT:  You would be able, you think, to hold the government to its burden?

THE JUROR:  Yes.

THE COURT:  On the next page, we asked a couple of questions about whether you had been affected in various ways by the events.  You said your son was living in Allston at the

time and sheltered -- I guess that was the 19th, the Friday of the week.

THE JUROR:  I don't know which way it was, but, yes.

THE COURT:  You weren't living in the area then?

THE JUROR:  No, I wasn't.

THE COURT:  Was he -- other than being inside for the day, was he affected in any other way?

THE JUROR:  No, no.

THE COURT:  Beginning on Page 23 with Question 88, we asked a series of questions about attitudes towards the death penalty.

THE JUROR:  Uh-huh.

THE COURT:  And in 88 we asked the general question. If you have any views about the death penalty in general, what are they?  You said "opposed in general."

THE JUROR:  Yes.

THE COURT:  Anything you want to amplify about that?

THE JUROR:  I spent a lot of time thinking about how I answered these questions.  This was very thought-provoking actually after the fact.  And this is how I've been thinking about it.  I am opposed in general, but I think that -- I'd like to think, if I was in front of a burning building and there were people inside, I would rush in and save them.  But I've never been in that position.  I don't know what the reality would be.  So I don't know how I would feel.

There's going to be four months perhaps of pretty horrible things to listen to and see, and I don't think anybody who serves as a juror is going to be the same person at the end of the trial as they are now.  So I wanted to leave the door just cracked a little bit because I don't know how I'm going to feel.

THE COURT:  Okay.  So in the next question, we tried to get a sense of the strength of your views by asking you to put it on a numerical scale.  It's kind of a clumsy question.  But at one end is strongly opposed and a belief that it should never be imposed; the death penalty should never be imposed.  The other pole was strongly favor and reflects a belief that it should be imposed whenever a defendant is convicted of intentional murder.  On that scale you put yourself at about a 3.  As you reflect on it, is that still the right place?

THE JUROR:  I suppose 3 out of 10, perhaps only 2 out of 10.

THE COURT:  Then on the next page, we asked about it in a slightly different way, putting forth a number of propositions and asked whether you thought there was one that captured your feelings.  You actually, I think, indicated both (b) and (c), as suggesting some uncertainty about which was the better expression of your views.  Why don't you just take a minute and carefully read it, and we'll talk further about it.

THE JUROR:  I think I was thinking that -- that I have

respect for the way things have been decided by the U.S., that that might be an appropriate sentence.  And, again, I would just go back to saying, you know, I don't -- I really don't know how I'm going to feel, you know, if I served after everything I hear.

THE COURT:  Well, of course, there may be both an intellectual content and an emotional content to that occasion, right?

THE JUROR:  Definitely.

THE COURT:  I think in this question we're trying to get at the first; that is, do you have any beliefs about the death penalty that would foreclose one or the other possibility?  That is, some people may believe strongly as the other scale indicated, that it should always be used for murder.  Others would believe it should never be used for anything, so on and so forth.  We're trying to gauge whether people have those kinds of views about the death penalty that might prevent them from being open-minded and considering the options.

THE JUROR:  In an ideal world, I would be opposed to the death penalty, but I think there might be circumstances where I would be convinced that that was appropriate.

THE COURT:  So, in other words, you are prepared to entertain the possibility, is that --

THE JUROR:  Yes.

THE COURT: -- a fair statement?

THE JUROR: Yes.

THE COURT: But you don't know what your choice will be once you've done that?

THE JUROR: That's correct. Is that clear as mud?

THE COURT: Let me just remind you of a couple other answers you gave and see if that has any effect on what you're telling us. On the next page, at the bottom, Question 95, we asked, If you found the defendant guilty and decided that the death penalty was the appropriate punishment for him, could you conscientiously vote for it? And you said, "I'm not sure." Do you see that?

THE JUROR: Yeah. I think "I'm not sure" is where I would stand.

THE COURT: Now, this may be getting more at the emotional component rather than the intellectual component or maybe a moral component rather than strictly -- because the premise of the question is you've decided that the death penalty is an appropriate punishment for him. And then could you conscientiously vote to impose it?

THE JUROR: I'm not sure.

THE COURT: Do you have an idea of what the things -- what considerations there might be as you face that question, if you did?

THE JUROR: I'm really wrestling with this question.

It's very difficult. Would you ask me that question again, please?

THE COURT: I'm not sure I could.

Let me just contrast it with a question on the top of the next page. Go to 96, at the top of the next page.

THE JUROR: Yes.

THE COURT: You have it there. I'm sorry. In this we asked kind of a related question. If you found the defendant guilty and you decided that life in prison without the possibility of release was the appropriate punishment, could you conscientiously vote for that?

THE JUROR: Yes.

THE COURT: And you said yes?

THE JUROR: Yes.

THE COURT: You didn't have the same unsureness, I guess.

THE JUROR: No.

THE COURT: I guess what we're asking is what do you think the source of the unsureness is? Is it you don't know what you'll know at the time, or is it that your views about the death penalty are such that you're not sure that you could personally vote to impose it?

THE JUROR: I'm sorry. I'm having a really hard time concentrating on your question. Could you pitch it again to me, please?

19-22

THE COURT:  All right.  One reason a person might be unsure about how they would consider the question of imposing the death penalty or not would be an uncertainty about what the person would know, when that decision had to be made, about the case and about the evidence and so on.  In other words, it's hard for me to say what I'll do because I don't know what I'll know then.  That's one thing.

THE JUROR:  Yes.

THE COURT:  It's another thing to say, I don't know if I could ever do that no matter what I know.  And I think the question is trying to get at that difference, if you see the difference.

THE JUROR:  Yes, yes.  I see the difference, but I don't know how to deal with it.

THE COURT:  Okay.  All right.  We'll leave it at that. Follow-up?

MR. CHAKRAVARTY:  Briefly, your Honor.  Good morning.

THE JUROR:  Good morning.

MR. CHAKRAVARTY:  Take a breath.

THE JUROR:  Okay.

MR. CHAKRAVARTY:  My name is Aloke Chakravarty.  I'm one of the prosecutors.  I just have a few follow-up questions. They're going to be some of the same questions.  I'm going to try to ask them a little bit differently to try to tease out a little more.  Maybe there's no more to give.  So don't feel

pressure one way or the other.

THE JUROR:  No pressure.

MR. CHAKRAVARTY:  Easy for me to say.

If you wouldn't mind looking at Question 77 on Page 20.

THE JUROR:  Yes.

MR. CHAKRAVARTY:  You explained kind of what your -- the reason for the responses on the first portion of that, the (a) and the (b).  There's one thing you said that I'm just trying to clarify.  You said you don't know what all of the charges are.  And have you made up your mind about some charges but not others, or you just don't know what the charges are, and you're going to wait to hear what the -- what they are?

THE JUROR:  I don't -- I don't know about the bombing.  I mean, I don't have the facts about the bombing.  I have one picture in my head of a surveillance camera shot and that's all.  That's all I know for sure.  The shootout, I certainly believe that he was involved in the shootout.  I think that's a very different kind of charge.  I don't know if I would -- so the guilty and the not guilty is -- I don't think it's across the board.  I think the question is rather odd.  He is guilty or is he not guilty?  Of what?  And how much?  In what way?  So --

MR. CHAKRAVARTY:  So at one point you had written "probably" somewhere in that.

THE JUROR:  "Yes," "no," and "probably."

MR. CHAKRAVARTY:  Is that capturing that same feeling, or is there something else you were trying to capture with that?

THE JUROR:  I think he is -- yes, probably, guilty of some of the charges without a doubt.  I don't know if he's guilty of all the charges.  And I don't know, you know, what I'm going to hear about the circumstances.

MR. CHAKRAVARTY:  Regardless, you can set that aside and listen to the facts and evidence in the case and make your decision?

THE JUROR:  Yes.

MR. CHAKRAVARTY:  If you look down to letter (d) on that question --

THE JUROR:  Uh-huh.

MR. CHAKRAVARTY:  On that one, there doesn't seem to be any hesitation.

THE JUROR:  That he should not receive the death penalty.  Yes, I believe that he should not receive the death penalty; is that what I have said here?

MR. CHAKRAVARTY:  Right.

THE JUROR:  In -- you know, and my knee-jerk reaction is that, you know, I'm opposed to the death penalty.

MR. CHAKRAVARTY:  So the factual basis, is there any different than you had with regards to the first question?

19-25

Like, were you considering different facts, or is it just the same facts that you were aware of that led you to this conclusion?

THE JUROR:  I guess the same facts.

MR. CHAKRAVARTY:  On 78, you said you think you may have had conversations with somebody else.  Who else would you have talked about it with?

THE JUROR:  This is referring to my answers in 77. Have I --

MR. CHAKRAVARTY:  Right.

THE JUROR:  Nothing of any importance, no important conversations.  The only things that people generally pitch at me is about the death penalty.  So I haven't had any conversations about guilt or innocence or the circumstances or the facts.  I really -- I can't remember any conversations that I've had.

MR. CHAKRAVARTY:  So let's get to the death penalty question.  Take a breath.  If you're selected as a juror, if you decide that the death penalty is appropriate in a case, a juror has to then cast a vote.  As the judge explained, you know, a juror doesn't have to cast that vote, but the consequences of that vote could be that a person will be killed.  Can you do that?

THE JUROR:  I'd have to be really convinced that that was appropriate, I mean, obviously.  It wouldn't be my

tendency, but you would have to make a really good case.  I don't know what I'm going to hear.  There's going to be -- if we're going to be hearing things for four months, that's an enormous amount of information and, you know, hearing from people who have been hurt and lost people.  I just can't imagine it.  I have trouble wrapping my brain around it.  I don't know.  I don't know how I'm going to feel at the end.  All I can say is I am opposed to the death penalty, but I would leave open just that crack of convince me.

MR. CHAKRAVARTY:  Thank you.

THE JUROR:  Okay.

MS. CONRAD:  May I have one moment, please?

(Discussion held off the record.)

MS. CONRAD:  Good morning, ma'am.  My name is Miriam Conrad.

THE JUROR:  Good morning.

MS. CONRAD:  So you said that you could keep an open mind as to guilt and listen to the evidence.  With respect to penalty, am I understanding you correctly that you would be willing to listen to the evidence and consider the possibility of the death penalty understanding that a juror is never required to vote for it?

THE JUROR:  Yes.

MS. CONRAD:  Thank you very much.

THE COURT:  All right, ma'am.  Thank you very much.

THE JUROR:  My pleasure.

THE COURT:  The pleasure was ours.

THE CLERK:  Juror No. 471.

THE JURY CLERK:  Juror No. 471.

THE CLERK:  Juror No. 471.  You can have a seat.

THE COURT:  Good morning.

THE JUROR:  How are you?

THE COURT:  Good, thank you.  Thanks for being here.

Have you been able to follow my instructions to avoid discussing the case with other folks?

THE JUROR:  Yup.

THE COURT:  And, as much as possible, have you been able to avoid media reporting on the case?

THE JUROR:  Yes, I have.

THE COURT:  So that's the questionnaire that you filled out when you were here.  I'm going to follow up on it. I want to start with your current employment.  You're a general manager of a restaurant.  Is that still the case?

THE JUROR:  Yes.

THE COURT:  Can you tell us generally what your responsibilities are?

THE JUROR:  I oversee shifts, handle cash, do orders, just make sure the restaurant doesn't burn down.

THE COURT:  Keep things going.

If you were on the jury here and were with us for a

few months, would that be a problem for you?

THE JUROR:  I mean, it would -- it would affect the restaurant, but, I mean, I'm sure they could find coverage until I get back.

THE COURT:  Okay.  We asked some questions about whether you had connection with people that served in the military.  You had a cousin who is or was in the Marines.

THE JUROR:  Is.  I'm sorry, was.

THE COURT:  When was that?

THE JUROR:  That was five years ago.

THE COURT:  Okay.  Was he overseas?

THE JUROR:  No.  Yeah.  I'm sorry, yes, he was.

THE COURT:  Where did he serve as far as you know?

THE JUROR:  I think -- I -- honestly, I don't know too much about it.  I think he was in Afghanistan, but I'm not sure.

THE COURT:  Do you know whether he was in combat, wherever he was?

THE JUROR:  No.

THE COURT:  He wasn't?

THE JUROR:  No, he was not.

THE COURT:  Let me ask you to go to Page 20.  In Question 77, we asked whether -- based on things you'd seen or read in the media or from other sources, whether you had formed certain opinions, and there's (a), (b), (c), (d), that the

defendant was guilty or not guilty, that he should receive the death penalty or should not receive the death penalty. And you answered you had an opinion that he was guilty, and you had an opinion that he should receive the death penalty. Am I reading the answer right?

THE JUROR: You are.

THE COURT: Okay. We asked then in the second part of the question below that, "If you answered yes to any of the questions, would you be able or unable to set aside your opinion and base your decision about guilt and punishment solely on the evidence that would be presented to you in court?" And you checked the box "able." You thought you would be able to do that.

THE JUROR: Yup.

THE COURT: Can you tell us about that?

THE JUROR: Actually, I've had a lot of time to think about it in these past couple weeks. I don't normally -- I am not a hundred percent for the death penalty. I'm more in favor of, you know, life in prison. But I work in Watertown, and the day of the Marathon, I witnessed a lot of people, like, coming into the restaurant that I work, and they were, like, crying and everything. So, I mean, I don't know. I'm sorry. I'm sorry. I'm really nervous.

I definitely -- like I said, since I'm not for it, like, normally, I would definitely be able to -- I have, like,

formed an opinion, but I am able to put that opinion aside if that makes sense.

THE COURT:  Well, let me back up just a little bit. The first part of the question was about whether the defendant was guilty or not.  And so the first thing the jury has to consider is whether the government has proved him guilty of the crimes he's charged with, right?

THE JUROR:  Uh-huh.

THE COURT:  You understand that in our criminal justice system a person is presumed to be not guilty, or innocent, of the charge made -- just because the charge is made.  He's guilty only if the government proves that he's guilty by the evidence at trial and convinces the jury beyond a reasonable doubt about that fact.

THE JUROR:  Right.

THE COURT:  It's not surprising that people have impressions about what happened those days.  The question is whether, if you were to serve as a juror, you could focus on the evidence produced at trial and limit your judgment to that evidence in deciding whether the government had proved the defendant guilty of the crimes he's charged with or not.

THE JUROR:  Yes.

THE COURT:  Would you be able to do that?

THE JUROR:  Yes, I would.

THE COURT:  We're going to come back to the questions

about your attitude about the death penalty in a minute.  But I want to talk about what you said about your experience in Watertown those days.  First of all, it wasn't clear from what you said -- maybe I just didn't hear it correctly -- whether you're talking about the day of the Marathon itself or you're talking later in the week when what might be called the manhunt was going on.

THE JUROR:  Right.

THE COURT:  Or both.

THE JUROR:  Actually, both.  The day -- actually, the day of the bombing, a lot of people that did run the Boston Marathon, they -- I mean, a lot of people did come and they were, like, crying.  Honestly, I had no idea what was going on.  I'm, like, what is -- why are these people upset?  What is going on?  And they -- you know, I found out what was going on.  So that kind of, like, right there formed my opinion.

And then the day of the manhunt, as you called it, that was, like, the whole, like, media thing, that was in the same parking lot as where I work.

THE COURT:  You mean media vans and things like that?

THE JUROR:  Yeah, that whole, like, you know, took place, like, right there.  Obviously, the restaurant was closed that day so --

THE COURT:  Were you there at the restaurant?

THE JUROR:  I was not.  It was closed so --

THE COURT:  So you know the media trucks were there because you learned it later?

THE JUROR:  They were all there the next morning, too, and I opened the next morning.

THE COURT:  On Saturday morning you opened the restaurant?

THE JUROR:  Yes.

THE COURT:  Would those events, you know, your closeness to Watertown and the events physically, would that have an effect on your ability to be a fair and impartial juror in this case?

THE JUROR:  I -- I want to say no, but I've seen -- like I said, I've seen, like, the people and everything, so I'm kind of --

THE COURT:  How many people were there that day?

THE JUROR:  I saw probably, like, four people that were, like, they came in and they were, like, sobbing.  They were like really upset.

THE COURT:  Were these people who were spectators or runners?

THE JUROR:  Runners.

THE COURT:  Runners?

THE JUROR:  Yeah.

THE COURT:  Okay.  Let me turn to the death penalty questions.  That begins on Page 23 at Question 88.  Question 88

itself asks, if you had any general views about the death penalty, what were they?  You said you're in favor of the death penalty because you're concerned that even when there's a life sentence somebody might get out.

THE JUROR:  Right.  I mean, that's -- like I said, I've had a lot of time to think about it.  I, obviously -- I don't -- I would prefer not to send somebody to death, but, I mean, if they do find a way, like, good behavior or something to get out, you know, I'm kind of tossed.

THE COURT:  Right.  Okay.  Very good.  Thank you.

THE CLERK:  Juror No. 478.

THE JURY CLERK:  Juror No. 478.

THE CLERK:  Juror No. 478.  You may have a seat.  Just make sure you speak into the microphone.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  Since you were last here, have you been able to follow my instructions not to talk about the case with anyone?

THE JUROR:  Yes.

THE COURT:  And also to avoid any media reporting about the case?

THE JUROR:  Yes.

THE COURT:  Okay.  So that's the questionnaire there that you filled out when you were here.  We're going to follow

up with some additional questions about those matters.  I

understand from the questionnaire that you are retired.

THE JUROR:  Uh-huh, yes.

THE COURT:  What did you do before you retired?  What

kind of work did you do?

THE JUROR:  Auto body.

THE COURT:  Were you self-employed or did you work for

somebody?

THE JUROR:  Self-employed.

THE COURT:  How many years did you do that?

THE JUROR:  Twenty years.

THE COURT:  I'd like you to turn to Page 20.  Did you

find it?

THE JUROR:  Yes.

THE COURT:  I want to direct your attention to

Question 77, near the top of the page.

THE JUROR:  Yes.

THE COURT:  Do you have it?

THE JUROR:  Yes, I've got it.

THE COURT:  We asked in that question whether -- as a

result of things you'd seen or read in the media or from any

other source, whether you'd formed certain opinions, that the

defendant was guilty or not or that he should receive the death

penalty or not.  To each of those sections of the question you

answered "unsure."  Could you tell us a little bit about that,

why you made that selection?

THE JUROR:  Well, at the time I didn't -- I didn't hear much.

THE COURT:  I'm sorry?

THE JUROR:  At the time I didn't -- before I came to the court, I didn't hear about what was going on.  So I wasn't sure, so that's why I put "unsure."

THE COURT:  At the time the events occurred, do you remember -- did you pay attention or did you learn about the Boston Marathon events?

THE JUROR:  Yes.

THE COURT:  The bombing?

THE JUROR:  I heard it -- I heard about the -- what happened at the Marathon, yes.

THE COURT:  At the --

THE JUROR:  I wasn't really -- it would show -- it was -- Mr. Tsarnaev -- it was on the news that I would read, about his background and all that stuff.

THE COURT:  So what we'd ask of jurors, if they sit on a trial of a case and have to decide the issues, is that they pay attention to the evidence in the course of the case and make their judgments based on that evidence.  Under our law, a defendant who is accused of a crime is presumed not to be guilty until the government proves otherwise by proving it at trial.

THE JUROR:  Uh-huh.

THE COURT:  And proves it beyond a reasonable doubt.

THE JUROR:  Yes.

THE COURT:  Are you familiar with those ideas?

THE JUROR:  Yes, I know, yes.

THE COURT:  Do you have any difficulty in applying those principles if you were a juror on the case?  Would you --

THE JUROR:  Right now, after I been in the court a couple of times and I've been hear what's going on, I can make a better decision.

THE COURT:  What do you mean?

THE JUROR:  About being guilty, sentenced to life or death, and that's my --

THE COURT:  I guess what I mean -- you said you could make a better decision.  I'm wondering what you meant by a "better decision."

THE JUROR:  After I been in the court a couple times, like, the first time and now.

THE COURT:  Well, okay.  So the question is whether you could, without favoring either side, listen to the evidence in the case and decide what you thought the evidence meant in terms of the charges that are made.

THE JUROR:  Excuse me?

THE COURT:  Whether you would be able to consider the charges that are made against the defendant.

THE JUROR:  Yes, uh-huh.

THE COURT:  Based on the evidence at trial.

THE JUROR:  Uh-huh.

THE COURT:  Without considering evidence or ideas or information that you think you might have from some other source.

THE JUROR:  Yes.

THE COURT:  Would you be able to do that?

THE JUROR:  Yes.

THE COURT:  Let me ask you a little bit about the death penalty, which is one of the possibilities.  Beginning on Page 23 we asked a series of questions.  Beginning with Question 88, near the top, in that case -- in that question, we asked whether you had any general views about the death penalty and, if so, what were they?  You left the answer blank.  Do you have any views about the death penalty in general, not about this case but in general?

THE JUROR:  No, sir.

THE COURT:  You don't?

THE JUROR:  No.

THE COURT:  Let me ask you to go to the next page, Question 90.  In that question we set out a number of possible positions that a person might have about the death penalty and asked if you could select one you thought represented your view.  Why don't you take a minute, if you would, and review

the question.  Then I'm going to ask you about the selection you made.  Okay.

THE JUROR:  Okay, sir.

THE COURT:  You picked letter (c) as the statement you thought was your view.  Do you think that's still correct?  You think that still summarizes your ideas about the death penalty?

THE JUROR:  Yes.

THE COURT:  So you're generally opposed, but you could be open to the possibility --

THE JUROR:  Yes.

THE COURT:  -- in a particular case if you thought it was appropriate?

THE JUROR:  Yes.

THE COURT:  Anything else you want to add to that?

THE JUROR:  No, sir.

THE COURT:  Follow-up?

MR. CHAKRAVARTY:  Yes, your Honor.  Good almost afternoon.  My name is Aloke Chakravarty.  I'm one of the prosecutors, the prosecuting lawyers.

If you look on Page 26, Question 99.

THE JUROR:  Excuse me.  What the page?

MR. CHAKRAVARTY:  Page 26, Question 99.

THE JUROR:  99.

MR. CHAKRAVARTY:  It suggests that there are some of the questions that you had some difficulty with.  Can you just

explain what the difficulty was, or was it a series of questions? Was it one question? What were you referring to here?

THE COURT: He's looking down at the bottom, Question 99, where you said you had some difficulty.

THE JUROR: Oh, I did. Some of them, right, all that questionnaires, all that page, yes.

MR. CHAKRAVARTY: Were there any in particular?

THE JUROR: No.

MR. CHAKRAVARTY: No. So the questions that the judge just asked you, those you understood when --

THE JUROR: I understood, yes.

MR. CHAKRAVARTY: There were several questions that you just left blank on, and there were some that you said you did not have an answer to. Why did you leave them blank, I guess, is the question?

THE COURT: I think that's hard to ask in the general -- with respect to the whole form.

MR. CHAKRAVARTY: Page 18 and 19, for example, there were several questions asking about what media coverage you listen to or watch, and you left all that blank. So on these pages, these questions about the media, what you had seen in the media or what -- excuse me, what you regularly view or listen to, were these things that you had difficulty understanding, or was it that you skipped the page or something

else?

THE JUROR:  First of all, I don't quite listen to many on the media.  I don't listen to many.  As far as skipping the page, I just feel I -- at that time I just -- that was the only one.  I answered it.

MR. CHAKRAVARTY:  So on the -- if you turn the page to Page 20, so you can see on several of the questions you answered none because you --

THE JUROR:  Uh-huh.

MR. CHAKRAVARTY:  That was the answer.  But on 79 you left that blank.  Is that for the same reason, that you just don't listen to much media?

THE JUROR:  Yes.

MR. CHAKRAVARTY:  Getting to your views on the death penalty, you said you're -- on the answer that you circled on Page 24, you said you're generally opposed, but you could impose it.  Can you give us a sense of how much you've thought about the death penalty?  Like, is it a religious belief of yours to oppose it?  Have you discussed it with other people?  I'm just trying to get a sense of what you thought about it.

THE JUROR:  Yeah.  This is -- not that I discussed it with people.  Just at that time that's how I -- that's how I describe it.  But now I -- I feel strong about the death penalty, yeah.

MR. CHAKRAVARTY:  When you say you feel strongly about

it, what do you mean?

THE JUROR: After I read all the evidence, I mean, after I listened to all the evidence.

MR. CHAKRAVARTY: Do I take that to mean that after you've looked at all the evidence, you could --

THE JUROR: I could.

MR. CHAKRAVARTY: -- vote for the death penalty?

THE JUROR: Uh-huh.

MR. CHAKRAVARTY: When you say you feel strongly about it, I'm trying to get a sense of what your belief is about the death penalty itself, not just whether you can vote for the death penalty.

THE JUROR: Well, this was on my -- after I hear all the evidence and everything, if it's on my mind, it comes to death penalty, yes, I would feel strong about it.

MR. CHAKRAVARTY: Okay. So you would support whatever decision you --

THE JUROR: Right, right.

MR. CHAKRAVARTY: And so turning to Page 25 and the next -- on Question 95 and then also on 96, you said you were not sure whether you could give either the death penalty or the life in prison.

THE JUROR: Well, that was the time I fill up all the questionnaires at the time, yeah.

MR. CHAKRAVARTY: Okay. And you understood these

questions?

THE JUROR:  Yes.  I understood them all.

MR. CHAKRAVARTY:  Thank you.

THE COURT:  Okay.  No questions?  Okay.  Thank you, sir.  Just leave that there.

THE CLERK:  Juror No. 480, please.

THE JURY CLERK:  Juror No. 480.

THE CLERK:  Juror No. 480.  Please have a seat.  Just make sure the microphone is pulled up to you.

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon.

THE COURT:  Have you been able to follow my instructions to avoid talking about the case with anyone?

THE JUROR:  Pretty much, yeah.  It's really hard to avoid.

THE COURT:  Well, I told you that you could talk about the fact that you had to come here.  But have you talked about the case itself?

THE JUROR:  Somewhat.

THE COURT:  Tell us what you've talked about.

THE JUROR:  Pretty much with my mother as far as having to call every week.  And it was starting to get stressful.  And then when it came down to every other day, I knew I would get called in sooner or later.

THE COURT:  Okay.  So you've talked about the schedule

that you've been on to try to keep up with whether you had to come back, is that --

THE JUROR:  Yes, because I spoke to them at work, made sure it was okay with them that I would be able to serve.

THE COURT:  Is it okay with them?

THE JUROR:  Yes.  And it -- basically, the unknown. You call up.  Okay.  Wait till -- I'm sure everyone is going through it, but --

THE COURT:  Have you talked about the merits of the case at all with anyone?

THE JUROR:  No.

THE COURT:  Have you also been able to avoid reading or hearing media stories about the case?

THE JUROR:  That's very hard, too, yeah.  So much news on lately with the storms and everything.  You try to look the other way.  So, for the most part, I try to do my best there.

THE COURT:  Okay.  So let me ask you about your work. You are a telecommunications engineer, is that it?

THE JUROR:  Yup.  I'm a telecom engineer for Partners HealthCare.  I work at Mass. General.  I really don't have patient interaction.  We've been working on a big upgrade with 30,000 phones.  So it's a big overtaking.

THE COURT:  Is your work confined to the Mass. General campus?  Partners has other entities.

THE JUROR:  Partners has Brigham's and Nantucket.

THE COURT: Are you involved in any of the others, or are you just Mass. General?

THE JUROR: We are involved in them. Whether we have to go to those sites is a different story. Mostly it's remotely.

THE COURT: Okay. The day of the bombing, after it occurred, people were brought to the emergency room at MGH. Were you working that day?

THE JUROR: I was working. We have a lot of buildings at Mass. General. The building I'm in is White Building, and it's sort of like near the main entrance. But I'm on the 14th floor. We had the TV on. As far as seeing patients come in, they have a new entrance and stuff like that, that they come in that way.

THE COURT: So you were in the hospital itself, but you weren't nearby where the people were --

THE JUROR: Yeah. We're sort of out of the way. We don't hang out in the E.D. There's just so much going on there.

THE COURT: Let me just go back to -- if you'd look at the questionnaire, I want to go back to Page 5 for a minute, Question 9.

THE JUROR: Yup.

THE COURT: Let me just ask: Would that be an issue for you if you were a juror in the case?

THE JUROR:  It's hard to say because, like, when we were sitting up here earlier, I was focusing on you, and I could pick up everything pretty good.

THE COURT:  Okay.  Do you use any assists?

THE JUROR:  I don't wear a hearing aid.  I did years ago.  It was too distracting.  Maybe some day I'll try it again, but --

THE COURT:  Okay.  Let me just ask you.  We asked about use of social media.  You use Facebook, Instagram, Twitter, almost daily.

THE JUROR:  Pretty much, yeah.  I'm on those.

THE COURT:  Can you tell us what kinds of things you do?

THE JUROR:  Before I got back to Mass. General, I used to work for a travel company, and I've been -- I traveled all over and met people all over.  It's a good way to keep in touch with people from the Caribbean and stuff like that.

THE COURT:  Okay.  As a social matter rather than as a business matter?

THE JUROR:  Just basically social.

THE COURT:  Let me ask you to look at Page 20, Question 77, near the top.

THE JUROR:  Yup.

THE COURT:  We asked here whether -- based on things you'd seen or read in the media or from other sources whether

you had an opinion -- formed any opinions about whether the defendant was guilty or not or whether he should receive the death penalty or not.  That's Part (a), (b), (c), and (d).  And to each of those you checked "unsure."  Could you tell us about that?

THE JUROR:  Yeah.  Basically, when it did happen, it was all over the media.  Everyone comes up with their own opinion.  Mine is I don't know whether he was involved or not. I'm not there.  I mean, I need to sit and look at evidence that would be provided and make my decision from that.

THE COURT:  You understand that in a criminal case the defendant is presumed to be innocent, or not guilty, of anything he's charged with unless the government proves him guilty by producing evidence at trial that is convincing to the jury so that they can conclude that the defendant is guilty of the charge beyond a reasonable doubt.  You understand those principles?

THE JUROR:  Yes.

THE COURT:  Are you saying you would be able to faithfully apply those principles if you were a juror on the case?

THE JUROR:  Sure.

THE COURT:  And if -- for any particular charge, if you thought the government had failed in its burden of proof, would you be able to vote not guilty on that charge?

THE JUROR:  I could, yeah.

THE COURT:  We asked a series of questions about your attitude toward the death penalty beginning at Page 23.  And in Question 88 we asked a general question.  If you had any views, what were they?

THE JUROR:  What question was that?

THE COURT:  88.  It's on Page 23.  There it is.  Can you tell us what you were getting at in that answer?  Take a minute to read it.

THE JUROR:  I guess basically what I was saying is, in terms of the death penalty, sometimes it's -- I feel it's better to have life in prison depending on the situation.

THE COURT:  Okay.  Well -- okay.  Let me ask you to turn to Page 24, Question 90.  We set out a series of possible statements and asked if there was one that you thought best reflected your own view, and you selected statement (e).  Why don't you just take a minute to review the question and see -- what I'm going to ask you is whether that still represents your best choice as to what matches your thinking about the matter.

THE JUROR:  I think that goes back to the last question where I felt that life in prison could be in some cases more favorable than the death penalty.

THE COURT:  More favorable to whom?

THE JUROR:  Be more favorable to -- I don't know how to put that.

19-48

THE COURT:  Okay.  Well, Statement (e) says if -- I'm just reading Statement (e).  It says, "I'm in favor of the death penalty."  So that indicates a general disposition to favor the death penalty.  Is that your view?

THE JUROR:  Yeah.

THE COURT:  "But I could vote for a sentence of life imprisonment without the possibility of release if I believed that sentence was called for by the facts and the law in the case."  Is that also your view?

THE JUROR:  Yeah.

THE COURT:  I'm trying to -- depending on how you understood the facts -- and you heard me describe the so-called penalty phase this morning, right?

THE JUROR:  Uh-huh.

THE COURT:  Are you prepared to be able to consider that the death penalty is the right punishment?

THE JUROR:  I believe so.

THE COURT:  And also consider that life imprisonment might be the right punishment?

THE JUROR:  I believe so.

THE COURT:  Okay.  Follow-up?

MR. CHAKRAVARTY:  Just very briefly.  Good afternoon.  My name is Aloke Chakravarty.  I'm one of the prosecutors in the case.  Just a couple quick questions.

THE JUROR:  Sure.

MR. CHAKRAVARTY:  Your work in the telecom department at Mass. General, will that affect your ability to be fair and impartial and listen to the evidence in court to be able to make up your decisions in this case?

THE JUROR:  I don't think it would affect it because I'm working with telephones and stuff like that.  I'm not doing anything with patient care or -- you know what I mean?

MR. CHAKRAVARTY:  And the -- whatever you had seen about the case on the news, are you prepared to put that aside and listen to the evidence in the case in court to be able to make up your decisions?

THE JUROR:  Yeah, I could.

MR. CHAKRAVARTY:  That's all.  Thank you.

MS. CLARKE:  Hello.  My name is Judy Clarke.  I'm one of the lawyers for Mr. Tsarnaev, and I had a few questions if that's okay.

THE JUROR:  Sure.

MS. CLARKE:  Just to follow up on your work, inside Mass. General, you're actually stationed inside the hospital facility?

THE JUROR:  I am -- most of our telecom people are placed over in the Charlestown Navy Yard.  Unfortunately, we're -- have lack of space, and we are building a new site in Somerville in a couple years.  Then we will be all together. We'll be out of the hospital.  There is a spot up on the 14th

floor at the hospital that they've had forever, so they decided to keep that for now.

MS. CLARKE:  So that's where you actually work out of?

THE JUROR:  Yes.

MS. CLARKE:  The 14th floor of the hospital?

THE JUROR:  Yes.

MS. CLARKE:  You were there at the hospital the day of the Marathon?

THE JUROR:  Yes.

MS. CLARKE:  Working?

THE JUROR:  Working.

MS. CLARKE:  Can you tell us what you saw or heard that day?

THE JUROR:  Basically, there's about six to eight of us in the office at any given time.  We do have a TV if there's emergencies.  One of the gentleman that works with us, his brother works for BWH.  He called him.  He said, There's an emergency going on at the Marathon, so we turned the TV on. That's how we knew.

MS. CLARKE:  And saw the events of the day?

THE JUROR:  Yeah.

MS. CLARKE:  What about, as people came into the hospital facility, did you see any of that activity?

THE JUROR:  Like I mentioned, Mass. General is so big. I could be at one end of the place, and the other end could be

19-51

something going on and we would never know.

MS. CLARKE:  Sure.  But did you see anything --

THE JUROR:  No.

MS. CLARKE:  -- that afternoon, the rest of that day or the next day?

THE JUROR:  No.  They have a brand-new emergency room that the ambulances and patients come in at this different entrance.  So us, where we were, I wouldn't see them.

MS. CLARKE:  Were you aware of any of the activities at the hospital that week or in the few days after the Marathon?

THE JUROR:  Obviously, I was aware that the bombing did happen, and they brought people to all different hospitals throughout the city.  That is usually common knowledge.  They send out all user emails stating what's going on.

MS. CLARKE:  What did you learn from those emails?

THE JUROR:  Basically, the same as what we heard on TV when we were -- when we turned the TV on after we heard of the incident.

MS. CLARKE:  Can you recall more specifics about what you got from the emails as opposed to what you got from the TV?

THE JUROR:  I think it was basically the same.  A lot of times they get the emails from the reports from the news media.

MS. CLARKE:  Were there any fund-raising efforts at

the hospital or any meetings about helping people?

THE JUROR:  Like I said, I'm more of a technical person, and I'm not involved in any patient care and stuff like that.  So it was sort of out of the picture.

MS. CLARKE:  Were you able to carry on your work that week the same as ordinary?

THE JUROR:  Yeah.  Like I said, I mean, Partners and Mass. General have so many sites and -- you could feel something in the air.  You know what I mean?  You could feel a buzz that something happened.

MS. CLARKE:  Could you describe that a little bit more for us?

THE JUROR:  I think the thing was -- I mean, you -- how do I put it?  You know something is going on, but you don't really have all the facts.  We knew there was a bombing.  We knew there were a lot of injured people.  Other than that, we -- I mean, even though it was up there, we still have work to do.

MS. CLARKE:  Sure.  I guess one of the things to think about is whether you got information that nobody else got.  And so you got that sort of buzz feeling.  That's what I'm really trying to explore.

THE JUROR:  Well, I think -- if I was in patient care, I would have got probably different emails.  I get the generic email for --

MS. CLARKE:  The telecom email?

THE JUROR:  Yeah, basically, an all-user email.  But if you're in patient care, I mean, there's probably different types of information provided.

MS. CLARKE:  Okay, okay.  On Question 77, which was at Page 20, that was the questions about the opinions.  And I certainly appreciate you saying it was all over the media, but as a juror, I have to listen to the evidence.  The question is: Have you ever formed an opinion about Mr. Tsarnaev's guilt or about the penalty outside of thinking about being a juror?

THE JUROR:  Well, I would say so when -- first happened, I mean, with all the media attention, you say, Okay. They got the person who they assumed did this.  Other than that, I mean -- they had two or three other reports out there that other people had done this as well.  So it was, like, who was right and who was wrong?  So, I mean, so --

MS. CLARKE:  But you weren't able to form an opinion based on anything you knew before you came in to fill out your questionnaire?

THE JUROR:  Not really, no.

MS. CLARKE:  How about as to the penalty that should be imposed?

THE JUROR:  I haven't had a chance to go through all the counts and all the charges.

MS. CLARKE:  Sure.  That makes absolute sense that you

would wait to hear the evidence.  But did you have an opinion when you came in to fill out the questionnaire --

THE JUROR:  No.

MS. CLARKE:  -- about the penalty?

THE JUROR:  No.

MS. CLARKE:  You didn't?

When you say, on Question 88, Page 23, that the "death penalty can be overrated sometimes and it may be better from the defendant's view if he is guilty than to live out his life in prison."  Can you talk to us just a little bit more about what you meant?

THE JUROR:  I guess -- I mean, when I came in to fill this out, it was a long day already.  I guess what I was trying to say, I mean, due to the fact his age was -- he was in his 20s and stuff like that, sometimes I thought it might have been -- this is my answer I should have said to you earlier -- was it might be, from my standpoint, that he lives the rest of his life in prison versus the death penalty.  I mean, I'm still going back and forth on that.  I mean, I wrote something down, but I'm not sure what I really was trying to get across.

MS. CLARKE:  Okay.  Can I just have one second?

THE JUROR:  Sure.

(Discussion held off the record.)

MS. CLARKE:  Thank you very much.  Thank you.

THE COURT:  All set.  Just leave the form there.

You're done.

THE CLERK:  Juror No. 481, please.

THE JURY CLERK:  Juror 481.

THE CLERK:  Juror 481.  You may have a seat.  Just make sure you speak into the microphone.

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon.

THE COURT:  Have you been able to avoid discussion of the case with anyone?

THE JUROR:  Yes.  I've had to tell people not to talk to me, but I have done that.

THE COURT:  Some people have approached you to talk about it?

THE JUROR:  Yeah.  Well, I work with lawyers so they --

THE COURT:  They're trouble.

THE JUROR:  They like to talk about it.

THE COURT:  Also, as much as possible, avoid any media accounts of the case --

THE JUROR:  Yes.

THE COURT:  -- or of the proceedings?

Let's talk about your employment.  You are an attorney.

THE JUROR:  Right.

THE COURT:  And you've been, I guess, with the

19-56

Commonwealth on and off, is it?

THE JUROR: Yeah. I have been there at the Department of Labor Relations for the past four and a half years almost; and then a few years prior to that, I was at a different agency.

THE COURT: Okay. Give us just a sense of what your workload is like. What do you do?

THE JUROR: I'm mostly a hearing officer, so I hear cases involving state and municipal employers and their unions that represent the employees and the employees themselves. So they are labor dispute cases. I also mediate sometimes and work as an arbitrator sometimes.

THE COURT: All within your official duties?

THE JUROR: Yes.

THE COURT: In other words, you're not --

THE JUROR: Yes.

THE COURT: -- moonlighting by arbitrating?

THE JUROR: No, no. All of that, just one job.

THE COURT: Does it involve the civil service system as well?

THE JUROR: Not really. Some of the employees are also part of civil service, but if they have -- they can go to the Civil Service Commission for civil service type cases. There's some overlap, but we don't work with them, the Civil Service Commission. But I did -- I was involved with the civil

service cases when I worked at the Human Resources Division of the Commonwealth a few years ago.

THE COURT:  Okay.  And you say you're mostly a hearing officer?

THE JUROR:  Yes.

THE COURT:  When you do that, are you sitting by yourself or part of a panel?

THE JUROR:  By myself.

THE COURT:  When you're not being a hearing officer, are you arguing cases for --

THE JUROR:  No, just a neutral.  But I did at my previous job, at the Human Resources Division, argue cases.

THE COURT:  Let me ask you to turn to Page 20, Question 77, where we asked about whether you'd formed opinions about the case from things you'd seen in the media and from other sources.

THE JUROR:  Yes.

THE COURT:  You checked to each of the boxes in the four subparts "unsure."

THE JUROR:  Uh-huh.

THE COURT:  Can you tell us about that?

THE JUROR:  I just -- I don't know if it's because of my job or just having a legal background, I don't really like to form a complete opinion on something like this.  I know that there has to be evidence, and I don't think what you

necessarily hear in the media is the evidence that, in a case like this, you would rely on.

THE COURT:  Have you ever had any part, either as a lawyer or not, in a criminal case?

THE JUROR:  No.

THE COURT:  You do know, of course, I'm sure, that the government has the burden of proof in every criminal case.  The defendant doesn't have to prove he's not guilty.

THE JUROR:  Yes.

THE COURT:  The government has to prove it beyond a reasonable doubt by the evidence at trial.

THE JUROR:  Yes.

THE COURT:  Would you be able to, as a juror, listen to the evidence, absorb it, think about it, discuss it with your fellow jurors and then make whatever decision you thought the evidence called for without any preconceptions?

THE JUROR:  As far as guilty or not guilty?

THE COURT:  Right.

THE JUROR:  Yes.

THE COURT:  Let me just ask you about Question 80, if you want to take a minute to refresh your recollection about that.

THE JUROR:  Okay.

THE COURT:  As -- correct me if I'm wrong.  As I understand, your present fiance was running then, but he was

not your fiance at the time.

THE JUROR:  Right.  We had broken up at the time.  We hadn't been engaged at all at that point, and we weren't together at that time.

THE COURT:  He was in the race, but he finished before the events?

THE JUROR:  Yes.

THE COURT:  Have you talked about it with him, his feelings or --

THE JUROR:  Yeah, I mean, before all this.  I know that -- well, we don't talk about it a lot because it was a -- it was a hard time for us since we weren't together at the time, so I don't really like to talk about it with him, but we have discussed it some.  And he, you know -- I know he had a hard time after going through it.

THE COURT:  In what sense?

THE JUROR:  Well, he just told me he was very freaked out afterwards.  I only talked to him briefly the next morning and then not for a couple months.  But just upset and just kind of shocked and I think just felt lucky that he was not closer --

THE COURT:  Do you know --

THE JUROR:  -- to the explosion.

THE COURT:  Do you know how much time interval it was before --

THE JUROR:  I think it was about ten minutes.

THE COURT:  So it was fairly close?

THE JUROR:  Yeah.

THE COURT:  And then on Question 81, on the end of the week when people were sheltering in place, you -- I guess you were living outside Boston?

THE JUROR:  Yeah.  I lived in Stoneham.

THE COURT:  You were just told to stay home rather than come in?

THE JUROR:  Yes.

THE COURT:  Were you confined to your residence in Stoneham?

THE JUROR:  Not that I remember.  I know I didn't go out, but I don't remember being instructed not to go out.

THE COURT:  On Page 22, Question 85, you recognize somebody on the witness list.  Can you tell us what your relationship is, if any, with that person?

THE JUROR:  I don't -- I don't know him anymore.  When we were in college, I was pretty good friends with him in college, I think our junior and senior year.  The only reason now I know that he works for the FBI is I saw a story on the Whitey Bulger case on *60 Minutes*, and he was interviewed.  So I hadn't known he was an FBI agent until I saw that.

THE COURT:  Give us an idea of when you were in college together.

THE JUROR:  1992, 1993.  We graduated in 1993.

THE COURT:  Do you know -- have you had any contact with him since then?

THE JUROR:  No.

THE COURT:  Would you have any difficulty in being a critical judge of his testimony if he were to be a witness?

THE JUROR:  I guess I probably, from my memory of him, think he's a good, honest guy, so that would be my preconceived idea of him.  So I guess that could change if it seemed like he was being inconsistent in his testimony.

THE COURT:  We asked a series of questions about jurors' views about the death penalty beginning on Page 23, at Question 88.

THE JUROR:  Uh-huh.

THE COURT:  And you said you have conflicted feelings. In general, you're opposed, but you can foresee circumstances where it could be justified.

THE JUROR:  Uh-huh.

THE COURT:  Does that remain your view?

THE JUROR:  Yeah.

THE COURT:  Would you qualify that or add to it in any way?

THE JUROR:  I mean, I guess I would usually say that I'm opposed to the death penalty, but you do -- or I do hear certain cases or crimes that are just really horrific, and it

19-62

wouldn't bother me to know that the death penalty was imposed or especially in cases maybe where there's some chance that that person could still be a danger, whether it be through contact they still have through people outside.  It's a tough --

THE COURT:  Okay.  Let's --

THE JUROR:  I go back and forth.

THE COURT:  Let's look at the next page, Question 90. We set out a series of statements that -- and asked -- reflected different views about the death penalty and asked if you could find one you thought best expressed your views.  You selected (b).

THE JUROR:  Yeah.

THE COURT:  You're opposed to it and would have a difficult time voting to impose it.

THE JUROR:  Yes.

THE COURT:  Even if the facts supported it.  That's the end of the sentence.

THE JUROR:  Yes.

THE COURT:  Is that, you think, an accurate --

THE JUROR:  Yes.

THE COURT:  On Page 25, at Question 95, there we asked, If you found this defendant guilty and you decided the death penalty was an appropriate -- was the appropriate punishment for him, could you conscientiously vote for the

death penalty? And it looks like you originally checked "no" and then changed it to "unsure." Tell us about that.

THE JUROR: That's because of my -- I've thought about that a lot since then, and my answer is no.

THE COURT: Is no?

THE JUROR: Yes. I can't picture myself ever doing that. I can't see myself sitting in a room with somebody for four months and then deciding to sentence them to death.

THE COURT: Okay. Questions?

MR. CHAKRAVARTY: Some, your Honor. Thank you. Good afternoon. My name is Aloke Chakravarty. I'm one of the prosecutors.

I just want to explore a little bit some of the questions that you weren't asked about your -- sounds like when you first got the subpoena -- excuse me, the summons -- you were concerned about the duration. I think you wrote you were worried about what your employer might think.

THE JUROR: Right, yeah.

MR. CHAKRAVARTY: A couple of questions. One, do you have your standalone department?

THE JUROR: Yeah, yeah. So I was referring to my director of my agency, not the whole Commonwealth.

MR. CHAKRAVARTY: Is the director a political appointee?

THE JUROR: Yes.

MR. CHAKRAVARTY:  From the governor?

THE JUROR:  Yes, from the last governor.

MR. CHAKRAVARTY:  So is that expected to change?

THE JUROR:  It could.  We really don't know right now what's going to happen with that.

MR. CHAKRAVARTY:  In that context, given the fact that the current governor is more outspoken about this case than the last governor, will that affect your ability to serve?

THE JUROR:  I actually didn't know that, so, no, that wouldn't.

MR. CHAKRAVARTY:  Sorry.  Just checking to see if any of the questions I had asked -- I wanted to ask hadn't been answered.  They look like they have been, so thank you.

MR. BRUCK:  Good afternoon.  My name is David Bruck, and I'm one of Jahar Tsarnaev's attorneys, and I just have a few questions I'd like to ask you.

I heard what you told the judge at the end about the death penalty, and I'd like to sort of bear down on that a little bit.  You're a lawyer and you know what the difference between holding a personal opinion is and being an objective judge.  Jurors are judges.

I guess the real question is whether or not you could put to one side your feelings about the death penalty and be guided by the evidence in the case.

THE JUROR:  As far as sentencing, whether I could

sentence him to death, putting aside --

MR. BRUCK:  I'd like to break it up first.

THE JUROR:  Okay.

MR. BRUCK:  The first question, before you have to decide whether to sentence somebody to death, is whether you could listen to the evidence --

THE JUROR:  Yes.

MR. BRUCK:  -- on both sides.

THE JUROR:  Yes.

MR. BRUCK:  Now, let's assume that you're on the jury and guilt has been proven beyond a reasonable doubt.  So there's no doubt about guilt.  You're in the second phase that the judge told you about.  In that second phase, could you listen fairly to the evidence favoring the death penalty and the evidence favoring life without release?

THE JUROR:  I could listen to it, yeah.

MR. BRUCK:  And you mentioned some things that you would consider as -- even with your views about the death penalty, as weighing in favor of the death penalty.  You gave some examples.

THE JUROR:  Uh-huh.

MR. BRUCK:  So in this or any case, could you watch for those things and watch for other things that might weigh in favor of the death penalty?

THE JUROR:  I guess I just -- which maybe isn't right,

but I see a difference, for me anyway, from being the one to make that decision.  I just don't think I could be the one to make that decision.

MR. BRUCK:  Could that --

THE JUROR:  In favor of the death penalty.

MR. BRUCK:  I'm sorry.  Could that feeling you have about yourself change based on evidence that you heard if the evidence was strongly enough in favor of imposing the death penalty even though you wouldn't want to?

THE JUROR:  I don't think so.  I think it would be something that I couldn't get over, like, for the rest of my life actually.  I don't know if this -- I'm not religious at all right now, but I don't know if this goes back to some Catholic upbringing many, many years ago, but I just -- I don't think I could do it.

MR. BRUCK:  All right.  Thank you.

THE COURT:  Thank you very much.

THE CLERK:  Juror No. 482, please.

THE JURY CLERK:  Juror 482.

THE CLERK:  Juror 482.  You may have a seat.  Make sure to speak into the afternoon if you would.

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon.

THE COURT:  You've been able to avoid any discussion of the case with people except to tell them where you're going?

THE JUROR: Yes.

THE COURT: How about media coverage of the case?

THE JUROR: I haven't watched or read online.

THE COURT: This is the questionnaire you filled out when you were here. I want to follow up on some of the things you told us there. I want to actually start on Page 20, at the bottom of the page, with Question 80 and then the next several questions. Maybe the way to approach this is to have you just take a moment and read, I guess, through Question 83, which is on Page 22, so you refresh what you had written and over to Question 83, first question at the top there.

THE JUROR: Okay.

THE COURT: Okay. So it appears from those questions that you have family and friends who were fairly in the middle of things when they were happening in Watertown.

THE JUROR: Yes, that's correct.

THE COURT: Can you tell us a little bit about that?

THE JUROR: My parents live in East Watertown. They were asked to shelter in place. My parents were actually at work at the time. My dad drives a cab in the area. He had to go home. My mom works at a restaurant in town. She had to go home as well. I have family friends who were on the same street where the defendant was found hiding in the boat. And they had bullet holes in their bedroom window, in their bedroom walls. A lot of friends live in Watertown and surrounding

areas.  I grew up there as well.  And I know members of the police force.

THE COURT:  You know members of the police force?

THE JUROR:  I know a couple members of the Watertown police force.  None that were listed on here.  The ones that were listed on the list are people that I know their names but do not recognize them personally.  They are not people I grew up with or went to school with.

THE COURT:  If you were a juror in the case, do you think all those connections or relationships would affect you in some way?

THE JUROR:  It's hard to say for sure.  I would try not to let them, but it's -- I can't give a hundred percent one way or the other.

THE COURT:  These are all someone else, right?  It was not you who was there.

THE JUROR:  Right.  It was not me who was there.

THE COURT:  How much have you talked to people about those experiences?

THE JUROR:  At the beginning when all this was taking place, there was -- I talked to people a lot in the area because all of my friends and family are sheltering in place.  Everyone is hunkering down.  You know, they're going up my parents' street in tanks and everything.  So it was kind of weird.

THE COURT: Yeah, okay. But as you sit here, you don't think that would have an effect on you if you were in a sense hearing about those events in the evidence?

THE JUROR: It probably would to a certain degree. It's really -- it's hard to say not in the moment.

THE COURT: Okay, yeah. I think that's enough. Thank you.

THE CLERK: Juror No. 487, please.

THE JURY CLERK: Juror 487.

THE CLERK: Juror No. 487. You may have a seat. Just make sure you speak into the microphone.

THE COURT: Good afternoon.

THE JUROR: Hi. How are you?

THE COURT: Have you had success in avoiding any discussion of the case with people?

THE JUROR: Yes.

THE COURT: And how about avoiding media coverage?

THE JUROR: Absolutely, yes.

THE COURT: Okay. So that's the questionnaire you filled out. We're going to follow up on some of the questions.

THE JUROR: Okay.

THE COURT: I want to start with Question 10 on Page 5 where we asked about the schedule in the case and what it might mean for you. First of all, did you have your trip?

THE JUROR: Yes, I did. Can you tell I was a little

panicked about that?

THE COURT:  You only said it three times, I think. But anyway --

THE JUROR:  Happy belated birthday to me.

THE COURT:  Hope you had a nice trip.

THE JUROR:  Thank you.

THE COURT:  That's one of the few advantages of this drawn-out process, is that people get to take their trips.

THE JUROR:  Yeah.

THE COURT:  Now, you also were, I think, concerned about whether, if you were a juror on the case, you would be sequestered.  That would be a problem for the family.  That's not going to happen.

THE JUROR:  Okay.

THE COURT:  With that -- the way I read your answer, that if it's not the case, you're okay with the schedule?

THE JUROR:  Yeah.  My -- I have four kids:  one in college; my next one is a senior in high school, who has her own car, who would be able to help with my two eighth-grader twin boys.  It's not ideal coming from the Cape, but there would be worse off people than me in that sense.

THE COURT:  Would it be okay with your employer?

THE JUROR:  Yes.

THE COURT:  Will you continue to get paid?

THE JUROR:  I do get paid.

THE COURT:  So I think the next thing I want to go to is Page 20, Question 77.

THE JUROR:  Okay.

THE COURT:  There we asked whether, based on things you'd seen or read or learned from whatever source, you had formed an opinion that the defendant was guilty or not and whether he should receive the death penalty or not.  As to (a) and (b), which were about whether he was guilty or not guilty, you said you had formed an opinion that he was guilty.  As to the appropriate penalty, you said you're unsure.  Okay.

Then at the second part of the question, just below that, you were asked, If you answered yes to any of these questions -- and you answered yes to Part (a) -- would you be able or unable to set aside your opinion and base your decision about guilt solely on the evidence presented to you in court, and you checked "able."  You would be able to do that.  Can you tell us about that?

THE JUROR:  Okay.  Basically, I'm not a huge news follower to begin with.  But the little bit that I knew of the case, you know, there was video evidence and, you know, being in the boat, the whole bit, obviously, it seemed he played a role in it.  So that was, like, my feeling of guilt.

On the death penalty, I've never had an opinion about it one way or the other.  I just didn't -- I've never been questioned on how I feel about that.  So, to me, since I don't

already have strong feelings about it, I could -- if -- once I knew the rules of it and what goes into it, then I think I could be -- form an educated opinion about it.  Whether -- that's what I mean about, like, on the evidence presented to me.  Like, I understand you're not guilty until you're proven guilty.

So I would have to -- I think I would be able to put that aside until I see all the evidence because, obviously, I have not seen any evidence really other than what's been out there.  But if someone said to me, like this, Do you think he's guilty?, Yeah, I thought so because of what I've seen so far.

THE COURT:  But from what you've said, I guess you recognize the principle that the government has the obligation to prove somebody's guilty --

THE JUROR:  Right, right.

THE COURT:  -- by the evidence at trial.

THE JUROR:  Right.

THE COURT:  And that's what the jurors will focus their attention on and decide whether, based on that evidence and not ideas from other sources, they can make their judgment.

THE JUROR:  That's what I feel.  I would be able to put that aside and see what the real evidence really is.

THE COURT:  Do you understand that the burden of proof is exclusively with the government; that is, the government has the responsibility to prove somebody guilty?

THE JUROR: Yes.

THE COURT: A person accused doesn't have any obligation to prove he's not guilty.

THE JUROR: Okay.

THE COURT: It's always -- the question is never which side has convinced me. It's has the government convinced me that this person is guilty as charged. Do you understand that?

THE JUROR: I do understand that.

THE COURT: Do you think you could apply that principle?

THE JUROR: I do think that I could apply that principle, yes.

THE COURT: We asked a series of questions about the death penalty and your attitudes about it beginning on Page 23, and Question 88 is the first one. That asks whether you have any views about it in general; and, if so, what are they? And you say you've never really had a strong opinion either way. Is that --

THE JUROR: It's true. You know, I -- I don't have an opinion either way. I do think life imprisonment is a horrible life, but it's a life, you know. Obviously, death would be the worst penalty you can have. But I've never felt it shouldn't exist. I really didn't have an opinion one way or the other on it.

THE COURT: Okay. On Page 24, Question 90, we asked

you to review a series of statements and see if one of them reflected your feelings about the death penalty involving someone guilty of murder.  You picked (d).  If you want, why don't you just take a moment to review the entire question and see -- obviously, what I'm going to ask you is does that still represent your choice?

THE JUROR:  Okay, yeah.  It definitely -- I don't have a strong opinion one way or the other, so it would have to be (d).

THE COURT:  Okay.  Based on your -- I gather from the answer then, you think that, based on your assessment of the evidence -- you heard me describe the penalty phase and how the government would be trying to convince you that there were aggravating factors that made this a serious -- more serious offense and, therefore, punishable by the death penalty while the defense would likely present evidence of things that arguably mitigate the punishment and make life imprisonment the better punishment and so on.  You would be able to consider all that before making up your mind whether death --

THE JUROR:  Yeah.

THE COURT:  -- or life imprisonment was appropriate?

THE JUROR:  I would hope so, yes, I mean, because I'm not for or against it.  So I think I would think, once I knew the criteria and if it felt that the guiltiness leaned more towards what that criteria is, then I would be for it.  If it

wasn't, I would be against it.

THE COURT: All right. Follow-up?

MR. CHAKRAVARTY: Just very briefly. Good afternoon. My name is Aloke Chakravarty. I'm one of the prosecutors.

THE JUROR: Okay.

MR. CHAKRAVARTY: Just a couple quick things. One, on Page 23, Question 87.

THE JUROR: Yup.

MR. CHAKRAVARTY: I just want to -- so nobody wants to see disturbing things. The question is will you view the evidence -- will you be able to view the evidence even if it's disturbing and pay attention to it and not look away essentially even if you -- it's not a pleasant experience? You think you will be able to do that in this case?

THE JUROR: I think that would be the hardest part for me, but I would know that would be my job to do that, so I would have to.

MR. CHAKRAVARTY: Then on Page 26, Question 98, I think it's just a clarification. Your answer there, was that in reference to essentially whether you were going to get paid?

THE JUROR: No, no, because I do get -- I receive child support. He's not an option. If I was sequestered, he's not an option for my kids to go to him.

MR. CHAKRAVARTY: So it's the commuting.

THE JUROR: It was the commuting, like, them having a

parent around.  I'm their only parent.

MR. CHAKRAVARTY:  Finally, at the end of the day in this case, there will be two phases.  It's one thing to intellectually arrive at a decision that the death penalty or life imprisonment is appropriate.

THE JUROR:  Right.

MR. CHAKRAVARTY:  But do you feel confident that you can make the decision to take somebody's life?

MS. CONRAD:  Objection.

THE COURT:  Yeah, phrased that way.

MR. CHAKRAVARTY:  Sorry.  In -- not in this case particularly but just in the process of doing a death penalty trial in federal court, a juror is asked to cast a vote for life imprisonment or the death penalty.  And you will be given the criteria, and you will be given the rule of law from the judge.  You'll have to assess the fact as to whether it merits that.

THE JUROR:  Right.

MR. CHAKRAVARTY:  Do you feel confident that you can make that decision?

MS. CONRAD:  Objection.

THE COURT:  No.  Go ahead.

MS. CONRAD:  "Feel confident"?

THE COURT:  Go ahead.  Answer the question if you can, if you understand it.

THE JUROR:  I do understand it.  I would feel confident if I -- from the evidence presented and the criteria, if it's met and that's the law and those are the things that it falls under, then I would feel confident that that would be the choice I would have to make.

MR. CHAKRAVARTY:  Well, you never have to make -- you have your own will to be able to make whatever choice you want.

THE JUROR:  No.  Right.

MR. CHAKRAVARTY:  I just want to get a sense of whether -- if you thought conscientiously that it was the appropriate thing, that you could cast that vote.

MS. CONRAD:  Objection.  Asked and answered.

THE COURT:  No.  Go ahead.  You can answer it.

THE JUROR:  Yes.

MR. CHAKRAVARTY:  Okay.

MS. CONRAD:  Good afternoon.

THE JUROR:  Hi.

MS. CONRAD:  My name is Miriam Conrad.  I'm one of Mr. Tsarnaev's lawyers.

THE JUROR:  Okay.

MS. CONRAD:  First, let me ask you a little bit.  You work for the school system?

THE JUROR:  I do.

MS. CONRAD:  Were there any events that the school system held either to raise money for victims of the Marathon

bombing or sort of Boston Strong type events that you recall?

THE JUROR:  No, not on -- at our school.

MS. CONRAD:  What about the schools that your children attend?

THE JUROR:  My children attend the school I work at right now.

MS. CONRAD:  But then?

THE JUROR:  But then, no, no.

MS. CONRAD:  Do you know anybody who was present?

THE JUROR:  My ex-husband's cousin was a runner, but I didn't even know that until afterwards.

MS. CONRAD:  How about anybody within the schools?

THE JUROR:  No.

MS. CONRAD:  And did you talk to your kids about the events?

THE JUROR:  Well, my kids are a little bit older.  And we were in Texas for April vacation that year, and we couldn't fly home.  So, yeah, I mean, they understood.  They knew what was happening.  They knew the flights were all canceled and we couldn't get back.

MS. CONRAD:  Were they upset?

THE JUROR:  I don't -- I mean, I wouldn't think it was -- probably not to the extent.  We were on vacation, so they weren't sitting in front of a TV.  They didn't see a lot of the -- you know, it kind of -- it downplayed it a little bit in

that sense for them.  You know, they didn't see a lot of it.

MS. CONRAD:  Do you understand -- I assume you know that one of the people who was killed was an eight-year-old boy.

THE JUROR:  Yes, I knew that.

MS. CONRAD:  As a mother of three sons --

THE JUROR:  Right.

MS. CONRAD:  -- do you have any thought about how you would feel listening to and hearing and seeing evidence about that death?

THE JUROR:  Yeah.  That would be -- I would think that's going to be the hardest part for me.

MS. CONRAD:  Do you think that would make it hard for you to be impartial, listening to the evidence?

MS. PELLEGRINI:  Same objection, your Honor.

THE COURT:  Yeah, sustained, I think.  Up to there it was okay, but --

MS. CONRAD:  Do you think that would affect your decision about the appropriate penalty in this case?

MS. PELLEGRINI:  Objection.

MS. CONRAD:  Your Honor, if I may, Mr. Weinreb asked that exact question in a previous --

THE COURT:  The problem is that it asks both permissible effect and impermissible effect.  I assume -- maybe this is a rash assumption, but I assume that that would be part

of the government's aggravation case.

MS. CONRAD:  Fair enough, fair enough.  Let me try a different question.

If I could just ask you, ma'am, to turn to Question 89.

THE JUROR:  Which page is it?

MS. CONRAD:  I'm sorry.  It's Page 23.

THE JUROR:  Okay.

THE COURT:  You selected 6 on the number scale.

THE JUROR:  Okay.

MS. CONRAD:  Does that reflect that you are slightly more in favor of the death penalty than against it?

THE JUROR:  Oh, isn't that interesting?  I didn't even realize that I did that.  No. I think that I would be right in the middle.

MS. CONRAD:  And that's what you reflected on the next question.

THE JUROR:  Right because, I mean, I just --

MS. CONRAD:  You also said -- well, strike that.

Let me stick with the death penalty for a second.  You mentioned the guidelines, that you would listen to what the guidelines were for the penalty phase --

THE JUROR:  Right.

MS. CONRAD:  -- if you got to that point.

THE JUROR:  Right.

MS. CONRAD:  As Judge O'Toole told you this morning, the penalty phase would include things about the crime as well as things about the defendant.

THE JUROR:  Okay.

MS. CONRAD:  Would you be willing to consider things that have nothing to do with the crime itself, but facts about the defendant, in deciding whether or not the death penalty was appropriate?

THE JUROR:  Not the evidence itself?

MS. CONRAD:  No, not the crime itself.

THE JUROR:  Not the crime itself.

MS. CONRAD:  You would hear evidence, for example -- let me just make this general.  In a death penalty case generally, would you be willing to consider facts about the defendant such as his criminal history, his personal background, childhood, and so forth?

THE JUROR:  Yes.

MS. CONRAD:  The judge also described how you would -- the jury would be instructed to weigh the aggravating factors and mitigating factors.  Do you think that the fact that the death of a child was part of this case would make it difficult for you to weigh both sides before --

MR. CHAKRAVARTY:  Objection, your Honor.

MS. CONRAD:  -- before coming to a decision?

THE COURT:  Sustained.

MS. CONRAD:  On Page 19, Question 74.

THE JUROR:  Yes.

MS. CONRAD:  You said that when you realized when you -- basically, when you realized it was this case, you weren't very happy about it.  Was there anything about that other than the length --

THE JUROR:  Length.  Well, I mean, and the brutality and the gruesomeness of it probably, you know, is my first -- and the length.

MS. CONRAD:  On Page 21, Question 82, you said that you bought a Boston Strong T-shirt for your nephew.

THE JUROR:  Yeah.  He's a cross-country --

MS. CONRAD:  What does that phrase mean to you?

MR. CHAKRAVARTY:  Objection, your Honor.

THE COURT:  Yeah.  I'll sustain the objection to that.  This isn't a discovery deposition.

MS. CONRAD:  Well, your Honor, but I think it's a reflection --

THE COURT:  You can ask about the circumstances if you want.

MS. CONRAD:  Okay.  So can you tell us why you bought a Boston Strong T-shirt for your nephew?

THE JUROR:  My nephew is a cross-country runner, and he originally lived in Boston.  And so, to me, it was more like a Boston thing.

MS. CONRAD:  How old is he?

THE JUROR:  How old is my nephew?  The same age as my oldest.  Nineteen.

MS. CONRAD:  Would the fact that you have children of your own make it difficult for you to be a fair and impartial juror in this case?

MR. CHAKRAVARTY:  Objection, your Honor.

MS. CONRAD:  Your Honor, that's the exact question Mr. Weinreb asked.  I have it in my hand from the transcript.

THE COURT:  Was it objected to?

MS. CONRAD:  I'm sorry?

THE COURT:  Was it objected to?

MS. CONRAD:  No, it was not objected to, but it seems to me -- well, I still think it's a fair question.  It wasn't objected to because it's a fair question.

THE COURT:  Go ahead.  You can answer it.

THE JUROR:  Repeat the question.

MS. CONRAD:  Sure.  Would the fact that you have children of your own, including three boys, make it difficult for you to be a fair and impartial juror in this case?

MS. PELLEGRINI:  I'm going to object to the question being phrased that way because that puts more emphasis, sounds to me, on the gender of the victims, and we get right back to the question of the child.

MS. CONRAD:  I'm tracking what Mr. Weinreb asked.  But

would the fact that you have children of your own make it difficult for you to be a fair and impartial juror in this case?

THE JUROR:  No.  I mean, Mr. Tsarnaev was a child also during this.  Is that what you mean?  Because of him?

MS. CONRAD:  No, I meant more that a victim was a child.

THE JUROR:  No.

MS. CONRAD:  Thank you.

THE COURT:  All right.  We're done.  Thank you very much.  Please leave that there.

We'll take a break.  I think we still have a bunch to go so maybe 2:00.

(Luncheon recess taken at 1:15 p.m.)

(The Court enters the courtroom at 2:10 p.m.)

THE COURT:  Okay?

MR. CHAKRAVARTY:  Your Honor, with regard to the next juror, I think this was somebody who the government thought that there was reason to call him in for the -- to tease out the hardship issue.

THE COURT:  Yup.

MR. CHAKRAVARTY:  So I just wanted to alert the Court to that.

THE COURT:  That's what I had in mind when I suggested it.

19-85

(Laughter.)

MS. CLARKE:  We can take credit for agreeing with you on it.

THE COURT:  Are you ready to agree on it?

MS. CLARKE:  We did.

THE COURT:  Oh, you wanted to see him.

MR. CHAKRAVARTY:  We thought we should just ask him -- so I was suggesting that if you wanted to go straight to that.

THE COURT:  Yes, we will.

MS. CLARKE:  Stop while you're ahead, Al.

THE COURT:  So 489.

THE JURY CLERK:  Juror 489.

(The juror enters the courtroom.)

THE CLERK:  Please be seated right here.  Be sure you speak into the microphone.

THE JUROR:  Okay.

THE CLERK:  Juror No. 489.

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon.

THE COURT:  You've been able to avoid talking about the case with anyone except to tell them you're here?

THE JUROR:  My boss knows, and they understand what's going on with my coming in.

THE COURT:  Have you also been able to avoid any media reports of the case?

THE JUROR:  Yeah, no news, nothing like that.

THE COURT:  Well, you mentioned your boss, so let's talk about that.  Looking at your form, you tell us you're -- I can't quite read the writing.  Maybe you can translate it.  It's on page 10.

THE JUROR:  Yeah, I work for Mattie Volkswagen in Fall River.  Audi dealership, Volkswagen.

THE COURT:  Technician, is that what you say?

THE JUROR:  Technician, correct.

THE COURT:  That's what I was trying to read.

Tell me what you do.

THE JUROR:  Fix and repair automobiles, Volkswagens, Audis, you know, general maintenance.

THE COURT:  Kinds of --

THE JUROR:  Yeah.

THE COURT:  This is a dealership?

THE JUROR:  Dealership, yeah.  New car dealer.

THE COURT:  And let me just ask you how you're paid.  I mean, are you on salary or are you on an hourly wage?

THE JUROR:  No, I'm a flat-rate tech.  I work per vehicle, and we get paid per repair, depending on what I do.

THE COURT:  Give me an example.

THE JUROR:  You bring your car in, it's an oil change, I get 50 time units, which would be a half-hour.  So I get paid a half-hour of my hourly wage.

THE COURT:  I see.  So it is ultimately an hourly wage; it's just --

THE JUROR:  It depends on --

THE COURT:  -- how many hours is not by the actual clock but how many jobs you do and the value that they have on that work?

THE JUROR:  Right.  It would be similar to piecework.

THE COURT:  So tell me about what would happen if you were here for several months.

THE JUROR:  I started -- I tried to discuss that with my boss.  I believe the dealership's going to try to pay me in some way of -- you know, some sort of salary, just if I was gone.

THE COURT:  That sounds a little general.  Can you tell me what you think they mean?

THE JUROR:  They'd give me a paycheck still, paying me for being on jury duty.  I don't know the amount.  I don't know how --

THE COURT:  Do you know -- that's what I was getting at.

THE JUROR:  That I don't know.  My boss hasn't gone over that with me yet.

THE COURT:  But is it fair that you think that they're trying to make it comfortable for you?

THE JUROR:  Yes, my boss -- it's a family-owned

business.  They own one dealership.  They're pretty close-knit.

THE COURT:  Are you related to them?

THE JUROR:  No, I am not.

THE COURT:  So, you know, you're the best assessor of this situation.

THE JUROR:  Yeah.

THE COURT:  We don't want it to be a significant hardship to you financially, but if you think it's not going to be --

THE JUROR:  I don't feel so.  I feel that my work will try to compensate me the best they can, and, you know, work Saturdays and try to make it up the best I can and go from there.

THE COURT:  Do you generally work full time; in other words --

THE JUROR:  Yes, I work full time.

THE COURT:  What does that mean?

THE JUROR:  Monday through Friday and every third Saturday.

THE COURT:  And eight-hour days?

THE JUROR:  Eight to five.

THE COURT:  Okay.  But what I'm hearing from you is you're content to go forward with this process right now?

THE JUROR:  Yeah, I have no problem.

THE COURT:  Okay.  So I'm going to ask you some

questions about things you wrote in the questionnaire --

THE JUROR:  No problem.

THE COURT:  -- to follow up.

Actually, could we have a sidebar?

(Discussion at sidebar and out of the hearing of the public:)

THE COURT:  We off?  Okay.

THE COURT:  All right.  Thanks.

We'll go off sidebar.

(In open court:)

THE COURT:  Would you turn to page 20.  Question 77, near the top, in this question we asked a series of subparts in asking about whether you had formed any opinions about whether the defendant was guilty or not and whether he should receive the death penalty if he is, and you checked "unsure" to each of

those.

Could you tell us what you were thinking, why you made that choice?

THE JUROR:  I don't know any facts, you know, of the case other than slightly what you see on the news.  So how are you going to tell me -- I know I've gotten in trouble -- when I was in high school I got in trouble then and, you know, it was dismissed.  You know, they yelled at me as a dumb kid, you know, not doing anything illegally, terribly wrong.

So you ask me an opinion on a case I don't know any facts, so it's hard to give you a straight answer.

THE COURT:  Okay.  I'm sure you understand that in our criminal justice system a person who is accused of a crime is presumed to be innocent, or not guilty, unless the government proves that he's guilty beyond a reasonable doubt by the evidence at trial.

THE JUROR:  Correct.

THE COURT:  Right?  You're familiar with those principles?

THE JUROR:  Yes.

THE COURT:  A defendant never has any obligation to prove that he's not guilty; it's always the burden on the government to prove affirmatively that he is guilty of what he's charged with.

THE JUROR:  Correct.

THE COURT:  It's not surprising that people have some impressions about what happened in this case from the news coverage and so on and so forth.  If you were a juror in this case, would you be able to put to the side any impressions you have and focus on the evidence in the case and make your decision solely on the basis of what's produced in the trial of the case?

THE JUROR:  Yes.

THE COURT:  Okay.  Do you have any hesitation about that?

THE JUROR:  No.

THE COURT:  We asked about, you know, any connection to the events and so on and so forth.  One of the questions was whether you had participated -- you or anybody close to you had participated in any support activities, you might call them.  And you noted that a good friend has a Boston Strong T-shirt?

THE JUROR:  Yeah, they bought one as a gift for my girlfriend.

THE COURT:  Oh, girlfriend?

THE JUROR:  Yeah, my girlfriend.

THE COURT:  I thought it said "good friend."

THE JUROR:  No, no.

THE COURT:  I hope that's the case too.

THE JUROR:  Yeah.

(Laughter.)

THE COURT:  You gave it to her?

THE JUROR:  I did not.

THE COURT:  Somebody else gave it to her?

THE JUROR:  A girlfriend from work gave it to her.

THE COURT:  On page 23, beginning at Question 88, we asked a series of questions about the death penalty and your attitudes about it.  88 itself is a general question, if you have general views, what are they, and you answered "no."

THE JUROR:  No, it's part of society.  It's part of the law.  If need be, it can be used, if it needs to be, and you go from there.

THE COURT:  Okay.  On the next question we asked you to indicate where you might be on a scale of 1 to 10, with 1 strongly opposed, 10 strongly in favor.  You picked 7, which is a little above halfway --

THE JUROR:  Yeah.  You know, the punishment should fit the crime, and the crime should fit the punishment.

THE COURT:  All right.  The next page, Question 90, we asked you to read the various proposed statements and see if there was one that you thought represented your view.  You selected D.

THE JUROR:  D.

THE COURT:  Would you just review the whole question quickly and just see if that still represents the view you have about the death penalty?

(Pause.)

THE JUROR:  Yeah, it could go either way depending -- you know, you would have to see the facts or something.  If it -- if it needs to be, you know, sentenced, put someone to death, it needs to be done.  You know, I seen, you know, through history classes in school, you know, some things that maybe should have been pressed weren't, and some stuff that -- I think they got it right in most cases that, you know, people that should just be in prison, they are.

So I think every case is going to be different.  And unless you were sitting on the case, how are you going to know the actual -- you know, the facts to make a decision on something?

THE COURT:  You heard this morning I described in brief terms the so-called penalty phase?

THE JUROR:  Yeah.

THE COURT:  Where the government would try to convince the jury that this was an aggravated offense, more serious than --

THE JUROR:  Yes.

THE COURT:  -- other cases, and it therefore deserved the more serious punishment; while, on the other hand, the defense would try to bring out things that mitigated the seriousness, or things about the defendant that might lead you to think that the death penalty was not appropriate and that

life in prison was a better choice.

You heard generally that term?

THE JUROR:  Yeah.

THE COURT:  Would you be able to reserve judgment as to whether the death penalty or life imprisonment should be imposed until you evaluated that penalty phase part of it?

THE JUROR:  I feel so.  I would say yes to that.

THE COURT:  And let me just ask you to go to the bottom of 25 and then the top of 26.

THE JUROR:  Uh-huh.

THE COURT:  First at the bottom of 25 and Question 95, if you found the defendant guilty and you decided that the death penalty was the appropriate punishment for him, could you conscientiously vote for the death penalty?

THE JUROR:  Yeah.  If the punishment -- if everything's found to be true -- you've listed off the charges, that's pretty serious -- if that need be, then that should be done.  I mean, I don't think there's any use or good that would be -- of leaving him in prison if he's found guilty on all them charges.

THE COURT:  Well, let me ask you to go to the top of the next page.  Here we asked kind of the other side of the question:  If you found the defendant guilty and you decided life imprisonment without the possibility of release was the appropriate punishment, could you conscientiously vote for life

imprisonment without the possibility of release?

THE JUROR:  You'd have to know the facts of the story. But, yeah, if he's not found guilty on everything, not all of it --

THE COURT:  I want to be sure you understand that when we're talking about a penalty phase, what has preceded is a phase in which he has been found guilty; in other words, you have already convicted -- you, the jury --

THE JUROR:  Okay.  I didn't quite understand that.

THE COURT:  -- had convicted the person of a crime for which the death penalty is a possibility.

THE JUROR:  Then you'd have to go --

THE COURT:  So he's guilty.

THE JUROR:  Then you'd have to go with the death penalty, then, if he's guilty of all the charges.

THE COURT:  Okay.

THE JUROR:  I misunderstood that.  I'm sorry.

THE COURT:  So your view would be if he is eligible for the death penalty because of his conviction or convictions, then you would tend to automatically impose it?

THE JUROR:  I would think so.  The charges that are being brought forward, I would say yes.

THE COURT:  So you wouldn't be able to evaluate the evidence in what we call the penalty phase?  You'd have your mind made up going into the penalty phase?

THE JUROR:  You kind of lost me there but -- so explain to me how that works.  You get -- I thought once you're found guilty and that was a charge, that was what happened.

THE COURT:  No.

THE JUROR:  Okay.

THE COURT:  In these cases if a person is found guilty of a crime for which the death penalty is possible, there is a second phase to the case.

THE JUROR:  Oh, okay.

THE COURT:  In an ordinary criminal case, if a person is found guilty by a jury of what he's -- what the person's charged with, the judge imposes the sentence.  He looks at what's available for the sentence, listens to the parties, but it's the judge makes up his or her mind as to what the sentence should be.

In a death penalty capital case, that's different. The judge doesn't make the sentence decision.

THE JUROR:  That lands on the jury.

THE COURT:  The jury makes the decision, and it does it in a phase called the penalty phase which follows what would be the first part of the trial in which the question of guilt or not is an issue, okay?

THE JUROR:  Okay.

THE COURT:  So you only get to the penalty phase and consideration of what the appropriate punishment is after the

jury has already concluded beyond a reasonable doubt that the person is guilty of the capital crime, okay?

THE JUROR:  Okay.

THE COURT:  The jury concludes that, then begins the second phase where, as I say, the government presents evidence in support of its urging that there be a death penalty that tends to show -- the government hopes, anyway -- that it is an aggravated case worse than other cases of intentional murder and, therefore, deserves this most serious punishment.

In the same phase the defense will produce what we call mitigating evidence that, taken all together, the events of the crime, the personality and characteristics and so on of the defendant, this is a -- the defense would argue this is not a case for the death penalty and you should understand it because of these mitigating circumstances.

The jury then considers whether there are aggravating factors, whether there are mitigating factors, balances it all together, and then each juror makes up his or her mind what the penalty ought to be in light of all that evidence.

THE JUROR:  Okay.  Now I got it.  I kind of understand better.  Then you'd have to hear all the facts, then, before you could make a decision.

THE COURT:  Right.  I guess -- so here's the question: I think you had been saying you thought it more or less followed from conviction that he should get the death penalty.

THE JUROR:  Yes.

THE COURT:  Now that I've explained again the penalty phase, are you changing that?

THE JUROR:  No, I'd stay probably with the death penalty.  I'd kind of lean more towards it if that's where you think my mindset would be.

THE COURT:  I don't think it should be -- I'm trying to find out where you think it would be.

THE JUROR:  That's what I would say.

THE COURT:  Would you be able to evaluate the evidence or do you think your tendency is so strong towards the death penalty that really it would be hard for you --

THE JUROR:  I wouldn't say I'm that strong towards it that I couldn't look at all the evidence and make a decision from there.

THE COURT:  Well, the real question is:  Could you be -- it's hard to say what you'll do because you don't know what the evidence will be.

THE JUROR:  I understand.

THE COURT:  But the question is whether you're able to give a fair consideration --

THE JUROR:  I'd be open --

THE COURT:  -- of both possibilities with the prospect that, depending on how you're persuaded, you could vote for the death penalty or, if you were persuaded in the other direction,

that you could vote for life imprisonment.

THE JUROR:  I would say I would be open-minded to the possibility either/or.

THE COURT:  Okay.

Follow-up?  Mr. Mellin.

MR. MELLIN:  Good afternoon, sir.  I'm Steve Mellin. I'm one of the prosecutors in the case.  I just want to follow up a little bit with those answers.

I guess what we're trying to drill down to is in order for the jury to get to this phase where the jury would be deciding life or death, the jury would already have found the defendant guilty.  Do you understand that?

THE JUROR:  Yes.

MR. MELLIN:  Okay.  So now the question is:  Would you -- because you found him guilty, would you automatically vote to impose the death penalty before hearing the evidence in the penalty phase, or do you believe you would listen to all of that evidence and decide the appropriate punishment based on that evidence?

THE JUROR:  I'd listen to the evidence first and go from there.

MR. MELLIN:  Okay.  So is there anything in kind of your -- as you sit here today -- you believe would make you automatically impose either punishment in that penalty phase?

THE JUROR:  No.

MR. MELLIN:  Okay.  Now, understanding that when you get to this penalty phase the jury would have already found the defendant guilty or a defendant guilty -- we'll take you out of this case and just kind of generally, okay?

THE JUROR:  Okay.

MR. MELLIN:  A jury would have already found the defendant guilty of a capital offense, like the killing of someone else, okay, would you be able to keep your mind open to listen to all of not only the government's aggravating evidence but also the defendant's mitigating evidence before you decided what the appropriate punishment would be?

THE JUROR:  I feel I could do that.

MR. MELLIN:  Okay.  Do you have any hesitation in saying that?

THE JUROR:  No.

MR. MELLIN:  Okay.  All right.

Thank you, your Honor.

MS. CLARKE:  Good afternoon.  My name is Judy Clarke. I'm one of Mr. Tsarnaev's lawyers.

How are you?

THE JUROR:  Good morning.  Or good afternoon maybe now.  There's no clock.

MS. CLARKE:  It does seem like morning to you.  You've been locked in a room.

Let me go back to your job very quickly.  I think we

were all concerned about whether you would be paid while you were on jury duty if you were selected.  Is that the policy of the group, to give paid leave for jury duty?

THE JUROR:  I don't know if it would be a policy. We're a small dealer.  It's a family-run, you know, dealership. I just, you know, had a small discussion with my boss if I was to be on it, how it would go.  She said they would work out something, you know, to help take care of me if I was gone for an extended period of time.

MS. CLARKE:  And was there any discussion about the case itself when you had that conversation?

THE JUROR:  No, they asked me just, you know, where I was, and I had to give them a paper that they give you at the door, you know, about coming into court.  But they didn't ask any questions on what happened or what was really going on.

MS. CLARKE:  And are they aware you could be on jury duty for three or four months?

THE JUROR:  I made them aware.  I told them that was a possibility.

MS. CLARKE:  And no conversation about what the case was or what it was about?

MR. MELLIN:  Objection.  Asked and answered.

THE COURT:  Well, no, I want to make sure I understand that.

Did they know it was this case?  Eventually.  Maybe

not the first day you came --

THE JUROR:  Maybe not the first day.

THE COURT:  They know now?

THE JUROR:  I think they understand now that it's potentially this case.

MS. CLARKE:  Okay.  Can I take you back to page 20, Question 77?

THE JUROR:  Yes.

MS. CLARKE:  And that was the series of "unsures" --

THE JUROR:  Yes.

MS. CLARKE:  -- on the opinion?

Have you ever had an opinion about guilt or penalty in this case?

THE JUROR:  Not really.  I mean, I don't know -- other than what I seen on the news of, you know, that day while stuff was going on, I don't know any real facts about it.  I haven't really looked into it.  We were told not to, so...

MS. CLARKE:  Well, that was after you got there.  But before you came on January the -- whatever that date in January was you came, had you formed an opinion?

THE JUROR:  Not really.  I mean, I'm not paying attention to the news that closely.  I knew something happened in Boston, you know, but other than someone telling me, I didn't know on my own.

MS. CLARKE:  Had you formed any opinion as to the

penalty that should be imposed in this case?

THE JUROR:  No.

MS. CLARKE:  Have you talked to anybody about that?

THE JUROR:  Not really.  I mean, I work in a dealership.  Usually we're talking cars and, you know, motor stuff.

MS. CLARKE:  Volkswagens?

THE JUROR:  Volkswagens, you know.

MS. CLARKE:  On page -- Question 88.  Where are we?  Page 23?

THE COURT:  Page 23.

MS. CLARKE:  And I think maybe I just didn't hear your answer to the judge when he asked you what your beliefs about the death penalty were.  And you had some answer other than "no," and I just didn't hear it.

THE JUROR:  What are you asking?  I mean...

MS. CLARKE:  Or maybe I didn't hear the question right.  Do you have any views on the death penalty in general?

THE JUROR:  It's used, if need be, in our society.  It's part of, you know, the way our culture works, I think, here in the United States.  You do a crime, you get punished.

MS. CLARKE:  And when you answered "no" on 88, what were you thinking?

THE JUROR:  You know, I'm not for it, against it or, you know, in that sense.  I don't have -- like, you know, I'm

not picketing in the lines out in front of a jail saying it shouldn't be used.

MS. CLARKE:  You're not picketing one way or the other?

THE JUROR:  Yeah.

MS. CLARKE:  You don't have strong views about it but you have some views about it, it sounds like.

THE JUROR:  Yeah.  If it needs to be used, it should be used.  You know, if it's not needed, it shouldn't be.

MS. CLARKE:  And can you tell us when, in your opinion, it needs to be used?

THE JUROR:  Well, if you're found guilty of, you know, terrorism or killing people, you know, intentionally, you know, to cause chaos, then maybe yeah.

MS. CLARKE:  So I guess what we've all been trying to get at is it sounds like if you found a person was guilty of terrorism or intentional murder --

THE JUROR:  Yeah.

MS. CLARKE:  -- then that would mean that they should get the death penalty?

THE JUROR:  Yeah.

MR. MELLIN:  Objection.  It's not a fair question, your Honor.

THE COURT:  Well, okay.  I understand the context of the answer.

MS. CLARKE:  And I guess where we come down to -- and it's okay.  I mean, all we want to know is how you feel about it.  There's no right or wrong answer to this question at all.

So the question is:  If somebody is found guilty in such a circumstance, would you automatically impose the death penalty?

THE JUROR:  Well, that's hard to say.  You don't have the facts of the case.  I mean, if it needs to be used, it will be used, but you're asking me to make a judgment on nothing.

MS. CLARKE:  No, I guess what I'm really trying to explore with you is when you say the punishment should fit the crime, what do you mean?  It sounds like --

THE JUROR:  Well, if you go rob a store and you steal 50 bucks, you shouldn't be sent to death.  But if you go around with a gun and go into an open theater and you kill 100 people, then the punishment would fit the crime.

MS. CLARKE:  So in a circumstance where there is an intentional murder with no excuse, is that a case that you would automatically think the death penalty is the appropriate punishment?

MR. MELLIN:  Objection.

THE COURT:  No, go ahead.  You can answer that.

THE JUROR:  I would say it's a possibility, I mean, if all the factors are there, you know.

MS. CLARKE:  And when you say "if all the factors are

there," what are you talking about?

THE JUROR:  If a person's mentally ill or they're pushed by, you know, other people, then it might not be -- it might be helpful to question that person than sentence him to death.  You know, keeping him in jail, you might be able to ask him what went on than, you know, getting rid of that person.  But I'd feel that, you know, it would need to be enforced if those factors weren't there.

MS. CLARKE:  If those factors weren't there.  In other words, if it was a deliberate, intentional murder without a defense, I mean, such as somebody who's insane, which is what I'm hearing you say, then what I'm hearing you say is that means that you would impose the death penalty?

MR. MELLIN:  Objection.  It's misleading.

THE COURT:  Yeah, sustain the objection to that question.

MS. CLARKE:  When you say the death penalty -- let me just take a look at page 25, Question 93.  Do you see where you say "The death penalty is needed sometimes but a person in prison can answer questions," can you help us understand what you meant by that?

THE JUROR:  Well, it depends on the case.  You know, you might be able to get useful information out of somebody in a prison to understand why they did it, and maybe if you can prevent it from happening again, it would be useful to have

someone in prison. But I can understand why it might not be helpful at all to -- you wouldn't bring closure to the people that were hurt by it, so the sentence of death might be better for society than it would be to just leave somebody in jail.

MS. CLARKE: I think you said at one point -- and I guess this is just sort of our interest in figuring out where your head is at on the death penalty. I think you said at one point if you're guilty or you're found guilty of these charges, then the death penalty would be appropriate. There's no use leaving you in prison. Can you help me -- did I get that right?

THE JUROR: I don't know if you got it word for word, but if you're found guilty and that's the appropriate, you know, means to an end, then, yeah, I would think it would be the proper course of action.

(Counsel confer off the record.)

MS. CLARKE: Thank you very much.

THE COURT: All right. Thank you. Just leave those there. We'll put them together.

THE JUROR: Uh-huh.

(The juror exits the courtroom.)

THE COURT: 490.

THE CLERK: Juror 490, please.

THE JURY CLERK: Juror 490.

(The juror enters the courtroom.)

THE CLERK:  Please come forward.  Be sure to speak into the microphone.

THE JUROR:  Sure.

THE COURT:  Good afternoon.

THE JUROR:  Hi.

THE COURT:  Since you were last here, have you been able to follow my instructions not to talk about the substance of the case with people?

THE JUROR:  Pretty much, yes.

THE COURT:  Is there a qualification?  I know you have to tell people where you're going and --

THE JUROR:  That's about it.  Yeah, that kind of stuff, right.

THE COURT:  Not the merits of the case or anything?

THE JUROR:  No.

THE COURT:  And how about avoiding, as much as you could, media accounts of the case?

THE JUROR:  Yeah, I haven't read very much.  I pretty much skim most of the articles I read in the paper.

THE COURT:  Okay.  Have you been seeing articles about this?

THE JUROR:  Not that much.

THE COURT:  You manage a significant retail store?

THE JUROR:  It's a Macy's.  It's a department store.

THE COURT:  Yeah.  And I guess tell us generally what

your job duties are.

THE JUROR: Pretty much I'm the store manager. It's, you know, one of our stores. It's in Warwick, Rhode Island. I pretty much help run the business.

THE COURT: Let me ask you to turn to page 20, Question 77. In this multiple-part question we asked whether, based on things you'd seen or read at the time you filled out the questionnaire, you'd formed an opinion about whether the defendant was guilty, and, if so, whether he should receive the death penalty. And you checked "yes" to both of those questions, right?

The question went on then to ask if you answered yes to any of the questions, would you be able or unable to set aside your opinion and base your decision about guilt and punishment solely on the evidence that will be presented to you in court, and you checked "able." Do you see that?

THE JUROR: Yes.

THE COURT: Can you explain what you were thinking when you said that?

THE JUROR: Well, basically what I meant was from all the media that I'd seen at the time and footage, it appeared that he was guilty, from what I had seen. And that as a result should he receive the death penalty that was charged, I felt yes. But then again I hadn't seen all of the evidence. So then the question obviously was, if there was some evidence,

would I listen to the evidence and make decisions based on that? And I said yes, I would.

THE COURT: Okay. I'm sure you understand that in our criminal justice system a person who's accused of a crime is presumed to be not guilty, or innocent, unless and until the government proves that he's guilty by the evidence at trial and proves it beyond a reasonable doubt.

THE JUROR: True.

THE COURT: Right? You're familiar with those concepts?

THE JUROR: It sounds a little backwards what I said, I know, yeah.

THE COURT: So what we ask jurors to do is to put aside things they may think about the case from other sources. And it's understandable in this case people have some ideas about those matters. But to put them aside and pay attention to the evidence in the case and confine their attention to that evidence and see what that means in terms of the charges in the case. Do you think you could do that?

THE JUROR: I could, yes.

THE COURT: On page 21 would you look at Question 81. You report -- this is about how people in your family or close to you may have been affected by the events. And the second part first was that your daughter's school, I guess, was cancelled --

THE JUROR:  Correct.

THE COURT:  -- that Friday?

THE JUROR:  Right.

THE COURT:  That was not a school vacation week for her school?

THE JUROR:  No.  No.

THE COURT:  I'm more interested in the first line. Your son's math teacher was hurt in the bombing?

THE JUROR:  Correct.

THE COURT:  Is this somebody you know personally?

THE JUROR:  I don't know real well.  It's a teacher. You go to parent-teacher councils and things like that, so I'd seen him through that.

THE COURT:  Is this a person who was his teacher at the time or who is now his teacher?

THE JUROR:  It was his teacher at the time.

THE COURT:  Okay.  Is he in the same school now?

THE JUROR:  Yes.

THE COURT:  And is the teacher still there?

THE JUROR:  Yes.

THE COURT:  Do you know what the nature of the injury was?

THE JUROR:  I know he was in the hospital for a couple of days.  You know, it was sort of head and on his face.  But I know he's better.  He went back to teaching there so...

THE COURT:  Have you talked with the teacher about his experience?

THE JUROR:  No, I didn't really ask questions about that.

THE COURT:  Is it -- I imagine it's generally known in the school that he --

THE JUROR:  Yeah, obviously.  An email was sent to the parents, pray for them and all of that.  It's a Catholic school.  And yes.

THE COURT:  And in Question 82, it looks like you made a relatively substantial donation to the One Fund?

THE JUROR:  I did.

THE COURT:  Do either of the matters that you set forth in -- or any of the matters, I guess I should say, that you set forth in Questions 81 and 82 give you any concern about your impartiality in the case?

THE JUROR:  Not really because, honestly, I pretty much consider myself a person of integrity and honesty, and facts are facts.

And that's -- relatively speaking too, that's a pretty consistent donation we would make for a lot of different charities and things.

THE COURT:  Okay.  Beginning on page 23 at Question 88 we asked a series of questions to try to get at jurors' views about the death penalty, if any.  Question 88 was whether you

had -- whether you had general views about the death penalty, and if you did, what were they.  And you wrote "none."

THE JUROR:  Let me read the question.  You mean just the fact that I could have written I support it or something like that?  I just didn't give it --

THE COURT:  So, I mean, you don't have to stick with that answer if you think it needs amplification.  I mean, do you have any policy, moral or views or anything like that about the death penalty or not?  I mean, you don't have to have them. I just --

THE JUROR:  No, I feel obviously in certain situations you should have the death penalty.  This just the kind of way I look at it.

THE COURT:  Okay.  And actually, you placed yourself relatively on the favor side of the 10-point scale that we gave you there, correct?

THE JUROR:  Right.

THE COURT:  Is that an accurate --

THE JUROR:  I would say so.

THE COURT:  On Question 90 on the next page we asked you to see if there was a statement that best expressed your views.  You selected F.  Would you just take a minute to look at all of the options and see if that still is, in your view, an accurate statement of your views?

(Pause.)

THE JUROR:  I'd say E or F.

THE COURT:  E or F?

THE JUROR:  Correct.

THE COURT:  And what is it about those choices that --

THE JUROR:  Well, obviously, like I said -- I mean, if the -- the facts are the facts.  I'm not going to disregard facts if I'm making a decision.

THE COURT:  Right.  So let me just -- you heard me this morning describe in sort of general terms what the so-called penalty phase of the trial would be?  This is a phase that occurs, of course, only after someone has been convicted of a capital crime; that is, a crime for which the death penalty is authorized, right?  So the jury has already convicted the person of a crime.

And then the penalty phase commences, and the jury will be presented additional evidence not about whether the person is guilty or not but about what the sentence should be.  Should it be the death penalty, which is authorized, or should it be life imprisonment without the possibility of release, which is authorized.  And the jury will be asked to decide that ultimate question, what should the penalty be, after an assessment of all the evidence that's been produced in the so-called penalty phase.

If you're at that stage, having found the defendant guilty of a qualifying crime, would you be able to have an open

mind and evaluate the evidence in either direction or would you have a tendency in one direction or another -- and perhaps as indicated in your selections here, would you have a tendency to go into that phase thinking that the death penalty was the right punishment?

THE JUROR:  I mean, it's hard to say, but probably.

THE COURT:  You probably would?

THE JUROR:  Yes.

THE COURT:  Okay.

MR. MELLIN:  Good afternoon, sir.

THE JUROR:  Hi.

MR. MELLIN:  I'm Steve Mellin.  I'm one of the prosecutors on the case.

Let me just follow up on what you said.  You said -- in answer to Judge O'Toole's last question, you said you would probably lean towards the death penalty.  Is that what you're saying?

THE JUROR:  Yes.

MR. MELLIN:  Can you expand on that?  Why do you say that?

THE JUROR:  Well, again, you know, without hearing all the evidence and going through everything, it's hard to say exactly.  But my thought process there was if the person's guilty and then we're trying to decide -- you know, then that person could be given the death penalty -- and that's one of

the things, then I would assume that -- I guess unless I heard all the information, I'm not understanding it -- potentially why you would not at that point, I guess.  You know, that's what I'm just trying to figure out.

MR. MELLIN:  Right.  Well, you've heard the judge now twice kind of explain that before the jury would get to the sentencing phase, there would be a determination of guilt by the jury.  Do you understand that?

THE JUROR:  Correct.

MR. MELLIN:  Okay.  And so it's only if the jury finds the defendant guilty of one of these capital offenses that you then go to the penalty phase, right?

THE JUROR:  Right.

MR. MELLIN:  Are you with me so far?

THE JUROR:  Right.

MR. MELLIN:  And then it's in the sentencing phase where the government puts on more evidence of why we believe the death penalty is appropriate.  Do you understand?

THE JUROR:  Right.

MR. MELLIN:  And then the defense has the opportunity at that time to put on evidence as to why they believe life imprisonment is appropriate.  Are you with me?

THE JUROR:  Uh-huh.

MR. MELLIN:  You have to say "yes" or "no" for the court reporter.

THE JUROR:  Oh, yes.

MR. MELLIN:  Okay.  So the question is:  As you go into that phase, are you going to be -- would you immediately vote to impose death, or would you listen to all of that evidence before you decided what the appropriate punishment is?

THE JUROR:  I mean, I would obviously listen to the evidence.  But as I said in my -- I would probably lean towards the death penalty going into that phase.

MR. MELLIN:  All right.  Thank you.

MR. BRUCK:  Good afternoon.

THE JUROR:  Hi.

MR. BRUCK:  Hi.  My name is David Bruck, and I'm one of Jahar Tsarnaev's lawyers, and I've got a few more questions, if that's okay.

MR. MELLIN:  I believe we're in agreement.

MR. BRUCK:  I'm sorry?

MS. CLARKE:  We're in agreement.

MR. BRUCK:  Oh, very good.  Sorry.

I guess I don't have any questions.  Thanks.

THE COURT:  All right.  Thank you, sir.  Just leave the form there and we'll put it back together.

THE JUROR:  Thank you.

(The juror exits the courtroom.)

THE CLERK:  Juror 499.

THE JURY CLERK:  Juror 499.

(The juror enters the courtroom.)

THE CLERK: Please be seated right up here. Just make sure you speak into the microphone.

THE JUROR: Yup.

THE COURT: Good afternoon.

THE JUROR: Good afternoon.

THE COURT: Since you were last here, have you been able to avoid talking about the merits of the case with anyone?

THE JUROR: Yes.

THE COURT: Have you also been able to, as much as possible, avoid any media accounts about the case?

THE JUROR: Yes.

THE COURT: Okay. Tell us a little bit about your employment, what you do, what it entails.

THE JUROR: Yeah. I work for the Commonwealth of Massachusetts, the Division of Insurance. I review financial statements of domestic insurance companies.

THE COURT: Is this part of the regulatory function of the division?

THE JUROR: It is. It is, yes.

THE COURT: What's the process, just generally speaking?

THE JUROR: They file statements quarterly, financial statements, and we pretty much monitor for solvency.

THE COURT: Okay. And you've been doing that for

almost 20 years, it looks like?

THE JUROR:  Just about.

THE COURT:  Okay.  You told us -- this is Question 34 on page 12 -- that your sister is in the Boston Police Department.  Has been for, I guess it looks like, about ten years?

THE JUROR:  Correct.

THE COURT:  Tell us a little bit about what you know about her work or assignments and so on.

THE JUROR:  She works out of East Boston.  I think she's in patrol.

THE COURT:  Obviously this is a case that involves the Boston police, and there will probably be a lot of Boston police witnesses.  Does the fact that your sister is a member of that department give you any concern about your ability to be a fair judge of the evidence in the case?

THE JUROR:  No, sir.

THE COURT:  No?

THE JUROR:  No.

THE COURT:  We'll do a quick sidebar.

(Discussion at sidebar and out of the hearing of the public:)





THE COURT:  All right.  Anything else?

MR. CHAKRAVARTY:  No.

THE COURT:  All right.  We'll go off sidebar.

(In open court:)

THE COURT:  Let me ask you to go to Question 77 on page 20.

MR. CHAKRAVARTY:  Your Honor, I think we're okay.

THE COURT:  Okay?  Let me just ask you to explain your answer there.  We asked if you had opinions about the -- whether the defendant was guilty or not, and mostly you answered "unsure."  Could you just tell us what you were thinking?

THE JUROR:  Well, I guess it was tough to develop an opinion whether he was -- I'm sorry.

I guess it was difficult to develop an opinion without any evidence.  I mean, to suggest he was guilty before trial just doesn't make any sense to me.

THE COURT:  Okay.  Okay.  Thank you.

(The juror exits the courtroom.)

THE CLERK:  Juror 503.

THE JURY CLERK:  Juror 503.

(The juror enters the courtroom.)

THE CLERK:  Please come forward.  Have a seat right

19-124

here.  Be sure to speak into the microphone.

THE JUROR:  Sure.

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon.

THE COURT:  We're going to follow up on some of the answers you gave to the questions in the questionnaire.  Let me first ask:  Have you been able to avoid discussing the substance of the case with anyone since you left here?

THE JUROR:  I have.

THE COURT:  And also to avoid media accounts about the case?

THE JUROR:  Yes.

THE COURT:  I want to ask you to turn to -- I guess it's page 15.  You wrote a rather extended answer to Question 50 which asks what court cases have you followed with interest, and you said principally this one?

THE JUROR:  Correct.

THE COURT:  And then you explained why, and that recalled your actual participation in some of the occurrences around the time of the event.

THE JUROR:  That is correct.  I ran the local command center at the hospital that I'm employed by during the -- you know, during this time period.  There was an issue with regard to the University of Massachusetts - Dartmouth and local law enforcement being coordinated by the Dartmouth police, the

state police, and even the New Bedford police had interaction with our hospital.

They had asked us to stand up and prepare operating rooms, have enough emergency department staff onboard because there was concern with regard to substances that they were uncertain that they might find when they raided the dormitory and an apartment complex that was also located in Dartmouth where there was a U-Haul truck or some kind of a van that was parked outside the home of acquaintances.  And there was concern that there might be explosives or other substances in there.

So my job was to make sure that our facility was at a level of emergency preparedness where we could respond if anybody was injured.

THE COURT:  So you were fairly actively involved that week in events that emanated, I guess, from the bombing events?

THE JUROR:  Yes, sir.

THE COURT:  Do you think that that would affect you as a juror if you were the juror in this case?

THE JUROR:  I think it -- I think it reinforces my perceptions with regard to the case.  So I do think it has an impact.

THE COURT:  What do you mean by reinforces your perceptions?

THE JUROR:  My perceptions of how I put together the

account from exposure to the media, whether it be in the *Globe* or the *Times* or the *Post* or GBH or BUR.  Everything that I've heard as well as my experiences that day lead me just to have an opinion with regard to this.

THE COURT:  Right.  So let's look at that.  Page 20.

THE JUROR:  Sure.

THE COURT:  In Question 77 -- I think you may have been referring to this -- we asked you whether you had some opinions, and you said you did have an opinion that he was guilty --

THE JUROR:  That's correct.

THE COURT:  -- and so on.

And that's what you were just referring to?

THE JUROR:  That's correct, sir.

THE COURT:  And do you think it would be difficult for you to forget what you know from your own participation and look only at the evidence in the case, or do you think you could do that?

THE JUROR:  I think my views and perspectives are slightly tainted by what I experienced while on duty.

THE COURT:  Yeah.  Okay.  Thank you.

THE JUROR:  Thank you, sir.

(The juror exits the courtroom.)

THE COURT:  This next juror answered a number of questions private, so I think we should just start out that way

and find out what that is.  So this will be sidebar.

MR. BRUCK:  Just a very private person.

(Discussion at sidebar and out of the hearing of the public:)

THE CLERK:  Juror 504.

THE JURY CLERK:  Juror 504.

(The juror enters the courtroom.)

THE CLERK:  Please be seated over here.  Be sure to speak into the microphone.

THE COURT:  Good afternoon.

THE JUROR:  Hello.

THE COURT:  That's the questionnaire you had when -- you filled out when you were here before, okay?  Let me just ask you:  Have you been able to avoid talking about the substance of the case since you were last here?

THE JUROR:  Yes.

THE COURT:  And have you been able to avoid, as much as you can, any exposure to media coverage of the case?

THE JUROR:  Yes.  There have been cases where I would see a headline scrolling through, but I opted not to click on the article.

THE COURT:  Yeah.  Okay.  That's what we asked you not to do.



MR. BRUCK:  We're satisfied, your Honor.

THE COURT:  Okay?

MR. MELLIN:  Yes.

THE COURT:  All right.  Thank you, sir.

THE JUROR:  Thank you.

(The juror exits the courtroom.)

THE COURT:  We'll go off sidebar?  Back onto the...

(In open court:)

THE CLERK:  Juror 505.

THE JURY CLERK:  Juror 055.

THE CLERK:  Please come forward.

(The juror enters the courtroom.)

THE CLERK:  Be seated right here.  Please be sure to speak into the microphone.

THE JUROR:  Sure.

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon.

THE COURT:  Let me just ask at the beginning, since you were last here have you been able to avoid talking with anybody about the substance of this case?

THE JUROR:  Yes.

THE COURT:  Any exposure to media stories about the case that you couldn't avoid?

THE JUROR:  No.  You know, I don't read the newspaper, so if it's on the news on my TV I usually walk away.  I don't research it.

THE COURT:  Thank you.

So that's the questionnaire that you completed when you were last here.  I want to follow up on some of the things in it.

You tell us that currently, I guess, you're a sales associate for a retail store?

THE JUROR:  Yes, I am.

THE COURT:  And what's your normal workweek like?

THE JUROR:  I usually work 30 to 40 hours a week and varied hours, day and night.  It's not a set schedule.

THE COURT:  We explained earlier in the questionnaire that the schedule we're going to follow would be a nine-to-four, Monday-through-Thursday?

THE JUROR:  Uh-huh.

THE COURT:  And you indicated, when we asked whether that would be a substantial hardship, that it would not be.  Do you think that that's still the case?

THE JUROR:  Financially it would be a hardship, but that aside, the hardship that I feel bothers me is I have two 18-year-olds that are graduating from high school in May.  And I am concerned or -- you know, just worried that I will not be available to them except in the evening.  And I'm not sure that I need to be, exactly, but that's -- you know, I'm thinking about them more than anything.

THE COURT:  When is -- do you know precisely when --

THE JUROR:  It's Sunday, May 30th, I believe they graduate.

THE COURT:  It's fairly late in May.

THE JUROR:  Yes.

THE COURT:  But there probably would be things running up to that?

THE JUROR:  Well, some things.  But some things are in the evening, of course.  They're very active in school, of course, so they have banquets and breakfasts, you know, and awards and all.  So I was just thinking about that today.

And my son has two hockey games left to play for varsity high school, and one is tomorrow.  And I was just really glad that it wasn't today.

THE COURT:  Okay.  Let me come back to the financial

aspect.

THE JUROR:  Uh-huh.

THE COURT:  You said it would have some impact there. Can you give us a sense of how serious that is?

THE JUROR:  Well, my husband was out of work for five years.  He started working again in 2012, I guess.  2012.  And in that time we ended up having to file bankruptcy, okay?  And then it's been very difficult to pay our mortgage.  I mean, we pay but we're not -- that's hard.  So whatever money I make is -- you know, I put to my kids and food, usually.

THE COURT:  I guess what I'm --

THE JUROR:  So we're not --

THE COURT:  Outside the sort of nine-to-four schedule here, Monday through Thursday, you would have some -- I presume some working time available?

THE JUROR:  Right.  I would.

THE COURT:  And so it wouldn't be a 100 percent loss. I guess I'm trying to figure out what percent it would be.

THE JUROR:  I'm not sure, you know, exactly, because the hours are given out depending on the week and how busy it would be.  I mean, it's all programmed that way.  So I wouldn't know how many nights I could work.  I probably could work every weekend, though.

THE COURT:  Okay.

MS. CLARKE:  Your Honor, I think the parties are okay.

THE COURT:  Okay.  All right.  Thanks.

THE JUROR:  Okay.

(The juror exits the courtroom.)

THE COURT:  I think that's it for today in terms of the interviews.

MS. CLARKE:  Yes.

THE COURT:  Quarter to four okay?

MS. CLARKE:  That should do it.

MR. BRUCK:  We may need less than that.

(The Court exits the courtroom and there is a recess in the proceedings at 3:14 p.m.)

(The Court enters the courtroom at 3:53 p.m.)

(Discussion at sidebar and out of the hearing of the public:)

THE COURT:  Okay.  446?

MR. CHAKRAVARTY:  Your Honor, the government has a motion.

Your Honor, the government contends that this juror is substantially impaired from imposing the death penalty.  And unlike in some other cases where the issue of whether a person opposed to the death penalty can find some daylight in which some circumstances they can weigh mitigating and aggravating factors in order to arrive at a decision, that wasn't the issue with this juror.  The issue with this juror was can this person under any circumstances impose the death penalty, not just

intellectually arrive at the decision to impose the death penalty.

And the Court put it best when you explained it to her, that distinction, and she got it. She understood the emotional versus the -- excuse me -- the intellectual versus that emotional distinction. And her words were that she -- she couldn't deal with it. That was made evident, clear again when I asked her; it was made evident in the questionnaire in which she said, "I am not sure." She stuck by that answer. And she never gave any confidence that she would ever be able to impose it.

In fact, she came up with an example somewhat analogous in which she says, "I would like to think I would run into a burning building," but she's not sure that -- in this case she said she's not sure that she would. She was not sure she would make the decision to even do that.

And given that in the context of the juror being perhaps the most anxious juror we have seen, visibly shaking -- I would say anxious, perhaps even emotional -- that the absence of her ever saying that she could under any circumstances -- even when I think the defense tried to kind of open that possibility, her idea of she wanted to leave the door cracked open a little bit was a purely theoretical exercise.

And for that reason we say she's substantially impaired.

MR. BRUCK:  We don't think this juror is close.  She is a remarkably thoughtful juror and talked about the thought she'd given to this after coming to court.  I thought the burning-building analogy was a really marvelous explanation for what is wrong with requiring people to tell us ahead of time what they're going to do.

She had a real understanding of what's involved in this case, unlike some other jurors we'd seen.  And she said over and over again there could be circumstances where it could be appropriate.  "I'd have to be really convinced."  She's talking about doing it.  "You'd have to make a powerful case.  I'm opposed to the death penalty, but I would leave the door open."

In response to the Court, in response to the government, in response to the one question that Ms. Conrad asked, every time she said she would do it if it was a strong-enough case.

This is a juror who should not only not be disqualified but can't be under *Wainwright v. Witt*.

THE COURT:  I think she's fine.  I had, you know, some of the same impressions that Mr. Bruck just referred to in terms of her intelligence and thoughtfulness.  I think there's a difference between being not sure and being not open to the prospect, and I think she is open to the prospect.

471 and 478 I think were agreed.

480?

MR. BRUCK:  No motion.

THE COURT:  No motion?

481?

MR. CHAKRAVARTY:  That's a government motion.  I don't know if you --

MR. BRUCK:  No argument.

THE COURT:  Okay.  482 I think we --

MS. CLARKE:  Agreed.

THE COURT:  -- excused.

487?

MR. BRUCK:  No motion.

THE COURT:  489?

MR. BRUCK:  The defense has a motion to disqualify this juror on two grounds.  The first has to do with his economic situation.  And I think it really bore out that the Court's intuition was correct but in a way that we haven't seen before, which is his very surprising indication that this small car dealership has basically offered to pay his way so that he can be a juror in this case, knowing which case it was.

That doesn't prove anything but it certainly raises a cloud of concern, that in effect given the notoriety of this case and the powerful feelings that it has aroused, that the people he works for have basically said:  You be our juror.  Go get him.  We can't ever prove that.  We don't know who they

are.  But it is so odd that a small dealership would basically pay a salary for someone who works on piecework so that he could be a juror for four months on a case of this nature.

So I think all by itself that is enough cause for concern to justify his disqualification.  It's another one of those we have 1370 people, why take the chance.

But on top of that, this is a juror whose ability to consider -- meaningfully consider life imprisonment is substantially impaired.  We don't say that he absolutely closed the door on it, but that's not the standard.  This juror to begin with said if the person was convicted of all those crimes, then -- he said, "There's no use leaving him in prison if he's guilty of all those charges."  He said several times he would impose the death penalty upon conviction.

The Court very, very patiently and repeatedly explained the process to him, at which point he did go to the sort of mantra of "I would consider all the evidence."  But we never really got away from the concept that considering the evidence for him meant considering the evidence of guilt.

He said, "Well, if he was mentally ill," which again sounds like if he wasn't guilty by reason of insanity or pushed by people, that was as close as he ever came to saying he could consider mitigation.  His idea of a case for life is where you could get information out of the person by questioning him.  And then he even pulled that back by saying "but that wouldn't

help the victims," or words to that effect.

This is just not a -- "If you are guilty of terrorism or killing people intentionally to cause chaos," was his example of when he would always impose the death penalty. Well, that's this case, or at least it seems to be his view of it.

The government's attempt to rehabilitate got him only as far as saying that he would listen to the evidence of mitigation; not that he would consider it. And that's as close as we ever came.

All of these things -- you know, again, you have to make a judgment call obviously based on conflicting and uncertain evidence. This is -- this juror is at the other end of the scale from the Juror 446 we just discussed in terms of his intelligence, his awareness of the -- of what is really at issue. And, you know, "Why leave him in jail if he's guilty?" This is the way this person thinks about it.

It is conceivable that despite everything that we've heard there lurks within this juror the ability to do his job at the penalty phase, but it has not been demonstrated with the reliability that this -- solemnity this issue requires.

You combine that with the somewhat odd circumstances by which he is financially able to serve, and on balance we think this juror should be disqualified.

MR. MELLIN:  Your Honor, we completely disagree.  As

to the hardship, your Honor asked him numerous questions about his situation at the dealership.  He explained the situation that they have.  Mr. Bruck is asking the Court to ignore his answers about what he was told by his employer about whether or not he was being paid.  He said he had talked to them; they said they would compensate him.  So I don't really think there is any issue whatsoever unless we're going to now start to question the actual statements made by jurors based on what they are told by their employers.

Regarding the death penalty, he was clear in his questionnaire.  Question 90, he selected D.  "I am not for or against the death penalty.  I could vote to impose it or I could vote to impose a sentence of life imprisonment without the possibility of release, whichever I believed was called for by the facts and the law of the case."  That was in his questionnaire.  Again, on Questions 95 and 96, he said "yes" to both of those, indicating he was open to both punishments that might be appropriate.

It was obvious when he was first asked questions by your Honor he was confused about the process, which is not surprising given the fact that he's a layman who is a service technician at a VW dealership.  He is not a lawyer and doesn't have these questions asked of him every single day.  Once he was explained the process and reinstructed by your Honor about how the process works and the fact that there will be two

phases, it was obvious at that point a light went off in his head, and it was clear that his answers from that point forward showed that he would be willing to carefully consider all of the evidence before he came to any conclusions.

He, in fact, listed two mitigators when answering one of the questions, two of the mitigators the defense will be looking at and asking the jury to consider in this case, mental health and whether someone else pushed him into it.  Those are going to be precisely the themes they're going to harken upon in their penalty phase presentation.  And this lay juror said, "These are the types of things that I could consider as mitigators."

So given that, your Honor, and his answers, I think it was very clear he would be able to consider the case-by-case analysis and decide the case based on all of the evidence.

THE COURT:  I'm not satisfied that he's qualified for this case.  I had the same concern about eagerness that Mr. Bruck was referring to, again, not an answer to that, but it's a concern.  I have sort of a different -- maybe it's because of my role in the process -- a different concern about him, and that's whether he's instructable.

I don't know -- based on the way he answered the questions, coming firmly on both sides of the issue on occasion, I'm not sure he has the ability to follow the instructions that will be fairly complex in this case.  So I

don't think this is -- so I will grant the cause excuse for him.

I've forgotten on 490, whether we excused him.

MR. BRUCK:  We did.  I think all the remaining jurors were excused.

THE COURT:  I remember the remaining three were, but I couldn't remember on him.

MR. BRUCK:  Yeah, 490 we abandoned the questioning.

MR. MELLIN:  He leaned towards death.

THE COURT:  Right.  Okay.

We will -- Jim and I are going to caucus about the next upcoming numbers.  I will say this:  I've looked through -- a little bit ahead here.  There are a lot of problems, it seems to me.  And I know you've been agreeing on things.  I just -- we'll produce the range, but take a good look at it.  First of all, I think -- I'm not sure what the exact numbers are.  I think we started with 25 and we got down to 14 for today?

MR. McALEAR:  We had 24, we got down to 16, down to 13 before we actually --

THE COURT:  Yeah, that's what it was.  So I think we're going to raise the gross and hopefully do a little bit better productivity-wise when it comes down to them because some of them -- just for example, I think in the next 20 or so, there are at least half a dozen 1A's.  Now, that doesn't mean

that we shouldn't ask them about it, but I think we should ask them first about it, and if they're not budgeable -- but I think it's -- there's a -- somebody like that -- there are some on the other side as well, you know, death penalty is the only thing for this fellow.  Those people, again, we can spend a little time with them, but we shouldn't want to do a lot.  And so I think we can be more productive with others who may be more in the zone and so on and so forth.

So I just say that because we'll give you the range, and take a look and see if maybe there's some agreement you can come to on people that's not worth bringing in.

Some people have multiple problems.  We're running into a very interesting problem, which I'm sure you've noticed, is we have people who tend to, you know, look like they're sort of hostile to the defendant until you get to the last questions, and then they turn out that they can't pull the lever for death penalty, you know?  So it's really an interesting straddle.  They even say some aggressive things about him but then they say, "But of course I'm not going to sentence him to death."

Anyway, so I think we're going to shoot for a gross of 30 and see what we end up with.  Maybe it will be closer to the 18 or 20 that we hope to actually get through.

MS. CLARKE:  Judge, we had submitted jointly at least an initial cut.

THE COURT:  Yes.  And I -- for this group and into tomorrow's group, which I don't remember exactly where -- I think I went up to 520 in my -- looking forward.

MR. McALEAR:  523.

THE COURT:  Okay.  I'm not basically going to second-guess the joint reductions in this way most -- not out of principle but out of efficiency.  In fact, I'm sacrificing some principle to do that.

(Laughter.)

MS. CLARKE:  We appreciate your confidence in us.

THE COURT:  But I would like you to perhaps consider some of mine as well.  It turned out I was right for the wrong reason perhaps with 489.  But anyway, okay.

MR. CHAKRAVARTY:  Your Honor, one scheduling issue.  I think you may have suggested what we're doing for Thursday.  Is it eleven o'clock we planned to --

THE COURT:  11:30, I think.

MR. CHAKRAVARTY:  11:30?

MR. BRUCK:  So that should be a slightly smaller group, I would think.

THE COURT:  Yeah, we'll have to adjust for that, although we got started about eleven o'clock today.  But we're going to have them on Thursday -- the jurors will come in at their regular time.

MS. CLARKE:  They'll be ready and happy.

THE COURT:  Right.  I don't know.

But anyway -- so the delay -- as I understand it, the Court of Appeals proceeding should be over by quarter to eleven, probably, but we're lending them the equipment, and so it has to be disassembled and brought back down.  So that's why we picked 11:30.

MS. PELLEGRINI:  Your Honor, speaking of equipment on Thursday, I wasn't sure that the Court was aware I had spoken with Mr. Lyness that we're going to come in at eight-thirty just to set up, but then we'll move a monitor so we can test it on the system that will work.

THE COURT:  Okay.  I wasn't aware of it but --

MS. PELLEGRINI:  Okay.  Are you all right with that?

THE COURT:  -- if you planned it through Paul, that's fine.

MS. PELLEGRINI:  Great.

MS. CLARKE:  So should we wait for you?

MR. McALEAR:  You guys don't have to wait here.  I'll meet with the judge, and I'll send the list as soon as I get back to my desk.  That's probably the most efficient way.

(The Court exits the courtroom and the proceedings adjourned at 4:11 p.m.)

C E R T I F I C A T E

We, Marcia G. Patrisso, RMR, CRR, and Cheryl Dahlstrom, RMR, CRR, Official Reporters of the United States District Court, do hereby certify that the foregoing transcript constitutes, to the best of our skill and ability, a true and accurate transcription of our stenotype notes taken in the matter of Criminal Action No. 13-10200-GAO, United States of America v. Dzhokhar A. Tsarnaev.


/s/ Marcia G. Patrisso
MARCIA G. PATRISSO, RMR, CRR
Official Court Reporter

/s/ Cheryl Dahlstrom
CHERYL DAHLSTROM, RMR, CRR

Date:  2/17/15