UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,        )
                                 )
        Plaintiff,               )
                                 )    Criminal Action
v.                               )    No. 13-10200-GAO
                                 )
DZHOKHAR A. TSARNAEV, also       )
known as Jahar Tsarni,           )
                                 )
        Defendant.               )
                                 )

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

**<u>JURY TRIAL - DAY TWENTY</u>**

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, February 18, 2015
10:04 a.m.

Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

APPEARANCES:

        OFFICE OF THE UNITED STATES ATTORNEY
        By: Aloke Chakravarty and Nadine Pellegrini,
        Assistant U.S. Attorneys
        John Joseph Moakley Federal Courthouse
        Suite 9200
        Boston, Massachusetts  02210
        - and -
        UNITED STATES DEPARTMENT OF JUSTICE
        By: Steven D. Mellin, Assistant U.S. Attorney
        Capital Case Section
        1331 F Street, N.W.
        Washington, D.C.  20530
        On Behalf of the Government

        FEDERAL PUBLIC DEFENDER OFFICE
        By: Miriam Conrad, Federal Public Defender
        51 Sleeper Street
        Fifth Floor
        Boston, Massachusetts  02210
        - and -
        CLARKE & RICE, APC
        By: Judy Clarke, Esq.
        1010 Second Avenue
        Suite 1800
        San Diego, California  92101
        - and -
        LAW OFFICE OF DAVID I. BRUCK
        By: David I. Bruck, Esq.
        220 Sydney Lewis Hall
        Lexington, Virginia  24450
        On Behalf of the Defendant

P R O C E E D I N G S

(The venire enters the courtroom at 10:04 a.m.)

THE CLERK:  All rise for the Honorable Court.

(The Court enters the courtroom at 10:05 a.m.)

THE CLERK:  Be seated.

THE COURT:  Good morning, everyone.

THE JURORS:  Good morning.

THE COURT:  We are continuing the process of selecting a jury for the case of the United States versus Dzhokhar Tsarnaev.  As you know, Mr. Tsarnaev is charged in connection with the bombing that occurred near the finish line of the Boston Marathon on April 15, 2013, and that resulted in the deaths of three people.  He's also charged in the death of an MIT police officer and other offenses occurring on April 18 and 19, 2013.

Some, but not all, of the crimes charged are by statute potentially punishable by death.  You will recall from my prior instructions that the trial jury will first consider and decide whether the government has proved Mr. Tsarnaev's guilt of any or all of the charges against him.  If he is convicted of any of the capital crimes, that is, crimes potentially punishable by death, then the jury will consider and decide whether he will be sentenced to death for any such crime or to life in prison without the possibility of release.

You may have wondered why the death penalty could be a

possibility in this case in view of the fact that Massachusetts laws do not provide the death penalty for murder, or for any other violation of Massachusetts law.  The answer is that this is a federal case involving alleged violations of the laws of the United States rather than a state case involving violation of Massachusetts law.

If the jury convicts Mr. Tsarnaev of any of the capital crimes charged in the indictment, the same jury then will hear additional evidence and decide whether to sentence him to death or to life in prison without the possibility of release.  Because the jury that is selected to decide the defendant's guilt or innocence will also decide his punishment if he's convicted of a capital crime, it is necessary to question jurors about your feelings and beliefs about the death penalty as part of the process of selecting a jury.

Let me explain briefly the procedures that must be followed in a case in which the death penalty is or may be at issue.  As in any criminal trial, initially the government will have the burden of proving that Mr. Tsarnaev is, in fact, guilty of any crime with which he is charged.  If he is convicted by the jury of a crime for which the death penalty may lawfully be imposed, there will be a second phase of the trial, usually referred to in shorthand as a penalty phase.

In the penalty phase the government will introduce evidence that seeks to prove beyond a reasonable doubt, first,

that the defendant acted with sufficient intent to be subject to the death penalty; and, second, that aggravating factors about the killings or about the defendant justify sentencing him to death.

Aggravating factors are circumstances that if proven make the crimes particularly serious or blameworthy, therefore under the law may justify imposing a more severe sentence on this defendant than on other persons convicted of intentional murder or killing.  The government bears the burden of proving any alleged aggravating factors to every juror beyond a reasonable doubt.

The defense will have the opportunity to present evidence of what it will argue are mitigating factors. Mitigating factors are usually circumstances about the crime or crimes or about the defendant's background or character that would suggest that the death penalty is not the appropriate sentence in the case or that life in prison without the possibility of release is adequate to punish the defendant.

Unlike the proof of aggravating factors, a mitigating factor must only be proved by the greater weight of the evidence.  That is a less demanding standard of proof than proof beyond a reasonable doubt.  Again, unlike the proof of aggravating factors, mitigating factors do not have to be proved to the satisfaction of all 12 jurors.  Any juror who finds or determines that a mitigating factor has been proved by

a greater weight of the evidence may consider that factor in deciding the appropriate sentence in the case regardless of whether any or all of the other jurors agree that that mitigating factor has been proven.

After the parties have made their presentations during the penalty phase, the jury will weigh all the evidence. Before a jury could vote to impose the death penalty, every juror would have to be persuaded that certain threshold factors that make the defendant potentially subject to the death penalty had been proved beyond a reasonable doubt.  In addition, in order to impose the death penalty every juror would have to be persuaded that any proven aggravating factors sufficiently outweigh any mitigating factors found by any juror or jurors to justify a sentence of death.  Even if the jury did not find any mitigating factors in the case, it would still have to be unanimously persuaded that any proven aggravating factors were themselves sufficient to justify a death sentence.

You should understand that a jury is never required to find that a sentence of death is justified.  The decision whether the government has proved that a defendant should be sentenced to death ultimately must be made by each juror himself or herself.  If, however, every juror is persuaded that the death penalty should be imposed, I would be required as the trial judge to sentence the defendant to death; in other words, I could not change the jury's decision.  The jury, and not the

judge, is responsible for determining whether a defendant who has been convicted of a capital crime will live or die.

What I've just described is only an overview of the law applicable to the jury's consideration of the death penalty. If you're selected to serve on the jury and if you find the defendant guilty of a crime or crimes punishable by death, I will give you very detailed instructions concerning your duties about deciding whether to impose the death penalty or life imprisonment without the possibility of release and the law that must be followed in making that decision.

As I told you when you filled out your questionnaires, there are no right or wrong answers to any of the questions that you've been asked or that you will be asked. We ask them because both the government and Mr. Tsarnaev are entitled to a jury that does not have its mind firmly made up one way or the other before hearing the evidence and a detailed explanation of the law. That applies both to whether Mr. Tsarnaev is guilty or not guilty of the specific crimes that are charged in the indictment, and if he's convicted of a capital crime, whether he should be sentenced to death or to life in prison without the possibility of release.

So today we're going to question each of you individually about some issues that are relevant to the selection process. In a moment we're going to ask you to return to the jury room and await your turn. We'll have you

come in one by one and we'll ask you some questions.

In addition to the lawyers and their staff, there will be a few other people present in the courtroom during the process. The proceedings are being simultaneously transmitted by video and audio to other courtrooms where there are other people who may be watching and listening.

We will not identify you by name but by number, and you will be seated so that the video camera will be behind you. Your answers will be generally public, but if you believe a truthful answer would require you to reveal sensitive personal information, we will temporarily stop the audio transmission to those other courtrooms so that people observing there will not hear your answer.

Again, we do not expect or want any particular answer to any questions. All we want and what the law expects is that you provide accurate and truthful answers to the questions you will be asked. If you do that, you will be doing your duty as a citizen and as a juror no matter what the answer may be.

I want to remind you about something I told you before. Of course a jury's verdict must be based on the evidence produced at trial and must be free of outside influence; therefore, I remind you again it is extremely important that you do not discuss the case, including the jury selection process, with your family, friends, each other, or any other person until you've been excused or, if you're

selected, until the case concludes.  And again, of course, you're not to conduct any independent research into the issues, either online or otherwise, and we ask you to avoid reading, watching or listening to any reports about the case in the media.

When you completed the questionnaires, we asked you and you did sign the questionnaires under the statement you were making truthful answers under the pains and penalties of perjury.  For this purpose we will now administer a similar oath or affirmation, and the clerk will do that by asking you to rise.

THE CLERK:  Will the jurors please rise and raise your right hand.

(The venire is duly sworn.)

THE COURT:  All right, jurors.  Thank you.  We'll ask you to withdraw, and we appreciate your patience while we complete this process.

(The venire exits the courtroom at 10:16 a.m.)

THE COURT:  Before we have the first juror, I just wanted to mention -- I'm sure you noticed -- one of the jurors didn't complete the form.  We had this happen once before where it was apparent that the juror had apparently just skipped, turning two pages.  It's less clear this was accidental, but my thought was -- it's Juror 534.  My thought was to ask Jim or someone to ask him to complete it and to sign indicating that

he completed it.  He can be doing that while we begin the process.

MS. CLARKE:  Yes.

(Pause.)

████████████████████████████████████

████████████████████████████████████

MR. CHAKRAVARTY:  That's the government's position, your Honor.

MS. CONRAD:  May I have one moment, please?

THE COURT:  I'm sorry?

MS. CONRAD:  May I have one moment, please?

THE COURT:  Sure.

(Counsel confer off the record.)

MS. CONRAD:  Your Honor, we have no objection to excusing him.

THE COURT:  It looks like he actually said that in the form but it didn't get picked up.

MR. CHAKRAVARTY:  Yes.

THE COURT:  Okay.

THE CLERK:  507.

THE JURY CLERK:  Juror 507.

(The juror enters the courtroom.)

THE CLERK:  Sir, over here, please.  Have a seat. Keep your voice up and speak into the mic so everyone around you can hear you, okay?

THE JUROR:  Okay.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  Since you were last here, have you been able to avoid discussing the substance of the case with anyone?

THE JUROR:  Yes.

THE COURT:  And also as much as you're able, to avoid any media coverage of the case, right?

THE JUROR:  Yes.

THE COURT:  That's the questionnaire you filled out when you were last here, and we're going to follow up with some questions about some of the answers you gave there, all right?

THE JUROR:  Yes.

THE COURT:  I want to start with your employment or unemployment situation.  You indicate you're not currently employed?

THE JUROR:  Currently I'm not working right now.

THE COURT:  And I guess you haven't for a while?

THE JUROR:  Yes.

THE COURT:  How are you getting along?

THE JUROR:  I'm helping my sister.  She owns a barber shop.

THE COURT:  Okay.  Are you looking for work?

THE JUROR:  Yes.

THE COURT:  Would -- so the -- you know the schedule

of the case is Monday through Thursday, nine to four, and on that schedule we think it may take -- it could take up to three or four months possibly to try.  Would that interfere with your search?

THE JUROR:  No, it wouldn't.

THE COURT:  No?

You had -- you served on a jury once before in the state?

THE JUROR:  Yes.

THE COURT:  Do you remember when that was?

THE JUROR:  I think it was August -- no, March 7th.

THE COURT:  Of?

THE JUROR:  2014.

THE COURT:  Just last year?

THE JUROR:  Yeah, last year.

THE COURT:  And what was the court?  Where were you?

THE JUROR:  It was in -- oh, where was it?  I can't remember right now.

THE COURT:  Okay.  So let me ask you to look at page 20, Question 77 near the top of the page.

THE JUROR:  Yes.

THE COURT:  In this question we asked whether, based on things you'd seen or read in the news or had information about from any source, you'd formed an opinion about whether the defendant was guilty or not and whether he should receive

the death penalty or not.

THE JUROR:  Okay.

THE COURT:  Do you see that?

THE JUROR:  Yeah.

THE COURT:  And it's Parts A, B, C and D of the question?

THE JUROR:  Yes.

THE COURT:  And you checked "unsure" to each of those.

Can you tell us what you were thinking when you made that selection?

THE JUROR:  How can I say this?  I guess -- how can I say this?

THE COURT:  Let's just start with the first question. In Part A it asks whether you had formed an opinion about whether the defendant is guilty, and you said "unsure."

THE JUROR:  Yes.  Like I say, he's innocent until proven guilty.

THE COURT:  Okay.  You recognize that that's obviously a principle that we have --

THE JUROR:  Yes.

THE COURT:  -- in our justice system, and that when somebody's accused of a crime, that's the default position. They're innocent unless they're proven guilty, and it's the burden of the government to prove somebody guilty beyond a reasonable doubt by the evidence at trial.  You know that?

And I guess the trial you served in was a criminal trial?

THE JUROR:  Yes, it was.

THE COURT:  You had that responsibility in that case?

THE JUROR:  Yes.

THE COURT:  This case has had a lot of media coverage from the time it happened, and so it's not surprising if people have some ideas about the case from things they've seen or heard.  What we would ask a juror to do is to put those things aside and to focus on the evidence in the case and to make a judgment only on the basis of what's presented in the course of the trial.

Do you think you'd be able to do that?

THE JUROR:  Yes, I would be able to do that.

THE CLERK:  You have to speak into the mic so everyone can hear you.

THE JUROR:  I'm sorry.

THE COURT:  Why don't you repeat your answer so everyone can hear you.

THE JUROR:  I would be able to do that, yes.

THE COURT:  Let me ask you, if you'd look at the bottom of the page, Question 80, we asked if you or anybody you knew of or was close to you had witnessed the marathon bombings personally.

THE JUROR:  Yes, I have.

THE COURT:  And you said you have a friend who, I guess --

THE JUROR:  His wife was running in the marathon and he was there.

THE COURT:  Where was he?

THE JUROR:  I don't remember what part he was.  All he told me that he heard a big bang and he got scared and started looking for her.

THE COURT:  Okay.  Did he find her?

THE JUROR:  Yeah, he found her.  Yes.

THE COURT:  Have you talked with him extensively about that or briefly or --

THE JUROR:  No, not really.

THE COURT:  Just -- how do you know about it, I guess?  He must have described it to you.

THE JUROR:  Well, I met him because I play in a league with him, and that's when he told me.

THE COURT:  When was it with relation to the marathon?  Shortly afterwards, a while afterwards?

THE JUROR:  I'm going to say probably like a week.

THE COURT:  Okay.  What do you do with him?  You play --

THE JUROR:  Pool.  In a league, pool.

THE COURT:  Pool?  Shooting pool?

THE JUROR:  Yes, in a league.  Sorry, sorry.

THE COURT:  Okay.  So you met him, you know, when your league was playing and he told you about it?

THE JUROR:  Yes, he told me about it.

THE COURT:  Have you talked about it since then with him?

THE JUROR:  No.

THE COURT:  How close a friend is he?

THE JUROR:  I've known him for nine years.

THE COURT:  Through the pool or otherwise?

THE JUROR:  Oh, no, otherwise.  From a long time ago.

THE COURT:  If you'd turn to the next page, Question 82, we asked whether you or people around you had taken part in any of what we may call support activities afterwards, you know, Boston Strong T-shirts or contributions to the One Fund and so on.  And you said yes, they have.  Can you tell us what you were indicating there?

THE JUROR:  How can I say this?  I know -- who was it? My sister, she -- I forgot the fund-raiser.  I forgot the name. She helped support a few of them.  I'm trying to think.

THE COURT:  Okay.  Did you yourself contribute to or participate in any of the activities?

THE JUROR:  No.

THE COURT:  Do you reside with your sister?

THE JUROR:  Not really.

THE COURT:  No?  Okay.

If you'd turn to page 23, beginning at Question 88 we asked a series of questions about attitudes about the death penalty. 88 itself asks if you had any views about the death penalty in general, what are they, and you said, "I don't have any views on the death penalty."

Is that a fair statement of your attitude?

THE JUROR: Yes, it is.

THE COURT: We then asked you in the next question to see if you might indicate on a scale of 1 to 10 where you might be in terms of being opposed or in favor. You selected Number 7.

What do you think that -- how does that place you on a scale, do you think?

THE JUROR: I would say if it came down to it, I would say yes.

THE COURT: Okay. Let's look at the next page. Question 90 was a long question. If you want -- actually, why don't you just take a minute to review that question and then we'll talk about your answer there.

THE JUROR: (Complies.)

THE COURT: Okay?

THE JUROR: Yeah.

THE COURT: So you selected D?

THE JUROR: Yes.

THE COURT: "I'm not for or against the death penalty.

I could vote for it," or you could vote for life imprisonment, whichever you thought was called for by the facts and the law in the case?

THE JUROR: Yes.

THE COURT: Now do you think that represents your --

THE JUROR: My answer? Yes.

THE COURT: So you heard me describe what we call the penalty phase today, and the government will produce what it will characterize as evidence of aggravating factors and the defense will produce mitigating and you'll weigh all that. And are you telling us you are prepared, depending on your evaluation of that evidence, to vote in either direction?

THE JUROR: Either direction, yes.

THE COURT: Either for the death penalty or for life imprisonment?

THE JUROR: Or life in prison, yes.

THE COURT: If you'd go to the bottom of page 25, Question 95, we asked if you found the defendant guilty and decided that the death penalty was the appropriate punishment, could you conscientiously vote for the death penalty, and you said "not sure." And then if you look at the next page at the top, we asked the other side of that question: If you found the defendant guilty and decided that life imprisonment without possibility of release was the appropriate sentence, could you vote conscientiously for that penalty, and you said "yes."

THE JUROR:  Yes.

THE COURT:  So there's a little bit of a difference between --

THE JUROR:  Yeah, I see that.

THE COURT:  Can you tell us about that?

(Pause.)

MR. BRUCK:  Your Honor, the parties are satisfied with this juror.

THE COURT:  I would like to see if...

(Pause.)

THE JUROR:  I will say at the time I was -- I would either decide life imprisonment or death penalty.

THE COURT:  Okay.  All right.  Thank you.

THE JUROR:  Yup.

(The juror exits the courtroom.)

MS. CONRAD:  Judge, could we have a quick sidebar on this next juror, 512?

THE COURT:  I have 508.

THE CLERK:  508.

MS. CONRAD:  Oh, I'm sorry.

THE CLERK:  508.

THE JURY CLERK:  Juror 508.

(The juror enters the courtroom.)

THE CLERK:  Ma'am, over here, please, if you would.  Have a seat, make sure you keep your voice up and speak into

the mic so everyone can hear you.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  Since you were last here, have you been able to avoid discussion of the merits of the case or substance of the case?

THE JUROR:  As much as possible until I found out that you were seating for this jury.

THE COURT:  Yeah.  So have you -- since you were here --

THE JUROR:  Right.

THE COURT:  -- have you talked about --

THE JUROR:  No.

THE COURT:  -- the substance of the case with anyone?

THE JUROR:  No.  No, I'm sorry.

THE COURT:  And avoid media coverage as well?

THE JUROR:  Yes, as much as I can.

THE COURT:  Have you had some occasions when it's come to your attention?

THE JUROR:  Yeah, like when you're on the smartphone or you're watching the news, then it pops up.  But I try to avoid it.

THE COURT:  Put it away or go in the other room or whatever?

THE JUROR:  Put it away, yes.

THE COURT:  So that's the questionnaire, and we're going to follow up on some of the things you told us in the questionnaire.

I want to start with your employment and -- well, let's just start there.  Tell me what you do.

THE JUROR:  I'm a program administrator for a defense contractor in Cambridge.  They do research and development.  They're mainly an engineering firm.

THE COURT:  Okay.  If you want to look at page 5, Question 10, you were concerned -- because your employment is your source of income and so on and you were concerned about serving on a long case like this and how it would affect you.

THE JUROR:  Right.

THE COURT:  Have you talked about that with your employer?

THE JUROR:  No, I haven't.  But I did look up the policy for serving on a jury, and it's just -- they pay me for three days and that's it.  So I wouldn't get paid for sitting on the jury.

THE COURT:  And you haven't followed up with that?

THE JUROR:  No, I haven't.

THE COURT:  Have you talked to coworkers or anything?

THE JUROR:  No.  Well, I mentioned it to coworkers if I got seated, and everyone's looked up the policy and they agree with me it would just be the three days they would pay

me, and that's it.

THE COURT:  So I would gather, then, that long service would be detrimental?

THE JUROR:  It could be an issue, yes.

THE COURT:  Thank you.  That's all I have.

(The juror exits the courtroom.)

THE COURT:  Hold on a minute.

THE CLERK:  Off the record?

THE COURT:  I guess so.

THE CLERK:  Cut.

(Discussion at sidebar and out of the hearing of the public:)

MS. CONRAD:  This is not the -- this is the juror's daughter, her Facebook page, and it's dated April 19, 2013.  It says, "Hey, Dzhokhar Tsarnaev, we going to find you" with a picture.  And then underneath it says, "Not doing anything productive today.  Blaming it on fear and staying in #get the SOB."  So at least I think it's something to ask her about.  I certainly am fine with the Court asking, but I believe she is on Facebook with her daughter.  We've got her Facebook page which shows her daughter as one of her friends.

So presumably it's -- she's seen -- oh, the daughter also had -- I'm sorry -- a second one which is a video of people celebrating in the streets of Watertown after the capture.  So I can hand that one up as well.

But I think that one is more concerning, that -- this one is more sort of what was going on; this expresses an affect towards the defendant.

MR. MELLIN:  That's fine, your Honor.  The Court can ask her if she's aware of this and just leave it -- or pursue it based on what her answer is.

THE COURT:  Yeah.  I'm not a Facebook user, so I'm not familiar with the mechanics.  So what does it mean that it's --

MS. CLARKE:  Good time to learn.

(Laughter.)

MS. CONRAD:  So the mechanics are if you're friends with somebody and they post something, you will see that unless you have blocked them.  Unless you've blocked their feed.  So this would have --

THE COURT:  You can see it.

MS. CONRAD:  You will see it.  It will feed into your Facebook feed.  You'll basically just get -- I can actually show you from what her Facebook page looks like.

Whenever someone you're friends with posts something, unless they're blocked, it will appear on your Facebook feed.

THE COURT:  Okay.  This is going to be inept, but like a mailbox kind of thing or like a billboard that you can't avoid?

MR. BRUCK:  Exactly.

MS. CONRAD:  It's like a billboard that you can't

avoid unless you block them.

THE COURT:  Is there a way of -- well, okay.

MS. CLARKE:  I think you have a future with Facebook.

THE COURT:  I don't think so.

MS. CONRAD:  This is the juror's Facebook page that shows the daughter as a friend.  So I can hand that up as well.

MR. CHAKRAVARTY:  So, your Honor, the government doesn't object to asking questions about this stuff.  We think it's completely irrelevant, obviously, but why not explore it while the juror is here.

Just to clarify, though, what you have been given is a Twitter, which is a different vehicle altogether.

MS. CONRAD:  Oh, I'm sorry.  You're absolutely right.  That is a Twitter; it's not Facebook.  On her Facebook is one that is the video celebrating after the Watertown capture.  I stand completely corrected.  I guess it shows what I know.  But Mr. Chakravarty's right; it is Twitter.

So I don't know if the mother -- in order to see a Twitter feed, the mother would have to actually follow her on Twitter, and I do not know if the mother follows her on Twitter because I think for one thing you can't really tell -- well, I guess if we went to her Twitter -- I don't know if the mother has a Twitter account.  That would be the easiest way of finding out.

MR. CHAKRAVARTY:  The other thing I would say about

the Facebook security settings is there are a variety of communication tools on Facebook. There are chat messages, just as you would through some other vehicle; there's effectively an email-type function; there's a wall that is open to whoever you've given security access to; and then what Ms. Conrad refers to is you get updates from all of the people that you have befriended if you set your security settings to consume those updates.

Typically what happens is there's a name, it says Al Chakravarty, and you will see that this person has updated their account. And then you can hover, I believe, over their account and it will expand. And then depending on your software and where you're viewing it from, you can go through and scroll through whatever those updates are.

So the point being that people can be friends. You don't automatically have total information and awareness of everything about what's in someone else's Facebook account.

THE COURT: I guess that's what I was getting at before. I mean, there's an operation that you have to do to get the full access?

MR. CHAKRAVARTY: Right.

MS. CONRAD: Well, to get access -- no. Well, I'm not sure -- this is Twitter. I'm not sure how relevant the Facebook stuff is now that I've been reminded that it was on Twitter. And apparently ███████- -- excuse me. Strike that.

Juror 512 does not have a Twitter account, according to her, and we didn't locate one. So the Twitter feed may be irrelevant. The Facebook may still be relevant, but it's less of an issue, I think, given the content.

But when -- you get a time -- you have a timeline. When somebody, a friend posts on their timeline, then you get a notification that that person has posted on their timeline and you see what that is unless you have blocked them or unfriended them.

THE COURT: So where are we now?

MS. CONRAD: Well, I think I would like to just ask generally whether she's discussed the bombing with her friend -- with her family, for example, and see, you know, what comes out of that. But I just think the fact that the daughter has publicly tweeted about -- in that form is something to explore. And I just want the Court -- if the Court wants to ask about it, that's fine; otherwise, I would like some leeway to follow up.

THE COURT: Okay.

MS. CONRAD: Thank you.

MR. CHAKRAVARTY: I think this was the Facebook -- is this for the Court?

MS. CONRAD: Yeah, just to sort of see that she's Facebook friends -- if you look at the left-hand column it says "friends," and then it says 181, whatever the number is, middle

left, and then there's pictures, and her daughter is listed there.

THE COURT:  And does the -- this just connects them, right?

MS. CONRAD:  Right, exactly.

And that's the daughter's Facebook.

THE COURT:  Okay.

MR. BRUCK:  And it may be relevant that the juror answers "none" to Question 81, any family members that were affected, where it indicates that her daughter, at least, sheltered in place.

THE COURT:  Okay.  All right.

THE CLERK:  We're on.

(In open court:)

THE CLERK:  Juror No. 512.

THE JURY CLERK:  Juror 512.

(The juror enters the courtroom.)

THE CLERK:  Ma'am, over here, please.  Have a seat.

THE JUROR:  Thank you.

THE CLERK:  Be sure you keep your voice up and speak into the mic, okay?

THE JUROR:  Sure.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  Since you were last here, have you been

able to avoid any discussion of the substance of the case with anyone?

THE JUROR:  I have.  Yes, I have.

THE COURT:  And as much as possible avoid media accounts?

THE JUROR:  Yes.

THE COURT:  Okay.  You have the questionnaire that you filled out.  We're going to follow up on some of the things you've told us.

THE JUROR:  Okay.

THE COURT:  Let me start with the nature of your work, your employment.

THE JUROR:  Yes.

THE COURT:  What do you do?

THE JUROR:  I'm a materials manager.

THE COURT:  What's that mean?

THE JUROR:  I coordinate all the material for -- I work for a computer integration system and we do -- build computers.  And so I need to order all the material for our customers.

THE COURT:  Okay.  In -- I'm on page 10.  At the bottom, 29, and 30 on the next page we asked about social media.

THE JUROR:  Yes.

THE COURT:  And there's a slight difference in the two

questions.  I think 29 is more getting at things that you post or blog and so on.  And you said you'd post messages on Facebook.  Can you give us an idea of --

THE JUROR:  I'm very limited with my Facebook.  I just started to use it.  And it was mostly for family -- just to see pictures and stuff of family.  If I post a message, it's just usually where I'm at.  But I don't do it on a regular basis. I'm not savvy enough for Facebook.

THE COURT:  You said about once a month?

THE JUROR:  Yeah, if that.

THE COURT:  And then 30 is, I think, more -- a broader question, I guess.  And it just says if you use social media please list all the social media you use and how frequently. So this says Facebook three or four times a week.  That's --

THE JUROR:  I log on.

THE COURT:  -- viewing other people's things?

THE JUROR:  Correct.

THE COURT:  Do you use any other --

THE JUROR:  I do not.

THE COURT:  Instagram, Twitter, anything like that?

THE JUROR:  I do not.

THE COURT:  Do you remember -- you remember, I presume, the events of the marathon day and so on?

THE JUROR:  Yes, I do.

THE COURT:  And that week?

THE JUROR:  Yeah.

THE COURT:  Did you exchange messages or postings or anything with people during that time that you remember?

THE JUROR:  I did not.

THE COURT:  Were you using it then?

THE JUROR:  Very little.  I had just started to log onto an account with Facebook at the time, yeah.

THE COURT:  Do you remember whether you used it that week at all?

THE JUROR:  I didn't use it at all that week.  The only information or experience that I had with it was just what was on television.

THE COURT:  Okay.  At the bottom of page 11, Question 33, we asked about connection with -- actually, we were getting at law offices, but we have a question about connection with law enforcement.  You gave us a couple of law enforcement people there.

THE JUROR:  Yes.

THE COURT:  A sister-in-law and brother-in-law are in the Baltimore Police Department?

THE JUROR:  Yes, they are.

THE COURT:  Can you just tell me a little bit about that?

THE JUROR:  Yes.  My sister-in-law has moved up to the rank of lieutenant there.  She was rated the top one there of a

group of about 100.  So she's a lieutenant there.  And my brother-in-law, who's her husband, is a sergeant in the police department as well.

THE COURT:  Okay.  Would that have any -- your relationship with those officers have any effect on your ability to be an impartial juror in a criminal prosecution?

THE JUROR:  No, because we see them just a few times a year.  It's not like I talk to them on a regular basis.

THE COURT:  I see you've had experience sitting on a couple of jury trials?

THE JUROR:  Yes, I have.

THE COURT:  Can you tell us when those were, if you remember?

THE JUROR:  I don't really know the dates, but there was one in Newburyport.  And that was, I would say, within the last two, three years.  And that was a DUI case there.  And then there was also one in Salem, Massachusetts.  And that was regarding fraud, regarding a lemon law for a car.

THE COURT:  That was a civil case?

THE JUROR:  Yes.

THE COURT:  For damages?

THE JUROR:  Yes.

THE COURT:  And you were the foreperson in that?

THE JUROR:  Yes, I was.

THE COURT:  Okay.  Do you remember when that was?

THE JUROR:  I would say it was probably about ten years ago.  It was a while back.

THE COURT:  Let me ask you to turn to page 20.

THE JUROR:  Sure.

THE COURT:  Question 77 near the top of the page.

THE JUROR:  Yup.

THE COURT:  This is a multiple-part question in which we tried to learn whether you had formed any opinion based on things you'd seen in the media or on TV or from any other source about issues in the case; in particular, whether the defendant's guilty or not and whether he should get the death penalty or not.

You answered "yes" that you had an opinion that he was guilty?

THE JUROR:  Yes.

THE COURT:  And you said you were unsure about the penalty.  Do you see the boxes there?

THE JUROR:  Yes.

THE COURT:  Okay.  Then below that we asked you if you answered yes to any of the questions, would you be able or unable to set aside any opinion you had and base your decision about guilt and punishment solely on the evidence presented to you in court, and you checked "able."

THE JUROR:  Yes.

THE COURT:  Would you tell us about that?

THE JUROR:  I'm a big advocate for data both at my job, gathering the data, and looking at evidence, or the data, in reference to making a decision; I don't base it on other people's opinions or what I've seen in the media.  Even at work, it's mostly data-driven.

THE COURT:  Okay.  So you've had experience in jury trials, and particularly a criminal trial, you know that a defendant who's accused of a crime is presumed to be not guilty unless the government proves that he's guilty by the evidence at trial and proves it beyond a reasonable doubt.

THE JUROR:  Yes.

THE COURT:  You know those principles because you had to deal with them, right?

THE JUROR:  Yes, I have.

THE COURT:  So obviously in a case that gets a lot of publicity, people may have ideas about the matter that they have from seeing things in the news and so on.  What we ask a juror to do is to -- if you have anything in that category, that you can put it away and focus on the evidence that's actually produced in the course of the trial and make a decision based only on that evidence and the body of evidence in the trial.

THE JUROR:  Yes.

THE COURT:  Do you think you'd be able to do that?

THE JUROR:  Yes, I would.

THE COURT:  In Question 82 you -- we asked whether you had participated in any support activities and gave some examples, and you said -- in the end you said you contemplated wearing a Boston Strong shirt.  It looks like you first said you wore one, and then it said you contemplated.  That was just an interesting amendment and I just wanted to know about that.

THE JUROR:  It was.  I used to see them hanging up all the time.  It was the blue shirt with the white Boston Strong -- I mean, the yellow Boston Strong on it.  And I had gone in to Boston a few times with my husband, and I thought that I had purchased one at one point.  But when I recollected, looking at the question again, I didn't purchase one, but I did contemplate on wearing it.

THE COURT:  Anybody else in the family have any of that merchandise?

THE JUROR:  No, no, they do not.

THE COURT:  Anybody in the family affected by the sheltering in place, do you know?  Do you remember at the end of the week people had to stay in because of the police activity?

THE JUROR:  Yes.  There wasn't any family members or anybody that I knew that was affected by that.

MS. CONRAD:  I'm sorry.  I couldn't hear the last part of what you said.

THE JUROR:  There wasn't anyone that I knew that was

affected by that.

MS. CONRAD:  If I could ask you to pull the microphone a little closer.  I'm having difficulty hearing what you're saying.  Thank you very much.

THE JUROR:  No problem.

THE COURT:  Beginning on page 23 at Question 88 we asked a series of questions to try to learn what prospective jurors thought about the death penalty.  And Question 88 is a very general question:  If you have views about the death penalty in general, what are they, and you said, "The death penalty only if it's warranted, if the crime is proven to be of such severity to impose death on the criminal."

Can you tell us a little bit of what you were expressing there?

THE JUROR:  Based on looking at all of the evidence, and if it was a case in reference to being a severe case with the law, in reference to following the law, whether or not it would warrant to impose the death penalty for the criminal.

THE COURT:  Okay.  We asked you to put yourself on a scale from 1 to 10, where 1 was strongly opposed and would never vote to impose the death penalty and 10 was -- as you see from the preamble, reflects a belief the death penalty should be imposed whenever a defendant has been convicted of an intentional murder.  You didn't pick 10, but you came close; you picked 9.

Can you tell us about that.

THE JUROR:  Well, I was strongly in favor of that, but it didn't warrant me to believe it was -- it imposed a 10 on that question.  Again, I guess if the data presents itself to warrant the death penalty, then I would be in favor of that.

THE COURT:  If you turn to the next page, Question 90, we came at it in a slightly different way but this time with various formulations and words, asked you to review them all and then pick the one you thought came closest to your view.  You selected E that said you're in favor of the death penalty but could vote for a sentence of life imprisonment without possibility of release if you believed that sentence was called for by the facts and the law in the case.

Is that an accurate representation of your views?

THE JUROR:  Yes, it is.  Yes, based on the facts and the law in the case, yes.

THE COURT:  So while you're -- I take from that that you're indicating you have sort of a tendency to favor the death penalty in a case but you could be open to considering life imprisonment as an alternative if you thought in the facts of the case that was appropriate?

THE JUROR:  That is correct.

THE COURT:  Okay.  Follow-up?

MR. MELLIN:  Good morning, ma'am.

THE JUROR:  Good morning.

MR. MELLIN:  I'm Steve Mellin.  I'm one of the prosecutors on the case.  I just want to ask you a few questions about the death penalty.

You indicated -- you just said if the data presents itself to warrant the death penalty, then you would consider it.  Is that right?

THE JUROR:  Yes, sir.

MR. MELLIN:  And "the data," I'm assuming you mean the evidence in this case?

THE JUROR:  Yes.

MR. MELLIN:  Okay.  And do you understand from Judge O'Toole's instructions this morning and discussion of how this works that there are two phases to this case:  that there's the guilt phase, and then if the jury finds the defendant guilty of one of these capital offenses, then there's a penalty phase?

THE JUROR:  Yes.

MR. MELLIN:  Okay.  And so understanding that, do you understand that if you get to this punishment phase or the penalty phase where you're deciding between life or death, the jury would have already found the defendant guilty of one of these capital offenses?

THE JUROR:  Yes.

MR. MELLIN:  Okay.  Going into that second phase, given your comments about the death penalty, would you be open to considering life imprisonment even though you've already

found him guilty of one of these capital offenses?

THE JUROR:  Yes, I would.

MR. MELLIN:  Okay.  And at that point would you -- are you going to automatically impose the death penalty or will you listen to the evidence before deciding between life or death?

THE JUROR:  I would listen to the evidence.

MR. MELLIN:  Now, you say that you are in support of the death penalty but in a case -- if you were a juror in a capital case and it came to the point where you as a juror were deciding between life and death and you believed that the evidence supported the death penalty, would you actually be able to vote to impose the death penalty against someone else?

THE JUROR:  I would, yes --

MR. MELLIN:  Thank you.

THE JUROR:  -- based on the data -- the evidence that's presented.

MR. MELLIN:  Thank you.

MS. CONRAD:  Good morning.

THE JUROR:  Good morning.

MS. CONRAD:  My name is Miriam Conrad.  I'm one of Mr. Tsarnaev's lawyers.

THE JUROR:  Yes.

MS. CONRAD:  Do you know whether you will be paid if you're seated as a juror in this case?

THE JUROR:  I do not think I will be paid.

MS. CONRAD:  You do not?

THE JUROR:  Right.  I looked at the policy through work, and it covered me for three days of jury duty.  And they're kind of struggling now financially.  So they know that I'm going through this process, but I do not think that they'll be able to pay me for that, which kind of causes a little bit of problems because my husband is self-employed and I do carry the medical benefits.  So I just --

MS. CONRAD:  I'm sorry, you --

THE JUROR:  I carry the medical coverage through my work.  So I just don't know what they'll cover and what they won't cover.

MS. CONRAD:  So would not being paid for the duration of a three- or four-month trial pose a financial hardship to you and your family?

THE JUROR:  It would, yes.

MS. CONRAD:  May I have a moment?

(Pause.)

MS. CONRAD:  Okay.  I guess I'll continue.

MR. CHAKRAVARTY:  Your Honor, it may make sense to explore just the hardship a little bit more.

THE COURT:  Yeah.  Have you talked to anybody at work, any supervisor or --

THE JUROR:  I have talked to the owner about that, yes.  But I did not talk to him in reference to whether I would

get paid or not.

THE COURT:  With respect to health insurance, do you have any concern that you would actually lose your employment or just that you wouldn't be paid during the --

THE JUROR:  That I wouldn't be paid during this time.

THE COURT:  If you stayed employed, even though you weren't getting paid on a weekly basis, do you know whether that would affect your health insurance?

THE JUROR:  I don't know.  That's the thing that was kind of bothersome to my husband and I, was whether or not I would get the health benefit or I would continue to get paid during that time period.

THE COURT:  Can you give us an idea of, I guess, the size of the company, how many employees are there?

THE JUROR:  There's 25 people -- around 25 to 30 people in North Andover, and then they also have a location in the Chicago area as well.  And there's probably about ten people that work there.  I'm new to this position.  I've been there just about two years now.

THE COURT:  Yeah.  Okay.

I think so.  All right.

Thank you.  That's fine.  Thanks.

(The juror exits the courtroom.)

THE CLERK:  Juror 517.

THE JURY CLERK:  Juror 517.

(The juror enters the courtroom.)

THE CLERK:  Sir, over here, if you would.  Have a seat.  Speak into the mic and make sure you keep your voice up, okay?

THE JUROR:  Okay.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  Since you were last here, have you been able to avoid any discussion of the substance of the case?

THE JUROR:  Yes.

THE COURT:  And avoid any media accounts of the case?

THE JUROR:  Yes.

THE COURT:  I want to follow up on some of the matters you -- the information you gave us in the questionnaire.

First of all, tell us a little bit about your work.  It says you're a senior quantitative analyst for an asset management company.  Can you tell us a little bit what that entails.

THE JUROR:  Absolutely.  So to most people I say that I'm a stock analyst.  Technically, I'm a quantitative research analyst.  So what I do is bring structure and discipline to the investment process.  What we offer is mutual funds and institutional funds for clients.  My particular role is in risk management and analysis, ranking companies based on quantitative analysis versus fundamental analysis.  I do a

little bit of technical analysis along with that.

In addition, I'm co-portfolio manager for a U.S. mid fund and, as of recent, portfolio manager for a small hedge fund.

THE COURT: Okay. Earlier in the questionnaire, it's on page 5, we set out what we expect the schedule of the case to be and asked whether serving on that schedule would be a substantial hardship. You said you don't know. Can you tell us what you were wondering about?

THE JUROR: Yeah. So there's a couple of reasons for that explanation. I mean, in the reality -- in reality, I have a commitment to work. I had talked to my employer and said should this be the outcome, I intend to stay committed. I understand that Fridays would be off, so I would be able to go in to the office then. And then I would telecommute a couple of hours during the day.

In addition to that, I wanted to make sure that they were good corporate citizens and I wasn't going to forgo my earnings.

THE COURT: Right. Did you get happy news on that?

THE JUROR: I was -- I was told that they're good corporate citizens. So that's -- you know, hopefully I can take that to the bank.

THE COURT: Okay. So you're feeling comfortable about it, that it's doable, I guess, with some stress?

THE JUROR:  Right.  I think it's doable.  The reality is for this case in particular, and probably many cases -- I'm not familiar.  I have never served in the past.  I'm guessing everybody's going to experience some sort of hardship.  And so I would say that I'm not an exception to that, if that's what you're asking.

THE COURT:  Okay.  Tell us about social media.  We asked at the bottom of page 10 and the top of 11 -- Question 29 at the bottom of page 10 more or less is asking about postings that you might make either to something like Facebook or websites, blogs, things like that.

You say you make a few Facebook postings but they're mostly family related.  Is that --

THE JUROR:  Yeah, yeah.

THE COURT:  Do you use it at work at all?

THE JUROR:  No, I'm not really active at all.  I've probably made half a dozen postings over the course of several years.

THE COURT:  Oh, okay.  And then 30, it's a broader question, I guess.  It asks about any social media you use.  You said Facebook, Twitter and LinkedIn, and then you said "use infrequently."

THE JUROR:  Right.  That's a relative term.  I probably check Facebook once or twice a week; Twitter basically very rarely, once a month or so; LinkedIn more frequently, but

it's more because people are reaching out and it's a means of communication.  So --

THE COURT:  That's more professionally oriented --

THE JUROR:  Yes.

THE COURT:  -- whereas the others are social, or are they professional as well?

THE JUROR:  The others I would say are social.

THE COURT:  Let me ask you to turn to page 20, Question 77.

THE JUROR:  Okay.

THE COURT:  We asked in this question whether, based on things you'd seen or heard in the media or learned from other sources, you had formed an opinion about whether the defendant here was guilty or not and whether he should receive the death penalty or not.  To each of those subparts of the question you checked that you were unsure.

Can you just tell us what you were thinking when you made that choice?

THE JUROR:  I think it's fair to say that I hadn't formed an opinion.  I'm familiar with the incidents as they occurred.  It's not something I actually followed.  So I guess I haven't formed an opinion one way or the other.

THE COURT:  Okay.  You know that in our criminal justice system a person is presumed innocent, or not guilty, of any crime he's accused of unless -- and stays that way unless

the government proves he's guilty by producing sufficient evidence at trial to convince a jury that a person is guilty beyond a reasonable doubt.

Do you understand those principles?

THE JUROR:  Yes.

THE COURT:  Regardless of things you may have seen or heard about the case, would you be able, as a juror, to respect and apply those principles if you had to decide the case?

THE JUROR:  I believe -- yes.

THE COURT:  You know that a defendant never has an obligation to prove he's not guilty of something; it's always the government's obligation to prove that he is guilty.  It's not an even either/or.  The question is not which side has convinced me; the question is has the government convinced me that he's guilty.

THE JUROR:  I'm aware of that.

THE COURT:  And you would be able to hold the government to its burden of proof?

THE JUROR:  Yes.

THE COURT:  You weren't personally affected by the events of that week in terms of sheltering or anything like that?

THE JUROR:  In terms of sheltering?  I'm not sure -- if you mean the week --

THE COURT:  The week after the marathon bombing --

THE JUROR:  Yeah.

THE COURT:  -- do you remember at the end of the week where people were asked to stay inside for a while?

THE JUROR:  Right.  I think you're referring to when the suspect was ascertained [*sic*].  I actually did work from home that day.  And so if that's what you're asking.

THE COURT:  Uh-huh.  By the way, you live near the beginning of the marathon, right?  Do you have any connection with the marathon?  Do you participate in any way?

THE JUROR:  I don't.  I did attend the opening once maybe five years ago in Hopkinton.  And I'm kind of in transit.  So that is my primary address, but I also have a secondary apartment here on Beacon Hill.

THE COURT:  Okay.  I was just getting at whether you have any close association with the event, the marathon event, because it's an annual event in Hopkinton.

THE JUROR:  Other than in the town itself, I haven't participated in the event.  It's certainly a popular thing in town itself.  I don't know what you mean by "association" other than with the town that I'm living in.

THE COURT:  It's meant to be very broad.  Whatever you think it means.

THE JUROR:  Okay.  It's a sense of town pride, if that's what you're referring to.

THE COURT:  I'm looking to see whether it has any

effect on -- it could have any effect on the way you would listen to and hear the evidence in the case.  That's all I'm getting at.

THE JUROR:  I don't believe so.  I'm not -- I think Hopkinton's a wonderful town.  I'm not originally from Hopkinton.  But I guess the short answer is no.

THE COURT:  Okay.  If you would turn to page 23, beginning at Question 88 we asked a series of questions pertaining to the death penalty and attitudes about it.  88 itself is a general question:  If you have general views, what are they?  And you said, "The state has the right but it is not something to take lightly."

Anything you want to add to that or modify?

THE JUROR:  I think that's my position.  Yes, I think it's a very serious topic and -- yeah.  Yeah, I think that covers it.

THE COURT:  All right.  And then below that we asked you to indicate on a scale of 1 to 10 where you thought you might be from strongly opposed to strongly favor.  You selected 3, slightly on the opposed side but not at either extreme.

THE JUROR:  Uh-huh.

THE COURT:  Is that a fair temperature for you?

THE JUROR:  Yeah.  I mean, these things are hard to scale.

THE COURT:  Of course.

THE JUROR:  Okay?  Particularly in my line of work, it's like -- you know.  When I approached this I was, like, well, am I in the middle?  I'm probably not in the middle.  So I had to pick a number, and somewhere to the left of that, and 3 seemed about right.

THE COURT:  Okay.  If you'd go to the next page, here we asked it in words rather than numbers, and asked if you could find a statement among the several suggested that came closest to what your views would be.  You picked C --

THE JUROR:  Uh-huh.

THE COURT:  -- which is "I'm opposed to the death penalty but I could vote to impose it if I believed the facts and the law in a particular case called for it."

THE JUROR:  Yes.

THE COURT:  You think that represents your view?

THE JUROR:  Yes, that's a good representation of my view.

THE COURT:  So that while you tend to oppose it you would be able to consider the evidence -- you heard me talk about the penalty phase, where there would be evidence from the government about what made this an aggravating situation, and from the defendant that presented mitigating considerations, and then the jurors are asked to weigh all that and come to a conclusion whether the death penalty or life imprisonment without release is the better penalty.

Would you be able to take account of all that, evaluate it and then decide which option you thought was the right option?

THE JUROR:  Yeah.  I think in this situation my personal view, which I put on C -- see, in an ideal world we don't have the death penalty, in my opinion.  But I think the law is clear.  And in this case, in other words, as it's written it's clear.  So, again, I think my opinion on the death penalty is I do think the state has the right to do capital punishment.  I think even though you pointed out earlier that Massachusetts does not have that but the federal government does, I don't see those as polar opposites.  I understand the distinction.

Again, I do think -- I think there are other questions in here, kind of where you stand on that, what do you think is a more severe punishment, I actually do see that as a more severe punishment than life imprisonment, if I recall the questions earlier.

Am I answering your question?

THE COURT:  Well, sort of.  The question actually was would you be prepared to vote for the death penalty or for life imprisonment, either/or, depending on your evaluation of the evidence that you had before you in the trial?  That's really the question.

THE JUROR:  Yes.

THE COURT:  Are you open to both possibilities?

THE JUROR:  Yes.

THE COURT:  Okay.  Follow-up?

MR. CHAKRAVARTY:  Yes, your Honor.

Good morning.  My name is Aloke Chakravarty.  I'm one of the prosecutors.

THE JUROR:  Good morning.

MR. CHAKRAVARTY:  I would like to explore a little bit of your work situation a little bit more.  Just, I know people in your industry often are paid on commission or are paid with bonuses, expecting bonuses.

THE JUROR:  Uh-huh.

MR. CHAKRAVARTY:  To the extent you're on a three- to four-month trial working when you can, is that going to impact your income?

THE JUROR:  It's a great question.  I'm confident -- I can't predict the future.  I kind of -- I asked straight out whether it would.  The response that I received is that it would not; however, do I feel obligated to actually still connect with work and -- yes, I do.

MR. CHAKRAVARTY:  So the question is:  Given the -- again, your industry that works on markets which are, like, nine to four or something like that --

THE JUROR:  Yes.

MR. CHAKRAVARTY:  -- which will be virtually the exact

times that our court is going to be in session.

THE JUROR:  Yes.

MR. CHAKRAVARTY:  So is your mind going to be able to focus on what's happening in court versus what's happening on your BlackBerry, if you have a BlackBerry?

THE JUROR:  Yes, I follow you.  That's a great question.  So if I can put it a different way, when I'm on vacation, okay, so when I'm not at work, am I checking the market throughout the day?  Typically not.  But that's, in part, because I've been with the company for a long time and have a very close colleague that I respect and depend on and feel comfortable with him at the helm when I'm not there.

MR. CHAKRAVARTY:  So we rely on your assessment.  You don't think that that's going to be sufficient distraction to prevent yourself from being able to listen to the evidence in this case?

THE JUROR:  I can't imagine it would be.  I mean, is there a scenario we can create, some hypothetical scenario where, you know, the market has some huge event that I may ponder on?  I guess we can create a scenario if we wanted to that -- but anybody can create a scenario if they wanted to that would distract them from what they're focusing on, right?

MR. CHAKRAVARTY:  Yeah, and we're not asking about hypotheticals.

If you wouldn't mind looking at the questionnaire

briefly.  On page 23, Question 87, you said you weren't sure whether the graphic nature of some of the evidence that's likely in this case might impact your ability to assess it.

THE JUROR:  Uh-huh.

MR. CHAKRAVARTY:  Can you elaborate on that?

THE JUROR:  Yeah.  So I consider myself to be a little squeamish, okay?  I mean, not to the point where -- mildly squeamish.  So there are people who get shots and turn their heads or close their eyes or look right at the shot itself. I'm one of those individuals that gets a shot and, you know, kind of looks straight ahead.  If -- but, yes, graphic material is impactful and powerful.  And so if you're asking if seeing material of a graphic nature stirs up emotions, my answer would be yes.

MR. CHAKRAVARTY:  So in this case -- I understand you have children.

THE JUROR:  Yes.

MR. CHAKRAVARTY:  And in this case there's at least one child involved in some of the evidence.

THE JUROR:  Uh-huh.

MR. CHAKRAVARTY:  And what we're trying to determine is whether that emotional component which is intrinsic in some graphic evidence -- whether that might unduly influence your assessment of that information.

THE JUROR:  Okay.  So I understand the nature of your

question.  So I happen to be in an industry where you just want to see the facts and analyze those, you know?  You can have an emotional response to even something in the marketplace.  You don't want to act on those responses; you want all the information and then act.  So is that going to impact my ability to assess the data itself?  No.

MR. CHAKRAVARTY:  So 87, not sure, you feel confident that it won't affect -- it will make an impact but it won't affect your ability to assess the evidence?

THE JUROR:  It will make an impact but it will not affect my ability to, right, review and analyze the information as it's given.

MR. CHAKRAVARTY:  Your Honor, the next couple of questions are related, and they relate to a sidebar issue.

THE COURT:  Okay.

(Discussion at sidebar and out of the hearing of the public:)









THE COURT:  Okay.  The end of sidebar, I think.

You don't have anything on that?

MS. CONRAD:  (Indicating.)

(In open court:)

MR. CHAKRAVARTY:  So finally the last couple of questions:  So in the second phase of a trial, of a death penalty -- in a death penalty case the jury has already convicted the defendant of being guilty of a capital crime, and the jury has to decide whether the death penalty or life without parole is an appropriate judgment.  It's one thing to

intellectually arrive at a decision based on the facts as they come in, and it's another for a juror to have the courage and conviction to vote one way or the other knowing that that is probably going to be the fate that befalls him.

So if you were seated as a juror and you believed that the death penalty is the appropriate conclusion in a particular case, would you have that fortitude to cast the vote for --

MS. CONRAD:  Objection to "this case" and "fortitude."

THE COURT:  Yes.

MR. CHAKRAVARTY:  I don't think I said "this case." But if you were -- I may have.  Excuse me.

If you were seated as a juror, you know, whether this case or in any other case in which you have to make that call, you know, obviously, as you pointed out, a very serious decision, do you think you could do that?

THE JUROR:  Yes, I can.  I'm under the assumption that there's some framework provided to the jurors how to reach that decision based off of the evidence and the law.  Is that a correct assumption?

THE COURT:  Yes.

MR. CHAKRAVARTY:  Yes, there will be.

THE JUROR:  Then yes.

MR. CHAKRAVARTY:  And that goes both ways, in terms of life without parole or the death penalty.

THE JUROR:  Right.  And I'm -- yes, I can do that

either way.  And again, I'm assuming that there's some framework provided.

MR. CHAKRAVARTY:  Thank you.

MS. CLARKE:  Thank you very much.  I don't have any questions for you.

THE COURT:  All right, sir.  Thank you.

(The juror exits the courtroom.)

THE COURT:  So we have the completed 534 questionnaire.

THE CLERK:  Juror No. 520.

MS. CLARKE:  Your Honor, maybe before the juror comes out, the Court might want to look at the witness question.

THE COURT:  I'm sorry?

MS. CLARKE:  The witness question.

THE COURT:  Hold off for a second.  Yeah, okay.  Let me --

MS. CLARKE:  You may want to go sidebar so the Court can understand the witness.

THE COURT:  Is it -- oh, okay.  Yeah, I think we'll need a little sidebar.

THE CLERK:  Sidebar?

THE COURT:  Yeah, quickly.

(Discussion at sidebar and out of the hearing of the public:)

THE COURT:  So in answer to Question 85, this juror

indicated that she knows -- I guess has sat and chatted with -- a fellow club member who is Witness No. 475, who was listed as a person on the MIT Police Department.

MS. CLARKE:  Right, and I think a rather actively involved officer, Henniger.

MR. CHAKRAVARTY:  Henniger is a likely witness.

THE COURT:  Well, I will explore her relationship to the extent of it and then we can decide based on that, I guess. I mean, obviously MIT connections here emerge and we would be interested in them.

MS. CLARKE:  A lot of them.

THE COURT:  I'm just pausing to wonder whether we would have to go into sidebar again for that or if we could do it without mentioning the name.  I don't know if you have any views on that.  It might not -- we might just as well, I guess, do a quick sidebar and then we could be less oblique about the discussion.

MS. CLARKE:  Right.

THE COURT:  All right.  Have her come in, and we'll get to that point and then do another sidebar.  Okay.

(In open court:)

THE CLERK:  Juror No. 520.

THE JURY CLERK:  Juror 520.

(The juror enters the courtroom.)

THE CLERK:  Ma'am, over here, if you would.  Have a

seat.  Keep your voice up and speak into the mic so everyone can hear you.

THE JUROR:  Okay.

THE COURT:  Good morning.

THE JUROR:  Hi.

THE COURT:  Have you been able to avoid any discussion of the substance of the case with anybody since the last time you were here?

THE JUROR:  Yes.

THE COURT:  And as much as possible avoid seeing any news accounts or media reporting on the case?

THE JUROR:  Sure.

THE COURT:  Okay.  We've put before you the questionnaire that you filled out when you were here.  We're going to follow up on some of the information in the questionnaire.

Did you have your vacation in January?

THE JUROR:  I did.

THE COURT:  And that was the only concern you had about serving on the case, was that it would interfere -- you might have that problem?

THE JUROR:  Yeah.  I also baby-sit my grandkids, but...

THE COURT:  But in terms of work, it won't be an impact for you at work?

THE JUROR:  It will.  I'll have to work around it.

THE COURT:  But you think you can?

THE JUROR:  Probably -- yeah.

THE COURT:  Okay.  So tell us what you do.  It's interesting.  You are a radar operator?

THE JUROR:  Yes.

THE COURT:  What does that involve?

THE JUROR:  I run three different radars.  They're in western Mass.  We run them from Lexington also.  So we track satellites.

THE COURT:  Where are you located, in one of those towns?

THE JUROR:  I live in Westford.  I sometimes work in Westford, sometimes in Lexington.

THE COURT:  But you don't work at the -- this is the Lincoln Labs, right, which is affiliated with MIT?

THE JUROR:  Yes.

THE COURT:  You don't work at the MIT campus?

THE JUROR:  No.

THE COURT:  You've been doing this for some time?

THE JUROR:  36, I think, years.

THE COURT:  We asked about social media use.  You say you use Facebook two to three times a month?

THE JUROR:  Yeah, not really that much.  I just use it to look at pictures of my grandkids when my daughter posts

things on there.

THE COURT:  You had a prior experience in, I guess, a state case as a juror?

THE JUROR:  Yes.

THE COURT:  When was that?

THE JUROR:  Probably 25 years ago.  My kids were little, so...

THE COURT:  Where was it, do you remember?  What court?

THE JUROR:  Lowell.

THE COURT:  Lowell District Court?

THE JUROR:  Yeah, I think so.

THE COURT:  So let me ask you to look at page 20, Question 77.  We asked there whether, based on your -- things you'd seen or read in the media or had information about from other sources, you thought -- you had formed an opinion that the defendant was guilty or not and that he should receive the death penalty or not.  And you said yes, you had formed an opinion that he was guilty.

THE JUROR:  Yes.

THE COURT:  And were unsure about the penalty?

THE JUROR:  Right.

THE COURT:  Below that we asked if you answered yes to any of these questions, would you be able or unable to set aside your opinion and base your decision about guilt or

punishment solely on the evidence produced in the course of the trial, and there was a box "able" or "not able," and you didn't select either one.

I wonder if you could tell us now whether you would be able to set any opinion aside or unable to do so.

THE JUROR: Yes.

THE COURT: Yes, what?

THE JUROR: Able.

THE COURT: Okay. Why do you say that?

THE JUROR: I would have to see the evidence, I guess.

THE COURT: Okay. You've noted in the next question that -- you said, "I think everyone thinks he's guilty." Have people said things like that to you?

THE JUROR: Sure.

THE COURT: And as a matter of fact, if you want to go back to the previous page, Question 75 --

THE JUROR: Yes.

THE COURT: -- somebody has said it more dramatically?

THE JUROR: That was my ex-husband, yes.

THE COURT: Your ex-husband. Was that said seriously or in jest or hard to tell?

THE JUROR: In jest but maybe seriously also.

THE COURT: Would it affect you?

THE JUROR: No, what he -- no.

THE COURT: So anyway, to come back to whether an

opinion would affect you, you know that in a criminal case a person -- I guess you sat on that case a while ago, but it is a while ago.  So you know that a person accused of a crime is presumed to be not guilty, or innocent, unless the government proves that the person is guilty by sufficient evidence at trial to convince the jury of that fact beyond a reasonable doubt.

THE JUROR:  Yes.

THE COURT:  You're familiar with those principles?

Would you be able, as a juror in this case, to put aside anything you might already think about the case and focus only on the evidence produced at the trial and make a decision based on that information and no other information?

THE JUROR:  I think so.

THE COURT:  We asked in Question 80 if people you knew were -- had witnessed the explosions at the marathon or -- the response to them, "In person."  Could you maybe refresh your recollection by reading that and then telling us what you were referring to.

THE JUROR:  Read it first?

THE COURT:  Yeah, just so you remember what you said.

THE JUROR:  Oh, yeah.  There were two people that I work with that go every year for opening day, the Red Sox.  And they go to the marathon first.  I don't know if it's opening day, but they go to the Red Sox game and see the marathon.

And they were walking in for a drink, and the bar stopped, they saw everything on TV.  And then they had to try to get out of town without their cell phones working.

THE COURT:  Okay.  And they told you about that afterwards?  That's how you know about it?

THE JUROR:  Yeah.

THE COURT:  Have you had any other -- when was that? When did they talk to you about it, the next day or --

THE JUROR:  Maybe not the next day.  Maybe within a month or two.

THE COURT:  Okay.  Have you had any further talk with them about their experience that day?

THE JUROR:  No.  One of them doesn't work there anymore, and I don't really see the other one that often.

THE COURT:  Okay.  Let me ask you to look at Question 82.  You ran in a Run to Remember?  Can you tell us about the Run to Remember Race?

THE JUROR:  That was last May.

THE COURT:  May of 2014?

THE JUROR:  Correct.

THE COURT:  That was a year after the marathon?

THE JUROR:  Yeah.  He ran in it that same year; I ran in it the year after.

THE COURT:  Okay.  What was it?  Who organized it?

THE JUROR:  I'm not sure.  I think the Boston police

ran it, and we just ran in it.  And we knew -- the head of the Boston police is also at the MIT Quarter Century Club that I belong to.  After 25 years you join --

THE COURT:  I'll come to that in a minute.  I just wanted to learn a little more about the race.  Where was it?

THE JUROR:  Right here.

THE COURT:  Right outside the courthouse?  Where was the course, along the waterfront or --

THE JUROR:  No, through town.

THE COURT:  Okay.  You also said you have a medal and a Sean Collier T-shirt.  Was that associated with the race, those things?

THE JUROR:  Yeah.

THE COURT:  The runners got those things; is that it?

THE JUROR:  No, we actually got the T-shirts from the MIT guy.

THE COURT:  Okay.  Let's do a brief sidebar.

THE CLERK:  Cut.

(Discussion at sidebar and out of the hearing of the public:)

THE COURT:  Sidebar means that people who aren't directly involved leave the room and we stop the audio broadcast to the others --

THE JUROR:  Okay.

THE COURT:  -- because we want to talk about potential

evidence in the case.

So look at page 22.  So you recognize a person on the witness list?  And this is the person you started to tell us about?

THE JUROR:  Yes.

THE COURT:  Just how do you know him and how well do you know him?

THE JUROR:  I met him three or four times, I guess, at the Quarter Century Club dinners that they have.

THE COURT:  This celebrates longevity in affiliation?

THE JUROR:  Yeah.

THE COURT:  Okay.  And was he at the race that you were talking about?

THE JUROR:  I didn't see him at the race, no.

THE COURT:  Oh, okay.  I thought you started to say something about him in the race.

THE JUROR:  Oh, no.  He just gave us the T-shirt ahead of time.

THE COURT:  I see.  So this Quarter Century Club kind of sponsored a memorial to Sean Collier.  Is that it?

THE JUROR:  Uh-huh.

THE COURT:  You have to say "yes" --

THE JUROR:  Yes.

THE COURT:  -- for the court reporter.

Okay.

MS. CLARKE:  Thank you, your Honor.

THE COURT:  That's good.  Thank you.

THE CLERK:  Back on.

(In open court:)

THE JUROR:  Am I done?

THE COURT:  You're done.  Just leave it there.
Thanks.

(The juror exits the courtroom.)

THE CLERK:  529.

THE JURY CLERK:  Juror 529.

(The juror enters the courtroom.)

THE CLERK:  Sir, over here, if you would, please.
Have a seat.

Speak into the mic and keep your voice up, okay?

THE JUROR:  Okay.

THE CLERK:  Thanks.

THE COURT:  Good morning.

THE JUROR:  Good morning.

THE COURT:  It's still morning, barely.

Since you were last here, have you been able to avoid
discussion of the substance of the case with anyone?

THE JUROR:  I've tried, but, of course, some people
did know I was coming for jury duty and had their opinions.  I
had my hands over my ears as much as possible.

THE COURT:  You tell them you don't want to talk about

it?

THE JUROR:  Right.  Unfortunately, everyone has an opinion because there's been a lot of coverage on this.

THE COURT:  Yeah, okay.  Speaking of coverage, have you been able to avoid media coverage of the case?

THE JUROR:  I've tried.  I do read the *Boston Globe*.  If I see an article, I'll immediately skip it.  With all the blizzards and storms we've had, I've been watching the news a little more, you know, the weather.  And, unfortunately, there's been a lot of coverage because this has been going on for quite a while.

THE COURT:  Right.

THE JUROR:  But I've tried to skip that as much as possible also.

THE COURT:  Right.  So there's the questionnaire that you filled out.  We're going to have some questions to follow up on some of the things you told us there.

I want to focus -- you're not working and apparently haven't worked for a while?

THE JUROR:  Correct.

THE COURT:  When you last worked you were a -- it says you were working as an interior designer.  Is that it?

THE JUROR:  Yes.

THE COURT:  We asked a little bit about use of social media.  This is -- if you want to follow along, it's on page

11.   You say you use Facebook daily and Twitter weekly?

THE JUROR:  I mean, I don't post that much.  I had not been posting that much on Facebook.  I do look at Facebook daily, maybe twice a day.  Twitter I look at on a weekly basis. I don't read that -- look at that as much.  I haven't posted on there in a long time.  I also have LinkedIn, which I don't think I've done anything on there in quite a while.

With Facebook, I'm also -- I just started with a local chapter of an organization.  They've asked me to do their social media work, so I am -- I did set up a group page for them, and I'm just posting about their events, so...

THE COURT:  Okay.  And how long have you been doing that?

THE JUROR:  That's been about a month, maybe a month and a half.

THE COURT:  Okay.  And you expect to continue doing that for a while?

THE JUROR:  Yeah.  I mean, I volunteered to do it.  It doesn't seem to be too much.  The thing is that because -- it's a Jewish Zionist organization and there's been, you know, a number of different posts that naturally they've had about Copenhagen and then other issues, you know.  And people have asked me, you know, "Can you share that on another page?"  And I said, "I don't feel comfortable doing that when I'm in this right now because I don't know if it's a conflict."  So I've

just posted basically about our own events and meetings we're having and things like that.  Other stuff we've just not put on.  If somebody else would like to, they can.

THE COURT:  All right.

THE JUROR:  I hope that's okay.

THE COURT:  Yeah.  Any of them -- any of the people who were suggesting those kinds of posts say anything about this case or suggest any posting about the events here?

THE JUROR:  No.  I mean, some of them did know I was coming.

THE COURT:  Right.

THE JUROR:  But no one --

THE COURT:  But putting any postings about the case --

THE JUROR:  No, because this has nothing to do with them.  They're more concerned about -- because this organization has some hospitals in Israel, so they're more concerned about things in Israel than something happening here that doesn't really concern them.

THE COURT:  Okay.  Let me ask you to look at page 20, Question 77 near the top.

THE JUROR:  Okay.

THE COURT:  It's a multiple-part question we asked to see whether you had formed any opinion about certain matters based on things you'd seen or read in the media or otherwise.  And you answered that you had formed an opinion that the

defendant was guilty.  You were unsure about the penalty. That's in Part C and D.  Do you see that?

THE JUROR:  Right.

THE COURT:  We then asked if you answered yes to any of the questions, and you did to Part A, would you be able or unable to set aside your opinion and base your decision about guilt and punishment only on the evidence presented to you in court, and you checked "unable."

Would you tell us about that?

THE JUROR:  I feel because I have seen, over the past couple of years, so much on TV and in the media, that still does, you know, linger in my mind and always will linger in my mind.  And, you know, I made an opinion from that.  And I just think no matter what is presented, I'm still going to feel that same way.  So that's going to, you know, really base my decision.  I don't think I can change my mind from guilty.

MR. BRUCK:  We're satisfied.

THE COURT:  Okay.  All right.  Thank you.

(The juror exits the courtroom.)

THE CLERK:  Juror 533.

THE JURY CLERK:  Juror No. 533.

(The juror enters the courtroom.)

THE CLERK:  Sir, over here, please.  Have a seat. Keep your voice up and speak into the mic so everyone can hear you, okay?

THE JUROR:  Okay.

THE CLERK:  Thanks.

THE COURT:  I guess I may as well say "good afternoon" at this point.

THE JUROR:  Yes.

THE COURT:  Since you were last here have you been able to avoid discussion of the substance of the case with anyone?

THE JUROR:  Yes.

THE COURT:  And as best you could to avoid media accounts about the case?

THE JUROR:  As best I possibly could.

THE COURT:  Okay.  Your form tells us you're a restaurant owner?

THE JUROR:  Yes.

THE COURT:  You've been doing that for a while?

THE JUROR:  Quite a long time, yes.

THE COURT:  What are your daily activities like?

THE JUROR:  Daily operation of the -- my business, bookkeeping, personnel, everything having to do with operating a restaurant.

THE COURT:  Okay.  You've told us that you don't think it will be any problem for you to serve on an extended trial like this?  I shouldn't say "any problem."  It's obviously something for somebody, but a substantial hardship.  It won't

be a substantial hardship for you?

THE JUROR:  You know, any time away from my business represents a certain level of hardship.  I do have people in place that can run my business when I'm not there; however, you know, being the owner of the business certainly -- you know, part of my daily life is that business.  It is my livelihood, and it is, you know, very personal to me.  So any time away from that, you know, is -- you know, there's always cause for concern.

THE COURT:  Right.  The question is whether you could, by rearranging things, kind of --

THE JUROR:  Anything could be done by rearranging things.  To the degree that it places a hardship on others, I guess is, you know, more important to me than what it places on me.

THE COURT:  In what sense would it place a hardship on others?

THE JUROR:  Just increase workload, increase, you know, number of hours that they would have to be worried about the business.  My wife is a part owner of the business as well, and I have a 13-year-old son at home.  My daughter is a senior in college, so she's relatively self-sufficient.  But, you know, to the degree that it places a hardship on her and my family, you know, I could be away, but it would certainly increase their workload substantially.

THE COURT:  We asked about use of social media and you said -- this is if you want to follow.  It's on page 11.

THE JUROR:  Sure.  11?

THE COURT:  Question 30.  You said Facebook, Instagram, Twitter all used rarely and for work-related purposes only.

THE JUROR:  I am a total novice when it comes to being, you know, in the social media world.  I know extremely little about it, only what my -- some of what my employees have taught me over the years.  I'm not on there on a daily basis, maybe once a month, maybe, to check and see who's, you know, posting things.  But I don't -- I am not active on that at all.  If I am, it's not for personal use; it's for my business use.

THE COURT:  Let me ask you to turn to page 20, Question 77 near the top.

THE JUROR:  Uh-huh.

THE COURT:  This is a multipart question in which we asked whether you had formed an opinion about various matters based on things you had seen or heard in the media or otherwise whether the defendant was guilty or not, whether he should receive the death penalty or not, and you checked "unsure" to each of the subparts of the question.

Could you tell us about that?

THE JUROR:  I really haven't followed it all that closely.  I've been really involved in my business, and I don't

really have time to pay attention to a lot of outside goings-on. I really -- I wasn't even home or aware of what had happened that particular day until, I want to say, maybe six or eight hours later. So I had no real, you know, in touch with the details of the goings-on. So I really don't know how to form an opinion one way or another outside of what other people have maybe told me. But I have not really followed it since it's happened and I really haven't paid much attention.

THE COURT: I'm sure you understand that in a criminal prosecution a person accused of a crime is presumed to be not guilty, or innocent, of the crime unless the government proves otherwise, proves that he's guilty by sufficient evidence at trial to convince the jury that -- of that fact beyond a reasonable doubt.

You're familiar with those principles?

THE JUROR: I understand.

THE COURT: Would you have any difficulty in faithfully applying those principles if you were a juror in the case?

THE JUROR: None at all.

THE COURT: In other words, focus solely on the evidence in the case and decide what that evidence means in terms of the issues?

THE JUROR: I think that's the most important thing.

THE COURT: Okay. Beginning on page 23 at Question 88

we asked a series of questions about attitudes towards the death penalty. 88 was a general question, if you had general views, what are they. And you said, "The death penalty may be warranted if evidence proves appropriate."

Anything you want to add or qualify about that?

THE JUROR: I really think that in any case, you know, if it's proven beyond a shadow of the doubt that it's warranted, then it should be -- it should be applied. It's there for a reason.

THE COURT: Okay. So in Question 89 we asked you to put yourself on a scale from 1 to 10. You put yourself kind of in the middle.

THE JUROR: Right in the middle.

THE COURT: If you look at page 24, Question 90, there's a series of statements that reflect different views about the death penalty. We asked you to look at those and see if there was one that represented your view. You selected D, "Neither for nor against, could vote to impose it or could vote for life imprisonment without the possibility of release, whichever I believe was called for by the facts and the law of the case."

THE JUROR: That kind of goes back to the question before.

THE COURT: Right. It's kind of a 5 answer.

THE JUROR: Five, right down the middle, answer.

Exactly.

THE COURT: And is that a good summary of your views?

THE JUROR: It really is. I don't think I could have phrased it much better than that.

THE COURT: You heard me this morning describe what we call the penalty phase. And of course, as I said then and as you know, you only get to the penalty phase after the person's been convicted by the jury of the crime for which the death penalty is a possibility.

THE JUROR: Uh-huh.

THE COURT: So you have a guilty person when you begin to consider those considerations. And as you heard, there will be evidence of aggravating factors that might distinguish the case as more serious than other cases and, therefore, deserving of a more serious punishment, and evidence of mitigating factors that might say this is not the case where the death penalty is appropriate but life imprisonment is a better punishment for this defendant in this circumstance.

Would you be able to pay attention to all of that, evaluate it, and then after weighing it select either possibility depending on how your mind was led?

THE JUROR: I like to think of myself as being pretty fair. One of my hobbies is officiating sports, being an umpire, being a referee. I officiate fairly and not toward one way or the other. I really don't care who wins; I just have to

officiate the rules.

THE COURT:  Okay.  And you'd bring that attitude to the --

THE JUROR:  I'd bring that attitude because that's basically how I look at things.  It's whatever the rules are, that's the way it has to end up being.

THE COURT:  Okay.  All right.  So any --

MR. CHAKRAVARTY:  Yeah, just very briefly.  Good afternoon.  My name is Aloke Chakravarty.  I'm one of the prosecutors.

I just want to ask you a couple of questions on the work situation.

THE JUROR:  Okay.

MR. CHAKRAVARTY:  Obviously this is your business.

THE JUROR:  Yes.

MR. CHAKRAVARTY:  It's your livelihood.  Your family's involved.  You're obviously going to be thinking about this at all times.  The question is:  Knowing that it's being taken care of, knowing we get out of court about four, you'll have Friday, you have the weekend -- I don't know if the restaurant is open on the weekend.

THE JUROR:  Yes, every day.

MR. CHAKRAVARTY:  So, you know, given the fact that you have these other arrangements, would you be able to listen to the evidence in court, assess it and participate as a juror

without having that -- the concern about the business kind of preventing you from doing that?

THE JUROR:  Well, one of the things that I've thought about myself, without talking to other people about it, is -- and I'm not sure what the correct phrasing is, so forgive me if I mess up the wording, but sequestering?

THE COURT:  No, you won't be sequestered.

THE JUROR:  From what you said initially, the hearing would be Monday through Thursday from like nine to four-ish?

THE COURT:  Right.

THE JUROR:  I would still be -- in essence, if I was able to leave and go back to my business, be able to work nights and be able to work weekends, which is a significant asset for me to be able to do.  If I can be there to help spell the people that are covering for me when I'm not there, it's very important.

Monday through Thursday in my restaurant is our slower time.  Nights and weekends are our busier time.  And for me to be able to be there during those times would be great.

MR. CHAKRAVARTY:  That's all I have.  Thank you.

MS. CLARKE:  That's it?

Hi.  My name is Judy Clarke.  I'm one of the lawyers for Mr. Tsarnaev.  How are you?

THE JUROR:  Very well, thank you.

MS. CLARKE:  I just had a few questions for you if you

could bear with me for a little bit of follow-up.

THE JUROR:  Okay.

MS. CLARKE:  On Question 77, which is at page 20 -- and the judge went through those questions with you -- you indicated that you were unsure, unsure, unsure, because you really hadn't had time to follow the events?

THE JUROR:  Or form an opinion.

MS. CLARKE:  Have you ever formed an opinion before filling out the questionnaire?  Had you formed any opinion as to guilt or punishment in this case?

THE JUROR:  No, not really.  Like I said, I really hadn't spent virtually any time thinking about it.  And, you know, like I said, I'd only learned about it well after -- not well after, but, you know, a number of hours after it had happened.  So I really hadn't formed any opinion one way or the other even once, you know, he was apprehended.

MS. CLARKE:  Okay.  And since filling this out have you formed any -- have you been thinking about it?

THE JUROR:  I've been thinking about it even less.

MS. CLARKE:  Even less of an opinion?

You said you learned about it a few hours after.

THE JUROR:  I want to say like six or eight hours after.  I was on my way to pick up my son at a friend's house and I was listening to the radio and, you know, chatter was going on about it that day.

MS. CLARKE:  So where were you on the 15th?

THE JUROR:  I was at home probably doing yardwork or just outside.  I might have been at work on my way to pick up my son.

MS. CLARKE:  Okay.

THE JUROR:  But I must confess, I don't remember. It's on -- it was a Monday?

MS. CLARKE:  It was a Monday, right.

THE JUROR:  And I generally take Mondays off.  And my son was over at a friend's house playing, and I was bringing him his bicycle, I think.

MS. CLARKE:  Do you remember where you were at the end of the week during the shelter-in-place day?

THE JUROR:  I was working.  I was at my restaurant.

MS. CLARKE:  You were sheltering at work?

THE JUROR:  As I'm apt to do almost every day.

MS. CLARKE:  Okay.  Okay.

If I could get you to go to Question -- I'll find the page in just a sec.  Question 52 on page 17 you were asked a series of sort of Muslim- or Islam-related questions and the War on Terror, and you indicated you believe the War on Terror is overblown or exaggerated, and you said "yes."  Can you help us understand that a little bit, what you were thinking?

THE JUROR:  I think that the media has a tendency to blow up or exaggerate some of the goings-on that may be -- that

they feel we need to know about so that they can create news, so that they can -- I don't want to say cause panic or cause concern, but keep it top of mind in the public's eye so that they feel that we always need to be on edge when in actuality maybe we don't.  Maybe we should all be living our lives and not being as concerned about it.

MS. CLARKE:  So sort of a media frenzy-related --

THE JUROR:  I think that has a lot to do with it.

MS. CLARKE:  Okay.  Thank you.

On -- if we could go over now back to page 23 with the series of questions about the death penalty, and you do -- you're rather forthright about it may be warranted if the evidence proves it appropriate.  And you indicated in 91, the next page, that "my views have remained the same."

Can you tell us a little bit about how you developed your views about the death penalty?

THE JUROR:  I guess I don't really remember when they -- when they formed in my mind, but I feel that it's there for a reason and it's there to dissuade certain behaviors.  And if a person does a thing that could include the death penalty, then it should be an option.  It could be part of the decision-making process, whether that person is put to death or whether they're incarcerated for life.  So as far as when that opinion started, I really don't remember, but, you know, it's there for a reason and I think you know it when you see it.

You know when -- it needs to happen when you see it.  It's hard to explain when that is, but when you know -- I'm sorry -- when you see it, you know it.  And when it's proved, you know it's proved.

MS. CLARKE:  I think I have that.  When it's proved.  Are you talking about when the crime is proved?

THE JUROR:  No, it's proved in, I guess, a court of law.

MS. CLARKE:  Okay.  Is the death penalty -- has it been a topic of conversation in your family or with colleagues?

THE JUROR:  Not at all.

MS. CLARKE:  Okay.  All right.

I was interested in your analogy of you have a hobby of officiating sports -- good luck.

THE JUROR:  Yeah.  Thank you.

MS. CLARKE:  Because usually the umpire's the one that's already in the middle.

THE JUROR:  You can only satisfy 50 percent of the people.

MS. CLARKE:  Right.  Well, you're doing pretty good, I guess.

THE JUROR:  Yeah.

MS. CLARKE:  But I guess one of the major differences in that analogy is the death penalty, as I think the judge has instructed a couple of times, it's really not a matter of

rules; it is aggravating and mitigating circumstances and the jury weighs them, but then it's really a reasoned, moral decision by each individual.

MR. CHAKRAVARTY:  Object, your Honor.

MS. CLARKE:  And I'll ask the question.

THE COURT:  Yeah, ask the question.

MS. CLARKE:  How do you think that that would fit with your sort of officiating and looking for rules?  It's really not a --

THE JUROR:  Well, I think the rules would have been established and enforced prior to that when the person was either found guilty or not guilty.  Those were done through rules and by laws.  I guess rules would be, in your case, laws. And at that point, then it's deciding whether to enforce the death penalty as part of enforcing that rule of guilt or not, having a lesser penalty, okay?

And if I can make an analogy, it would be giving a very, very, very stern warning, life imprisonment, versus ejection, which would be the death penalty.

MS. CLARKE:  And those are discretionary calls with the official?

THE JUROR:  A lot of times officials do have discretion to make those determinations, yes.

MS. CLARKE:  And I guess that's what I'm wondering.

THE JUROR:  And the phrase that we use is "in my

judgment."

MS. CLARKE:  As opposed to "the rule says X" or "the rule says Y"?

THE JUROR:  There are times when the rules are not up to interpretation and times when they are.

MS. CLARKE:  Okay.

THE COURT:  Just for clarity, what kind of sports do you ref?

THE JUROR:  Baseball, basketball and soccer.

MS. CLARKE:  You're a busy guy.

THE JUROR:  It can keep you very busy.  It's kind of an advocation.

MS. CLARKE:  Can I just have one moment?

(Counsel confer off the record.)

MS. CLARKE:  Thank you very much.

THE COURT:  All right.  Thank you, sir.

THE JUROR:  Thank you.

(The juror exits the courtroom.)

THE COURT:  Let's just take a moment before the next -- this is where we have the newly filled-out pages.  I just thought -- we'll just wait a second to absorb the...

(Pause.)

MR. BRUCK:  This juror has a fair amount of -- well, I don't know if we need to go to sidebar or if I could just hand the Court the materials that you might want to be aware of.

(Pause.)

MR. BRUCK:  And one other.  There's one other document that I would note.  I would note the date on this cover photo changed.

MR. CHAKRAVARTY:  Mr. Bruck, do you have copies for us?  Is that the only copy?

MR. BRUCK:  I'm sorry.  I just realized that we have only one set for everybody.  I apologize.

THE COURT:  Where's the date?

MR. BRUCK:  January 7th, which would be --

THE COURT:  Where do I see it?

MR. BRUCK:  On the photograph of the demonstration --

THE COURT:  Oh.

MR. BRUCK:  -- which would have been after the instructions.  This may be an occasion to go back to questioning about events in Paris, among other things.

THE COURT:  Was this the profile before?

MR. BRUCK:  Yes.

THE COURT:  And he changed it to this?

MR. BRUCK:  It appears he changed it to that, yes.

THE COURT:  It may be a change in a positive direction.

MR. BRUCK:  Maybe so.

THE COURT:  Have you seen it?

MR. CHAKRAVARTY:  I haven't seen it, no.

MR. BRUCK:  I apologize that we didn't have a set for everybody.

████████████████████████████████████████████████

████████████████████████████████████████  I just wanted the record to show --

THE COURT:  Yeah, I saw it.  I think there's no issue.

Do you know when -- I'll tell you what.  Why don't we take a five-minute break so people don't feel rushed.

MR. CHAKRAVARTY:  No, we're all right.

THE COURT:  You looked like you were discussing.  I was going to give you a chance to do it.

So we'll ask about it.

MR. BRUCK:  I think we just explore it, yes.

THE COURT:  Okay.

THE CLERK:  Juror No. 534.

THE JURY CLERK:  Juror No. 534.

(The juror enters the courtroom.)

THE CLERK:  Sir, over here, if you would.  Have a seat.  Keep your voice up and make sure you speak into the mic so everyone can hear you.

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon.

THE COURT:  Since you were here to fill out the questionnaire, have you been able to avoid talking about the substance of the case with people?

THE JUROR:  Yeah.  I am getting questions about, you know, from --

THE COURT:  Where you're going?

THE JUROR:  Yeah, exactly.  Why do you need to be at jury duty today as opposed to at a different time, but...

THE COURT:  Okay.  But that's just about the mechanics rather than the substance, right?

THE JUROR:  Absolutely.

THE COURT:  And have you been able to, as much as you can, avoid media accounts of this case?

THE JUROR:  Yeah.  You see it come up, but you just keep moving.

THE COURT:  Right.  So that's the questionnaire that you filled out.  You completed it this morning.  There were some pages at the end --

THE JUROR:  Yeah.

THE COURT:  Do you remember what the circumstance was that --

THE JUROR:  The circumstances were that as people were finishing theirs, I dropped mine.  And when I reassembled it, I lost my place, so...

THE COURT:  Okay.  But you had a chance to complete the last, I guess --

THE JUROR:  Last few questions, yes.

THE COURT:  -- 15 questions or so?  So we're going to

follow up on some of that.

THE JUROR:  Okay.

THE COURT:  So tell us what you do in your work.  You say you're a research director and you advise banks and vendors on technology trends?

THE JUROR:  Right.  It's the same question my family asks:  What do you do?  So I follow payment technology, so how money moves from Point A to Point B.  And so I help banks and vendors understand what the trends are, but also what the technologies actually do, what the opportunities are and where some of the inefficiencies might be.

THE COURT:  Okay.  And how long have you been doing that?

THE JUROR:  About ten years now.

THE COURT:  It's an interesting specialty.  How do you get into that?

THE JUROR:  Interesting technology -- so I was a banker for ten years, went to an information security start-up for a few years after that, and from there went back to advising institutions and the vendors that serve them on how the technologies work and also what some of the pitfalls might be.

THE COURT:  So this is more curiosity than germane, perhaps:  Do you get involved in analyzing things like bitcoin?

THE JUROR:  Yes, as a matter of fact, I do.  So I

analyze it; I talk to clients about how they can use it, what some of the challenges might be.  I was quoted in an article about how the Federal Reserve wants to use something like bitcoin for payment movement, for payment processing.  It's a neat technology.  It's got some challenges in terms of the money-laundering capabilities, but it's something that the industry just has to figure out.

THE COURT:  Okay.  At the bottom of page 10 and at the top of page 11 we asked a couple of questions about use of social media, blogs, websites and so on.  Let's take them one by one.

THE JUROR:  Okay.

THE COURT:  Number 9 at the bottom of page 10, these are things more that you post on messages or opinions and so on.  The company you work for has its own website, I guess?

THE JUROR:  Correct.

THE COURT:  And you post on that.

THE JUROR:  Correct.

THE COURT:  Regularly?  Is that part of your --

THE JUROR:  It's part of my job.  Every couple of weeks or so I'll post something, whether it's an opinion, an observation or an event that's coming up.

THE COURT:  Okay.  And it says that -- I think it says you also tweet about those topics?

THE JUROR:  Yes.

THE COURT:  Is that, again, official or is that you in your personal capacity?

THE JUROR:  It's -- it's in my official capacity, but my opinions are my own type of thing, so I will -- I will point out something that might be happening or provide an opinion on a particular technology or a particular development.

THE COURT:  Okay.  Then at the top of the next page we asked another question about social media which may be partly duplicative, but we're also looking to be more general, I think, in this question.  Facebook and Twitter:  You say you review daily and post episodically.  Can you give us an idea what "episodically" is?

THE JUROR:  Just, so a prime example, the snow we've been having, sharing a picture with my friends of how deep the snow is, you know, that much of our six-foot lamppost is still visible.  But that's -- that's the nature of it.

THE COURT:  Okay.  Do you recall -- I assume you remember the events that underlie this case, the marathon events and so on and so forth?

THE JUROR:  Yes.  Sorry, yes.

THE COURT:  Were you following those with some attention when they occurred?

THE JUROR:  Honestly, it's hard not to.  My office looks out on the finish line.  And I was traveling the day of the incident, but it's hard not to follow given that where I

live is just a few miles away.

THE COURT:  Yeah.  So as an analyst, you probably won't be surprised by the idea that the parties in the case look at people's Twitter accounts and Facebook?

THE JUROR:  Absolutely.

THE COURT:  And it looks like you're fairly active retweeting during that period of time?

THE JUROR:  Probably.

THE COURT:  Do you remember it?

THE JUROR:  Not specifically.  More just reaction than anything else, I would assume.  And probably especially during the shelter-in-place part of it.  But that's -- but I have no specific memory and I didn't go back to -- didn't go back to check.

THE COURT:  So what -- to the extent you can remember it, did that continue or was that fairly confined to the time that the events were happening and unfolding and so on and so forth?

THE JUROR:  Confined to the time.  Once the arrest was made, if I'm remembering correctly, it would have tapered off.  There would be no need after that.

THE COURT:  Do you remember whether you sheltered in place?

THE JUROR:  I did.

THE COURT:  Was that in Boston?

THE JUROR:  In Milton.

THE COURT:  In Milton?  Okay.

And, again, I'm advised that you may have changed your -- I don't know what it's called, your --

THE JUROR:  Oh, yeah, my picture.

THE COURT:  From "B Strong" to something else?

THE JUROR:  Yeah.

THE COURT:  Was that because you were nervous about the effect here?

THE JUROR:  More just --

THE COURT:  It was around that time, wasn't it?

THE JUROR:  Yeah.  And I wouldn't say nervous, just more trying to support my town and support the people who were injured.  It's -- it was a trying time.

THE COURT:  No.  But I meant earlier this year, did you change it from a B Strong to a series of pencils?

THE JUROR:  Oh, yeah.  Yeah, the --

THE COURT:  Did you have any thinking about that?

THE JUROR:  Yeah, that was the -- I'm going to pronounce it -- but the Charlie Hebdo attack in Paris.

THE COURT:  Oh, I see.

THE JUROR:  The idea that -- just that the three pencils is the -- here's how we -- how straight that we were, the pencil was the attack, and then the pencil being resharpened to say we're going to keep going.

THE COURT:  Okay.  It sounds like you pay attention to events in the world fairly attentively.

THE JUROR:  Well, yes.

THE COURT:  Is that right?

THE JUROR:  Yes.

THE COURT:  Oh, I wanted to ask you about -- your father and stepmother are both attorneys?

THE JUROR:  Yes.

THE COURT:  What kind of law?  Are they still practicing?

THE JUROR:  They are still practicing.

THE COURT:  What kind of law do they practice?

THE JUROR:  My father -- my father practices tax and estate law, and my stepmother practices family law.

THE COURT:  Page 18, Question 67, you indicate you know a little Russian and a little Arabic.

THE JUROR:  Yeah.  The -- let's see.  Sorry, what page?

THE COURT:  Page 18.

THE JUROR:  So I went to Egypt, I went to Jordan and learned, you know, "water," count to five, that type of thing. Russian, a couple of words, a couple of phrases, but nothing...

THE COURT:  When were you in Egypt and Jordan?

THE JUROR:  Before 2014.  I want to say 2000 -- no, I'm sorry.  Before 2009.  So maybe 2007, 2008, somewhere in

there.

THE COURT:  Were those business trips or personal?

THE JUROR:  Personal.  So sightseeing.

THE COURT:  Let me ask you to turn to page 20, Question 77.

THE JUROR:  Uh-huh.

THE COURT:  In this question in multiple parts we asked you if you had -- based on things you'd seen and read about and so on, whether you'd formed various opinions whether the defendant was guilty or not, whether he should receive the death penalty or not, and you answered yes, you had formed an opinion about whether he was guilty.

THE JUROR:  Right.

THE COURT:  And that he was guilty, right?

Then -- but you said you were unsure about the penalty questions.  In the second part of the question, 77, we asked you if you answered yes to any of these questions, as you did to Part A, would you be able or unable to set aside that opinion and base your decision about guilt or punishment solely on the evidence presented at court, and you checked "able."

THE JUROR:  Yes.

THE COURT:  Would you tell us about that?

THE JUROR:  So sure.  Part of what I do professionally is to form opinions, and sometimes those opinions are wrong based off of new facts, based on interpretations.  So I've been

wrong before.  I could -- I'm sure I'll be wrong again.  And so I looked at it from the standpoint of, yes, based off of what I'd seen, I had an opinion, but if the evidence shows otherwise, then I could consider it.

THE COURT:  Okay.  I'm sure you appreciate that in our criminal justice system a person accused of a crime is presumed not guilty, or innocent, of the crime unless the government proves him guilty by evidence at trial that convinces the jury beyond a reasonable doubt that he is, in fact, guilty.  The burden of proving someone guilty is always with the government.  The defendant has no responsibility to prove that he's not guilty, that he didn't commit the offense he's charged with.

Would you have any difficulty in applying those principles faithfully if you were a juror in the case?

THE JUROR:  No problems, no.

THE COURT:  And that's notwithstanding any impressions or opinions you may have previously formed?  You'd be able to put those aside and focus on the evidence in the case?

THE JUROR:  Yes.

THE COURT:  Okay.  Let me ask you to look at page 21. You have a couple of Boston Strong -- I guess you said you have a blue and yellow marathon ribbon?

THE JUROR:  Yes.

THE COURT:  A lapel thing?

THE JUROR:  Yeah, the -- our annual conference took

place right after the event, right after the marathon.  And so one of our -- one of our sponsors had purchased the marathon ribbons for some of the analysts and gave them out -- gave them out to some of the attendees.

THE COURT:  You said right after.  Can you --

THE JUROR:  Within a week.  I think it was a week after.

THE COURT:  And was that here in Boston?

THE JUROR:  Yes, it was.

THE COURT:  And the T-shirt you said also was a gift?

THE JUROR:  Yes.  And I did buy a B Strong cap.  And one thing that I omitted, because I had forgotten about it, was within my church had provided space for a yard sale to benefit the Richard family.  So that was -- that was sometime that summer.

THE COURT:  Did you take part in the yard sale?

THE JUROR:  I bought things at the yard sale.

THE COURT:  Were you part of organizing it or anything?

THE JUROR:  No.

THE COURT:  So now this is the -- let me turn to page 23.  Again, at Question 88 we asked a series of questions addressing issues about the death penalty, your views on it. 88 is a penalty question:  If you have any views on the penalty, what are they?  You said, "I don't have any views on

the death penalty; however, I do believe there are situations where it is" --

THE JUROR: "Applicable." Sorry. I have terrible handwriting.

THE COURT: Do you want to say anything more about that or just --

THE JUROR: I am -- I'm against the taking of life in general, but there are -- I believe there are situations where that penalty is appropriate depending on whether it was heinous, whether it was cruel. And so while I wouldn't be thrilled with the situation of having to decide or having to opine, I do think that there is a moral responsibility to follow what's set out: Is that a penalty that is on the table, does it fit the nature of the act?

THE COURT: Okay. In Question 89 we asked you to put yourself on a scale from strongly opposed to strongly favor. You put yourself more or less in the middle, 6, neither in favor -- and you wrote in, "Neither in favor or opposed. Rather, the evidence should" -- is that "dictate"?

THE JUROR: Yes, "dictate whether it's imposed."

THE COURT: -- "dictate whether it is imposed."

And I guess that's similar to what you just said?

THE JUROR: Yes. Sorry.

THE COURT: If you'd look at page 24, Question 90, rather than on a numerical scale, here we asked you to see if

there was a statement that you thought summed up your views adequately, and you selected D, which says you're not for or against the death penalty. You could vote to impose it or you could vote to impose a sentence of life imprisonment without the possibility of release as you believe was called for by the facts and the law in the case.

Is that actually a --

THE JUROR: That's a fair summary, yes.

THE COURT: You heard me this morning earlier describe the penalty phase of a death penalty case if we get to that?

THE JUROR: Yes.

THE COURT: And of course you get to it only if the jury has convicted somebody of a capital crime, so the person is guilty when you begin the consideration of the penalty. You appreciate that?

THE JUROR: Yes.

THE COURT: And so there would be evidence of what the government would argue are aggravating factors that make this a particularly blameworthy crime that might, therefore, deserve a more serious punishment than usual, and you hear evidence of mitigating factors that might suggest that the death penalty is not an appropriate response but life imprisonment is more appropriate.

Would you be able to weigh all those things and make a judgment in either direction depending on how your weighing

came out?

THE JUROR: Yes, I would.

THE COURT: So you're not firmly predisposed to either outcome?

THE JUROR: No, sir.

THE COURT: Okay. Any follow-up?

MR. CHAKRAVARTY: Just one quick question about the last series that the judge asked you about. So if there is a death penalty phase in any death penalty case, not just this one, a juror is asked to weigh the aggravating factors and the mitigating factors that the judge described. As the judge instructed earlier, some of those mitigating factors might not be about the crime but might be about a defendant and his characteristics.

Would you be able to consider those as well as the facts of the crime in order to decide one way or the other and make your decision?

THE JUROR: Yes.

MR. CHAKRAVARTY: That's all I have. Thank you.

MR. BRUCK: Good afternoon.

THE JUROR: Good afternoon.

MR. BRUCK: My name is David Bruck, and I'm one of Jahar Tsarnaev's attorneys, and I've just got a few more follow-up questions, if that's okay.

THE JUROR: That's okay.

MR. BRUCK:  The good news is that I'm the last one, I'm pretty sure.

I wonder if you could tell me -- you said your office is right at the finish line?

THE JUROR:  No, not right at the finish line.

MR. BRUCK:  I'm sorry.

THE JUROR:  We could see the finish line from our office.

MR. BRUCK:  Okay.  Is the building on Boylston Street?

THE JUROR:  No, we recently moved our office, but the office we were in was on Arch Street.

MR. BRUCK:  Okay.  About how far from the finish line?

THE JUROR:  A mile?  I'm not sure.  We could -- where we were, we could see right down Boylston Street.

MR. BRUCK:  I see.  You said you weren't there that day?

THE JUROR:  Correct.

MR. BRUCK:  Were coworkers -- was it a workday at your office?

THE JUROR:  Yes, it was.

MR. BRUCK:  Did people tell you when you got back to work about what the experience had been like?

THE JUROR:  They shared what they saw.  Yes, they did.

MR. BRUCK:  So people saw the explosion from the office?

THE JUROR:  Well, they saw the smoke and they saw the -- and they saw the lights from the emergency vehicles.

MR. BRUCK:  And did people hear the explosions?

THE JUROR:  I'm not sure.

MR. BRUCK:  Okay.  And you got back how soon -- you were out of town, is that --

THE JUROR:  Yes.

MR. BRUCK:  And how soon did you get back to Boston after?

THE JUROR:  A day or two.

MR. BRUCK:  And people were talking about the -- their experience or what they had seen or -- when you got back to work?

THE JUROR:  Yes.

MR. BRUCK:  And your family, what -- where were you when you first heard about the bombing?

THE JUROR:  I was in an airport in between flights.

MR. BRUCK:  Were there people you were concerned about that you wanted to check on or did check on?

THE JUROR:  Yes, yes and yes.  So I checked on my family to make sure they're fine.  My wife doesn't work in Boston but my parents do, as does my brother.

MR. BRUCK:  So you called to check on all of them?

THE JUROR:  Yes.

MR. BRUCK:  I imagine you felt some anxiety until you

found out everybody was safe?

THE JUROR:  Yes.

MR. BRUCK:  Did any of those people have any stories to report about what they had seen or heard or experienced as a result of the bombing that day?

MR. CHAKRAVARTY:  Objection, your Honor.

THE COURT:  Yeah, I think that's getting a little remote.

MR. BRUCK:  Okay.

I'd like to ask you now a little more about the 19th, the day of the manhunt, I guess you could call it.

If I'm recalling correctly, did you say you stayed home that day?

THE JUROR:  I just remember the shelter-in-place order.

MR. BRUCK:  That's what I meant.  Right.  And did that order affect you?

THE JUROR:  I mean, we stayed home.

MR. BRUCK:  You stayed home?

THE JUROR:  Yeah.  And I also have the benefit of telecommuting, so I took that option.

MR. BRUCK:  Okay.  And did the shelter-in-place also affect your family?

THE JUROR:  Yes.

MR. BRUCK:  Everyone stayed home?

THE JUROR: I believe so.

MR. BRUCK: Okay. The judge was asking you -- you know, this word "opinion" sometimes can get us a little thrown off, and I want to probe a little more deeply about an opinion in the case. What I'm getting at is that we form judgments about thousands of things that we hear about. We don't have all the evidence, but we hear something and we decide what we think about it or we -- and that's what I want to ask you about on the question of the death penalty in this case.

You said you don't generally favor it, but you think it has a place or you -- before you knew -- had any idea you were going to be sitting here or be a juror, did you have a sense about whether this was an appropriate case for the death penalty?

THE JUROR: I figured it would be on the table, and I figured that something like this it could be appropriate, yes.

MR. BRUCK: Can you tell me any more about that? Why did you think that?

THE JUROR: Sure. Attacks on children, attacks on innocence. That, to me, is an aggravating factor.

MR. BRUCK: Right. So how would you describe -- I mean, was that -- would you say you had made a provisional judgment, or is that not a good description of your state of mind?

THE JUROR: It was so remote at the time. The -- so

as an analyst you start looking at what the options are or what the possibilities are.

MR. BRUCK:  Right.

THE JUROR:  The Commonwealth does not have a death penalty.  A federal case -- if it became a federal case, it would.  So it was more saying, Well, here are the possibilities.  We'll see what happens.

MR. BRUCK:  I see.  But without any sense of which way you thought -- based on what you heard, what you knew, your opinions about the whole picture, did you have any sense of which way you thought it should go?

THE JUROR:  I thought that if it was willful, if it was intentional, if it was intended to frighten, then, yeah, it could be -- it could be appropriate.

MR. BRUCK:  Okay.  You told the judge a little bit about the Charlie Hebdo expression of support.  Is that whole sequence in the course -- and you may have followed subsequent attacks in Europe since then.  Is that something that would affect your judgment about this case at all?

THE JUROR:  No.  I mean, the Charlie Hebdo case was freedom of speech.  I see this as being different.

MR. BRUCK:  Okay.  Bear with me just a moment.

THE JUROR:  Yeah, sure.

(Counsel confer off the record.)

MR. BRUCK:  We explored a little bit about your

tentative views, I guess you would call them, about the punishment in a case like this.  Have other people close to you, either at work or in your family, expressed opinions about what the punishment should be?

MR. CHAKRAVARTY:  Objection, your Honor.

THE COURT:  No, if they expressed -- I'm --

MR. BRUCK:  Expressed opinions to the juror.

THE COURT:  Yeah, expressed to you.

THE JUROR:  Sure.  And it basically follows along the lines of what their view of the death penalty is.

MR. BRUCK:  So that can you --

THE JUROR:  Sure.  If they were against the death penalty in all cases, then they would say life in prison; if they were for the death penalty, then they would say, well, you know, I think that that's what the outcome should be.

MR. BRUCK:  Okay.  I think that's all.  Thank you so much.

THE JUROR:  Sure.

THE COURT:  Thank you.

THE JUROR:  Thank you.

(The juror exits the courtroom.)

THE CLERK:  Juror No. 536.



THE COURT:  Let's have a brief sidebar.

THE CLERK:  Cut.

(Discussion at sidebar and out of the hearing of the public:)

THE COURT:  I see what you're saying.  It's a juvenile --

MS. CONRAD:  Oh, I guess I hadn't picked up on that. I'm sorry.



so everyone can hear you, okay?

THE JUROR: Okay. Thanks.

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon.

THE COURT:  Since you were last here, have you been able to avoid any discussion of the substance of the case with people?

THE JUROR:  Yes.

THE COURT:  And as much as possible to avoid any media accounts of the case?

THE JUROR:  As much as I could, yes.

THE COURT:  When you see it, you put it aside?

THE JUROR:  Yes.

THE COURT:  Okay.  Make yourself comfortable.

THE JUROR:  Okay.

THE COURT:  So that's the questionnaire that you filled out when you were here.

THE JUROR:  Okay.

THE COURT:  And I just want to follow up on some of the answers that you gave us.

THE JUROR:  Okay.

THE COURT:  You are a manager of information systems for a large company?

THE JUROR:  Yes.  Correct, General Dynamics Information Technology.

THE COURT:  How long have you been doing that?

THE JUROR:  I've been doing that since May of 2002.

THE COURT: What does it involve?

THE JUROR: Basically, I put solutions for all enterprise systems, and that can span between divisions and so forth, human resource systems, financial systems, and give the business a means of accessing information through those solutions.

THE COURT: You have employees you supervise?

THE JUROR: I do.

THE COURT: About how many?

THE JUROR: I have five.

THE COURT: We asked about social media. You use Facebook and Twitter a few times a week?

THE JUROR: Yeah, just a few times. It's mainly to stay in touch with family.

THE COURT: Any business use?

THE JUROR: No, no. It's not recommended.

THE COURT: I know. You had a brother-in-law who was deployed in Iraq for a while?

THE JUROR: Correct.

THE COURT: When was that?

THE JUROR: That was -- I want to say 2006? I can't remember off the top of my head. But it was during that time. Deployed for almost a full year.

THE COURT: Was he in combat, do you know, actual combat?

THE JUROR:  He was.  He's military police, and he was in combat.

THE COURT:  He shared his experiences with you?

THE JUROR:  Not so much.  He had some kind of posttraumatic trauma over there, so didn't really talk much about it, just kind of wanted to get back into the family routine, so -- and we didn't push for answers or questions to be answered.

THE COURT:  And is he your wife's brother?

THE JUROR:  Yes.

THE COURT:  Any physical injury apart from whatever psychological issues?

THE JUROR:  No.

THE COURT:  You applied to be an FBI agent once?

THE JUROR:  I did.  I did.  No, it's just an interest.  One of the things I -- I was watching FBI Files and I wanted to look into cyber crimes.  And so I was in information technology at that point in time.  There were heightened terrorist attacks through systems.  And it just intrigued me, so I pursued it, and I ended up pulling back after two years.

THE COURT:  Oh, were you -- I took it to be an application, but you actually worked for --

THE JUROR:  I did.  I went to Philadelphia.  And the decision was made -- I thought I could decide what city I was going to reside in, and that wasn't the case.  You couldn't

stay in the city you process in, which was Boston.  And I listed ten, and they told me that I wouldn't end up in the ten that I selected, so...  And then because I had my family here, I decided to pull back.

THE COURT:  Okay.  Let me ask you to turn to page 20.

THE JUROR:  Sure.

THE COURT:  Question 77.

THE JUROR:  Sure.

THE COURT:  And if it's convenient, you can take the clip off of the packet there.

THE JUROR:  Oh, thank you.

THE COURT:  77 up at the top.

THE JUROR:  Yeah.

THE COURT:  It's a multipart question, and we asked whether -- based on things you'd seen or read or learned about, whether you had formed an opinion about whether the defendant was guilty or not and whether he should receive the death penalty or not.  Up to Part A you said, yes, you had formed an opinion that he was guilty.

THE JUROR:  That's correct.

THE COURT:  And as to the death penalty questions, C and D, you said you were unsure?

THE JUROR:  That's correct.

THE COURT:  Then in the next part of the question we said if you answered yes to any of these questions, as you did

to Part A, would you be able or unable to set aside your opinion and base your decision about guilt or punishment based solely on the evidence presented to you in court, and you selected "able."

THE JUROR:  Yes.

THE COURT:  Can you tell us about that?

THE JUROR:  Sure.  You know, basically, as we're all -- we kind of form opinions, and we know that, I think things have to be substantiated of course.  So with evidence you make a good judgment call.  I'm thinking based on the knowledge I have at the moment, my opinion, it's not substantiated.  So I'm just making a formal opinion.  You asked me to make an opinion; I stated it.

Now, if evidence is provided and the case is overwhelming, the evidence for guilt and the sentence is penalty [sic], then that's something I have to consider.  So I'm able to do that.

THE COURT:  Okay.  We'll come back to the penalty question.

THE JUROR:  Sure.

THE COURT:  I want to focus on the question of guilt.  And it's understandable --

THE JUROR:  Sure.

THE COURT:  -- given the amount of publicity this case and events under it have generated that people have formed

impressions and opinions.

THE JUROR:  Yes.

THE COURT:  You understand that in a criminal prosecution a person is -- who's accused of a crime is presumed to be not guilty, or innocent, of the crime unless the government proves that he's guilty by the evidence at trial, and proves that beyond a reasonable doubt.

THE JUROR:  Sure.

THE COURT:  A defendant in a criminal case never has any obligation to prove that he's not guilty.  The default position is that he's not guilty, and the government must move the jury off that default into a position where it could find him guilty based on the evidence.

Would you have any difficulty in faithfully applying those principles if you were a juror in the case?

THE JUROR:  No.  At this point, again, I'm only basing an opinion based on what I've assimilated from the media and so forth.  But if I'm presented with the situation in which evidence is provided, then I'm making a judgment call based on facts.  So right now it's just opinions.

THE COURT:  So if -- with respect to any of the charges, if after evaluating the evidence in the trial you were not convinced beyond a reasonable doubt that the defendant was guilty of that offense, would you be able to find him not guilty?

THE JUROR:  Yes.  And just to give you examples of why I'm stating my opinions, if I'm watching things in the media, you know, prior to attending here and knowing that I'm going to be a participant here -- if I'm watching things in the media and seeing individuals elude the police, you make a formal opinion based on what you're seeing and those events.  So that's all I'm saying.  I'm just being honest.

THE COURT:  Uh-huh.  We appreciate that.

We asked a series of questions, 80 through 82, about whether you or people close to you had witnessed the events or been personally affected in some way, and you indicated that that was not the case.

THE JUROR:  Not to my knowledge.

THE COURT:  And you haven't participated in any of what we might call support activities, Boston Strong T-shirts or One Fund or anything like that?

THE JUROR:  No, I haven't.

THE COURT:  Let's come back to the questions of the death penalty.

THE JUROR:  Is that 77 again?

THE COURT:  No, this is on page 23.

THE JUROR:  Oh, 23.

THE COURT:  We asked a series of questions directed at the death penalty beginning with Question 88.

THE JUROR:  I'm there.

THE COURT:  And 88 was a general question:  If you have any views about the death penalty in general, what are they?  You said you don't have an issue with the death penalty if the prosecution has presented evidence that is beyond a reasonable doubt.

You heard this morning that I described that the case may have two phases, that the first phase is to determine whether the defendant is guilty or not of a particular crime, including a capital crime which could carry the death penalty. If he is convicted of a capital crime, then the question of the imposition of the death penalty or not is put to the jury in what we call the penalty phase.  That's unusual to -- that's not the usual criminal practice.  Ordinarily, if someone is convicted of a crime, the judge would impose the sentence.  But in a death penalty cases, the jury has that responsibility.

THE JUROR:  Okay.  I'm aware.

THE COURT:  So that when you get to the penalty consideration, you have a person who has been found guilty by the jury of the capital crime, okay, beyond a reasonable doubt. So I just wanted to make sure you were focused on that.

THE JUROR:  Sure.

THE COURT:  There are things that -- in order to impose the death penalty, some conclusions have to be proved to the jury beyond a reasonable doubt in the penalty phase as well.  But you understand the propositions, the questions are

different in a guilt phase, that is whether he's guilty of the offense or not as a matter of fact, than in the penalty phase, where the question is given that he is guilty of this offense, what should the punishment be.

Do you understand that distinction?

THE JUROR:  Yes, I do.

THE COURT:  Okay.  Does that lead you to change or modify or reaffirm the answer that you gave in Question 88?

THE JUROR:  Well, again, it does.  I mean, again, I have an opinion.  I have a belief the death penalty -- I'm not against the death penalty and I -- if the death penalty is presented in the case and the guilt is there for capital punishment and we have to assess a punishment, then I am not against the death penalty if that's what it comes down to.  So it's just I don't want to state I'm not against it, if it's presented to me and that is an option.  And, again, based on the information that's provided, evidence, I would make a decision whether or not.

THE COURT:  Right.  Well, of course the question goes in the other direction as well.

THE JUROR:  Sure.

THE COURT:  And that is, if a person is convicted of a capital crime by the jury, would you have the tendency to think that it should follow that he would get the death penalty?  In other words, it would be almost automatic that he would be

given the death penalty if he was guilty of that crime.

THE JUROR:  Yes.  I mean, if it's hand in hand, the situation is if we found guilt, then basically it requires a death penalty.  Is that what you're asking me?

THE COURT:  If you would think that because he was guilty of the offense, then the question about whether the death penalty should be imposed was answered.

THE JUROR:  So, yes, I would have to say "yes."

THE COURT:  Okay.  That would mean that you wouldn't be able to consider the penalty phase evidence and balance those aggravating --

THE JUROR:  I may be misunderstanding the question, then.  I just want to make sure I'm clear.

THE COURT:  The penalty phase, as I say, commences only after a person has been convicted beyond a reasonable doubt of a crime that is sufficiently serious that the death penalty is a possibility.

THE JUROR:  Okay.

THE COURT:  All right?

THE JUROR:  Yes.

THE COURT:  The death penalty -- whether the death penalty is imposed is a separate matter of judgment than whether the person is guilty of the offense.

THE JUROR:  Okay.

THE COURT:  Are you with me?

THE JUROR:  Understood.

THE COURT:  Okay.  In the penalty phase, the jury will be focused only on what is the right punishment for the crime we've already found him guilty of.

THE JUROR:  Okay.

THE COURT:  Okay?

And so the question is whether you would, because he was guilty, think that there was a preordained answer to that question --

THE JUROR:  Oh, I see.

THE COURT:  -- and that the answer was the death penalty, or whether you would be able to pay attention to the evidence in the penalty phase on both sides, evaluate it, and make a choice, rational choice, between one course or the other based on your evaluation of the evidence.

THE JUROR:  Yes, I should --

THE COURT:  Do you understand?

THE JUROR:  Yes.  So basically I understand it's not automatic, and what we're saying is we have two phases.  So one phase to consider the guilt, and then the penalty.  And am I able to then listen to statements on whether to deserve [*sic*] the penalty of death or not?  Yes, I think I can sit through that and make an impartial decision.

THE COURT:  Yeah.  The question isn't whether the death penalty is automatic as a matter of law; it's not.

THE JUROR:  It's not.

THE COURT:  Because the jury has to make that.  The question is:  Might it be automatic in your mind?

THE JUROR:  Yeah.

THE COURT:  That's the question.

THE JUROR:  It's not.  Sorry.  I know it took a little bit to get there but...

THE COURT:  Well, and one of the reasons I wanted to be sure of that, because if you look at Question 89, literally -- 89, where the numerical scale -- we asked you to put yourself on a scale.  10, if you look at the question, says, "Reflects a belief that the death penalty should be imposed whenever the defendant has been convicted of an intentional murder," and that is the sort of automatic imposition.

THE JUROR:  I understand.  And not having knowledge of kind of the judicial system and how that works, I'm thinking if I found someone guilty of a crime and the penalty is death, then I thought it was automatic.  But in this case, understanding there's a two-phase to it, I would have to make the same judgment call, meaning impartial, right, on the second phase of that.

THE COURT:  Okay.  Let's look at the question on the next page, Number 90.

THE JUROR:  Sure.

THE COURT:  Rather than selecting a number on a scale, we asked you to look at the series of propositions and see if there was one that you thought expressed your view.

THE JUROR:  Uh-huh.

THE COURT:  I want you to take a minute to just read the whole question so you have the context.

THE JUROR:  (Complies.)

THE COURT:  Okay?  You selected E, which is you're in favor of the death penalty but could vote for a sentence of life imprisonment without the possibility of release if you believed that sentence was called for by the facts and the law in the case.

THE JUROR:  Yes.

THE COURT:  Is that a fair summary of your --

THE JUROR:  It is.

THE COURT:  So that means, I guess, you could -- if you thought life imprisonment was the appropriate penalty you would -- after assessing the evidence you would go in that direction?

THE JUROR:  That's correct.

THE COURT:  And vice versa?

THE JUROR:  Correct.

THE COURT:  Follow-up?

MR. CHAKRAVARTY:  Just very briefly.  Good afternoon. My name is Aloke Chakravarty.  I'm one of the prosecutors.

THE JUROR:  Nice to meet you.

MR. CHAKRAVARTY:  I'm going to test your patience a little bit and just belabor just this last issue that the judge was clarifying.

THE JUROR:  Okay.

MR. CHAKRAVARTY:  The fact that there's -- it's a bifurcated process, essentially, the guilt decision being separate from the penalty, which is a different analysis.

THE JUROR:  Uh-huh.

MR. CHAKRAVARTY:  The judge instructed you earlier today that there are aggravating factors and mitigating factors, and some of those mitigating factors could be characteristics about the defendant.

THE JUROR:  Sure.

MR. CHAKRAVARTY:  That might not be about the crime but about the defendant.  So is that the kind of thing that you would keep your mind open to in the penalty phase?

THE JUROR:  Yeah.  I guess not having gone through something like this, I think I have to keep open to all -- you know, basically any option, right, any decision or any evidence or even witnesses at that point, right?  I'm trying to be fair; I'm trying to be impartial.  So I'm basically trying to make an assessment based on the information that's coming in.  Right now I lack the knowledge.  I've never gone through this process before.  So I'm able to be receptive to these things and

participate as much as I can.  I don't know if that answers your question.

MR. CHAKRAVARTY:  It does.  I'm just following up on that, though.

THE JUROR:  Sure.

MR. CHAKRAVARTY:  It's one thing to be open to some things --

THE JUROR:  Understood.

MR. CHAKRAVARTY:  -- and it's another thing to genuinely be able to consider and withhold making a decision until you've seen kind of what that entire sum of evidence is.

And do you have a bias one way or the other as we sit here today?

THE JUROR:  No, I don't.  I don't.  I mean, again, it's what's been presented to me to date, right?  So if something else is presented -- it's a matter of persuading me to -- one way or the other, and that can only be done by providing, you know, facts and evidence and, I guess, information.

MR. CHAKRAVARTY:  And just to clarify that Question 89 which is on page 23, you circled the 10, which was the extreme, and the judge asked you about whether by that you meant that you would automatically impose the death penalty.  And after clarification it sounded like you -- can you explain why you circled a 10 there if it --

THE JUROR: Sure. Again, not understanding the full judicial process, I'm thinking if someone's been found guilty of a capital crime and the penalty is death, then I am strongly in favor for that. If it's automatic. I didn't know it was a two-phase process, right? So...

MR. CHAKRAVARTY: So you thought the law required that?

THE JUROR: Yeah, exactly. That's why I said earlier it's required, and I find out it's not.

MR. CHAKRAVARTY: Okay. So now with that clarification, where would you say you are on this?

THE JUROR: I would say I'm in probably the 5 or 6 range.

MR. CHAKRAVARTY: Thank you.

THE JUROR: Okay. You're welcome.

MS. CONRAD: Good afternoon, sir. My name is Miriam Conrad. Excuse me. Can you hear me okay?

THE JUROR: I can.

MS. CONRAD: I'm one of Mr. Tsarnaev's lawyers. And I apologize for my voice.

THE JUROR: No problem.

MS. CONRAD: Can I just ask you: On page 6, Question 13, you indicated that your wife is a nurse?

THE JUROR: She is.

MS. CONRAD: And where is she a nurse?

THE JUROR:  She's a nurse at the Brigham and Women's Hospital.

MS. CONRAD:  And was she a nurse there at the time of the marathon bombing event?

THE JUROR:  She is.  She's been employed there for 17 years.

MS. CONRAD:  And in what unit was she?

THE JUROR:  She's in the postpartum.

MS. CONRAD:  Okay.  Was she in that unit at that time?

THE JUROR:  I can't recall.  I don't -- honestly, placing it back to that time frame, she was employed there. She is a nurse there.  I just can't recall as far as the timeline if she was there the day of.

MS. CONRAD:  She was there the day of?

THE JUROR:  No, no, I can't recall the day of if she was working or not.

MS. CONRAD:  But I'm sure you're aware that a number of victims and survivors of the bombing went to the Brigham and Women's for treatment?

THE JUROR:  Yes, I am.

MS. CONRAD:  Do you know if she was involved in treating any of those victims?

THE JUROR:  Not to my knowledge, honestly.

MS. CONRAD:  Do you know if she was exposed or saw any of them or any of the activity?

THE JUROR: Yeah, sure. In the hospital they actually have protocols to make everyone aware of the situation, so she was aware of what was going on.

MS. CONRAD: And did she talk about that?

THE JUROR: There was not much to talk about. She was just put on alert as most hospitals do during emergency times.

MS. CONRAD: And do you know if she participated in any activities relating to the marathon bombing or Brigham and Women's involvement in that?

THE JUROR: Again, not to my knowledge and nothing that she shared with me.

MS. CONRAD: Are you friends with her on Facebook?

THE JUROR: With my wife?

MS. CONRAD: Yes.

THE JUROR: Yes, I am.

MS. CONRAD: And are you aware that she recently changed her profile picture to Brigham and Women's Strong?

THE JUROR: Yes, I am aware, due to the recent death of a doctor.

MS. CONRAD: So that wasn't related to the marathon bombing?

THE JUROR: Oh, no, no, no.

MS. CONRAD: Okay. Thank you very much for clarifying that.

THE JUROR: You're welcome.

MS. CONRAD:  And you actually were an FBI agent, right?

THE JUROR:  No, never.  I was just an applicant.

MS. CONRAD:  Oh, I'm sorry.  I thought you went to Philadelphia.

THE JUROR:  On interviews.  I never completed the process.

MS. CONRAD:  I see.  I'm sorry.  I totally misunderstood.

THE JUROR:  I'm sorry.

MS. CONRAD:  So you never went through the training process?

THE JUROR:  No, never went to Quantico.

MS. CONRAD:  And can you tell us a little bit more about why you were interested in working for the FBI?  You mentioned an interest in terrorism and cyber crime?

MR. CHAKRAVARTY:  Objection, your Honor.

THE COURT:  Go ahead.

THE JUROR:  Basically, as I said, my interest came from just watching the FBI Files.  I was really interested. Being in information systems, you tend to be someone who deals with a lot of challenges on a day to day, right?  No one calls IT when everything is working.  So I just -- I found interest in that.

And one day actually I went onto their website.  They

said they were looking for IT personnel, you know, to help during those cyber attacks. And I submitted my application. And because of my background -- I'm also bilingual, so I speak Spanish. And so they actually put me on the fast track. So within a couple of months I was already in Philadelphia interviewing.

MS. CONRAD: Now, is that an opportunity that you think you might try to pursue in the future?

THE JUROR: No. I have, you know, small ones now, and so my focus is providing for them. And I'm kind of stable in my professional career right now.

MS. CONRAD: And you have two sons. Is that correct?

THE JUROR: I do.

MS. CONRAD: And one of them is eight years old?

THE JUROR: Yes, the youngest.

MS. CONRAD: And I'm sure you're aware that the crimes charged in this case include the death of an eight-year-old boy?

THE JUROR: Yes.

MS. CONRAD: And how do you think the fact that you have two sons, young sons, of your own would affect your ability to be impartial in this case?

MS. PELLEGRINI: Objection.

MS. CONRAD: That's exactly the question we talked about.

THE COURT:  Go ahead.  Go ahead.

MS. CONRAD:  Thank you.

THE JUROR:  Should I answer?

THE COURT:  Yes.

THE JUROR:  I think, you know, as a dad losing a child, I mean, there's definitely some emotional, you know, issues that one would go through, and I can relate to those issues.  I think one of the things is, you know, I'm here.  I'm imperfect myself.  I can't condemn others.  But I'm willing to sit and understand situations.  So -- and basically I'm just trying to relate my beliefs.

My beliefs is I don't condemn others; I can only participate in situations in which I've been provided some, how can I say?  I won't say "authority," but given a privilege to do so.  I think I can be impartial to understand situations.  And I may be going around the question because I feel that -- I don't know.  Sorry.  I'm trying to answer it.  I'm trying to not come out too -- how can I explain it?  I'm trying to put my thoughts together.  I'm sorry.

MS. CONRAD:  Why don't you just take a minute and think it through --

THE JUROR:  Sure.

MS. CONRAD:  -- because really, you know, what I'm asking is I understand and appreciate how much you want to be impartial and keep an open mind --

THE JUROR:  Sure.

MS. CONRAD:  -- but we're only human.

THE JUROR:  Exactly.

MS. CONRAD:  And we're really just asking you, because you know better than we do, how you think you would feel.

THE JUROR:  Sure.

MS. CONRAD:  Recognizing it's difficult to predict, how you think you would feel listening to testimony and seeing images that depict the death of an eight-year-old boy.

THE JUROR:  Sure.

MR. CHAKRAVARTY:  Objection, your Honor.  The initial question was about how it would affect his --

THE COURT:  Well, that's all right.  Answer the question just put.

THE JUROR:  Sure.  So sorry.

Well, again, I think there -- being human, I think there's an emotional aspect to that.  And I think that having a family can, you know, have an impact on my decision.  I hope that answers your question.

MS. CONRAD:  It does.  Thank you.

And can you turn to page -- I think I lost my page. It's Question 92, and I think it's on page 25.

THE JUROR:  Sure.

MS. CONRAD:  Sorry about that.  Can you just explain that to me?

THE JUROR: Sure. Oh, I'm sorry. I kind of figured that that was going to be one. It was a little cryptic. But basically, my beliefs -- I'm of Christian belief, right? So I don't think that there's -- I can condemn someone else or judge someone else. I'm imperfect myself.

MS. CONRAD: I'm sorry. Can or cannot?

THE JUROR: I'm sorry?

MS. CONRAD: I couldn't hear you.

THE JUROR: Oh, I said I cannot. But again, as part of my beliefs, we are asked to, you know, again, enforce our laws of principality. So if there is a law in which I am required to make a decision, again, I abide by those laws. So just being a resident of those principalities.

MS. CONRAD: So I'm not quite sure how that relates to your views on the death penalty. If you could just expand on that.

THE JUROR: Sure. I mean, again, my personal belief, I'm neither strongly in favor or against it, right? So I can make a decision based -- if it's been granted to me to participate in such a situation where I have to determine someone's penalty, whether it's death or not. So I'm abiding by the laws in which I reside in, right?

MS. CONRAD: So going back to Question 89 on page 23 for a minute, that gave sort of a range from 1 to 10 --

THE JUROR: Uh-huh.

MS. CONRAD:  -- of positions with respect to the death penalty.  And you chose the one that was most strongly in favor of the death penalty.

THE JUROR:  Uh-huh.

MS. CONRAD:  So I'm really just trying to gauge -- I get that you thought that it was automatic.

THE JUROR:  Right.

MS. CONRAD:  But, for example, why you chose 10 instead of 9 or 8.

THE JUROR:  Again, assuming that if someone's been found guilty of a capital crime, then guilt to me would be that -- that it would be automatic to sentence to the death penalty.  So I basically said if -- based on the evidence that's been provided I found the person guilty, then I would assume that that would be automatic death penalty.

MS. CONRAD:  But your own personal views.

THE JUROR:  Uh-huh.

MS. CONRAD:  I mean, this is really more a question of, you know, philosophy or policy as opposed to something that you would do in a particular case, at least in this question, as I read it.  So looking at the question that way --

THE JUROR:  Well, this one wasn't about belief, right?

MS. CONRAD:  I'm sorry?

THE JUROR:  Oh, sorry.  89?

MS. CONRAD:  Just take your time, please, and read it

over.

THE JUROR:  Okay.

(Pause.)

MS. CONRAD:  So looking at it more as a question of philosophy or policy --

THE JUROR:  Sure.

MS. CONRAD:  -- where do you think your views would tend to --

THE JUROR:  I think I restated it in my understanding, and I said a 5 or 6 now that the question has been clarified for me.

MS. CONRAD:  Okay.  And do you think that if the defendant -- if a defendant were convicted of killing a child, would you be able to consider facts beyond -- about the defendant himself before deciding about the death penalty or would you think that the death penalty would be the appropriate punishment?

THE JUROR:  Well, this goes back to understanding aggravation and mitigation, right?  So if the mitigation is something that I'm called to listen to, then I would have to base it on that information coming in.

MS. CONRAD:  And finally, you mentioned that your brother-in-law had been in combat in Iraq?

THE JUROR:  Yes.

MS. CONRAD:  And do you know if he saw any deaths or

injuries?

THE JUROR:  As I said, he didn't share any of that with us and we didn't probe just because we didn't want to add to the trauma.

MS. CONRAD:  So if there were to be evidence in this case that a motive for the bombings was military action in Afghanistan and Iraq, would your brother-in-law's service in those arenas affect your ability to consider the evidence fairly and impartially?

THE JUROR:  Again, it's experiences that bring me here, right, and makes me participate as part of the jury.  So I think they all play a part -- as far as what decision, I don't know.  I don't understand the information that's coming in right now, so -- what I mean, that's going to be presented to me.  But I can -- with confidence I can say that I can assess things and be somewhat analytical and, you know, distinguish that.

I just don't know -- it's hard for me never participating in that to say it's not going to have an emotional effect on me or it is.  So I can just say I can try to be as impartial as possible, but I think being human, there are certain aspects where it plays on your emotions as well, so...

MS. CONRAD:  Thank you very much.

THE JUROR:  You're welcome.

THE COURT:  Thank you, sir.  I appreciate it.

THE JUROR:  All set?

THE COURT:  Yes.  Just leave that there.

THE JUROR:  Okay.  Have a nice day.

(The juror exits the courtroom.)

THE COURT:  All right.  We'll take a break.  Maybe 2:15 at this point?  Does that sound all right?

COUNSEL IN UNISON:  Sure.

(The Court exits the courtroom and there is a recess in the proceedings at 1:25 p.m.)

THE CLERK:  Juror No. 537.

THE JURY CLERK:  Juror No. 537.

THE CLERK:  Ma'am, over here, please, if you would.  Have a seat.

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon.

THE COURT:  Have you been able to avoid discussion of the substance of the case with people?

THE JUROR:  Pretty much.  Some people are -- ask a lot of questions, and I try to politely put them off.

THE COURT:  Okay.  Media reports as well, you tried to avoid?

THE JUROR:  Uh-huh.

THE COURT:  As best you could?

THE JUROR:  Yes.

THE COURT:  So there's the questionnaire that you had filled out.  We're going to follow up on some of the information you gave us, all right?

THE JUROR:  Okay.

THE COURT:  Tell me a little bit about your work as a data shepherd.  That's a term I hadn't heard.  I kind of like it.

THE JUROR:  Well, it's very difficult to describe what I do.  I'm on a team at work that's responsible for the basically customer data for our company.  And we're responsible for making sure it's at the right place, at the right time, and that the quality is pretty good.  Since it's across multiple systems and multiple databases, we shepherd it around.

THE COURT:  Is it a large company?

THE JUROR:  It's large-ish.  It's not huge.  It's local.

THE COURT:  Okay.  Before that, you were a business systems consultant.  Is this the same thing as data shepherding, dealing with business systems?

THE JUROR:  Pretty much.  For most of my work experience, I worked in kind of back-end applications, applications that support how a company does business.  So financial applications, sales applications, that kind of thing.

THE COURT:  Okay.  We asked a little bit about use of social media.  If you want to look on -- this is at the bottom

of Page 10, Question 29.  And you -- I guess you say you post family pictures, music videos you like, and other random things on Facebook a few times a month.

THE JUROR:  Yes.

THE COURT:  Basically.  And then there's a sort of literary blog that you contribute to, is that it?

THE JUROR:  It's a website.

THE COURT:  Website.  And you post there from time to time?

THE JUROR:  Not so much recently but, yes, certainly in the past.

THE COURT:  Then on the next page, at the top, in Question 30, you say you have Instagram, Twitter, and Tumblr accounts but you don't post.  Do you follow other people's tweets?

THE JUROR:  Somewhat.  I'm not --

THE COURT:  Sporadically?

THE JUROR:  Yeah, sporadically, yeah.  I don't have a smart phone, so I'm kind of disconnected to a lot of that.

THE COURT:  So let me ask you to turn to Page 20, Question 77, which is a multipart question.  We asked about whether you had formed an opinion about certain matters based on what you heard or read in the media and otherwise, including whether the defendant was guilty.  You said, yes, you had an opinion.  You had formed an opinion that he was guilty.

THE JUROR:  Uh-huh.

THE COURT:  And as to Part (c), which was whether you'd formed an opinion that he should receive the death penalty, you said "no"; and as to (d), that he should not receive the death penalty, you said "yes."

Then in the next section of the question, we said, "If you answered yes to any of these questions, would you be able or unable to set aside your opinion and base your decision on guilt and punishment solely on the evidence that will be presented to you in court?"  And you checked the box that said "able."

THE JUROR:  Uh-huh.

THE COURT:  And then you added, "I believe I could base my decision about guilt on the evidence.  However, I'm less certain that I could set aside my opinions about the death penalty."

THE JUROR:  Yes.

THE COURT:  So let's separate those two for a minute, okay?

THE JUROR:  Okay.

THE COURT:  Let's talk about the question of guilt or not.

THE JUROR:  Uh-huh.

THE COURT:  You said you have an opinion --

THE JUROR:  Uh-huh.

THE COURT: -- now as to what you've seen in the media and wherever. I'm sure you know that, in a criminal prosecution, an accused is presumed to be innocent, or not guilty, unless the government proves the person guilty of the crime charged by evidence at the trial and convinces the jury beyond a reasonable doubt that the person has committed that crime. You're familiar with those principles?

THE JUROR: Yes.

THE COURT: You have to answer verbally so she can take down the answers.

THE JUROR: I'm sorry. Yes.

THE COURT: Would you have any difficulty in basing a decision, as a trial juror, solely on the evidence produced in the course of the trial rather than matters you'd heard before you were asked to be a juror or that you otherwise came to have information about from some other source?

THE JUROR: I think I would be able to make a decision based on the evidence at trial.

THE COURT: Okay. We'll come to the questions about the penalty in a minute, but there are a couple of other questions in the meantime. We asked about whether you or anybody close to you had, first of all, been directly affected by the explosions and so on, and you said "nobody." This is, again, if you want to look at the bottom. It's Question 80.

THE JUROR: Yes.

THE COURT:  On the next page we asked whether there was some other effect that people experienced, like sheltering in place on the 19th, so on and so forth.  I guess you said your husband, who works in Boston, had to do that.

THE JUROR:  Yes.

THE COURT:  Were you yourself affected?

THE JUROR:  No, not with the shelter in place.

THE COURT:  Was the effect on your husband a substantial one, an inconvenience or a serious inhibition?

THE JUROR:  It was upsetting, but he -- it was what it was, I guess.  He was not traumatized, I would say, by it.  He was certainly concerned and upset but not --

THE COURT:  Where were you that day?

THE JUROR:  I was at work out in Natick.

THE COURT:  So you weren't affected by the sheltering order?

THE JUROR:  No.

THE COURT:  Or request, whatever it was?

THE JUROR:  No, I was not.

THE COURT:  In the next question, we asked about various kinds of support activities people might have participated in.  You think some members contributed to the One Fund, and you don't remember whether you did?

THE JUROR:  I don't think -- I might have put money into a container or something at a business, but I don't -- I

don't think I wrote a check or anything like that.

THE COURT:  Question 83 on Page 22.

THE JUROR:  These are out of order.

THE COURT:  Yes.  Mine were, too.  22 follows Page 9.

THE JUROR:  Yes, I've got it.

THE COURT:  You say -- so we asked about other connections, and you say your husband attended MIT as an undergrad.

THE JUROR:  Yes.

THE COURT:  You know that one of the victims of the crimes alleged here is an MIT police officer?

THE JUROR:  Yes, I do.

THE COURT:  Does your husband's MIT connection give you any concern about an effect on your impartiality in the case?

THE JUROR:  No.

THE COURT:  Is he an active alum?

THE JUROR:  I believe he contributes but doesn't participate in alumni activities or anything like that.

THE COURT:  I guess the rest of that answer is you indicate you used to work nearby some of the relevant locations.

THE JUROR:  Yes.  I used to work in Watertown.

THE COURT:  Would that have any effect on your service as a juror in this case?

THE JUROR:  No.

THE COURT:  How long ago was that that you worked there?

THE JUROR:  About seven years.

THE COURT:  Now, on Page 23, beginning with Question 88, we asked a series of questions about the attitude toward the death penalty, so we'll go through some of these now, okay?

88 itself is a general question.  If you had views in general about it, what are they?  You say you struggle with it.  You think -- you'd like to think that you're against taking a life for any reason but that you think that some acts may be so heinous that the death penalty should be considered, and you're not sure where to draw the line.

THE JUROR:  Yes.

THE COURT:  Anything you want to add or qualify there?

THE JUROR:  No.  I mean, I think if I were personally affected, I would probably -- I would feel more strongly.  But just kind of a dispassionate observer, I am against the death penalty.

THE COURT:  Okay.  Let me ask if you'd turn to Page 24, Question 90.  Here we set forth a variety of different formulations of what people might think about the death penalty and what they -- how they might respond to being considered to participate in its decision-making about it.  Why don't you just take a minute to review the whole question.  Then I will

focus on the answer you gave.  Okay?

THE JUROR:  Uh-huh.

THE COURT:  You selected (c), indicating you're opposed to the death penalty, but -- it goes on to say, "But I could vote to impose it if I believe that the facts and the law in a particular case called for it."  Does that get your view, or do you have to amend that in any way?

THE JUROR:  I fall between (b) and (c), I think.  I have very few beliefs that are set in stone, so I don't like to make definitive statements about anything.  But, as I have thought about this a lot, I probably tend more to (b) now than to (c), but it's between those two.

THE COURT:  Okay.  In referring to (b), I imagine you're looking at the portion of the statement that says you would have a difficult time voting for it.

THE JUROR:  Yes.

THE COURT:  I gather you wouldn't go so far as to say you have an impossible time doing it?  You could never do it?  That would be (a).  I just draw your attention to (a).  You could never --

THE JUROR:  Yes.  I really don't know.  Since I haven't been in that situation, I can't say.

THE COURT:  You may have learned something this morning that you didn't know before, and that is, I gave a little instruction --

THE JUROR:  Exactly, yeah, yeah.

THE COURT:  -- about the process.  Of course, the process in a penalty phase occurs only after the jury has convicted a person of a capital offense that carries the possibility of the death penalty.  So the jury has already decided this person is guilty of that offense.

THE JUROR:  Uh-huh.

THE COURT:  From there then the question is what is the appropriate punishment of the two available alternatives?  And there will be evidence presumably from the government suggesting this is an aggravating circumstance that calls for a greater-than-usual punishment.  There will be mitigation evidence from the defense to say a life sentence is perfectly appropriate and sufficient and so on and so forth.  We ask jurors then to think about all of that, see what it means to them, and then make their choice.  If you were in that situation, you know, hypothetically -- you don't know any of the evidence.  You push yourself forward to that circumstance.  Can you give us your self-assessment about whether you think you would be able to make either choice or whether you would be impaired in some way in making a choice for the death penalty because of your views?

THE JUROR:  I think it would be very difficult to convince me to impose the death penalty.  There would be a very high bar set for that.

THE COURT:  Okay.  Let me ask you to look at Page 25, at Question 95, at the bottom.  It's a bit of an awkward question.

THE JUROR:  Yes.

THE COURT:  Because it asks you to first assume that you found it appropriate and then asks whether you could vote for it.  I guess you're pointing out the contradiction -- the possible contradiction there.

THE JUROR:  Uh-huh.

THE COURT:  I think what it was getting at perhaps -- and I'd like you to think about it -- is the distinction between making an intellectual assessment and coming to a conclusion about appropriateness, for example, and then conscientiously, in your whole self in a sense, would you be able to follow through on that conclusion and actually vote for it?

THE JUROR:  That's a good question.  I don't know.

THE COURT:  Okay.  Follow-ups?

MR. CHAKRAVARTY:  Thank you, your Honor.  Because that was such a good question, I will choose to kind of go with it a little bit.

The penalty phase of the proceeding comes after a conviction, meaning the jury has agreed that the person has committed the crime.  I'm not saying in this case.  I'm saying in any case.  Then, as the judge said earlier, there's a

presentation of evidence that goes to the punishment and the aggravating factors as well as mitigating factors that may be presented. At no time does a juror ever have to vote for the death penalty.

THE JUROR: Uh-huh.

MR. CHAKRAVARTY: In that context, could you not just listen to the evidence but actually be persuaded to vote for the death penalty in that circumstance?

MS. CLARKE: I don't know if that's the question, your Honor, so I'd object.

THE COURT: I think it should be reformulated.

MR. CHAKRAVARTY: I'll break it down to a couple smaller questions. One is: Do you have a -- aside from your beliefs against the death penalty, you feel that you would go into that proceeding with a bias against giving the death penalty?

THE JUROR: I think, as I said before, it would have to be a fairly high bar for me to accept the death penalty. So if that's a bias, then I guess I would be biased.

MR. CHAKRAVARTY: So the judge also instructed you this morning about aggravating factors would have to be proved beyond a reasonable doubt.

THE JUROR: Right.

MR. CHAKRAVARTY: You say it's a high bar. Do you mean a bar higher than that?

MS. CLARKE:  Judge, that's asking for a --

THE COURT:  I agree.  You don't have to answer it.

MR. CHAKRAVARTY:  So assuming whatever that bar is is met and you've consciously come to that decision that that would be what the facts and the law call for in a particular case.  You said in your questionnaire that -- first go to, I guess -- on Page 25 you wrote, "I'm not sure how I could decide the death penalty was the appropriate punishment but then not vote for it."

Understanding you have the right to vote for however you deem fit regardless of what the other jurors do -- think, again, given that circumstance, do you feel like there would be some restriction on your ability to act on that conscious decision?

MS. CLARKE:  Judge, I'm not -- well, perhaps the juror can understand it, but I don't get the question.

THE COURT:  You can answer that if you're able to.

THE JUROR:  Are you asking, if I believe that the death penalty was the appropriate punishment, then I could -- I wouldn't have any qualm about voting for it.

MR. CHAKRAVARTY:  Not a qualm.  It's not about qualms.  It's about whether that's something that would inhibit your ability to act on what you had decided.

MS. CLARKE:  Well --

THE COURT:  No.  Go ahead.  You can answer that.

THE JUROR:  I guess not.  If you phrase it like that, I can't think -- if I thought that that was the right thing to do, then that would be what I would vote.  So --

MR. CHAKRAVARTY:  So when you wrote on 95 that -- you check-marked the box "no" to whether you could conscientiously vote for the death penalty if you had decided that it was appropriate.  How do you reconcile that with what you're telling us now?

THE JUROR:  Well, I checked "no" and then I scribbled it out.  And then I sort of said I'm not sure, and I don't really understand the question the way it's phrased.

MR. CHAKRAVARTY:  Okay.  That's actually helpful to clarify that you scribbled that out.  All right.

So on -- going back a little bit to Question 77.

THE COURT:  It's Page 23 -- no, I'm sorry, 20, 20.  My mistake.

MR. CHAKRAVARTY:  So Question 77, you wrote in that you were able to set aside your opinions on the issue of guilt, I think, is what the -- the judge asked you about.  At the bottom you said, "I'm less certain that I could set aside my opinions about the death penalty."  And so do I take from that that your opinions that you had indicated that Dzhokhar Tsarnaev should not receive the death penalty, you were less certain that you could set that aside?

THE JUROR:  Correct.

MR. CHAKRAVARTY: And the body of information that you would have to make the decision about guilt -- excuse me, that you currently have about guilt or punishment, I assume, is the same body of information? Yet, you were able to set aside the opinion with regards to guilt, but you're not confident with regards to your ability to set it aside with regard to punishment?

THE JUROR: Correct, because -- well, I think, again, it gets back to the high bar. It would be -- I would have trouble voting for the death penalty for anyone, not just in this case.

MR. CHAKRAVARTY: Okay. So another way of trying to get at the same issue, is that trouble going to impair your ability to review the evidence of aggravation and mitigation and kind of make your own rules with regards to whether the death penalty should be imposed as opposed to follow the Court's instructions?

THE JUROR: I guess I really can't answer that because I don't know how -- I don't know how it works. I don't know how the instructions are given for the death penalty versus life imprisonment. So if there's a spectrum and the spectrum says if you -- if these questions are answered yes, then it has to be the death penalty, then that would be one thing. But I don't know how it works, so I really can't answer that, I don't think, probably to your satisfaction.

MR. CHAKRAVARTY:  So --

THE COURT:  Maybe I could just try to clarify that a little bit for you.  Without getting into the intricacies too deeply, you heard me say there will be presentations by the government presumably of aggravating factors and by the defense of mitigating factors.  There will be specific propositions that will be suggested that if you found it to be true, as a matter of fact, it could be accepted, for example, as an aggravating factor, it will be something that will be asserted as a factor about this case which makes this worse than other cases.  So the government is essentially asking you consider the evidence and see if you find, as a matter of fact, that this factor is present in this case.  You would have to find that beyond a reasonable doubt.

On the other side, the defense would propose propositions that, if found to be supported by the evidence, would tend to mitigate the penalty to be applied.  And the jury would be asked to consider whether they found those things to be facts in the case.  You heard me say, if a mitigating factor were found by the juror, that juror could consider that mitigating factor in making a determination.

It's not that there are rules that say, if the boxes are checked, you come out this way.  There is some discipline in that each side will suggest a set of propositions to you, and you'll consider whether those have been proved or not.

Then you'll consider the other side's propositions and whether those have been proved.  Then you'll assess all of that.  And in the end, the kind of summary question that's put to the jurors is, if you find aggravating factors and if you found or didn't find mitigating factors, is the weight of the aggravating factors sufficient for you to say this is a case for the death penalty or not?  That's kind of a summary.  Does that help?

THE JUROR:  It does help.  I don't know that it changes my answer at all.  I think it's wrong to take a human life.

THE COURT:  Take your time.

THE JUROR:  But in some cases I understand why you would want the death penalty.

MR. CHAKRAVARTY:  Give you a moment.

THE JUROR:  No, I'm fine.

MR. CHAKRAVARTY:  The last statement you said in passive voice, and you say that because -- I want to get beyond the theoretical.  It's clear that you're leaving open the possibility intellectually that you could arrive at that decision.  But, as a practical matter, could this be something that you ever see as something you would be capable of doing, of actually casting a vote to take somebody's life?

THE JUROR:  Probably not.  Seeing as if I were ever in a case or in a situation where I felt it were appropriate, I

probably would not be on the jury because I would be too close to the situation in some way, shape or form.

MR. CHAKRAVARTY:  Just one final question.  It's a little bit -- hopefully, a little bit relieving from this.

THE JUROR:  That's fine.

MR. CHAKRAVARTY:  On Question 78, you said there had been a lot of discussion, and you were generally an open person and you had communicated your opinions to others about the case.  If you could just clarify what kinds of opinions were these types of opinions?

THE JUROR:  These kind of discussions that we're having right here and even before -- definitely before I was called for jury duty.  Just something people talk about.  So really just discussions about when the whole presumed innocent and the death penalty and just people discussing what their beliefs were and some of them saying, Oh, yeah, definitely on this side and others saying maybe not so much.

MR. CHAKRAVARTY:  Thank you.

MS. CLARKE:  Thank you.  Good afternoon.  My name is Judy Clarke.  I'm one of the lawyers for Mr. Tsarnaev.  And I'm going to go back to the death penalty if you don't mind.

THE JUROR:  Okay.

MS. CLARKE:  It's pretty clear that you've thought about it.

THE JUROR:  I've thought about it a lot.

MS. CLARKE:  And thought about it a lot.  And I certainly appreciate that.  It seems from your answer in 88 and 89 that you do envision a place for the death penalty in our society.

THE JUROR:  I don't know in our society.  I think in some societies but --

MS. CLARKE:  Right.  We happen to be the society that --

THE JUROR:  Yes.

MS. CLARKE:  Let me ask it this way:  If you were in the legislature, I take it you would vote against it?

THE JUROR:  Yes, I think I probably would.

MS. CLARKE:  But you're not.  And the Congress has given us the death penalty for certain federal offenses.

THE JUROR:  Uh-huh.

MS. CLARKE:  You understand that?

THE JUROR:  Yes.

MS. CLARKE:  I guess really the path I want to go down is you're aware that it's not disqualifying to be against the death penalty and sit on a capital jury.

THE JUROR:  Uh-huh.

MS. CLARKE:  Right?

THE JUROR:  Yes.

MS. CLARKE:  And that seems fair, to have people with both viewpoints --

MR. CHAKRAVARTY:  Objection, your Honor.

MS. CLARKE:  -- sitting on a capital jury.

MR. CHAKRAVARTY:  Instructing on the law of qualification.

MS. CLARKE:  Okay.  I guess what all we ask of jurors in that situation is to listen to the evidence.  You can do that?

THE JUROR:  Uh-huh.

MS. CLARKE:  I think she wants a yes.

THE JUROR:  I'm sorry.  Yes.

MS. CLARKE:  You'll get us both in a lot of trouble.

Debate with our fellow jurors, you can do that?

THE JUROR:  Yes.

MS. CLARKE:  And, in fact, I think you said, with regard to guilt, you can make a decision based on the evidence at the trial.

THE JUROR:  Yes.

MS. CLARKE:  Even though you held an opinion that Mr. Tsarnaev is guilty.

THE JUROR:  Yes.

MS. CLARKE:  And I guess that's all we ask in the penalty phase, is that you listen to the evidence presented.

THE JUROR:  Yes.

MS. CLARKE:  Could you do that?

THE JUROR:  Yes.

MS. CLARKE:  Consider all of that evidence with your fellow jurors.

THE JUROR:  Yes.

MS. CLARKE:  Weigh the aggravating evidence against the mitigating evidence.

THE JUROR:  Yes.

MS. CLARKE:  And come to a decision.

THE JUROR:  Yes.

MS. CLARKE:  And then where the rubber meets the road is if you decided -- if you decided -- if your conscience -- if in your heart you decided, based on the weight of the evidence that the death penalty was the appropriate sentence -- that's your decision; you've made it -- could you follow through on that decision?

THE JUROR:  Yes, I guess I could, but, again, I -- not having been there, I really can't say.

MS. CLARKE:  You've never been there, but that's really --

THE JUROR:  Yes.

MS. CLARKE:  I guess we're trying to put you there --

THE JUROR:  I know.

MS. CLARKE:  -- as closely as we can without asking you if you're for the death penalty or against the death penalty in a particular case.  If you make the decision in a particular case that it's the right thing to do, if your

conscience tells you the death penalty is the right result, could you actually vote to impose it?  And that's really the question.

THE JUROR:  Yes, I believe I could.

MS. CLARKE:  Okay.  Thank you very much.

THE COURT:  Okay.  That's it.  Thank you.

THE JUROR:  Thank you.  Just leave that there.

THE CLERK:  Juror No. 538.

THE JURY CLERK:  Juror No. 538.

THE CLERK:  Sir, over here, please.  Have a seat.

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon.

THE COURT:  Thanks for your patience.

Have you been able to avoid discussing the substance of the case since you were last here with anyone?

THE JUROR:  Yes.

THE COURT:  And also, as much as possible, avoid contact with media reports about the case?

THE JUROR:  Yes.

THE COURT:  Okay, good.

That's the questionnaire that you filled out when you were here last.  We're going to follow up on some of the information you gave us there.

THE JUROR:  Okay.

THE COURT:  So tell us about your current employment.

You're the project manager for a contracting company.

THE JUROR:  Correct.

THE COURT:  What kind of work does the company do?

THE JUROR:  The one across the street is an example.

THE COURT:  You're responsible for that?

THE JUROR:  Yup.  Not personally but --

THE COURT:  We won't hold it against you.

THE JUROR:  Large scale, yeah.

THE COURT:  What, in general terms, does the project manager do?

THE JUROR:  So I'm on the preconstruction side, which is estimating and purchasing the different trades for the job. So I work with the owner early on to help them cost the job, estimate the job, as they try to put a deal together, and then eventually, once we go forward, I'll actually purchase the concrete, the steel, the different trades, and then kind of hand it off to the wonderful folks in the field who actually build the building.

THE COURT:  Then you'll move on to your next project?

THE JUROR:  Yes.  They call it the preconstruction side.

THE COURT:  Looks like from your form you're a reformed lawyer.

THE JUROR:  Yes.

THE COURT:  You were general counsel at the last

company you were with, I guess.

THE JUROR:  Assistant, yes.

THE COURT:  Okay.  Fair enough.  Was it a conscious change, or was it one of those things that presented itself and --

THE JUROR:  Architecture was my undergrad, and then I thought about doing construction law.  That was the plan.  And a good clerkship out of -- during law school turned into a full-time job for the next six years.  And when that company sold, my wife and I had moved back here where she lives and we live now.  And I knew of this company I work for now, and I made a career change.

THE COURT:  Uh-huh, okay.  Good.  Your wife, you tell us, is a pediatrician?

THE JUROR:  Yes.

THE COURT:  Where is her practice generally?

THE JUROR:  At Children's in town, in the city here.

THE COURT:  As I'm sure you know, the events, the bombing and aftermath, when people were injured, a lot of the Boston hospitals were involved in that, including Children's, I believe.  Did she have any involvement in it?

THE JUROR:  No.  She's a developmental pediatrician, so she's more office hour, nonemergency type issues.

THE COURT:  Is her office at the Children's Hospital site, or is it at an off-campus?

THE JUROR:  It's on the campus, on Longwood.  It's -- but it's not in the hospital.

THE COURT:  Was she -- do you know whether she was there the day of the Marathon?

THE JUROR:  I do not recall to be quite honest.  I feel like she was not because we would have discussed that, and it would have been a bigger issue.  But I'm not a hundred percent sure on that.  That's Patriots' Day.  I believe I have that off, and I believe she had that off, too, so --

THE COURT:  We asked -- this is at the top of Page 11, Question 30.  We asked people about social media that they might use.  You say you have a Twitter account that you use mostly for sports, is that it, tracking sports?

THE JUROR:  I did for a while.  It's kind of annoying, but, yes, I subscribe to a couple sports feeds, I guess.

THE COURT:  I see.  Okay.  And Instagram, you say you have an account, but you don't use it?

THE JUROR:  Yes.  I'm told I should use it but I do not.

THE COURT:  Let me ask you to turn to Page 20, Question 77.  In this question we asked whether, based on things you'd seen or heard in the media or from other sources, you had formed opinions about various matters and as set forth in Subparts (a), (b), (c), and (d).  And I guess, in the end, each of them you answered "unsure," although for (a) and (b)

you first put "yes" and "no."  And then you wrote in on the side, "assuming I had to make an opinion, then, yes."  Could you exculpate that for us?  Just (a) and (b) right now.  We'll get to (c) and (d) later.

THE JUROR:  I guess I was struggling with the fact that, if I'm trying to make a decision without going through a case or without knowing all the facts, without sitting through a trial, this would be my opinion based on the information I have, which is limited but it's media driven.

I'm also -- the struggle is, as a lawyer, not practicing but as a lawyer, I know there's a process and that you have to go through all that process.  So when I was filling this out, I had to remember to put on different hats here and try to stick with what I believe in.  And, one, if I had to just make a guess, this is what I would guess; and, two, I think there's a process to follow, and I think that, if you follow that process, that -- you know, that would be the correct result in my opinion.

THE COURT:  Right.  We're asking this question because it's understandable, given the amount of coverage that these events had, that people might have impressions or opinions about it.  What we really want to get at is, even if that's the case, will a prospective juror be able to put aside any opinions that derive from that kind of information and be able to participate in the case receptive only to the evidence

that's presented in the case and considering only that.

So we asked that in the second part of the question down below.  If you had an opinion, would you be able or unable to set it aside and decide the case on the evidence presented in the court?  You at the time checked "able," but then you added, "Yes, very important."  So can you maybe address those issues?

THE JUROR:  Yes.  I think I can do the analysis because it's not no different -- it's not any different, but it's an analysis that, you know, I can set everything aside and take a set of facts that we're given, or at least we have to interpret ourselves, and the law that you will give us.  I think I can apply that, you know, outside of biases I might have.  If that's what you're asking, I can actually -- I think I can do that.  I mean, that's the short of it.

THE COURT:  You never practiced criminal law, I take it?

THE JUROR:  No.

THE COURT:  But I'm sure you had courses, at least a course in it, in college -- in law school, I mean.  I'm sure you know that the burden on -- placed on the government in any criminal case is to prove a defendant's guilt beyond a reasonable doubt by the evidence at trial.  Would you -- if you were a juror in this case, in assessing the evidence as to one of the charges, for example, if you found that the government's

evidence had not convinced you beyond a reasonable doubt, would you be able to find the defendant not guilty of that charge?

THE JUROR:  If they could not produce the evidence, then I would go by that.  The evidence -- if they cannot produce it, then, yes, I'll apply the law you give us.  And if that's the case, then, yes.  But I assume everything is going to be brought forth.  It's going to be a long trial.  There's going to be a lot of evidence.  I would have a lot more than I would have to answer some of the answers above where I was making a guess or an opinion based on limited information.  So, yes.

THE COURT:  We asked about -- in the next few questions, about the way people might have been affected by the events.  In Question 81, you said you were aware of requests to be vigilant.  First of all, where were you on the Friday -- that Friday?  Were you at home or were you at work or --

THE JUROR:  The Friday?

THE COURT:  That was the shelter-in-place day.

THE JUROR:  The day, that I recall, I was at work because I work in Winchester.  It was close to -- you know, within reasonable distance of Watertown.  And I remember getting a call from my mother saying, you know, Pay attention.  Make sure -- I was aware of it.  So that's what kind of stuck in my head as this is making national news.  I'm very close to where this is all going on.  And so either it was through a

media report or through my mother telling me to be aware of your surroundings and what's going on.

THE COURT:  Okay.

THE JUROR:  It was quiet in the office that day, so I think a lot of people either weren't there because of what was going on or something else was causing them not to be at the office, but it was quiet that day.

THE COURT:  The office is in Winchester; is that what you said?

THE JUROR:  Yes.

THE COURT:  Let me ask about Question 85.  So you recognize one of the people on the witness list.  That's the MBTA police officer who was injured in the events in Watertown, right?

THE JUROR:  That's what I believe.  I think, in the exhibit, it might have said Watertown officer, if I remember correctly.  So I don't know which one it was, but I -- I thought it was MBTA.

MR. CHAKRAVARTY:  That may be a typo.  You're right. It's an MBTA police officer.

THE COURT:  Tell us -- you say you met his wife.

THE JUROR:  So he grew up in the town my wife grew up in.  And they were both at a swimming pool in Winchester.  And he was there with his wife, his -- I think he had one kid at least -- I'm not sure about two -- and then his folks or her

folks.  I didn't meet them but they were there.  And my wife said hello, and she introduced me to his wife.  I don't recall actually shaking his hands or being formally introduced to him. But he was sitting in a chair inches away.  Our kids were playing in the pool along with some other kids.  So that was the interaction.

THE COURT:  When was this?

THE JUROR:  Last summer, July probably, 2014, yeah.

THE COURT:  Would that have any effect on you as a juror knowing that your wife knows his wife?  Let me clarify that.  Does she know him or his wife or both?

THE JUROR:  I don't know if she knows Richard Donahue. She knows of him because, when his name was posted, you know, online -- in the media, she goes, That's a Winchester boy.  I think my brothers -- because she has brothers that went to school at Winchester, and they -- I think my older -- her younger but the oldest one knows him.  So we knew that at least her sibling knew him.  And so she recognized the name.  And so I think that's the extent.  We've never done anything socially with them.  I don't think we know of a phone number or anything, so --

THE COURT:  I guess so the blunt question is:  Would you --

THE JUROR:  Would I --

THE COURT:  Would you feel any obligation to vindicate

him in some way?

THE JUROR:  I don't feel any deep connection with him, so I don't feel an obligation to vindicate him.  I think it would be easy to kind of pull that apart if there was something that -- inside of me that I don't realize that's holding me back.  But I think I could peel that apart and analyze the facts.

THE COURT:  Are you members of the club?

THE JUROR:  Yes.

THE COURT:  You go regularly, I presume?

THE JUROR:  Yes.

THE COURT:  Regularly enough anyway?

THE JUROR:  Yeah.  My kids go there all the time.

THE COURT:  Sure.  Do you know whether the Donahues are, or were they guests of somebody?

THE JUROR:  I think their parents may be members.  I don't -- I'm not sure.  That's the only time I've seen them there, from my knowledge, but I think their parents may be.

THE COURT:  Okay.

THE JUROR:  Either his parents or her parents.  I'm not sure which one.

THE COURT:  Let's turn to Page 23.  Beginning at Question 88, we asked a series of questions about the -- your attitudes towards the death penalty.  Question 88 is a question whether you have any general views, and if so, what are they?

You say you have no deep views, but you recognize the question requires some methodical and clean process. You say that the process can be, I guess, excessively lengthy if I understand what you're saying. Anything you want to change or add about that?

THE JUROR: You could probably write a lot more about this, but I was just -- again, I understand we need this process. We need to follow it. It's the law. Let's follow the law. But I also have a cynical side where I realize it's a lot of -- I wouldn't call anything -- I shouldn't call it waste, but it's a lot of time spent for something that, you know, if it doesn't happen, then it almost seems like, jeez, we spent all this time going through this process. We should have not gone for the death penalty type of -- or I guess what I'm trying to say is I realize that you need to go through this process, and so let's go through the process. But in that, it's going to be a lot of time. And many people, nonlawyers, people I work with, people, friends, you know, can joke and tease about how it's a waste of money. So you kind of feel that side, too, at times. So I don't know if it's a perfect answer there.

THE COURT: Look at 91 on the next page and what you wrote there.

THE JUROR: That's kind of what I was trying to say to some extent. I've never really been involved with any study of

the death penalty, so I don't know that much about it to be honest. So I know that it's -- it's different depending on the different -- you know, the different states that have death penalty. I know we're in a federal court here. But I don't know that much about it, but I know that -- when you have a casual conversation, you often discuss -- things like this will pop up. What do you think about the death penalty?

So I think that -- I acknowledge that the time that is spent to do it, to actually go through with it, is quite significant, and it often seems like it's a waste. I'm also a person that believes that, if you have a law, you have to follow the law. And if you want to change that, you can go about changing the law, which we all know that process.

THE COURT: Okay. In 89, on Page 23, we asked you to put yourself on a numerical scale. You circled 5 and 6, which is sort of the middle.

THE JUROR: I've never really had any deep thought about it. If everything was perfectly decided and you never had anything decided incorrectly or, you know, the truth -- justice was always properly carried out, then I think there's times, yes, it's deserved. But it's the cost/benefit analysis. I think I mention somewhere in here at some point it seems like it may be a great cost.

THE COURT: But we're in the process.

THE JUROR: We're in the process, yeah.

THE COURT: Observation influence your decision-making, the fact that you have those cost/benefit views?

THE JUROR: I think it's pretty clear I can do the analysis and that's what matters. Ultimately, that's what governs the way I look at deciding these issues, is what is the law. Let's apply the law. I'm not beyond what the law is, so I'm -- there's the other route if you want to change the law so --

THE COURT: Look at Question 90 on Page 24. Rather than asking you to circle numbers, here we asked you to look at a number of statements and see if you found one that you thought represented your view. You selected (d). If you want to take a minute and review all the others to see if you'd make any different choice today.

THE JUROR: It's in the middle, which is kind of how I've been waffling back and forth the last ten minutes here. I don't have any deep-rooted belief either way, and I think that comes back to, you know, let's apply kind of the guidelines, if you want to call it, the law that you're required to apply.

THE COURT: You heard -- this morning I described in brief terms the so-called penalty phase where there would be proposed for your consideration aggravating factors and mitigating factors. And the jurors are asked to decide what of those had been established by the evidence and then to weigh

Page 171 of 210

them against each other and so on and see if the aggravating factors outweighed other considerations and, therefore, suggested the death penalty is an appropriate punishment; or, on the other hand, did not and the mitigating factors or just the balance itself was insufficient to make this the special case that calls for the death penalty.  Would you be able to, after evaluating that, be prepared to decide in either direction?

THE JUROR:  Yeah.  And I assume you would provide the legal framework for us to work within, and we would apply the facts.  So, yes, I mean, to me it's just another form of a legal question in law school.  It's apply what's in front of you.

THE COURT:  What I'm getting at is you never have to make any particular decision.  It's your own decision to make based on your own assessment of the evidence.  But the question I'm really asking is:  Are you open to making a decision in either direction?

THE JUROR:  Yeah.  You have -- yes.  And if truly things are favoring one side or the other, then I believe the evidence will be there, and it will prove out that way.

THE COURT:  All right.

MR. CHAKRAVARTY:  Just briefly.  Good afternoon.  My name is Aloke Chakravarty.  I'm one of the prosecutors.  Just a couple of questions.

THE JUROR: Okay.

MR. CHAKRAVARTY: Hopefully, a couple of questions. You know how lawyers are.

On the MBTA police officer issue, there's going to be testimony about what happened to him. There's likely to be testimony about what happened to him, perhaps even testimony from himself. Would your interaction with his family alter your assessment of that evidence? And would you be able to be fair and impartial in reviewing it?

THE JUROR: I could be fair and impartial.

MR. CHAKRAVARTY: Another fact that's likely to be exposed during the trial is that a child was killed during the trial. I notice that you have children yourself. Does that -- the fact that a child was killed, which is obviously an emotional thing for anybody, would that impair your ability to be fair and impartial with regards to reviewing the evidence and doing, as you said, following the law to make a decision?

THE JUROR: No. I think I can apply the analysis necessary. You have to strip away any potential biases you may have, and I think I can do that.

MR. CHAKRAVARTY: Then, finally, one question -- and if you want to answer this privately, be my guest, but I wasn't sure what you meant. Page 8, Question 19, I was hoping you could explain. We could perhaps go to sidebar.

THE COURT: Yeah. I think we should do that. We'll



have a short sidebar.

(SIDEBAR CONFERENCE AS FOLLOWS:

THE COURT:  Okay.

THE JUROR:  So my --

MR. CHAKRAVARTY:  I didn't understand what it meant.



MR. BRUCK:  We have questions when the sidebar is over.

THE COURT:  Right, of course.  Sorry.

. . .  END OF SIDEBAR CONFERENCE.)

MR. BRUCK:  Good afternoon.  My name is David Bruck, and I'm one of Jahar Tsarnaev's attorneys.  And I just have a few questions, I don't think terribly many.  About Rick Donahue and his family, do you know what his involvement in -- why he's a witness in the case or what his involvement in this whole story is?

THE JUROR:  He was badly injured, is what I recall. And I believe it was from media.  It was a shootout -- I believe it was a shootout, the night shootout, if I recall correctly.

MR. BRUCK:  Anything else that comes to mind about the story?

THE JUROR:  And I believe he was shot by friendly --

by another police officer, I believe.

MR. BRUCK:  You remember -- did you read any of the coverage about his medical treatment and the whole --

THE JUROR:  I didn't follow his medical treatment other than I would hear from my wife or from someone in the family, like, yeah, he's really in difficult shape and, you know even at one point I thought -- I heard he wasn't going to survive.  They were really on edge.  But -- it wasn't from my own reading of the media or anything.  It was --

MR. BRUCK:  Did your wife talk at all -- I'm recalling and just wonder if it rings a bell with you the role of a very young female doctor who is credited with saving his life, does any of that come back to you?

THE JUROR:  Actually, no.

THE COURT:  I didn't hear the answer.

MR. BRUCK:  He doesn't recall.

THE JUROR:  No, I don't recall that, no.

MR. BRUCK:  I take it there's some possibility you would encounter -- you and your family would encounter his family in the future?

THE JUROR:  Yes.  If they go to the -- especially if they go to the swim club or we happen to take our kids swimming.

MR. BRUCK:  Does the Donahue family live in Winchester as far as you know?

THE JUROR:  Actually, I don't know that.

MR. CHAKRAVARTY:  Objection, your Honor, as to where they live.

THE COURT:  No.  Go ahead.  I think that's all right.

THE JUROR:  I do not know.

MR. BRUCK:  I want to ask you a few questions about the death penalty if that's okay.  Were you living in Illinois at the time of the great debate back and forth about the death penalty in Illinois?

THE JUROR:  What years are you speaking of?

MR. BRUCK:  I guess it was late '90s and early --

THE JUROR:  I was in Illinois until 2006 -- '08.

MR. BRUCK:  Okay.

THE JUROR:  So yes, yes.

MR. BRUCK:  Do you remember when the governor had --

THE JUROR:  There's a moratorium, I believe.

MR. BRUCK:  -- a mass commutation?

THE JUROR:  I didn't follow it that closely, but I remember -- is it Governor Thompson or is it Edgar?  I'm sorry. I don't recall.

MR. BRUCK:  Governor Ryan maybe?

THE JUROR:  Was it Governor Ryan?

MR. BRUCK:  Whatever.

THE JUROR:  I don't recall.  I don't recall.

MR. BRUCK:  Did you have any feelings one way or the

other about the debate in Illinois about the death penalty or the governor's actions?

THE JUROR:  Nothing too deep, not to say that I don't get into deep discussion on certain things.  I recall thinking I wonder if this guy is going to be recognized some day down the road as this was something he should have really -- you know, it was the right thing to do.  I thought about that for a short time, but it didn't go any further than just kind of thinking while you're driving a car or something and just -- no discussion.

MR. BRUCK:  Okay.  I think you may have been living there when Illinois abolished the death penalty.  Does that ring a bell at all?

THE JUROR:  I don't recall when it was abolished, but I was in Chicago until 2006.

MR. BRUCK:  Okay.  Do you have a view about whether Illinois did the right thing or did the wrong thing?

MR. CHAKRAVARTY:  Objection, your Honor.

THE COURT:  No.  Go ahead.  He can answer that.

THE JUROR:  I really don't have any -- a real deep view on the death penalty, unfortunately, not that I don't care, but I just really don't have a deep view to be honest.

MR. BRUCK:  And as the judge told you, there are no right or wrong answers.  There is a right answer to every question, but that is, how you really feel.  So that's all

we're interested in.

You talked about the ways in which this whole process could be a waste.  I wonder whether -- if you were in a jury in a capital case, whether you would feel any tug to -- in favor of the death penalty so as not to have the whole huge effort be -- have been a waste of time?

THE JUROR:  I don't think I'll feel the tug, but I know what you're saying.  And my comment was more from a cynical side.  I have many very practical friends that think they understand everything and have quick opinions on things and can summarize anything very quickly.  You'll hear things like that, and sometimes you're like, Yeah, it could be a waste.  But when it comes down to it, I think the process is more important.  You know, the truth or the evidence will determine what -- which side prevails.  So I feel like it's out there.  It just needs to be presented, and we can make the decision.  The cynical side that a person could acknowledge having would be that waste discussion, you know.

MR. BRUCK:  Okay.  You, quite a number of times, talked about you could do the analysis and sort of weigh where the facts came down.  I wanted to be sure that we were clear on the process and on the way the decision ultimately gets made.  The judge explained that, in the sentencing phase, you go into -- it's devoted entirely to the penalty.  And there's aggravating factors presented and mitigating factors, and the

jury does weigh facts and make factual findings. But did you also get from all that that in the end the decision is not a factual one. It's a discretionary one, where you could go either way depending on your sense of right or wrong, of what's fair, what's moral, what's necessary, not just what the facts are? Does that -- were you clear on that?

MR. CHAKRAVARTY: Objection to the form of the question.

THE COURT: No. Go ahead. He can answer that.

THE JUROR: I see where you're coming from. And because I've never been involved in that aspect, it wasn't entirely clear. But I think what I can do is, when I'm told you have -- work within this framework, I can work within that framework. And so it's not like, you know, Judge O'Toole is going to say X. Now you can do Y. He's going to tell you, I assume, you work within -- you need to determine whether this fact outweighs this fact, and then I can do that, you know, so -- is that kind of the way you're asking the question?

MR. BRUCK: He told you, in the end, you have to decide not just whether facts outweigh each other but whether the reasons for death sufficiently outweigh the reasons for life so, in your judgment, the death penalty is the correct outcome, which is very discretionary. You see what I mean? It's not just facts or even which fact outweighs which fact. It's which verdict is the right thing to do.

THE JUROR:  I assume, before any of that decision-making would happen, I would -- the jurors would be given all the information on how we're supposed to analyze or weigh or whatever you want to call it, and then I would evaluate that and move forward.  I haven't seen all that, so I don't know what that's going to be.  So I don't know if you're asking me to know a little bit more about that process, which I do not know anything about.

MR. BRUCK:  Right.

THE JUROR:  So it's hard to -- it's hard to kind of answer that because I assume I'm going to be given some direction.  Does that make sense?

MR. BRUCK:  Well, I don't want to belabor this, but I've been hearing from your answers that you might expect more direction than the jury actually gets, and I want to be clear. In the end, the jury is told, Do what's right.

THE JUROR:  If the judge would happen to say, Do what's right, and it was that vague, then I would have to come up with my own decision on what doing -- on what doing right is.  So I don't think it's going to be that vague, though, but I don't know.

MR. BRUCK:  Okay.

THE JUROR:  So -- it's --

MR. BRUCK:  Okay.  I think that's all, but let me check for a second with my --

(Discussion held off the record.)

MR. BRUCK:  That is all.  Thank you very much.
Appreciate it.

THE COURT:  Thank you.  Thank you very much.
Appreciate it.

THE JUROR:  Thank you.

THE CLERK:  Juror No. 547.

THE JURY CLERK:  Juror 547.

THE CLERK:  Ma'am, over here, please, if you would.
Have a seat.





MR. BRUCK:  The parties are satisfied, your Honor.

THE COURT:  I want to explore some other things, I guess without the sidebar though.

. . .  END OF SIDEBAR CONFERENCE.)

THE COURT:  Let me just ask you, in Question 10 we set out the schedule in the case and so on.  You know, recognizing that it's somewhat a burden for anybody to do, whether it would be especially difficult for you.

THE JUROR:  It would be.

THE COURT:  You wrote that you were concerned about the kids.

THE JUROR:  Yes.

THE COURT:  Tell us about that.

THE JUROR:  I have no family out here, and my husband's mother is 73, and my whole family is from New York. My husband works construction during the day, and he works 3 to 11 at night so --

THE COURT:  You're it?

THE JUROR:  I'm it.

THE COURT:  Thank you.

THE JUROR:  Sorry.  Thank you.

THE CLERK:  Juror No. 548.

THE JURY CLERK:  Juror 548.

THE CLERK:  Ma'am, over here, please, if you would. Have a seat.

THE COURT:  Good afternoon.

THE JUROR:  Good afternoon.

THE COURT:  Have you been able to avoid discussion of the substance of the case since you were last here?

THE JUROR:  Yes.

THE COURT:  And also, as much as you can, stay away from news stories about the case?

THE JUROR:  Yes.

THE COURT:  You have to answer because the court reporter is taking things down.

So you work at a law firm.

THE JUROR:  Yes.

THE COURT:  As an assistant legal assistant?

THE JUROR:  Correct.

THE COURT:  You say to a partner and two associates?

THE JUROR:  Correct.

THE COURT:  What kind of law do those lawyers practice?

THE JUROR:  We mostly do employment and contracts, litigation but not criminal litigation.

THE COURT:  That's what I was getting at. Particularly these lawyers that you work for, they don't do criminal?

THE JUROR:  Right, correct.

THE COURT:  We've got a little family information from you about family members.  You have a sister who's a registered nurse in the area?

THE JUROR:  Yes.

THE COURT:  Is she affiliated with a hospital?

THE JUROR:  She used to be Brigham and Women's, but she's somewhere in Chestnut Hill.  I'm not sure.  It's a private place where she works now.

THE COURT:  When was she with Brigham and Women's, do you remember, what years?

THE JUROR:  Probably up to last year.

THE COURT:  Last year meaning 2014?

THE JUROR:  Yes.

THE COURT:  Was she -- so she was there in 2013?

THE JUROR:  Yes.

THE COURT:  So do you know what kind of work she did there, what department she was in?

THE JUROR:  At one point she was in the emergency room, but I'm not sure.

THE COURT:  As you may know, a number of the victims of the Marathon bombing were taken to the Brigham and Women's emergency room.  Do you know whether she worked on any of those --

THE JUROR:  No.  She happened to be away during that period.  She used to volunteer at the hospital tent at the finish line, but she was away.  She wasn't there.

THE COURT:  Was she away the whole week?

THE JUROR:  Yes.

THE COURT:  You have a sister who worked for the Department of Justice.

THE JUROR:  Yes, correct.

THE COURT:  Bureau of Prisons.

THE JUROR:  Yes.

THE COURT:  Does or did?

THE JUROR:  She did.  She used to work for the Sheridan Prison in Oregon, the federal prison.

THE COURT:  Okay.

THE JUROR:  Then she became assistant warden there.

She was an attorney and then she was assistant warden, but she's no longer.

THE COURT:  Is she -- has she retired, or is she working at something else?

THE JUROR:  She's in her city government.

THE COURT:  In Oregon?

THE JUROR:  I think she was a commissioner.  In Oregon, yup.

THE COURT:  You told us that you had some prior jury service in Middlesex in a criminal case.

THE JUROR:  Yes, quite a long time ago.

THE COURT:  When was that?

THE JUROR:  It was probably early 1980.

THE COURT:  Oh, okay.

THE JUROR:  '80s.

THE COURT:  That's right.  I see you say it was a while ago.

So let me ask you to turn to Page 20 if you would.  If it's convenient for you to take the clip off, you might handle the paper -- it might be a little easier for you.

THE JUROR:  Okay.

THE COURT:  Question 77, at the top, we asked whether, based on things you'd seen or heard in the media or in other -- from other sources, you'd formed certain opinions in the case.

THE JUROR:  Correct.

THE COURT:  You answered that you had formed an opinion that the defendant was guilty.

THE JUROR:  Correct.

THE COURT:  And that he should receive the death penalty, (c).

THE JUROR:  Yes, yes.

THE COURT:  Okay.  We then asked, "If you answered yes to any of the questions, would you be able or unable to set aside your opinion and base your decision about guilt and punishment solely on the evidence that would be presented in court?"  And you checked "unable."

THE JUROR:  Maybe -- I don't know if I understood the question.

THE COURT:  Okay.  Well, let's -- how about this:  Let's forget what you said then and ask you the question now.  You said that you have an opinion that he's guilty.

THE JUROR:  Uh-huh.

THE COURT:  Let's just focus on that one first, and we'll come to the other later.  Notwithstanding the fact you have that opinion -- and it's understandable people have ideas from the amount of coverage that the events got -- would you be able or unable to set aside that opinion and base your decision about guilt based solely on the evidence presented to you in the court in the course of the trial?

THE JUROR:  I see.

THE COURT:  Would you be able to do that or unable to do that?

THE JUROR:  I don't think I would be able to do that.

THE COURT:  Okay.  Can you tell us a little bit why you say that?

THE JUROR:  If I have the opinion that he's guilty already, I don't -- I don't know if I could look at the evidence that they present and not still think that.  I'm not sure.

THE COURT:  Well, you understand in, general, that in our criminal justice system a person who's accused of a crime is presumed to be not guilty, or innocent, unless the government proves the person is guilty by the evidence at trial.

THE JUROR:  Correct.

THE COURT:  And the government's burden is to prove a person's guilt of the crime the person is charged with beyond a reasonable doubt based on that evidence.

THE JUROR:  Correct.

THE COURT:  What we ask jurors to do is, notwithstanding any other ideas they might have, to focus on the trial evidence and make their judgments about guilt or innocence based on that body of trial evidence.  Sometimes jurors have ideas that are -- from other sources that are so strongly held that they can't put them aside and do that.  I

guess that's what we're asking you, where you think you fall in that --

THE JUROR:  I don't think I could.

THE COURT:  All right.  Okay.  Thank you.

4:15?

MS. CLARKE:  That would be great.

MR. CHAKRAVARTY:  Thank you.

(Recess taken at 3:47 p.m.)

(The Court entered the courtroom at 4:23 p.m.)

THE COURT:  Okay.  I think we have addressed 507, 508, and 512, which brings us to 517.

MR. CHAKRAVARTY:  No motion, your Honor.

MS. CLARKE:  No motion.

THE COURT:  I believe we addressed 520 and 529.  Wait a minute.  I was just talking about the people we saw.

MS. CLARKE:  520 and 529.

THE COURT:  Right.  Those are both we interrupted, right?

That brings us to 533.

MR. CHAKRAVARTY:  No motion.

MS. CLARKE:  No motion.

THE COURT:  534.

MR. BRUCK:  Defense has a motion on 534, your Honor.  And this is based on a cumulative number of contacts and involvements in these events and the online evidence.  This is

the juror who, effective on the first anniversary -- this is the Bitcoin expert.  Of course, we learned today that his office was within sight of the bombing.  His coworkers -- he was gone that day, but his coworkers saw smoke rising, saw the police response, none of which was hinted at by his questionnaire.  Question 80, "...you or, to the best of your knowledge, a family member or close friend witnessed the Marathon bombing explosions or the response to them in person, please describe who was there."  Now, maybe the people he works with aren't described as close friends, but it seemed like that was an opportunity to say, yes, my coworkers saw the explosion and the response to them.  He did not.

We then have his Twitter feed.  He retweeted on the 19th, the day of the shelter in place -- and I'll hand these back to the Court in a moment -- a whole series of tweets from the Boston Police Department, "pray for Boston," various Twitter hashtags and, also authored his own Twitter, original tweet, on April 19th, "One bomber dead, another on the run, one MIT policeman dead, transit system shut down.  Please stay inside.  Please stay safe."  Not that there's anything wrong with any of this, but this is just not the picture of the intensity of involvement that this juror conveyed.  And even if he had conveyed it forthrightly, there's a lot.  He sheltered in place.  His family all stayed home on the 19th.

He did not disclose on his form -- he mentioned on 82

various Boston Strong merchandise and items that he owned but did not mention the one that's maybe the most significant, which is that he went to his own church's benefit not for Boston Strong or the One Fund generally but for the Martin family -- for the Richard family in particular, which is a more emotionally close form of support.  Again, I mean, there's not anything in the world wrong with all this.  It's just that there's a danger of sort of approaching a new normal for this case about, if this was any ordinary case and a juror came along with these connections, I don't think anyone would think twice about saying, no, it's -- let's put him aside.  Might be a good juror for another case but not this one.

This was his Facebook profile picture, not just on this page.  This is his Facebook face to the world beginning on the first anniversary and extending all the way until the day after he filled out these forms, at which point he changed his Facebook profile picture to this, a Charlie Hebdo, which he explained.  Once again, nothing in the world wrong with any of this.

THE COURT:  Do you know what it was before he put up the "B Strong"?

MR. BRUCK:  Before Boston Strong?

THE COURT:  Before that.

MR. BRUCK:  It appears to have been -- it appears to have been a high school picture of himself.

So we have the Twitter material; we have the Facebook material; the fact that he both -- his coworkers.  He describes the phone calls.  You know, the fact that he's away from town on April 15th in some ways exacerbates, I think, the emotional impact because he had a lot of people he was worried about, including his children, his wife, and his parents; a lot of worried phone calls.  He's, almost two and a half years later, very calm in talking about it, but I think we all picture what it was like for him at that time.  And we can really picture it by seeing the emotional tenor of his Twitter account four days later during the manhunt.  We add all of this together, and there's just too much.

I think he's also -- he gave the impression of somebody who's very interested in serving and has probably the financial latitude and the situation where he could take the time and do it.  He can work at night and work on weekends.  He'd like to be on this jury, and I think that was reflected in the somewhat modified disclosure that he made.  All things considered, we think this juror should be disqualified.

MS. PELLEGRINI:  Your Honor, the government opposes the motion.  I note that Mr. Bruck starts with what he calls the cumulative effect of, you know, the -- where his building is located, what coworkers might have seen.  And I think that the new danger that we're facing here is motions to strike by insinuation.  I notice that, when he asked all the questions,

he never followed up with how did that affect you? So we're left with always to guess, to speculate, and to surmise exactly what, if any, alleged emotional impact this might have. We're also left to guess how that would affect his ability to serve as a fair and impartial juror.

I think this juror presented himself as intelligent, well-informed. He mentioned to the Court that he tweets episodically, and that seems to be evident in his Facebook and his Twitter accounts.

I also note that the -- it's not a Boston Strong. That's a Boston Red Sox logo. That "B" is the Boston Red Sox. There's been a lot of co-opting by various organizations of the phrase. Although this was another juror, I note that somebody used it, you know, Boston Strong, when somebody passed away. So it's taken on a lot of meanings and not one where necessarily we have to sort of add to the issue of whether or not this person could be fair and impartial.

There is nothing about his answers to the questions that normally grab our attention, which are his ability to put aside what he already knows and to look at the evidence that's presented in court. This was a juror who said he understood the spectrum of evidence and the questions that would be asked of him.

And there was nothing that was sort of closed off or emotionally damaged in any way, nor was there anything

secretive or duplicitous in any of his answers.  His answers to the Court, if the Court will recall, were quite straightforward, and he explained right away what those items were.  Without prompting, he brought up some of the things that he had posted.

So, overall, we think this is the type of person who is not impaired in any way and should be able to remain at least as a provisionally qualified juror.

MR. BRUCK:  One last thing about this is that -- I should have mentioned also, he professed to have no opinion at all about the death penalty in this case.  Upon questioning from me in the end, he wouldn't quite admit to having an opinion, but he described this case as the sort of case in which he thought the death penalty might well be appropriate, aspects that are from the facts of this case.  I think to have to sort of pull that out from him is another indication that weighs against disqualifying him.

THE COURT:  I don't think he should be excused for cause.  I think he did present -- let me just say, I think we're assessing here not the presence or absence of particular factors, but we're assessing human beings.  We're assessing the jurors.  And so the presentation, of course, is very important.  And I thought he presented as a very intelligent, thoughtful person and actually coming close to exactly what you want in a juror.

I accept that he is as open-minded as a lot of humanity on these matters.  I don't think any of the matters that you've referred to impeaches that condition sufficiently.  I do think that that's -- I agree with the government.  That's maybe just my own impression but that the logo is much more a Red Sox logo than it is a Marathon-related logo.  So I think he's acceptable.

MR. BRUCK:  We would ask that the eight pages of material that I've handed to the Court be marked as an exhibit.

THE COURT:  Is this the totality of it?

MR. BRUCK:  It is.

THE COURT:  Fine.  Let me just say on that, I mean, he was -- apparently, from what I have seen customarily, was tweeting and retweeting during that week.  And, of course, there are people who were doing a lot of paying attention during that week.  And I don't think, as a general matter, although it could be in a particular case, but as a general matter, is not disabling.  And I don't think it is in this particular case.

Okay.  Number 536.

MR. BRUCK:  The defense has a motion on this juror.  This is the juror who initially made himself out to be a 10; and then after some very laborious discussion and rediscussion and explaining how the system worked gave some answers that suggested that maybe he really wasn't a 10.

In the end, I don't think the Court can be confident that this juror wouldn't impose the death penalty in every case of intentional murder.  His support for the death penalty appeared to have a -- some religious doctrinal basis.  He talked about principalities and sort of biblical language in explaining why he would favor it.  And he said some things that remain rather confusing about how he wouldn't judge -- he wouldn't judge people, and yet principalities have the right to carry this out or he would support that.

He reminded me a little bit of a -- he called to mind a term that the Court used yesterday, which is an uninstructable.  This juror may have been a little brighter than the juror you found to be uninstructable, I think, yesterday, but the same objection obtains.

And then just adding to the totality of the circumstances, he has a seven-year-old son.  He has a wife that works at Brigham, Brigham and Women's.  He has a brother-in-law who's experienced P.T.S.D. in Iraq and who doesn't talk about it, which is hardly the sort of thing that gives one confidence that it doesn't weigh on that family, his wife's family, all of these -- the inconsistency of these -- of this juror's responses and the -- and the difficulty of getting a clear picture.

He applied for the FBI and then seemed to be a little bit anxious to minimize whatever allegiance or, you know,

enthusiasm he might have had about going to work for the FBI.

He's a juror who clearly really, really, really wants to be on this jury. We did get that strong impression. I think all of his answers need to be viewed through that filter. This is a concern that all of us have had. I know the Court surely has from the very beginning, jurors who -- it's nice to have people wanting to serve, but this high-profile case is in a special category, and I think special vigilance is required. So it's a wide array of factors, but, on balance, we think this juror should be disqualified.

MR. CHAKRAVARTY: The government opposes and disagrees with Mr. Bruck's characterization of the juror. There's no doubt that this juror was talkative. He's earnest. I think, like some jurors we've seen over time, they want to be as honest as they can. It is a nerve-racking situation, so they think out loud.

This juror clearly had a misunderstanding, especially of the Question 89, I believe, as to what the construct was in a death penalty case. And what Mr. Bruck calls a laborious process was really one time the Court instructing and then later, when the government asked, further clarifying that, in fact, he's not pro death penalty at all. He simply would impose it if the law said that this is a circumstance in which it is appropriate to impose. I think he changed it to -- his answer to, like, a 5 or a 6, which puts him basically as

somebody who's capable of implementing the death penalty but also equally open.

And I think the danger in confusing his lack of understanding of the process and conflating that with, as Mr. Bruck characterizes it, a desire to get on simply because he was explaining himself for longer, I think that's easily dispelled when you change the frame of reference in which he looked at that question. If he understood the question then, it would have been a very simple process to get through to where the remaining issues lie, which, as far as I can tell, Mr. Bruck's remaining issues with this juror is that he applied to the FBI, something that he freely admitted. He admitted going further in the process than the parties may have known. And he explained why, in a very logical way, why he withdrew from that change of career in his life. And he also explained why he applied to the FBI. He had skills to offer, the same reason why many of us apply for government, to -- those are not disqualifying factors.

The other thing that Mr. Bruck points to, aside from his answer on the death penalty question, was the fact that he had some religious overtone to the genesis of his death penalty views. And if -- you know, if I used that argument to challenge one of Mr. Bruck's offered jurors, then I think that the problem with that argument would be patently clear. And here, at worst, the religious genesis of his views was, I ought

to follow the law when in the principality of being in a secular court.

All of those objectively are factors which suggest that this is a person who is going to try to do the right thing, who's going to follow his conscience, that he believes in other factors that should weigh on his opinion aside from -- meaning his personal beliefs in order to exercise the discretion necessary to give either life imprisonment or the death penalty and that he was open about what his biases were. He had that ability to self-assess.

Going to the point of whether this is a guy who was really trying to talk his way into getting onto the jury, I suggest, No. 1, somebody with young children is not necessarily going to want to be in that situation. Somebody whose wife is a presumably busy nurse is not going to want to be in that situation. And somebody who, when asked about it in the questionnaire as to what was your reaction, his reaction wasn't, Oh, I can't wait to do this. It was, I was confused about whether I was a federal court summons with a state summons. Then when he realized now that he's in court, he doesn't have a problem with it. That's not the answer someone would say if they were trying to sneak onto the jury by being down the road, middle of the road. So for all those reasons, we think he's a qualified juror.

THE COURT: The strike is denied. He projected a

different sort of personality a little bit.  I don't think it was disqualifying.  I actually would reach the opposite conclusion about instructability.  I think he took instruction here in front of us and adjusted his thinking accordingly.

I am satisfied that he misunderstood Question 89 when he read it or -- I'm not sure he misunderstood the question. He misunderstood what the legal framework would be when he had to face a question like that in the course of a full trial. And he had an assumption about the law that he was then told was not the correct understanding, and he changed it.  So I think that's fine.

Some of the other matters, I don't -- I don't think his FBI experience is significant one way or the other.  I mean, he hasn't been -- I'm not sure, if he had actually served in the FBI for a few years, that would matter.  I mean, you would have to go beyond that to see if it would produce a disabling bias in favor of the government.  But from his experience, it didn't seem to be.  He seems to think he made the right decision by going where he went.  So I think he's acceptable.

537.

MR. CHAKRAVARTY:  Your Honor, that's the government's motion.  537, the government's basis is that she's substantially impaired from implementing the death penalty. This juror was not only pleasant and thoughtful and had clearly

thought about the death penalty question in particular, but she was intelligent and articulate. And she had clearly made the decision and reconciled that she should not be an absolutist on the death penalty. All of the examination was consistent with that. The way she altered her answers on the questionnaire was consistent with the idea that she did not, as a philosophical matter, think that it was appropriate to never say never. It was -- it was appropriate not to say never.

But, in practice, actually implementing this thing, was not only something she was candid about in saying no to Question 95 on the questionnaire and then altering it to suggest that, well, I'm not sure that I could ever come to that decision to do it; but if I did, then I'm not sure whether I could actually make -- cast the vote, pull the lever, so to speak.

But sitting in front of us, it was clear that this was a -- taking its emotional toll on her. And while making that decision would take an emotional toll on anybody when they're in that position, here, simply to, in her words, make the decision to take a life, would be one that, I think -- certainly, it does not give the government any confidence that she would be willing to do it. In her words, when I asked her the questions, "was probably not."

When I think it was Miss Clarke led her down the primrose path, as any good series of leading questions might

do, got her to, you know, check the boxes.  I think that, as we've seen with other jurors, simply saying -- there's no magic words in this process.  It's the sense of the juror.  And this juror seems firmly committed to -- and it's not her idea that the death penalty is not an appropriate punishment that the government objects to.  It's, again, as I think yesterday or the day before, there was another juror, who it was simply the ability for this juror to make that -- to pull that lever.  And unlike a previous juror -- yeah, so Mr. Jacks is reminding me what some of the quotes were.  She said -- she explicitly said that she would have trouble voting for the death penalty for anyone, not just in this case, and that it was wrong to take a human life.  Those are exactly the type of impairments that will prevent her from casting that vote even when she has consciously arrived at the decision that it might be the appropriate conclusion to a case.  For those reasons, we think that she is substantially impaired.

MR. BRUCK:  Well, your Honor, we very much disagree. This juror was very similar to other jurors who have been qualified.  I agree with Mr. Chakravarty that she is extremely thoughtful and has given this a great deal of thought.  And we saw that reflected in her answers and in a little bit of a struggle that she was going through to be completely candid and forthright with the Court.  And each side can cite sort of highlights and low lights.  But in the end, I don't think Miss

Clarke would have led her down any path. She knew exactly what this was about. By the time it came to the end of the questioning, she knew what the issue was. She knew what she could or couldn't do. And she said repeatedly that she could vote for the death penalty if that was what she concluded was appropriate and that while it would be a very high bar, which, of course, is not disqualifying -- it is supposed to be a high bar -- she could vote for it or she could find that it was appropriate. That's all that's required.

The government is, of course, welcome to use a peremptory on her, but I don't think she can be treated as impaired or disqualified under *Wainwright v. Witt*. This is the kind of intelligent, thoughtful juror that I think we should be welcoming into this process.

THE COURT: She certainly is intelligent and thoughtful. I would have to conclude she's substantially impaired though, I think, on the basis of her answers and her deportment here.

She is similar to some others we've had. I can think of maybe two or three that have both been qualified and disqualified because this is a very fine assessment here when somebody says I don't like it but maybe I could. Sometimes that's a -- that can satisfy us that that person can do it. Sometimes you continue to be left with doubt, that the words are there but the heart isn't and so on.

I actually think she was so thoughtful that she was -- in her original answer to Question 95 was sort of parsing it in a way that she kind of ruled it an invalid question because it asked for her to presume the answer in a sense. I think she may be returned to presuming the answer in the end, and that is, the middle clause, that you have decided that it was the appropriate punishment. It wasn't so much that she -- my sense, that she couldn't act on that if that's what she concluded. Her hesitancy was whether she would ever really conclude that in anything other than a theoretical sense. I don't take from her that she genuinely was prepared to, in practice, entertain both possibilities there. So -- all right.

438.

MR. BRUCK: The defense has a motion. This is the juror whose wife grew up and whose wife's brothers grew up with Officer Rick Donahue. And I don't know that extensive argument is required on this. This is not merely a witness in the case. This is a count. Count 19 of the Indictment is the shooting of, as the juror knew, by friendly fire, as the saying goes, which very -- would -- came very close to being a murder. That is, he almost died.

And the juror was familiar with many of the details. It's clear that his family followed this before the encounter at the pool when it was -- because he talked about how it wasn't known whether he was going to live or die. Then, of

course, they meet at the country club, and he acknowledged that it's entirely possible they will again when this trial is over or at some point in the future.

This is way too close a connection to such an important witness and such an important victim in the case that we clearly think this juror should -- should be disqualified.

MR. CHAKRAVARTY:  You know, the government is cognizant of the concern with Mr. Donahue, but what was abundantly clear is that this juror doesn't know even today much more than has been publicly known in the community at large, in fact, maybe a lot less than has been known.  He also has attributed the causation of Mr. Donahue's injuries to friendly fire, not to the defendant, I think an important characteristic.  But the key fact is he doesn't even recall meeting Mr. -- the witness, or the victim, Donahue.  It was a chance encounter at the pool in which he recognizes that they share some -- the circles in which they travel happen to intersect.  And that could be true for other witnesses as well.

But the key in assessing that and one of the reasons why we go through this interview process and don't just rely on the questionnaire is to assess the juror's reaction.  And that's where this recovering lawyer, reformed lawyer, I think the Court said, he was not only analytical about it.  He was completely unemotional.  It was, yeah, this is a -- I'm being honest with the Court in terms of what the connection is, but

this connection does not inform his view of the case in the sense of -- I think he said he doesn't know much about the case. He gave his candid opinion about what he would think if he weren't a lawyer and didn't think of having the framework with which to assess the evidence.

And then when applying the law, he made clear, I think to the satisfaction of the government, who, you know, he's a lawyer. There's some healthy skepticism on both sides as to, you know, where he might play out. But he, both in his answers and his deportment, I think is the Court's phrase, he answered those in a way that seemed sincere, that there were no extraneous influences on his assessment of the evidence in the case. For that reason, we think that the Donahue connection is certainly not disqualifying.

THE COURT: I think, as we've established by previous rulings, there are connections and there are connections. And some are more concerning than others and others are more trivial.

I think this is a problem that should excuse him from service in this case. From what I hear, his family uses the club, expects to probably use it next summer. And I think there's a danger that he would be worrying about encounters, even if they're few and chance, having served and rendered a verdict that might or might not be satisfactory to the family. So I think he should be excused for that reason. Otherwise, I

found him -- he would be well-qualified as a juror but not in this case.

I think the last two we dealt with as they came up. So I think we have 517, 533, 534, and 536.

So now we talked about trying to -- we get started at 11:30 tomorrow.  The question rises on how many we should try to put into the hopper.

MS. CLARKE:  Not 25.

THE COURT:  I agree.  I was thinking somewhere between 12 and 15, something like that.

MR. CHAKRAVARTY:  That's fine.

THE COURT:  When I proposed those numbers, the practice has been developing that there will be some attrition, so I propose it with that expectation/hope.  So it might leave us with eight or nine or something like that, which I think we could handle with a late start.  You want to vote between 12 and 15?

MR. CHAKRAVARTY:  We'll go for 15.  Don't force us to agree.

THE COURT:  Sometimes I have a chance to look ahead, and I can see that you'll need a higher number to get the net you're looking for and sometimes you don't.  I just have no clue.  I don't know if anybody has looked ahead to see whether there's going to be an attriting (ph) sample.

MR. BRUCK:  It's going to be a long day.  I think the

vote might be for 12 on this side.

THE COURT:  Twelve is fine.  I think 12 given other stresses.

MS. CLARKE:  The Court has given us four to look at.

THE COURT:  From yesterday, yes.  I believe they're in there.  As I think I said from your master list, the two-sided list with the boxes, I think I've exceeded all of those through this group anyway, but I think that's been pretty much --

MR. CHAKRAVARTY:  The government agrees with the Court's recommendations so --

MS. CLARKE:  And we do, too.

THE COURT:  So we'll take those out.  I don't think I brought that with me.  556, 558, 568, 573.  Okay.

(Whereupon upon, at 4:57 p.m. the trial recessed.)

C E R T I F I C A T E

We, Marcia G. Patrisso, RMR, CRR, and Cheryl Dahlstrom, RMR, CRR, Official Reporters of the United States District Court, do hereby certify that the foregoing transcript constitutes, to the best of our skill and ability, a true and accurate transcription of our stenotype notes taken in the matter of Criminal Action No. 13-10200-GAO, United States of America v. Dzhokhar A. Tsarnaev.


/s/ Marcia G. Patrisso
MARCIA G. PATRISSO, RMR, CRR
Official Court Reporter


/s/ Cheryl Dahlstrom
CHERYL DAHLSTROM, RMR, CRR
Official Court Reporter


Date:  February 18, 2015