UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                              )
UNITED STATES OF AMERICA,     )
                              )
        Plaintiff,            )
                              )   Criminal Action
v.                            )   No. 13-10200-GAO
                              )
DZHOKHAR A. TSARNAEV, also    )
known as Jahar Tsarni,        )
                              )
        Defendant.            )
                              )
```

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

**EXCERPT**
**JURY TRIAL - DAY TWENTY-SEVEN**

<u>**OPENING STATEMENT BY MR. WEINREB**</u>

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, March 4, 2015
9:50 a.m.

Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

APPEARANCES:

     OFFICE OF THE UNITED STATES ATTORNEY
     By: William D. Weinreb, Aloke Chakravarty and
        Nadine Pellegrini, Assistant U.S. Attorneys
     John Joseph Moakley Federal Courthouse
     Suite 9200
     Boston, Massachusetts  02210
     - and -
     UNITED STATES DEPARTMENT OF JUSTICE
     By: Steven D. Mellin, Assistant U.S. Attorney
     Capital Case Section
     1331 F Street, N.W.
     Washington, D.C.  20530
     On Behalf of the Government

     FEDERAL PUBLIC DEFENDER OFFICE
     By: Miriam Conrad, William W. Fick and Timothy G. Watkins,
        Federal Public Defenders
     51 Sleeper Street
     Fifth Floor
     Boston, Massachusetts  02210
     - and -
     CLARKE & RICE, APC
     By: Judy Clarke, Esq.
     1010 Second Avenue
     Suite 1800
     San Diego, California  92101
     - and -
     LAW OFFICE OF DAVID I. BRUCK
     By: David I. Bruck, Esq.
     220 Sydney Lewis Hall
     Lexington, Virginia  24450
     On Behalf of the Defendant

P R O C E E D I N G S

*  *  *

MR. WEINREB:  Good morning.

THE JURORS:  Good morning.

MR. WEINREB:  Nearly two years ago, on Marathon Monday, the defendant, Jahar Tsarnaev, rounded the corner onto Boylston Street and began walking towards the Boston Marathon finish line.  It was about 2:30 in the afternoon.  The race had started about six hours earlier, and the sidewalks were packed with spectators.  The Red Sox game had just ended, and people were pouring out of Fenway Park, making the crowds even bigger. There were people from all over the world and all walks of life -- men, women, boys, girls -- all loudly cheering on the runners.  And because Marathon Monday falls on Patriots' Day, the school holiday, there were plenty of families enjoying the special day with their children.

But the defendant wasn't there to watch the race.  He had a backpack over his shoulder, and inside that backpack was a homemade bomb.  It was the type of bomb favored by terrorists because it's designed to tear people apart and create a bloody spectacle.  It was a sealed pressure cooker about this wide and this high, and it was filled with explosive powder and thousands of pieces of tiny shrapnel:  nails, tacks, and little BBs.  The purpose of that type of bomb is to shred flesh, shatter bone, set people on fire, and cause its victims to die

painful, bloody deaths and permanent disfigurement.

The defendant's goal that day was to my maim and kill as many people as possible, so he took his time figuring out where to plant his bomb.  He began walking slowly down towards the finish line with his brother, Tamerlan, who was also carrying a bomb in his own knapsack.  They walked a little ways together, and then they split up.

Tamerlan continued all the way down to the finish line and planted his bomb there in a crowd of people.  The defendant waited a bit and then started walking in the same direction.  He decided to stop in front of a crowded restaurant called Forum, and to place his bomb right behind a row of children who were standing on a railing by a curb -- the curb watching the race.

One of those children was an eight-year-old boy named Martin Richard who was watching the race with his family.  No one noticed the defendant plant the bomb because there was nothing out of the ordinary to see.  He just got there, slipped his backpack onto the ground, and stood there looking at the backs of those children.  He pretended to be a spectator, but he had murder in his heart, although you wouldn't have known it just to look at him.

The defendant looked and acted like a typical young adult, but the evidence will show that he wasn't.  He had a side to him that he kept hidden, even from his closest friends.

When he was with his friends, he hung out and played video games.  But when he was by himself, he read terrorist writings and listened to terrorist lectures.  Those writings and lectures convinced him that he should kill innocent Americans in order to punish the United States for mistreating Muslims in other countries.  And by doing so, he thought he would earn a place in paradise, which explains what happened next.

The defendant stood there for nearly four minutes directly behind the row of children who were watching the race.  Dozens of people stood around him, and dozens more were behind him in the Forum restaurant enjoying a meal with friends, cheering on the runners, or just enjoying the day.  Then when the defendant had given his brother, Tamerlan, enough time to get into place, he called Tamerlan on the phone and spoke to him for about 20 seconds.  About ten seconds later, Tamerlan detonated his bomb.  A few seconds after that, the defendant walked briskly back the way he had come, leaving his own bomb behind him on the ground.  When he was a safe distance away, he detonated the bomb by remote control.

The explosions from the two bombs were terrifying.  They made a defining roar and created fireballs several stories high.  The air filled with the smell of burning sulphur and people's screams.  Pieces of the pressure cookers and thousands of pieces of tiny shrapnel were propelled with huge force in every direction.  Some of them landed hundreds of feet away.

The defendant's bomb exploded in the middle of a crowd of people. Pieces of the pressure cooker and bits of shrapnel tore through them, shredding their flesh and severing their arteries. The explosion deafened many of them and set others on fire. Some of them were blinded. Many had a leg or a foot blown off their bodies, and some bled to death on the pavement while the defendant ran away.

One person the defendant murdered that day was Martin Richard. As I said earlier, he was one of the children standing on the railing watching the race. Martin was eight years old. He was at the marathon with his father, Bill Richard; his mother, Denise; his six-year-old daughter [*sic*], Jane; and his 11-year-old brother, Henry. They were all standing together waiting for a family friend to cross the finish line.

The bomb tore large chunks of flesh out of Martin's body. As the smoke cleared, Denise Richard found her little boy lying on the ground and tried to comfort him. She could only half see him because the bomb had permanently blinded her in one eye. Martin bled to death on the sidewalk as she looked helplessly on. Bill Richard, who had been blown into the street, came back to the curb and reached out to Jane to pick her up off the sidewalk. When she tried to stand up, she fell down again because her leg was no longer attached to her body.

Another person the defendant murdered that day is

Lingzi Lu, a student at Boston University.  She was a 23-year-old known for her kindness and her passion for music. She was at the marathon with her friend, Danling.  They just happened to be walking by the Forum restaurant when the bomb went off.  That blast knocked Danling to the ground.  When she opened her eyes, she saw a man in front of her missing his leg. She looked down to see if her own legs were still there, and she saw that her insides were coming out of her stomach, so she used her hands to push them back in.  She looked around to find her friend and saw her lying a few feet away.  Lingzi was screaming in pain and terror, but Danling couldn't hear her because the bomb had deafened her.  Danling never saw her friend again because Lingzi, like Martin Richard, bled to death on the sidewalk.

A third person the defendant murdered that day was Krystle Marie Campbell.  Krystle was 29 years old.  She was at the finish line with her good friend, Karen Rand.  They were there to cheer on Karen's boyfriend, who was running the race. Krystle was killed by the bomb that the defendant's brother set off.  It burned her skin, filled her with shrapnel, and opened gaping wounds in her legs and torso.  It also knocked her friend, Karen Rand, to the ground and blew off Karen's leg. Karen held Krystle's hand tight as the life drained out of her body.

Now, even though the defendant's brother set off the

bomb that killed Krystle Campbell, the defendant is still responsible for her death.  That's because he and his brother were partners in crime.  They planned these crimes together, and they carried them out together.  The defendant knew that his brother's bomb was going to kill people, just like he knew his own bomb was.  That's exactly what he wanted to have happen.

As soon as those bombs went off, Boylston Street erupted into chaos.  The wounded lay on the sidewalk in pools of their own blood, wondering if they were going to live.  Others fled the scene.  But in the midst of the chaos, some people sprang into action.  Police officers, medical personnel, family members and friends of the dead and dying, many of them jumped in to offer aid.  There were a lot of heroes that day, and you'll hear from some of them.

What was the defendant doing while people were frantically trying to save the wounded from bleeding to death on the street?  We know the answer because he was caught on a surveillance tape.  Just 20 minutes after he set off that bomb on Boylston Street, while paramedics were still giving CPR to Martin Richard in a futile attempt to try to save his life, the defendant drove to the Whole Foods in Central Square and purchased a gallon of milk.  You'll see him on the surveillance tape walking into the Whole Foods, going over to the milk counter, shopping for the milk, choosing which one to buy,

going back to the counter, calmly paying for it, and walking out of the store.  You'll even see him come back a minute later and decide to exchange that milk for a different type of milk.

And what did he do after that?  While victims of the bombing lay in the hospital and learned that they would have to have their limbs chopped off to save their lives, the defendant pretended that nothing had happened.  He went back to UMass Dartmouth, where he was enrolled as a sophomore.  He hung out with his friends and partied.  He went to the gym and played video games.  He posted a message on Twitter that said, "I'm a stress free kind of guy."  He acted like he didn't have a care in the world.

The defendant acted that way because he believed that what he had done was good, was something right.  He believed that he was a soldier in a holy war against Americans and that he had won an important victory in that war by killing Martin Richard, Lingzi Lu, and Krystle Campbell.  And he also believed that by winning that victory, he had taken a step toward reaching paradise.  That was his motive for committing these crimes.

How do we know that?  We know it in part because the defendant wrote out an explanation of why he committed these crimes.  The police found that writing when they arrested him, and you will see it later on in court.  This is part of what the writing said:  "I ask Allah to make me a shahied to allow

me to return to him and be among all the righteous people in the highest levels of heaven.  Allah Akbar."  "Shahied" means martyr, and "Allah Akbar" means God is great.

The defendant wrote, "The U.S. government is killing our innocent civilians, but most of you already know that.  I can't stand to see such evil go unpunished.  We Muslims are one body.  You hurt one, you hurt us all.  The ummah is beginning to rise.  We are promised victory, and we will surely get it."  "Ummah" is a word that people with the defendant's beliefs use to describe the Muslim people.

The defendant wrote, "Now, I don't like killing innocent people.  It is forbidden in Islam.  Stop killing our innocent people, and we will stop."

The defendant carried out an attack on the Boston Marathon because he believed that the United States government is the enemy of the Muslim people.  He believed that punishing America by killing innocent young women and children would cause America to stop targeting Muslim terrorists overseas and help win him a spot in heaven.  And you will hear evidence of how he acquired that belief.  He acquired it by reading books, listening to songs, and watching videos that were created by other terrorists, and they convinced him that he should become a terrorist too.

The defendant's transformation into a terrorist took place over a year or two.  In 2011, he started reading

terrorist writings and posting online messages about the persecution of Muslims.  In 2012, he started listening to terrorist lectures and songs.  He told one of his friends that he had a plan to reach paradise.  In 2013, he created an online identity that he used to spread radical Muslim ideas.  He said that people don't take notice when Muslims die over there, meaning overseas, but if something happens over here, meaning in America, then everybody takes notice.  He also said that he knew how to make a bomb.

You will hear that the defendant had terrorist writings, videos, and lectures on his laptop computer, on his iPod and on CDs in his car.  We will show you many of those writings and videos during the trial, and you'll hear evidence that reading those kinds of writings and listening to those lectures, watching those videos, is a common way that young adults like the defendant turn into terrorists themselves.

One of the things the defendant had on his computer was a virtually complete set of *Inspire* magazine.  That is a magazine published in English by a group that calls itself al-Qaeda in the Arabian Peninsula.  The goal of *Inspire* magazine is to do just that:  to inspire young men like the defendant to become terrorists and to encourage them to attack western countries, regardless of whether they're associated with a terrorist organization.

It's filled with stories of terrorists who punished

America by killing innocent people, and it treats them as glorious heroes.  It gives instructions on the best way to commit attacks so as to terrify people and kill as many people as possible.

One of the issues in *Inspire* magazine that the defendant had on his computer contained instructions for making a bomb out of a pressure cooker filled with explosive powder and shrapnel.  It recommends placing it in a crowded area to maximize its deadly effect.  The defendant and his brother began accessing those instructions around Christmas of 2012. Later, the defendant's brother bought pressure cookers to hold the explosive powder and remote-control cars that were turned into remote-control detonators.  They filled the bombs with explosive powder emptied from ordinary fireworks, as well as nails, tacks, and BBs to make them more deadly.

A few months before the marathon bombing, the defendant got a 9-millimeter handgun.  He told a friend of his named Stephen Silva that he needed a gun, so Silva got him a Ruger semiautomatic pistol with the serial number filed off. Silva will be a witness in this case, and he'll testify about giving the Ruger to the defendant.

It is clear that the defendant intended to use the Ruger because on March 20th, 2013, just about a month before the marathon attack, he and his brother drove to the Manchester firing range in New Hampshire to practice shooting.  The

defendant rented two 9-millimeter pistols, just like the Ruger, and purchased four boxes of ammunition, and then he and his brother spent about an hour on target practice.

After bombing the marathon on April 15th, the defendant maintained his double identity. He acted normal around his friends. He pretended to them that he hadn't even been at the Boston Marathon, and he continued reading the terrorist writings and listening to the terrorist lectures on his computer. For example, you'll hear evidence that on April 16th, the day after the bombing, the defendant opened up the copy of *Inspire* magazine on his computer that contained instructions for building pressure cooker bombs and pipe bombs; and then you'll hear that a few days later, he and his brother exploded several pipe bombs and another pressure cooker bomb, this time in Watertown.

Now, I want to go back to April 15th and talk about what happened after the bombings over the next few days on Boylston Street. As soon as the bombs exploded, police officers halted the marathon midway and everyone -- made everyone leave the scene. Bomb technicians began checking for additional bombs. Ambulances came and took the wounded to hospitals. And then the long, painstaking process of gathering evidence began.

Three consecutive blocks of Boylston Street were roped off and treated as a crime scene. FBI agents and hundreds of

other federal, state, and local law enforcement officers donned special clothing and began scouring the area for evidence. Among all the blood and human remains, they found shredded cloth from the backpacks, pieces of the exploded pressure cookers, and wires and batteries from the remote-control devices used to detonate them.

And they found hundreds of pieces of shrapnel, little nails, tacks, and BBs. They found them on the street, they found them inside buildings, on the tops of roofs, and ER doctors found them on the bodies of the victims they were treating at the hospital, in their hair, in their clothing, and in their bloody wounds. The police also collected surveillance tapes from businesses on Boylston Street and elsewhere, and photos and videos from members of the public who had been there watching the race.

Now, as I said earlier, the defendant exploded his bomb right in front of a restaurant called Forum, and that restaurant has a surveillance camera that is right over the door of the restaurant, and it happened to be pointing directly at the place where the defendant placed his bomb. The surveillance tape shows the defendant walk up to that spot. He's got a backpack slung over his shoulder. And the moment he gets there, he dips his shoulder, and after that, you never see the backpack on his back again. But photographs show that it's at his feet.

It shows him stop right behind Martin Richard and the other children who are lined up on the railing watching the race.  It shows him stand there looking at them and looking over their heads at the runners.  Then it shows him make the phone call to his brother.  A few seconds later, everyone in the Forum snaps their head to the left, towards the finish line, as the first bomb explodes.  Almost immediately, the defendant begins walking rapidly in the other direction.  As soon as he reaches a safe distance, his bomb explodes.

That video revealed that the defendant was one of the bombers, but the FBI didn't know who the defendant was.  They had a face but not a name.  So they started looking at all the other surveillance tapes, seeing if they could find him walking up to that spot.  And they did find him, and they found him walking with another man, who turned out to be the defendant's brother, Tamerlan.  Tamerlan also had a backpack on.  So now the FBI had two suspected bombers.  They had two faces but still no names.

Three days passed while the FBI and other law enforcement officers worked around the clock trying to identify who the two men in the video were.  At the end of three days, they decided it was time to ask the public for help.  So on Thursday, April 15th [sic], at 5 p.m., almost exactly three days after the bombings occurred, the FBI published some of those surveillance videos and still photos from the

surveillance videos on its website, and they had a press conference where they asked members of the public to call in if they had any idea who those two men were.

News stations broadcast those videos and those photos all around the country and around the world. A few hours later, at 8:45 p.m., the defendant got a text from his good friend, Dias Kadyrbayev.

Dias texted, "You saw the news?"

The defendant texted back, "Yeah, bro, I did."

Dias texted, "For real?"

The defendant texted back, "I saw the news. Better not text me, my friend. LOL."

Dias texted, "You saw yourself in there?"

The defendant didn't answer directly. He just texted back, "If you want, you can go to my room and take what's there." That's exactly what Dias did. He and two other of the defendant's friends went to his dorm room at UMass Dartmouth. They searched it, and they found a backpack containing fireworks that had been partially emptied of their explosive powder. They took that backpack, and they threw it into a Dumpster to get rid of the evidence, but fortunately the police later were able to recover it. They also took the defendant's laptop computer and brought it back to their apartment in New Bedford.

Meanwhile, the defendant and his brother went out in

search of another gun.  They drove by the MIT campus, which was close to their apartment, and they saw a police officer sitting in his cruiser next to a building.  The police officer was named Sean Collier.  He was a 27-year-old from Somerville.  Students loved him because he was a friendly guy and took an active role in campus life.

A surveillance video shows what happened next.  Now, unfortunately, the surveillance camera that took this video was very far away.  It was on top of a very high building, the distance from where the car was, and it was so far away that the human figures in it appear tiny.  It's impossible to see their faces or exactly what they're doing with their hands.  Even so, it shows enough for you to be certain, in conjunction with other evidence that I'll tell you about, that the defendant and his brother killed Officer Collier.

The video shows two men walk through the courtyard and round the corner where Sean Collier is sitting in his cruiser.  So they round one corner, walk all the length of the building, walk around the corner right to the cruiser.  As soon as they reach the car, they open the door.

A few seconds later you can see a young man ride his bicycle right by the cruiser.  The man on the bike was an MIT graduate student named Nate Harman.  He'll testify that as he rode by, he saw a man leaning into the driver's side of the cruiser, and he startled him.  The man looked up in surprise

and looked directly into Mr. Harman's face, and Mr. Harman's description of the man matches the defendant exactly.

At the same time the video shows the two men standing by the side of the car, a student working in an office that had a window right above where the cruiser was parked called MIT's version of 911 and reported hearing six possible gunshots from below.  Shortly after the call was made, the video shows the two men, the defendant and his brother, run away from the car back the way that they came.  Five minutes later, fellow officers responded to the scene and found Officer Collier dead in his cruiser.

The evidence will show that the defendant and his brother used the defendant's Ruger, the one that he had gotten from his friend, to execute Officer Collier by shooting him in the head at point-blank range twice in the side of his head and once right between the eyes.  They also shot him three times in his right hand.  Then they tried to steal his gun from his holster, but they couldn't get the holster lock to open, so they gave up, and they fled the scene.

You'll know they tried to steal his gun from his holster because the holster had a two-stage lock to prevent the gun from being pulled out by someone else.  The first stage is easy to open, but the second one isn't, especially if you're not the person wearing the holster.  When other officers found Officer Collier in his cruiser, they saw that the first stage

of the lock had been opened, but the second was still closed, and they also saw that the gun and the holster were covered with blood, as if somebody had been yanking at it, while the rest of his utility belt was clean.

Now, because the surveillance camera was so far away, you can't see the defendant and his brother do the actual shooting.  So the video doesn't reveal whether the defendant pulled the trigger, whether his brother pulled the trigger, or whether they both did, but it doesn't matter.  They both murdered him.  And other evidence, which I'll talk about in a few minutes, leaves no doubt that they are the ones who killed Officer Collier and that they did it with the defendant's gun.

After murdering Officer Collier, the defendant and his brother got back into their Honda Civic, which was loaded with additional bombs, another pressure cooker bomb, like the one that had exploded on Boylston Street, and at least four pipe bombs.  Their plan was to drive to New York City, but they needed a different car, one that couldn't be traced back to them or the murder of Sean Collier, so they drove in to Boston to find one.

About 20 minutes later, they found what they were looking for:  a young Chinese man named Dun Meng, who was sitting in a leased Mercedes SUV next to the AutoZone in Brighton reading a text message on his cell phone.  The defendant and his brother drove up in their Honda Civic, and

the defendant's brother got out.  He went over to the passenger side of Mr. Meng's car, and he knocked on the window, and he signaled to Mr. Meng to roll it down.  When Mr. Meng did, the defendant's brother reached inside, opened the lock, opened the door, and got into the car, and then he pointed the defendant's gun in Mr. Meng's face.

He demanded that Mr. Meng give him all of his money, and Mr. Meng did, but he only had $40 on him.  The brothers wanted more, so the defendant's brother told Mr. Meng to start driving, and the defendant followed in the Honda Civic.  A nearby surveillance camera captured both cars driving away from the scene.

They kept driving until they got to a quiet block in Watertown, and then they parked, one behind the other.  The defendant got out and transferred all of the bombs from the Honda into the trunk of the Mercedes.  Then he, himself, got into the backseat of the Mercedes, and the three of them drove to an ATM in -- a Bank of America ATM in Watertown Square. When they got there, the defendant took Mr. Meng's ATM card, demanded his password, and robbed him of $800 by using the ATM machine to withdraw it from Mr. Meng's bank account.  That $800 was still inside the defendant's wallet when he was arrested the next day.

After robbing Mr. Meng, the defendant and his brother drove Mr. Meng to a Shell station on Memorial Drive in

Cambridge. They got there about 12:15 a.m. The defendant and his brother had murdered Sean Collier less than two hours earlier, and their terrified carjacking victim was still inside the car. Even so, the first thing the defendant did when they got to the gas station was to leave his brother inside the Mercedes with Mr. Meng and go inside the Shell station to buy snacks. You'll see him shopping for those snacks on the Shell station video. He takes his time. He's not concerned. He makes sure he's getting exactly what he wants.

But then things took a bad turn for the defendant. While he was inside the Shell station shopping for snacks, Mr. Meng realized that this might be his last chance to escape before the defendant and his brother have no longer any use for him. So in a flash, while the defendant's brother's hands were occupied programming the GPS, Mr. Meng undid his seatbelt with one hand, opened the door with the other, jumped out of the car, and sprinted across the street to the Mobil station. You'll see him on a surveillance camera springing across the street and entering the Mobil station. And when he gets there, you'll see the terrified look on his face, and you'll hear it in his voice on the 911 tape.

After Mr. Meng called 911, the police responded to the Mobil station and they interviewed Mr. Meng. They got all the information about the Mercedes, and they began tracking its location in real time using the GPS system in the car. By that

time, the defendant and his brother had driven back up to that block in Watertown where they had left the Honda Civic.  The defendant had gotten back into the Honda Civic, his brother remained in the Mercedes, and they had begun driving back in the direction of Boston in the two cars.

The GPS tracking system in the Mercedes revealed that it was moving south on Dexter Avenue, which is a quiet, residential street in Watertown.  A Watertown police officer named Joe Reynolds heard on his police radio that the Mercedes was wanted in a carjacking, and he began driving north on Dexter Avenue.  He had no idea that the two people driving the cars were the Boston Marathon bombers.

As Officer Reynolds drove north on Dexter, the defendant and his brother were driving south.  The defendant was in the Honda.  He was in the lead.  The defendant's brother was in the Mercedes.  He was following.  As the two cars drove past Officer Reynolds, Officer Reynolds made a U-turn and began following them.

The defendant decided to turn onto Laurel Street, which is another quiet residential street in Watertown, and his brother followed him.  It was nearly one in the morning.  The houses lining both sides of the street were dark and quiet.  The street wasn't well lit.  The defendant stopped his car in the middle of the street and got out, and his brother followed his lead and did the same.  As soon as Officer Reynolds turned

onto Laurel Street to follow them, they fired a bullet through his windshield, trying to kill him.  Officer Reynolds backed up a short distance, got out of his car, and began shooting back.

Another Watertown police officer, Sergeant John MacLellan, was on the street within seconds.  As soon as he turned onto Laurel Street, the defendant and his brother tried to kill him too.  They shot at him with the defendant's gun while he was still in his car.  Rather than back up, he put his car into drive, got out, and let it roll slowly down the street towards the brothers so that he and Officer Reynolds could take cover behind it.  And that's what they did.  They walked behind it, shooting as they went.

The defendant and his brother did everything in their power to kill those two officers.  They shot at them with the defendant's Ruger, and they began throwing pipe bombs at them. Two of those bombs exploded within feet of the officers.  Two others failed to detonate.  Eventually, the defendant hurled a pressure cooker bomb at the officers.  It exploded with a thunderous boom and created a massive fireball.  Shrapnel rained down on the officers and blew in the homes on Laurel Street where the residents were cowering in terror.

A third Watertown police officer, Sergeant Jeffrey Pugliese, arrived on the scene.  He ran around the backs of some houses to get as close to the defendant and his brother as he could.  The defendant's brother saw Sergeant Pugliese in the

side yard of the house and began shooting at him.  Sergeant Pugliese just stood there and shot back.  Eventually, the defendant's brother ran out of ammunition.  He began walking rapidly down the street towards Officer Reynolds and Sergeant MacLellan.  Sergeant Pugliese ran after him.  He tackled him and tried to handcuff him.  Officer Reynolds and Sergeant MacLellan jumped in.

While they were doing that, the defendant got back into the Mercedes, which was pointing away down the street, turned it around, and began driving at the three officers at top speed trying to mow them down.  He must have known they were trying to arrest his brother, but he cared more about killing them than he cared about his brother's life.

Officer Reynolds and Sergeant MacLellan saw the car coming.  They jumped off and took cover and told Sergeant Pugliese to do the same, but Sergeant Pugliese didn't.  He grabbed the defendant's brother by his belt and tried to drag him out of the way of the coming Mercedes.  At the last possible second, when the Mercedes was almost on top of him, Sergeant Pugliese rolled to the side.  The defendant ran right over his brother and dragged his body about 50 feet down the street.  He sideswiped Officer Reynolds' cruiser, which shook his brother's body loose, and continued driving away at top speed.

As he sped by, other officers who had responded to the

scene and were waiting down there at the end of the street, began shooting at the Mercedes.  One of them was an MBTA officer named Richard Donohue.  Officer Donohue was shot in the thigh by a stray bullet.  It severed an artery, and he began bleeding heavily.  Other officers tried to stanch the flow of blood, but it was impossible.  Officer Donohue lost so much blood that he stopped breathing and nearly died.  Fortunately, paramedics arrived, quickly got him to a hospital where doctors were able to save his life.

The defendant drove a few more blocks and then ditched the Mercedes in the middle of the street.  He made his way through the quiet, sleeping neighborhood to a house with a dry-docked boat in the backyard.  The boat was a good size.  It was about 22 feet long, about 8 feet wide, and it was up on a trailer, and it was covered with a tarp.  It was still the end of winter, and it was covered with a tarp to protect it from the elements.  It must have struck the defendant as a good place to hide out while the police searched for him.

Although the defendant had been shot and was bleeding, he still had his wits about him.  He smashed the cell phone that he had used to call his brother right before they detonated the bombs.  He also smashed his other cell phone.  By smashing those phones, he destroyed some of the evidence of what he had done, such as text messages between him and his brother that were stored on his phone.  He also made it

impossible for the police to use the GPS devices in the phones to figure out his location.  Once he had smashed the phones, he took out Dun Meng's ATM card, which he still had, and he tried to hide it, along with the smashed phones, in a kind of ditch by where the boat was.  But, again, the police searched the area and found it later.

Once he had destroyed and hidden the evidence, he climbed into the boat and hid.  Meanwhile, the police cordoned off a whole section of Watertown where they knew the defendant might be hiding, and they searched all night and all the next day, but they couldn't find him.  When they finally decided to call off the search for the day, David Henneberry, the man who owned the boat, went outside to check on it.  Mr. Henneberry saw that the tarp covering the boat was loose, and he climbed a short ladder to investigate.  When he lifted the tarp to look inside, he saw the defendant lying there, so he went back into his house and called 911.

The police showed up quickly and surrounded the boat.  Several officers saw what they considered suspicious movement and fired on it.  That triggered a barrage of shots at the boat.  Then hostage negotiators arrived and tried to talk the defendant into surrendering.  Eventually they succeeded.  The defendant climbed out of the boat, and the police arrested him.

That's when the police found the writing I mentioned earlier, the one where the defendant explained that he had

bombed the marathon to punish America for mistreating Muslim people.  He had written that explanation in pencil on an inside wall of the boat while he was hiding inside of it, and you will see the writing itself, the pencil he used to write it, and other evidence that was found in the boat.

Meanwhile, officers had been combing Laurel Street and Dexter Streets for evidence.  One of the first places they looked was the Honda Civic that the defendant had been driving. When the defendant escaped from Laurel Street in the Mercedes, he left the Honda Civic behind.  On the floor of the Civic, on the driver's side, right beneath the defendant's feet where he had been driving, officers found two bloody white gloves.  DNA analysis shows that the blood on those gloves came from Officer Collier.  That is one of the ways you will know that the defendant and his brother are the ones who killed Officer Collier.

Another piece of evidence found in the Honda was the defendant's key ring, which had a UMass Dartmouth tag on it, and his car key, the same key he had used to drive the Honda to Laurel Street.  Those items also were bloody, and once again, DNA analysis shows that the blood came from Officer Collier. That's yet another way you'll know that the defendant helped kill Officer Collier that night.

Officers also found the defendant's Ruger, a BB gun that looks exactly like a Ruger, and 54 spent Ruger casings,

meaning shells from bullets that had been fired from the Ruger. All of the Ruger casings were matched by a ballistics expert to the defendant's Ruger.

Now, six Ruger casings were also found at the MIT crime scene, three inside the cruiser and three outside of it. A ballistics expert examined those, and they also matched the defendant's Ruger. And that's yet another way you will know that the defendant and his brother murdered Officer Collier that night using the defendant's gun.

You're going to see all of the ballistics evidence, you'll hear from the ballistics expert, and you'll hear from the DNA expert who examined the gloves and the key ring.

Shrapnel from the bombs the defendant used on Laurel Street and pieces of the pressure cooker were found everywhere. They were inside people's cars, on their front lawns, in their backyards, on their roofs, even inside their homes. Slugs from the Ruger were also found inside people's homes, some of them embedded in their -- in their interior walls. We will show you maps, diagrams, photographs of them.

Now, you've heard me talk a lot about the defendant's brother, Tamerlan, but you won't be seeing him in the courtroom. That's because the defendant killed him by running him over with this Mercedes. Tamerlan's bullet wounds also contributed to his death. But even though Tamerlan won't be in the courtroom, this case involves him too. That's because he

and the defendant were partners.  They agreed to do these crimes together, and they carried them out together.

The judge will instruct you that when two people agree to commit a crime together, they're guilty of conspiracy.  And the defendant is charged with three counts of conspiracy: conspiracy to use a weapon of mass destruction, conspiracy to bomb a place of public use, and conspiracy to destroy property with explosives.

The defendant is also charged with many substantive counts of using a weapon of mass destruction, arming a place of public use, and destroying property with explosives.  And he's charged with many counts of using guns and explosives to commit violent crimes.  Even though he and his brother played different roles in each of these crimes, they are both equally guilty of committing them because they carried them out as partners.

Now, what do I mean when I say they were partners?  I don't mean that they did exactly the same thing.  That's not required for the defendant to be guilty under the law.  What I mean is that each one played a role in committing the crime.  For example, the defendant -- the defendant planted one bomb at the marathon, and his brother planted the other one.  The defendant got his -- got a gun from his friend, Stephen Silva, and his brother stuck it in Dun Meng's face.  The defendant took Dun Meng's ATM card and password and robbed him of $800.

The defendant's brother told Dun Meng where to drive.  The defendant threw bombs at the police in Watertown and handled the ammunition while his brother fired shots at the officers. And both brothers together murdered Officer Sean Collier and tried to steal his gun.

So even though Tamerlan Tsarnaev is not here, we will be offering evidence about his role in these crimes, but the focus is going to be on the defendant.  That's because this is his day in court.  He's the one the government has to prove guilty, not his brother.  It's important for you to hear all the evidence against the defendant so that at the end of the trial you have what you need to find him guilty.  It's far less important for you to hear all the evidence against the defendant's brother.  In the end, it doesn't matter what role each of them played, so long as you find that they were partners and carried out these crimes together.

Now, as you can tell from what I've said, there's a lot of evidence in this case.  Some of the witnesses are just going to talk about how and where things were found.  Others will simply testify that things are what they appear to be.  We need to call those witnesses because you need to have confidence in the evidence, but we'll do our best to streamline its -- its introduction into evidence and make that go as fast as possible, if we can.

I want to conclude just by telling you a bit about the

order in which we're going to present the government's case. We'll start with the marathon bombings and the collection of evidence at the marathon crime scenes. We'll show you some of the surveillance video, photos and -- photos from the people who were at the -- the marathon before the bombs went off that the FBI used to identify the defendant and his brother as suspects in the bombing.

Then we'll put on evidence of what the defendant did in the days after the bombings and of the manifesto he wrote on the inside wall of the boat. Next we'll put on evidence of the events on April 18th and 19th, how the FBI published photos of the defendant and his brother on their website and held the press conference; how the defendant and his brother then murdered Officer Collier, carjacked, kidnapped, and robbed Dun Meng, and tried to kill police officers in Watertown with gun -- with a Ruger and with bombs.

After hearing about all the evi- -- the events that led up to the defendant's arrest, you'll hear about all the evidence that was collected from the Watertown crime scene and analyzed by the experts, including the bloody gloves, the bloody car keys, the Ruger, and all the ballistics evidence. You'll also hear about evidence collected from the defendant's residence in Cambridge and from his dorm room at UMass Dartmouth.

One of the most important pieces of evidence is the

defendant's laptop computer, the one that his friends took from the dorm room. The police got that computer and analyzed it. As with a lot of people, the defendant's computer is a window into his life, especially into the part of him that he kept mostly hidden from his friends.

You'll hear a lot of evidence about all of the terrorist materials that were on his computer and the other digital devices that he owned. And you'll hear about other things that the defendant said and wrote that shed light on the sources of his terrorist beliefs. Some of those are papers he wrote for school, and some are things he wrote to friends and emails and text messages and posted on social media.

You'll also hear from the medical examiners who examined the bodies of the four people the defendant murdered.

MR. BRUEMMER: If you could choose number 4, please.

THE COURT: I'm sorry?

MR. BRUEMMER: If you could choose 4, please.

THE COURT: Do you want a feed?

Jurors in the back row, just as you see monitors in the front row, there are between your seats a console. You can lift up the monitor, and -- actually, it may not be at the very end. I think you may have to look in front.

MR. WEINREB: Each of the medical examiners who examined the people who died in this case will be testifying. And they'll tell you that Sean Collier was killed by multiple

gunshot wounds to the brain.  Krystle Campbell had blast injuries to her head, neck, body, and limbs.  Her back was burned red; and her head, body, and legs were filled with shrapnel.  There were gaping wounds in her legs that had drained virtually all of the blood from her body.

Lingzi Lu was cut, battered, and bruised.  The bomb that the defendant detonated blew large perforating holes in her legs that caused her to bleed to death.  Martin Richard was only 4 feet, 5 inches tall, and he weighed only 70 pounds.  Because of his size and height, the bomb damaged his entire body.  The defendant blew large holes into Martin's chest and abdomen, exposing his ribs and organs and eviscerating his bowels.  He blew Martin's arm nearly entirely off his body, burned his skin, and drove BBs and nails into his legs.  Martin lost so much blood that he had virtually none left in his body by the time he was brought to the morgue.  He died at the scene from his wounds.

In the end, the evidence will prove to you beyond a reasonable doubt that the defendant committed all 30 crimes that he is charged with.  He murdered Martin Richard, Lingzi Lu, Krystle Campbell, and Sean Collier.  He used weapons of mass destruction at the Boston Marathon to terrorize the country and to influence American foreign policy.  He used guns and bombs in Watertown to continue his campaign of terror, and he did it all because he believed that America needed to be

punished for killing Muslims overseas.  He did it to advance a cause that he believed in.  And he did it because he thought it would help secure him a place in paradise.  That is why, at the end of the case, we will ask you to find him guilty of all 30 counts in the indictment.

Thank you.

C E R T I F I C A T E


        I, Marcia G. Patrisso, Official Reporter of the United

States District Court, do hereby certify that the foregoing

transcript constitutes, to the best of our skill and ability, a

true and accurate transcription of my stenotype notes taken in

the matter of Criminal Action No. 13-10200-GAO, United States

of America v. Dzhokhar A. Tsarnaev.


/s/ Marcia G. Patrisso
MARCIA G. PATRISSO, RMR, CRR
Official Court Reporter


Date:   3/4/15